IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>1.    JAYSON JEFFREY PENN,<br>2.    MIKELL REEVE FRIES,<br>3.    SCOTT JAMES BRADY,<br>4.    ROGER BORN AUSTIN,<br>5.    TIMOTHY R. MULRENIN,<br>6.    WILLIAM VINCENT KANTOLA,<br>7.    JIMMIE LEE LITTLE,<br>8.    WILLIAM WADE LOVETTE,<br>9.    GARY BRIAN ROBERTS, and<br>10.   RICKIE PATTERSON BLAKE,<br><br>    Defendants. | Criminal Case No. 20-cr-00152-PAB |

**DEFENDANTS JAYSON JEFFREY PENN'S AND WILLIAM WADE LOVETTE'S MOTION TO EXCLUDE GOVERNMENT EXHIBIT 9057**

The Court should exclude GX 9057 because it is irrelevant to the conduct charged in the superseding indictment and because the evidence presented by the government at trial is unfairly prejudicial and not otherwise admissible as character or habit evidence.

GX 9057 is a December 2011 email chain between Pilgrim's Pride colleagues Charles von der Heyde,[1] William Lovette, and Jayson Penn in which they discuss the merits of membership in a trade organization called the United States Poultry and Egg Export Council (USAPEEC). The USAPEEC is an organization that promotes international exports of U.S.

---

[1] The government does not allege that Mr. von der Heyde was a co-conspirator.

1

poultry and egg products. Doc. 395-1 at 11-16.[2] Its activities relate to markets that are not the subject of the alleged conspiracy and it primarily comprises U.S. traders and exporters of poultry and egg products; in other words, it is "all about traders." GX 9057. In the email, Mr. Penn discussed his experience as a member of USAPEEC's executive committee *before* he joined Pilgrim's Pride and his relationships with commodity traders, who could provide market intelligence about other suppliers in export markets.

This document is irrelevant to the conduct charged in the superseding indictment and should be excluded on this basis. Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). The government asserts that GX 9057 is relevant because Mr. Penn "explicitly laid out how the conspiracy operates" by explaining that he used relationships with friendly competitors to fix prices. Doc. 849 at 1. This characterization of the document is baseless. Indeed, Mr. Penn's involvement in USAPEEC predates the conspiracy period by many years and occurred when he was employed by Case Farms, not Pilgrim's. As is clear on the face of the document, Mr. Penn was discussing his "former set-up," which was "not nearly as sophisticated as Pilgrim's" since Pilgrim's has "more intellectual options for information discovery." GX 9057. And the entire conversation related to discussions with *traders*, not competitors.[3] Mr. Penn explained how USAPEEC brings together "a lot of years of export knowledge converged in one place" with traders who "handle the majority of US poultry exports." *Id*. He noted the "best information I

---

[2] *See also* About USAPEEC, https://www.usapeec.org/aboutusapeec/ (last visited Nov. 18, 2021).

[3] The government has never purported to rely on allegations that suppliers obtained information from these third parties, nor has it contended that doing so is illegal or a means or method in furtherance of the charged conspiracy.

2

always got *was from traders*," who "provided market guidance and direct price knowledge *of* our competition." *Id*. (emphasis added). Mr. von der Heyde, on the other hand, thought USAPEEC was "all about traders"[4] and that the traders were unreliable because "[t]raders tell u what they want you to believe. Reality is often different." *Id*. Descriptions of an old "set-up" for gathering market information at a different company, related to conversations with commodity traders (not competitors), regarding a different market than the one at issue in this case, simply has no relevance to the charged conspiracy.[5] It is neither direct evidence of the conspiracy, nor is it relevant to proving the "means and methods" of the charged conspiracy, which allegedly unfolded years later in connection with sales to quick-service restaurants and broadline retailers.[6] Similarly, 'forward pricing' in the export market for U.S. poultry and egg products is both unrelated and irrelevant to bidding and pricing in connection with quick-service restaurants and broadline retailers, as demonstrated by the wholesale lack of testimony on that subject.

