1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
      Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14               Excerpt of Trial to Jury
               Testimony of Robert Bryant, Vol. 1
15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 10:55 a.m., on the 1st day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washingon, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1                    APPEARANCES (Continued)
 2           Laura F. Carwile of Reichman, Jorgensen, Lehman,
 3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
 4  CA 94065; appearing for Defendant Austin.
 5           Elizabeth B. Prewitt of Latham & Watkins, LLP,
 6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;
 7           Marci Gilligan LaBranche of Stimson, Stancil,
 8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO
 9  80218, appearing for Defendant Mulrenin.
10           James A. Backstrom, Counselor at Law, 1515 Market
11  Street, Suite 1200, Philadelphia, PA 19102-1932;
12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,
13  Bethesda, MD 20814, appearing for Defendant Kantola.
14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth
15  Street, Suite 1100, Los Angeles, CA 90017;
16           Dennis J. Canty, Canty Law Corporation,
17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,
18  appearing for Defendant Little.
19           John Anderson Fagg, Jr. and James McLoughlin of
20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.
22
23
24
25
```

```
 1             APPEARANCES (Continued)

 2        Craig Allen Gillen and Anthony Charles Lake of

 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4   Atlanta, GA 30339;

 5        Richard L. Tegtmeier of Sherman & Howard, LLC,

 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7   for Defendant Roberts.

 8        Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11        Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                      PROCEEDINGS

16        MR. KOENIG:  Thank you, Your Honor.  The United States

17   calls Robert Bryant.

18      (Robert Bryant was sworn.)

19        THE WITNESS:  I do.

20        COURT DEPUTY CLERK:  Please state your name and spell

21   your first and last name for the record.

