1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
      Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                  REPORTER'S TRANSCRIPT
14              Excerpt of Trial to Jury
             Testimony of Robert Lewis, Vol. 1
15 _____

16           Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 11:05 a.m., on the 3rd day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        APPEARANCES

 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

 5   for Plaintiff.

 6          Anna Tryon Pletcher and Michael Tubach of

 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 8   San Francisco, CA 94111-3823;

 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washingon, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16          Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25
```

```
 1                    APPEARANCES (Continued)

 2           Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4   CA 94065; appearing for Defendant Austin.

 5           Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7           Marci Gilligan LaBranche of Stimson, Stancil,

 8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9   80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
 1                      APPEARANCES (Continued)
 2              Craig Allen Gillen and Anthony Charles Lake of
 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4    Atlanta, GA 30339;
 5              Richard L. Tegtmeier of Sherman & Howard, LLC,
 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7    for Defendant Roberts.
 8              Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10    DC 20006;
11              Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13    for the Defendant Blake.
14
15                           PROCEEDINGS
16              The United States may call its next witness.
17              MR. TORZILLI:  Thank you, Your Honor.  The United
18    States calls Bob Lewis.
19              THE COURT:  That was Robert Lewis?
20              MR. TORZILLI:  Yes.
21          (Robert Lewis was sworn.)
22              THE WITNESS:  I do.
23              COURT DEPUTY CLERK:  Please state your name and spell
24    your first and last name for the record.
25              THE WITNESS:  Robert, R-O-B-E-R-T; B-U-R-L; Lewis,
```

1    L-E-W-I-S.

2                    **DIRECT EXAMINATION**

3    *BY MR. TORZILLI:*

4    *Q.*   Good morning, Mr. Lewis.

5    *A.*   Good morning.

6    *Q.*   Can you tell the Ladies and Gentlemen of the Jury what your

7    current occupation is?

8    *A.*   I am currently retired.

9    *Q.*   Did you ever work in the chicken business?

10   *A.*   Yes.

11   *Q.*   What year did you start working in the chicken business?

12   *A.*   1973.

13   *Q.*   When you started working in the chicken business in 1973,

14   what were you doing?

15   *A.*   I was a buyer in the purchasing department with the USA

16   division.

17   *Q.*   Of what?  Of what company?

18   *A.*   Oh, of KFC Corporation.

19   *Q.*   And KFC corporation, what does that stand for?

20   *A.*   Kentucky Fried Chicken.

21   *Q.*   How long were you in that position?

22   *A.*   Approximately, 10 years.

23   *Q.*   And then where did you go to work?

24   *A.*   In 1984 I was promoted to director and transferred to

25   Miami, Florida, to run an export operation there for KFC

Robert Lewis - Direct

1    International.

2    *Q.*   How long were you in Miami in that position?

3    *A.*   Approximately, four years.

4    *Q.*   Then where did you go?

5    *A.*   I was transferred back to Louisville as the director of

6    purchasing and distribution for KFC International.

7    *Q.*   How long did you stay in that position?

8    *A.*   Approximately, five years or so.

9    *Q.*   And then what did you do, Mr. Lewis?

10   *A.*   I moved back into the KFC USA division and became a member

11   of the poultry team.

12   *Q.*   What did you do next?

13   *A.*   Purchased further processed and fresh chicken for KFC.

14   *Q.*   And what was your next position after that?

15   *A.*   In 1999 I moved to a purchasing cooperative called UFPC or

16   Unified Food Service Purchasing Co-op and continued working in

17   the fresh chicken area.

18   *Q.*   Did UFPC change its name at some point in time?

19   *A.*   It did.  It became RSCS, which is Restaurant Supply Chain

20   Solutions.

21   *Q.*   How long were you with Restaurant Supply Chain Solutions or

22   RSCS?

23   *A.*   Approximately, 11 years.

24   *Q.*   So approximately until the year 2009?

25   *A.*   That's correct.

Robert Lewis - Direct

1  Q.  And what did you do in the year 2009?

2  A.  In 2009 I retired.

3  Q.  Just a couple of follow-ups on RSCS.  Can you tell the

4  Ladies and Gentlemen of the Jury what RSCS is, what it does?

5  A.  RSCS is a purchasing cooperative exclusively for Yum Brands

6  which owns KFC, Taco Bell, Pizza Hut.  Its purpose is to manage

7  the supply chain for all products used by those three concepts.

8  Q.  Does RSCS buy chicken?

9  A.  Yes.

10  Q.  Okay.  Does it negotiate contracts --

11  A.  Yes.

12  Q.  -- for the purchase of chicken?

13  A.  Yes.

14  Q.  And who actually buys the chicken that's sold in KFC

15  restaurants?

16  A.  RSC actually buys it, but then, of course, it's sold to the

17  KFC restaurants.

18  Q.  And who sells the chicken that's sold in KFC restaurants?

19  A.  The individual operators.

20  Q.  So there is the individual KFC store operators, and who do

21  they buy the chicken from?

22  A.  The individual operators by their chicken through RSCS from

23  approved suppliers.

24  Q.  Mr. Lewis, do you know how a chicken gets from the

25  slaughterhouse to a KFC restaurant?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   Can you describe that process, please?

3    A.   Live birds are brought in from the field to the processing

4    plant.  At the processing plant the birds are placed on a

5    moving shackle line.  The birds are carried into an area where

6    they are stunned and then they are slaughtered.  And then they

7    go through a hot scald to help facilitate the removal of

8    feathers.  The head and feet are then removed.  The birds go

9    through an evisceration process where the internal organs are

10   all removed.  The birds then go through a chilling operation

11   and from there they are dropped into vats by weight or size.

12        And from there they move to what is called second

13   processing for the KFC birds, in this case would be moved to a

14   cut-up line where the product would be cut up, marinated and

15   packaged for delivery to the restaurants.

16   Q.   Are you familiar with the term WOG?

17   A.   WOG?  Yes, sir.  Without giblets is what WOG stands for.

18   Q.   How is WOG spelled?

19   A.   WOG is just W-O-G.

20   Q.   And it stands for what?

21   A.   Without giblets.

22   Q.   What's a WOG?

23   A.   A WOG is a whole bird.

24   Q.   What's removed from the whole bird?

25   A.   The viscera or the internal organs.

Robert Lewis - Direct

1   Q.   Are you familiar with a term called eight-piece?

2   A.   Yes.

3   Q.   Is that a chicken product?

4   A.   It is.

5   Q.   What's an eight-piece chicken product?

6   A.   The birds that I described earlier that are moved into the

7   second processing are cut into eight pieces from the WOG, and

8   those are the products that end up in the restaurants in cut-up

9   form.

10  Q.   How popular is eight-piece chicken products in KFC

11  restaurants?

12  A.   Extremely.  It's the primary item sold in a KFC store.

13  Q.   Does eight-piece have bone-in?

14  A.   Eight-piece is a bone-in product, yes.

15  Q.   So it's a bone-in chicken product?

16  A.   Yes.

17  Q.   Where are KFC restaurants located?

18  A.   All across the country and around the world.

19  Q.   Do chicken products going to KFC restaurants from the

20  slaughterhouses, so the chicken processing facilities, do they

21  cross state lines?

22  A.   Yes.

23  Q.   How do you know that?

24  A.   From experience.

25  Q.   You said you retired from RSCS approximately 2009; is that

Robert Lewis - Direct

1   correct?

2   *A.*   That's correct.

3   *Q.*   Was there a time when you returned to RSCS?

4   *A.*   Yes.

5   *Q.*   Approximately when did that occur?

6   *A.*   2014.

7   *Q.*   Why did you return to work at RSCS?

8   *A.*   The individual who had been heading up the poultry group

9   left abruptly and KFC was in the middle of the Mother's Day

10  period, which is the highest demand period for KFC throughout

11  the year, and they wanted me to come back to help them secure a

12  supply.

13  *Q.*   When you first came back to RSCS in 2014, how long were you

14  supposed to stay?

15  *A.*   Two months.

16  *Q.*   How long did you in fact stay?

17  *A.*   Seven months.

18  *Q.*   Why did you stay seven months rather than the two months

19  you were supposed to stay when you started?

20  *A.*   Well, after the two-month period was about to end, which

21  would have covered the Mother's Day period, July the 4th

22  holiday became -- well, it came upon us.  And we had the same

23  issue with supplies, so they asked me to stay for a couple more

24  months.  And then the contract I had with them was extended

25  again that carried me till the end of the year.

Robert Lewis - Direct

1   Q.   Approximately what time of year did you return to RSCS in

2   2014?

3   A.   Early May.

4   Q.   What was the first task you were asked to work on when you

5   returned to RSCS in May of 2014?

6   A.   Secure fresh chicken supply for KFC stores.

7   Q.   What issues -- what, if any, issues was RSCS facing with

8   respect to the supply of chicken at that time?

9   A.   Well, they were facing store closures if sufficient product

10  wasn't secured.

11  Q.   Store closures?

12  A.   Yes.

13  Q.   Could you explain what was happening that was leading to

14  potential store closures of KFC restaurants?

15  A.   Well, fresh bone-in chicken is the most critical item for a

16  KFC restaurant.  And if they don't have a supply, then many

17  times the only alternative they have is to shut the restaurant

18  down.

19  Q.   What's the consequence of a KFC restaurant shutting down?

20  A.   Lost sales and profit that they will never regain.

21  Q.   How bad -- how widespread was the supply shortage when you

22  came on to the scene again at RSCS in May of 2014?

23  A.   It was a national issue.

24  Q.   You mentioned Mother's Day a few moments ago.  Can you

25  explain to the Ladies and Gentlemen of the Jury the

Robert Lewis - Direct

1   significance of Mother's Day for KFC restaurants?

2   A.  Well, traditionally it was a time when children who wanted

3   to celebrate and honor their mother would come to KFC and buy

4   meals to have on Mother's Day and perhaps that weekend.

5   Q.  Is there a busier week in the calendar for KFC restaurants

6   than Mother's Day week?

7   A.  No.

8   Q.  So it's the busiest week of the year?

9   A.  Yes.

10  Q.  Do you have an understanding -- did you develop an

11  understanding in 2014 from KFC restaurant operators as to how

12  they viewed the supply issues that you were facing when you

13  returned to RSCS in May of 2014?

14  A.  Yes.  There was a great deal of anxiety and concern

15  throughout.

16  Q.  And can you explain the nature of the anxiety and concern

17  that you came to understand KFC restaurant operators to be

18  feeling at that time?

19  A.  Well, I would explain it as a near crisis situation.

20  Q.  Okay.  And how about do you have an understanding as to

21  within RSCS as to the feelings or views that they had towards

22  the supply issues that you identified in May of 2014?

23  A.  Yes.  I would call that also a crisis situation.

24  Q.  At around this time, so the May of 2014 time frame when you

25  first came back on the scene at RSCS, how much chicken was the

Robert Lewis - Direct

1    network of KFC restaurants in the United States purchasing?

2    A.   As a total system, chicken on the bone was in the

3    neighborhood of about 400 million pounds per year.

4    Q.   Per year?

5    A.   Per year.

6    Q.   And is that all products or is that just the eight-piece

7    bone-in chicken?

8    A.   That would be the eight-piece product plus the supplemental

9    dark meat, wings and white meat, which represents a small

10   percentage of the total, but it includes all bone-in product.

11   Q.   Can you explain what supplemental dark, white and wings

12   meat are?

13   A.   Supplemental dark, white and wings are exactly the same

14   product as the full eight-piece product.  It's just that some

15   markets have customers that prefer white meat over dark meat so

16   they needed extra supplies while other areas prefer dark meat

17   over white meat so they purchased dark meat to satisfy their

18   customers.

19   Q.   What did you do to address what you described as the crisis

20   level of supply shortage that the KFC restaurant network in the

21   United States was facing in May of 2014?

22   A.   I'm sorry, would you repeat that question?

23   Q.   Absolutely, sir.

24        What did you do to attempt to address the supply

25   issues that you described as being at crisis level in the

Robert Lewis - Direct

1   May 2014 time frame?

2   A.   When I first got there, the first thing I did was try to

3   assess the situation to determine how serious was the problem,

4   what had already been done in an attempt to rectify the

5   situation, take a look at the existing contracts to see the

6   suppliers -- who the suppliers were that were involved and how

7   much they were committed to supplying, and just had general

8   conversations with the folks that were already in place just to

9   get a feel for what we were facing.

10  Q.   So one of the things you did was review the existing

11  contracts you said?

12  A.   Yes.

13  Q.   And so can you explain what existing contracts you reviewed

14  at that time?

15  A.   Those contracts took the form of an SBRA addendum which

16  would be attached to the master SBRA, as we call it, that we

17  had signed with the suppliers.

18  Q.   So for what calendar year were the SBRA addendums for?

19  A.   2014.

20  Q.   And for the benefit of the Ladies and Gentlemen of the

21  Jury, can you explain what SBRA stand for and what it means?

22  A.   SBRA stands for Supplier Business Relationship Agreement.

23  It is a confidential agreement that we sign with each of the

24  approved suppliers that basically contains two major pieces.

25  One would be the master agreement itself which covers all the

Robert Lewis - Direct

1    terms and conditions that govern the relationship.  And the

2    second part of it would be the SBRA addendums which I just

3    mentioned that cover the details of the products that we are

4    securing from each supplier.

5    *Q.*  You said that as part of your first task, you were trying

6    to rectify the supply crisis that KFC restaurants were facing.

7    Can you describe to what extent you were successful in that

8    effort?

9    *A.*  We were successful in covering the Mother's Day demand.

10   *Q.*  How did you go about doing that?

11   *A.*  Working with the existing approved suppliers.

12   *Q.*  Did there come a time in that process, Mr. Lewis, where you

13   had to purchase chicken at prices that were above the agreed to

14   contracted prices?

15   *A.*  Yes.

16   *Q.*  Could you explain that situation, please?

17   *A.*  Well, product that was required over and above the

18   contractual agreement, I don't remember the number of loads

19   exactly, but those truckloads of product were purchased at a

20   premium to the price that was in the SBRA addendums.

21   *Q.*  Do you remember approximately how much of a premium above

22   the contracted prices?

23          *MR. McLOUGHLIN:*  Objection, Your Honor.  Unless we are

24   going to ask about every supplier's contract price, each one

25   would be different so you would have a different amount.

Robert Lewis - Direct

1      THE COURT:  Overruled.  He can answer if he knows.

2  BY MR. TORZILLI:

3  Q.  You can answer.

4  A.  I don't recall the specific numbers.

5  Q.  Okay.  Do you remember approximately?

6      MR. McLOUGHLIN:  Objection.  The witness has said he

7  doesn't recall.

8      MR. TORZILLI:  He said he didn't recall specifically.

9      THE COURT:  Overruled.  He can give a general answer.

10  A.  I'm going to say that it was probably in the neighborhood

11  of 6 to 8 cents per pound premium for part of it.  And then at

12  one stage after we had secured the product that we felt we

13  needed, senior management at RSCS instructed me to go out and

14  buy 10 insurance loads, and they told me the price to pay for

15  that 10 loads of product.  It was not negotiated.

16  BY MR. TORZILLI:

17  Q.  Do you recall for the 10 truckloads of insurance what the

18  price was above the contracted price?

19  A.  The price was $1.40 FOB the plant per pound.

20  Q.  So $1.40 for eight-piece chicken-on-the-bone product?

21  A.  Correct.

22  Q.  And approximately how much within a range, if you recall,

23  was the contract price at that time?

24  A.  The contract price at that time averaged approximately 92

25  cents per pound.

Robert Lewis - Direct

1  Q.  So almost a 50-cent premium above contracted price?

2  A.  Correct.

3  Q.  After you were successful in rectifying the supply issues

4  that you described, what did you wind up taking on next as a

5  task at RSCS in 2014?

6  A.  In the absence of a department head, they asked me to stay

7  on and to be the point person for 2015 price negotiations.

8  Q.  Can you describe what you mean by 2015 price negotiations?

9  A.  That was a process where each of the approved suppliers

10  were contacted and we pursued proposals from them to cover the

11  calendar year 2015 chicken demand from KFC.

12  Q.  Did you work with others at RSCS to conduct the price

13  negotiations for the following year, 2015?

14  A.  Yes.

15  Q.  Who did you work with?

16  A.  Well, I worked with the individual that I was -- I guess

17  you could say was reporting to, a gentleman by the name of Pete

18  Suerken, who was senior vice-president of RSCS, and an

19  individual that was on the poultry team by the name of Steve

20  Campisano.  And then eventually the new department head that

21  was hired came into the team, and his name was Rich Eddington.

22  Q.  So first taking Mr. Suerken, what was Mr. Suerken's role in

23  the price negotiations?

24  A.  I guess you could call Mr. Suerken the quarterback of the

25  team.  He was -- he was the individual that I had to go to to

Robert Lewis - Direct

1   get final approval on everything that I was attempting to

2   accomplish.

3   Q.   And what was Mr. Eddington's role in price negotiations?

4   A.   Mr. Eddington's role was basically an observer for a period

5   of time because he was new to the business.  And part of my

6   responsibility during that period was to help Mr. Eddington get

7   acclimated, but he eventually took over the day-to-day

8   activities and actually ended up signing all of the SBRA

9   addendums.

10   Q.   Do you recall an approximate time frame where Mr. Eddington

11   took over for you as the day-to-day or the point person on

12   these price negotiations?

13   A.   I would say that was in the September, October period

14   perhaps.

15   Q.   And Mr. Campisano, what was his role in the price

16   negotiations?

17   A.   Mr. Campisano was basically the poultry group's

18   representative from the distribution side.  Once the product is

19   purchased from the supplier, of course, we have to get the

20   product to the restaurants.  And he was involved in that part

21   of the business, to work with the distribution companies to get

22   the product to the restaurants.

23   Q.   So Mr. Lewis, in your role participating in the price

24   negotiations in 2014, did you have communications with chicken

25   suppliers that Mr. Suerken or Mr. Eddington or Mr. Campisano

Robert Lewis - Direct

1    weren't a party to?

2    *A.*  No.

3    *Q.*  So they were involved in all the communications that you

4    had with chicken suppliers?

5    *A.*  They were involved in all of the meetings that we had with

6    suppliers.  They were not necessarily the originators of

7    written correspondence to the suppliers.  I did most of that.

8    *Q.*  And you mentioned approved chicken suppliers.  Who were the

9    approved chicken suppliers going into the contract negotiations

10   in 2014?

11   *A.*  There were six approved suppliers at that time, Pilgrim's

12   Pride, Tyson Foods, Mar-Jac Poultry, Koch Foods, Claxton

13   Poultry and George's.

14   *Q.*  Can you describe the process that you and the team you were

15   working with went about to conduct the contract price

16   negotiations in 2014?

17   *A.*  The first step was to obtain from KFC Corporation a demand

18   forecast.  The demand forecast told us pretty much on a weekly

19   basis how many pounds of the chicken-on-the-bone product would

20   be required to keep the restaurants operating.  Once we had

21   that information, then we approached the suppliers and asked

22   them to submit proposals to include the FOB price and the

23   number of truckloads or pounds that they were willing to commit

24   to for the following year for 2015.

25           And once we received those initial proposals, they

Robert Lewis - Direct

1    were analyzed.  And if there were any questions or concerns,

2    then we would approach the suppliers to get clarification.  And

3    then we eventually finalized the proposals.  We had final

4    agreement.  And then the SBRA addendums were prepared and

5    distributed.

6    Q.  Through that process, Mr. Lewis, did you consider those six

7    approved chicken suppliers to be in competition with each other

8    during these price negotiations?

9    A.  Yes, I did.

10   Q.  In what ways were these six approved chicken suppliers

11   competing against one another during these price negotiations?

12   A.  Well, we worked with each one of them independently and

13   sought to receive from each one their proposal.

14   Q.  And what were the principal parts of the proposal that you

15   were looking to receive from each of the six competing

16   suppliers?

17   A.  Well, at that particular point in time since supply had

18   been so top of mind with everyone, we were first looking to see

19   how much product they could supply, were willing to supply.

20   And then secondarily, we were interested in the lowest FOB

21   cost.

22   Q.  The lowest FOB -- I didn't hear that last word.

23   A.  FOB cost.

24   Q.  Lowest FOB cost.

25   A.  Uh-huh.

Robert Lewis - Direct

1    *Q.* Who at Pilgrim's were you conducting price negotiations

2    with in 2014?

3    *A.* Roger Austin.

4         *MR. TORZILLI:* Can we call up Exhibit 9235?

5         Your Honor, with the assistance of Ms. Grimm, can I

6    hand up a binder?

7         *THE COURT:* Yes, you may.

8    *BY MR. TORZILLI:*

9    *Q.* Mr. Lewis, you have a binder in front of you.  Can you turn

10   to Tab 7?  Tab 7 should have Government Exhibit 9235.

11   *A.* Yes.

12        *MR. TORZILLI:* Your Honor, this I believe has been

13   admitted into evidence and would ask that it be published to

14   the jury.

15        *THE COURT:* It may.

16   *BY MR. TORZILLI:*

17   *Q.* Mr. Lewis, do you recognize Exhibit 9235?

18   *A.* Yes.

19   *Q.* What is 9235?

20   *A.* It's a picture of Roger Austin.

21   *Q.* And a fair and accurate -- is it a fair and accurate

22   depiction of Defendant Roger Austin?

23   *A.* Yes.

24   *Q.* How long have you known Roger Austin?

25   *A.* Approximately, 15 years.

Robert Lewis - Direct

1    Q.  Do you know him professionally?

2    A.  Yes.

3    Q.  In what capacity do you know him professionally?

4    A.  He and I worked very closely together to supply KFC with

5    chicken.

6    Q.  So you have negotiated prices with Mr. Austin even before

7    2014?

8    A.  Yes, prior to my retirement, yes, I did.

9    Q.  And would you consider yourself to have had a personal

10   relationship with Mr. Austin?

11   A.  Yes.

12        MR. TORZILLI:  We can take that down.

13   A.  I am sorry, may I ask you what you consider personal

14   relationship?

15   BY MR. TORZILLI:

16   Q.  Well, let me ask you, sir, if you can explain what the

17   totality of your relationship is, then, if you're maybe unsure

18   of whether it's personal or professional.

19   A.  We did things together outside of the business realm.

20   Might play golf, might go to dinner.  I have been in his home a

21   couple of times.  I know his wife.  I have met his children.

22   Pretty much it.

23   Q.  Sir, if you'll go to Tab 8 in your binder.  It's an exhibit

24   marked as 9237.

25        MR. TORZILLI:  And I believe it's already been

Robert Lewis - Direct

1    admitted.  And Your Honor, I would ask permission to publish.

2           THE COURT:  Let me just check that.  It has been.  You

3    may.

4           MR. TORZILLI:  Thank you, Your Honor.

5    BY MR. TORZILLI:

6    Q.  Mr. Lewis, what is Exhibit 9237?

7    A.  9237 is a picture of Scott Brady.

8    Q.  In 2014 was Scott Brady someone that you were negotiating

9    prices with?

10   A.  Yes.

11   Q.  What company was Scott Brady working for at that time?

12   A.  He was working for Claxton Poultry.

13   Q.  Claxton Poultry?  Is the picture that's contained within

14   Exhibit 9237 in your view a fair and accurate depiction of

15   Defendant Scott Brady?

16   A.  Yes.

17   Q.  How long have you known Defendant Scott Brady?

18   A.  Probably more than 10 years.

19   Q.  Did you negotiate prices with Scott Brady before 2014, if

20   you recall?

21   A.  I -- I am not sure about that.

22   Q.  During 2014 was there anyone else working for Claxton

23   Poultry that was involved in the price negotiations that you

24   were conducting?

25   A.  Yes.

Robert Lewis - Direct

1   *Q.*  Who else?

2   *A.*  Mikell Fries.

3   *Q.*  Can you turn to Tab 9 in the binder in front of you?  You

4   should see Government Exhibit 9240.  Are you there?

5   *A.*  Yes.  I am sorry, yes.

6   *Q.*  What's Government Exhibit 9240?

7   *A.*  That is a picture of Mikell Fries.

8   *Q.*  Is it a fair and accurate depiction of Defendant Mikell

9   Fries?

10  *A.*  Yes.

