1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14               Excerpt of Trial to Jury
               Testimony of Joseph Brink, Vol. 1
15 _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 2:15 p.m., on the 16th day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES

 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

 5   for Plaintiff.

 6            Anna Tryon Pletcher and Michael Tubach of

 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 8   San Francisco, CA 94111-3823;

 9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washington, DC 20006, appearing for Defendant Penn.

11            David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16             Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19            Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25
```

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1       APPEARANCES (Continued)

2           Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5           Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16       *MR. TORZILLI:*  Thank you, Your Honor.  The United

17   States calls Joseph Brink.

18      (**Joseph Brink** was sworn.)

19       *THE WITNESS:*  I do.

20       *COURT DEPUTY CLERK:*  Please state your name and spell

21   your first and last name for the record.

22       *THE WITNESS:*  Joseph Wade Brink, J-O-S-E-P-H, Brink,

23   B-R-I-N-K.

24       *MR. TORZILLI:*  Your Honor, may I with the assistance

25   of Ms. Grimm pass up a binder both to the witness and the

Joseph Brink - Direct

1  bench?

2          *THE COURT:*  Yes, you may.

3          *MR. TORZILLI:*  May I inquire, Your Honor?

4          *THE COURT:*  You may.

**DIRECT EXAMINATION**

6  *BY MR. TORZILLI:*

7  *Q.*  Good afternoon, Mr. Brink.

8          Where do you work?

9  *A.*  I work for Fiesta Restaurant Group.

10  *Q.*  What's your job title at Fiesta Restaurant Group?

11  *A.*  I am the chief procurement officer.

12  *Q.*  How long have you been the chief procurement officer at

13  Fiesta Restaurant Group?

14  *A.*  For about six years.

15  *Q.*  Can you explain what your principal job responsibilities

16  are in your current position?

17  *A.*  My current responsibilities is to procure all packaging and

18  food items for the restaurants.  And I also am in charge of

19  securing electricity, gas, trash, other services for the

20  restaurants.

21  *Q.*  Does the procurement of food items also include chicken?

22  *A.*  Yes, it does.

23  *Q.*  Does it include the negotiation of chicken supply with

24  chicken producers?

25  *A.*  Yes, it does.

Joseph Brink - Direct

1  *Q.* Have you held any other positions at Fiesta Restaurant

2  Group?

3  *A.* Yes.

4  *Q.* What positions have you held?

5  *A.* Prior to being the chief procurement officer, I was the

6  vice-president of supply chain management.

7  *Q.* For what time period were you in that role?

8  *A.* From 2011 through 2015.

9  *Q.* When you concluded that role in 2015, what role did you

10  assume?

11  *A.* Chief procurement officer.

12  *Q.* Your current position?

13  *A.* Yes, sir.

14  *Q.* Could you describe your principal job responsibilities in

15  your prior role of vice-president of supply chain management?

16  *A.* My job back then was to secure all food and packaging items

17  for the restaurants.

18  *Q.* Did it include chicken?

19  *A.* Yes.

20  *Q.* What restaurants does Fiesta Restaurant Group presently

21  operate?

22  *A.* We currently operate Pollo Tropical.

23  *Q.* Did Fiesta Restaurant Group operate Pollo Tropical in 2012

24  to 2016?

25  *A.* Yes.

Joseph Brink - Direct

1    Q.   For people who have never been to Pollo Tropical or don't

2    know what it's about, can you describe what Pollo Tropical is,

3    please?

4    A.   Pollo Tropical is a restaurant chain based in Florida.

5    It's a Caribbean-inspired restaurant with chicken that is

6    marinated with citrus and spices in the restaurants.  And it's

7    grilled on a grill with rice and beans and other Caribbean

8    food.

9    Q.   What type of restaurant or what format of restaurant is

10   Pollo Tropical?

11   A.   We're a hybrid between a quick service restaurant and a

12   fast casual restaurant.

13   Q.   Approximately how many locations in the United States does

14   Pollo Tropical operate?

15   A.   138.

16   Q.   Is chicken on the menu at Pollo Tropical?

17   A.   Yes.

18   Q.   How important is chicken as a menu item at the restaurant?

19   A.   It is the main item at our restaurant.

20   Q.   What are Pollo Tropical's principal -- or can you name a

21   few principal competitors of Pollo Tropical?

22   A.   Kentucky Fried Chicken, Chipotle, Raising Cane's,

23   Chick-fil-A, Boston Market.  Any chicken restaurant chain is a

24   competitor.

25   Q.   Would Pollo Tropical continue to exist if it didn't have an

Joseph Brink - Direct

1   adequate supply of chicken?

2   A.  No, it would not.

3   Q.  Why not?

4   A.  Because primarily the entire menu is chicken-based

5   products.

6   Q.  Does Pollo Tropical have a value proposition that it seeks

7   to deliver to its customers?

8   A.  Yes, we do.

9   Q.  Can you explain what that value proposition is?

10  A.  Our value proposition is for our companies -- our

11  restaurants and we offer a value-priced menu of chicken, rice

12  and beans for our customers.

13  Q.  Can you explain what you mean by value-priced menu?

14  A.  We price our menu to accommodate those who are lower income

15  who have limited income for buying food to provide a meal for

16  their families.

17  Q.  Does Pollo Tropical study or survey the types of customers

18  that dine at the restaurant?

19          MS. NIELSEN:  Objection, relevance.

20          THE COURT:  Overruled.  He can answer.

21  A.  Yes, we do.

22  BY MR. TORZILLI:

23  Q.  And have you developed an understanding of the types of

24  customers that dine at Pollo Tropical?

25          MR. BELLER:  Your Honor, I am also going to object and

Joseph Brink - Direct

1   ask we go on side bar, please.

2        (At the bench:)

3             THE COURT:  Mr. Beller or Ms. Nielsen, go ahead.

4             MR. BELLER:  Your Honor, this particular issue has

5   been litigated at length and the Court has issued orders on

6   this, which is that the end user and any sort of harm to the

7   end user is not admissible.  That is something that the

8   government conceded.  This is something that was included in

9   the motions *in limine*.  The Court ultimately denied the motion

10  *in limine* and that was because the government conceded that it

11  was not going to be going to end user.

12            So that begs the question of why the profile of the

13  Pollo Tropical customer and what their financial situation is,

14  and I imagine that one of the answers is going to be the

15  ethnicity of the customer, as to why any of that is relevant

16  given the extensive litigation that has been done on this.  I

17  think it's incredibly inappropriate given this Court's prior

18  rulings and the positions of the parties that have been taken

19  over the course of the last many months.

20            THE COURT:  Ms. Nielsen, anything else to add?

21            MS. NIELSEN:  Yes, Your Honor.  Under 403 we would

22  also object.  This seems to be an attempt by the government to

23  elicit sympathy, and I think it's misleading and inappropriate

24  both with respect to relevance and 403.

25            THE COURT:  Mr. Torzilli?

Joseph Brink - Direct

1          *MR. TORZILLI:*  Thank you, Your Honor.

2          A couple points.  One is I think the arguments suggest

3    or kind of miss the point of the testimony here.  I have no

4    interest in trying to prove up harm to an end user or customer

5    base, but we are very interested in both establishing that for

6    Mr. Brink's purchases of chicken from chicken suppliers, he had

7    to be very mindful of the price that he was going to negotiate

8    because he had very little flexibility in terms of being able

9    to raise his price downstream, which is in contrast to, for

10   example, the testimony that the jury heard from Mr. Skalak and

11   Mr. Ledford and Chick-fil-A where they just have a different

12   profile and strategy that enables them to have a little bit

13   more flexibility to negotiate even if it's a little higher

14   price.  They have more flexibility to be able to negotiate a

15   little higher price.

16          Pollo Tropical doesn't have that because, as Mr. Brink

17   is about to explain, these customers are price sensitive.  So

18   if he negotiates higher prices from his suppliers, he has to

19   pass that along in the form of higher prices and he loses

20   customers.  And that gives him a huge incentive to do

21   everything he can to negotiate the absolute lowest price he can

22   from Claxton and Pilgrim's and other chicken suppliers, so it's

23   highly relevant on that point.

24          And then secondly, Your Honor, it's also highly

25   relevant to help to rebut the defendants' defense.  We have

Joseph Brink - Direct

1    heard now for weeks about how 2014 is all about supply and

2    demand and the price sensitivity of customers.  It seems highly

3    relevant to the type of economically driven analysis,

4    micro-economically driven analysis that the defendants want to

5    insinuate into the trial, and it seems like we should have some

6    flexibility to be able to rebut that.

7        MR. BELLER:  Your Honor, I would note as to the second

8    argument that it would be a 701, 702 issue.  If the government

9    wanted to qualify Mr. Brink as an expert on microeconomics as

10   defined by Mr. Torzilli, they certainly had the opportunity to

11   do so and they did not.  Your Honor, to the extent Mr. Torzilli

12   is asking for some sort of instruction that this is, in fact, a

13   per se antitrust violation, that's something that we can

14   absolutely further discuss, but my understanding is that the

15   reason the government avoided getting into any sort of end user

16   cause and effect issue is because they did not want to, in

17   fact, put forth a per se argument in front of this jury.

18       MS. NIELSEN:  Judge, I would like to renew my

19   objection to relevance based on Mr. Torzilli's offer here.  The

20   Sherman Act does not impose a duty to sell chicken at a certain

21   price to the benefit of Pollo Tropical.  It is irrelevant what

22   the flexibility of Pollo Tropical is and has no bearing on

23   whether there is a conspiracy to raise the price of chicken or

24   rig bids.

25       MR. TORZILLI:  May I, Your Honor, because I think the

12

Joseph Brink - Direct

 1   record -- and I am happy to elaborate, but just -- if Your

 2   Honor is prepared to rule, I just want to make the record

 3   incredibly clear that the case we are trying, the case that we

 4   have indicted is a per se illegal violation of Section 1 of the

 5   Sherman Act.  So if any of this side bar indicates in any way

 6   to the contrary, that is a misconception that I want to clarify

 7   with these comments.

 8        MR. BELLER:  And Your Honor, I stated a per se

 9   violation.  My intention was to indicate the word "not" in

10   there.  So to the extent that was misspoken that wasn't my

11   intention.  And I would be incredibly surprised if anyone

12   understood the exclusion of the word not to somehow create a

13   confusion over that point.

14        THE COURT:  I am going to sustain the objection.

15   We've heard testimony about a lot of price sensitivity.  Of

16   course, KFC is a very price sensitive customer, but yes, it

17   didn't necessitate and there weren't any questions about the

18   end user product.  Similarly here, this witness can, of course,

19   talk about price sensitivity in terms of negotiations with his

20   suppliers, but it wouldn't seem to require and, in fact, I

21   agree with both Mr. Beller and Ms. Nielsen that the agreement

22   was that we would not be getting into end user impacts.  And it

23   seems like the testimony about the end users is unnecessary and

24   could potentially have a prejudicial effect if it was brought

25   in front of the jury and could somehow suggest that there was

Joseph Brink - Direct

1    an adverse impact upon lower socioeconomic customers, all

2    right?

3        (In open court:)

4        *THE COURT:*  Objection will be sustained.

5    *BY MR. TORZILLI:*

6    *Q.*  Mr. Brink, have you negotiated contracts with chicken

7    suppliers for supply of chicken to Pollo Tropical restaurants?

8    *A.*  Yes.

9    *Q.*  What considerations do you take into account when you

10   conduct those negotiations?

11   *A.*  We look at the price of -- current price of grain at the

12   time.  We look at the availability of suppliers --

13   *Q.*  Mr. Brink, if I can interrupt you.  If you can lean into

14   the mic a little more so your voice projects a little more.

15   *A.*  I'm sorry.  We look at the location of the manufacturing

16   plants to have product strategically placed across the country.

17   And we look at the number of facilities suppliers have and the

18   ability for a supplier to produce our product to our product

19   specifications and have it delivered to our distributor.

20   *Q.*  When you are looking at grain information, what are you

21   doing?  Can you explain what you're doing there and what you're

22   trying to accomplish?

23   *A.*  We're looking at grain prices as grain is one of the key

24   ingredients for chicken producers for cost.

25   *Q.*  And ultimately how do you use the information that you

Joseph Brink - Direct

1  glean from your review of grain information in your negotiation

2  with chicken suppliers?

3  A.  I use the grain prices as a scanning point to look at what

4  the market is doing for prices of grain and how that should

5  correlate for price of chicken.

6  Q.  And what's your purpose in doing that?  What's your

7  ultimate goal?

8  A.  Is to have an idea of what the prices should be looking

9  like before the negotiation process starts.

10  Q.  How important is price in your consideration of the things

11  you are trying to accomplish in your negotiations with chicken

12  suppliers?

13  A.  Pricing is a very critical element for our business.

14  Q.  By very critical, could you rank it relative to the other

15  ones that you mentioned, for example, plant locations and

16  adherence to specs?

17  A.  Price, No. 1.

18  Q.  What would be No. 2 do you think?

19  A.  Locations of manufacturing plants.  Followed right behind

20  it would be the ability to adhere to our specifications and

21  making the product and getting it to us on time.

22  Q.  And what are you trying to accomplish in achieving your

23  goal of having price be the No. 1 consideration that you have

24  in mind when you negotiate with chicken suppliers?

