**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,

    Defendants.

## UNITED STATES' PRE-TRIAL RENEWED MOTION TO EXCLUDE EXPERT TESTIMONY

The government pre-trial respectfully renews its motion to exclude expert testimony: (1) relating to benchmarking, which is not probative of any element of the crime; (2) relying on privileged materials and otherwise unreliable information; and (3) transmitting or interpreting hearsay in communications, such as text messages and emails.[1]

---

[1] The government filed a motion seeking similar relief on November 26, 2021, ECF 872, that the Court denied as moot after learning the defendants did not plan to call any expert witnesses, ECF 904.

*Benchmarking*. The defendants' likely expert testimony by Professor Snyder[2] revolves heavily around a competitive benchmarking analysis that should be excluded. According to defendants' expert disclosures:

> Professor Snyder will testify about the results of his benchmarking analyses. Benchmarking is a standard approach used by economists by which one set of data is compared to another. Professor Snyder used benchmarking to compare the prices at issue to prices that were not alleged to have been affected by the alleged conspiracy. To perform his benchmarking analyses, Professor Snyder relied on a data set comprised of *prices paid by a sample of buyers of comparable products and prices charged by a sample of suppliers of comparable products* across various time periods. Professor Snyder is expected to testify that the benchmarking analyses showed that the prices at issue were not systematically higher than a database of benchmark prices, including prices not alleged to have been affected by the alleged conspiracy, and, therefore, are inconsistent with the alleged price-fixing and bid-rigging conspiracy.

Attach. A at 1 (emphasis added) (footnote omitted).

The benchmarking analysis is irrelevant. A benchmarking analysis is a retrospective-type analysis that compares one set of transactions that presumably occurred in an effectively competitive market against a set of transactions that occurred in a collusive market. While this type of analysis may be relevant in a private civil antitrust case involving treble damages, *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 164 (S.D. Ind. 2009) (describing benchmarking analysis as "appropriate for assessing common impact and damages in a class action"), it is an irrelevant and confusing econometric exercise has no place in this criminal trial. The "prices paid by a

---

[2] Defendant Blake also noticed an economic expert, Dr. Aparna Sengupta. Because Defendant Blake did not request reciprocal discovery, the government has no information about what Dr. Sengupta will testify to. She may similarly testify about a benchmarking analysis.

sample of buyers of comparable products and prices charged by a sample of suppliers of comparable products" are unconnected to the conspiracy, its participants, or its victims.

The irrelevance of the defendants' expert benchmarking analysis is revealed by the economic literature that the defendants themselves cite. The defendants' supplemental disclosures cite to two articles. One article is entitled "Measuring Benchmark Damages in Antitrust Litigation."[3] There is of course no such thing as damages in a criminal antitrust case and, in any event, the defendants themselves moved *in limine* to preclude the government from offering damages evidence in the form of consumer harm or loss. ECF 528 at 1 ("Defendants respectfully submit this motion *in limine* to exclude evidence of alleged losses or harms to end consumers resulting from the charged conspiracy."). The other article is entitled "Evaluating Market Power Using Competitive Benchmark Prices Instead of the Herfindahl-Hirschman Index."[4] Market power, or its analog, anticompetitive effects, is an element of a civil rule-of-reason Section 1 claim, *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018), but they are irrelevant to this criminal case that charges a *per se* illegal price-fixing and bid-rigging conspiracy, *see Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (noting *per se* illegal agreements among competitors such as price fixing do not require anticompetitive effects evidence).

---

[3] McCrary, Justin and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," J. Econometric Methods, 2014.
[4] Hausman, Jerry A. and J. Gregory Sidak, "Evaluating Market Power Using Competitive Benchmark Prices Instead of the Herfindahl-Hirschman Index," Antitrust L. J. 2007.

3

Even if marginally relevant, the testimony does not speak to the existence of the conspiracy. The defendants' sparse disclosure indicates that Professor Snyder's testimony is based on the false premise that there are sales that occurred under effectively competitive conditions, meaning sales in a control group were transacted at a competitive price rather than a price higher than the competitive level. The defendants have no way of demonstrating that any control group prices they select were unaffected by anticompetitive forces, including the price-fixing conspiracy charged in this case and other anticompetitive conspiracies not at issue in this criminal trial.[5] Without a basis to show that a control group is untainted, a benchmarking analysis cannot shed any light on whether the conspiracy charged in this case existed. *See Aegerter v. City of Delafield* 174 F.3d 886, 891-92 (7th Cir. 1999) (identifying the "cellophane fallacy" that resulted from the from the Supreme Court's failure in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956), to recognize that cellophane's then-current price was above competitive levels making the Court's analysis reach a false conclusion about the substitutability of cellophane to other products). As a result, the analysis would not aid the jury in determining any fact at issue.

Similarly, to assess whether any defendants knowingly joined the conspiracy, the defendants must show at a minimum that the data used in the analysis was something known to and used by the defendants during the conspiracy period. That is the minimum that would be required to establish that any analysis could shed light on any

---

[5] As a consequence, any fair cross examination of defendants' benchmarking analysis will necessitate significant questioning about the conspiracies alleged in the *In re Broilers* civil litigation.

defendant's state of mind. Evidence that does not pertain to actions a defendant took or what a defendant was actually aware of at the time cannot be used to establish his state of mind. Therefore, to the extent the defendants cannot show they were privy to the dataset at the time—and the government has not seen evidence that the defendants were—these data are not relevant to their participation in the conspiracy.

