```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

   Criminal Action No. 20-CR-00152-PAB
3

   UNITED STATES OF AMERICA,
4

        Plaintiff,
5

   vs.
6

   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                        REPORTER'S TRANSCRIPT
14                       Trial to Jury, Vol. 5

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:19 a.m., on the 1st day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
 1                          APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6           Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washingon, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1              APPEARANCES (Continued)
 2          Laura F. Carwile of Reichman, Jorgensen, Lehman,
 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
 4    CA 94065; appearing for Defendant Austin.
 5          Elizabeth B. Prewitt of Latham & Watkins, LLP,
 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;
 7          Marci Gilligan LaBranche of Stimson, Stancil,
 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO
 9    80218, appearing for Defendant Mulrenin.
10          James A. Backstrom, Counselor at Law, 1515 Market
11    Street, Suite 1200, Philadelphia, PA 19102-1932;
12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,
13    Bethesda, MD 20814, appearing for Defendant Kantola.
14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth
15    Street, Suite 1100, Los Angeles, CA 90017;
16          Dennis J. Canty, Canty Law Corporation,
17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,
18    appearing for Defendant Little.
19          John Anderson Fagg, Jr. and James McLoughlin of
20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.
22
23
24
25
```

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16         THE COURT:  We are back on the record.  Mr. Byrne is

17   not here again; is that right?

18         MR. CANTY:  We do expect him back this week, but not

19   yet.  In his stead we have Ms. Durwin, Jennifer Durwin.

20         THE COURT:  Great.  But I think everybody else is

21   present.

22         The attorneys indicated that there was an issue to

23   take up regarding Mr. Bryant and his immunity agreement.

24         Mr. Tubach, go ahead.

25         MR. TUBACH:  Good morning.  Late yesterday we filed a

1    short document that simply attaches the immunity document that

2    we proposed be used if necessary.  And we also attached the

3    government --

4         THE COURT:  I have had a chance to look at that,

5    right, yes.

6         MR. TUBACH:  Thank you.  It's pretty simple.

7         THE COURT:  Yeah, I agree.  Let's hear what Mr. Koenig

8    or whoever else from the government wants to respond on that

9    one.

10        MR. KOENIG:  Yes, sure.  Michael Koenig on behalf of

11   the United States.  We believe this is pretty straightforward.

12   We redacted out all the parts we think don't need to be

13   included, and I don't see anything prejudicial about it.

14        THE COURT:  Is the government's -- what is attached as

15   Exhibit C, is that how the government, assuming it would be

16   used, is that how the government would propose that it appear?

17        MR. KOENIG:  Yes.

18        THE COURT:  With that type of redactions, kind of

19   black line?

20        MR. KOENIG:  Yes.

21        THE COURT:  Here is the problem.  Obviously Exhibit A,

22   which is what defendants are proposing, that doesn't look like

23   the plea agreement.  It's in the form of a stipulation, but has

24   the huge advantage of being specific to Mr. Bryant.  And that's

25   good because it won't cause the jury to speculate about other

1    people or especially, you know, some corporate-wide thing or

2    things of that nature.  So if Exhibit A incorporates it -- it

3    seems fairly comprehensive, but I don't know I have -- I

4    probably have the plea agreement -- but assuming that that has

5    various provisions which could come up, that seems to be a good

6    idea.

7           Now, maybe it's not in the proper form.  Maybe the

8    government doesn't want or we're not going to put in a

9    stipulation to that effect with all that detail.  However, it

10   would seem to offer the foundation for one side or the other to

11   bring out various pertinent provisions of the plea agreement

12   without raising -- you know, causing the jury to speculate

13   about things.  So other than the form of it, I think that the

14   defendants' proposal is by far and away the best.

15          The strike-out version, No. 1, the jury is going to

16   find that very confusing and it always is when you have

17   strike-out type things, but also it is, as the defendants

18   worry, just, you know, clearly the type of document that is

19   much broader, and who knows, it could cause someone to think

20   that maybe this is part of some corporate-wide agreement.

21          *MR. KOENIG:*  Sure.  The only thing I would add is that

22   we did offer to the defendants to negotiate what the text would

23   be either visible or included in their version.  We haven't

24   received word back.  I will say there are things that they want

25   to include such as, you know, Mr. Bryant shall participate in,

1   you know, covert activities and stuff like that, which is just

2   not something that's happened.  And so I think that we'll be

3   okay going with Your Honor's suggestion.  However, I do think

4   that there is some substance issues to be hammered out.

5       THE COURT:  That could very well be true.  For

6   instance, I don't think we should get into things like covert

7   acts which are just -- didn't happen or are irrelevant and

8   would once again cause the jury to speculate about certain

9   types of things.  But otherwise I think that going the route of

10  Exhibit A, something close to that or, you know, that type of

11  approach is much better specific to Bryant.

12      Mr. Tubach?

13      MR. TUBACH:  Your Honor, I was just going to suggest

14  that perhaps at the first break we could sit down with the

15  government and try to hammer out the specific language and

16  propose a stipulation for the Court.

17      THE COURT:  Right.  It doesn't necessarily have to be

18  in the form of a stipulation.  I don't know.  Were you

19  contemplating, Mr. Tubach, that it would be admitted?

20      MR. TUBACH:  No, not necessarily.  It depends, of

21  course, on what the witness says.

22      THE COURT:  Because the whole time I have been

23  thinking that it would just be an agreement between both sides

24  as to what he could be confronted with or what he could be

25  rehabilitated with.  And it wouldn't necessarily -- you know, I

1    wasn't think about an exhibit, per se.  But if there is

2    something that, for instance, once again, it doesn't

3    necessarily have to be in the form of a stipulation, but if

4    there is a document that he can be referred to other than the

5    actual plea agreement so there is no inadvertent mistake, that

6    seems to have a big advantage.

7         MR. TUBACH:  We can certainly restyle the agreement

8    among the parties.

9         THE COURT:  Yeah, whatever.

10        MR. TUBACH:  We will work with the government at a

11   break and try to hammer out the language.

12        THE COURT:  Right.  That sounds excellent.

13        MR. TUBACH:  Thank you.

14        THE COURT:  Yes, go ahead, Mr. Feldberg.

15        MR. FELDBERG:  Michael Feldberg for Mr. Austin.  I

16   should have raised this Thursday, and I apologize, in the

17   discussion we had about Mr. Bryant's testimony.  We have

18   reviewed Your Honor's rulings on witnesses expressing

19   essentially emotions or internal reactions.  We know or we

20   believe from the 302s that Mr. Bryant may testify that he was

21   shocked to hear something.  There is no indication in the 302s

22   that he ever expressed any shock to anyone.

23        Our view is that an internal feeling that he had is

24   not relevant to anything.  It's his state of mind which is not

25   at issue here.  It's simply an internal emotion that he didn't

1    express to anyone.  And therefore, we're raising to the Court

2    whether that should be -- whether he should be permitted to

3    testify to what amounts to a feeling that was unexpressed.

4         THE COURT:  And his -- you fear that his testimony

5    about shock would be in regard to what specifically?

6         MR. FELDBERG:  Well, it's not entirely clear from the

7    302s, but it appears to be to a statement that he says he heard

8    Mr. Austin say about information sharing.

9         THE COURT:  Okay.  Mr. Koenig, are you the one who is

10   going to handle it?  Go ahead.

11        MR. KOENIG:  Yeah.  It's plainly relevant.  It wasn't

12   actually what Mr. Austin said.  It was what another person said

13   to Mr. Austin.  And it was at a time when Robbie Bryant was new

14   to the negotiation scene and, you know, it's relevant to his

15   state of mind as to, you know, thinking wow, this is how this

16   works?  And it's also in contrast to his perception of how

17   Mr. Austin reacted as well.  I just -- I think it's --

18   somebody's state of mind is plainly relevant here.

19        MR. FELDBERG:  There are certain people whose states

20   of mind may be relevant, but Mr. Bryant is not.  He is not on

21   trial here.  He did not as far as we know express this

22   sentiment to anyone, and therefore it's purely an internal

23   emotion which is not at issue in this case.

24        THE COURT:  Unfortunately, I don't think I can rule on

25   it in advance.  I am going to need to hear the testimony.

1    We'll have to see.  I will caution the attorneys, though, that

2    state of mind is not some panacea for the, you know, flooding

3    in of hearsay.  So state of mind can be complicated, but, you

4    know, I think Mr. Koenig is on the whole right.  Usually if a

5    witness has a reaction, the reaction is relevant to

6    something -- that's the issue I can't tell right now -- then it

7    may come in, not necessarily state of mind.  It may just come

8    in because it's an appropriate reaction, but once again, I just

9    can't tell from the context yet.

10        *MR. KOENIG:*  May I also add, Your Honor, Your Honor

11    did rule that people's perceptions whether something is right

12    or wrong is relevant.  And in this case I think that's clearly

13    when he internally thinks, oh, my gosh, what's going on or

14    something like that, that is clearly relevant to him saying I

15    thought this wasn't the right thing to do.

16        *THE COURT:*  Right.  I mean, it could be.  Once again,

17    normally you're not able to get in -- if something occurs, you

18    may not be able to get in, oh, well, when I heard that, here is

19    what I was thinking.  I mean, this isn't like some kind of

20    James Joycean internal monologue that witnesses can talk about

21    in their mind, but if the reaction is relevant, for instance,

22    to explain what was done next or there is something else, then

23    that could make it relevant.

24        *MR. KOENIG:*  Sure.  In this case it is relevant to

25    what happened next in the sense that, you know, we would ask,

1    well, why didn't you say something?  Well, I was the new guy

2    and these other people seemed to -- this was their way of doing

3    business.  I didn't feel comfortable speaking up, or something

4    along those lines.

5            MR. FELDBERG:  But Mr. Koenig's comment right now just

6    demonstrates why it's not relevant because what happened next

7    was nothing.

8            THE COURT:  Right.  So once again, I can't tell yet,

9    but, you know, what Mr. Feldberg just said could be quite

10   pertinent if whatever reaction the witness had didn't matter.

11   It didn't cause anything to happen or not happen.  We'll have

12   to see.

13           It's 8:30, so I think we should get going.  Are people

14   otherwise ready to bring the jury back in?  And hopefully -- I

15   know most of you have, but -- there is Mr. Keech, although he

16   is not on duty anymore.  Ms. Grimm is back.  But I think

17   Mr. Keech is going to maybe hang around just as a transitional

18   matter.

19           Ms. Grimm, are we good on the number of jurors?

20           COURT DEPUTY CLERK:  I need to check.

21           THE COURT:  Okay.  Why don't you go check and we'll

22   see.

23           On the Stiller point, I haven't been able to get

24   through all of that yet, so I won't be able to rule on it or

25   comment on it right away.

1      MS. CALL:  Briefly on that point so you are aware,

2  there was an issue with ECF this morning.  The government did

3  file a response.

4      THE COURT:  I got it, but I haven't been able to get

5  through it all.

6      Why don't you get your witness.  You can bring your

7  witness up right now, whoever your witness is.

8      MR. TORZILLI:  Your Honor, before we call the witness,

9  we have one thing we would like to accomplish in the presence

10 of the jury.

11     THE COURT:  Moving the admission of something?

12     MR. TORZILLI:  Correct.

13     THE COURT:  Well, we don't have to have the witness

14 here necessarily, but as long as the witness is ready to go

15 when we do.

16     MR. TORZILLI:  While we are on the subject, Your

17 Honor, so we need to because of a flight cancellation --

18     THE COURT:  Actually, we are going to hold off on the

19 witness right now because there is another matter.  Thanks a

20 lot.

21     MR. TORZILLI:  We need to take a witness out of order.

22     THE COURT:  Okay.  We are waiting for one juror.

23     Mr. Torzilli, go ahead.

24     MR. TORZILLI:  So we need to take a witness out of

25 order.  The AT&T witness's flight was canceled last night, so

 1   he is not here yet.  So we will be calling Mr. Barela, and

 2   before we do that, we do in the presence of the jury want to

 3   admit some exhibits into evidence.  And that will be handled by

 4   my colleague, Ms. Butte.

 5           THE COURT:  Mr. Tubach?

 6           MR. TUBACH:  Your Honor, it might speed up the process

 7   if we can know which exhibits the government intends to

 8   introduce into evidence so we don't have to thumb through our

 9   binders to look for them.

10           THE COURT:  I think that's a good idea.

11           MS. BUTTE:  We are going to intend to move to admit

12   into evidence some of the exhibit list that we used last week

13   before the custodian of records.  And I have extra copies, but

14   it is Exhibit 9549, 9550, 9551, 9552.

15           MR. McLOUGHLIN:  Your Honor, could you go a little

16   slower please?

17           THE COURT:  Sure.

18           MS. BUTTE:  9552, 9553, 9556, 9557, 9594 and 9660,

19   which is actually a corrected exhibit for Mr. Ward's testimony.

20   The previous exhibit was 9501.  And there are two Bates numbers

21   that had some incorrect digits, so we corrected that.  If you

22   would like, I can go ahead and pass out copies now so everybody

23   has that.

24           THE COURT:  What was the last one?

25           MS. BUTTE:  9660.

1          THE COURT:  That's a new exhibit?

2          MS. BUTTE:  Yes.  It's a revised version of 9501.

3          THE COURT:  Let's go ahead and get those distributed.

4          MR. FELDBERG:  Your Honor, point of clarification.  Is

5     the government moving to admit just the list or the documents

6     on the list?

7          MS. BUTTE:  The documents -- or the list itself, not

8     the documents on the list.

9          MR. FELDBERG:  Thank you.

10         THE COURT:  Which one is that?  9660, is that a list?

11         MS. BUTTE:  Yes, it is.  It's a corrected list of

12    just -- of exhibits.

13         THE COURT:  Is that what Mr. Feldberg asked you about?

14         MS. BUTTE:  I think he asked me about all of them.

15    They are all lists of exhibits that were used before the

16    custodians that testified on Wednesday afternoon and then

17    Thursday.

18         THE COURT:  So each of those documents is a list that

19    the government showed the custodians on Thursday.

20         MS. BUTTE:  Yes, the one exception is 9660, which is

21    just a corrected list for Mr. Ward.  The exhibits on 9660

22    matched what was in his binder, but the list itself that he had

23    had two Bates numbers that were off a digit.

24         THE COURT:  Hold on, Ms. Prewitt.  One second.

25         Ms. Prewitt, go ahead.

1          MS. PREWITT:  I would like a little clarification on

2     the basis for admission.  As I recall, these lists were shown

3     to witnesses, but whoever created it, I don't know if they

4     verified everything on the list.  And perhaps I am

5     mis-recollecting, but we don't have the person who actually

6     compiled it testify.

7          MR. TUBACH:  If I can just add --

8          THE COURT:  Go ahead.

9          MR. TUBACH:  -- it's also just hearsay.  It's just --

10    they are documents with lists of numbers on them, and at least

11    one of them the witness has never seen.  So I am not sure how

12    the government can correct an exhibit that a witness looked at

13    and fix their mistakes and get that in somehow.

14         THE COURT:  Response as to that, Ms. Butte?

15         MS. BUTTE:  Yes, Your Honor.  We intend to admit these

16    under Rule 1006 as summary exhibits.

17         THE COURT:  Interesting theory, summary exhibit of

18    exhibits.  But I guess what's the relevance of the lists?

19         MS. BUTTE:  We just thought it would be easier to

20    create a record of what we believe we laid foundation for

21    authentication on Thursday.

22         THE COURT:  But why would they be admitted for the

23    jury as opposed to -- obviously the government did show

24    witnesses those lists and that may be highly relevant to

25    authenticity, but why is it relevant to the jury since I'm the

1   one who is going to ultimately be deciding whether something is

2   admissible?

3        MS. BUTTE:  We just thought it might be easier to have

4   that a part of the record with the jury, but we are happy to

5   admit the underlying exhibits separately as we proceed during

6   the trial.

7        THE COURT:  Right.  I don't really see the relevance

8   of any of these lists to the jury.  Now, you'll recall way back

9   when a list of admitted exhibits was shown to the jury just so

10  they could see and I wouldn't have to go through this long list

11  of admitting exhibits, but this is different because these are

12  all exhibits, none of which I believe have been admitted yet.

13  So it would be different.  And as a matter of fact, it may be a

14  bit confusing since these are lists of exhibits that have not

15  been admitted I don't believe.

16       MS. BUTTE:  Some of the exhibits have been admitted,

17  Your Honor.

18            THE COURT:  Okay.

19       MS. BUTTE:  For example, some of the exhibits that

20  were part of the basis of Mr. Sangalis' testimony and

21  Mr. Finch's testimony.

22       THE COURT:  Well, once again, I think that the lists

23  are relevant for establishing authenticity, but aren't really

24  relevant to the jury.  Even though some of the exhibits have

25  been admitted, the jury knows that.  The jury heard those

 1   exhibits being admitted.  So I don't think that these lists

 2   would help in any way, assist the jury in any way, but -- so as

 3   a result, I really -- I fail to see what the relevance of

 4   admitting them would be.

 5            MS. BUTTE:  Thank you, Your Honor.

 6            THE COURT:  Once again, we haven't ruled on this

 7   really specifically in front of the jury, but that's my view of

 8   the subject.

 9            We are one juror short and we are trying to reach that

10   juror.  She is here?  Okay.  Let's bring the jury in.

11            (Jury present.)

12            THE COURT:  Good morning, ladies and gentlemen.  I

13   hope you had a good weekend.  Hope you didn't eat too much

14   Halloween candy.  As you will recall, on Thursday we ended with

15   you staying just a little bit extra so that Mr. Finch could

16   wrap up, which means that the United States is in a position to

17   call its next witness.  We have that witness prepositioned at

18   the witness stand.

19            The United States may call its next witness.

20            MR. TORZILLI:  Thank you, Your Honor.  The United

21   States calls Larry Barela.

22            THE COURT:  I am sorry, what was the last name?

23            MR. TORZILLI:  Larry Barela.

24       (**Larry Barela** was sworn.)

25            THE WITNESS:  I do.

Larry Barela - Direct

1        *COURT DEPUTY CLERK:*  Please state your name and spell

2   your first and last name for the record.

3        *THE WITNESS:*  Larry Barela; first name spelled

4   L-A-R-R-Y, last name, B-A-R-E-L-A.

5                    **DIRECT EXAMINATION**

6   *BY MR. TORZILLI:*

7   *Q.*  Mr. Barela, good morning.

8   *A.*  Good morning.

9   *Q.*  Where do you work?

10  *A.*  I work for OpenText.

11  *Q.*  What's OpenText?

12        *THE COURT:*  I don't think that microphone is working.

13  I think we need to somehow -- Mr. Keech, do you mind, since you

14  are a resident microphone expert, do you mind taking a look at

15  that real quick?

16        *COURT DEPUTY CLERK:*  The lectern or witness stand?

17        *THE COURT:*  The lectern.  It doesn't seem to be

18  amplifying.

19        That's working.  Go ahead.

20  *BY MR. TORZILLI:*

21  *Q.*  What is OpenText?

22  *A.*  OpenText owns a number of different software applications.

23  And the software application in the division I work in is the

24  electronic discovery division within OpenText, so my division

25  is responsible for dealing with electronic discovery.

654

Larry Barela - Direct

1  Q.  In one sentence can you describe what electronic discovery

2  is?

3  A.  My definition would be it is really a workflow of

4  identifying, collecting, processing, reviewing and then

5  producing electronic -- electronically stored information.

6  Q.  Does it also involve hosting electronically stored

7  information?

8  A.  Yes.

9  Q.  Where is your office located?

10  A.  Downtown Denver, 1860 Blake Street.

11  Q.  What do you do for OpenText?

12  A.  I'm a cloud applications consultant.  And I work primarily

13  with our customers to formalize the plan for handling

14  electronic discovery and then working with my team to support

15  that customer.

16  Q.  How long have you been at OpenText, Mr. Barela?

17  A.  I have been with OpenText for three years, since

18  October 2018.  And prior to that I was with a company called

19  Catalyst from 2001 to 2018.  OpenText acquired Catalyst in

20  2018.

21  Q.  How long have you been in the field of electronic

22  discovery?

23  A.  About 25 years.

24  Q.  Are you familiar with Mar-Jac Poultry?

25  A.  Yes.

Larry Barela - Direct

1    Q.   How are you familiar with Mar-Jac Poultry?

2    A.   They are a customer of ours and we host electronic

3    documents for them.

4    Q.   What services does or has OpenText provided to Mar-Jac?

5    A.   Document processing, document hosting and document

6    production.

7    Q.   Mr. Barela, can you explain what you mean by document

8    hosting?

9    A.   Document hosting is providing an application that allows

10   the customer along with our counsel to review documents and tag

11   those documents as either relevant or nonrelevant, privileged,

12   confidential, and, you know, eventually leading to the

13   production of documents.

14   Q.   How do Mar-Jac documents get transmitted to OpenText?

15   A.   Mar-Jac documents are uploaded to our secure website.  It's

16   referred to as an FTP site.  And once documents are uploaded to

17   that site, then we have an automated process that moves those

18   documents to the hosting platform for review.

19   Q.   What does FTP stand for?

20   A.   File transfer protocol.

21   Q.   And what security measures are in place in the FTP site

22   that you maintained for Mar-Jac Poultry?

23   A.   User name and password is given to the customer, and then

24   the customer is responsible for uploading the documents.

25   Q.   Is the FTP site that OpenText created and maintained for

656

Larry Barela - Direct

1    Mar-Jac for Mar-Jac's exclusive use as opposed to other

2    OpenText clients?

3    A.  No.  This is the -- this is where all of our customers

4    would upload documents.  They just have a, like I said, a

5    separated folder where they are uploading those documents to.

6    Q.  So how can you tell when documents come in that the

7    documents are coming from Mar-Jac Poultry?

8    A.  By the use of the user name and password.

9    Q.  When OpenText receives documents loaded to the FTP site the

10   company maintains for Mar-Jac, where do the documents wind up?

11   A.  The documents will wind up in the review platform.

12   Q.  Does OpenText have a proprietary name for the review

13   platform that it uses for Mar-Jac documents?

14   A.  Yes.  The name of the application is Insight.

15   Q.  Mr. Barela, are you familiar with the term Bates number?

16   A.  Yes.

17   Q.  What is a Bates number?

18   A.  A Bates number is the number that if we were creating a

19   production that we are going to stamp on every page of every

20   document so that we can uniquely identify that page within a

21   document.

22   Q.  Was Bates numbering applied to the documents received from

23   Mar-Jac?

24   A.  Yes.

25   Q.  Is in your experience Bates numbering a reliable way to

Larry Barela - Direct

1    keep track of voluminous document productions?

2    A.  Yes.

3    Q.  Do you know whether OpenText delivered documents that it

4    was hosting for Mar-Jac after they were loaded onto OpenText's

5    Insight review platform?

6    A.  Yes.  We delivered and produced documents.

7    Q.  To whom were those documents delivered?

8    A.  The documents are placed on the secured website and then

9    they are downloaded by the customer or the customer's counsel.

10   So we place the documents on the FTP site.  Other than the user

11   name and password, we really don't know who downloaded the

12   documents, but we have to assume that with that user name and

13   password that it is the customer.

14   Q.  Is the process you described in your experience a secure

15   way in which clients at OpenText can download documents that

16   were being hosted by OpenText?

17   A.  Yes.

18   Q.  In preparation, Mr. Barela, for your testimony today, did

19   you review any of OpenText's records?

20   A.  Yes.

21   Q.  Could you generally describe what OpenText records you

22   reviewed in preparation for your testimony?

23   A.  There were four documents that I was asked to confirm that

24   the content of those documents matched what we received and the

25   content that was currently in the review platform.

658

Larry Barela - Direct

1    *Q.*  I am now going to with the assistance of Ms. Grimm hand a

2    document to you that's been marked as Government Exhibit 410.

3            Mr. Barela, have you had an opportunity to review

4    Exhibit 410?

5    *A.*  Yes.

6    *Q.*  Do you recognize Exhibit 410?

7    *A.*  Yes.

8    *Q.*  How do you recognize it?

9    *A.*  This was a document that was given to me by our in-house

10   counsel.

11   *Q.*  What did you do with a copy of Exhibit 410 after it was

12   provided to you?

13   *A.*  I looked for the Bates number which is at the bottom of

14   this page.  I took the Bates number, I logged into our secure

15   site, to the review site, looked for that Bates number.  And

16   the searches also returned were this document.

17   *Q.*  When you completed your search, did you compare the image

18   that appears in Government Exhibit 410 with the image of the

19   document that appears on your secure hosting platform?

20   *A.*  Yes.

21   *Q.*  And after you did that comparison, what did you conclude?

22   *A.*  That it was a hundred percent identical.

23   *Q.*  So Government Exhibit 410 is 100 percent identical to the

24   image of the document that appears on your hosting platform?

25   *A.*  Correct.

Larry Barela - Direct

1    Q.  You can put that exhibit aside, sir.  And again with the

2    assistance of Ms. Grimm, we are going to hand you a document

3    that's been marked as Government Exhibit 1028.

4           Mr. Barela, have you had an opportunity to review

5    Government Exhibit 1028?

6    A.  Yes.

7    Q.  Do you recognize Government Exhibit 1028?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is another document that was given to me by our

11   in-house counsel.  And I was asked to confirm the content and

12   that was on our hosting platform.

13   Q.  What did you do to go about confirming the content of

14   what's been marked as Government Exhibit 1028?

15   A.  I looked for the Bates number in the lower right-hand

16   corner.  I used that Bates number to perform a search in the

17   Insight application, and the search results brought back this

18   exact document.

19   Q.  And once the search results brought back the document, did

20   you compare the image of the document that appears on your

21   secure document review platform with the image of the document

22   that's been marked as Government Exhibit 1028?

23   A.  Yes, I did.

24   Q.  And after you did that comparison, what did you conclude?

25   A.  That it was a hundred percent match to the document we're

660

Larry Barela - Direct

1    hosting.

2    Q.   What type of document is Government Exhibit 1028?

3    A.   This is an e-mail message.

4    Q.   Does the e-mail message in Government Exhibit 1028 have an

5    attachment?

6    A.   Yes.

7    Q.   How do you know it has an attachment?

8    A.   There is a field at the top of this e-mail which is called

9    Attachments and it has the name of the attachment listed.

10   Q.   Is the attachment field in what's known as the header

11   information?

12   A.   Yes.

13   Q.   Could you explain what header information is?

14   A.   Header information is -- represents a number of different

15   fields.  I think what we're most familiar with is the From, To,

16   CC, BCC, subject line, the send date and the name of the

17   attachments, so those are the header fields.

18   Q.   You can put that exhibit aside now.  Thank you.  And once

19   again, with the assistance of Ms. Grimm, we will hand you a

20   document that's been marked as government Exhibit 1029.

21        Mr. Barela, have you had an opportunity to review

22   what's been marked as Government Exhibit 1029?

23   A.   Yes.

24   Q.   Do you recognize it?

25   A.   Yes.

661

Larry Barela - Direct

1    *Q.*  How do you recognize it?

2    *A.*  This is the third document that was given to me by in-house

3    counsel to compare the contents of this document to what we

4    hosted in the review platform.

5    *Q.*  And what did you do to go about reviewing whether a version

6    of this document appears on your document review platform?

7    *A.*  Look for the Bates number which is stamped at the bottom of

8    the document, within the Insight application perform a search

9    for that Bates number.  The search result came back with this

10    document.

11    *Q.*  What did you do next?

12    *A.*  I then opened the document, compared the printed version

13    that I had to the version that was in the application and

14    confirmed that it's a hundred percent identical.

15    *Q.*  So the document that appears on OpenText document review

16    platform is an exact match to the image that appears in

17    Government Exhibit 1029?

18    *A.*  Yes.

19    *Q.*  Were you able to determine whether -- well, let me ask a

20    different question.

21          What type of document is Government Exhibit 1029?

22    *A.*  This is an Excel document, Microsoft Excel.

23    *Q.*  Is it also an e-mail attachment?

24    *A.*  Yes.  It is an attachment to the previous e-mail, what we

25    just discussed.

Larry Barela - Direct

1   Q.  So Government Exhibit 1029 is the attachment to the e-mail

2   that appears in Government Exhibit 1028?

3   A.  That's correct.

4   Q.  Thank you.  You can put that exhibit aside.  And now again

5   with the assistance of Ms. Grimm, we will hand you a document

6   that's been marked as Government Exhibit 1030.

7          Mr. Barela, have you had an opportunity to review

8   what's been marked as Government Exhibit 1030?

9   A.  Yes.

10  Q.  Do you recognize it?

11  A.  Yes.

12  Q.  How do you recognize it?

13  A.  This is the fourth document given to me by in-house counsel

14  that I was asked to review and compare contents to what we have

15  hosted.

16  Q.  What did you do to review the contents?

17  A.  Lower right-hand corner, I pulled the Bates number,

18  performed a search for the Bates number and the Insight

19  application and then retrieved the document.  The document did

20  come back in the search.

21  Q.  Did you compare -- after you retrieved the document, did

22  you compare the image that appears on OpenText document review

23  platform to the image that appears in Government Exhibit 1030?

24  A.  Yes.

25  Q.  After you did that review, what did you conclude?

Larry Barela - Direct

1    *A.*   This document is a hundred percent identical to the

2    document that we're hosting.

3    *Q.*   Mr. Barela, are you familiar with the term metadata?

4    *A.*   Yes.

5    *Q.*   In the electronic discovery profession, what does -- what

6    is metadata?

7    *A.*   Metadata represents the fielded information about the

8    document.  It's usually subjective information and objective

9    information.  So subjective is how the attorneys and the

10   customers may tag the document.  The objective information is

11   the information that is -- that comes with the document, so

12   things like the creation date, the last modified date, the

13   author of the document.  Depending on the document type, there

14   can be, you know, just a handful of metadata fields or there

15   can be hundreds of metadata fields.

16   *Q.*   Are there metadata fields associated with the document

17   that's been marked as Government Exhibit 1030?

18   *A.*   Yes.

19   *Q.*   Is one of those metadata fields known as the custodian

20   field?

21   *A.*   Yes.

22   *Q.*   In the electronic discovery profession, what does the

23   custodian field of metadata signify?

24   *A.*   The custodian field signifies ownership of the document.

25   So generally when the document is collected, it's collected

664

Larry Barela - Direct

1  from an individual.  That individual becomes a custodian.

2          *MR. TUBACH:*  Object as hearsay, Your Honor, testifying

3  about what other people do.

4          *THE COURT:*  Overruled.

5  *BY MR. TORZILLI:*

6  *Q.*  You can complete your answer, sir.

7  *A.*  So once again, the custodian field represents ownership of

8  the document, where did the document come from.  It could be an

9  individual, could be a server, but it indicates ownership.

10 *Q.*  Did you review the custodian field for the document on the

11 OpenText platform that is a duplicate of Government

12 Exhibit 1030?

13 *A.*  Yes.

14 *Q.*  Is that field populated?

15 *A.*  Yes.

16 *Q.*  What is contained in the custodian field for the document?

17         *MR. TUBACH:*  Objection, Your Honor.

18         *THE COURT:*  Hold on just one second.  Let's rule on

19 the objection.

20         Mr. Tubach?

21         *MR. TUBACH:*  It's hearsay, Your Honor.  This isn't

22 anything this witness created.  It would have been provided to

23 him by others.

24         *THE COURT:*  Let's do a side bar.

25         (At the bench:)

Larry Barela - Direct

1          THE COURT:  Mr. Tubach, can you hear me?

2          MR. TUBACH:  I can, Your Honor.

3          THE COURT:  Mr. Torzilli, can you hear?

4          MR. TORZILLI:  Yes, sir.

5          THE COURT:  Mr. Tubach, go ahead.  Let me ask

6   Mr. Torzilli the following.  So what answer, Mr. Torzilli, will

7   the witness provide?

8          MR. TORZILLI:  He is going to say the custodian field

9   is populated with Martin P.

10         THE COURT:  Indicating that the document was collected

11  from him?

12         MR. TORZILLI:  Yes.  I think what he would testify is

13  that it signifies that the ownership of this document is

14  attributable to Pete Martin.

15         THE COURT:  And how would this witness know that?

16         MR. TORZILLI:  He knows what appears in the custodian

17  field of the -- associated with this document.

18         THE COURT:  Right.  But would he have any reason to

19  know whether it's true or whether someone else provided the

20  document but said it was Martin's or how would he know anything

21  about that other than his testimony about the general

22  convention?

23         MR. TORZILLI:  He will be able to testify that when

24  the document was provided to OpenText via the FTP site he has

25  testified to, the custodian metadata appeared in the

Larry Barela - Direct

 1    transmission of this document.

 2              THE COURT:  Okay.  Mr. Tubach, what was the objection?

 3              MR. TUBACH:  Your Honor, the objection is hearsay.  He

 4    has no firsthand knowledge how that appeared.  It's clearly a

 5    record of someone, someone, a lawyer, somebody else, we have no

 6    idea, put on a document that was then loaded up to an FTP site.

 7    He simply would be testifying about what other people said out

 8    of court and then told him essentially through an FTP site.

 9              THE COURT:  Mr. Torzilli, response?  Also responses to

10    lack of foundation.  Go ahead.

11              MR. TORZILLI:  Sure.  He's not testifying to what

12    someone else said.  He is testifying to what he observes.  And

13    he observes in a custodian field that the name Pete Martin

14    appears there.  And he will testify he observed that the

15    document in the state that it was transmitted to OpenText had

16    this information in it, so these are based on his personal

17    knowledge, personal observations he has made.

18              THE COURT:  Okay.  Both of the -- both as to hearsay

19    and also to foundation, both will be sustained.  Thank you.

20         (In open court:)

21              THE COURT:  Objection will be sustained as to

22    foundation and hearsay.

23         Go ahead, Mr. Torzilli.

24              MR. TORZILLI:  Thank you, Your Honor.

25    BY MR. TORZILLI:

Larry Barela - Cross

1  *Q.*  Mr. Barela, with respect to the documents that have been

2  marked as Government Exhibit 410, 1028, 1029 and 1030, can you

3  tell us whether or not those are true and correct copies of

4  documents that were loaded to OpenText's FTP site that it

5  maintains for production of documents from Mar-Jac?

6  *A.*  Yes, they are true copies.

7         *MR. TORZILLI:*  Your Honor, one moment to consult?

8         *THE COURT:*  You may.

9         *MR. TORZILLI:*  No further questions.

10        *THE COURT:*  Thank you.

11        Cross-examination.

12        Mr. Tubach?

13                    **CROSS-EXAMINATION**

14  *BY MR. TUBACH:*

15  *Q.*  Good morning, Mr. Barela.

16  *A.*  Good morning.

17  *Q.*  Let me just understand your general process.  As I

18  understand it, someone with a user name and password loads

19  documents up to an FTP site that your firm controls, and then

20  those documents are put on a Relativity platform; is that

21  correct?

22  *A.*  It's not Relativity.  It's Insight.  That's the platform.

23  *Q.*  Sorry, Insight.  I didn't mean to make a judgment as to

24  which is better.  Insight is a database platform used by

25  clients of yours, customers, to review documents that they have

Larry Barela - Cross

1   provided you and you have then uploaded to the site.

2   A.   Yes, correct.

3   Q.   You have no idea who the person is that's uploading the

4   documents up to the FTP site that you then put on Insight; is

5   that correct?

6   A.   We have a project manager that's going to work with those

7   clients or with our customers, so, you know, going back through

8   their e-mail and their communication, yes, we do have that

9   back-and-forth communication between the customer and the

10   project manager.

11   Q.   My question, though, is you sitting here don't have any

12   idea who loaded any of these documents up to the FTP site; is

13   that correct?

14   A.   That's correct?

15        MR. TORZILLI:   Objection, asked and answered.

16        THE COURT:   Objection is overruled.

17        Go ahead, Mr. Tubach.

18   BY MR. TUBACH:

19   Q.   And you have no idea where whoever that person is got those

20   documents from, no personal knowledge, right?

21   A.   Right.

22   Q.   So the only thing you're saying here today is that whatever

23   somebody loaded up to your FTP site is the same thing as the

24   physical documents you are looking at here; is that right?

25   A.   Correct.

Larry Barela - Cross

1   Q.  One quick question about Exhibit 1029, if you have that in

2   front of you, sir.

3   A.  Yes.

4   Q.  I believe you testified this was a hundred percent

5   identical version to the Bates number document that you

6   reviewed on your platform; is that correct?

7   A.  Correct.

8   Q.  If you look at the bottom of 1029, is there a Bates number

9   on there that your firm applied?

10  A.  Yes.

11  Q.  The bottom reads Excerpt; is that right?

12  A.  Yes.

13  Q.  Is that an excerpt -- is that a description of a document

14  that your firm creates in putting documents on the Insight

15  website, database?

16  A.  Generally not.  We would provide the number, but not

17  that -- not the excerpt.

18  Q.  So this "Excerpt from" is not actually something that your

19  firm put on there; is that correct?

20  A.  To the best of my knowledge, no.

21  Q.  So can you tell me as you sit here today if Exhibit 29 is

22  just an excerpt of a document, what's missing?

23  A.  There is nothing missing from this document compared to the

24  document that's -- that we're hosting.

25  Q.  So you can't explain why 1029 uses the word excerpt rather

Larry Barela - Cross

1   than full copy or anything else?

2   A.  I cannot.

3   Q.  Turning to Exhibit 1030, your firm received Exhibit 1030 as

4   a PDF; is that correct?

5   A.  Yes.

6   Q.  And it looks to be handwritten documents, correct?

7   A.  Correct.

8   Q.  Now, the document didn't start out as a PDF.

9   A.  Correct.

10  Q.  You don't have any idea how the document got turned into a

11  PDF, right?

12  A.  Correct.

13  Q.  You didn't convert it to a PDF yourself?

14  A.  No.

15  Q.  And you have no idea, no personal knowledge about how this

16  photocopy was created, correct?

17  A.  Right.

18  Q.  Or what it represents?

19  A.  Right.

20  Q.  Or who wrote it, right.

21  A.  Right.

22      MR. TUBACH:  Thank you.  I have no further questions.

23      THE COURT:  Thank you, Mr. Tubach.

24      Additional cross?

25      Redirect?

Larry Barela - Redirect

1       **REDIRECT EXAMINATION**

2   *BY MR. TORZILLI:*

3   *Q.*  Mr. Barela, can you clarify how OpenText knows that

4   documents from Mar-Jac are being produced to OpenText?