The introduction of GX 9057 would also unduly prejudice Mr. Penn and Mr. Lovette under Rule 403. The government seeks to inject pre-conspiracy period conduct that is perfectly lawful—conversations with traders and exporters in an effort to gather market intelligence about one's competitors—and wrongly suggest to the jury that it is evidence of the charged conspiracy,

---

[4] Mr. Lovette agreed with Mr. von der Heyde. In Mr. Lovette's only substantive statement in the entire email chain, he says "I agree. I was a board member back in 90's and thought there was allot [sic] of money wasted." *Id.*

[5] The government's citation to toll records showing a handful of phone calls between Mr. Penn and individuals at Tyson and Mar-Jac years after this email was sent does not somehow render this document, which relates to discussions with traders and *not* competitors, relevant to the charged conspiracy. See Doc. 849 at 3.

[6] To the extent Mr. Lovette endorsed *anything* in this email chain, it was that USAPEEC was "all about the traders" and that membership was "wasted money." *See* GX 9057.

3

threatening "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The document would also confuse the issues, cause undue delay, and waste time because Mr. Penn and Mr. Lovette will need to introduce rebuttal evidence of pre-charge period conduct involving traders who belong to an organization focused on foreign markets. *See United States v. Hurn*, 368 F.3d 1359, 1365 (11th Cir. 2004) (recognizing constitutional right "to introduce evidence concerning a collateral matter where the government attempts to use that collateral matter as the basis for securing a conviction"). Among the topics Mr. Penn and Mr. Lovette necessarily must address are the composition, purpose, and actions of USAPEEC, commodity traders, poultry exporters, their businesses and business practices, and the many ordinary interactions these entities and individuals have with suppliers. All this evidence "would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case." *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998).

The government argues that Mr. Penn's use of the term "friendly competitors" in GX 9057 to describe these traders is somehow linked to another Pilgrim's employee's use of that term in a different email string on an unrelated subject almost a year later. *See* Doc. 949 at 2 n.2 (citing GX 3037 (Brenda Ray email dated August 31, 2012) and GX 6198 (different version of same email)). As the court noted at the November 18, 2021, hearing, that is not a sufficient basis for admitting the document. *See* Trial Tr. 130:13-19[7] (Nov. 18, 2021). There is no link between these two documents, and the inference that there is something nefarious about having friends

---

[7] All transcript citations are to unofficial draft transcripts because Mr. Penn and Mr. Lovette do not yet have an official, certified transcript. Given the draft status, Mr. Penn and Mr. Lovette defer to the Court's recollection if it differs from the draft transcript in any way.

4

who are also competitors is unwarranted. As Mr. Ledford, the buyer for KFC and then Chick-Fil-A, testified, his best friend is the buyer for Popeyes, one of his competitors. Moreover, allowing this document into evidence so the government can try to argue a tenuous link between the independent use of the term "friendly competitor" by different people in different circumstances would require a sideshow into the circumstances in which export traders can also be competitors—such as when a supplier sells directly to an overseas customer rather than through a trader. Such an inquiry would have no relevance to this case and would confuse the jury and unnecessarily delay trial.

Additionally, any suggestion by the government that Mr. Penn's past interactions with traders are somehow evidence of the charged conspiracy would advance a new and uncharged theory of liability akin to competitor signaling through a third-party or a hub-and-spoke conspiracy, which involves the use of a "hub," often a non-competitor, to coordinate a conspiracy between competitors. Trial Tr. 128:13-18 (Nov. 18, 2021) (government arguing document may reflect the use of a third-party to find out information about competitors as part of an unlawful agreement). The indictment, however, does not mention traders, signaling, or hub-and-spoke issues. It alleges only that Defendants—employees of chicken suppliers—fixed prices and rigged bids by exchanging information directly. *See* Doc. 101. The Court has already ruled that evidence relating to theories of liability other than the single theory charged in the superseding indictment is inadmissible: "to introduce alternative theories of liability," the Court pointed out, "would unfairly prejudice defendants since they have not had fair notice of such theories." Doc. 603 at 5-6; *see Griffeth v. United States*, 2014 WL 6930056, at *2 (D. Utah Dec. 8, 2014), *aff'd*, 672 F. App'x 806 (10th Cir. 2016) (excluding "facts and arguments" related to

different legal theory); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 663 F. Supp. 1360, 1434 (D. Kan. 1987), *aff'd and remanded*, 899 F.2d 951 (10th Cir. 1990) (excluding "evidence of alleged price fixing" where it was "collateral" to "type of collusion" at issue).