22        THE WITNESS:  Robert Alan Bryant, R-O-B-E-R-T,

23   B-R-Y-A-N-T.

24                    DIRECT EXAMINATION

25   BY MR. KOENIG:
```

Robert Bryant - Direct

1   *Q.*   Good morning, Mr. Bryant.  Where do you work?

2   *A.*   Pilgrim's.

3   *Q.*   And what is Pilgrim's?

4   *A.*   It's a poultry company.

5   *Q.*   What kind of products do they make?

6   *A.*   Chicken.

7   *Q.*   Okay.  How long have you worked at Pilgrim's?

8   *A.*   All together about 30 years.

9   *Q.*   Okay.  So when did you start approximately?

10  *A.*   June of 1992.

11  *Q.*   And about how old were you then?

12  *A.*   I was 18, 18 or 19.  It was supposed to be a summer job

13  before I went to college.

14  *Q.*   Okay.  And what location of Pilgrim's did you start at?

15  *A.*   Mayfield, Kentucky.

16  *Q.*   What's at Mayfield, Kentucky?

17  *A.*   Excuse me?

18  *Q.*   What is -- Mayfield, Kentucky is a city.

19  *A.*   That's correct.  And we generally named or called the

20  plants after the major city where they were located, so that

21  one was called the Mayfield plant or the Hickory plant.

22  *Q.*   So it's a production facility?

23  *A.*   It is.

24  *Q.*   And what did you do when you started as an 18 or

25  19-year-old at Pilgrim's?

Robert Bryant - Direct

1    *A.*   I started in sanitation, literally cleaning up the place in

2    the afternoon.

3    *Q.*   Did there come a time when Pilgrim's went through a

4    structural reorganization?

5    *A.*   Yes.

6    *Q.*   When was that approximately?

7    *A.*   Around 2010.

8    *Q.*   Did you move to -- well, from sanitation by that time had

9    you moved up?  Had you received promotions?

10   *A.*   I had.

11   *Q.*   Did you go to school at all during your time at

12   Pilgrim's --

13   *A.*   I did.

14   *Q.*   Just make sure you let me finish the question, please.

15          Where did you go to school?

16   *A.*   Mid-Continent University.

17   *Q.*   Where is that?

18   *A.*   At Mayfield.

19   *Q.*   What was your degree?

20   *A.*   Business administration.

21   *Q.*   Are you currently in school still?

22   *A.*   I am.

23   *Q.*   Where at?

24   *A.*   Colorado State University.

25   *Q.*   And what degree are you pursuing?

Robert Bryant - Direct

1   A.   An MBA.

2   Q.   Okay.  And is this like a night school type thing?

3   A.   No, it's on-line.  You know, I do that in the evenings and

4   on weekends while I am doing my normal job.

5   Q.   Okay.  So you said around 2010 Pilgrim's went through a

6   structural reorganization?

7   A.   That's correct.

8   Q.   And did you move to a new role at that time?

9   A.   I did.

10   Q.   What was that role?

11   A.   It was called divisional planner for fresh food service.

12   Q.   Can you please explain to the jury what fresh food service

13   is?

14   A.   There's five different business units primarily in

15   Pilgrim's.  Fresh food service is one of those business units.

16   It has three primary customers:  QSRs or fast-food restaurants;

17   retail delis, which would be your supermarkets, the rotisserie

18   birds that you would buy there in the eight-piece; and then the

19   broad-line distributors, which would be like Sysco, US Foods,

20   Gordon Food Service.  So they pull multiple proteins and sizes

21   and products, paper goods to deliver to like a restaurant or an

22   independent grocer.

23   Q.   You mentioned the term QSR.

24   A.   Yes.

25   Q.   What does that stands for?

Robert Bryant - Direct

 1  A.  Quick-serve restaurant.

 2  Q.  That's just industry lingo for fast-food?

 3  A.  Correct.

 4  Q.  Can you give us some examples of a QSR who Pilgrim's sells

 5  to?

 6  A.  KFC, Popeye's, Church's, Bojangles.

 7  Q.  And that was just an example list.  That wasn't a full --

 8  A.  Yes.  That wasn't all encompassing.

 9  Q.  You mentioned -- I think you mentioned supermarket delis or

10  grocery delis?

11  A.  That's correct.

12  Q.  What is the product that's sold from Pilgrim's to the

13  delis?

14  A.  It's the rotisserie birds that you would buy that are in a

15  box or a bag and the eight-piece, and then we would sell some

16  tenders, the hot delis that you would get those type of

17  products from.

18  Q.  Okay.  So you buy the rotisserie chicken already cooked?

19  A.  Correct.

20  Q.  All right.  So you were the divisional planner for fresh

21  food service starting in around 2010?

22  A.  That's correct.

23  Q.  Where was -- where were you -- where did you office at that

24  time?

25  A.  At Mayfield.

Robert Bryant - Direct

1  *Q.*  Okay.  And what were your responsibilities as divisional

2  planner?

3  *A.*  I was basically responsible for the supply chain for the

4  business unit.  At that time there was seven plants inside that

5  business unit, six or seven plants inside that business unit.

6  And then -- so making sure we had enough birds to fill customer

7  orders, those customer orders were filled in full, and the bird

8  size was the correct size to fill those.  With demand

9  fluctuations, it was my job to cover those peaks and valleys.

10  *Q.*  And in the position of divisional planner, how long did you

11  hold that position?

12  *A.*  From approximately -- from approximately 2010 until I was

13  promoted again in the fall of 2016.

14  *Q.*  All right.  And during that time who was your supervisor

15  from 2010 to 2016?

16  *A.*  I had two during that time.  When I was first promoted, it

17  was Jason McGuire.  And then in the fall of 2014 or early 2015

18  it transitioned to Tim Stiller.

19  *Q.*  All right.  And so during the time that Jason McGuire was

20  your supervisor, who did Jason McGuire report to?

21  *A.*  At the very beginning it was Steve Smith and then later it

22  was Jayson Penn.

23  *Q.*  And at that time who did Jayson Penn report to?

24  *A.*  Bill Lovette.

25  *Q.*  And what was Bill Lovette's position?

Robert Bryant - Direct

1   A.   He was our CEO.

2   Q.   Tim Stiller, you said that started end of 2014, start of

3   2015; is that right?

4   A.   That's correct.

5   Q.   And who did he report to?

6   A.   He reported to Jayson Penn.

7   Q.   Okay.  And who did Jayson Penn report to during that

8   period?

9   A.   Bill Lovette.

10  Q.   Did you have any -- in your role as divisional planner for

11  fresh food service, did you have any role in pricing or

12  negotiations with customers?

13  A.   Not at the beginning, but later I transitioned into more

14  customer facing roles.

15  Q.   And when was that?

16  A.   Particularly in 2014.

17  Q.   That was a new thing for you at the time?

18  A.   To be at the national account level customer facing, yes,

19  relatively new.

20  Q.   What do you mean by national account level?

21  A.   I dealt with some smaller customers.

22  Q.   Previously?

23  A.   Previously, but really being customer facing to the larger

24  national accounts, that was the first time I had a lot of

25  exposure to them.

Robert Bryant - Direct

1   Q.   Okay.  Let's talk again during your time as divisional

2   planner from 2010 to 2016 -- did I get that right?

3   A.   That's correct.

4   Q.   Can you explain to the jury your compensation structure?

5   A.   So a base salary plus short-term bonus.

6   Q.   And do you have an understanding of how the short-term

7   bonus was calculated?

8   A.   Yes.

9   Q.   And what is that understanding?

10  A.   At the time my short-term bonus was calculated basically

11  off profitability of the individual business unit and the total

12  company, and then I received a percentage of my salary based

13  off that, that calculation.

14  Q.   Okay.  Can we break that down just a little bit more?

15  How -- like you said based on profitability.

16  A.   That's correct.

17  Q.   Was it some sort of sliding scale or what --

18  A.   No.  My understanding was it was done off the valuation of

19  the individual business unit.  For instance, if the business

20  unit was valued at like a billion dollars, for instance --

21  Q.   Did you say a billion dollars?

22  A.   1 billion, yes, and the expected return was 10 percent

23  profit margin off that return.  Then once we hit $100 million,

24  then the bonus was fully funded at a hundred percent.  There

25  was a 25 percent entry level that you had to get to first and

Robert Bryant - Direct

1   then it capped at 200 percent.

2   Q.  So the profits for your business unit, which is fresh food

3   service, right?

4   A.  Correct.  And that was -- the bonus was 60 percent business

5   unit, 40 percent company, total company.

6   Q.  But for your business unit -- let's just take your example.

7   If the business unit -- if the target was a hundred million

8   dollars in profit, the bonus pool was funded, correct?  Is that

9   what you're saying?

10  A.  That's correct.

11  Q.  Okay.  And then you said it was capped at 200 percent?

12  A.  That's correct.

13  Q.  So what would that mean the profitability would have to be?

14  A.  Around $200 million.

15  Q.  Okay.  And then so what determines profitability?

16  A.  You know, I mean, profit, but there is kind of three

17  components to us that we chase to make the company more

18  profitable, price increases, improving the mix and then pushing

19  down cost.

20  Q.  So it's price increases?

21  A.  Correct.

22  Q.  Mix?

23  A.  Correct.

24  Q.  Can you explain to the jury what mix is?

25  A.  There is -- when you sell a bird, you may sell off

Robert Bryant - Direct

1    individual parts, for instance, a leg quarter or a front half.

2    When you put that bird back together and value it, it may not

3    be as profitable as selling it in a different form.  So if you

4    can transition that form into something that's more profitable,

5    you have improved your mix.

6    Q.   Okay.  And then once the bonus -- once the bonus was fully

7    funded, then you got a slice of that?

8    A.   That's correct.

9         MS. HENRY:  Objection, leading.

10        THE COURT:  Overruled.

11   BY MR. KOENIG:

12   Q.   Okay.  So you have that position until -- let me back up.

13   When you said 200 percent was the cap, 200 percent of what?

14   A.   200 percent of your bonus.  So if your bonus was

15   10 percent, for instance -- of your salary, then your -- when

16   it capped at 200, it would be 10 percent times two basically,

17   so it would be 20 percent of your salary.

18   Q.   Understood.  Okay.

19        All.  Right.  Now, then in 2016 after you had been

20   divisional planner for fresh food service for roughly six

21   years, did you get another promotion?

22   A.   I did.

23   Q.   And what position did you get promoted to?

24   A.   In 2019 I was promoted to general manager.

25   Q.   2016?

Robert Bryant - Direct

1    *A.*  2016, sorry.  2016 I was promoted to the director of sales

2    for fresh food service.

3    *Q.*  All right.  Did your responsibilities change when you moved

4    to director of sales from divisional planner?

5    *A.*  They did.

6    *Q.*  How so?

7    *A.*  Then I was responsible not only for the supply chain, but

8    for the sales program for the entire business unit, so the

9    negotiations, pricing and so forth.

10   *Q.*  And during that time from the -- and how long did you hold

11   that position?

12   *A.*  From 2016 until the summer of 2019.

13   *Q.*  All right.  And who was your supervisor during that period?

14   *A.*  Tim Stiller.

15   *Q.*  Okay.  And who was Mr. Stiller's supervisor?

16   *A.*  Jayson Penn.

17   *Q.*  And who was Jayson Penn's supervisor?

18   *A.*  Bill until --

19   *Q.*  Excuse me, who?

20   *A.*  Bill Lovette until he retired or left the company.

21   *Q.*  And then what happened when Bill Lovette retired?

22   *A.*  Jayson Penn became our CEO.

23   *Q.*  All right.  Mr. Bryant, are you here under an agreement

24   where you will not be prosecuted?

25   *A.*  I am.

Robert Bryant - Direct

1  Q.  And what conduct does that agreement relate to?

2  A.  Price-fixing.

3  Q.  Did you meet -- as part of that agreement, did you meet

4  with federal agents and the Department of Justice?

5  A.  I did.

6  Q.  How many times?

7  A.  Approximately 20.

8  Q.  During any of those interviews did you lie to the

9  government?

10  A.  I did.

11  Q.  Did you have a role in the price-fixing conduct?

12  A.  I did.

13  Q.  What did you do?

14  A.  I received competitor pricing and used that pricing to

15  submit bids to customers and asked others to retrieve

16  competitor pricing.

17  Q.  Can you say that last sentence?  I couldn't hear it.

18  A.  I asked others to retrieve competitor pricing that we used

19  to formulate bids.

20  Q.  What was the purpose of getting prices?  Who did you get

21  prices from?  Sorry.

22  A.  As far as?

23  Q.  When you say I received prices or I directed other people

24  to get prices for me, whose prices are we talking about here?

25  A.  Competitors.

Robert Bryant - Direct

1    Q.   And what kind of pricing was it?

2    A.   It was pricing for bids.  I can give an example.

3    Q.   Sure.

4    A.   I received the pricing for a KFC bid from Roger in 2017.

5    Q.   From whom?

6    A.   From Roger Austin in 2017 for a bid that was due that week.

7    And later on in 2017 Scott Tucker --

8    Q.   Who is Scott Tucker?

9    A.   He is a salesperson -- or was a salesperson for

10   Pilgrim's -- provided pricing to me from Mar-Jac, which is

11   another poultry company, for some products we were negotiating

12   with US Food Service.

13   Q.   And Mar-Jac was a competitor?

14   A.   That's correct.

15   Q.   And the pricing you got from Mr. Austin, that was from

16   competitors as well?

17   A.   Yes.

18   Q.   All right.  So what was the purpose of getting the

19   competitors' pricing?

20   A.   Depended on the situation, but it was either to increase

21   prices or limit a decrease in price.

22   Q.   Okay.  For just Pilgrim's?

23   A.   No, for the other -- other competitors involved as well.

24   Q.   And did you have an understanding as to why competitors

25   gave their pricing to Pilgrim's?

Robert Bryant - Direct

1          MR. KORNFELD:  Objection.

2          MR. FELDBERG:  Objection, Your Honor.

3          THE COURT:  Grounds?

4          MR. FELDBERG:  Hearsay.

5          MR. KORNFELD:  And foundation, Your Honor.

6          THE COURT:  And response?

7          MR. KOENIG:  I just asked do you have an understanding

8   as to why competitors gave pricing to Pilgrim's.

9          THE COURT:  Okay.  That's true.  It's a yes or no.  He

10  can answer yes or no.  Overruled.

11  BY MR. KOENIG:

12  Q.  You can answer the question.

13  A.  Yes.

14  Q.  And what is the basis for that understanding?

15  A.  From what I witnessed in 2014, there was some significant

16  price increases that were -- that we received in 2014.  And I

17  witnessed phone calls between people at Pilgrim's and

18  competitors and I seen the results of those phone calls

19  transition into increased prices.

20  Q.  So what then is your understanding for the reason the

21  competitors gave pricing to Pilgrim's?

22          MR. FELDBERG:  Same objection, foundation and hearsay,

23  Your Honor.

24          THE COURT:  Okay.  Overruled as to -- well, let me ask

25  you this, Mr. Koenig.  Can you establish who the information

Robert Bryant - Direct

1    came from because that's relevant to the admissibility of any

2    hearsay statement.

3            MR. KOENIG:   Okay.

4    BY MR. KOENIG:

5    Q.  You said based on experience in 2014?

6    A.  That's correct.

7    Q.  And what did you say the information was?

8    A.  It was -- I witnessed telephone calls between Roger Austin

9    and who he relayed were competitors of Pilgrim's.

10   Q.  Who in particular?

11   A.  Scott Brady and Bill Kantola.

12   Q.  Where does Scott Brady work?

13   A.  Scott Brady works at Claxton.

14   Q.  Was Claxton a competitor?

15   A.  They were.  They are.

16   Q.  And who is the other name you said?

17   A.  Bill Kantola.

18   Q.  Okay.  And where did he work?

19   A.  Koch Foods.

20   Q.  Was Koch Foods a competitor of Pilgrim's?

21   A.  They are.

22   Q.  All right.  So and then you said you made some other

23   observations as well; is that correct?

24   A.  That's correct.

25   Q.  What were those?

Robert Bryant - Direct

1   A.   I witnessed my boss, Jason McGuire, at the time asking

2   Roger to provide information to our competitors.

3   Q.   And ultimately what happened in those negotiations?

4   A.   We got a price increase.

5   Q.   Just you?

6   A.   No.   The industry got a price increase.

7   Q.   What do you mean by industry?

8   A.   Generally when I say industry, I mean our competitors in

9   that market.

10  Q.   Okay.   So what was your understanding of why the

11  competition gave prices to Pilgrim's?

12  A.   My understanding was --

13          MR. POLLAK:   Objection, Your Honor, lack of foundation

14  as to competition generally.

15          THE COURT:   If you could define that term.   It will be

16  sustained in part.   Go ahead.

17  BY MR. KOENIG:

18  Q.   What did you understand when I -- let me ask it this way.

19          In 2014, were you talking about a specific customer?

20  A.   Yes.

21  Q.   Which one?

22  A.   KFC.

23  Q.   And who -- did you have an understanding of who the

24  competition was for the KFC contract for that year?

25  A.   I did.

Robert Bryant - Direct

1   *Q.*  And who were they?

2   *A.*  Tyson, George's, Koch Foods, Claxton, Mar-Jac, to name a

3   few.

4   *Q.*  Okay.  Now, what was your understanding of why the

5   companies you just mentioned gave pricing to Pilgrim's?

6          *MR. POLLAK:*  Objection, Your Honor, lack of foundation

7   with respect to several of those companies are analogous to

8   whether they gave prices, much less the motivation.

9          *MR. FELDBERG:*  Same objection, Your Honor.

10  *BY MR. KOENIG:*

11  *Q.*  We will move on and circle back.

12         You mentioned that you told people to get prices?

13  *A.*  I did.

14  *Q.*  And again, were these current prices you were asking for?

15  *A.*  No.  They were their prices that they tended to submit.

16  *Q.*  To whom?

17  *A.*  KFC or US Foods.

18  *Q.*  Okay.  And why did you do that?

19  *A.*  To increase prices or to limit a decrease depending on the

20  current market conditions.

21  *Q.*  And when you directed people to do the sharing of the

22  future prices, did you have an understanding as to whether

23  Pilgrim's prices were also shared?

24  *A.*  Yes.

25  *Q.*  What was your understanding?

Robert Bryant - Direct

1    A.  My understanding was it was a two-way street.  We received

2    those prices and they received ours.

3    Q.  All right.  So were you ever afraid that by giving

4    Pilgrim's future pricing to a competitor that the competitor

5    would undercut Pilgrim's?

6    A.  No.

7               MR. FELDBERG:  Objection.

8               THE COURT:  Overruled.

9    BY MR. KOENIG:

10   Q.  Why not?

11   A.  My past experience in 2014 where we raised prices

12   significantly and shared that information.  And then when I

13   assumed the role as director, it was more of an agreement to

14   not go after volume.  It was about either increasing prices or

15   limiting a decrease in price.

16   Q.  Okay.  So can you explain a little bit about what that

17   means not to go after volume?

18   A.  So not to -- if you had 50 loads a week with a customer,

19   the agreement was to leave that 50 loads a week or grow

20   incrementally if they were growing with that customer and not

21   try to gain additional market share over their incremental

22   growth.

23   Q.  What is -- so in other words, can you say it in more simple

24   terms?

25   A.  To keep the volume the same and just deal with price.

Robert Bryant - Direct

1    Q.  You mentioned loads.  Can you explain that to the jury,

2    what that meant?

3    A.  A load is 40,000 pounds of product or a whole

4    tractor-trailer load full of product.  So we typically dealt in

5    loads per week.  Sometimes we would annualize that volume.

6    Q.  Did you -- when these price exchanges happened with

7    competitors, you said you did it for the purpose of either

8    raising price or limiting the decrease, right?

9    A.  Correct.

10   Q.  Why would price-fixing -- or my apologies.  Why would price

11   sharing facilitate that goal?

12   A.  You would get a range that you would look at and then place

13   yourself inside that range.  And then without that information,

14   you know, you may offer too much of a decrease or go too

15   aggressively and be exposed to actually losing volume.

16   Q.  Now, the conduct that's the subject of the agreement we

17   mentioned before, did anyone else at Pilgrim's engage in that

18   conduct with you?

19   A.  They did.

20   Q.  And who was that?

21   A.  Roger Austin, Scott Tucker, Justin Gay, Jason McGuire, Tim

22   Stiller.  I believe that's -- yeah, Jimmie Little.

23   Q.  And did anyone outside of Pilgrim's engage in that conduct

24   with you?

25   A.  Yes.

Robert Bryant - Direct

1   Q.  Yes?  Okay.  Who?

2           MR. POLLAK:  Objection, lack of foundation.

3           THE COURT:  Sustained.  If you could lay foundation

4   before he mentions who.

5           MR. KOENIG:  Sure.

6   BY MR. KOENIG:

7   Q.  Let's first run through the people at Pilgrim's.

8           Could we pull up Exhibit 9235?  Can we turn on just

9   the lawyer and court view only?

10          What is 9235?

11  A.  It's a picture.

12  Q.  Of who?

13  A.  Roger Austin.

14  Q.  Who is Roger Austin?

15  A.  He is -- at the time when I worked with him, he was the

16  head of our fresh food service business sales, our outside

17  sales.

18          MR. KOENIG:  Your Honor, Mr. Feldberg looks like he is

19  dying to say something.

20          MR. FELDBERG:  There is no issue of identification.

21  Mr. Austin is right here.

22          THE COURT:  Well, okay.  It is premature.  We haven't

23  had any -- nothing has been moved into admission.

24          Go ahead.

25  BY MR. KOENIG:

Robert Bryant - Direct

1    Q.  Is that photograph in 9235 a fair and accurate

2    representation of what you know Mr. Austin to look like?

3    A.  Yeah.

4    Q.  Who was -- who is Roger Austin?

5    A.  He worked for Pilgrim's.

6    Q.  What was his role?

7    A.  He was head of sales for the fresh food service business,

8    so he dealt primarily with the QSR brands.

9    Q.  Which accounts in particular?

10   A.  KFC, Popeye's, Church's, Chick-fil-A, Pizza Ranch, a whole

11   host of -- any of those fresh bone-in-type accounts, he handled

12   those.

13          MR. KOENIG:  The government offers 9235 into evidence.

14          THE COURT:  Any objection to the admission of 9235?

15          MR. FELDBERG:  Two objections, Your Honor.  One, there

16   is no need for a photograph.  Mr. Austin is right here.  There

17   is no question of identification.  And second, if the Court

18   would permit a photograph, we submitted one to counsel that is

19   less unflattering to Mr. Austin.

20          THE COURT:  All right.  The witness has identified

21   Exhibit 9235 as a photograph of Mr. Austin and the objection

22   will be overruled.  9235 will be admitted.

23          MR. KOENIG:  Thank you, Your Honor.

24   BY MR. KOENIG:

25   Q.  Now, you said before that when I asked you who else at

Robert Bryant - Direct

1  Pilgrim's engaged in the conduct at issue here, and you said

2  Roger Austin, right?

3  A.  That's correct.

4  Q.  What is your basis for saying that he participated in that

5  conduct?

6  A.  Specifically in 2017 I received a phone call from Roger

7  where he gave me competitor pricing.

8  Q.  Okay.

9  A.  We used that information to formulate our bid for 2017.

10  Q.  All right.  Any other examples?

11  A.  You know, over the course of the years there were many,

12  many times that Roger called and relayed information from

13  various competitors and their position on a whole host of

14  subjects, so it was common place for him to talk to people

15  outside or with competitors and then relay that information

16  back.

17  Q.  All right.  And so you said a whole host of things.  Did

18  that include future pricing?

19  A.  It included pricing specs.  If a customer asked about --

20  Q.  My question was, did it include future pricing?

21  A.  It did.

22  Q.  Did it include current pricing?

23  A.  It did.

24  Q.  All right.  How do you know that?

25  A.  That's what he communicated to me.

Robert Bryant - Direct

1    Q.   Okay.  Did he mention tracking current prices?

2    A.   He did at one point.

3    Q.   What did he say?

4    A.   He told me that he had everyone's pricing dating back to

5    the nineties.

6    Q.   Approximately when did he say that?

7    A.   I believe it was in 2017.

8    Q.   Do you have an understanding as to why Roger Austin

9    collected future pricing from competitors?

10   A.   Yes.

11   Q.   What is the basis for your understanding?

12   A.   You know, what I witnessed over the course of the years,

13   you know, basically to keep score on where we were at and if

14   others had submitted where he thought that they were going to

15   submit on pricing.

16   Q.   This is future pricing?

17   A.   Correct, and past.

18   Q.   And do you have an understanding -- and you may have

19   touched on this just a little bit -- but do you have an

20   understanding as to why Mr. Austin would track competitors'

21   current pricing?

22   A.   Yes.

23   Q.   And what's your basis for that understanding?

24   A.   It's the same thing, to -- over the course of the years he

25   relayed --

Robert Bryant - Direct

1    Q.  Can you speak up a little bit?

2    A.  Yeah, over the course of the years he relayed that

3    information to me and we had discussions about not only our

4    pricing, but competitor pricing.

5    Q.  From your perspective was having the current pricing useful

6    for anything?

7    A.  It could be.

8    Q.  And what was that?

9    A.  Depending on the pricing, sometimes people could make

10   adjustments on something like a max billable case weight which

11   in effect would increase pricing.  So knowing that information,

12   then you could adjust or attempt to adjust your max billable

13   with the customer to match that increase.

14   Q.  And when I said -- I think I said tracking everyone's

15   current pricing, but whose pricing was being tracked?

16   A.  Our competitors.

17   Q.  All right.  Did you find it useful for, you know -- you

18   said that one of the things that was collected by Mr. Austin

19   was future pricing, correct?

20   A.  Correct.

21   Q.  And what was the -- what did you say your understanding of

22   why he did that?

23            MR. TUBACH:  Asked and answered, Your Honor.

24            THE COURT:  Overruled.

25   A.  For bids, see where others were coming in at, make sure

28

Robert Bryant - Direct

1    that we were in line with them or they were in line with us.

2    And then you got the pricing after or in between contracts so

3    you know where their pricing was, in fact, going into the other

4    contract and if you needed to make adjustments.

5    *BY MR. KOENIG:*

6    *Q.*   Okay.  So you did the future pricing and then there is the

7    contract and then the current pricing.  To what end are you

8    looking at current pricing?

9    *A.*   To see where everybody actually did end up for sure and

10   whether or not you needed to make some sort of adjustment.  And

11   you could look at doing something with a case weight to offset

12   something that may have happened.

13   *Q.*   And when you said everyone, who did you mean?

14   *A.*   Competitors.

15   *Q.*   All right.  So it was a monitoring mechanism?

16   *A.*   It was.

17            MR. KOENIG:  Can we pull up Exhibit 9244, please?

18   *BY MR. KOENIG:*

19   *Q.*   Do you recognize 9244?

20   *A.*   I do.

21   *Q.*   What is it?

22   *A.*   It's a photograph.

23   *Q.*   Of whom?

24   *A.*   Jimmie Little.

25   *Q.*   Who is Jimmie Little?

Robert Bryant - Direct

1  *A.*  He was a salesperson for us until he retired.  He handled

2  some accounts -- some of the accounts that Roger had.  So Roger

3  was responsible for that group, and then he segmented off those

4  accounts to individual owners and he was one of those.

5  *Q.*  Which accounts did Jimmie Little handle?

6  *A.*  Church's, Boston Market.  I think he handled Pollo

7  Tropical, Pizza Ranch to name a few.

8  *Q.*  Do you see Jimmie Little in the courtroom?

9  *A.*  I do.

10  *Q.*  Could you please identify him?

11  *A.*  He is right here on the corner.

12  *Q.*  Any particular article of clothing?

13  *A.*  I can't -- I am color-blind, so he has got the sweater vest

14  on with a tie and a jacket.  Sorry.

15       *MR. KOENIG:*  Please let the record identify that

16  Mr. Bryant identified Jimmie Little.

17       *THE COURT:*  It shall.

18       *MR. KOENIG:*  And the government offers Government

19  Exhibit 9244 into evidence.

20       *THE COURT:*  Any objection to the admission of

21  Exhibit 9244?

22       All right.  9244 will be admitted.

23  *BY MR. KOENIG:*

24  *Q.*  Now, you mentioned that Jimmie Little was someone at

25  Pilgrim's who engaged in this conduct that we are talking

Robert Bryant - Direct

1   about, right?

2   A.   That's correct.

3   Q.   What's your basis for saying that?

4   A.   Phone conversations that we had where he relayed

5   information from conversations he had with -- I can't remember

6   their name, but a person at Holmes and a person at Tyson Foods.

7   Q.   Hold one second.  I want to get to that.  When were the

8   phone conversations?

9   A.   Probably 2015, 2014.  I don't remember the exact date.

10  Q.   So you said Holmes?

11  A.   That's correct.

12  Q.   What is Holmes?

13  A.   It's another poultry processor in Texas.

14  Q.   Are they a competitor of Pilgrim's?

15  A.   They are.

16  Q.   And so what did Mr. Little say about Holmes?

17  A.   I just recall him relaying that he talked to his contact at

18  Holmes and what they were going to submit on pricing.  I don't

19  remember the customer.  I just remember we had a shared

20  customer with them and he was relaying what they were going to

21  submit versus us on that shared customer.

22  Q.   All right.  And did you have an understanding as to why

23  Jimmie Little was collecting that information?

24  A.   I did.

25  Q.   What was the basis for that understanding?

Robert Bryant - Direct

1    A.  Our phone calls and past experience together.

2    Q.  And what is your understanding of the reason he was

3    collecting that pricing information?

4    A.  To -- at this point it was to increase prices without a

5    concern of losing volume.

6    Q.  Increase together with Holmes?

7    A.  That's correct.

8    Q.  You also mentioned Jason McGuire.  Do you remember that?

9    A.  I do.

10   Q.  And can you remind the jury who Jason McGuire was?

11   A.  He was my manager at the time.

12   Q.  What time was that?

13   A.  From 2010 until late 2014.

14   Q.  And during that time who did Jason McGuire report to?

15   A.  In 2014, he was reporting to Jayson Penn.

16   Q.  And how does Jason McGuire spell his first name?

17   A.  J-A-S-O-N.

18   Q.  And how does Jayson Penn spell his first name?

19   A.  J-A-Y-S-O-N.

20   Q.  In your time, your 30 years at Pilgrim's, is there any