11          *MR. TORZILLI:*  Your Honor, move to admit 9240.

12          *THE COURT:*  Any objection to the admission of Exhibit

13  9240?

14          *MR. KORNFELD:*  Your Honor, just reiterating the

15  arguments we made in the pleadings regarding the photos.  There

16  is no question that these gentlemen know each other.

17          *THE COURT:*  Any objection?  Exhibit 9240 will be

18  admitted.

19          *MR. TORZILLI:*  May we publish, Your Honor?

20          *THE COURT:*  You may.

21  *BY MR. TORZILLI:*

22  *Q.*  How long have you known Defendant Mikell Fries?

23  *A.*  Probably more than 15 years.

24  *Q.*  Did you negotiate prices with Defendant Mikell Fries prior

25  to 2014?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   I would ask you to turn to Tab 10 in your binder,

3    Government Exhibit 9251.

4    A.   Yes.

5    Q.   What's Government Exhibit 9251?

6    A.   It's a picture of Brian Roberts.

7    Q.   Did you negotiate prices in 2014 with Brian Roberts?

8    A.   Yes.

9    Q.   What company was he working for at that time?

10   A.   Tyson Foods.

11         MR. TORZILLI:   Your Honor, I believe 9251 has already

12   been admitted.

13         THE COURT:   It has.

14         MR. TORZILLI:   And would ask to publish.

15         THE COURT:   You may.

16         MR. TORZILLI:   Thank you.

17   BY MR. TORZILLI:

18   Q.   How long have you known Defendant Brian Roberts?

19   A.   Probably more than 15 years.

20   Q.   Do you consider Brian Roberts to be a friend of yours?

21   A.   Yes.

22   Q.   Did you know him personally or do things that were beyond

23   business dealings?

24   A.   Yes.

25   Q.   Could you describe some examples of that?

Robert Lewis - Direct

1    *A.*  Similar things as I said before, played golf together, had

2    dinner together, lunch together.  I have been to his home a

3    couple of times.  I know his wife.  I have met his children.

4    That's about it, I guess.

5    *Q.*  Besides Mr. Roberts was anyone else from Tyson Foods

6    involved in the 2014 price negotiations that you undertook?

7    *A.*  It seems as though there might have been other individuals

8    there, but I don't remember.  I don't recall if they were.

9    *Q.*  Can you turn to Tab 14 of your binder?  You should see

10   there Government Exhibit 9247.  Are you there?

11        *MS. PREWITT:*  Objection, Your Honor.  He is leading

12   the witness.

13        *THE COURT:*  Overruled.

14   *BY MR. TORZILLI:*

15   *Q.*  What do you see in Government Exhibit 9247?

16   *A.*  A picture of Tim Mulrenin.

17   *Q.*  Is that a true and accurate depiction of Defendant Timothy

18   Mulrenin?

19   *A.*  Yes.

20        *MR. TORZILLI:*  Move to admit 9247.

21        *THE COURT:*  Any objection to the admission of

22   Exhibit 9247?

23        *MS. PREWITT:*  Yes, Your Honor.  I object to the

24   admission.  And I don't like my chances prevailing, Your Honor,

25   because I understand you overruled similar objections, but I

Robert Lewis - Direct

1   would like to make one point regarding prejudicial impact.  We

2   are all in this court with masks on our faces.  In essence,

3   this gives the government an opportunity to control my client's

4   image with an unflattering image, although we have offered a

5   substitute, so I am lodging the objection on that basis, Your

6   Honor.

7          THE COURT:  That objection is overruled.  The witness

8   testified that it's a fair and accurate photo.  Exhibit 9247

9   will be admitted.

10          MR. TORZILLI:  Thank you, Your Honor.  Permission to

11   publish?

12          THE COURT:  You may.

13   BY MR. TORZILLI:

14   Q.  Mr. Lewis, do you recall whether Mr. Mulrenin had any role

15   in the price negotiations that you undertook in 2014?

16   A.  I do not recall.

17   Q.  Can you turn to Tab 11 of your binder?  You should see

18   there Government Exhibit 9242.

19   A.  Yes.

20          MR. TORZILLI:  And Your Honor, I believe this was

21   already received into evidence.

22          THE COURT:  It has been.

23          MR. TORZILLI:  Ask permission to publish?

24          THE COURT:  You may.

25   BY MR. TORZILLI:

Robert Lewis - Direct

1   Q.  Mr. Lewis, what's Exhibit 9242?

2   A.  It's a picture of Bill Kantola.

3   Q.  Is it a fair and accurate picture of Mr. Kantola?

4   A.  Yes.

5   Q.  Did Mr. Kantola have any role in the 2014 price

6   negotiations that you were involved in?

7   A.  Yes.

8   Q.  What company was Defendant Bill Kantola working for at that

9   time?

10  A.  Koch Foods.

11  Q.  Was that the first time, was 2014 the first time you had

12  done price negotiations with Mr. Kantola?

13  A.  No.

14  Q.  So you had done it prior to your retirement?

15  A.  Yes.

16  Q.  And how long have you known Defendant Bill Kantola?

17  A.  I would say 15 years or so.

18  Q.  You mentioned George's as a chicken supplier that was

19  competing in price negotiations at RSCS in 2014.  Did I

20  remember your testimony correctly?

21  A.  Yes.

22  Q.  What is George's?

23  A.  George's is an approved supplier of both fresh chicken, the

24  chicken on the bone and further processed chicken for KFC.

25  Q.  Who at George's were you negotiating with in 2014?

Robert Lewis - Direct

1    *A.*   Darrell Keck.

2    *Q.*   Darrell Keck?

3    *A.*   Keck, K-E-C-K.

4    *Q.*   Was anyone else at George's involved?

5    *A.*   Yes.   Ric Blake was involved.   And I believe one of the

6    George's owners was involved, but I'm not definite about that.

7    *Q.*   Can you explain your understanding of the George's

8    ownership structure?

9    *A.*   The George's owners are the George family.   And I believe

10   the father has retired by now, but the two twins, the sons --

11   Charles is one.   I can't remember the other -- are co-CEOs of

12   the company.

13   *Q.*   To the best of your recollection, one of those two twin

14   brothers who are co-CEOs were also involved in the 2014 price

15   negotiations.

16   *A.*   Yes, that's my recollection.

17   *Q.*   Along with Mr. Keck?

18   *A.*   Yes.

19   *Q.*   And along with Mr. Blake?

20   *A.*   Yes.

21   *Q.*   If you can turn to Tab 12 of the binder in front of you.

22   You should have what's been marked as Government Exhibit 9236.

23         *MR. TORZILLI:*   And Your Honor, I believe this has been

24   received into evidence.

25         *MR. POLLAK:*   Your Honor, it has not, but we have no

Robert Lewis - Direct

1   objection and we'll stipulate that this is a picture of

2   Mr. Blake.

3            *THE COURT:*  9236 has been admitted.

4            *MR. TORZILLI:*  Permission to publish?

5            *THE COURT:*  It may be.

6   *BY MR. TORZILLI:*

7   *Q.*  Sir, what is Exhibit 9236?

8   *A.*  It's a picture of Ric Blake.

9   *Q.*  And is it in your view a fair and accurate depiction of

10  Defendant Ric Blake?

11  *A.*  Yes.

12  *Q.*  Have you negotiated price -- you conducted price

13  negotiations with Defendant Ric Blake prior to 2014?

14  *A.*  Yes.

15  *Q.*  How long have you known Defendant Ric Blake, approximately?

16  *A.*  I would say 10 to 12 years perhaps.

17  *Q.*  Would you consider Mr. Blake a friend of yours?

18  *A.*  Yes, I would.

19  *Q.*  And can you describe maybe some of the things that you did

20  with him if you did that were not necessarily strictly business

21  dealings?

22  *A.*  Dinners, lunches.  I know he is a great golfer.  I am not

23  sure if I ever golfed with him, but that's probably about the

24  extent of it.

25  *Q.*  One last photo.  Tab 13 of your binder should have what's

Robert Lewis - Direct

1   been marked as Exhibit 9245.  Are you there?

2   A.  Yes, yes.

3   Q.  What do you see in Exhibit 9245?

4   A.  A picture of Bill Lovette.

5   Q.  Who is Bill Lovette?

6   A.  I know Bill Lovette primarily as an executive with two or

7   three different poultry companies over the years.

8   Q.  So he's someone you know from the chicken business?

9   A.  I'm sorry?

10  Q.  He is someone you know from the chicken business?

11  A.  Correct, yes.

12  Q.  Is the photo appearing in 9245 a fair and accurate

13  depiction of Mr. Lovette?

14  A.  Yes.

15          MR. TORZILLI:  Your Honor, at this time we would offer

16  9245.

17          MR. McLOUGHLIN:  Objection, Your Honor.

18          THE COURT:  It's already been admitted.

19          MR. TORZILLI:  Permission to publish?

20          THE COURT:  You may.

21  BY MR. TORZILLI:

22  Q.  Have you ever in your career negotiated chicken prices with

23  Mr. Lovette?

24  A.  Not that I recall.

25  Q.  You mentioned that one of the steps that you undertook

Robert Lewis - Direct

1    during the price negotiations that you undertook in 2014 was to

2    ask for and receive price proposals; is that accurate?

3    *A.*   Yes.

4    *Q.*   Were there any meetings that you were involved in with the

5    competing chicken suppliers in 2014 prior to the submission of

6    those price proposals?

7    *A.*   Yes.

8    *Q.*   Could you just describe first generally what your purpose

9    was for conducting those prepricing proposal meetings?

10   *A.*   In general, it was to talk about what we needed in the way

11   of chicken for the year 2015 and that we were wanting them to

12   submit proposals that would include their price and the supply

13   commitment.  And we also had some other items that were

14   designed to help increase supply over the long term and maybe

15   soften the prices some.  And we had asked them to address those

16   and respond as well.

17   *Q.*   Did you as part of those meetings meet with Defendant Roger

18   Austin?

19   *A.*   Yes.

20   *Q.*   Approximately when did that meeting occur?

21   *A.*   Early August.

22   *Q.*   Did you meet with representatives of Claxton Poultry?

23   *A.*   Yes.

24   *Q.*   Who from Claxton Poultry did you meet with?

25   *A.*   That would have been Scott Brady and Mikell Fries.

Robert Lewis - Direct

1   Q.   When approximately did you meet with Defendants Brady and

2   Fries?

3   A.   Early August.

4   Q.   Did you meet with representatives of Tyson?

5   A.   Yes.

6   Q.   Who from Tyson did you meet with?

7   A.   Brian Roberts.

8   Q.   When approximately did that meeting occur?

9   A.   Early August.

10  Q.   Do you recall whether Defendant Timothy Mulrenin was there?

11  A.   No, I do not recall that.

12  Q.   Did you meet with representatives of Koch Foods?

13  A.   Yes.

14  Q.   Who from Koch Foods did you meet with?

15  A.   Bill Kantola.

16  Q.   When did the meeting with Defendant Bill Kantola occur?

17  A.   Early August.

18  Q.   Do you know a precise date?

19  A.   It seems to me it was August 7th.

20  Q.   Do you remember the precise start time of that meeting?

21  A.   9:00 o'clock.

22  Q.   Do you recall how much time was budgeted for that

23  9:00 o'clock meeting on August 7th with Defendant Bill Kantola?

24  A.   Two hours.

25  Q.   So the meeting was budgeted for 9:00 a.m. to 11:00 a.m. on

Robert Lewis - Direct

1    August 7th?

2    A.   Yes.

3    Q.   Did during that meeting Mr. Kantola say he planned to call

4    his competitors after the meeting concluded?

5    A.   No.

6    Q.   Did you ever ask Mr. Kantola to call any of his competitors

7    after the meeting concluded?

8    A.   No.

9    Q.   Did you meet with George's?

10   A.   Yes.

11   Q.   Who from George's did you meet with?

12   A.   Darrell Keck, Ric Blake, and I believe one of the George

13   brothers.

14   Q.   When approximately did the meeting with George's occur?

15   A.   First of August.

16   Q.   Did you meet with Mar-Jac representatives?

17   A.   Yes.

18   Q.   Who from Mar-Jac did you meet with?

19   A.   Greg Tench and Pete Martin.

20   Q.   When did that meeting occur approximately?

21   A.   First part of August.

22   Q.   Sir, if you can now turn to Tabs 15 to 20 in the binder in

23   front of you.

24        MR. TORZILLI:   For the record, those tabs should

25   contain Exhibits 1139, 1138, 1137, 1136, 1135, and 1134.

Robert Lewis - Direct

1      A.  Okay.

2      BY MR. TORZILLI:

3      Q.  Sir, what are those six exhibits?

4      A.  Those are e-mails that I wrote to each of the suppliers

5      that we were negotiating with as a follow-up to the meeting

6      that had been conducted with them in the early part of August.

7              MR. TORZILLI:  Your Honor, at this time we offer those

8      six exhibits.

9              THE COURT:  Can you state them again?

10             MR. McLOUGHLIN:  Objection, hearsay, Your Honor.

11             THE COURT:  Let's take them one at a time, okay?

12     What's the first one, Mr. Torzilli.

13             MR. TORZILLI:  1139.

14             THE COURT:  Any objection to the admission of Exhibit

15     1139?  And I am going to need copies of each.

16             MR. TORZILLI:  Absolutely.  Your Honor, actually if it

17     would facilitate things, I can hand up a copy of this binder.

18             MS. HENRY:  Does the government have copies for the

19     defendants as well, please?

20             MR. TORZILLI:  We provided you the exhibits --

21             THE COURT:  Mr. Torzilli, you don't talk to -- you

22     always address things to the Court.

23             MR. TORZILLI:  Your Honor, we provided exhibit numbers

24     for all these exhibits days ago.

25             THE COURT:  So the answer is no?

Robert Lewis - Direct

1          *MR. TORZILLI:*  The answer is indeed no.

2          *THE COURT:*  If you could have Ms. Grimm hand up those

3     copies.

4          *MR. GILLEN:*  Your Honor, it would be helpful if the

5     government would put on the screen the exhibits to which they

6     are referring to so we don't have to be dealing with a hard

7     copy.

8          *THE COURT:*  I think that that would be a good idea.

9          *MR. GILLEN:*  Thank you.

10          *THE COURT:*  So what tab am I supposed to look at for

11     1139?

12          *MR. TORZILLI:*  15 to 20.  And Your Honor, I think it

13     can be sort of taken together because the e-mails are -- with

14     one exception that I can get into -- are virtually identical,

15     at least for purposes of the ruling that Your Honor is

16     presently facing.

17          *THE COURT:*  Through 20?

18          *MR. TORZILLI:*  Tabs 15 through 20.

19          *THE COURT:*  They are very similar.  Why don't we take

20     them as a whole.  So the question is any objection to the

21     admission of Exhibits 1139, 1137, 1138, 1135, 1134 and 1136?

22          *MR. McLOUGHLIN:*  Your Honor, I will withdraw the

23     objection.

24          *THE COURT:*  Each of those exhibits will be admitted.

25          *MR. TORZILLI:*  Thank you, Your Honor.

Robert Lewis - Direct

1          THE COURT:  Here is the notebook back unless this is a

2     copy the Court can have, but if you need it, you can take it.

3          MR. TORZILLI:  Thank you.

4          THE COURT:  Ladies and gentlemen, let's -- is this a

5     convenient breaking spot, Mr. Torzilli?

6          MR. TORZILLI:  Yes, sir.

7          THE COURT:  Ladies and gentlemen, we will go ahead and

8     break for lunch.  Keep the yellow juror buttons visible.  Even

9     if you are walking around the hallways of the courthouse, good

10    idea, because of course we will have some witnesses who have

11    never seen you before.  And keep the admonition in mind about

12    not talking to either yourselves -- don't deliberate yet -- and

13    anyone else.

14         The jury is excused for lunch.  We will plan on

15    reconvening at 1:30.  Thank you.

16         (Jury excused.)

17         We will be in recess.  Thank you.

18    (Recess at 12:00 p.m.)

19    (Reconvened at 1:35 p.m.)

20         THE COURT:  Are we ready to go?  Mr. McLoughlin, did

21    you have anything?

22         MR. McLOUGHLIN:  Your Honor, we have one preliminary

23    matter that we would like to try to deal with.

24         THE COURT:  If you don't mind, Mr. Lewis, we are not

25    quite ready for you.  Sorry.  If you don't mind, if you can go

Robert Lewis - Direct

1    back to the witness room for just a minute.  It turned out

2    there was a preliminary issue.

3           MR. McLOUGHLIN:  Your Honor, as you may imagine, we

4    have been scrambling.  I am raising an issue, Your Honor, for

5    either now or whenever Your Honor would like to address it

6    which is Exhibit 9168, which the government moved to admit

7    after the testimony of Mr. Sangalis.  We have because it was

8    listed for Agent Koppenhaver had the opportunity to review it

9    and it is a Form 8-K, which I have for Your Honor and the

10   government if you would like to do it now, that we believe the

11   way it was redacted and not redacted is a clear violation of

12   the Court's order that's document 603 in which you addressed

13   the issue of not disclosing the compensation of Mr. Lovette and

14   Mr. Penn.

15          The document as the government redacted it includes a

16   variety of their compensation, Mr. Lovette's compensation,

17   including his guaranteed bonus of a half million dollars which

18   was guaranteed regardless of the production.  It includes the

19   fact that the company was going to buy his house in Arkansas.

20   And it has unredacted that he was going to get 200,000 shares

21   of restricted stock, all of which goes to his wealth and his

22   lifestyle and was not redacted.

23          Moreover, where they talk about compensation, the

24   government's interpretation of your order was that if the total

25   compensation apparently was not disclosed, they have complied.

Robert Lewis - Direct

1    And therefore the exhibit shows that if the 2011 EBITDA was

2    $400 million, Mr. Lovette would get a bonus that is cash that

3    is disclosed in the exhibit, as is the $500 million EBITDA

4    figure which was a million dollars and above $500 million.  And

5    so the dollar figures or his bonuses are there.

6             It was our belief based on Your Honor's ruling that in

7    order to address this issue of whether there was an incentive

8    for the rise of chicken prices, it would just address the

9    percentages.  Further, this compensation figure --

10            THE COURT:  I am sorry, Mr. McLoughlin, but when you

11   say percentages, what do you mean?

12            MR. McLOUGHLIN:  So if your compensation -- if the

13   EBITDA is above a certain number, then your bonus is 5 percent

14   higher or 10 percent higher.

15            THE COURT:  In other words, the bonus would vary

16   depending on, for instance, profitability.

17            MR. McLOUGHLIN:  Yes, which, of course, isn't directly

18   related to chicken prices at all.  Chicken prices, you think

19   about a company as complex as this company, if you had merely

20   the small percentage of revenue that is addressed by QSR

21   prices, the number of additional factors that affect his bonus

22   and his compensation, the international division and billions

23   of sales --

24            THE COURT:  Let's not get distracted on that issue

25   because that's another argument, but back to this one as to the

Robert Lewis - Direct

1    8-K.

2         *MS. CALL:*  Your Honor, we can broadcast it if it would

3    be helpful and we have the relevant page up.

4         *THE COURT:*  I am not sure yet that we are going to

5    take a bunch more time on this issue, but I will let

6    Mr. McLoughlin wrap it up, although maybe he has.

7         *MR. McLOUGHLIN:*  I have, Your Honor.

8         *THE COURT:*  Would it be fair, Mr. McLoughlin, to say

9    that the essence of your argument is that the information

10   contained in the 8-K is not information that would suggest to

11   the jury the variability of the bonus based upon chicken sales?

12        *MR. McLOUGHLIN:*  Yes, and that there is also numbers

13   in here that are clearly totally unrelated to chicken sales

14   because they are guaranteed and there were things like, you

15   know, in signing you're going to get your house bought.

16        *THE COURT:*  Right.  That's the flip-side of the coin

17   is the other -- the information about salary because it's not

18   linked to those things would be prejudicial.

19        *MR. McLOUGHLIN:*  Exactly, Your Honor.  It's just the

20   basis in which Your Honor ruled in its order.

21        *MR. TUBACH:*  I join in this objection on behalf of

22   Mr. Penn.  I won't make any further argument.

23        *THE COURT:*  Go ahead and give your response.  I am not

24   necessarily ruling on it, but when do you think this may come

25   up, Ms. Call?

Robert Lewis - Direct

1          MS. CALL:  It is towards the latter -- or middle to

2    latter part of Agent Koppenhaver's testimony, so I don't think

3    we will get there today, but there is a possibly.  He is our

4    next witness.

5          THE COURT:  Then why don't you give me your real quick

6    response.

7          MS. CALL:  Sure, yes.  The only portion of the

8    document that the government intends to actually show the jury,

9    and we are happy to redact the rest if necessary, is the

10   portion titled Compensation where we have redacted out the

11   total compensation figure.  The only part we would direct them

12   to is how the bonus structure is tied to EBITDA.

13         THE COURT:  To what?  Spell that for the court

14   reporter just so -- the acronym.

15         MS. CALL:  And correct me if I'm wrong because I am no

16   expert, EBITDA.  And it's frankly just not a percentage based

17   number.  It is based to the actual profits of the company, and

18   then the bonus amount is then a number, so I quite frankly

19   don't know how we could do it as percentages without perhaps

20   another summary.  But that is the only portion we intended to

21   draw the jury to and we would say that the bonus that Defendant

22   Lovette stood to gain from the profits of the company are

23   relevant to the price increases he sought to obtain.

24         THE COURT:  But how would the document itself explain

25   that because Mr. McLoughlin just said it's a fixed number.

Robert Lewis - Direct

1          *MS. CALL:*  The financial term?

2          *THE COURT:*  No, he said that the bonus.  He was

3    talking about at least one component of the bonus that's on the

4    document is just a fixed number.

5          *MS. CALL:*  It varies based on different amounts of the

6    EBITDA term.  It's a chart that has I think three different

7    levels and how the bonus varies based on that.

8          *THE COURT:*  But presumably there is going to be

9    someone else testifying about how that bonus is calculated,

10   right?

11         *MS. CALL:*  I don't quite understand, Your Honor.

12         *THE COURT:*  How does this document -- why would this

13   document explain or show the variability in the bonus?

14         *MS. CALL:*  Because I believe that's what is clear on

15   the face of the document.  And the only term that requires an

16   explanation is that EBITDA term and how that relates to the

17   company's profit.  And I will note that Mr. Bryant has already

18   noted that the company's profit did directly relate to the

19   price increases that were achieved in various years because of

20   that margin term in the contracts.  So basically a higher

21   margin means higher profit means high EBITDA means higher

22   bonus, sort of the steps of that.

23         *THE COURT:*  Well, when we take the mid-afternoon

24   break, I want to see that page so I can better familiarize

25   myself with it.  And we won't take this issue up until we have

Robert Lewis - Direct

1    had a chance to discuss it which we may be able to do at the

2    mid-afternoon break.  I don't want to spend more time on it at

3    the moment, okay?

4            MS. CALL:  Would you like us to provide a copy of that

5    page to Ms. Grimm at the break?

6            THE COURT:  Yes, at the beginning of the break so I

7    can look at it over the break.

8            MR. McLOUGHLIN:  I will hand up the document to the

9    clerk, Your Honor.  It's actually -- the compensation section

10   that they referred to that they want to use is actually two

11   pages, and it includes the fact that the first 500,000 in bonus

12   is guaranteed notwithstanding any productivity or

13   profitability.  And that has not been redacted so --

14           THE COURT:  And you think you have the redacted copy?

15           MR. McLOUGHLIN:  I am sorry?

16           THE COURT:  Mr. McLoughlin, does the copy that you

17   have seem to contain other redactions?

18           MR. McLOUGHLIN:  It does, Your Honor.

19           THE COURT:  Yeah, maybe you can have Ms. Grimm put a

20   post-it note on those pages that you believe are relevant.  And

21   he has indicated 10 and 11.  Are those the ones?

22           MS. CALL:  It is only Page 10 that the government

23   actually plans to --

24           MR. McLOUGHLIN:  If it's an exhibit, it can go back to

25   the jury room.  They can do whatever they want with it.

Robert Lewis - Direct

1          *THE COURT:*  No, this is just to call my attention to.

2          Let's bring the jury back in.

3          *MS. CALL:*  I briefly misspoke.  It's Page 7.