25  A.  We're trying to get the best price for our chickens that

Joseph Brink - Direct

1   would match our product specifications and quality

2   specifications and having it delivered to our distributors on a

3   timely basis.

4   Q.   Do you have a process that you typically try to use to help

5   get the best price and to fulfill your other key goals in your

6   negotiations with suppliers?

7   A.   I don't understand your question.  I'm sorry.

8   Q.   Sure.  Do you have a process that you use to go about

9   achieving your goals, the goals you just mentioned a few

10  moments ago, in your negotiation process with chicken

11  suppliers?

12  A.   Yes, we have a process.  We send out our requests for

13  proposals.  We ask our suppliers to give us -- we give them

14  estimated volumes and we have them submit pricing to us.

15  Q.   And then what do you do after that?

16  A.   We will take the pricing proposals, we will then review it.

17  And then we will go back to the suppliers and ask them maybe to

18  sharpen their pencils one more time and finalize the process to

19  secure the chicken.

20  Q.   When you are in the process of going back to the suppliers

21  and, as you say, sharpen their pencils, what form do those

22  communications take?

23  A.   Communication to the suppliers?

24  Q.   Yes.

25  A.   Typically either through phone calls or e-mails.

Joseph Brink - Direct

1  Q.  Do they ever involve face-to-face meetings?

2  A.  Yes.

3  Q.  Did you use the process that you just summarized a moment

4  ago in your negotiations in 2014?

5  A.  Yes.

6  Q.  And can you summarize your personal role in the

7  negotiations that Pollo Tropical undertook with chicken

8  suppliers in that year?

9  A.  I was the one person who took care of procuring all chicken

10  for the brand.

11  Q.  In 2014 where did Pollo Tropical have its restaurant

12  locations?

13  A.  We had restaurants located in Florida.  We had restaurants

14  located in Texas, restaurants located in Georgia.  And I do

15  believe at that time we were in Tennessee also.

16  Q.  Did the negotiations that you undertook in 2014 with the

17  chicken suppliers, was that for supply to all those restaurants

18  in all those locations?

19  A.  Yes.

20  Q.  Going into those contract negotiations in 2014, what

21  chicken suppliers were you doing business with?

22  A.  At the time we were doing business with Pilgrim's, Claxton,

23  Holmes for our fresh chicken.

24  Q.  Mr. Brink, what is Claxton?

25  A.  Claxton is a chicken producing company based out of

Joseph Brink - Direct

1    Claxton, Georgia.

2    Q.   In 2014 do you know how many plants Claxton had?

3    A.   One.

4    Q.   In 2014 do you know what type of birds Claxton was

5    producing in that one plant?

6    A.   They were producing small birds.

7    Q.   And can you explain what your understanding of the term

8    small birds is as you just used it?

9    A.   Small birds are birds that are around -- after they've been

10   processed they are around 3 pounds, a little heavier than

11   3 pounds.  They are smaller chickens.  They are typically

12   younger.  And they are usually utilized in fast-food

13   restaurants.

14   Q.   Have you ever heard the term big birds?

15   A.   Yes.

16   Q.   What are big birds?

17   A.   Big birds are birds that are bred to be a lot larger, and

18   they are used at plants to produce and debone breast chickens

19   and everything else.

20   Q.   In 2014 did Claxton produce big birds?

21   A.   No.

22   Q.   To your knowledge, has Claxton ever produced big birds?

23   A.   I don't think so.

24   Q.   What is Holmes?

25   A.   Holmes is a chicken supplier based out of Nixon, Texas.

Joseph Brink - Direct

1    Q.   In 2014 how many plants did Holmes have?

2    A.   One.

3    Q.   In 2014 what types of birds did Holmes produce at its one

4    plant?

5    A.   Small birds.

6    Q.   Did Holmes produce big birds?

7    A.   I do not believe so.

8    Q.   In 2014 did you negotiate a chicken supply contract with

9    Pilgrim's?

10   A.   Yes.

11   Q.   Who was your main contact for your negotiations with

12   Pilgrim's?

13   A.   Jimmie Little.

14   Q.   In 2014 did you negotiate a chicken supply contract with

15   Claxton Poultry?

16   A.   Yes.

17   Q.   Who was your main contact for your negotiations with

18   Claxton Poultry?

19   A.   Walter Cooper.

20   Q.   And in 2014 did you negotiate a chicken supply contract

21   with Holmes?

22   A.   Yes.

23   Q.   Who was your main contact at Holmes?

24   A.   John Cottrill.

25   Q.   Can you spell that, if you know?

Joseph Brink - Direct

1    *A.*   C-O-T-T-R-I-L-L.

2    *Q.*   Were Pilgrim's, Claxton and Holmes competitors of each

other during those contract negotiations?

4    *A.*   Yes.

5    *Q.*   Can you explain in what ways they were competing against

6    each other during those contract negotiations in 2014?

7          *MS. NIELSEN:*  Objection as to foundation.

8          *THE COURT:*  Sustained.  If you could lay a foundation.

9    *BY MR. TORZILLI:*

10   *Q.*   Were the three firms that we're talking about Pilgrim's,

11   Claxton and Holmes, in your view competitors of each other for

12   Pollo Tropical's chicken supply?

13   *A.*   Yes.

14   *Q.*   Okay.  And what's the basis for you saying yes to that

15   question?

16   *A.*   Because they all produce the specifications and the correct

17   product that we utilize in our restaurants, and they were

18   currently our current suppliers providing product for our

19   restaurants at the time.

20   *Q.*   In what ways were those three firms, Pilgrim's, Claxton and

21   Holmes, competitors of one another during your contract

22   negotiations for chicken supply in 2014?

23          *MS. NIELSEN:*  Objection, foundation.

24          *THE COURT:*  Overruled.

25   *A.*   They all -- they all produced chicken.  They all had the

Joseph Brink - Direct

1    ability to provide product to our restaurants, and so we gave

2    them the opportunity to bid for the business for 2015.

3    BY MR. TORZILLI:

4    Q.  And what were you looking for in the bids and any

5    subsequent discussions you were having with them?  What were

6    you looking for from them in your negotiation process?

7    A.  We were -- we want to have fair and competitive pricing

8    that we can utilize to analyze the pricing against each company

9    to determine how we're going to allocate the chicken for the

10   following year's contract.

11   Q.  What product or products were you negotiating with these

12   three chicken suppliers in 2014?

13   A.  We were negotiating our whole chickens without giblets.

14   They are calls WOGs and they're split to our specifications,

15   cut basically.  And then we were also securing our sized

16   breast, 4 to 6-ounce sized breast.

17   Q.  How is the product -- the whole chicken, you call it a

18   split WOG?

19   A.  Yes.

20   Q.  Can you explain how that split WOG is used and prepared at

21   the restaurant?

22   A.  The split WOG comes to the restaurant unmarinated.  We take

23   the chickens.  We have tumblers.  We add our spices and our

24   marination.  The restaurants will tumble the chicken to

25   marinate it.  Then afterwards it will sit in marination for 24

Joseph Brink - Direct

1   hours before the restaurants can use the chicken to serve to

2   the customers.

3   Q.   And for the breasts, how are they used and prepared at the

4   restaurant?

5   A.   They too come to the restaurants unmarinated.   We put them

6   in the marination tumbler.   We add our marination, our spices.

7   We tumble to marinate them and they sit in marination for 24

8   hours also.

9   Q.   What category of size bird do you use for your whole

10   chicken products?

11   A.   Our whole chicken products comes from a small bird.

12   Q.   Could you use a big bird rather than a small bird in the

13   restaurant for that product?

14   A.   No, we cannot.

15   Q.   Can you explain why?

16   A.   The jumbo large birds are extremely large, and we would not

17   be able to marinate it and cook it.   It would just take too

18   long and it won't work at the restaurant.

19   Q.   For the sized breast product is that -- what category size

20   bird is that product coming from?

21   A.   That also comes from a small bird.

22   Q.   Could you use a big bird product instead of a small bird

23   product for your sized breast products?

24   A.   No, we cannot.

25   Q.   Can you explain why not?

22

Joseph Brink - Direct

1  *A.*  The larger the breast comes from a chicken, the tougher the

2  meat is.  Large chickens have what's called woody breast

3  syndrome and they get very chewy and very tough.  And again,

4  natural fall chicken breasts are from 4 to 6-ounce.  You cannot

5  get it from a large bird.

6  *Q.*  So what would likely happen in the event you did try to use

7  large bird rather than small bird for your sized breast

8  products at the restaurant?

9  *A.*  They wouldn't work because large birds naturally are not a

10  4 to 6-ounce chicken breast.

11  *Q.*  The 2014 negotiations before you received any pricing

12  proposals or bids from any of the three firms that were

13  competing for your business, did you have any discussions with

14  any of those firms about supply for the following year?

15  *A.*  Yes.

16  *Q.*  Did you have discussions with Mr. Cooper?

17  *A.*  Yes.

18  *Q.*  Can you summarize the discussions that you had with

19  Mr. Cooper, and again focusing on the time period before any

20  submission of a bid or a pricing proposal.

21          *MR. BELLER:*  Objection, calls for hearsay.

22          *THE COURT:*  Response?

23          *MR. TORZILLI:*  Just asking him to summarize what he's

24  learned, gleaned, understood from his conversations.

25          *THE COURT:*  Sustained.

Joseph Brink - Direct

1    *BY MR. TORZILLI:*

2    *Q.* Mr. Brink, did you develop an understanding as to the

3    position that Mr. Cooper had with respect to the negotiations

4    during the time period prior to his submission of any pricing

5    proposal or bid?

6              *MR. BELLER:* Objection, the same including foundation.

7              *THE COURT:* Response, Mr. Torzilli?

8              *MR. TORZILLI:* I am asking for his understanding.

9              *THE COURT:* Well, it sounds like you want him to

10   describe something to describe what his actions were then in

11   response, the witness'?

12             *MR. TORZILLI:* The witness', yes.

13             *THE COURT:* Then if you could rephrase the question.

14   *BY MR. TORZILLI:*

15   *Q.* Based on your interactions with -- well, first let me ask

16   and confirm, did you have interactions with Mr. Cooper prior to

17   the time that he submitted a pricing proposal or bid?

18   *A.* Yes.

19   *Q.* So now focused on your point of view at that time, so

20   before any bid or pricing proposal was submitted by Claxton,

21   what was your point of view or understanding of what you would

22   be receiving from Claxton in terms of a bid or a pricing

23   proposal?

24             *MS. NIELSEN:* Objection, calls for hearsay.

25             *THE COURT:* Overruled.

24

Joseph Brink - Direct

1   A.  When I spoke to Walter about chicken and going into 2015,

2   we were talking about what it was going to be looking like for

3   pricing.

4          MR. BELLER:  Objection.  This is all hearsay.

5          THE COURT:  One moment.  Overruled.

6   A.  The discussion was what was the plan for chicken.  We were

7   talking about chicken and the discussion was that chicken

8   prices shouldn't be that bad going into 2015.

9   BY MR. TORZILLI:

10  Q.  Did you have a sense prior to receiving a proposal or a bid

11  of what -- numbers-wise I'm asking -- what you were likely to

12  receive or what you expected to receive in terms of a bid or

13  pricing proposal from Claxton?

14         MS. NIELSEN:  Objection, calls for hearsay.

15         THE COURT:  Overruled.

16  A.  There was no pricing discussed at that time.

17  BY MR. TORZILLI:

18  Q.  Did you have an expectation as to what level of pricing you

19  would be receiving from Claxton?

20  A.  There was no pricing discussed, but with the price of corn

21  going down significantly, that was the conversation.

22  Q.  So did there come a time when a bid or pricing proposal for

23  Mr. Cooper came in?

24  A.  Yes.

25  Q.  Did you review it when it came in?

Joseph Brink - Direct

1   A.   Yes.

2   Q.   Did you have a reaction when it came in after you reviewed

3   it?

4   A.   Yes.

5   Q.   What was your reaction?

6   A.   I was shocked.

7   Q.   Can you explain what you mean?

8   A.   The pricing that came in was extremely high, way higher

9   than we ever imagined it would be, the highest ever recorded

10  for our company to receive on chicken.

11  Q.   What did you do after you received and reviewed

12  Mr. Cooper's bid?

13  A.   Called and e-mailed Walter to find out what was happening

14  with these prices that were submitted.

15  Q.   In what form did Mr. Cooper submit that initial bid or

16  pricing proposal?

17  A.   He submitted it I do believe through e-mail.

18  Q.   Did you respond to the e-mail?

19  A.   I'm sure I did.

20       MR. TORZILLI:  Your Honor, if I may enlist Ms. Grimm's

21  assistance in handing up to the witness a document and hand it

22  up to the bench as well.

23       THE COURT:  You may.

24       MR. TORZILLI:  This is Government Exhibit 9740.

25  A.   Okay.

Joseph Brink - Direct

1    *BY MR. TORZILLI:*

2    Q.   Have you had an opportunity to review Exhibit 9740?

3    A.   Yes.

4    Q.   Do you recognize it?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is a string of e-mails that was from Walter Cooper to

8    myself starting on Monday, September 22nd, 2014.  It was

9    regarding pricing and stair-stepping our prices and then going

10   into our issues with our weights in the box of chickens and

11   everything else.