*Privilege and Reliability*. On November 11, 2021, the government learned that the defendants in the *In re Broilers* civil litigation had claimed privilege over 136 of the defendants' trial exhibits, including documents related to the data obtained by and modified by Edgeworth Economics,[6] and they even claimed privilege over documents detailing how that data were modified. Upon receipt of the privilege claim, the government sequestered the materials. The civil defendants, who are the privilege holders, have since informed the government that they may assert privilege over additional documents. The defendants do not dispute the privilege claims as they have removed the 136 potentially privileged exhibits from their exhibit list, and pledged not to offer them into evidence. However, the defendants have failed to respond to the government's question of whether they intend to present expert testimony or other evidence that relies in some way upon the privileged materials.[7]

Any such testimony or evidence should be excluded. Information related to how Edgeworth modified the data is privileged, meaning that any economic expert

---

[6] Edgeworth Economics is the economic consulting firm that the civil defendants retained to render economic expert services.
[7] The defendants' sparse expert disclosures, including no disclosures regarding Dr. Sengupta, are insufficient for the government to know the degree to which the experts have relied on the privileged documents.

5

necessarily cannot fully appreciate its origins or alterations. The details of selection, reporting, cleaning, and manipulation of raw data are central to determining the appropriate methodology for analysis and the proper interpretation of results, meaning any conclusion drawn without this information would be speculative at best. Indeed, since the claims in the civil antitrust case differ, the data may be unsuited to addressing questions at issue at this case, which could only be determined by understanding the details of its construction. Therefore, the data that Edgeworth modified is not of the type reasonably relied upon by other economists in the field under Fed. R. Evid. 702.[8]

There is also no basis for the Court or the parties to conclude, due to the privilege issues, that the evidence underlying the expert testimony is both relevant and reliable under Federal Rule of Evidence 703. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Likewise, the privilege issues prevent the defendants' experts from gaining the requisite "familiarity with the methods or reasoning used by" Edgeworth to modify the data. *HealthOne of Denver, Ind. v. UnitedHealth Grp. Inc., No*. 10-CV-01633-WYD-BNB, 2012 WL 94678, at *6 (D. Colo. Jan. 12, 2012).

Moreover, the government will be unfairly prejudiced by any expert testimony relying on privileged materials from Edgeworth, as there is no way to conduct meaningful cross examination of expert testimony that relies on sequestered materials. *Cf. Licciardi v. TIG Ins. Group*, 140 F.3d 357, 363 (1st Cir. 1998) (finding an abuse of

---

[8] As the government understands Edgeworth's work in the *In re Broilers* civil matter, it received data from broiler chicken suppliers, and modified the data in order to normalize it. The process of modifying the data, including the decisions Edgeworth made about the ways in which to modify the data–and why–is in part subject to the privilege claims.

6

discretion where district court admitted testimony by an expert where the opposing party "had no opportunity to . . . conduct a meaningful cross examination."); *Freund v. Fleetwood Enterprises*, 956 F.2d 354, 358 (1st Cir. 1992) (excluding expert testimony where a late disclosure prevented party from preparing a meaningful cross-examination of expert).

Finally, permitting the defendants to use data that is a work product from the civil litigation will run counter to the motion *in limine* that the defendants filed and the Court granted: to exclude evidence or argument regarding any civil litigation related to this criminal case. ECF 603 at 9. Any fair cross examination of expert testimony based on these data will require probing the data's reliability, which will entail presenting to the jury the fact that the data was manipulated by economic experts at Edgeworth during a lawsuit ahead of the defendants in this case receiving it. Even if remedies can be fashioned to limit the description of the lawsuit, it will be imperative for the jury, in assessing the weight to be given to the evidence, to know that Edgeworth altered the data for use in litigation to *resist* price fixing claims against suppliers (including the suppliers that employed all ten defendants). As there are not readily apparent ways to convey that information to the jury, the Court should not permit the testimony.

*Interpreting Communications*. The government suspects that the defendants may attempt to elicit expert testimony that transmits or interprets hearsay in communications, such as text messages and emails. As explained in their May 14, 2021, expert disclosure, Professor Snyder may testify that "documentary evidence suggest[s] alternative, non-conspiratorial explanations and motivations for the challenged conduct."

7

ECF 299.1 at 18.

An expert may not simply transmit hearsay to the jury. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citing *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)). Even if the defendants' experts appropriately rely on hearsay, they should not be permitted to disclose any such hearsay—such as co-conspirator or victim/customer communications—because the prejudice resulting from the publishing of inadmissible evidence to the jury substantially outweighs any probative value from those communications.

The defendants' experts also should not be permitted to interpret or opine on co-conspirator or victim/customer communications because they have neither the expertise nor the methodology to do so. Professor Snyder is an economist, and nothing in his experience suggests that his expertise encompasses those types of communications. The effect of permitting such testimony would simply be to cloak defense counsel's arguments in the veil of expert testimony, usurping the jury's fact-finding function and unfairly prejudicing the government. *See Thames v. Evanston Ins. Co.*, 13-CV-425-PJC, 2015 WL 3398147, at *2 (N.D. Okla. May 26, 2015) ("Expert testimony that would mirror counsel's arguments during the trial would not be helpful.").

*Daubert hearing*. As an alternative to exclusion, the government respectfully requests that the Court convene a *Daubert* hearing to determine if the defendants' likely expert evidence meets the threshold for admissibility under Rules 702-704.

Dated: February 3, 2022					Respectfully submitted,

By: /s/ Michael T. Koenig
    Michael T. Koenig
    Heather D. Call
    Carolyn M. Sweeney
    Paul J. Torzilli
    Trial Attorneys
    Antitrust Division
    U.S. Department of Justice
    Washington Criminal II Office
    450 Fifth Street, N.W.
    Washington, D.C. 20530
    Tel: (202) 616-2165
    michael.koenig@usdoj.gov
    Attorneys for the United States