5   *A.*  With the user name and password, the customer is allowed to

6   open or to upload documents that we presume belong to them.

7           *MR. TUBACH:*  Objection, Your Honor, hearsay, lacks

8   foundation.

9           *THE COURT:*  Overruled.

10  *BY MR. TORZILLI:*

11  *Q.*  You can complete your answer, sir.

12  *A.*  So once the documents are uploaded, there is communication

13  with the project manager from the customer.  They will make

14  decisions on where documents are going to be stored for review.

15  So those documents, for instance, may be copied to a folder so

16  that attorneys could log in and review those documents.

17  *Q.*  Thank you.  And going back to Government Exhibit 1029 --

18  *A.*  Yes.

19  *Q.*  -- did you in your review use the Bates number that's

20  stamped on the lower right-hand corner of the document in the

21  process you used to determine that that is an exact match to

22  the document that appears on the Insight review platform?

23  *A.*  Yes.

24  *Q.*  And just to clarify with respect to Government

25  Exhibit 1030, you testified that's a handwritten note?

672

Larry Barela - Redirect

1   A.  To the best of my knowledge, it looks like a handwritten

2   note.

3   Q.  And just to clarify the process you undertook, you looked

4   at all the handwriting that appears in Government Exhibit 1030

5   and compared it to the handwriting that appears in the version

6   of the document on your Insight review platform?

7   A.  Yes.

8   Q.  And when you did that, what did you determine?

9           MR. POLLACK:  Objection, Your Honor.  Your Honor, a

10  witness cannot authenticate handwriting unless they have

11  knowledge it was -- prior to litigation.

12          THE COURT:  Overruled.  This is not a handwriting

13  comparison.  It's just to determine whether or not the

14  appearance of the document appears to be exact.

15          Go ahead.  Overruled.

16  BY MR. TORZILLI:

17  Q.  Complete your answer, sir.

18  A.  Yes, the document appears to be exact.

19  Q.  And after that did you determine whether it's a true and

20  accurate copy of the image that appears on your company's

21  document review platform?

22  A.  Yes.

23  Q.  And what did you determine?

24  A.  That it is a true and accurate copy.

25          MR. TORZILLI:  No further questions.

Simeon Morbey - Direct

1            THE COURT:  Mr. Barela, you are excused.  However, you

2    are subject to recall if one of the defendants chooses to

3    recall you, so they will be in contact with you if that is

4    true.  Otherwise, however, you are excused for now.  Thank you

5    very much.

6            THE WITNESS:  Thank you.

7            THE COURT:  The United States may call its next

8    witness.

9            MS. ROGOWSKI:  Good morning, Your Honor.  The

10   government calls Simeon Morbey.

11       (**Simeon Morbey** was sworn.)

12            THE WITNESS:  I do.

13            COURT DEPUTY CLERK:  Please state your name and spell

14   your first and last name for the record.

15            THE WITNESS:  My name is Simeon Morbey.  Simeon is

16   S-I-M-E-O-N; Morbey, M-O-R-B -- as in boy -- E-Y.

17                      **DIRECT EXAMINATION**

18   BY MS. ROGOWSKI:

19   Q.  Good morning, Mr. Morbey.  Do you work at a firm,

20   Mr. Morbey?

21   A.  I do.

22   Q.  How long have you worked at that firm?

23   A.  About 10 years.

24   Q.  Could you please briefly describe for the jury your

25   responsibilities in that position with respect to eDiscovery?

674

Simeon Morbey - Direct

1    A.  Yes.  I am an eDiscovery specialist.  EDiscovery relates to

2    the identification of electronic information.

3    Q.  And could you just say a little bit more what you mean by

4    the identification of electronic information, please?

5    A.  Sure.  EDiscovery specialists will work with information

6    that's given to the firm.  I work with information that's given

7    to the firm electronically.  And we put that up on a document

8    review platform and we have reviewers go through the documents

9    and look at what they are and make summaries of those

10   documents.

11   Q.  Thank you, Mr. Morbey.

12        MS. ROGOWSKI:  At this time I would like permission to

13   through Ms. Grimm provide the witness with a binder and a list

14   of exhibits.

15        THE COURT:  You may.

16   BY MS. ROGOWSKI:

17   Q.  I will give you a moment to look through that list and to

18   page through that binder.

19        All right, Mr. Morbey.  Do you recognize the

20   government exhibit list 9555 and the binder that's sitting in

21   front of you?

22   A.  I do.

23   Q.  How do you recognize it?

24   A.  I was provided this list by the government to review in

25   preparation for my testimony.

675

Simeon Morbey - Direct

1    Q.   And do you recognize the binder in front of you?

2    A.   Yes.  I recognize it as the documents that are referenced

3    in the list of Government Exhibit 9555.

4    Q.   And you said that you referenced these documents.  When did

5    you do that referencing?

6    A.   On October 23rd and October 24th.

7    Q.   As a part of your work in eDiscovery, Mr. Morbey, at your

8    firm, did there come a time when your firm received documents

9    from broiler chicken suppliers in relation to a matter?

10   A.   Yes.

11   Q.   Could you please explain your involvement in that, if any?

12   A.   Yes.  My team and I at my firm received documents from

13   approximately 18 broiler producers, including Mar-Jac, Koch and

14   Claxton.  We received those documents and directly put them up

15   on the document review platform that I mentioned earlier for

16   the purposes of reviewing them.

17   Q.   And what's the name of that document review platform?

18   A.   CS Disco.

19   Q.   As a part of that same project, Mr. Morbey, are you aware

20   of any depositions that occurred in that matter?

21   A.   I am.

22   Q.   And as a part of that project, were you aware of the

23   deposition of --

24        MR. TUBACH:  Objection, Your Honor.  Can we have a

25   side bar?

Simeon Morbey - Direct

1        THE COURT:  Yes, let's do.

2     (At the bench:)

3        THE COURT:  Ms. Rogowski can you hear me?

4        MS. ROGOWSKI:  I can.

5        THE COURT:  Mr. Tubach?

6        MR. TUBACH:  Yes.

7        THE COURT:  Mr. Fagg?  I guess he doesn't have a

8  headset on.

9        Mr. Tubach, go ahead.

10        MR. TUBACH:  The Court has been abundantly clear there

11  is to be no reference to litigation here.  And he now testified

12  that he received documents from broiler producers, 18 of them,

13  and she has now elicited testimony from him that they were used

14  in a deposition.  This is outrageous.

15        THE COURT:  The witness did not say that the documents

16  were used in depositions, but even more concerning, I think, is

17  he testified that among the things that he received were

18  depositions.  Obviously, I am a little bit worried that there

19  has been testimony now about this witness receiving chicken

20  documents from 18 different sources, which seems to be

21  unnecessary, but also I don't understand the relevance of him

22  having received deposition transcripts.

23        Can you explain that, Ms. Rogowski?

24        MS. ROGOWSKI:  Yes, Your Honor.  I don't believe that

25  he testified that he did, in fact, receive deposition

Simeon Morbey - Direct

 1   transcripts.  The question that was asked was whether or not he

 2   was aware of depositions that occurred.  And then the next

 3   question, if I had been able to finish, Your Honor, was just

 4   going to be if a deposition occurred with respect to a Mr. Pete

 5   Martin.  And that is all that the government tends to elicit.

 6         And then the government intends to just further ask

 7   questions about the documents not in relation to any deposition

 8   or matter.  I am sure Your Honor understands that we are trying

 9   our best to avoid any references to the civil litigation.  It's

10   just specifically with respect to document No. 1030, Government

11   Exhibit No. 1030, it's just very difficult to explain how

12   Mr. Morbey came into the possession of these documents from

13   Mar-Jac without getting into any detail at all related to

14   litigation.  If Your Honor has any further suggestions, we

15   would certainly follow them.

16         THE COURT:  Let me ask you this, Ms. Rogowski.  In

17   regard to document 1030, does the government have a witness who

18   will be able to testify that the handwriting is Mr. Martin's?

19         MS. ROGOWSKI:  Not at this time, Your Honor.

20         THE COURT:  All right.  Then I am going to issue a

21   written order probably at the break, but I am going to exclude

22   1030.  I do agree with Mr. Tubach's argument that there is a

23   confrontation clause issue in regard to the deposition --

24   sorry, the use of the deposition transcript to authenticate the

25   handwriting.  While it's true that I wouldn't anticipate that

Simeon Morbey - Direct

1   Mr. Martin would give any other answer despite that fact, I

2   think that that essentially would be a clear err issue that the

3   Court of Appeals can take up, but not me, so I do think there

4   is a problem.  And if the United States doesn't have some

5   witness who could come in here and say, yup, that's his

6   handwriting, I don't think that it can be authenticated through

7   his civil deposition.

8        As a result, I don't see how the government could lay

9   the foundation necessary for authentication and also for

10  admissibility that that is what the government claims it is,

11  namely the handwriting of Mr. Martin.

12       MS. ROGOWSKI:  Understood, Your Honor.  Thank you.

13       THE COURT:  Thank you.

14       MR. POLLACK:  Your Honor, on behalf of Mr. Blake.

15       THE COURT:  Go ahead, Mr. Pollack.

16       MR. POLLACK:  Your Honor, separate and apart from this

17  specific issue relating to Government Exhibit 1030, the Court

18  had ruled unambiguously that reference to the civil litigation

19  would be prejudicial and for that reason directed the parties

20  not to elicit anything that would disclose the existence of

21  civil litigation.  I don't understand how the question about

22  depositions can possibly be a good faith question in conformity

23  with the Court's instruction, and unfortunately I can't really

24  think of a good limiting instruction to undo the prejudice

25  that's the very prejudice that the Court had wanted to avoid.

Simeon Morbey - Direct

1    So I would move on behalf of Mr. Blake for an

2    instruction in front of the jury that the question was improper

3    and move to strike the testimony of this witness as a sanction.

4    *THE COURT:*  I am going to reject that request.  Of

5    course, the good faith basis is exactly what Ms. Rogowski

6    mentioned, namely that the government was hoping to

7    authenticate the handwriting in Government Exhibit 1030 through

8    the use of Mr. Martin's deposition.  Apparently the government

9    obtained the deposition through documents produced in a way

10   that this witness would know about, so that was a good faith

11   basis.

12   I think that the government should make sure to lead

13   witnesses particularly like this so we don't have a discussion

14   about 18 separate sources, but I don't believe that the -- that

15   any limiting instruction would have -- would do anything other

16   than potentially call attention to the particular testimony.  I

17   don't think it merits an instruction to disregard the witness'

18   testimony and that's the reason I'm rejecting Mr. Pollack's

19   request, all right?

20   Thank you.

21   *MS. ROGOWSKI:*  If Your Honor -- if the government

22   could, the government does request to be heard further on the

23   issue of this document.  Specifically as you alluded to, we

24   cannot elicit testimony in front of the jury about this, but

25   this document was, in fact, discussed during Pete Martin's

680

Simeon Morbey - Direct

1    deposition.  It did come from Mar-Jac through Mr. Morbey's law

2    firm.  And due to Your Honor's rulings, we haven't been able to

3    elicit testimony that makes that clear which is -- which the

4    government accepts, but we do believe that the fact that this

5    document came from Mar-Jac, even if we are not able to

6    establish that it came from Mr. Martin, the fact that this

7    document came from the company Mar-Jac is, in fact, relevant.

8    And the government just simply requests to be heard further on

9    this issue at a later time.

10        THE COURT:  Well, unless you could explain to me right

11   now how the government would ever admit the document without

12   someone testifying as to whose handwriting it is, then I don't

13   know how you would get it in through any type of hearsay

14   exception.

15        MS. ROGOWSKI:  Your Honor, the government would seek

16   to establish if not able to tie the document directly to

17   Mr. Martin that the document came from a notebook in Mar-Jac's

18   file, that it specifically references competitor

19   communications.  And this document was, in fact, ruled upon

20   during the *James* hearing, the 801(d)(2)(E).  Your Honor has

21   already found that 801(d)(2)(E) does apply, I believe.

22        THE COURT:  Yeah, but we are going in circles.  This

23   has been the most litigated exhibit that we've had so far.  And

24   once again, the issue is how you would be able to establish

25   whose handwriting it is that's fundamental to the issue of

681

Simeon Morbey - Direct

1  authenticity and also the ability for the Court to be able to

2  apply some type of a hearsay exception to it that we are aware

3  of the author.  The document on its face does not indicate who

4  the author is.  And unless there is some evidence that's

5  admissible for establishing who wrote it, whose handwriting it

6  is, I can't see any basis for admission.  That's why I asked

7  you whether there was going to be some person who would

8  authenticate the handwriting other than the deposition which I

9  just ruled on.

10       MS. ROGOWSKI:  I certainly understand what Your Honor

11  is saying.  May I just have a brief moment to confer with my

12  colleagues?

13       THE COURT:  Well, I think we are kind of on a

14  different subject now.  We are talking about it generally.  But

15  you don't have any other questions with this witness as to that

16  exhibit, correct?

17       MS. ROGOWSKI:  Correct, Your Honor.

18       THE COURT:  So we will take that up later if there is

19  anything left to talk about, all right?

20       MS. ROGOWSKI:  Thank you, Your Honor.

21       THE COURT:  Thank you.

22    (In open court:)

23       Objection is sustained.

24  BY MS. ROGOWSKI:

25  Q.  Thank you, Mr. Morbey.

Simeon Morbey - Direct

1          You said earlier that the documents that your firm

2    received were uploaded into a platform called CS Disco,

3    correct?

4    A.   Yes.

5    Q.   How do you know they were unloaded into that platform?

6    A.   I or a member of my team directed CS Disco to upload them

7    to the platform.  And we reviewed the documents that were

8    uploaded and we had compared them with a description of what

9    was produced to us by the broiler producers.

10   Q.   Could you briefly describe the types of documents that were

11   uploaded into CS Disco?

12   A.   We uploaded e-mails, e-mail attachments, examples of

13   contracts, PDFs of price lists, that type of thing.

14   Q.   Were there also calendar invitations?

15   A.   Yes, there were.

16   Q.   Mr. Morbey, are you familiar with something called

17   metadata?

18   A.   I am.

19   Q.   How are you familiar with it?

20   A.   I work with metadata in part of my work in eDiscovery.

21   Q.   Could you briefly describe to the jury what metadata is?

22   A.   Metadata is information about a document.  For example, for

23   an e-mail the metadata would include the sender, the recipient,

24   the date it was sent, the subject of the e-mail, that type of

25   thing.

Simeon Morbey - Direct

1   *Q.* And did you also receive the metadata for these documents

2   from the broiler chicken suppliers that you were discussing?

3   *A.* Yes.

4   *Q.* What kinds of metadata did the e-mails and attachments from

5   this group of documents that were uploaded into your review

6   database contain?

7   *A.* As I said, they contained for e-mails information regarding

8   the person who sent the e-mail, the people who -- the

9   individuals who received the e-mail, including carbon copy and

10  blind copy, the date and time the e-mails were sent.  There may

11  be other things, but that's what comes to mind right now.

12  *Q.* And how was this metadata populated?  Where did that

13  information come from?

14  *A.* That information was provided to us in what is called a

15  load file by the broiler producers.  It was part of the

16  production packet that we received from the broiler producers.

17      *THE COURT:* Let's have a side bar real quick, all

18  right?

19      (At the bench:)

20      *THE COURT:* Am I correct that the only documents that

21  may be relevant to this trial that his firm received are those

22  from Mar-Jac, Koch and Claxton?

23      *MS. ROGOWSKI:* Not entirely correct, Your Honor.  So

24  we established in previous testimony there are Pilgrim's and

25  Tyson documents that Mr. Morbey's firm received.  We had

Simeon Morbey - Direct

1    witnesses who could authenticate both the documents that came

2    from the Grand Jury productions and the documents that came to

3    DOJ through Mr. Morbey's firm.  The reason we have Mr. Morbey

4    only discussing documents from Koch, Claxton and Mar-Jac is

5    that we did not have the same types of witnesses from those

6    three companies.

7              THE COURT:  Right.  But once again, same question.

8    For purposes of his direct examination, are the only documents

9    of relevance ones from Mar-Jac, Koch and Claxton?

10             MS. ROGOWSKI:  Yes, Your Honor.

11             THE COURT:  Then you need to direct him through

12   leading questions so that he does not anymore mention the

13   chicken suppliers.

14             MS. ROGOWSKI:  Understood, Your Honor.  And I will do

15   that.

16             THE COURT:  Okay?  Because it's just irrelevant that

17   he -- to this case that he received documents from potentially

18   all sorts of non -- or from companies that aren't involved at

19   all in this litigation and none of the defendants worked for

20   those companies, okay?

21             MS. ROGOWSKI:  Yes.  Understood, Your Honor.  Thank

22   you.

23        (In open court:)

24   BY MS. ROGOWSKI:

25   Q.  Okay, Mr. Morbey.  Let's talk specifically about the

Simeon Morbey - Direct

1    documents your firm received from Koch, Claxton and from

2    Mar-Jac.

3            To the best of your knowledge, Mr. Morbey, where did

4    the metadata in those specific documents come from?

5            MR. TUBACH:  Objection, Your Honor, hearsay.

6            THE COURT:  If you could -- I think the issue is

7    really foundation.  Could you please lay foundation for that?

8    BY MS. ROGOWSKI:

9    Q.  Mr. Morbey, with respect to the specific documents from

10   Koch, Claxton and Mar-Jac, are you aware of those documents

11   containing metadata?

12   A.  Yes, I am.

13   Q.  And how are you aware of that?

14   A.  When I reviewed the documents on the Government's Exhibit

15   list, 955, I reviewed the metadata as well that was produced

16   with the -- along with the documents by the broiler producers.

17   Q.  Thank you, Mr. Morbey.  And just for the sake of clarity

18   for Government exhibit number, did you mean Government

19   Exhibit 9555?

20   A.  Yes, apologies, 9555.

21   Q.  And what types of metadata did you see in those documents

22   from Koch, Claxton and Mar-Jac that your firm received?

23           MR. TUBACH:  That's hearsay.  That's information

24   coming from a witness who is not --

25           THE COURT:  You will need to be more specific with the

Simeon Morbey - Direct

1    question because the metadata, I don't know what it would be.

2    It could include hearsay.  So you would have to limit it to

3    non-hearsay information that may be -- that the witness may

4    have seen as part of his review.

5    *BY MS. ROGOWSKI:*

6    *Q.*  Your Honor -- I am sorry.

7           Mr. Morbey, as part of your review of the documents

8    from Koch, Claxton and Mar-Jac, did you see any indications of

9    metadata in those documents?

10   *A.*  Yes.

11   *Q.*  And what types of metadata did you see in your review of

12   those documents?

13   *A.*  Including the types I have already mentioned, I saw for

14   each of them a hash value.  I saw -- you know, it depends on

15   the different documents, different types of documents, an

16   e-mail versus a scan of a hard copy document have different

17   types of metadata, but each one would have a hash value because

18   that is a -- it's an electronic fingerprint that identifies

19   each document as a unique document.

20   *Q.*  And did you see any time stamps on the e-mails in the

21   documents specifically from Koch, Claxton and Mar-Jac?

22   *A.*  I saw time stamps on e-mails on the face of the document

23   from Koch, Claxton and Mar-Jac.

24   *Q.*  To the best of your knowledge, Mr. Morbey, was the time

25   stamp on the documents that your firm received the same as the

687

Simeon Morbey - Direct

1   time stamp on the documents that came from the companies?

2          *MS. CARWILE:*  Objection, lacks foundation.

3          *THE COURT:*  Sustained.  If you can establish how he

4   would know that.

5   *BY MS. ROGOWSKI:*

6   *Q.*  Do you have an understanding, Mr. Morbey, of how the time

7   stamp was created on the documents that your firm received?

8   *A.*  No, I do not.

9   *Q.*  Mr. Morbey, after the documents from Koch, Claxton and

10  Mar-Jac were uploaded into your firm's database, did your law

11  firm receive any requests to produce those documents to the

12  Department of Justice?

13         *MS. CARWILE:*  I am going to object, Your Honor, on

14  multiple grounds.  If we can be heard on the side bar.

15         *THE COURT:*  On this question?

16         *MS. CARWILE:*  Yes.

17         *THE COURT:*  All right.

18     (At the bench:)

19         *THE COURT:*  Can you hear me Ms. Carwile?

20         *MS. CARWILE:*  I can.

21         *THE COURT:*  Ms. Rogowski, can you hear me?

22         *MS. ROGOWSKI:*  Yes, I can, Your Honor.

23         *THE COURT:*  Go ahead, Ms. Carwile.

24         *MS. CARWILE:*  Thank you, Your Honor.

25         I just wanted to renew the objection that we've now at

688

Simeon Morbey - Direct

1    this point discussed law firm, deposition, multiple broiler

2    chicken producers three times.  And we have asked and the Court

3    has ordered the government not to make those comments, and this

4    is again the third time it has happened.  We have settled on

5    the word firm.  The government is the one that used the word

6    law firm in that question.

7           THE COURT:  The government during the first part of

8    the question used the word firm, but then you are quite right,

9    then used the term law firm.  And what -- so what's your

10   request, Ms. Carwile?

11          MS. CARWILE:  I think as requested, the same as

12   Mr. Pollack made earlier, this is in violation of the Court's

13   ruling that there would be no mention of the civil litigation.

14   And if the Court would admonish the jury the question was

15   improper and have it be stricken.

16          THE COURT:  Well, once again, it's the same issue.  By

17   my doing that is really going to call attention to this issue

18   and make the jury sensitive.  The jury has actually heard quite

19   a bit on Thursday from the custodians about litigation,

20   eDiscovery, all sorts of things.  It's probably not surprising

21   that he works for a law firm, although it shouldn't have been

22   asked that way, especially since the witness is talking about

23   eDiscovery and other types of litigation issues.

24          I am going to refuse the request because I think that

25   the effect of it will be even worse than the question, but I

Simeon Morbey - Direct

1    would once again stress to the government that it needs to form

2    its questions carefully and it needs to ask leading questions

3    to make sure that the witness is -- does not stray off or

4    mention things that he shouldn't, all right?

5            MS. ROGOWSKI:  Thank you, Your Honor.

6        (In open court:)

7            THE COURT:  The objection will be overruled.

8            Go ahead.

9    BY MS. ROGOWSKI:

10   Q.  Mr. Morbey, after the documents were uploaded into the CS

11   Disco review database, did your firm receive a request to

12   produce those documents to the Department of Justice?

13   A.  Yes.

14   Q.  And how do you know that?

15   A.  I have seen the request.

16   Q.  And were you involved in the production of those documents

17   to the Department of Justice?

18   A.  I and members of my team were involved in the production,

19   yes.

20   Q.  How were you involved?

21   A.  I and members of my team create -- instructed CS Disco to

22   create production volumes that were downloaded to hard drives

23   which we directed to be sent directly to the Department of

24   Justice.

25   Q.  And were those hard drives in fact sent to the Department

Simeon Morbey - Direct

1    of Justice?

2            *MR. TUBACH:*  Objection, lacks foundation.

3            *THE COURT:*  Overruled.  He can answer.

4    *A.*  Yes, to the best of my knowledge, yes.

5    *BY MS. ROGOWSKI:*

6    *Q.*  Mr. Morbey, taking a look again at the binder and the list

7    of exhibits labeled Government Exhibit 9555, have you reviewed

8    the e-mails, attachments and the other documents in that

9    binder?

10   *A.*  I have reviewed the trial exhibits described on Government

11   Exhibit 9555, yes.

12   *Q.*  And did you compare those documents to any documents in

13   possession of your firm?

14   *A.*  Yes, I have.

15   *Q.*  How did you compare them?

16   *A.*  I looked at the exhibit provided by the government and

17   compared it to the document that was on the CS Disco system.

18   And in comparing those two things, as well as the metadata that

19   was on there, I was able to make the conclusion that the

20   documents were the same.

21   *Q.*  And so to the best of my knowledge, are the documents in

22   the binder in front of you from Koch, Claxton and Mar-Jac in

23   fact true copies of the documents that were produced to your

24   firm?

25   *A.*  Yes, to the best of my knowledge.

Simeon Morbey - Cross

1       *MS. ROGOWSKI:*  No further questions.

2       *THE COURT:*  Thank you.

3       Cross-examination?

4       Ms. Carwile?

5       *MS. CARWILE:*  Yes.

6       *THE COURT:*  Go ahead.

7                      **CROSS-EXAMINATION**

8    *BY MS. CARWILE:*

9    *Q.*  Good morning, Mister -- is it Morbey?

10   *A.*  Morbey.

11   *Q.*  Thank you.  Thank you for the correct pronunciation.

12      My name is Laura Carwile.  I represent Roger Austin

13   and I just have a few questions for you.  Let me get situated

14   here, please.

15      So Mr. Morbey, we have heard a lot of testimony prior

16   to you taking the stand regarding certain chicken companies

17   providing their documents to the government and the process

18   through which that occurs.  But it's correct that you do not

19   work for Claxton, Koch or Mar-Jac and that they are not your

20   employer; is that right?

21   *A.*  That is correct.

22   *Q.*  And is it fair to say that in the chain of the receipt of

23   these documents from Claxton, Koch or Mar-Jac to the Department

24   of Justice, ultimately your company sits somewhere in the

25   middle of that chain?

Simeon Morbey - Cross

1  A.  We are in that chain, yes.

2  Q.  And you are in the middle of it.

3  A.  I guess that would be fair.

4  Q.  Okay.  And let me see if I have the chain laid out

5  correctly.  So your company received documents from Claxton,

6  Koch and Mar-Jac from a vendor who had compiled those documents

7  for those three companies.

8  A.  We received the documents from -- yes, that would be

9  correct.

10  Q.  Okay.  So just so that I'm clear, you did not receive the

11  documents listed on Government's 9555 directly from Claxton,

12  Koch and Mar-Jac in that there was a vendor between those three

13  companies and your receipt of those documents.

14  A.  Yes.  However, we did receive transmittal letters from

15  Koch, Claxton and Mar-Jac describing the productions that were

16  received and in some cases providing passwords to access the

17  documents.

18  Q.  And I will get to letters in a second.  Thank you for

19  bringing that up.  But as to the documents themselves, my

20  statement about the fact that there was a vendor between the

21  three companies and you is correct.

22  A.  To the best of my knowledge, yes.

23  Q.  So as to these 71 documents, the government provided you

24  this list of documents, correct?

25  A.  Correct.

693

Simeon Morbey - Cross

1   Q.  And as from Claxton, Mar-Jac and Koch, you actually

2   received more documents than is laid out on Government's 9555.

3   A.  Correct.

4   Q.  You received them is it correct to say in more than three

5   productions of documents?

6   A.  I -- I don't know how many -- the number of productions,

7   but that probably is correct.

8   Q.  Okay.  So as you sit here today, you can't tell us how many

9   productions encompassed the documents listed on Government

10  Exhibit 9555.

11  A.  That's correct.

12  Q.  And it's either three or more than three.  Given that there

13  are three companies, that's why I am asking for three.

14  A.  That sounds right.

15  Q.  All right.  And is it correct that you received the

16  documents, the productions that contain the documents on

17  Government 9555 on hard drive or hardware via FTP link?  How

18  did you receive these documents?

19  A.  It would be either through hard drive or FTP link.

20  Q.  Okay.  And just to be clear, because please forgive me in

21  advance if I misstate any technical terms, but hardware meaning

22  physical storage compartments like USB, hard drive, thumb

23  drive, something to that effect is what I mean when I say

24  hardware.  Is that all right?

25  A.  Yes.

Simeon Morbey - Cross

 1    Q.  So you either received the productions that contained these

 2    documents -- and for the record going forward when I say these

 3    documents, I am going to be referring to this list.  I am not

 4    going to keep saying the number if that's all right.  So you

 5    received the productions that contained these documents either

 6    in hardware or via FTP link?

 7    A.  I believe that's the case, yes.

 8    Q.  Okay.  And you are unaware -- could you tell us as you sit

 9    here today whether each document listed on this list came from

10    a hardware production or an FTP link?

11    A.  No, I could not tell you that today.

12    Q.  All right.  So it's correct to say that you're not privy to

13    the process by which Claxton, Koch and Mar-Jac compiled the

14    documents for production to anyone, but certainly to your

15    company.  Let me rephrase because I think that was a little

16    inartful.

17         You do not have personal knowledge about how the

18    companies, Claxton, Koch and Mar-Jac, compile and create the

19    sets of productions that ultimately make their way to you; is

20    that correct?

21    A.  Correct, I do not have personal knowledge.

22    Q.  And you talked about metadata on direct, and I will get

23    into that a little more, but is it correct, then, to say that

24    you cannot as you sit here today testify that the metadata that

25    exists on the servers for Claxton, Koch and Mar-Jac was

Simeon Morbey - Cross

1    identical to the metadata of the productions that you received

2    that ultimately made it onto this list?

3    A.   Correct.

4    Q.   So let's talk about -- let's start with the hardware

5    productions, Mr. Morbey.  Claxton, Koch and/or Mar-Jac would

6    have a vendor, which we have already established did the

7    compiling of these documents, create hardware for some of these

8    productions that would then make their way to your company,

9    correct?

10   A.   I'm not sure what you mean by compiling.

11   Q.   Okay.  So let me back up.  In order to create the

12   productions that ultimately housed the documents on your list,

13   Claxton, Koch and Mar-Jac ostensibly compiled certain documents

14   in their own companies, correct?

15   A.   I have no personal knowledge of that.

16   Q.   Okay.  Fair enough.  That was a fair point.

17        I guess my question, that I can make it a little

18   simpler.  You received hardware labeled as productions from

19   Claxton, Koch and Mar-Jac; is that correct?

20   A.   That is correct.

21   Q.   And alternatively, and we'll get into this as well, but you

22   received FTP links from the same companies at some point.

23   A.   That is correct.

24   Q.   So is it you, Mr. Morbey, who actually took physical

25   possession of any hardware that would have contained the

696

Simeon Morbey - Cross

1  documents on your list?

2  A.  I don't understand your question.  Could you please

3  rephrase?

4  Q.  So hardware is a physical object.  You would agree with me?

5  A.  I do.

6  Q.  It obviously somehow made its way to your office, your

7  company, correct?

8  A.  Yes.

9  Q.  Are you the person who took physical possession from the

10  Post Office or whoever brings documents and productions to your

11  company?  Are you the person who took possession of that

12  hardware?

13  A.  It would probably come to the company's mailroom, and then

14  it would be delivered to me or a member of my team.

15  Q.  Okay.  And I'm going to get into that phrase "me or a

16  member of my team" in a second, but my question is specific.

17  And let me ask it a different way so that I can be clearer.

18       It is correct to say that you did not personally take

19  possession from your mailroom of every production that contains

20  one or more documents on the list in front of you.

21  A.  I did not physically touch each hard drive, if that's what

22  you are asking.

23  Q.  That is what I am asking.  Thanks very much.

24       Could you tell us as you sit here today which of the

25  documents listed on this list you did take physical possession

Simeon Morbey - Cross

1   of, the hardware of, from the companies who sent them?

2   A.  No, I could not.

3   Q.  Okay.  On direct you stated that you or a member of your

4   team received either hardware or FTP link of productions from

5   these three companies.  And then you -- I have the exact

6   wording at some point, but you delivered in some respect those

7   productions to a third-party vendor called CS Disco; is that

8   right?

9   A.  We received the productions and I remember my team ingested

10  them into CS Disco.  The ingestion as far as -- the ingestion

11  of the documents we received from Claxton, Koch and Mar-Jac to

12  the best of my knowledge were uploaded to CS Disco by myself or

13  a member of my team.

14  Q.  Okay.  So I think -- forgive my naivety regarding

15  technological matters, but your testimony is you or a member of

16  your team took the physical hardware that you received from the

17  vendors from whom the three companies provided the documents,

18  and you or a member of your team uploaded them into a document

19  hosting platform called CS Disco?

20  A.  Correct.

21  Q.  There was no person in between.  You didn't send the

22  hardware, for instance, to the headquarters of CS Disco.

23  A.  To the best of my knowledge, the documents that are

24  contained on the Government Exhibit 9555 were not sent to CS

25  Disco to ingest.

Simeon Morbey - Cross

1   *Q.*  What is that knowledge based on?

2   *A.*  So when we received these documents from the broiler --

3   *Q.*  From these three companies?

4   *A.*  From these three companies, if it was a hard copy

5   production, it would come to my office.  And at that point I

6   would direct one of our support staff to work on uploading the

7   documents to the CS Disco platform.

8   *Q.*  Got it.  So two questions about what your answer just was.

9        You said hard copy documents.  Do you mean physical

10  pieces of paper?

11  *A.*  I'm sorry, I misspoke.  I meant hard drives.

12  *Q.*  That's okay.  I figured that's what you meant.  I just

13  wanted clarification in case I was misunderstanding something.

14       So to the best of your knowledge -- can you be certain

15  that all the productions that contained the documents on that

16  list were uploaded by you or a member of your team directly on

17  to the CS Disco platform?

18  *A.*  Yes, to the best of my knowledge.

19  *Q.*  Okay.  So to the best of your knowledge, but you can't say

20  that you're certain.

21  *A.*  Sitting here today I am not entirely sure which production

22  volumes each of these documents came from.

23  *Q.*  That's fair.  Thank you for that answer.

24       So okay.  So now we're on to the point where someone

25  at your company has possession of this hardware that contains

699

Simeon Morbey - Cross

1    the productions.  What I heard you say just now was that you

2    would direct a member of your support staff to upload those

3    documents into this platform called CS Disco, correct?

4    A.  Yes.

5    Q.  Of the exhibits or the list of documents on the list in

6    front of you, are there any for which you personally uploaded

7    the document you received onto the CS Disco platform?

8    A.  Sitting here today, I don't know.

9    Q.  Is it then fair to say given your previous testimony and

10   the answer before this that it's most likely that these -- this

11   list of documents was -- or the documents that are listed on

12   this list were uploaded by a member of your support staff onto

13   the CS Disco platform?

14   A.  Sitting here today, I can't say which was a support staff

15   person or which was me.  It is accurate to say that either I or

16   a member of my team did the uploading.

17   Q.  Okay.  In the productions that came from Claxton, Koch or

18   Mar-Jac, could you tell us what percent of the time you

19   personally were the one uploading documents onto the CS Disco

20   platform?

21   A.  I -- I don't have a good -- that would be a guess,

22   speculation on my part, and I'm not sure.

23   Q.  Is it below 50 percent?

24   A.  Still speculation.

25   Q.  What's your habit and practice when you receive productions

Simeon Morbey - Cross

1    from anyone?  Do you often do it yourself or is it your support

2    staff that uploads them onto the platform?

3    A.   I generally have my support staff do it.  However, there

4    are certain instances where due to time off or illness, I do it

5    myself.  And that's why I cannot give you a complete answer.  I

6    just don't have that number to give you right now.

7    Q.   Okay.  But you don't recall, for instance, time off or an

8    illness for your support staff when you received these

9    productions that are containing the list of documents in front

10   of you?

11   A.   As I said, I don't remember which production volumes these

12   documents come from, and therefore I don't remember the time

13   period.  So I am unable to recall any particular time off for

14   support staff around those particular times.

15   Q.   Okay.  Thank you.  So once the documents have been

16   uploaded -- let me ask you so we can move on from this portion.

17   Is the same procedure correct with regards to the FTP link

18   documents, meaning someone from your support staff most likely,

19   although in certain cases you, would upload anything obtained

20   from an FTP link onto the CS Disco platform?

21   A.   Yes.  It would be the same process.  However, in certain

22   circumstances the FTP comes directly from counsel for the

23   broiler producers.

24   Q.   For one of these three companies?

25   A.   To the best of my recollection, that would happen.  But to

Simeon Morbey - Cross

1   be fair, I am not a hundred percent sure that it was for one of

2   these three companies, but from time to time that would happen

3   from -- for FTP links the documents provided by broiler

4   producers.

5   Q.  So my question actually isn't about the step from one of

6   these three companies to your company.  It's actually now about

7   the procedure from your company to the CS Disco platform.  My

8   question is as to documents provided to your company via FTP

9   link from one of these three companies, how is the uploading

10  procedure done and by whom regarding those documents?

11  A.  So similar to our discussion about hard drives, physical

12  hard drives, the uploading would be done by myself or a member

13  of my team.  Generally speaking, it would be a member of my

14  team.  However, from time to time I would do it.  And I don't

15  have again the information to give you when that was, but it

16  would be -- the documents would be uploaded directly to the CS

17  Disco database.  And in each case there would be a password to

18  access the documents that would be provided by counsel for the

19  broiler producers and I think including the three companies

20  here.

21  Q.  So just to be clear, when I am asking you questions, I am

22  only talking about these three companies, so if we can just

23  talk about these three companies.

24  A.  Understood.  I apologize.

25  Q.  So was there ever a time when you or a member of your staff

Simeon Morbey - Cross

1   forwarded an FTP link with the password directly to CS Disco?

2   A.  Not that I recall.

3   Q.  Okay.  All right.  So there is -- CS Disco is a vendor

4   company; is that right?

5   A.  Yes.

6   Q.  Your company employs CS Disco as sort of a contractor or a

7   vendor who oversees both the uploading and then any additional

8   actions taken regarding documents for your company, correct?

9   A.  I am not sure what you mean by any additional actions, but

10  they -- it is an electronic information platform for review

11  that we use, yes.

12  Q.  And we'll get into the other actions, but I guess my

13  question is CS Disco is not part of your company, correct?

14  A.  That's true.

15  Q.  It is a third-party separate company than your company.

16  A.  Correct.

17  Q.  You do not employ anyone who works for CS Disco in that you

18  are not the boss of someone at CS Disco in the lay terminology.

19  A.  Yes.

20  Q.  So the vendor -- and CS Disco I am going to maybe use

21  interchangeably with the vendor, if that's all right with you.

22  A.  Yes.

23  Q.  -- is physically located, the employees of that vendor are

24  physically located at a different location than your company,

25  correct?

Simeon Morbey - Cross

1    A.  They are not located at my company.

2    Q.  Right.  And ostensibly CS Disco is not a proprietary

3    software for your company.  It's used by other companies to do

4    the same thing it does for your company.