Because GX 9057 is irrelevant, unduly prejudicial, and would confuse the issues and waste time, the Court need not consider any other basis for admission. Indeed, the government does not argue that the document is admissible for any purpose other than to prove the conspiracy charged in the indictment and therefore has forfeited any argument regarding alternative bases for admissibility. *See* Doc. 849; *United States v. Salazar*, CR. 17-831 MCA, 2018 WL 522316, at *4 (D.N.M. Jan. 23, 2018) (government waived argument by failing to raise it in opening brief). Nevertheless, Mr. Penn and Mr. Lovette acknowledge the Court's statement that it evaluated GX 9057 as part of the government Rule 404(b) notice. In that context, the Court ruled that the document was not Rule 404(b) evidence because the Court had already found the statements preliminarily admissible under Rule 801(d)(2)(E). Doc. 692 at 4; *but see United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015) (intrinsic evidence is "inextricably intertwined with" or "directly connected to" the "charged conduct"). Even without the Court's preliminary *James* ruling, GX 9057 would not qualify as Rule 404(b) evidence. Mr. Penn was describing his past conversations with *traders* in an effort to gather market intelligence—a clear sign there was no agreement among competitors and a type of information gathering that is perfectly lawful on its own. The "acts" portion of Rule 404(b) applies only to "uncharged bad acts." *United States v. Nance*, 767 F.3d 1037, 1041 (10th Cir. 2014); *see United States v. Vaughan*, 450 F. App'x 757, 760 (10th Cir. 2011) (same). And while the bad act "need not be criminal," it must clearly "impugn [the] defendant's character." *United States v. Kendall*, 766

F.2d 1426, 1436 n.5 (10th Cir. 1985). Nothing about Mr. Penn's participation in an export-focused trade group or the simple act of gathering information from non-competitors qualifies as a character-impugning act.

Additionally, nothing about GX 9057 is capable of proving knowledge, opportunity, intent, or a plan to conspire. GX 9057 relates to conduct at a trade group to which neither Mr. Penn nor Mr. Lovette ever belonged during the conspiracy period[8] and that concerned markets not at issue in this case. It involves conversations with traders who have never been alleged to be involved in any way in the charged conspiracy. It concerns a "set up" that was discontinued long before the conspiracy period. And it relates to efforts to help a different, less sophisticated company that did not employ Pilgrim's "intellectual" approach to market analysis. Put simply, there is no similarity between the conduct described in GX 9057 and the conduct charged in the superseding indictment, and certainly none that would demonstrate the plan, intent, opportunity, or knowledge to engage in the specific (and very different) conduct charged here. *See United States v. Edwards*, 540 F.3d 1156, 1163 (10th Cir. 2008) (evidence defendant engaged in factually dissimilar conduct was not admissible under Rule 404(b)); *Kendall*, 766 F.2d at 1436 (Rule 404(b) evidence must "be so related to the charged offense" that it has "real probative value, not just possible worth").

Finally, GX 9057 is not admissible under Rule 406 as habit evidence. "A habit is a regular practice of meeting a particular situation with a specific type of conduct," such as taking a particular flight of stairs two at a time, performed regularly enough that the conduct becomes "semi-automatic." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1232 (10th Cir. 2001).

---

[8] The email suggests Mr. Lovette was a board member in the 1990s.

Occasional, decades-old phone calls with traders who were members of an industry group—which stopped in 2010—is not the "semi-automatic," habitual conduct necessary to qualify as Rule 406 evidence. *See id*; *Thompson v. Boggs*, 33 F.3d 847, 855 (7th Cir. 1994) (instances of past conduct not admissible as habit evidence where there was no indication that the "behavior at issue occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances" (quotation omitted)).

\* \* \* \* \*

For the reasons discussed, the Court should exclude GX 9057.

| | |
|---|---|
| Dated: November 19, 2021 | Respectfully submitted, |
| *s/ John A. Fagg, Jr.* <br> John A. Fagg, Jr. <br> MOORE & VAN ALLEN PLLC <br> Attorney for William Wade Lovette <br> 100 North Tryon Street, Suite 4700 <br> Charlotte, NC 28202 <br> (704) 331-3622 <br> johnfagg@mvalaw.com | *s/ Michael F. Tubach* <br> Michael F. Tubach <br> O'MELVENY & MYERS LLP <br> Attorney for Jayson Jeffrey Penn <br> Two Embarcadero Center, 28th Floor <br> San Francisco, California 94111-3823 <br> (415) 984-8700 <br> mtubach@omm.com |

CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Michael F. Tubach*
Michael F. Tubach