21   other Jayson spelled with a Y that you encountered other than

22   Jayson Penn?

23   A.  Not that I recall.

24        MR. KOENIG:  Can we pull up 9248?

25   BY MR. KOENIG:

Robert Bryant - Direct

1    *Q.*  Do you recognize 9248?

2    *A.*  Yes.  That's a pretty bad picture.

3    *Q.*  Of whom?

4    *A.*  Of Jayson Penn.

5    *Q.*  Do you see Jayson Penn in the courtroom today?

6    *A.*  I do.

7    *Q.*  Can you please identify him for the jury?

8    *A.*  Yes.  He is standing up.

9         *MR. KOENIG:*  Will you let the record reflect that

10   Mr. Bryant identified Jayson Penn.

11        *THE COURT:*  It shall.

12        *MR. KOENIG:*  The government offers 9248 into evidence.

13        *THE COURT:*  Any objection to the admission of 9248?

14        *MR. TUBACH:*  Other than it's a bad photo, Your Honor,

15   I would join in Mr. Feldberg's earlier objection.

16        *THE COURT:*  It seems to have some pixilation problems,

17   but Exhibit 9248 will be admitted.

18   *BY MR. KOENIG:*

19   *Q.*  And then during the period 2010 to 2014, who did Jayson

20   Penn report to?

21   *A.*  Bill Lovette.

22        *MR. KOENIG:*  Let's pull up Exhibit 9245.

23   *BY MR. KOENIG:*

24   *Q.*  Do you recognize 9245?

25   *A.*  I do.

Robert Bryant - Direct

1   Q.  What is it?

2   A.  It's a photograph.

3   Q.  Of?

4   A.  Bill Lovette.

5   Q.  Do you see Mr. Lovette in the courtroom today?

6   A.  I do.

7   Q.  Could you please identify him?

8   A.  Yeah.  He is standing.

9        MR. KOENIG:  Let the record reflect that Mr. Bryant

10  identified Mr. Bill Lovette.

11       THE COURT:  It shall.

12       MR. KOENIG:  The government offers 9245 into evidence.

13       THE COURT:  Any objection to the admission of

14  Exhibit 9245?

15       MR. FAGG:  The same objections that were raised

16  earlier, Your Honor.

17       THE COURT:  Those objections will be overruled.

18  Exhibit 9245 will be admitted.

19  BY MR. KOENIG:

20  Q.  Now, before we got on to this photo gallery, we were

21  talking about Jason McGuire, I believe, right?

22  A.  That's correct.

23  Q.  Okay.  And you had said previously that he also engaged in

24  the conduct that we are talking about.

25  A.  That's correct.

Robert Bryant - Direct

1   *Q.*  What is your basis for saying that?

2   *A.*  Phone call conversations with him.  I did witness him

    directing Roger to share some information --

4   *Q.*  Can you please use last names?

5   *A.*  Roger Austin.  I witnessed him directing Roger Austin to

6   share information with our competition, and then I received

7   some e-mails from Jason about that same conduct.

8        *MR. TUBACH:*  Your Honor, again with Jason, there being

9   two Jasons --

10  *A.*  Jason McGuire.

11       *THE COURT:*  Yes, I agree.  If we could ask the witness

12  to try to do that as well.  Go ahead.

13  *BY MR. KOENIG:*

14  *Q.*  Yes, if you could, please, use last names.

15  *A.*  Yes.

16  *Q.*  All right.  So you were speaking about a time when Jason

17  McGuire asked Roger Austin to do what?

18  *A.*  Share some information with our competition.

19  *Q.*  What kind of information?

20  *A.*  It was some information about our position on price

21  increases and justification for those price increases.

22  *Q.*  All right.  What time frame was that?

23  *A.*  That was in 2014.

24  *Q.*  And did you have an understanding as to why Jason McGuire

25  asked Roger Austin to do that?

Robert Bryant - Direct

1    A.   I did.

2    Q.   What was the basis of your understanding?

3    A.   Those same phone calls and e-mails that we had between

4    myself and Jason McGuire.

5    Q.   And what was your understanding of why Jason McGuire asked

6    Roger Austin to share the information with competitors?

7    A.   To build support for price increases in 2014.

8    Q.   What do you mean by support for price increases?

9    A.   I mean to build support with competitors to raise prices in

10   the 2014 bid season.

11   Q.   Okay.  You also mentioned a Tim Stiller.  Do you recall

12   that?

13   A.   I do.

14   Q.   Who was Tim Stiller?

15   A.   He was my manager from the fall of 2014 or early 2015 until

16   earlier this year.

17   Q.   All right.  And during that entire time who did Mr. Stiller

18   report to?

19   A.   Jayson Penn.

20   Q.   All right.  Now, what was your basis for saying that

21   Stiller participated in the activities that we have been

22   talking about here?

23   A.   He directed me and others to get pricing information from

24   competitors and use that for bids.

25   Q.   And did you have an understanding as to why he wanted you

Robert Bryant - Direct

1    to do that?

2    *A.*   Yes.

3    *Q.*   What's the basis for your understanding?

4    *A.*   Phone calls, text messages, e-mail conversation -- or

5    e-mails and conversations that we had about his expectations.

6    *Q.*   Okay.  And so what was your understanding of why he was

7    telling you to get pricing from competitors?

8    *A.*   Depended, but either to increase or decrease -- or limit a

9    decrease on prices.

10   *Q.*   You mentioned Scott Tucker.  Who is Scott Tucker?

11   *A.*   He was a salesperson that also worked for Roger Austin.  I

12   don't recall when he started with the company, but he was with

13   us from -- I know from 2014 until this year with Pilgrim's.

14   *Q.*   When you said -- you mentioned Roger Austin.  Was Roger

15   Austin his supervisor?

16   *A.*   He was until Roger retired.

17   *Q.*   What accounts did Mr. Tucker handle?

18   *A.*   I know he handled KFC.  I think he handled Bojangles and a

19   few others.

20   *Q.*   All right.  Now, you mentioned Mr. Tucker among the list of

21   people at Pilgrim's who participated with you in this conduct.

22   What is your basis for saying that with respect to Mr. Tucker?

23   *A.*   Same basis, phone calls.  And he entered into an agreement

24   on -- Scott Tucker entered into an agreement with a former

25   co-worker at Mar-Jac to increase prices for US Food Service.

37

Robert Bryant - Direct

1   Q.  And who directed him to do that?

2   A.  I did.

3   Q.  All right.  You mentioned Justin Gay as another person at

4   Pilgrim's.  Do you remember that?

5   A.  I do.

6   Q.  Who is Justin Gay?

7   A.  He was also a salesperson that worked for Roger Austin.

8   Q.  When was that?

9   A.  I don't recall when he originally started, but it was

10  probably in the middle 2000s until this year.

11  Q.  What accounts did Mr. Gay handle?

12  A.  Chick-fil-A, Popeye's.  Initially he was on the KFC

13  account.

14  Q.  Initially meaning when?

15  A.  Like in the middle 2000s.  And Scott Tucker took over that

16  role from him.  That he had Chick-fil-A and Popeye's that I can

17  recall and he may have had some others.  Later he assumed

18  Roger's role as the lead on that for that team.

19  Q.  Just backing up just a little bit, when somebody is in

20  charge of an account like Justin Gay, for example, what does

21  that mean?  What is the responsibility of somebody who is in

22  charge of an account?

23  A.  That means they are responsible for that customer, sales

24  growth.

25  Q.  Can you speak up just a little bit?

Robert Bryant - Direct

1   A.   Yeah.  They are responsible for that customer, you know,

2   providing growth to the company.

3   Q.   Which company?

4   A.   Pilgrim's.  So they are technically the account owner for

5   that particular customer and all it encompasses.  They are not

6   directly responsible for the pricing.  That was usually given

7   to them, but they were responsible for getting that price from

8   the customer.

9   Q.   Can you expound on that just a little bit?  They were given

10  the pricing?

11  A.   Yes.  Technically the sales director was responsible for

12  pricing for the overall business unit.  Now, the account owner

13  would give guidance on whether or not they thought it was too

14  high, too low, or they could get that done, but -- it was a

15  little bit collaborative, but in the end they were responsible

16  for getting that price done with the customer, whatever was

17  agreed upon.

18  Q.   So you were the sales director for a time, right?

19  A.   I was.

20  Q.   So did you have discussions with people, account owners,

21  about pricing?

22  A.   I did.

23  Q.   And did they have influence on you when you guys were

24  discussing pricing?

25  A.   They did.

Robert Bryant - Direct

1    Q.   Okay.  So you were the ultimate decision maker, though.

2    A.   Yes.  I would do the analysis on what we should do, and

3    then they would push back if they thought it was too much or

4    they didn't feel that they could get it done or a whole host of

5    reasons, but they were responsible for the account, so their

6    job was to keep us -- keep guardrails on us.

7    Q.   All right.  I apologize for the detour.  Now, you said

8    Mr. Gay reported to Mr. Austin; is that correct?

9    A.   That's correct.

10   Q.   What was your basis for saying that Justin Gay was

11   participating in the activities we've been discussing today?

12   A.   Same -- same basis, phone calls where he relayed

13   information from conversation he had with competitors.  You

14   know, there was one instance where he was -- tried to get me to

15   agree.  Ultimately he did get me to agree to a discount for a

16   customer that our competitors had already aligned around.

17   Q.   All right.  What customer was that?

18   A.   Popeye's.

19   Q.   And what year was that?

20   A.   I don't recall.  I don't remember exactly what year that

21   was, but --

22   Q.   Were you sales director at the time?

23   A.   Probably.  It was probably -- it may have been in the

24   spring of 2017, but they have a spring and fall promotion

25   around April and then they have one in September that are

Robert Bryant - Direct

1    fairly common that they would seek discounts for.

2    Q.   Okay.  And so -- and you had authority to approve or not

3    approve the discount.

4    A.   That's correct.

5    Q.   And what were the considerations that went into whether you

6    approved a discount?

7    A.   Whether or not I felt it was needed.  If the additional

8    sales would offset the decrease in price and we would net-net,

9    actually be more profitable.

10   Q.   Who were your competitors at that time for Popeye's?

11   A.   Tyson, George's, Claxton, Mar-Jac.  There's a group of

12   competitors in this QSR business that are fairly common that

13   you run across, that those are -- those five or six are fairly

14   common.

15   Q.   Was Koch one of those too?

16   A.   Koch, yes.

17   Q.   And among the considerations did you ask Mr. Gay what the

18   competition was doing?

19   A.   I don't recall asking him that because during that

20   conversation I remember telling him I didn't think it was

21   needed or warranted.  And he said, well, everybody else is

22   doing it, so we're going to have to fall in line with them.

23   And I think at the time it was around a nickel per pound that

24   he said that -- he said that the others had already agreed to.

25   Q.   So what was your understanding of, "We had to because

Robert Bryant - Direct

1   others were going to do it"?

2   A.  What he was saying, Justin Gay was saying, at the time was

3   that our competitors had already agreed to a discount for the

4   promotion and we needed to do the same or -- we needed to do

5   the same discount or else it would look bad on us from our

6   customer that we didn't concede a discount for the promotion.

7   Q.  All right.  Thank you.  You mentioned several -- no, you

8   didn't mention.  Were there people outside of Pilgrim's who

9   were engaged in the conduct that gave rise to your agreement?

10  A.  Yes.

11          MR. FELDBERG:  Objection.

12          MR. TUBACH:  Objection, lacks foundation.

13          THE COURT:  Sustained.  If you could rephrase.

14  BY MR. KOENIG:

15  Q.  What was the conduct that gave rise to the agreement where

16  you will not be prosecuted?

17  A.  Price-fixing.

18  Q.  Were there people outside of Pilgrim's who engaged in that

19  conduct with you?

20  A.  There were.

21  Q.  Who were those people?

22  A.  The three that I heard most often were Bill Kantola, Scott

23  Brady and Carl Pepper.

24  Q.  Okay.  Let's go through each of those, please.

25          MR. KOENIG:  Can we pull up Exhibit 9242?

Robert Bryant - Direct

1   *BY MR. KOENIG:*

2   *Q.*  Do you recognize 9242?

3   *A.*  I do.

4   *Q.*  What is it?

5   *A.*  It's a photograph.

6   *Q.*  Of whom?

7   *A.*  Bill Kantola.

8   *Q.*  And where did Mr. Kantola work?

9   *A.*  Koch Foods.

10  *Q.*  And was Koch Foods a competitor of Pilgrim's?

11  *A.*  They are.

12  *Q.*  Do you see Mr. Kantola in the courtroom today?

13  *A.*  It's hard to tell with masks on.  Well, there he is.  I am

14  sorry, and I can see his red tie.

15          *MR. KOENIG:*  Can the record please reflect that

16  Mr. Bryant identified Bill Kantola?

17          *THE COURT:*  It shall.

18          *MR. KOENIG:*  The government offers Government

19  Exhibit 9242 into evidence.

20          *THE COURT:*  Any objection to the admission of

21  Exhibit 9242?

22          *MS. HENRY:*  Yes, Your Honor, for the same reasons

23  stated previously.

24          *THE COURT:*  Exhibit 9242 will be admitted and the

25  objection will be overruled.

Robert Bryant - Direct

1   *BY MR. KOENIG:*

2   *Q.*  What is your basis for saying that Bill Kantola

3   participated in the price-fixing activity?

4           *MR. TUBACH:*  Object to that characterization.

5           *THE COURT:*  I am sorry, Ms. Henry, go ahead.

6           *MS. HENRY:*  A lack of foundation as well as.

7           *THE COURT:*  The question asks for a foundation.

8           Mr. Tubach?

9           *MR. TUBACH:*  It's the characterization that I was

10  objecting to, Your Honor.  It's describing conduct he is now

11  characterizing.

12          *THE COURT:*  Mr. Koenig, response?

13          *MR. KOENIG:*  Yes.  Your Honor, we have now

14  characterized in open court -- Mr. Bryant has several times

15  without objection.  And so at this point I would say an

16  objection just to calling the activity, just generally

17  referring to it as the price-fixing activity is, you know,

18  not -- has been waived for one thing.

19          *MS. HENRY:*  Your Honor, the previous discussion has

20  related to price sharing activity.

21          *MR. TUBACH:*  And he then testified about what his

22  immunity related to, but Mr. Koenig is trying to meld those and

23  that's not proper.

24          *MR. FELDBERG:*  And it's also the ultimate issue.

25          *THE COURT:*  For clarification of the record just so we

Robert Bryant - Direct

1    have a good understanding with the witness as to terminology, I

2    will sustain the objections.  If you can clarify exactly what

3    the shorthand term may refer to.

4          Go ahead, Mr. Koenig.  You can define a term to be

5    used with him by asking the witness questions.

6    BY MR. KOENIG:

7    Q.  When I asked you the activity that your agreement related

8    to, if I refer to that as the activities we're discussing here

9    today, will you understand what I mean?

10   A.  I do.

11   Q.  So what was your basis for saying that Bill Kantola

12   participated in the activity we are discussing today with you?

13         MS. HENRY:  Your Honor, same objection.

14         THE COURT:  Overruled.

15   A.  I overheard phone calls between Roger and Bill Kantola

16   and --

17   BY MR. KOENIG:

18   Q.  Excuse me.  Can you use last names, please?

19   A.  Roger Austin.  I overheard phone calls between Roger Austin

20   and Bill Kantola and also received information from Roger

21   Austin that he relayed to me from Bill Kantola.

22         MS. HENRY:  Objection, hearsay, Your Honor.

23         THE COURT:  Overruled.  Sorry, it's 803(6).

24         Go ahead.

25         MR. KOENIG:  I am sorry, 803(6)?  801(d)(2)(E)?

Robert Bryant - Direct

1          THE COURT:  What?

2          MR. KOENIG:  801(d)(2)(E)?

3          THE COURT:  Well, I think that's what the exception --

4    what exception are you asking for?

5          MR. KOENIG:  I just heard you say 803(6).

6          THE COURT:  Sorry.  I may have misspoken, but what

7    were you talking about, Mr. Koenig?  What was the exception you

8    were using?

9          MR. KOENIG:  801(d)(2)(E).

10         THE COURT:  All right.  Yes, agreed.

11         Go ahead.

12   BY MR. KOENIG:

13   Q.   The phone calls you mentioned, when did those occur?

14   A.   2014, but the passing of information happened quite

15   frequently between 2014 and 2017.

16   Q.   And what exactly did you overhear in 2014?

17   A.   The exact words or --

18   Q.   We'll come back to it.

19         All right.  Did you have an understanding as to why

20   Roger Austin and Bill Kantola were sharing pricing information?

21   A.   I did.

22   Q.   And what was the basis for that understanding?

23         MS. HENRY:  Objection, Your Honor.  He laid no

24   foundation for the understanding of Mr. Kantola.

25         THE COURT:  Overruled.

Robert Bryant - Direct

1    *BY MR. KOENIG:*

2    *Q.*  You may answer.

3    *A.*  Can you repeat?

4    *Q.*  What was your basis for understanding why Mr. Austin and

5    Mr. Kantola would engage in the sharing of prices?

6    *A.*  Those phone conversations that I had with Roger and that

7    information that he shared with me along with overhearing the

8    phone conversation he had with him.

9    *Q.*  And what, then, was your understanding?

10        *MR. FELDBERG:*  Objection, Your Honor.  The question is

11   vague because he has been unspecific about any particular phone

12   call or any particular communication.

13        *THE COURT:*  Overruled.

14   *BY MR. KOENIG:*

15   *Q.*  Well, that's actually helpful.

16        What time frame are we talking about?

17   *A.*  A long period.  Initially it started before the 2010

18   promotion of myself.  He would relay -- Roger Austin would

19   relay information from Bill about a requested spec change --

20   *Q.*  From who?

21   *A.*  From Bill Kantola about a requested spec change for its

22   stints or a bird size change, but later after 2014 it was more

23   pricing centric information and what Koch's position was on a

24   particular topic.

25   *Q.*  A particular topic?

Robert Bryant - Direct

1   A.  Yes, whether it was pricing or spec or whatever the

2   customer question was at that particular time.

3   Q.  So then what was your understanding as to why Roger Austin

4   and Bill Kantola were engaging in this price sharing conduct?

5   A.  It was to either raise or prevent a price decrease, raise

6   prices or --

7   Q.  For both companies?

8   A.  Correct.

9        MR. KOENIG:  Can we blow up government Exhibit 9237,

10  please?

11  BY MR. KOENIG:

12  Q.  Do you recognize government Exhibit 9237?

13  A.  I do.

14  Q.  What is it?

15  A.  It's a picture.

16  Q.  Of whom?

17  A.  Looks like Scott Brady.

18  Q.  Okay.  Where did Scott Brady work?

19  A.  When I first met him, he worked for Pilgrim's, and later he

20  moved to Claxton Poultry.

21  Q.  So in like the 2014 to 2017 time frame where did he work?

22  A.  He was working at Claxton.

23  Q.  And was Claxton at that time a competitor of Pilgrim's?

24  A.  They were.

25  Q.  All right.  Do you see Scott Brady in this courtroom?

Robert Bryant - Direct

1   *A.*  Yes.  It's been many years since I have seen him, but I

2   believe that's him in the gray jacket -- I think it's gray, I

3   think.

4          *MR. LAVINE:*  Your Honor, let the record reflect that

5   the witness has identified a gentleman in the gray jacket as

6   Scott Brady, please.

7          *THE COURT:*  Well, we're not going to -- the question

8   is -- first of all, you're not cross-examining him.

9          *MR. LAVINE:*  I understand.

10         *THE COURT:*  So the question would be whether or not

11  the government asked for the record to reflect something.

12         *THE WITNESS:*  I apologize.  I thought all the defense

13  were here.  I didn't realize there was a second table back

14  there.

15  *BY MR. KOENIG:*

16  *Q.*  So do you see him?

17  *A.*  I am trying to look for him.  I mean, if they didn't have

18  their masks on -- I believe he is in the blue shirt with the

19  round stuff on his tie.

20  *Q.*  Glasses?

21  *A.*  Yeah.

22         *MR. KOENIG:*  Please let the record reflect that

23  Mr. Bryant identified Scott Brady.

24         *THE COURT:*  Yes.  Initially he did not, but he did

25  just now the record shall reflect.  And we have -- it's just

Robert Bryant - Direct

1  about noon.  It is noon now.  If you have one or two questions

2  left --

3         MR. KOENIG:  I will stick to my promise of one

4  question, not even a question.  The government offers

5  Exhibit 9237 into evidence.

6         THE COURT:  Any objection to the admission of

7  Exhibit 9237?

8         MR. LAVINE:  Yes, Your Honor.  He says he believes I

9  believe is what he said here, it looks like.  He didn't confirm

10  that that's a photo of Mr. Brady.  He had difficulty even

11  trying to identify him and he says he believes.  He is not sure

12  who this person is, so I would absolutely object for admission

13  of that photograph.

14         THE COURT:  If you could lay additional foundation.

15  BY MR. KOENIG:

16  Q.  How long have you known Scott Brady?

17  A.  I mean, we worked together while he was at Pilgrim's.  I

18  had some meetings with him at Pilgrim's.  After he left

19  Pilgrim's, I don't recall meeting with him since then, so it's

20  been several years since we've met in person.

21  Q.  How many times would you say you have met Scott Brady in

22  person?

23  A.  A few, a few.  Like I was in sales -- or a sales

24  coordination role.  And I can remember specifically when he

25  came to the Mayfield, Kentucky plant when I worked there.  We

Robert Bryant - Direct

1   had customers from Cracker Barrel come that he showed the

2   plant.  We were in meetings together at that -- for that.

3   Q.  Now, I would like you to please look at the person you

4   identified as Scott Brady in this courtroom and the picture and

5   let me know -- let the jury know whether that's a fair and

6   accurate representation of the person you identified.

7           MR. LAVINE:  Objection, Your Honor.  That's just an

8   improper question at this point in time.  He can't identify

9   him.  He is talking about what his recollection was meeting

10  him, what, nine, 10, 11 years ago?  He has no foundation for

11  identifying Mr. Brady in this courtroom.

12          THE COURT:  Well, comparing the photo and the

13  appearance in court is not the way to establish identification,

14  but based on the foundation he can be asked about the photo

15  again.

16  BY MR. KOENIG:

17  Q.  All right.  Who is depicted in the photograph?

18  A.  It's Scott Brady.

19          MR. KOENIG:  The government moves to admit 9237.

20          THE COURT:  Any objection to the admission of 9237?

21          MR. LAVINE:  Your Honor, I will object on all the

22  grounds we already stated.  There is no foundation.  Basically

23  what government counsel has done is led him down this path to

24  try to identify Mr. Brady.  He has no independent ability to

25  identify my client whatsoever.

Robert Bryant - Direct

1        THE COURT:  Well, he has met with Mr. Brady on several

2   different occasions.  Objections are overruled.  Exhibit 9237

3   will be admitted.

4        All right.  Ladies and gentlemen, we will go ahead and

5   take our lunch break.  Plan on reconvening at 1:30.  Keep the

6   admonitions in mind, ladies and gentlemen.  Don't start

7   deliberating amongst yourselves, obviously, or talk about the

8   case in any way.  Don't look up any information.  The jury is

9   excused for lunch.  Thank you.

10       (Jury excused.)

11       Mr. Bryant, you can step down and then if you could

12   return -- be ready to go at 1:30, all right?  Thank you.

13       Quick issues, if possible.

14       Mr. Fagg, did you have something?

15       MR. FAGG:  Just a question on Your Honor's order on

16   witness sequestration.  We understood that once a witness was

17   on the stand that he or she was not to consult with counsel for

18   the party, and we just wanted to seek clarification on that.

19       THE COURT:  We've had clarification on that.  That is

20   the rule.

21       MR. KOENIG:  The government understood that as well.

22   Thank you.

23       THE COURT:  All right.  We will be in recess, then,

24   until 1:30.  I will try to look over that Stiller motion as

25   best that I can.  Do you anticipate getting into those issues?

Robert Bryant - Direct

1   How soon, Mr. Koenig?

2           *MR. KOENIG:*  I would say before the afternoon break.

3           *THE COURT:*  Then why don't we plan on reconvening at

4   1:15 and hopefully I can rule on that.

5           *MR. KOENIG:*  And I think we have come to an agreement

6   on the agreement, the form of the agreement that we discussed

7   this morning.

8           *THE COURT:*  Okay.  That's great.  Will something be

9   introduced or will there just be a written document that can be

10  used as a guide or refreshing recollection, something of that

11  nature?

12          *MR. KOENIG:*  Well, I can't speak for the defendants,

13  but -- and I haven't --

14          *THE COURT:*  I don't need to know now.  I was just

15  curious in case it was known.

16          Mr. Tubach?

17          *MR. TUBACH:*  Your Honor, we were just going to

18  finalize the document as we had discussed and agreed with the

19  government and mark it as an exhibit, and we can then see if we

20  need to use it at all.

21          *THE COURT:*  Okay.  Mr. Feldberg, did you have

22  anything?

23          *MR. FELDBERG:*  No, I was just standing in anticipation

24  of the break, Your Honor.

25          *THE COURT:*  And in anticipation, we will be in recess.

Robert Bryant - Direct

1    Thank you.

2         (Recess at 12:06 p.m.)

3         (Reconvened at 1:20 p.m.)

4         THE COURT:  We are going to talk about Docket No. 763

5    which is defendants' joint motion to exclude any mention of

6    non-defendant Timothy Stiller's alleged obstruction conduct.

7         Let me ask first of all about the phone.  What's the

8    implication there, I mean, phone and water?  So what?

9         MS. CALL:  Yes, Your Honor, for the government.  For

10   that actual statement, we don't plan on eliciting that in

11   Mr. Bryant's testimony.

12        THE COURT:  Okay.  What about the next one, the spin?

13        MS. CALL:  Yes.  I believe that may be elicited, Your

14   Honor.  And the relevance is obviously the term industry here

15   has been stated on the record before as jargon in this

16   conspiracy to meet competitors.  And it's part of the defense

17   here that industry sometimes means customer, so it is important

18   the meaning of that term when used by conspirators in this case

19   and that's highly relevant.

20        THE COURT:  I am sorry, so Stiller allegedly tells

21   Bryant that he could spin certain documents to be favorable to

22   whom?

23        MS. CALL:  To the defense, Your Honor.  Our

24   understanding is there was an indictment issued in another

25   matter where there was a text message using the word industry

54

Robert Bryant - Direct

1    and that Mr. Stiller when showing that document to Mr. Bryant

2    said that he would spin the term industry.

3         THE COURT:  Okay.

4         MR. TUBACH:  Your Honor, on that point the other

5    indictment that the government is relating to is the indictment

6    of Mr. Stiller.

7         THE COURT:  Yes, I inferred that, although I don't

8    know really anything about that.  I think that's in front of

9    Judge Domenico.

10        MS. CALL:  I don't believe that's correct, Your Honor.

11        MR. TUBACH:  It might be the Claxton.

12        MS. CALL:  Yes, I believe it was a corporate

13   indictment that Mr. Bryant was referring to.

14        MR. TUBACH:  My apologies, that's right.  But in any

15   event, this conversation is alleged to have happened in 2021

16   which would be at least two years after this conspiracy

17   allegedly ended which falls directly under *Grunewald*.

18        THE COURT:  Yeah, but in *Grunewald* it's a little

19   different.  There is a lot of cases, and the government cites

20   some of them, would allow a statement to come in, but not for

21   the truth of the matter, to prove the existence of the

22   conspiracy, not some act in furtherance of it, but to prove the

23   existence of the conspiracy.

24        This, of course, what we're talking about here would

25   be a statement by a non-defendant, but allegedly a member of

Robert Bryant - Direct

1   the conspiracy, to demonstrate I assume the existence of the

2   conspiracy; is that right, Ms. Call?

3         *MS. CALL:*  Yes, Your Honor.  And that's the exact

4   distinction that the government hopefully pointed out in its

5   briefing, that the line of cases with *Grunewald* specifically

6   relates to admissibility under 801(d)(2)(E) where the line of

7   cases cited by the government has to do with the relevance and

8   admissibility of other non-hearsay statements.

9         So when Mr. Stiller says, you know, he can spin the

10  term industry, the government would not introduce that for the

11  fact of whether Mr. Stiller could actually spin the term

12  industry to mean something else, but it's more so a statement

13  of intent or some other non-hearsay purpose.

14        *THE COURT:*  How does Mr. Bryant know what he is even

15  talking about when he says that?

16        *MS. CALL:*  I believe Mr. Bryant would testify that he

17  was in conversations with Mr. Stiller at the time of the actual

18  text message that is cited in the indictment which was several

19  years earlier, and he understood the meaning of the text

20  message at the time based on those conversations.

21        *THE COURT:*  And he understood it, though, to refer to

22  Mr. Stiller's -- sorry, to the Claxton indictment?

23        *MS. CALL:*  No.  And I think there is a little bit of

24  confusion.  So a text message was cited in an indictment which

25  had to do with the term industry.  Mr. Stiller showed

Robert Bryant - Direct

1   Mr. Bryant the indictment, said he could spin the term industry

2   to mean something else when anticipating to actually testify in

3   we believe this case.

4        *THE COURT:*  How does Mr. Bryant know that?

5        *MS. CALL:*  I believe it's the context of the

6   communication.

7        *MR. KOENIG:*  May I just --

8        *MS. CALL:*  May we confer for one moment?

9        *THE COURT:*  Yes.  We are not going to have two lawyers

10  talking on the same subject from one client.

11       *MR. TUBACH:*  While we have --

12       *THE COURT:*  No, we can't, because Ms. call has got to

13  listen to what you're saying.

14       *MS. CALL:*  Two points of clarification.  For one, the

15  actual text message at issue says --

16       *THE COURT:*  It's a text message from who to who?

17       *MS. CALL:*  It is from Tim Stiller to Roger Austin, I

18  believe.  And it says:  Tell the industry we are going to hold.

19  So the meaning of the term industry is what is then being