4          (Jury present.)

5          *THE COURT:*  We will let Mr. Lewis get seated too.

6          *MR. TORZILLI:*  While that's happening, Your Honor, it

7    might be helpful for the afternoon session if I hand up to the

8    bench a copy of the witness exhibit binder for this witness.

9          *THE COURT:*  Yes, that's fine.

10          Go ahead, Mr. Torzilli.

11          *MR. TORZILLI:*  Thank you.

12   *BY MR. TORZILLI:*

13   *Q.*  Good afternoon, Mr. Lewis.

14   *A.*  Good afternoon.

15   *Q.*  I would like you to first turn to Tab 16 of the binder in

16   front of you.  It should be an exhibit marked and admitted into

17   evidence as Government Exhibit 1137.

18          *MR. TORZILLI:*  And request permission to publish?

19          *THE COURT:*  You may.

20   *BY MR. TORZILLI:*

21   *Q.*  Mr. Lewis, what is Government Exhibit 1137?

22   *A.*  It's an e-mail from myself to Mikell Fries at Claxton

23   Poultry dated August the 7th.

24   *Q.*  You sent the e-mail to who at Claxton Poultry?  I am sorry,

25   I didn't hear the entirety.

Robert Lewis - Direct

1    *A.*   Mikell Fries and Scott Brady.

2    *Q.*   When did you write that e-mail?

3    *A.*   August the 7th, 2014.

4    *Q.*   What was the e-mail about?

5    *A.*   Meeting follow-up.

6    *Q.*   And did you as part of your meeting follow-up e-mail ask

7    Mr. Fries and Mr. Brady to do anything?

8    *A.*   Yes.

9    *Q.*   What did you ask them to do?

10   *A.*   I asked them to provide certain information that's

11   contained in the e-mail.

12   *Q.*   Okay.  And did you have a deadline by which you wanted them

13   to provide you that information?

14   *A.*   Yes, August 19.

15   *Q.*   What were you expecting to receive from them around

16   August 19th?

17          *MR. McLOUGHLIN:*  Objection, Your Honor.  He can ask

18   the question of what they were asked to provide which is in the

19   writing, but to the extent this witness' expectations are

20   somewhat different, they are simply not relevant.

21          *THE COURT:*  Overruled.  He can answer.

22   *A.*   I asked them for their initial proposal for 2015 and

23   included in the body a number of things that we wanted to

24   consider over and above the price and the volume.

25   *BY MR. TORZILLI:*

Robert Lewis - Direct

1   Q.  So what were you asking Mr. Fries and Mr. Brady to provide

2   you in terms of the initial proposal?

3   A.  A price, an FOB price.

4   Q.  An FOB price for what product?

5   A.  For chicken on the bone product.

6   Q.  And besides FOB price for chicken on the bone, anything

7   else that you asked them to provide in the initial proposal?

8   A.  Yes, the volume they were willing to commit to and then a

9   response to the bullet items contained in the body of the

10  e-mail.

11  Q.  Thank you.  You can put that exhibit aside.

12          Did the August 19 deadline that you asked Mr. Fries

13  and Mr. Brady to respond by, was that a deadline that you asked

14  other suppliers to comply with as well?

15  A.  Yes.

16  Q.  Which suppliers?

17  A.  Tyson, Pilgrim's, Koch, Mar-Jac, George's.

18  Q.  So all the -- you asked all the suppliers to provide a

19  response to you by August 19?

20  A.  Yes.

21  Q.  And did you want all the suppliers to provide you similarly

22  a pricing proposal?

23  A.  Yes.

24  Q.  Let's look at -- should be Tab 15 in your binder.  It's

25  been marked as Government Exhibit 1139.

Robert Lewis - Direct

1      *MR. TORZILLI:* That's been received into evidence and

2   ask permission to publish.

3   *A.* You may.

4   *BY MR. TORZILLI:*

5   *Q.* Are you there, Mr. Lewis?

6   *A.* Yes.

7   *Q.* What is Government Exhibit 1139?

8   *A.* It's an e-mail again from me to Roger Austin at Pilgrim's

9   Pride.

10  *Q.* And what were you asking -- what, if anything, were you

11  asking of Defendant Roger Austin in this e-mail that's been

12  marked as Government Exhibit 1139?

13  *A.* We were asking for his proposal for chicken-on-the-bone

14  product for 2015.

15  *Q.* And if you look at the bottom of your e-mail here in 1139,

16  do you see a sentence in there asking for or providing a

17  deadline by which Mr. Austin was supposed to provide the

18  information?

19  *A.* I do not see a deadline.

20  *Q.* But did you, in fact, convey, perhaps not by means of this

21  e-mail, but convey to Mr. Austin to provide the information by

22  August 19?

23      *MR. McLOUGHLIN:* Objection, leading.

24      *THE COURT:* Overruled.

25  *A.* That would have been a consistent request of all six

Robert Lewis - Direct

1    suppliers.

2    *BY MR. TORZILLI:*

3    *Q.*  Thank you, sir.

4         And last, if you can turn to Tab 19.

5         *MR. TORZILLI:*  And Tab 19 is marked as Government

6    Exhibit 1134 and has been received into evidence and ask

7    permission to publish.

8         *THE COURT:*  You may.

9         *MR. TORZILLI:*  Thank you, Your Honor.

10   *BY MR. TORZILLI:*

11   *Q.*  And Mr. Lewis, what is Government Exhibit 1134?

12   *A.*  It is an e-mail from me to Kevin Phillips and Mitch

13   Mitchell at Case Farms.

14   *Q.*  What's Case Farms?

15   *A.*  Case Farms is an approved poultry supplier for KFC.

16   *Q.*  Was Case Farms a competitor in price negotiations for

17   contracts that begin in 2015?

18   *A.*  Yes.

19   *Q.*  And again, what were you asking Mr. Phillips and

20   Mr. Mitchell in this e-mail?

21   *A.*  Their initial proposal for KFC's chicken-on-the-bone

22   product.

23   *Q.*  And what was the deadline you provided to them for their

24   response?

25   *A.*  August 19.

Robert Lewis - Direct

1    Q.   Thank you.  You can put that exhibit aside and we can take

2    that down.  Thank you.

3              Okay.  So turning back to the time frame here that

4    we're talking about, August 2014, what was the next step in the

5    process that you were undertaking to conduct price negotiations

6    with the competing chicken suppliers?

7    A.   At that point we would have begun the -- began analyzing

8    the proposals to determine the price they provided, the volume

9    they were willing to commit to, and then answers, of course, to

10   the other questions we had asked.

11   Q.   So what happened on or about August 19th?

12   A.   The proposals were received.

13   Q.   And who did you receive them from?

14   A.   The six approved KFC suppliers.

15   Q.   You said that you reviewed the proposals when they came in.

16   Did I understand you correctly?

17   A.   Yes.

18   Q.   And what did you do to go about reviewing the proposals?

19   A.   I'm sorry, would you repeat?

20   Q.   What did you do to review the proposals?  What in

21   particular did you do?

22   A.   Well, I just reviewed the information that they provided

23   again which was pricing, volume, and responses to the six or

24   seven bullets that were in the bottom of our meeting follow-up

25   request.

Robert Lewis - Direct

1   Q.   Did you say you analyzed the proposals as well?

2   A.   Yes.

3   Q.   And did you draw any conclusions based on your analysis of

4   the proposals?

5   A.   Yes.

6   Q.   What conclusions did you draw?

7   A.   I was quite surprised, perhaps shocked at the magnitude of

8   the price increases that were being presented.

9   Q.   What was surprising and shocking about the magnitude of the

10  price increases?

11  A.   As long as I can remember, I don't recall prices being that

12  high.

13  Q.   So in your entire experience in the chicken industry, you

14  hadn't seen prices that high that you recalled?

15  A.   That's correct.

16  Q.   And can you remind us when you first started in the chicken

17  industry?

18  A.   I'm sorry?

19  Q.   Can you remind us what year you started in the chicken

20  industry?

21  A.   1973.

22  Q.   1973?

23  A.   Yes, but I worked in the poultry group beginning in the

24  early nineties, so the time we are talking about would have

25  been early nineties until I left.

Robert Lewis - Direct

1    Q.  Early nineties until 2009 when you retired.

2    A.  Correct.

3    Q.  When you received the proposals on or around August 19 of

4    2014, were you aware that the supply of the types of birds,

5    types of chickens that KFC restaurants used was tight or in

6    short supply?

7    A.  Yes.

8    Q.  How did you know that?

9    A.  Well, we were having great difficulty sourcing enough

10   product to meet KFC's demand.

11   Q.  And that was the problem you encountered when you first

12   came back on the scene at RSCS in May of 2014.  Is that fair to

13   say?

14   A.  That's correct.

15   Q.  So even taking into account that you knew supply was tight,

16   was it still true that you were surprised and shocked by the

17   magnitude of the price increases you were facing?

18   A.  Yes.

19   Q.  I'm sorry, I didn't hear --

20   A.  Yes, I'm sorry, yes.

21   Q.  So after you reviewed and analyzed the proposed prices that

22   came in, what did you do next?

23   A.  Well, I contacted all the suppliers again and began to

24   challenge them on the proposals.

25   Q.  And what form did challenging the suppliers take?  What

Robert Lewis - Direct

1    specific communications?

2    A.   Telephone conversations.

3    Q.   Telephone conversations?

4    A.   Yes.

5    Q.   Let's take a look at -- sir, if you could turn to tab -- it

6    should be Tab 29 in your binder.  It's marked as Government

7    Exhibit 1132.

8    A.   I have it.

9    Q.   Are you there?  What is Government Exhibit 1132?

10   A.   The top portion of that is an e-mail from Scott Brady at

11   Claxton Poultry to me and two other individuals in the poultry

12   group, Rich Eddington and Mary Hester.

13   Q.   What date is the e-mail that Mr. Brady sent to you and

14   others?

15   A.   August 19.

16   Q.   And what was included in the e-mail that Mr. Brady sent to

17   you and others on August 19?

18   A.   The 2015 proposal.

19   Q.   So this was the pricing proposal that you had asked them to

20   provide?

21   A.   That's correct.

22   Q.   Can you turn now to Tab 30, the next tap?  That should be

23   marked as Government Exhibit 1133.  Are you there?

24   A.   Yes.

25   Q.   What is Government Exhibit 1133?

Robert Lewis - Direct

1    A.  This is part of the SBRA addendum showing the FOB price for

2    various poultry products from Claxton.

3    Q.  Can you tell whether this Exhibit 1133 is the attachment to

4    the e-mail that we just looked at as Government Exhibit 1132?

5    A.  Yes.

6    Q.  It is?

7    A.  Yes.

8         MR. TORZILLI:  Your Honor, at this time we would offer

9    into evidence Government Exhibit 1132 and Government Exhibit

10   1133.

11        THE COURT:  Any objection to the admission of those

12   two exhibits?

13        MR. LAVINE:  No objection, Your Honor.

14        MS. PREWITT:  No, Your Honor.

15        THE COURT:  Exhibits 1132 and 1133 will be admitted.

16        MR. TORZILLI:  Thank you, Your Honor.  Permission to

17   publish 1133?

18        THE COURT:  You may.

19        MR. TORZILLI:  Thank you.

20   BY MR. TORZILLI:

21   Q.  Sir, if you can look at the front page of Government

22   Exhibit 1133, can you tell us what the very first entry in the

23   chart on the left-hand side, the entry that says injected

24   eight-piece, what that means?

25   A.  That is actually the eight-piece chicken-on-the-bone purple

Robert Lewis - Direct

1  label as we referred to it, which is a primary eight-piece

2  product.

3  Q.  What does purple label mean?  Why is the chicken labeled

4  purple?

5  A.  It was a way for the restaurants to distinguish between

6  other products that were shipped into the store.

7  Q.  Thank you.  And then next to that on the right is 1.1099.

8  Do you see that?

9  A.  Yes.

10 Q.  What does that mean?

11 A.  That's the FOB price per pound that's being proposed for

12 2015.

13 Q.  And then to the right of that there is a parenthetical that

14 says:  FOB price from cost model.  What does that mean?

15 A.  That means the page that we just -- that's attached.  It's

16 the bottom line number from that model.

17 Q.  What does FOB stand for?

18 A.  Free onboard.

19 Q.  What does it mean?

20 A.  Well, in this case it means that the supplier has loaded

21 the product onto a truck, but the freight to get that to its

22 destination is not included in the price.

23 Q.  So if someone wanted to receive the product from the

24 processing facility, they would still have to pay on top of the

25 FOB price some sort of freight or delivery charge; is that

Robert Lewis - Direct

 1  fair?

 2  A.  Actually, both.  They had to pay freight either directly to

 3  the restaurant or to a distributor.  If a distributor is

 4  involved, there is a distribution fee that's added as a third

 5  component.

 6       MR. TORZILLI:  Thank you.  If you can turn to the next

 7  page of the exhibit.

 8  BY MR. TORZILLI:

 9  Q.  Can you tell us what this is generally?

10  A.  This is the cost model that shows the total FOB plant cost

11  for the purple label and orange label product.

12  Q.  And about seven lines up from the bottom there is an entry

13  that says Total FOB Plant Cost, and then has some numbers

14  there.  Can you tell us what that is?

15  A.  Yes.  That is the FOB plant cost per pound which is

16  $1.1099.

17  Q.  Is that the same number we looked at on the previous page?

18  A.  It is, yes.

19  Q.  Three lines up from that is an entry called Supplier

20  Margin.  Do you see that?

21  A.  Yes.

22  Q.  Can you tell us what Supplier Margin means?

23  A.  That is the margin the supplier receives for these products

24  on a per-pound basis.

25  Q.  And what's margin?  What is that?  Can you define that for

Robert Lewis - Direct

1   us, please?

2   A.  It's their profit.

3   Q.  That's the supplier's profit?

4   A.  The supplier's profit.

5   Q.  So is the proposed price that in this case Claxton

6   submitted to you on August 19th of $1.1099, is that an example

7   of a price proposal that surprised and shocked you by its

8   magnitude?

9   A.  Yes.

10  Q.  Can you give the Ladies and Gentlemen of the Jury a sense

11  of what your expectation was in terms of a price that would be

12  proposed at this time by the competing suppliers?

13           MR. McLOUGHLIN:  Objection to the witness'

14  expectation, Your Honor.

15           THE COURT:  Overruled.

16  A.  Based on some history involving the big birds demand, we

17  actually anticipated a small increase in the pricing.  And we

18  would have readily accepted that, but the magnitude of the

19  change was, well, very surprising.

20  BY MR. TORZILLI:

21  Q.  You can put that exhibit aside.  I want to hand up to you

22  an exhibit that is not in your binder.

23           MR. TORZILLI:  If I can elicit the assistance of

24  Ms. Grimm to hand up to the witness.

25           THE COURT:  Yes, you may.

Robert Lewis - Direct

 1    *BY MR. TORZILLI:*

 2    Q.   Mr. Lewis, have you had an opportunity to familiarize

 3    yourself with the document in front of you?

 4    A.   Yes, I have just now.

 5    Q.   And for the record it's a two-page document.  The first

 6    page bears exhibit number -- Government Exhibit 1104 and the

 7    second page is Government Exhibit 1105-1.

 8           Does this document look familiar to you, sir?

 9    A.   The top sheet of this document does not look familiar to

10    me.

11    Q.   Okay.  What is it?  What do you understand it to be?

12    A.   It's an e-mail from Roger to Rich Eddington and copying

13    myself.  Well, I am sorry, to Rich Eddington and to me.

14    Q.   What's the date of it?

15    A.   August 20th, 2014.

16    Q.   And what does it appear that Mr. Austin is providing to you

17    in this e-mail of August 20th, 2014?

18    A.   His proposed pricing for 2015.

19    Q.   Is this the proposed pricing for 2014 that was due on

20    August 19th?

21    A.   I'm sorry, you said 2014?

22    Q.   Of 2014, yes.

23    A.   It is, yes.

24        *MR. TORZILLI:*  At this time, Your Honor, Government

25    moves to admit 1104 and 1105-1.

1         *MR. FELDBERG:*  No objection, Your Honor.

2         *THE COURT:*  1104 is already into evidence.  I am not

3    sure about 1105-1.  Ms. Grimm, do you know?

4         *COURT DEPUTY CLERK:*  I am checking.  1105-1 is not in

5    and 1104 is in.

6         *THE COURT:*  Ms. Grimm indicated that according to her

7    records 1105-1 has been admitted.

8         *COURT DEPUTY CLERK:*  Has not.

9         *THE COURT:*  What?

10        *COURT DEPUTY CLERK:*  1105-1 has not been admitted.

11   1104 has.

12        *THE COURT:*  Right.  And 1105 has been admitted, but

13   not 1105-1.  So any objection to the admission of 1105-1?

14        *MR. FELDBERG:*  Not from us, Your Honor.

15        *MR. TUBACH:*  No objection to that, Your Honor.  This

16   is an additional attachment.  This is an incomplete document.

17   There is an additional attachment to the e-mail that's not

18   reflected in this and we'd ask it be included also.

19        *MR. McLOUGHLIN:*  For Mr. Lovette we would object to it

20   being an excerpt.  If they are going to attach the attachment

21   to the e-mail, it should be the complete document and not an

22   excerpt.

23        *THE COURT:*  Is 1105 the complete document,

24   Mr. Torzilli?

25        *MR. TORZILLI:*  1105 is a printout that is almost a

59

Robert Lewis - Direct

1    duplicate of 1105-1.  The differences are that 1105-1 is a

2    bigger printout, easier to see.  And 1105-1 has a column that

3    was hidden because it's a printout of an Excel spreadsheet that

4    was hidden in the printout of 1105.  So this is a more accurate

5    representation of the Excel file than 1105.

6          THE COURT:  But does Exhibit 1105 meet

7    Mr. McLoughlin's objection?

8          MR. TORZILLI:  I'm not certain.

9          THE COURT:  And Mr. Tubach, let me ask you, the

10   portion that's not in 1105-1, is it in 1105?

11         MR. TUBACH:  I don't believe so, Your Honor.  It's a

12   separate PowerPoint that's also attached to this e-mail as is

13   evidenced on the cover of 1104.

14         THE COURT:  I am going to overrule the objections and

15   allow in Exhibit 1105-1.

16         MR. TORZILLI:  Thank you, Your Honor.

17   BY MR. TORZILLI:

18   Q.  Mr. Lewis, if you can turn to Exhibit 1105-1, so the second

19   page of the document now in front of you.  Can you tell us what

20   this is?

21   A.  This is a pricing proposal for both purple and orange label

22   product that shows the current pricing and the proposed pricing

23   and then the difference between the two.

24   Q.  Thank you.

25         MR. TORZILLI:  Permission to publish, Your Honor?

Robert Lewis - Direct

1          *THE COURT:* 1105-1?

2          *MR. TORZILLI:* Yes.

3          *THE COURT:* Yes, you may.

4          *MR. TORZILLI:* Thank you, Your Honor.

5    *BY MR. TORZILLI:*

6    *Q.* Can you explain, then, sir, what the column heading Current

7    means?

8    *A.* Well, since it shows period nine in the upper left corner,

9    I'm assuming that that is the price in effect for period nine

10   of 2014.  That total is 9240 in the first column.

11   *Q.* And what does the column Purple Proposed mean?

12   *A.* That is Pilgrim's' proposed price for 2015.

13   *Q.* And then what do you understand the next column that says

14   Difference to represent?

15   *A.* The difference between Columns 1 and 2.

16   *Q.* So the difference between the current price and the price

17   that Mr. Austin was proposing?

18   *A.* Yes.

19   *Q.* Let's go to, if you would, the very bottom of those

20   columns.  It says Total Cost.  Do you see that entry?

21   *A.* Yes.

22   *Q.* Can you explain what's happening to total cost for the

23   purple label product?

24   *A.* It is increasing by nearly 18 cents per pound.

25   *Q.* And is that an example of a shocking and surprising

Robert Lewis - Direct

1   proposed price?

2   A.   Yes.

3   Q.   Thank you.   And then a couple of entries above that there

4   is Supplier Margin.   Do you see that?

5   A.   Yes.

6   Q.   Can you remind us what supplier margin is?

7   A.   It's the supplier's profit.

8   Q.   And what was happening to supplier margin in this document?

9   A.   It was nearly doubling up by 10 cents per pound.

10  Q.   And is that an example of surprising and shocking and high

11  magnitude?

12  A.   Yes.

13  Q.   Okay.   You can put this exhibit aside.

14       And just one more exhibit that's not in your binder.

15       MR. TORZILLI:   If I can enlist the assistance of

16  Ms. Grimm one more time.

17  BY MR. TORZILLI:

18  Q.   Mr. Lewis, have you had an opportunity to review the

19  document now in front of you?

20  A.   Yes.

21       MR. TORZILLI:   Just for the record, this has been

22  marked as -- it's a two-page document.   The first page is

23  marked as be Government Exhibit 1028 and the second page has

24  been marked as Government Exhibit 1029.

25  BY MR. TORZILLI:

Robert Lewis - Direct

1    *Q.*  What do you understand this to be, Mr. Lewis?

2    *A.*  An e-mail from Greg Tench at Mar-Jac Poultry to Rich

3    Eddington and myself attaching the KFC cost model or the

4    proposed price for 2015.

5    *Q.*  So do you understand this to be Mar-Jac's pricing proposal

6    for the following contract year?

7    *A.*  Yes.

8          *MR. TORZILLI:*  Government moves to admit 1028 and

9    1029.

10         *THE COURT:*  Any objection to the admission of Exhibits

11   1028 and 1029?

12         *MR. TUBACH:*  No, Your Honor.

13         *THE COURT:*  And just so you know, you don't actually

14   have to say no if you don't want to.  I just want to make sure

15   everyone has a fair shot at objecting if they wish to.

16         Exhibits 1028 and 1029 will be admitted.

17         *MR. TORZILLI:*  Thank you, Your Honor.

18   *BY MR. TORZILLI:*

19   *Q.*  You can put that aside, Mr. Lewis.

20         You had said after the proposals came in that you were

21   speaking to the competing chicken suppliers about their

22   proposals.  And my question to you is if you can summarize what

23   you were communicating to them at that time.

24   *A.*  Well, our disappointment that the prices changed so

25   dramatically.  We again expected a small increase, but this

1    level of increase was -- was very surprising.

2    Q.  Did you and your team at RSCS have meetings with any of the

3    competing chicken suppliers to discuss their pricing proposals?

4    A.  Yes, I believe we did, although I cannot answer that

5    definitely.

6    Q.  Was there a time when you asked the competing chicken

7    suppliers to lower their prices from what they had proposed?

8    A.  Yes.

9    Q.  And what, if any, response did you get from the suppliers

10   to your request?

11          MR. TUBACH:  Your Honor, it's a compound question.

12          THE COURT:  Overruled.

13   BY MR. TORZILLI:

14   Q.  You can answer.

15   A.  Every supplier, that is all six suppliers gave us a slight

16   decrease in the pricing.

17   Q.  So all six suppliers you were negotiating with lowered

18   their price a little bit?

19   A.  Yes.

20   Q.  And after they lowered their price a little bit, where did

21   it stand in terms of you had said it was a shocking order of

22   magnitude.  What happened after they lowered their price?

23   A.  It didn't change our thinking.

24   Q.  It didn't change your thinking.

25   A.  No.

Robert Lewis - Direct

1   Q.  I would like you, sir, to turn to Tab 21.  You should find

2   there a document that's been marked as Government Exhibit 1160.

3           Are you there?

4   A.  Yes.

5   Q.  What is this?

6   A.  It's an e-mail from me dated August the 29th to all

7   representatives of the six suppliers we were negotiating with.

8   Q.  What was the purpose of your message?

9   A.  It was a follow-up on our chicken-on-the-bone negotiations.

10  Q.  And when did you write this e-mail that was a follow-up on

11  your chicken-on-the-bone negotiations?

12  A.  August 29th of 2014.

13          MR. TORZILLI:  Your Honor, government offers 1160 into

14  evidence.

15          THE COURT:  Any objection to the admission of Exhibit

16  1160?