12   Q.   Does Exhibit 9740 contain a written pricing proposal from

13   Mr. Cooper to you?

14   A.   Yes, it does.

15   Q.   And does it contain your response to him?

16   A.   Yes.

17   Q.   And then does it contain subsequent communications between

18   you and him about the pricing proposal?

19   A.   Yes.

20   Q.   And is this all part of the negotiations that you undertook

21   to secure chicken supply for Pollo Tropical Restaurants to

22   begin in January of 2015?

23   A.   Yes.

24          *MR. TORZILLI:*  Your Honor, the United States offers

25   9740 into evidence.

Joseph Brink - Direct

1          MR. CANTY:  No objection from us, Your Honor.

2          THE COURT:  Any objections to Exhibit 9740?

3          Exhibit 9740 will be admitted.

4          MR. TORZILLI:  Thank you, Your Honor.  And permission

5     to publish.

6          THE COURT:  You may.

7     BY MR. TORZILLI:

8     Q.  Mr. Brink, if we can look at the very first e-mail in the

9     string.  It begins on the bottom of the second to the last page

10    and then goes onto the very last page.

11    A.  Right.

12    Q.  And it should be on your screen.  Do you see it?

13    A.  Yes, I do.

14    Q.  Okay.  So can you explain what you understood -- well,

15    first of all, let me ask you, who is this communication from?

16    A.  This is from Walter Cooper to myself sent on Monday,

17    September 22nd, 2014.

18    Q.  Okay.  And what's your understanding if you could summarize

19    what Mr. Cooper is conveying to you in this e-mail?

20    A.  In this e-mail they provided pricing for our split WOG

21    chickens.  And they were talking here about case weights to be

22    determined for the previous quarter's average and increasing in

23    volume on the chicken splits and then showing an -- a option of

24    stair-stepping the price increase over a period of time instead

25    of it having an all at one time on January 1st.

Joseph Brink - Direct

1   *Q.*  Let's break that down a little bit.  So item No. 1, do you

2   see that?

3   *A.*  Yes.

4   *Q.*  Could you read that into the record, please?

5   *A.*  "Pricing delivered to Kelly Foods for the splits, $1.07 per

6   pound."

7   *Q.*  What did you understand that to mean?

8   *A.*  That is the price of the chickens that we purchased for

9   Pollo Tropical, our split chickens, that would be delivered to

10  Kelly Foods, our chicken distributor, at $1.07 per pound.

11  *Q.*  Is that delivered pricing delivered to Kelly Foods?

12  *A.*  Correct.

13  *Q.*  Would there be an additional step that would be required to

14  get the chicken from Kelly Foods to the Pollo Tropical

15  restaurants?

16  *A.*  Yes.

17  *Q.*  Is there an additional cost associated with that effort?

18  *A.*  Yes.

19  *Q.*  Would that be like a delivery fee?

20  *A.*  Correct.

21  *Q.*  Then switching to item No. 2, if you could read that into

22  the record, please.

23  *A.*  "Case weights to be determined from the previous quarter's

24  average."

25  *Q.*  So what are case weights?

29

Joseph Brink - Direct

1    A.  We have 15 chickens in a box.  And we purchase the chickens

2    15 per box and there's 46 pounds per case.  We pay by the case

3    delivered to Kelly Foods.

4    Q.  And what did you understand the determination from the

5    previous quarter's average to refer to?

6    A.  They were talking about taking the weights, the case

7    weights average from the previous quarter, and putting that as

8    the case weight price for the following quarter.

9    Q.  Item No. 3, do you mind reading that into the record,

10   please.

11   A.  "Increase in volume between 500,000 to 1 million pounds on

12   the splits."

13   Q.  What did you understand Mr. Cooper to be saying there?

14   A.  They wanted to have extra chicken for next year, have a

15   half a million pounds to a million pounds more on the chickens.

16   Q.  So Claxton was asking you if Claxton could sell you more

17   chicken?

18   A.  Correct.

19   Q.  And item No. 4 says, "Step pricing in 2014."  Can you

20   explain what your understanding of that entry is, please?

21   A.  That was a proposal to give us our price increase over a

22   period of time, that we would not be hit with it all at one

23   time.

24   Q.  You testified a few moments ago about being shocked when

25   you saw the proposal.  Can you describe what, if any, aspect of

Joseph Brink - Direct

1    this e-mail caused you to have the reaction that you had?

2    A.   The pricing.  And then also on the stair-step proposal,

3    they wanted to start taking the price increase in October 1st

4    and then November 1st and December 1st and continuing on until

5    January 1st, but we still have a contract in place from

6    October 1st through December 1st.

7    Q.   So Claxton wanted the increase to start before the end of

8    calendar year 2014?

9    A.   Correct.

10   Q.   If we can now turn to the next e-mail in the chain.  It's

11   on the middle of Page 3.  Middle of Page 2, thank you.

12          Do you see that e-mail, Mr. Brink?

13   A.   Yes.

14   Q.   Who wrote this?

15   A.   I did to Walter Cooper on 9/22 -- September 22nd, 2014.

16   Q.   Can you read the first sentence to the jury, please?

17   A.   "Walter, this is a larger increase than Pilgrim's."

18   Q.   So what were you intending to tell Mr. Cooper there?

19   A.   That his pricing was way too high.

20   Q.   You make a reference to Pilgrim's.  Why did you reference

21   Pilgrim's by name?

22   A.   Pilgrim's was the -- one of the suppliers that we were

23   dealing with at the time.

24   Q.   How typical was it for you to explicitly mention one

25   supplier when you're negotiating with another supplier?

Joseph Brink - Direct

1    A.  Typically we don't like doing it, but with such large

2    increases, I needed to figure out why we're having these

3    increases as trying to give them guidance and help to figure

4    out why.

5    Q.  We can turn to the third and final sentence of this.  Can

6    you read that to the jury, please?

7    A.  "If we are paying these higher prices, we will not pay for

8    more than our spec allows."

9    Q.  What were you intending to tell Mr. Cooper there?

10   A.  He said that our box weight chickens will be increasing

11   because they're putting more weight on the birds going into our

12   boxes.  That would exceed our product specification sizing.

13   Therefore, we would be paying more money for our product that's

14   too big for us.

15   Q.  And you used the word or the abbreviation "spec" there.  So

16   what does that mean?

17   A.  That means specifications.

18   Q.  And what -- if you could summarize, what were your

19   specifications at this point in time?

20   A.  Our product specifications at that time were 2.88 pounds

21   each chicken on the small end, and the large end is 3.12 pounds

22   on the large end with a target of 3 pounds.  And our bill

23   weight was 3.06 pounds per case.

24   Q.  Did Mr. Cooper respond to your message?

25   A.  Yes.

Joseph Brink - Direct

1   Q.  Let's take a look at the next e-mail in the string about

2   two-thirds of the way down.  This is a little bit longer

3   e-mail, but I do want to ask you about some of the passages in

4   it.

5   A.  Okay.

6   Q.  In the first paragraph three lines down there is a sentence

7   that begins, "Pilgrim's should"?

8   A.  Yes.

9   Q.  Do you see that?  Can you read that sentence to the Jim,

10  please?

11  A.  Yes.  It states, "Pilgrim's should be your lowest cost

12  supplier as they have more pounds to spread their cost over and

13  more pounds to sell than we do."

14  Q.  Do you have an understanding what Mr. Cooper was trying to

15  tell you with that sentence?

16  A.  That Pilgrim's was a larger supplier than Claxton and they

17  had the ability to spread out their cost accordingly.

18  Q.  And what would that mean for the -- what did you understand

19  him to be saying something about the price that Pilgrim's ought

20  to be offering Pollo Tropical for the split WOG product?

21  A.  He was referring to in this e-mail that Pilgrim's should be

22  lower than Claxton and Holmes.

23  Q.  If I can direct your attention now to the next paragraph,

24  the second to the last sentence that starts with, "We are able

25  to accept."  Do you see that?

Joseph Brink - Direct

1    A.   Yes.

2    Q.   Will you read that sentence to the jury, please?

3    A.   "We are able to accept more volume if need be and we are

4    willing to stair-step the pricing so there will not be a hit

5    for Pollo.  Is Pilgrim's willing to do all this"?

6    Q.   What was your understanding of what Mr. Cooper was trying

7    to message to you with that passage?

8    A.   That Claxton was willing to take on more of our chicken

9    volume needs and they were willing to stair-step the increase

10   so it wouldn't hit us all at one time for Pollo Tropical.  And

11   then basically he asked, is Pilgrim's willing to do all of

12   this?

13   Q.   Mr. Brink, whose idea was it to potentially stair-step the

14   increase?  Was it Pollo Tropical's idea or Mr. Cooper's idea?

15   A.   It was Pollo Tropical's.

16   Q.   And when was the idea first conveyed to Mr. Cooper?

17   A.   Shortly after I got the price increase.

18   Q.   And what was the overall purpose of trying to stair-step

19   the increase from your perspective, Mr. Brink?

20   A.   The purpose was to try and mitigate the price increase to

21   hit our restaurants all at one time.  That would allow us to

22   gradually get the price increase.

23   Q.   Okay.  Thank you, Mr. Brink, and apologies for cutting you

24   off.

25            But just if we can move on to the next paragraph.

Joseph Brink - Direct

1    *A.*   Yes.

2    *Q.*   And there I want to direct your attention to the second

3    sentence that says, "They have already been billing catch

4    weight to Kelly."  Do you see that?

5    *A.*   Yes.

6    *Q.*   And first I want to ask who you understood "they" to be

7    referring to there?

8    *A.*   Pilgrim's.

9    *Q.*   And what did you understand the sentence as a whole to

10   mean?

11   *A.*   That Pilgrim's has been billing catch weight to Kelly's.

12   *Q.*   What's catch weight?

13   *A.*   Catch weight is the actual weight of the box on the chicken

14   as invoiced to the supplier, meaning our distributor, Kelly

15   Foods.

16   *Q.*   Is catch weight advantageous to Pollo Tropical or

17   disadvantageous?

18   *A.*   It's disadvantageous.

19   *Q.*   Can you explain why?

20   *A.*   When we have catch weights coming in and being billed as

21   catch weight, therefore Kelly Foods, our food distributor, has

22   to take all the catch weights and put them on all of our

23   invoices.  At the time of receiving the invoices the restaurant

24   will have to sit there and match up every single case catch

25   weight on label and match it up on the invoice.

Joseph Brink - Direct

 1    *Q.*  Is that a more labor intensive process for Pollo?

 2    *A.*  Yes, it is.

 3    *Q.*  The next sentence says, "They probably."  Do you see that

 4    sentence?

 5    *A.*  Yes.

 6    *Q.*  Could you read that to the jury, please?

 7    *A.*  "They probably have told Pollo or will tell Pollo no extra

 8    pounds and the price is the price with no consideration or

 9    explanation, take it or leave it ... I hope for Pollo that

10    Pilgrim's will consider stair stepping -- step pricing," sorry.

11    *Q.*  What's your understanding of what Mr. Cooper was telling

12    you in that message?

13    *A.*  That message was telling me that Pilgrim's -- that he was

14    referring that Pilgrim's was not going to work with us on

15    providing us extra chicken.  And they were going to give us

16    pricing with no consideration or explanation with a

17    take-it-or-leave-it mentality, and he was hoping for Pollo's

18    sake that Pilgrim's would work with us on a stair-stepping

19    proposal.

20    *Q.*  There is a phrase in there that Mr. Cooper writes to you.

21    He says, "The price is the price."  What did you understand

22    that to mean?

23    *A.*  The price is the price was whatever price I was given, that

24    was the price that was going to be for my new contract for next

25    year.

Joseph Brink - Direct

 1   *Q.*  Is the term "The price is the price" something that is --

 2   that you heard at any point in time besides seeing it in the

 3   e-mail that Mr. Cooper wrote to you?

 4         *MS. NIELSEN:*  Objection, calls for hearsay.

 5         *THE COURT:*  Overruled.

 6   *A.*  Yes.

 7   *BY MR. TORZILLI:*

 8   *Q.*  Can you explain those circumstances, please?

 9   *A.*  In regards to Walter Cooper?

10   *Q.*  In regards to your familiarity with the term "The price is

11   the price," other than seeing it in this e-mail.

12   *A.*  The price is the price, when someone gives that price and

13   says that, that is the price that you're given and there is no

14   negotiation or ability to negotiate the price or get

15   explanation on why.

16   *Q.*  And was that a term that you encountered at all in the

17   negotiations in this year other than seeing it in this e-mail?

18   *A.*  Yes.

19   *Q.*  And can you explain where and when approximately you

20   encountered that term?

21   *A.*  I encountered that term on -- with another supplier,

22   Pilgrim's, when we had our phone conference on Monday,

23   September 22nd, 2014.

24   *Q.*  So on the same -- well, on the same day that you received

25   this e-mail from Mr. Cooper?

Joseph Brink - Direct

 1   *A.*   Yes.  I had a meeting with Pilgrim's at 11:30, a phone

 2   conference on September 22nd, 2014.