5    A.  That's my understanding.

6    Q.  So it's separate and apart from the company you work for.

7    A.  Yes.

8    Q.  We have gotten now to the point where these documents have

9    been uploaded by someone onto the CS Disco platform.  Now, let

10   me ask you this.  Are you -- well, I'll get to that in a

11   second.  Sorry about that.

12          At some point as you testified on direct the

13   government directed the group of people that include your

14   company to provide documents to it from Claxton, Koch and

15   Mar-Jac, correct?

16   A.  Yes.

17   Q.  And at this point in the chain the documents are ostensibly

18   uploaded onto the CS Disco platform handled by a third-party

19   vendor.  Am I correct that the process by which those documents

20   made their way to the Department of Justice was that you or a

21   member of your team told an employee at CS Disco to compile

22   documents from one of these three companies and to provide that

23   production or those productions from their physical office to

24   the Department of Justice?

25   A.  I remember my team instructed CS Disco to create production

704

Simeon Morbey - Cross

1   volumes of the documents that had been produced to us by

2   Claxton, Mar-Jac and Koch, download those to hard drives and to

3   send those hard drives to the offices of the Department of

4   Justice.

5   Q.  Got it.  So I think we are saying the same thing, but I

6   appreciate you gave me a little more detail.  I appreciate

7   that.

8           So when you directed or you or a member of your team

9   directed CS Disco to provide those production volumes, were

10  they always to your knowledge on a piece of hardware rather

11  than an FTP link?

12  A.  To the best of my knowledge, yes.

13  Q.  Okay.  But you didn't actually physically see the hardware

14  that CS Disco provided the government because that went

15  directly from CS Disco's office to the government.

16  A.  That is correct.

17  Q.  So you talked earlier -- I think it was during our

18  discussion, but I can't remember now -- about cover letters

19  that would accompany production volumes both to you and from CS

20  Disco but directed by your company; is that right?

21  A.  For documents produced by Mar-Jac, Claxton and Koch, we

22  received cover letters from counsel representing those

23  companies.  And accompanying the production volumes we sent to

24  the DOJ we had transmittal letters as well.

25  Q.  And how were those letters transmitted to the DOJ, the ones

Simeon Morbey - Cross

1    from your company?

2    A.   The letters were included in hard copy in the productions

3    sent to the DOJ.   They were also -- courtesy copies were

4    provided via e-mail with the password to access the documents

5    included in that courtesy copy.

6    Q.   So you provided CS Disco with a copy of a cover letter.

7    And CS Disco provided that letter to the Department of Justice

8    along with the hardware that it had compiled regarding the

9    production volume, correct?

10   A.   Yes.

11   Q.   All right.   So regarding the -- and am I correct -- and I

12   am sorry if I have already asked you this.   Am I correct that

13   you did not physically personally examine the hardware that was

14   sent from CV Disco to the Department of Justice regarding the

15   productions related in this list?

16   A.   I did not touch the hard drives, no.

17   Q.   Right.   Okay.   So fair to say also that your company did

18   not -- it was not your company -- let me take a step back.

19        Some of these production volumes contained errors of

20   some kind, is that fair to say, that were brought to your

21   attention?

22        MS. ROGOWSKI:   Your Honor, objection, beyond the

23   scope.

24        THE COURT:   I will overrule the objection.   And you

25   are talking about productions from Koch, Claxton and Mar-Jac?

Simeon Morbey - Cross

1          MS. CARWILE:  I am, yes.  I am sorry if I didn't make

2     that clear, but I am only talking about those three.

3          MS. ROGOWSKI:  Your Honor, objection to foundation as

4     well.

5          THE COURT:  That objection is overruled too.  If he

6     knows, he can answer it.

7          Go ahead.

8     BY MS. CARWILE:

9     Q.  Do you know the answer to that?

10    A.  I'm not clear whether you are referring to the production

11    that was made to my company or the production that we

12    instructed CS Disco to make to the DOJ.

13    Q.  Fair enough.  Were there errors in the productions that

14    came to your company from one of these three companies?

15    A.  Sitting here my recollection is yes, there were.

16    Q.  Okay.  And were there errors that were brought to your

17    attention from the government regarding productions you had

18    directed CS Disco to provide them that are relevant to this

19    list of documents in front of you?

20         THE COURT:  And you said from the government.  Do you

21    mean productions to DOJ?

22         MS. CARWILE:  Yes.  I also asked that inartfully.

23    BY MS. CARWILE:

24    Q.  I mean productions to DOJ.  What I mean is were you

25    provided information from the government regarding potential

Simeon Morbey - Cross

1    problems with the productions as relate to this list?

2    A.   I am aware that the DOJ asked my company certain questions

3    regarding the productions that were made.  To the best of my

4    knowledge, we referred those questions to CS Disco and all

5    those questions were satisfactorily addressed.

6    Q.   But you referred those questions directly to CS Disco,

7    right?  You just said that.

8    A.   Yes.

9    Q.   And those errors were corrected ostensibly by CS Disco.

10   A.   I don't know if there were errors or not, but the issues

11   that were raised were addressed.  And if there was a

12   reproduction of a particular volume of documents, CS Disco made

13   that reproduction.  I'm not sure if a reproduction was required

14   for the documents that are contained in the government's list,

15   9555, but again, to the best of my knowledge, each question

16   that the government raised was addressed satisfactorily by CS

17   Disco.

18   Q.   Right.  But you only know that from being the messenger

19   between the two; is that fair to say?  You received the message

20   from the government that there may be some error with one of

21   the productions relevant to this list.  You forwarded that

22   question on to CS Disco who then provided directly back to the

23   government updated production volumes, correct?

24   A.   And we understood.

25   Q.   Is that correct?

708

Simeon Morbey - Cross

1   A.  That's correct.  We also understood that there was nothing

2   further to do -- to discuss based on those production volumes.

3   The questions had been addressed.

4   Q.  Right.  Nothing had been brought to your attention as the

5   messenger to CS Disco again after some question from the

6   government regarding documents that they cared about, right?

7   A.  Yes.  Nothing further was raised.

8   Q.  Just a few more questions.

9        This may be obvious at this point, I don't mean to

10  belabor the point, but some of this hardware that was provided

11  to the government from CS Disco had passwords, correct?

12  A.  There were passwords associated with the productions to the

13  Department of Justice to access the documents on the hard

14  drives, yes.

15  Q.  And you did not create those passwords.  Your company did

16  not create those passwords.

17  A.  That is correct.

18  Q.  Let me just look at a few things.  So I would like you to

19  look at the list now and I am going to ask you about two

20  specific exhibits.  And I am going to start with Exhibit --

21  Government Exhibit 8010.

22        Do you see that on the list?

23  A.  I see that on the list.  Would you like me to turn to it in

24  the book?

25  Q.  That would be great.  Thank you.

Simeon Morbey - Cross

1    A.   Sorry.  It's going to take a second.

2    Q.   That's okay.  Take your time.

3         You have it in front of you?

4    A.   I have the native document place holder in front of me.

5    Q.   So do I.  So here is my question about this.  You had

6    testified on direct that you had taken a look at all of the

7    documents that the government directed you to to see if they

8    were accurate to some degree, and we'll discuss that in a

9    second, but you had looked at these documents in preparation

10   for your testimony today, correct?

11   A.   Yes.  I have looked at the native place holder and the

12   underlying Excel spreadsheet.

13   Q.   So you looked at the underlying of Exhibit 8010, correct?

14   A.   Yes.

15   Q.   And that is an Excel spreadsheet?

16   A.   I believe so.  And I believe it's on the screen in front of

17   me; is that right?  It looks like 8010.

18   Q.   I don't have a screen, so I am just going to take a brief

19   peek.  That looks right enough.

20        All right.  So do you know what this document purports

21   to be?  And I don't mean -- I don't want you to give any

22   identifiers.  I am just asking generally what the document

23   would be without naming individuals.

24   A.   It looks to be an extract of a cellphone that includes

25   contact information, call log information, chats, MMS messages

Simeon Morbey - Cross

1   and SMS messages.

2   Q.  So colloquially speaking, it's a cellphone doc; is that

3   right?

4   A.  I'm not -- I don't use that term, but, I mean, it is from a

5   cellphone, so...

6           MR. TUBACH:  I apologize.  Could we have a brief side

7   bar on this?

8           THE COURT:  Yes.  Actually, since it's almost time for

9   our mid-morning break, why don't we go ahead, ladies and

10  gentlemen, and take the mid-morning break at this time.  Why

11  don't we plan on reconvening 25 minutes to 11:00, all right?

12          The jury excused.  Thank you.

13          (Jury excused.)

14       Mr. Morbey, you are excused until the break is done.

15  Thank you very much.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  Mr. Tubach, go ahead.

18          MR. TUBACH:  I just wanted to bring to the Court's

19  attention 8010 as reflected on -- our electronic person helper

20  here put on the screen is different than what we received which

21  I believe from the government is exactly three texts in 8010.

22  I don't know if there is some error in the printing process or

23  if there is some other explanation for this.  At least what I

24  have in the document is just three small texts -- I am happy to

25  show this to counsel -- and not the entire list of texts that

Simeon Morbey - Cross

1   were shown on the screen.

2        THE COURT:  The exhibit list that I have which is

3   Docket No. 669, I am not sure how recent that was, but that

4   description seems consistent with what was displayed to the

5   witness.

6        Ms. Rogowski, go ahead.

7        MS. ROGOWSKI:  Your Honor, the version we have in our

8   Trial Director software, which should be the most recent

9   version that you all have from the flash drives of last week,

10  it does, in fact, match the description that Mr. Morbey gave.

11  I'm not sure what happened with this exhibit that Mr. Tubach

12  just handed me.  It's not labeled, so I am not sure exactly

13  where this one came from, but I do believe that the version

14  that we provided in our flash drives last week to defense

15  counsel is, in fact, the same to the best of my knowledge.

16       THE COURT:  Do you have hard copies?

17       MS. ROGOWSKI:  I have a few, Your Honor, in a binder,

18  but it's just the native place holder because the document

19  itself is a big Excel spreadsheet.

20       THE COURT:  Right.  That would not help anyone.

21       Okay.  Mr. Tubach, anything else?

22       MR. TUBACH:  We can try and figure out if the error is

23  on our part in some way.  It just looked very different than

24  what I had.

25       THE COURT:  Okay.  Then we will be in recess until the

Simeon Morbey - Cross

1   time that I indicated.  Thank you.

2       (Recess at 10:17 a.m.)

3       (Reconvened at 10:36 a.m.)

4       THE COURT:  Are we ready for the jury?

5       Yes, Mr. Morbey, if you don't mind, you can come up

6   and resume the witness stand.

7       MR. TUBACH:  Briefly, I believe that the disconnect

8   was that the exhibit is a Excel spreadsheet with multiple tabs

9   and we only had one tab, so I think that's -- I think we are

10  fine.

11      THE COURT:  Okay, great.  Thank you for that update.

12      One other thing real quick, and I just -- I am in the

13  process of docketing a ruling as to Docket 1030, not that you

14  would necessarily be able to pull it up, but if you are able to

15  pull it up, you can do so.

16      MS. ROGOWSKI:  Your Honor, we did want to raise

17  something with respect to Exhibit No. 1030 before the jury

18  comes back out.  I understand you are in the process of

19  docketing and we don't know what you have planned to docket,

20  but we did want to raise a hash value comparison with our next

21  witness that relates to Exhibit 1030, but we wanted to raise

22  that now before the jury comes back out in case there is an

23  objection.

24      THE COURT:  Well, once again, I think the issue has to

25  go to whether you have anyone to authenticate the author.

Simeon Morbey - Cross

1           *MS. ROGOWSKI:*  That's another thing we wanted to

2    raise, Your Honor.  The government is considering calling a

3    witness who can testify to the handwriting of Mr. Martin.  We

4    have not made any decisions at this point, but we wanted to let

5    you know.  And we also wanted to let you know that depending on

6    what your ruling in the docket entry says, we do want to take

7    this issue up further.  And we would request that we could do

8    so in writing.  We think it could be more efficient for the

9    Court.

10          *THE COURT:*  I am sorry, do something in writing?  You

11   can.  The order will stand and we are not going to be in this

12   endless loop of motions for reconsideration, I guarantee you;

13   but on the other hand, the government can call a witness to

14   authenticate the handwriting.  There is no reason it can't.

15          *MS. ROGOWSKI:*  Understood, Your Honor.

16          *THE COURT:*  Subject to what the defendants may say.  I

17   mean, we will have to see what the objection, if any, would be.

18          Let's bring the jury in.

19          (Jury present.)

20          *THE COURT:*  Ms. Carwile, go ahead.

21   *BY MS. CARWILE:*

22   *Q.*  Mr. Morbey, I am going to wrap this up because I don't want

23   to keep you here too long.

24          So my final question to you is this.  As to the time

25   zone data and generally the metadata that accompanied the

Simeon Morbey - Cross

1    documents on that list, you cannot personally speak to the

2    accuracy of that information in terms of whether it's identical

3    to the metadata and the time zone data on the servers of the

4    Claxton, Mar-Jac and Koch companies, correct?

5    A.  I have no personal knowledge of the metadata information

6    contained on the Koch, Claxton and Mar-Jac servers.

7            MS. CARWILE:  Thank you.

8            THE COURT:  Additional cross?

9            Mr. Tubach.

10           MR. TUBACH:  Just on one document, Your Honor.

11                        **CROSS-EXAMINATION**

12   BY MR. TUBACH:

13   Q.  Good morning, Mr. Morbey.

14   A.  Good morning.

15   Q.  Could you turn to Document 1029, please, in your binder?

16   A.  I am almost there.

17   Q.  Take your time.

18   A.  I'm there.

19   Q.  Do you have Document 1029 in front of you?

20   A.  Yes.

21   Q.  You see it says at the bottom "Excerpt from" and then it

22   lists a Bates number?

23   A.  Yes, I do.

24   Q.  Do you have any idea whether this is the document as you

25   either received it from the company or produced it to DOJ?

Robert Bryant - Redirect

1   *A.*  My understanding based on my comparison is that this is

2   part of a document that was produced to my company that bears

3   the Bates stamp Mar-Jac_0000596413.  And when I made the

4   comparison, I looked at the complete document that was produced

5   and then saw that this was a portion of that.

6   *Q.*  So this is only a portion.  What's marked as Exhibit 1029,

7   it's only a portion of a document that is the Bates number that

8   you just read to us, right?

9   *A.*  That is my understanding.

10        *MR. TUBACH:*  Thank you very much.  No further

11  questions.

12        *THE COURT:*  Thank you.  Additional cross-examination?

13        All right.  Redirect.

14                    **REDIRECT EXAMINATION**

15  *BY MS. ROGOWSKI:*

16  *Q.*  Mr. Morbey, you were asked a lot of questions on

17  cross-examination, so I want to make sure I clarify a few

18  points.

19        Could you please clarify for the jury, you did, in

20  fact, take a look at each of the documents in your binder; is

21  that correct?

22  *A.*  I did, yes.

23  *Q.*  And for those documents that are -- that there is a native

24  spreadsheet, you did, in fact, take a look at the actual native

25  file that we sent you; is that correct?

Robert Bryant - Redirect

1    *A.*  I took a look at the native file that was produced to my

2    company from the broiler producer, I forget whether it's

3    Mar-Jac or Claxton or Koch, whoever produced it, and I compared

4    that to what the government sent me to compare.

5    *Q.*  And what the government sent to you to compare was also a

6    native file; is that correct?

7    *A.*  Correct.

8    *Q.*  And a native file just means the full spreadsheet?

9    *A.*  Correct.

10   *Q.*  So you compared those two sets of documents.  What did you

11   conclude in your comparison?

12   *A.*  Are the two sets the full list that the government gave me?

13   *Q.*  Yes.

14   *A.*  I concluded that the list that the government gave me was

15   the same documents that were the documents that were produced

16   to my company.

17   *Q.*  Based on your review, do you have any reason to believe

18   there were any errors in the production that would have

19   affected how the documents were copied materially?

20   *A.*  I have no reason to believe there was any issue with the

21   copying.

22        *MS. ROGOWSKI:*  No further questions.

23        *THE COURT:*  All right.  Mr. Morbey, you are excused.

24   However, one or more of the defendants may ask that you testify

25   later, but for now -- and if so, they will be in contact with

Anna Bieganowska - Direct

1   you.  But for now you are excused.  Thank you very much.

2          *THE WITNESS:*  Thank you, Your Honor.

3          *THE COURT:*  The United States may call its next

4   witness.

5          *MS. BUTTE:*  Thank you, Your Honor.  We call Anna

6   Bieganowska.

7     (**Anna Bieganowska** was sworn.)

8          *THE WITNESS:*  I do.

9          *COURT DEPUTY CLERK:*  Please state your name and spell

10  your first and last name for the record.

11         *THE WITNESS:*  Anna Bieganowska, A-N-N-A,

12  B-I-E-G-A-N-O-W-S-K-A.

13                       **DIRECT EXAMINATION**

14  *BY MS. BUTTE:*

15  *Q.*  Thank you, Ms. Bieganowska, and good morning.

16          What is your highest level of education?

17  *A.*  Bachelor's degree.

18  *Q.*  Where do you work?

19  *A.*  The U.S. Department of Justice, antitrust division.

20  *Q.*  How long have you worked at the Department of Justice?

21  *A.*  A little over two years.

22  *Q.*  What are your general responsibilities?

23  *A.*  I help organize the official file, take notes on calls and

24  help process incoming document productions.

25  *Q.*  What is a document production?

Anna Bieganowska - Direct

1   *A.*   A production is a -- a document production is a compilation

2   of documents given to a party such as the Department of Justice

3   during an investigation.

4   *Q.*   Does the Department of Justice receive document productions

5   from third parties?

6   *A.*   It does.

7   *Q.*   And what are your responsibilities with respect to incoming

8   document productions?

9   *A.*   When we receive an incoming document production, I will

10  usually take the production.  If it comes, for example, on hard

11  media such as a CD, it will come with a cover letter which

12  describes what's contained within the production.  It will also

13  sometimes come with a submission index, so just describing the

14  contents.  And so we'll scan the cover letter, that submission

15  index and a copy of the media.

16       We will take that information and input it into a

17  database called eRoom.  We will attach all attachments and

18  update that eRoom entry with any information about the

19  production, including the Bates range.  We will input that same

20  exact information into a system called CMTS for our case media

21  tracking system.  And through CMTS we can submit a ticket to

22  our LSS staff to actually process the production and put it on

23  a document review platform called Relativity.

24  *Q.*   What does LSS stand for?

25  *A.*   Litigation support system.

Anna Bieganowska - Direct

1          MS. BUTTE:  Through Ms. Grimm we would like to give

2     the witness a binder of documents and also an exhibit list,

3     Exhibit 9655.

4          THE COURT:  She may.

5     BY MS. BUTTE:

6     Q.  Turning to the list and the exhibits in front of you, were

7     you able to determine if the documents in this binder were

8     produced by third parties to the Department of Justice?

9     A.  I was, and they were.

10    Q.  How did you determine that for the documents with the MJ

11    Poultry, Mar-Jac, Koch, Koch, K-o-c-h, Koch Foods, CLA and

12    Claxton prefixes?

13    A.  I was able to look at the exhibit list and the

14    corresponding Bates numbers and find those Bates numbers in

15    Relativity.  I was then able to use the Bates number and any

16    other underlying information contained in Relativity to find

17    the same exact documents within CMTS and eRoom.  I was also

18    able through CMTS to find a load completion notice for all of

19    these files which is just a confirmation that the files were,

20    in fact, loaded to Relativity.

21    Q.  Do the exhibits in front of you with the MJ Poultry,

22    Mar-Jac, Koch, Koch Foods, CLA and Claxton prefixes appear to

23    be true copies of the documents produced by third parties to

24    the Department of Justice?

25    A.  They do.

Anna Bieganowska - Direct

1   Q.   Are you familiar with the term parent e-mail?

2   A.   Yes.

3   Q.   What does it mean?

4   A.   A parent e-mail is the main e-mail in a family of

5   documents, so any corresponding attachments with that parent

6   e-mail are referred to as children or family documents.

7   Q.   If you could turn to Tab 10 in your binder.  And this

8   contains Government Exhibit 1023.

9        Did you review this document?

10  A.   I did.

11  Q.   What is it?

12  A.   It's an e-mail.

13  Q.   Could you turn to Tab 11 in your binder.  And this contains

14  Government Exhibit 1024.

15       Did you review this document?

16  A.   I did.

17  Q.   What is it?

18  A.   It's another e-mail.

19  Q.   If you could turn to Tab 12 in your binder.  And this

20  contains Government Exhibit 1025.

21       Did you review 1025?

22  A.   I did.

23  Q.   What is it?

24  A.   It's another e-mail.

25  Q.   If you could turn to Tab 13 in your binder.  And this

Anna Bieganowska - Direct

1   contains Government Exhibit 1026.

2           Did you review this document?

3   *A.*  I did.

4   *Q.*  What is it?

5   *A.*  It's a spreadsheet.

6   *Q.*  If you could turn back to Tab 12 which also contains

7   Government Exhibit 1025-1.

8           Did you review 1025-1?

9   *A.*  I did.

10  *Q.*  What is this document?

11  *A.*  It's the underlying metadata for two of the e-mail

12  attachments.

13  *Q.*  Does this document indicate that Government Exhibit 1023 is

14  a parent e-mail of Exhibits 1024, 1025 and 1026?

15  *A.*  It does.

16  *Q.*  Did you also review these documents in Relativity?

17  *A.*  I did.

18  *Q.*  What did that show?

19  *A.*  It showed that they were the exact same documents and that

20  the underlying metadata was the same.

21  *Q.*  Did it show they were family members of each other?

22  *A.*  It did.

23  *Q.*  If you can turn to Tab 15 in your binder.  This contains

24  Government Exhibit 1410.

25          Did you review this document?

Anna Bieganowska - Direct

1   A.   I did.

2   Q.   What is it?

3   A.   It's an e-mail.

4   Q.   If you could turn to the next page which is Government

5   Exhibit 1410-1.

6          Did you review this document?

7   A.   I did.

8   Q.   What is it?

9   A.   It's the underlying metadata for that e-mail that I just

10   mentioned.

11   Q.   Does this indicate if Government Exhibit 1410 has an

12   attachment?

13   A.   It does.

14   Q.   If you could turn to Tab 16 in your binder.  And this is

15   Government Exhibit 1411.

16          Did you review this document?

17   A.   I did.

18   Q.   What is this document?

19   A.   It's a spreadsheet.

20   Q.   Is this an attachment of Exhibit 1410?

21   A.   It is.

22   Q.   Could you turn to Tab 18 in your binder.  And this contains

23   Government Exhibit 1521.

24          Did you review this document?

25   A.   I did.

Anna Bieganowska - Direct

1    Q.   What is it?

2    A.   It's an e-mail.

3    Q.   If you could turn to the next page which is Exhibit 1521-1.

4         Did you review this document?

5    A.   I did.

6    Q.   And what is it?

7    A.   It's a spreadsheet.

8    Q.   If you turn to the next page in that same tab which is

9    Government Exhibit 1521-2, did you review this document?

10   A.   I did.

11   Q.   What is this document?

12   A.   The underlying metadata for that spreadsheet showing that

13   it's an attachment of the previous e-mail.

14   Q.   Turning back to the list of exhibits that we gave you

15   that's marked as Government Exhibit 9655, have you reviewed

16   this list and the documents in your binders with a Bates prefix

17   GEO and GEO-DOJ?

18   A.   I did.

19   Q.   What did you do to review them?

20   A.   I used the list of Bates numbers and I was able to search

21   for them in Relativity.  I then also confirmed manually that

22   those Bates numbers were the same as the ones on this list.

23   Q.   To the best of your knowledge, were the documents with the

24   GEO and GEO-DOJ prefixes produced to the Department of Justice?

25   A.   Yes.

Anna Bieganowska - Direct

 1              *MS. BUTTE:*  May I have a moment to confer?

 2              *THE COURT:*  You may.

 3              *MS. BUTTE:*  No further questions.

 4              *THE COURT:*  Thank you.

 5              Cross-examination?

 6              *MS. CARWILE:*  Not for me.

 7              *THE COURT:*  Okay.  Any?  Thank you very much,

 8    Ms. Bieganowska.  You may step down.

 9              The United States may call its next witness.

10              *MS. BUTTE:*  Your Honor, may I just clarify, is

11    Ms. Bieganowska excused?

12              *THE COURT:*  Given where she works, it would seem like

13    you can confer with the defendants as to whether or not she

14    should -- well, let me just ask, any reason that she may need

15    to be recalled?

16              *MR. TUBACH:*  The only reason might be if there is some

17    revisiting of the exhibit.

18              *THE COURT:*  Yeah, as long as she can receive some

19    advanced notice as to whether she needs to return.

20              Mr. Koenig?

21              *MR. KOENIG:*  Thank you, Your Honor.  The United States

22    calls Robert Bryant.

23         (**Robert Bryant** was sworn.)

24              *THE WITNESS:*  I do.

25              *COURT DEPUTY CLERK:*  Please state your name and spell

Robert Bryant - Direct

1    your first and last name for the record.

2          THE WITNESS:   Robert Alan Bryant, R-O-B-E-R-T,

3    B-R-Y-A-N-T.

4                    **DIRECT EXAMINATION**

5    BY MR. KOENIG:

6    Q.   Good morning, Mr. Bryant.   Where do you work?

7    A.   Pilgrim's.

8    Q.   And what is Pilgrim's?

9    A.   It's a poultry company.

10   Q.   What kind of products do they make?

11   A.   Chicken.

12   Q.   Okay.   How long have you worked at Pilgrim's?

13   A.   All together about 30 years.

14   Q.   Okay.   So when did you start approximately?

15   A.   June of 1992.

16   Q.   And about how old were you then?

17   A.   I was 18, 18 or 19.   It was supposed to be a summer job

18   before I went to college.

19   Q.   Okay.   And what location of Pilgrim's did you start at?

20   A.   Mayfield, Kentucky.

21   Q.   What's at Mayfield, Kentucky?

22   A.   Excuse me?

23   Q.   What is -- Mayfield, Kentucky is a city.

24   A.   That's correct.   And we generally named or called the

25   plants after the major city where they were located, so that

Robert Bryant - Direct

1    one was called the Mayfield plant or the Hickory plant.

2    Q.  So it's a production facility?

3    A.  It is.

4    Q.  And what did you do when you started as an 18 or

5    19-year-old at Pilgrim's?

6    A.  I started in sanitation, literally cleaning up the place in

7    the afternoon.

8    Q.  Did there come a time when Pilgrim's went through a

9    structural reorganization?

10   A.  Yes.

11   Q.  When was that approximately?

12   A.  Around 2010.

13   Q.  Did you move to -- well, from sanitation by that time had

14   you moved up?  Had you received promotions?

15   A.  I had.

16   Q.  Did you go to school at all during your time at

17   Pilgrim's --

18   A.  I did.

19   Q.  Just make sure you let me finish the question, please.

20         Where did you go to school?

21   A.  Mid-Continent University.

22   Q.  Where is that?

23   A.  At Mayfield.

24   Q.  What was your degree?

25   A.  Business administration.

Robert Bryant - Direct

1   Q.   Are you currently in school still?

2   A.   I am.

3   Q.   Where at?

4   A.   Colorado State University.

5   Q.   And what degree are you pursuing?

6   A.   An MBA.

7   Q.   Okay.  And is this like a night school type thing?

8   A.   No, it's on-line.  You know, I do that in the evenings and

9   on weekends while I am doing my normal job.

10   Q.   Okay.  So you said around 2010 Pilgrim's went through a

11   structural reorganization?

12   A.   That's correct.

13   Q.   And did you move to a new role at that time?

14   A.   I did.

15   Q.   What was that role?

16   A.   It was called divisional planner for fresh food service.

17   Q.   Can you please explain to the jury what fresh food service

18   is?

19   A.   There's five different business units primarily in

20   Pilgrim's.  Fresh food service is one of those business units.

21   It has three primary customers:  QSRs or fast-food restaurants;

22   retail delis, which would be your supermarkets, the rotisserie

23   birds that you would buy there in the eight-piece; and then the

24   broad-line distributors, which would be like Sysco, US Foods,

25   Gordon Food Service.  So they pull multiple proteins and sizes

728

Robert Bryant - Direct

 1    and products, paper goods to deliver to like a restaurant or an

 2    independent grocer.

 3    Q.   You mentioned the term QSR.

 4    A.   Yes.

 5    Q.   What does that stands for?

 6    A.   Quick-serve restaurant.

 7    Q.   That's just industry lingo for fast-food?

 8    A.   Correct.

 9    Q.   Can you give us some examples of a QSR who Pilgrim's sells

10    to?

11    A.   KFC, Popeye's, Church's, Bojangles.

12    Q.   And that was just an example list.  That wasn't a full --

13    A.   Yes.  That wasn't all encompassing.

14    Q.   You mentioned -- I think you mentioned supermarket delis or

15    grocery delis?

16    A.   That's correct.

17    Q.   What is the product that's sold from Pilgrim's to the

18    delis?

19    A.   It's the rotisserie birds that you would buy that are in a

20    box or a bag and the eight-piece, and then we would sell some

21    tenders, the hot delis that you would get those type of

22    products from.

23    Q.   Okay.  So you buy the rotisserie chicken already cooked?

24    A.   Correct.

25    Q.   All right.  So you were the divisional planner for fresh

Robert Bryant - Direct

1    food service starting in around 2010?

2    A.   That's correct.

3    Q.   Where was -- where were you -- where did you office at that

4    time?

5    A.   At Mayfield.

6    Q.   Okay.  And what were your responsibilities as divisional

7    planner?

8    A.   I was basically responsible for the supply chain for the

9    business unit.  At that time there was seven plants inside that

10   business unit, six or seven plants inside that business unit.

11   And then -- so making sure we had enough birds to fill customer

12   orders, those customer orders were filled in full, and the bird

13   size was the correct size to fill those.  With demand

14   fluctuations, it was my job to cover those peaks and valleys.

15   Q.   And in the position of divisional planner, how long did you

16   hold that position?

17   A.   From approximately -- from approximately 2010 until I was

18   promoted again in the fall of 2016.

19   Q.   All right.  And during that time who was your supervisor

20   from 2010 to 2016?

21   A.   I had two during that time.  When I was first promoted, it

22   was Jason McGuire.  And then in the fall of 2014 or early 2015

23   it transitioned to Tim Stiller.

24   Q.   All right.  And so during the time that Jason McGuire was

25   your supervisor, who did Jason McGuire report to?

Robert Bryant - Direct

1   A.   At the very beginning it was Steve Smith and then later it

2   was Jayson Penn.

3   Q.   And at that time who did Jayson Penn report to?

4   A.   Bill Lovette.

5   Q.   And what was Bill Lovette's position?

6   A.   He was our CEO.

7   Q.   Tim Stiller, you said that started end of 2014, start of

8   2015; is that right?

9   A.   That's correct.

10   Q.   And who did he report to?

11   A.   He reported to Jayson Penn.

12   Q.   Okay.  And who did Jayson Penn report to during that

13   period?

14   A.   Bill Lovette.

15   Q.   Did you have any -- in your role as divisional planner for

16   fresh food service, did you have any role in pricing or

17   negotiations with customers?

18   A.   Not at the beginning, but later I transitioned into more

19   customer facing roles.

20   Q.   And when was that?

21   A.   Particularly in 2014.

22   Q.   That was a new thing for you at the time?

23   A.   To be at the national account level customer facing, yes,

24   relatively new.

25   Q.   What do you mean by national account level?

731

Robert Bryant - Direct

1   *A.*  I dealt with some smaller customers.

2   *Q.*  Previously?

3   *A.*  Previously, but really being customer facing to the larger

4   national accounts, that was the first time I had a lot of

5   exposure to them.

6   *Q.*  Okay.  Let's talk again during your time as divisional

7   planner from 2010 to 2016 -- did I get that right?

8   *A.*  That's correct.

9   *Q.*  Can you explain to the jury your compensation structure?

10  *A.*  So a base salary plus short-term bonus.

11  *Q.*  And do you have an understanding of how the short-term

12  bonus was calculated?

13  *A.*  Yes.

14  *Q.*  And what is that understanding?

15  *A.*  At the time my short-term bonus was calculated basically

16  off profitability of the individual business unit and the total

17  company, and then I received a percentage of my salary based

18  off that, that calculation.

19  *Q.*  Okay.  Can we break that down just a little bit more?

20  How -- like you said based on profitability.

21  *A.*  That's correct.

22  *Q.*  Was it some sort of sliding scale or what --

23  *A.*  No.  My understanding was it was done off the valuation of

24  the individual business unit.  For instance, if the business

25  unit was valued at like a billion dollars, for instance --

Robert Bryant - Direct

1   Q.  Did you say a billion dollars?

2   A.  1 billion, yes, and the expected return was 10 percent

3   profit margin off that return.  Then once we hit $100 million,

4   then the bonus was fully funded at a hundred percent.  There

5   was a 25 percent entry level that you had to get to first and

6   then it capped at 200 percent.

7   Q.  So the profits for your business unit, which is fresh food

8   service, right?

9   A.  Correct.  And that was -- the bonus was 60 percent business

10  unit, 40 percent company, total company.

11  Q.  But for your business unit -- let's just take your example.

12  If the business unit -- if the target was a hundred million

13  dollars in profit, the bonus pool was funded, correct?  Is that

14  what you're saying?

15  A.  That's correct.

16  Q.  Okay.  And then you said it was capped at 200 percent?

17  A.  That's correct.

18  Q.  So what would that mean the profitability would have to be?

19  A.  Around $200 million.

20  Q.  Okay.  And then so what determines profitability?

21  A.  You know, I mean, profit, but there is kind of three

22  components to us that we chase to make the company more

23  profitable, price increases, improving the mix and then pushing

24  down cost.

25  Q.  So it's price increases?

Robert Bryant - Direct

1   A.   Correct.

2   Q.   Mix?

3   A.   Correct.

4   Q.   Can you explain to the jury what mix is?

5   A.   There is -- when you sell a bird, you may sell off

6   individual parts, for instance, a leg quarter or a front half.

7   When you put that bird back together and value it, it may not

8   be as profitable as selling it in a different form.  So if you

9   can transition that form into something that's more profitable,

10  you have improved your mix.

11  Q.   Okay.  And then once the bonus -- once the bonus was fully

12  funded, then you got a slice of that?

13  A.   That's correct.

14       MS. HENRY:  Objection, leading.

15       THE COURT:  Overruled.

16  BY MR. KOENIG:

17  Q.   Okay.  So you have that position until -- let me back up.

18  When you said 200 percent was the cap, 200 percent of what?

19  A.   200 percent of your bonus.  So if your bonus was

20  10 percent, for instance -- of your salary, then your -- when

21  it capped at 200, it would be 10 percent times two basically,

22  so it would be 20 percent of your salary.

23  Q.   Understood.  Okay.

24       All.  Right.  Now, then in 2016 after you had been

25  divisional planner for fresh food service for roughly six

734

Robert Bryant - Direct

1    years, did you get another promotion?

2    A.   I did.

3    Q.   And what position did you get promoted to?

4    A.   In 2019 I was promoted to general manager.

5    Q.   2016?

6    A.   2016, sorry.  2016 I was promoted to the director of sales

7    for fresh food service.

8    Q.   All right.  Did your responsibilities change when you moved

9    to director of sales from divisional planner?

10   A.   They did.

11   Q.   How so?

12   A.   Then I was responsible not only for the supply chain, but

13   for the sales program for the entire business unit, so the

14   negotiations, pricing and so forth.

15   Q.   And during that time from the -- and how long did you hold

16   that position?

17   A.   From 2016 until the summer of 2019.

18   Q.   All right.  And who was your supervisor during that period?

19   A.   Tim Stiller.

20   Q.   Okay.  And who was Mr. Stiller's supervisor?

21   A.   Jayson Penn.

22   Q.   And who was Jayson Penn's supervisor?

23   A.   Bill until --

24   Q.   Excuse me, who?

25   A.   Bill Lovette until he retired or left the company.

735

Robert Bryant - Direct

1    Q.   And then what happened when Bill Lovette retired?

2    A.   Jayson Penn became our CEO.

3    Q.   All right.  Mr. Bryant, are you here under an agreement

4    where you will not be prosecuted?

5    A.   I am.

6    Q.   And what conduct does that agreement relate to?

7    A.   Price-fixing.

8    Q.   Did you meet -- as part of that agreement, did you meet

9    with federal agents and the Department of Justice?

10   A.   I did.

11   Q.   How many times?

12   A.   Approximately 20.

13   Q.   During any of those interviews did you lie to the

14   government?

15   A.   I did.

16   Q.   Did you have a role in the price-fixing conduct?

17   A.   I did.

18   Q.   What did you do?

19   A.   I received competitor pricing and used that pricing to

20   submit bids to customers and asked others to retrieve

21   competitor pricing.

22   Q.   Can you say that last sentence?  I couldn't hear it.

23   A.   I asked others to retrieve competitor pricing that we used

24   to formulate bids.

25   Q.   What was the purpose of getting prices?  Who did you get

736

Robert Bryant - Direct

1    prices from?  Sorry.

2    A.  As far as?

3    Q.  When you say I received prices or I directed other people

4    to get prices for me, whose prices are we talking about here?

5    A.  Competitors.

6    Q.  And what kind of pricing was it?

7    A.  It was pricing for bids.  I can give an example.

8    Q.  Sure.

9    A.  I received the pricing for a KFC bid from Roger in 2017.

10   Q.  From whom?

11   A.  From Roger Austin in 2017 for a bid that was due that week.

12   And later on in 2017 Scott Tucker --

13   Q.  Who is Scott Tucker?

14   A.  He is a salesperson -- or was a salesperson for

15   Pilgrim's -- provided pricing to me from Mar-Jac, which is

16   another poultry company, for some products we were negotiating

17   with US Food Service.

18   Q.  And Mar-Jac was a competitor?

19   A.  That's correct.

20   Q.  And the pricing you got from Mr. Austin, that was from

21   competitors as well?

22   A.  Yes.

23   Q.  All right.  So what was the purpose of getting the

24   competitors' pricing?

25   A.  Depended on the situation, but it was either to increase

Robert Bryant - Direct

1    prices or limit a decrease in price.

2    Q.   Okay.  For just Pilgrim's?

3    A.   No, for the other -- other competitors involved as well.

4    Q.   And did you have an understanding as to why competitors

5    gave their pricing to Pilgrim's?