20  referred to.

21       *THE COURT:*  Oh, that's the underlying use of the term

22  industry.

23       *MS. CALL:*  Yes.  I apologize for not making that more

24  clear, Your Honor.  And I believe the second point of

25  clarification, I believe what Mr. Bryant says about his more

Robert Bryant - Direct

1   recent conversation with Mr. Stiller about this text message is

2   that Mr. Stiller was saying it in the context of possibility

3   testifying in this case when he said that he would spin the

4   term industry.

5          THE COURT:  Okay.  And how does Mr. Bryant know that?

6          MS. CALL:  Because this is a conversation with

7   Mr. Stiller.

8          THE COURT:  I know, but what are they talking about?

9          MS. CALL:  He is showing him the indictment in the

10  corporate case which cites that text message.  And the

11  communication was something along the lines of, you know, when

12  I testify in the case, I could spin the term industry to

13  mean --

14         THE COURT:  In that case.

15         MS. CALL:  No.  Our understanding is it was actually

16  referring to this case that he was anticipating testifying in

17  at the time because the indictment had actually just come out

18  in that corporate case and it was the first time that text

19  message was referenced in an indictment, so he hadn't

20  previously been aware that the government had that message.

21         THE COURT:  Why would Mr. Stiller be anticipating

22  testifying in this case at that time whenever -- oh -- at that

23  time.

24         MS. CALL:  The time of the communication was before

25  Mr. Stiller was ever charged.

Robert Bryant - Direct

1          THE COURT:  Okay.  Let's hear from -- anything else,

2     Ms. Call --

3          MS. CALL:  I don't believe so, Your Honor.

4          THE COURT:  -- on that point?

5          Mr. Tubach?

6          MR. TUBACH:  Just on that point, Your Honor, this is

7     immediately after the Claxton indictment came out.  The text

8     message had never been referenced in the indictment in this

9     case.  So the fact that they would have been talking about,

10     well, he can spin it would naturally refer to the Claxton

11     indictment, not to this indictment.  And it seems to me this is

12     highly prejudicial to the defendants, none of whom are alleged

13     to be involved in this conduct at all.

14          This does not have to do with the underlying conduct

15     of whether he sends a text message saying put this out to the

16     industry.  That's not what we're talking about here.  We are

17     talking about in 2021, this year, he says something about an

18     indictment in a different case and how he can spin evidence

19     referenced in that case.  That's just highly prejudicial to

20     these defendants.

21          THE COURT:  I will give you the last word, Ms. Call,

22     on this one.

23          MS. CALL:  Yes.  And just to make clear, the text

24     message is on the government's exhibit list in this case as

25     part of the conspiracy charged in this case.  So Mr. Stiller's

Robert Bryant - Direct

1    potential obstructive conduct or intended perjury as we see it

2    would be highly relevant to this case and the existence of the

3    conspiracy in this case.

4           THE COURT:  I am going to exclude that statement.  The

5    problem is just that there is really no reason and I haven't

6    heard any articulation of why Mr. Bryant would assume or know

7    that the attempt to spin was going to occur in this case as

8    opposed to what would seem to be his natural reaction is that

9    if he saw an indictment of Claxton, he would assume that it

10   would take place there.  So maybe there would be a claim of

11   obstruction in that case, but if the government is trying to

12   suggest obstruction here, there is just not that link.

13          You could maybe argue that they are somewhat

14   identical, but still, I mean, once again we are talking about

15   obstruction in this particular case or some effort to obstruct

16   and it doesn't seem like there is a link.

17          What's the next statement or next thing?

18          MS. CALL:  If we may, Your Honor, I would like to take

19   a look at the actual report to see if the context was made more

20   clear regarding the context of the discussion because as I

21   said, it was at least my understanding -- I don't want to

22   misstate anything -- that it was related to testimony in this

23   case.

24          THE COURT:  Well, this is our chance to talk about it,

25   so we can't keep going back.  Otherwise, there is no closure on

Robert Bryant - Direct

1   it.  Okay.  What else?  So what about this -- how would the

2   government in regard to Stiller comments segregate out the

3   issue of civil litigation?  Because some of the statements seem

4   to refer -- in fact, two of them refer to civil litigation or

5   seem to be tied to it.

6          *MS. CALL:*  Yes, Your Honor.  And the precise time

7   frame I would have to take look at, but I think there is an

8   interrelation between the collection of documents by the

9   company for the civil case and the criminal matter in that they

10  for a period of time were both going on at the same time.  So

11  while that may have been specific to civil litigation, and we

12  would not attempt to draw that out with Mr. Bryant because we

13  have instructed him to avoid referencing the civil litigation,

14  but I think --

15         *THE COURT:*  If the statements were made in response to

16  the pendency of civil litigation, the fact that Mr. Bryant may

17  not mention that may nonetheless have to be brought out in

18  cross because that's what he was talking about or reacting to

19  or I'm not sure.

20         *MS. CALL:*  Yes, Your Honor.  I think it is a bit of a

21  catch-22 here that the civil litigation, the criminal

22  investigation are going on at the same time.  Obstructive

23  conduct may frankly relate to both.  And so there is a bit of a

24  hard time, you know, catching hairs or whatever in

25  distinguishing between the two, but I think the obstructive

Robert Bryant - Direct

1    conduct whether it is a civil price-fixing charge or a criminal

2    one is entirely relevant to the existence of the conspiracy

3    that's charged in the criminal case.

4         THE COURT:  Mr. Tubach?

5         MR. TUBACH:  Just one point on the timing, Your Honor.

6    The third statement is allegedly at the start of the civil

7    litigation which was in 2016.  That's when the civil litigation

8    started.  The criminal investigation was nowhere on the horizon

9    at that point.  There does come a point where there is an

10   overlap between criminal and civil.  This statement there is no

11   overlap at all.  The only way to get this in would be to say in

12   response to civil litigation he told someone else to go comb

13   through your files.  I don't see how -- it can't possibly

14   relate to the criminal investigation because it wasn't pending

15   at that point.

16        THE COURT:  Anything else on that point?

17        MS. CALL:  I don't believe that's a correct statement

18   about the beginning of the criminal investigation in terms of

19   the time line.

20        THE COURT:  Well, the question would be how

21   Mr. Stiller would be aware of a criminal investigation at that

22   time.

23        MS. CALL:  Yes.  And I don't think the report was

24   exactly clear on the time line or even frankly his knowledge of

25   exactly when the civil case started.  I don't believe he

Robert Bryant - Direct

1    followed the docket.  It's our understanding that litigation

2    holds didn't go out within Pilgrim's at least to Mr. Stiller

3    until 2017.  And by at least March of 2018 there was an

4    attempted interview of Mr. Stiller.  So the time frame is

5    rather short between when he would have been aware of the civil

6    litigation and the criminal investigation.

7          THE COURT:  Okay.  I don't see any relevancy to the

8    two statements about civil litigation.  I understand that there

9    could be a similar motivation, but if the -- it becomes rather

10   complicated and it would open the necessity of bringing in an

11   explanation of all the civil litigation in order to establish

12   that the motivations were the same.  And that frankly triggers

13   403 issues, which we have discussed before.  So that's -- to me

14   that's highly problematic.

15         Was the last one about the meeting with the attorneys?

16   This is on the top of Page 2, the second statement quoted,

17   looking at Docket No. 763.

18         MS. CALL:  I believe, Your Honor, our understanding of

19   this is that it was more recent.  In fact, it was after the

20   time Mr. Bryant obtained counsel in relation to his

21   representation in this matter.  So this would have less of the

22   issue with the civil litigation and would be more directly

23   related to his cooperation in the criminal investigation.

24         THE COURT:  Okay.  Mr. Tubach or anyone, response on

25   that particular statement?

Robert Bryant - Direct

1           MR. TUBACH:  Yes, Your Honor, that it's so recent

2    again that I do believe -- I know there are cases

3    distinguishing the *Grunewald* concept from the idea of proving

4    up the existence of the conspiracy, but this allegedly

5    obstructive conduct has nothing to do with these defendants, is

6    highly prejudicial.  And it's not alleged that any of these 10

7    defendants knew about it, heard about it, until it landed in a

8    302.  And I think it would be terribly prejudicial to allow

9    this evidence in.

10          THE COURT:  Anyone else?

11          Ms. Henry?

12          MS. HENRY:  It also does potentially relate to an

13   entirely different proceeding that involves Mr. Stiller.

14          THE COURT:  Response on that point, Ms. Call?

15          MS. CALL:  Mr. Stiller had not yet been charged at the

16   time of that conversation as well.  I will add that I did get

17   clarification regarding the possible testimony, the text

18   message that would spin the term industry or the conversation

19   about the term industry, I believe it was in that same report

20   that Mr. Stiller told Mr. Bryant that he anticipated testifying

21   for Defendant Penn.

22          THE COURT:  But the question is still did he say that

23   to Bryant?

24          MS. CALL:  Yes.

25          THE COURT:  What did he say again?

Robert Bryant - Direct

1            MS. CALL:  So it says -- I will read the full

2    paragraph from the report just for clarity:  Bryant recalled a

3    conversation with Stiller where he said he was carved out of

4    protections from the company's Plea Agreement and believed the

5    DOJ was upset with him because he could single-handedly swing

6    the case for Penn.  Stiller stated the reason Penn got indicted

7    was because he had his phone retention set to forever and not

8    30 days because Penn liked to keep everything.

9            THE COURT:  I didn't hear anything about testifying.

10           MS. CALL:  I wonder if I read the wrong portion.  I

11   apologize.

12           THE COURT:  Perhaps.

13           MS. CALL:  I think it's he could single-handedly swing

14   the case for Penn was a reference to testimony is what I meant

15   to point out.

16           THE COURT:  I am going to maintain my previous ruling

17   as to that.  As to the second statement on the top of Page 2,

18   once again of Docket No. 763, I am going to allow Mr. Bryant to

19   testify about that, not for the truth of the matter asserted,

20   but rather to prove the existence of the conspiracy.  And I

21   believe that that's supported by the Anderson case which is

22   417 U.S. 211, particularly at 219 and 220.  I will give the

23   jury a contemporaneous instruction that they are not to

24   consider it for the truth of the matter asserted, but only for

25   purposes, if any, of establishing existence of a conspiracy.

Robert Bryant - Direct

1          All right.  Are we ready to bring the jury in?

2          MS. CALL:  Your Honor, I don't believe we addressed

3   the last bullet point.

4          THE COURT:  That had the same civil lawsuit issue,

5   right?

6          MS. CALL:  Uh-huh.  And I will say this does relate

7   directly to some of the exhibits in the government's case as

8   there is a text message from the 2017 time frame where

9   Mr. Stiller tells Mr. Bryant no comp names over e-mail, so some

10  of this conversation is context to the secrecy and concealment

11  occurring around that time frame.

12         THE COURT:  Once again, at least as far as what I've

13  heard, it doesn't seem like there is much ability to

14  distinguish between not saying things over e-mail or text so

15  there wasn't a trail for purposes of the civil lawsuit or for

16  purposes of criminal matters, particularly this one.

17         MS. CALL:  I suppose our position Your Honor, would

18  just be that it doesn't necessarily make a difference.  The

19  case law that we've cited and the relevance here is just the

20  concealment of a conspiracy.  The purpose being whether they

21  are concealing it because of civil litigation or because of a

22  criminal litigation doesn't necessarily matter all that much

23  and isn't the reason we would be eliciting that testimony

24  because, as we said, the fact that they are concealing is just

25  proof of existence of the conspiracy.

Robert Bryant - Direct

1          *THE COURT:*  Right, but that would then require

2     explanation about the civil litigation.  I assume the civil

3     litigation isn't necessarily filed against Mr. Stiller.

4          *MS. CALL:*  I think, Your Honor, if it would be

5     appropriate, we could perhaps elicit the testimony in a way as

6     did there come a time when the acts of the conspirators became

7     more secretive without going into the reasons behind it.

8          *THE COURT:*  Well, maybe, but Mr. Tubach, let's hear

9     from him.

10         *MR. TUBACH:*  That sounds like a great idea, Your

11    Honor.

12         I don't think that's going to solve the problem.  The

13    other issue here is that at the time in 2016 or 2017, the civil

14    lawsuit was about something very different, which is output

15    restriction.

16         *THE COURT:*  I am sorry, what was it?

17         *MR. TUBACH:*  It was about an output restriction

18    allegedly, that the defendants -- the companies got together

19    and allegedly conspired to reduce the supply of chicken.

20    That's not at all what this case is about.  It has nothing to

21    do with supply reduction.  This case is allegedly about

22    price-fixing.  So any comments that would have been made in

23    relation to civil litigation couldn't have related to this

24    criminal case because Mr. Stiller didn't know about the

25    pendency of any criminal litigation at that point.

Robert Bryant - Direct

1        THE COURT:  And then at some later point the scope of

2    the civil litigation expanded?

3        MR. TUBACH:  After this indictment.

4        THE COURT:  Response on that, Ms. Call?

5        MS. CALL:  I believe the initial charges in the civil

6    case did plead somewhat broadly and included the term

7    price-fixing, although one component of that was an output

8    restriction agreement.  So I think it's a little hard to say

9    that it would be entirely separate from what is alleged here.

10       THE COURT:  Yeah, I will maintain the exclusion of

11   that because I think that especially with that clarification

12   not only does it raise a 403 issue, but I think it also raises

13   a relevancy issue given the fact that it appears as if the

14   civil litigation had a subject matter limitation that would

15   distinguish it from the essence of the Sherman Act claim here.

16            All right.  Let's bring the jury back in.

17            (Jury present.)

18       THE COURT:  Ladies and gentlemen, one thing I will

19   mention to you, and that is no problem if you are taking notes.

20   As I said before, you don't have to if you don't want to.  But

21   assuming you are, if you don't mind, could you make sure to

22   close your notebooks when you go in and out of the courtroom

23   just so they are not laying open, not that anyone is going to

24   try to look at them in any way, but if they are like laying

25   open, there might be -- we don't want anyone to think that

68

Robert Bryant - Direct

 1   anyone would look at them when they shouldn't.  So if you don't

 2   mind doing that, I would appreciate it.

 3            Mr. Koenig, we have got Mr. Bryant back on the witness

 4   stand.  We are ready to go.

 5            MR. KOENIG:  Thank you, Your Honor.

 6   BY MR. KOENIG:

 7   Q.  All right, Mr. Bryant.  I want to go back -- we will pick

 8   up where we left off in just a second, but I want to go back

 9   just to clarify something to understand -- help the jury

10   understand what you meant.

11            Do you remember me asking you about the conduct that

12   was the subject matter of the agreement not to prosecute you?

13   A.  I do.

14   Q.  And what was your response?  What did you call it?

15   A.  The price-fixing?

16   Q.  Yes.  Okay.  Now, and in your testimony you then talked

17   about sharing prices with competitors, right?

18   A.  That's correct.

19   Q.  And what was the purpose of sharing prices with

20   competitors?

21            MR. TUBACH:  Objection, Your Honor.

22            THE COURT:  Overruled.

23   A.  To increase prices or to limit a decrease in price.

24   BY MR. KOENIG:

25   Q.  So what did you mean when you said price-fixing?

Robert Bryant - Direct

1    *A.*   I mean to help each other increase or limit a decrease in

2    price.

3    *Q.*   So just so that the jury -- that's your understanding.

4    That's what you meant when you said the words price-fixing?

5    *A.*   That's correct.

6    *Q.*   And was it increasing or resisting a decrease for just

7    Pilgrim's?

8    *A.*   No.

9    *Q.*   For who?

10   *A.*   For all the parties involved.

11   *Q.*   The competitors.

12   *A.*   The competitors, yes.

13   *Q.*   Together.

14   *A.*   Together, yes.

15   *Q.*   All right.  So now, if you recall, we left off with

16   Mr. Brady.

17   *A.*   Yes.

18   *Q.*   And I believe you had said earlier that he was involved in

19   what you considered to be price-fixing.

20   *A.*   That's correct.

21   *Q.*   Now, what was your basis for saying that?

22   *A.*   Similar to before.  You know, I did overhear one phone call

23   in particular, information that Roger had relayed to me over

24   the course of the years.

25   *Q.*   Okay.  Can you be more specific in time frame?

Robert Bryant - Direct

1    A.   From 2014 until -- through 2017.

2    Q.   What specific information did -- and a reminder to use last

3    names.   You said Roger.

4    A.   Yes, Roger Austin, sorry, and Scott Brady.   You know, over

5    them discussing the KFC bid and Pilgrim's position on that bid,

6    various other information similar to what I testified earlier

7    about in that whether it be spec changes, bird weights,

8    whatever the customer had asked for or feedback from them at

9    that time.

10   Q.   And that includes bid prices, correct?

11   A.   That's correct.

12   Q.   Let me just also -- I want to clarify another thing.   Do

13   you remember when I was asking you questions about current

14   versus future pricing?

15   A.   I do.

16   Q.   All right.   I just want to make sure that the jury

17   understands your answer, okay?   So you've referenced this term

18   future pricing.

19   A.   Yes.

20   Q.   Right?

21   A.   Yes.

22   Q.   Now, can you explain to the jury what is a bid?

23   A.   A bid is -- and sometimes you will hear it an RFP or

24   request for pricing.   So sometimes they are annually.

25   Sometimes they are multi-year agreements in that the customer

Robert Bryant - Direct

1  will request us to submit pricing or a bid for a portion of

2  that business.

3  Q.  Is that the type of pricing you meant by future pricing?

4  A.  That's correct.

5  Q.  And then so at some point then in the bidding process you

6  either enter into a contract or you don't, right?

7  A.  That's correct.

8  Q.  Now, you also used the term current pricing.

9  A.  That's correct.

10  Q.  And so is that when you're -- did you mean by that when

11  current pricing to be when you're performing on the contract

12  after the bid and contract?

13        MR. FAGG:  Objection, leading.

14        THE COURT:  Sustained.

15  BY MR. KOENIG:

16  Q.  After the contract is entered into, what happens next?

17  A.  You have an agreed upon price and volume.

18  Q.  Agreed upon with?

19  A.  With the customer.

20  Q.  And does there come a time when you perform on the

21  contract?

22  A.  There does, yes.

23  Q.  And what is the basis for the price when you're performing

24  on the contract?

25  A.  The contract price that resulted from that negotiation.

Robert Bryant - Direct

1    Q.  All right.  And so what did you mean by current pricing?

2    A.  Current pricing would be the pricing that we were operating

3    on under the terms of that current contract, whether it be a

4    one-year or three-year contract.

5    Q.  Okay.  So if you could just give the jury an example and

6    let's just say 2014 KFC, for example.

7    A.  Okay.

8    Q.  Do you recall that time?

9    A.  I do.

10   Q.  So going through -- can you just explain the bidding

11   process and then go into 2015 and explain where future pricing

12   is and where current pricing is.

13   A.  So in 2014 we would have had negotiations for the contract

14   with KFC that would have began in 2015 and covered three years,

15   so 2015, 2016 and 2017.  There was a pre-bid meeting.  There

16   was a request from KFC for us among others to submit pricing.

17   Then there was negotiations about pricing.

18   Q.  So the request to submit pricing, Pilgrim's did submit

19   pricing; is that right?

20   A.  That's correct.

21   Q.  So now is that future pricing, current pricing?  What is

22   the bid?

23   A.  The bid is future pricing.

24   Q.  Okay.  Now continue, please.

25   A.  There would have been some negotiation after the submission

Robert Bryant - Direct

1   of the bid both on price and volume.  There would have come a

2   point where we agreed on those two terms.

3   Q.  We being?

4   A.  The Pilgrim's or whoever else the other customer would be

5   and the customer.  And then that contract would have been

6   slated to start around the first of the year of 2015.  And then

7   that would have been transitioned from the future to current

8   pricing at that point.

9   Q.  All right.  Thank you.

10          Now, you mentioned earlier, I believe, that at some

11  point I think 2017 Roger Austin mentioned something to you

12  about tracking current pricing.

13  A.  That's correct.

14  Q.  And did you have an understanding of why Roger Austin

15  would -- did, in fact, track current pricing?

16  A.  Yes.

17  Q.  Okay.  And what is the basis of your understanding?

18  A.  You know, my discussions with him on why he did that and

19  why he wanted that information.

20  Q.  And what then was your understanding?

21  A.  For lack of a better word, to keep score.

22  Q.  What does that mean, to keep score?

23  A.  So he would know where our competitor pricing was at and if

24  or when negotiations or some other -- something happened that

25  he needed that, it was readily available so it could be used.

Robert Bryant - Direct

1  *Q.* Let me back up. You did mention that Roger Austin

2  exchanged future pricing with competitors, correct?

3  *A.* That's correct.

4  *Q.* And did you have an expectation when that exchange occurred

5  that the competitor giving you the price was being honest with

6  you, giving you a real price, a real future price?

7      *MR. FELDBERG:* Objection, lack of foundation.

8      *MR. FAGG:* Also leading, Your Honor.

9      *MS. PREWITT:* And foundation.

10     *THE COURT:* I will sustain it on foundation grounds.

11  *BY MR. KOENIG:*

12  *Q.* When you received future pricing from competitors, what was

13  your expectation with respect to the reliability of that

14  information?

15     *MR. FELDBERG:* Same objection, Your Honor. It's the

16  same question essentially.

17     *THE COURT:* Sustained. If you could lay a foundation

18  for --

19  *BY MR. KOENIG:*

20  *Q.* Did you have an expectation regarding the reliability of

21  information that you obtained, the future pricing information?

22  *A.* Yes.

23  *Q.* And what is the basis for your expectation?

24  *A.* My past experience receiving information from Roger Austin

25  among -- and Scott Tucker.

Robert Bryant - Direct

1   Q.  So then what was your understanding as to the reliability

2   of that information?

3          MR. FELDBERG:  Objection, foundation.  The attempted

4   foundation is too vague to be reliable.

5          THE COURT:  Objection is overruled.  He can answer.

6   BY MR. KOENIG:

7   Q.  So what was your expectation with regard to the reliability

8   of competitors' future pricing information that you received?

9   A.  I never -- I did not -- I didn't question the information.

10  I trusted the information that I received from Roger Austin

11  among others.

12  Q.  All right.  Now, was there a mechanism for verifying?

13  A.  There was.

14  Q.  And what was that?

15  A.  So if you had the bid information and then you tracked the

16  customer, the current pricing after the new contract had been

17  initiated, then you would know that the information was

18  accurate.

19  Q.  And you're saying tracking competitors' current pricing.

20  A.  Correct, correct.

21  Q.  Okay.  Thank you.

22         All right.  Let's circle back to Mr. Brady.  I asked

23  you what your basis was for saying that Mr. Brady participated

24  in the price-fixing activity as you understand the term

25  price-fixing to be.

Robert Bryant - Direct

1      MR. TUBACH:  I continue to object to this

2  characterization.  It is not proper.  It is the ultimate issue

3  for the jury.  And the fact that the witness is characterizing

4  this conduct as price-fixing is not an accurate statement at

5  all.

6      THE COURT:  I will sustain the objection.  I think

7  that there might be a better way to come up with a different

8  term.  That term is to a large extent the ultimate issue.  And

9  so the witness' use of the term to describe his view of things

10  could cause confusion.  So perhaps you could figure out some

11  other term for him to refer to it.  I think you had referred to

12  it previously as activity, but maybe if there is some other

13  term you can use, you can use that too.  Go ahead.

14  BY MR. KOENIG:

15  Q.  Okay.  What was your basis for saying that Mr. Brady

16  participated in the activities that led to your agreement not

17  to be prosecuted?

18      MR. TUBACH:  Lack of foundation, what someone else did

19  and his belief.

20      THE COURT:  Well, I think --

21      MR. TUBACH:  He is trying to get in the back door what

22  the Court is saying he can't do.

23      THE COURT:  I think Mr. Koenig is just trying to look

24  for the appropriate term so he can trigger the subject that he

25  is asking about.  Overruled.

Robert Bryant - Direct

1    *BY MR. KOENIG:*

2    Q.   So your basis?

3    A.   Information relayed to me from Roger Austin and overhearing

4    a phone call during the KFC bid in 2014.

5    Q.   And what did you overhear?

6    A.   I overheard Roger and Scott Brady discussing Pilgrim's

7    position after we submitted our first round bid.

8    Q.   Okay.  Did you have an understanding or do you have an

9    understanding who at that time Scott Brady reported to?

10   A.   I'm not sure.  I think he reported --

11           *MR. KORNFELD:*  Objection, Your Honor, if he is not

12   sure.  I would ask him not to speculate.

13           *THE COURT:*  Sustained.

14   *BY MR. KOENIG:*

15   Q.   All right.  So we were going through this list of people

16   outside of Pilgrim's who you said participated in the price

17   sharing for the purpose of maintaining or resisting price

18   decreases, right, for raising prices or resisting price

19   decreases together, right?

20   A.   That's correct.

21   Q.   And who is the third name you mentioned?

22   A.   Carl Pepper.

23   Q.   Who is Carl Pepper?

24   A.   He was -- is or was a salesperson at Tyson Foods.

25   Q.   And was Tyson Foods a competitor?

Robert Bryant - Direct

1    *A.*  They were.

2    *Q.*  Of Pilgrim's I mean.

3    *A.*  That's correct, yes.

4    *Q.*  Do you have an understanding of who Carl Pepper reported to

5    at Tyson?

6    *A.*  I do not.

7    *Q.*  What is your basis for saying that Carl Pepper of Tyson's

8    engaged in price sharing for the purpose of competitors

9    together raising prices or defeating a decrease?

10           *MS. PREWITT:*  Objection, Your Honor, if I could be

11   heard.  He is eliciting testimony that would be speculative

12   because this witness is not in a position to be testifying as

13   to what someone else's purpose was, especially when that other

14   person was party to a conversation he was not a party to.

15           *THE COURT:*  Objection is overruled.  Mr. Koenig

16   obviously has to lay a foundation for his knowledge about that,

17   but he's been doing that.

18           Go ahead.

19   *BY MR. KOENIG:*

20   *Q.*  Okay.  Did you have an understanding that Mr. Pepper from

21   Tyson's was engaging in that conduct we've described?

22   *A.*  Yes.

23   *Q.*  What's the basis for your understanding?

24   *A.*  Information that was shared to me from Roger Austin.

25   *Q.*  So what then was your understanding of Mr. Pepper's

Robert Bryant - Direct

1  involvement?

2  A.  He had regular conversations with Roger Austin about

3  pricing and similar topics of customers and questions and that

4  they -- so it was more sharing of that type of information.

5  Q.  Let's go to a specific time frame now.  Did there come a

6  time in 2017 when Pilgrim's Pride and -- well, let me back up.

7        Are you familiar with the name RSCS?

8  A.  I am.

9  Q.  What does that mean?

10  A.  Restaurant Supply Chain Solutions.

11  Q.  And what is -- if I just say RSCS, you'll know what I'm

12  talking about?

13  A.  Yes.

14  Q.  Okay.  What is RSCS?

15  A.  It's like a procurement arm for --

16  Q.  Can you please speak up or lean forward a bit, please?

17  A.  It's like a procurement arm or a buying co-op for Yum

18  Brands, so they would buy the products for like KFC, Taco Bell,

19  Pizza Hut.

20  Q.  And did they have any other responsibilities with regard to

21  pricing?

22  A.  Yes.

23  Q.  What were those responsibilities?

24  A.  They would negotiate the contracts on behalf of the Yum

25  Brands.

Robert Bryant - Direct

1   Q.   All right.   And is it fair for me -- not for me.   Is it

2   fair to say that the term RSCS and KFC sometimes use those

3   interchangeably?

4   A.   Most often.

5   Q.   So if I say KFC, negotiations with KFC, you would

6   understand that that means RSCS?

7   A.   I would.

8   Q.   All right.   So did there come a time in 2017 when Pilgrim's

9   was negotiating with RSCS/KFC?

10  A.   Yes.