17          MR. KORNFELD:  Objection, hearsay, Your Honor.

18          THE COURT:  And response to that, Mr. Torzilli?

19          MR. TORZILLI:  Sure.  It's not offered for the truth,

20  but offered for the effect on the individuals that are in the

21  To field of this e-mail.  They are being asked to do something

22  and a deadline is provided.

23          MR. KORNFELD:  What they are being asked to do is the

24  truth of the matter asserted.

25          THE COURT:  All right.  The objection is overruled.

Robert Lewis - Direct

1    However, I will only admit this, ladies and gentlemen, so this

2    is Exhibit 1160, I will only admit this for the effect on the

3    listener, in this case the recipient.  So you should not assume

4    that the content of the statements in Exhibit 1160 are true.

5    Rather, it would just be for you to assess the effect of it on

6    the recipients.  Exhibit 1160 will be admitted with that

7    limitation.

8              *MR. TORZILLI:*  Thank you, Your Honor.

9              Permission to publish?

10             *THE COURT:*  You may.

11   *BY MR. TORZILLI:*

12   *Q.*  Mr. Lewis, returning your attention to Government Exhibit

13   1160, what were you telling the recipients of your e-mail that

14   you wanted them to do?

15   *A.*  To submit their final proposals by the middle of the

16   following week.

17   *Q.*  So their final what proposals?

18   *A.*  Final pricing proposals along with the volume commitment.

19   *Q.*  And you wanted it the following week?

20   *A.*  Yes.

21   *Q.*  So how many days after you wrote this e-mail were you

22   asking the recipients of this e-mail to provide you their

23   responses?

24   *A.*  About three work days -- working days, sorry.

25   *Q.*  And generally speaking, without necessarily going into

66

Robert Lewis - Direct

1   individual names but generally speaking, to whom were you

2   sending this e-mail?

3   A.  To all the individuals that we had been meeting with and

4   discussing with about the 2015 price.

5   Q.  Were these the lead negotiators for each of the competing

6   chicken suppliers at that time?

7   A.  Yes.

8   Q.  You in your e-mail sent it to all of them in one To field

9   rather than individual e-mails to each company like you did in

10  e-mails we looked at earlier.  Can you explain why you did it

11  this way?

12  A.  It was basically a matter of convenience.  Rather than send

13  out all these individual notes like we would ordinarily do,

14  there was so many people involved and the message was the same

15  that I decided to send it to all.  And besides, there is no

16  competitive information that's mentioned or asked for in there

17  that would interfere with the confidentiality we were trying to

18  protect.

19  Q.  Did you at any time ask any of the recipients of this

20  e-mail to communicate with any of their competitors before they

21  submitted their final proposal?

22  A.  No.

23  Q.  Did any of the recipients of this e-mail ever tell you they

24  were in communication with any of their competitors about their

25  proposals they were going to submit?

Robert Lewis - Direct

1   A.   No.

2   Q.   Okay.  What happened next?

3   A.   Well, we finalized the proposals, reached agreement with

4   each of the suppliers and then prepared the SBRA addendums.

5   Q.   Do you know any of the suppliers in their final proposal

6   lowered their prices?

7   A.   From their bid price to their final price, yes.  All of

8   them dropped it slightly.

9   Q.   And even with the slight drop, what was your view or

10  reaction to the proposed pricing that you were receiving?

11  A.   The magnitude of the price increase was disturbing.

12  Q.   So you got to a point where you reached contracts with each

13  of the competing suppliers.  Is that what you said?

14  A.   Yes.

15  Q.   Could you now turn to Tabs 23 through 28 of your binder?

16  And that should be where you find Government Exhibits 1121,

17  1119, 1123, 1125, 1126 and 1127.

18        Have you had an opportunity to look at those?

19  A.   Yes.

20  Q.   What are those six exhibits?

21  A.   These are the SBRA agreements, the addendums for the

22  agreement with each of the six suppliers summarizing the

23  agreement we have on pricing, volume for 2015 through 2017.

24  Q.   Are these signed contracts between RSCS and each of the six

25  competing chicken suppliers?

Robert Lewis - Direct

1    A.  Yes.

2    Q.  And are these the signed contracts that you were

3    negotiating in 2014 with the competing chicken suppliers?

4    A.  I'm sorry, I didn't understand the question.

5    Q.  Were these the contracts that you had been conducting price

6    negotiations with during 2014?

7    A.  Yes.

8        MR. TORZILLI:  Your Honor, move to admit 1119, 1121,

9    1123, 1126, 1127 and 1125.

10       THE COURT:  Looks like we have potentially a lot of

11   objections.  Why don't we take, first of all, Exhibit 1121.

12   Any objection to the admission of Exhibit 1121?

13       MR. TUBACH:  Your Honor, I have the same objection to

14   all of them.  I have no objection to the admissibility, the

15   admission of the contracts themselves, but the first page of

16   the exhibit is not actually part of the contract and we ask

17   that that page not be admitted.

18       MR. GILLEN:  Your Honor, also I believe we were going

19   to see the exhibit so we can look at them on the screen.  So if

20   they could do that, that would be helpful.

21       THE COURT:  That may take a while.  Does the

22   government have hard copies for Mr. Gillen?

23       MR. TUBACH:  I have a hard copy I am happy to share.

24       THE COURT:  Let me know when you are ready,

25   Mr. Gillen.  We are going to talk just about -- we will take

Robert Lewis - Direct

 1   them one at a time.  Mr. Tubach has indicated a general

 2   objection, but why don't we take them one at a time.

 3        MR. GILLEN:  I am fine, Your Honor.

 4        THE COURT:  And response, Mr. Torzilli, as to the

 5   objection by Mr. Tubach?

 6        MR. TORZILLI:  The document was produced the way it

 7   appears here with the cover sheet, so it is part of the

 8   document.  So we would ask that the document be moved into

 9   evidence as a complete document which is what appears here.

10        MR. TUBACH:  Your Honor, this witness can't possibly

11   authenticate anything about the first document.  He had retired

12   long before and left the company long before this first

13   document was created.

14        THE COURT:  Well, I think there is general agreement

15   the first page is really not part of the original document.  It

16   may have been part of -- added subsequently to it.

17        Mr. McLoughlin?

18        MR. McLOUGHLIN:  Your Honor, if you are considering at

19   all keeping that first page, I think a side bar might be

20   appropriate.  But if Your Honor is ruling these out, there is

21   no need.

22        THE COURT:  I will sustain the objection.  If the

23   government could -- it doesn't have to be done now, but we will

24   need to make sure that the exhibit is remarked because the

25   exhibit sticker is on the first page, and then we'll have a

Robert Lewis - Direct

1   hard copy for later.

2          *MR. TORZILLI:*  As an alternative, Your Honor, can we

3   redact the information down to where the marked sticker is?

4          *THE COURT:*  Yes.

5          *MR. TORZILLI:*  Okay.  We will redact from the top all

6   the way down so it just has the sticker and the Bates number at

7   the very bottom.

8          *THE COURT:*  Any objection to that, Mr. Tubach or

9   Mr. McLoughlin?

10         *MR. TUBACH:*  No, Your Honor.  As long as the first

11  page only has the sticker, we are fine with that.

12         *THE COURT:*  And the Bates number?

13         *MR. TUBACH:*  Yeah, and the Bates numbers.  We are fine

14  with that.

15         *THE COURT:*  I think as a practical matter that would

16  be much easier.

17         Any objections to any of the other exhibits noted in

18  the list that Mr. Torzilli is moving the admission of?

19         *MR. TUBACH:*  Consistent with the Court's ruling as

20  long as the same thing happens with all those, we have no

21  objections.

22         *THE COURT:*  I understand.  Anyone else?

23         *MR. McLOUGHLIN:*  Your Honor, we join with Mr. Tubach

24  as long as it's the same.  But with respect to Exhibit 1129 --

25         *THE COURT:*  I don't think that one was part of the

71

Robert Lewis - Direct

1    motion, not yet.

2           *MR. TORZILLI:*  It's not.

3           *THE COURT:*  All right.  Then Exhibits 1119, 1121,

4    1123, 1125, 1126 and 1127 will be admitted subject to the

5    redaction of the first page as we have discussed.

6           Go ahead, Mr. Torzilli.

7           *MR. TORZILLI:*  Thank you.  Permission to publish the

8    second page of 1126?

9           *THE COURT:*  You may.

10   *BY MR. TORZILLI:*

11   Q.  Mr. Lewis, if you can go to Tab 23 of your binder and turn

12   to the second page of it.

13          Are you there?

14   A.  Yes.

15   Q.  Can you tell us what this is, please.

16   A.  This is the signed SBRA agreement with Pilgrim's Pride to

17   cover eight-piece COB for the years 2015 through 2017.

18   Q.  This is a three-year contract?

19   A.  It is a three-year supply contract in effect.  The prices

20   were subject to change annually.

21   Q.  Was it typical for RSCS to negotiate three-year contracts

22   for its chicken supply?

23   A.  No.

24   Q.  What was the typical time frame for supply contracts for

25   chicken?

Robert Lewis - Direct

1   A.   One year.

2   Q.   Why the change?

3   A.   Well, given all the issues we'd had with supply, it was a

4   way to try to ensure that KFC was going to be covered

5   volume-wise for an extended period of time.  And we also felt

6   that it was an advantage for the supplier because it was volume

7   that they could look forward to for an extended period of time.

8   Q.   Do you see a supplier margin entry on this page?

9   A.   Yes.

10  Q.   And what's the amount associated with the supplier margin?

11  A.   21 and three-quarter cents per pound.

12  Q.   Do you recall whether Pilgrim's Pride's original pricing

13  proposal had a supplier margin amount?

14  A.   Yes.

15  Q.   What was the supplier margin amount in its original pricing

16  proposal?

17  A.   .2175.

18  Q.   So did Pilgrim's Pride reduce its profit or its supplier

19  margin proposal at any point in the price negotiations?

20  A.   No.

21  Q.   Who signed the agreement on behalf of Pilgrim's Pride?

22  A.   Mr. Austin.

23  Q.   If you can now turn to the page in Exhibit 1126 that has

24  the production number or Bates number ending in 1580.  Up at

25  the top it says Exhibit 2.  Are you there?

Robert Lewis - Direct

1   A.   Yes.

2   Q.   What does this page convey?

3   A.   This page shows the individual products that are to be

4   supplied by Pilgrim's along with the FOB price per pound and

5   the weekly volume commitment.

6   Q.   How much chicken was Pilgrim's Pride going to be providing

7   to KFC restaurants on a weekly basis under this contract?

8   A.   2,110,500 pounds or 63 truckloads.

9   Q.   So as a relatively small increase in the price, what effect

10  does that have on the KFC system as a whole?

11  A.   In 2015 if you take the volume from the SBRA agreements

12  that were signed, the total volume would exceed

13  400 million pounds of chicken on the bone, so 1 cent would be

14  $4 million.

15  Q.   And what were the magnitude of the price increases that you

16  were facing at this time in 2014?

17  A.   15 to 20 cents per pound.

18  Q.   If you could now turn to the next tab.  It's Tab 24 in

19  Government Exhibit 1119.

20          MR. TORZILLI:  Permission to publish Page 2?

21          THE COURT:  You may.

22  BY MR. TORZILLI:

23  Q.   If you could turn to Page 2 of this exhibit.

24          What is it?

25  A.   It's the SBRA agreement for Claxton Poultry covering

Robert Lewis - Direct

1  chicken on the bone for 2015 through 2017.

2  Q.  Is the agreement signed?

3  A.  It is signed.

4  Q.  Who signed it on behalf of Claxton Poultry?

5  A.  Mikell Fries.

6  Q.  If you can go to the next tab, it's Tab 25, and it's

7  Government Exhibit 1127.

8      MR. TORZILLI:  Permission to publish Page 2, Your

9  Honor?

10      THE COURT:  You may.

11  BY MR. TORZILLI:

12  Q.  If you can go to Page 2 of that exhibit.

13      What is it?

14  A.  It's the SBRA addendum between RSCS and Tyson Foods for

15  chicken-on-the-bone product covering years 2015 through 2017.

16  Q.  Is it signed on behalf of Tyson Foods?

17  A.  Yes.

18  Q.  Who on behalf of Tyson Foods signed this contract?

19  A.  Brian Roberts.

20  Q.  Thank you.  If you can go to Tab 26 of your binder,

21  Government Exhibit 1123.

22      Permission to publish Page 2.

23      THE COURT:  You may.

24      MR. TORZILLI:  Thank you, Your Honor.

25  BY MR. TORZILLI:

Robert Lewis - Direct

1    Q.   Mr. Lewis, if you can go to Page 2 and tell us what it is.

2    A.   This is the SBRA agreement RSCS signed with Koch Foods

3    covering poultry for the years 2015 through -- or 2017, I am

4    sorry, 2015 through 2017.

5    Q.   And Mr. Lewis, for these SBRA pricing addendums --

6    A.   I am sorry?

7    Q.   Is the price -- let me start my question again.  I am

8    sorry.

9         In the SBRA pricing addendums like the one we are

10   looking at now, is the price that's contained in here fixed for

11   the entirety of the year?

12   A.   No.

13   Q.   It changes during the course of the year?

14   A.   It does.  The price that you see in this exhibit is really

15   the price for period one of 2015, but by agreement the

16   suppliers had the opportunity to change feed costs each and

17   every period through the course of the contract.

18   Q.   How long is a period?

19   A.   A period is four weeks.

20   Q.   Four weeks?

21   A.   Yes.

22   Q.   Are there 13 periods in a year?

23   A.   There are.

24   Q.   So the price can change 13 times during a year?

25   A.   That's correct.

Robert Lewis - Direct

1   *Q.*  And who signed this contract on behalf of Koch Foods?

2   *A.*  Bill Kantola.

3   *Q.*  If you can flip to the next tab in your binder, Tab 27.  It

4   should be Government Exhibit 1121.

5         *MR. TORZILLI:*  Your Honor, permission to publish the

6   second page of 1121?

7         *THE COURT:*  You may.

8   *BY MR. TORZILLI:*

9   *Q.*  What is this?

10  *A.*  This is the signed SBRA agreement between RSCS and George's

11  covering poultry products for 2015 through 2017.

12  *Q.*  Is it signed?

13  *A.*  Yes.

14  *Q.*  Who signed it on behalf of George's?

15  *A.*  Charles George.

16  *Q.*  Is that one of the twin brothers who's co-CEO of the

17  company?

18  *A.*  Yes.

19  *Q.*  If you can turn to Tab 28 of Government Exhibit 1125 and go

20  to the second page of that.

21        *MR. TORZILLI:*  And permission to publish the second

22  page of that, Your Honor.

23        *THE COURT:*  You may.

24        *MR. TORZILLI:*  Thank you.

25  *BY MR. TORZILLI:*

Robert Lewis - Direct

1    *Q.*  What's this?

2    *A.*  This is an SBRA addendum between RSCS and Mar-Jac Poultry

3    for poultry products to be supplied 2015 through 2017.

4    *Q.*  Is it signed on behalf of Mar-Jac?

5    *A.*  Yes.

6    *Q.*  Who signed it on behalf of Mar-Jac?

7    *A.*  Greg Tench.

8    *Q.*  Now, you mentioned this morning before our lunch break that

9    when you were working on the first project when you came back

10   to RSCS, the supply price I think you called it, you reviewed

11   the contracts that were then in place.  Did I understand your

12   testimony correctly?

13   *A.*  Yes.

14   *Q.*  So if you could turn to Tab 3.  Tab 3 is Government Exhibit

15   1129.

16           Are you familiar with Government Exhibit 1129?

17   *A.*  Yes.

18   *Q.*  What is it?

19   *A.*  It's a Tyson Foods pricing that was in effect for period

20   one, 2014.

21   *Q.*  So this is a Tyson Foods pricing model that was in effect

22   for period one?

23   *A.*  Correct.

24   *Q.*  So can you remind us what period of time period one would

25   be in that calendar year?

Robert Lewis - Direct

1    A.  It would be January.

2    Q.  So, for example, on January 1st of 2014 if you wanted to

3    know Tyson's price, would you be able to look at this?

4    A.  Yes.

5    Q.  And is this something that you reviewed, you looked at in

6    the ordinary course of your business when you arrived on the

7    scene at RSCS in 2014?

8    A.  Yes.

9         MR. TORZILLI:  Your Honor, move to admit 1129.

10        THE COURT:  Any objection to the admission of Exhibit

11   1129, Ms. Prewitt?

12        MS. PREWITT:  Yes, Your Honor.  There is handwriting

13   it and I don't know that the witness has authenticated who that

14   handwriting is from.

15        THE COURT:  He has not done so.

16        Response?

17        MR. TORZILLI:  May I inquire?

18        THE COURT:  Yes.

19   BY MR. TORZILLI:

20   Q.  Mr. Lewis, there is handwriting on Government Exhibit 1129.

21   Do you see that?

22   A.  I do.

23   Q.  And do you have an understanding of the source of that

24   handwriting?

25   A.  Yes.  This was actually submitted to Carol Knight who was

Robert Lewis - Direct

1   our administrative assistant, and she went through each of

2   these documents that are included in this exhibit for accuracy

3   and checked them for accuracy.

4          THE COURT:  Are you reoffering the exhibit?

5          MR. TORZILLI:  Yeah, I am offering the exhibit.

6          THE COURT:  Any objection to the admission of Exhibit

7   1129?

8          MS. PREWITT:  No, Your Honor.

9          THE COURT:  All right.  Exhibit 1129 will be admitted.

10         MR. TORZILLI:  Thank you, Your Honor.

11  BY MR. TORZILLI:

12  Q.  And now, sir, if I can direct your attention to Tabs 1, 2,

13  4, 5 and 6 which are Government Exhibits 1120, 1122, 1124, 1728

14  and 1729.

15         MR. McLOUGHLIN:  Your Honor, could we ask to have him

16  read that out one more time, please?

17         THE COURT:  Do you mind, Mr. Torzilli?

18         MR. TORZILLI:  Don't mind at all.  Government Exhibit

19  1120, Government Exhibit 1122, Government Exhibit 1124,

20  Government Exhibit 1728, and Government Exhibit 1729.

21         MR. McLOUGHLIN:  Thank you, Your Honor.

22         Thank you, Mr. Torzilli.

23  BY MR. TORZILLI:

24  Q.  Sir, have you had an opportunity to review these five

25  documents?

Robert Lewis - Direct

1   A.   Yes.

2   Q.   What are these five documents?

3   A.   These are the signed SBRA agreements for 2014.

4   Q.   Are these signed SBRA agreements ones that you reviewed,

5   you looked at, you referred to when you arrived back at RSCS in

6   May of 2014 when you were working on the supply crisis issue?

7   A.   Yes.

8        MR. TORZILLI:   Your Honor, we move to admit these five

9   exhibits.

10       THE COURT:   Any objection to the admission of the five

11  exhibits that Mr. Torzilli has moved to admit?

12       Mr. Tubach?

13       MR. TUBACH:   Yes, Your Honor, just the same objections

14  previously about the first page.  We would be fine with the

15  same redaction as previously indicated.

16       THE COURT:   Okay.  Anyone else?

17       Exhibits 1120, 1122, 1124 and 1728 and 1729 will be

18  admitted subject to the redaction of Page 1 in the manner that

19  we had referred to earlier in the case of the cover sheets that

20  were mentioned including 1119.

21       MR. TUBACH:   Two of those documents were admitted

22  yesterday, but --

23       THE COURT:   Oh, they were?  Well, under different

24  exhibit numbers?

25       MR. TUBACH:   Yes, Your Honor.  They were admitted when

Robert Lewis - Direct

1  Mr. Bryant testified.

2        THE COURT:  Yes, but were the exhibit numbers the

3  same?

4        MR. TUBACH:  No, the exhibit numbers were, but they

5  were the same document.

6        MR. TORZILLI:  They were produced by different

7  parties.

8        THE COURT:  Well, it doesn't really matter.  If the

9  copy is the same, we should not be admitting duplicates.

10       MR. TORZILLI:  Understood.

11       THE COURT:  So which are the duplicates?  Maybe

12  Mr. Tubach will be able to tell us because the last thing that

13  we want is more exhibits.

14       MR. TUBACH:  Exhibit 1729, Your Honor, is one.

15       THE COURT:  Do you know what that was admitted

16  yesterday under?

17       MR. TUBACH:  What number it was yesterday?

18       THE COURT:  Yeah, exhibit number, do you happen to

19  know?  Maybe not.

20       MR. TUBACH:  Now you are testing my memory.  I

21  apologize.

22       MR. TORZILLI:  May I suggest a meet and confer with

23  the other side to iron this out because I do --

24       THE COURT:  I am going to make an exception this time

25  because I don't want to get bogged down with this issue, but on

Robert Lewis - Direct

1    the whole both sides should make sure that we avoid introducing

2    duplicates.  It just leads to a lot of confusion.  But I will

3    at this time admit those five exhibits subject to the redaction

4    that we noted before, all right?

5         MR. TORZILLI:  Thank you, Your Honor.

6    BY MR. TORZILLI:

7    Q.  Mr. Lewis, I would like to return to the brief discussion

8    we were having about period pricing.

9    A.  Yes.

10   Q.  We were talking about that's pricing that can change

11   periodically.  What typically accounts for the change in price

12   from period to period?

13   A.  Feed cost.

14   Q.  Can you say what feed cost is, please?

15   A.  Well, chickens require corn and soybean meal, and of course

16   that's a market that changes very often.  Feed cost is also a

17   very large percentage of the total cost, probably runs in the

18   neighborhood of 30, 35 percent of the total cost.  So as feed

19   price changes, the suppliers use a rolling three-month average

20   and recalculate that each period and report that with their new

21   period pricing.

22   Q.  So if the price of feed, the price of corn and soy is going

23   up, what happens to the period price of chicken?

24   A.  The price increases.

25   Q.  And by the same token, if feed prices go down, what happens

Robert Lewis - Direct

1   to the period price for chicken?

2   A.   The price declines.

3   Q.   Do you know what was happening to feed prices in 2014?

4   A.   I do not.

5   Q.   If you can look at Tab 22 in your binder.  You should find

6   a document marked as Government Exhibit 1243.

7        Are you there, sir?

8   A.   Yes.

9   Q.   What is this?

10   A.   This is a price summary by supplier for various poultry

11   products covering period 13 of 2014.

12   Q.   What would period 13 of 2014 be in the annual cycle?

13   A.   That's the last period of the year.

14   Q.   So it would be the last four weeks of calendar year 2014?

15   A.   Generally, yes.

16   Q.   And is this -- are the period prices within RSCS something

17   that's documented on a period-by-period basis?

18   A.   Yes.

19   Q.   And are the period pricing charts something that's created

20   in the ordinary course of business at RSCS?

21   A.   Yes.

22   Q.   Is it a regular part of RSCS's business to keep and

23   maintain records about period prices?

24   A.   Yes.

25   Q.   And is it important for the information that's documented

Robert Lewis - Direct

1    about period pricing to be accurate?

2    A.  Yes.

3            MR. TORZILLI:  Your Honor, we would move to admit

4    1243.

5            THE COURT:  Any objection to the admission of Exhibit

6    1243?

7            MR. TUBACH:  The only -- there is some handwriting on

8    some of the pages we haven't established yet I believe on the

9    second page and on the fourth page.

10           THE COURT:  Right.  You can ask additional questions

11   if you wish, Mr. Torzilli.

12           MR. TORZILLI:  Thank you, Your Honor.

13   BY MR. TORZILLI:

14   Q.  Mr. Lewis, do you see handwriting on the second page of

15   Exhibit 1243?

16   A.  I do.

17   Q.  Do you have an understanding of what that handwriting

18   pertains to?

19   A.  I do not.

20   Q.  And will you turn to the fourth and final page of Exhibit

21   1243?

22           Are you there?

23   A.  I'm there.

24   Q.  Do you see handwriting on this page?

25   A.  Yes.

85

Robert Lewis - Direct

1   *Q.*  Do you have an understanding of what that handwriting is?

2   *A.*  Yes.

3   *Q.*  Can you explain?

4   *A.*  Yes.  The suppliers were allowed a fuel surcharge.  And

5   again Carolyn Knight has reviewed this document for accuracy

6   and the checkmarks indicate that the numbers were accurate.