 3   *Q.*   Tell us about that phone conference, Mr. Brink.

 4   *A.*   That phone conference was to discuss the chicken pricing

 5   for 2015 and found out the pricing was going to be 19 cents a

 6   pound increase.  We asked why when the price of grain was going

 7   down.

 8           *MS. NIELSEN:*  Judge, I'm sorry to interrupt, but I am

 9   objecting to hearsay.

10           *THE COURT:*  Sustained.  If you could identify the

11   declarant.

12   *BY MR. TORZILLI:*

13   *Q.*   Mr. Brink, can you identify on the call that you had with

14   individuals from Pilgrim's who all the participants were?

15   *A.*   The participants were Jimmie Little from Pilgrim's, myself,

16   and Lynn Schweinfurth, our CFO, was in my office.

17   *Q.*   Would you be so kind as to spell that name?

18   *A.*   S-C-H-W-E-I-N-F-U-R-T-H.

19           *MR. TORZILLI:*  Can we have a brief side bar, please?

20           *THE COURT:*  Yes.

21      (At the bench:)

22           *MR. TORZILLI:*  Your Honor, this is co-conspirator, so

23   I think it's excluded from the definition of hearsay.  Anything

24   that Mr. Little said on the call is co-conspirator.

25           *THE COURT:*  Anything, Ms. Nielsen?

1          *MS. NIELSEN:*  Your Honor, we would object.  I don't

2     believe this was presented at the *James hearing*, and as to a

3     group conversation with the CFO, certainly his statements would

4     be hearsay.  We continue to object to hearsay.

5          *THE COURT:*  Okay.

6          *MR. TORZILLI:*  So, Your Honor, if I may, just to

7     remind Your Honor about the *James* proceeding, I believe we had

8     about 15 entries on the *James* hearing that related to documents

9     for this episode.  By episode, I mean the negotiations with

10    Pollo Tropical.  And I believe 13, if memory serves, certainly

11    in the neighborhood of 13 of those 15 were ruled in the

12    government's favor, meaning conditionally admissible.

13          And we have learned, because we just have had this

14    document about 24 hours since it was unsequestered after Your

15    Honor's ruling on our motion to exclude, that Mr. Brink has

16    made the connection between the 22nd date.  So the statements

17    by Mr. Little, which prior to the last few hours certainly

18    hadn't been connected in terms of how they related to the

19    conspiracy, have now come into focus.  So that's my explanation

20    for why the statements were not on the *James* log.

21          *MR. BELLER:*  This is David Beller speaking for Mikell

22    Fries.  Your Honor, as the Court may or may not know, Mr. Brink

23    was first examined by the government in March of 2021.  There

24    were significant interviews conducted following that date, and

25    so certainly the government could have been or should have been

Joseph Brink - Direct

1    on notice as to this particular meeting.  This is the first

2    that we are hearing or at least that I recall about a meeting

3    on September 22nd, which these statements were, in fact,

4    communicated and communicated specifically by Mr. Little and by

5    someone else.

6          Your Honor, we don't need to go into the fact that the

7    government, Department of Justice, is, in fact, a party to that

8    civil action, but certainly there was the opportunity for the

9    government to obtain whatever documents they chose to obtain in

10   advance of the *James* hearing.  And the fact that the government

11   did not do so should not be prejudiced against the defense now

12   because the government has come across documents and come

13   across additional information from the witness that they wish

14   to offer under 801(d)(2)(E).  We join Ms. Nielsen's objection

15   as to hearsay.

16          *MR. TUBACH:*  Michael Tubach.  If I could, the witness

17   is not being asked about this document.  He is being asked

18   about a meeting and a conversation.  There is nothing about

19   this document that the government needed to be able to elicit

20   the conversation and present the statements of an alleged

21   co-conspirator at the *James* hearing.

22          *THE COURT:*  Mr. Torzilli, I wasn't quite clear.  So

23   did the government through its interviews of Mr. Brink know

24   about the September meeting before the government gained

25   possession of this particular exhibit recently?

Joseph Brink - Direct

1          *MR. TORZILLI:*  We have the phone record of a call

2     between Mr. Little and Mr. Brink on -- in the phone records

3     that have been admitted into evidence, as well as summary

4     exhibits we've tendered.  But when we received this document

5     and seen the content of the document, which is explicitly

6     drawing on information from Pilgrim's including a quote that

7     Your Honor may remember Mr. Bryant focusing on, "The price is

8     the price," that made a connection that hadn't existed in our

9     minds that related this e-mail from Mr. Cooper to the call that

10    we were aware occurred.

11          And so I think when we take those two together, it

12    very much comes into focus that this was very conspiratorial.

13    And I will also add there was a call between Mr. Little and

14    Mr. Cooper shortly after the call between Mr. Brink and his

15    colleague and Mr. Little concluded.

16          *THE COURT:*  Okay.  What I am not quite clear on is

17    when Mr. Brink was interviewed sometime before the government

18    getting possession of this particular document, did he recall

19    the meeting and did he provide statements regarding that?  I

20    know that you said that the United States has put two and two

21    together, but what I am wondering is whether the witness

22    already had this information or is he testifying based on some

23    refreshed recollection.

24          *MR. TORZILLI:*  He certainly looked at the document,

25    Your Honor, before he came here.  We interviewed him this

Joseph Brink - Direct

1   morning, and he in the interview this morning brought up the

2   timing issue when he was looking at this document in the

3   interview.  So I would answer Your Honor's question as yes.  I

4   mean, he made a connection that at least as far as I'm aware

5   hadn't been as sharp in terms of the exact dates and certainly

6   we hadn't appreciated that Mr. Brink knew about prior to the

7   interview this morning.

8           MR. TUBACH:  This is Michael Tubach again.  On

9   March 5th, 2021 Mr. Brink was interviewed and he stated -- and

10  I am quoting from the summary of interview on Page 4 -- quote,

11  there was no compromise or discussion, the suppliers' attitudes

12  were "take it or leave it."  So it's quite clear that Mr. Brink

13  was aware of these conversations.  Obviously, the document they

14  are looking at is one in Mr. Brink's possession and his

15  company's possession.  And the fact that the government either

16  through -- for whatever reason, intention or otherwise, didn't

17  seem to get this document until we were able to get it recently

18  shouldn't be the government gets to introduce all these

19  801(d)(2)(E) that they didn't elicit previously.

20          MR. TORZILLI:  Your Honor, just to go back to

21  yesterday, we were the ones to ask these documents be excluded.

22  But now they are included, it seems like we should be able to

23  present a case based on the evidence that the defendants wanted

24  to be included in the evidentiary record or at least available

25  for inclusion in the evidentiary record.

Joseph Brink - Direct

1          THE COURT:  I think we are getting back to a point

2     that I believe that Mr. Beller made which is that the exhibit,

3     the document does not have the hearsay statement; is that

4     right?

5          MR. TUBACH:  The witness was testifying about a

6     conversation that he had with Mr. Little that's not referenced

7     in the document.

8          MS. NIELSEN:  Your Honor, this is Dru Nielsen.  I also

9     would indicate that we received handwritten notes today about

10    the recent interview of Mr. Brink where they indicate there was

11    a phone conference; however, there is no information included

12    in those handwritten notes about the content of the

13    conversation.  So we have no notice of what this conversation

14    is prior to today.  And I would object to them being able to

15    elicit this information, which they clearly have a plan to do

16    it, when they haven't disclosed the content of the

17    conversation.  And I would also note that an oral conversation

18    does not have the same reliability as a document or even an

19    e-mail that we can actually review and know the content of.

20          THE COURT:  Okay.  Anything else, Mr. Torzilli?

21          MR. TORZILLI:  No, other than Mr. Brink will -- if the

22    objection is overruled, he'll say whatever he is going to say

23    from his memory about the conversation.  And the defendants can

24    cross-examine him with appropriate questions on the reliability

25    of what he's testified to.

Joseph Brink - Direct

1          *THE COURT:*  Okay.  Where I think we started on this

2     particular objection was whether or not Mr. Brink could testify

3     about something that Mr. Little stated and have that be

4     received as co-conspirator hearsay.  Mr. Torzilli's position

5     appears to be that because the government has recently come

6     into possession of certain Pollo Tropical documents that they

7     otherwise did not have access to for purposes of this case,

8     that that helped the government put two and two together.

9          Mr. Brink has been interviewed on several different

10    occasions and it sounds like Mr. Brink would only be testifying

11    or maybe his review of the document this morning may have only

12    sharpened his memory in regard to timing.  But going back to

13    what we originally were talking about, and that is a

14    description of what was being stated to him by Mr. Little.  The

15    document doesn't seem to have affected his memory, for

16    instance, refreshed it as to something that he otherwise

17    wouldn't have known about on that issue, and as a result, I

18    think the fact that it was not on the *James* log does not

19    provide a basis for the government to admit the statement as

20    co-conspirator hearsay now because that's really not the -- it

21    doesn't have anything to do with the recent receipt of the

22    document.  So as a result, I will sustain the objection as to

23    him testifying as to a statement of Mr. Little as

24    co-conspirator hearsay.

25          *MR. TORZILLI:*  One last point in terms of the

Joseph Brink - Direct

1   admissibility is that if Your Honor is inclined to, as you just

2   indicated, rule that it's not admissible under 801(d)(2)(E) as

3   co-conspirator, I would ask that it be admitted under

4   801(d)(2)(A) as a party statement attributable to Mr. Little.

5          THE COURT:  And Mr. Canty, can you hear me?

6          MR. CANTY:  Yes, Your Honor.

7          THE COURT:  I just wanted to make sure that you were

8   in on this loop.  Okay.  Any objections as to that?

9          MS. NIELSEN:  Judge, this is Ms. Nielsen.  I would

10  continue to object in terms of the lack of disclosure.  They

11  interviewed Mr. Brink today.  They noted this conversation, but

12  they did not give any notice of the content of that alleged

13  phone conversation.  I think this is a violation of Rule 16 and

14  it's essentially trial by ambush at this point because we don't

15  know what the witness is going to say.  They had this

16  information and they failed to disclose it.

17         THE COURT:  Mr. Torzilli, what is the witness going to

18  say about this call that he just described the participants to?

19         MR. TORZILLI:  I think he is going to say something

20  very much along the lines of what Mr. Tubach was relating when

21  he was reading off the March -- I think it was the March 2021

22  interview report that in essence Mr. Little was saying there is

23  not going to be any negotiation here.  You're going to have to

24  take it or leave it.  And I am potentially overstating it here,

25  but essentially it's a take-it-or-leave-it situation and

Joseph Brink - Direct

1    essentially the price is the price.  To quote Mr. Cooper and

2    Mr. Bryant, the price is the price and that's it.

3          THE COURT:  And anything new that he said this morning

4    that wasn't passed on to defense counsel?

5          MR. TORZILLI:  The key thing from this morning is that

6    he related dates that were the exact same dates.  The phone

7    call and Mr. Cooper's e-mail occurred on the exact same date,

8    but almost the exact same time.

9          THE COURT:  Anything else, Ms. Nielsen?  Sorry, I

10   can't hear you.

11         MS. NIELSEN:  Your Honor, I am going to note the

12   prejudice to the defense.  This witness has testified there was

13   another witness on this alleged call, the CFO.  And because

14   we've had no notice of this alleged conversation, we have not

15   had the opportunity to interview that person who may have a

16   very different recollection of what the content of that call

17   was.  And now that the government has given us no notice, we

18   don't have that opportunity.  And there is extreme prejudice to

19   this type of information coming in at this late date.

20         MR. TUBACH:  I will just note, Your Honor, that the

21   summary we got in March simply said the suppliers' attitudes

22   were.  There is no way for us to know who that is and who he is

23   talking about.  And the fact that the government has apparently

24   failed to get ahold of the very documents that would refresh

25   this witness' memory until it was brought to their attention

Joseph Brink - Direct

1    very recently means we shouldn't be subject to this kind of

2    sandbagging.

3         THE COURT:  Mr. Torzilli?

4         MR. TORZILLI:  In terms of the documents, we had no

5    possession of the documents until the Norman Fries Company,

6    which is being referred to in this case as Claxton Poultry,

7    sent them to us.  We wanted to exclude them from the case.

8    Your Honor decided that wasn't an appropriate way to go.  So we

9    think it's appropriate for us to use these documents like it's

10   any other piece of evidence is that point.

11        And then certainly on the point about the CFO, I don't

12   think the -- I would have to check the interview reports, but I

13   don't think we ever got to the point of asking Mr. Brink who

14   all the people were on the call until the defendants objected

15   which necessitated me asking the question of identifying all of

16   the individuals on the call and then that information was

17   elicited.

18        THE COURT:  Okay.  The objections will be overruled.

19   I don't find any malfeasance or impropriety by the government

20   in terms of this document or any of the recently produced

21   Claxton documents.  This is a document that was sent to the

22   government.  The government made efforts to get a ruling on it

23   and then later learned that Pollo Tropical was -- consented to

24   have the document released from under the protective order in

25   the Northern District of Illinois case.

Joseph Brink - Direct

1          And I do agree with Mr. Torzilli, too, it was only by

2    way of objection that it came out who all the different

3    participants to the conversation were.  So the fact that there

4    may be some additional information regarding the date

5    admissible only against Mr. Little is not unduly prejudicial,

6    not a discovery violation, so those objections will be

7    overruled.  Thank you.