6            MR. KORNFELD:  Objection.

7            MR. FELDBERG:  Objection, Your Honor.

8            THE COURT:  Grounds?

9            MR. FELDBERG:  Hearsay.

10           MR. KORNFELD:  And foundation, Your Honor.

11           THE COURT:  And response?

12           MR. KOENIG:  I just asked do you have an understanding

13   as to why competitors gave pricing to Pilgrim's.

14           THE COURT:  Okay.  That's true.  It's a yes or no.  He

15   can answer yes or no.  Overruled.

16   BY MR. KOENIG:

17   Q.   You can answer the question.

18   A.   Yes.

19   Q.   And what is the basis for that understanding?

20   A.   From what I witnessed in 2014, there was some significant

21   price increases that were -- that we received in 2014.  And I

22   witnessed phone calls between people at Pilgrim's and

23   competitors and I seen the results of those phone calls

24   transition into increased prices.

25   Q.   So what then is your understanding for the reason the

Robert Bryant - Direct

1  competitors gave pricing to Pilgrim's?

2          MR. FELDBERG:  Same objection, foundation and hearsay,

3  Your Honor.

4          THE COURT:  Okay.  Overruled as to -- well, let me ask

5  you this, Mr. Koenig.  Can you establish who the information

6  came from because that's relevant to the admissibility of any

7  hearsay statement.

8          MR. KOENIG:  Okay.

9  BY MR. KOENIG:

10 Q.  You said based on experience in 2014?

11 A.  That's correct.

12 Q.  And what did you say the information was?

13 A.  It was -- I witnessed telephone calls between Roger Austin

14 and who he relayed were competitors of Pilgrim's.

15 Q.  Who in particular?

16 A.  Scott Brady and Bill Kantola.

17 Q.  Where does Scott Brady work?

18 A.  Scott Brady works at Claxton.

19 Q.  Was Claxton a competitor?

20 A.  They were.  They are.

21 Q.  And who is the other name you said?

22 A.  Bill Kantola.

23 Q.  Okay.  And where did he work?

24 A.  Koch Foods.

25 Q.  Was Koch Foods a competitor of Pilgrim's?

739

Robert Bryant - Direct

1   A.  They are.

2   Q.  All right.  So and then you said you made some other

3   observations as well; is that correct?

4   A.  That's correct.

5   Q.  What were those?

6   A.  I witnessed my boss, Jason McGuire, at the time asking

7   Roger to provide information to our competitors.

8   Q.  And ultimately what happened in those negotiations?

9   A.  We got a price increase.

10  Q.  Just you?

11  A.  No.  The industry got a price increase.

12  Q.  What do you mean by industry?

13  A.  Generally when I say industry, I mean our competitors in

14  that market.

15  Q.  Okay.  So what was your understanding of why the

16  competition gave prices to Pilgrim's?

17  A.  My understanding was --

18        MR. POLLAK:  Objection, Your Honor, lack of foundation

19  as to competition generally.

20        THE COURT:  If you could define that term.  It will be

21  sustained in part.  Go ahead.

22  BY MR. KOENIG:

23  Q.  What did you understand when I -- let me ask it this way.

24        In 2014, were you talking about a specific customer?

25  A.  Yes.

740

Robert Bryant - Direct

1    Q.  Which one?

2    A.  KFC.

3    Q.  And who -- did you have an understanding of who the

4    competition was for the KFC contract for that year?

5    A.  I did.

6    Q.  And who were they?

7    A.  Tyson, George's, Koch Foods, Claxton, Mar-Jac, to name a

8    few.

9    Q.  Okay.  Now, what was your understanding of why the

10   companies you just mentioned gave pricing to Pilgrim's?

11          MR. POLLAK:  Objection, Your Honor, lack of foundation

12   with respect to several of those companies are analogous to

13   whether they gave prices, much less the motivation.

14          MR. FELDBERG:  Same objection, Your Honor.

15   BY MR. KOENIG:

16   Q.  We will move on and circle back.

17          You mentioned that you told people to get prices?

18   A.  I did.

19   Q.  And again, were these current prices you were asking for?

20   A.  No.  They were their prices that they tended to submit.

21   Q.  To whom?

22   A.  KFC or US Foods.

23   Q.  Okay.  And why did you do that?

24   A.  To increase prices or to limit a decrease depending on the

25   current market conditions.

Robert Bryant - Direct

1    *Q.*  And when you directed people to do the sharing of the

2    future prices, did you have an understanding as to whether

3    Pilgrim's prices were also shared?

4    *A.*  Yes.

5    *Q.*  What was your understanding?

6    *A.*  My understanding was it was a two-way street.  We received

7    those prices and they received ours.

8    *Q.*  All right.  So were you ever afraid that by giving

9    Pilgrim's future pricing to a competitor that the competitor

10   would undercut Pilgrim's?

11   *A.*  No.

12         *MR. FELDBERG:*  Objection.

13         *THE COURT:*  Overruled.

14   *BY MR. KOENIG:*

15   *Q.*  Why not?

16   *A.*  My past experience in 2014 where we raised prices

17   significantly and shared that information.  And then when I

18   assumed the role as director, it was more of an agreement to

19   not go after volume.  It was about either increasing prices or

20   limiting a decrease in price.

21   *Q.*  Okay.  So can you explain a little bit about what that

22   means not to go after volume?

23   *A.*  So not to -- if you had 50 loads a week with a customer,

24   the agreement was to leave that 50 loads a week or grow

25   incrementally if they were growing with that customer and not

Robert Bryant - Direct

1    try to gain additional market share over their incremental

2    growth.

3    Q.  What is -- so in other words, can you say it in more simple

4    terms?

5    A.  To keep the volume the same and just deal with price.

6    Q.  You mentioned loads.  Can you explain that to the jury,

7    what that meant?

8    A.  A load is 40,000 pounds of product or a whole

9    tractor-trailer load full of product.  So we typically dealt in

10   loads per week.  Sometimes we would annualize that volume.

11   Q.  Did you -- when these price exchanges happened with

12   competitors, you said you did it for the purpose of either

13   raising price or limiting the decrease, right?

14   A.  Correct.

15   Q.  Why would price-fixing -- or my apologies.  Why would price

16   sharing facilitate that goal?

17   A.  You would get a range that you would look at and then place

18   yourself inside that range.  And then without that information,

19   you know, you may offer too much of a decrease or go too

20   aggressively and be exposed to actually losing volume.

21   Q.  Now, the conduct that's the subject of the agreement we

22   mentioned before, did anyone else at Pilgrim's engage in that

23   conduct with you?

24   A.  They did.

25   Q.  And who was that?

Robert Bryant - Direct

1    *A.*  Roger Austin, Scott Tucker, Justin Gay, Jason McGuire, Tim

2    Stiller.  I believe that's -- yeah, Jimmie Little.

3    *Q.*  And did anyone outside of Pilgrim's engage in that conduct

4    with you?

5    *A.*  Yes.

6    *Q.*  Yes?  Okay.  Who?

7            *MR. POLLAK:*  Objection, lack of foundation.

8            *THE COURT:*  Sustained.  If you could lay foundation

9    before he mentions who.

10           *MR. KOENIG:*  Sure.

11   *BY MR. KOENIG:*

12   *Q.*  Let's first run through the people at Pilgrim's.

13           Could we pull up Exhibit 9235?  Can we turn on just

14   the lawyer and court view only?

15           What is 9235?

16   *A.*  It's a picture.

17   *Q.*  Of who?

18   *A.*  Roger Austin.

19   *Q.*  Who is Roger Austin?

20   *A.*  He is -- at the time when I worked with him, he was the

21   head of our fresh food service business sales, our outside

22   sales.

23           *MR. KOENIG:*  Your Honor, Mr. Feldberg looks like he is

24   dying to say something.

25           *MR. FELDBERG:*  There is no issue of identification.

Robert Bryant - Direct                                            744

1    Mr. Austin is right here.

2           THE COURT:  Well, okay.  It is premature.  We haven't

3    had any -- nothing has been moved into admission.

4           Go ahead.

5    BY MR. KOENIG:

6    Q.  Is that photograph in 9235 a fair and accurate

7    representation of what you know Mr. Austin to look like?

8    A.  Yeah.

9    Q.  Who was -- who is Roger Austin?

10   A.  He worked for Pilgrim's.

11   Q.  What was his role?

12   A.  He was head of sales for the fresh food service business,

13   so he dealt primarily with the QSR brands.

14   Q.  Which accounts in particular?

15   A.  KFC, Popeye's, Church's, Chick-fil-A, Pizza Ranch, a whole

16   host of -- any of those fresh bone-in-type accounts, he handled

17   those.

18          MR. KOENIG:  The government offers 9235 into evidence.

19          THE COURT:  Any objection to the admission of 9235?

20          MR. FELDBERG:  Two objections, Your Honor.  One, there

21   is no need for a photograph.  Mr. Austin is right here.  There

22   is no question of identification.  And second, if the Court

23   would permit a photograph, we submitted one to counsel that is

24   less unflattering to Mr. Austin.

25          THE COURT:  All right.  The witness has identified

Robert Bryant - Direct

745

1   Exhibit 9235 as a photograph of Mr. Austin and the objection

2   will be overruled.  9235 will be admitted.

3            MR. KOENIG:  Thank you, Your Honor.

4   BY MR. KOENIG:

5   Q.  Now, you said before that when I asked you who else at

6   Pilgrim's engaged in the conduct at issue here, and you said

7   Roger Austin, right?

8   A.  That's correct.

9   Q.  What is your basis for saying that he participated in that

10  conduct?

11  A.  Specifically in 2017 I received a phone call from Roger

12  where he gave me competitor pricing.

13  Q.  Okay.

14  A.  We used that information to formulate our bid for 2017.

15  Q.  All right.  Any other examples?

16  A.  You know, over the course of the years there were many,

17  many times that Roger called and relayed information from

18  various competitors and their position on a whole host of

19  subjects, so it was common place for him to talk to people

20  outside or with competitors and then relay that information

21  back.

22  Q.  All right.  And so you said a whole host of things.  Did

23  that include future pricing?

24  A.  It included pricing specs.  If a customer asked about --

25  Q.  My question was, did it include future pricing?

Robert Bryant - Direct

1    A.   It did.

2    Q.   Did it include current pricing?

3    A.   It did.

4    Q.   All right.  How do you know that?

5    A.   That's what he communicated to me.

6    Q.   Okay.  Did he mention tracking current prices?

7    A.   He did at one point.

8    Q.   What did he say?

9    A.   He told me that he had everyone's pricing dating back to

10   the nineties.

11   Q.   Approximately when did he say that?

12   A.   I believe it was in 2017.

13   Q.   Do you have an understanding as to why Roger Austin

14   collected future pricing from competitors?

15   A.   Yes.

16   Q.   What is the basis for your understanding?

17   A.   You know, what I witnessed over the course of the years,

18   you know, basically to keep score on where we were at and if

19   others had submitted where he thought that they were going to

20   submit on pricing.

21   Q.   This is future pricing?

22   A.   Correct, and past.

23   Q.   And do you have an understanding -- and you may have

24   touched on this just a little bit -- but do you have an

25   understanding as to why Mr. Austin would track competitors'

Robert Bryant - Direct

1    current pricing?

2    *A.*   Yes.

3    *Q.*   And what's your basis for that understanding?

4    *A.*   It's the same thing, to -- over the course of the years he

5    relayed --

6    *Q.*   Can you speak up a little bit?

7    *A.*   Yeah, over the course of the years he relayed that

8    information to me and we had discussions about not only our

9    pricing, but competitor pricing.

10   *Q.*   From your perspective was having the current pricing useful

11   for anything?

12   *A.*   It could be.

13   *Q.*   And what was that?

14   *A.*   Depending on the pricing, sometimes people could make

15   adjustments on something like a max billable case weight which

16   in effect would increase pricing.  So knowing that information,

17   then you could adjust or attempt to adjust your max billable

18   with the customer to match that increase.

19   *Q.*   And when I said -- I think I said tracking everyone's

20   current pricing, but whose pricing was being tracked?

21   *A.*   Our competitors.

22   *Q.*   All right.  Did you find it useful for, you know -- you

23   said that one of the things that was collected by Mr. Austin

24   was future pricing, correct?

25   *A.*   Correct.

748

Robert Bryant - Direct

1   Q.  And what was the -- what did you say your understanding of

2   why he did that?

3            MR. TUBACH:  Asked and answered, Your Honor.

4            THE COURT:  Overruled.

5   A.  For bids, see where others were coming in at, make sure

6   that we were in line with them or they were in line with us.

7   And then you got the pricing after or in between contracts so

8   you know where their pricing was, in fact, going into the other

9   contract and if you needed to make adjustments.

10  BY MR. KOENIG:

11  Q.  Okay.  So you did the future pricing and then there is the

12  contract and then the current pricing.  To what end are you

13  looking at current pricing?

14  A.  To see where everybody actually did end up for sure and

15  whether or not you needed to make some sort of adjustment.  And

16  you could look at doing something with a case weight to offset

17  something that may have happened.

18  Q.  And when you said everyone, who did you mean?

19  A.  Competitors.

20  Q.  All right.  So it was a monitoring mechanism?

21  A.  It was.

22           MR. KOENIG:  Can we pull up Exhibit 9244, please?

23  BY MR. KOENIG:

24  Q.  Do you recognize 9244?

25  A.  I do.

Robert Bryant - Direct

1   Q.   What is it?

2   A.   It's a photograph.

3   Q.   Of whom?

4   A.   Jimmie Little.

5   Q.   Who is Jimmie Little?

6   A.   He was a salesperson for us until he retired.   He handled

7   some accounts -- some of the accounts that Roger had.   So Roger

8   was responsible for that group, and then he segmented off those

9   accounts to individual owners and he was one of those.

10  Q.   Which accounts did Jimmie Little handle?

11  A.   Church's, Boston Market.   I think he handled Pollo

12  Tropical, Pizza Ranch to name a few.

13  Q.   Do you see Jimmie Little in the courtroom?

14  A.   I do.

15  Q.   Could you please identify him?

16  A.   He is right here on the corner.

17  Q.   Any particular article of clothing?

18  A.   I can't -- I am color-blind, so he has got the sweater vest

19  on with a tie and a jacket.   Sorry.

20        MR. KOENIG:   Please let the record identify that

21  Mr. Bryant identified Jimmie Little.

22        THE COURT:   It shall.

23        MR. KOENIG:   And the government offers Government

24  Exhibit 9244 into evidence.

25        THE COURT:   Any objection to the admission of

Robert Bryant - Direct

750

 1    Exhibit 9244?

 2              All right.  9244 will be admitted.

 3    *BY MR. KOENIG:*

 4    *Q.*  Now, you mentioned that Jimmie Little was someone at

 5    Pilgrim's who engaged in this conduct that we are talking

 6    about, right?

 7    *A.*  That's correct.

 8    *Q.*  What's your basis for saying that?

 9    *A.*  Phone conversations that we had where he relayed

10    information from conversations he had with -- I can't remember

11    their name, but a person at Holmes and a person at Tyson Foods.

12    *Q.*  Hold one second.  I want to get to that.  When were the

13    phone conversations?

14    *A.*  Probably 2015, 2014.  I don't remember the exact date.

15    *Q.*  So you said Holmes?

16    *A.*  That's correct.

17    *Q.*  What is Holmes?

18    *A.*  It's another poultry processor in Texas.

19    *Q.*  Are they a competitor of Pilgrim's?

20    *A.*  They are.

21    *Q.*  And so what did Mr. Little say about Holmes?

22    *A.*  I just recall him relaying that he talked to his contact at

23    Holmes and what they were going to submit on pricing.  I don't

24    remember the customer.  I just remember we had a shared

25    customer with them and he was relaying what they were going to

751

Robert Bryant - Direct

1   submit versus us on that shared customer.

2   Q.  All right.  And did you have an understanding as to why

3   Jimmie Little was collecting that information?

4   A.  I did.

5   Q.  What was the basis for that understanding?

6   A.  Our phone calls and past experience together.

7   Q.  And what is your understanding of the reason he was

8   collecting that pricing information?

9   A.  To -- at this point it was to increase prices without a

10  concern of losing volume.

11  Q.  Increase together with Holmes?

12  A.  That's correct.

13  Q.  You also mentioned Jason McGuire.  Do you remember that?

14  A.  I do.

15  Q.  And can you remind the jury who Jason McGuire was?

16  A.  He was my manager at the time.

17  Q.  What time was that?

18  A.  From 2010 until late 2014.

19  Q.  And during that time who did Jason McGuire report to?

20  A.  In 2014, he was reporting to Jayson Penn.

21  Q.  And how does Jason McGuire spell his first name?

22  A.  J-A-S-O-N.

23  Q.  And how does Jayson Penn spell his first name?

24  A.  J-A-Y-S-O-N.

25  Q.  In your time, your 30 years at Pilgrim's, is there any

752

Robert Bryant - Direct

1    other Jayson spelled with a Y that you encountered other than

2    Jayson Penn?

3    A.  Not that I recall.

4           MR. KOENIG:  Can we pull up 9248?

5    BY MR. KOENIG:

6    Q.  Do you recognize 9248?

7    A.  Yes.  That's a pretty bad picture.

8    Q.  Of whom?

9    A.  Of Jayson Penn.

10   Q.  Do you see Jayson Penn in the courtroom today?

11   A.  I do.

12   Q.  Can you please identify him for the jury?

13   A.  Yes.  He is standing up.

14          MR. KOENIG:  Will you let the record reflect that

15   Mr. Bryant identified Jayson Penn.

16             THE COURT:  It shall.

17          MR. KOENIG:  The government offers 9248 into evidence.

18             THE COURT:  Any objection to the admission of 9248?

19          MR. TUBACH:  Other than it's a bad photo, Your Honor,

20   I would join in Mr. Feldberg's earlier objection.

21             THE COURT:  It seems to have some pixilation problems,

22   but Exhibit 9248 will be admitted.

23   BY MR. KOENIG:

24   Q.  And then during the period 2010 to 2014, who did Jayson

25   Penn report to?

Robert Bryant - Direct

1    A.  Bill Lovette.

2            MR. KOENIG:  Let's pull up Exhibit 9245.

3    BY MR. KOENIG:

4    Q.  Do you recognize 9245?

5    A.  I do.

6    Q.  What is it?

7    A.  It's a photograph.

8    Q.  Of?

9    A.  Bill Lovette.

10   Q.  Do you see Mr. Lovette in the courtroom today?

11   A.  I do.

12   Q.  Could you please identify him?

13   A.  Yeah.  He is standing.

14           MR. KOENIG:  Let the record reflect that Mr. Bryant

15   identified Mr. Bill Lovette.

16           THE COURT:  It shall.

17           MR. KOENIG:  The government offers 9245 into evidence.

18           THE COURT:  Any objection to the admission of

19   Exhibit 9245?

20           MR. FAGG:  The same objections that were raised

21   earlier, Your Honor.

22           THE COURT:  Those objections will be overruled.

23   Exhibit 9245 will be admitted.

24   BY MR. KOENIG:

25   Q.  Now, before we got on to this photo gallery, we were

Robert Bryant - Direct

1   talking about Jason McGuire, I believe, right?

2   A.  That's correct.

3   Q.  Okay.  And you had said previously that he also engaged in

4   the conduct that we are talking about.

5   A.  That's correct.

6   Q.  What is your basis for saying that?

7   A.  Phone call conversations with him.  I did witness him

8   directing Roger to share some information --

9   Q.  Can you please use last names?

10  A.  Roger Austin.  I witnessed him directing Roger Austin to

11  share information with our competition, and then I received

12  some e-mails from Jason about that same conduct.

13       MR. TUBACH:  Your Honor, again with Jason, there being

14  two Jasons --

15  A.  Jason McGuire.

16       THE COURT:  Yes, I agree.  If we could ask the witness

17  to try to do that as well.  Go ahead.

18  BY MR. KOENIG:

19  Q.  Yes, if you could, please, use last names.

20  A.  Yes.

21  Q.  All right.  So you were speaking about a time when Jason

22  McGuire asked Roger Austin to do what?

23  A.  Share some information with our competition.

24  Q.  What kind of information?

25  A.  It was some information about our position on price

755

Robert Bryant - Direct

1   increases and justification for those price increases.

2   Q.  All right.  What time frame was that?

3   A.  That was in 2014.

4   Q.  And did you have an understanding as to why Jason McGuire

5   asked Roger Austin to do that?

6   A.  I did.

7   Q.  What was the basis of your understanding?

8   A.  Those same phone calls and e-mails that we had between

9   myself and Jason McGuire.

10  Q.  And what was your understanding of why Jason McGuire asked

11  Roger Austin to share the information with competitors?

12  A.  To build support for price increases in 2014.

13  Q.  What do you mean by support for price increases?

14  A.  I mean to build support with competitors to raise prices in

15  the 2014 bid season.

16  Q.  Okay.  You also mentioned a Tim Stiller.  Do you recall

17  that?

18  A.  I do.

19  Q.  Who was Tim Stiller?

20  A.  He was my manager from the fall of 2014 or early 2015 until

21  earlier this year.

22  Q.  All right.  And during that entire time who did Mr. Stiller

23  report to?

24  A.  Jayson Penn.

25  Q.  All right.  Now, what was your basis for saying that

Robert Bryant - Direct

1  Stiller participated in the activities that we have been

2  talking about here?

3  A.  He directed me and others to get pricing information from

4  competitors and use that for bids.

5  Q.  And did you have an understanding as to why he wanted you

6  to do that?

7  A.  Yes.

8  Q.  What's the basis for your understanding?

9  A.  Phone calls, text messages, e-mail conversation -- or

10  e-mails and conversations that we had about his expectations.

11  Q.  Okay.  And so what was your understanding of why he was

12  telling you to get pricing from competitors?

13  A.  Depended, but either to increase or decrease -- or limit a

14  decrease on prices.

15  Q.  You mentioned Scott Tucker.  Who is Scott Tucker?

16  A.  He was a salesperson that also worked for Roger Austin.  I

17  don't recall when he started with the company, but he was with

18  us from -- I know from 2014 until this year with Pilgrim's.

19  Q.  When you said -- you mentioned Roger Austin.  Was Roger

20  Austin his supervisor?

21  A.  He was until Roger retired.

22  Q.  What accounts did Mr. Tucker handle?

23  A.  I know he handled KFC.  I think he handled Bojangles and a

24  few others.

25  Q.  All right.  Now, you mentioned Mr. Tucker among the list of

Robert Bryant - Direct                                    757

 1  people at Pilgrim's who participated with you in this conduct.

 2  What is your basis for saying that with respect to Mr. Tucker?

 3  A.  Same basis, phone calls.  And he entered into an agreement

 4  on -- Scott Tucker entered into an agreement with a former

 5  co-worker at Mar-Jac to increase prices for US Food Service.

 6  Q.  And who directed him to do that?

 7  A.  I did.

 8  Q.  All right.  You mentioned Justin Gay as another person at

 9  Pilgrim's.  Do you remember that?

10  A.  I do.

11  Q.  Who is Justin Gay?

12  A.  He was also a salesperson that worked for Roger Austin.

13  Q.  When was that?

14  A.  I don't recall when he originally started, but it was

15  probably in the middle 2000s until this year.

16  Q.  What accounts did Mr. Gay handle?

17  A.  Chick-fil-A, Popeye's.  Initially he was on the KFC

18  account.

19  Q.  Initially meaning when?

20  A.  Like in the middle 2000s.  And Scott Tucker took over that

21  role from him.  That he had Chick-fil-A and Popeye's that I can

22  recall and he may have had some others.  Later he assumed

23  Roger's role as the lead on that for that team.

24  Q.  Just backing up just a little bit, when somebody is in

25  charge of an account like Justin Gay, for example, what does

Robert Bryant - Direct

1    that mean?  What is the responsibility of somebody who is in

2    charge of an account?

3    A.  That means they are responsible for that customer, sales

4    growth.

5    Q.  Can you speak up just a little bit?

6    A.  Yeah.  They are responsible for that customer, you know,

7    providing growth to the company.

8    Q.  Which company?

9    A.  Pilgrim's.  So they are technically the account owner for

10   that particular customer and all it encompasses.  They are not

11   directly responsible for the pricing.  That was usually given

12   to them, but they were responsible for getting that price from

13   the customer.

14   Q.  Can you expound on that just a little bit?  They were given

15   the pricing?

16   A.  Yes.  Technically the sales director was responsible for

17   pricing for the overall business unit.  Now, the account owner

18   would give guidance on whether or not they thought it was too

19   high, too low, or they could get that done, but -- it was a

20   little bit collaborative, but in the end they were responsible

21   for getting that price done with the customer, whatever was

22   agreed upon.

23   Q.  So you were the sales director for a time, right?

24   A.  I was.

25   Q.  So did you have discussions with people, account owners,

Robert Bryant - Direct

1   about pricing?

2   A.  I did.

3   Q.  And did they have influence on you when you guys were

4   discussing pricing?

5   A.  They did.

6   Q.  Okay.  So you were the ultimate decision maker, though.

7   A.  Yes.  I would do the analysis on what we should do, and

8   then they would push back if they thought it was too much or

9   they didn't feel that they could get it done or a whole host of

10  reasons, but they were responsible for the account, so their

11  job was to keep us -- keep guardrails on us.

12  Q.  All right.  I apologize for the detour.  Now, you said

13  Mr. Gay reported to Mr. Austin; is that correct?

14  A.  That's correct.

15  Q.  What was your basis for saying that Justin Gay was

16  participating in the activities we've been discussing today?

17  A.  Same -- same basis, phone calls where he relayed

18  information from conversation he had with competitors.  You

19  know, there was one instance where he was -- tried to get me to

20  agree.  Ultimately he did get me to agree to a discount for a

21  customer that our competitors had already aligned around.

22  Q.  All right.  What customer was that?

23  A.  Popeye's.

24  Q.  And what year was that?

25  A.  I don't recall.  I don't remember exactly what year that

Robert Bryant - Direct                                        760

1    was, but --

2    Q.  Were you sales director at the time?

3    A.  Probably.  It was probably -- it may have been in the

4    spring of 2017, but they have a spring and fall promotion

5    around April and then they have one in September that are

6    fairly common that they would seek discounts for.

7    Q.  Okay.  And so -- and you had authority to approve or not

8    approve the discount.

9    A.  That's correct.

10   Q.  And what were the considerations that went into whether you

11   approved a discount?

12   A.  Whether or not I felt it was needed.  If the additional

13   sales would offset the decrease in price and we would net-net,

14   actually be more profitable.

15   Q.  Who were your competitors at that time for Popeye's?

16   A.  Tyson, George's, Claxton, Mar-Jac.  There's a group of

17   competitors in this QSR business that are fairly common that

18   you run across, that those are -- those five or six are fairly

19   common.

20   Q.  Was Koch one of those too?

21   A.  Koch, yes.

22   Q.  And among the considerations did you ask Mr. Gay what the

23   competition was doing?

24   A.  I don't recall asking him that because during that

25   conversation I remember telling him I didn't think it was

761

Robert Bryant - Direct

1    needed or warranted.  And he said, well, everybody else is

2    doing it, so we're going to have to fall in line with them.

3    And I think at the time it was around a nickel per pound that

4    he said that -- he said that the others had already agreed to.

5    Q.  So what was your understanding of, "We had to because

6    others were going to do it"?

7    A.  What he was saying, Justin Gay was saying, at the time was

8    that our competitors had already agreed to a discount for the

9    promotion and we needed to do the same or -- we needed to do

10   the same discount or else it would look bad on us from our

11   customer that we didn't concede a discount for the promotion.

12   Q.  All right.  Thank you.  You mentioned several -- no, you

13   didn't mention.  Were there people outside of Pilgrim's who

14   were engaged in the conduct that gave rise to your agreement?

15   A.  Yes.

16          MR. FELDBERG:  Objection.

17          MR. TUBACH:  Objection, lacks foundation.

18          THE COURT:  Sustained.  If you could rephrase.

19   BY MR. KOENIG:

20   Q.  What was the conduct that gave rise to the agreement where

21   you will not be prosecuted?

22   A.  Price-fixing.

23   Q.  Were there people outside of Pilgrim's who engaged in that

24   conduct with you?

25   A.  There were.

762

Robert Bryant - Direct

1   Q.   Who were those people?

2   A.   The three that I heard most often were Bill Kantola, Scott

3   Brady and Carl Pepper.

4   Q.   Okay.  Let's go through each of those, please.

5        MR. KOENIG:  Can we pull up Exhibit 9242?

6   BY MR. KOENIG:

7   Q.   Do you recognize 9242?

8   A.   I do.

9   Q.   What is it?

10  A.   It's a photograph.

11  Q.   Of whom?

12  A.   Bill Kantola.

13  Q.   And where did Mr. Kantola work?

14  A.   Koch Foods.

15  Q.   And was Koch Foods a competitor of Pilgrim's?

16  A.   They are.

17  Q.   Do you see Mr. Kantola in the courtroom today?

18  A.   It's hard to tell with masks on.  Well, there he is.  I am

19  sorry, and I can see his red tie.

20       MR. KOENIG:  Can the record please reflect that

21  Mr. Bryant identified Bill Kantola?

22       THE COURT:  It shall.

23       MR. KOENIG:  The government offers Government

24  Exhibit 9242 into evidence.

25       THE COURT:  Any objection to the admission of

Robert Bryant - Direct

1    Exhibit 9242?

2         *MS. HENRY:*  Yes, Your Honor, for the same reasons

3    stated previously.

4         *THE COURT:*  Exhibit 9242 will be admitted and the

5    objection will be overruled.

6    *BY MR. KOENIG:*

7    *Q.*  What is your basis for saying that Bill Kantola

8    participated in the price-fixing activity?

9         *MR. TUBACH:*  Object to that characterization.

10        *THE COURT:*  I am sorry, Ms. Henry, go ahead.

11        *MS. HENRY:*  A lack of foundation as well as.

12        *THE COURT:*  The question asks for a foundation.

13        Mr. Tubach?

14        *MR. TUBACH:*  It's the characterization that I was

15   objecting to, Your Honor.  It's describing conduct he is now

16   characterizing.

17        *THE COURT:*  Mr. Koenig, response?

18        *MR. KOENIG:*  Yes.  Your Honor, we have now

19   characterized in open court -- Mr. Bryant has several times

20   without objection.  And so at this point I would say an

21   objection just to calling the activity, just generally

22   referring to it as the price-fixing activity is, you know,

23   not -- has been waived for one thing.

24        *MS. HENRY:*  Your Honor, the previous discussion has

25   related to price sharing activity.

Robert Bryant - Direct

764

1      MR. TUBACH:  And he then testified about what his

2  immunity related to, but Mr. Koenig is trying to meld those and

3  that's not proper.

4      MR. FELDBERG:  And it's also the ultimate issue.

5      THE COURT:  For clarification of the record just so we

6  have a good understanding with the witness as to terminology, I

7  will sustain the objections.  If you can clarify exactly what

8  the shorthand term may refer to.

9      Go ahead, Mr. Koenig.  You can define a term to be

10  used with him by asking the witness questions.

11  BY MR. KOENIG:

12  Q.  When I asked you the activity that your agreement related

13  to, if I refer to that as the activities we're discussing here

14  today, will you understand what I mean?

15  A.  I do.

16  Q.  So what was your basis for saying that Bill Kantola

17  participated in the activity we are discussing today with you?

18      MS. HENRY:  Your Honor, same objection.

19      THE COURT:  Overruled.

20  A.  I overheard phone calls between Roger and Bill Kantola

21  and --

22  BY MR. KOENIG:

23  Q.  Excuse me.  Can you use last names, please?

24  A.  Roger Austin.  I overheard phone calls between Roger Austin

25  and Bill Kantola and also received information from Roger

Robert Bryant - Direct                    765

1   Austin that he relayed to me from Bill Kantola.

2           *MS. HENRY:*  Objection, hearsay, Your Honor.

3           *THE COURT:*  Overruled.  Sorry, it's 803(6).

4           Go ahead.

5           *MR. KOENIG:*  I am sorry, 803(6)?  801(d)(2)(E)?

6           *THE COURT:*  What?

7           *MR. KOENIG:*  801(d)(2)(E)?

8           *THE COURT:*  Well, I think that's what the exception --

9   what exception are you asking for?

10          *MR. KOENIG:*  I just heard you say 803(6).

11          *THE COURT:*  Sorry.  I may have misspoken, but what

12  were you talking about, Mr. Koenig?  What was the exception you

13  were using?

14          *MR. KOENIG:*  801(d)(2)(E).

15          *THE COURT:*  All right.  Yes, agreed.

16          Go ahead.

17  *BY MR. KOENIG:*

18  *Q.*  The phone calls you mentioned, when did those occur?

19  *A.*  2014, but the passing of information happened quite

20  frequently between 2014 and 2017.

21  *Q.*  And what exactly did you overhear in 2014?

22  *A.*  The exact words or --

23  *Q.*  We'll come back to it.

24          All right.  Did you have an understanding as to why

25  Roger Austin and Bill Kantola were sharing pricing information?

Robert Bryant - Direct

1    *A.*  I did.

2    *Q.*  And what was the basis for that understanding?

3           *MS. HENRY:*  Objection, Your Honor.  He laid no

4    foundation for the understanding of Mr. Kantola.

5           *THE COURT:*  Overruled.

6    *BY MR. KOENIG:*

7    *Q.*  You may answer.

8    *A.*  Can you repeat?

9    *Q.*  What was your basis for understanding why Mr. Austin and

10   Mr. Kantola would engage in the sharing of prices?

11   *A.*  Those phone conversations that I had with Roger and that

12   information that he shared with me along with overhearing the

13   phone conversation he had with him.

14   *Q.*  And what, then, was your understanding?

15          *MR. FELDBERG:*  Objection, Your Honor.  The question is

16   vague because he has been unspecific about any particular phone

17   call or any particular communication.

18          *THE COURT:*  Overruled.

19   *BY MR. KOENIG:*

20   *Q.*  Well, that's actually helpful.

21          What time frame are we talking about?

22   *A.*  A long period.  Initially it started before the 2010

23   promotion of myself.  He would relay -- Roger Austin would

24   relay information from Bill about a requested spec change --

25   *Q.*  From who?

767
Robert Bryant - Direct

1   A.  From Bill Kantola about a requested spec change for its

2   stints or a bird size change, but later after 2014 it was more

3   pricing centric information and what Koch's position was on a

4   particular topic.

5   Q.  A particular topic?

6   A.  Yes, whether it was pricing or spec or whatever the

7   customer question was at that particular time.

8   Q.  So then what was your understanding as to why Roger Austin

9   and Bill Kantola were engaging in this price sharing conduct?

10  A.  It was to either raise or prevent a price decrease, raise

11  prices or --

12  Q.  For both companies?

13  A.  Correct.

14       MR. KOENIG:  Can we blow up government Exhibit 9237,

15  please?

16  BY MR. KOENIG:

17  Q.  Do you recognize government Exhibit 9237?

18  A.  I do.

19  Q.  What is it?

20  A.  It's a picture.

21  Q.  Of whom?

22  A.  Looks like Scott Brady.

23  Q.  Okay.  Where did Scott Brady work?

24  A.  When I first met him, he worked for Pilgrim's, and later he

25  moved to Claxton Poultry.

Robert Bryant - Direct

1   *Q.*  So in like the 2014 to 2017 time frame where did he work?

2   *A.*  He was working at Claxton.

3   *Q.*  And was Claxton at that time a competitor of Pilgrim's?

4   *A.*  They were.

5   *Q.*  All right.  Do you see Scott Brady in this courtroom?

6   *A.*  Yes.  It's been many years since I have seen him, but I

7   believe that's him in the gray jacket -- I think it's gray, I

8   think.

9        *MR. LAVINE:*  Your Honor, let the record reflect that

10  the witness has identified a gentleman in the gray jacket as

11  Scott Brady, please.

12       *THE COURT:*  Well, we're not going to -- the question

13  is -- first of all, you're not cross-examining him.

14       *MR. LAVINE:*  I understand.

15       *THE COURT:*  So the question would be whether or not

16  the government asked for the record to reflect something.

17       *THE WITNESS:*  I apologize.  I thought all the defense

18  were here.  I didn't realize there was a second table back

19  there.

20  *BY MR. KOENIG:*

21  *Q.*  So do you see him?

22  *A.*  I am trying to look for him.  I mean, if they didn't have

23  their masks on -- I believe he is in the blue shirt with the

24  round stuff on his tie.

25  *Q.*  Glasses?

Robert Bryant - Direct

1  A.  Yeah.

2       MR. KOENIG:  Please let the record reflect that

3  Mr. Bryant identified Scott Brady.

4       THE COURT:  Yes.  Initially he did not, but he did

5  just now the record shall reflect.  And we have -- it's just

6  about noon.  It is noon now.  If you have one or two questions

7  left --

8       MR. KOENIG:  I will stick to my promise of one

9  question, not even a question.  The government offers

10  Exhibit 9237 into evidence.

11       THE COURT:  Any objection to the admission of

12  Exhibit 9237?

13       MR. LAVINE:  Yes, Your Honor.  He says he believes I

14  believe is what he said here, it looks like.  He didn't confirm

15  that that's a photo of Mr. Brady.  He had difficulty even

16  trying to identify him and he says he believes.  He is not sure

17  who this person is, so I would absolutely object for admission

18  of that photograph.

19       THE COURT:  If you could lay additional foundation.

20  BY MR. KOENIG:

21  Q.  How long have you known Scott Brady?

22  A.  I mean, we worked together while he was at Pilgrim's.  I

23  had some meetings with him at Pilgrim's.  After he left

24  Pilgrim's, I don't recall meeting with him since then, so it's

25  been several years since we've met in person.

Robert Bryant - Direct

1    *Q.*  How many times would you say you have met Scott Brady in

2    person?

3    *A.*  A few, a few.  Like I was in sales -- or a sales

4    coordination role.  And I can remember specifically when he

5    came to the Mayfield, Kentucky plant when I worked there.  We

6    had customers from Cracker Barrel come that he showed the

7    plant.  We were in meetings together at that -- for that.

8    *Q.*  Now, I would like you to please look at the person you

9    identified as Scott Brady in this courtroom and the picture and

10   let me know -- let the jury know whether that's a fair and

11   accurate representation of the person you identified.