11  Q.   And when was that?

12  A.   January of 2017.

13  Q.   Okay.   And Pilgrim's -- so was Pilgrim's invited to bid by

14  RSCS at some point?

15  A.   We were.

16  Q.   And when was that?

17  A.   I don't recall exactly when we got the invitation, but we

18  were scheduled to meet with them in January of that year, I

19  believe it was January 27th.

20  Q.   All right.   Do you have an understanding of how the bidding

21  process worked in 2017?

22  A.   I do.

23  Q.   All right.   So if you could just explain to the jury for --

24  you know, starting with the RFP, the invitation to bid, through

25  when the final contract is signed just the process.

Robert Bryant - Direct

1   *A.*   Yes.  So there would be an e-mail sent inviting us to

2   participate in a bid.  Normally there would be a pre-bid

3   meeting.  Then there would be a deadline after the pre-bid

4   meeting for submission of your bid.  And then you would get --

5   or we would get feedback from our bid from KFC that told us --

6   gave us guidance or that we were too high or whatever.  And

7   generally they would ask for a second round of pricing

8   submission.  At some point we would come to a final agreement.

9   *Q.*   Okay.  And did you have an understanding of RSCS and KFC's

10  expectations of how you would formulate your bids?

11  *A.*   Yes.

12  *Q.*   What's your basis for that understanding?

13  *A.*   Over the years we developed a pricing model specifically

14  for KFC, and that would be used as the basis for our bid.

15  *Q.*   And so what was your understanding, then, of how RSCS and

16  KFC expected Pilgrim's to formulate its bids?

17        *MR. FELDBERG:*  Objecting, foundation.  His prior

18  answer doesn't establish a foundation.

19        *THE COURT:*  Overruled.

20  *A.*   They would expect us to use the pricing model to calculate

21  our cost in margin and formulate a final price submission.

22  *BY MR. KOENIG:*

23  *Q.*   Have you heard the term blind bid?

24  *A.*   I have.

25  *Q.*   What does that mean?

Robert Bryant - Direct

1   *A.*   A blind bid to me is when you submit a bid without

2   consultation and it's --

3   *Q.*   Without consultation?

4   *A.*   Correct.

5   *Q.*   With whom?

6   *A.*   With anyone other than --

7   *Q.*   Including competitors?

8   *A.*   Correct.

9         *MR. KORNFELD:*   I am going to object.   I would ask

10   Mr. Koenig allow the witness to finish his answer before we get

11   another question.

12         *THE COURT:*   Right.   That will make for a better record

13   if you could do so.

14         *MR. KOENIG:*   Fair enough.

15   *BY MR. KOENIG:*

16   *Q.*   Okay.   So your understanding of -- what does the term blind

17   bid mean to you?

18   *A.*   Blind bid would mean that you -- similar to a sealed bid

19   that others may be more accustomed to where you would put your

20   bid in an envelope and seal it so no one else would know what

21   it is, only the buyer, and submit your bid.

22   *Q.*   And based on what you stated earlier, was it your

23   understanding, then -- what was your understanding of the type

24   of bid RSCS expected?

25   *A.*   A blind bid.

Robert Bryant - Direct

1  Q.  Okay.  And what was your understanding of the reason for

2  the blind bid?

3         MR. KORNFELD:  Objection, Your Honor, foundation as to

4  his understanding of RSCS's expectations.

5         THE COURT:  Sustained.

6  BY MR. KOENIG:

7  Q.  Did you have an understanding of whether RSCS -- I am

8  sorry.  Let me back up.

9         Did you have an understanding as to why RSCS wanted

10  blind bidding?

11  A.  Yes.

12  Q.  What is the basis for your understanding?

13  A.  My prior experience with customers and the bid process and

14  in consultation with those customers.

15  Q.  And what then was your understanding?

16         MR. KORNFELD:  Objection, Your Honor, foundation.  His

17  experience with unstated customers, plural, doesn't establish a

18  foundation for his understanding of RSCS's expectations in

19  these negotiations.

20         THE COURT:  He has been in the business for a long

21  time.  Overruled.

22  BY MR. KOENIG:

23  Q.  So you can answer.

24  A.  My expectation was that --

25  Q.  Your understanding?

Robert Bryant - Direct

1  A.  My understanding was that KFC expected us to submit a blind

2  bid and our most competitive bid.

3  Q.  My question though was did you have an understanding of

4  why --

5  A.  Yes.

6  Q.  -- they expected that?

7  A.  So they would get the most competitive price.

8  Q.  And what do you mean by most competitive price?

9  A.  What I mean by most competitive price is if you're unsure

10  of what other competitors may submit, then you're going to

11  submit the lowest price possible to ensure that you retain your

12  business or grow your business.

13  Q.  So how did you -- well, how did you intend, if you did, how

14  did you intend RSCS and KFC to perceive Pilgrim's and its

15  suppliers during the bidding process in 2017?

16  A.  As independent actors.

17  Q.  As competitors?

18  A.  Correct.

19  Q.  All right.  So during the -- do you have an understanding

20  as to whether Pilgrim's and its competitors bidding in 2017 for

21  KFC were competing on price?

22  A.  I do.

23  Q.  What's the basis for your understanding?

24  A.  Once again, my past experience in the bidding process and,

25  you know, in conversation with KFC and other customers.

Robert Bryant - Direct

1    *Q.*   Okay.  Were you involved in the 2017 KFC negotiations?

2    *A.*   I was.

3    *Q.*   And so is that part of your basis?

4    *A.*   It is.

5    *Q.*   So what is your understanding as to whether Pilgrim's and

6    the other chicken suppliers in 2017 were competing on price?

7    What is your understanding?

8          *MR. FELDBERG:*  Objection, foundation.

9          *THE COURT:*  Overruled.

10         *MR. POLLAK:*  The objection was suppliers without

11   particularly who we are talking about.  I don't think there is

12   a foundation for every supplier.

13         *THE COURT:*  Sustained.  If you could clarify what he

14   meant -- means by suppliers.

15   *BY MR. KOENIG:*

16   *Q.*   Do you know who -- what chicken suppliers were bidding for

17   KFC business in 2017?

18   *A.*   I do.

19   *Q.*   And which suppliers were those?

20   *A.*   Pilgrim's, Koch, Claxton, Mar-Jac, George's, Tyson.  There

21   could have been some others, but to name a few.

22   *Q.*   Okay.  What was your understanding, then, of whether

23   Pilgrim's and the other competitors you just named were

24   competing on price for KFC 2017?

25         *MR. POLLAK:*  Your Honor, same objection.  He has not

Robert Bryant - Direct

1   established a foundation for why he would know what each of

2   those suppliers was doing.  He simply laid a foundation if

3   those were the competitors, not that he had a basis of

4   knowledge.

5          THE COURT:  Sustained.  Why don't we start with his

6   basis for knowing as to each.

7   BY MR. KOENIG:

8   Q.  Okay.  Let's get into that, then.

9          Heading into 2017 negotiations with KFC and RSCS, did

10  you have an expectation with respect to where prices were going

11  to go, like up or down?

12  A.  I did.

13  Q.  And what was the basis for your expectation?

14  A.  Market research, you know, that I performed that told me

15  that prices -- there were going to need to be some pricing

16  concessions for this bid.

17  Q.  So what was your expectation, then?

18  A.  Market -- that the prices would go down.

19  Q.  Now, why were you negotiating with KFC in 2017?

20  A.  We were near the end of the three-year agreement that we

21  had negotiated in 2014.

22  Q.  Could you repeat that please?  It was a little soft.

23  A.  We were negotiating -- or beginning negotiations for the

24  2018 contract, so the 2014 negotiations that covered calendar

25  years 2015, 2016 and 2017 was set to expire at the end of 2017,

Robert Bryant - Direct

1  so we were beginning the negotiations for calendar year 2018

2  and farther.

3  Q.  Okay.  And did you participate in the 2014 negotiations?

4  A.  I did.

5  Q.  And what happened with KFC's prices in the 2014

6  negotiations?

7  A.  They went up.

8  Q.  Can you quantify?

9  A.  Substantially, in the neighborhood of 15 to 20 cents.

10  Q.  Per?

11  A.  Per pound.

12  Q.  Okay.  Now, in all your years at Pilgrim's, were you aware

13  generally, even if you weren't involved in the negotiations or

14  the pricing, were you generally aware of year-to-year pricing

15  for a given customer like KFC?

16  A.  Yes.

17  Q.  And did you have an understanding of how much year to year

18  pricing typically changed for KFC?

19  A.  Yes.

20  Q.  And what was your understanding of how much it typically

21  changed?

22  A.  Not a lot.  Normally it was a few pennies up or down year

23  to year.

24  Q.  But then in 2014 what did you say the magnitude of the

25  price increase was?

Robert Bryant - Direct

1   A.  It was between 15 and 20 cents a pound.

2   Q.  Had you ever seen that big of a price increase before?

3   A.  Not for KFC, no.

4   Q.  So after 2014 and those price increases -- it was a

5   three-year deal.  I think you said that, right?

6   A.  That's correct.

7   Q.  So you're going into 2017.  And what was your expectation

8   for prices?

9   A.  That we would have to give a price decrease.

10  Q.  And you mentioned market factors, right?

11  A.  That's correct.

12  Q.  Were there any other factors?

13  A.  It was primarily market factors.  There were more supply

14  available in 2017 than there had been.  And the relationship

15  with KFC was not good in 2017 because of the price increases

16  that we got in the 2014 contract, so it damaged the

17  relationship a little bit.

18  Q.  All right.  I guess why, then, why did the negotiations in

19  2014 matter in 2017?

20  A.  A lot of the same people at KFC and they were upset with

21  Pilgrim's in general because they perceived us to be the price

22  leader in 2014.

23  Q.  And was it your understanding -- did you have an

24  understanding in 2014 what the other competitors you had just

25  previously mentioned, were they suppliers for -- did they bid,

Robert Bryant - Direct

1   those same competitors bid for KFC in 2014?

2   A.   Yes, it's my understanding they did.

3   Q.   And did you have an understanding as to whether those

4   competitors besides Pilgrim's also received a large price

5   increase?

6   A.   Yes.

7   Q.   And what is the basis for that understanding?

8   A.   My boss at the time, Jason McGuire, shared some e-mails

9   with me and phone conversations that others -- or other

10  competitors were getting similar price increases.

11  Q.   And by similar price increases, what was the price increase

12  you mentioned?

13  A.   It was between 15 and 20 cents.

14  Q.   Per pound?

15  A.   Per pound, yes.

16  Q.   All right.  Now, you mentioned that -- and correct me if

17  I'm wrong, but you mentioned that at some point in January 2017

18  Pilgrim's was invited to submit a bid for KFC business, right?

19  A.   That's correct.

20  Q.   Do you recall when that bid was due?

21  A.   The first week of February.

22  Q.   But you mentioned before that you had a January 27th

23  meeting with RSCS and KFC, right?

24  A.   That's correct.

25  Q.   Why were you meeting with -- why was there a meeting

Robert Bryant - Direct

1   scheduled for before the bid was due?

2   A.   We were doing a prebid meeting.

3   Q.   Was that typical?

4   A.   It was.

5   Q.   And what was the type of stuff that you would discuss at

6   prebid meetings?

7   A.   Normally it would be -- we would discuss Pilgrim's

8   position, you know, whether it be market conditions or

9   whatever, and KFC would state their position on the market or

10  expectations from the bid.  And if there was any unresolved

11  issues that had arisen since the last meeting or something that

12  they wanted to bring out or ask for that would be differently

13  in this round of bidding, that would be brought up in that

14  meeting.

15  Q.   Did you do anything -- first of all, did you attend the

16  January 27th meeting?

17  A.   I did.

18  Q.   And who else from Pilgrim's attended that meeting?

19  A.   Myself, Roger Austin, Scott Tucker, Justin Gay and Tim

20  Stiller.

21  Q.   And who from RSCS attended that meeting?

22  A.   Pete Suerken, Sara Fisher, Steve Campisano and Rich

23  Eddington.

24  Q.   If you could explain, who is Pete Suerken?

25  A.   Pete Suerken was like the lead negotiator at KFC.  He was

Robert Bryant - Direct

1    responsible for that team on the KFC side.

2    Q.  And who was the sort of his opposite on the Pilgrim's side?

3    Who was in charge of the negotiations?

4    A.  It would have been Roger Austin.

5    Q.  And was Pete Suerken involved in the 2014 negotiations?

6    A.  He was.

7    Q.  All right.  Did you do anything to prepare for that January

8    27th meeting?

9    A.  I did.

10   Q.  If we can take a look at Government Exhibit 1882.

11           All right, Mr. Bryant.  Do you recognize Government

12   Exhibit 1882?

13   A.  I do.

14   Q.  And what is it?

15   A.  It's an e-mail from me to Roger Austin on January 17th,

16   2017.

17   Q.  What does the e-mail generally relate to?

18   A.  The KFC meeting we were going to have on January 27thof

19   2017.

20           MR. KOENIG:  Your Honor, the government offers

21   Government Exhibit 1882.

22           MR. FELDBERG:  No objection from us.

23           THE COURT:  Any objections to the admission of Exhibit

24   1882?

25           MR. KORNFELD:  Your Honor, I think this contains

Robert Bryant - Direct

1    double hearsay.

2         THE COURT:  Meaning?  I am being shown one page.  Is

3    it a one-page document?

4         MR. KORNFELD:  That's what I am looking at, Your

5    Honor.  The author is talking about another conversation with

6    another person who is not in the chain.

7         MS. HENRY:  And that would be Sara Fisher.

8         MR. KORNFELD:  Thank you.

9         THE COURT:  Is Ms. Fisher part of the Court's previous

10   ruling?

11        MR. KOENIG:  No, Your Honor.  She was on the RSCS side

12   of things.

13        THE COURT:  Okay.

14        MR. KOENIG:  And really it's for the effect on the

15   listener for that part and we aren't going to dwell on it.

16        MR. KORNFELD:  I am not sure which listener the

17   government is talking about, but I am not sure that that's even

18   relevant.

19        THE COURT:  Anything more, Mr. Koenig, on this one?

20        MR. KOENIG:  Any more argument on it?

21        THE COURT:  Yes, as to the objection.

22        MR. KOENIG:  Well, I guess it's, you know -- I mean,

23   all the government is trying to elicit here is just the

24   preparations they went through.  It's just not for the truth.

25        THE COURT:  Okay.

Robert Bryant - Direct

1         MR. KOENIG:  By that I mean the statement that he

2    is --

3         THE COURT:  Understand.  The objection will be

4    overruled in part.  Exhibit 1882 will be admitted.

5         However, ladies and gentlemen, there is a reference to

6    what someone referred to simply as Sarah wants.  That portion

7    of it, in other words, what Sarah wants should not be

8    considered by you for the truth of the matter.  We talked about

9    that earlier in you may recall a previous exhibit.  However,

10   the rest of the statements you can consider for the truth of

11   the matter asserted, and to that extent the objections will be

12   overruled.

13        MR. KOENIG:  Thank you, Your Honor.  And we would ask

14   at this time to publish it to the jury.

15        THE COURT:  You may.

16   BY MR. KOENIG:

17   Q.  All right.  If we could just focus on first the bottom

18   e-mail on the page.  Have you had a chance to review that?

19        Ms. Pearce, could you just blow up the bottom portion?

20        THE COURT:  And let me just ask Ms. Perez and

21   Mr. Kahler, can you see that?

22        JUROR:  I can see it now.

23        THE COURT:  Understood.

24   BY MR. KOENIG:

25   Q.  So what is the -- it looks like an e-mail from you.  What

Robert Bryant - Direct

1  were you trying to convey just generally?

2  A.  In general, I was trying to brainstorm a list of topics

3  that could come up with KFC at the January 27th meeting.

4  Q.  All right.  And do you see the line that says:  Will Pete

5  actually attend the meeting?

6  A.  I do.

7  Q.  Who is the Pete you are referring to?

8  A.  Pete Suerken.

9  Q.  Why did you ask, Will Pete actually attend the meeting?

10  A.  I wanted to know if he would actually be there because he

11  was their lead negotiator and it gave me an indication of how

12  serious the meeting would be.

13  Q.  And who did you send that e-mail to?

14  A.  Roger Austin and Scott Tucker.

15       MR. KOENIG:  All right.  Let's go up to the next

16  e-mail, if you could just blow that one up, just the next

17  e-mail itself with the header information, please.

18  BY MR. KOENIG:

19  Q.  All right.  So what are we looking at here?

20  A.  An e-mail from Roger Austin to me and Scott Tucker on

21  January 17, 2017.

22  Q.  So this is Roger Austin's response to your e-mail below,

23  right?

24  A.  That's correct.

25  Q.  Can you read to the jury the last two sentences of that

Robert Bryant - Direct

1   e-mail?

2   A.  Claxton meets with them in Thursday and I will get a blow

3   by blow Friday morning.  Koch meets with them in Friday.

4   Q.  Let's just start with the first sentence.  Now, wait.  What

5   is the date of this e-mail?

6   A.  January 17th, 2017.

7   Q.  All right.  What day of the week was that?

8   A.  Tuesday.

9   Q.  So what would be the date of the coming Thursday?

10  A.  That would be the 19th.

11  Q.  And Friday?

12  A.  The 20th.

13  Q.  And when was Pilgrim's meeting scheduled for with RSCS?

14  A.  The 27th.

15  Q.  All right.  So could you explain what your understanding

16  was of the first highlighted sentence starting with Claxton?

17  A.  That Claxton had a meeting with KFC that Thursday the 19th,

18  and that Roger and Scott Brady would talk on Friday morning and

19  he would give -- provide me with the details of the outcome of

20  that meeting.

21  Q.  And so you made a jump there from Claxton to Scott Brady.

22  What's your basis for making that jump?

23  A.  Roger and Scott -- Roger Austin and Scott Brady talked and

24  Roger relayed information to me routinely from Scott Brady and

25  I associated Scott Brady works at Claxton.

Robert Bryant - Direct

1   Q.   Okay.  And them, what is your understanding of them?

2   A.   KFC.

3   Q.   All right.  And you may have touched on this, but blow by

4   blow, what does that mean to you?

5   A.   That means the details of the meeting with KFC between

6   Claxton and KFC.

7   Q.   Why would you care what happened?  Did you care what

8   happened with the meeting with KFC and Claxton?

9   A.   Yes.

10  Q.   Why?

11  A.   Whatever information we could gain from that, it would help

12  in our preparation with KFC.  Their position on the markets, if

13  they offered up additional loads to Claxton, who were they

14  coming from, a whole host of questions could come from that

15  meeting.

16  Q.   All right.  Now the second line, could you just re-read

17  that, the second highlighted line?

18  A.   Koch meets with them in Friday.

19  Q.   What did you understand that to mean?

20  A.   That meant that Bill Kantola was going to meet with KFC on

21  that Friday and that Roger and Bill -- Roger Austin and Bill

22  Kantola would speak and we would find out the details of that

23  meeting.

24  Q.   Okay.  And again, you made the jump from Koch to Kantola.

25  Why did you make that jump?

Robert Bryant - Direct

1   A.  Because Bill Kantola and Roger Austin spoke routinely.  And

2   I got information from Roger that was provided by Bill Kantola

3   and Bill Kantola worked at Koch.

4   Q.  Again, did you care what happened at the Koch RSCS meeting?

5   A.  Yes.

6   Q.  And why?

7   A.  For the same reasons, what did KFC tell Koch.  Was there

8   any differences in the messaging to Koch and Claxton and what

9   impact would that have on our negotiation.

10  Q.  And you said you attended the January 27th meeting?

11  A.  That's correct.

12  Q.  At that meeting did you tell RSCS that you had already

13  learned or that you were trying to learn what was going on with

14  Koch and Claxton's meetings?

15  A.  Not that I recall, no.

16  Q.  Why not?

17  A.  We wouldn't want them to know that we were sharing that

18  type of information.

19  Q.  Them being KFC and RSCS?

20  A.  That's correct.

21  Q.  Why wouldn't you want them to know?

22  A.  Because it could be -- the customer would probably perceive

23  that as us undermining their bid process.

24  Q.  How so?

25  A.  Because we would be working together against their bid

Robert Bryant - Direct

1  process effectively undermining them.

2  Q.  Working together to accomplish what?

3         MR. TUBACH:  Objection as to foundation, lack of

4  foundation.

5         THE COURT:  Overruled.

6  A.  Working together against their best interests and in our

7  best interests.  And by ours I mean our competitors'

8  collectively best interest.

9  BY MR. KOENIG:

10  Q.  Okay.  But again to what end?

11  A.  To -- in 2017 it was about limiting a price decrease.

12  Q.  Together?

13  A.  Together, yes.

14  Q.  Competitors together.

15  A.  Correct.

16  Q.  Okay.  Now, so if we could go then now to the very top

17  e-mail.  Who is this from and to?

18  A.  This is from myself to Roger Austin.

19  Q.  In the previous part of the e-mail chain Scott Tucker was

20  on there, right?

21  A.  That's correct.

22  Q.  But he doesn't appear on the header here.

23  A.  That's correct.

24  Q.  Why is that?

25  A.  Because I removed him from the e-mail chain.

Robert Bryant - Direct

1   *Q.*  Do you specifically remember this e-mail?

2   *A.*  I do.

3   *Q.*  How many e-mails did you receive in January of 2017?

4   *A.*  Probably -- I mean, thousands.

5   *Q.*  Do you remember each and every one of those?

6   *A.*  No.

7   *Q.*  So why do you remember this one?

8   *A.*  Because of what I wrote and --

9   *Q.*  What did you write?

10  *A.*  I would like to know where we need to be No. 2 in price if

11  you can find out.

12  *Q.*  And what did you mean by that?

13  *A.*  I was asking Roger if he could find out what price we

14  needed to submit for the bid to be second highest in price.

15  *Q.*  And what was -- did you have an expectation as to how Roger

16  Austin would go about doing that?

17  *A.*  I did.

18  *Q.*  What was your expectation?

19  *A.*  My expectation was that he would use his contacts at other

20  companies that I mentioned before like Carl Pepper and Bill

21  Kantola and Scott Brady and come back to me with pricing

22  guidance on where our bid needed to be to be No. 2 in price.

23  *Q.*  And why did you want to be No. 2 in price?

24  *A.*  Because the relationship with KFC was damaged.  We were the

25  price leader in 2014, so if we were No. 2 in price, then we

Robert Bryant - Direct

1   weren't the price leader anymore and we didn't sacrifice any

2   more margin than we had to to try to repair that relationship.

3   Q.  Well, why didn't you -- if you are trying to repair the

4   relationship, why didn't you say where do we need to be to be

5   down --

6           MS. HENRY:  Objection, leading.

7           THE COURT:  He hasn't asked the question yet.  Go

8   ahead.

9   BY MR. KOENIG:

10  Q.  Why didn't you ask where do we need to be to be the lowest?

11          MS. HENRY:  Objection, leading.

12          THE COURT:  Overruled.

13  A.  Because being No. 2 satisfied being not the highest price

14  but still maximized profitability.

15  BY MR. KOENIG:

16  Q.  All right.  And then you said at the end of the sentence:

17  If you can find out.

18          So if you had this expectation of how you would do it,

19  why did you write "if you can find out"?

20  A.  At this point I had --

21  Q.  Can you lean forward a little, please?

22  A.  Yeah.  At this point I had recently been promoted and this

23  was the first time I can recall actually asking somebody to

24  obtain this type of information.  And I really wasn't sure how

25  to go about it, but I understood the expectation for the bid.

Robert Bryant - Direct

1   So --

2   Q.   What was the expectation for the bid?

3   A.   That I needed to have pricing information.  I needed to

4   have pricing information prior to submitting the bid.

5   Q.   Where did you get that idea?

6   A.   From the 2014 negotiations.

7   Q.   And you said get pricing information.  Pricing information

8   from who?

9   A.   Competitor information, competitor pricing information.

10  Q.   All right.  So are there times during your career when you

11  were not aware of competitor pricing going into a bid?

12  A.   Yes.

13  Q.   And conversely were there times when you were aware?

14  A.   Yes.

15  Q.   Which of those is this?

16  A.   This was an instance that I --

17  Q.   Maybe not at this point, but --

18  A.   Yes.  I did receive --

19        MR. KORNFELD:  Objection, Your Honor.  I would ask we

20  be allowed to hear the answer before we hear another question.

21        THE COURT:  Sustained.

22        MR. KOENIG:  My apologies.

23  A.   I did receive competitor pricing information for this bid.

24  BY MR. KOENIG:

25  Q.   And how did you receive it?

Robert Bryant - Direct

1    *A.*  It was a phone call from Roger Austin.

2    *Q.*  And what did he tell you?

3    *A.*  I mean, he -- when he called, he gave me each company's

4    price and on both eight-piece and dark meat.

5    *Q.*  Could you explain to the jury -- you just used two terms,

6    eight-piece and dark meat.  Can you explain those?

7    *A.*  Yes.  Eight-piece is a typical eight-piece cut-up chicken

8    that's fried.  And then dark meat would just be the drumstick

9    and the thigh or thigh quarter.  That's when you split a leg

10   quarter.  KFC on their bone-in program bought primarily

11   eight-piece, but they also had dark meat that used a

12   supplemental -- supplemental pieces.

13   *Q.*  So was Pilgrim's bidding on both eight-piece and dark meat

14   in this round of negotiations?

15   *A.*  We were.

16   *Q.*  And when you received that pricing information from Roger

17   Austin, did you find it useful?

18   *A.*  I did.

19   *Q.*  How so?

20   *A.*  We used that information to formulate our bid submission

21   for 2017.

22   *Q.*  All right.  And what was your understanding -- well,

23   scratch that.

24           So you used it to formulate your bid submission.  Can

25   you explain that a little bit more?

103

Robert Bryant - Direct

1   A.  We used the information to come up with our price.  So, you

2   know, I wrote in here we wanted to be No. 2 in price.

3   Ultimately I think we came in at No. 3 on price when we finally

4   submitted the bid.

5   Q.  You mentioned -- earlier you testified that the goal was to

6   resist going lower in price than you had to, correct?

7   A.  That's correct.

8   Q.  And was receiving that price, was it -- and I think you

9   also said resisting going lower, not just Pilgrim's, but

10  together the competitors.

11  A.  That's correct.

12  Q.  Was the information you received from Roger Austin useful

13  in that regard?

14  A.  It was.

15  Q.  How so?

16  A.  Like I said, we used that to see where others were in

17  price, and then we used it to formulate our price for the

18  submission.  Without that information, I mean, I can't say

19  where our price would have been, how much we would have

20  submitted lower or not.

21  Q.  And I think you testified before that your understanding

22  was that the exchange of this future pricing or bids was a

23  two-way street.  Did you say that?

24  A.  I did.

25  Q.  Can you just explain to the jury what that meant?

Robert Bryant - Direct

1   *A.* That meant that -- my understanding was that Roger was

2   receiving this information from our competitors, so he was

3   sharing information with them as well.  They wouldn't just

4   provide their price without getting our price in return.

5   *Q.* And so was it your expectation, then, that when you asked

6   Roger Austin to find out the prices, was it your expectation

7   that he would also be giving Pilgrim's future bid pricing?

8   *A.* Yes.

9   *Q.* And did you have an understanding of how the competitors on

10  this bid would use Pilgrim's information?

11          *MR. FAGG:* Objection, foundation.

12          *MR. KORNFELD:* And I would join that.  And again, we

13  are talking competitors, plural.

14          *THE COURT:* He can answer yes or no and then

15  foundation can be established.

16          Go ahead.

17  *A.* Yes.

18  *BY MR. KOENIG:*

19  *Q.* You did have an understanding.  Okay.  And who were the

20  competitors also bidding in competition with Pilgrim's in 2017

21  for the KFC price?

22  *A.* In general, they are the same competitors I mentioned, so

23  Koch, Claxton, Mar-Jac, Tyson, George's.  I think I covered

24  them all.  Pilgrim's.

25  *Q.* And was it your expectation that some or all of those

1   competitors would receive Pilgrim's bid from Roger Austin?

2   A.   Yes.

3   Q.   All right.   Now, you said you had an understanding of what

4   the competitors you just named on this bid would do with that

5   information, right?

6   A.   That's correct.

7   Q.   And what is the basis for your understanding?

8   A.   You know, what I seen in 2014 during the bid process and

9   through the course of the years, that they would use that

10  information to be in line with each other.

11  Q.   Okay.   Well, so what was your understanding, then, that the

12  competitors you just named, what was your understanding that

13  they would do with Pilgrim's bid information?

14          MR. KORNFELD:   Objection, Your Honor, foundation.   My

15  client, Claxton, for example, there is no foundation that this

16  witness has any understanding of how he even knew our prices.

17          THE COURT:   Sustained.

18  BY MR. KOENIG:

19  Q.   Let's go back to your basis.   In 2014 was it your

20  understanding that Pilgrim's bid information was provided to

21  Claxton?

22  A.   Yes.

23  Q.   To Koch?

24  A.   Yes.

25  Q.   What happened after they received that information?   What

Robert Bryant - Direct

1   happened to bid prices?

2   *A.*  In 2014 they went up.

3   *Q.*  All right.  Together, the competitors together went up?

4   *A.*  It's my understanding, yes.  I say the industry, but our

5   competitors, yes, raised prices together.

6   *Q.*  So does that form the basis for your understanding or

7   expectation of what Claxton, Koch, other competitors on this

8   2017 bid would do with Pilgrim's bid information?

9   *A.*  It did.

10  *Q.*  All right.  What was that understanding?

11        *MR. KORNFELD:*  Objection, Your Honor.  I would

12  respectfully suggest that he still hasn't laid the foundation.

13  And as an aside, I would ask if the government is done with

14  this exhibit, that it be removed from the screen, please.

15        *MR. KOENIG:*  Sure.

16        *THE COURT:*  Okay.  We can take the exhibit down.

17        Mr. Pollack?

18        *MR. POLLAK:*  Yes, Your Honor.  The question a moment