7       *MR. TORZILLI:*  Your Honor, we offer 1243 and offer

8   redactions to the handwriting that appears on the second page.

9       *THE COURT:*  All right.  So you are moving the

10  admission of 1243 with the handwriting on Page 2 redacted, but

11  no redactions as to Page 4.

12      *MR. TORZILLI:*  Yes, sir.

13      *THE COURT:*  Any objection -- or sorry, any objection

14  to the admission of that exhibit as redacted?

15      All right.  As redacted on Page 2, Exhibit 1243 will

16  be admitted.

17      *MR. TORZILLI:*  Thank you, Your Honor.  And permission

18  to publish?

19      *THE COURT:*  You may.  Well, but not Page 2.

20      *MR. TORZILLI:*  Permission to publish Page 1?

21      *THE COURT:*  Yes, you may.

22  *BY MR. TORZILLI:*

23  *Q.*  Sir, if I can direct your attention to Page 1 of Exhibit

24  1243, and can you explain to us what the first entry of the

25  chart at the top is?

Robert Lewis - Direct

1   A.  The first entry shows the FOB price for period 13 for each

2   of the seven suppliers listed for KFC's purple label product.

3   Q.  And what's the price being expressed as?  It's price per

4   what?

5   A.  Per pound FOB the plant.

6   Q.  Mr. Lewis, was period pricing like the period pricing we're

7   looking at now, was that already part of an agreed to contract?

8   A.  Yes.

9   Q.  Okay.  So is it fair to say that a period price is a price

10  as opposed to, say, a bid or a proposed price?

11  A.  Yes.

12  Q.  Okay.  And can you explain your answer?

13  A.  Well, a bid price is a proposed price.  It's what the

14  supplier is proposing to us to accept.  These prices are

15  already under contract.  They are locked in place.

16  Q.  So this is part of an agreed to contract that's just an

17  adjustment from your original price.  Is that fair to say?

18  A.  That's correct, yes.

19  Q.  Did any of the defendants you've identified in court today

20  ever call you to ask for their competitors' period pricing?

21  A.  No.

22  Q.  Did you expect any of the defendants that you've identified

23  to ever call you to ask about their competitors' period prices?

24  A.  No.

25  Q.  Why not?

Robert Lewis - Direct

1    A.  Well, I believe that that would be --

2              MR. McLOUGHLIN:  Your Honor, excuse me, objection to

3    the witness' personal beliefs here.

4              THE COURT:  Sustained.

5              MR. McLOUGHLIN:  It's not relevant to the question

6    before the jury.

7              THE COURT:  Sustained.

8    BY MR. TORZILLI:

9    Q.  Can you explain rather than your belief why you did not

10   expect any of the defendants you have identified here today to

11   ever call you to ask for their competitors' period pricing?

12             MR. McLOUGHLIN:  Your Honor, same objection.  Putting

13   the same drink in a different bottle does not change the issue

14   here.

15             MR. KORNFELD:  Your Honor, I would additionally

16   interpose a relevance objection to an expectation of something

17   that didn't happen.

18             THE COURT:  I am going to sustain both objections.

19   There is no foundation for him even expecting such a thing.

20   BY MR. TORZILLI:

21   Q.  Sir, you testified that period pricing is part of the

22   contract; is that right?

23   A.  Yes.

24   Q.  Okay.  And can you tell me whether RSCS's contract prices

25   are public information or private information?

Robert Lewis - Direct

1    *A.*  Private.

2             *MR. McLOUGHLIN:*  Objection, Your Honor, to the

3    question and to the answer.  What is private when, in fact, for

4    example with respect to Pilgrim's, Pilgrim's knows the price of

5    the contract.  The man on the street may not know it and so,

6    quote, it's private, but that's simply irrelevant to the issues

7    here.

8             *THE COURT:*  He has answered.  The objection is

9    overruled as well.

10   *BY MR. TORZILLI:*

11   *Q.*  Can you explain the basis for your answer?

12   *A.*  I believe that it is morally wrong.  In fact, I think

13   it's --

14            *MR. McLOUGHLIN:*  I object to the witness' belief which

15   has already been ruled improper.

16            *THE COURT:*  Overruled.  He can answer.

17   *BY MR. TORZILLI:*

18   *Q.*  Please complete your answer, sir.

19   *A.*  I believe it's morally wrong.  In fact, I think it's a form

20   of cheating.

21   *Q.*  What do you mean by cheating?

22   *A.*  Well, it's not right.

23   *Q.*  What do you mean not right?

24   *A.*  Well, it's against all the moral standards that I live by.

25            *MR. LAVINE:*  Your Honor, I'm going to object to this.

Robert Lewis - Direct

1   This has no relevance whatsoever.

2          *THE COURT:*  I don't want -- I think he has answered

3   the question.  Let's move on.

4          *MR. McLOUGHLIN:*  For the record, Your Honor, I would

5   like to state this individual's morality has nothing to do with

6   the issue before this jury and the legality or illegality of

7   the allegations.

8          *THE COURT:*  I don't consider that to be an objection,

9   but I've already directed Mr. Torzilli to move on.

10         Go ahead.

11  *BY MR. TORZILLI:*

12  *Q.*  Sir, can you turn to Tab 31 of your binder?  It's the

13  document that's been marked as Government Exhibit 10-4.

14  *A.*  Yes.

15  *Q.*  Do you recognize this?

16  *A.*  Yes.

17  *Q.*  Have you seen it before?

18  *A.*  Yes.

19  *Q.*  What is it?

20  *A.*  It is a summary by supplier of the 2014 contract price and

21  margin along with the 2015 contract price and margin.  The

22  middle column is the price that was in effect in period 13 of

23  2014.

24  *Q.*  Have you seen this before testifying here today?

25  *A.*  Yes.

Robert Lewis - Direct

1    Q.  Have you reviewed what's been marked as Government

2    Exhibit 10-4 before you came to court today?

3    A.  Yes.

4    Q.  Have you reviewed it for accuracy?

5    A.  Yes.

6    Q.  Can you describe what you did to review Exhibit 10-4 for

7    accuracy?

8    A.  I looked at the SBRA agreements for 2014 and 2015 to get

9    the FOB price and the margin that's shown.  And I looked on the

10   period report that we reviewed earlier to get the prices for

11   the period 13 of 2014.

12   Q.  And after conducting your review for accuracy, what did you

13   determine?

14   A.  I determined that all the numbers shown are accurate.

15        MR. TORZILLI:  At this time, Your Honor, the

16   government moves for the admission of Exhibit 10-4.

17        THE COURT:  Any objection to the admission of

18   Exhibit 10-4?

19        MS. HENRY:  Your Honor, we object to the column with

20   the period 13 prices as being irrelevant.

21        MR. KORNFELD:  We would object to the last column

22   regarding margin.  That number is a compilation of several

23   numbers on the contract that have already been admitted.  That

24   is not an accurate reflection of the margin that this witness

25   already talked about in the contracts that were admitted.

Robert Lewis - Direct

1          THE COURT:  And I am sorry, Mr. Kornfeld, it says

2     margin in a couple of places.  I wasn't --

3          MR. KORNFELD:  I am talking on the far right where it

4     says 2015 contract price and margin.  The original contract for

5     Claxton is an example that the margin was 10 cents.  Now it's a

6     larger number.  There is a reason for that that I don't think

7     this accurately reflects the contracts that have been admitted

8     into evidence.

9          THE COURT:  Okay.  Both Ms. Henry's and Mr. Kornfeld's

10    objections will be overruled.  The witness has laid the

11    foundation for it.  The Court has already ruled on this in a

12    separate order.  The Court will admit Government Exhibit 10-4.

13         MR. TORZILLI:  Thank you, Your Honor.  And permission

14    to publish 10-4?

15         THE COURT:  You may.

16    BY MR. TORZILLI:

17    Q.  Mr. Lewis, can you explain to the Ladies and Gentlemen of

18    the Jury what this exhibit represents?

19    A.  Well, it clearly shows the prices that were in effect under

20    the 2014 contract and how dramatically they changed for the

21    2015 contract.  It also shows the change from the 2014 margin

22    to the 2015 margin and the amount of change there.  The most

23    important message I think this sends is that the price that was

24    in effect --

25         MR. McLOUGHLIN:  Objection, Your Honor.  The witness

Robert Lewis - Direct

1    can explain what it says, but the message he thinks it sends to

2    the jury, the message is for the jury, not for this witness to

3    lecture.  This is argument in the form of testimony.

4         *THE COURT:*  It sounds like it might be straying into

5    that.  If you could ask a more narrow question, Mr. Torzilli.

6         *MR. TORZILLI:*  Yes, Your Honor.

7    BY MR. TORZILLI:

8    *Q.*  Mr. Lewis, looking at Government Exhibit 10-4, can you

9    explain what the middle column of numbers represents?

10   *A.*  The middle column are the period 13, 2014 FOB prices by

11   supplier.

12   *Q.*  For each of the competing suppliers?

13   *A.*  Yes.

14   *Q.*  So is that an actual price that someone was paying for a

15   pound of chicken?

16   *A.*  Yes.

17   *Q.*  At what time period was someone actually paying those

18   prices for a pound of chicken?

19   *A.*  Period 13, which would be roughly December of 2014.

20   *Q.*  So, for example, December 31st of 2014?

21   *A.*  Yes.

22   *Q.*  If someone was buying a pound of Pilgrim's chicken, they

23   would pay about 88-1/2 cents?

24   *A.*  Yes.

25   *Q.*  And then what about the column to the right of it, what is

Robert Lewis - Direct

1   that?

2   *A.*   That is the new FOB price that takes effect January the 1st

3   of 2015.

4   *Q.*   So if someone was going to buy a pound of Pilgrim's chicken

5   on January 1st, 2015 under the RSCS contract, they would be

6   paying how much per pound?

7   *A.*   $1.0856.

8   *Q.*   And that would be how much of an increase from the day

9   before?

10   *A.*   Roughly 10 to 12 cents per pound.

11   *Q.*   And in your --

12   *A.*   I am sorry.

13   *Q.*   Approximately how much of an increase did you say?

14   *A.*   My mind is not working that fast, I'm sorry.

15   *Q.*   If you had a calculator, if you had a calculator, would you

16   be subtracting 88-1/2 cents from $1.08?

17   *A.*   Yes, I would.

18   *Q.*   That should be about 20 cents.  So when you were testifying

19   earlier about being shocked about the magnitude of the price

20   increases, is this an example of what you were talking about?

21   *A.*   Yes.

22          *MR. KORNFELD:*  Objection, leading, Your Honor.

23          *THE COURT:*  Sustained.

24   *BY MR. TORZILLI:*

25   *Q.*   Can you relate your earlier testimony about being shocked

Robert Lewis - Direct

1   at the magnitude --

2          MR. KORNFELD:  Your Honor, I am going to object to

3   Mr. Torzilli repeatedly articulating in the form of a question

4   this witness' prior testimony.  We've heard it on multiple

5   times.  The jury knows what his testimony was.  I think it's

6   improper to couch a question and repeat testimony in the form

7   of a question.

8          THE COURT:  I am going to sustain the objection

9   because it does -- it's been repeated.  There are occasions

10  when it's appropriate such as when a topic hasn't been

11  discussed for a while, but I would ask -- I don't think he

12  needs to be reminded, so if we could avoid that.

13         Go ahead, Mr. Torzilli.

14         MR. TORZILLI:  Thank you.

15  BY MR. TORZILLI:

16  Q.  Sir, going back to Government Exhibit 10-4, and again

17  concentrating on the Pilgrim's row here, there is an entry that

18  says .1175 and then an entry that says .2175.  Do you see that?

19  A.  Yes.

20  Q.  Can you explain the relationship between those two numbers?

21  A.  Well, the .1175 is the profit margin for 2014.  The .2175

22  is the profit margin for the new contract covering 2015.

23  Q.  So does that reflect the profit margin increase for

24  Pilgrim's?

25  A.  Yes.

Robert Lewis - Direct

1    Q.  And then if you were to go down to Claxton and Tyson and

2    Koch and George's and Mar-Jac and do the same comparison, would

3    that be the change in the profit for each of those competing

4    suppliers from 2014 to 2015?

5    A.  Yes.

6    Q.  Thanks.  You can put that exhibit aside.  Just a couple

7    more questions, Mr. Lewis.

8         I want to ask you about the spread in prices across

9    suppliers.  And my question is whether RSCS had a strategy to

10   try to keep the prices of chicken products close across

11   suppliers or not close across suppliers?

12   A.  Our strategy was to keep the prices close together.

13   Q.  Why did you want to keep the prices close together?

14   A.  It enables us to better manage the landed cost to the

15   stores and keep it consistent across the country.

16   Q.  Did you ever ask the competing chicken suppliers to

17   coordinate their prices amongst themselves to achieve that?

18   A.  No.

19   Q.  When you were at RSCS in 2014, did you ever ask any of the

20   competing suppliers to communicate with each other about their

21   bids or their pricing proposals or their negotiations with you?

22   A.  No.

23   Q.  Did any of the competing suppliers ever tell you that they

24   were in communication with each other about their bids or their

25   pricing proposals or their negotiations with you?

Robert Lewis - Cross

1          *MR. McLOUGHLIN:*  Objection, assumes facts not in

2    evidence.

3          *THE COURT:*  Sustained.

4          *MR. TORZILLI:*  Your Honor, one minute to confer?

5          *THE COURT:*  Yes.

6          *MR. TORZILLI:*  Nothing further, Your Honor.

7          *THE COURT:*  Cross-examination.

8          Mr. Lavine, go ahead.

9          *MR. LAVINE:*  Thank you, Your Honor.

10                        **CROSS-EXAMINATION**

11   *BY MR. LAVINE:*

12   *Q.*  Mr. Lewis, my name is Bryan Lavine and I represent

13   Mr. Brady.

14          How are you today?

15   *A.*  Very well, thank you.

16   *Q.*  Good.  So we've heard the government go through talking to

17   you about when you came in in 2014 and what you did.  I want to

18   go back and kind of start when you first came in and I want to

19   kind of see if I can fill in some holes.  Is that all right

20   with you?

21   *A.*  All right.  If I may make a request, can you speak more

22   into the microphone?

23   *Q.*  I am sorry.  Can you hear me now?

24   *A.*  Yes, thank you.

25   *Q.*  I usually think I talk loud enough, but maybe not.

Robert Lewis - Cross

1           So you had worked at RSCS for many years; is that

2    correct?

3    *A.*   Yes, sir.

4    *Q.*   And you retired in 2009.

5    *A.*   Correct.

6    *Q.*   And you were asked to come back to RSCS in about 2014.

7    *A.*   Yes.

8    *Q.*   And that was to help negotiate the contract for the 2015 to

9    2017 KFC contract.

10   *A.*   No, sir.  The original reason was to help KFC get through

11   the Mother's Day --

12   *Q.*   The supply problem?  I didn't mean to interrupt you.

13   Please finish.

14   *A.*   The original agreement was for two months.

15   *Q.*   Right.  And at the time an individual by the name of Mike

16   Ledford who had previously handled the pricing negotiations had

17   left the company; is that correct?

18   *A.*   Yes.

19   *Q.*   And you came back as a consultant for that two-month

20   period?

21   *A.*   Yes.  I didn't have a title, but I think that describes it.

22   *Q.*   And so in your role you helped to try and work through the

23   supply problems that KFC was having at that time.

24   *A.*   Yes.

25   *Q.*   Now, an individual came in by the name of Rich Eddington

Robert Lewis - Cross

1    shortly thereafter; am I correct?

2    A.   Yes.

3    Q.   And he was the replacement for Mr. Ledford.

4    A.   Yes.

5    Q.   All right.  Now, when you returned as I think you said on

6    direct, the chicken market appeared to be encountering an

7    extreme supply shortage.  Would that be fair to say?

8    A.   Yes.

9    Q.   Now, I want to ask you when you retired in 2009 to the time

10   that you came back, did you keep current on chicken prices?

11   A.   No.

12   Q.   I wouldn't either if I retired.  I don't blame you for

13   that.

14   A.   No, I did not.

15   Q.   And so it's fair to say you didn't really keep up with the

16   market changes that occurred from let's say 2009 to 2014.

17   A.   I did not keep up with it, no.

18   Q.   It's a good thing you didn't.  Enjoy your retirement.

19           Now, you agree, sir, that RSCS negotiates the price of

20   chicken for KFC.

21   A.   Yes.

22   Q.   And it also negotiates for KFC the volume of chicken that's

23   going to be allocated to the KFC suppliers.

24   A.   Yes.

25   Q.   Now, RSCS wants to make sure there is enough chicken to

Robert Lewis - Cross

1    supply all of the KFC all year round.  And that's the reason

2    you were brought in, is that right sir, because of the supply

3    problem?

4    A.  I was brought in, yeah, but the specific problem at the

5    time was the Mother's Day demand.

6    Q.  Right.  We're going to get to that, sir.

7            Now, even with your history at RSCS, RSCS focuses on

8    trying to get the best price possible.

9    A.  Yes.

10   Q.  And there are several suppliers that provide chicken that

11   KFC acquires for their franchisees.  And in 2014 let's say

12   you've listed out the suppliers that were the main suppliers to

13   KFC.

14   A.  Yes.

15   Q.  And each supplier has to be approved by RSCS or KFC in

16   order to sell chicken to KFC.

17   A.  Yes, they have to be approved by KFC.

18   Q.  By KFC.  It's KFC's specifications, not RSCS.

19   A.  That's correct.

20   Q.  Right.  Now, in fact, sir, every plant a supplier uses for

21   KFC must be approved by KFC.

22   A.  Yes.

23   Q.  And each supplier has to produce chicken according to the

24   specifications demanded by KFC.

25   A.  Yes.

Robert Lewis - Cross

1    Q.  And as part of the supply chain, if one supplier cannot

2    supply the chicken for KFC for whatever reason, one of the

3    other approved suppliers can step in and deliver that chicken.

4    A.  Yes.

5    Q.  And that's because they both are following the

6    specifications as demanded by KFC.

7    A.  Yes.

8    Q.  Now, many of these suppliers have been supplying KFC for

9    chicken for years; is that correct?

10   A.  Yes.

11   Q.  And there is transparency as to cost and margin with each

12   supplier.  Would you agree with that, sir?

13          MR. TORZILLI:  Objection, vague.

14          THE COURT:  Overruled.  He can answer.

15   A.  May I have the question again, please?

16   BY MR. LAVINE:

17   Q.  Sure.  There is transparency as to the cost and margin with

18   each supplier for each year with -- I am going to say with RSCS

19   because they negotiate the contracts on behalf of KFC.

20   A.  Yes.

21   Q.  So up until the time of the 2015 contract, it was an annual

22   contract, was it not?

23   A.  Yes.

24   Q.  So each year RSCS had the cost and the margin for each of

25   these suppliers.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   So they could look back three years.  They could look back

3    four years.  They could track their costs, their labor costs?

4    A.   Yes.

5    Q.   Their margin?

6    A.   Yes.

7    Q.   Everything, because you have all of the information from

8    these suppliers.

9    A.   Yes.

10   Q.   So you're able, you being RSCS, is able to track the

11   expenses of each supplier on an annual basis.

12   A.   Yes.

13   Q.   And they are able to track the margin on an annual basis.

14   A.   Yes.

15   Q.   And RSCS also has access to costs and prices from various

16   outside sources as to market conditions and the costs of

17   producing the chicken; is that accurate, sir?

18   A.   Yes.

19   Q.   All right.  Now, when we talk about the negotiation

20   process, as you said the first -- when you came in 2014, they

21   went to a three-year contract.

22   A.   Yes.

23   Q.   And before that they were annual contracts.

24   A.   Yes.

25   Q.   And in 2015 was the first time that the three-year contract

1    concept had been introduced into the negotiation process.

2    A.   Yes.

3    Q.   And the idea was to help guarantee the supply on behalf of

4    KFC.

5    A.   Yes.

6    Q.   And the benefit to the supplier was that they would know

7    what the volume was going to be on a three-year basis.

8    A.   Yes.

9         THE COURT:   Mr. Lavine, would this be a good time to

10   break or if you have a couple more, whatever you want to do.

11        MR. LAVINE:   Your Honor, you know you give a lawyer a

12   chance to ask a couple questions and I'm going to keep going.

13   This is the perfect time to break.

14        THE COURT:   All right.   Ladies and gentlemen, we will

15   go ahead and take the mid-afternoon break, 20 minutes, so if we

16   could plan on reconvening 25 minutes until 4:00.

17        Keep the admonitions in mind.   The jury is excused.

18        Jury excused.

19        We will be in recess.   Thank you.

20   (Recess at 3:16 p.m.)

21   (Reconvened at 3:36 p.m.)

22        THE COURT:   Let's go ahead and get the jury back in.

23        Yes, Ms. Prewitt?

24        MS. PREWITT:   One housekeeping issue, Your Honor.

25   With respect to Government Exhibit 1129, Your Honor might

103
Robert Lewis - Cross

1    remember this is the period pricing.  This is one of the late

2    editions in terms of additional exhibits assigned to this

3    particular witness.  I did notice that the last page there is a

4    transmittal letter with that contract pricing that is hearsay,

5    Your Honor.  I would just ask, and I don't know if the

6    government would have any objection to this, but it just be

7    removed from the exhibit.

8          THE COURT:  Let me take a look at it.  What tab number

9    is that, Mr. Torzilli?

10         MR. TORZILLI:  It's not a tab.

11         THE COURT:  It was a loose one?

12         MR. TORZILLI:  Yeah, one of the loose ones.

13         THE COURT:  Hold on.  I am not finding it.  Do you

14   happen to have a copy?

15         MR. TORZILLI:  May I?

16         MS. PREWITT:  I don't have a hard copy.  I just have

17   it on the computer.

18         THE COURT:  Okay.  Sorry, Ms. Prewitt.  What were you

19   mentioning?

20         MS. PREWITT:  Your Honor, it's a 13-page exhibit

21   ending with Bates No. 004337.  Perhaps this is actually what

22   the government is seeking to admit in which I would have no

23   issue, but it's the 13-page exhibit --

24         MR. TORZILLI:  1129?

25         MS. PREWITT:  This is Exhibit 1129.

Robert Lewis - Cross

1         MR. TORZILLI:  I am sorry, I misheard you.  I thought

2    you were saying 1029.  Tab 3.

3         THE COURT:  Tab 3.  Oh, right, the very last page

4    which is an e-mail, okay.

5         So Mr. Torzilli, do you intend to include that page as

6    part of Exhibit 1129?

7         MR. TORZILLI:  Yes.  It is part of the document as it

8    was transmitted to us.  It looks like it is a transmittal

9    e-mail that accompanied the rest of the exhibit.

10        THE COURT:  I think Ms. Prewitt's question was because

11   it is of a different character than the rest of the exhibit and

12   because there could be a hearsay objection to it -- did we

13   admit 1129?

14        MS. PREWITT:  Yes, we did, Your Honor.

15        THE COURT:  Right.  She is just asking can we take

16   that out since it's of a different character.  You can correct

17   me if I'm wrong, Ms. Prewitt.

18        MS. PREWITT:  That's right, Your Honor.  It's hearsay.

19   And look, it's not something that this witness would be able to

20   testify to in terms of he didn't create the document.  The

21   underlying records are what was put into evidence here, Your

22   Honor.

23        MR. TORZILLI:  May I have a moment to confer?

24        THE COURT:  Yeah, real quick.

25        MR. TORZILLI:  We will withdraw that portion of the

1    exhibit.

2            THE COURT:  Okay.  Not that it can't be separately

3    admitted as a newly marked exhibit.  So just for the record,

4    then, as to Exhibit 1129, what was admitted as the last page

5    which ends in the following Bates stamp Nos. 4337, that last

6    page will be withdrawn.

7            MS. PREWITT:  Thank you, Your Honor.

8            THE COURT:  Let's bring in the jury, Mr. Keech.

9            MR. TORZILLI:  May I retrieve?

10           THE COURT:  Yes, you may, Mr. Torzilli.

11           (Jury present.)