8          The objection is overruled.

9          *MS. HENRY:*  Your Honor, can we go back on?

10      (At the bench:)

11          *THE COURT:*  Ms. Henry, go ahead.

12          *MS. HENRY:*  It was my understanding that you were

13    admitting this as a statement of Mr. Little under 801(d)(2)(A).

14          *THE COURT:*  I am not sure what you mean by this.

15          *MS. HENRY:*  The testimony that is about to be

16    elicited.

17          *THE COURT:*  Yes.

18          *MS. HENRY:*  And then will there be a limiting

19    instruction, and if there is -- because it would only be

20    admissible against Mr. Little under that.

21          *THE COURT:*  Yes, that's what I indicated.

22          *MS. HENRY:*  And then I will make an objection that we

23    don't feel a limiting instruction will cure the prejudice

24    because of the way the jury is hearing so many of them, et

25    cetera.  I just want to put that on the record.

Joseph Brink - Direct

1          THE COURT: Okay. That objection will be overruled.

2          MS. HENRY: Thank you.

3          MR. TORZILLI: Thank you, Your Honor.

4     (In open court:)

5          THE COURT: Why don't we go ahead and take our break

6    now. We should have taken it before, but I wasn't watching the

7    clock, ladies and gentlemen. So let's take our break. We will

8    go for 20 minutes. Why don't we plan on reconvening 20 minutes

9    until 4:00. Keep the admonitions in mind, ladies and

10   gentlemen. And the jury is excused for the afternoon break.

11          (Jury excused.)

12          Thank you, Mr. Brink. You are excused for the break

13   and we'll reconvene at 10 minutes until 4:00.

14          Just by way of reminder, before we bring the jury back

15   in, we will talk about the schedule so that we'll know what to

16   tell them regarding tomorrow morning. We don't have to

17   necessarily work out all the details, but we need to agree on

18   what time to have the jury return tomorrow, all right?

19          We will be in recess. Thank you.

20     (Recess at 3:31 p.m.)

21     (Reconvened at 3:50 p.m.)

22          THE COURT: Let's go ahead and bring the jury back in.

23          Ms. Call?

24          MS. CALL: We wanted to discuss timing for tomorrow.

25          THE COURT: Yes. So what do we think is the best

Joseph Brink - Direct

1   plan?

2           *MS. CALL:*  So I think we have about 50 documents left,

3   which by at least Mr. Tubach's math is approximately four

4   hours.  Given that that's the majority of a court day, I think

5   our suggestion -- I think the government's suggestion would be

6   to just excuse the jury for tomorrow.

7           And I think there is two reasons that would be

8   helpful.  The first is the government may have to make

9   adjustments to the summary exhibits based on any rulings, and

10  we do want to give the parties an opportunity to check those

11  revised summaries for accuracy before we attempt to introduce

12  them.

13          The second being we think we are very close to

14  reaching a stipulation on those hundred additional documents

15  that have been sources for phone numbers and employers, and

16  when I say stipulation, I mean to the information, not to the

17  admissibility of the documents.  But we have been trading some

18  drafts back and forth.  And we haven't heard back from

19  yesterday, but I think we are very near resolution.  So ideally

20  if we can accomplish that tomorrow, that will put us in a good

21  position to get to the final witnesses in the government's case

22  on -- I guess that would be Thursday if I am doing my days of

23  the week correct.

24          *THE COURT:*  Mr. Tubach?

25          *MR. TUBACH:*  Yes, Your Honor.  It seems unlikely we

Joseph Brink - Direct

1   are going to finish Mr. Brink this evening.

2          THE COURT:  Right.

3          MR. TUBACH:  So we -- our strong preference would be

4   to bring him back and finish him up tomorrow morning so we are

5   done and then go through the rest of the witnesses.  I believe

6   there are two more witnesses and perhaps others beyond that,

7   but do the witnesses that we can do before the government wants

8   to get into introducing documents where we have to talk about

9   the admissibility of other documents.  So my suggestion would

10  be that we come back and do as many witnesses as we can while

11  we have the jury at least here and healthy and then get to the

12  business of doing documents.

13         THE COURT:  Well, why don't we think about this

14  proposition, that we come back and finish up Mr. Brink.  How

15  long do we think that that could take?

16         MS. CALL:  I think our estimate for direct is probably

17  going right up until the end today.

18         THE COURT:  Okay.  Any idea how long the crosses may

19  last?

20         MR. TUBACH:  I don't.  Your Honor.  That's not my

21  responsibility.  I think there are also two other witnesses,

22  Ms. Hoyt and Mr. Dawson, that could testify without the need

23  for any other documents being admitted, I believe.  The

24  government can correct me if I'm wrong about that.  Once the

25  jury is here in the morning, it would seem to make sense to get

Joseph Brink - Direct

1    the testimony on and off and get the witnesses done and gone

2    before sending the jury home.  And maybe if we spend the rest

3    of the day tomorrow if we have extra time doing the documents,

4    and if we need more time, then we spend Thursday.

5              THE COURT:  Ms. Call?

6              MS. CALL:  Yes, Your Honor.  I think the only issue I

7    am foreseeing is this notice with the summaries, and we, like I

8    said, want to provide defense counsel as much time as possible.

9    I think both the stipulation and rulings on evidence will alter

10   them in form, and I don't think it will be significant in terms

11   of substance, but I just want to make sure they have time.  So

12   if we are rushing to put on witnesses rather than get through

13   the documents, which the government has been waiting for quite

14   some time to kind of get to these hearings on the documents,

15   it's kind of --

16             THE COURT:  Well, I think that -- let's assume that we

17   did witnesses tomorrow.  How much of the day do you think would

18   be devoted to that, once again, not all witnesses, but Ms. Hoyt

19   and Mr. Dawson?

20             MS. CALL:  I think it would be the entire day.

21             THE COURT:  The entire day?

22             MS. CALL:  To include cross for Mr. Brink and then

23   direct and cross for Ms. Hoyt likely based on how timing of

24   witnesses has worked thus far in trial.

25             MR. TUBACH:  Your Honor, if we have to come back

Joseph Brink - Direct

1    tomorrow anyway to finish up Mr. Brink, it would make sense to

2    do Mr. Dawson and Ms. Hoyt tomorrow while the jury is here so

3    they are not coming in and out.

4         THE COURT:  That's my inclination too.  I know what

5    you mean by the notice issue, and I don't want the government

6    to have to end on a whimper if it's just all documents at the

7    end, but --

8         MS. CALL:  And I think the timing that would happen

9    would be we would do witnesses all day tomorrow, and then we

10   would have exhibits all day Thursday.  And then I suppose it

11   would be -- I suppose defense counsel would have the weekend

12   then until we put on the next witness if timing worked out like

13   that.

14        THE COURT:  Well, yeah, I think that maybe that might

15   work out.  I think maybe why don't we plan on telling the jury

16   to come back at 8:30, but let's try to do witnesses tomorrow.

17   I think that they will feel like that was a better week since

18   it was a little bit disrupted obviously yesterday.

19        Mr. Gillen?

20        MR. GILLEN:  For planning purposes, Your Honor, it

21   sounds as though the government doesn't feel like -- they may

22   or may not rest on Thursday, correct?  May I ask the Court to

23   inquire about what the government's scheduling is in terms of

24   when they realistically think they are going to rest in

25   anticipation of planning to bring people in for the defense.

53

Joseph Brink - Direct

 1          THE COURT:  Well, as I just heard, I think what the

 2     government anticipates is with just the witnesses that we

 3     referred to finishing up Mr. Brink, calling Mr. Dawson, putting

 4     on Ms. Hoyt, and they anticipate that that will take all day

 5     tomorrow, so yes.  And then given the fact that we would devote

 6     Thursday sounds like to documents and we would probably tell

 7     the jury take that day off, and given the fact that we don't

 8     have court on Friday, yes, I think that you're quite correct,

 9     that the government would not be resting this week.

10          MR. GILLEN:  Until Monday?  I am just trying to figure

11     out when we need to prepare to have people come in for the

12     defense.

13          THE COURT:  Ms. Call?

14          MS. CALL:  I think Monday would probably be our

15     estimate.  I will note, and this might be a good time, that in

16     terms of the government's notice and in terms of defense

17     witnesses, right now we have a multi-page witness list that's

18     alphabetically organized.  And we perhaps could use some notice

19     of who the first several defense witnesses would be.  But in

20     terms of timing, yes, I think it would likely be Monday for the

21     government resting.

22          THE COURT:  Okay.  I will let everyone talk about that

23     because, yeah, it's always tricky to know when the government

24     is going to rest and who's going to be available for the

25     defense, so that needs to be coordinated as best we can.  But

Joseph Brink - Direct

1    we'll certainly know more by the end of the day tomorrow and

2    the end of the day tomorrow would be Wednesday, so that should

3    provide some notice for next week.

4         MR. GILLEN:  I think that will be enough Your Honor.

5    Thank you.

6         MS. CALL:  Just to be crystal clear, so if on Thursday

7    we only spend four hours on documents, I think the suggestion

8    would be to rest for the day then.  And the government will

9    finalize its summaries, get them to the defense so they can

10   review them before we would put on the next witness who we

11   would expect to offer them through on Monday rather than doing

12   it right there and then, throwing them at the defense and

13   having to enter them without the defendants seeing the final

14   versions right away.

15        THE COURT:  Could you repeat that again?  I wasn't

16   following at the beginning, so I didn't understand.

17        MS. CALL:  The point was since the summaries may be

18   adjusted based on admissibility determinations on Thursday, we

19   would anticipate finalizing them after Thursday, getting them

20   to the defendants so that they can review them for accuracy and

21   then likely not calling a next witness no matter what time we

22   finish with documents on Thursday, calling the next witness on

23   Monday so that they can review them before we seek to admit

24   them into evidence.

25        MS. PREWITT:  I understand there is some issues

Joseph Brink - Direct

 1  regarding just verifying which documents have been admitted.  I

 2  think if we could just have the final versions.  And, you know,

 3  those that haven't been admitted yet could be not bolded, those

 4  that are admitted could be bolded, and we could still verify

 5  the accuracy, Your Honor.  I don't think -- we don't need to

 6  wait for Thursday to know what those charts are going to look

 7  like.

 8          THE COURT:  I guess it depends on what the nature of

 9  them.  Perhaps they could be if they have quotes.  I just don't

10  know.

11          MS. PREWITT:  My understanding is that's all been

12  verified.  I think the issue is just there is a column with

13  notations about which are the correlating exhibits if they

14  would say or the foundation.  My understanding is that may

15  change based on Your Honor's rulings.  But if we could have a

16  final version except for that variable, I think we could -- you

17  know, I don't know that we would need to be waiting, Your

18  Honor.

19          THE COURT:  Oh, and the idea being that we could then

20  use the rest of the day on Thursday to --

21          MS. PREWITT:  Sure, absolutely, Your Honor.

22          MR. McLOUGHLIN:  Your Honor, the point I was going to

23  make is I think there may be some controversy with respect to a

24  number of those summary exhibits at least in their current

25  form.  We don't forecast that that form that raises the issues

Joseph Brink - Direct

1    will change.  So the implication that we are going to be able

2    to resolve all that with alacrity on Monday I think would be

3    unrealistic.  And I think the most prudent thing would be to

4    plan for discussing those summary exhibits in whatever form

5    they are in on Thursday so that we can, you know, give our 4.2

6    minutes a piece to resolve it.

7              THE COURT:  Mr. Kornfeld?

8              MR. KORNFELD:  Just to amplify what Mr. McLoughlin

9    said, another reason why that's important is the summaries are

10   going to be potentially relevant to our written Rule 29

11   motions.  And to the Court's point last week, if we file those,

12   the Court under the rule can take them under advisement.  We

13   don't have to necessarily hit the brakes on the whole trial.

14   But for those to be meaningful written submissions, we have to

15   know the state of the evidence.  And the summaries are looming

16   as a potentially significant piece of the government's case

17   depending on what is admitted and what perhaps is not admitted.

18             THE COURT:  Ms. Call, so what would be the downside to

19   working Thursday afternoon based on summaries that have some

20   contingent aspects to them?

21             MS. CALL:  For clarification, when you say working, do

22   you mean moving on to another witness or --

23             THE COURT:  No, taking them up on Thursday with the

24   remaining time that we have, assuming we go through the

25   documents that we didn't -- that we were working on a little

Joseph Brink - Direct

1   bit yesterday.

2         *MS. CALL:*  Yes.  I am perhaps not quite sure what the

3   remaining issues are.  Obviously Your Honor has had two rulings

4   on these summaries.  The item that's -- that's I think Docket

5   741 and 781.  The thing that is in flux right now is really

6   depending on the stipulation we are working on between the

7   parties which is like how many sources are cited in each row

8   whether the government is going to be using exhibits to prove

9   whose phone number is what and who works where or whether that

10  information will be stipulated to by the parties.

11        And that's why I am hesitant knowing that we are just

12  waiting to hear back at this point.  And the defendants have

13  requested structural changes based on that to the summaries.

14  We want to make sure we make those changes accurately, but we

15  can't do that until we hear back, so we are a bit in limbo

16  right now.