12        *MR. LAVINE:*  Objection, Your Honor.  That's just an

13   improper question at this point in time.  He can't identify

14   him.  He is talking about what his recollection was meeting

15   him, what, nine, 10, 11 years ago?  He has no foundation for

16   identifying Mr. Brady in this courtroom.

17        *THE COURT:*  Well, comparing the photo and the

18   appearance in court is not the way to establish identification,

19   but based on the foundation he can be asked about the photo

20   again.

21   *BY MR. KOENIG:*

22   *Q.*  All right.  Who is depicted in the photograph?

23   *A.*  It's Scott Brady.

24        *MR. KOENIG:*  The government moves to admit 9237.

25        *THE COURT:*  Any objection to the admission of 9237?

771

Robert Bryant - Direct

1        MR. LAVINE:  Your Honor, I will object on all the

2  grounds we already stated.  There is no foundation.  Basically

3  what government counsel has done is led him down this path to

4  try to identify Mr. Brady.  He has no independent ability to

5  identify my client whatsoever.

6        THE COURT:  Well, he has met with Mr. Brady on several

7  different occasions.  Objections are overruled.  Exhibit 9237

8  will be admitted.

9        All right.  Ladies and gentlemen, we will go ahead and

10  take our lunch break.  Plan on reconvening at 1:30.  Keep the

11  admonitions in mind, ladies and gentlemen.  Don't start

12  deliberating amongst yourselves, obviously, or talk about the

13  case in any way.  Don't look up any information.  The jury is

14  excused for lunch.  Thank you.

15        (Jury excused.)

16        Mr. Bryant, you can step down and then if you could

17  return -- be ready to go at 1:30, all right?  Thank you.

18        Quick issues, if possible.

19        Mr. Fagg, did you have something?

20        MR. FAGG:  Just a question on Your Honor's order on

21  witness sequestration.  We understood that once a witness was

22  on the stand that he or she was not to consult with counsel for

23  the party, and we just wanted to seek clarification on that.

24        THE COURT:  We've had clarification on that.  That is

25  the rule.

Robert Bryant - Direct                                                    772

1          MR. KOENIG:  The government understood that as well.

2     Thank you.

3          THE COURT:  All right.  We will be in recess, then,

4     until 1:30.  I will try to look over that Stiller motion as

5     best that I can.  Do you anticipate getting into those issues?

6     How soon, Mr. Koenig?

7          MR. KOENIG:  I would say before the afternoon break.

8          THE COURT:  Then why don't we plan on reconvening at

9     1:15 and hopefully I can rule on that.

10          MR. KOENIG:  And I think we have come to an agreement

11     on the agreement, the form of the agreement that we discussed

12     this morning.

13          THE COURT:  Okay.  That's great.  Will something be

14     introduced or will there just be a written document that can be

15     used as a guide or refreshing recollection, something of that

16     nature?

17          MR. KOENIG:  Well, I can't speak for the defendants,

18     but -- and I haven't --

19          THE COURT:  I don't need to know now.  I was just

20     curious in case it was known.

21          Mr. Tubach?

22          MR. TUBACH:  Your Honor, we were just going to

23     finalize the document as we had discussed and agreed with the

24     government and mark it as an exhibit, and we can then see if we

25     need to use it at all.

Robert Bryant - Direct

1          THE COURT:  Okay.  Mr. Feldberg, did you have

2     anything?

3          MR. FELDBERG:  No, I was just standing in anticipation

4     of the break, Your Honor.

5          THE COURT:  And in anticipation, we will be in recess.

6     Thank you.

7          (Recess at 12:06 p.m.)

8          (Reconvened at 1:20 p.m.)

9          THE COURT:  We are going to talk about Docket No. 763

10    which is defendants' joint motion to exclude any mention of

11    non-defendant Timothy Stiller's alleged obstruction conduct.

12          Let me ask first of all about the phone.  What's the

13    implication there, I mean, phone and water?  So what?

14          MS. CALL:  Yes, Your Honor, for the government.  For

15    that actual statement, we don't plan on eliciting that in

16    Mr. Bryant's testimony.

17          THE COURT:  Okay.  What about the next one, the spin?

18          MS. CALL:  Yes.  I believe that may be elicited, Your

19    Honor.  And the relevance is obviously the term industry here

20    has been stated on the record before as jargon in this

21    conspiracy to meet competitors.  And it's part of the defense

22    here that industry sometimes means customer, so it is important

23    the meaning of that term when used by conspirators in this case

24    and that's highly relevant.

25          THE COURT:  I am sorry, so Stiller allegedly tells

774

Robert Bryant - Direct

1    Bryant that he could spin certain documents to be favorable to

2    whom?

3         MS. CALL:  To the defense, Your Honor.  Our

4    understanding is there was an indictment issued in another

5    matter where there was a text message using the word industry

6    and that Mr. Stiller when showing that document to Mr. Bryant

7    said that he would spin the term industry.

8         THE COURT:  Okay.

9         MR. TUBACH:  Your Honor, on that point the other

10   indictment that the government is relating to is the indictment

11   of Mr. Stiller.

12        THE COURT:  Yes, I inferred that, although I don't

13   know really anything about that.  I think that's in front of

14   Judge Domenico.

15        MS. CALL:  I don't believe that's correct, Your Honor.

16        MR. TUBACH:  It might be the Claxton.

17        MS. CALL:  Yes, I believe it was a corporate

18   indictment that Mr. Bryant was referring to.

19        MR. TUBACH:  My apologies, that's right.  But in any

20   event, this conversation is alleged to have happened in 2021

21   which would be at least two years after this conspiracy

22   allegedly ended which falls directly under *Grunewald*.

23        THE COURT:  Yeah, but in *Grunewald* it's a little

24   different.  There is a lot of cases, and the government cites

25   some of them, would allow a statement to come in, but not for

Robert Bryant - Direct

1    the truth of the matter, to prove the existence of the

2    conspiracy, not some act in furtherance of it, but to prove the

3    existence of the conspiracy.

4           This, of course, what we're talking about here would

5    be a statement by a non-defendant, but allegedly a member of

6    the conspiracy, to demonstrate I assume the existence of the

7    conspiracy; is that right, Ms. Call?

8           MS. CALL:  Yes, Your Honor.  And that's the exact

9    distinction that the government hopefully pointed out in its

10   briefing, that the line of cases with *Grunewald* specifically

11   relates to admissibility under 801(d)(2)(E) where the line of

12   cases cited by the government has to do with the relevance and

13   admissibility of other non-hearsay statements.

14          So when Mr. Stiller says, you know, he can spin the

15   term industry, the government would not introduce that for the

16   fact of whether Mr. Stiller could actually spin the term

17   industry to mean something else, but it's more so a statement

18   of intent or some other non-hearsay purpose.

19          THE COURT:  How does Mr. Bryant know what he is even

20   talking about when he says that?

21          MS. CALL:  I believe Mr. Bryant would testify that he

22   was in conversations with Mr. Stiller at the time of the actual

23   text message that is cited in the indictment which was several

24   years earlier, and he understood the meaning of the text

25   message at the time based on those conversations.

Robert Bryant - Direct

1          THE COURT:  And he understood it, though, to refer to

2    Mr. Stiller's -- sorry, to the Claxton indictment?

3          MS. CALL:  No.  And I think there is a little bit of

4    confusion.  So a text message was cited in an indictment which

5    had to do with the term industry.  Mr. Stiller showed

6    Mr. Bryant the indictment, said he could spin the term industry

7    to mean something else when anticipating to actually testify in

8    we believe this case.

9          THE COURT:  How does Mr. Bryant know that?

10         MS. CALL:  I believe it's the context of the

11   communication.

12         MR. KOENIG:  May I just --

13         MS. CALL:  May we confer for one moment?

14         THE COURT:  Yes.  We are not going to have two lawyers

15   talking on the same subject from one client.

16         MR. TUBACH:  While we have --

17         THE COURT:  No, we can't, because Ms. call has got to

18   listen to what you're saying.

19         MS. CALL:  Two points of clarification.  For one, the

20   actual text message at issue says --

21         THE COURT:  It's a text message from who to who?

22         MS. CALL:  It is from Tim Stiller to Roger Austin, I

23   believe.  And it says:  Tell the industry we are going to hold.

24   So the meaning of the term industry is what is then being

25   referred to.

Robert Bryant - Direct

1          THE COURT:  Oh, that's the underlying use of the term

2     industry.

3          MS. CALL:  Yes.  I apologize for not making that more

4     clear, Your Honor.  And I believe the second point of

5     clarification, I believe what Mr. Bryant says about his more

6     recent conversation with Mr. Stiller about this text message is

7     that Mr. Stiller was saying it in the context of possibility

8     testifying in this case when he said that he would spin the

9     term industry.

10         THE COURT:  Okay.  And how does Mr. Bryant know that?

11         MS. CALL:  Because this is a conversation with

12    Mr. Stiller.

13         THE COURT:  I know, but what are they talking about?

14         MS. CALL:  He is showing him the indictment in the

15    corporate case which cites that text message.  And the

16    communication was something along the lines of, you know, when

17    I testify in the case, I could spin the term industry to

18    mean --

19         THE COURT:  In that case.

20         MS. CALL:  No.  Our understanding is it was actually

21    referring to this case that he was anticipating testifying in

22    at the time because the indictment had actually just come out

23    in that corporate case and it was the first time that text

24    message was referenced in an indictment, so he hadn't

25    previously been aware that the government had that message.

Robert Bryant - Direct

1          THE COURT:  Why would Mr. Stiller be anticipating

2    testifying in this case at that time whenever -- oh -- at that

3    time.

4          MS. CALL:  The time of the communication was before

5    Mr. Stiller was ever charged.

6          THE COURT:  Okay.  Let's hear from -- anything else,

7    Ms. Call --

8          MS. CALL:  I don't believe so, Your Honor.

9          THE COURT:  -- on that point?

10         Mr. Tubach?

11         MR. TUBACH:  Just on that point, Your Honor, this is

12   immediately after the Claxton indictment came out.  The text

13   message had never been referenced in the indictment in this

14   case.  So the fact that they would have been talking about,

15   well, he can spin it would naturally refer to the Claxton

16   indictment, not to this indictment.  And it seems to me this is

17   highly prejudicial to the defendants, none of whom are alleged

18   to be involved in this conduct at all.

19         This does not have to do with the underlying conduct

20   of whether he sends a text message saying put this out to the

21   industry.  That's not what we're talking about here.  We are

22   talking about in 2021, this year, he says something about an

23   indictment in a different case and how he can spin evidence

24   referenced in that case.  That's just highly prejudicial to

25   these defendants.

779

Robert Bryant - Direct

1          THE COURT:  I will give you the last word, Ms. Call,

2     on this one.

3          MS. CALL:  Yes.  And just to make clear, the text

4     message is on the government's exhibit list in this case as

5     part of the conspiracy charged in this case.  So Mr. Stiller's

6     potential obstructive conduct or intended perjury as we see it

7     would be highly relevant to this case and the existence of the

8     conspiracy in this case.

9          THE COURT:  I am going to exclude that statement.  The

10     problem is just that there is really no reason and I haven't

11     heard any articulation of why Mr. Bryant would assume or know

12     that the attempt to spin was going to occur in this case as

13     opposed to what would seem to be his natural reaction is that

14     if he saw an indictment of Claxton, he would assume that it

15     would take place there.  So maybe there would be a claim of

16     obstruction in that case, but if the government is trying to

17     suggest obstruction here, there is just not that link.

18          You could maybe argue that they are somewhat

19     identical, but still, I mean, once again we are talking about

20     obstruction in this particular case or some effort to obstruct

21     and it doesn't seem like there is a link.

22          What's the next statement or next thing?

23          MS. CALL:  If we may, Your Honor, I would like to take

24     a look at the actual report to see if the context was made more

25     clear regarding the context of the discussion because as I

Robert Bryant - Direct

1   said, it was at least my understanding -- I don't want to

2   misstate anything -- that it was related to testimony in this

3   case.

4         THE COURT:  Well, this is our chance to talk about it,

5   so we can't keep going back.  Otherwise, there is no closure on

6   it.  Okay.  What else?  So what about this -- how would the

7   government in regard to Stiller comments segregate out the

8   issue of civil litigation?  Because some of the statements seem

9   to refer -- in fact, two of them refer to civil litigation or

10  seem to be tied to it.

11        MS. CALL:  Yes, Your Honor.  And the precise time

12  frame I would have to take look at, but I think there is an

13  interrelation between the collection of documents by the

14  company for the civil case and the criminal matter in that they

15  for a period of time were both going on at the same time.  So

16  while that may have been specific to civil litigation, and we

17  would not attempt to draw that out with Mr. Bryant because we

18  have instructed him to avoid referencing the civil litigation,

19  but I think --

20        THE COURT:  If the statements were made in response to

21  the pendency of civil litigation, the fact that Mr. Bryant may

22  not mention that may nonetheless have to be brought out in

23  cross because that's what he was talking about or reacting to

24  or I'm not sure.

25        MS. CALL:  Yes, Your Honor.  I think it is a bit of a

Robert Bryant - Direct

1    catch-22 here that the civil litigation, the criminal

2    investigation are going on at the same time.  Obstructive

3    conduct may frankly relate to both.  And so there is a bit of a

4    hard time, you know, catching hairs or whatever in

5    distinguishing between the two, but I think the obstructive

6    conduct whether it is a civil price-fixing charge or a criminal

7    one is entirely relevant to the existence of the conspiracy

8    that's charged in the criminal case.

9            THE COURT:  Mr. Tubach?

10           MR. TUBACH:  Just one point on the timing, Your Honor.

11   The third statement is allegedly at the start of the civil

12   litigation which was in 2016.  That's when the civil litigation

13   started.  The criminal investigation was nowhere on the horizon

14   at that point.  There does come a point where there is an

15   overlap between criminal and civil.  This statement there is no

16   overlap at all.  The only way to get this in would be to say in

17   response to civil litigation he told someone else to go comb

18   through your files.  I don't see how -- it can't possibly

19   relate to the criminal investigation because it wasn't pending

20   at that point.

21           THE COURT:  Anything else on that point?

22           MS. CALL:  I don't believe that's a correct statement

23   about the beginning of the criminal investigation in terms of

24   the time line.

25           THE COURT:  Well, the question would be how

Robert Bryant - Direct

1    Mr. Stiller would be aware of a criminal investigation at that

2    time.

3         MS. CALL:  Yes.  And I don't think the report was

4    exactly clear on the time line or even frankly his knowledge of

5    exactly when the civil case started.  I don't believe he

6    followed the docket.  It's our understanding that litigation

7    holds didn't go out within Pilgrim's at least to Mr. Stiller

8    until 2017.  And by at least March of 2018 there was an

9    attempted interview of Mr. Stiller.  So the time frame is

10   rather short between when he would have been aware of the civil

11   litigation and the criminal investigation.

12        THE COURT:  Okay.  I don't see any relevancy to the

13   two statements about civil litigation.  I understand that there

14   could be a similar motivation, but if the -- it becomes rather

15   complicated and it would open the necessity of bringing in an

16   explanation of all the civil litigation in order to establish

17   that the motivations were the same.  And that frankly triggers

18   403 issues, which we have discussed before.  So that's -- to me

19   that's highly problematic.

20        Was the last one about the meeting with the attorneys?

21   This is on the top of Page 2, the second statement quoted,

22   looking at Docket No. 763.

23        MS. CALL:  I believe, Your Honor, our understanding of

24   this is that it was more recent.  In fact, it was after the

25   time Mr. Bryant obtained counsel in relation to his

Robert Bryant - Direct

1    representation in this matter.  So this would have less of the

2    issue with the civil litigation and would be more directly

3    related to his cooperation in the criminal investigation.

4          THE COURT:  Okay.  Mr. Tubach or anyone, response on

5    that particular statement?

6          MR. TUBACH:  Yes, Your Honor, that it's so recent

7    again that I do believe -- I know there are cases

8    distinguishing the *Grunewald* concept from the idea of proving

9    up the existence of the conspiracy, but this allegedly

10   obstructive conduct has nothing to do with these defendants, is

11   highly prejudicial.  And it's not alleged that any of these 10

12   defendants knew about it, heard about it, until it landed in a

13   302.  And I think it would be terribly prejudicial to allow

14   this evidence in.

15         THE COURT:  Anyone else?

16         Ms. Henry?

17         MS. HENRY:  It also does potentially relate to an

18   entirely different proceeding that involves Mr. Stiller.

19         THE COURT:  Response on that point, Ms. Call?

20         MS. CALL:  Mr. Stiller had not yet been charged at the

21   time of that conversation as well.  I will add that I did get

22   clarification regarding the possible testimony, the text

23   message that would spin the term industry or the conversation

24   about the term industry, I believe it was in that same report

25   that Mr. Stiller told Mr. Bryant that he anticipated testifying

784

Robert Bryant - Direct

1    for Defendant Penn.

2         THE COURT:  But the question is still did he say that

3    to Bryant?

4         MS. CALL:  Yes.

5         THE COURT:  What did he say again?

6         MS. CALL:  So it says -- I will read the full

7    paragraph from the report just for clarity:  Bryant recalled a

8    conversation with Stiller where he said he was carved out of

9    protections from the company's Plea Agreement and believed the

10   DOJ was upset with him because he could single-handedly swing

11   the case for Penn.  Stiller stated the reason Penn got indicted

12   was because he had his phone retention set to forever and not

13   30 days because Penn liked to keep everything.

14        THE COURT:  I didn't hear anything about testifying.

15        MS. CALL:  I wonder if I read the wrong portion.  I

16   apologize.

17        THE COURT:  Perhaps.

18        MS. CALL:  I think it's he could single-handedly swing

19   the case for Penn was a reference to testimony is what I meant

20   to point out.

21        THE COURT:  I am going to maintain my previous ruling

22   as to that.  As to the second statement on the top of Page 2,

23   once again of Docket No. 763, I am going to allow Mr. Bryant to

24   testify about that, not for the truth of the matter asserted,

25   but rather to prove the existence of the conspiracy.  And I

785

Robert Bryant - Direct

1    believe that that's supported by the *Anderson* case which is

2    417 U.S. 211, particularly at 219 and 220.  I will give the

3    jury a contemporaneous instruction that they are not to

4    consider it for the truth of the matter asserted, but only for

5    purposes, if any, of establishing existence of a conspiracy.

6           All right.  Are we ready to bring the jury in?

7           MS. CALL:  Your Honor, I don't believe we addressed

8    the last bullet point.

9           THE COURT:  That had the same civil lawsuit issue,

10   right?

11          MS. CALL:  Uh-huh.  And I will say this does relate

12   directly to some of the exhibits in the government's case as

13   there is a text message from the 2017 time frame where

14   Mr. Stiller tells Mr. Bryant no comp names over e-mail, so some

15   of this conversation is context to the secrecy and concealment

16   occurring around that time frame.

17          THE COURT:  Once again, at least as far as what I've

18   heard, it doesn't seem like there is much ability to

19   distinguish between not saying things over e-mail or text so

20   there wasn't a trail for purposes of the civil lawsuit or for

21   purposes of criminal matters, particularly this one.

22          MS. CALL:  I suppose our position Your Honor, would

23   just be that it doesn't necessarily make a difference.  The

24   case law that we've cited and the relevance here is just the

25   concealment of a conspiracy.  The purpose being whether they

786

Robert Bryant - Direct

1    are concealing it because of civil litigation or because of a

2    criminal litigation doesn't necessarily matter all that much

3    and isn't the reason we would be eliciting that testimony

4    because, as we said, the fact that they are concealing is just

5    proof of existence of the conspiracy.

6         THE COURT:  Right, but that would then require

7    explanation about the civil litigation.  I assume the civil

8    litigation isn't necessarily filed against Mr. Stiller.

9         MS. CALL:  I think, Your Honor, if it would be

10   appropriate, we could perhaps elicit the testimony in a way as

11   did there come a time when the acts of the conspirators became

12   more secretive without going into the reasons behind it.

13        THE COURT:  Well, maybe, but Mr. Tubach, let's hear

14   from him.

15        MR. TUBACH:  That sounds like a great idea, Your

16   Honor.

17        I don't think that's going to solve the problem.  The

18   other issue here is that at the time in 2016 or 2017, the civil

19   lawsuit was about something very different, which is output

20   restriction.

21        THE COURT:  I am sorry, what was it?

22        MR. TUBACH:  It was about an output restriction

23   allegedly, that the defendants -- the companies got together

24   and allegedly conspired to reduce the supply of chicken.

25   That's not at all what this case is about.  It has nothing to

787

Robert Bryant - Direct

1    do with supply reduction.  This case is allegedly about

2    price-fixing.  So any comments that would have been made in

3    relation to civil litigation couldn't have related to this

4    criminal case because Mr. Stiller didn't know about the

5    pendency of any criminal litigation at that point.

6         THE COURT:  And then at some later point the scope of

7    the civil litigation expanded?

8         MR. TUBACH:  After this indictment.

9         THE COURT:  Response on that, Ms. Call?

10         MS. CALL:  I believe the initial charges in the civil

11    case did plead somewhat broadly and included the term

12    price-fixing, although one component of that was an output

13    restriction agreement.  So I think it's a little hard to say

14    that it would be entirely separate from what is alleged here.

15         THE COURT:  Yeah, I will maintain the exclusion of

16    that because I think that especially with that clarification

17    not only does it raise a 403 issue, but I think it also raises

18    a relevancy issue given the fact that it appears as if the

19    civil litigation had a subject matter limitation that would

20    distinguish it from the essence of the Sherman Act claim here.

21         All right.  Let's bring the jury back in.

22         (Jury present.)

23         THE COURT:  Ladies and gentlemen, one thing I will

24    mention to you, and that is no problem if you are taking notes.

25    As I said before, you don't have to if you don't want to.  But

Robert Bryant - Direct

1    assuming you are, if you don't mind, could you make sure to

2    close your notebooks when you go in and out of the courtroom

3    just so they are not laying open, not that anyone is going to

4    try to look at them in any way, but if they are like laying

5    open, there might be -- we don't want anyone to think that

6    anyone would look at them when they shouldn't.  So if you don't

7    mind doing that, I would appreciate it.

8            Mr. Koenig, we have got Mr. Bryant back on the witness

9    stand.  We are ready to go.

10           MR. KOENIG:  Thank you, Your Honor.

11   BY MR. KOENIG:

12   Q.  All right, Mr. Bryant.  I want to go back -- we will pick

13   up where we left off in just a second, but I want to go back

14   just to clarify something to understand -- help the jury

15   understand what you meant.

16           Do you remember me asking you about the conduct that

17   was the subject matter of the agreement not to prosecute you?

18   A.  I do.

19   Q.  And what was your response?  What did you call it?

20   A.  The price-fixing?

21   Q.  Yes.  Okay.  Now, and in your testimony you then talked

22   about sharing prices with competitors, right?

23   A.  That's correct.

24   Q.  And what was the purpose of sharing prices with

25   competitors?

789

Robert Bryant - Direct

1          MR. TUBACH:  Objection, Your Honor.

2          THE COURT:  Overruled.

3   A.  To increase prices or to limit a decrease in price.

4   BY MR. KOENIG:

5   Q.  So what did you mean when you said price-fixing?

6   A.  I mean to help each other increase or limit a decrease in

7   price.

8   Q.  So just so that the jury -- that's your understanding.

9   That's what you meant when you said the words price-fixing?

10  A.  That's correct.

11  Q.  And was it increasing or resisting a decrease for just

12  Pilgrim's?

13  A.  No.

14  Q.  For who?

15  A.  For all the parties involved.

16  Q.  The competitors.

17  A.  The competitors, yes.

18  Q.  Together.

19  A.  Together, yes.

20  Q.  All right.  So now, if you recall, we left off with

21  Mr. Brady.

22  A.  Yes.

23  Q.  And I believe you had said earlier that he was involved in

24  what you considered to be price-fixing.

25  A.  That's correct.

Robert Bryant - Direct

1   Q.   Now, what was your basis for saying that?

2   A.   Similar to before.  You know, I did overhear one phone call

3   in particular, information that Roger had relayed to me over

4   the course of the years.

5   Q.   Okay.  Can you be more specific in time frame?

6   A.   From 2014 until -- through 2017.

7   Q.   What specific information did -- and a reminder to use last

8   names.  You said Roger.

9   A.   Yes, Roger Austin, sorry, and Scott Brady.  You know, over

10  them discussing the KFC bid and Pilgrim's position on that bid,

11  various other information similar to what I testified earlier

12  about in that whether it be spec changes, bird weights,

13  whatever the customer had asked for or feedback from them at

14  that time.

15  Q.   And that includes bid prices, correct?

16  A.   That's correct.

17  Q.   Let me just also -- I want to clarify another thing.  Do

18  you remember when I was asking you questions about current

19  versus future pricing?

20  A.   I do.

21  Q.   All right.  I just want to make sure that the jury

22  understands your answer, okay?  So you've referenced this term

23  future pricing.

24  A.   Yes.

25  Q.   Right?

Robert Bryant - Direct

1    A.   Yes.

2    Q.   Now, can you explain to the jury what is a bid?

3    A.   A bid is -- and sometimes you will hear it an RFP or

4    request for pricing.  So sometimes they are annually.

5    Sometimes they are multi-year agreements in that the customer

6    will request us to submit pricing or a bid for a portion of

7    that business.

8    Q.   Is that the type of pricing you meant by future pricing?

9    A.   That's correct.

10   Q.   And then so at some point then in the bidding process you

11   either enter into a contract or you don't, right?

12   A.   That's correct.

13   Q.   Now, you also used the term current pricing.

14   A.   That's correct.

15   Q.   And so is that when you're -- did you mean by that when

16   current pricing to be when you're performing on the contract

17   after the bid and contract?

18            MR. FAGG:  Objection, leading.

19            THE COURT:  Sustained.

20   BY MR. KOENIG:

21   Q.   After the contract is entered into, what happens next?

22   A.   You have an agreed upon price and volume.

23   Q.   Agreed upon with?

24   A.   With the customer.

25   Q.   And does there come a time when you perform on the

Robert Bryant - Direct

1   contract?

2   A.   There does, yes.

3   Q.   And what is the basis for the price when you're performing

4   on the contract?

5   A.   The contract price that resulted from that negotiation.

6   Q.   All right.  And so what did you mean by current pricing?

7   A.   Current pricing would be the pricing that we were operating

8   on under the terms of that current contract, whether it be a

9   one-year or three-year contract.

10  Q.   Okay.  So if you could just give the jury an example and

11  let's just say 2014 KFC, for example.

12  A.   Okay.

13  Q.   Do you recall that time?

14  A.   I do.

15  Q.   So going through -- can you just explain the bidding

16  process and then go into 2015 and explain where future pricing

17  is and where current pricing is.

18  A.   So in 2014 we would have had negotiations for the contract

19  with KFC that would have began in 2015 and covered three years,

20  so 2015, 2016 and 2017.  There was a pre-bid meeting.  There

21  was a request from KFC for us among others to submit pricing.

22  Then there was negotiations about pricing.

23  Q.   So the request to submit pricing, Pilgrim's did submit

24  pricing; is that right?

25  A.   That's correct.

Robert Bryant - Direct

1   Q.  So now is that future pricing, current pricing?  What is

2   the bid?

3   A.  The bid is future pricing.

4   Q.  Okay.  Now continue, please.

5   A.  There would have been some negotiation after the submission

6   of the bid both on price and volume.  There would have come a

7   point where we agreed on those two terms.

8   Q.  We being?

9   A.  The Pilgrim's or whoever else the other customer would be

10  and the customer.  And then that contract would have been

11  slated to start around the first of the year of 2015.  And then

12  that would have been transitioned from the future to current

13  pricing at that point.

14  Q.  All right.  Thank you.

15          Now, you mentioned earlier, I believe, that at some

16  point I think 2017 Roger Austin mentioned something to you

17  about tracking current pricing.

18  A.  That's correct.

19  Q.  And did you have an understanding of why Roger Austin

20  would -- did, in fact, track current pricing?

21  A.  Yes.

22  Q.  Okay.  And what is the basis of your understanding?

23  A.  You know, my discussions with him on why he did that and

24  why he wanted that information.

25  Q.  And what then was your understanding?

Robert Bryant - Direct

794

1    *A.* For lack of a better word, to keep score.

2    *Q.* What does that mean, to keep score?

3    *A.* So he would know where our competitor pricing was at and if

4    or when negotiations or some other -- something happened that

5    he needed that, it was readily available so it could be used.

6    *Q.* Let me back up.  You did mention that Roger Austin

7    exchanged future pricing with competitors, correct?

8    *A.* That's correct.

9    *Q.* And did you have an expectation when that exchange occurred

10   that the competitor giving you the price was being honest with

11   you, giving you a real price, a real future price?

12          *MR. FELDBERG:* Objection, lack of foundation.

13          *MR. FAGG:* Also leading, Your Honor.

14          *MS. PREWITT:* And foundation.

15          *THE COURT:* I will sustain it on foundation grounds.

16   BY MR. KOENIG:

17   *Q.* When you received future pricing from competitors, what was

18   your expectation with respect to the reliability of that

19   information?

20          *MR. FELDBERG:* Same objection, Your Honor.  It's the

21   same question essentially.

22          *THE COURT:* Sustained.  If you could lay a foundation

23   for --

24   BY MR. KOENIG:

25   *Q.* Did you have an expectation regarding the reliability of

795

Robert Bryant - Direct

1    information that you obtained, the future pricing information?

2    A.   Yes.

3    Q.   And what is the basis for your expectation?

4    A.   My past experience receiving information from Roger Austin

5    among -- and Scott Tucker.

6    Q.   So then what was your understanding as to the reliability

7    of that information?

8            MR. FELDBERG:   Objection, foundation.   The attempted

9    foundation is too vague to be reliable.

10           THE COURT:   Objection is overruled.   He can answer.

11   BY MR. KOENIG:

12   Q.   So what was your expectation with regard to the reliability

13   of competitors' future pricing information that you received?

14   A.   I never -- I did not -- I didn't question the information.

15   I trusted the information that I received from Roger Austin

16   among others.

17   Q.   All right.   Now, was there a mechanism for verifying?

18   A.   There was.

19   Q.   And what was that?

20   A.   So if you had the bid information and then you tracked the

21   customer, the current pricing after the new contract had been

22   initiated, then you would know that the information was

23   accurate.

24   Q.   And you're saying tracking competitors' current pricing.

25   A.   Correct, correct.

Robert Bryant - Direct

1   Q.  Okay.  Thank you.

2        All right.  Let's circle back to Mr. Brady.  I asked

3   you what your basis was for saying that Mr. Brady participated

4   in the price-fixing activity as you understand the term

5   price-fixing to be.

6        MR. TUBACH:  I continue to object to this

7   characterization.  It is not proper.  It is the ultimate issue

8   for the jury.  And the fact that the witness is characterizing

9   this conduct as price-fixing is not an accurate statement at

10  all.

11       THE COURT:  I will sustain the objection.  I think

12  that there might be a better way to come up with a different

13  term.  That term is to a large extent the ultimate issue.  And

14  so the witness' use of the term to describe his view of things

15  could cause confusion.  So perhaps you could figure out some

16  other term for him to refer to it.  I think you had referred to

17  it previously as activity, but maybe if there is some other

18  term you can use, you can use that too.  Go ahead.

19  BY MR. KOENIG:

20  Q.  Okay.  What was your basis for saying that Mr. Brady

21  participated in the activities that led to your agreement not

22  to be prosecuted?

23       MR. TUBACH:  Lack of foundation, what someone else did

24  and his belief.

25       THE COURT:  Well, I think --

Robert Bryant - Direct

1      MR. TUBACH:  He is trying to get in the back door what

2   the Court is saying he can't do.

3      THE COURT:  I think Mr. Koenig is just trying to look

4   for the appropriate term so he can trigger the subject that he

5   is asking about.  Overruled.

6   BY MR. KOENIG:

7   Q.  So your basis?

8   A.  Information relayed to me from Roger Austin and overhearing

9   a phone call during the KFC bid in 2014.

10  Q.  And what did you overhear?

11  A.  I overheard Roger and Scott Brady discussing Pilgrim's

12  position after we submitted our first round bid.

13  Q.  Okay.  Did you have an understanding or do you have an

14  understanding who at that time Scott Brady reported to?

15  A.  I'm not sure.  I think he reported --

16      MR. KORNFELD:  Objection, Your Honor, if he is not

17  sure.  I would ask him not to speculate.

18      THE COURT:  Sustained.

19  BY MR. KOENIG:

20  Q.  All right.  So we were going through this list of people

21  outside of Pilgrim's who you said participated in the price

22  sharing for the purpose of maintaining or resisting price

23  decreases, right, for raising prices or resisting price

24  decreases together, right?

25  A.  That's correct.

798

Robert Bryant - Direct

1   Q.  And who is the third name you mentioned?

2   A.  Carl Pepper.

3   Q.  Who is Carl Pepper?

4   A.  He was -- is or was a salesperson at Tyson Foods.

5   Q.  And was Tyson Foods a competitor?

6   A.  They were.

7   Q.  Of Pilgrim's I mean.

8   A.  That's correct, yes.

9   Q.  Do you have an understanding of who Carl Pepper reported to

10  at Tyson?

11  A.  I do not.

12  Q.  What is your basis for saying that Carl Pepper of Tyson's

13  engaged in price sharing for the purpose of competitors

14  together raising prices or defeating a decrease?

15      MS. PREWITT:  Objection, Your Honor, if I could be

16  heard.  He is eliciting testimony that would be speculative

17  because this witness is not in a position to be testifying as

18  to what someone else's purpose was, especially when that other

19  person was party to a conversation he was not a party to.

20      THE COURT:  Objection is overruled.  Mr. Koenig

21  obviously has to lay a foundation for his knowledge about that,

22  but he's been doing that.

23      Go ahead.

24  BY MR. KOENIG:

25  Q.  Okay.  Did you have an understanding that Mr. Pepper from

Robert Bryant - Direct

799

1   Tyson's was engaging in that conduct we've described?

2   A.   Yes.

3   Q.   What's the basis for your understanding?

4   A.   Information that was shared to me from Roger Austin.

5   Q.   So what then was your understanding of Mr. Pepper's

6   involvement?

7   A.   He had regular conversations with Roger Austin about

8   pricing and similar topics of customers and questions and that

9   they -- so it was more sharing of that type of information.

10  Q.   Let's go to a specific time frame now.  Did there come a

11  time in 2017 when Pilgrim's Pride and -- well, let me back up.

12          Are you familiar with the name RSCS?

13  A.   I am.

14  Q.   What does that mean?

15  A.   Restaurant Supply Chain Solutions.

16  Q.   And what is -- if I just say RSCS, you'll know what I'm

17  talking about?

18  A.   Yes.

19  Q.   Okay.  What is RSCS?

20  A.   It's like a procurement arm for --

21  Q.   Can you please speak up or lean forward a bit, please?

22  A.   It's like a procurement arm or a buying co-op for Yum

23  Brands, so they would buy the products for like KFC, Taco Bell,

24  Pizza Hut.

25  Q.   And did they have any other responsibilities with regard to

Robert Bryant - Direct

1   pricing?

2   A.   Yes.

3   Q.   What were those responsibilities?

4   A.   They would negotiate the contracts on behalf of the Yum

5   Brands.

6   Q.   All right.  And is it fair for me -- not for me.  Is it

7   fair to say that the term RSCS and KFC sometimes use those

8   interchangeably?

9   A.   Most often.

10  Q.   So if I say KFC, negotiations with KFC, you would

11  understand that that means RSCS?

12  A.   I would.

13  Q.   All right.  So did there come a time in 2017 when Pilgrim's

14  was negotiating with RSCS/KFC?

15  A.   Yes.

16  Q.   And when was that?

17  A.   January of 2017.

18  Q.   Okay.  And Pilgrim's -- so was Pilgrim's invited to bid by

19  RSCS at some point?

20  A.   We were.

21  Q.   And when was that?

22  A.   I don't recall exactly when we got the invitation, but we

23  were scheduled to meet with them in January of that year, I

24  believe it was January 27th.

25  Q.   All right.  Do you have an understanding of how the bidding

Robert Bryant - Direct

1    process worked in 2017?

2    A.  I do.

3    Q.  All right.  So if you could just explain to the jury for --

4    you know, starting with the RFP, the invitation to bid, through

5    when the final contract is signed just the process.

6    A.  Yes.  So there would be an e-mail sent inviting us to

7    participate in a bid.  Normally there would be a pre-bid

8    meeting.  Then there would be a deadline after the pre-bid

9    meeting for submission of your bid.  And then you would get --

10   or we would get feedback from our bid from KFC that told us --

11   gave us guidance or that we were too high or whatever.  And

12   generally they would ask for a second round of pricing

13   submission.  At some point we would come to a final agreement.

14   Q.  Okay.  And did you have an understanding of RSCS and KFC's

15   expectations of how you would formulate your bids?

16   A.  Yes.

17   Q.  What's your basis for that understanding?

18   A.  Over the years we developed a pricing model specifically

19   for KFC, and that would be used as the basis for our bid.

20   Q.  And so what was your understanding, then, of how RSCS and

21   KFC expected Pilgrim's to formulate its bids?

22        MR. FELDBERG:  Objecting, foundation.  His prior

23   answer doesn't establish a foundation.

24        THE COURT:  Overruled.

25   A.  They would expect us to use the pricing model to calculate

Robert Bryant - Direct

1   our cost in margin and formulate a final price submission.

2   *BY MR. KOENIG:*

3   *Q.*  Have you heard the term blind bid?

4   *A.*  I have.

5   *Q.*  What does that mean?

6   *A.*  A blind bid to me is when you submit a bid without

7   consultation and it's --

8   *Q.*  Without consultation?

9   *A.*  Correct.

10  *Q.*  With whom?

11  *A.*  With anyone other than --

12  *Q.*  Including competitors?

13  *A.*  Correct.

14          *MR. KORNFELD:*  I am going to object.  I would ask

15  Mr. Koenig allow the witness to finish his answer before we get

16  another question.

17          *THE COURT:*  Right.  That will make for a better record

18  if you could do so.

19          *MR. KOENIG:*  Fair enough.

20  *BY MR. KOENIG:*

21  *Q.*  Okay.  So your understanding of -- what does the term blind

22  bid mean to you?