19  ago was about some or all of the competitors when he was laying

20  the foundation, and then he specifically asked in '14 about

21  Claxton and Koch.  But now he is asking for an observation

22  about all of the competitors, so I don't think the foundation

23  has been laid.

24        *THE COURT:*  The objection will be overruled.  He

25  testified previously about all of the different competitors and

Robert Bryant - Direct

1   that's the basis for his expectations in 2017.

2   BY MR. KOENIG:

3   Q.  Okay.  So Mr. Bryant, what was your expectation that the

4   competitors on this bid in 2017 for KFC would do with Pilgrim's

5   bid information?

6            MR. POLLAK:  Objection, Your Honor.  He hasn't

7   testified that they all had Pilgrim's bid information.  He only

8   testified that those were given to Koch and Claxton.

9            MR. KOENIG:  I disagree.  He said he expected that

10  Pilgrim's bid information would make its way to all the

11  competitors.

12           THE COURT:  Overruled.

13  BY MR. KOENIG:

14  Q.  You can answer.

15  A.  My expectation is that they would use that to formulate

16  their own bids.  In 2017 it was so we could limit price

17  decreases.

18  Q.  And who is we?

19  A.  Pilgrim's among the competitors.

20  Q.  So we includes Pilgrim's and other competitors.

21  A.  That's correct.

22  Q.  And again, did you have an expectation as to whether if a

23  competitor in this bid received Pilgrim's bid information they

24  would use it to undercut Pilgrim's?

25  A.  That was not my expectation, no.

Robert Bryant - Direct

1   Q.  Well, I just asked if you had an understanding.

2   A.  I had an understanding, yes.

3   Q.  And what is the basis for your understanding?

4   A.  Well, in 2014 and other times when those agreements or

5   those -- that information was exchanged, that it was not about

6   volume.  It was about pricing only.  And if there was a risk to

7   volume, then the account owner would have been asked to manage

8   that.

9   Q.  Do you recall a time when Pilgrim's future pricing, their

10  bids were given to a competitor who undercut Pilgrim's?

11  A.  I don't recall that.  I mean, there could have been a time

12  that happened, but nothing comes to mind right away.

13  Q.  All right.  And so we have gone through the purpose of

14  Pilgrim's -- Pilgrim's purpose or your purpose in receiving the

15  future pricing from competitors and the purpose or what your

16  expectation was of Pilgrim's giving pricing information.  One

17  last thing.  Did you have an understanding of the purpose of

18  competitors on this 2017 bid, did you have an understanding of

19  their purpose in providing you with the future pricing bid

20  information?

21  A.  Yes.

22  Q.  And what was your basis for that understanding?

23  A.  The same as before, previous bids and information that was

24  exchanged in 2014 and after.

25  Q.  All right.  And so what was your understanding of their

Robert Bryant - Direct

1   purpose?

2           *MR. KORNFELD:*  Objection, foundation, Your Honor.

3           *THE COURT:*  Let me hear from Mr. Pollack first.

4           *MR. POLLAK:*  It is foundation, but can we have a side

5   bar?

6           *THE COURT:*  We can.  Can you hear me, Mr. Pollack?

7           *MR. POLLAK:*  I can, Your Honor.

8           *THE COURT:*  Mr. Koenig?

9           *MR. KOENIG:*  Yes.

10          *THE COURT:*  Did anyone else want to join in on that?

11          *MS. PREWITT:*  Elizabeth Prewitt for Mr. Mulrenin.

12          *MR. FAGG:*  John Fagg.  We may have a separate

13  objection as well.

14          *THE COURT:*  First of all let's start off with

15  Mr. Pollack.

16          *MR. POLLAK:*  Thank you, Your Honor.  I believe the

17  testimony to date has been that he has testified that Pilgrim's

18  bid information was shared with Koch and with Claxton and that

19  he had an expectation that companies with whom Pilgrim's bid

20  information was shared would reciprocate by giving their bid

21  information to him.  He's testified as to who all the

22  competitors were.  And when he was asked about whether or not

23  this sharing occurred, he was specifically asked did it occur

24  with some or all of the competitors.

25          Mr. Koenig said a minute ago that there was testimony

Robert Bryant - Direct

1    that he had an expectation that Pilgrim's bid information would

2    be given to all of the competitors.  I don't think that that is

3    an accurate characterization of his testimony and I don't think

4    he has laid a foundation for him to have that expectation even

5    had he testified to it.  He said that he observed phone

6    conversations between Mr. Austin and Koch, Mr. Austin and

7    Claxton and Mr. Austin and Tyson's and that's it.

8         THE COURT:  Let's have Mr. Koenig respond in terms of

9    just what the testimony has been first.  Go ahead, Mr. Koenig.

10        MR. KOENIG:  Well, the testimony has been that in 2014

11   he observed this same type of behavior and he said that he

12   understood that the pricing went to all the competitors, but I

13   think more to the point --

14        MR. TUBACH:  Your Honor, sorry.  Just to interject, he

15   is talking next to the mic and it's undoing the effect --

16        MR. KOENIG:  It's off.  It's off.

17        THE COURT:  It's probably a good idea to avoid the

18   microphone just so -- not that Mr. Koenig didn't take the

19   precaution, but just in the future.

20        MR. KOENIG:  Is it okay if I stand here?

21        THE COURT:  You can stand pretty much wherever you

22   want.

23        MR. KOENIG:  Anyway, I think more to the point --

24        THE COURT:  Mr. Koenig, you can also talk much more

25   softly.  Of course, I can't monitor the extent to which a loud

Robert Bryant - Direct

1   voice can be heard over the white noise because I am listening

2   to the transceiver, but we don't have to talk too loud.  Go

3   ahead.

4          MR. KOENIG:  Okay.  I am sorry.  It's in my nature, I

5   guess.  I apologize and will try to speak softer.  So I think

6   this whole -- this whole line of objections will be rendered

7   pretty much moot by an exhibit we have coming up, so I can just

8   delay asking him the questions until our next exhibit.

9          THE COURT:  Okay.  So anything else then, Mr. Pollack?

10         MR. POLLAK:  I would just ask the Court particularly

11  if the Court has the opportunity to review the transcript to

12  review its prior ruling on whether or not that objection should

13  have been sustained.

14         THE COURT:  I am sorry, when you say that objection,

15  which objection?

16         MR. POLLAK:  Previously I had objected and Mr. Koenig

17  had represented that the witness had testified that it was the

18  witness' expectation that Pilgrim's bid information would be

19  given to all competitors.  And I think the Court overruled my

20  objection after that representation.  I think if you go back to

21  the transcript, the testimony will not support that

22  representation.

23         THE COURT:  Well, once again, the question that is

24  being asked of the witness, which I don't think we are going to

25  get into right now, but it was his expectation.  That

Robert Bryant - Direct

1   expectation can be based on 2014.  And whether or not the

2   question Mr. Koenig previously asked was just limited to just

3   two, that doesn't mean that his expectation wouldn't have been

4   all, so that's why the objection was overruled.

5          MR. POLLAK:  But the objection was the fact that he

6   had not laid a foundation as to why he would have an

7   expectation with respect to the others.

8          THE COURT:  Right.  He testified it was based upon at

9   least in part 2014 where he observed all the prices of

10  competitors involved in those -- that bidding process going on.

11         All right.

12         MR. GILLEN:  Just for the record, Craig Gillen.  I

13  will state that I believe the record reflects that this witness

14  did not "overhear" any discussions between Mr. Austin and

15  anyone from Tyson.  I think when counsel -- Mr. Pollack might

16  have indicated that he did.  My recollection of the evidence is

17  that he said he was told by Mr. Austin that he had communicated

18  with Mr. Pepper, but he did not himself overhear any of those

19  calls.

20         THE COURT:  Yeah, understood.

21         Mr. Kornfeld?

22         MR. KORNFELD:  Thank you, Your Honor.  In addition to

23  the foundation objection, I don't think this witness'

24  expectation is relevant under 401.  It also calls for

25  speculation.  How he knows how, you know, Mr. Fries or Claxton

Robert Bryant - Direct

1    as an example would use this information, he has already -- he

2    hasn't established that he understands how they do the pricing.

3    So I think it's not -- his expectation is not relevant as to

4    how the producers would use it aside from the foundation.  And

5    if anything, he is speculating because there is nothing in the

6    record to establish, other than he could barely identify

7    Mr. Brady, there is nothing in the record to establish he knows

8    a darn thing about Claxton.

9         THE COURT:  Well, that objection will be overruled

10   too.  He testified he was involved in 2014 in price

11   negotiations with KFC.  He is closely involved in the price

12   negotiations here.  He is communicating with Mr. Austin.  He is

13   asking Mr. Austin to figure out where he would need to be,

14   where Pilgrim's would need to be to be No. 2.  Therefore, an

15   expectation as to whether or not price information would be

16   shared is an appropriate thing for him to worry about because

17   he testified he would expect then that Pilgrim's information

18   would ultimately be shared as well.

19         Mr. Fagg?

20         MR. FAGG:  Thank you, Your Honor.  A slightly

21   different issue.  I would just ask that the government when

22   they are asking their questions simply ask questions and not

23   restate about what was previously testified to.  There have

24   been a number of questions including one quite recently in

25   which it essentially amounts to the prosecutor testifying on

Robert Bryant - Direct

1   direct examination to a witness before he sets up the next

2   question, so we would just ask that the question be simply

3   limited to that, questions only.

4        THE COURT:  Some sign posting can be helpful to

5   maintain clarity.  And also Mr. Koenig on occasion has been

6   asking the witness to lean closer to the microphone, but

7   obviously there tends to be a correlation between that and

8   testimony that Mr. Koenig thinks may be important, but whenever

9   it occurs would be the best time to ask the witness to lean

10  into the microphone, not particular times.

11       MR. KOENIG:  If I did that, it was not intentional.

12  It was just when I noticed that because I am having trouble

13  hearing him, but I will be mindful of that going forward.

14       THE COURT:  Right.  We will just try to remind the

15  witness of that.

16            Anything else, Mr. Fagg?

17       MR. FAGG:  No, Your Honor.  Thank you.

18       THE COURT:  Thank you.

19     (In open court:)

20       THE COURT:  The objection is overruled.  Go ahead.

21  BY MR. KOENIG:

22  Q.  So what then was your understanding of your competitors' in

23  this bid purpose in giving their future pricing to Pilgrim's?

24       MR. POLLAK:  Your Honor, I thought that Mr. Koenig

25  said that he was going to withdraw the question and use an

Robert Bryant - Direct

1   exhibit.

2         *MR. KOENIG:*  And then you said overruled.

3         *THE COURT:*  Well, my expectation was you were going to

4   move on.

5         *MR. KOENIG:*  Okay.  I will.  I misunderstood.

6         Actually, I do want to pull up Exhibit 1882 one more

7   time.  It's already in evidence.

8         *THE COURT:*  That may be displayed.

9         *MR. KOENIG:*  Ms. Pearce, could you just go to the top

10  e-mail?

11  *BY MR. KOENIG:*

12  *Q.*  All right.  So Mr. Bryant, you testified I believe earlier

13  that you remembered specifically this e-mail.

14  *A.*  I do.

15  *Q.*  Why did you -- why do you remember that e-mail?

16        *MR. KORNFELD:*  Your Honor, he asked that question a

17  while back.  Asked and answered.

18        *MR. KOENIG:*  I will rephrase it.

19        *THE COURT:*  Go ahead.

20  *BY MR. KOENIG:*

21  *Q.*  When you sent this e-mail, how did it make you feel?

22        *MR. KORNFELD:*  Objection, irrelevant as to how it made

23  him feel.

24        *THE COURT:*  Overruled.

25  *A.*  I immediately wished I hadn't sent the e-mail.  I regretted

Robert Bryant - Direct

1    sending the e-mail and I felt like it was wrong to ask that

2    question of Roger.

3    BY MR. KOENIG:

4    Q.  Why did you feel it was wrong?

5    A.  Because I was asking him to go get pricing information from

6    competitors.  And this was to my memory the first time I'd

7    asked somebody to do something like this.

8    Q.  Okay.  Well -- but how long had you been around and aware

9    of this sort of activity?

10   A.  Since 2014.

11   Q.  So why suddenly now are you feeling regret and

12   wrongfulness?

13   A.  Because I was asking or directing somebody to do that, and

14   prior to that I wasn't in a position that -- to make a request

15   like this.

16   Q.  But you were still a participant back in 2014.

17   A.  Yes.

18   Q.  So if you thought it was wrong, why did you do it?

19   A.  I knew that there was an expectation that I should have

20   that information for this bid.

21   Q.  And how did you -- why did you believe there was an

22   expectation?

23   A.  From 2014 and, you know, the expectation from my current

24   boss.

25   Q.  Who was?

Robert Bryant - Direct

1   A.  Well, in 2014 it was Jason McGuire, but in 2017 it was Tim

2   Stiller.

3   Q.  Let's go to the --

4         MR. KOENIG:  You can take that down now, Ms. Pearce.

5   BY MR. KOENIG:

6   Q.  Let's go to the January 27th meeting with RSCS that you

7   testified about.  Do you remember that?

8   A.  I do.

9   Q.  All right.  And if you could -- it was a while ago -- so

10  could you remind the jury who from the Pilgrim's side attended

11  that meeting?

12  A.  Myself, Roger Austin, Tim Stiller, Justin Gay and Scott

13  Tucker.

14  Q.  And who from the RSCS/KFC side?

15  A.  Pete Suerken, Rich Eddington, Sara Fisher and Steve

16  Campisano.

17  Q.  Could you remind the jury who Pete Suerken is?

18  A.  He was the head of the KFC negotiation team.

19  Q.  All right.  And what do you recall about what happened at

20  that meeting?

21  A.  My expectation and Pilgrim's expectation that the

22  relationship was damaged was true.  I remember Pete in the

23  meeting --

24  Q.  Pete who?

25  A.  Pete Suerken in the meeting said something to the effect

Robert Bryant - Direct

1    of --

2             MR. KORNFELD:  Objection, Your Honor, hearsay, what

3    Mr. Suerken said.

4             THE COURT:  Response?

5             MR. KOENIG:  Well, it's -- two things.  It's effect on

6    the listener, but also I believe there was in opening statement

7    made to the effect that Mr. Suerken was happy with the 2014

8    prices.

9             THE COURT:  Well, opening statements are not evidence,

10   so that in and of itself is irrelevant.  Is what you're saying

11   that the statement will explain what some additional action

12   took or some --

13            MR. KOENIG:  Sure.

14            THE COURT:  Ladies and gentlemen, so the objection

15   will be overruled.  I will allow the statement to explain the

16   effect on the listener.  In other words, you can't consider the

17   statement of Mr. Suerken for the truth of the matter asserted,

18   but rather only for what effect it had on who heard it, in

19   other words, causing them to maybe do something or not do

20   something.

21            MR. KOENIG:  Can I also add there is also an 803(3)

22   issue here statement?  Obviously, their objection was before

23   the witness had a chance to answer, but it does go to future --

24   current state of mind plan or intent by the speaker, if you

25   hear the statement I mean.

Robert Bryant - Direct

1      THE COURT:  I don't know about that yet, but there is

2  a basis for admissibility now, so let's do that.

3      MR. KOENIG:  All right, thank you.

4  BY MR. KOENIG:

5  Q.  So what did Mr. Suerken say?

6  A.  He said that he was going to beat us down with a hammer or

7  a baseball bat, I don't recall which, in price and take loads

8  from us.

9  Q.  And what does that mean, take loads from you?

10  A.  Loads of business, basically.  So earlier I said that we

11  typically deal in loads per week volume, so he was going to

12  reduce our loads per week is what he was threatening to do in

13  the meeting and reduce our price.

14  Q.  All right.  Just to be clear, reduce price and take

15  business away.  Is that what you said?

16  A.  That's correct.

17  Q.  Okay.  Now, that was on the 27th, right, of January?

18  A.  That's correct.

19  Q.  And when did you -- I believe you said -- when did you say

20  the bids were due, the first round bids?

21  A.  The first week of February.

22  Q.  All right.  At some point between the January 2017 meeting

23  with KFC/RSCS and the bid submission, Pilgrim's bid submission,

24  did you receive a call from Tim Stiller?

25  A.  I did.

Robert Bryant - Direct

1   *Q.* And what -- you may not have received a call, but did you

2   have a phone conversation with Mr. Stiller?

3   *A.* Yes.

4   *Q.* And what was said on that phone call?

5   *A.* Tim called me and asked me if I had pricing information

6   from Roger. And I had not received anything from Roger at that

7   point. Tim got upset with me and Tim's words were, "You don't

8   know shit. I'll call and get it myself" or "I'll find out for

9   myself." And then he hung up the phone.

10   *Q.* What was your understanding of what he meant by pricing

11   information?

12   *A.* He was looking for competitor pricing information that he

13   expected me to have from Roger.

14   *Q.* Then did you end up having a phone conversation subsequent

15   to that with Roger Austin?

16   *A.* I did.

17   *Q.* Can you tell the jury what happened on that phone call?

18   *A.* I called Roger after the conversation with Tim and --

19   *Q.* Can you use his last name?

20   *A.* Tim Stiller, and relayed to Roger Austin that Tim was upset

21   that I didn't have the pricing information he wanted. And

22   Roger said that he had a similar call and that he would make

23   some calls and get back to me.

24   *Q.* And did he get back to you?

25   *A.* He did.

Robert Bryant - Direct

1    Q.  Approximately how long after?

2    A.  It may have been the next day, I don't recall, but it was

3    before the bid was due, but he did call me back.

4    Q.  And what happened on that phone conversation?

5    A.  Roger called and he said, "Are you ready?  I got it."  And

6    then he relayed to me pricing and customer names.

7    Q.  Customer names?

8    A.  Or, sorry, competitor names.  And I wrote those, that

9    pricing information and competitor names down in my notebook so

10   I could relay that back to Tim since he was upset that I didn't

11   already have it, Tim Stiller.

12         MR. KOENIG:  If we could please pull up Government

13   Exhibit 1919 and not have it published to the jury, please.

14   BY MR. KOENIG:

15   Q.  All right, Mr. Bryant.  Do you recognize Exhibit 1919?

16   A.  I do.

17   Q.  What is it?

18   A.  It's my handwritten notes.

19   Q.  Was it -- do you recognize your own handwriting?

20   A.  I do.

21   Q.  And was it -- was that a regular practice for you to take

22   notes?

23   A.  It was.

24   Q.  And why was that?

25   A.  We had regular meetings.  I had a weekly meeting on Mondays

Robert Bryant - Direct

1   I needed to prepare for, so I would make notes about various

2   things.  This appears to be part of that where this is me

3   taking notes on complaints to some of our customers.

4           MR. KOENIG:  Okay.  Can we go to Page 11, please?

5   BY MR. KOENIG:

6   Q.  And do you recognize Page 11?

7           MR. POLLAK:  Could you give a Bates number?

8           THE COURT:  Do you want me to read it?

9           MR. TUBACH:  It ends in No. 160.

10          MR. KOENIG:  150.

11          THE COURT:  This Page 11 ends in 160 it would seem.

12          MR. KOENIG:  Oh, it does.  I am sorry, the first page

13  ends in 150.  It's a set.

14  BY MR. KOENIG:

15  Q.  All right.  Do you recognize Page 11 of the notebook?

16  A.  I do.

17  Q.  All right.  And what do you recognize it to be?

18  A.  My personal notes from the KFC meeting on January 27th,

19  2017.

20  Q.  And then let's look at Page 12.

21          Do you recognize Page 12?

22  A.  I do.

23  Q.  And what is Page 12?  What do you recognize it to be?

24  A.  The -- my notes from -- with the pricing information Roger

25  provided to me.

Robert Bryant - Direct

1          MR. KOENIG:  At this time the government moves to

2   admit Exhibit 1919.

3          THE COURT:  How many pages is the exhibit?

4          MR. KOENIG:  The exhibit in total is 80 pages.  We

5   really only want two pages.

6          THE COURT:  Okay.  Which two pages, then, are you

7   moving the admission of?

8          MR. KOENIG:  Pages 11 and 12, please.

9          THE COURT:  Any objection to Pages 11 and 12, Bates

10  stamp numbers ending in 160 and 161 of Exhibit 1919?

11         MR. FELDBERG:  Yes, Your Honor, hearsay.

12         THE COURT:  All right.  Any additional objections?

13         Okay.  The objection will be overruled.  Pages 11 and

14  12 of Exhibit 1919 will be admitted.

15         MR. KOENIG:  Thank you, Your Honor.  And may we

16  publish Page 11 to the jury first?

17         THE COURT:  You may.

18  BY MR. KOENIG:

19  Q.   All right.  Mr. Bryant, what does the top row say?

20  A.   KFC meeting 1/27/17.

21  Q.   All right.  And these -- what did you say these notes then

22  represent?

23  A.   My personal notes from the KFC meeting on January 27, 2017.

24         MR. KOENIG:  All right.  And then if we can go just a

25  little bit down the page, Ms. Pearce.

Robert Bryant - Direct

1   *BY MR. KOENIG:*

2   Q.   It's a little hard to read, but what does that top row

3   there say?

4   A.   Price next week.

5   Q.   What did you mean by that?

6   A.   The pricing or the bid was due the following week.

7   Q.   Okay.  And earlier you testified -- you testified as to

8   when the bid was due.  When was the bid due?

9   A.   The first week of February.

10  Q.   All right.  And you wrote that on January 27?

11  A.   That's correct.

12  Q.   Okay.  Let's go to Page 12, please.  And if we could blow

13  up the bottom part of the page.

14          All right.  What are we looking at on the bottom part

15  of the page here?

16  A.   That's the pricing information that I received from Roger

17  Austin.

18  Q.   Okay.  So do you see at the top it looks like it says

19  1.0234?

20  A.   That's correct.

21  Q.   What is that?

22  A.   That was Pilgrim's current price.

23  Q.   So under -- it's the current price under the contract?

24  A.   2017 price.

25  Q.   It had been negotiated in 2014, right?

Robert Bryant - Direct

1    A.   That's correct.

2    Q.   All right.   Now, what -- so there is two columns there.

3    There is numbers and then words.   Could you explain to the jury

4    what those mean, those two columns?

5    A.   Yeah, that's the price per pound for eight-piece for each

6    one of those competitors.

7    Q.   And could you please read the names of the competitors?

8    A.   Koch, Claxton, Mar-Jac, Tyson and George's.

9    Q.   And was it your understanding that those companies were all

10   competing for KFC's products in 2017?

11   A.   That's correct.

12   Q.   And maybe you said this and I missed it, but you said it's

13   their pricing for each competitor.   Is that future pricing?

14   A.   That was my understanding.   It was their plan bid

15   submission.

16   Q.   And for what product?

17   A.   The eight-piece product for KFC.

18   Q.   And that's the chicken on the bone?

19   A.   That's correct.

20   Q.   And is there a unit?   Is it -- what is the unit that we're

21   looking at here?

22   A.   That is technically point -- to use the first line with

23   Koch, that would be $1.0125 per pound.

24        THE COURT:   Mr. Koenig, can you look for a convenient

25   breaking spot?   It's a little after 3:15.

Robert Bryant - Direct

1          MR. KOENIG:  I think this might be actually a good

2    breaking spot.

3          THE COURT:  Okay.  Ladies and gentlemen, we will take

4    the mid-afternoon break.  Keep the admonitions in mind.  The

5    jury is excused.  We will plan on reconvening 25 minutes of

6    4:00.  Jury is excused.

7               (Jury excused.)

8          Mr. Bryant, you can step down, and if you can come

9    back after the break.  Thank you.

10         Anything quick before we break?  We will be in recess.

11   Thank you.

12       (Recess at 3:17 p.m.)

13       (Reconvened at 3:36 p.m.)

14          THE COURT:  All right.  Let's bring the jury back in.

15          (Jury present:)

16          THE COURT:  Mr. Koenig, go ahead.

17          MR. KOENIG:  Thank you, Your Honor.  I believe we were

18   looking at 1919.

19          THE COURT:  Yes.

20   BY MR. KOENIG:

21   Q.  All right, Mr. Bryant.  Can you just give a real quick

22   overview of what those two columns represent again at the top?

23   A.  Yeah.  It's price per pound and then the individual

24   company's price.

25   Q.  And that's future pricing?

Robert Bryant - Direct

1   *A.*   That was my understanding, yes.

2   *Q.*   All right.  Now, for the competitors who were bidding on

3   the 2017 contract, did you have an understanding of their

4   purpose in providing Pilgrim's with that pricing, future

5   pricing information?

6   *A.*   Yes.

7   *Q.*   What is the basis of your understanding?

8   *A.*   Those phone calls with Roger Austin and my past experience

9   in 2014.

10  *Q.*   And then what is your understanding?

11  *A.*   In 2017 the purpose was to limit the price decrease.

12  *Q.*   For just Pilgrim's?

13  *A.*   For everyone, for the companies you see on the list.

14  *Q.*   The competitors.

15  *A.*   The competitors, yeah.

16  *Q.*   All right.  Now, you mentioned previously I believe

17  eight-piece, right?  That's the pricing that's highlighted in

18  yellow?

19  *A.*   That's correct, yes.

20  *Q.*   All right.  Well, actually before we get to that, can you,

21  Ms. Pearce, highlight what's to the right there?

22          All right.  Do you see what's been highlighted,

23  Mr. Bryant?

24  *A.*   I do.

25  *Q.*   And what does that say?

1   *A.*   NHA and new price.

2   *Q.*   Now, what company is -- what companies have NHA next to

3   their names?

4   *A.*   Claxton and Tyson.

5   *Q.*   What is NHA?

6   *A.*   It's short for no human antibiotics.

7   *Q.*   Okay.  And what is the significance of NHA?

8   *A.*   Different companies like to make different claims.  There's

9   conventional birds that are treated with antibiotics and then

10  there is a range in between there and no antibiotic use ever.

11  In 2017 it was a point of negotiation that KFC wanted to source

12  product that was NHA for the bid on 2017 beginning in 2018.

13  *Q.*   All right.  What is your understanding of why NHA is

14  written next to just two of the names, next to just Claxton and

15  Tyson?

16  *A.*   Those two were -- had already converted plants to be NHA

17  compliant at the time of this note.

18  *Q.*   And had Pilgrim's at this time been supplying NHA to KFC?

19  *A.*   We had not at this time.

20  *Q.*   Would there have been an additional cost to Pilgrim's to

21  supply NHA to KFC?

22  *A.*   There is an additional cost to remove the antibiotics, yes.

23  *Q.*   All right.  And so you mentioned I think previously that

24  this was a point of negotiation.  Could you explain that a

25  little bit more?

Robert Bryant - Direct

1    *A.*   Yes.   The reason why it was a point of negotiation and the

2    reason why we -- or I wrote NHA next to those is those two were

3    already -- already had birds that were NHA compliant.   And the

4    conversation was will they charge for providing that NHA and

5    will we be able to charge for providing NHA to KFC.

6    *Q.*   All right.   Was it relevant to you whether Claxton or Tyson

7    or any other competitor for that matter was going to charge for

8    NHA?

9    *A.*   Yes.

10   *Q.*   Why?

11   *A.*   Well, if Claxton and Tyson did not charge for NHA and they

12   gave that to KFC at no cost, then it would put me at a -- or

13   Pilgrim's at a disadvantage on being able to pass along that

14   cost to KFC.   And that's why it was a point of discussion.

15          *MR. KOENIG:*   Okay.   And then can we go to the bottom

16   grouping of numbers and words?

17   *BY MR. KOENIG:*

18   *Q.*   Do you see where Ms. Pearce has highlighted there?

19   *A.*   I do.

20   *Q.*   Can you explain to the jury what they're looking at?

21   *A.*   That is dark meat pricing and case weights for those same

22   competitors.

23   *Q.*   How can you tell it's dark meat?

24   *A.*   We formulated the dark meat pricing as a back is what -- we

25   would use the term back of the eight-piece price.   For

Robert Bryant - Direct

1   instance, on the first line George's, it's negative 28.  So

2   that would be 28 cents minus -- subtracted from their

3   eight-piece price of .9652 at the top.

4   Q.  Okay.  So if we could just go through an example here.  So

5   you mentioned George's and you did the -- so you take 28 cents

6   off of the eight-piece price?

7   A.  That's correct.

8   Q.  And that gives you the price per pound for dark meat?

9   A.  That's correct.

10  Q.  So in the case of George's, can you explain that one more

11  time?

12  A.  So it would be 28 cents or .28 minus -- or it would be

13  .9652 minus .28 to get their dark meat price.

14  Q.  So if George's were to change its dark meat price from 28

15  back to 29 back, what effect would that have on its price for

16  dark meat?

17  A.  That would be a decrease because they were subtracting

18  more.

19  Q.  And if George's were to switch from 28 back to 27 back,

20  what effect would that have on the price?

21  A.  That would be an increase of a penny a pound because you're

22  subtracting less.

23  Q.  So is it fair to say the bigger the number back, the

24  cheaper the dark meat?

25  A.  That's correct.

Robert Bryant - Direct

1    *Q.*  And conversely the smaller the number back, the more

2    expensive the dark meat.

3    *A.*  That's correct.  In theory, yes.  It's relative to their

4    eight-piece price.

5    *Q.*  Sure.  And then so can you read the competitors' names

6    there?

7    *A.*  For dark meat?

8    *Q.*  Yeah.

9    *A.*  George's, Mar-Jac, Tyson, Claxton and Koch.

10   *Q.*  Okay.  And just for the sake of the record, I don't know

11   that you read them for the eight-piece.  Could you do that too?

12   *A.*  Koch, Claxton, Mar-Jac, Tyson and George's.

13   *Q.*  All right.  Now, back to the dark meat.  What are those

14   numbers in front of the suppliers' names?

15   *A.*  That's their case weight billing, so that's what they could

16   charge per case.