12           THE COURT:  Go ahead, Mr. Lavine.

13           MR. LAVINE:  Thank you, Your Honor.

14   BY MR. LAVINE:

15   Q.  Mr. Lewis, if I ask a question that you don't -- I am not

16   clear on, just ask me to repeat the question and I will be

17   happy to do so.

18   A.  Thank you.

19           THE COURT:  And one other thing.  Mr. Lewis, in the

20   event that you want to use a calculator, I found one in my

21   chambers.  It is the lowest tech calculator you can imagine,

22   but just in case you want to crunch a number or something, we

23   have that available for you.

24           Okay.  Go ahead, Mr. Lavine.

25   BY MR. LAVINE:

Robert Lewis - Cross

1    Q.  Mr. Lewis, before we broke we started to talk a little

2    about the negotiation process.  And I want to go through that

3    because I think it's important for the Ladies and Gentlemen of

4    the Jury to understand this.

5            So now the negotiations that you started in in 2014

6    for the three-year contract, they are not a take-it-or-leave-it

7    type of negotiations, are they?

8    A.  I'm not sure I understand what you mean by that.

9    Q.  Well, what I mean by that is it's not they submit a number

10   and that's it.  I mean, when I say they, the suppliers.

11   A.  No, it's not -- no.

12   Q.  Poor question on my part.  I apologize for that.  When the

13   supplier submits their bids, it's not a take-it-or-leave-it.

14   It's not a one-time deal and that's it.

15   A.  That's correct.

16   Q.  There is a negotiation process.

17   A.  Yes.

18   Q.  All right.  And that negotiation process a lot of times

19   will start, for example, a call from you to the supplier to

20   just start the process and tell them that you're going to be

21   following up with questions and you're going to be eventually

22   asking them to submit a proposal; is that correct, sir?

23   A.  That's correct.

24   Q.  And after that there can be e-mail exchanges.  For example,

25   the bid proposals are many times e-mailed to you or people at

Robert Lewis - Cross

1    RSCS by the suppliers; is that correct, sir?

2    A.   Yes.

3    Q.   And that -- once that is submitted there can be follow-up

4    phone calls by you or Mr. Eddington or Mr. Suerken, whoever is

5    there and responsible for the negotiation, there can be follow

6    up phone calls.

7    A.   Yes.

8    Q.   And after the submission of the first proposal, you can

9    follow up with a meeting.  You can send out a calendar invite

10   or you can send out an e-mail as we saw that you did earlier

11   today saying there is certain things we need to address and we

12   plan on meeting on such and such a date.

13   A.   Yes.

14   Q.   Or you could also have a meeting and follow up that meeting

15   with an e-mail saying:  We appreciate you meeting on such and

16   such a date.  We look forward to working with you and here is

17   what we would like to address.

18   A.   Yes.

19   Q.   So in a sense it's a very fluid negotiation process.

20   A.   Yes.

21   Q.   Now, as I said, some of the communication occurs by e-mail

22   between you and the supplier.  When I say you, sir, I am not

23   picking on you.  I am just saying RSCS.  The communication can

24   be by e-mail.

25   A.   Yes.

Robert Lewis - Cross

1   Q.   By telephone call.

2   A.   Yes.

3   Q.   Or by meeting, face-to-face meeting.

4   A.   Yes.

5   Q.   Now, a lot of times as you said with the suppliers that you

6   mentioned before, they had contracts already in place with

7   RSCS.

8   A.   Yes.

9   Q.   And so you would be looking for them to renew their

10  contract with RSCS for the following year or in the situation

11  of 2015 it would be for the three-year period.

12  A.   Yes.

13  Q.   And unless -- and for each renewal period -- and when I say

14  that, I know previously you did annual and you went to three

15  years -- unless there was a problem with a supplier, the same

16  suppliers will negotiate price and RSCS will allocate volume

17  among those same suppliers.

18  A.   Yes.

19  Q.   And part of the reason for that is they have been qualified

20  or approved by KFC and they meet KFC's specifications; is that

21  correct, sir?

22  A.   Yes.

23  Q.   So as I said, when the negotiation process begins, someone

24  from RSCS, and in this situation with the 2015 contracts it

25  would have been you, sir, you have a discussion with each

Robert Lewis - Cross

1   supplier as to issues that you want to address in trying to

2   discuss with them to find out what their proposed volume or

3   what the amount of loads that they can provide to KFC; is that

4   correct?

5   A.   Yes.

6   Q.   Now, when I use loads, if you would explain to the Ladies

7   and Gentlemen of the Jury, what exactly is a load?

8   A.   A load -- I am sorry, a load is approximately 33,500 pounds

9   of product.

10  Q.   So 10 loads would be about 333,000 pounds of chicken.

11  A.   That's correct.

12  Q.   That's a lot of chicken.  So after you start this process,

13  then you send out a cost-plus model for each supplier to fill

14  out, correct?

15  A.   No.  The supplier developed the cost-plus model and sent it

16  to us.

17  Q.   But you have a form, that's true, but the form was

18  developed by RSCS; is that correct?

19  A.   That is correct.

20  Q.   In fact, sir, in all honesty with you, you were involved in

21  developing that cost-plus model, were you not, sir?

22  A.   I was.

23  Q.   And is it accurate to say that Paul Sinowitz was also

24  helping you in the development of that model?

25  A.   I don't recall that.

Robert Lewis - Cross

1   Q.   Okay.  That's fine.  Now, the cost-plus model which we saw

2   in a sense with the contracts has lines for the suppliers to

3   enter all of the suppliers' costs and margin so RSCS can see

4   how the suppliers reached the COB price.

5   A.   Yes.

6   Q.   And the COB is the chicken on the bone that we're talking

7   about.

8   A.   Yes.

9   Q.   And during the negotiation process, RSCS is negotiating the

10  price, correct?

11  A.   Yes.

12  Q.   And RSCS is sometimes -- you are trying to push that price

13  down.

14  A.   Always.

15  Q.   Absolutely.  Because you are trying to get the best

16  possible price you can.

17  A.   Yes.

18  Q.   And eventually RSCS decides what volume of chicken is going

19  to be allocated to each supplier.

20  A.   Yes.

21  Q.   And that's a determination that is made only by RSCS.

22  A.   Yes.

23  Q.   All right.  Now, if there is a cost or a line item input on

24  that model that RSCS or you, sir, thinks is too high, you're

25  going to address those items with the supplier and get them to

Robert Lewis - Cross

1    reduce those line items; is that correct, sir?

2    A.  Yes.

3    Q.  And that's because you know basically what a lot of the

4    costs are.  And if a supplier comes in with one line item that

5    you think is a little out of whack, you are going to go back

6    and say, we're not paying this.  You're just way too high.

7    A.  I do not know what makes up the individual cost components

8    in the model.  Those numbers are developed by the supplier and

9    we have no way of auditing those numbers to know if they are

10   exactly correct.

11   Q.  That's correct, sir.  But you do know in a sense what the

12   industry is doing or what other suppliers are doing.  So if you

13   see a line item that is out of -- that is way too high, you're

14   going to address that point, are you not, sir?

15   A.  Yes.

16   Q.  Yes, okay.  Now, as I think was mentioned on direct, during

17   this process RSCS tries to negotiate the price of the suppliers

18   to be paid so that the suppliers are in the tightest narrowest

19   possible range, correct?

20   A.  We were actually more interested in negotiating the lowest

21   possible price.  If they were close together, that was -- that

22   would be great.

23   Q.  But you also wanted to try and keep them as tight as

24   possible.  I know you wanted the lowest possible price, but you

25   also wanted them in the narrowest possible range you could get

Robert Lewis - Cross

1   them; isn't that correct, sir?  And there are reasons for that

2   and we are going to address that.

3   A.  Yes.

4   Q.  All right.  And is it fair to say, sir, and this is a term

5   we've heard, that RSCS gives in a sense directional guidance to

6   suppliers to try and get them to a specific range or try and

7   get them to a lower price.

8   A.  Yes.  Directional is a good word.

9   Q.  Okay.  Fair enough.  And, in fact, many times RSCS will try

10  to direct the supplier prices toward the price of the lowest

11  priced supplier.

12  A.  Yes.

13  Q.  Okay.  Now, when you're negotiating with them, you on

14  behalf of RSCS, you're not going to tell them what your lowest

15  bottom number is.

16  A.  No.

17  Q.  Okay.  Now, as we talked about this idea of being in a

18  narrow, narrow range, the reason for this tight range is

19  because RSCS is dealing with multiple KFC customers across the

20  country.  That's one of the reasons, isn't it?

21  A.  Yes.

22  Q.  And you don't want KFC franchisees complaining because one

23  supplier has a lower price than another.

24  A.  Yes.

25  Q.  All right.  So if I can summarize it in a sense of in

113

Robert Lewis - Cross

1  negotiating with suppliers, you wanted to avoid disparity of

2  prices between suppliers in order to maintain harmony among the

3  franchisees.

4  A.  Again, my primarily goal was the lowest price.

5  Q.  Absolutely, sir.

6  A.  If they happened to be close together, that would be a

7  great outcome.

8  Q.  Right.  But you couldn't have -- you couldn't have

9  suppliers with a great deal of price disparity because that

10 would cause a problem with your franchisees; would it not, sir?

11 A.  Potentially, yes.

12 Q.  Okay.  So I want to turn now a little bit toward knowledge

13 of the suppliers, if we can.  And I'm going to focus right

14 here -- as I told you initially, I represent Mr. Brady of

15 Claxton Poultry.  Now, one of the suppliers that KFC uses or

16 RSCS uses is Claxton Poultry, correct?

17 A.  Yes.

18 Q.  And you are familiar with Claxton Poultry.

19 A.  Yes.

20 Q.  It has one plant located in Claxton, Georgia?

21 A.  It was when I was there.  I assume that's the same today.

22 Q.  Yes, sir, I believe so.  And Claxton only produces the

23 small bird.

24 A.  That I am not certain about either.

25 Q.  Okay.  So you don't know that Claxton does not produce a

Robert Lewis - Cross

1  big bird.

2  A.  I have not kept up with that, sir.  I don't know.

3  Q.  When you -- in 2009, if you recall, and I realize it's

4  several years ago, do you recall at that time that Claxton only

5  produced a small bird?

6  A.  I don't recall.

7  Q.  Okay.  And Claxton has been part of the supply chain for

8  many years; has it not?

9  A.  Yes.

10  Q.  And it was there as part of the supply chain when you were

11  working there prior to 2009.

12  A.  Yes.

13  Q.  And you dealt with Mikell Fries over the years?

14  A.  Yes.

15  Q.  And you recall meeting Mr. Fries in 2014 in the

16  negotiations of that 2015 contract.

17  A.  Yes.

18  Q.  And you also dealt with Mr. Brady during that period of

19  time; is that correct, sir?

20  A.  Yes.

21  Q.  Now, you do know that Mr. Fries is the one that has the

22  pricing authority at Claxton.

23  A.  Yes.

24  Q.  And for the 2015 negotiations -- and when I say that, sir,

25  it's a short term for me instead of saying 2015 to 2017, so

Robert Lewis - Cross

1    please bear with me on this.  The 2015 negotiations Scott Brady

2    was your main point of contact for Claxton, was he not?

3    *A.*   Yes.

4    *Q.*   And Mr. Fries was also involved in several of the meetings

5    with RSCS personnel, including yourself.

6    *A.*   Yes.

7    *Q.*   Now, I want to talk a little bit now about the whole supply

8    issue in 2014.  And I know you testified on direct that the

9    reason you were brought in was to try and remedy that supply

10   chain situation in May of 2014.

11         Now, when you testified earlier, you said there was a

12   crisis situation as far as the supply of chicken; is that

13   right?

14   *A.*   Yes.

15   *Q.*   In fact, sir, would you agree that it was -- and I am going

16   to use your terminology here -- it was in a state of near panic

17   with those responsible for purchasing chicken; is that correct,

18   sir?

19   *A.*   Yes.

20   *Q.*   And there was a great deal -- and I am using your words --

21   there was a great deal of anxiety that their restaurants would

22   not be able to meet demand.

23   *A.*   That the restaurants would --

24   *Q.*   Not be able to meet the demand, would not have enough

25   chicken to be able to sell to their customers.

Robert Lewis - Cross

1    A.   Yes, that's correct.

2    Q.   And as you said, sir, KFC on Mother's Day ran out of

3    chicken in 2014.

4    A.   I did not say that.

5    Q.   All right.  Well, please correct me, then.

6    A.   I do not recall saying that.

7    Q.   Okay.  Do you recall that KFC ran out -- many of the

8    franchisees ran out of chicken on Mother's Day in 2014?  Take

9    your time.

10   A.   That was a long time ago.

11   Q.   Yes.  I am saying take your time.

12   A.   I can remember I believe that there was some restaurants

13   that borrowed from other restaurants and maybe an occasion or

14   two where some actually used some product from grocery stores.

15   Whether they ran out and shut down, I don't recall.

16   Q.   And that's fair enough, sir.  It is eight years ago.

17        Do you recall in 2014 that because of the supply

18   concerns, and that's the reason that you were brought in was

19   because to try and remedy the supply concerns, that RSCS went

20   to Mar-Jac and purchased 10 loads of chicken at a very high

21   price?

22   A.   I do.

23   Q.   And so the jury understands this -- I did the math

24   earlier -- but when you are talking about 10 loads, you are

25   talking about 335,000 pounds of chicken.

Robert Lewis - Cross

1   A.   Yes.

2   Q.   And also at one point as I think you've testified on direct

3   that during the summer of 2014 management instructed you to

4   offer $1.40 a pound for chicken.

5   A.   Yes.  That was a directive from the senior management team

6   at RSCS and it was positioned as, okay, you seem to have the

7   demand covered, but we want some insurance.

8   Q.   We want to make sure this doesn't happen again.

9   A.   Well, we want to be sure even though we think we've got

10  everything covered, we want 10 more loads just to make sure

11  that we have it covered.  And that was 335,000 pounds of

12  product, but at $160,000 incremental cost.  That was a pretty

13  good investment we thought from a coverage standpoint.

14  Q.   Absolutely.  Makes all the sense in the world, sir,

15  absolutely.  But you still paid $1.40 a pound for the chicken?

16  A.   We did.

17  Q.   I realize that this was eight years ago, but do you recall

18  calling Mr. Brady, and this would have been in the same time of

19  May of 2014, offering to pay a premium to Claxton in order to

20  deliver additional chicken?

21  A.   I don't recall that specifically, but I won't deny that it

22  happened.

23  Q.   Okay.  That's fine.  Now, I want to go back -- I know we're

24  in 2014, but I want to go back to 2009.  Prior to your

25  retirement in 2009, the market had an abundance of small birds,

Robert Lewis - Cross

1    did it not, sir?

2              *MR. TORZILLI:*  Objection, scope.

3              *THE COURT:*  Overruled.

4    *A.*  The supply in 2009 was much easier to obtain than in 2014.

5    *BY MR. LAVINE:*

6    *Q.*  Right.  You didn't have the mammoth problem -- when I say

7    mammoth, it was a mammoth problem in 2014 as far as supply.

8    You didn't have that type of problem in 2009 or 2008 when you

9    were still working at RSCS.

10   *A.*  That's correct.

11   *Q.*  And at that time in the 2008 time frame or 2009 where you

12   didn't have that supply problem, the buyer, this being KFC or

13   in a sense RSCS, had more negotiating power against the

14   suppliers because there was not a supply issue.

15   *A.*  That's fair.  I agree, yes.

16   *Q.*  In 2014 there was a supply shortage of the small bird.

17   *A.*  Yes.

18   *Q.*  As a result, the suppliers didn't have to compete so hard

19   for the KFC business.

20   *A.*  That's not totally true.  We were still pushing to get

21   lower prices than what they had proposed.

22   *Q.*  Absolutely, I agree with that, sir.  But in the 2014 time

23   frame, the demand for chicken was much greater than the supply.

24   Would you agree with that, sir, in 2014?

25   *A.*  Yes, I would agree.

Robert Lewis - Cross

1  *Q.* All right.  Now, turning back to this 2014 time frame, do

2  you recall that KFC brought in some consultants by the name of

3  McKinsey to help and assess KFC's supply chain and other

4  issues?

5  *A.* I didn't remember that happening until someone prompted me

6  the other day that they were there.  I had forgotten that they

7  were even there.

8  *Q.* But sitting here today whatever the prompt was, which I

9  assume the prompt was from the government?

10  *A.* I am sorry, repeat that?

11  *Q.* Who prompted you about the McKinsey consultants, if you

12  recall?

13  *A.* There were a series of questions that were presented to me

14  from one of the defense attorneys that I was asked to answer,

15  and that was one of the questions.

16  *Q.* That's fair enough.  Now, McKinsey, if you know, sir, they

17  were consultants, could you tell the Ladies and Gentlemen of

18  the Jury what McKinsey does, if you know?

19  *A.* No.  All I know is they're consultants.

20  *Q.* And they came in in 2014 to assess the operations and the

21  supply and distribution of KFC.

22      *MR. TORZILLI:* Objection, foundation.

23      *THE COURT:* Sustained.  It assumes facts not in

24  evidence too.

25  *BY MR. LAVINE:*

Robert Lewis - Cross

1   *Q.* Do you know whether -- you do know that McKinsey was

2   brought in in 2014.

3   *A.* Yes.

4   *Q.* And do you know why they were brought in?

5   *A.* I don't know why.  I don't recall that.

6   *Q.* Do you recall meeting with KFC, RSCS and McKinsey

7   individuals?

8   *A.* I don't recall, no.

9   *Q.* Okay.  Do you recall that KFC in the 2014 time frame had

10  very poor margins with suppliers?

11  *A.* I'm not sure I understand your question, sir.

12  *Q.* Well, in 2014 the suppliers weren't making a lot of money

13  on the small birds, were they, sir?

14          *MR. TORZILLI:* Objection, facts not in evidence.

15          *THE COURT:* That was a question.  He can answer.

16  Overruled.

17  *A.* Answer the question?  I am sorry.  I have no idea whether

18  their margin was fair or not.  We have no way of auditing those

19  numbers, so we trust the supplier that they have given us the

20  correct information.

21  *BY MR. LAVINE:*

22  *Q.* Right.  When you were brought in as a consultant, I realize

23  you were also brought in to deal with the supply, but when you

24  stayed on, you tried to develop a different approach with the

25  suppliers; is that correct, sir?

Robert Lewis - Cross

1   A.   Yes, you could say that, yes.

2   Q.   Because KFC was not the customer of choice at that point in

3   time for the suppliers.

4   A.   I don't know that.

5   Q.   Okay.  Now, in 2014 RSCS and you, sir, realized that the

6   margin for big bird had increased over time; is that accurate,

7   sir?

8   A.   We had been told for a period of time that the margins for

9   big bird --

10        MR. TORZILLI:  Objection, hearsay.

11        THE COURT:  Overruled.

12  BY MR. LAVINE:

13  Q.   You can go ahead.

14  A.   We had been told over time that the suppliers were

15  receiving a greater margin for big birds than for small birds.

16  Again, we had no way of verifying that, but that's what they

17  were telling us, but I didn't realize that it was going to be

18  the magnitude of difference that we saw in 2015.

19  Q.   Fair enough.  You also knew at that time that some

20  suppliers were considering converting some of their additional

21  small bird plants to big bird plants.

22  A.   That's what they were saying.

23  Q.   Right.  In fact, the industry was shifting to bigger bird

24  sizes; is that correct, sir?

25  A.   I am sorry, what?

1    *Q.*  In fact, the industry was shifting to bigger bird sizes.

2    *A.*  Yes.

3    *Q.*  And so the bird size that KFC used was becoming less

4    readily available.

5    *A.*  Yes.

6    *Q.*  And, sir, on the plant conversion if a plant was converted

7    from a small bird to a big bird plant, it wasn't going to be

8    converted back again; is that correct, sir?

9    *A.*  Understand it was impossible if not very difficult to

10   convert it back.

11   *Q.*  Thank you.  In fact, sir, Sanderson Farms was one of the

12   largest small bird suppliers for KFC.  And they moved to big

13   birds sometime in the '13, '14 time frame, so their supply of

14   small birds was no longer available; is that correct, sir?

15           *MR. TORZILLI:*  Objection, foundation.

16           *THE COURT:*  Sustained.

17           *MR. LAVINE:*  I will rephrase the question.

18   *BY MR. LAVINE:*

19   *Q.*  Are you familiar with Sanderson Farms?

20   *A.*  Yes.

21   *Q.*  And Sanderson Farms would produce small birds; is that

22   correct, sir?

23   *A.*  Yes.

24   *Q.*  Did there come a time that Sanderson Farms stopped

25   producing small birds?

Robert Lewis - Cross

1  A.  For KFC, yes.

2  Q.  Right.

3  A.  I don't know if they stopped altogether, but for KFC, yes.

4  Q.  I didn't mean to interrupt.

5       They stopped producing for KFC.

6  A.  Yes.

7  Q.  So that was a supply area that KFC didn't have anymore.

8  A.  That's correct.

9       MR. LAVINE:  Could we bring up I think it's 1137,

10  which I think has already been admitted?

11       COURT DEPUTY CLERK:  I show it is admitted, Your

12  Honor.  Is it okay to publish?

13       THE COURT:  Yes.

14  BY MR. LAVINE:

15  Q.  Mr. Lewis, if you would take a look at what has been marked

16  as Government Exhibit 1137 which you have already looked at

17  earlier today?

18  A.  Yes.

19  Q.  Now, if you would read the first sentence of the first

20  paragraph, please.

21  A.  Thanks for a very productive meeting on August 5th.  You

22  can see that RSCS has a very different mindset concerning

23  supplier relationships, and is taking a totally different

24  approach to negotiations versus prior years.

25  Q.  Thank you.  Now, can you explain to me what you mean by

Robert Lewis - Cross

1   that sentence?  And that's a sentence that you wrote, sir.

2   A.   When I arrived at RSCS in May of 2014, while analyzing the

3   situation it came to my mind that the relationships with

4   suppliers had been strained.  And apparently there wasn't a lot

5   of transparency and so the relationships apparently were

6   suffering.  So the idea was we wanted to be friendlier, if you

7   will, in our dealings with suppliers, that we wanted to share

8   more information with them, that we wanted to communicate more

9   effectively, and that's what we meant by a different approach.

10  Q.   And do you recall, sir, that the prior year, 2014, the

11  negotiations had not gone well and left a bad taste in the

12  suppliers' mouths?

13  A.   I didn't say that and I don't know that.

14  Q.   All right.  Fair enough.  So after assessing the situation,

15  you had worked to try and improve the suppliers' communication

16  and relationship with the suppliers; is that correct, sir?

17  A.   Yes.

18  Q.   Do you know what happened with the prices to suppliers in

19  2014?

20  A.   I'm sorry, I don't understand.

21  Q.   Whether or not the chicken prices for suppliers was reduced

22  in 2014?

23        MR. TORZILLI:  Objection, vague as to 2014.

24        THE COURT:  He can answer if he understands.

25  Overruled.

1       MR. LAVINE:  Let me rephrase the question, Your Honor.

2       THE COURT:  Go ahead.

3   BY MR. LAVINE:

4   Q.  I am referencing here the negotiations for the final

5   contract of 2014, that the chicken prices for suppliers was

6   decreased in 2014.  Do you recall that, sir?

7   A.  The difference between the final contract price and the

8   original bid price were slightly different.  All the suppliers

9   did drop their original price by -- well, I considered it a

10  miniscule amount.

11  Q.  I'm sorry, I wasn't clear on that, sir.  I am talking when

12  you came in and you assessed the situation, you looked at the

13  2014 contracts.

14  A.  Yes.

15  Q.  Not the 2015.  I am not talking about the '15 to

16  '17 contract.

17  A.  Okay.

18  Q.  I am talking about the 2014 price of chicken.

19  A.  Okay.

20  Q.  That RSCS negotiated the prices down for suppliers in 2014.

21      MR. TORZILLI:  Objection, foundation.

22      THE COURT:  Overruled.

23  A.  I don't know the answer to that.

24  BY MR. LAVINE:

25  Q.  Okay.  That's fair enough.

1          So I would like to now turn to the negotiation for the

2   2015 to 2017 contract.  Now, do you agree that in 2014 that the

3   negotiations would have started in all likelihood with a phone

4   call from you, sir?