17        *THE COURT:*  Let's assume that you do hear back one way

18  or the other.  By Thursday afternoon could we have a draft of

19  them that we could then start working on even though we may

20  have -- you know, hopefully by that time I would have made

21  rulings on all of those, and then we could figure out maybe

22  some portions of them would have to be X'd out, but other

23  portions we would know are okay.

24        *MS. CALL:*  Yes.  And the defendants do have them, but

25  we'll send the kind of most up-to-date version.

Joseph Brink - Direct

1        *THE COURT:*  So let's try to do that, then, as

2   Ms. Prewitt suggests, and I think that that would avoid the

3   unrealistic chance of alacrity on Monday.  That --

4        *MS. CALL:*  Perhaps so the government can be informed,

5   what would we be taking up Thursday with respect to the

6   summaries, because at least I believed everything to already

7   have been briefed and ruled on.

8        *THE COURT:*  Well, I don't exactly know.  I'm not sure.

9   I think that the -- my sense was the defense just wanted to see

10  the final version to double-check them against the documents

11  and see whether there were any issues.

12        Ms. LaBranche?

13        *MS. LaBRANCHE:*  Just because I am going to be the one

14  handling thing this for our team, I can just tell the

15  government the real issue for us at least is going to be when

16  you look at a lot of these exhibits, there is a column that has

17  exhibit number which it appears.  The government is identifying

18  it as a source of exhibit and there are -- a source of whatever

19  the statement on the chart is.  And they are just wildly

20  inaccurate, misleading, confusing.  We are going to try and get

21  something on file to the Court as soon as tonight to outline

22  what our concerns are initially so the Court will know where

23  we're coming from, but to me that's the real issue that I want

24  to address on Thursday afternoon.

25        *THE COURT:*  Mr. Lavine?

Joseph Brink - Direct

1          MR. LAVINE:  Your Honor, I think there is a little

2    confusion going on here and if I can quickly get this resolved.

3    Where there is going to be discussion as far as these

4    summaries, and I think there is a difference of opinion, but

5    what is being referred to as far as exhibit column, if we have

6    a stipulation worked out, which I believe we will tonight, most

7    of those, if not all of those exhibit numbers are gone.  So you

8    won't have that issue and it will be refined to just the

9    e-mails and the phone numbers in there.  All of those exhibit

10   numbers will be gone.  And I believe firmly I will get that

11   stipulation worked out tonight.

12          MS. LaBRANCHE:  May I inquire?  Would that be as to

13   all of the exhibits or just to those Exhibit 1, Exhibit 2 that

14   were on the back charts?  So like, for instance, 10-1, is the

15   government still going to want the right-hand column on

16   Exhibit 10-1?

17          MS. CALL:  Yes.  So my understanding from discussions

18   with Mr. Lavine about the proposed stipulation would be -- it's

19   a little circular because we were proposing stipulating to the

20   phone number and employer information, but as the government

21   understood it, the defendants did not want the government

22   citing a stipulation in our summaries to give it credence, so

23   we have agreed to have a different summary that contains the

24   information in the stipulation and cite to that in the

25   remaining summaries.  But yes, it would be so all of the -- I

Joseph Brink - Direct

1   will just call them the orange, green and blue summaries would

2   have one cite per row provided we do reach a stipulation.

3          THE COURT:  Okay.  Well, I don't want to spin our

4   wheels here, so I think what would be most productive is that

5   the government got them shaped up to the extent that, you know,

6   as much as it can.  And then once we get through the rest of

7   the exhibits, we will take those summaries up even though they

8   may not quite -- you know, some aspects of them may change a

9   little bit based upon rulings that would be made earlier, but

10  nonetheless, I would like to try to work through them as best

11  we can.

12         MS. CALL:  Would Your Honor like electronic copies of

13  them before Thursday or paper?

14         THE COURT:  Are they in color?

15         MS. CALL:  Yes.

16         THE COURT:  Paper if you don't mind just because I

17  could print them in color, but I don't have a color copier in

18  chambers, so it would be a little more convenient if we could

19  get them in paper.

20         All right.  Are we ready to bring the jury back in?

21         All right.  Let's do.

22         (Jury present.)

23         THE COURT:  Mr. Torzilli, go ahead.

24  BY MR. TORZILLI:

25  Q.  Mr. Brink, to go back to the phone call, the conference

Joseph Brink - Direct

1    call that you were having on September 22nd, 2014, can you

2    state who the participants on that call were?

3    A.   It was Jimmie Little from Pilgrim's, myself and Lynn

4    Schweinfurth in my office.

5    Q.   And can you remind us what position he holds?

6    A.   Lynn Schweinfurth, she was our controller, our chief

7    financial officer, our CFO.

8    Q.   What was discussed on the call?

9    A.   We discussed 2015 pricing, that Jimmie presented a 19 cents

10   a pound.  And I asked why was this high.  I wanted to talk

11   about why so high when the cost of grain was going down.  And I

12   was -- I was told we're not doing that this year.  That was in

13   the past.  Going forward we want the same margins as the large

14   bird plants.  There is no discussion and this is the price.

15        MR. POLLACK:  Your Honor, can we request a limiting

16   instruction?

17        THE COURT:  Yes.  Ladies and gentlemen, any statements

18   regarding this particular call from Mr. Little can only be

19   considered against Mr. Little, not the other defendants, okay?

20        Go ahead, Mr. Torzilli.

21        MR. TORZILLI:  Thank you, Your Honor.

22   BY MR. TORZILLI:

23   Q.   Did you have an understanding as to what Mr. Little was

24   trying to convey to you when he was talking about large bird or

25   big bird margins?

Joseph Brink - Direct

1  *A.*  I was under the impression that they wanted -- Pilgrim's

2  wanted the same margin as the large bird plants as the small

3  bird plants make less margin.

4  *Q.*  Did you have a response that you provided to Mr. Little on

5  the call?

6  *A.*  I told them that's not acceptable.  That's not how we've

7  been doing it for years and years with chicken and they changed

8  the game.

9  *Q.*  You talked about a 19 cents coming up on the call.  Do you

10  recall that?

11  *A.*  Yes.

12  *Q.*  Can you explain what 19 cents related to?

13  *A.*  19 cents per pound increase of our chicken -- on the split

14  chickens.

15  *Q.*  And an increase from what?

16  *A.*  19 cents from the previous price.

17  *Q.*  The price you were currently paying in essence?

18  *A.*  Correct.

19  *Q.*  Do you recall anything else occurring on the call other

20  than what you've just testified to?

21  *A.*  That was the pricing we had to have and I needed to make a

22  commitment very shortly.  They had customers who had -- who

23  wanted the business and we had to secure our volume

24  immediately, as they had other ones who wanted the business.

25  *Q.*  Was any deadline discussed on that call?

Joseph Brink - Direct

1    *A.*  Yes.  I had until 2:00 o'clock to make a commitment with

2    Pilgrim's.

3    *Q.*  To maybe skip ahead a little bit here, but did you

4    ultimately come to an agreement with Pilgrim's at the

5    conclusion of your negotiations in 2014?

6    *A.*  Yes, we did.

7    *Q.*  How did the prices that you ultimately agreed to at the

8    conclusion of the negotiations compare to the initial proposals

9    that you were provided?

10   *A.*  They did not change.

11   *Q.*  So didn't go down, didn't go up?

12   *A.*  Correct.

13   *Q.*  And then how about with respect to Claxton, did you arrive

14   at an agreement with Claxton on the prices at the conclusion of

15   the negotiations?

16   *A.*  Yes, we did.

17   *Q.*  How did the prices you agreed to at the conclusion of the

18   negotiations compare to the initial proposal that you were

19   provided?

20   *A.*  The pricing was basically the same, what we had before, but

21   they did stair-step our proposal to get the increase over a

22   six-month period, so that did help us for the company.

23   *Q.*  You said basically the same.  Did they come down at all?

24   *A.*  Yes.  There was -- I do believe the FOB price did not

25   change.  That means what the cost of the chicken costs at the

Joseph Brink - Direct

1   plant.  They were able to get I do believe a penny a pound

2   lower on freight going from the plant to Kelly's Distribution

3   Company.

4   *Q.*  So the delivery price went down.

5   *A.*  A penny, I do believe.

6        *MR. TORZILLI:*  If we could go back to Exhibit 9740 and

7   permission to publish that again to the jury, Your Honor.

8        *THE COURT:*  You may.

9        *MR. TORZILLI:*  Thank you.

10  *BY MR. TORZILLI:*

11  *Q.*  If we can now focus on the very top e-mail.

12       Who wrote that one?

13  *A.*  I did on Monday, September 22nd, 2014, to Walter Cooper.

14  *Q.*  Is this a continuation of your communications with

15  Mr. Cooper about the 2014 pricing proposal?

16  *A.*  Yes.

17  *Q.*  I want to ask you about the first sentence which is a

18  sentence that occupies the entirety of that first paragraph.

19  Can you read that sentence to the jury, please?

20  *A.*  "If we are paying the higher prices for the chicken, then

21  you all are getting more margin and we will not pay -- this

22  includes Pilgrim's and Holmes -- more than our spec requires."

23  *Q.*  You used the term "you all" there.  What did you mean when

24  you used you all?

25  *A.*  Suppliers.

Joseph Brink - Direct

1   *Q.*  So Claxton -- suppliers, plural, meaning Claxton plus

2   others?

3   *A.*  Correct.

4          *MS. NIELSEN:*  Objection, leading.

5          *THE COURT:*  Overruled.

6   *BY MR. TORZILLI:*

7   *Q.*  I am sorry, sir.  I didn't hear your answer.

8   *A.*  Correct.

9   *Q.*  And then you refer to, "You all are getting more margin."

10  And what did you mean to tell Mr. Cooper when you said margin?

11  What's margin?

12  *A.*  The profit that the company is making on our chicken.

13  *Q.*  And so what was that phrase meant to convey, "You all are

14  getting more margin?"  What were you trying to identify for

15  Mr. Cooper there?

16  *A.*  That they were getting more money for the chicken and more

17  than our spec requires as they were going to be packing our

18  chicken in larger weights, so that makes our chicken costs go

19  up even more.

20  *Q.*  And you didn't want to pay for the larger packaging?

21  *A.*  Correct.

22  *Q.*  You referred to Pilgrim's and Holmes in here, the two other

23  suppliers that were competing for your business.  Why did you

24  refer to them explicitly in this message to Mr. Cooper of

25  Claxton?

Joseph Brink - Direct

1    A.  I wanted to make them understand that not just one

2    supplier, all suppliers were not going to be charging us more

3    for chicken than required.

4    Q.  So Claxton wouldn't be disadvantaged by the position you're

5    taking here?

6    A.  Correct.

7    Q.  You refer to Holmes.  Can we talk a little bit more about

8    Holmes for a second?  Can you summarize the state of your

9    negotiations with Holmes during this time period, the 2014 time

10   period?

11   A.  Yes.  Holmes, we were negotiating with Holmes chicken, and

12   I had pricing from them also for 2015.  And their prices were

13   significantly lower than Claxton and Pilgrim's.

14   Q.  When you say significantly lower than Claxton and

15   Pilgrim's, can you give us a ball park?

16   A.  About 10 cents a pound lower.

17   Q.  So would it be fair to say about half as much of an

18   increase?

19   A.  That's about correct, yes.

20   Q.  Now, Holmes you mentioned is located in Nixon, Texas?

21   A.  Yes.

22   Q.  So what Pollo Tropical restaurants was Holmes serving?

23   A.  Primarily the Texas market.

24   Q.  Did you ultimately arrive at an agreement with Holmes at

25   the conclusion of the negotiations in 2014?

Joseph Brink - Direct

1   A.  Yes, we did.

2   Q.  And what approximately did you end up with in terms of a

3   price with Holmes?

4   A.  I do believe we had 9 cents a pound price increase for

5   2015.

6   Q.  So of the three suppliers that you were negotiating with

7   through the 2014 negotiation process, Holmes was the lowest?

8   A.  Yes, sir.

9   Q.  Did you consider purchasing more product from Holmes and

10  less product from Pilgrim's and Claxton because of the

11  difference in price between them?

12  A.  Yes, I did.

13  Q.  And what did you ultimately determine?

14  A.  We were able to get Texas covered and they were able to

15  fill in some weights going to Florida, but they did not have

16  the capacity to take on our entire business.  And we can't do

17  that.  I didn't want to have all my chicken coming from Texas

18  going all the way to Florida.

19  Q.  Why didn't you want to have all your chicken coming from

20  Texas to Florida?

21  A.  It defeats the purpose of having multiple plants located

22  around the country to protect us from storms, hurricanes,

23  freezing temperatures.  It's better to have your chickens

24  spread across the country.

25  Q.  The second paragraph, first sentence, you say, "The

Joseph Brink - Direct

1  increase is 19 cents per case."  Do you see that?

2  A.  Yes.

3  Q.  What did you mean by 19 cents per case?

4  A.  I meant to say 19 cents per pound.

5  Q.  And then you say, "That is basically what Pilgrim's is

6  charging us."  What did you mean by that?

7  A.  I was giving him guidance that the pricing that he's giving

8  us is the same price as -- basically pretty darn close to

9  Pilgrim's.

10  Q.  That's pretty explicit guidance referring to Pilgrim's

11  there by name.  What was your purpose for doing that?