23  *A.*  Blind bid would mean that you -- similar to a sealed bid

24  that others may be more accustomed to where you would put your

25  bid in an envelope and seal it so no one else would know what

Robert Bryant - Direct

1   it is, only the buyer, and submit your bid.

2   Q.  And based on what you stated earlier, was it your

3   understanding, then -- what was your understanding of the type

4   of bid RSCS expected?

5   A.  A blind bid.

6   Q.  Okay.  And what was your understanding of the reason for

7   the blind bid?

8           MR. KORNFELD:  Objection, Your Honor, foundation as to

9   his understanding of RSCS's expectations.

10          THE COURT:  Sustained.

11  BY MR. KOENIG:

12  Q.  Did you have an understanding of whether RSCS -- I am

13  sorry.  Let me back up.

14          Did you have an understanding as to why RSCS wanted

15  blind bidding?

16  A.  Yes.

17  Q.  What is the basis for your understanding?

18  A.  My prior experience with customers and the bid process and

19  in consultation with those customers.

20  Q.  And what then was your understanding?

21          MR. KORNFELD:  Objection, Your Honor, foundation.  His

22  experience with unstated customers, plural, doesn't establish a

23  foundation for his understanding of RSCS's expectations in

24  these negotiations.

25          THE COURT:  He has been in the business for a long

Robert Bryant - Direct

1    time.  Overruled.

2    *BY MR. KOENIG:*

3    *Q.*  So you can answer.

4    *A.*  My expectation was that --

5    *Q.*  Your understanding?

6    *A.*  My understanding was that KFC expected us to submit a blind

7    bid and our most competitive bid.

8    *Q.*  My question though was did you have an understanding of

9    why --

10   *A.*  Yes.

11   *Q.*  -- they expected that?

12   *A.*  So they would get the most competitive price.

13   *Q.*  And what do you mean by most competitive price?

14   *A.*  What I mean by most competitive price is if you're unsure

15   of what other competitors may submit, then you're going to

16   submit the lowest price possible to ensure that you retain your

17   business or grow your business.

18   *Q.*  So how did you -- well, how did you intend, if you did, how

19   did you intend RSCS and KFC to perceive Pilgrim's and its

20   suppliers during the bidding process in 2017?

21   *A.*  As independent actors.

22   *Q.*  As competitors?

23   *A.*  Correct.

24   *Q.*  All right.  So during the -- do you have an understanding

25   as to whether Pilgrim's and its competitors bidding in 2017 for

Robert Bryant - Direct

1   KFC were competing on price?

2   *A.*   I do.

3   *Q.*   What's the basis for your understanding?

4   *A.*   Once again, my past experience in the bidding process and,

5   you know, in conversation with KFC and other customers.

6   *Q.*   Okay.  Were you involved in the 2017 KFC negotiations?

7   *A.*   I was.

8   *Q.*   And so is that part of your basis?

9   *A.*   It is.

10  *Q.*   So what is your understanding as to whether Pilgrim's and

11  the other chicken suppliers in 2017 were competing on price?

12  What is your understanding?

13          *MR. FELDBERG:*  Objection, foundation.

14          *THE COURT:*  Overruled.

15          *MR. POLLAK:*  The objection was suppliers without

16  particularly who we are talking about.  I don't think there is

17  a foundation for every supplier.

18          *THE COURT:*  Sustained.  If you could clarify what he

19  meant -- means by suppliers.

20  *BY MR. KOENIG:*

21  *Q.*   Do you know who -- what chicken suppliers were bidding for

22  KFC business in 2017?

23  *A.*   I do.

24  *Q.*   And which suppliers were those?

25  *A.*   Pilgrim's, Koch, Claxton, Mar-Jac, George's, Tyson.  There

Robert Bryant - Direct

1    could have been some others, but to name a few.

2    Q.  Okay.  What was your understanding, then, of whether

3    Pilgrim's and the other competitors you just named were

4    competing on price for KFC 2017?

5         MR. POLLAK:  Your Honor, same objection.  He has not

6    established a foundation for why he would know what each of

7    those suppliers was doing.  He simply laid a foundation if

8    those were the competitors, not that he had a basis of

9    knowledge.

10        THE COURT:  Sustained.  Why don't we start with his

11   basis for knowing as to each.

12   BY MR. KOENIG:

13   Q.  Okay.  Let's get into that, then.

14        Heading into 2017 negotiations with KFC and RSCS, did

15   you have an expectation with respect to where prices were going

16   to go, like up or down?

17   A.  I did.

18   Q.  And what was the basis for your expectation?

19   A.  Market research, you know, that I performed that told me

20   that prices -- there were going to need to be some pricing

21   concessions for this bid.

22   Q.  So what was your expectation, then?

23   A.  Market -- that the prices would go down.

24   Q.  Now, why were you negotiating with KFC in 2017?

25   A.  We were near the end of the three-year agreement that we

Robert Bryant - Direct

1    had negotiated in 2014.

2    Q.  Could you repeat that please?  It was a little soft.

3    A.  We were negotiating -- or beginning negotiations for the

4    2018 contract, so the 2014 negotiations that covered calendar

5    years 2015, 2016 and 2017 was set to expire at the end of 2017,

6    so we were beginning the negotiations for calendar year 2018

7    and farther.

8    Q.  Okay.  And did you participate in the 2014 negotiations?

9    A.  I did.

10   Q.  And what happened with KFC's prices in the 2014

11   negotiations?

12   A.  They went up.

13   Q.  Can you quantify?

14   A.  Substantially, in the neighborhood of 15 to 20 cents.

15   Q.  Per?

16   A.  Per pound.

17   Q.  Okay.  Now, in all your years at Pilgrim's, were you aware

18   generally, even if you weren't involved in the negotiations or

19   the pricing, were you generally aware of year-to-year pricing

20   for a given customer like KFC?

21   A.  Yes.

22   Q.  And did you have an understanding of how much year to year

23   pricing typically changed for KFC?

24   A.  Yes.

25   Q.  And what was your understanding of how much it typically

Robert Bryant - Direct

1    changed?

2    A.   Not a lot.   Normally it was a few pennies up or down year

3    to year.

4    Q.   But then in 2014 what did you say the magnitude of the

5    price increase was?

6    A.   It was between 15 and 20 cents a pound.

7    Q.   Had you ever seen that big of a price increase before?

8    A.   Not for KFC, no.

9    Q.   So after 2014 and those price increases -- it was a

10   three-year deal.   I think you said that, right?

11   A.   That's correct.

12   Q.   So you're going into 2017.   And what was your expectation

13   for prices?

14   A.   That we would have to give a price decrease.

15   Q.   And you mentioned market factors, right?

16   A.   That's correct.

17   Q.   Were there any other factors?

18   A.   It was primarily market factors.   There were more supply

19   available in 2017 than there had been.   And the relationship

20   with KFC was not good in 2017 because of the price increases

21   that we got in the 2014 contract, so it damaged the

22   relationship a little bit.

23   Q.   All right.   I guess why, then, why did the negotiations in

24   2014 matter in 2017?

25   A.   A lot of the same people at KFC and they were upset with

Robert Bryant - Direct

1  Pilgrim's in general because they perceived us to be the price

2  leader in 2014.

3  Q.  And was it your understanding -- did you have an

4  understanding in 2014 what the other competitors you had just

5  previously mentioned, were they suppliers for -- did they bid,

6  those same competitors bid for KFC in 2014?

7  A.  Yes, it's my understanding they did.

8  Q.  And did you have an understanding as to whether those

9  competitors besides Pilgrim's also received a large price

10  increase?

11  A.  Yes.

12  Q.  And what is the basis for that understanding?

13  A.  My boss at the time, Jason McGuire, shared some e-mails

14  with me and phone conversations that others -- or other

15  competitors were getting similar price increases.

16  Q.  And by similar price increases, what was the price increase

17  you mentioned?

18  A.  It was between 15 and 20 cents.

19  Q.  Per pound?

20  A.  Per pound, yes.

21  Q.  All right.  Now, you mentioned that -- and correct me if

22  I'm wrong, but you mentioned that at some point in January 2017

23  Pilgrim's was invited to submit a bid for KFC business, right?

24  A.  That's correct.

25  Q.  Do you recall when that bid was due?

Robert Bryant - Direct

1    A.   The first week of February.

2    Q.   But you mentioned before that you had a January 27th

3    meeting with RSCS and KFC, right?

4    A.   That's correct.

5    Q.   Why were you meeting with -- why was there a meeting

6    scheduled for before the bid was due?

7    A.   We were doing a prebid meeting.

8    Q.   Was that typical?

9    A.   It was.

10   Q.   And what was the type of stuff that you would discuss at

11   prebid meetings?

12   A.   Normally it would be -- we would discuss Pilgrim's

13   position, you know, whether it be market conditions or

14   whatever, and KFC would state their position on the market or

15   expectations from the bid.  And if there was any unresolved

16   issues that had arisen since the last meeting or something that

17   they wanted to bring out or ask for that would be differently

18   in this round of bidding, that would be brought up in that

19   meeting.

20   Q.   Did you do anything -- first of all, did you attend the

21   January 27th meeting?

22   A.   I did.

23   Q.   And who else from Pilgrim's attended that meeting?

24   A.   Myself, Roger Austin, Scott Tucker, Justin Gay and Tim

25   Stiller.

Robert Bryant - Direct

1   Q.  And who from RSCS attended that meeting?

2   A.  Pete Suerken, Sara Fisher, Steve Campisano and Rich

3   Eddington.

4   Q.  If you could explain, who is Pete Suerken?

5   A.  Pete Suerken was like the lead negotiator at KFC.  He was

6   responsible for that team on the KFC side.

7   Q.  And who was the sort of his opposite on the Pilgrim's side?

8   Who was in charge of the negotiations?

9   A.  It would have been Roger Austin.

10  Q.  And was Pete Suerken involved in the 2014 negotiations?

11  A.  He was.

12  Q.  All right.  Did you do anything to prepare for that January

13  27th meeting?

14  A.  I did.

15  Q.  If we can take a look at Government Exhibit 1882.

16          All right, Mr. Bryant.  Do you recognize Government

17  Exhibit 1882?

18  A.  I do.

19  Q.  And what is it?

20  A.  It's an e-mail from me to Roger Austin on January 17th,

21  2017.

22  Q.  What does the e-mail generally relate to?

23  A.  The KFC meeting we were going to have on January 27thof

24  2017.

25          MR. KOENIG:  Your Honor, the government offers

Robert Bryant - Direct

1    Government Exhibit 1882.

2          MR. FELDBERG:  No objection from us.

3          THE COURT:  Any objections to the admission of Exhibit

4    1882?

5          MR. KORNFELD:  Your Honor, I think this contains

6    double hearsay.

7          THE COURT:  Meaning?  I am being shown one page.  Is

8    it a one-page document?

9          MR. KORNFELD:  That's what I am looking at, Your

10   Honor.  The author is talking about another conversation with

11   another person who is not in the chain.

12         MS. HENRY:  And that would be Sara Fisher.

13         MR. KORNFELD:  Thank you.

14         THE COURT:  Is Ms. Fisher part of the Court's previous

15   ruling?

16         MR. KOENIG:  No, Your Honor.  She was on the RSCS side

17   of things.

18         THE COURT:  Okay.

19         MR. KOENIG:  And really it's for the effect on the

20   listener for that part and we aren't going to dwell on it.

21         MR. KORNFELD:  I am not sure which listener the

22   government is talking about, but I am not sure that that's even

23   relevant.

24         THE COURT:  Anything more, Mr. Koenig, on this one?

25         MR. KOENIG:  Any more argument on it?

Robert Bryant - Direct

1          THE COURT:  Yes, as to the objection.

2          MR. KOENIG:  Well, I guess it's, you know -- I mean,

3    all the government is trying to elicit here is just the

4    preparations they went through.  It's just not for the truth.

5          THE COURT:  Okay.

6          MR. KOENIG:  By that I mean the statement that he

7    is --

8          THE COURT:  Understand.  The objection will be

9    overruled in part.  Exhibit 1882 will be admitted.

10         However, ladies and gentlemen, there is a reference to

11   what someone referred to simply as Sarah wants.  That portion

12   of it, in other words, what Sarah wants should not be

13   considered by you for the truth of the matter.  We talked about

14   that earlier in you may recall a previous exhibit.  However,

15   the rest of the statements you can consider for the truth of

16   the matter asserted, and to that extent the objections will be

17   overruled.

18         MR. KOENIG:  Thank you, Your Honor.  And we would ask

19   at this time to publish it to the jury.

20         THE COURT:  You may.

21   BY MR. KOENIG:

22   Q.  All right.  If we could just focus on first the bottom

23   e-mail on the page.  Have you had a chance to review that?

24         Ms. Pearce, could you just blow up the bottom portion?

25         THE COURT:  And let me just ask Ms. Perez and

Robert Bryant - Direct                814

1   Mr. Kahler, can you see that?

2            *JUROR:*  I can see it now.

3            *THE COURT:*  Understood.

4   *BY MR. KOENIG:*

5   *Q.*  So what is the -- it looks like an e-mail from you.  What

6   were you trying to convey just generally?

7   *A.*  In general, I was trying to brainstorm a list of topics

8   that could come up with KFC at the January 27th meeting.

9   *Q.*  All right.  And do you see the line that says:  Will Pete

10  actually attend the meeting?

11  *A.*  I do.

12  *Q.*  Who is the Pete you are referring to?

13  *A.*  Pete Suerken.

14  *Q.*  Why did you ask, Will Pete actually attend the meeting?

15  *A.*  I wanted to know if he would actually be there because he

16  was their lead negotiator and it gave me an indication of how

17  serious the meeting would be.

18  *Q.*  And who did you send that e-mail to?

19  *A.*  Roger Austin and Scott Tucker.

20           *MR. KOENIG:*  All right.  Let's go up to the next

21  e-mail, if you could just blow that one up, just the next

22  e-mail itself with the header information, please.

23  *BY MR. KOENIG:*

24  *Q.*  All right.  So what are we looking at here?

25  *A.*  An e-mail from Roger Austin to me and Scott Tucker on

Robert Bryant - Direct

1    January 17, 2017.

2    Q.  So this is Roger Austin's response to your e-mail below,

3    right?

4    A.  That's correct.

5    Q.  Can you read to the jury the last two sentences of that

6    e-mail?

7    A.  Claxton meets with them in Thursday and I will get a blow

8    by blow Friday morning.  Koch meets with them in Friday.

9    Q.  Let's just start with the first sentence.  Now, wait.  What

10   is the date of this e-mail?

11   A.  January 17th, 2017.

12   Q.  All right.  What day of the week was that?

13   A.  Tuesday.

14   Q.  So what would be the date of the coming Thursday?

15   A.  That would be the 19th.

16   Q.  And Friday?

17   A.  The 20th.

18   Q.  And when was Pilgrim's meeting scheduled for with RSCS?

19   A.  The 27th.

20   Q.  All right.  So could you explain what your understanding

21   was of the first highlighted sentence starting with Claxton?

22   A.  That Claxton had a meeting with KFC that Thursday the 19th,

23   and that Roger and Scott Brady would talk on Friday morning and

24   he would give -- provide me with the details of the outcome of

25   that meeting.

816

Robert Bryant - Direct

1  *Q.* And so you made a jump there from Claxton to Scott Brady.

2  What's your basis for making that jump?

3  *A.* Roger and Scott -- Roger Austin and Scott Brady talked and

4  Roger relayed information to me routinely from Scott Brady and

5  I associated Scott Brady works at Claxton.

6  *Q.* Okay. And them, what is your understanding of them?

7  *A.* KFC.

8  *Q.* All right. And you may have touched on this, but blow by

9  blow, what does that mean to you?

10 *A.* That means the details of the meeting with KFC between

11 Claxton and KFC.

12 *Q.* Why would you care what happened? Did you care what

13 happened with the meeting with KFC and Claxton?

14 *A.* Yes.

15 *Q.* Why?

16 *A.* Whatever information we could gain from that, it would help

17 in our preparation with KFC. Their position on the markets, if

18 they offered up additional loads to Claxton, who were they

19 coming from, a whole host of questions could come from that

20 meeting.

21 *Q.* All right. Now the second line, could you just re-read

22 that, the second highlighted line?

23 *A.* Koch meets with them in Friday.

24 *Q.* What did you understand that to mean?

25 *A.* That meant that Bill Kantola was going to meet with KFC on

Robert Bryant - Direct

1    that Friday and that Roger and Bill -- Roger Austin and Bill

2    Kantola would speak and we would find out the details of that

3    meeting.

4    Q.  Okay.  And again, you made the jump from Koch to Kantola.

5    Why did you make that jump?

6    A.  Because Bill Kantola and Roger Austin spoke routinely.  And

7    I got information from Roger that was provided by Bill Kantola

8    and Bill Kantola worked at Koch.

9    Q.  Again, did you care what happened at the Koch RSCS meeting?

10   A.  Yes.

11   Q.  And why?

12   A.  For the same reasons, what did KFC tell Koch.  Was there

13   any differences in the messaging to Koch and Claxton and what

14   impact would that have on our negotiation.

15   Q.  And you said you attended the January 27th meeting?

16   A.  That's correct.

17   Q.  At that meeting did you tell RSCS that you had already

18   learned or that you were trying to learn what was going on with

19   Koch and Claxton's meetings?

20   A.  Not that I recall, no.

21   Q.  Why not?

22   A.  We wouldn't want them to know that we were sharing that

23   type of information.

24   Q.  Them being KFC and RSCS?

25   A.  That's correct.

818

Robert Bryant - Direct

1   Q.   Why wouldn't you want them to know?

2   A.   Because it could be -- the customer would probably perceive

3   that as us undermining their bid process.

4   Q.   How so?

5   A.   Because we would be working together against their bid

6   process effectively undermining them.

7   Q.   Working together to accomplish what?

8        MR. TUBACH:   Objection as to foundation, lack of

9   foundation.

10       THE COURT:   Overruled.

11  A.   Working together against their best interests and in our

12  best interests.   And by ours I mean our competitors'

13  collectively best interest.

14  BY MR. KOENIG:

15  Q.   Okay.   But again to what end?

16  A.   To -- in 2017 it was about limiting a price decrease.

17  Q.   Together?

18  A.   Together, yes.

19  Q.   Competitors together.

20  A.   Correct.

21  Q.   Okay.   Now, so if we could go then now to the very top

22  e-mail.   Who is this from and to?

23  A.   This is from myself to Roger Austin.

24  Q.   In the previous part of the e-mail chain Scott Tucker was

25  on there, right?

819

Robert Bryant - Direct

 1  *A.*  That's correct.

 2  *Q.*  But he doesn't appear on the header here.

 3  *A.*  That's correct.

 4  *Q.*  Why is that?

 5  *A.*  Because I removed him from the e-mail chain.

 6  *Q.*  Do you specifically remember this e-mail?

 7  *A.*  I do.

 8  *Q.*  How many e-mails did you receive in January of 2017?

 9  *A.*  Probably -- I mean, thousands.

10  *Q.*  Do you remember each and every one of those?

11  *A.*  No.

12  *Q.*  So why do you remember this one?

13  *A.*  Because of what I wrote and --

14  *Q.*  What did you write?

15  *A.*  I would like to know where we need to be No. 2 in price if

16  you can find out.

17  *Q.*  And what did you mean by that?

18  *A.*  I was asking Roger if he could find out what price we

19  needed to submit for the bid to be second highest in price.

20  *Q.*  And what was -- did you have an expectation as to how Roger

21  Austin would go about doing that?

22  *A.*  I did.

23  *Q.*  What was your expectation?

24  *A.*  My expectation was that he would use his contacts at other

25  companies that I mentioned before like Carl Pepper and Bill

Robert Bryant - Direct

1    Kantola and Scott Brady and come back to me with pricing

2    guidance on where our bid needed to be to be No. 2 in price.

3    Q.  And why did you want to be No. 2 in price?

4    A.  Because the relationship with KFC was damaged.  We were the

5    price leader in 2014, so if we were No. 2 in price, then we

6    weren't the price leader anymore and we didn't sacrifice any

7    more margin than we had to to try to repair that relationship.

8    Q.  Well, why didn't you -- if you are trying to repair the

9    relationship, why didn't you say where do we need to be to be

10   down --

11          MS. HENRY:  Objection, leading.

12          THE COURT:  He hasn't asked the question yet.  Go

13   ahead.

14   BY MR. KOENIG:

15   Q.  Why didn't you ask where do we need to be to be the lowest?

16          MS. HENRY:  Objection, leading.

17          THE COURT:  Overruled.

18   A.  Because being No. 2 satisfied being not the highest price

19   but still maximized profitability.

20   BY MR. KOENIG:

21   Q.  All right.  And then you said at the end of the sentence:

22   If you can find out.

23          So if you had this expectation of how you would do it,

24   why did you write "if you can find out"?

25   A.  At this point I had --

821

Robert Bryant - Direct

 1   Q.  Can you lean forward a little, please?

 2   A.  Yeah.  At this point I had recently been promoted and this

 3   was the first time I can recall actually asking somebody to

 4   obtain this type of information.  And I really wasn't sure how

 5   to go about it, but I understood the expectation for the bid.

 6   So --

 7   Q.  What was the expectation for the bid?

 8   A.  That I needed to have pricing information.  I needed to

 9   have pricing information prior to submitting the bid.

10   Q.  Where did you get that idea?

11   A.  From the 2014 negotiations.

12   Q.  And you said get pricing information.  Pricing information

13   from who?

14   A.  Competitor information, competitor pricing information.

15   Q.  All right.  So are there times during your career when you

16   were not aware of competitor pricing going into a bid?

17   A.  Yes.

18   Q.  And conversely were there times when you were aware?

19   A.  Yes.

20   Q.  Which of those is this?

21   A.  This was an instance that I --

22   Q.  Maybe not at this point, but --

23   A.  Yes.  I did receive --

24        MR. KORNFELD:  Objection, Your Honor.  I would ask we

25   be allowed to hear the answer before we hear another question.

Robert Bryant - Direct

1        THE COURT:  Sustained.

2        MR. KOENIG:  My apologies.

3   A.  I did receive competitor pricing information for this bid.

4   BY MR. KOENIG:

5   Q.  And how did you receive it?

6   A.  It was a phone call from Roger Austin.

7   Q.  And what did he tell you?

8   A.  I mean, he -- when he called, he gave me each company's

9   price and on both eight-piece and dark meat.

10  Q.  Could you explain to the jury -- you just used two terms,

11  eight-piece and dark meat.  Can you explain those?

12  A.  Yes.  Eight-piece is a typical eight-piece cut-up chicken

13  that's fried.  And then dark meat would just be the drumstick

14  and the thigh or thigh quarter.  That's when you split a leg

15  quarter.  KFC on their bone-in program bought primarily

16  eight-piece, but they also had dark meat that used a

17  supplemental -- supplemental pieces.

18  Q.  So was Pilgrim's bidding on both eight-piece and dark meat

19  in this round of negotiations?

20  A.  We were.

21  Q.  And when you received that pricing information from Roger

22  Austin, did you find it useful?

23  A.  I did.

24  Q.  How so?

25  A.  We used that information to formulate our bid submission

Robert Bryant - Direct

1    for 2017.

2    Q.  All right.  And what was your understanding -- well,

3    scratch that.

4         So you used it to formulate your bid submission.  Can

5    you explain that a little bit more?

6    A.  We used the information to come up with our price.  So, you

7    know, I wrote in here we wanted to be No. 2 in price.

8    Ultimately I think we came in at No. 3 on price when we finally

9    submitted the bid.

10   Q.  You mentioned -- earlier you testified that the goal was to

11   resist going lower in price than you had to, correct?

12   A.  That's correct.

13   Q.  And was receiving that price, was it -- and I think you

14   also said resisting going lower, not just Pilgrim's, but

15   together the competitors.

16   A.  That's correct.

17   Q.  Was the information you received from Roger Austin useful

18   in that regard?

19   A.  It was.

20   Q.  How so?

21   A.  Like I said, we used that to see where others were in

22   price, and then we used it to formulate our price for the

23   submission.  Without that information, I mean, I can't say

24   where our price would have been, how much we would have

25   submitted lower or not.

824

Robert Bryant - Direct

1   *Q.* And I think you testified before that your understanding

2   was that the exchange of this future pricing or bids was a

3   two-way street.  Did you say that?

4   *A.* I did.

5   *Q.* Can you just explain to the jury what that meant?

6   *A.* That meant that -- my understanding was that Roger was

7   receiving this information from our competitors, so he was

8   sharing information with them as well.  They wouldn't just

9   provide their price without getting our price in return.

10  *Q.* And so was it your expectation, then, that when you asked

11  Roger Austin to find out the prices, was it your expectation

12  that he would also be giving Pilgrim's future bid pricing?

13  *A.* Yes.

14  *Q.* And did you have an understanding of how the competitors on

15  this bid would use Pilgrim's information?

16         *MR. FAGG:*  Objection, foundation.

17         *MR. KORNFELD:*  And I would join that.  And again, we

18  are talking competitors, plural.

19         *THE COURT:*  He can answer yes or no and then

20  foundation can be established.

21         Go ahead.

22  *A.* Yes.

23  *BY MR. KOENIG:*

24  *Q.* You did have an understanding.  Okay.  And who were the

25  competitors also bidding in competition with Pilgrim's in 2017

Robert Bryant - Direct

1  for the KFC price?

2  A.  In general, they are the same competitors I mentioned, so

   Koch, Claxton, Mar-Jac, Tyson, George's.  I think I covered

4  them all.  Pilgrim's.

5  Q.  And was it your expectation that some or all of those

6  competitors would receive Pilgrim's bid from Roger Austin?

7  A.  Yes.

8  Q.  All right.  Now, you said you had an understanding of what

9  the competitors you just named on this bid would do with that

10 information, right?

11 A.  That's correct.

12 Q.  And what is the basis for your understanding?

13 A.  You know, what I seen in 2014 during the bid process and

14 through the course of the years, that they would use that

15 information to be in line with each other.

16 Q.  Okay.  Well, so what was your understanding, then, that the

17 competitors you just named, what was your understanding that

18 they would do with Pilgrim's bid information?

19     MR. KORNFELD:  Objection, Your Honor, foundation.  My

20 client, Claxton, for example, there is no foundation that this

21 witness has any understanding of how he even knew our prices.

22     THE COURT:  Sustained.

23 BY MR. KOENIG:

24 Q.  Let's go back to your basis.  In 2014 was it your

25 understanding that Pilgrim's bid information was provided to

826

Robert Bryant - Direct

1   Claxton?

2   *A.*   Yes.

3   *Q.*   To Koch?

4   *A.*   Yes.

5   *Q.*   What happened after they received that information?  What

6   happened to bid prices?

7   *A.*   In 2014 they went up.

8   *Q.*   All right.  Together, the competitors together went up?

9   *A.*   It's my understanding, yes.  I say the industry, but our

10  competitors, yes, raised prices together.

11  *Q.*   So does that form the basis for your understanding or

12  expectation of what Claxton, Koch, other competitors on this

13  2017 bid would do with Pilgrim's bid information?

14  *A.*   It did.

15  *Q.*   All right.  What was that understanding?

16      *MR. KORNFELD:*  Objection, Your Honor.  I would

17  respectfully suggest that he still hasn't laid the foundation.

18  And as an aside, I would ask if the government is done with

19  this exhibit, that it be removed from the screen, please.

20      *MR. KOENIG:*  Sure.

21      *THE COURT:*  Okay.  We can take the exhibit down.

22      Mr. Pollack?

23      *MR. POLLAK:*  Yes, Your Honor.  The question a moment

24  ago was about some or all of the competitors when he was laying

25  the foundation, and then he specifically asked in '14 about

Robert Bryant - Direct

1    Claxton and Koch.  But now he is asking for an observation

2    about all of the competitors, so I don't think the foundation

3    has been laid.

4         THE COURT:  The objection will be overruled.  He

5    testified previously about all of the different competitors and

6    that's the basis for his expectations in 2017.

7    BY MR. KOENIG:

8    Q.  Okay.  So Mr. Bryant, what was your expectation that the

9    competitors on this bid in 2017 for KFC would do with Pilgrim's

10   bid information?

11        MR. POLLAK:  Objection, Your Honor.  He hasn't

12   testified that they all had Pilgrim's bid information.  He only

13   testified that those were given to Koch and Claxton.

14        MR. KOENIG:  I disagree.  He said he expected that

15   Pilgrim's bid information would make its way to all the

16   competitors.

17        THE COURT:  Overruled.

18   BY MR. KOENIG:

19   Q.  You can answer.

20   A.  My expectation is that they would use that to formulate

21   their own bids.  In 2017 it was so we could limit price

22   decreases.

23   Q.  And who is we?

24   A.  Pilgrim's among the competitors.

25   Q.  So we includes Pilgrim's and other competitors.

Robert Bryant - Direct

1    A.   That's correct.

2    Q.   And again, did you have an expectation as to whether if a

3    competitor in this bid received Pilgrim's bid information they

4    would use it to undercut Pilgrim's?

5    A.   That was not my expectation, no.

6    Q.   Well, I just asked if you had an understanding.

7    A.   I had an understanding, yes.

8    Q.   And what is the basis for your understanding?

9    A.   Well, in 2014 and other times when those agreements or

10   those -- that information was exchanged, that it was not about

11   volume.  It was about pricing only.  And if there was a risk to

12   volume, then the account owner would have been asked to manage

13   that.

14   Q.   Do you recall a time when Pilgrim's future pricing, their

15   bids were given to a competitor who undercut Pilgrim's?

16   A.   I don't recall that.  I mean, there could have been a time

17   that happened, but nothing comes to mind right away.

18   Q.   All right.  And so we have gone through the purpose of

19   Pilgrim's -- Pilgrim's purpose or your purpose in receiving the

20   future pricing from competitors and the purpose or what your

21   expectation was of Pilgrim's giving pricing information.  One

22   last thing.  Did you have an understanding of the purpose of

23   competitors on this 2017 bid, did you have an understanding of

24   their purpose in providing you with the future pricing bid

25   information?

Robert Bryant - Direct

1    *A.*   Yes.

2    *Q.*   And what was your basis for that understanding?

3    *A.*   The same as before, previous bids and information that was

4    exchanged in 2014 and after.

5    *Q.*   All right.  And so what was your understanding of their

6    purpose?

7            *MR. KORNFELD:*  Objection, foundation, Your Honor.

8            *THE COURT:*  Let me hear from Mr. Pollack first.

9            *MR. POLLAK:*  It is foundation, but can we have a side

10   bar?

11           *THE COURT:*  We can.  Can you hear me, Mr. Pollack?

12           *MR. POLLAK:*  I can, Your Honor.

13           *THE COURT:*  Mr. Koenig?

14           *MR. KOENIG:*  Yes.

15           *THE COURT:*  Did anyone else want to join in on that?

16           *MS. PREWITT:*  Elizabeth Prewitt for Mr. Mulrenin.

17           *MR. FAGG:*  John Fagg.  We may have a separate

18   objection as well.

19           *THE COURT:*  First of all let's start off with

20   Mr. Pollack.

21           *MR. POLLAK:*  Thank you, Your Honor.  I believe the

22   testimony to date has been that he has testified that Pilgrim's

23   bid information was shared with Koch and with Claxton and that

24   he had an expectation that companies with whom Pilgrim's bid

25   information was shared would reciprocate by giving their bid

830

Robert Bryant - Direct

1    information to him.  He's testified as to who all the

2    competitors were.  And when he was asked about whether or not

3    this sharing occurred, he was specifically asked did it occur

4    with some or all of the competitors.

5          Mr. Koenig said a minute ago that there was testimony

6    that he had an expectation that Pilgrim's bid information would

7    be given to all of the competitors.  I don't think that that is

8    an accurate characterization of his testimony and I don't think

9    he has laid a foundation for him to have that expectation even

10   had he testified to it.  He said that he observed phone

11   conversations between Mr. Austin and Koch, Mr. Austin and

12   Claxton and Mr. Austin and Tyson's and that's it.

13         THE COURT:  Let's have Mr. Koenig respond in terms of

14   just what the testimony has been first.  Go ahead, Mr. Koenig.

15         MR. KOENIG:  Well, the testimony has been that in 2014

16   he observed this same type of behavior and he said that he

17   understood that the pricing went to all the competitors, but I

18   think more to the point --

19         MR. TUBACH:  Your Honor, sorry.  Just to interject, he

20   is talking next to the mic and it's undoing the effect --

21         MR. KOENIG:  It's off.  It's off.

22         THE COURT:  It's probably a good idea to avoid the

23   microphone just so -- not that Mr. Koenig didn't take the

24   precaution, but just in the future.

25         MR. KOENIG:  Is it okay if I stand here?

Robert Bryant - Direct

1          THE COURT:  You can stand pretty much wherever you

2     want.

3          MR. KOENIG:  Anyway, I think more to the point --

4          THE COURT:  Mr. Koenig, you can also talk much more

5     softly.  Of course, I can't monitor the extent to which a loud

6     voice can be heard over the white noise because I am listening

7     to the transceiver, but we don't have to talk too loud.  Go

8     ahead.

9          MR. KOENIG:  Okay.  I am sorry.  It's in my nature, I

10    guess.  I apologize and will try to speak softer.  So I think

11    this whole -- this whole line of objections will be rendered

12    pretty much moot by an exhibit we have coming up, so I can just

13    delay asking him the questions until our next exhibit.

14         THE COURT:  Okay.  So anything else then, Mr. Pollack?

15         MR. POLLAK:  I would just ask the Court particularly

16    if the Court has the opportunity to review the transcript to

17    review its prior ruling on whether or not that objection should

18    have been sustained.

19         THE COURT:  I am sorry, when you say that objection,

20    which objection?

21         MR. POLLAK:  Previously I had objected and Mr. Koenig

22    had represented that the witness had testified that it was the

23    witness' expectation that Pilgrim's bid information would be

24    given to all competitors.  And I think the Court overruled my

25    objection after that representation.  I think if you go back to

Robert Bryant - Direct

1    the transcript, the testimony will not support that

2    representation.

3         THE COURT:  Well, once again, the question that is

4    being asked of the witness, which I don't think we are going to

5    get into right now, but it was his expectation.  That

6    expectation can be based on 2014.  And whether or not the

7    question Mr. Koenig previously asked was just limited to just

8    two, that doesn't mean that his expectation wouldn't have been

9    all, so that's why the objection was overruled.

10        MR. POLLAK:  But the objection was the fact that he

11   had not laid a foundation as to why he would have an

12   expectation with respect to the others.

13        THE COURT:  Right.  He testified it was based upon at

14   least in part 2014 where he observed all the prices of

15   competitors involved in those -- that bidding process going on.

16        All right.

17        MR. GILLEN:  Just for the record, Craig Gillen.  I

18   will state that I believe the record reflects that this witness

19   did not "overhear" any discussions between Mr. Austin and

20   anyone from Tyson.  I think when counsel -- Mr. Pollack might

21   have indicated that he did.  My recollection of the evidence is

22   that he said he was told by Mr. Austin that he had communicated

23   with Mr. Pepper, but he did not himself overhear any of those

24   calls.

25        THE COURT:  Yeah, understood.

Robert Bryant - Direct

1          Mr. Kornfeld?

2          MR. KORNFELD:  Thank you, Your Honor.  In addition to

3   the foundation objection, I don't think this witness'

4   expectation is relevant under 401.  It also calls for

5   speculation.  How he knows how, you know, Mr. Fries or Claxton

6   as an example would use this information, he has already -- he

7   hasn't established that he understands how they do the pricing.

8   So I think it's not -- his expectation is not relevant as to

9   how the producers would use it aside from the foundation.  And

10  if anything, he is speculating because there is nothing in the

11  record to establish, other than he could barely identify

12  Mr. Brady, there is nothing in the record to establish he knows

13  a darn thing about Claxton.

14          THE COURT:  Well, that objection will be overruled

15  too.  He testified he was involved in 2014 in price

16  negotiations with KFC.  He is closely involved in the price

17  negotiations here.  He is communicating with Mr. Austin.  He is

18  asking Mr. Austin to figure out where he would need to be,

19  where Pilgrim's would need to be to be No. 2.  Therefore, an

20  expectation as to whether or not price information would be

21  shared is an appropriate thing for him to worry about because

22  he testified he would expect then that Pilgrim's information

23  would ultimately be shared as well.

24          Mr. Fagg?

25          MR. FAGG:  Thank you, Your Honor.  A slightly

Robert Bryant - Direct

1    different issue.  I would just ask that the government when

2    they are asking their questions simply ask questions and not

3    restate about what was previously testified to.  There have

4    been a number of questions including one quite recently in

5    which it essentially amounts to the prosecutor testifying on

6    direct examination to a witness before he sets up the next

7    question, so we would just ask that the question be simply

8    limited to that, questions only.

9         THE COURT:  Some sign posting can be helpful to

10   maintain clarity.  And also Mr. Koenig on occasion has been

11   asking the witness to lean closer to the microphone, but

12   obviously there tends to be a correlation between that and

13   testimony that Mr. Koenig thinks may be important, but whenever

14   it occurs would be the best time to ask the witness to lean

15   into the microphone, not particular times.

16        MR. KOENIG:  If I did that, it was not intentional.

17   It was just when I noticed that because I am having trouble

18   hearing him, but I will be mindful of that going forward.

19        THE COURT:  Right.  We will just try to remind the

20   witness of that.

21        Anything else, Mr. Fagg?

22        MR. FAGG:  No, Your Honor.  Thank you.

23        THE COURT:  Thank you.

24     (In open court:)

25        THE COURT:  The objection is overruled.  Go ahead.

Robert Bryant - Direct

1  BY MR. KOENIG:

2  Q.  So what then was your understanding of your competitors' in

3  this bid purpose in giving their future pricing to Pilgrim's?

4          MR. POLLAK:  Your Honor, I thought that Mr. Koenig

5  said that he was going to withdraw the question and use an

6  exhibit.

7          MR. KOENIG:  And then you said overruled.

8          THE COURT:  Well, my expectation was you were going to

9  move on.

10          MR. KOENIG:  Okay.  I will.  I misunderstood.

11          Actually, I do want to pull up Exhibit 1882 one more

12  time.  It's already in evidence.

13          THE COURT:  That may be displayed.

14          MR. KOENIG:  Ms. Pearce, could you just go to the top

15  e-mail?