17   *Q.*  Can you explain case weight?

18   *A.*  Yeah.  So there's a max billable or some customers there is

19   a fixed billable case weight.  So the birds are sized and they

20   can fall anywhere in that size which would cause for random

21   case weights.  Instead of having random or just a pure price

22   per pound, there was a max billable.  So it was like a dollar a

23   pound times your max billable of 50, so it would be $50 a case

24   rather than a range of $45 a case up to $55 a case, anywhere in

25   between there based on that.  So there was a maxed billable on

Robert Bryant - Direct

1    a lot of these contracts that kind of fixed that case price.

2    Q.  All right.  So when Pilgrim's takes a truckload, sells a

3    truckload of chicken to KFC, how does the billing work then?

4    A.  It was fixed billing times their price per pound and it was

5    more or less a per case price plus freight to the individual

6    location.

7    Q.  So you got a case rate.  Multiply it by the price per

8    pound.

9    A.  Correct.

10   Q.  And that gives you the case price.

11   A.  Per case, yeah.

12   Q.  All right.  Now, way over on the right there do you see

13   where it says 52.50?

14   A.  I do.

15   Q.  What is that?

16   A.  That was the max billable for eight-piece.

17   Q.  For who?

18   A.  George's.  And at this point I don't recall if we were

19   exactly all at that 52.50 at that point.  I remember that there

20   was some discussions about putting us back to 51.50, and

21   George's may have got to state 52.50 because they had a cheaper

22   price.

23   Q.  Could you explain that a little more?

24   A.  Yeah.  So since their price was lower --

25   Q.  We are talking about George's here?

Robert Bryant - Direct

1    *A.*  That's correct -- that they could have a little bit cheaper

2    price but have more on the part of max billable and still come

3    out to a per case price that was competitive with someone that

4    had a higher eight-piece per pound price but a lower max

5    billable or vice versa.

6    *Q.*  Okay.  Did you find the information that you received from

7    Roger Austin and wrote down on this page, did you find that

8    information useful?

9    *A.*  We did.

10   *Q.*  How so?

11   *A.*  We used it to formulate our bid.

12   *Q.*  Well, but how was it useful to formulate your bid?

13   *A.*  We knew we were going to have to give a decrease in price.

14   We weren't sure how much we were going to have to decrease our

15   price.  So using this we had a guide to where our pricing

16   needed to be for the bid.

17   *Q.*  All right.  And what was -- did you have an understanding

18   of what the purpose of obtaining the prices from the

19   competitors as reflected on this part of 1919, what was your

20   understanding of the purpose?

21        *MR. TUBACH:*  Asked and answered multiple times now.

22        *THE COURT:*  Overruled.  He can answer.

23   *A.*  The purpose in 2017 in this particular bid was to limit the

24   price decrease so collectively we could all decrease price a

25   modest amount without the fear of losing business or decreasing

Robert Bryant - Direct

1   our price too much.

2   *BY MR. KOENIG:*

3   *Q.*   By "we," who do you mean?

4   *A.*   The competitors, the people on the screen.

5   *Q.*   Okay.  I want to take just a quick little detour here.

6          Have you heard of the concept of covering shortages?

7   *A.*   I have.

8   *Q.*   Can you explain to the jury what that means?

9   *A.*   There is a lot of variability when you are dealing with a

10  live animal both in -- just the small bird particularly most

11  things are sized into a quarter pound increment.  So getting

12  enough birds inside the individual quarter pound increments can

13  be rather difficult.  Then you also have the demand side that

14  comes in where customer orders are on feature or ad or

15  something where demand spikes and you simply don't have enough

16  product to cover your customer's order.  So when we cover a

17  shortage, you know, if we have more or if someone else has -- a

18  competitor has more than we, we try to figure out a way to

19  cover that shortage.

20  *Q.*   And so how did you cover shortages?

21  *A.*   A couple ways.  You could disclose that you were short to

22  the customer and use them to help facilitate how they wanted to

23  fill in that gap or you could reach out to a competitor and see

24  if they had extra product that you could purchase to fill that

25  shortage.

Robert Bryant - Direct

1   Q.   Did you have an understanding of which of those two routes

2   for filling -- covering shortages was KFC's expectation -- let

3   me back up.

4        Did you have an understanding what KFC's expectation

5   was as to how you would go about covering shortages?

6   A.   Yes.

7   Q.   And what's your basis for that?

8   A.   Being in the industry for years and dealing with that.  I

9   mean, I was in supply chain from probably 2000s till 2016, so I

10  dealt with those type of issues on a daily basis.

11  Q.   So what is your understanding of KFC's expectation for how

12  you would go about filling shortages?

13       MR. FELDBERG:   Your Honor, objection.  He hasn't said

14  anything specific enough to give him a foundation for answering

15  that question.

16       THE COURT:   Overruled.  He has been involved in it a

17  long time.  It would be his business to understand the

18  customer's expectation.  Go ahead.

19  A.   In general, the customer would like to know what's going on

20  and they would like for you to communicate with them that

21  you're going to be short and that you needed help and get their

22  direction or involvement from them on that.

23  BY MR. KOENIG:

24  Q.   All right.  But sometimes you didn't do it that way?

25  A.   I don't know that I would use sometimes.  Probably more

Robert Bryant - Direct

1    often than not that when we were short that Roger or someone

2    on -- Roger Austin or someone on his team reached out to a

3    competitor to purchase product.  What I recall is if that

4    wasn't available or if we were going to give up a PO and have

5    them cover it, then we would get KFC involved to reissue that

6    PO to a different competitor.

7    Q.  PO?

8    A.  Purchase order.

9    Q.  Okay.  So if you knew that KFC wanted you to contact them

10   when you were short product, why then did you just contact

11   competitors directly?

12   A.  When you're short, you know, it could affect your supply

13   volume and your service level with that customer.  So if you

14   could cover that volume without involving the customer, then --

15   and still cover the order, then you didn't have to get them

16   involved and there wasn't a risk.

17          So, for instance, if you were short a load a week

18   consistently to a customer and you repeatedly went to them,

19   then they would go try to place that load somewhere else if

20   they could.  So especially if it was a short-term problem for

21   like three months, well, three months, they may take it away

22   from you.

23   Q.  When you purchased chicken from a competitor to cover

24   shortages, what was the -- how was the price determined?

25   A.  I mean, there is different types of shortages.  There is

Robert Bryant - Direct

1   spot shortages where we would buy like raw product and bring it

2   in.   In the case of KFC, the price was supposed to be their

3   current contract price.   And normally what I seen, maybe not

4   every single time, but normally what I seen was a per case

5   price and then --

6   Q.   Can you say that again.   I didn't hear it?

7   A.   A per case price.   And with the -- we -- there would

8   normally be another line item for freight separate from that.

9   Q.   So for KFC anyway, if you were buying chicken from another

10  supplier, they would charge you by the case.

11  A.   Yes, most of the time, yes.   There could be some instances

12  where they could have gave them the whole, you know, cents per

13  pound case and all that, but generally it was per case, 640

14  cases at this per case price and here's your freight.

15  Q.   So from a competitor's per case price were you able to

16  determine their eight-piece price, for example, per pound?

17  A.   No.   You would have to know what their billing weight was.

18  You could try to guess and go through different scenarios to

19  see if it was a price near yours, but you wouldn't know or vice

20  versa.   You could try to do -- but you needed both to know how

21  they came up with the billing, the case weight billing.

22  Q.   Okay.   In order to purchase from a competitor, did you need

23  to know their eight-piece price per pound?

24  A.   No, you didn't have to know that.   You just needed the per

25  case price and then the freight.

Robert Bryant - Direct

1   Q.  So you wrote all these prices down.  And what did you do

2   next?

3   A.  I called Tim and --

4   Q.  Who is that?

5   A.  I called Tim Stiller and gave him this information so we

6   could have a conversation about our bid.

7   Q.  All right.  So what did you discuss about the bid?

8   A.  I recall having a conversation with Tim and -- Tim Stiller

9   and Roger Austin.  I don't recall if that was at the same time

10  or separately.  We developed a model that put us second in

11  price.  However, before we submitted that bid, and I don't

12  recall if it was Tim Stiller or Roger Austin said that they

13  didn't -- they felt like we needed to be more middle of the

14  pack, so we submitted our price third in line.

15  Q.  And did you use the prices you had written down in order to

16  do that?

17  A.  We did.

18  Q.  All right.  When you received those prices from Roger

19  Austin, those future prices, did you believe they were

20  accurate?

21  A.  I trusted that they were.

22  Q.  Okay.  And why?

23  A.  You know, I worked with Roger for many years and I'd seen

24  what transpired in 2014 and other times, and so I trusted the

25  information I was receiving from him.

Robert Bryant - Direct

1   Q.   I understand that you trusted Roger Austin.  Did you trust

2   the competitors' list that they had given him an accurate and

3   true price?

4   A.   Yes.

5   Q.   Why is that?

6   A.   It was my understanding that, you know, this information

7   has been falling back and forth for several years with -- and

8   had been successful over that period of time, so there is a

9   history of this that I was relying on.

10   Q.   Can you recall a time when somebody gave you a price that

11   turned out not to be true?

12   A.   No, I can't recall that.

13   Q.   You mentioned at the beginning of your testimony your

14   agreement where you won't be prosecuted.  Do you remember that?

15   A.   I do.

16   Q.   Did there come a time when Mr. Stiller discussed that

17   agreement with you?

18   A.   Yes.

19   Q.   And without referencing the details of why you had the

20   agreement, can you share what Mr. Stiller told you?  Did he

21   tell you something about owning a contract?

22   A.   He did.

23   Q.   What contract was that?

24   A.   The 2017 KFC contract.

25   Q.   So the one we were just -- we have been talking about all

Robert Bryant - Direct

1    afternoon.

2    A.   That's correct.

3    Q.   And what did you believe he meant by own the contract?

4    A.   That I had immunity from prosecution and that he said -- he

5    didn't say -- he didn't say that, but my -- what I interpreted

6    him to say at that point was that he told me I needed to own

7    the 2017 contract implying that I had immunity and that he had

8    no involvement in it and to help protect him from exposure

9    because he did not have immunity.

10   Q.   Okay.  I would like to move on now to a few months later in

11   2017.  Did there come a time when you were negotiating with US

12   Foods in 2017?

13   A.   Yes.

14   Q.   Why were you negotiating with US Foods in 2017?

15   A.   We were seeking price increases on boneless breast meat.

16   Q.   By "we," who do you mean?

17   A.   Pilgrim's.

18   Q.   So did you have discussions with anybody at Pilgrim's about

19   that?

20   A.   I did.

21   Q.   And who was that?

22   A.   Tim Stiller.

23   Q.   And what was the substance of those discussions?

24   A.   We believed that our boneless breast meat was undervalued

25   based on other sales in our mix, so we were trying to formulate

Robert Bryant - Direct

1   a plan to increase prices on boneless breast, particularly to

2   US Foods.

3   Q.  And about how much were you looking to increase price?

4   A.  Around 20 cents a pound.  It depended on the product.  It

5   was a range depending on that particular product.  It was

6   several products.

7   Q.  Let me ask you a clarifying question.  Previously for 2014

8   what did you say that the eight-piece boneless price increase

9   was?

10  A.  Bone-in price.

11  Q.  I am sorry, bone-in.

12  A.  It was 15 to 20 cents.

13  Q.  Do you recall testifying you hadn't seen a price increase

14  that big before?

15  A.  That's correct.

16  Q.  But now you're talking about boneless and a 20-cent price

17  increase.  How do those two things match up?

18  A.  Yeah, totally different products.  Boneless, you know, at

19  the time was selling over $2 a pound, and if you look at it on

20  a percentage increase and then -- actually, I think it was

21  selling for more than $2.50 a pound at that time.  And bone-in

22  was, you know, below a dollar a pound.  So on a percent

23  increase it was still small, but for a boneless product it

24  wouldn't be uncommon to see, you know, a 10 to 20-cent price

25  increase, especially on portion breasts because you are cutting

Robert Bryant - Direct

1   that product down and then you discount out what's called a

2   trim, the product that they don't want.  So in order to have

3   that cut-out value, you have to charge more for the piece of

4   the product that they do want.  So it wasn't uncommon for those

5   cut-out values to be a lot different.

6   Q.  All right.  Let's put a bookmark in this.  I want to go

7   back to the KFC 2017 negotiations just briefly.

8          After you submitted the first round bid in the first

9   week of February, did you have further discussions about the

10  2017 KFC bidding?

11  A.  We did.

12  Q.  Who was involved in those discussions?

13  A.  Myself and Tim Stiller and Roger Austin.

14  Q.  And what do you recall, if anything, about those

15  discussions?

16  A.  Tim along with myself were upset after our first round bid

17  submission and KFC asked for additional pricing concessions.

18  Tim was upset about that.

19  Q.  Tim who?

20  A.  Tim Stiller, sorry.

21  Q.  All right.  So then what happened?

22  A.  We were weighing our options on the way forward, whether or

23  not we were willing to concede more in price or not.  Tim, Tim

24  was upset, like I said, and he relayed a conversation he had

25  with Roger Austin.  He said either the night before or the day

Robert Bryant - Direct

1    before that he had told Roger to tell the industry that we were

2    going to hold or we were going to find a new

3    hundred-million-pound customer.

4    Q.   A hundred-million-pound customer, what does that mean?

5    A.   That was a reference to KFC.  At the time we were selling

6    approximately 50 loads a week and that would be the equivalent

7    of roughly a hundred million pounds a year annually.

8    Q.   So before that what was the first part of the sentence?

9    A.   He told Roger to tell the industry that we were going to

10   hold.

11   Q.   And what was your understanding of that?

12   A.   My understanding of that was that he wanted Roger to

13   communicate to our competitors that we were not going to

14   concede on price, that we were going to hold with our original

15   bid submission.

16   Q.   Okay.  So what was your understanding of the word industry?

17   A.   Our competitors, the ones that we've been reviewing.

18   Q.   And who did Tim Stiller report to at that time?

19   A.   Jayson Penn.

20   Q.   Who did Jayson Penn report to at that time?

21   A.   Bill Lovette.

22   Q.   Now, I apologize for the regression.  Let's go back to

23   where we had bookmarked.

24          I think we left off where you were explaining --

25   A.   The mix.

Robert Bryant - Direct

1   Q.   You were looking for a price increase on boneless for US

2   Foods, right?

3   A.   That's correct, yes.

4   Q.   If you could also just explain what is US Foods?

5   A.   US Foods is a broad-line distributor.  You may have heard

6   of Sysco, but they buy many different products.  They are like

7   a one-stop shop for like a normal restaurant.  They'll have

8   various different proteins along with paper goods, like salt

9   and pepper, the plastic forks, things of that nature available.

10  Q.   Who do they sell to?

11  A.   Like restaurants, independent stores, some independent

12  retailers, you know, hospitals.  You know, they are like a

13  store door delivery to someone who is going to prepare it for

14  the most part.

15  Q.   So you are looking to raise the price to US Foods for

16  boneless breast, right?

17  A.   That's correct.

18  Q.   And you had a meeting with someone did you say to discuss

19  how to go about that?

20  A.   Yes.

21  Q.   And who was that with?

22  A.   Tim Stiller.

23  Q.   So what did you decide?

24  A.   We decided on the price increases.  There was some concern

25  that if we just submitted a price increase, that we could

145

Robert Bryant - Direct

1    potentially lose business because our competitors may not do

2    the same.

3    Q.  All right.  So for the boneless breast you were looking to

4    increase the price for, did you have a primary competitor at US

5    Foods at that time?

6    A.  Yeah, we had several competitors.  The one that we were

7    concerned about at that time in the market that we were going

8    to raise prices was Mar-Jac.

9    Q.  Why were you concerned about Mar-Jac?

10   A.  Because they were the primary competitor in that

11   marketplace.  If we went and submitted a price increase to US

12   Foods, that they would --

13   Q.  They?

14   A.  US Foods, our fear was US Foods would go to Mar-Jac and

15   say, hey, we have an opportunity for you guys to take on more

16   business if you can do it and not tell them that someone was

17   submitting a price increase for that same business.

18   Q.  So in essence, you were afraid you were going to lose

19   business.

20   A.  That's correct, and not get a price increase.

21   Q.  And lose business to Mar-Jac.

22   A.  That's correct.

23   Q.  So what did you do?

24   A.  Tim and I brainstormed on the best way to submit the price

25   increase.  One of us, I don't recall if it was me or Tim

Robert Bryant - Direct

1    Stiller, remembered that Scott Tucker used to work at Mar-Jac
2    or Marshall Durbin, which was bought by Mar-Jac, and still had
3    co-workers there that he stayed in contact with.  So Tim asked
4    if I would reach out to Scott Tucker and see if Mar-Jac would
5    be willing to submit a price increase to US Foods for boneless
6    also.

7    Q.   Submit a price increase for what?

8    A.   Boneless also.

9    Q.   Did you do that?

10   A.   I did.

11   Q.   What did you say to Mr. Tucker?

12   A.   I explained to him that we wanted to raise prices on
13   boneless USF and that -- asked if he still had contacts at
14   Mar-Jac and he said he did.  And I asked him if he could find
15   out if they would be willing to increase prices on their
16   boneless.

17   Q.   Okay.  But was US Foods one of Scott Tucker's accounts?

18   A.   No.

19   Q.   So why did you pick him?

20   A.   Felt like he could be trusted to make that -- that call to
21   that competitor.

22   Q.   What do you mean trusted?

23   A.   To reach out to a competitor and have that -- a
24   conversation about raising prices together.

25   Q.   And to your understanding did he, in fact, do that?

Robert Bryant - Direct

1   A.   Yes.

2   Q.   And how do you know that?

3   A.   He called and reported back to me on his conversations with

4   Mar-Jac.

5        MR. KOENIG:   Could we please pull up Exhibit 9140?

6   BY MR. KOENIG:

7   Q.   Do you recognize Exhibit 9140?

8   A.   I do.

9   Q.   What is it?

10  A.   It's an e-mail from me to Tim Stiller on April 18th, 2017.

11  Q.   And what is the subject matter of the e-mail?  And I am not

12  meaning to read the subject line, but what does the e-mail

13  relate to?

14  A.   It relates to Sysco RFP, and then I have added some

15  information from -- letting Tim Stiller know I've got some

16  information from Scott Tucker.

17  Q.   Okay.

18       MR. KOENIG:   At this point, Your Honor, the government

19  moves to admit 9140.

20       THE COURT:   Any objection to the admission of

21  Exhibit 9140?

22       9140 will be admitted.

23       MR. FAGG:   Your Honor, can we have just one moment on

24  that?

25       THE COURT:   Yeah, you may.

Robert Bryant - Direct

1          MR. FAGG:  Your Honor, a number of objections on this.

2     So one, certainly the bottom of the piece of the e-mail appears

3     to be hearsay.  And also I struggle to see the relevance of

4     this e-mail.  They are talking about US Foods and now they are

5     talking about Sysco, an entirely different customer.

6          THE COURT:  All right.  Response?

7          MR. KOENIG:  Well, the witness will explain how this

8     ties back to what we were just talking about with US Foods.

9     And as far as all we are concerned about is the top part of the

10    e-mail really, the most recent e-mail.

11         THE COURT:  Well, before offering it do you want to

12    ask the witness additional questions or how do you want to do

13    it?

14         MR. KOENIG:  Sure.

15    BY MR. KOENIG:

16    Q.  So on the face of this e-mail, Mr. Bryant, it looks like it

17    just relates to Sysco.  Do you see that?

18    A.  I do.

19    Q.  Does it relate to US Foods as well?

20    A.  It does.

21    Q.  How do you know that?

22    A.  Because I sent the e-mail and I remember why I sent this

23    e-mail to Tim Stiller.

24    Q.  Was it to report back on something with respect to US

25    Foods?

Robert Bryant - Direct

1    *A.* It was.

2          MR. KOENIG: The government would move to admit 9140

3    again.

4          THE COURT: Mr. Fagg, anything additional from you?

5          MR. FAGG: No, Your Honor. The bottom of it still

6    remains hearsay.

7          THE COURT: Response on that part? I am not familiar

8    with that name on the bottom. Mr. Koenig?

9          MR. KOENIG: We only want to focus on the very top

10   e-mail. You know, if Your Honor wants to give an instruction

11   about the bottom --

12         THE COURT: All right. Then Exhibit 9140 will be

13   admitted.

14         However, Ladies and Gentlemen of the Jury, the bottom

15   portion of it which actually consumes about two-thirds of the

16   page is from a person first name Janine. That portion of the

17   e-mail will not be admitted for the truth of the matter

18   asserted, but rather for the effect on the responders. The top

19   portion of the e-mail, that from Mr. Bryant, that from

20   Mr. Stiller, that can be considered for the truth of the matter

21   asserted.

22         Objections will be overruled. Exhibit 9140 will be

23   admitted.

24         MR. KOENIG: Thank you, Your Honor. May we have

25   permission to publish it to the jury?

Robert Bryant - Direct

1        THE COURT:  You may.

2        MR. KOENIG:  All right, Ms. Pearce.  If you could just

highlight the top e-mail.  Can you do it a little bigger maybe

by selecting less width?

5   BY MR. KOENIG:

6   Q.  All right.  So can you just go back and say who this is

7   from and who it's to?

8   A.  Yes.  This is from myself to Tim Stiller on April 18th,

9   2017.

10  Q.  And what's the time stamp?

11  A.  1:15 p.m.

12  Q.  Okay.  And so can you read the first line or the only line

13  in that e-mail to the jury, please?

14  A.  Yes, and Janine, and I've got feedback from Mar-Jac.

15  Q.  What do you mean by that?

16  A.  By feedback from Mar-Jac, I mean I was telling Tim Stiller

17  that Scott Tucker had given me an update on his conversations

18  with Mar-Jac to -- about the price increase to US Food Service.

19  Q.  Who did Scott Tucker report to at that time?

20  A.  Roger Austin.

21  Q.  And what was the feedback that you got from Mar-Jac through

22  Scott Tucker?

23  A.  Initially the feedback that I got from Scott Tucker from

24  Mar-Jac was that they agreed to raise prices similar to ours.

25  However, they wanted to wait a couple weeks to submit those

Robert Bryant - Direct

1    price increases so there would be the appearance that we were

2    not working together.

3    Q.   Okay.  And what was your understanding of appearance that

4    you weren't working together?  Can you explain that?

5    A.   Yes.  They --

6    Q.   They being?

7    A.   Mar-Jac.  The feedback I got from Scott Tucker was that

8    they wanted the gap in submission so there wasn't -- there

9    wouldn't be an appearance that we had talked about price

10   increases together, so they didn't want both to submit at the

11   same time.  They wanted us to submit first and then a few weeks

12   later they would submit.

13   Q.   Okay.  And did you get feedback on the amount of increase

14   Mar-Jac agreed to?

15   A.   They used the word similar, that they were going to submit

16   a similar price increase to what we were going to submit.

17   Q.   But not identical.

18   A.   But not identical.

19   Q.   All right.  And you used I think in your first -- and I

20   just repeated it, but in one of your responses to questioning,

21   you said Mar-Jac agreed.  What did you mean by that?

22   A.   They agreed that they would raise prices.

23   Q.   Agreed with whom?

24   A.   Pilgrim's or Scott Tucker.

25            MR. KOENIG:  Can we go to, please, 9139?

Robert Bryant - Direct

1          And, your Honor, this is going to have the same issue.

2     *BY MR. KOENIG:*

3     *Q.*  Do you recognize Government Exhibit 9139?

4     *A.*  I do.

5     *Q.*  What is it?

6     *A.*  It's another e-mail from me to Tim Stiller on April 18,

7     2017.

8     *Q.*  And what does the top e-mail relate to?

9     *A.*  More information I was relaying to Tim Stiller about the US

10    Foods bid.

11         *MR. KOENIG:*  Government moves to admit 9139.

12         *THE COURT:*  Any objection to the admission of

13    Exhibit 9139?

14         Exhibit 9139 will be admitted.

15         *MR. KOENIG:*  All right, Ms. Pearce.

16         Could we publish to the jury, Your Honor?

17         *THE COURT:*  You may.

18    *BY MR. KOENIG:*

19    *Q.*  So this is again you to Tim Stiller, right?

20    *A.*  That's correct.

21    *Q.*  Same day?

22    *A.*  Same day.

23    *Q.*  What was the time stamp?

24    *A.*  Still 1:15 p.m.

25    *Q.*  And could you read to the jury what you said in this

Robert Bryant - Direct

1  e-mail?

2  *A.*  They told Mar-Jac the same thing on boneless.

3  *Q.*  And what did you mean by that?

4  *A.*  I meant that US Foods gave us feedback that no one else was

5  seeking a price increase and that, you know, basically pushing

6  back or against a price increase.  And they gave both companies

7  the same message after we had both submitted price increases.

8  *Q.*  And Mar-Jac was a competitor at the time?

9  *A.*  They were.

10  *Q.*  Did you end up getting the price increase you sought?

11  *A.*  We did.

12  *Q.*  Just remind the jury again, what's the date and time stamp?

13  *A.*  1:15 p.m.

14  *Q.*  On 4/18/2017?

15  *A.*  That's correct.

16  *Q.*  Can we pull up, please, Exhibit 3039?

17        Do you recognize 3039?

18  *A.*  I do.

19  *Q.*  What is it?

20  *A.*  It's a text message from Tim Stiller to myself on

21  4/18/2017.

22  *Q.*  And what does it generally relate to?

23  *A.*  The previous two e-mails.

24  *Q.*  All right.  And how do you know it's from Tim Stiller?

25  *A.*  I just -- I recognize the 805 area code.

Robert Bryant - Direct

1   *Q.*  Do you have any other contacts that have 805 area code?

2   *A.*  Not that I can recall.  I generally associate that 805

3   number with Tim Stiller.

4           *MR. KOENIG:*  Your Honor, at this time we move to admit

5   3039 into evidence.

6           *THE COURT:*  Any objection to the admission of

7   Exhibit 3039?

8           Exhibit 3039 will be admitted.

9           *MR. KOENIG:*  May we publish to the jury, Your Honor?

10          *THE COURT:*  You may.

11  *BY MR. KOENIG:*

12  *Q.*  If you could, tell the jury what the date and time stamp

13  is.

14  *A.*  4/18/2017 at 1:20 p.m.

15  *Q.*  All right.  And what was the date and time stamp of 9139?

16  *A.*  4/18/2017 at 1:15 p.m.

17  *Q.*  And could you just read the From phone number into evidence

18  to the jury?

19  *A.*  805-276-6918.

20  *Q.*  And is it your testimony that that is Tim Stiller's number?

21  *A.*  It is.

22  *Q.*  And the number that's next to your name, what is that

23  number?  Can you read that one?

24  *A.*  270-727-7771.

25  *Q.*  And is it your testimony that that is your phone number?

155

Robert Bryant - Direct

1    A.   It is.

2    Q.   Now, could you read the body of the text message?

3    A.   No comp names in e-mail, exclamation point.

4    Q.   What did you understand that to mean?

5    A.   Tim Stiller was scolding me for sending him an e-mail with

6    a competitor name in it.

7    Q.   All right.  So the word comp, what does that mean?

8    A.   That means competitor.

9    Q.   Was it your understanding he was referring back to

10   Government's Exhibits 9140 and 9139?

11   A.   That was my understanding, yes.

12   Q.   Let's move to 2014.

13        So you testified a little bit about KFC negotiations

14   in 2014, right?

15   A.   That's correct, yes.

16   Q.   And I think you said this morning earlier that 2014 was

17   sort of your entrance on the scene.  Is that what you said?

18   A.   Yeah, on the national accounts primarily, yeah.

19   Q.   And what does that mean as far as your role?

20   A.   So it became more customer facing, involved in more

21   negotiations from that point forward; not that I hadn't done

22   some, but really the first time I was speaking rather than just

23   observing in meetings and participating.

24   Q.   Did you -- did there come a time in 2014 when you learned

25   of a plan to increase prices at fast-food restaurants?

Robert Bryant - Direct

1    *A.*   Yes.

2    *Q.*   When did you learn that?

3    *A.*   Late June, early July of 2014.

4    *Q.*   And who did you learn that from?

5    *A.*   Jason McGuire.

6    *Q.*   Who is Jason McGuire again?

7    *A.*   He was my manager.

8    *Q.*   All right.  Do you happen to recall Jason McGuire's desk

9    phone number?  Just yes or no.

10   *A.*   Possibly, yes.  I think I do.

11   *Q.*   Okay.  Would it help if I offered you something to refresh

12   your recollection?

13   *A.*   Yeah.  I think I can quote it from memory.  It's been a

14   while, but I can try.

15   *Q.*   Sure, you can go ahead and try.

16   *A.*   I think it was 970-506-4711.

17          *MR. KOENIG:*  May I give him something to refresh his

18   recollection?

19          *THE COURT:*  You may.

20          *MR. TUBACH:*  He didn't testify he didn't recall.