5   *A.*   Yes.

6   *Q.*   And you would have -- for example, with regard to Claxton,

7   you would have reached out and spoken to a Mr. Scott Brady.

8   *A.*   Yes.

9   *Q.*   And that in a sense was the way that you started

10  negotiations with most of the suppliers was by just a phone

11  call.

12  *A.*   Yes.

13  *Q.*   And during that call you would have discussed the upcoming

14  contract with Mr. Brady.

15  *A.*   Yes.

16  *Q.*   And you were taking a different approach to the

17  negotiations.

18  *A.*   I'm not sure that would have been mentioned over the

19  telephone, our position.

20  *Q.*   Do you recall also saying that RSCS would be looking at the

21  margin needed to compare to the big bird profitability?

22  *A.*   Yes.

23  *Q.*   Thank you.

24          Now, during that call, if you recall, sir, it was

25  mentioned that RSCS was going to address the discrepancy

Robert Lewis - Cross

1  between the big bird margin and the small bird margin.  Do you

2  recall that, sir?

3  *A.*  I do not.

4  *Q.*  All right.  Do you recall any discussions of having to

5  address that discrepancy?

6  *A.*  I recall that we needed to have a discussion about big bird

7  margin versus small bird margin, but I don't remember details

8  around that discussion.

9  *Q.*  Fair enough, sir.  And that discrepancy would have been --

10  you would have had to address that with each of the suppliers.

11  *A.*  Yes.

12  *Q.*  And even Claxton who at the time, sir, only produced a

13  small bird.

14  *A.*  Yes.  I guess I wasn't aware they didn't produce the big

15  bird.

16  *Q.*  Yes.  Now, this discrepancy or big bird issue would be

17  offered also to Claxton.  Let me retract that question.

18          The big bird discrepancy really was to some of the

19  bigger producers that may be considering moving to the big bird

20  or converting some of their plants to big bird plants, correct?

21  *A.*  I don't understand if Claxton was not producing the big

22  bird why that would matter with them.

23  *Q.*  Right.  We'll get to that in a second, sir.

24  *A.*  Okay.

25  *Q.*  But the discrepancy with the big bird really started with

1   the larger producers who produced the big bird; is that

2   correct?

3   A.   Yes.

4   Q.   Because they were getting a bigger margin on the big bird

5   versus a small bird.

6   A.   So they said.

7   Q.   Correct.  And so there was a big bird premium that was

8   offered to the suppliers during the negotiations in 2014 for

9   the '15 to '17 contract; is that correct?

10   A.   That's correct.

11   Q.   And that big bird premium was offered to all of the

12   suppliers.

13   A.   A premium was offered to all suppliers.  It was not the

14   same premium.

15   Q.   Okay.  But in a sense you were offering it to the bigger

16   producers to continue producing the small bird.

17   A.   In all due respect, I do not like the word offering.

18   Q.   Okay.

19   A.   I would be more inclined to say accepting.

20   Q.   Accepting.  How about incentivize?

21   A.   I don't believe we were in a position to do anything but

22   accept it.

23   Q.   Okay.  Were you also not trying to incentivize the larger

24   producers to continue producing the small bird for KFC?

25   A.   Yes.

Robert Lewis - Cross

1    Q.  And would you also be fair to say you would be

2    incentivizing Claxton to continue supplying KFC?

3    A.  Yes.

4    Q.  And so whatever premium and however you want to

5    differentiate between one supplier to the other, you in a

6    sense, you were offering that -- when I say offering, it was in

7    the price basically to incentivize them to continue producing

8    small bird for KFC.

9    A.  Yes, but we were again very uncomfortable with the

10   magnitude of that so-called premium.

11   Q.  I understand that, sir.  You've made that clear and I

12   accept that.  But if you were not to offer or include in the

13   price for Claxton some type of premium, their number would be

14   completely out of whack of those producers who produced big

15   birds; is that correct, sir?

16   A.  That's correct.

17   Q.  And that goes back to in a sense of your attempt while you

18   were trying to get the best price possible, you still want to

19   try and keep those producers -- those suppliers' price in

20   somewhat of a narrow range.  Do you agree with that, sir?

21   A.  We were more interested in the lowest price.  And if they

22   happened to be close together, then that was a good thing.

23   Q.  Correct.  But if there was a 9-cent differential, that

24   would be pretty significant, wouldn't it, sir?

25   A.  Yeah, 9 cents is pretty significant.

Robert Lewis - Cross

1   *Q.*  Yeah.  You wouldn't want a 9-cent disparity between

2   suppliers' prices when you are dealing with your franchisees.

3   *A.*  No, we wouldn't.

4   *Q.*  Okay.  Now, after you reached out to, for example,

5   Mr. Brady, there would be a meeting in early August with RSCS;

6   is that correct?

7   *A.*  Yes.

8   *Q.*  Do you remember, sir, sending an e-mail to Mr. Brady

9   confirming the initial telephone call you had with him and you

10  outlined various things that you were looking for from Claxton

11  Poultry?

12  *A.*  I believe that memo was actually the result of a meeting,

13  not a telephone call.

14  *Q.*  Okay.  And do you recall in that -- when you communicated

15  with Mr. Brady again that you addressed the issue of the profit

16  margin needed and how it compares to big bird profitability?

17  *A.*  Yes.

18  *Q.*  And so you expected Claxton to respond to that inquiry.

19  *A.*  Yes.

20  *Q.*  All right.  Thank you.

21       Now, when we referred back to the meeting that you had

22  in reference to the e-mail that we showed before, which I think

23  was Government Exhibit 1137, you outlined what -- if we could

24  bring that up -- you outlined what you were looking for from

25  Claxton and you requested they submit a cost model?

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And you requested that be submitted by August 19.

3    A.   Yes.

4              MR. LAVINE:   If we could bring up -- you can take that

5    down, please.  If we could bring up Government Exhibit 1132.

6              And Your Honor, I believe it has been admitted.

7              COURT DEPUTY CLERK:   Yes, Your Honor, it has.  Is it

8    okay to publish?

9              THE COURT:   Would you like it published?

10             MR. LAVINE:   I would like it published, please.

11             THE COURT:   Yes, we can do that.

12   BY MR. LAVINE:

13   Q.   Now, the first page of this is an e-mail, at the bottom is

14   an e-mail that you sent to Scott Brady and Mr. Fries on August

15   the 7th, which was a follow-up to the August 5th meeting; is

16   that correct, sir?

17   A.   Yes.  I'm sorry, yes.

18   Q.   And again it talks about a different approach that you're

19   going to take with the suppliers.

20   A.   Yes.

21   Q.   And it goes through and you've got various questions that

22   you ask, correct?

23   A.   I'm sorry, what was that?

24   Q.   At the bottom of this are the questions that you pose to

25   Mr. Brady and Mr. Fries.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   If you look at the top part of this e-mail, this is from

3    Mr. Brady to you, Rich Eddington and Mary Hester.

4    A.   Yes.

5    Q.   And just so we're clear, Mr. Eddington was brought in and

6    he replaced Mr. Ledford, and he took an active role in the

7    negotiations of this contract, did he not, sir?

8    A.   He did, yes.

9    Q.   Thank you.  Now, with this Mr. Brady is attaching the 2015

10   pricing model for COB.

11   A.   Yes.

12        MR. LAVINE:  All right.  If we can bring up I guess

13   the second page of this?  Where is the contract?  Hold on.

14        If you could bring up, Your Honor, 1133, which I

15   believe has been admitted.

16        COURT DEPUTY CLERK:  It has.  Okay to publish?

17        THE COURT:  It has.  And yes, it may be published.

18        MR. LAVINE:  Thank you, Your Honor.

19   BY MR. LAVINE:

20   Q.   Now, on the first page of this government counsel went

21   through with you, but the one I want to focus on is the first

22   line which is injected eight-piece.  Do you see that there?

23   A.   Yes.

24   Q.   The price there is $1.1099.

25   A.   Yes.

Robert Lewis - Cross

1   Q.  Now, if we go to the second page --

2            THE COURT:  Let's hold on for one second.  Some device

3   is going off.

4            All right.  Go ahead.

5            MR. LAVINE:  Thank you, Your Honor.

6   BY MR. LAVINE:

7   Q.  Now, what would you say the second page is, sir?

8   A.  That is Claxton's proposal, price proposal for 2015 for

9   purple and orange label chicken on the bone.

10  Q.  And if you would look on the purple column --

11           MR. LAVINE:  If you would go down, if we could

12  highlight where it says corporate overhead to total FOB plant

13  cost, please.  I am sorry, the bottom part of the numbers, I

14  would like plant cost excluding plant administration down, if

15  you could highlight that, please.  Perfect.  Thank you.

16  BY MR. LAVINE:

17  Q.  Now, Mr. Lewis, as you can see, it has a supplier margin of

18  10.

19  A.  Yes.

20  Q.  And that in a sense would be your normal -- when I say

21  normal, give or take the normal supply margin that you would

22  expect to see in one of these cost models; is that correct,

23  sir?

24  A.  That was actually Claxton's profit margin for 2014.

25  Q.  Well, actually this is for 2015.

Robert Lewis - Cross

1    A.  I realize that.

2    Q.  Are you sure that the profit margin was 10 cents?

3    A.  Yes.

4    Q.  Are you sure it wasn't .0673?

5    A.  Okay.  I'm not sure.

6    Q.  Okay.  This number is the profit margin being proposed by

7    Claxton for 2015.

8    A.  Yes.

9    Q.  And you also see it has a big bird profitability line of

10   12.

11   A.  Yes.

12   Q.  It's not including the big bird profitability in the

13   supplier margin.  There is a distinction here, is there not,

14   sir?

15   A.  I'm sorry, what was the question?

16   Q.  This proposal is different from some of the others that you

17   looked at.  In fact, all of the ones that you looked at to

18   verify the government's summary, demonstrative summary, they

19   just had a supplier margin of X dollars.  Claxton broke it down

20   between --

21   A.  I believe you are correct, sir.

22   Q.  And the reason it's broken down would be, sir, because it's

23   two different margins that they are discussing with you; is

24   that correct, sir?

25   A.  No.  We're talking a single margin for the small bird

135

Robert Lewis - Cross

1    purple label and orange label product.

2    Q.  But, sir, we talked a little while ago about the fact that

3    you were discussing with them trying to deal with the disparity

4    with the big bird versus the small bird margin and that

5    something had to be given to the suppliers to incentivize them

6    to continue supplying small bird; is that correct, sir?

7    A.  Yes.

8    Q.  And that incentivizing for Claxton is the big bird

9    profitability of 12.

10   A.  That was the amount we eventually agreed to, yes.

11        MR. LAVINE:  You can take that down now.  Thank you.

12   BY MR. LAVINE:

13   Q.  Now, would it be fair to say, sir, that RSCS is the one

14   that initiated this -- whatever you want to call it, big bird

15   premium, whatever, to incentivize the suppliers to continue

16   supplying KFC.

17   A.  No.

18   Q.  It didn't come from RSCS?

19   A.  No.  The suppliers had been talking about that over a

20   period of time, so they are the ones that started the

21   discussion.

22   Q.  Well, they may have started the discussion, but the money,

23   the dollars or cents that RSCS was going to pay to deal with

24   that disparity was initiated -- came from RSCS.

25   A.  I'm not sure how to answer that question.

136

Robert Lewis - Cross

1  *Q.*  All right.  Let me -- it's my fault.  Let me try and

2  rephrase the question if I can, sir.

3           We know, sir, that Claxton only produces a small bird,

4  all right?  And so they are not producing a big bird.  They

5  don't have a plant to convert to a big bird plant.  And as we

6  talked about before, if Claxton doesn't get some type of

7  compensation similar to what the big producers are getting,

8  you're going to have a very wide disparity of price between

9  your suppliers.

10          *MR. TORZILLI:*  Your Honor, I object to the question.

11 He says he doesn't know whether at the time Claxton was

12 producing big birds or not.

13          *THE COURT:*  Yeah, I will sustain the objection.

14 Mr. Lewis has indicated several occasions he didn't know

15 whether they only produced small birds.

16          If you could rephrase.

17 *BY MR. LAVINE:*

18 *Q.*  Do you agree, sir, that Claxton has one plant?

19 *A.*  Yes.

20 *Q.*  And Claxton has been producing for KFC for many years.

21 *A.*  Yes.

22 *Q.*  Have you ever known Claxton to produce a big bird?

23 *A.*  I thought maybe they did, but again I'm not certain.

24 *Q.*  So as you stand here today, you don't know whether they

25 produce a big bird or not.

Robert Lewis - Cross

1          *MR. TORZILLI:*  Asked and answered.

2          *THE COURT:*  Overruled.

3    *A.*  No.

4    *BY MR. LAVINE:*

5    *Q.*  Now, there was a follow-up meeting I believe on August 28th

6    with yourself, Mr. Eddington, Mary Hester, Todd Imhoff,

7    Mr. Fries and Mr. Brady to discuss the proposal.

8    *A.*  Yes, I believe that is correct.

9    *Q.*  And who is Todd Imhoff?

10   *A.*  Todd Imhoff was Steve Suerken's boss.  He was the No. 2 guy

11   at RSCS.

12   *Q.*  And Rich Eddington was the one that came in to replace Mike

13   Ledford and he took over the negotiations.  He was involved

14   heavily with the negotiations of the 2015 contract.

15   *A.*  I wouldn't use the word heavy, but he was involved in the

16   negotiations.

17   *Q.*  All right.  Now, at this meeting, sir -- well, let me ask

18   it a different way.  Generally during negotiations some

19   suppliers would start off with the answer of no as far as

20   negotiating; is that correct?

21   *A.*  I am sorry, what was that?

22   *Q.*  Some suppliers would come in and say they are not going to

23   negotiate.

24   *A.*  No.  All suppliers were willing to negotiate.

25   *Q.*  No suppliers were willing to negotiate?

Robert Lewis - Cross

1    *A.*  Every supplier that we had contacted was willing to

2    negotiate.

3    *Q.*  So they were all willing to negotiate.

4    *A.*  Yes, all six --

5    *Q.*  I am sorry?

6    *A.*  All six approved suppliers were willing to negotiate.  They

7    were willing to make proposals.

8    *Q.*  Okay.  And Claxton was willing to negotiate.

9    *A.*  Yes.

10   *Q.*  And Claxton never walked away from the table?

11   *A.*  No.

12   *Q.*  Now, during this meeting with Mr. Fries and Mr. Brady, you

13   learned of Claxton's general price negotiation strategy.  Would

14   that be fair to say, sir?

15   *A.*  I don't understand the question.

16   *Q.*  Well, every supplier's got their own strategy as to how

17   they are going to negotiate.

18   *A.*  I would assume so.

19   *Q.*  And Claxton had its own type of strategy.

20   *A.*  I would assume so.

21   *Q.*  And did you become aware that Claxton's strategy was that

22   they didn't want to be the highest priced supplier?

23        *MR. TORZILLI:*  Objection, foundation as to Claxton's

24   strategy.

25        *THE COURT:*  Sustained.

Robert Lewis - Cross

1   *BY MR. LAVINE:*

2   Q.   During this meeting did you learn of or did you become

3   aware of Claxton's strategy?

4   A.   No.  I don't recall that.

5   Q.   Okay.  Now, during this meeting -- now, you've negotiated

6   with Mr. Fries before, have you not?

7   A.   Yes.

8   Q.   And he has always been willing to negotiate?

9   A.   Yes.

10   Q.   He has never said this is it, I'm leaving?

11   A.   Not that I recall.

12   Q.   He never threatened to switch to a big bird?

13   A.   I don't recall him saying that if he did, no.

14   Q.   And he didn't threaten to take his business elsewhere, did

15   he, sir?

16   A.   No.

17   Q.   And is it fair to say that in your dealings with Mr. Fries

18   that they responded to your directional guidance?

19   A.   Yes.

20   Q.   All right.  Now, after that meeting in August, do you

21   recall you placed a call to Mr. Brady, as I think you did with

22   other suppliers to try and get them to negotiate the price of

23   this, of the COB, correct?

24   A.   I would assume that I did.

25   Q.   And do you recall at that time that Mr. Brady agreed to

1   come down 2 cents?

2   *A.*   I recall that Mr. Brady made an adjustment to his margin.

3   *Q.*   Which would -- which correspondingly would mean that the

4   COB price would come down.

5   *A.*   Correct.

6   *Q.*   In a sense he's listening to your directional guidance?

7   *A.*   I don't remember what prompted that change, but I did not

8   guide him on that that I remember.  I don't remember that.

9   *Q.*   Okay.  And, in fact, with all due respect, Mr. Lewis, I

10  mean, I realize this happened eight years ago, but there is a

11  lot of things you just don't remember about the negotiation

12  process for the 2015-2017 contract; is that correct, sir?

13  *A.*   Yes, that's correct.

14  *Q.*   Now, we've looked at the initial bid price for Claxton

15  which was $1.1099.  Do you recall that, sir?

16  *A.*   I believe that.

17  *Q.*   And the initial margin was 10 cent supplier margin and 12

18  cent big bird premium.

19          *MR. TORZILLI:*  Objection.  That misstates the

20  evidence.

21          *MR. LAVINE:*  I will be happy to bring it up, Your

22  Honor.

23          *THE COURT:*  Rephrase it -- or I am sorry, I did not

24  understand.

25          *MR. LAVINE:*  I will bring up the exhibit to show.

141

Robert Lewis - Cross

1          *THE COURT:*  Okay.

2          *MR. LAVINE:*  It doesn't misstate the evidence at all,

3    Your Honor, but I will be happy to do that.

4          *THE COURT:*  Okay.  That's fine.

5          *MR. LAVINE:*  Could we bring up Exhibit 1133?

6          And Your Honor, this has been admitted.

7          *THE COURT:*  It has been.

8    *BY MR. LAVINE:*

9    *Q.*  On Page 1 you can see that it is $1.1099, correct?

10   *A.*  Yes.

11   *Q.*  And I want to turn to Page 2, please.  And at the bottom

12   you can see where the supplier margin is 10 and the big bird

13   profitability is 12.  Do you see that, sir?

14   *A.*  Yes.

15   *Q.*  So you agree with me that when the bid proposal that was

16   submitted by Claxton had a supplier margin of 10 and a big bird

17   profitability of 12?

18   *A.*  Yes.

19         *MR. LAVINE:*  You can take that down now, please.

20         If you could bring up 1119, please.

21         *COURT DEPUTY CLERK:*  This exhibit is admitted.  Is it

22   okay to publish to the jury?

23         *THE COURT:*  Do you want it published?

24         *MR. LAVINE:*  Yes, please, Your Honor.

25         *THE COURT:*  Yes, it may be published.

Robert Lewis - Cross

1       MR. LAVINE:  If you can go to the second page.

2   BY MR. LAVINE:

3   Q.  The COB price on this is 1.0669; is that correct?

4   A.  Yes.

5       MR. LAVINE:  And if we could go to the next page,

6   please.

7       COURT DEPUTY CLERK:  Your Honor, my notes indicate

8   here that -- oh, is it just Page 1 is redacted?  I am sorry, I

9   may be misreading it.  My apologies.

10      THE COURT:  Just Page 1 was.

11      Go ahead, Mr. Lavine.

12  BY MR. LAVINE:

13  Q.  On the second page you can see that the supplier margin is

14  10?

15  A.  Yes.

16  Q.  And the big bird adjustment is .094.

17  A.  Yes.

18  Q.  It has been reduced since the bid proposal; is that

19  correct, sir?

20  A.  Yes.

21  Q.  And, in fact, the COB price has come down to 1.0669; is

22  that correct, sir?

23  A.  Yes.

24      MR. LAVINE:  Thank you.  You can take that down now.

25      I would like to bring up a demonstrative, Your Honor.

1    It's H-684.

2    *BY MR. LAVINE:*

3    *Q.*  Would you please look at this demonstrative.

4            *MR. TORZILLI:*  Your Honor, I am going to object.

5            *THE COURT:*  Hold on one second.  Mr. Lavine, is this a

6    one-page document or several?

7            *MR. LAVINE:*  One page.

8            *THE COURT:*  Go ahead.

9            *MR. TORZILLI:*  We haven't seen this before and it

10   looks like it's drawing from numerous exhibits.  They are

11   voluminous exhibits and we haven't had an opportunity to verify

12   the information on it.

13           *THE COURT:*  Mr. Lavine just has gone over at least

14   some of that information in regard to Claxton.  I will overrule

15   the objection.  H-684 may be used for demonstrative purposes

16   only.

17           *MR. LAVINE:*  That's all I am asking for, Your Honor.

18           May we publish it?

19           *THE COURT:*  You may.

20   *BY MR. LAVINE:*

21   *Q.*  Now, Mr. Lewis, in front of you is a demonstrative exhibit.

22   The title is Initial Bids to Contract Prices 2014 to '15 Bid

23   Cycle.

24           Now, do you see the blue is the August 2014 bid of

25   $1.1099.  Do you see that, sir?

1    A.  Yes.

2    Q.  The green is to show that the final contract number was

3    1.0669.

4    A.  Yes.

5    Q.  And so Claxton's number came down over 4 cents from the bid

6    proposal to the final contract; is that correct, sir?

7    A.  That's what this indicates, yes.

8    Q.  And that follows the numbers of the bid proposal you and I

9    just went over, as well as the final contract that we just

10   discussed.

11   A.  Yes.

12   Q.  So you don't have any question -- to question the accuracy

13   of these numbers, do you, sir?

14   A.  No.

15        MR. LAVINE:  You can take it down now.  Thank you.

16   BY MR. LAVINE:

17   Q.  Now, sir, I think we showed when we went through the bid

18   proposal to the contract that the margin, the big bird premium

19   went from 12 to .094 -- 40.  It reduced also, did it not, sir?

20   A.  Yes.

21   Q.  Now, sir, even though we've talked about margins here

22   today, isn't the real number that RSCS is concerned about is

23   the bottom line number?  It's the cost for the COB.  That's

24   what you're concerned about.

25   A.  Yes.

Robert Lewis - Cross

1    *Q.* That's what you're trying to bring down to the lowest

2    number possible, isn't it?

3    *A.* Yes.

4    *Q.* And the margin number is just another number that you look

5    at in assessing the bid; is that correct, sir?

6    *A.* Yes.

7    *Q.* All right. Is it fair to say, sir, that the initial

8    submission by suppliers is in a sense a hope list. It's what

9    they are hoping they can get.

10   *A.* Yes, that's fair.

11   *Q.* And the supplier and RSCS both know that there is -- this

12   is going to be negotiated over several rounds of negotiations.

13   *A.* Yes.

14   *Q.* Because RSCS doesn't come in and look at the first number

15   and say done, negotiation over.

16   *A.* No, we don't.

17   *Q.* And the margin that's stated in this cost model, it's not

18   really the profit in the strictest sense, is it, sir?

19            *MR. TORZILLI:* Object to foundation.

20            *THE COURT:* Overruled. He can answer if he

21   understands.

22   *BY MR. LAVINE:*

23   *Q.* Let me see if I can explain it -- not explain it. Let me

24   ask a question, Your Honor. I apologize.

25            When this -- when the cost proposal comes in, it is

Robert Lewis - Cross

1    the supplier's in a sense best guesstimate of what their

2    expenses are going to be, what the margin may be, and in this

3    case over a three-year period.

4         *MR. TORZILLI:*  Objection as to the supplier's state of

5    mind.

6         *THE COURT:*  He can answer if he understands.

7         Go ahead.

8    *A.*  Yes.

9    *BY MR. LAVINE:*

10   *Q.*  And the reason for that, sir, is that as the year

11   progresses, if their plant costs go up, that margin comes down.

12   *A.*  The margin doesn't change for the duration of the

13   agreement.

14   *Q.*  As far as the contract is concerned.  But to the individual

15   supplier, for example, Claxton -- let's just focus on Claxton

16   for a second.  In this contract they had a margin of 10 cents

17   supplier margin and .0940 big bird premium.  If their plant

18   costs go up, labor, for example, if their labor costs go up,

19   they can't renegotiate this contract with you, can they?

20   *A.*  No.