12  A.  Because previously we were talking about that Pilgrim's

13  should be lower in price because they're bigger than Claxton.

14  I was referring back to them to tell him that his prices were

15  basically the same price as Pilgrim's.

16  Q.  I would like to go back in time just a little bit to before

17  you actually received a formal proposal from Pilgrim's.

18  A.  Okay.

19  Q.  Did you have any meetings or any discussions with

20  Mr. Little about chicken supply for 2015 before he submitted

21  the proposal to you?

22        MR. BELLER:  Objection, calls for hearsay.

23        THE COURT:  It was a yes/no question.  He can answer.

24  Overruled.

25  A.  Yes.

Joseph Brink - Direct

1    *BY MR. TORZILLI:*

2    *Q.* You did have a discussion with him?  And where and

3    approximately when did that discussion occur?

4    *A.* It was late August, early September, we had a lunch meeting

5    at the Pollo Tropical restaurant in Addison, Texas.

6    *Q.* And what was the purpose of the -- before you actually got

7    to the restaurant, what was the purpose of the meeting?

8    *A.* Really, we had not seen each other for a while.  It was to

9    catch up, to go over are there any issues, you know, anything

10   to discuss about chicken product specs not being correct,

11   delivery issues, anything that would pertain to something that

12   Jimmie could help fix.

13   *Q.* Did the subject of chicken supply and prices for the

14   following year come up during the meeting?

15   *A.* Yes, it did.

16   *Q.* Can you summarize the discussions on that topic, please?

17          *MR. BELLER:* Objection, calls for hearsay.

18          *THE COURT:* Response?

19          *MR. TORZILLI:* 801(d)(2)(A).

20          *THE COURT:* Overruled.  He may answer.

21          *MR. BELLER:* If that's the case, Your Honor, I would

22   request a limiting instruction under 801(d)(2)(A).

23          *THE COURT:* Let's have a side bar, then, real quick.

24      (At the bench:)

25          *THE COURT:* I may have misunderstood.

Joseph Brink - Direct

1    So Mr. Torzilli, did you mention that this was only

2  offered pursuant to 801(d)(2)(A)?

3    MR. TORZILLI:  Yes, sir.  This is a statement by a

4  party that we are offering against the party.

5    THE COURT:  I will provide that limiting instruction.

6  Thank you.

7    (In open court:)

8    THE COURT:  Ladies and gentlemen, for purposes of this

9  meeting any statement of Mr. Little can only be considered

10  against Mr. Little, not the other defendants.

11    Go ahead, Mr. Torzilli.

12  BY MR. TORZILLI:

13  Q.  Mr. Brink, can you summarize what occurred at the meeting

14  on the topic of chicken prices and chicken supply to Pollo

15  Tropical for the then following calendar year 2015?

16  A.  Towards the end of our lunch, the topic of chicken came up

17  for pricing for next year.  And Jimmie said, "It's going to be

18  2."  I said, "2 cents"?  He said, "No.  It will start with a

19  2."  And that's when our meeting ended and I left the

20  restaurant.

21  Q.  So what did you understand him to be saying when he said,

22  "It's going to start with a 2"?

23  A.  Meaning it was going to be at 20 cents or more of an

24  increase per pound.

25  Q.  And what, in fact, was the initial proposal from Mr. Little

Joseph Brink - Direct

1    to you?

2    A.   Two weeks later it was 19 cents a pound.

3    Q.   After you completed the meeting, you walked out as you

4    said, when was the next time you had person-to-person

5    communication approximately with Mr. Little?

6    A.   That would be our meeting we arranged to have on

7    September 22nd, 2014 at 11:30 a.m.

8    Q.   You had said earlier in your testimony that one of the

9    things you do is follow grain?

10   A.   Yes.

11   Q.   And did you have any forecast based on your review of grain

12   as to what you expected chicken prices to be for the following

13   year, so for calendar year 2015?

14   A.   I did not have a definite number yet, but it should have

15   been lower than we were paying now.  So I was really waiting

16   for the proposals to come in to really kind of get more of a

17   guidance from the suppliers on their pricing.

18   Q.   What were you seeing in your study of grain information

19   about what the then current trends were?

20   A.   The grain prices were taking -- they were going down in

21   price.  There was a correction in the market on grain prices.

22   Q.   Did that lead you to an expectation about chicken prices?

23   A.   Yes, it did.

24   Q.   And what was the expectation you formed?

25   A.   Expected the prices to be lower.

72

Joseph Brink - Direct

1   Q.  One more question.  To go back to the September 22nd call

2   that you had with your controller and with Mr. Little, what

3   time did that call take place?

4   A.  11:30 a.m. central time.

5   Q.  How do you know or what leads you to believe that the call

6   occurred at that time?

7   A.  Because I gave the call-in information, the dial number and

8   the pass code to dial in for the meeting.

9   Q.  So you were the meeting host?

10  A.  I was the host, yes.

11  Q.  Sir, if you can open -- you should have a binder -- yeah, a

12  white binder in front of you.  If you can open that up and it

13  should be tabbed.  And behind Tab 1 you should see a document

14  that's been marked as Government Exhibit 548.

15  A.  Yes.

16  Q.  Do you recognize this?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  It's an e-mail from Jimmie Little to myself sent to me on

20  9/16/2014.

21  Q.  So this is a point in time before you received any pricing

22  proposal from him?

23  A.  Correct.

24  Q.  And what is the -- just generally speaking, what is the

25  topic of the communications contained in Government

Joseph Brink - Direct

1   Exhibit 548?

2   *A.*   It's discussing chicken pricing for 2015.

3   *Q.*   And these are e-mails you exchanged with Mr. Little?

4   *A.*   Yes, it is.

5            *MR. TORZILLI:*   Your Honor, the government offers 548

6   into evidence.

7            *THE COURT:*   Any objection to the admission of

8   Exhibit 548?

9            *MR. CANTY:*   No objection.

10           *MR. BELLER:*   Your Honor, Exhibit 548 is nothing but

11  hearsay.

12           *THE COURT:*   Response?

13           *MR. TORZILLI:*   May we have the response on the side

14  bar?

15           *THE COURT:*   Yes, you may, sure.

16     (At the bench:)

17           *THE COURT:*   Mr. Torzilli, go ahead.

18           *MR. TORZILLI:*   Sure.  The response is and the reason I

19  wanted to go on side bar is this is 801(d)(2)(E) material.  I

20  believe it's *James* log entry No. 147 and the ruling resulting

21  from the *James* proceeding.  The Court ruled that the statements

22  contained here are during the course and in furtherance of the

23  conspiracy.

24           *THE COURT:*   Mr. Beller?

25           *MR. BELLER:*   Your Honor, if, in fact, that's true, my

Joseph Brink - Direct

1   apologies to the Court and to Mr. Torzilli for taking the time

2   with this.  I am quickly trying to access several charts that

3   we have made on this -- I have made on this.  I didn't see this

4   particular exhibit, so it may be a fallacy of my charts.  To

5   the extent this is, in fact, included, this is something that

6   we already have been heard on and my apologies.

7        THE COURT:  No problem.

8        Anyone else that may be listening?  Okay.  I will

9   overrule the objection, then, and it will come in as

10  801(d)(2)(E) statements.  Thank you.

11     (In open court:)

12       THE COURT:  The objection will be overruled.  Go

13  ahead, Mr. Torzilli.

14       MR. TORZILLI:  Thank you.  I'd offer 548 into

15  evidence, then, if it's not already been received.

16       THE COURT:  Exhibit 548 will be admitted.

17       MR. TORZILLI:  And permission to publish 548?

18       THE COURT:  You may.

19  BY MR. TORZILLI:

20  Q.  Mr. Brink, I would like to draw your attention in

21  Government Exhibit 548 to the first e-mail, so the e-mail at

22  the bottom from Mr. Little where he says, "When works for you

23  to know 2015 pricing?  I don't want you to be ready," which let

24  me first ask whether you understood Mr. Little to have a typo

25  in that sentence?

Joseph Brink - Direct

1    A.   Correct.

2    Q.   And then did you have a discussion with Mr. Little around

3    this time about the pricing?

4    A.   Yes.   That was when -- after our meeting we had at the

5    restaurant, this was the follow-up e-mail that Jimmie sent to

6    me.

7    Q.   And then in the next e-mail, this is an e-mail that you

8    wrote; is that right?

9    A.   Yes, it is.

10   Q.   And can you read your e-mail to the jury, please?

11   A.   Yeah.   On September 15, 2014, I wrote, "After our last

12   conversation has something changed?   There is no justification

13   for the price increase that you talked about."

14   Q.   You refer to "no justification for the price increase."

15   What did you mean to tell Mr. Little with that part of your

16   message?

17   A.   That the pricing that was initially hinted at at our lunch

18   was way too high.

19   Q.   And you use the term "justification."   What's your basis

20   for saying there was no justification.

21   A.   Because of the grain prices and that's the main reason.

22   Q.   Now, Mr. Little had told you in -- I realize it's a

23   subsequent conversation about big bird versus small bird and

24   relative margins.   What was -- when you heard that from

25   Mr. Little, did you give that consideration in terms of how

Joseph Brink - Direct

1   your negotiating position might be changed?

2   A.  I don't understand your question.  I'm sorry.

3   Q.  Sure.  There came a time, am I correct, when Mr. Little

4   related to you about the need for small bird margins to be

5   increased in some way to relate more closely to big bird

6   margins?

7   A.  Correct.

8   Q.  And when you heard that, did you give that any

9   consideration?

10  A.  No, I did not.

11  Q.  Okay.  Why did you give it no consideration?

12  A.  Because it's not the same chicken.  You can't buy large

13  chickens and use it in our restaurants.  In our current format,

14  it will not work.

15  Q.  Why not?

16  A.  The final output of a large chicken plant yields more

17  pounds of chicken with the same amount of labor as it takes for

18  a small bird plant.  Therefore, they can -- their output of

19  chicken on a large bird plant is greatly more than a small bird

20  plant utilizing the same amount of labor.  Therefore, that

21  justifies their higher margins.

22  Q.  If you could turn to Tab 2 in your binder, and there you

23  should find Government Exhibit 566.

24          Do you recognize this, sir?

25  A.  Yes, I do.

Joseph Brink - Direct

1   Q.  What is it?

2   A.  These are e-mails from Jimmie Little and myself going back

3   and forth on chicken prices.

4   Q.  What's the time frame for these e-mails?

5   A.  Starting on September 29th and ending through October 2nd.

6   Q.  Are these e-mails a continuation of the discussions and

7   negotiations you were having with him about supply and prices

8   for 2015?

9   A.  Yes, it was.

10          MR. TORZILLI:  Your Honor, the government offers 566

11  into evidence.

12          THE COURT:  Any objection to the admission of

13  Exhibit 566?

14          MR. CANTY:  No objection.

15          THE COURT:  Exhibit 566 will be admitted.

16          MR. TORZILLI:  Thank you, Your Honor.  And permission

17  to publish?

18          THE COURT:  You may.

19          MR. TORZILLI:  And if we can go to the second page to

20  call up the initial e-mail.

21  BY MR. TORZILLI:

22  Q.  So on the screen, Mr. Brink, should be the initial e-mail

23  in this set of communications between you and Mr. Little.  Do

24  you see it?

25  A.  Yes, I do.

Joseph Brink - Direct

1   Q.  And who wrote the initial communication?

2   A.  This is from Jimmie Little to myself received on

3   September 29th, 2014.

4   Q.  And can you please summarize what this e-mail is about?

5   A.  This is an e-mail from Jimmie Little offering the official

6   2015 pricing proposal.  And he offered us a packaged offer and

7   the pricing is FOB.  He did not have the freight cost added

8   into it.  And the package deal is for split chickens and the

9   boneless breast meat chickens.

10  Q.  What did you understand packaged deal to mean -- packaged

11  offer, excuse me, to mean?

12  A.  That I cannot take one of the chickens without the other.

13  Q.  Did you have an understanding as to what might happen to

14  the price of the products if you decided to not proceed with

15  the products on a package basis?

16  A.  I would get a new pricing proposal which would be higher.

17  Q.  You mentioned FOB.  What does that stand for and what does

18  it mean?

19  A.  Basically it's freight onboard.  It's the pricing of the

20  chicken that's at the manufacturing plant before it gets

21  shipped from the plant to the final destination.

22  Q.  Is FOB a delivered price?

23  A.  No.

24  Q.  What would need to be included to convert FOB to a

25  delivered price?

Joseph Brink - Direct

1    *A.*  They would have to add the cost of the freight.

2    *Q.*  Mr. Brink, in the second line of the e-mail that we are

3    focused on, there is a part of a sentence that says, "Visit

4    with your team to explain the small bird supply issue."  Do you

5    see that?

6    *A.*  Yes, I do.

7    *Q.*  What did you understand Mr. Little to be raising with you

8    there?

9    *A.*  That he was willing to come to our office to meet with the

10   executive team to explain the small bird supply issue at my

11   convenience.

12   *Q.*  What did you understand the small bird supply issue that he

13   is raising here to refer to?

14   *A.*  That there was a lack of smaller birds in the market.