16  BY MR. KOENIG:

17  Q.  All right.  So Mr. Bryant, you testified I believe earlier

18  that you remembered specifically this e-mail.

19  A.  I do.

20  Q.  Why did you -- why do you remember that e-mail?

21          MR. KORNFELD:  Your Honor, he asked that question a

22  while back.  Asked and answered.

23          MR. KOENIG:  I will rephrase it.

24          THE COURT:  Go ahead.

25  BY MR. KOENIG:

Robert Bryant - Direct

1   Q.  When you sent this e-mail, how did it make you feel?

2           MR. KORNFELD:  Objection, irrelevant as to how it made

3   him feel.

4           THE COURT:  Overruled.

5   A.  I immediately wished I hadn't sent the e-mail.  I regretted

6   sending the e-mail and I felt like it was wrong to ask that

7   question of Roger.

8   BY MR. KOENIG:

9   Q.  Why did you feel it was wrong?

10  A.  Because I was asking him to go get pricing information from

11  competitors.  And this was to my memory the first time I'd

12  asked somebody to do something like this.

13  Q.  Okay.  Well -- but how long had you been around and aware

14  of this sort of activity?

15  A.  Since 2014.

16  Q.  So why suddenly now are you feeling regret and

17  wrongfulness?

18  A.  Because I was asking or directing somebody to do that, and

19  prior to that I wasn't in a position that -- to make a request

20  like this.

21  Q.  But you were still a participant back in 2014.

22  A.  Yes.

23  Q.  So if you thought it was wrong, why did you do it?

24  A.  I knew that there was an expectation that I should have

25  that information for this bid.

Robert Bryant - Direct

1    Q.  And how did you -- why did you believe there was an

2    expectation?

3    A.  From 2014 and, you know, the expectation from my current

4    boss.

5    Q.  Who was?

6    A.  Well, in 2014 it was Jason McGuire, but in 2017 it was Tim

7    Stiller.

8    Q.  Let's go to the --

9         MR. KOENIG:  You can take that down now, Ms. Pearce.

10   BY MR. KOENIG:

11   Q.  Let's go to the January 27th meeting with RSCS that you

12   testified about.  Do you remember that?

13   A.  I do.

14   Q.  All right.  And if you could -- it was a while ago -- so

15   could you remind the jury who from the Pilgrim's side attended

16   that meeting?

17   A.  Myself, Roger Austin, Tim Stiller, Justin Gay and Scott

18   Tucker.

19   Q.  And who from the RSCS/KFC side?

20   A.  Pete Suerken, Rich Eddington, Sara Fisher and Steve

21   Campisano.

22   Q.  Could you remind the jury who Pete Suerken is?

23   A.  He was the head of the KFC negotiation team.

24   Q.  All right.  And what do you recall about what happened at

25   that meeting?

Robert Bryant - Direct

1    *A.*  My expectation and Pilgrim's expectation that the

2    relationship was damaged was true.  I remember Pete in the

3    meeting --

4    *Q.*  Pete who?

5    *A.*  Pete Suerken in the meeting said something to the effect

6    of --

7         MR. KORNFELD:  Objection, Your Honor, hearsay, what

8    Mr. Suerken said.

9         THE COURT:  Response?

10        MR. KOENIG:  Well, it's -- two things.  It's effect on

11   the listener, but also I believe there was in opening statement

12   made to the effect that Mr. Suerken was happy with the 2014

13   prices.

14        THE COURT:  Well, opening statements are not evidence,

15   so that in and of itself is irrelevant.  Is what you're saying

16   that the statement will explain what some additional action

17   took or some --

18        MR. KOENIG:  Sure.

19        THE COURT:  Ladies and gentlemen, so the objection

20   will be overruled.  I will allow the statement to explain the

21   effect on the listener.  In other words, you can't consider the

22   statement of Mr. Suerken for the truth of the matter asserted,

23   but rather only for what effect it had on who heard it, in

24   other words, causing them to maybe do something or not do

25   something.

Robert Bryant - Direct

1          MR. KOENIG:  Can I also add there is also an 803(3)

2    issue here statement?  Obviously, their objection was before

3    the witness had a chance to answer, but it does go to future --

4    current state of mind plan or intent by the speaker, if you

5    hear the statement I mean.

6          THE COURT:  I don't know about that yet, but there is

7    a basis for admissibility now, so let's do that.

8          MR. KOENIG:  All right, thank you.

9    BY MR. KOENIG:

10   Q.  So what did Mr. Suerken say?

11   A.  He said that he was going to beat us down with a hammer or

12   a baseball bat, I don't recall which, in price and take loads

13   from us.

14   Q.  And what does that mean, take loads from you?

15   A.  Loads of business, basically.  So earlier I said that we

16   typically deal in loads per week volume, so he was going to

17   reduce our loads per week is what he was threatening to do in

18   the meeting and reduce our price.

19   Q.  All right.  Just to be clear, reduce price and take

20   business away.  Is that what you said?

21   A.  That's correct.

22   Q.  Okay.  Now, that was on the 27th, right, of January?

23   A.  That's correct.

24   Q.  And when did you -- I believe you said -- when did you say

25   the bids were due, the first round bids?

Robert Bryant - Direct

1    A.   The first week of February.

2    Q.   All right.  At some point between the January 2017 meeting

3    with KFC/RSCS and the bid submission, Pilgrim's bid submission,

4    did you receive a call from Tim Stiller?

5    A.   I did.

6    Q.   And what -- you may not have received a call, but did you

7    have a phone conversation with Mr. Stiller?

8    A.   Yes.

9    Q.   And what was said on that phone call?

10   A.   Tim called me and asked me if I had pricing information

11   from Roger.  And I had not received anything from Roger at that

12   point.  Tim got upset with me and Tim's words were, "You don't

13   know shit.  I'll call and get it myself" or "I'll find out for

14   myself."  And then he hung up the phone.

15   Q.   What was your understanding of what he meant by pricing

16   information?

17   A.   He was looking for competitor pricing information that he

18   expected me to have from Roger.

19   Q.   Then did you end up having a phone conversation subsequent

20   to that with Roger Austin?

21   A.   I did.

22   Q.   Can you tell the jury what happened on that phone call?

23   A.   I called Roger after the conversation with Tim and --

24   Q.   Can you use his last name?

25   A.   Tim Stiller, and relayed to Roger Austin that Tim was upset

Robert Bryant - Direct

1    that I didn't have the pricing information he wanted.  And

2    Roger said that he had a similar call and that he would make

3    some calls and get back to me.

4    Q.  And did he get back to you?

5    A.  He did.

6    Q.  Approximately how long after?

7    A.  It may have been the next day, I don't recall, but it was

8    before the bid was due, but he did call me back.

9    Q.  And what happened on that phone conversation?

10   A.  Roger called and he said, "Are you ready?  I got it."  And

11   then he relayed to me pricing and customer names.

12   Q.  Customer names?

13   A.  Or, sorry, competitor names.  And I wrote those, that

14   pricing information and competitor names down in my notebook so

15   I could relay that back to Tim since he was upset that I didn't

16   already have it, Tim Stiller.

17        MR. KOENIG:  If we could please pull up Government

18   Exhibit 1919 and not have it published to the jury, please.

19   BY MR. KOENIG:

20   Q.  All right, Mr. Bryant.  Do you recognize Exhibit 1919?

21   A.  I do.

22   Q.  What is it?

23   A.  It's my handwritten notes.

24   Q.  Was it -- do you recognize your own handwriting?

25   A.  I do.

Robert Bryant - Direct

1   Q.   And was it -- was that a regular practice for you to take

2   notes?

3   A.   It was.

4   Q.   And why was that?

5   A.   We had regular meetings.  I had a weekly meeting on Mondays

6   I needed to prepare for, so I would make notes about various

7   things.  This appears to be part of that where this is me

8   taking notes on complaints to some of our customers.

9        MR. KOENIG:   Okay.  Can we go to Page 11, please?

10  BY MR. KOENIG:

11  Q.   And do you recognize Page 11?

12       MR. POLLAK:   Could you give a Bates number?

13       THE COURT:   Do you want me to read it?

14       MR. TUBACH:   It ends in No. 160.

15       MR. KOENIG:   150.

16       THE COURT:   This Page 11 ends in 160 it would seem.

17       MR. KOENIG:   Oh, it does.  I am sorry, the first page

18  ends in 150.  It's a set.

19  BY MR. KOENIG:

20  Q.   All right.  Do you recognize Page 11 of the notebook?

21  A.   I do.

22  Q.   All right.  And what do you recognize it to be?

23  A.   My personal notes from the KFC meeting on January 27th,

24  2017.

25  Q.   And then let's look at Page 12.

843

Robert Bryant - Direct

1              Do you recognize Page 12?

2    A.   I do.

3    Q.   And what is Page 12?  What do you recognize it to be?

4    A.   The -- my notes from -- with the pricing information Roger

5    provided to me.

6              MR. KOENIG:  At this time the government moves to

7    admit Exhibit 1919.

8              THE COURT:  How many pages is the exhibit?

9              MR. KOENIG:  The exhibit in total is 80 pages.  We

10   really only want two pages.

11             THE COURT:  Okay.  Which two pages, then, are you

12   moving the admission of?

13             MR. KOENIG:  Pages 11 and 12, please.

14             THE COURT:  Any objection to Pages 11 and 12, Bates

15   stamp numbers ending in 160 and 161 of Exhibit 1919?

16             MR. FELDBERG:  Yes, Your Honor, hearsay.

17             THE COURT:  All right.  Any additional objections?

18             Okay.  The objection will be overruled.  Pages 11 and

19   12 of Exhibit 1919 will be admitted.

20             MR. KOENIG:  Thank you, Your Honor.  And may we

21   publish Page 11 to the jury first?

22             THE COURT:  You may.

23   BY MR. KOENIG:

24   Q.   All right.  Mr. Bryant, what does the top row say?

25   A.   KFC meeting 1/27/17.

844

Robert Bryant - Direct

1   Q.  All right.  And these -- what did you say these notes then

2   represent?

3   A.  My personal notes from the KFC meeting on January 27, 2017.

4        MR. KOENIG:  All right.  And then if we can go just a

5   little bit down the page, Ms. Pearce.

6   BY MR. KOENIG:

7   Q.  It's a little hard to read, but what does that top row

8   there say?

9   A.  Price next week.

10  Q.  What did you mean by that?

11  A.  The pricing or the bid was due the following week.

12  Q.  Okay.  And earlier you testified -- you testified as to

13  when the bid was due.  When was the bid due?

14  A.  The first week of February.

15  Q.  All right.  And you wrote that on January 27?

16  A.  That's correct.

17  Q.  Okay.  Let's go to Page 12, please.  And if we could blow

18  up the bottom part of the page.

19        All right.  What are we looking at on the bottom part

20  of the page here?

21  A.  That's the pricing information that I received from Roger

22  Austin.

23  Q.  Okay.  So do you see at the top it looks like it says

24  1.0234?

25  A.  That's correct.

845

Robert Bryant - Direct

1   Q.   What is that?

2   A.   That was Pilgrim's current price.

3   Q.   So under -- it's the current price under the contract?

4   A.   2017 price.

5   Q.   It had been negotiated in 2014, right?

6   A.   That's correct.

7   Q.   All right.  Now, what -- so there is two columns there.

8   There is numbers and then words.  Could you explain to the jury

9   what those mean, those two columns?

10   A.   Yeah, that's the price per pound for eight-piece for each

11   one of those competitors.

12   Q.   And could you please read the names of the competitors?

13   A.   Koch, Claxton, Mar-Jac, Tyson and George's.

14   Q.   And was it your understanding that those companies were all

15   competing for KFC's products in 2017?

16   A.   That's correct.

17   Q.   And maybe you said this and I missed it, but you said it's

18   their pricing for each competitor.  Is that future pricing?

19   A.   That was my understanding.  It was their plan bid

20   submission.

21   Q.   And for what product?

22   A.   The eight-piece product for KFC.

23   Q.   And that's the chicken on the bone?

24   A.   That's correct.

25   Q.   And is there a unit?  Is it -- what is the unit that we're

Robert Bryant - Direct

1    looking at here?

2    A.   That is technically point -- to use the first line with

3    Koch, that would be $1.0125 per pound.

4         THE COURT:  Mr. Koenig, can you look for a convenient

5    breaking spot?  It's a little after 3:15.

6         MR. KOENIG:  I think this might be actually a good

7    breaking spot.

8         THE COURT:  Okay.  Ladies and gentlemen, we will take

9    the mid-afternoon break.  Keep the admonitions in mind.  The

10   jury is excused.  We will plan on reconvening 25 minutes of

11   4:00.  Jury is excused.

12            (Jury excused.)

13        Mr. Bryant, you can step down, and if you can come

14   back after the break.  Thank you.

15            Anything quick before we break?  We will be in recess.

16   Thank you.

17       (Recess at 3:17 p.m.)

18       (Reconvened at 3:36 p.m.)

19        THE COURT:  All right.  Let's bring the jury back in.

20        (Jury present:)

21        THE COURT:  Mr. Koenig, go ahead.

22        MR. KOENIG:  Thank you, Your Honor.  I believe we were

23   looking at 1919.

24        THE COURT:  Yes.

25   BY MR. KOENIG:

Robert Bryant - Direct

1    *Q.* All right, Mr. Bryant. Can you just give a real quick

2    overview of what those two columns represent again at the top?

3    *A.* Yeah. It's price per pound and then the individual

4    company's price.

5    *Q.* And that's future pricing?

6    *A.* That was my understanding, yes.

7    *Q.* All right. Now, for the competitors who were bidding on

8    the 2017 contract, did you have an understanding of their

9    purpose in providing Pilgrim's with that pricing, future

10   pricing information?

11   *A.* Yes.

12   *Q.* What is the basis of your understanding?

13   *A.* Those phone calls with Roger Austin and my past experience

14   in 2014.

15   *Q.* And then what is your understanding?

16   *A.* In 2017 the purpose was to limit the price decrease.

17   *Q.* For just Pilgrim's?

18   *A.* For everyone, for the companies you see on the list.

19   *Q.* The competitors.

20   *A.* The competitors, yeah.

21   *Q.* All right. Now, you mentioned previously I believe

22   eight-piece, right? That's the pricing that's highlighted in

23   yellow?

24   *A.* That's correct, yes.

25   *Q.* All right. Well, actually before we get to that, can you,

Robert Bryant - Direct

1    Ms. Pearce, highlight what's to the right there?

2           All right.  Do you see what's been highlighted,

3    Mr. Bryant?

4    A.   I do.

5    Q.   And what does that say?

6    A.   NHA and new price.

7    Q.   Now, what company is -- what companies have NHA next to

8    their names?

9    A.   Claxton and Tyson.

10   Q.   What is NHA?

11   A.   It's short for no human antibiotics.

12   Q.   Okay.  And what is the significance of NHA?

13   A.   Different companies like to make different claims.  There's

14   conventional birds that are treated with antibiotics and then

15   there is a range in between there and no antibiotic use ever.

16   In 2017 it was a point of negotiation that KFC wanted to source

17   product that was NHA for the bid on 2017 beginning in 2018.

18   Q.   All right.  What is your understanding of why NHA is

19   written next to just two of the names, next to just Claxton and

20   Tyson?

21   A.   Those two were -- had already converted plants to be NHA

22   compliant at the time of this note.

23   Q.   And had Pilgrim's at this time been supplying NHA to KFC?

24   A.   We had not at this time.

25   Q.   Would there have been an additional cost to Pilgrim's to

849

Robert Bryant - Direct

1   supply NHA to KFC?

2   *A.*   There is an additional cost to remove the antibiotics, yes.

3   *Q.*   All right.  And so you mentioned I think previously that

4   this was a point of negotiation.  Could you explain that a

5   little bit more?

6   *A.*   Yes.  The reason why it was a point of negotiation and the

7   reason why we -- or I wrote NHA next to those is those two were

8   already -- already had birds that were NHA compliant.  And the

9   conversation was will they charge for providing that NHA and

10   will we be able to charge for providing NHA to KFC.

11   *Q.*   All right.  Was it relevant to you whether Claxton or Tyson

12   or any other competitor for that matter was going to charge for

13   NHA?

14   *A.*   Yes.

15   *Q.*   Why?

16   *A.*   Well, if Claxton and Tyson did not charge for NHA and they

17   gave that to KFC at no cost, then it would put me at a -- or

18   Pilgrim's at a disadvantage on being able to pass along that

19   cost to KFC.  And that's why it was a point of discussion.

20       *MR. KOENIG:*   Okay.  And then can we go to the bottom

21   grouping of numbers and words?

22   *BY MR. KOENIG:*

23   *Q.*   Do you see where Ms. Pearce has highlighted there?

24   *A.*   I do.

25   *Q.*   Can you explain to the jury what they're looking at?

Robert Bryant - Direct

1   A.   That is dark meat pricing and case weights for those same

2   competitors.

3   Q.   How can you tell it's dark meat?

4   A.   We formulated the dark meat pricing as a back is what -- we

5   would use the term back of the eight-piece price.  For

6   instance, on the first line George's, it's negative 28.  So

7   that would be 28 cents minus -- subtracted from their

8   eight-piece price of .9652 at the top.

9   Q.   Okay.  So if we could just go through an example here.  So

10  you mentioned George's and you did the -- so you take 28 cents

11  off of the eight-piece price?

12  A.   That's correct.

13  Q.   And that gives you the price per pound for dark meat?

14  A.   That's correct.

15  Q.   So in the case of George's, can you explain that one more

16  time?

17  A.   So it would be 28 cents or .28 minus -- or it would be

18  .9652 minus .28 to get their dark meat price.

19  Q.   So if George's were to change its dark meat price from 28

20  back to 29 back, what effect would that have on its price for

21  dark meat?

22  A.   That would be a decrease because they were subtracting

23  more.

24  Q.   And if George's were to switch from 28 back to 27 back,

25  what effect would that have on the price?

Robert Bryant - Direct

1   A.   That would be an increase of a penny a pound because you're

2   subtracting less.

3   Q.   So is it fair to say the bigger the number back, the

4   cheaper the dark meat?

5   A.   That's correct.

6   Q.   And conversely the smaller the number back, the more

7   expensive the dark meat.

8   A.   That's correct.  In theory, yes.  It's relative to their

9   eight-piece price.

10  Q.   Sure.  And then so can you read the competitors' names

11  there?

12  A.   For dark meat?

13  Q.   Yeah.

14  A.   George's, Mar-Jac, Tyson, Claxton and Koch.

15  Q.   Okay.  And just for the sake of the record, I don't know

16  that you read them for the eight-piece.  Could you do that too?

17  A.   Koch, Claxton, Mar-Jac, Tyson and George's.

18  Q.   All right.  Now, back to the dark meat.  What are those

19  numbers in front of the suppliers' names?

20  A.   That's their case weight billing, so that's what they could

21  charge per case.

22  Q.   Can you explain case weight?

23  A.   Yeah.  So there's a max billable or some customers there is

24  a fixed billable case weight.  So the birds are sized and they

25  can fall anywhere in that size which would cause for random

Robert Bryant - Direct

1    case weights.  Instead of having random or just a pure price

2    per pound, there was a max billable.  So it was like a dollar a

3    pound times your max billable of 50, so it would be $50 a case

4    rather than a range of $45 a case up to $55 a case, anywhere in

5    between there based on that.  So there was a maxed billable on

6    a lot of these contracts that kind of fixed that case price.

7    Q.  All right.  So when Pilgrim's takes a truckload, sells a

8    truckload of chicken to KFC, how does the billing work then?

9    A.  It was fixed billing times their price per pound and it was

10   more or less a per case price plus freight to the individual

11   location.

12   Q.  So you got a case rate.  Multiply it by the price per

13   pound.

14   A.  Correct.

15   Q.  And that gives you the case price.

16   A.  Per case, yeah.

17   Q.  All right.  Now, way over on the right there do you see

18   where it says 52.50?

19   A.  I do.

20   Q.  What is that?

21   A.  That was the max billable for eight-piece.

22   Q.  For who?

23   A.  George's.  And at this point I don't recall if we were

24   exactly all at that 52.50 at that point.  I remember that there

25   was some discussions about putting us back to 51.50, and

Robert Bryant - Direct

1   George's may have got to state 52.50 because they had a cheaper

2   price.

3   Q.  Could you explain that a little more?

4   A.  Yeah.  So since their price was lower --

5   Q.  We are talking about George's here?

6   A.  That's correct -- that they could have a little bit cheaper

7   price but have more on the part of max billable and still come

8   out to a per case price that was competitive with someone that

9   had a higher eight-piece per pound price but a lower max

10  billable or vice versa.

11  Q.  Okay.  Did you find the information that you received from

12  Roger Austin and wrote down on this page, did you find that

13  information useful?

14  A.  We did.

15  Q.  How so?

16  A.  We used it to formulate our bid.

17  Q.  Well, but how was it useful to formulate your bid?

18  A.  We knew we were going to have to give a decrease in price.

19  We weren't sure how much we were going to have to decrease our

20  price.  So using this we had a guide to where our pricing

21  needed to be for the bid.

22  Q.  All right.  And what was -- did you have an understanding

23  of what the purpose of obtaining the prices from the

24  competitors as reflected on this part of 1919, what was your

25  understanding of the purpose?

Robert Bryant - Direct

 1          MR. TUBACH:  Asked and answered multiple times now.

 2          THE COURT:  Overruled.  He can answer.

 3   A.  The purpose in 2017 in this particular bid was to limit the

 4   price decrease so collectively we could all decrease price a

 5   modest amount without the fear of losing business or decreasing

 6   our price too much.

 7   BY MR. KOENIG:

 8   Q.  By "we," who do you mean?

 9   A.  The competitors, the people on the screen.

10   Q.  Okay.  I want to take just a quick little detour here.

11          Have you heard of the concept of covering shortages?

12   A.  I have.

13   Q.  Can you explain to the jury what that means?

14   A.  There is a lot of variability when you are dealing with a

15   live animal both in -- just the small bird particularly most

16   things are sized into a quarter pound increment.  So getting

17   enough birds inside the individual quarter pound increments can

18   be rather difficult.  Then you also have the demand side that

19   comes in where customer orders are on feature or ad or

20   something where demand spikes and you simply don't have enough

21   product to cover your customer's order.  So when we cover a

22   shortage, you know, if we have more or if someone else has -- a

23   competitor has more than we, we try to figure out a way to

24   cover that shortage.

25   Q.  And so how did you cover shortages?

855

Robert Bryant - Direct

1    A.  A couple ways.  You could disclose that you were short to

2    the customer and use them to help facilitate how they wanted to

3    fill in that gap or you could reach out to a competitor and see

4    if they had extra product that you could purchase to fill that

5    shortage.

6    Q.  Did you have an understanding of which of those two routes

7    for filling -- covering shortages was KFC's expectation -- let

8    me back up.

9         Did you have an understanding what KFC's expectation

10   was as to how you would go about covering shortages?

11   A.  Yes.

12   Q.  And what's your basis for that?

13   A.  Being in the industry for years and dealing with that.  I

14   mean, I was in supply chain from probably 2000s till 2016, so I

15   dealt with those type of issues on a daily basis.

16   Q.  So what is your understanding of KFC's expectation for how

17   you would go about filling shortages?

18        MR. FELDBERG:  Your Honor, objection.  He hasn't said

19   anything specific enough to give him a foundation for answering

20   that question.

21        THE COURT:  Overruled.  He has been involved in it a

22   long time.  It would be his business to understand the

23   customer's expectation.  Go ahead.

24   A.  In general, the customer would like to know what's going on

25   and they would like for you to communicate with them that

Robert Bryant - Direct

1   you're going to be short and that you needed help and get their

2   direction or involvement from them on that.

3   *BY MR. KOENIG:*

4   *Q.*  All right.  But sometimes you didn't do it that way?

5   *A.*  I don't know that I would use sometimes.  Probably more

6   often than not that when we were short that Roger or someone

7   on -- Roger Austin or someone on his team reached out to a

8   competitor to purchase product.  What I recall is if that

9   wasn't available or if we were going to give up a PO and have

10  them cover it, then we would get KFC involved to reissue that

11  PO to a different competitor.

12  *Q.*  PO?

13  *A.*  Purchase order.

14  *Q.*  Okay.  So if you knew that KFC wanted you to contact them

15  when you were short product, why then did you just contact

16  competitors directly?

17  *A.*  When you're short, you know, it could affect your supply

18  volume and your service level with that customer.  So if you

19  could cover that volume without involving the customer, then --

20  and still cover the order, then you didn't have to get them

21  involved and there wasn't a risk.

22         So, for instance, if you were short a load a week

23  consistently to a customer and you repeatedly went to them,

24  then they would go try to place that load somewhere else if

25  they could.  So especially if it was a short-term problem for

857

Robert Bryant - Direct

1   like three months, well, three months, they may take it away

2   from you.

3   Q.  When you purchased chicken from a competitor to cover

4   shortages, what was the -- how was the price determined?

5   A.  I mean, there is different types of shortages.  There is

6   spot shortages where we would buy like raw product and bring it

7   in.  In the case of KFC, the price was supposed to be their

8   current contract price.  And normally what I seen, maybe not

9   every single time, but normally what I seen was a per case

10  price and then --

11  Q.  Can you say that again.  I didn't hear it?

12  A.  A per case price.  And with the -- we -- there would

13  normally be another line item for freight separate from that.

14  Q.  So for KFC anyway, if you were buying chicken from another

15  supplier, they would charge you by the case.

16  A.  Yes, most of the time, yes.  There could be some instances

17  where they could have gave them the whole, you know, cents per

18  pound case and all that, but generally it was per case, 640

19  cases at this per case price and here's your freight.

20  Q.  So from a competitor's per case price were you able to

21  determine their eight-piece price, for example, per pound?

22  A.  No.  You would have to know what their billing weight was.

23  You could try to guess and go through different scenarios to

24  see if it was a price near yours, but you wouldn't know or vice

25  versa.  You could try to do -- but you needed both to know how

Robert Bryant - Direct

1    they came up with the billing, the case weight billing.

2    Q.  Okay.  In order to purchase from a competitor, did you need

3    to know their eight-piece price per pound?

4    A.  No, you didn't have to know that.  You just needed the per

5    case price and then the freight.

6    Q.  So you wrote all these prices down.  And what did you do

7    next?

8    A.  I called Tim and --

9    Q.  Who is that?

10   A.  I called Tim Stiller and gave him this information so we

11   could have a conversation about our bid.

12   Q.  All right.  So what did you discuss about the bid?

13   A.  I recall having a conversation with Tim and -- Tim Stiller

14   and Roger Austin.  I don't recall if that was at the same time

15   or separately.  We developed a model that put us second in

16   price.  However, before we submitted that bid, and I don't

17   recall if it was Tim Stiller or Roger Austin said that they

18   didn't -- they felt like we needed to be more middle of the

19   pack, so we submitted our price third in line.

20   Q.  And did you use the prices you had written down in order to

21   do that?

22   A.  We did.

23   Q.  All right.  When you received those prices from Roger

24   Austin, those future prices, did you believe they were

25   accurate?

Robert Bryant - Direct

1   A.   I trusted that they were.

2   Q.   Okay.  And why?

3   A.   You know, I worked with Roger for many years and I'd seen

4   what transpired in 2014 and other times, and so I trusted the

5   information I was receiving from him.

6   Q.   I understand that you trusted Roger Austin.  Did you trust

7   the competitors' list that they had given him an accurate and

8   true price?

9   A.   Yes.

10  Q.   Why is that?

11  A.   It was my understanding that, you know, this information

12  has been falling back and forth for several years with -- and

13  had been successful over that period of time, so there is a

14  history of this that I was relying on.

15  Q.   Can you recall a time when somebody gave you a price that

16  turned out not to be true?

17  A.   No, I can't recall that.

18  Q.   You mentioned at the beginning of your testimony your

19  agreement where you won't be prosecuted.  Do you remember that?

20  A.   I do.

21  Q.   Did there come a time when Mr. Stiller discussed that

22  agreement with you?

23  A.   Yes.

24  Q.   And without referencing the details of why you had the

25  agreement, can you share what Mr. Stiller told you?  Did he

Robert Bryant - Direct

1   tell you something about owning a contract?

2   A.   He did.

3   Q.   What contract was that?

4   A.   The 2017 KFC contract.

5   Q.   So the one we were just -- we have been talking about all

6   afternoon.

7   A.   That's correct.

8   Q.   And what did you believe he meant by own the contract?

9   A.   That I had immunity from prosecution and that he said -- he

10  didn't say -- he didn't say that, but my -- what I interpreted

11  him to say at that point was that he told me I needed to own

12  the 2017 contract implying that I had immunity and that he had

13  no involvement in it and to help protect him from exposure

14  because he did not have immunity.

15  Q.   Okay.  I would like to move on now to a few months later in

16  2017.  Did there come a time when you were negotiating with US

17  Foods in 2017?

18  A.   Yes.

19  Q.   Why were you negotiating with US Foods in 2017?

20  A.   We were seeking price increases on boneless breast meat.

21  Q.   By "we," who do you mean?

22  A.   Pilgrim's.

23  Q.   So did you have discussions with anybody at Pilgrim's about

24  that?

25  A.   I did.

Robert Bryant - Direct                     861

1   Q.   And who was that?

2   A.   Tim Stiller.

3   Q.   And what was the substance of those discussions?

4   A.   We believed that our boneless breast meat was undervalued

5   based on other sales in our mix, so we were trying to formulate

6   a plan to increase prices on boneless breast, particularly to

7   US Foods.

8   Q.   And about how much were you looking to increase price?

9   A.   Around 20 cents a pound.  It depended on the product.  It

10  was a range depending on that particular product.  It was

11  several products.

12  Q.   Let me ask you a clarifying question.  Previously for 2014

13  what did you say that the eight-piece boneless price increase

14  was?

15  A.   Bone-in price.

16  Q.   I am sorry, bone-in.

17  A.   It was 15 to 20 cents.

18  Q.   Do you recall testifying you hadn't seen a price increase

19  that big before?

20  A.   That's correct.

21  Q.   But now you're talking about boneless and a 20-cent price

22  increase.  How do those two things match up?

23  A.   Yeah, totally different products.  Boneless, you know, at

24  the time was selling over $2 a pound, and if you look at it on

25  a percentage increase and then -- actually, I think it was

862

Robert Bryant - Direct

1   selling for more than $2.50 a pound at that time.  And bone-in

2   was, you know, below a dollar a pound.  So on a percent

3   increase it was still small, but for a boneless product it

4   wouldn't be uncommon to see, you know, a 10 to 20-cent price

5   increase, especially on portion breasts because you are cutting

6   that product down and then you discount out what's called a

7   trim, the product that they don't want.  So in order to have

8   that cut-out value, you have to charge more for the piece of

9   the product that they do want.  So it wasn't uncommon for those

10  cut-out values to be a lot different.

11  Q.  All right.  Let's put a bookmark in this.  I want to go

12  back to the KFC 2017 negotiations just briefly.

13          After you submitted the first round bid in the first

14  week of February, did you have further discussions about the

15  2017 KFC bidding?

16  A.  We did.

17  Q.  Who was involved in those discussions?

18  A.  Myself and Tim Stiller and Roger Austin.

19  Q.  And what do you recall, if anything, about those

20  discussions?

21  A.  Tim along with myself were upset after our first round bid

22  submission and KFC asked for additional pricing concessions.

23  Tim was upset about that.

24  Q.  Tim who?

25  A.  Tim Stiller, sorry.

863
Robert Bryant - Direct

1    Q.   All right.  So then what happened?

2    A.   We were weighing our options on the way forward, whether or

3    not we were willing to concede more in price or not.  Tim, Tim

4    was upset, like I said, and he relayed a conversation he had

5    with Roger Austin.  He said either the night before or the day

6    before that he had told Roger to tell the industry that we were

7    going to hold or we were going to find a new

8    hundred-million-pound customer.

9    Q.   A hundred-million-pound customer, what does that mean?

10   A.   That was a reference to KFC.  At the time we were selling

11   approximately 50 loads a week and that would be the equivalent

12   of roughly a hundred million pounds a year annually.

13   Q.   So before that what was the first part of the sentence?

14   A.   He told Roger to tell the industry that we were going to

15   hold.

16   Q.   And what was your understanding of that?

17   A.   My understanding of that was that he wanted Roger to

18   communicate to our competitors that we were not going to

19   concede on price, that we were going to hold with our original

20   bid submission.

21   Q.   Okay.  So what was your understanding of the word industry?

22   A.   Our competitors, the ones that we've been reviewing.

23   Q.   And who did Tim Stiller report to at that time?

24   A.   Jayson Penn.

25   Q.   Who did Jayson Penn report to at that time?

864

Robert Bryant - Direct

1    A.   Bill Lovette.

2    Q.   Now, I apologize for the regression.  Let's go back to

3    where we had bookmarked.

4         I think we left off where you were explaining --

5    A.   The mix.

6    Q.   You were looking for a price increase on boneless for US

7    Foods, right?

8    A.   That's correct, yes.

9    Q.   If you could also just explain what is US Foods?

10   A.   US Foods is a broad-line distributor.  You may have heard

11   of Sysco, but they buy many different products.  They are like

12   a one-stop shop for like a normal restaurant.  They'll have

13   various different proteins along with paper goods, like salt

14   and pepper, the plastic forks, things of that nature available.

15   Q.   Who do they sell to?

16   A.   Like restaurants, independent stores, some independent

17   retailers, you know, hospitals.  You know, they are like a

18   store door delivery to someone who is going to prepare it for

19   the most part.

20   Q.   So you are looking to raise the price to US Foods for

21   boneless breast, right?

22   A.   That's correct.

23   Q.   And you had a meeting with someone did you say to discuss

24   how to go about that?

25   A.   Yes.

Robert Bryant - Direct

1   Q.  And who was that with?

2   A.  Tim Stiller.

3   Q.  So what did you decide?

4   A.  We decided on the price increases.  There was some concern

5   that if we just submitted a price increase, that we could

6   potentially lose business because our competitors may not do

7   the same.

8   Q.  All right.  So for the boneless breast you were looking to

9   increase the price for, did you have a primary competitor at US

10  Foods at that time?

11  A.  Yeah, we had several competitors.  The one that we were

12  concerned about at that time in the market that we were going

13  to raise prices was Mar-Jac.

14  Q.  Why were you concerned about Mar-Jac?

15  A.  Because they were the primary competitor in that

16  marketplace.  If we went and submitted a price increase to US

17  Foods, that they would --

18  Q.  They?

19  A.  US Foods, our fear was US Foods would go to Mar-Jac and

20  say, hey, we have an opportunity for you guys to take on more

21  business if you can do it and not tell them that someone was

22  submitting a price increase for that same business.

23  Q.  So in essence, you were afraid you were going to lose

24  business.

25  A.  That's correct, and not get a price increase.

Robert Bryant - Direct                                                866

1    *Q.*  And lose business to Mar-Jac.

2    *A.*  That's correct.

3    *Q.*  So what did you do?

4    *A.*  Tim and I brainstormed on the best way to submit the price

5    increase.  One of us, I don't recall if it was me or Tim

6    Stiller, remembered that Scott Tucker used to work at Mar-Jac

7    or Marshall Durbin, which was bought by Mar-Jac, and still had

8    co-workers there that he stayed in contact with.  So Tim asked

9    if I would reach out to Scott Tucker and see if Mar-Jac would

10   be willing to submit a price increase to US Foods for boneless

11   also.

12   *Q.*  Submit a price increase for what?

13   *A.*  Boneless also.

14   *Q.*  Did you do that?

15   *A.*  I did.

16   *Q.*  What did you say to Mr. Tucker?

17   *A.*  I explained to him that we wanted to raise prices on

18   boneless USF and that -- asked if he still had contacts at

19   Mar-Jac and he said he did.  And I asked him if he could find

20   out if they would be willing to increase prices on their

21   boneless.

22   *Q.*  Okay.  But was US Foods one of Scott Tucker's accounts?

23   *A.*  No.

24   *Q.*  So why did you pick him?

25   *A.*  Felt like he could be trusted to make that -- that call to

867

Robert Bryant - Direct

1    that competitor.

2    Q.   What do you mean trusted?

3    A.   To reach out to a competitor and have that -- a

4    conversation about raising prices together.

5    Q.   And to your understanding did he, in fact, do that?

6    A.   Yes.

7    Q.   And how do you know that?

8    A.   He called and reported back to me on his conversations with

9    Mar-Jac.

10        MR. KOENIG:   Could we please pull up Exhibit 9140?

11   BY MR. KOENIG:

12   Q.   Do you recognize Exhibit 9140?

13   A.   I do.

14   Q.   What is it?

15   A.   It's an e-mail from me to Tim Stiller on April 18th, 2017.

16   Q.   And what is the subject matter of the e-mail?  And I am not

17   meaning to read the subject line, but what does the e-mail

18   relate to?

19   A.   It relates to Sysco RFP, and then I have added some

20   information from -- letting Tim Stiller know I've got some

21   information from Scott Tucker.

22   Q.   Okay.

23        MR. KOENIG:   At this point, Your Honor, the government

24   moves to admit 9140.

25        THE COURT:   Any objection to the admission of

Robert Bryant - Direct

1    Exhibit 9140?

2           9140 will be admitted.

3           MR. FAGG:  Your Honor, can we have just one moment on

4    that?

5           THE COURT:  Yeah, you may.

6           MR. FAGG:  Your Honor, a number of objections on this.

7    So one, certainly the bottom of the piece of the e-mail appears

8    to be hearsay.  And also I struggle to see the relevance of

9    this e-mail.  They are talking about US Foods and now they are

10   talking about Sysco, an entirely different customer.

11          THE COURT:  All right.  Response?

12          MR. KOENIG:  Well, the witness will explain how this

13   ties back to what we were just talking about with US Foods.

14   And as far as all we are concerned about is the top part of the

15   e-mail really, the most recent e-mail.

16          THE COURT:  Well, before offering it do you want to

17   ask the witness additional questions or how do you want to do

18   it?

19          MR. KOENIG:  Sure.

20   BY MR. KOENIG:

21   Q.  So on the face of this e-mail, Mr. Bryant, it looks like it

22   just relates to Sysco.  Do you see that?

23   A.  I do.

24   Q.  Does it relate to US Foods as well?

25   A.  It does.

869

Robert Bryant - Direct

1   *Q.* How do you know that?