21          *THE COURT:*  He just simply asked to hand something to

22   the witness.

23          *MR. TUBACH:*  If it's for purposes of refreshing

24   recollection, he hasn't said he needs it.

25          *THE COURT:*  He didn't indicate that he needs his

Robert Bryant - Direct

1    recollection refreshed?

2         MR. KOENIG:  Well, I mean he said he thought he could

3    remember it, but he wasn't sure.

4         THE COURT:  Well, he was confident enough to state it,

5    so there doesn't seem to be any need to refresh.

6         MR. KOENIG:  Okay.  Thank you.

7    BY MR. KOENIG:

8    Q.  All right.  So Jason McGuire was your boss at that time,

9    right?

10   A.  Yes.

11   Q.  And who was Jason McGuire's boss at that time?

12   A.  Jayson Penn.

13   Q.  And who was Jayson Penn's boss at that time?

14   A.  Bill Lovette.

15   Q.  So when -- going back to this June, July 2014 time period

16   and McGuire telling you about this plan, what exactly did he

17   say?

18   A.  He told me that we were going to raise prices on our QSR,

19   our fast-food customers.  And he asked me to help prepare a

20   PowerPoint presentation and that we were going to blitz the

21   customers with basically the similar information to all of them

22   as a justification for price increases.

23   Q.  What was the phrased you used?  You were going to what to

24   the customers?

25   A.  He used the word blitz.

Robert Bryant - Direct

1   Q.   What was your understanding of blitzing the customers?

2   A.   Visiting several customers in a relatively short period of

3   time.

4   Q.   And what was the message that was to be delivered?

5   A.   There were basically two messages that we were delivering

6   to those customers.  The first one was that from a supply side

7   there was a decrease in small birds; therefore, we needed a

8   price increase.  And secondly, the profitability of small birds

9   was lagging behind other segments in the poultry industry;

10  therefore, we needed a price increase.

11  Q.   Okay.  Can you explain to the jury what a small bird is?

12  A.   Yes.  There is different segments in the poultry industry.

13  There is small birds, there is medium bird and then a large

14  bird.  Small birds are primarily what's used in QSR because

15  they are sized and what you typically see in the fast-food

16  restaurant where then you get into your little bit larger bird,

17  medium birds.  That's your case ready or what you would see in

18  the meat case at your local retail store.  Then your large

19  birds are more of an ingredient-type segment.

20  Q.   So why would a shortage of small birds, why would that

21  matter to a place like KFC or Popeye's?

22  A.   Particularly in their size, they couldn't very easily

23  transition into a different size.  First of all, their brand is

24  built around a different size in size segment, so they couldn't

25  very easily transition away from that size.  So that's why it

Robert Bryant - Direct

1   was important for them to have this particular bird size

2   available.

3   Q.   All right.  So what did you do?

4   A.   First thing after -- we built a deck.  I worked on getting

5   a PowerPoint presentation -- we call it a deck -- getting a

6   PowerPoint presentation built for these customer meetings.

7   Q.   For the blitz?

8   A.   For the blitz, yes.

9   Q.   And what was your role, if any, in creating the PowerPoint

10  presentation?

11  A.   I had one slide really that I was responsible for that he

12  asked -- that Jason McGuire asked me to prepare, and that was

13  outlining the supply side of small birds and the decrease in

14  that supply over the last four, five years compared to current

15  at the time in 2014.

16  Q.   All right.  So as part of the customer blitz, which

17  customers did you visit?

18  A.   I recall visiting KFC, Popeye's and Church's.  There could

19  have been more, but I recall those three.

20  Q.   All right.  Let's start with Popeye's and Church's.  What

21  was the timing of those meetings?

22  A.   It was late July of 2014.

23  Q.   Okay.  Did you visit them nearly at the same time?

24  A.   Yes.  What I recall is their offices are relatively close

25  in north Atlanta like around the Dunwoody area, so maybe less

Robert Bryant - Direct

1   than a mile apart or not much more than a mile apart, so you

2   could visit one and get the other in the same day or the

3   opposite day and so you could get two customers visited in a

4   very short period of time.

5   Q.  Okay.  And so do you recall the date, the approximate date

6   of those meetings?

7   A.  Around the 20-something of July, maybe 23rd, 24th,

8   somewhere in there.  I remember it was the week before we

9   started our budget reviews that year.

10  Q.  Okay.  When you said Popeye's, was it Popeye's you were

11  visiting or was it somebody else?

12  A.  It's SMS.

13  Q.  What is SMS?

14  A.  It's similar to the RSCS.  It's the procurement side that

15  negotiates the contracts for the Popeye's franchisees.

16  Q.  Okay.  So it was SMS who you were visiting?

17  A.  That's correct.

18  Q.  But is it fair that you use SMS and Popeye's somewhat

19  interchangeably?

20  A.  That's correct.

21  Q.  All right.  So you went into the Popeye's meeting, right?

22  A.  That's correct.

23  Q.  Who else attended?

24  A.  I remember myself, Jason McGuire, Justin Gay and Roger

25  Austin.

Robert Bryant - Direct

1    Q.   Okay.  And who from the Popeye's side?

2    A.   I know -- I remember Kent Kronaugue and I believe their CFO

3    may have been there, but I am unclear on who all from the other

4    side attended.

5    Q.   Who is Kent Kronaugue?

6    A.   Kent Kronaugue, he is the buyer for Popeye's.  I think now

7    he is the president of the SMS, but still actively buying.

8    Q.   Was he the lead negotiator?

9    A.   That's correct, yes.

10   Q.   And what did you -- what message did you deliver in that

11   meeting?

12   A.   The message that Jason McGuire wanted us to deliver on the

13   supply side contraction and then the profitability of the small

14   bird segment.

15   Q.   Did there -- what was their reaction, SMS?

16   A.   I mean, the customers generally always listen to what you

17   have to say and they're -- you know, I believe they recognized

18   that there would have to be a price increase or they knew that

19   we would -- that it was fair for us to be seeking a price

20   increase.

21   Q.   Did you think it was fair to be seeking a price increase?

22   A.   I did.

23   Q.   And based on what?

24   A.   Based off the supply contraction and the profitability.

25   And, you know, that year in particular there was -- I mean, in

Robert Bryant - Direct

1   order to justify a price increase, it can't just be supply

2   because just because supply decreases, if demand decreases the

3   same amount as supply, you don't have a justification for a

4   price increase.  But in this scenario supply contracted and

5   there were shortages, so the two combined led me to believe

6   that a price increase were warranted.

7   *Q.*  Did you share with Popeye's the size of the price increase

8   you were thinking of?

9   *A.*  I don't recall at that time, no.

10  *Q.*  Why not?

11  *A.*  We were laying foundational -- you know, we were stating

12  our marketed intel and our position to our customers at that

13  time so they would be expecting to see increases and just

14  giving our justification for the ask.

15  *Q.*  Now, did there come a time during that meeting where the

16  Popeye's/SMS people left the room?

17  *A.*  Yes.

18  *Q.*  And who was then remaining in the room?

19  *A.*  Just the Pilgrim's people.

20  *Q.*  Who was that again?

21  *A.*  Myself, Roger Austin, Justin Gay and Jason McGuire.

22  *Q.*  And was there any conversation when the SMS/Popeye's people

23  left?

24  *A.*  There was.

25  *Q.*  And what was that?

Robert Bryant - Direct

1   *A.* I remember Jason McGuire told Roger Austin, "I need you to

2   put this out to the industry."

3   *Q.* And what was your understanding of that?

4   *A.* My understanding was that he was asking him to give

5   Pilgrim's justification for a price increase to our

6   competitors.

7   *Q.* So delivering both the message of price increase and

8   justification.

9   *A.* That's correct, to build pricing support.

10  *Q.* What does that mean, build pricing support?

11  *A.* To build support with the competitors for a price increase

12  that fall.

13  *Q.* So what was the ultimate goal, then?

14  *A.* To raise prices in 2014.

15  *Q.* Just Pilgrim's?

16  *A.* No, the industry or the competitors.

17  *Q.* Together.

18  *A.* Together, yes.

19  *Q.* All right. Was it important to get -- you said build

20  pricing support. Why was pricing support from competitors

21  important?

22  *A.* For the same reason we had the discussion about US Foods.

23  If we were the only ones that raised prices, then -- and our

24  competitors didn't, then our customers could buy all they could

25  find from our competitors and then only buy from Pilgrim's what

Robert Bryant - Direct

1   we had to -- what they had to.

2   Q.   So you would lose business.

3   A.   That's correct.

4   Q.   Without the pricing support as you put it.

5   A.   That's correct.

6   Q.   And what was your reaction to Mr. McGuire's direction to

7   Mr. Austin?

8   A.   I was surprised about it, just -- now I remembered it

9   clearly.  I remember thinking that's how it works.  You know,

10  it was one of my first national account meetings and that I

11  just -- I didn't realize that we shared that type of

12  information with our competitors.

13  Q.   Now, earlier you testified, right, that as far back as 2010

14  you had heard Roger Austin talking about what he learned from

15  competitors.  But now in 2014 you are surprised.  How do you

16  reconcile those things?

17  A.   Yeah, well, before that it wasn't pricing information and

18  things like that.  It was more spec, bird size, things of that

19  nature.  And then the reason why I remember the statement was

20  because, you know, this was one of my first real customer faced

21  meetings where I'm actually delivering a message to a customer

22  and we're going into negotiation and Jason McGuire was asking

23  Roger to -- Roger Austin to share our strategy to get that

24  price increase that year.

25  Q.   And did you have occasion to observe Mr. Austin's reaction?

Robert Bryant - Direct

1    A.   Yes.

2    Q.   What was that?

3    A.   There really wasn't a reaction.  It was like a normal

4    business conversation.

5    Q.   A what?

6    A.   A normal business conversation.

7    Q.   Okay.  Do you think SMS or Popeye's overheard it?

8    A.   No.

9    Q.   Why not?

10   A.   I just remember they left the room and the door was closed

11   and it was just us.  And that was another reason why I

12   remembered the comment because it seemed fairly bold to say

13   that at a customer conference room.

14   Q.   When SMS came back in the room, did you report what you

15   heard?

16   A.   No.

17   Q.   Why not?

18   A.   First, I was new on the -- new customer facing in that.

19   Before that I would go in and observe, but this time I was

20   presenting and, you know, my manager had given an instruction

21   and Roger didn't have a reaction and I thought it was accepted.

22   Q.   Okay.  Now, after that meeting did there come a time when

23   you had a similar meeting with RSCS or KFC?

24   A.   Yes.

25   Q.   When was that?

Robert Bryant - Direct

1    A.  August 1st.

2    Q.  If we could pull up -- hold on.

3            And you attended that meeting?

4    A.  I did.

5    Q.  And who else from Pilgrim's attended that meeting?

6    A.  Myself, Jason McGuire, Roger Austin, Scott Tucker, Justin

7    Gay, and I believe Tommy Lane.

8    Q.  That's not a name we've heard before, Tommy Lane.

9    A.  Yes.

10   Q.  Who is he?

11   A.  He works at Pilgrim's and I think his title was business

12   analyst.

13   Q.  What was his role?

14   A.  He -- there is a cost model for KFC pricing that has grain

15   and soy inputs into it that causes their price to float, so he

16   kept up with those models for us.

17   Q.  So he is a pricing guy.

18   A.  Yes.

19   Q.  All right.  If you could, please, pull up -- did you show a

20   PowerPoint presentation?

21   A.  We did.

22           MR. KOENIG:  Could you please pull up Government

23   Exhibit 1055?

24   BY MR. KOENIG:

25   Q.  Do you recognize Government Exhibit 1055?

Robert Bryant - Direct

1    A.   I do.

2    Q.   What is it?

3    A.   It's the PowerPoint presentation for the August 1st KFC

4    meeting.

5    Q.   And this is the PowerPoint presentation that you helped

6    create?

7    A.   That's correct.

8    Q.   And was shown to KFC or RSCS at that August 1st meeting?

9    A.   That's correct.

10         MR. KOENIG:   Your Honor, I would move -- we would

11   offer 1055 into evidence.

12         THE COURT:   Any objection to the admission of

13   Exhibit 1055?

14         MR. TUBACH:   No objection.

15         MR. FELDBERG:   No objection, Your Honor.

16         THE COURT:   Exhibit 1055 will be admitted.

17         MR. KOENIG:   Thank you, Your Honor.   May we publish to

18   the jury?

19         THE COURT:   You may.

20         MR. KOENIG:   Can we go back to Page 1?

21   BY MR. KOENIG:

22   Q.   All right.   Mr. Tucker, do you see those two logos at the

23   top?

24   A.   Excuse me?

25   Q.   Mr. Bryant, my apologies.   Mr. Bryant, do you see those two

Robert Bryant - Direct

1    logos at the top of the screen?

2    A.  I do.

3    Q.  What are they?

4    A.  One is the Pilgrim's logo and the other one is RSCS's logo.

5    Q.  Okay.  And what's the date written on it?

6    A.  August 1st, 2014.

7    Q.  And again it's your testimony that this is the presentation

8    shown to RSCS on August 1st, 2014?

9    A.  That's correct.

10        MR. KOENIG:  Can we go to Page 2?

11   BY MR. KOENIG:

12   Q.  What is this list of names?

13   A.  Those are the attendees from the Pilgrim's side.

14   Q.  And is that the same list of names you just read off?

15   A.  I believe so.

16        MR. KOENIG:  Let's go to Page 3, please.

17   BY MR. KOENIG:

18   Q.  Can you explain -- first of all, what is this slide?

19   A.  This is the slide that I helped prepare.

20   Q.  Okay.  And what were you trying to convey with this slide?

21   A.  Yes.  It's a little hard to read here because it actually

22   had some animation in it, but one set of those bars was the

23   five years prior of bird availability and then the other set is

24   that current availability.  And I was attempting to show the

25   reduction in size ranges for the particular size that KFC

Robert Bryant - Direct

1   purchased from.

2   Q.  All right.  So are you -- which sizes are shown that KFC

3   purchases from?

4   A.  It would be from that two and a quarter to two and

5   three-quarter size ranges.

6   Q.  I see at the top there is some little white arrows.

7   A.  Yes.

8   Q.  What are those supposed to represent?

9   A.  So in the two and a quarter to two and a half size there

10  was a 5 percent reduction in availability in that size.  And

11  then in that two and a half and two and three-quarter there was

12  a 7 percent reduction in availability in that size.

13  Q.  All right.  And again, this meeting was part of the -- was

14  this meeting part of the customer blitz?

15  A.  It was.

16  Q.  What, if any, what effect were you trying to have on RSCS

17  by showing this?

18  A.  I mean, it was part of our basis for the price increase and

19  to show them that the sizes that they needed were shrinking and

20  that they needed to pay more in order to have access to those

21  birds.

22  Q.  Were you hoping to evoke any emotion from them by showing

23  them this?

24  A.  I was hoping that they would get onboard with the price

25  increase.

Robert Bryant - Direct

1    *Q.*  Why would this information be important to them?

2    *A.*  Because they bought in those two size ranges.  And with

3    that reduction and, you know, there was some natural growth in

4    that same size, that -- and they felt shortages that year, so

5    there was -- it was important to them.

6    *Q.*  Now, at that meeting did you tell KFC the size price

7    increase you were going to be looking for?

8    *A.*  Not that I recall.

9    *Q.*  Why not?

10   *A.*  This was -- this was a prebid meeting where we were just

11   laying foundation or groundwork for a price increase.  And what

12   I recall, we hadn't received an official ask from KFC to submit

13   pricing yet.

14   *Q.*  Around this time did you then learn of the size price

15   increase that Pilgrim's would be requesting?

16   *A.*  I did.

17   *Q.*  And what did you learn?

18   *A.*  It was going to be around 15 or 20 cents a pound.

19   *Q.*  And what was your reaction to that size of price increase?

20   *A.*  I was concerned.

21   *Q.*  Why were you concerned?

22   *A.*  Reasons I stated earlier, that, you know, in my experience

23   up to this point dealing -- seeing national account price, I

24   hadn't seen a price increase of that size.  I didn't believe

25   our competition at this point would come to the same

1    conclusions that we did and would ask for a similar price

2    increase, so I was concerned that we would lose a lot of

3    business.

4    Q.  So at this point even though you had heard, you know, what

5    you heard at the Popeye's meeting, at this point what was your

6    understanding of how competition was functioning among the

7    bidding suppliers?

8         MR. TUBACH:  Objection, lack of foundation of any kind

9    of negotiation of national accounts.

10        THE COURT:  Sustained.

11   BY MR. KOENIG:

12   Q.  You said you were worried the price increase wouldn't

13   stick; is that right?

14   A.  Can you repeat, please?

15   Q.  You were afraid that the price increase wouldn't work.  Is

16   that what you said?

17   A.  I was concerned that --

18        MR. FELDBERG:  Objection.  That's not what he said.

19   It's misleading.

20        THE COURT:  Overruled.  He can answer.

21   A.  I was concerned that we would lose business with that price

22   increase.  That was my concern.

23   BY MR. KOENIG:

24   Q.  But now you testified just a few minutes ago that you

25   thought based on shortages of small birds and some disparity in

Robert Bryant - Direct

1    the profitability between small birds and larger birds that you

2    thought a price increase was justified.  But then you're saying

3    at the same time you were worried.  So how do you reconcile

4    those things?

5    A.  I felt that a price increase was warranted, but my

6    experience to this point, I had not seen a price increase that

7    large to a national account.  So if Jason McGuire would have

8    said we're going to go after a nickel, I would have thought

9    that's probably doable.  When he said we're going after 20

10   cents, I thought that at the time that we were going to lose a

11   lot of business because I didn't -- my opinion at that time was

12   that our competitors would not do the same thing.

13          MR. TUBACH:  Objection, lack of foundation.

14          THE COURT:  Overruled.

15   A.  My opinion at that time was our competitors wouldn't come

16   to that large of a price increase because I hadn't seen that

17   before in my career, particularly with KFC.

18   BY MR. KOENIG:

19   Q.  Yeah, and I think you said this before, but what was the

20   typical year-to-year price increase with KFC?

21   A.  A few pennies up or down.

22   Q.  Per pound you said?

23   A.  Per pound, yes.

24   Q.  All right.  And I think you -- back when we were talking

25   about 2017 for KFC, you mentioned -- you went through kind of

Robert Bryant - Direct

1   the structure, right?  There was the invitation to bid, RFP.

2   Was this sort of the same structure?

3   A.  Yes.  This was a prebid meeting.

4   Q.  All right.  But so there was an RFP eventually issued?

5   A.  That's correct, yes.

6   Q.  And then there was a deadline?

7   A.  There was, yes.

8   Q.  What was the deadline?

9   A.  It was somewhere around August 20th, somewhere in there.

10  Q.  And same as the question before.  Did you have an

11  understanding of what KFC and RSCS expected regarding how

12  Pilgrim's would formulate its price?

13  A.  Yes.

14        MR. FAGG:  Objection, Your Honor, foundation.

15        THE COURT:  Sustained.  If you could lay a little

16  foundation.

17        MR. KOENIG:  I just asked whether he had an

18  understanding and he said yes.

19        THE COURT:  All right.  Overruled.  And then if the

20  witness can answer that question then next.

21  BY MR. KOENIG:

22  Q.  What is the basis for your understanding as to how KFC

23  expected Pilgrim's to formulate its pricing?

24  A.  You know, at this point I have been in some sales role

25  probably from 2000, not customer facing on the national account

Robert Bryant - Direct

1    as much, but obviously working for Jason McGuire for four years

2    and discussing different bids over the course of those years

3    with him and how those bids were handled.

4    Q.  And so what was your understanding?

5    A.  That it would be a blind bid or -- I think we've used that

6    term before.

7    Q.  Can you remind the jury what a blind bid is?

8    A.  It's a bid that's done in like a vacuum or I think I used

9    the analogy of a sealed bid where you put your price in an

10   envelope and seal it and the only person that sees it is the

11   person that's buying it.

12   Q.  All right.  And so when was the bid submitted,

13   approximately?

14   A.  Around the 20th of August, somewhere in that neighborhood.

15   Q.  All right.  And when the bid was submitted, were you still

16   nervous that it wasn't going to work?

17   A.  I was still concerned, yes.

18   Q.  Did there come a time when you became less nervous?

19   A.  Yes.

20        MR. KOENIG:  Can we pull up Government Exhibit 1066,

21   please?

22   BY MR. KOENIG:

23   Q.  Do you recognize 1066?

24   A.  I do.

25   Q.  What is it?

Robert Bryant - Direct

1   A.  It's an e-mail from Jason McGuire to -- it's an e-mail from

2   Jason McGuire to me on August 21st, 2014.

3   Q.  Okay.  And what does it relate to generally, the e-mail?

4   A.  It relates to our bid submission to KFC.

5          MR. KOENIG:  Okay.  Your Honor, at this time I would

6   offer Exhibit 1066 into evidence.

7          THE COURT:  Any objection to the admission of 1066?

8          Exhibit 1066 will be admitted.

9          MR. KOENIG:  Permission to publish to the jury, Your

10  Honor?

11         THE COURT:  You may.

12         MR. KOENIG:  All right.  Let's go down to the bottom

13  e-mail in the chain.

14  BY MR. KOENIG:

15  Q.  So who is this e-mail from and to?

16  A.  The top one is from Roger Austin to Jason McGuire.

17  Q.  And what does the subject line read?

18  A.  Any word from them on our proposal?

19  Q.  What's your understanding of that question?

20  A.  That he's -- Jason McGuire -- the subject of that is about

21  our bid to KFC in 2014.

22  Q.  Okay.  So who is them?

23  A.  Them in that sentence would be KFC.

24  Q.  And what was Mr. Austin's response?

25  A.  I heard they made a couple of calls and were surprised.

Robert Bryant - Direct

1    Q.   What was your understanding of that?

2    A.   That KFC had gotten feedback from other competitors and

3    were surprised by how -- surprised by the level of their price

4    increase.

5          MR. KOENIG:   All right.   Can we go up to the next set

6    of e-mails?

7    BY MR. KOENIG:

8    Q.   And how did McGuire respond?

9    A.   Surprised like how much higher everyone else was.

10   Q.   Who was everyone else in your understanding?

11   A.   My understanding was that was our competitors.

12   Q.   Higher, what does that refer to?

13   A.   Higher on their bid submission or their pricing.

14   Q.   And what was Mr. Austin's response?

15   A.   Yes.

16   Q.   Okay.   And --

17         THE COURT:   So we are at 5:00 o'clock now, so maybe if

18   you could look for a convenient breaking spot.

19         MR. KOENIG:   If I can just finish this e-mail.

20         THE COURT:   How long will that take do you anticipate?

21         MR. KOENIG:   Two minutes.

22         THE COURT:   Go ahead.

23         MR. KOENIG:   All right.   Then can we go to the next

24   set of e-mails in this?

25   BY MR. KOENIG:

Robert Bryant - Direct

1    Q.   Now, what was Jason McGuire's response to Roger Austin?

2    A.   Can you smell their dirty drawers from where they crapped

3    their pants?  Ha.

4    Q.   I won't ask you to interpret that.

5         And Roger Austin's response?

6    A.   Definitely.

7    Q.   All right.  And their in McGuire's e-mail, T-H-E-I-R, who

8    is that?

9    A.   He would be referring to KFC.

10        MR. KOENIG:  And now the top e-mail?

11        THE WITNESS:  Is that a question for me?

12        MR. KOENIG:  No, Ms. Pearce.

13   BY MR. KOENIG:

14   Q.   Now, it looks like Jason McGuire forwarded it to you?

15   A.   That's correct.

16   Q.   And what was your response?

17   A.   That's good...

18   Q.   What did you mean by that?

19   A.   This was the first indication that I can recall that Jason

20   McGuire shared with me that the price increases from not only

21   us but our competitors were being submitted to KFC.

22   Q.   Okay.  So did this alleviate some of your worries?

23   A.   I was a little less concerned, but still concerned, yes.

24   Q.   And what was Mr. McGuire's response?

25   A.   Yes, that should help y'all out some.

1    *Q.*  What did you understand that to mean?

2    *A.*  I believe it's the next day on the 22nd, it could be the

3    23rd, Roger and myself and Scott Tucker had a meeting with KFC,

4    a follow-up to our bid submission, so he was basically saying

5    that this information should help us in that next meeting.

6    *Q.*  How so?

7    *A.*  Because we now know that or have confirmation that our

8    competitors submitted similar price increases.

9              *MR. KOENIG:*  I think that's a good place to stop.

10             *THE COURT:*  Ladies and gentlemen, we will go ahead and

11   break for the day.  Keep the admonitions in mind.  Once again,

12   don't look up any information.  You may have heard unfamiliar

13   terms.  Don't try to look up any of that.  All of your

14   information has to come from the trial itself, okay?

15             The jury is excused.  8:30 tomorrow is when we will

16   start.  Try to make sure you are in the jury room so assuming

17   we're ready we can start then.  Thank you very much.  You are

18   excused.

19             (Jury excused.)

20             Mr. Bryant, you are excused and you can be back

21   tomorrow at 8:30 ready to go.  Thank you very much.

22             Anything that we should take up before we recess?

23             Ms. Call?

24             *MS. CALL:*  Very briefly, Your Honor.  I will try to

25   speak as loud as my colleague.  I wanted to address another

 1   filing from last night, Docket 760, the defendant's motion to

 2   exclude newly identified summary exhibits.  It's the

 3   government's position that this is moot, the finding in the

 4   Court's order in Docket No. 741 as to summary exhibits and that

 5   would be breaking up of what was previously identified as A4.

 6   And the government's response to the previous motion to exclude

 7   doesn't change the fact in the Court's prior finding as the

 8   material summarized in those exhibits are not conveniently

 9   examined in court.  But I did want to raise it because if Your

10   Honor is inclined to consider the motion, the government would

11   like an opportunity to be heard in a briefing.

12        THE COURT:  Not surprisingly, I not only will be

13   considering it, but will be ruling on it.  So if you want to

14   respond to it, when do you think you could do so?

15        MS. CALL:  Likely by tomorrow morning.

16        THE COURT:  Okay.  Anyone anticipate it would come up

17   before then?

18        MS. CALL:  No.  I don't believe any of these summaries

19   will be used until a later witness.

20        THE COURT:  Okay.  I won't rule on it until after the

21   government responds tomorrow morning.

22        MS. CALL:  And I did want a clarification on that

23   prior ruling as well as to the exhibits that had been

24   identified as A5 and A6, which were the phones with the text

25   messages as well as the visual aids with the photographs and

1    the phone calls.  The government had indicated in its response

2    that it intended to use those as demonstratives still, and I

3    wanted to ensure that that wasn't at odds with your ruling.

4         *THE COURT:*  The objection was to their -- I think it

5    was to their admissibility.  And the indication was that they

6    were just going to be used as demonstratives.  We'll have to

7    see, you know, who is presenting them, but because of the fact

8    that the indication was that they would be used as

9    demonstratives and wouldn't be admitted for that reason but

10   would be still shown to the jury, I didn't see a -- I didn't

11   think that it was necessary for the Court to rule on them.

12        One fine point let me mention, and this will go for

13   both sides when we come to it, but when a document is being

14   displayed to the jury, so this is a document that's been

15   admitted, what's been going on is oftentimes a portion of the

16   e-mail is highlighted in yellow as we go on.  That's okay, but

17   you need -- whoever is doing the highlighting needs to wait

18   until the witness has answered and then highlight the answer.

19   Otherwise -- and it's not purposeful, but otherwise the

20   highlighting can be used to silently lead a witness by pointing

21   out to the witness the answer to the question, okay?  So you

22   just have to as a witness mentions the date, then the date can

23   be highlighted.  But if the question is, "what's the date," the

24   date shouldn't be highlighted before the witness answers.

25        *MS. CALL:*  Understood.  Thank you, Your Honor.

1          *THE COURT:* Anything else?  All right.  We will be in

2     recess then until tomorrow.  If there is an issue, let

3     Ms. Grimm know.

4          The Court will be in recess.  Thank you.

5       (Recess at 5:09 p.m.)

6                              INDEX

7     WITNESSES

8       Robert Bryant

9            Direct Examination By Mr. Koenig                    4

10                            EXHIBITS

11    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

12    1055                      167

13    1066                      175

14    1882                       93

15    1919, 11-12               123

16    3039                      154

17    9139                      152

18    9140                      149

19    9235                       24

20    9237                       51

21    9242                       43

22    9244                       29

23    9245                       33

24    9248                       32

25

1                          REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.  Dated

4     at Denver, Colorado, this 21st day of November, 2021.

5

6                                S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25