21   *Q.*  If their plant costs go up, if their labor costs go up,

22   that means they have to absorb that cost.

23   *A.*  Yes.

24   *Q.*  And that's going to come out of their margin, isn't it,

25   sir?

Robert Lewis - Cross

1   A.  Yes.

2   Q.  Now, sir, I want to bring up government's -- wait a second.

3        Do you recall talking to the government and making the

4   statement that you would expect that there would be similar

5   margin numbers between some suppliers who have identical plant

6   setups?

7   A.  Yes.

8   Q.  And an example that I think you used was Mar-Jac and

9   Claxton; was that correct, sir?

10  A.  I don't remember giving examples.

11  Q.  But my statement is accurate, is it not, sir?  Forget the

12  Mar-Jac and Claxton as far as --

13  A.  Yeah, your statement is correct, yes.

14  Q.  Do you also recall saying, sir, and considering your

15  experience -- and undoubtedly you have a tremendous amount of

16  experience in this area -- do you agree that if the prices for

17  the 2015 KFC contract had been set by an agreement, you would

18  expect the contract prices to be closer.

19  A.  Yes.

20  Q.  Thank you, sir.

21       MR. LAVINE:  If we could bring up Government's 10-4,

22  please.

23       THE COURT:  And you can publish that.  Would you like

24  it published?

25       MR. LAVINE:  Absolutely.  I want it published to the

Robert Lewis - Cross

1  jury, absolutely.

2          THE COURT:  It's been admitted.

3          MR. LAVINE:  Thank you.  Apologize for the delay, Your

4  Honor.

5          THE COURT:  That's all right.

6          MR. LAVINE:  All these documents, it's tough to keep

7  them all straight.

8  BY MR. LAVINE:

9  Q.  Now, government counsel asked you a lot of questions about

10  period pricing and made an emphasis to show the period 13

11  prices.  Do you see that, sir?

12  A.  Yes.

13  Q.  So I want to talk about period pricing for a second.

14          Now, would you agree that period pricing is a method

15  in which the calendar year is broken down into 13 periods of

16  four weeks?

17  A.  Yes.

18  Q.  And for each of these periods the contract price is

19  adjusted.

20  A.  Correct.

21  Q.  And based on the corn and soybean price and the suppliers'

22  freight and basis cost; is that right, sir?

23  A.  Yes.

24  Q.  Corn and soybean is the feed for the birds.

25  A.  Yes.

Robert Lewis - Cross

1    *Q.*  I want to take it step by step.  And freight and basis are

2  the suppliers' delivery cost.

3    *A.*  Yes.

4    *Q.*  When feed prices go down, it exacerbates the small bird

5  differential, does it not, sir, because it costs less to feed a

6  big bird and you make more money on the big bird.

7        *MR. TORZILLI:*  Objection, foundation.

8        *THE COURT:*  Overruled.

9    *A.*  I'm not sure I know how to answer your question.

10 *BY MR. LAVINE:*

11   *Q.*  Well, sir, if your feed costs go down, it costs less to

12 feed a big bird.  So if it costs less --

13   *A.*  Yes.

14   *Q.*  So that's an accurate statement.

15   *A.*  Yes.

16   *Q.*  In some periods the period price will be less than the

17 contract price for the eight-piece COB due to the fluctuation

18 of the pricing of the corn and soybean.

19       *MR. TORZILLI:*  Objection.  He's testified that the

20 period price is a contract price.

21       *THE COURT:*  Overruled.  He can answer.

22   *A.*  Yes.

23 *BY MR. LAVINE:*

24   *Q.*  And would you agree, sir, that the customer -- that is you,

25 sir, or RSCS -- tells the supplier at what price to purchase

1   the corn and soybean.

2   *A.*   Yes.

3   *Q.*   Now, in looking at government's exhibit where it has period

4   13 pricing is based on a 2014 contract that was negotiated and

5   agreed to in December of 2013.

6   *A.*   Yes.

7   *Q.*   One year before.

8   *A.*   Yes.

9   *Q.*   And the price reflected in the period 13 pricing does not

10  take into account or consideration any market conditions aside

11  from the corn and soybean meal; is that correct, sir?

12  *A.*   Yes.

13  *Q.*   And the reason for that is all you're looking at is a

14  contract that was negotiated in December of 2013.  That

15  contract is not going to change.  If the market goes haywire,

16  that's the price between RSCS and the supplier.

17  *A.*   Yes.

18  *Q.*   And so when you look at this period 13 pricing, this

19  doesn't take into consideration any market fluctuations outside

20  of the feed costs.

21  *A.*   That's correct.

22  *Q.*   And so in a sense, sir, there is no comparison between this

23  period 13 pricing and your 2015 contract prices, is there, sir?

24  *A.*   There is a comparison.  It's just been adjusted for feed.

25  *Q.*   Adjusted for feed.  But it doesn't take into consideration

1    any market fluctuations aside from the feed.

2    A.   It does not.

3    Q.   Thank you.

4         Now, Mr. Lewis, they have asked you a lot of questions

5    about communication with suppliers.  You don't have any

6    personal knowledge that Mr. Fries entered into any agreement

7    with anyone to fix a price, do you, sir?

8    A.   I do not.

9    Q.   And you don't have any personal knowledge that Mr. Fries

10   entered into any agreement to raise a price, do you, sir?

11   A.   I do not.

12   Q.   And you don't have any personal knowledge that Mr. Fries

13   entered into an agreement to maintain prices, do you, sir?

14   A.   I do not.

15   Q.   And you have no personal knowledge that Mr. Brady entered

16   into an agreement with anyone to fix a price, do you, sir?

17   A.   No.

18   Q.   And you don't have any personal knowledge that Mr. Brady

19   entered into an agreement with anyone to raise prices, do you,

20   sir?

21   A.   No.

22   Q.   And you don't have any personal knowledge that Mr. Brady

23   entered into an agreement with anyone to maintain prices, do

24   you, sir?

25   A.   No.

1          MR. LAVINE:  Your Honor, if I can just have one

2     moment, please.

3          THE COURT:  You may.

4          MR. LAVINE:  Thank you.  Mr. Lewis, thank you very

5     much for your time.  I greatly appreciate it.

6          Your Honor, I pass the witness.

7          THE COURT:  All right.  Thank you.

8          Ladies and gentlemen, it's almost 5:00.  We will go

9     ahead and break for the day.  Please keep the admonitions in

10    mind.  Don't try to visit anywhere.  I am not sure you heard

11    anywhere that's nearby, but don't do that.  Keep your vigilance

12    up with family members.  Don't let yourself slip and start

13    talking or even to let people hear or let people talk to you

14    about the case.  Don't let them try to do that.  Tell them they

15    can't.  Try to avoid any press just in case you happen to all

16    of the sudden hear something or something comes up.  Obviously,

17    don't search for anything either, all right?

18         See you back tomorrow.  The jury is excused for the

19    evening.

20         (Jury excused.)

21         Please be seated.

22         And Mr. Lewis, you are excused for the day.  Thank you

23    very much.

24         Why don't we go ahead and talk about the 8-K at this

25    time.  One question that I have -- Ms. Call, you were the one

1      handling this, right?

2            *MS. CALL:*  Yes.

3            *THE COURT:*  So what was supplied to Ms. Grimm,

4      Exhibit 9168, is that still what the government would be

5      attempting to admit?

6            *MS. CALL:*  With one correction, Your Honor.  I did

7      speak with Mr. McLoughlin.  I think in trying to address his

8      concerns we missed one paragraph.  So we would also redact the

9      third page with the Bates number ending in 736106, the

10     paragraph that starts with "The company agrees" and ends with

11     "restricted share agreement below," so redact that on top of

12     what we had proposed.

13           *THE COURT:*  I am sorry, what was the last part?

14           *MS. CALL:*  I said we would redact that on top of what

15     we had already proposed and what Ms. Grimm provided Your Honor.

16           *THE COURT:*  Right.  I had a question about that

17     paragraph, so that's out.

18           Okay.  Let's go over to Page 6110, which I think is

19     the last page of this agreement.  And this indicates how the

20     bonus amount varies.  Mr. McLoughlin --

21           *MR. McLOUGHLIN:*  Yes, Your Honor.

22           *THE COURT:*  -- let's just focus on that last page.

23     This is the one that ends in 6110.

24           *MR. McLOUGHLIN:*  Yes, Your Honor.

25           *THE COURT:*  What information on that page did you have

1    an objection to?

2         *MR. McLOUGHLIN:*  Your Honor, what the government is

3    leaving in here is -- there are two things.  First, the far

4    left column you have the 2011 EBITDA and then you have the

5    bonus amount which they have in the actual numbers.  So the

6    first thing here is the actual numbers tell the jury just what

7    his bonus is in certain conditions.  So those numbers have

8    exactly the issue that we have of saying this is what the class

9    warfare problem is.

10        The second thing is that they make clear in the

11   paragraph below, they only redact the numbers.  So it's also

12   clear from the paragraph below that no matter what happens he

13   is going to get a fixed bonus and it invites the jury to

14   speculate about just how big it is.

15        I would note also, Your Honor, that this is for the

16   year 2011.  If I recall the superseding indictment correctly,

17   the conspiracy period is 2012 to 2019.  The 8-K says in that

18   last paragraph that after 2011 the process for calculating his

19   bonus will change.  And it is going to be exclusively up to the

20   discretion of the board of directors.  And so what we have here

21   in terms of this misleading issue is you put all of these large

22   numbers in front of the jury for a year that's not within the

23   scope of the conspiracy, and then for the years where there is

24   something within the scope of the conspiracy they don't have an

25   exhibit, which they shouldn't in the first place, but this

1   invites the jury --

2            THE COURT:  Why don't we hear Ms. Call's response just

3   on that part of it, if you don't mind.  Remind me,

4   Mr. McLoughlin, if there is other aspects of that page or the

5   rest of the exhibit that you have objections to, but why don't

6   we just focus on what you just mentioned.

7            MR. McLOUGHLIN:  It's those two columns which give the

8   jury significant numbers and invite further speculation.

9            THE COURT:  Ms. Call, response?

10           MS. CALL:  Yes, Your Honor.  I don't know that I have

11  a response on speculation other than we can remove the

12  redaction, but I don't think that solves Mr. McLoughlin's

13  problem there.  But in terms of the term, and I think the third

14  page of the document did say that this agreement covered into

15  2013, but that is now redacted to address some of

16  Mr. McLoughlin's other concerns, which does go into the

17  conspiracy period.  And this is simply the employment agreement

18  from when Defendant Lovette I believe joined the company.

19           THE COURT:  I am sorry, I missed that.  What goes into

20  that?

21           MS. CALL:  The term of this agreement went into the

22  end of 2013.  I am happy to pass up an unredacted portion if

23  you would like to confirm that.

24           THE COURT:  When you say this agreement, what are you

25  talking about?

1     MS. CALL:  The 8-K identifies this as Defendant

2  Lovette's employment agreement.  I am trying to find the page

3  where I noticed that.

4     THE COURT:  Because Mr. McLoughlin is quite correct

5  that the page that we were talking about before that ends in

6  6110 has the language that he mentioned about how for purposes

7  of 2011 the annual bonus will be determined by the board and is

8  subject to board approval.  So his point is that the numbers

9  reflected by the terms of this page would only include a time

10  period outside of the charged conspiracy.

11     MS. CALL:  One moment, Your Honor.  Your Honor, how

12  about as a suggestion we will meet and confer on this because I

13  think there are some board meeting minutes that we also were

14  planning to use, and we might be able to come to resolution on

15  proper redactions between the parties.

16     THE COURT:  Yeah, because this page I think is

17  irrelevant and for the reasons -- and I also have a concern

18  that Mr. McLoughlin mentioned which is that my order allowed in

19  evidence that would demonstrate that Mr. Lovette could be

20  incentivized by the bonus structure to fix prices because that

21  would increase the profitability of the company.  That was

22  appropriate, but that I wanted to avoid discussions of his

23  salary, lifestyle, things of that nature.  And that's why

24  putting in front of the jury a bonus that doesn't fluctuate at

25  all, just his base bonus, it doesn't have anything to do with

 1   his incentives.  That's just what he gets.  And that's

 2   irrelevant to this particular case.  The incentives are

 3   relevant, but just his base bonus is not relevant.

 4        MS. CALL:  Yes, Your Honor.  And to make sure I am

 5   understanding you correctly, we did redact out the base bonus,

 6   so the only thing that's still left on this page is the

 7   variability between different amounts of the EBITDA term we

 8   spoke about earlier.  So the second redaction on the page was

 9   the base bonus amount which I believe was 500,000 there.

10        THE COURT:  My copy does not have that redacted.

11        MS. CALL:  I can pass up another.

12        THE COURT:  Well, that's not really relevant.  We

13   don't have to get into that because you are going to talk about

14   it.

15        MS. CALL:  Yeah.  I understand your order, Your Honor.

16   Thank you.

17        THE COURT:  Anything else, Mr. McLoughlin, about this

18   document that you want to bring up even though it may be talked

19   about between the two sides?

20        MR. McLOUGHLIN:  Just so the record is clear, Your

21   Honor, am I correct the government is withdrawing this exhibit

22   and it is no longer in evidence?

23        THE COURT:  I don't know that, but she has clearly

24   indicated that she is going to work on that last page.

25        MR. McLOUGHLIN:  Your Honor, just for the record, for

1    the reasons stated we would move to strike the exhibit.

2         THE COURT:  Well, it hasn't been offered yet.

3         MR. McLOUGHLIN:  It has been and admitted.  It was

4    yesterday after the testimony of Mr. Sangalis.  We have been

5    trying to catch up, Your Honor.  It has not been displayed to

6    the jury.

7         THE COURT:  Do you show that, Mr. Keech?

8         MR. McLOUGHLIN:  It's at the close of his testimony,

9    but it was never displayed to the jury, so we have a no harm,

10   no foul at this point.

11        COURT DEPUTY CLERK:  You said yesterday?

12        THE COURT:  It would have been last week.

13        MR. McLOUGHLIN:  Ms. Rogowski moved it in.

14        THE COURT:  I am going to assume that it was admitted.

15   So we have the indication from Ms. Call that the page that ends

16   6106 will be -- that one paragraph will be redacted.

17        And then, Ms. Call, I would like you to work with

18   Mr. McLoughlin on redactions to that last page.

19        And then Mr. McLoughlin, did you have additional

20   concerns with the admitted pages?

21        MR. McLOUGHLIN:  Yes, Your Honor.  Just for the

22   record, it was at Page 184 of our transcript that it was

23   admitted, the daily transcripts.  And yes, Your Honor is right,

24   Your Honor identified the fact that you have the numbers up

25   above invites speculation as to the base bonus, but also we

1   have the circumstances as I indicated that this is for 2011.

2   It doesn't apply in 2012.  It says for future year -- your

3   bonus opportunity for years after 2011 will be set by the

4   board.  So all of this only applies not to -- it's not a

5   formula to be used in the future in 2012.  It only applies for

6   the year of 2011.  So the risk, the 403 risk here in

7   combination with the irrelevancy is an issue, particularly

8   given that the government wants to keep the numbers.

9          THE COURT:  I will take a look at the transcript of

10   when it was admitted.  I don't want to spend time going over

11   exhibits that were already admitted because this trial will

12   hopelessly bog down, but I will let Ms. Call think about that

13   too.  I do have concerns about the relevancy because it seems

14   to be talking about a time period that is outside of the

15   charged conspiracy period.

16          MR. McLOUGHLIN:  And just for the record, Your Honor,

17   and we will discuss it with the government, Paragraph 2B on the

18   prior page ending Bates No. 36109, 2B also has material that we

19   would request to be redacted in part because they address the

20   issues of the compliance and the code of conduct which Your

21   Honor has already excluded.  We don't need to go into that now

22   at this point, Your Honor, but you have already made a ruling

23   about the code of business conduct, and so we would also seek

24   to have that redacted in compliance with your order, but we can

25   talk to the government.

1          *THE COURT:*  Okay.  And that's on Page 6109?

2          *MR. McLOUGHLIN:*  Yes, Your Honor, the prior page.

3          *THE COURT:*  What paragraph is it?

4          *MR. McLOUGHLIN:*  Paragraph 2B under position and

5     responsibilities.  It says during the term, you will be bound

6     by the policies and procedures of the company applicable to you

7     including the company's codes of ethics and business conduct.

8          *THE COURT:*  Okay.  I can rule on that right now.

9     There is no problem with that mentioned.  What would be a

10    problem is that if a code or a portion of a code were brought

11    in front of the jury suggesting that or perhaps creating

12    confusion about what standard would apply to the defendants in

13    this case.  This mention wouldn't do that, so that's not a

14    problem, okay?  Are we done with this particular exhibit?

15         Ms. Prewitt?

16         *MS. PREWITT:*  Just very briefly, Your Honor.  We were

17    just handed a thumb drive with additional exhibits slotted for

18    Agent Koppenhaver.  That's a witness that Ms. Hall represented

19    was going to be testifying today.  Obviously, that's not the

20    case.  But the more serious issue is updated summary charts we

21    are receiving.  Look, we are doing everything we can to digest

22    this material as it's coming in, but at this point we have 10

23    individual defendants and each of us have a limited range to be

24    combing through additional exhibits that come through the door.

25    Your Honor, I would just like some representation from the

1    government that midnight, 2:00 a.m. as has been the habit in

2    this case, we are not going to get another set of exhibits

3    attributed to this witness and we will not be getting updated

4    summary charts.

5           MR. McLOUGHLIN:  And Your Honor, on behalf of

6    Mr. Lovette we would move to exclude the exhibits.  The

7    government represented to the Court and to us we would get the

8    exhibits 48 hours in advance.  We are not 48 hours before

9    Mr. Koppenhaver is going to testify and it is virtually

10   impossible for us to prepare given that we keep getting, as

11   Ms. Prewitt said, multiple e-mails a night with new exhibits

12   and some removed, some added.  It is impossible.

13          THE COURT:  Let's talk about Special Agent

14   Koppenhaver.  So he appears to be someone from whom -- or

15   through whom a lot of exhibits are going to be admitted, so can

16   someone from the government give me a preview of how is that

17   going to happen?  What is that going to look like?  Why does he

18   have foundation or why would he be a sponsoring witness for

19   this large number of exhibits?

20          MS. CALL:  Yes, Your Honor.  Would you like me to go

21   straight to the exhibits or perhaps give a broader outline of

22   the types of testimony we would expect?  I would be happy to do

23   either.

24          THE COURT:  Why don't you give me a quick broad

25   outline.  I don't want to get too bogged down because it's

1   getting later.

2   　　　　*MS. CALL:*  I think there is four general categories he

3   would testify to.  First would be the background of the

4   investigation and investigative techniques to include review of

5   phone records, which have already for the most part been

6   admitted as business records.  The second would be --

7   　　　　*THE COURT:*  What would he say about review of phone

8   records?

9   　　　　*MS. CALL:*  Essentially that he conducted a review and

10  identified certain calls between certain participants.  I

11  believe Your Honor has already seen several summary exhibits.

12  The first one would be 90-10 associating certain individuals

13  with certain phone numbers.  So it would essentially be

14  identifying the calls he identified between two particular

15  phone numbers.

16  　　　　*THE COURT:*  Okay.

17  　　　　*MS. CALL:*  So the second would be then introducing

18  other documents aside from those phone records after

19  establishing relevancy.  It's generally just going to be on the

20  face of the document.  We in line with the Court's previous

21  ruling don't intend to have him interpret documents in any way

22  aside from reading perhaps header information and then actual

23  sentences word for word from the documents and no

24  interpretation.  So the relevance would be established, and

25  admissibility for most of them I believe is going to be the

1   co-conspirator exception, so that's what we would be

2   establishing.

3        THE COURT:  But what would you ask him about each one?

4   Why would he be the guy to get them in through as opposed to

5   you just standing up with him sitting in the witness room and

6   you moving the admission of those exhibits?

7        MS. CALL:  It would mostly be establishing time frames

8   that he investigated during the course of his investigation, so

9   identifying phone calls occurring around the times of

10  particular e-mails or text messages.

11       THE COURT:  But that's not how he looked at or

12  examined these documents.  He is not gathering documents in

13  some chronological fashion, right?  I just don't understand why

14  he is needed as a witness for any of these things.

15       MS. CALL:  I believe, Your Honor, that would be a part

16  of his testimony that as a part of his investigation, he

17  focused on certain time frames and gathered particular evidence

18  relating to those time frames.

19       THE COURT:  But these are mainly documents that are

20  just coming to the government in some huge batch from a Grand

21  Jury subpoena, right?

22       MS. CALL:  In addition to search warrants and other

23  investigative techniques, yes.

24       THE COURT:  Okay.  But, I mean, for instance, e-mails

25  that would come in through the co-conspirator hearsay

1    exception, he isn't gathering them on some type of yearly basis

2    or anything like that.  He's just presumably looking through

3    large masses of documents that got produced through subpoenas.

4              MS. CALL:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. CALL:  There is just two more points, I think.

7    The third point would be using just I think two or three

8    demonstratives showing some of that chronology I was discussing

9    between the calls and the documents that he reviewed, and the

10   last thing is describing the interview of Defendant Little as

11   relevant to the obstruction count.

12             THE COURT:  Okay.  Because he has personal knowledge

13   of that?

14             MS. CALL:  Correct, Your Honor.

15             THE COURT:  Okay.  And I forget when, but I think

16   early maybe today a motion was filed on summary witnesses.  I'm

17   not sure if the government has had a chance to respond to that,

18   but obviously it sounds like it could come up with Special

19   Agent Koppenhaver.  Is the government going to respond or -- I

20   mean, there has been a lot filed on that already.

21             MS. CALL:  Yes, Your Honor.  I think we would propose

22   submitting a short response and we can get that in this

23   evening.  We are drafting it at the moment.  But I will note

24   that I think some of the concerns expressed in that filing seem

25   to be based on introduction of hearsay through a summary agent

1    which is not at all what the government intends to do.

2           *THE COURT:*  I don't think so.  I really think that --

3    you know, there are 10th Circuit cases like the *Brooks* case, I

4    would urge you to take a look at the *Brooks* case, but usually

5    an overview witness, and maybe that's what Special Agent

6    Koppenhaver is, but the rule of such a witness is very limited

7    as to describe some basics.  And what I am concerned about

8    possibly with Special Agent Koppenhaver, but in particular with

9    Special Agent Taylor, who, of course, will be the summary

10   witness, is that there will be -- that he is going to be giving

11   a closing argument and he is not going to be giving a closing

12   argument.  So you have to take -- I want to make sure the

13   government looks over that case law very carefully because, you

14   know, Special Agent Taylor is scheduled for five hours.  You

15   know, maybe there is five hours of fact testimony from him, but

16   maybe not, okay?

17          All right.  We'll be in recess.  Thank you.

18       (Recess at  5:22 p.m.)

19                              **INDEX**

20   WITNESSES

21      Robert Lewis

22          Direct Examination By Mr. Torzilli              5

23          Cross-examination By Mr. Lavine               96

24

25

INDEX (Continued)

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 10-4 | | 91 | | | |
| 1028 | | 62 | | | |
| 1029 | | 62 | | | |
| 1119 | | 71 | | | |
| 1120 | | 82 | | | |
| 1121 | | 71 | | | |
| 1122 | | 82 | | | |
| 1123 | | 71 | | | |
| 1124 | | 82 | | | |
| 1125 | | 71 | | | |
| 1126 | | 71 | | | |
| 1127 | | 71 | | | |
| 1129 | | 79 | | | |
| 1132 | | 53 | | | |
| 1133 | | 53 | | | |
| 1134 | | 36 | | | |
| 1135 | | 36 | | | |
| 1136 | | 36 | | | |
| 1137 | | 36 | | | |
| 1138 | | 36 | | | |
| 1139 | | 36 | | | |
| 1160 | | 65 | | | |

1                           INDEX (Continued)

2     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

3     1243                      85

4     1728                      82

5     1729                      82

6     9240                      24

7     9247                      27

8                         REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript from

10    the record of proceedings in the above-entitled matter.  Dated

11    at Denver, Colorado, this 29th day of November, 2021.

12

13                              S/Janet M. Coppock

14

15

16

17

18

19

20

21

22

23

24

25