15   *Q.*  Is that the dynamics you just explained a couple minutes

16   ago?

17   *A.*  Yes.

18   *Q.*  Let's look at the next message.  It's at the top of Page 2,

19   Exhibit 566.  So what's this?

20   *A.*  This is an e-mail I sent to Jimmie questioning about the

21   pricing he gave to us that did not have the total amended cost

22   for the freight included in the pricing.

23   *Q.*  What did you want -- what, if anything, did you want

24   Mr. Little to do?

25   *A.*  Give him guidance to get better pricing so we could have

Joseph Brink - Direct

1   our FOB and delivered costs together and get pricing back in

2   line, helping them to give them guidance.

3   Q.  You say in the second sentence, "Your competitors have

4   submitted pricing that matches you but it was delivered

5   pricing."  Do you see that?

6   A.  Yes.

7   Q.  Now, first I want to ask you about that term "competitors."

8   It's plural there.  Who are you referring to when you say your

9   competitors?

10  A.  Our current suppliers that we had bids coming in from.

11  Q.  So that would be -- you were intending there both Claxton

12  and Holmes?

13  A.  Yes.

14  Q.  And then what did you mean by that sentence that it matches

15  but it was delivered pricing?

16  A.  Basically telling him that his pricing, his FOB pricing was

17  just way too high compared to my other competitors that I had

18  pricing with.  We had delivered pricing lower than his FOB

19  pricing.

20  Q.  And then in the third paragraph there is a sentence, the

21  first sentence there, it says, "Since you all."  Do you see

22  that?

23  A.  Yes.

24  Q.  Can you read that sentence to the jury, please?

25  A.  "Since you all are charging us these exorbitant pricing, I

Joseph Brink - Direct

1    want to know the pricing formula, which markets, etc."

2    *Q.*   You use the term "you all" there.  Who are you referring to

3    when you use you all?

4    *A.*   Pilgrim's.

5    *Q.*   And then in the last -- what do you mean by exorbitant

6    pricing?

7    *A.*   The prices were way too high compared to what it should be.

8    *Q.*   So the proposal that you had received from him that appears

9    in the initial e-mail, is that what you're referring to?

10   *A.*   Yes, sir.

11   *Q.*   And then in the last sentence -- I'm sorry, in the last

12   paragraph and the last sentence, you say "match your

13   competitors."  Do you see that?

14   *A.*   Yes.

15   *Q.*   Okay.  What are you trying to refer to when you say "then

16   you match your competitors?"

17   *A.*   That he should have his final delivered pricing in to us so

18   I could match up the final cost going into a distributor, so I

19   can match apples to apples or chicken to chicken.

20   *Q.*   And what was your overall purpose of this e-mail?  What

21   were you trying to get Mr. Little to do?

22   *A.*   They were one of our incumbents.  I was trying to guide and

23   help him to get him to lower his pricing.

24        *MR. TORZILLI:*  If we can go to the next set of e-mails

25   in 566.

Joseph Brink - Direct

1    *BY MR. TORZILLI:*

2    *Q.*  So on your screen are the next set of e-mails.  Can you

3    just summarize what's going on in that set of e-mails?

4    *A.*  Jimmie was sending me e-mails as he had the pricing now for

5    freight.  And he was basically telling me what the new price

6    would be for the freight added for the chicken.

7    *Q.*  And once you add the freight, what did that make the total

8    delivered price?

9    *A.*  Where is the freight here?  There was no pricing here for

10   freight.  He said here there was "No change in FOB but will add

11   freight."  He wanted to know if he can come by the new store

12   and I told him that we're just busy.  So he had not given us

13   the freight rate yet.

14   *Q.*  That's what you had requested, though.

15   *A.*  Correct.

16   *Q.*  And then in the e-mail that -- if you look at the screen

17   that's at the top of the screen, the one that begins with "I",

18   "I am in Houston?"

19   *A.*  Yes.

20   *Q.*  Can you read that second sentence that begins with,

21   "Again"?

22   *A.*  "Again your competitors are lower than you with delivered

23   pricing compared to your FOB pricing.  Pilgrim's needs to match

24   to show compromise."

25   *Q.*  And what was the message you were trying to convey to

Joseph Brink - Direct

1    Mr. Little there?

2    A.   That his pricing, his FOB pricing was higher than I had

3    from my competitors.

4    Q.   And what was the purpose of delivering that message to him?

5    A.   To help guide my supplier to lower his pricing.

6    Q.   And let's look at the next set of e-mails here in 566.

7    Let's start with the one -- what is now at the bottom of the

8    screen from Mr. Little.  And what's going on in that message?

9    A.   This was the e-mail that Jimmie sent to me on October 2nd,

10   2014, and he did provide the freight cost delivered to Kelly's

11   Food Service.

12   Q.   What was the amount of the freight for those deliveries to

13   Kelly's?

14   A.   .05125 cents a pound.

15   Q.   And what did that make the total delivered price that was

16   being proposed for the splits?

17   A.   Makes it .19125 cents per pound.

18   Q.   How did you come up with that computation?

19   A.   I took the FOB price of $1.02 plus Kelly's freight rate of

20   .05125 cents per pound to get a total cost of 1.07125 per

21   pound.

22   Q.   1.07125?

23   A.   Yes.

24   Q.   Thank you.  And then what was your response to Mr. Little?

25   A.   Basically told him this is not going to work.  He needs to

Joseph Brink - Direct

1    lower his pricing.

2    Q.  And again you used the term "your competitors" with a

3    plural, right?

4    A.  Correct.

5    Q.  And why did you use competitors with plural?

6    A.  Because both competitors delivered pricing was still lower

7    than Pilgrim's.

8    Q.  Did you have anything in mind in terms of how much you

9    wanted Pilgrim's to lower its price at this point in time?

10   A.  I don't recall.

11   Q.  Let's look at the final message here.

12        MR. BELLER:  Your Honor, I am going to object at this

13   point.  It's just unnecessarily cumulative.  This is redundant.

14   The document is in front of the jury.  And this has been going

15   on for multiple hours that we have the witness testify about

16   statements that the jury can read for themselves.  I think for

17   purposes of moving the trial along, I am objecting.

18        THE COURT:  All right.  Overruled.

19        Go ahead, Mr. Torzilli.

20   BY MR. TORZILLI:

21   Q.  Who wrote the top e-mail in 566?

22   A.  Jimmie Little wrote the e-mail to myself on 10/3/2014.

23   Q.  Can you read that first sentence to the jury, please?

24   A.  It says, "Joe, we will need to hold on our current

25   pricing."

Joseph Brink - Direct

1   Q.   You see the use of the term "hold" here?

2   A.   Yes.

3   Q.   Do you have an understanding of what Mr. Little was trying

4   to convey to you with hold?

5   A.   Meaning he was not going to change the pricing proposal

6   that he just gave to me.

7   Q.   Is that a term -- hold a term that in your experience

8   negotiating contracts has come up from time to time?

9   A.   Yes.

10  Q.   And so generally speaking, what did you understand that to

11  mean based on your experience?

12  A.   That there was no further discussion on pricing, that the

13  pricing proposal that was submitted was the final pricing

14  proposal.

15  Q.   And what does Mr. Little ask you to do at the conclusion of

16  this e-mail?

17  A.   He said "I've tried to call you multiple times," and I was

18  traveling opening up new restaurants.  It says, "We need to

19  discuss by end of day as both companies need to make plans for

20  supply for 2015."

21  Q.   And he left you his number?

22  A.   Yes, he did.

23  Q.   Did you call him?

24  A.   I'm sure I did.

25  Q.   Do you recall the phone conversation that you initiated as

Joseph Brink - Direct

1   a result of this e-mail?

2   *A.*  I was at the restaurant, a new store opening.  I called

3   Jimmie and we had to secure the chicken for 2015.

4   *Q.*  What do you mean by secure the chicken for 2015?

5   *A.*  Make an agreement that we are going to proceed with 2015 as

6   Pilgrim's being a supplier for us.

7   *Q.*  Is that what Mr. Little told you?

8          *MR. BELLER:*  Objection, calls for hearsay.

9          *THE COURT:*  Response?

10         *MR. TORZILLI:*  801(d)(2)(A).

11         *THE COURT:*  All right.  Ladies and gentlemen, the

12   response of Mr. Little can only be considered against

13   Mr. Little, not the other defendants as to this particular

14   conversation.

15         Go ahead.

16   *BY MR. TORZILLI:*

17   *Q.*  What do you recall Mr. Little saying to you on the phone

18   conversation you had with him?

19   *A.*  That the pricing that we have submitted, meaning Pilgrim's,

20   was the final pricing, and we have to secure chicken for both

21   companies.  And he gave me our volumes, and the volumes he gave

22   to us that he was going to let me have for the company was less

23   than we had before.

24   *Q.*  After you had the conversation you just related with

25   Mr. Little, what, if anything, did you do next?

87

Joseph Brink - Direct

1   A.  I don't understand your question.  I'm sorry.

2   Q.  Okay.  After you completed your conversation that you just

3   testified to --

4   A.  Yes.

5   Q.   -- what was the next thing you did in the negotiations to

6   secure chicken supply from Pilgrim's for the following calendar

7   year?

8   A.  We had to secure the chickens and we got -- we had to now

9   agree to how much volume of chicken they were going to provide

10  for us.  Typically we book our annual usage, but this time

11  Pilgrim's was only going to allow me to buy it by the week plus

12  or minus 10 percent.

13  Q.  Can you explain what that means?

14  A.  When we purchase chicken for the whole year, we give a

15  supplier X amount of pounds and that's how much we're going to

16  hit our target to buy for the year.  When a supplier changes

17  that and gives us a per-week usage, you're allowed to have a

18  hundred thousand pounds plus or minus 10 percent.  So if I

19  exceed -- my demand for chicken exceeds more than 10 percent,

20  they would not fill my needs for chicken.

21  Q.  Was that approach to supplying you a change from what you

22  had experienced with Pilgrim's in previous years?

23  A.  Yes.

24  Q.  Do you have an understanding as to why Pilgrim's changed

25  their approach to supplying Pollo Tropical?

1    A.   No, I do not.

2    Q.   Is that something you ever asked Mr. Little or anyone else

3    at Pilgrim's about?

4    A.   I don't remember.

5    Q.   Did you eventually come to an agreement with Pilgrim's?

6    A.   Yes, we did.

7    Q.   And if you can turn to Tab 5.  You should find what's been

8    marked as Government Exhibit 572.

9         THE COURT:  Maybe, Mr. Torzilli, since we are just

10   about at 5:00, would this be a convenient breaking spot?

11        MR. TORZILLI:  Perfect time, Your Honor.

12        THE COURT:  Okay, great.

13        Ladies and gentlemen, we will go ahead and break for

14   the day.  We will have you come back tomorrow at the usual

15   time, 8:30.  Remember to keep the admonitions in mind.  Don't

16   let people talk to you about the case.  Obviously, don't talk

17   among yourselves about the case.  And we'll see you back

18   tomorrow at 8:30.

19        The jury is excused.

20        (Jury excused.)

21        Mr. Brink, you are excused until tomorrow at 8:30.

22   Thank you very much.

23        Anything we should talk about before we recess?

24        Ms. Nielsen, go ahead.

25        MS. NIELSEN:  Your Honor, I need to ask the Court's

 1   permission to not be present tomorrow.  I have a trial set in

 2   Weld County.

 3        THE COURT:  You are double dipping?

 4        MS. NIELSEN:  I am double dipping.  I wish I wasn't.

 5   I was making objections today and I anticipated that I would

 6   get through my cross-examination.  So I apologize to the Court

 7   and I will ask -- Mr. Fagg will be back tomorrow.

 8        THE COURT:  Oh, he will?  Given the conflict, Mr. Fagg

 9   can make objections.

10        MS. NIELSEN:  And I apologize to the Court.

11        THE COURT:  No problem.  Thank you.

12        Mr. McLoughlin?

13        MR. McLOUGHLIN:  Mr. Fagg is in the air.  We haven't

14   figured out who is going to do what yet, but...

15        THE COURT:  Right.  Obviously, were something to

16   prevent Mr. Fagg from being here, then we would go to plan C.

17        MR. McLOUGHLIN:  I am happy to be plan C, I guess.

18        THE COURT:  Well, the next plan.  I don't want to be

19   disparaging in terms of alphabetical order.

20        MR. McLOUGHLIN:  I have been lowered down.

21        THE COURT:  Anything else we should talk about today?

22        All right.  We will be in recess then until 8:30.

23   Thank you.

24        (Recess at 5:01 p.m.)

25

1                                      INDEX

2        WITNESSES

3            Joseph Brink

4                Direct Examination By Mr. Torzilli                    5

5                                    EXHIBITS

6        Exhibit        Offered   Received   Refused   Reserved   Withdrawn

7        548                          74

8        566                          77

9        9740                         27

10                          REPORTER'S CERTIFICATE

11           I certify that the foregoing is a correct transcript from

12       the record of proceedings in the above-entitled matter.   Dated

13       at Denver, Colorado, this 5th day of December, 2021.

14

15                                    S/Janet M. Coppock

16

17

18

19

20

21

22

23

24

25