2   *A.* Because I sent the e-mail and I remember why I sent this

3   e-mail to Tim Stiller.

4   *Q.* Was it to report back on something with respect to US

5   Foods?

6   *A.* It was.

7           MR. KOENIG:  The government would move to admit 9140

8   again.

9           THE COURT:  Mr. Fagg, anything additional from you?

10          MR. FAGG:  No, Your Honor.  The bottom of it still

11  remains hearsay.

12          THE COURT:  Response on that part?  I am not familiar

13  with that name on the bottom.  Mr. Koenig?

14          MR. KOENIG:  We only want to focus on the very top

15  e-mail.  You know, if Your Honor wants to give an instruction

16  about the bottom --

17          THE COURT:  All right.  Then Exhibit 9140 will be

18  admitted.

19          However, Ladies and Gentlemen of the Jury, the bottom

20  portion of it which actually consumes about two-thirds of the

21  page is from a person first name Janine.  That portion of the

22  e-mail will not be admitted for the truth of the matter

23  asserted, but rather for the effect on the responders.  The top

24  portion of the e-mail, that from Mr. Bryant, that from

25  Mr. Stiller, that can be considered for the truth of the matter

Robert Bryant - Direct

1   asserted.

2        Objections will be overruled.  Exhibit 9140 will be

3   admitted.

4        MR. KOENIG:  Thank you, Your Honor.  May we have

5   permission to publish it to the jury?

6        THE COURT:  You may.

7        MR. KOENIG:  All right, Ms. Pearce.  If you could just

8   highlight the top e-mail.  Can you do it a little bigger maybe

9   by selecting less width?

10  BY MR. KOENIG:

11  Q.  All right.  So can you just go back and say who this is

12  from and who it's to?

13  A.  Yes.  This is from myself to Tim Stiller on April 18th,

14  2017.

15  Q.  And what's the time stamp?

16  A.  1:15 p.m.

17  Q.  Okay.  And so can you read the first line or the only line

18  in that e-mail to the jury, please?

19  A.  Yes, and Janine, and I've got feedback from Mar-Jac.

20  Q.  What do you mean by that?

21  A.  By feedback from Mar-Jac, I mean I was telling Tim Stiller

22  that Scott Tucker had given me an update on his conversations

23  with Mar-Jac to -- about the price increase to US Food Service.

24  Q.  Who did Scott Tucker report to at that time?

25  A.  Roger Austin.

Robert Bryant - Direct

1  Q.  And what was the feedback that you got from Mar-Jac through

2  Scott Tucker?

3  A.  Initially the feedback that I got from Scott Tucker from

4  Mar-Jac was that they agreed to raise prices similar to ours.

5  However, they wanted to wait a couple weeks to submit those

6  price increases so there would be the appearance that we were

7  not working together.

8  Q.  Okay.  And what was your understanding of appearance that

9  you weren't working together?  Can you explain that?

10  A.  Yes.  They --

11  Q.  They being?

12  A.  Mar-Jac.  The feedback I got from Scott Tucker was that

13  they wanted the gap in submission so there wasn't -- there

14  wouldn't be an appearance that we had talked about price

15  increases together, so they didn't want both to submit at the

16  same time.  They wanted us to submit first and then a few weeks

17  later they would submit.

18  Q.  Okay.  And did you get feedback on the amount of increase

19  Mar-Jac agreed to?

20  A.  They used the word similar, that they were going to submit

21  a similar price increase to what we were going to submit.

22  Q.  But not identical.

23  A.  But not identical.

24  Q.  All right.  And you used I think in your first -- and I

25  just repeated it, but in one of your responses to questioning,

Robert Bryant - Direct                                                872

1    you said Mar-Jac agreed.  What did you mean by that?

2    A.  They agreed that they would raise prices.

3    Q.  Agreed with whom?

4    A.  Pilgrim's or Scott Tucker.

5            MR. KOENIG:  Can we go to, please, 9139?

6            And, your Honor, this is going to have the same issue.

7    BY MR. KOENIG:

8    Q.  Do you recognize Government Exhibit 9139?

9    A.  I do.

10   Q.  What is it?

11   A.  It's another e-mail from me to Tim Stiller on April 18,

12   2017.

13   Q.  And what does the top e-mail relate to?

14   A.  More information I was relaying to Tim Stiller about the US

15   Foods bid.

16           MR. KOENIG:  Government moves to admit 9139.

17           THE COURT:  Any objection to the admission of

18   Exhibit 9139?

19           Exhibit 9139 will be admitted.

20           MR. KOENIG:  All right, Ms. Pearce.

21           Could we publish to the jury, Your Honor?

22           THE COURT:  You may.

23   BY MR. KOENIG:

24   Q.  So this is again you to Tim Stiller, right?

25   A.  That's correct.

Robert Bryant - Direct

1    Q.   Same day?

2    A.   Same day.

3    Q.   What was the time stamp?

4    A.   Still 1:15 p.m.

5    Q.   And could you read to the jury what you said in this

6    e-mail?

7    A.   They told Mar-Jac the same thing on boneless.

8    Q.   And what did you mean by that?

9    A.   I meant that US Foods gave us feedback that no one else was

10   seeking a price increase and that, you know, basically pushing

11   back or against a price increase.  And they gave both companies

12   the same message after we had both submitted price increases.

13   Q.   And Mar-Jac was a competitor at the time?

14   A.   They were.

15   Q.   Did you end up getting the price increase you sought?

16   A.   We did.

17   Q.   Just remind the jury again, what's the date and time stamp?

18   A.   1:15 p.m.

19   Q.   On 4/18/2017?

20   A.   That's correct.

21   Q.   Can we pull up, please, Exhibit 3039?

22        Do you recognize 3039?

23   A.   I do.

24   Q.   What is it?

25   A.   It's a text message from Tim Stiller to myself on

Robert Bryant - Direct

1   4/18/2017.

2   Q.  And what does it generally relate to?

3   A.  The previous two e-mails.

4   Q.  All right.  And how do you know it's from Tim Stiller?

5   A.  I just -- I recognize the 805 area code.

6   Q.  Do you have any other contacts that have 805 area code?

7   A.  Not that I can recall.  I generally associate that 805

8   number with Tim Stiller.

9           MR. KOENIG:  Your Honor, at this time we move to admit

10  3039 into evidence.

11          THE COURT:  Any objection to the admission of

12  Exhibit 3039?

13          Exhibit 3039 will be admitted.

14          MR. KOENIG:  May we publish to the jury, Your Honor?

15          THE COURT:  You may.

16  BY MR. KOENIG:

17  Q.  If you could, tell the jury what the date and time stamp

18  is.

19  A.  4/18/2017 at 1:20 p.m.

20  Q.  All right.  And what was the date and time stamp of 9139?

21  A.  4/18/2017 at 1:15 p.m.

22  Q.  And could you just read the From phone number into evidence

23  to the jury?

24  A.  805-276-6918.

25  Q.  And is it your testimony that that is Tim Stiller's number?

Robert Bryant - Direct                                                    875

1   A.  It is.

2   Q.  And the number that's next to your name, what is that

3   number?  Can you read that one?

4   A.  270-727-7771.

5   Q.  And is it your testimony that that is your phone number?

6   A.  It is.

7   Q.  Now, could you read the body of the text message?

8   A.  No comp names in e-mail, exclamation point.

9   Q.  What did you understand that to mean?

10  A.  Tim Stiller was scolding me for sending him an e-mail with

11  a competitor name in it.

12  Q.  All right.  So the word comp, what does that mean?

13  A.  That means competitor.

14  Q.  Was it your understanding he was referring back to

15  Government's Exhibits 9140 and 9139?

16  A.  That was my understanding, yes.

17  Q.  Let's move to 2014.

18        So you testified a little bit about KFC negotiations

19  in 2014, right?

20  A.  That's correct, yes.

21  Q.  And I think you said this morning earlier that 2014 was

22  sort of your entrance on the scene.  Is that what you said?

23  A.  Yeah, on the national accounts primarily, yeah.

24  Q.  And what does that mean as far as your role?

25  A.  So it became more customer facing, involved in more

Robert Bryant - Direct

1   negotiations from that point forward; not that I hadn't done

2   some, but really the first time I was speaking rather than just

3   observing in meetings and participating.

4   Q.  Did you -- did there come a time in 2014 when you learned

5   of a plan to increase prices at fast-food restaurants?

6   A.  Yes.

7   Q.  When did you learn that?

8   A.  Late June, early July of 2014.

9   Q.  And who did you learn that from?

10  A.  Jason McGuire.

11  Q.  Who is Jason McGuire again?

12  A.  He was my manager.

13  Q.  All right.  Do you happen to recall Jason McGuire's desk

14  phone number?  Just yes or no.

15  A.  Possibly, yes.  I think I do.

16  Q.  Okay.  Would it help if I offered you something to refresh

17  your recollection?

18  A.  Yeah.  I think I can quote it from memory.  It's been a

19  while, but I can try.

20  Q.  Sure, you can go ahead and try.

21  A.  I think it was 970-506-4711.

22       MR. KOENIG:  May I give him something to refresh his

23  recollection?

24       THE COURT:  You may.

25       MR. TUBACH:  He didn't testify he didn't recall.

Robert Bryant - Direct

1      THE COURT:  He just simply asked to hand something to

2  the witness.

3      MR. TUBACH:  If it's for purposes of refreshing

4  recollection, he hasn't said he needs it.

5      THE COURT:  He didn't indicate that he needs his

6  recollection refreshed?

7      MR. KOENIG:  Well, I mean he said he thought he could

8  remember it, but he wasn't sure.

9      THE COURT:  Well, he was confident enough to state it,

10  so there doesn't seem to be any need to refresh.

11      MR. KOENIG:  Okay.  Thank you.

12  BY MR. KOENIG:

13  Q.  All right.  So Jason McGuire was your boss at that time,

14  right?

15  A.  Yes.

16  Q.  And who was Jason McGuire's boss at that time?

17  A.  Jayson Penn.

18  Q.  And who was Jayson Penn's boss at that time?

19  A.  Bill Lovette.

20  Q.  So when -- going back to this June, July 2014 time period

21  and McGuire telling you about this plan, what exactly did he

22  say?

23  A.  He told me that we were going to raise prices on our QSR,

24  our fast-food customers.  And he asked me to help prepare a

25  PowerPoint presentation and that we were going to blitz the

878
Robert Bryant - Direct

1    customers with basically the similar information to all of them

2    as a justification for price increases.

3    *Q.*   What was the phrased you used?  You were going to what to

4    the customers?

5    *A.*   He used the word blitz.

6    *Q.*   What was your understanding of blitzing the customers?

7    *A.*   Visiting several customers in a relatively short period of

8    time.

9    *Q.*   And what was the message that was to be delivered?

10   *A.*   There were basically two messages that we were delivering

11   to those customers.  The first one was that from a supply side

12   there was a decrease in small birds; therefore, we needed a

13   price increase.  And secondly, the profitability of small birds

14   was lagging behind other segments in the poultry industry;

15   therefore, we needed a price increase.

16   *Q.*   Okay.  Can you explain to the jury what a small bird is?

17   *A.*   Yes.  There is different segments in the poultry industry.

18   There is small birds, there is medium bird and then a large

19   bird.  Small birds are primarily what's used in QSR because

20   they are sized and what you typically see in the fast-food

21   restaurant where then you get into your little bit larger bird,

22   medium birds.  That's your case ready or what you would see in

23   the meat case at your local retail store.  Then your large

24   birds are more of an ingredient-type segment.

25   *Q.*   So why would a shortage of small birds, why would that

Robert Bryant - Direct

1   matter to a place like KFC or Popeye's?

2   A.  Particularly in their size, they couldn't very easily

3   transition into a different size.  First of all, their brand is

4   built around a different size in size segment, so they couldn't

5   very easily transition away from that size.  So that's why it

6   was important for them to have this particular bird size

7   available.

8   Q.  All right.  So what did you do?

9   A.  First thing after -- we built a deck.  I worked on getting

10  a PowerPoint presentation -- we call it a deck -- getting a

11  PowerPoint presentation built for these customer meetings.

12  Q.  For the blitz?

13  A.  For the blitz, yes.

14  Q.  And what was your role, if any, in creating the PowerPoint

15  presentation?

16  A.  I had one slide really that I was responsible for that he

17  asked -- that Jason McGuire asked me to prepare, and that was

18  outlining the supply side of small birds and the decrease in

19  that supply over the last four, five years compared to current

20  at the time in 2014.

21  Q.  All right.  So as part of the customer blitz, which

22  customers did you visit?

23  A.  I recall visiting KFC, Popeye's and Church's.  There could

24  have been more, but I recall those three.

25  Q.  All right.  Let's start with Popeye's and Church's.  What

Robert Bryant - Direct

1    was the timing of those meetings?

2    A.   It was late July of 2014.

3    Q.   Okay.  Did you visit them nearly at the same time?

4    A.   Yes.  What I recall is their offices are relatively close

5    in north Atlanta like around the Dunwoody area, so maybe less

6    than a mile apart or not much more than a mile apart, so you

7    could visit one and get the other in the same day or the

8    opposite day and so you could get two customers visited in a

9    very short period of time.

10   Q.   Okay.  And so do you recall the date, the approximate date

11   of those meetings?

12   A.   Around the 20-something of July, maybe 23rd, 24th,

13   somewhere in there.  I remember it was the week before we

14   started our budget reviews that year.

15   Q.   Okay.  When you said Popeye's, was it Popeye's you were

16   visiting or was it somebody else?

17   A.   It's SMS.

18   Q.   What is SMS?

19   A.   It's similar to the RSCS.  It's the procurement side that

20   negotiates the contracts for the Popeye's franchisees.

21   Q.   Okay.  So it was SMS who you were visiting?

22   A.   That's correct.

23   Q.   But is it fair that you use SMS and Popeye's somewhat

24   interchangeably?

25   A.   That's correct.

Robert Bryant - Direct

1   *Q.*  All right.  So you went into the Popeye's meeting, right?

2   *A.*  That's correct.

3   *Q.*  Who else attended?

4   *A.*  I remember myself, Jason McGuire, Justin Gay and Roger

5   Austin.

6   *Q.*  Okay.  And who from the Popeye's side?

7   *A.*  I know -- I remember Kent Kronaugue and I believe their CFO

8   may have been there, but I am unclear on who all from the other

9   side attended.

10  *Q.*  Who is Kent Kronaugue?

11  *A.*  Kent Kronaugue, he is the buyer for Popeye's.  I think now

12  he is the president of the SMS, but still actively buying.

13  *Q.*  Was he the lead negotiator?

14  *A.*  That's correct, yes.

15  *Q.*  And what did you -- what message did you deliver in that

16  meeting?

17  *A.*  The message that Jason McGuire wanted us to deliver on the

18  supply side contraction and then the profitability of the small

19  bird segment.

20  *Q.*  Did there -- what was their reaction, SMS?

21  *A.*  I mean, the customers generally always listen to what you

22  have to say and they're -- you know, I believe they recognized

23  that there would have to be a price increase or they knew that

24  we would -- that it was fair for us to be seeking a price

25  increase.

Robert Bryant - Direct

1   Q.  Did you think it was fair to be seeking a price increase?

2   A.  I did.

3   Q.  And based on what?

4   A.  Based off the supply contraction and the profitability.

5   And, you know, that year in particular there was -- I mean, in

6   order to justify a price increase, it can't just be supply

7   because just because supply decreases, if demand decreases the

8   same amount as supply, you don't have a justification for a

9   price increase.  But in this scenario supply contracted and

10  there were shortages, so the two combined led me to believe

11  that a price increase were warranted.

12  Q.  Did you share with Popeye's the size of the price increase

13  you were thinking of?

14  A.  I don't recall at that time, no.

15  Q.  Why not?

16  A.  We were laying foundational -- you know, we were stating

17  our marketed intel and our position to our customers at that

18  time so they would be expecting to see increases and just

19  giving our justification for the ask.

20  Q.  Now, did there come a time during that meeting where the

21  Popeye's/SMS people left the room?

22  A.  Yes.

23  Q.  And who was then remaining in the room?

24  A.  Just the Pilgrim's people.

25  Q.  Who was that again?

Robert Bryant - Direct

1  A.  Myself, Roger Austin, Justin Gay and Jason McGuire.

2  Q.  And was there any conversation when the SMS/Popeye's people

3  left?

4  A.  There was.

5  Q.  And what was that?

6  A.  I remember Jason McGuire told Roger Austin, "I need you to

7  put this out to the industry."

8  Q.  And what was your understanding of that?

9  A.  My understanding was that he was asking him to give

10  Pilgrim's justification for a price increase to our

11  competitors.

12  Q.  So delivering both the message of price increase and

13  justification.

14  A.  That's correct, to build pricing support.

15  Q.  What does that mean, build pricing support?

16  A.  To build support with the competitors for a price increase

17  that fall.

18  Q.  So what was the ultimate goal, then?

19  A.  To raise prices in 2014.

20  Q.  Just Pilgrim's?

21  A.  No, the industry or the competitors.

22  Q.  Together.

23  A.  Together, yes.

24  Q.  All right.  Was it important to get -- you said build

25  pricing support.  Why was pricing support from competitors

Robert Bryant - Direct

1   important?

2   *A.*   For the same reason we had the discussion about US Foods.

3   If we were the only ones that raised prices, then -- and our

4   competitors didn't, then our customers could buy all they could

5   find from our competitors and then only buy from Pilgrim's what

6   we had to -- what they had to.

7   *Q.*   So you would lose business.

8   *A.*   That's correct.

9   *Q.*   Without the pricing support as you put it.

10   *A.*   That's correct.

11   *Q.*   And what was your reaction to Mr. McGuire's direction to

12   Mr. Austin?

13   *A.*   I was surprised about it, just -- now I remembered it

14   clearly. I remember thinking that's how it works. You know,

15   it was one of my first national account meetings and that I

16   just -- I didn't realize that we shared that type of

17   information with our competitors.

18   *Q.*   Now, earlier you testified, right, that as far back as 2010

19   you had heard Roger Austin talking about what he learned from

20   competitors. But now in 2014 you are surprised. How do you

21   reconcile those things?

22   *A.*   Yeah, well, before that it wasn't pricing information and

23   things like that. It was more spec, bird size, things of that

24   nature. And then the reason why I remember the statement was

25   because, you know, this was one of my first real customer faced

885

Robert Bryant - Direct

1    meetings where I'm actually delivering a message to a customer

2    and we're going into negotiation and Jason McGuire was asking

3    Roger to -- Roger Austin to share our strategy to get that

4    price increase that year.

5    Q.   And did you have occasion to observe Mr. Austin's reaction?

6    A.   Yes.

7    Q.   What was that?

8    A.   There really wasn't a reaction.  It was like a normal

9    business conversation.

10   Q.   A what?

11   A.   A normal business conversation.

12   Q.   Okay.  Do you think SMS or Popeye's overheard it?

13   A.   No.

14   Q.   Why not?

15   A.   I just remember they left the room and the door was closed

16   and it was just us.  And that was another reason why I

17   remembered the comment because it seemed fairly bold to say

18   that at a customer conference room.

19   Q.   When SMS came back in the room, did you report what you

20   heard?

21   A.   No.

22   Q.   Why not?

23   A.   First, I was new on the -- new customer facing in that.

24   Before that I would go in and observe, but this time I was

25   presenting and, you know, my manager had given an instruction

Robert Bryant - Direct

1    and Roger didn't have a reaction and I thought it was accepted.

2    Q.   Okay.  Now, after that meeting did there come a time when

3    you had a similar meeting with RSCS or KFC?

4    A.   Yes.

5    Q.   When was that?

6    A.   August 1st.

7    Q.   If we could pull up -- hold on.

8         And you attended that meeting?

9    A.   I did.

10   Q.   And who else from Pilgrim's attended that meeting?

11   A.   Myself, Jason McGuire, Roger Austin, Scott Tucker, Justin

12   Gay, and I believe Tommy Lane.

13   Q.   That's not a name we've heard before, Tommy Lane.

14   A.   Yes.

15   Q.   Who is he?

16   A.   He works at Pilgrim's and I think his title was business

17   analyst.

18   Q.   What was his role?

19   A.   He -- there is a cost model for KFC pricing that has grain

20   and soy inputs into it that causes their price to float, so he

21   kept up with those models for us.

22   Q.   So he is a pricing guy.

23   A.   Yes.

24   Q.   All right.  If you could, please, pull up -- did you show a

25   PowerPoint presentation?

Robert Bryant - Direct

1    *A.*   We did.

2          *MR. KOENIG:*   Could you please pull up Government

3    Exhibit 1055?

4    *BY MR. KOENIG:*

5    *Q.*   Do you recognize Government Exhibit 1055?

6    *A.*   I do.

7    *Q.*   What is it?

8    *A.*   It's the PowerPoint presentation for the August 1st KFC

9    meeting.

10   *Q.*   And this is the PowerPoint presentation that you helped

11   create?

12   *A.*   That's correct.

13   *Q.*   And was shown to KFC or RSCS at that August 1st meeting?

14   *A.*   That's correct.

15          *MR. KOENIG:*   Your Honor, I would move -- we would

16   offer 1055 into evidence.

17          *THE COURT:*   Any objection to the admission of

18   Exhibit 1055?

19          *MR. TUBACH:*   No objection.

20          *MR. FELDBERG:*   No objection, Your Honor.

21          *THE COURT:*   Exhibit 1055 will be admitted.

22          *MR. KOENIG:*   Thank you, Your Honor.  May we publish to

23   the jury?

24          *THE COURT:*   You may.

25          *MR. KOENIG:*   Can we go back to Page 1?

Robert Bryant - Direct

1   *BY MR. KOENIG:*

2   Q.  All right.  Mr. Tucker, do you see those two logos at the

3   top?

4   A.  Excuse me?

5   Q.  Mr. Bryant, my apologies.  Mr. Bryant, do you see those two

6   logos at the top of the screen?

7   A.  I do.

8   Q.  What are they?

9   A.  One is the Pilgrim's logo and the other one is RSCS's logo.

10  Q.  Okay.  And what's the date written on it?

11  A.  August 1st, 2014.

12  Q.  And again it's your testimony that this is the presentation

13  shown to RSCS on August 1st, 2014?

14  A.  That's correct.

15       MR. KOENIG:  Can we go to Page 2?

16  *BY MR. KOENIG:*

17  Q.  What is this list of names?

18  A.  Those are the attendees from the Pilgrim's side.

19  Q.  And is that the same list of names you just read off?

20  A.  I believe so.

21       MR. KOENIG:  Let's go to Page 3, please.

22  *BY MR. KOENIG:*

23  Q.  Can you explain -- first of all, what is this slide?

24  A.  This is the slide that I helped prepare.

25  Q.  Okay.  And what were you trying to convey with this slide?

Robert Bryant - Direct

1    A.   Yes.  It's a little hard to read here because it actually

2    had some animation in it, but one set of those bars was the

3    five years prior of bird availability and then the other set is

4    that current availability.  And I was attempting to show the

5    reduction in size ranges for the particular size that KFC

6    purchased from.

7    Q.   All right.  So are you -- which sizes are shown that KFC

8    purchases from?

9    A.   It would be from that two and a quarter to two and

10   three-quarter size ranges.

11   Q.   I see at the top there is some little white arrows.

12   A.   Yes.

13   Q.   What are those supposed to represent?

14   A.   So in the two and a quarter to two and a half size there

15   was a 5 percent reduction in availability in that size.  And

16   then in that two and a half and two and three-quarter there was

17   a 7 percent reduction in availability in that size.

18   Q.   All right.  And again, this meeting was part of the -- was

19   this meeting part of the customer blitz?

20   A.   It was.

21   Q.   What, if any, what effect were you trying to have on RSCS

22   by showing this?

23   A.   I mean, it was part of our basis for the price increase and

24   to show them that the sizes that they needed were shrinking and

25   that they needed to pay more in order to have access to those

890

Robert Bryant - Direct

1    birds.

2    Q.  Were you hoping to evoke any emotion from them by showing

3    them this?

4    A.  I was hoping that they would get onboard with the price

5    increase.

6    Q.  Why would this information be important to them?

7    A.  Because they bought in those two size ranges.  And with

8    that reduction and, you know, there was some natural growth in

9    that same size, that -- and they felt shortages that year, so

10   there was -- it was important to them.

11   Q.  Now, at that meeting did you tell KFC the size price

12   increase you were going to be looking for?

13   A.  Not that I recall.

14   Q.  Why not?

15   A.  This was -- this was a prebid meeting where we were just

16   laying foundation or groundwork for a price increase.  And what

17   I recall, we hadn't received an official ask from KFC to submit

18   pricing yet.

19   Q.  Around this time did you then learn of the size price

20   increase that Pilgrim's would be requesting?

21   A.  I did.

22   Q.  And what did you learn?

23   A.  It was going to be around 15 or 20 cents a pound.

24   Q.  And what was your reaction to that size of price increase?

25   A.  I was concerned.

Robert Bryant - Direct

1    *Q.* Why were you concerned?

2    *A.* Reasons I stated earlier, that, you know, in my experience

3    up to this point dealing -- seeing national account price, I

4    hadn't seen a price increase of that size.  I didn't believe

5    our competition at this point would come to the same

6    conclusions that we did and would ask for a similar price

7    increase, so I was concerned that we would lose a lot of

8    business.

9    *Q.* So at this point even though you had heard, you know, what

10   you heard at the Popeye's meeting, at this point what was your

11   understanding of how competition was functioning among the

12   bidding suppliers?

13         *MR. TUBACH:* Objection, lack of foundation of any kind

14   of negotiation of national accounts.

15         *THE COURT:* Sustained.

16   BY MR. KOENIG:

17   *Q.* You said you were worried the price increase wouldn't

18   stick; is that right?

19   *A.* Can you repeat, please?

20   *Q.* You were afraid that the price increase wouldn't work.  Is

21   that what you said?

22   *A.* I was concerned that --

23         *MR. FELDBERG:* Objection.  That's not what he said.

24   It's misleading.

25         *THE COURT:* Overruled.  He can answer.

Robert Bryant - Direct

1   A.  I was concerned that we would lose business with that price

2   increase.  That was my concern.

3   BY MR. KOENIG:

4   Q.  But now you testified just a few minutes ago that you

5   thought based on shortages of small birds and some disparity in

6   the profitability between small birds and larger birds that you

7   thought a price increase was justified.  But then you're saying

8   at the same time you were worried.  So how do you reconcile

9   those things?

10  A.  I felt that a price increase was warranted, but my

11  experience to this point, I had not seen a price increase that

12  large to a national account.  So if Jason McGuire would have

13  said we're going to go after a nickel, I would have thought

14  that's probably doable.  When he said we're going after 20

15  cents, I thought that at the time that we were going to lose a

16  lot of business because I didn't -- my opinion at that time was

17  that our competitors would not do the same thing.

18          MR. TUBACH:  Objection, lack of foundation.

19          THE COURT:  Overruled.

20  A.  My opinion at that time was our competitors wouldn't come

21  to that large of a price increase because I hadn't seen that

22  before in my career, particularly with KFC.

23  BY MR. KOENIG:

24  Q.  Yeah, and I think you said this before, but what was the

25  typical year-to-year price increase with KFC?

Robert Bryant - Direct                          893

1    *A.*   A few pennies up or down.

2    *Q.*   Per pound you said?

3    *A.*   Per pound, yes.

4    *Q.*   All right.  And I think you -- back when we were talking

5    about 2017 for KFC, you mentioned -- you went through kind of

6    the structure, right?  There was the invitation to bid, RFP.

7    Was this sort of the same structure?

8    *A.*   Yes.  This was a prebid meeting.

9    *Q.*   All right.  But so there was an RFP eventually issued?

10   *A.*   That's correct, yes.

11   *Q.*   And then there was a deadline?

12   *A.*   There was, yes.

13   *Q.*   What was the deadline?

14   *A.*   It was somewhere around August 20th, somewhere in there.

15   *Q.*   And same as the question before.  Did you have an

16   understanding of what KFC and RSCS expected regarding how

17   Pilgrim's would formulate its price?

18   *A.*   Yes.

19          *MR. FAGG:*  Objection, Your Honor, foundation.

20          *THE COURT:*  Sustained.  If you could lay a little

21   foundation.

22          *MR. KOENIG:*  I just asked whether he had an

23   understanding and he said yes.

24          *THE COURT:*  All right.  Overruled.  And then if the

25   witness can answer that question then next.

Robert Bryant - Direct

894

1    BY MR. KOENIG:

2    Q.  What is the basis for your understanding as to how KFC

3    expected Pilgrim's to formulate its pricing?

4    A.  You know, at this point I have been in some sales role

5    probably from 2000, not customer facing on the national account

6    as much, but obviously working for Jason McGuire for four years

7    and discussing different bids over the course of those years

8    with him and how those bids were handled.

9    Q.  And so what was your understanding?

10   A.  That it would be a blind bid or -- I think we've used that

11   term before.

12   Q.  Can you remind the jury what a blind bid is?

13   A.  It's a bid that's done in like a vacuum or I think I used

14   the analogy of a sealed bid where you put your price in an

15   envelope and seal it and the only person that sees it is the

16   person that's buying it.

17   Q.  All right.  And so when was the bid submitted,

18   approximately?

19   A.  Around the 20th of August, somewhere in that neighborhood.

20   Q.  All right.  And when the bid was submitted, were you still

21   nervous that it wasn't going to work?

22   A.  I was still concerned, yes.

23   Q.  Did there come a time when you became less nervous?

24   A.  Yes.

25           MR. KOENIG:  Can we pull up Government Exhibit 1066,

Robert Bryant - Direct                                  895

1   please?

2   *BY MR. KOENIG:*

3   *Q.*  Do you recognize 1066?

4   *A.*  I do.

5   *Q.*  What is it?

6   *A.*  It's an e-mail from Jason McGuire to -- it's an e-mail from

7   Jason McGuire to me on August 21st, 2014.

8   *Q.*  Okay.  And what does it relate to generally, the e-mail?

9   *A.*  It relates to our bid submission to KFC.

10          *MR. KOENIG:*  Okay.  Your Honor, at this time I would

11   offer Exhibit 1066 into evidence.

12          *THE COURT:*  Any objection to the admission of 1066?

13          Exhibit 1066 will be admitted.

14          *MR. KOENIG:*  Permission to publish to the jury, Your

15   Honor?

16          *THE COURT:*  You may.

17          *MR. KOENIG:*  All right.  Let's go down to the bottom

18   e-mail in the chain.

19   *BY MR. KOENIG:*

20   *Q.*  So who is this e-mail from and to?

21   *A.*  The top one is from Roger Austin to Jason McGuire.

22   *Q.*  And what does the subject line read?

23   *A.*  Any word from them on our proposal?

24   *Q.*  What's your understanding of that question?

25   *A.*  That he's -- Jason McGuire -- the subject of that is about

Robert Bryant - Direct

1   our bid to KFC in 2014.

2   Q.   Okay.  So who is them?

3   A.   Them in that sentence would be KFC.

4   Q.   And what was Mr. Austin's response?

5   A.   I heard they made a couple of calls and were surprised.

6   Q.   What was your understanding of that?

7   A.   That KFC had gotten feedback from other competitors and

8   were surprised by how -- surprised by the level of their price

9   increase.

10        MR. KOENIG:  All right.  Can we go up to the next set

11  of e-mails?

12  BY MR. KOENIG:

13  Q.   And how did McGuire respond?

14  A.   Surprised like how much higher everyone else was.

15  Q.   Who was everyone else in your understanding?

16  A.   My understanding was that was our competitors.

17  Q.   Higher, what does that refer to?

18  A.   Higher on their bid submission or their pricing.

19  Q.   And what was Mr. Austin's response?

20  A.   Yes.

21  Q.   Okay.  And --

22        THE COURT:  So we are at 5:00 o'clock now, so maybe if

23  you could look for a convenient breaking spot.

24        MR. KOENIG:  If I can just finish this e-mail.

25        THE COURT:  How long will that take do you anticipate?

Robert Bryant - Direct

1          MR. KOENIG:  Two minutes.

2          THE COURT:  Go ahead.

3          MR. KOENIG:  All right.  Then can we go to the next

4   set of e-mails in this?

5   BY MR. KOENIG:

6   Q.  Now, what was Jason McGuire's response to Roger Austin?

7   A.  Can you smell their dirty drawers from where they crapped

8   their pants?  Ha.

9   Q.  I won't ask you to interpret that.

10         And Roger Austin's response?

11  A.  Definitely.

12  Q.  All right.  And their in McGuire's e-mail, T-H-E-I-R, who

13  is that?

14  A.  He would be referring to KFC.

15         MR. KOENIG:  And now the top e-mail?

16         THE WITNESS:  Is that a question for me?

17         MR. KOENIG:  No, Ms. Pearce.

18  BY MR. KOENIG:

19  Q.  Now, it looks like Jason McGuire forwarded it to you?

20  A.  That's correct.

21  Q.  And what was your response?

22  A.  That's good...

23  Q.  What did you mean by that?

24  A.  This was the first indication that I can recall that Jason

25  McGuire shared with me that the price increases from not only

898

| 1 | us but our competitors were being submitted to KFC. |

Q.  Okay.  So did this alleviate some of your worries?

A.  I was a little less concerned, but still concerned, yes.

Q.  And what was Mr. McGuire's response?

A.  Yes, that should help y'all out some.

Q.  What did you understand that to mean?

A.  I believe it's the next day on the 22nd, it could be the 23rd, Roger and myself and Scott Tucker had a meeting with KFC, a follow-up to our bid submission, so he was basically saying that this information should help us in that next meeting.

Q.  How so?

A.  Because we now know that or have confirmation that our competitors submitted similar price increases.

        MR. KOENIG:  I think that's a good place to stop.

        THE COURT:  Ladies and gentlemen, we will go ahead and break for the day.  Keep the admonitions in mind.  Once again, don't look up any information.  You may have heard unfamiliar terms.  Don't try to look up any of that.  All of your information has to come from the trial itself, okay?

        The jury is excused.  8:30 tomorrow is when we will start.  Try to make sure you are in the jury room so assuming we're ready we can start then.  Thank you very much.  You are excused.

        (Jury excused.)

        Mr. Bryant, you are excused and you can be back

1    tomorrow at 8:30 ready to go.  Thank you very much.

2            Anything that we should take up before we recess?

3            Ms. Call?

4            MS. CALL:  Very briefly, Your Honor.  I will try to

5    speak as loud as my colleague.  I wanted to address another

6    filing from last night, Docket 760, the defendant's motion to

7    exclude newly identified summary exhibits.  It's the

8    government's position that this is moot, the finding in the

9    Court's order in Docket No. 741 as to summary exhibits and that

10   would be breaking up of what was previously identified as A4.

11   And the government's response to the previous motion to exclude

12   doesn't change the fact in the Court's prior finding as the

13   material summarized in those exhibits are not conveniently

14   examined in court.  But I did want to raise it because if Your

15   Honor is inclined to consider the motion, the government would

16   like an opportunity to be heard in a briefing.

17           THE COURT:  Not surprisingly, I not only will be

18   considering it, but will be ruling on it.  So if you want to

19   respond to it, when do you think you could do so?

20           MS. CALL:  Likely by tomorrow morning.

21           THE COURT:  Okay.  Anyone anticipate it would come up

22   before then?

23           MS. CALL:  No.  I don't believe any of these summaries

24   will be used until a later witness.

25           THE COURT:  Okay.  I won't rule on it until after the

1    government responds tomorrow morning.

2         *MS. CALL:*  And I did want a clarification on that

3    prior ruling as well as to the exhibits that had been

4    identified as A5 and A6, which were the phones with the text

5    messages as well as the visual aids with the photographs and

6    the phone calls.  The government had indicated in its response

7    that it intended to use those as demonstratives still, and I

8    wanted to ensure that that wasn't at odds with your ruling.

9         *THE COURT:*  The objection was to their -- I think it

10   was to their admissibility.  And the indication was that they

11   were just going to be used as demonstratives.  We'll have to

12   see, you know, who is presenting them, but because of the fact

13   that the indication was that they would be used as

14   demonstratives and wouldn't be admitted for that reason but

15   would be still shown to the jury, I didn't see a -- I didn't

16   think that it was necessary for the Court to rule on them.

17        One fine point let me mention, and this will go for

18   both sides when we come to it, but when a document is being

19   displayed to the jury, so this is a document that's been

20   admitted, what's been going on is oftentimes a portion of the

21   e-mail is highlighted in yellow as we go on.  That's okay, but

22   you need -- whoever is doing the highlighting needs to wait

23   until the witness has answered and then highlight the answer.

24   Otherwise -- and it's not purposeful, but otherwise the

25   highlighting can be used to silently lead a witness by pointing

1    out to the witness the answer to the question, okay?  So you

2    just have to as a witness mentions the date, then the date can

3    be highlighted.  But if the question is, "what's the date," the

4    date shouldn't be highlighted before the witness answers.

5              MS. CALL:  Understood.  Thank you, Your Honor.

6              THE COURT:  Anything else?  All right.  We will be in

7    recess then until tomorrow.  If there is an issue, let

8    Ms. Grimm know.

9              The Court will be in recess.  Thank you.

10        (Recess at 5:09 p.m.)

11                            INDEX

12   WITNESSES

13     Larry Barela

14          Direct Examination By Mr. Torzilli              653

15          Cross-examination By Mr. Tubach                 667

16          Redirect Examination By Mr. Torzilli           671

17     Simeon Morbey

18          Direct Examination By Ms. Rogowski             673

19          Cross-examination By Ms. Carwile               691

20          Cross-examination By Mr. Tubach                714

21          Redirect Examination By Ms. Rogowski           715

22     Anna Bieganowska

23          Direct Examination By Ms. Butte                717

24     Robert Bryant

25          Direct Examination By Mr. Koenig               725

1                              INDEX

2                            EXHIBITS

3   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4   1055                       887

5   1066                       895

6   1882                       813

7   1919, 11-12                843

8   3039                       874

9   9139                       872

10  9140                       869

11  9235                       745

12  9237                       771

13  9242                       763

14  9244                       750

15  9245                       753

16  9248                       752

17                     REPORTER'S CERTIFICATE

18       I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.   Dated

20  at Denver, Colorado, this 20th day of January, 2022.

21

22                              S/Janet M. Coppock
                              _____

23

24

25