1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                      REPORTER'S TRANSCRIPT
14                    Trial to Jury, Vol. 23

15   _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:31 a.m., on the 7th day of December,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                              APPEARANCES
2              Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3    Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng,
4    U.S. Department of Justice, 450 Fifth Street N.W., Washington,
5    DC 20530, appearing for Plaintiff.
6              Anna Tryon Pletcher and Michael Tubach of
7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8    San Francisco, CA 94111-3823;
9              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11             David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14             Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16              Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19             Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1                    APPEARANCES (Continued)

 2           Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5           Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7           Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4   Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7   for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15                   PROCEEDINGS

16         *THE COURT:*  We are back on the record in 20-CR-152.

17  The jury is not present.  We are going to talk about jury

18  instructions.  The defendants are not required to attend.  They

19  can attend as they please.  Some are present and some aren't,

20  which is, of course, perfectly fine.

21         The government overnight sent out a red-line version

22  of some suggested changes, but I think what we'll do is we'll

23  just start with the first instruction in the Court's packet and

24  we'll work our way through them.  Once we get through them,

25  then we will -- I will then revise them all based upon what we

1   talked about.  We'll pass out a clean set and then we'll go

2   back through that set just to make sure that everything that we

3   talked about has been successfully conformed, all right?

4        Anything before we begin that people want to talk

5   about?  Okay.  Then why don't we first of all -- and by the

6   way, too, we won't have a table of contents in the

7   instructions, so that will go out, but it's handy to have at

8   the present time.

9        Okay.  Any comments or objections to the first three

10  instructions up through presumption of innocence?  Those are

11  pretty much stock instructions.

12       MS. CHENG:  No from the government, Your Honor.

13       THE COURT:  All right.  Why don't we first, then, take

14  a look at Evidence Defined simply because I don't believe that

15  there were any stipulations or facts -- were there

16  stipulations?  I can't remember.  But it was an admitted -- we

17  admitted as an exhibit; was that right?  We should leave

18  stipulations in.  Even if we have something that was an

19  admitted exhibit, we should leave that language in, but I don't

20  think I judicially noticed anything.

21       I think that the time thing was -- wasn't the time

22  conversion admitted as part of some exhibit?  I think.

23       MR. KOENIG:  There were time conversions, but I don't

24  know if they -- there was testimony.

25       THE COURT:  If you don't mind, Mr. Koenig, can you use

1    the microphone just so we make sure everyone can hear?

2        *MR. KOENIG:*  Looks like it got left on overnight.

3    There was the judicially noticed.  I don't think that was

4    entered as an exhibit.  There was time zone conversion stuff in

5    the summaries and then there was some testimony on that as

6    well.

7        *THE COURT:*  Well, testimony doesn't count.  The

8    question would just be whether I took judicial notice of

9    anything.  I don't think so.  I don't think so.  We can

10    double-check that, but I don't believe so.  I think that the

11    way that we should revise the second paragraph is after the

12    word "evidence" where it says "that I allowed into evidence,"

13    and "the stipulations that the lawyers agreed to," period.  And

14    we'll take out the bolding, obviously.

15        Does that sound -- anyone have a problem with that?

16    Okay.  Assuming no other suggestions on this instruction, let

17    us go over to Evidence-Direct and Circumstantial.  Anyone have

18    issues on that one?

19        Mr. Beller?

20        *MR. BELLER:*  Your Honor, I am sorry.  Can we go back

21    to the Evidence Defined instruction?

22        *THE COURT:*  Go ahead .

23        *MR. BELLER:*  Let me take this is outside of the

24    pattern.  And that is whether the Court would consider adding a

25    paragraph regarding any references to Indictment or Superseding

1    Indictment and the fact that Indictment and/or Superseding

2    Indictment is not evidence, but instead is simply a formal

3    charging document.

4         Your Honor, this is something that came to my

5    attention early this morning, so I am sorry that I do not have

6    a paper copy available, but I do believe that one of the

7    defense teams has access to a printer.  And if the Court will

8    consider allowing me to print the suggestion along with

9    citations for the suggestion and potentially inserting very

10   simple language regarding Indictment at the end of what is and

11   is not evidence.

12        THE COURT:  Yes.  And, of course, the introductory

13   instruction undoubtedly informed the jury of that.  And I don't

14   have a problem incorporating something to that effect.  The

15   question may be where.  I think we should use parallel language

16   to what they were previously told.  And here's the language

17   that I read:  "The Indictment is simply the description of the

18   charges made by the government against the defendants.  It is

19   not evidence of guilt or anything else.  Each defendant has

20   pleaded not guilty and is presumed innocent."

21        That's what -- and it goes on from there, but that's

22   what was read during the introductory instruction.

23        MR. BELLER:  Thank you.  So I will propose something

24   that tracks that language, Your Honor.  And if we can circle

25   back to that, I will have something in writing for all the

1    parties to consider.

2         THE COURT:  Yeah, I am not sure that it necessarily

3    would go in this instruction, but I think we can think about if

4    it's not already in here, I'm not sure, but we could think

5    about adding it at some point.

6         MR. BELLER:  Thank you, Your Honor.

7         THE COURT:  The other thing you should think about is

8    I don't think -- remember we talked about whether the issue of

9    a Superseding Indictment was even going to come up and it never

10   did.  I'm not sure the jury even knows that there is such a

11   thing as a Superseding Indictment.  Of course, it's relevant in

12   a sense to the statute of limitations issue because it defines

13   time periods.  Nonetheless, it may be possible to even strike

14   that first paragraph of the statute of limitations instruction

15   and not get into that if we wanted to or we just leave it

16   because the jury will -- they'll just go with the flow and that

17   may make some sense to them.

18        So I just bring that up.  Don't mean to detain you at

19   the podium, Mr. Beller, but that's something to think about,

20   too, because it never became an issue in the trial.

21        MR. BELLER:  Thank you.

22        THE COURT:  Okay.  Then let's switch over.  Anything

23   on direct and circumstantial?  Didn't seem like it.

24        Mr. Pollack?

25        MR. POLLACK:  Yes, Your Honor.  In the third paragraph

 1   where we're discussing inferences, we say in the last sentence,

 2   "An inference is a conclusion that reason and common sense may

 3   lead you to draw from the facts which have been proved."  I

 4   would like to insert the notion that an inference is not

 5   permissible if it is based on speculation.  And I would cite

 6   *United States v. Rufai*, 732 F.3d 1175 at 1188, 10th Circuit,

 7   2013 case.  "The jury will not be allowed to engage in a degree

 8   of speculation and conjecture that renders its findings a guess

 9   or mere possibility."

10        THE COURT:  I am going to overrule that.  This is the

11   10th Circuit pattern.  It says "An inference is a conclusion

12   that reason and common sense," so it has to be based on reason

13   and common sense.  Also it says right in the paragraph above,

14   "You are permitted to draw reasonable inferences from the

15   testimony and exhibits."  So I think the implications that it

16   can't be based on speculation --

17        MR. POLLACK:  I agree that one might read that in and

18   I think it ought to be said explicitly.

19        THE COURT:  I am going to overrule that.

20        MS. HENRY:  Your Honor, I just wanted to ask whether

21   we could do the same protocol that we have done previously?  I

22   would obviously agree with Mr. Blake and Mr. Beller's comments

23   and objections here.  And do we need to do them separately

24   or --

25        THE COURT:  No.  Why don't we talk about that for just

4495

 1   a bit.  We could do things one of two ways in terms of making

 2   our records.  So one thing we could do is we could talk, people

 3   could make various points.  We wouldn't have to do anything

 4   formal like joining.  And then once I produce the cleaned up

 5   copy incorporating the various things that we talked about, we

 6   could then consider that to be our final jury instruction

 7   conference and we could be a bit more formal then.  And you can

 8   do the same things that you did before if you want.  One

 9   objection is joined by all unless someone stands up and makes a

10   different point.  We could do that.

11           Now, the disadvantage of doing it that way -- and

12   that's what I would normally do.  I normally would have a final

13   jury instruction conference like that where everyone knows this

14   is your chance to make the record -- is that because we are

15   going to be talking about things this morning, we'll see how

16   long it lasts, people tend to in the final jury instruction

17   conference want to incorporate everything that was said in

18   the -- you know, before.

19           So for the Court of Appeals, it's all the same.  It's

20   just one thing and you kind of lose the benefit of the

21   formality of the final jury instruction conference.  So I am

22   happy to do it either way, but you're the ones who have a real

23   interest in making the record.  So we could either just work

24   through them now and we could do the exact same thing that you

25   suggest, Ms. Henry, which is one objection suffices for all

1   unless someone else brings up a point.  Whatever people want to

2   do is perfectly fine with me.

3          MS. HENRY:  I am not certain I am qualified to speak

4   on behalf --

5          THE COURT:  I am sure you are not.  And people can

6   make their points.  The other thing that I was -- by saying

7   that what I am kind of suggesting too is that there tends to

8   not be that much of a difference between the two approaches if

9   people are going to be incorporating arguments from the earlier

10  session.

11         Mr. Fagg?

12         MR. FAGG:  Sure, Your Honor.  Perhaps I would suggest

13  on behalf of the defendants that we would have today and this

14  morning's proceedings one objection raised by any one is an

15  objection for all.  And then to the extent that there are

16  additional objections that people wish to raise when we have

17  the formal conference later, those would also -- those could be

18  raised then as well, but that if the objection is raised this

19  morning, that that is deemed an objection.

20         MS. HENRY:  Or, Your Honor, maybe we could at least

21  start with the premise that we are all sharing in the

22  objections as we go forward.  And maybe when we have a break,

23  we could discuss whether or not we feel that the separate

24  conference is appropriate.

25         THE COURT:  I think that we would have the rule that

1    one objection suffices for all no matter what, whatever

2    approach we took.  And then, of course, any defendant can

3    differentiate himself at any point in time, but maybe what

4    we'll do is we'll just proceed.  We will just work our way

5    through.  And then when I produce the revised packet, we will

6    just go from there.  You can think about it, but I probably

7    would not deem our second session to be where if you don't make

8    your record, you're out of luck because, once again, what

9    people do in response to that is just incorporate everything

10   that they said in the morning, so it doesn't really make any

11   difference.

12          *MS. HENRY:*  Thank you, Your Honor.

13          *THE COURT:*  Okay.  Anything else on direct and

14   circumstantial?

15          Ms. Pletcher?

16          *MS. PLETCHER:*  Yes, thank you, Your Honor.

17          Because this is an antitrust case and the government's

18   case is based on conduct that is consistent with lawful

19   behavior, we would like to insert a paragraph at the end here

20   or even a separate instruction with respect to inferences based

21   on the principle in *Matsushita*, 475 U.S. 574, which is the

22   inference of a conspiracy is impermissible if a defendant's

23   conduct is consistent with other equally plausible

24   explanations.

25          We think that's a real danger here that the jury might

1   not understand that and would ask that the Court either use the

2   proposal that we put forth in defendants' Instruction No. 4 in

3   our proposed instructions, that's Docket No. 592, or even

4   actually in our authorities cited on Page 10 in that same

5   document.

6           There is some language from *Llacua v. W. Range*

7   *Association*, which is the 10th Circuit case that embodies this

8   principle saying that "Where circumstantial evidence is just as

9   consistent with unilateral action as with concerted action, it

10  does not, standing alone, support an inference of an antitrust

11  conspiracy.  It's impermissible to draw inferences of

12  conspiracy if conduct is consistent with other, equally

13  plausible explanations."

14          *THE COURT:*  Okay.  Response by the government?

15          *MS. CHENG:*  Thanks, Your Honor.

16          I think we would oppose the insertion of that

17  particular statement.  At least we have not seen authority of

18  that being included in prior jury instructions in criminal

19  cases.  Certainly that was what the Court said in *Matsushita*,

20  but that was a rule of reason case where the Court was trying

21  to determine where the line fell on a set of conduct and the

22  permissible inferences to be drawn therefrom using that

23  standard.

24          We are in a per se world, which means that the cases

25  that are applicable to this section is different.  And

1   inferences many circuits and the Supreme Court have held can be

2   drawn from permissible -- otherwise permissible conduct to

3   support or be a facilitating practice for the price-fixing or

4   bid-rigging case that's at issue.

5           And I can spend a little bit more time looking into

6   some of the cases that have been cited by Ms. Pletcher.  And we

7   can perhaps, if the Court would permit us to, revisit this

8   issue once we have some case law.

9           THE COURT:  Well, we've got to make progress.  You

10   know the cases because like the *Llacua* case, it's in there.

11   But the real question becomes whether or not there is that

12   distinction between a criminal case and a civil case and a per

13   se case and a case that is just a rule of reason civil case.

14   That's really the issue.  Anything more on that?

15           MS. CHENG:  Not at this moment, Your Honor.  But we

16   would like -- and I understand we do want to keep the train

17   moving on our set of instructions, but if we could just have a

18   quick moment to confirm some of what we were thinking on the

19   case law, that would be helpful.

20           THE COURT:  That depends on how long Ms. Pletcher has

21   for rebuttal here.  Go for it.

22           Ms. Pletcher, go ahead.

23           MS. PLETCHER:  So *Matsushita* was a per se case, and

24   the distinction here between a civil case and a criminal case I

25   think is of no moment.  The question is what types of

1    inferences is the jury allowed to make in an antitrust case and

2    even specifically in a per se case.  And *Matsushita* is very

3    clear on that point.

4         And the danger in this particular case, I think it's

5    even more great that the jury may make the wrong types of

6    inferences because there is very little direct evidence and

7    against some defendants there is no direct evidence.  The

8    entire case is based on circumstantial inferences.  So I think

9    having this guidance for the jury is particularly important

10   here.

11        *THE COURT:*  Well, that's true; but, of course, the

12   Courts in other cases have emphasized the fact that you

13   wouldn't expect that there would be any direct evidence or at

14   least that would be very common that there wouldn't, so that

15   the jury is going to be making deductions or at least being

16   able to draw inferences from acts or other types of indirect

17   evidence.  So --

18        *MS. PLETCHER:*  That is true, that is true.  And I

19   think the bigger principle is in antitrust cases in particular,

20   it's not like a drug case where you are looking at trading a

21   bag of some illicit substance for money, which is very

22   obviously an illegal act.  The acts that the juries are going

23   to be considering are acts -- things like signing contracts and

24   exchanging price information, which we know in and of itself is

25   lawful.  So that's really the crux of the issue.  And

1   determining inferences that lead to, you know, finding of a

2   criminal conspiracy based on that type of evidence puts us

3   squarely within the world of *Matsushita*.

4        THE COURT:  Yeah, once again, the question would be

5   the fact that you're dealing with economic activity would

6   not -- I mean, that is, of course, commonly something that

7   would happen in an antitrust case.  So if you are trying to

8   educate the jury in terms of the process of drawing an

9   inference, you could run the risk of skewing their -- the

10  process.  And what the courts have talked about is a totally

11  legitimate ability to draw inferences from things that aren't

12  direct, from conspiratorial agreements that aren't direct.

13       Another approach that you could take is to make sure

14  that the instructions define what activity is illegal and what

15  is not, not the inference that may lead you to conclude that

16  there was the activity, but the activity itself.  And that then

17  seems to be the more clear and direct method by which the Court

18  could make sure that the jury understands, hey, if you draw an

19  inference and your inference leads you to conclude that X

20  happened, X is not illegal.  You know, you could make that

21  clear in the instructions too.  So there is a little bit of a

22  tension between that process.  And that is one tension that you

23  get into when you, you know, use that language that you just

24  mentioned from *Matsushita*.  So it's a little bit tricky.

25       MS. PLETCHER:  I understand that, Your Honor.  I think

1    maybe a way to be even more precise about this and get to the

2    problem is to do both.  One is, as you said, define the conduct

3    specifically, but also *Llacua* emphasizes the idea that the

4    issue is that circumstantial evidence that's just as consistent

5    with unilateral action standing alone does not support the

6    inference.  And maybe it's that language, that "standing alone"

7    language that kind of puts sort of a limiting principle on

8    this, but still conveys to the jury the limitations on the

9    permissible inferences they can draw.

10          *THE COURT:*  Yeah, what does that mean, though?  Tell

11   me what that means.  I don't even know what that means.

12          *MS. PLETCHER:*  The way I understand it and the way I

13   think the jury would understand that is that if there is an

14   action or piece of evidence that they are looking at, say

15   signing a contract, a particular contract, and that alone is

16   the only evidence that they have that a particular defendant

17   participated in an alleged price-fixing incident, that is

18   perfectly consistent with lawful behavior.  And that piece

19   alone could not sustain a conviction beyond a reasonable doubt.

20   There would have to be something else, some other fact that

21   they would rely on if that was the only piece of evidence that

22   they had.

23          *THE COURT:*  Yeah, it could be.  It's -- the

24   hypothetical standing alone is just so unlikely to ever happen,

25   I mean, especially in a complicated case.  I don't know if you

1    would ever get that situation, but yeah, you're right,

2    theoretically you could get that situation.

3         Okay.  Ms. Cheng has taken full advantage of the

4    opportunity.

5         *MS. CHENG:*  Thanks, Your Honor.

6         I would like to make two quick points on it.  The

7    first is that the inclusion of an additional paragraph on that

8    would be duplicative because this Court has already on Page 25

9    of the instructions proposed something specific to the type of

10   conduct and the types of inferences that can be drawn from that

11   type of conduct if it's truly legitimate.

12        For example, it says, "The fact that competitors

13   exchanged price information does not necessarily establish an

14   agreement to fix prices.  There may be other, legitimate

15   reasons that would lead competitors to exchange price

16   information."

17        That we believe is sufficient to account for any

18   concerns that the jury might draw improper inferences solely

19   from this type of legitimate conduct.  And I think creating

20   sort of a broader rule that generally this type of business

21   conduct is not something you can draw an inference of

22   conspiracy from would not be as precise as what we already have

23   in the instruction which talks about price exchange and why

24   that's improper and why that would be proper standing alone

25   without an agreement.

1          My second point is that I mentioned when I was up here

2    earlier that there are other cases in circuit courts written

3    after *Matsushita* that have confirmed that price-fixing can be

4    drawn from or deduced from or inferred from pricing exchange.

5    And I have just one example here which is *Todd v. Exxon* from

6    the Second Circuit, and that is at 275 F.3d 191.  And the

7    Second Circuit says, "Information exchange in an example of a

8    facilitating practice that can help support an inference of a

9    price-fixing agreement."  And therefore, there are precisely

10   these types of situations where in combination with other

11   things these are legitimate inferences to be drawn, and so we

12   believe that creating this additional paragraph would be

13   confusing and duplicative.

14        THE COURT:  Well, let's assume that I incorporate

15   Ms. Pletcher's suggestion and it has that language that talks

16   about if it's the only thing.  Why would the government care?

17   Is there a situation where the government is relying upon one

18   thing against some defendant?

19        MS. CHENG:  No.  There is not a situation where our

20   entire case falls on one particular thing, but I think -- I

21   want to get a little bit more precision perhaps on what exactly

22   is the proposed language because is it that inferences can't be

23   drawn from the price exchange which is a legitimate activity?

24        THE COURT:  No.  Ms. Pletcher can reiterate it, but I

25   think she just wanted to take that language that comes out of

1   *Matsushita* and also *Llacua* about -- we would just tell the jury

2   you can't -- if it turns on just one thing that could be looked

3   at different ways, then that would be insufficient.  And if the

4   government's case doesn't rest as to any particular defendant

5   on one thing, then what are you worried about?

6       *MS. CHENG:*  So I guess first I think we would have to

7   look at the precise phrasing of that.  If it's merely a

8   statement that, you know, don't draw all your inferences from

9   one fact --

10      *THE COURT:*  No, it's not that.  It's that if for a

11  given defendant you only had one -- the government's case

12  hinged upon one thing that was -- that the inference could

13  be -- that was also perfectly consistent with lawful behavior,

14  if the inference could also be lawful, then you would have to

15  go -- let's here Ms. Pletcher's suggested language, but I think

16  that was what Ms. Pletcher's suggestion was.

17      By the way, this would not necessarily go into the --

18  in fact, probably wouldn't go in this particular instruction.

19  It probably would go into the conspiracy instruction.

20      *MS. CHENG:*  Understood.  Thanks.  That would be

21  helpful.

22      *THE COURT:*  We will have Ms. Pletcher come back.

23      *MS. PLETCHER:*  Thank you, Your Honor.

24      So the language that I would suggest comes straight

25  out of *Llacua*.  "Where circumstantial evidence is just as

1    consistent with unilateral action as with concerted action, it

2    does not, standing alone, support an inference of an antitrust

3    conspiracy.  It's impermissible to draw inferences of

4    conspiracy if conduct is consistent with other, equally

5    plausible explanations." It's in *Llacua*, 1179-80.

6          THE COURT:  But your suggestion is it in direct and

7    circumstantial, even though that is a general instruction, it

8    doesn't get specific?

9          MS. PLETCHER:  I do suggest that because of that last

10   paragraph that talks about inferences.  It seems like it's a

11   natural add-on there.  It could also go into the piece in the

12   substantive elements, but it feels like it flows naturally here

13   because of the -- it could be a separate instruction on

14   inferences, but if that were the case, I would recommend that

15   the Court read it right after the direct and circumstantial so

16   it would just be together.

17         THE COURT:  Okay.  Ms. Cheng, anything else on that?

18         MS. CHENG:  Your Honor, we would be comfortable with

19   that language if it goes into one of the substantive elements

20   instructions rather than the portion on drawing inferences for

21   the reason you said earlier, which is at this point of that --

22   or related to the inference specific instruction, I think it's

23   maybe premature before the jury has a sense of what the primary

24   question is at the heart of the case, which is whether there is

25   an agreement.  And I think that instruction that's proposed

1      would make more sense in the conspiracy specific section.

2              THE COURT:  Okay.  Yeah, I think it probably would go

3      in maybe the instruction on first element conspiracy, but I

4      won't add it to this instruction, but let's plan on adding that

5      language to one of the other instructions once we get into the

6      conspiracy, okay?

7              MS. CHENG:  Sounds good, Your Honor.

8              MS. PLETCHER:  Thank you.

9              THE COURT:  All right.  Now, so let's turn to

10     Credibility of Witnesses.  Obviously, we will take out the

11     bracketed and bolded language.  Any other -- assuming we do

12     that, any other issues with that instruction?

13             Mr. Fagg, go ahead.

14             MR. FAGG:  Your Honor, we do have a quick proposed

15     revision there and it would come at the end of this

16     instruction.  And the language that we're proposing would come

17     from *United States v. Coleman*, which is 7 F.3d 1500, which is a

18     10th Circuit case from 1993.  And the language that we would

19     propose to add there is, "None of the defendants testified, and

20     I remind you that you cannot consider any of the defendants'

21     decision not to testify as evidence of guilt.  I want you to

22     clearly understand, please, that the Constitution of the United

23     States grants to a defendant the right to remain silent.  That

24     means the right not to testify."

25             THE COURT:  That's the very next instruction.  The

1    next instruction explains all that.

2         *MR. FAGG:*  I am sorry, my copy does not have that.

3         *THE COURT:*  We definitely have that one, so yeah, that

4    is the next instruction, but we would definitely do that.  We

5    obviously need to incorporate that at some point, and naturally

6    it would follow right after we talk about the other witnesses

7    that we remind the jury that the fact that the defendants

8    didn't testify cannot be used against them in any way.

9         *MR. FAGG:*  Thank you.  I will try to merge my

10   documents together.

11        *THE COURT:*  No problem.  And then unless anyone has

12   anything else on credibility of witnesses -- go ahead,

13   Ms. Nielsen.

14        *MS. NIELSEN:*  Your Honor, I think there might be a

15   typo on Page 11 in the paragraph, "In reaching a conclusion on

16   particular point," I think there should be an "a."

17        *THE COURT:*  Yes, good catch.  We will make that.

18        Okay.  Then let's turn over to the next instruction.

19   This is the instruction we'll remove the brackets, remove the

20   bold.  And so the beginning of that first sentence would say,

21   "None of the defendants testified and I remind you," so on and

22   so forth.  Any problems with that instruction?

23        *MR. BELLER:*  Your Honor, a very picky-ish point.

24   Recognizing that this is the pattern instruction, I simply take

25   issue with the word "cannot" versus my request that is it

1    should be "must not."  And I use "must not" instead of "cannot"

2    simply for consistency regarding the instructions, previous

3    instructions given to the jury regarding what the jury should

4    and should not do or must and must not do based on, you know,

5    other standards.  So it's my request that we use "must not"

6    instead of "cannot" for consistency's sake.

7            THE COURT:  Okay.  Ms. Cheng, response to that?

8            MS. CHENG:  Your Honor, we have -- we have a

9    preference for sticking to the 10th Circuit pattern jury

10   instruction on this.  Thank you.

11           THE COURT:  Yeah, I don't really think it makes any

12   difference.  I mean, Mr. Beller is correct that usually in the

13   instructions the directives are expressed in form of "must."

14   There is a lot of "musts" in this instruction, so probably for

15   the sake of varying -- the pattern instruction has the word

16   "cannot."  I frankly don't really care.  It's really a

17   distinction without a difference, but if -- we'll put in --

18   well, I'll put in "must" for now.  If there are other

19   instructions that use "cannot" and we've bought ourselves a

20   problem, then I may revert back, but I don't have a problem

21   changing it to "must."

22           And that brings up to the question when we get to the

23   elements instruction that Mr. Kornfeld brought up yesterday.

24   Frequently the term "must" is used and in other instructions

25   the term, we say the jury must do certain things, so I think we

 1   will probably make that change that Mr. Kornfeld flagged

 2   yesterday too.

 3          Mr. Fagg, did you have anything else on that

 4   instruction?

 5          MR. FAGG:  Yes, Your Honor.  Thank you.

 6          THE COURT:  Go ahead.

 7          MR. FAGG:  So in looking at -- and I understand that

 8   there is a pattern instruction here, but looking at the *Coleman*

 9   case that I cited a moment ago, which is from the 10th Circuit

10   and also from the Seventh Circuit pattern jury instructions, we

11   would request to add at the very end of this instruction after

12   the word "testify," say "or does not call any witnesses or

13   present any evidence."

14          THE COURT:  Yes.  I took that out.  But you're right

15   that because certain defendants called the witnesses yesterday

16   and others did not, I think we need to add that back.  I think

17   that's an appropriate change.  That's part of the pattern and

18   we will add that back in.

19          MR. FAGG:  Thank you, Your Honor.

20          THE COURT:  Anything else on this one?

21          All right.  Let's go to Impeachment by Prior

22   Inconsistencies.

23          Mr. Beller?

24          MR. BELLER:  Your Honor, I realize that this is taken

25   verbatim as a pattern instruction.  Given this particular case,

1    Your Honor, and the fact that prior inconsistent statements by

2    the witnesses were asked about I think with rare exception in

3    almost every testifying witness or certainly most of them, and

4    especially the testimony of Mr. Bryant and Mr. Bryant's 20

5    prior statements, I believe that the instruction itself is

6    perhaps not as robust as what the underlying facts of this case

7    may warrant.  So it is the request of the defense, Your Honor,

8    that the Court consider the instruction given in *White v. Deere*

9    *& Company.*

10         I realize the Court is very aware of that particular

11   case and that particular instruction.  And so I do have a

12   printed copy of a request, a red-lined version that marries the

13   pattern instruction with the instruction that the Court

14   provided in *White v. Deere*.  I do not believe that it modifies

15   anything significant other than making the prior impeachment, I

16   think the definition of prior inconsistent statement or prior

17   impeachment defining it in a way that's just a bit more robust,

18   again that tracks the language or marries the language of *White

19   v. Deere* along with the pattern instruction.

20         If I may provide it to Ms. Grimm for the Court,

21   please.

22         *THE COURT:*  Yes, you may.

23         *MR. BELLER:*  Your Honor, the section that is in red is

24   in red because I believe that that is not verbatim taken out of

25   the case, but rather is simply added by counsel.  And so I note

1    that and separately sort of write that so the Court can

2    recognize what is counsel's words versus what is verbatim taken

3    out of a case or out of a pattern.  And I am going to change

4    that just a little bit and say that that is, in fact, in the

5    pattern instruction, Your Honor.

6          THE COURT:  Let's give the government a chance to take

7    a look at that.

8          Ms. Cheng, once you are ready, I will hear your

9    thoughts on this.

10         MS. CHENG:  Your Honor, the government would oppose

11   this proposal.  First, we don't have the facts in our case to

12   support giving such an instruction.  For example, if you look

13   at the final paragraph, "if a witness is shown knowingly to

14   have testified falsely about any material matter," this did not

15   happen in our case.  And as a result, we think it would be

16   prejudicial to have this instruction in place of the 10th

17   Circuit pattern.  We don't really see a reason or any facts in

18   the case so far for us to deviate from the pattern instruction;

19   and as a result, we would strongly oppose this proposal.

20         Thank you.

21         THE COURT:  Mr. Beller, anything more?

22         MR. BELLER:  No, Your Honor, other than respectfully

23   responding to Ms. Cheng and that is whether a witness is shown

24   knowingly to have testified falsely.  As the Court knows,

25   that's a credibility determination to be made by the jury, and

1    so I don't necessarily concede that point.  And so with all

2    that said, I will rest on the record that has been made thus

3    far.

4         THE COURT:  Yeah, I am going to reject the tendered

5    instruction.  Mr. Beller, do you want to mark this as a

6    tendered instruction?

7         MR. BELLER:  I will do so.  We can mark it and hold on

8    to it for purposes of the appellate record.

9         THE COURT:  Yes.  As a matter of fact, I am going to

10   give this to Ms. Grimm right now.  She will go ahead and mark

11   it, but let's do that.  We will mark this as Defendants'

12   Tendered No. 1.

13        MR. BELLER:  Thank you, Your Honor.

14        THE COURT:  Okay.  Anything else on impeachment by

15   prior inconsistencies?

16        MR. BELLER:  If we can have just one moment, Your

17   Honor.

18        THE COURT:  Sure.  And just for the record, the reason

19   I think that I am rejecting that one is because I think that

20   the 10th Circuit pattern instruction incorporates those issues.

21   And I think it's -- the *White* instruction, a little bit more

22   detailed, but I think that the 10th Circuit pattern does

23   exactly and tells the jury exactly what the appropriate

24   consideration of prior inconsistencies are, and therefore I

25   think that that's an appropriate instruction to give.

1          MR. BELLER:  Your Honor, looking at the Court's

2     pattern jury instruction, I am wondering if the Court will

3     consider slight modifications.  And the modifications if I can

4     do orally through interlineation, and I do have something that

5     I can tender to the Court, and that is to remove the word

6     "only" after "attention" on the second paragraph and also to

7     remove the last two sentences, the first starting with, "You

8     cannot use the prior inconsistent statement," and the second

9     being, "You can use only it as one way of evaluating the

10    witnesses' testimony."

11          The reason being, Your Honor, because I believe the

12    jury is, in fact, the judges of the facts, the jury having

13    considered the testimony of the witnesses can choose to provide

14    whatever credit or, you know, lack of credit that they choose

15    to.  If the jury determines that a prior statement is the

16    factual one as opposed to the statement that's coming from the

17    stand, they can consider that as well.  And so I believe that

18    by limiting through the pattern instruction with those last two

19    sentences, it does have the potential to unnecessarily and

20    otherwise limit the jury's determination outside of what they

21    believe is appropriate and reasonable given their experience.

22          THE COURT:  Okay.  I am going to reject that request.

23    The instruction indicates what use they can use, not as a

24    matter of constraining the jury's discretion, but rather

25    limiting the jury to consideration of the evidence.  Those

1    other statements are not evidence, but they can be considered

2    in evaluating the actual testimony.  So that's the appropriate

3    distinction that it's making.  And I think that the suggested

4    language would confuse the previous statements with evidence

5    which would be inappropriate for the jury to do.

6              MR. BELLER:  Thank you, Your Honor.

7              May I also tender this instruction to be marked and

8    rejected as Defendants' Exhibit 2?

9              THE COURT:  Yes.  We will do so.

10             MR. BELLER:  Thank you.  If I may have a moment to

11   show Ms. Cheng what I am providing to the Court.

12             THE COURT:  That's great.  And we will go ahead and

13   get that done.

14             Go ahead, Ms. Henry.

15             MS. HENRY:  With regard to the proposal that

16   Mr. Beller just made, if I can just expand that a little bit.

17   I believe that there were some documents that were put in

18   evidence, actually, that the jury may see as prior inconsistent

19   statements.  And they may end up confused by this instruction

20   because of that.  And I wondered if there could be potentially

21   even -- "You cannot use the prior inconsistent statements as

22   proof of anything else," it's a problem because it's going to

23   confuse the jury on that issue as well.

24             THE COURT:  I can't think of an example, but you're

25   right that if a properly admitted -- say an e-mail contains a

1    statement that may be considered to be different than something

2    in court, once again, I can't think of an instance, but it

3    could be, then you wouldn't want the jury considering the

4    e-mail which was admitted to be something that they have to

5    limit their consideration of because that is evidence, unlike,

6    for instance, an interview with the FBI before court.

7            MS. HENRY:  And, Your Honor, there may be times where

8    the witness actually adopted -- when it refreshed recollection

9    and the witness adopted his prior statement and gives testimony

10   which again is in evidence.  I am concerned it is misleading

11   and the confusion that will come from this additional language.

12           THE COURT:  I am not worried about that.  If a witness

13   adopts the statement, then the testimony is that he adopted the

14   statement, so that wouldn't fall within this one.  The question

15   before us is whether there could be a statement made before

16   this trial, but which is evidence -- which was admitted into

17   evidence that the jury may think that this instruction applies

18   to.

19           Ms. Cheng?

20           MS. CHENG:  Your Honor, I am having some trouble

21   thinking of the precise -- a precise example here.  Is the

22   question whether if there is a previous FBI interview, that

23   somehow those previous statements do not only go to the

24   credibility of the witness, but to, say, the truth of the

25   matter asserted or to --

1          THE COURT:  No, the issue is this.  You have a

2     witness.  The witness gives testimony, but the witness made a

3     statement previously, not to the FBI, but in an e-mail that was

4     sent to a co-conspirator, for instance, that's admitted into

5     evidence.  And then the danger would be whether that

6     inconsistent statement in the e-mail has to be considered only

7     to help decide the credibility of the witness as opposed to the

8     jury taking the e-mail at face value and considering it

9     substantive evidence.

10         MS. CHENG:  Your Honor, I can't think of an example of

11    that, which maybe is why I am having some trouble with that

12    particular hypothetical.  I think hypothetically that could be

13    true where maybe a prior inconsistent statement was used for

14    some other purpose, and then hypothetically a witness made a

15    different statement.  But I would say in that case the prior

16    inconsistent statement would be -- I suppose if there is live

17    testimony that is inconsistent with the prior statement, my

18    inclination is to think that the prior statement was used --

19    the prior inconsistent statement was used in order to defeat

20    witness credibility in some way rather than a stand-alone truth

21    if the witness is on the stand and disavowing it.

22         THE COURT:  Mr. Tubach?

23         MR. TUBACH:  My only contribution here is to provide

24    the Court with an example.  Mr. Bryant, for example, testified

25    that the potential Mayfield Natchitoches plant conversion was a

1    fake, that it was never real.  Its purpose I think he testified

2    was to somehow influence Mr. Austin.  There is an e-mail in

3    evidence where he says, "I wish we could do it sooner," which

4    would be arguably inconsistent with his testimony that it

5    shouldn't happen at all.  That e-mail is in as substantive

6    evidence and should be regarded as such.  There are many other

7    examples --

8         THE COURT:  Yeah, it's not uncommon that you would

9    bring up someone's previous statement in an e-mail, for

10   instance, and then ask the witness about it and say, wait a

11   minute.  The example that you just provided would be one

12   example.  Yeah, that's an interesting thing.  But the question

13   then becomes how we revise this instruction to make that

14   distinction, and that is a little bit tricky.

15        Mr. Tubach, do you have a suggestion?

16        MR. TUBACH:  I think the way it could be done, I don't

17   know how the precise phraseology would be.  If the prior

18   inconsistent statement is presented to the witness and is not

19   otherwise admitted as evidence elsewhere, then.

20        THE COURT:  That's one way to do it.  The other way to

21   do it would be if what we are really talking about here are FBI

22   interviews, we could limit it that way.  You heard the

23   testimony of a witness who before this trial were interviewed

24   and may have made statements that are different from their

25   testimony here in court.

1          MR. TUBACH:  I am thinking out loud.  Are there any

2     other instances where there would be prior inconsistent

3     statements that would not otherwise be admitted?  I honestly

4     can't think of one right now.

5          THE COURT:  Yeah, I am thinking this is really an

6     issue with those FBI interviews, and for that reason by use of

7     the term interview, that may be the appropriate limiting factor

8     to focus the jury on which statements they have to consider

9     only -- or can't use for another purpose.

10          Ms. Cheng?

11          MS. CHENG:  The government would not object to the

12     Court's proposal on limiting it to the FBI or prior interviews.

13          THE COURT:  Mr. Feldberg?

14          MR. FELDBERG:  Your Honor, if we were going to include

15     such an instruction, we would request that you carve out from

16     that prior statements and interviews with the FBI that were

17     adopted by the witness in testimony in court.

18          THE COURT:  Yeah, I am not going to do that because,

19     once again, if a witness adopts a statement, for instance, is

20     confronted with a statement or reminded of a statement and

21     says, "Oh, well, whatever I said," that's an adoption and the

22     testimony is the adoption, so that's fine.  That's why I am not

23     worried about that particular point.

24          MR. FELDBERG:  As long as we don't do something that

25     might lead the jury to think that the witness' adoption of the

1    prior statement in court somehow doesn't count.

2           THE COURT:  Yeah, that would be difficult to make that

3    distinction, but I am not worried about that, that possibility,

4    because if the witness says, "Oh, yeah, that's right, whatever

5    I said," a number of witnesses made comments to that effect,

6    "I don't remember, but I think that's right," or something like

7    that.

8           MR. FELDBERG:  There were several instances, for

9    example, in Mr. Bryant's testimony where he was asked about

10   prior interviews and then asked, "And that was true, wasn't

11   it?"  And he said, "Yes."

12          THE COURT:  Yeah, that's an adoption in court and

13   that's testimony.  When the witness says, "Yeah, that's right,"

14   that's an adoption, so the statement can be considered then.

15   It would only be when the witness disagrees with it, you know,

16   you confront the witness with something and the witness -- the

17   testimony is inconsistent.  The fact that you read a statement

18   to him that he did not adopt, that cannot be used for any

19   purpose other than for considering the credibility of his

20   denial.  You can't consider the statement that was, for

21   instance, read to him as substantive evidence.  That's what the

22   instruction points out.

23          MR. FELDBERG:  Unless it was adopted.

24          THE COURT:  Unless it was adopted, in which case you

25   don't have the inconsistency anyway.

1          Ms. Henry, go ahead.

2          If you want to defer to Mr. Beller, but we will get

3    right back to you, Ms. Henry.

4          MS. HENRY:  I will defer.

5          MR. BELLER:  Your Honor I would note at the risk of

6    sounding like a sore loser, the defense tendered Instruction 1

7    and rejected, Your Honor, I think appropriately addresses the

8    concern of Ms. Henry.  So I respectfully invite the Court to

9    re-read that instruction simply with this past dialogue in

10   mind.

11         MS. HENRY:  Your Honor, I would just like to point out

12   he said what I was going to say, so I did right by deferring.

13         THE COURT:  You could have saved him a trip.

14         Actually, I don't think tendered instruction No. 1

15   solves that problem.  I really don't.  So I think we need to

16   get out our pencils and figure out exactly how to modify the

17   Court's instruction.  I would suggest as follows unless

18   Mr. Fagg has another one.

19         MR. FAGG:  Go ahead, Your Honor.

20         THE COURT:  I would suggest as follows:  "In the first

21   paragraph you have heard the testimony of witnesses who, in

22   interviews before this trial, may have made statements that are

23   different," blah, blah, blah.  I would suggest that we avoid

24   saying with the FBI or with the prosecution just because I

25   don't think that -- you know, it's true that witnesses may have

1    even yesterday testified that they had a trial prep session or

2    something of that, but they weren't confronted with an

3    inconsistent statement.  The only times that you had an

4    interview memo, really, that I recall anyone being confronted

5    with was with -- you know, it probably involved other things.

6    So anyway, I think if we just say "in interviews," that would

7    probably do the trick, but I am open to suggestion.

8            Mr. Fagg, how does that work for you?

9            Or Ms. Henry, go ahead.

10           *MS. HENRY:*  I was going to suggest in addition "as

11   proof of anything else unless otherwise in evidence."

12           *THE COURT:*  Where was that?

13           *MS. HENRY:*  After "You cannot use the prior

14   inconsistent statements as proof of anything else unless

15   otherwise in evidence."

16           *THE COURT:*  I think that might be a bit confusing to

17   the jury.  I am not sure how they would evaluate that.  That's

18   why I would prefer to limit it to where the inconsistency

19   occurred.

20           *MS. HENRY:*  The problem with that, Your Honor, is that

21   in many of the interviews they were shown documents, and some

22   of those documents that were shown in the interviews are in

23   evidence.

24           *THE COURT:*  Right.

25           *MS. HENRY:*  So again we have a confusion here which is

1    why we want to go back to Mr. Beller's point.

2          MR. FELDBERG:  My point is a little different.  I

3    appreciate Ms. Henry and Mr. Beller's points about exhibits,

4    but we had a thought on the last sentence here, something like,

5    "You cannot use the prior inconsistent statements as proof of

6    anything else if the witness did not adopt them."

7          THE COURT:  Yeah, I am going to reject that because

8    then we would have to go into a big long explanation of what

9    adoption means because I don't think the jury would naturally

10   understand that.  And that's a little bit of a tricky concept

11   that I don't think is necessary because if a witness adopted a

12   statement, I think that it would be fairly clear.  If a witness

13   said, "Yeah, well, if it says that, then that's what I said,"

14   so I think that that would not need clarification.

15         MR. FELDBERG:  Thank you.

16         THE COURT:  Ms. Cheng?

17         MS. CHENG:  Your Honor, we wanted to propose just a

18   slight modification to the Court's proposal which is instead of

19   saying "in interviews before this trial," for it to say instead

20   "in interviews before they testified," because we did have some

21   witnesses who were interviewed during the trial period.

22         THE COURT:  That would be fine.  I can't think of

23   anyone impeached, but we could adopt that.

24         Anyone else want to make any other suggestions?

25         So the proposal is that the first paragraph would read

1    as follows:  "You have heard the testimony of witnesses who, in

2    interviews before they testified, may have made statements that

3    are different from their testimony here in court."  And the

4    rest of the paragraph would remain the same.

5             Any additional objections that we haven't already

6    talked about?

7             Okay.  I am going to modify it to that effect.  And

8    once again, people can think about that and make additional

9    objections once we get the instructions revised.

10            Okay.  Why don't we go to the Testimony of Robert

11   Bryant.  Everyone good on that one?  Let's go to the next one.

12            Oh, Mr. Feldberg, go ahead.

13            MR. FELDBERG:  Shockingly, we had a couple of thoughts

14   here, Your Honor.  The thoughts are really -- the first thought

15   is really triggered by the fact that the third paragraph of the

16   Court's proposed charge and the first sentence of the second

17   paragraph really get at the same concept.  The first sentence

18   of the second paragraph --

19            THE COURT:  Yeah, I am thinking about taking out the

20   first sentence of the second paragraph.  It is part of the

21   pattern, it's true, and it's in the part of the pattern that

22   talks about immunity agreements, but I am worried that it

23   could, as Mr. Fagg articulated yesterday, cull the jury in a

24   way that may not be necessary because, as Mr. Feldberg points

25   out, the first sentence of the third paragraph already talks

1   about weight to be given to unsupported testimony.

2           So let's hear what -- was that it, Mr. Feldberg?  You

3   may want to articulate a few other points; and if so, go right

4   ahead.

5           MR. FELDBERG:  That was the main point, Your Honor.

6   If Your Honor is prepared to take out the first sentence of the

7   second paragraph.

8           THE COURT:  I am thinking about it, so we want to give

9   Ms. Cheng a chance.

10          MR. FELDBERG:  We had a suggestion which we could hand

11  up of a red-line essentially moving the third paragraph up to

12  the beginning of the second paragraph.

13          Ms. Carwile, could you --

14          THE COURT:  Yes, thanks, Ms. Carwile.

15          MR. FELDBERG:  If she could hand up a red-line and we

16  will get that to counsel and counsel for the government as

17  well.  That was just one thought.

18          The second thought is an additional instruction that

19  would follow this particular instruction, and it's derived from

20  United States v. Serrano, a 10th Circuit case from 2005,

21  406 F.3d 1208 at Page 1217.  And I don't think I have copies to

22  hand up, but it's a short proposed instruction that reads:  You

23  heard evidence in this case that one witness, Roberts Bryant,

24  is subject to an immunity agreement with the government.  The

25  government has exclusive authority to grant immunity to a

 1    witness.  No one outside the government can offer immunity to a

 2    witness or enter into a non-prosecution agreement with a

 3    witness.

 4         Anticipating a possible objection from the prosecution

 5    that Ms. Ray was immunized, the fact of her immunity agreement

 6    was never brought to the attention of the jury.

 7         THE COURT:  That's not evidence, so...

 8         MR. FELDBERG:  So we would suggest -- and I could hand

 9    up my only copy of the *Serrano* instruction, but we would

10    suggest that as an additional instruction following the

11    proposed Bryant instruction.

12         THE COURT:  Okay.  Thank you, Mr. Feldberg.

13         So why don't we focus -- Mr. Pollack, do you have

14    something that's different from what we just talked about?

15         MR. POLLACK:  I think it may be.

16         THE COURT:  Okay.  Go ahead.

17         MR. POLLACK:  Your Honor, the concern that I have -- I

18    think eliminating the sentence that you just discussed helps,

19    but there is also the sentence in the third paragraph that

20    says, "You cannot convict a defendant on the unsupported

21    testimony of a witness," et cetera.  I would say, "You cannot

22    credit the unsupported testimony of a witness."

23         Because this suggests that if they believe Mr. Bryant,

24    that would be sufficient to convict, say, Mr. Blake.  But

25    Mr. Bryant didn't give any testimony about Mr. Blake.  So even

1    if one believed Mr. Bryant, that's a separate issue from

2    whether or not the elements of the offense have been met as to

3    a particular defendant.  So I think really the point is you

4    can't credit this witness, this witness' unsupported testimony,

5    unless you believe the unsupported testimony beyond a

6    reasonable doubt.

7         THE COURT:  Yeah, I think that would contradict the

8    case law because credit is another way of saying believe.  And

9    I think the cases are -- the case law is uniform throughout the

10   country that, in fact, a jury can credit unsupported testimony

11   and convict people on it.  They just have to be very cautious

12   about that if that person was subject to a cooperation immunity

13   agreement.

14        MR. POLLACK:  Then I accept that, Your Honor, and I

15   think that's a fair point.  Maybe my fix doesn't work.  But we

16   need to find some way to address the underlying problem which

17   is I, as a juror, might believe absolutely everything

18   Mr. Bryant said.  That is not sufficient to convict a number of

19   the defendants.

20        THE COURT:  Yeah, that's true, and that may be, but

21   that may have to boil down to argument because, once again, it

22   goes to Mr. Bryant's actual testimony.  And given the fact that

23   he only testified about three, four of the defendants,

24   obviously Mr. Blake and others would want to, you know, point

25   out to the jury the fact that Mr. Bryant's testimony is quite

1    limited in that respect and even in the best case scenario

2    couldn't extend -- you know, this would be the argument as far

3    as, for instance, Mr. Blake.

4         *MR. POLLACK:*  What if the language were added "unless

5    you believe the unsupported testimony proves each of the

6    elements against a particular defendant beyond a reasonable

7    doubt," because you are about to instruct on what the elements

8    are.

9         *THE COURT:*  Well, the problem with that, if I heard

10   you correctly, it may suggest that the jury had to -- that

11   Mr. Bryant had to do all the lifting on each of the elements.

12        *MR. POLLACK:*  Well, he would if the suggestion is that

13   you could convict based solely on his testimony, that's

14   correct.  The only way you can convict solely on his testimony

15   is if he has done all of the lifting on all of the elements.

16        *THE COURT:*  I am not sure that that's what the case

17   law would support because that would be an odd thing that

18   unsupported testimony would mean that that witness had to get

19   the jury past everything, including interstate commerce or

20   things of that nature.

21        *MR. POLLACK:*  That's the problem with the "You cannot

22   convict" language.  It is inherent that you can't convict

23   unless all the elements have been met, so the only way you

24   could convict solely on Bryant's testimony is if Bryant's

25   testimony met all of the elements.  And it certainly could.  I

 1   can't remember if Mr. Bryant was asked whether the chicken

 2   traveled in interstate.  He may well have been.  But if you are

 3   going to leave the suggestion as I think the current text does

 4   that a jury can convict solely on Mr. Bryant's testimony, then

 5   I think it should be told that that's true only if they find

 6   that Mr. Bryant's testimony -- they can certainly consider it

 7   and give it full credit in conjunction with other evidence, but

 8   what they can't do is convict solely on his testimony unless he

 9   has established all the elements.

10       THE COURT:  My guess is that -- and you are right,

11   it's not specified, but my guess is that the intent of the

12   instruction is to inform the jury that if Mr. Bryant's

13   testimony as to a given defendant is a but-for cause of the

14   conviction, in other words, you wouldn't convict but for

15   Mr. Bryant's unsupported testimony, you know, then you

16   should -- you have to believe it beyond a reasonable doubt.

17   That's my guess.

18       MR. POLLACK:  No, I think that's right.  And you can

19   imagine a lot of cases, a drug case, for example, where a

20   single cooperating witness could be the basis for a conviction,

21   and I think the pattern instruction probably has that type of

22   case in mind and it makes sense in that type of case.  But I

23   just think here I don't think we can leave the suggestion that

24   Mr. Bryant's unsupported testimony, even if you credited it a

25   thousand percent, is alone sufficient to convict all of the

1    defendants because, as you say, his testimony didn't touch a

2    number of the defendants.

3            THE COURT:  Yeah.

4            MR. POLLACK:  So maybe if the Court would be amenable

5    to it, I could give it some thought and propose some language

6    that addresses my concern.

7            THE COURT:  Yeah, think how we might revise it to take

8    that into account because I see your point.  We just have to

9    figure out maybe how to articulate it.

10           Ms. Henry?

11           MS. HENRY:  Your Honor, Mr. Pollack may have gotten a

12   little ahead of himself because I think the draft that Your

13   Honor circulated did not, in fact, include the language "solely

14   on the basis of the unsupported testimony."  I believe that

15   that is an insertion that the government was requesting?  Is

16   that --

17           MR. POLLACK:  I am not focused on word "solely," and

18   it's not in the draft that I have.  I am focused on the fact

19   that it says you cannot convict based on the unsupported

20   testimony unless you believe it beyond a reasonable doubt.  The

21   negative inference of that is that you can convict if you do

22   believe it beyond a reasonable doubt.  And my point is you

23   can't convict even if you believe it beyond a reasonable doubt.

24   So I will try to propose some language, Your Honor.

25           THE COURT:  Okay.  I think Ms. LaBranche was next.

1          MS. LaBRANCHE:  I wanted to follow up on the arguments

2     made by Mr. Feldberg.  We've all noted that this case has been

3     presented to the jury in a way -- real unusual way that frankly

4     I think impacts the credibility of the government's case in

5     general.  And I believe that the instruction that Mr. Feldberg

6     is asking for is necessary because of the unusual circumstances

7     of this case.

8          Essentially the government here has elected not to

9     present witnesses who have knowledge of the facts of the case.

10    And instead what they want to do is they just want to put in --

11    what they actually did is just put in all of these voluminous

12    documents without a sponsoring witness.  They are then going to

13    argue them in closing about what they think these documents

14    mean and what they want the jury to think these documents mean

15    even though we know that there are people -- we, in this room,

16    know that there are people like Carl Pepper who would say that

17    the documents mean different things than the government is

18    going to argue.

19         And I know that we may not be able to make that point

20    to the jury, but we can make the point to the jury that it is

21    the government who has the ability to give immunity in a case

22    and the government alone.  We need the jury to understand that

23    the government, if they wanted to, had the ability to bring

24    more people in and they didn't.  And that's why I think

25    Mr. Feldberg's -- the request for that instruction is so

1    important in this case.

2         THE COURT:  And by instruction, you mean the second

3    instruction that he was talking about as opposed to the

4    Testimony of Robert Bryant instruction?

5         MS. LaBRANCHE:  That is correct.  If I might give the

6    government -- and I actually printed some copies and I have

7    some for the Court as well.

8         THE COURT:  This is excellent.  Sure.

9         MS. LaBRANCHE:  This is a very short instruction, Your

10   Honor, and it refers to the only witness who did receive

11   immunity in this case is based upon 18 U.S.C. 6002, as well the

12   10th Circuit case *United States v. Serrano*.

13        THE COURT:  So why don't we hold that one because we

14   are going to go in order.  So why don't we talk, first of all,

15   about the instruction regarding Mr. Bryant as the Court has

16   included in the packet, and then we will switch over to that

17   next one.

18        Ms. Pletcher, go ahead.

19        MS. PLETCHER:  Thank you, Your Honor.

20        I just have a couple of very small language issues

21   here that I think are material.  In the first sentence, the

22   instruction says, "Robert Bryant, who is subject to an immunity

23   agreement."  But then the second sentence says, "A

24   non-prosecution and cooperation agreement."  I think the jury

25   might be confused as to the difference between the two,

1    immunity agreement versus a non-prosecution.

2           THE COURT:  Here is what I was getting at.  The

3    exhibit that was introduced was labeled -- of course, it was a

4    little bit difficult because -- and this is a material aspect.

5    That's not a Bryant immunity agreement or a cooperation

6    agreement or a plea agreement.  You know, that's something that

7    came out of the Pilgrim's.  So it's an extract, but it's

8    entitled -- it's called immunity agreement.  So that's what it

9    is and that's why I used the phrase immunity agreement there.

10          However, the material paragraphs of it could at least

11   be described as a non-prosecution and a cooperation agreement,

12   and the pattern instructions, you know, talk about those

13   things.  That doesn't mean to say that we can't modify, say,

14   for instance, the second sentence in some way so that it

15   doesn't potentially confuse the jury because there's a

16   divergence between the first sentence use of an immunity

17   agreement and the second sentence talks about something that

18   the jury may think are different things.

19          MS. PLETCHER:  Right.  And I understand what the Court

20   is saying.  And maybe there is enough there for the jury to

21   piece it together to actually look at it, but I would suggest

22   saying instead of "non-prosecution" in the second line -- well,

23   actually in both just referring to "immunity and cooperation

24   agreement" both in the first sentence and the second sentence.

25          THE COURT:  Immunity and cooperation.

1          MS. PLETCHER:  Immunity and cooperation agreement

2     because immunity and non-prosecution aren't the same thing, as

3     I understand it.

4          THE COURT:  That's true.  It's a possibility of using

5     that.

6          MS. PLETCHER:  And the other point I wanted to raise

7     is towards the end of the second paragraph, the line that says,

8     "On the other hand, you should also consider that Mr. Bryant

9     can be prosecuted for perjury for making a false statement."  I

10    would suggest the Court change the term "making" to "having

11    made," since Mr. Bryant did admit that he had made a false

12    statement.

13         THE COURT:  I am not going to do that.  I think that

14    would be heavy-handed and suggest that -- it's a matter of

15    prosecutorial discretion.  It's also a matter of the jury

16    making a determination of that, so I will reject that

17    suggestion.

18         MS. PLETCHER:  Thank you.

19         MR. FAGG:  Very briefly, as it relates to the

20    description of the agreement, Your Honor, one possible solution

21    there would be to call it an immunity and cooperation

22    agreement, and then in the next sentence you could just say

23    this agreement so it's not so wordy.

24         THE COURT:  Yeah, that's -- Mr. Kornfeld?

25         MR. KORNFELD:  Two small points, Your Honor.  At the

1    end of the first paragraph it talks about "determining

2    Mr. Bryant's believability."  I would submit to you that --

3    well, credibility is probably more consistent with other

4    instructions, but given his immunity --

5              THE COURT:  I am sorry, Mr. Kornfeld, where --

6              MR. KORNFELD:  The end of the first paragraph where it

7    says -- second sentence.

8              THE COURT:  Yes.

9              MR. KORNFELD:  I would suggest maybe "believability

10   and credibility," because I think in this instance there are

11   two different concepts.  There are both what he said and his

12   motivations for saying it.  So my suggestion would be first

13   choice "believability and credibility;" second choice, strike

14   "believability," insert "credibility."

15             THE COURT:  I wouldn't do both because the credibility

16   instruction defines those as equal terms in the second

17   paragraph of the credibility instruction, but that's not to say

18   that we can't substitute the word "credibility" if we like that

19   better than believability.  So that's a possibility.  We will

20   see what the government thinks of that, but yeah, the

21   credibility instruction defines those as equal terms.

22             MR. KORNFELD:  And then the second point, and it's a

23   minor one but I think an important one, and that's in the

24   second paragraph where it says you should consider the

25   testimony -- second sentence, "You should consider the

1    testimony of Mr. Bryant."  And then it says, on the other hand,

2    you should also consider that he might be prosecuted.

3            And the "on the other hand" kind of suggests an

4    either/or, and we think it's a conjunctive, not a disjunctive.

5    In other words, I don't think it's one or the other.

6            Thank you, Your Honor.

7            THE COURT:  So the suggestion would be just to remove

8    the term -- or the phrase "on the other hand."

9            MR. KORNFELD:  Exactly.

10           THE COURT:  Okay.

11           All right.  Ms. Cheng, there are quite a few

12   suggestions.  You can take them in any order.

13           MS. CHENG:  All right.  I will begin with some of the

14   last couple of suggestions and then circle back.  With regard

15   to believability and credibility, we agree with the Court it

16   would be confusing to use both of those terms, especially

17   because in the Credibility of Witnesses instruction it says,

18   "You are the sole judges of the credibility or 'believability'

19   of each witness."  And I believe the intention there perhaps

20   was to just put credibility in more common terms for the jury

21   for them to understand.  So we are inclined to stick with what

22   was in the pattern which is this concept of believability.

23           THE COURT:  I think that -- I mean, who uses the term

24   believability?  I don't think anyone does.

25           MS. CHENG:  The pattern does.

1          THE COURT:  I am just thinking who uses the term

2    believability?  That's why maybe we should go with credibility.

3    I would substitute in credibility.

4          MS. CHENG:  That's fair.  Regardless, we would oppose

5    using both of those terms.

6          THE COURT:  Yeah, I agree.  We should not use both

7    because the instruction defines them as equal terms.

8          MS. CHENG:  With regard to the "on the other hand"

9    phrasing, that's straight from the 10th Circuit pattern, and we

10   believe it's important to retain it because it marks a change

11   in sort of how this instruction is talking about the various

12   ways to consider that, just to consider the types of -- to

13   consider what's being mentioned here.

14          So it goes through a series of how Mr. Bryant's

15   testimony should be handled with greater care and caution, how

16   it has been affected by his own interest, promise not to

17   prosecute, et cetera.  And the "on the other hand" I think is

18   an important point for the jury for them to understand that

19   this is a counterpoint and it's not either/or, but rather

20   stands on the other side of the ledger making that

21   determination.  Without it I think it's simply confusing for

22   the jury to really understand how these things change and they

23   might think it's part of the existing list and the direction of

24   the existing list of items.  So that's what we will say on that

25   language.

1        And then circling back sort of to the consideration

2   whether to remove the first sentence of the second paragraph if

3   at all.  We would strongly oppose the removal of the sentence

4   primarily because absent that sentence, this is really putting

5   the Court's imprimatur on Mr. Bryant's testimony as effectively

6   not believable.

7        It starts off by saying, "You heard testimony from

8   Mr. Bryant."  And it begins by saying he deserves greater care

9   and caution.  It's been affected by his interest.  The promise

10  is to not prosecute him.  He might have prejudice.  And then

11  now the defendants also want to remove the final sentence.  So

12  it really just starts off with a litany of reasons not to

13  believe Mr. Bryant.  And for that reason, because it's an

14  accurate statement of the law that it's true that Mr. Bryant's

15  testimony alone, if believed by the jury, can be of sufficient

16  weight to sustain a verdict and it's a true statement, an

17  accurate statement of the law, we believe it's important to

18  have that counterweight there before the litany of reasons

19  effectively for the jury to be wary of his testimony.  So

20  that's the first point.

21        THE COURT:  So let's go back to Mr. Pollack's point.

22  Do you think that the jury could convict all of the defendants

23  based upon the unsupported testimony of Mr. Bryant?

24        MS. CHENG:  So first I will say Mr. Bryant testified

25  to the existence of the conspiracy for which all of the

1    defendants are charged.  And certainly it's not that because

2    Mr. Bryant spoke or focused on particular defendants that none

3    of the other defendants are implicated by his testimony.  He is

4    talking about the existence of an overarching conspiracy that

5    is what the government charged.

6         With regard to the concern that perhaps one or two of

7    the elements of knowing joinder can't be met solely by

8    Mr. Bryant, I think Mr. Pollack's concern is already taken care

9    of by the construction of the sentence which says "To sustain a

10   guilty verdict as to some or all of the defendants."  And that

11   makes it clear to the jury that if the jury decides that his

12   testimony cannot support the conviction of all the defendants,

13   but merely, you know, one or two or several of them that

14   Mr. Bryant gave more testimony about, that I think makes it

15   quite clear to the jury what the correct burden is here and

16   what -- how Mr. Bryant's testimony should be considered.

17        *THE COURT:*  But you didn't answer my question.  So

18   could the testimony of Mr. Bryant sustain a conviction as to

19   all of the defendants?

20        *MS. CHENG:*  Mr. Bryant's testimony can meet I believe

21   the first element with regard to the existence of a conspiracy

22   and interstate commerce which is an overarching element.

23        *THE COURT:*  The existence of a conspiracy that

24   includes everybody?

25        *MS. CHENG:*  Yes, because the existence of the

1    conspiracy --

2        *THE COURT:*  Or the existence of a conspiracy that then

3    other witnesses establish that other people joined?

4        *MS. CHENG:*  That's correct.  The knowing joinder is,

5    of course, going to be specific to each defendant.  And we

6    understand that part of our burden is that, you know, we must

7    show that each defendant knowingly joined the conspiracy.  We

8    do think that Mr. Bryant's testimony is sufficient to sustain a

9    conviction with regard to show that -- to meet that element for

10   some of the defendants for which he described knowing joinder.

11       *THE COURT:*  So then why would we leave in the phrase

12   "or all" if his testimony can't do that?  That would seem to be

13   misleading.

14       *MS. CHENG:*  May I have a moment to confer, please?

15       *THE COURT:*  Sure.

16       *MS. CHENG:*  Your Honor, I am wondering if maybe there

17   is a distinction here in how it's phrased between this sentence

18   we are looking at and the final sentence in this instruction.

19   This final sentence makes it clear to the jury that they cannot

20   convict a defendant based on the unsupported testimony of a

21   witness.  And in contrast, as we were just talking about, is

22   about sustaining a verdict of guilty.  And so his testimony

23   could sustain a verdict of guilty because his testimony

24   provides the necessary elements -- could provide the necessary

25   element with regard to at least some of the -- two of the

1    elements for all of them.

2            THE COURT:  So you like Mr. Feldberg's instruction?

3            MS. CHENG:  No, we do not like Mr. Feldberg's

4    instruction.  I think our proposal would be to perhaps assuming

5    that our team is comfortable with --

6            THE COURT:  You can consult with them and see how

7    comfortable they are.

8            MS. CHENG:  Can I have a moment?

9            THE COURT:  Yeah, sure.

10           MS. CHENG:  So after conferring with the team, we are

11   comfortable removing "or all" from that, from the statement

12   from the first sentence in the second paragraph.

13           THE COURT:  Okay.  I am going to go with

14   Mr. Feldberg's instruction.  Here is why.  If we remove the

15   term "or all," then you'd set off -- you'd trigger all sorts of

16   speculation by the jury as to some?  Oh, yeah, which ones?  And

17   I just don't think that that would be appropriate to do that.

18           I do think that Mr. Feldberg's suggestion that we

19   shift that, the final paragraph, up will appropriately frame

20   the limits of the testimony for the jury.  So I think that that

21   would do the trick there.

22           And as I said, even though there is 10th Circuit

23   authority for the fact that a jury could convict someone on the

24   unsupported testimony of a person, in the case of Mr. Bryant,

25   it wouldn't be all and it would be very difficult to define

1    who, but that last paragraph shifted up I think will

2    appropriately let them know what they could do.

3            MS. CHENG:  I apologize, Your Honor.  Could you please

4    clarify Mr. Feldberg's suggestion?  Is it simply --

5            THE COURT:  Did you get a copy of it?  He did a

6    red-line version of it.

7            MS. CHENG:  Okay.

8            MR. KORNFELD:  Your Honor, while they are

9    consulting --

10           THE COURT:  Let's hold on because while they are

11   consulting, they can't listen to you.

12           MR. KORNFELD:  Fair enough.

13           THE COURT:  And Mr. Feldberg, just so you know, that

14   doesn't mean that we are incorporating -- that we are leaving

15   out some of the things that other people talked about.  It's

16   just the general proposal of Mr. Feldberg.

17           MS. CHENG:  Your Honor, our concern with replacing

18   this first sentence with the last sentence per Mr. Feldberg's

19   proposal is that -- is related to the concern I expressed at

20   the beginning, which is that it really becomes an instruction

21   with the Court's weight behind it effectively saying that

22   Mr. Bryant's testimony doesn't really carry weight.  And if

23   you -- I mean, as Mr. Feldberg proposed it, really this

24   instruction is saying you can't convict a defendant based on

25   unsupported Mr. Bryant.  You need greater care with him.  You

1    need to consider whether he has been affected.  He, you know,

2    he might have an interest in the outcome of the case and he has

3    prejudice.

4          And just going through that litany, I think this

5    becomes a very one-sided instruction.  And it no longer is

6    about really the believability or the weight of his testimony

7    and really becomes, at least in our perspective, heavily

8    weighted against his testimony and effectively saying he is not

9    quite believable.  And for that reason I think -- and my

10   suspicion is it's part of why the 10th Circuit instruction had

11   that statement in here is to try to right that balance.

12   Otherwise, I think it simply just reads as the Court saying

13   that Mr. Bryant may not be believable.

14        *THE COURT:*  By its nature an immunized witness is

15   going to have cautionary things, so the 10th Circuit is not

16   worried about balance.  It's not trying to make sure that the

17   jury thinks he is a good guy too, but rather it provides those

18   cautionary things and that's just inherent in the process.  But

19   yeah, I wouldn't have a problem including that language that

20   Mr. Feldberg's instruction takes out.

21        The problem is that by the nature of Mr. Bryant's

22   testimony, it's difficult to consider the concept.  And we

23   would then -- there is a real danger that the Court would be

24   perceived, for instance, if it identified who the jury could

25   consider, it would unduly emphasize the testimony, I think, and

1    trigger some speculation.  So that's why I think that the

2    reorganization that Mr. Feldberg provided provides the essence

3    of what the government believes, you know, would be the

4    appropriate limitation, but without getting into a very tricky

5    and potentially confusing issue.

6           MS. CHENG:  Your Honor, would it address your concern

7    if we retained the order of the sentences as originally given

8    in the pattern, and instead of saying "some or all" simply said

9    "a," so that it matches the final sentence, which is, "You

10   should not convict defendant."  And this way instead of

11   saying "some," we say "a defendant," so that there is no

12   speculation on the part of the jury about who those defendants

13   may be.

14          MR. FELDBERG:  May I respond, Your Honor?

15          THE COURT:  Yes.  Go ahead, Mr. Feldberg.

16          MR. FELDBERG:  I think that would be duplicative.  The

17   sentence that was the third paragraph and is now moved up to

18   the second paragraph in our proposal has the balancing language

19   that the prosecution is concerned about and the Court frankly

20   wants to include.  It's got both, "You shouldn't convict based

21   on a defendant based on the unsupported testimony of a witness

22   unless you believe the unsupported testimony beyond a

23   reasonable doubt."  So it's got both the yin and the yang here,

24   the good and the bad, and that's the balance.  And essentially

25   saying it again in the next sentence would be duplicative.

1          *THE COURT:*  Ms. Cheng, anything else?

2          *MS. CHENG:*  Your Honor, if you look at the two

3     sentences we are really talking about, the red and the green in

4     the copy from Mr. Feldberg, they are really in some ways two

5     sides of the coin.  And I think to only include the

6     construction that is negative towards Mr. Bryant's testimony,

7     and I am not going to repeat myself too much, but I want to

8     emphasize again how to the government this really becomes an

9     instruction talking only about greater care and not about the

10    counterbalance which is -- and I understand the Court's point

11    about the 10th Circuit's concerns here, but specifically in

12    this instruction we think that it would otherwise be much too

13    weighted against Mr. Bryant's testimony.

14         And with the addition of "a" instead of "some or all,"

15    that will address Mr. Pollack's concerns.  And we can avoid

16    deviating too much from the pattern by keeping both of those

17    sentences in the place they were in.  With the simple change of

18    "some or all" to "a," I think that addresses a lot of the

19    things we are talking about without weighing this instruction

20    so it becomes one-sided against Mr. Bryant's testimony.

21         *THE COURT:*  All right.  Mr. Fagg, let me go back to

22    that point that you made about the first paragraph.  How did

23    you propose the shorthand reference in the second sentence?

24    For instance, if we were to say, "Subject to an immunity and

25    cooperation agreement," did you suggest that we say "such an

 1   agreement is not evidence of guilt"?

 2        MR. FAGG:  This agreement.

 3        THE COURT:  This agreement?  Okay.  Mr. Fagg, go

 4   ahead.

 5        MR. FAGG:  That was it.  I was just responding.

 6        THE COURT:  Here is my ruling on this one.  I am going

 7   to adopt Mr. Fagg's suggestion as to that, the language of the

 8   first.  As Mr. Pletcher and Mr. Fagg's point, we'll say "who is

 9   subject to an immunity and cooperation agreement with the

10   government.  This agreement is not evidence of the guilt of any

11   of the defendants and you may consider it only in determining

12   Mr. Bryant's credibility."

13        After that I will adopt Mr. Feldberg's revision except

14   for in what is now the third paragraph where he proposes

15   striking out the name of Mr. Bryant.  I will leave Mr. Bryant's

16   name in there, but otherwise that's what we'll do.  I also am

17   going to overrule the objection to the phrase "on the other

18   hand."  I do believe that that is an appropriate sign posting

19   that will assist the jury in how it should appropriately

20   consider the different factors regarding Mr. Bryant, so I won't

21   adopt that one.

22        Mr. Pollack, did you have a chance to come up with

23   that language?  Or if you wanted to defer your suggestion until

24   later, we could do that too.  Go ahead.

25        MR. POLLACK:  Yes, Your Honor.  I do have a

1    suggestion.  So we moved the sentence that I was concerned

2    about, but we haven't addressed the concern.  So it seems to me

3    that the sentence is dealing with a situation where we are both

4    talking about convicting a defendant and we're talking about

5    doing it solely on Mr. Bryant's testimony.  And while I don't

6    think you got a direct answer, I think it was pretty clear from

7    the government that the answer is no, not all of the elements

8    are met against each of the defendants, even if you fully

9    believe Mr. Bryant.

10          So I guess the first point is rather than "You should

11   not convict," I would say "You may not convict" or "cannot

12   convict a defendant based on the unsupported testimony of a

13   witness who has entered into a non-prosecution or a cooperation

14   agreement or immunity agreement" -- I am indifferent as to how

15   that is characterized -- "unless you believe that the

16   unsupported testimony proves that defendant's guilt beyond a

17   reasonable doubt."

18          And I think that --

19          THE COURT:  Can you say that again, Mr. Pollack?

20   Unless you conclude did you say?

21          MR. POLLACK:  Yes.  You may not convict a defendant

22   based on the unsupported testimony of a witness who has entered

23   into a non-prosecution --

24          THE COURT:  We will use the phrase "immunity or

25   cooperation agreement" to be consistent.  Go ahead.

1          MR. POLLACK:  And that's fine.  Unless you believe

2    that the unsupported testimony proves that defendant's guilt

3    beyond a reasonable doubt.

4          THE COURT:  Okay.  Let's get the government's reaction

5    to that.

6          MR. KORNFELD:  May I propose just a friendly amendment

7    to that language?

8          THE COURT:  Sure.

9          MR. KORNFELD:  At the beginning it says "should."

10   Actually when Mr. Pollack read it, he said, "You may not

11   convict."  I think "may" or "must" for reasons we have talked

12   about in other contexts is appropriate here.

13         THE COURT:  Yeah, do you accept that friendly

14   amendment?

15         MR. POLLACK:  I had thought that was part of my

16   proposal already, so I do accept it, yes.

17         MS. CHENG:  So, Your Honor, we object to Mr. Pollack's

18   suggestion here.  The reason is that with the current phrasing,

19   you know, you should or may or must not convict a defendant

20   unless -- based on the unsupported testimony unless you believe

21   the unsupported testimony proves a certain defendant's guilt.

22   I think from the jury's perspective this creates the suggestion

23   that, for example, Mr. Bryant's testimony cannot be used at all

24   against, say, Defendant Blake.  But that's not the case because

25   Mr. Bryant's testimony can still meet the requirements for the

1    other elements even if he does not specifically identify some

2    of the defendants.

3         And the reason we believe that is lawyers, of course,

4    we can maybe parse through the sentence that's proposed and

5    suggest -- and think, okay, well that means that maybe he can

6    meet two of the elements, but not three of the elements as to

7    one or two of the defendants, but it's unlikely that a jury

8    will think that way.  And instead, what the jury -- and our

9    concern is that the jury will take away from this new proposed

10   instruction is that we can only consider Mr. Bryant's testimony

11   against particular defendants and we can't consider that

12   testimony against, say, Defendant Blake.  And we believe that

13   would be how it would be construed by a jury.  And changing the

14   instruction to change that would create that effect.

15        THE COURT:  Okay.  Mr. Pollack, anything else?

16        MR. POLLACK:  No, Your Honor.  This sentence is only

17   talking about the conditions under which you could convict

18   solely based on Mr. Bryant's testimony.  It's not saying

19   anything to suggest that you have to disregard his testimony in

20   its entirety if you don't convict based on the testimony, so I

21   just don't think that that is an issue.

22        If the government doesn't like talking about how you

23   could convict based solely on his testimony, I wouldn't have a

24   problem just omitting this sentence altogether.  But my

25   objection is having a sentence in there that suggests by

1   negative inference that you could convict solely on his

2   testimony.

3          THE COURT:  Okay.  Yeah, I am going to reject

4   Mr. Pollack's proposed language, although I am going to try to

5   take a look at it over lunch.  We are going to see if we can

6   find anything about that.  I think it goes back to the issue we

7   were talking about whether the instruction is getting at a

8   but-for reason to convict.  As I mentioned before, I don't

9   think that the unsupported testimony of a given witness has to

10  prove each of the elements, and I do have a concern that the

11  proposed language would suggest that Mr. Bryant's testimony, at

12  least the unsupported aspects of it, would have to do that.

13         And, of course, it would be illogical because you

14  would rarely, if ever, have a situation where a given witness'

15  unsupported evidence would, say, prove interstate commerce

16  because, of course, the government is going to put in

17  interstate commerce evidence.  So it wouldn't make sense to do

18  that.

19         MR. POLLACK:  Is the Court's concern that even though

20  by its terms this sentence is only talking about the conditions

21  under which you could convict solely on Bryant's testimony,

22  that somehow there is some suggestion that by saying that, that

23  that suggests that you can't consider his testimony in

24  conjunction with other testimony or other evidence and that

25  Bryant has to carry the laboring oar all by himself?  Is that

1    the Court's concern?

2           THE COURT:  In part.  What I think the statement which

3    is now the second paragraph means is that if as to a given

4    defendant the jury would not convict but for some testimony of

5    Mr. Bryant, not, you know, as to interstate commerce or

6    something, but, you know, on one of the other elements, for

7    instance, then you would have to, you know, believe that

8    unsupported testimony beyond a reasonable doubt.  It's a little

9    bit odd because, of course, the jury has to believe everything

10   beyond a reasonable doubt, but I wouldn't want to suggest to

11   the jury that the testimony of a given witness has to meet each

12   of the elements of the offense.

13          MR. POLLACK:  I think I understand, Your Honor.  And

14   maybe a suggestion as to how to deal with that would not be to

15   alter the sentence that we just discussed, but maybe to add an

16   additional sentence, something to the effect of "To the extent

17   you give weight to Mr. Bryant's testimony and find it relevant

18   to any particular defendant, you can consider his testimony

19   along with all the other evidence in considering whether the

20   government has proven the guilt of that defendant beyond a

21   reasonable doubt."

22          THE COURT:  True.  However, that might dilute some of

23   the rest of the -- of this instruction.  You know, we have the

24   general credibility instruction which talks about those

25   concepts.  I am worried if we put that in here, it may dilute

1    this one, which is trying to caution the jury in regard to

2    Mr. Bryant given the fact that he is subject to the agreement.

3          MR. POLLACK:  And obviously, I don't want to do that.

4    To me, the simplest solution is simply to take out the

5    sentence.  I mean, the sentence about conviction based on his

6    testimony alone --

7          THE COURT:  We are taking that out.

8          MR. POLLACK:  The sentence that Mr. Feldberg moved?

9          THE COURT:  Not that one.  The one that talks about

10   his testimony alone, that one's going out.

11         MR. POLLACK:  Okay.  But to me this sentence also

12   talks about his testimony alone.  It talks about the

13   unsupported testimony of this witness.

14         THE COURT:  Yes, right.

15         MR. POLLACK:  So this sentence that is specifically

16   about the conditions under which a jury could convict based

17   solely on Mr. Bryant's testimony, the problem with having it in

18   standing alone is I think both sides are concerned about the

19   negative inference of having that stand alone.  I am concerned

20   about the inference that you could convict based on his

21   testimony if you believe it.  The government's concern or the

22   Court's concern that there is a negative inference that if it's

23   the but-for causation, you can't convict regardless of what the

24   other evidence is.

25         And so one way to deal with that is to deal with each

 1    of our concerns about the negative implications of that

 2    sentence.  Another way to deal with it would simply be to take

 3    the sentence out altogether.  And I frankly, I think the latter

 4    is the simpler, but -- and maybe we all need to give further

 5    thought on how to do it, but I do believe that if the sentence

 6    is in there, it leaves a strong negative implication that one

 7    could convict solely on Bryant's unsupported testimony if one

 8    believes Bryant.  And I think the government has at least

 9    implicitly conceded that that is not true.

10         THE COURT:  Why don't we do this.  Mr. Pollack, why

11    don't you work on perhaps an additional sentence to add either

12    to this instruction or another one.  And we'll go back to that.

13    I think what we'll do is we'll take our mid-morning break now

14    unless Ms. Cheng has a burning issue she wants to bring up real

15    quick.

16         MS. CHENG:  Just a quick point that the government

17    would not oppose removing the sentence that Mr. Pollack was

18    talking about.

19         THE COURT:  So remove the entire second paragraph?

20         MS. CHENG:  The new second -- yes, the new second

21    paragraph that's in the green text that was previously the last

22    paragraph.

23         THE COURT:  Okay.  Well, let's have people think about

24    that over the break, although Mr. Tubach apparently has

25    something to interject real quick.

1          *MR. TUBACH:*  One issue, Your Honor.  With the Court's

2     permission, I would like to be excused for the remainder of

3     today's proceedings.  Ms. Pletcher will be here to carefully

4     safeguard Ms. Penn and Scott Shafer, one of our colleagues,

5     will be sitting here.

6          *THE COURT:*  Yes, that's perfectly fine.  So is 15

7     minutes good for everyone?  Does that work?  Why don't we take

8     15 minutes and plan on reconvening at 25 of 11:00.  The Court

9     will be in recess.

10         (Recess at 10:21 a.m.)

11         (Reconvened at 10:40 a.m.)

12         *THE COURT:*  Mr. Feldberg, go ahead.

13         *MR. FELDBERG:*  Right before the break, I believe

14    Ms. Cheng said the prosecution's position was that we should

15    eliminate the second paragraph or they will be fine with

16    eliminating the second paragraph in the Feldberg redraft of the

17    Bryant charge, the green version.  And I think I speak for all

18    of defense counsel that we are okay with that.

19         *THE COURT:*  I figured as much.  Now Ms. Cheng is

20    thinking to herself, should I reconsider?

21         Okay.  Ms. Cheng?

22         *MS. CHENG:*  That sounds good.  Just one point of

23    clarification.  So the sentence -- the second paragraph would

24    begin with, "You should consider the testimony of Mr. Bryant

25    with greater care and caution."  And the instruction would end

1    with the sentence starting, "After considering these things,"

2    correct?

3            THE COURT:  Hold on.  Let me find the Feldberg

4    variation.

5            Go ahead.  Ms. Cheng.

6            MS. CHENG:  So to confirm, the second paragraph would

7    now begin with, "You should consider the testimony of

8    Mr. Bryant with greater care and caution."  And it ends with,

9    "After considering these things, you may give his testimony

10   such weight;" is that correct?

11           THE COURT:  "As you feel it deserves."

12           MS. CHENG:  Exactly.  And there is no sentence after

13   that.

14           THE COURT:  That's correct.

15           MS. CHENG:  Thank you.  With that clarification, I

16   believe we are comfortable with the Feldberg variation.  Thank

17   you.

18           And that works for you, Mr. Pollack?  It sounds like

19   it.

20           MR. POLLACK:  Yes, Your Honor.  As I indicated, I

21   think that is actually the simplest solution that deals with

22   all the problems that that sentence would have created.

23           THE COURT:  Okay, great.  So we will revise that

24   accordingly.

25           Then let's go to Mr. Feldberg's proposed instruction

1  regarding the government having exclusive immunity granting

2  authority.

3          Ms. Cheng?  You mentioned something.  I don't know if

4  I gave you a full opportunity to state the government's

5  position as to that instruction.

6          MS. CHENG:  Apologies, Your Honor.  Just one moment.

7          THE COURT:  That's all right.

8          MS. CHENG:  All right.  So the government would oppose

9  this additional paragraph or separate instruction.  In *Serrano*

10  there was actually testimony in that case that the DOJ had

11  power over non-prosecution.  Here we don't have that kind of

12  testimony, although defendants are certainly free to make that

13  argument in their closing.  But I think including this

14  additional paragraph makes it seem like it's somehow improper

15  to give immunity and would be at odds with what we -- with the

16  instruction we just discussed where it is part of a proper

17  process that certain conspirators may or witnesses may receive

18  immunity.

19          THE COURT:  Okay.  Mr. Feldberg or anyone else?

20          MR. FELDBERG:  I would defer to Ms. LaBranche.  And

21  also I would say there is nothing in here that suggests

22  anything improper about immunity.

23          MS. LaBRANCHE:  What happened in the *Serrano* case,

24  Your Honor, is defendants tried to call a couple witnesses who

25  then took the Fifth.  The defendants wanted the Court to grant

1    them use immunity and the government would not ask for

2    immunity, so no immunity was granted in that case.  So I am not

3    sure what testimony the government is referring to.

4         I would just say this is relevant to this case.  It's

5    the law.  There is nothing controversial about it.  And again,

6    because the government has elected to present the case this way

7    without witnesses with knowledge of the documents or knowledge

8    of the facts, despite the fact that they have this incredible

9    power to give immunity to a witness that no one else in this

10   courtroom has, I think the jury needs to be instructed on that

11   so that they can consider that.  The government was in a unique

12   position to bring in any witness they wanted to and they still

13   didn't bring witnesses in.

14        *THE COURT:*  Okay.  Anyone else?

15        Ms. Cheng, anything more from you?

16        *MS. CHENG:*  Your Honor, our position remains that it's

17   just not relevant to the case.  A lot of the arguments

18   Ms. LaBranche just made can certainly be made in other -- it

19   should not be included in a jury instruction from our

20   perspective.

21        *THE COURT:*  I am going to strike the last sentence of

22   the proposed instruction, but I am going to give this as a

23   separate instruction otherwise.  I am going to make the term

24   "government" lower case to conform with the other instructions,

25   but I will give that right after the Bryant instruction.  It is

1    the law and I think it's appropriate.  The second sentence,

2    though, is the flip-side of the coin.  I don't think that

3    that's necessary.

4            *MS. LaBRANCHE:*  Your Honor, I am wondering if to be

5    consistent with the changes we just made in the last

6    instruction, should the language --

7            *THE COURT:*  Yes, you are right.  So it will say

8    "immunity and cooperation agreement."

9            Ms. Cheng?

10           *MS. CHENG:*  If the Court is inclined to give this

11   instruction, may we please suggest it be included as part of

12   the instruction currently with the heading Testimony of Robert

13   Bryant?  It seems to us having two separate instructions both

14   specifically naming Robert Bryant and both implying --

15           *THE COURT:*  It could.  Where would you suggest putting

16   it?

17           *MS. CHENG:*  Perhaps just at the very end or perhaps

18   after the first paragraph.  And just to avoid duplication we

19   could simply put --

20           *THE COURT:*  We could end the first paragraph with

21   that, with the second sentence.

22           *MS. CHENG:*  Yes, Your Honor.  That would be our

23   preferred method if the Court is inclined to give this.

24           *THE COURT:*  Mr. Feldberg or Ms. LaBranche, what do you

25   think of that suggestion?

1          MS. LaBRANCHE:  Can I have just one moment, Your

2     Honor?

3          THE COURT:  Yes.

4          MR. FELDBERG:  May I just confer for a moment?

5          THE COURT:  Yes.

6          MS. LaBRANCHE:  Your Honor, I think it may just

7     structurally make more sense to -- if the Court is going to put

8     them in one -- can you hear me?

9          THE COURT:  Yeah.

10         MS. LaBRANCHE:  If the Court is going to put it into

11    the Testimony of Robbie Bryant instruction, it seems like then

12    it should just be the second sentence.

13         THE COURT:  Yes.

14         MS. LaBRANCHE:  And I would suggest it go after the

15    first sentence in the Testimony of Robbie Bryant.

16         THE COURT:  That's the other logical place for it,

17    although the disadvantage of putting it there is it breaks up

18    the reference to an agreement because then in the very next

19    sentence the way it's written now it says, "this agreement."

20    For that reason it may make more sense to have it be the last

21    sentence in the first paragraph.

22         MS. LaBRANCHE:  It seems out of place to me there.  If

23    it's not going to be the second sentence, I would prefer it be

24    a separate instruction.

25         THE COURT:  I think it makes sense not to do a

1    separate instruction because you have the repetitive first

2    sentence, but we could either put it as the second sentence of

3    Mr. Feldberg's proposed instruction on the government has a

4    right to grant immunity, we could have it as the very last

5    sentence of the instruction.  We could have it as the last

6    sentence of the first paragraph or if the government finds it

7    acceptable, we could put it as the second sentence in the first

8    paragraph.

9            Ms. Cheng, what do you think of that?

10           MS. CHENG:  We are comfortable with it either being

11   the second sentence in the first paragraph.

12           THE COURT:  Let's make it the second sentence, then,

13   pursuant to Ms. LaBranche's suggestion.  So the second sentence

14   of the instruction on Mr. Bryant will read now, "The government

15   has exclusively authority to grant immunity to a witness," and

16   then it will go on from there, okay?

17           All right.  We will make that revision.  Then we get

18   to a stock instruction about the Jury's Recollection Controls.

19   Any issues with that?

20           All right.  Now we get to the Elements of the Offense.

21           MR. POLLACK:  Your Honor, I do have a suggestion or

22   proposal before we get to the elements.

23           THE COURT:  Okay, sure.

24           MS. PREWITT:  Before we get to that, I would ask to be

25   excused if I can.  Ms. LaBranche is here with Mr. Mulrenin.

1          THE COURT:  You may.

2          MS. PREWITT:  Thank you, Your Honor.

3          THE COURT:  Sure.

4          MR. POLLACK:  I often find, Your Honor, when I head to

5     the podium, others start heading to the exits.

6          THE COURT:  No inference should be drawn I am sure.

7          MR. POLLACK:  Your Honor, throughout the elements

8     instructions there are references to the defendant.  The Court

9     gives a multiple defendants instruction but gives it much later

10    on, almost to the end of the instructions well after the

11    elements.  My proposal would be to move the multiple defendants

12    to immediately precede the elements, so when they are hearing

13    about the elements and what needs to be proved against the

14    defendant, they already have in mind that that's an

15    individualized determination they are going to have to make 10

16    times.

17         THE COURT:  I don't have any problem with that.  That

18    may make good sense and may be good to put that in context when

19    they are hearing the substantive instructions.

20         Anyone have a problem with Mr. Pollack's suggestion?

21    So would you want that right before the elements instruction?

22         MR. POLLACK:  Yeah, so it would go immediately after

23    the instruction about the Jury's Recollection Controls before

24    you start with the instructions about the elements themselves.

25         THE COURT:  Is that good for everybody?  Yup, we will

1    do that.

2           MR. POLLACK:  And then, Your Honor, there is an

3    instruction that I would like to propose that I think would

4    naturally follow the multiple defendants instruction.  It's a

5    standard instruction from the Sand Instructions Treatise and

6    it's Sand Instruction 58-9.  And I am sure we have a written

7    copy or can get one to hand up to the Court, but it is entitled

8    Common Defense.

9           But the instruction reads:  To help in the

10   administration of the trial, I have asked defense counsel to

11   cooperate in order to promote efficiency.  They have been

12   required to sit together and encouraged for our benefit to

13   cooperate and to join together in examining witnesses and

14   presenting their defenses.  This does not constitute evidence

15   that their clients were previously associated in any conspiracy

16   and you must draw no inference from their common defense

17   efforts.

18          THE COURT:  Yeah, I don't have a problem with that,

19   but I think we need to play with the language.  For one thing,

20   I would not give the jury any instruction that I have told

21   people to cooperate because I didn't.  There is a natural

22   inference that people -- and the jury would have observed

23   evidence of, you know, I hate to use these loaded terms, but

24   cooperation or things of that nature.  And for that reason I

25   don't mind an instruction that would caution the jury don't

4563

1    draw anything from that.

2           I don't like the sitting together point because what

3    are you going to do?  You know, sit elsewhere?  Appear by

4    video?

5           MR. POLLACK:  If we had -- each defendant might have a

6    separate defense table as they are sitting with their own

7    counsel as opposed to I am sitting with Mr. Kantola and his

8    counsel, so that's the only point there.

9           THE COURT:  I see.  I don't mind if we could figure

10   out a way to change the wording a little bit on it, but I think

11   that that's -- that would be an appropriate instruction and

12   probably an appropriate placement of that instruction, although

13   it could go other places as well, but --

14          MR. POLLACK:  Would the Court just like to take the

15   standard instruction and make its own instruction?

16          THE COURT:  Why don't you make an attempt at that,

17   Mr. Pollack.  I will too over the lunch hour.  And let's come

18   up with something that would make sure that the jury

19   understands that -- maybe you would make the reference of

20   sitting at the same tables or something of that nature, but

21   yeah, I am very open to that.

22          MR. POLLACK:  Okay.  Thank you, Your Honor.

23          MR. KORNFELD:  Your Honor, the timing of this request

24   is purely coincidental, but may I also be excused?

25          THE COURT:  Very, you very politely decided not to do

1    it when Mr. Pollack was going to the podium.

2         MR. KORNFELD:  I didn't want him to get a complex.

3         MR. LAVINE:  Your Honor, I don't want to add to

4    Mr. Pollack's concerns, but may I also be excused?

5         THE COURT:  Yes.

6         MR. BYRNE:  The floodgate is now open, so may I?

7         THE COURT:  That's fine, as long as the person who has

8    authority to make decisions on behalf of a client remains.  You

9    don't all have to be present, so ...

10        We will work on the instruction that we just talked

11   about.

12        Let's now turn our attention to Elements of the

13   Offense.

14        Ms. Pletcher, go ahead.

15        MS. PLETCHER:  Yes, Your Honor.  In understanding what

16   the Court said earlier today about objections that have been

17   previously made throughout the trial, they are still standing

18   now?

19        THE COURT:  No, I didn't say that, actually.  What I

20   meant to suggest is that if we split our discussion of the jury

21   instructions into two portions, this morning and then a more

22   formal jury instruction conference after the Court has

23   incorporated the revisions, then you would have a tendency for

24   lawyers to incorporate the morning's objections in it and you

25   don't gain the benefit of doing a, "formal jury instruction

1    conference." You need to articulate any objections to the

2    instructions this morning or this afternoon, whenever, and

3    should not rely upon some objection that was made on day two or

4    even before the trial started.  So yeah, you do need to

5    articulate any objections that you have today at some point.

6         MS. PLETCHER:  Thank you for that clarification.  I

7    don't want to try the Court's patience here because you have

8    heard this one before and for the record we will make it again.

9         THE COURT:  It can be a shorthand notation, whatever

10   you want to make for the record.

11        MS. PLETCHER:  Sure.  With respect to the elements of

12   the offense, the defendants have previously argued that the

13   question is whether the allegations refer to a per se offense

14   or a rule of reason offense.  Defendants do believe that the

15   allegations set forth are a rule of reason case, and there

16   should be, as defendants have proposed in our proposed

17   instructions, an element here requiring the jury to find that

18   the restraint of trade was unreasonable.

19        Beyond that I have just two --

20        THE COURT:  And I will reject that at this time for

21   the reasons that are previously noted in some of my rulings,

22   but the government I do believe has charged this as a per se

23   case.  The nature of the conduct charged is I believe clearly a

24   per se case, and for that reason I do believe that the rule of

25   reason does not apply.  So I will reject that argument.

1          Go ahead, Ms. Pletcher.

2          MS. PLETCHER:  Thank you, Your Honor.

3          And two comments with respect to language.  On the

4     second paragraph of the proposed instruction, "To find a

5     defendant guilty of this crime, you must be convinced that the

6     government has proved each of the following elements against

7     him."  I would suggest that we replace that with "against each

8     defendant," again to be very clear that --

9          THE COURT:  Well, the paragraph says "a defendant," so

10    it's limited already, "To find a defendant guilty," so it

11    doesn't say to find defendants guilty or it doesn't say some or

12    all.  Instead, it just says one.  That's why consistent with

13    that I used the term "him."

14         MS. PLETCHER:  I understand.  Perhaps with

15    Mr. Pollack's addition of his instruction prior to this one

16    that clarifies each defendant is different, that resolves the

17    concern that I had.

18         THE COURT:  For that reason, it may be a good

19    placement, sure.

20         MS. PLETCHER:  The other one was in the very end, the

21    last sentence, "then you should find the defendant not guilty,"

22    would suggest that that "should" be changed to a "must."

23         THE COURT:  Yeah, we changed that already.

24         MS. PLETCHER:  Okay, great.  That's all.  Thank you.

25         THE COURT:  Mr. Byrne, you are exiting, yes.  No

1    problem.

2         Ms. Henry, go ahead.

3         *MS. HENRY:*  Your Honor, just for the record and to

4    make it clear, the issue on the unreasonable restraint element,

5    we want to point out that not just for the reasons that we've

6    stated earlier, but after we're now at the point where the

7    evidence has come in, we believe that based on the evidence

8    that has come in that there is especially immunity to look at

9    it under the rule of reason.

10        *THE COURT:*  And I will reject that suggestion as well.

11   I think that once again, even taking a look at all the evidence

12   as it has come in and has concluded, the Court still considers

13   this to be a charge of a per se violation and the evidence

14   would support it being characterized as a per se violation, so

15   I would not add any rule of reason language.

16        Ms. Cheng?

17        *MS. CHENG:*  Your Honor, a quick point on the change

18   from "should" to "must" in the last sentence here.  For

19   symmetry and accuracy, I think we should also change the

20   preceding paragraph where if the jury finds the elements are

21   proved beyond a reasonable doubt, then you must find the

22   defendant guilty as well.  Otherwise, it would be inviting some

23   type of jury nullification in thinking that if we find all the

24   elements are met, we can do whatever we want; but if we find

25   they are not met, we definitely must find the defendant not

1     guilty.

2           THE COURT:  Which may be why the 10th Circuit --

3     actually, I didn't find that in the 10th Circuit patterns, but

4     it may be one reason why the word "should" is used in both

5     places.  I am not sure and would need to check whether it would

6     be appropriate to tell the jury that they must.  I am just not

7     sure about that.  I know what you mean about the jury

8     nullification issue.

9           MS. CHENG:  And I think it just invites that thinking

10    if the language is different.

11          THE COURT:  It could.  Yeah, you are right, it could.

12    If there is a differentiation, the jury then thinks about, you

13    know, is wondering what the difference could be.  It actually

14    could be a little bit strange in that regard.  So I would

15    invite the government to take a look at that issue over the

16    lunch hour and try to see if there has been -- if there is some

17    case law about that, whether if you tell the jury that, you

18    know, if you find the elements beyond a reasonable doubt, you

19    must convict.  I am not sure.

20          MS. CHENG:  Understood, Your Honor.  We will certainly

21    do that.  Another option, of course, is to keep them both as

22    "should," which would be the government's preferred method, but

23    if we were to change it, we will certainly look into the case

24    law and get back to you after the lunch break.

25          THE COURT:  Right.  That's a good point.  Thank you.

1        Anyone else on the elements?

2        Ms. LaBranche, did you have anything?

3        Okay.  All right.  On or About.  I think we have

4    tracked the language from the Indictment, but everyone good

5    with On or About?

6        Now, Per Se Violation.

7        MR. FAGG:  With regard to the On or About instruction,

8    we actually don't believe that this instruction makes sense in

9    this case.  "The Indictment charges the crime was committed

10   beginning at least as early at 2012 and continuing through

11   2019.  The government must prove beyond a reasonable doubt that

12   a defendant committed the crime reasonably near those dates."

13   I don't even know what that means and I am not sure how the

14   jury would know what that means.

15       THE COURT:  Sure, yeah.  Right.

16       Ms. Cheng, response?

17       MS. CHENG:  Your Honor, I am not sure what the

18   alternative proposal is here.

19       THE COURT:  I think that Mr. Fagg's proposal, but he

20   can correct me if I'm wrong, is that the way that it's charged

21   is already on or about, that you don't need to add another

22   layer of on or about to it because it's not specific anyway.

23   And as a result, the jury would not run the risk of

24   inappropriately holding the government to some actual date when

25   the government simply needs to prove on or about.

1            MS. CHENG:  I see.  So is the suggestion that we don't

2      include this instruction at all?

3            THE COURT:  I think that's the suggestion.

4            MS. HENRY:  I just wish to make it clear that I am not

5      adopting that objection.

6            THE COURT:  So Ms. Henry, Mr. Kantola would prefer

7      this instruction?

8            MS. HENRY:  Correct.

9            THE COURT:  Understood.

10           And Mr. Fagg, was that your suggestion that why do we

11     even need this instruction?

12           MR. FAGG:  I wasn't sure exactly what it means, Your

13     Honor.  I didn't have necessarily a proposal or alternative

14     language here, but I am happy to think about it.

15           THE COURT:  Sure.

16           MS. CHENG:  What about this proposal, which is we meld

17     the sentences together, say the government must prove beyond a

18     reasonable doubt that a defendant committed the crime

19     reasonably near.

20           THE COURT:  Let's think about this.  If it's not that

21     big of a deal, but Ms. Henry on behalf of Mr. Kantola likes it,

22     maybe we just leave it in.

23           MS. CHENG:  We are comfortable with it as written.

24     The government would have no objection to that.

25           THE COURT:  Okay.  All right.  If someone has a change

1    of mind on that, but otherwise why don't we just leave it as is

2    if Mr. Kantola prefers it, the government likes it and Mr. Fagg

3    doesn't seem, you know, that it's that problematic.  You just

4    have some questions about why.

5            MR. FAGG:  That's fair, Your Honor.

6            THE COURT:  All right.  Now let's turn our attention

7    to Per Se Violation of Antitrust Laws.  I know I think

8    Mr. Beller had mentioned some issues yesterday, but anyone who

9    wants to start can do so.

10            MR. BELLER:  Your Honor, if I voiced issues, it was by

11    mistake, because I can't recall what they are now.

12            THE COURT:  I think one person, someone, I thought it

13    was you, said hey, the government didn't even propose this one,

14    although the government isn't objecting to it now.

15            MS. HENRY:  If nobody else will object to it, I

16    definitely object to the inclusion of the per se instruction.

17    Again, we -- the government did not request it.  It's

18    duplicative, not needed, and we see no reason for it to be in

19    there.  And we believe that it is contrary to what was

20    presented at trial and otherwise inappropriate.

21            THE COURT:  Okay.  Mr. Fagg?

22            MR. FAGG:  Sure, Your Honor.

23            I was just trying to find my notes unsuccessfully.  So

24    we do believe that -- once Ms. Henry said this instruction is

25    unnecessary, we also believe that, and the fact that the

1  government hadn't requested it.  We think that the elements of

2  an antitrust charge are covered in the instructions that come

3  after this and believe that this instruction as it's written

4  expands out that definition of what a violation of the Sherman

5  Act is, particularly as it relates to this case.  And I think

6  it's unnecessary as a stand-alone instruction.

7           THE COURT:  Anyone else?

8           MS. PLETCHER:  We agree with Mr. Fagg and Ms. Henry

9  that this particular instruction is unnecessary, but also

10 highlights the problem that we objected to earlier with respect

11 to the elements of the offense for the jury to be able to find

12 that the alleged conspiracy is unreasonable.  And this

13 instruction kind of highlights the fact that the government is

14 relying on a presumption of per se nature of the offense and

15 that that takes away an element for the jury to decide.  So it

16 compounds the problems that we identified with the earlier

17 instruction identifying nature, the three elements of the

18 offense.

19          THE COURT:  Okay.  Ms. Henry?

20          MS. HENRY:  To further clarify the record, we also

21 believe that the presumption is an unconstitutional presumption

22 and it's usurping the fact-finding mission of the jury.  The

23 jury is the one who is required to find the facts.  And this

24 takes that away from them under the *Booker*, *Apprendi*, and other

25 line of cases that the Supreme Court which have -- *Winship* and

1    others which have made it very clear that not a judicial

2    presumption, not an instruction can take this away.

3              THE COURT:  Thank you, Ms. Henry.

4              All right.  Anyone else?

5              Ms. Cheng, go ahead.

6              MR. FAGG:  Sorry, Your Honor, one other point.  I also

7    don't believe that the defenses that are at issue here apply to

8    this case.  And that I think is what this instruction is trying

9    to get at, and so that's another reason why it's unnecessary.

10             THE COURT:  That's true.  There wasn't evidence that

11   probably was supported, but the question would be what if a

12   defendant were to get up and argue that and say, hey, yeah, you

13   haven't heard any evidence that anyone had anything other than

14   just good intentions here, you know, that type of thing, then

15   it could be an appropriate concept for the jury.

16             Ms. Henry?

17             MS. HENRY:  The issue of whether there are good

18   intentions if they go to the issue of whether or not there was

19   an agreement is an appropriate type of argument.  I think that

20   this is going to a different issue, which is to say if there

21   was an agreement, was that agreement per se illegal, and that's

22   a very different issue that I don't believe was particularly

23   raised by the facts.  I think there are quite a few facts about

24   whether or not people entered into an agreement that were put

25   into evidence.

1          THE COURT:  Anyone else?

2          Ms. Cheng, go ahead.

3          MS. CHENG:  I will just start off by saying that the

4    government agrees with the inclusion of this instruction.  In

5    some of the dissents, counsel have said that the government did

6    not propose this precise instruction, which is true, but the

7    government did include portions of this instruction across

8    several different instructions that I had proposed.  You can

9    see parts that the Court proposed in a more efficient way in

10   the government's original instruction, No. 13 on Section 1 of

11   the Sherman Act charge, in No. 18 on conspiracy to fix prices,

12   and in No. 20 on knowingly joined.  This was in the

13   government's prior instruction.

14          So I think, you know, to that extent we think this is

15   an accurate statement of the law that helps guide the jury in

16   thinking about the legal issues.  And if it were the case that

17   this was not included, then the government would want to make

18   sure that the spirit of what's mentioned here is included in

19   the other conspiracy instructions because it is an important

20   element of our case that this is a per se violation and a per

21   se offense, which means that good intentions do not justify it.

22   Whether it's reasonable does not justify it.  Whether

23   defendants competed at various other times does not justify it.

24   So for that reason we want to emphasize that we agree with this

25   instruction.

1           And if I can make one quick note on the second

2    sentence in the first paragraph which begins with "Conspiracies

3    to rig bids," and in the second clause it says "without

4    consideration of the precise harm they may have caused."  I

5    think just for simplicity we would recommend changing that to,

6    "without consideration of any harm they may have caused," just

7    so that the jury understands that it's not the government's

8    burden to show that any harm resulted as a result of the

9    conspiracy.

10           *THE COURT:*  Ms. Henry?

11           *MS. HENRY:*  Your Honor, if we are going to get into

12    the specific language here, there is a lot of problems with it.

13    First of all, the first sentence is not related to per se only

14    issues and is going to end up confusing the jury, especially if

15    this is given as a per se instruction.  Again, it just doesn't

16    make sense.

17           Without consideration of the precise harm they have

18    caused, there has been actually -- the evidence we would say is

19    not the idea that there was any specific harm actually caused

20    here as well, so again we have issues with that.  We have

21    issues with the confusion that is going to be caused when you

22    talk about any business justification for their use because

23    there clearly were business justifications for contacts between

24    competitors that were discussed in the evidence here that is

25    going to confuse and mislead the jury to say that they

1    cannot -- that they cannot have any business justification when

2    it is not tied into other issues.

3           So, you know, again I think if you go back through

4    this, aside from all of the other issues that have been raised

5    which I think there are considerable issues, it is unnecessary.

6    It is inappropriate.  It will not help the jury.  It is

7    confusing.  It is unconstitutional.

8           THE COURT:  All right.  Anyone else?  Mr. Fagg?

9           MR. FAGG:  Your Honor, the other point I would raise

10   is that in addition to being confusing, especially in light of

11   the coming instructions on the violations of the antitrust laws

12   in a conspiracy in an antitrust case, the first sentence is

13   particularly prejudicial to the defendants and we think

14   unnecessarily so where it's talking about the harmful effect on

15   competition and lack of any redeeming virtue.  And so we would

16   certainly object to the first sentence.  I think it's

17   unnecessary.

18          THE COURT:  Ms. Cheng?

19          MS. CHENG:  So I'll begin with the first sentence.  I

20   understand the argument now is that perhaps the first sentence

21   is unduly prejudicial, but this is an accurate statement of the

22   law and I believe taken directly from Supreme Court cases and

23   is often cited to explain why the antitrust laws treat these

24   types of price-fixing in all its forms, price-fixing cases as

25   per se violations.

1          To the argument that it's not helpful for the jury,

2     the government respectfully disagrees.  Even the ABA suggested

3     model jury instruction has a section on the purpose of the

4     Sherman Act because the Sherman Act is perhaps not as well

5     known of a law to the jury as perhaps some of the laws.  And

6     it's very important from our perspective to explain to the

7     jury, you know, what we are here for and the purpose underlying

8     the Act, which is to preserve and encourage free competition in

9     the marketplace, and to make it clear that these types of

10    restraints are not tolerated and to provide that important

11    background.

12         For this reason we think that this per se violation

13    instruction will provide really important guidance to the jury.

14    And again absent that instruction, we will want to make some of

15    the similar points, perhaps in a less efficient way, in the

16    coming elements -- or instructions, I mean.

17         *THE COURT:*  Ms. Henry?

18         *MS. HENRY:*  Your Honor, this actually does not explain

19    the purpose of the Sherman Act at all.  And if that is an issue

20    that we need to deal with, we would want to go back and look at

21    what an appropriate instruction regarding the purpose would be,

22    but this does not get at that point.  We do feel that this

23    particular instruction as we've said is simply inappropriate.

24         *THE COURT:*  Okay.  Anyone else?

25         Here is my ruling on this, and that is, first of all,

1    in terms of the objections to the first sentence, that -- I

2    think that language comes from *Northern Pacific Railway* case,

3    1958 Supreme Court case.  It has been cited many, many times by

4    the Supreme Court after that fact, so I will overrule those

5    objections.

6         Mr. Kantola's objections to the second sentence in

7    there for a variety of reasons but somewhat focused on either

8    unconstitutionality or on the fact that the rule of reason is

9    not incorporated in it or at least it's inconsistent with the

10   rule of reason will both be overruled as well.  For the same

11   reasons that I rejected Mr. Kantola's objections regarding the

12   unconstitutionality of the Sherman Act in Docket No. 553, I

13   overrule those objections here.

14        I think that the second sentence is an appropriate

15   summary of the law and would instruct the jury.  I will reject

16   the government's suggestion to take out "precise harm."  Once

17   again, that is a term that has been used in previous cases and

18   I think that that is an appropriate term to use.  And I also

19   overrule the objections that this is purely duplicative.

20        Of course, we don't want any given statement to be

21   duplicative, but if we find duplicative statements in the

22   following instructions, we can certainly take that up at that

23   time, but I don't believe that this instruction as a whole is

24   duplicative.  I think it incorporates appropriate law regarding

25   per se violations as charged in this particular case.

1    And Mr. Penn's objection, a follow-up to the

2  instruction on the description of the elements having to do

3  with the rule of reason will be rejected for the same reasons

4  that I rejected them in regard to the element instruction as

5  well.

6    MS. HENRY:  Your Honor, without retreating from any of

7  our objections, but we respectfully request you modify it to

8  say the "precise harm this may have caused" rather than

9  instruct the jury that "they have caused."

10    THE COURT:  I am going to reject that as well.  The

11  second sentence isn't specific to this case.  It's a general

12  statement.  And the whole reason for the per se rule is because

13  those types of restraints are harmful in and of themselves.

14    MS. HENRY:  The Supreme Court has actually noted that

15  some restraints that may be grouped into the general area of

16  price-fixing and bid rigging are actually not causing harms,

17  but that the per se standard is justified on the basis of

18  judicial economy.  And I can cite some cases.

19    THE COURT:  Well, that could be, but once again, this

20  language is talking generally and it doesn't have an

21  implication necessarily for this case, so I will reject that

22  argument.

23    Mr. Beller?

24    MR. BELLER:  Thank you, Your Honor.

25    It may be best to discuss order of instructions once

 1    we finalize instructions, but I do want to at this point raise

 2    for the Court that it may make sense for this per se violation

 3    instruction to come after the definitions of conspiracy,

 4    perhaps after the elemental instructions.  So if the Court is

 5    going to give it, that would be my request.  And its exact

 6    place I think we can probably identify once we've finished

 7    going through the other instructions.

 8         THE COURT:  Why don't you hold that point, but I am

 9    open to that.  I think that this fits well coming where it does

10    now just because the second paragraph talks -- refers to the

11    elements, so there is some logic there.  But we can certainly,

12    as we work through and we are thinking more about the other

13    instructions, we can certainly reconsider the order.

14         MR. BELLER:  Thank you.

15         THE COURT:  Okay.  Let's shift our attention, then, to

16    the next instruction entitled First Element - Conspiracy.

17         Ms. Pletcher, go right ahead.

18         MS. PLETCHER:  Thank you, Your Honor.  I want to start

19    with our objection to the term "mutual understanding" as part

20    of the definition of a conspiracy.  And the first point where

21    it comes up --

22         THE COURT:  Yeah, I see that.

23         MS. PLETCHER:  The issue with that is that mutual

24    understanding is not sufficient to prove a conspiracy, that the

25    concept of mutual understanding is much less of a concrete one

1    than an actual agreement.  An agreement, I would suggest that

2    the Court use the language from *Monsanto*, which is that to

3    establish that an agreement is a "conscious commitment to a

4    common scheme designed to achieve an unlawful objective."

5         That is similar to the language the Court cited from

6    *Metropolitan Enterprises* which states that, "A conspiracy is a

7    combination of two or more persons acting in concert to

8    accomplish an unlawful purpose or to accomplish a lawful

9    purpose by unlawful means."  That concept of acting in concert

10   to accomplish a common scheme or common objective is really

11   critical to the definition of an agreement, in particular in a

12   case like this where the concept of mutual understanding is

13   just less of a -- it's a lower standard.  And it's particularly

14   problematic here.

15        We have, for example, a lot of evidence of, say,

16   market conditions and how market conditions are -- market

17   conditions are industry-wide.  And it may be that there is a

18   mutual understanding among suppliers that market conditions

19   would be pushing prices in a certain direction.  That mutual

20   understanding is not an agreement, certainly not the type of

21   agreement that the government needs to prove here.  And I am

22   really concerned with the difference between the two will

23   create some confusion and also just lower the standard that the

24   jury needs to reach to convict in this case.

25             *THE COURT:*  In other words, that mutual understanding

1    may be interpreted by the jury as just a coincidental similar

2    understanding or the same understanding, but not derived by an

3    agreement.

4            MS. PLETCHER:  That's right, the conscious commitment

5    to a common scheme.  And that's the Supreme Court's language

6    and that's the language that we would suggest that the Court

7    use here.  And specifically what we would suggest is just

8    swapping out that sentence to create such a relationship and

9    just swapping that out with the definition from *Monsanto*

10   saying, "A conspiracy is a conscious commitment to a common

11   scheme designed to achieve an unlawful objective."

12           THE COURT:  What was it again?

13           MS. PLETCHER:  Conscious commitment to a common scheme

14   designed to achieve an unlawful objective.  And that's from

15   *Monsanto v. Spray-Rite*, 465 U.S. 752 at 764.

16           THE COURT:  Okay.

17           MS. PLETCHER:  I have other comment on this one.  I

18   don't know if you want to address that issue first.

19           THE COURT:  Why don't you keep going and we will take

20   them all.

21           MS. PLETCHER:  My next comment on this one goes to the

22   paragraph that starts with, "Direct proof of a conspiracy may

23   not be available."  I suggest that that's not applicable here.

24   The government has alleged whether there is direct proof, and

25   whether there is or isn't I think is something that we will

```
 1    leave for the jury to decide, but I think that's unnecessary
 2    and could be misleading.
 3              THE COURT:  That sentence?
 4              MS. PLETCHER:  Yeah, that sentence.  What's wrong with
 5    that one, it almost sounds like an excuse for why there isn't
 6    more direct proof and it's not necessary.
 7              THE COURT:  Okay.
 8              MS. PLETCHER:  And, of course, the government does
 9    allege there is direct proof.
10              THE COURT:  Okay.  Thank you, Ms. Pletcher.
11              MS. PLETCHER:  I might have one more.  One moment,
12    Your Honor.
13              Your Honor, I do have a suggested red-line that I
14    think incorporates that "conscious commitment to a common
15    scheme" language that I can hand up, hand to Ms. Grimm if it's
16    helpful to the Court.
17              THE COURT:  Sure.  Do you have a copy for the
18    government?
19              MS. PLETCHER:  I have a copy for the government.
20              THE COURT:  Mr. Beller, go ahead.
21              MR. BELLER:  Thank you, Your Honor.
22              In addition to the position taken by Ms. Pletcher, I
23    would draw the Court's attention to that second page with the
24    paragraph that starts with, "Direct proof," the same paragraph
25    that Ms. Pletcher was referencing.  Your Honor, one, I would
```

1     note for an argument I will make in a moment the sentence

2     "Therefore, you may infer the existence of a conspiracy from

3     what you find the parties actually did, as well as from the

4     words they used."

5          I would then draw the Court's attention to the next

6     page with the paragraph that starts, "In determining," and

7     would note that the third sentence in that paragraph is, "The

8     conspiracy may be inferred from all the circumstances and the

9     actions and statements of the participants."  Those two

10    sentences seem to be duplicative.  By being duplicative, I

11    believe it puts unnecessary influence on the inference that the

12    jury can make regarding the circumstances, actions and

13    statements.  And I would ask then as to the paragraph that

14    starts, "In determining," that that third sentence simply be

15    redacted so as not to be repeated.

16          Your Honor, the other request that I would make as to

17    this instruction is again going back to the paragraph that

18    starts, "Direct proof of a conspiracy."  And I would draw the

19    Court's attention to sentence No. 4.  Sentence No. 4 is

20    currently written as, "Mere similarity of conduct among various

21    persons."  However --

22          THE COURT:  I am sorry, the fourth sentence in which

23    paragraph?

24          MR. BELLER:  This is the paragraph that starts,

25    "Direct proof of a conspiracy."

1          THE COURT:  Okay.  Sorry.  Go ahead.

2          MR. BELLER:  On Page 2, excuse me.  Your Honor, the

3    sentence starts with the words, "Mere similarity."

4          THE COURT:  Uh-huh.

5          MR. BELLER:  Okay.  Then we have "however."  Your

6    Honor, I think grammatically and for ease of reading, the

7    however should actually be in the beginning of that sentence.

8    It should say, "However, mere similarity of conduct among

9    various persons or the fact."  I believe the "however" is

10   misplaced in that sentence and it draws a dichotomy between the

11   different phrases that shouldn't be brought.

12         THE COURT:  Got it.  Okay.  Thank you, Mr. Beller.

13         Anyone else?

14         All right.  Ms. Cheng?

15         MS. CHENG:  So let me begin with this suggestion of

16   "conscious commitment to a common scheme," which is quite a

17   mouthful.  And I recognize that that language is from *Monsanto*,

18   but that language was never intended for a jury.  It was at the

19   summary judgment phase.  And it's our view that is simply just

20   too technical for the jury to understand.  I am not sure I can

21   fully grasp the difference between "conscious commitment to a

22   common scheme" compared to what the cases in the 10th Circuit

23   used, which is precisely this language of mutual understanding.

24         So *Metropolitan Enterprises* used the language of

25   mutual understanding.  In *Beachner* the court has said in the

1    10th Circuit, "It is enough that the participating parties have

2    a tacit understanding based upon a long course of conduct."

3    And likewise in *Metropolitan Enterprises*, it says "that the

4    members in some way or some manner, or through some

5    contrivance, positively or tacitly came to a mutual

6    understanding to try to accomplish a common and unlawful plan."

7            And this language is commonly upheld and most recently

8    this year in the *Lischewski* case where the defendants there

9    made the same understanding about the mutual understanding, but

10   the 10th Circuit upheld it because this language is very clear

11   in the context of the jury instruction that we are talking

12   about a mutual understanding, that they will act together for

13   some unlawful purpose or to achieve a lawful purpose by

14   unlawful means and be together.  We don't think that creates

15   any lower standard than agreement or what is required by the

16   case law because it is taken precisely from the cases.  This

17   language is not new.  It is something that's part of the 10th

18   Circuit case law.  We don't think that it is misleading in any

19   way or changes the burden in any way with regard to this

20   element.

21           The second point I will make is about some of these

22   deletions.  We disagree with the characterizations that these

23   are duplicative or unnecessary because the audience here is a

24   jury member who may not really have encountered a conspiracy

25   before.  I think that language of "partnership in crime" is an

1    important one to help explain sort of the basic theory behind

2    conspiracy law.  And without it I think it is very confusing to

3    even know what type of relationship we are talking about here

4    where two or more persons must enter into a type of agreement.

5           And I will note, too, that the defendants' proposal

6    about consciously commit to a common scheme I think will take

7    further explanation.  I think the easiest way to explain that

8    is by explaining it's an agreement or tacit or mutual

9    understanding to accomplish an unlawful objective.

10           With regard to the deletion of, "Direct proof of a

11    conspiracy may not be available" that Mr. Beller talked about,

12    we think it is important to keep that sentence in there to sort

13    of situate the subsequent sentences of why circumstances or

14    acts of the members or a course of dealing can help disclose

15    the existence of a conspiracy.

16           Conspiracies are often by nature meant to be

17    secretive.  And with the inclusion of this sentence, the direct

18    proof of a conspiracy may not be vague and ambiguous.  I think

19    it helps sign post better for the jury what the following

20    sentences say.  With that, I will adjourn with my two laptops.

21           THE COURT:  How about Mr. Beller's points?  He had a

22    minor change regarding the word "however" on Page 21, the

23    paragraph starting with "Direct proof," but he also had the

24    suggestion to eliminate duplicity in the middle paragraph on

25    Page 22, third sentence.

1          *MS. CHENG:*  With regard to the first change in

2    "however," I think it's a common construction to have "however"

3    in the middle of the sentence rather than necessarily at the

4    beginning, but that's in our view more of a stylistic change.

5    I think -- so as far as -- so I think we are comfortable if the

6    Court wants to move it in front, but I do think it's clear as

7    it stands with "however" in the middle of the sentence.  It's a

8    shift in how -- in the positions here.

9          With regard to this duplication that Mr. Beller has

10   alleged, I think the reason it's in here twice is because we

11   are talking about the actions and statements of alleged

12   co-conspirators in the second part of it.  And in the first

13   part of it, we are talking about generally the existence of a

14   conspiracy.  Maybe there is some way to perhaps meld these two

15   paragraphs together, but as it stands, I think they are going

16   to rather different points about one is to explain that and to

17   add contrast for the fact it may not be direct proof, and

18   second in relation to the sentence right before it is more

19   about how to consider the various actions and statements of all

20   the co-conspirators.  So for that reason we don't think it's

21   duplicative where it is currently in the instruction.

22          *THE COURT:*  Any response, Ms. Pletcher?

23          *MS. PLETCHER:*  Yes, thank you, Your Honor.

24          The agreement is the core of the alleged crime.  So

25   defining the agreement the way the Supreme Court has set it out

1    is the appropriate thing to do here, and that really is the way

2    it was set out in the *Monsanto* case, the concept of a conscious

3    commitment to a common scheme.

4            Mutual understanding the government argues it's easier

5    for the jury to understand, but I don't think that's correct.

6    A conscious commitment to a common scheme is perfectly easy to

7    understand.  I think it actually captures what an illegal

8    agreement actually is.  And a mutual understanding dilutes it

9    in that it offers up the possibility of having some sort of an

10   agreement to do something that is not necessarily a commitment

11   to a common objective.  I am very concerned about that

12   alternative.

13           And the use of the word "or," "an agreement or mutual

14   understanding," although I understand that's meant to clarify

15   what an agreement means can very easily be read to infer that

16   it's either in the alternative, an agreement or mutual

17   understanding, and that kind of adds to the concern that I have

18   got here.

19           THE COURT:  Okay.  Thank you, Ms. Pletcher.

20           Anything else?

21           MS. PLETCHER:  No, that's all.

22           THE COURT:  Ms. Henry?

23           MS. HENRY:  Your Honor, the government made mention of

24   the *Beachner* case, and I want to just focus there a few moments

25   that the case there involved a scheme which the government

1    focused on, and the Court focused on the reciprocal obligations

2    of the competitors involved in the scheme.  It was not simply

3    an issue of mutual understanding.

4            Again, in the counterpart case, which was very similar

5    to the *Beachner* case, in the *Ashland-Warren* case, it was called

6    "mutually dependent on one another to achieve a common goal

7    through a single comprehensive plan."  Again, the language in

8    many of these cases is very similar.  Basically it takes off on

9    the *Monsanto* discussion which has been a text issue of how to

10   describe an agreement that is repeated throughout a lot of

11   cases.  It is repeated throughout a number of the Supreme Court

12   cases and is the -- basically the textbook way of describing

13   the relevant agreement.

14           *THE COURT:*  Okay.  Ms. Pletcher, go ahead.

15           *MS. PLETCHER:*  Thank you, Your Honor.  I apologize,

16   one more point I meant to make.  There are some cases that do

17   use the mutual understanding language, but not every case does.

18   And, you know, we are looking with 10th Circuit in *Metropolitan*

19   *Enterprises* does offer an alternative.  I think it's consistent

20   with *Monsanto* without using the language mutual understanding.

21   And the Court cited that in its Footnote No. 20.  "A conspiracy

22   is a combination of two or more persons acting in concert to

23   accomplish an unlawful purpose or to accomplish a lawful

24   purpose by unlawful means."

25           *THE COURT:*  Okay.

1          *MS. PLETCHER:*  Thank you.

2          *THE COURT:*  All right.  So on this instruction which

3     is entitled First Element - Conspiracy, I am going to overrule

4     Ms. Pletcher's objection.  The fact that the Supreme Court may

5     characterize a conspiracy with certain words does not

6     necessarily mean that the use of those terms would be

7     appropriate to a jury.  The audience of a Supreme Court case

8     may be somewhat more oriented towards people learned in the

9     law.  The phrases used in jury instructions have an additional

10    purpose of making sure that they're understandable terms for

11    those not learned in the law.  And I agree with Ms. Cheng, the

12    term "mutual understanding" has been upheld on many different

13    occasions and I think it is appropriate.

14         Ms. Pletcher is correct that theoretically and out of

15    context that term may be subject to misinterpretation, but when

16    read in the context of the sentence that it is found at the

17    beginning, the one that Ms. Pletcher focused on, it is really

18    not subject to misinterpretation.  That sentence says, "To

19    create such a relationship, two or more persons must enter into

20    an agreement or mutual understanding that they will act

21    together for some unlawful purpose or to achieve a lawful

22    purpose by unlawful means."

23         So it wouldn't be simply the situation of people

24    simultaneously having the light bulb go off above their heads,

25    but it would have to be that they mutually, and I think that

1    the term "mutual" would carry an inference just as the previous

2    term "agreement" would, that they will act together.  So they

3    are going to be acting together for some unlawful purpose.  I

4    think in context, the term "mutual understanding" would not be

5    ambiguous and lead the jury to find a mere individual purpose.

6    Moreover, when looked at in the overall context of the

7    instructions, I don't believe that the jury would reach that

8    conclusion in any event, so I will overrule that particular

9    objection.

10        Also if we move over to Page 21, Ms. Pletcher objected

11   to the first sentence that begins with, "Direct proof of a

12   conspiracy may not be available."  I will overrule that

13   objection as well.  Ms. Cheng I believe is right that that

14   statement defines the context of what follows, namely that

15   because direct proof may not be available, it can be disclosed

16   in other ways.  There are other ways of discerning that one

17   exists, namely through indirect evidence, so I think that

18   that's necessary for context.

19        I will adopt Mr. Beller's suggestion about moving

20   "however" to the beginning of the sentence that now reads:

21   "Mere similarity."  I agree with Ms. Cheng and Mr. Beller, I

22   think it's a stylistic change.  I don't think it changes the

23   substance, but I think it reads a little bit more naturally to

24   begin the sentence with the word however.

25        And on Page 22, the middle paragraph, Mr. Beller's

4593

1    suggestion that we move the sentence about, "The conspiracy may

2    be inferred," I think he is right.  I think that is

3    duplicative.  I don't think that it's necessary in that

4    paragraph because just a few paragraphs before we had that

5    concept already, so I will go ahead and remove that sentence

6    from this paragraph because it -- the concept has already been

7    referred to just two paragraphs previously.

8         Ms. Henry?

9         MS. HENRY:  Your Honor, with respect to the contextual

10   issue that you raised, I can see how that applies to the point

11   that you made in the first paragraph.  A concern that I would

12   have would be in the second paragraph and the third paragraph

13   where that term is repeated, that context is not there.  And

14   the case law is very clear that the gist of this element is the

15   agreement.  And so we would ask you to take out the "or mutual

16   understanding," just an agreement to accomplish a common

17   purpose or the agreement among them and to remove the mutual

18   understanding in those paragraphs where it lacks the contextual

19   qualifications that you explained, and it also focuses the jury

20   very appropriately on what the case law says unequivocally also

21   in the 10th Circuit that the gist of the issue here is the

22   agreement.

23        THE COURT:  I will overrule that objection.  I think

24   that once the mutual understanding has been defined, as I

25   believe it has been placed in context earlier in the paragraph,

1     the subsequent references to it would not be misconstrued.  And

2     as a result, I will overrule that objection.

3              All right.  Let us go then to the next instruction.

4     This is Conspiracy to Fix Prices and Rig Bids.  And I think

5     that the government -- the government had a suggestion on this

6     one.  Well, maybe not on this one.

7              Oh, and by the way, Mr. Fagg, were you the one who

8     tendered the marked up instruction what has the red-lining or

9     green lining?  Or I am not sure how to say it.

10             MR. FAGG:  I believe I handed that to Ms. Pletcher and

11    she did it, but I am happy to --

12             THE COURT:  Yeah, because I will overrule those other

13    suggested changes which I didn't directly address and they

14    weren't directly addressed, but it included a strike-out of

15    certain other language like the partnership in crime things

16    too.  So did you want to mark that or does someone want to mark

17    that as a tendered exhibit, because we certainly can.  It's

18    just that it was offered to me because it incorporated some of

19    that language that Ms. Pletcher liked, but we didn't really

20    talk about necessarily all of the different language in it.

21             MR. FAGG:  Yes.  We would like to tender it, Your

22    Honor.

23             THE COURT:  So Ms. Grimm, is this defendants' tendered

24    No. 3?

25             COURT DEPUTY CLERK:  Three.

1          *THE COURT:*  And I will give this to Ms. Grimm.  I will

2     overrule the objections to those various changes as well.  We

3     talked about some of them, but not necessarily all of them.

4     And I don't know, Mr. Fagg, if you want to make an additional

5     record on any of those?

6          *MR. FAGG:*  Sure.  I gave away all my copies, but I

7     believe as it relates to the "partnership in crime" language in

8     there, I understand that that is the law and that is how the

9     courts have described it.  We just think it's unnecessarily

10    prejudicial in this instruction and would object to its

11    inclusion.

12         *THE COURT:*  Okay.  And I will overrule that objection.

13    As Mr. Fagg alluded to, it has been used in many different

14    cases as a description of a conspiracy.

15         All right.  We will mark that as defense tendered

16    No. 3 and I will reject that.

17         All right.  Now let's switch over to the Conspiracy to

18    Fix Prices and Rig Bids.

19         *MR. BELLER:*  If we may have a moment, Your Honor.

20         *THE COURT:*  Absolutely.  The government did have a

21    suggested one, but go ahead, Mr. Beller.

22         *MR. BELLER:*  Your Honor, I would note as to this

23    instruction on Page 23, if we can look at the second paragraph

24    that begins, "A conspiracy."

25         *THE COURT:*  And let me just make one point,

1    Mr. Beller, just to see if we can save some time.  Did you see

2    the government's proposed change?  Did you get that one?

3             MR. BELLER:  Yes.  Let me pull it up.  Is this the one

4    that was e-mailed very late last night?  I don't know.  I was

5    not checking.

6             MS. CHENG:  It was e-mailed around 10:00 p.m. last

7    night.

8             MR. BELLER:  So which instruction do you want to work

9    off of, the government's proposed?

10            THE COURT:  If you don't mind getting it, let's talk

11   about that because we may be able to condense it and save some

12   time, not that I know what you're going to talk about, but it

13   might help us a little bit.

14            MR. BELLER:  Absolutely.  Just a moment, Judge.

15            MS. PLETCHER:  Your Honor, I do have the revisions

16   suggested by the government and have some thoughts about it.

17   So the government's suggestion is to condense the original

18   language to say bid-rigging is a form of price-fixing.  I want

19   to make sure I have the right copy here.  "If you find the

20   government has proven such an agreement or mutual understanding

21   beyond a reasonable doubt, then the government has satisfied

22   the burden for this element."

23            So I would object to that because --

24            THE COURT:  Here is what I suggest just to try to cut

25   it short.  I would suggest that we take that first -- this is

1    the government's proposed changes to the second paragraph.  Do

2    you have that, Mr. Beller?

3         MR. BELLER:  I do, Your Honor.

4         THE COURT:  So my suggestion is that if bid-rigging is

5    a form of price-fixing and we accept that, we take that

6    sentence, we move it up and make it the second sentence of the

7    first paragraph, so that kind of definitional -- defines

8    bid-rigging as a form of price-fixing.  Then the rest of the

9    first paragraph goes on and then we just eliminate the rest of

10   the second paragraph.  That would be my suggestion including

11   the proposed second and last ones because I think that they

12   would then just be duplicative.

13        MR. BELLER:  So let me say, and speaking on behalf of

14   only myself, exactly what the Court proposed is what I was

15   going to be taking issue with in the original.  And so that

16   satisfies at least that portion of the objection that I was

17   going to be making.

18        THE COURT:  Okay.

19        MR. BELLER:  That was a long-winded way of saying I am

20   okay with that.  Thank you.

21        THE COURT:  Yeah, no problem.

22        Let's see what the government thinks of that proposal.

23        Ms. Cheng?

24        MS. CHENG:  Just to confirm, the proposal is moving

25   "Bid-rigging is a form of price-fixing," moving that sentence

1   so that it becomes the second sentence.

2          THE COURT:  If the first paragraph.

3          MS. CHENG:  In the first paragraph, and then just

4   removing what is now the second sentence, the remainder of the

5   second sentence.

6          THE COURT:  The remainder of the second paragraph.

7          MS. CHENG:  Sorry, apologies, paragraph.  Yes, that is

8   correct.  The government is fine with that.

9          THE COURT:  Okay.  So that doesn't necessarily handle

10  everything, but is everyone okay with at least that

11  condensation of the first and second paragraphs?

12         Mr. Fagg?

13         MR. FAGG:  I am not sure that I am, Your Honor.  And I

14  am not sure what time we are planning on taking our lunch break

15  today.

16         THE COURT:  We are very flexible, of course.  I do

17  have something at 12:30, although it doesn't involve the use of

18  this courtroom, but otherwise we are pretty flexible.  We could

19  take the lunch break now or whenever.

20         MR. FAGG:  Okay.  I think if we look --

21         THE COURT:  Why don't we do this.  Why don't we throw

22  out a few ideas here and then we will break at noon.  Is an

23  hour okay for lunch?  Does that work for everybody?  Okay.  Why

24  don't we plan on reconvening at 1:00.  I think that my

25  12:30 issue will be accomplished in that time and we should be

1    able to reconvene at 1:00.  It will give you a chance to think

2    about it a little bit.

3              MR. FAGG:  Thank you, Your Honor.  I will take

4    advantage of thinking about it and also throw caution to the

5    wind and just give you some initial thoughts.

6              THE COURT:  Yes, go ahead.

7              MR. FAGG:  This case has been charged as a form of

8    bid-rigging and fixing prices.  And I believe that is what has

9    been described elsewhere throughout the instructions.  I think

10   if we now come in here and say that bid rigging is a form of

11   price-fixing, that that may be confusing to the jury.  So that

12   was what my hesitation was when you asked if there was any

13   objection to just moving that up, moving the government's

14   proposed language up and deleting the rest of that.  I will

15   formulate thoughts more articulately during the lunch hour, but

16   that was what my hesitation was.

17             THE COURT:  Got it.

18             Mr. Feldberg?

19             MR. FELDBERG:  As long as we are throwing thoughts

20   around, Your Honor, my team had one other thought from this

21   proposed change.  That's at the paragraph at the bottom of

22   Page 25, the information exchanged paragraph.  Of course, that

23   does in our view correctly state the law.  And the Court cites

24   two 10th Circuit cases, *Mitchael* and *Suntar Roofing* and quotes

25   from those cases in support of that proposed charge.  And our

4600

1    thought is why not simply charge the jury with the language in

2    the quotes from *Mitchael* and *Suntar*.

3         THE COURT:   I am sorry, where are you?

4         MR. FELDBERG:   I am at the bottom of Page 25 and

5    carrying over to 26, the paragraph that begins, "The fact that

6    competitors exchanged price information does not necessarily

7    establish an agreement to fix prices," and the paragraph goes

8    on.   And then at the end of that paragraph, there is a citation

9    in Footnote 31 to *Mitchael* and *United States v. Suntar Roofing*

10   and quotes from each of those 10th Circuit cases.   And since

11   that's the law and that's the law that the Court is relying on,

12   our thought is perhaps we should simply give the jury those two

13   sentences as the charge on this issue.

14        THE COURT:   Oh, I see.

15        MR. FELDBERG:   I should add I have not socialized that

16   idea with the rest of the defendants.

17        THE COURT:   Sure.   We are just throwing out ideas

18   right now.   Okay.   Why don't we, unless there is another quick

19   thought, for people to ruminate over the lunch hour.

20        MR. BELLER:   I think I can cover two quick thoughts

21   just for rumination.   The first one, Your Honor, if we look at

22   the Court's Page 25, this is the Government's Page 26, the last

23   line, "Regardless, if the conspiracy as charged existed, it was

24   unlawful."   This is the last sentence of Paragraph 1.   I would

25   ask that that be changed to say, "Regardless, if the conspiracy

1     as charged was proved beyond a reasonable doubt, it was

2     unlawful."

3          The next piece to at least consider is in that same

4     paragraph there is a sentence that starts, "Or such evidence

5     may show that some or all of the defendants made an agreement

6     but failed to live up to it, started undercutting one another

7     right away, offered prices lower than those agreed upon," and

8     the sentence goes on and talks about potential abandonment.  I

9     don't believe that there has been any evidence of that and so

10    that particular sentence --

11         THE COURT:  I am sorry, where was that again?

12         MR. BELLER:  Excuse me, Your Honor.  This is the

13    Court's copy, Page 25, the very top paragraph.  And the

14    sentence begins, "Or such evidence may show."

15         THE COURT:  Yes.

16         MR. BELLER:  And ends with "abandoned."  I don't

17    believe there is evidentiary support for any of that and it

18    seems unnecessary to include.

19         I would also note that if the Court flips to the

20    preceding page, Page 24, the first full paragraph, "If you find

21    that one or more of the defendants," Your Honor, I believe

22    those two phrases are virtually identical in content and

23    meaning.  And I believe there is no evidence of them, so not

24    only is it duplicative, I believe it is just unnecessary as to

25    the facts.

1          THE COURT:  I am sorry, where was that again,

2     Mr. Beller?

3          MR. BELLER:  I am on now Page 24, the first full

4     paragraph that begins, "If you find that one or more of the

5     defendants."

6          THE COURT:  Oh, I see.

7          MR. BELLER:  That paragraph seems to be consistent

8     with or duplicative with the paragraph on the second page -- or

9     the next page, Page 25.

10          THE COURT:  Let's end on that note and we'll --

11     Mr. Fagg, real quick.

12          MR. FAGG:  Very quickly, we do have a response to the

13     government's submission regarding the deliberate ignorance.

14          THE COURT:  Okay, great.

15          MR. FAGG:  We would be happy to hand that up to the

16     Court so that you could review it over the lunch hour.

17          THE COURT:  Yeah, that will be very handy.  I

18     appreciate that.

19          MR. FAGG:  Would you like for us to e-mail that to

20     chambers as well or --

21          THE COURT:  No, this is fine.

22          All right.  Why don't we plan on reconvening, then,

23     five after 1:00, so give everyone a full hour and then we will

24     take up where we left off.

25          All right.  The Court will be in recess.  Thank you.

1        (Recess at 12:03 p.m.)

2        (Reconvened at 1:07 p.m.)

3            THE COURT:  I can see one problem with that easel

4    already -- or actually I should say you can't see because of

5    that easel.

6            MS. CALL:  Yes, Your Honor.  To address the brief

7    elephant in the room, so we were looking at positions.  It

8    looks like this hopefully doesn't obstruct Your Honor's view of

9    the jurors.  The only things we plan on putting on there are

10   the summary exhibits which we can pass out.  They are just

11   blown up, not like manipulated in any way.  And we would be

12   very clear in saying anything as we turn to a different one

13   what's exactly on the easel.  So I am hoping there is no issue

14   with defense counsel not being able to see it given they will

15   all have it as well.  And we will bring paper copies if that

16   would be helpful.

17           THE COURT:  I would -- regardless, whatever gets

18   shown, the defendants may want to reposition just to confirm

19   it, so I don't know.  What do the defendants think?

20           MS. HENRY:  Your Honor, we absolutely would want to

21   see what is being shown to the jury, and we also believe that

22   the defendants themselves have an absolute constitutional right

23   to see it as it is shown to the jury.

24           MS. CALL:  Another option, but I don't know how this

25   works for Mr. Kahler's view, is to try to trade out that

1    monitor with where the easel currently is because the summaries

2    could just be perpendicular to Your Honor's positioning, but

3    then, of course, you can't see it, but then all the defendants

4    would be able to see.  And the monitor would be there.

5              MS. HENRY:  We certainly can't see the monitor now.

6              MS. CARWILE:  Your Honor, if we could also note that

7    the two people, the two clients --

8              THE COURT:  Their view of the jury would be blocked.

9    That's the thing.  The easels in a crowded courtroom just like

10   this are just really very, very problematic.  How about right

11   in front of the evidence cart over there?

12             MS. CALL:  I imagine the only difficult thing would be

13   switching boards, not wanting to interfere with counsel table

14   for Defendant Mulrenin and Roberts.

15             THE COURT:  Well, that might be able to be

16   accomplished.  You might be able to accomplish that if you had

17   them stacked up or something of that nature.  Maybe you can

18   think along those lines, but that would -- well, it still is a

19   view problem because Mr. Pollack and Mr. Fagg probably couldn't

20   even see it.

21             MR. FAGG:  I am not sure I even understand where it

22   would be over there.

23             THE COURT:  It would have to be pretty much right in

24   front of where the document viewer is currently positioned like

25   right behind Ms. LaBranche.

1          MR. FAGG:  I think if it is positioned in a way that

2     the jury would be able to see it, then --

3          THE COURT:  Large segments of the courtroom would not.

4     It's really just almost no good place for it.  That's why I

5     think although it's handy to have something simultaneously up,

6     you can do that with split screening.  Once again, with a time

7     line it's always, as I said, it's just always very problematic

8     no matter what.

9          MS. CALL:  Uh-huh.

10          THE COURT:  But I do agree, I don't know if a

11     defendant has the right to see it himself, but at least one

12     attorney would have that right.  And even if it's exactly what

13     you say, I would not blame people for wanting to double-check

14     it just to see what form it's in.

15          MS. CALL:  I am trying to test out the views.

16          THE COURT:  Believe me, many have tried.

17          MS. CALL:  I do think this is a unique setup we have

18     here that makes it slightly more difficult to find a workable

19     position.

20          THE COURT:  We don't have time to suspend it from the

21     ceiling.

22          MS. CALL:  One place we were mindful of, is this at a

23     height if we were to move it slightly back and angle in a way

24     defendants could see as well, is it tall enough that it may

25     obstruct your view of the jurors?

1          THE COURT:  Yes.  I mean, we could get a different

2     easel.

3          MS. CALL:  We can lower this one, actually.

4          THE COURT:  I don't know if that would work either

5     because just no matter what, for it to be angled for the jury

6     just by definition, you follow that line.  It's going to cut

7     off a large number of other people.

8          MR. KOENIG:  If it's over there parallel to the bench?

9          THE COURT:  I think we need this flat panel monitor.

10         MR. KOENIG:  There is cord.  It could be moved over

11    here so Mr. Kahler could see the monitor.

12         THE COURT:  It would have to be Mr. Kahler and

13    Ms. Perez, those are the two jurors who rely upon it.  That's

14    possible, but we still have the problem how the other people

15    are going to see it.

16         MR. KOENIG:  Back a little farther and then the TV

17    here.

18         THE COURT:  Okay.  This is highly inadvisable, but I

19    am going to unplug that and then we'll move that.  Ms. Grimm,

20    remind me that we need IT to check this out before tomorrow

21    morning given the fact I am unplugging something.  So

22    Mr. Koenig, that would have to be so it doesn't block views.

23    It would have to come in closer here.  What if the white board

24    were moved closer to the jury?

25              The issue would be if it's something you already know

4607

1    about like it's an admitted exhibit, the view of it would be

2    confirmatory of what it is to see what it looks like if some

3    minor repositioning was necessary, because we can't avoid the

4    problems with the podium, we've got that issue.  But if it's

5    minor repositioning, then it may not be so bad just to confirm.

6            Ms. Henry, what's your view?  Can you see it?

7            *MS. HENRY:*  I can't see it if I'm sitting down.  I can

8    see -- I will be honest, I can't read a single thing on it

9    except for the Pilgrim's and Tyson stuff.  It's far away.  It's

10   just difficult, but I mean -- we're going to have to at least

11   have an opportunity to go over, look at the boards every time

12   and look at things because frankly we have had so many

13   iterations of these.  We have had so many changes on them and

14   so many mistakes, there is no way that we are going to allow

15   those charts to go up without looking at them extremely

16   carefully, and I would not be able to do that from here.

17           *MS. CALL:*  We are happy to bring the boards this

18   afternoon so if counsel wants to review them today or in the

19   morning before closings again, they have the opportunity to do

20   so.  They are the same ones that were admitted into evidence.

21           *THE COURT:*  Mr. Beller?

22           *MR. BELLER:*  Thank you, Your Honor.

23           I will tell the Court I cannot see it from where I am,

24   but that's only because there is a monitor and people.  You

25   know, if the Court -- if that's what the Court decides to do,

1    we may just need to fairly often stand up if it's pointed to or

2    something along those lines.

3        THE COURT:  I am going to allow that position, but the

4    government needs to bring in those white boards.  Can they be

5    brought over now?

6        MS. CALL:  They can.

7        THE COURT:  Because I agree.  I understand why the

8    defendants want to take a hard look at them to make sure that

9    they are the version that was admitted.

10       MR. FAGG:  One question on that.  Would the white

11   board just be positioned there and it would only be changed

12   when the government moves to another exhibit or does counsel

13   intend to go over and point to or highlight anything on the

14   board?  If so, it seems very close to the jury.

15       THE COURT:  It is close to the jury.

16       So what about that, Ms. Call?

17       MS. CALL:  I think at that distance it will be a far

18   point and not interacting that closely with it, just changing

19   the boards.

20       THE COURT:  Who will be changing the boards?

21       MS. CALL:  Who will be my Vanna White?  It may very

22   well be Mr. Koenig.  I am happy to do while during the closing,

23   but I believe he has offered to help with that.

24       THE COURT:  I will allow it with that.  Of course, if

25   the defendants want to use white boards, too, or use the easel

1    in some manner, they are perfectly able to do that as well.

2    But as long as the white boards are brought over before we

3    recess today so the defendants have a chance to take a hard

4    look at those, then it can be used with that configuration.

5            MS. CALL:  May I then excuse myself to get the white

6    boards brought over?  We will arrange them in the back of the

7    courtroom so as not to interfere with the conference.  And then

8    if it would be appropriate, I would respectfully request being

9    excused for the rest of the afternoon as well.

10           THE COURT:  You may.

11            Ms. Grimm, let's do a little demonstration and make

12   sure I haven't screwed it up completely.  Let's see if it turns

13   on and displays things.

14       MR. FAGG:  Your Honor, to make one suggestion that

15   perhaps I don't know if we have the capability to display

16   something, but perhaps some volunteer could sit in Mr. Kahler's

17   seat just to make sure that actually works.

18           THE COURT:  Do you mind, Mr. Fagg?  Not that

19   Mr. Koenig is not totally objective, but I can't remember if

20   Mr. Kahler sits quite that far away, but in any event.

21           MR. FAGG:  I believe he can see it, Your Honor.

22           THE COURT:  He has one seat of separation.  I think it

23   would be okay.

24            All right.  Let's go back to instructions, then,

25   unless someone has a different point.

1          Mr. Pollack?

2          MR. POLLACK:  First I would note I have no objection

3     to Mr. Fagg serving on the jury.

4          Before lunch, Your Honor, we had discussed maybe doing

5     a revision of the Sand 58-9 instruction.  I have taken a stab

6     at that and --

7          THE COURT:  Great, because I did not, unfortunately.

8          Ms. Cheng, have you had a chance to take a look at it?

9          MS. CHENG:  Yes, we have, and we have no objection.

10         THE COURT:  It looks good to me.

11         Have the defendants had a chance to look at it, the

12    other ones?

13         MR. POLLACK:  I have sent it around to the other

14    defendants.

15         THE COURT:  Let's see if there are any comments on it.

16    The title wouldn't be a part of the instruction, but yes, it

17    looks good to me.  So you wanted this as the instruction right

18    before the elements instruction; is that correct?

19         MR. POLLACK:  Correct, immediately right after the

20    multiple defendants instruction.

21         THE COURT:  Okay.  We shall do so.

22         Okay.  And where did we leave off, then?

23         MR. FAGG:  Your Honor, I think we left off with the

24    instruction, the First Element - Conspiracy to Fix Prices and

25    Rig Bids.  We would object to the government's proposed

1   modification to this and what was discussed earlier about

2   combining bid-rigging together with price-fixing.  This case,

3   the government charged this case as a conspiracy to fix prices

4   and rig bids for broiler chicken products.

5        And so in the Court's earlier instruction, initial

6   instructions to the jury, it was described as a conspiracy to

7   fix prices and rig bids.  And so we would object at this point

8   to collapsing those into one simply because of how the

9   government's case may have come in, and that is what has been

10  at issue in this case throughout and it's been referenced in

11  all the parties' pleadings and the Court's orders.  And as I

12  said, in the preliminary instructions that Your Honor gave to

13  the jury, it was defined as a conspiracy to fix prices and rig

14  bids, and so we would object to combining these here at this

15  late hour to try and perhaps mold into the government's case.

16  We think it's unnecessary and we think that it is frankly

17  prejudicial given the preliminary instructions that were given

18  and where we are now.

19       THE COURT:  Well, by making that argument, Mr. Fagg,

20  are you suggesting that if the government didn't prove

21  bid-rigging, then they would lose?

22       MR. FAGG:  I am not, Your Honor, no.  I am talking

23  about how it was described to the jury, right, which is a

24  conspiracy to fix prices and do rig bids.  And I think that if

25  we now tell them, oh, well, these are actually just the same

1    thing in this instruction at the end of the case when it's been

2    described to them quite properly as what an antitrust

3    conspiracy is earlier, I think it's confusing to them.

4         *THE COURT:*  Okay.  Ms. Pletcher, go ahead.

5         *MS. PLETCHER:*  Thank you, Your Honor.

6         On that point I agree with Mr. Fagg's point that this

7    could be confusing to the jury and add that at a theoretical

8    level it's true, bid-rigging and price-fixing could be the

9    same, but because they were charged separately, laying it out

10   separately I think does give the jury the most clear

11   understanding of what the charges are and how they should be

12   thinking about the evidence.

13        And the language that was originally proposed from *B&H*

14   is very standard traditional bid-rigging jury instruction

15   language, and so we would support the inclusion of that

16   language as originally proposed in the Court's instruction.

17        *THE COURT:*  Okay.  So you would prefer to stick with

18   at least for the first two paragraphs the Court's proposed

19   language.

20        *MS. PLETCHER:*  That's correct, Your Honor.

21        *THE COURT:*  Okay.

22        Mr. Beller?

23        *MR. BELLER:*  Your Honor, only because I articulated

24   something different earlier, I will tell you that I had the

25   opportunity to spend part of the lunch hour looking at this.

1    And despite my earlier argument to the Court otherwise, I agree

2    with Mr. Fagg and Ms. Pletcher regarding those two paragraphs.

3    I do have other slight issues, but we can take those up in

4    time.

5              THE COURT:  Agreed.

6              Ms. Henry?

7              MS. HENRY:  I was just going to note that the last

8    sentence, which I think Your Honor had suggested deleting when

9    we were moving it before, is extraneous.  And even if the

10   language describing what a conspiracy to rig bids was put back

11   in, I don't think you need that last sentence.

12             THE COURT:  Which sentence specifically are you

13   talking about?

14             MS. HENRY:  "The aim and result of every" dah, dah,

15   dah.

16             THE COURT:  Well, if we have both paragraphs, one

17   describing price-fixing, one describing bid-rigging, then to be

18   parallel we would probably include that sentence too.  If we

19   collapse the two paragraphs, we wouldn't need the additional

20   one that the government has suggested, but I think it's a

21   parallel phrase if we keep both paragraphs.

22             Ms. Cheng?

23             MS. CHENG:  Your Honor, before I get started

24   addressing this instruction that we are on, do you mind if I

25   quickly talk about the "must" versus "should" language that the

1    Court asked the government to look into during lunch?

2        THE COURT:  Why don't we take that up after this one

3    since we are in the middle of this one, but then we can take

4    that up.

5        MS. CHENG:  Certainly.  So let me start by clarifying

6    that there are no separate theories here on bid-rigging versus

7    price-fixing.  And we are not walking away from the fact that

8    this is a price-fixing and bid-rigging conspiracy by explaining

9    that bid-rigging is a form of price-fixing.  The reason we

10   think it's confusing to keep the standard bid-rigging

11   instruction in is that in an example of bid-rigging where, say,

12   a municipality decides to find one winner for its bids to do

13   highway construction, for example, in those instances you would

14   have, you know, a winner, a loser, a high bidder, a low bidder.

15   They might take turns in the rounds of bids.  And that's really

16   what this typical bid-rigging instruction is meant to address.

17   That's the kind of factual situation that was at issue in *B&H*

18   *Construction* and that's not the case here.

19       In this case, the reason we wanted to include bid is

20   that bid is the name of how prices are manifested in the

21   broiler chicken industry.  They don't come and simply say this

22   is a price, this is our price for this, et cetera.  They go

23   through rounds of contracting that involve bids.  And so it's

24   not -- the reason we are using the word "bid" is really for

25   nomenclature to make it clear and give notice to the defendants

1    that we are talking about these types of prices and that's how

2    prices manifest in this industry.

3         I think the concern is that if we include this

4    separate theory that the government is not bringing about, you

5    know, that there can be prices to be bid, who should be

6    successful, who should bid high, who should bid low, who should

7    refrain, that's just not the factual situation that we have

8    here.  And we worry about jury confusion by including it.  It's

9    quite simple in our opinion and not confusing to the jury to

10   explain that big-rigging a form of price-fixing because in this

11   instance the jury has heard about bids instead of necessarily

12   always prices.  They have heard about both in this case.

13        THE COURT:  Mr. Fagg?

14        MR. FAGG:  Your Honor, to respond to that, in

15   Paragraph 1 of the Indictment it talks about rigging bids and

16   fixing prices.  In Paragraph 2 of the Indictment it talks about

17   "and to fix prices and to rig bids."  And I understand why they

18   wanted to include bids in this because we heard bids 10,000

19   times in the course of this trial, but the reality is that's

20   the case that they indicted.

21        THE COURT:  Yeah.  Of course, the jury is not getting

22   the Indictment, but Mr. Fagg is right, the preliminary

23   instruction did mention both terms and that's the charge.  I am

24   going to stick with the original language on those two

25   paragraphs.  The language as you will note is not specific to

4616

 1   this case.  It's a general language.  And so I don't think that

 2   it would -- to the extent it doesn't fit with the facts

 3   perfectly, it's not because the instruction misleads anyone to

 4   that effect.

 5        Mr. Beller, you had some additional wordsmithing.

 6        MR. BELLER:  I do.  Hopefully by interlineation if the

 7   Court turns to the Court's copy on Page 25, the first full

 8   paragraph starts with, "The mere fact," on Page 25 of the

 9   Court's version, not the government's suggestion.

10        Your Honor, I am asking that the word "may" be

11   interlineated between "defendants" and "have" so that the

12   sentence as written currently seems to imply that it is a fact

13   that the defendants engaged in parallel pricing, so I would ask

14   that that be changed to read, "The mere fact that some or all

15   of the defendants may have engaged in similar or parallel

16   pricing."

17        THE COURT:  Ms. Cheng, any problem with that?  It

18   seems appropriate.

19        MS. CHENG:  No, Your Honor.

20        MR. BELLER:  Thank you, Your Honor.  In addition,

21   consistent with the arguments that the Court just heard, the

22   last paragraph of that same page, "The fact that competitors

23   exchanged price," I would ask to be consistent that we

24   interlineate "for bids or bidding information does not

25   necessarily establish an agreement to fix prices."

1          THE COURT:  Well, maybe to keep it consistent with the

2    fact that we have two paragraphs to begin the instruction, one

3    talking about bid-rigging and one talking about price-fixing,

4    it should say, The fact that competitors may have exchanged

5    price -- did you say price information and bid information or

6    how did you -- does not necessarily establish an agreement to

7    fix prices or to rig bids.

8          MR. BELLER:  Perfectly appropriate, I think, change,

9    perfectly appropriate.

10          THE COURT:  Ms. Cheng, what do you think about that

11    one?

12          MS. CHENG:  We would object to that, Your Honor,

13    because bid information implies some type of future prices,

14    which is unlike maybe the standard designation price

15    information which can be found in public or perhaps some other

16    location and can include past or present.  I think bid

17    information carries with it the sense that it is future bids

18    rather than past bids.  And I think that would be an

19    inappropriate instruction for the jury to think that exchanging

20    future price information is somehow -- is somehow -- is somehow

21    could not be a violation.

22          MR. BELLER:  Respectfully, Your Honor, I think that

23    changes the law.  The Sherman Act does not differentiate

24    specifically current pricing versus future pricing in terms of

25    one being illegal and the other being -- one being legal and

 1    the other being illegal.  In fact, to Ms. Cheng's point, the

 2    instruction and the law as a whole says that it does not

 3    necessarily establish an agreement to fix prices.  That means

 4    in the alternative, Ms. Cheng's argument can certainly be

 5    correct that it does, but at the same time what the law says is

 6    that it doesn't necessarily.  And that applies to both pricing

 7    information, as well as bid information, in other words,

 8    current price and future price.  It is just more properly and

 9    accurately summarized with the inclusion of bid-rigging.

10           THE COURT:  Ms. Henry, go ahead.

11           MS. HENRY:  Your Honor, I was just going to provide

12    some further legal support to the proposition that Mr. Beller

13    just raised which is the *Gypsum* case itself involved exchanges

14    of information about offers that had been made to customers,

15    and that was an information exchange case and as you're aware

16    it was found not to be price-fixing.

17           THE COURT:  Okay.  Thank you.

18           Mr. Pollack?

19           MR. POLLACK:  Yes.  I would just have one minor

20    suggestive change and that would be, "The fact competitors

21    exchanged price information or bid information," as opposed to

22    "and."

23           THE COURT:  Yeah, I wrote it down as "or."

24           Ms. Carwile?

25           MS. CARWILE:  Yes.  I just wanted to remind the Court

1    that prior to the break, Mr. Feldberg had suggested the

2    alternative language which the Court quoted in Footnote 31

3    which actually would address the concerns stated here regarding

4    prices and bid information or bid information to Mr. Pollack's

5    point.  The *Suntar* case specifically notes that it is not

6    unlawful to exchange bid information.

7              THE COURT:  Good point.

8              MS. CARWILE:  So I think that's why Mr. Feldberg had

9    suggested taking those two quotes and replacing the first

10   sentence of this paragraph with those two quotes.  That's all.

11             THE COURT:  Mr. Beller?

12             MR. BELLER:  And I would agree with that, Your Honor.

13             THE COURT:  We still need to figure out to work that

14   in were we to follow that suggestion.

15             MS. CARWILE:  To point if the Court would like a

16   red-line just as to that particular point, I have that

17   available for counsel.  And I can provide that to Ms. Grimm as

18   well.

19             THE COURT:  Of course.

20             MS. CARWILE:  Your Honor, if I can draw your attention

21   to one other addition that was made in this red-line.

22             THE COURT:  Yes.

23             MS. CARWILE:  You may have already seen it, but on

24   Page 26 we had also suggested to add the word "competitors" at

25   the beginning of that string set, for lack of a better phrase,

1    not necessarily lawful to exchange information.

2           THE COURT:  Ms. Cheng, whenever you are ready to

3    address --

4           MS. CHENG:  Your Honor, we disagree with the inclusion

5    of the second sentence as duplicative.  It seems to say the

6    exact same thing as the first sentence which stands on its own

7    as a sufficient and accurate statement, so there is no reason

8    to include two sentences arguing the same point.

9           THE COURT:  Sorry.  I didn't quite follow you.  When

10   you were talking about the second sentence or which sentences

11   are you looking at?  Are you looking at the sentences from the

12   instruction that Ms. Carwile just tendered or are you looking

13   at the Court's?

14          MS. CHENG:  That's correct.  I apologize.  It's the

15   instruction from Ms. Carwile.

16          THE COURT:  When you say the second sentence, can you

17   read the first part of that?

18          MS. CHENG:  Sure.  The second sentence begins, "It is

19   not unlawful for."

20          THE COURT:  Got it.  And that's the quote that is

21   taken from *Suntar* which is cited in Footnote 31 of the Court's

22   instructions.

23          MS. CARWILE:  That is correct, Your Honor.

24          THE COURT:  And you think that that is duplicative of

25   what?

4621

1          MS. CHENG:  The immediately preceding sentence which

2     Ms. Carwile also suggested.

3          MS. CARWILE:  If I can briefly indicate the difference

4     there.  These two sentences deal with both the exchange of

5     pricing information and the exchange of bid information.  And

6     I -- we left them like this because that's what the case law

7     directly states.

8          MS. CHENG:  Perhaps an easier way to address that is

9     to say "even regarding price or bids," rather than -- having

10    two separate sentences with the only change being price and

11    bid.

12         THE COURT:  Ms. Carwile?

13         MS. CARWILE:  I think that -- I would respectfully

14    disagree that these two sentences say the exact same thing.  I

15    think that given the government's allegation here that there

16    was both the exchange of price information and their focus on

17    the exchange of bidding information and in their words future

18    pricing or future bidding, that the correct statement of the

19    law here which are again two quotes directly from the Court

20    citations make clear the state of the law with regard to both

21    price exchange and separately, relatedly perhaps, but

22    separately bidding information.  I think there are two separate

23    statements here.

24         THE COURT:  Ms. Cheng, anything else?

25         MS. CHENG:  Your Honor, I will repeat again that it is

1    duplicative.  And I think that can be shown by the fact that

2    these cases were originally cited by the Court for one

3    proposition in one single sentence because it really is meant

4    to reach the same point about mere exchange of information.

5    And it seems odd to me to have two full sentences making the

6    same point.

7           And I am not sure the jury will appreciate or

8    understand the difference here when, as mentioned earlier, the

9    government has a single theory on price-fixing and bid-rigging,

10   which this conversation too highlights to me a little bit of

11   the confusion that can occur to have price-fixing and

12   bid-rigging be separated in the way that we've discussed

13   because it does create confusion for the jury to think that

14   there are perhaps two theories of the case and that the

15   government must show a separate type of -- a form of

16   price-fixing or a form of bid-rigging that involves a high

17   bidder, a low bidder, who should refrain, or that type of

18   rotational process.

19           THE COURT:  Yeah.  Of course, the instruction starts

20   off with a paragraph that differentiates between price-fixing

21   and bid-rigging, but in general terms.  And what Mr. Feldberg

22   was getting at is that those quotes describe or the language

23   describes those two different situations, so I don't think that

24   there would be a danger of jury confusion.

25           Moreover, the reference from *Suntar* does not discuss

4623

1    bid-rigging in the way that you're concerned about, in other

2    words, some factually inapplicable way to this case.  Instead,

3    it uses general language.  So I don't think that the -- what we

4    are referring to as the second sentence, the one that begins

5    with, "It is not unlawful," I don't think that that's

6    duplicative.

7           And it does to me provide the jury with some

8    additional information too, in particular the preparation of a

9    bid language I think would be helpful information to the jury.

10          MS. CHENG:  Your Honor, would you be amenable to maybe

11   keeping the second sentence and adding "a bid or price" perhaps

12   just to avoid the duplication?

13          THE COURT:  Well, once again, the subject of the

14   paragraphs are two different things, one on price-fixing, one

15   on bid-rigging.  And they are, I think, correct statements of

16   the law, so I am inclined to keep them.

17          MS. CHENG:  Understood, Your Honor.

18          THE COURT:  But we need to work it in.  Assuming that

19   we go with those two, which I am inclined to do, we need to

20   work on the remainder of the paragraph because I think that

21   that is somewhat awkward.  The rest of the paragraph doesn't

22   work quite as well.

23          MS. CHENG:  Your Honor, I understand the Court has

24   already ruled in rejecting the inclusion of bid-rigging as a

25   form of price-fixing in the first paragraph, but would the

1   Court be comfortable, if we were to include both of these

2   paragraphs, to begin the second paragraph with "bid-rigging is

3   a form of price-fixing," just to avoid confusion that there are

4   two different theories and that some of the allegations of the

5   Indictment go to bid-rigging and some of the allegations go to

6   price-fixing when in reality the same proof is being used to

7   show a price-fixing and bid-rigging conspiracy in this case.

8           THE COURT:  Well, the government did charge both, and

9   earlier you indicated that the government is not backing off of

10  that.  We defined both concepts in general terms.  It would

11  seem to me -- and the quotes that Mr. Feldberg has incorporated

12  speak in general terms too, so I think that the type of

13  differentiation that you wanted to make can be done by way of

14  an argument certainly, but I don't -- if everyone had agreed to

15  the proposal to define bid-rigging as a form of price-fixing, I

16  was okay with doing that.  But the defendants after having

17  thought about it prefer the differentiation, which I don't

18  think is unfair or improper given the fact that that's how the

19  Indictment reads.  So I would not be -- I don't think that that

20  would be appropriate to try to define them together given the

21  fact that there are objections to it.

22          MS. CHENG:  Thanks, Your Honor.

23          And if I can just mention, and if the Court's decision

24  is to have two separate paragraphs, one on price-fixing, one on

25  bid-rigging, I understand that's where -- how the Court has

 1  ruled, but I wanted to point out specifically the sentence

 2  which begins in the second paragraph, the sentence which

 3  begins, "A conspiracy to rig bids may be an agreement among

 4  competitors about the prices to be bid," et cetera.  And this

 5  is on Page No. 23, I believe, of the Court's instructions that

 6  we received yesterday.

 7       So the government does continue to take issue

 8  especially with this sentence because it seems to create some

 9  type of specific burden on the government or some type of -- it

10  talks about facts that are simply not in issue here because

11  it's not the kind of bid-rigging case where there would be high

12  and low bidders, as I mentioned earlier.  The purpose for using

13  bids is because bids are how prices manifest in this market.

14       THE COURT:  Yeah, but what is there about the first

15  sentence of the second paragraph that would tell the jury

16  something misleading about this case?

17       MS. CHENG:  It's the fact that it gives very specific

18  facts such as who should be the successful bidder, who should

19  bid high, who should bid low.  Again, this is geared very much

20  toward a typical bid-rigging case like in *B&H* where they did

21  have asphalt suppliers or construction suppliers choosing among

22  themselves whose turn it was to win a bid effectively.  And in

23  those cases it's a winner-take-all market where they

24  effectively divided volume in terms of you win this time, I win

25  this time, and that's just simply not the facts here.  And the

1    inclusion of this instruction we believe would be confusing as

2    a result.

3         And they might also think that the idea of bids is

4    somehow distinct and separate from the idea of prices in this

5    case, but really they are one and the same.  And we want to

6    avoid a situation where if they think of the word "bid," they

7    are only thinking about, well, is there somebody who bid high

8    and somebody who bid low and somebody was a successful bidder

9    and somebody who was the unsuccessful bidder?  And we want to

10   avoid a situation where the jury's mind goes there if they hear

11   the word "bid" because bids are really prices.

12        THE COURT:  I am going to reject those arguments.  The

13   first paragraph talks about certain things that aren't

14   necessarily true in this case either, I mean, price promotions,

15   things of that nature.  You heard a little bit about that in

16   regard to maybe it was Chick-fil-A being on some specials

17   during the course of the summer or whatnot, but the

18   descriptions here are general and it doesn't necessarily apply

19   to the facts.  I don't think that the intent of the language is

20   to describe exactly what the facts are in this particular case.

21        And, of course, it says, "A conspiracy to rig bids may

22   be an agreement about the prices to be bid."  It seems to

23   apply.  "Who should be the successful bidder," maybe not, and

24   things of that nature.  So I don't think the fact that there is

25   simply a description of what bid-rigging is would necessarily

1    mislead the jury in any way, shape or form.  And, in fact, the

2    intent of that language was simply to let the -- give the jury

3    a general understanding of what bid-rigging may involve.

4    That's what it says, may involve.

5           Ms. Henry.

6           MS. HENRY:  I have a suggestion with regard to that --

7    the sentence right after the *Suntar* language that you had

8    raised didn't quite fit anymore.  "There may be legitimate

9    reasons that would lead competitors to exchange price

10   information."  And then there say "other than fixing prices or

11   rigging bids" rather than put the other -- take out the "other"

12   at the very beginning of the sentence and put it at the end.  I

13   think that makes it -- I think that answers Your Honor's

14   concern about it not flowing correctly.

15          THE COURT:  Yeah, I think that that helps, there is no

16   doubt about it.  I think that makes it read more naturally.

17          MS. HENRY:  And then I have a question.  When we

18   started on this particular instruction, Mr. Beller had the

19   issue on the duplicative paragraphs.  And I didn't know whether

20   you had addressed that issue yet or whether we had come to

21   closure on that.

22          And I will turn it back to Mr. Beller.

23          MR. BELLER:  And before we go there, I am hoping we

24   may just be able to finish with this particular paragraph for

25   just a moment.  The only additional request that I would make

4628

1    in addition to what's been articulated by my colleagues is

2    adding the word "further" immediately preceding "It is not

3    illegal for a competitor to obtain."  As we are talking about

4    the natural flow of language, I believe "further" is necessary

5    there in order to tie the concepts together.

6         THE COURT:  I am sorry, where are you, Mr. Beller?

7         MR. BELLER:  Your Honor, I am -- now I am on

8    Ms. Carwile's edition, this is Page 26.  Immediately following

9    her red interlineation, the next sentence, there may be

10   other -- or now potentially as modified, "There may be

11   legitimate reasons that would lead competitors to exchange

12   price information other than price-fixing and bid-rigging."

13   Immediately following that, I would ask for the word, "Further,

14   it is not illegal for a competitor to obtain."

15        THE COURT:  That last sentence that Mr. Beller just

16   mentioned is a bit of an odd sentence because it talks about

17   sources of information other than from competitors, which is

18   why Ms. Carwile suggested we add competitors which is another

19   reason of saying why do we need it in the first place.  I have

20   doubts about that.  Now, that could be an important concept

21   like, hey, competitors can use information from a variety of

22   sources and that's okay.  But if we say further, that suggests

23   that it's a different concept.

24        So then adding in the word "competitors" to the list I

25   think draws attention between the word "further" and then

4629

1   "competitors" because it seems like the same thing again.

2   That's why "further" may be okay, but maybe that means that we

3   should eliminate "competitors."  And the meaning of that

4   particular sentence would be that business people use -- can

5   use a variety of sources of information.

6           MR. BELLER:  And, Your Honor, based on that I --

7   hearing what the Court is saying, I think what is

8   extraordinarily important about that line is it's not simply

9   the legality of having the information, but to obtain it, rely

10  on it and act on it is what is key and what's crucial.

11          So in order to address the Court's concern, if we need

12  to cross out the word "further" or rather decline my invitation

13  to include the word "further," I would certainly be happy to

14  withdraw our request.

15          THE COURT:  Sure.

16          Ms. Henry, did you have anything?

17          Okay.  Mr. Pollack, go ahead.

18          MR. POLLACK:  I have got something else related to

19  this instruction, but it does not relate to the issues we just

20  have been discussing, so I want to make sure the Court is done

21  with it before I raise anything else.

22          THE COURT:  We have some things stacked up because, of

23  course, Mr. Beller did make some other issues.  Why don't you

24  go ahead, Mr. Pollack.  I am making some notes and hopefully we

25  will, before leaving this one, we will get to everything.

1    MR. POLLACK:  Thank you, Your Honor.  The issue I was

2  going to address I believe is two paragraphs above the

3  paragraph that we've just been discussing, and I think it's the

4  last partial paragraph on Page 24 of the Court's instructions

5  that begins with, "Evidence of the bids submitted," and it goes

6  on.  "Evidence of the bids submitted and prices actually

7  charged by the defendants has been admitted."

8         But, of course, it's not the corporate entities that

9  are on trial here.  It's the individual defendants.

10         THE COURT:  That's a good point.

11    MR. POLLACK:  So I would suggest "charged by the

12  defendants' employers has been admitted to assist you in

13  deciding whether a defendant entered into an agreement to fix

14  prices."

15         THE COURT:  Or we could just strike the words "by the

16  defendants."

17    MR. POLLACK:  The price actually charged has been

18  admitted to as you in deciding whether -- then "they" doesn't

19  make sense, changing the "they" to "a defendant."

20         THE COURT:  "Whether the defendants" we could say

21  instead of "they."

22    MR. POLLACK:  I would ever "a defendant" because it's

23  an individualized consideration for each defendant.

24         THE COURT:  "Or a defendant."  How do people feel

25  about that?  So the proposal would be that after the word

1    "charged" we strike the words "by the defendants."  And then in

2    the second line of that sentence, we say "whether a defendant

3    entered into an agreement."

4              Ms. Cheng, any problem with that?

5              MS. CHENG:  No objection.

6              THE COURT:  That's a good catch.  Let's take that out.

7              Mr. Fagg?

8              MR. FAGG:  Thank you, Your Honor.  Circling back very

9    briefly on the point about competitors that Ms. Carwile raised,

10   I do think it's appropriate to include competitors there.  That

11   cites to the *Mitchael* or -- I am not sure how you pronounce

12   that.

13             THE COURT:  Yeah, I don't know either.

14             MR. FAGG:  How about the *Itracorp* case, which

15   specifically deals with competitors.  And if we expect the jury

16   to interpret the end of that phrase "and others involved in the

17   production and sale of broiler chickens" after it's coming

18   after things like media and internet sources, it seems like we

19   are burying the lede there, so I just wanted to note that.

20             THE COURT:  Yeah.  Anyone else have any proposals or

21   should we let Ms. Cheng do a comprehensive run down?

22             Go ahead.

23             MS. CHENG:  I will try to be as comprehensive as I

24   can.

25             So with regard to this last sentence we have been

1    talking about, there may be other legitimate reasons -- sorry,

2    "It is not illegal for a competitor," so that sentence as it

3    stands is almost five full lines, I think would just be too

4    confusing.  And the government would instead prefer what the

5    Court has proposed just now which is a simpler sentence saying,

6    "Business people rely on various sources," or something to that

7    effect, "as a part of doing business."

8            Of course, that doesn't have to be the exact terms,

9    but I think that would actually make it a lot clearer than

10   putting in a list of competitors, customers, media, internet,

11   brokers, et cetera.  And it effectively just describes

12   everything that perhaps a business person can do, such as

13   obtain, rely upon and act upon information, so it may be easier

14   simply to have that statement.

15           THE COURT:  Yeah, I am going to overrule that

16   suggestion.  I do think that this is an appropriate

17   instruction.  As long as -- I think we would not take up

18   Mr. Beller's suggestion, although he is comfortable with

19   withdrawing it, starting it off with "further" which would

20   suggest a separate concept.  But certainly adding the word

21   "competitor" in there wouldn't -- it's not an incorrect

22   statement of the law.  But it does more broadly define or at

23   least convey the concept that a competitor can rely on all

24   sorts of information.  It just can't rely on information that

25   involves an agreement to fix prices.

1          What about -- Ms. Cheng, sorry.  Anything else on that

2     point, Ms. Cheng?

3          MS. CHENG:  Yeah.  I want to add maybe at the end of

4     the sentence every time it says "to fix prices," for

5     consistency with our discussion to also add "or rig bids."  And

6     that might be true for other statements, perhaps not just in

7     this instruction, but others as well throughout.

8          THE COURT:  Yeah, I think that that's probably

9     appropriate because we have to take a look at each sentence,

10    but that would flow naturally from the differentiation.

11         MS. CHENG:  Thank you, Your Honor.

12         And with the addition of "competitor" in the sentence

13    that begins, "It is not illegal," just because it is a longer

14    sentence and I believe it is very important, this final clause,

15    "so long as there is no agreement to fix prices or rig bids,"

16    the government would suggest moving that to the first part of

17    the sentence so that the sentence begins, "So long as there is

18    no agreement to rig bids or fix prices, it is not illegal," et

19    cetera.  Otherwise, if it begins with "It is not illegal,"

20    perhaps the jury might miss this very important caveat which is

21    really the heart of the Sherman Act case, the agreement.

22         THE COURT:  I will be reading the instructions, so I

23    won't miss it.  I understand your point.  I don't think that

24    they would miss it.  In fact, oftentimes putting something at

25    the end of the sentence can be like a primacy or in this case

4634

1    it would be the opposite of it, the last thing they hear, but I
2    think that the sentence is clear as it is "so long as."

3         MS. CHENG:   Thank you, Your Honor.

4         I believe Ms. Henry has suggested with regard to the
5    preceding sentence, there may be -- let me know if I am
6    misinterpreting or didn't hear the suggestion properly.  Is the
7    new suggestion now for it to say, "There may be legitimate
8    reasons that would lead competitors to exchange pricing
9    information other than price-fixing or bid-rigging?"  Is that
10   where --

11        THE COURT:   I think that that is what Ms. Henry
12   suggested.

13        MS. HENRY:   I uttered "in fixing prices or rigging
14   bids."

15        THE COURT:   Yeah, that was essentially the suggestion,
16   yes.

17        MS. CHENG:   Your Honor, there might be some potential
18   confusion there from a jury who reads that sentence that might
19   think, well, as long as there is some legitimate reason, that
20   suggests that if there is one legitimate reason, that would
21   make the conduct okay and legitimate.  And especially paired
22   with the following sentence, I do worry that the idea could get
23   lost that you can have this type of conduct, legitimate
24   conduct, that is happening at the same time as an unlawful
25   conspiracy.

1        And one way to cure that would just be to not include

2    the "other than price-fixing or bid-rigging," and simply keep

3    the sentence as it was, "There may be other legitimate reasons

4    that would lead competitors to exchange price information,"

5    which I think conveys the same point.

6        THE COURT:  Yeah, I am a little bit confused by that

7    because if we left the language alone and it said "other" when

8    we just discussed price-fixing and bid-rigging, it would seem

9    to imply that moreover, there are other legitimate reasons to

10    exchange price information, but I don't think that that's

11    exactly what the government wants.

12        MS. CHENG:  Your Honor, we could simply remove the

13    "other" in the first sentence -- I guess now the third

14    sentence.

15        THE COURT:  Once again, Ms. Henry's proposed language

16    puts it in context.  So I would think that the government would

17    want that additional language as opposed to leaving the period

18    there because that puts the word "legitimate" more into the

19    context of not illegal.

20        MS. CHENG:  Right, Your Honor.

21        THE COURT:  Which the government I would think would

22    want.

23        MS. CHENG:  Right.  Nothing further on that, then.

24        THE COURT:  Okay.  So that sentence is okay.

25        Then how about some of Mr. Beller's points that he

1   made before lunch?

2         MS. CHENG:  I am sorry, Your Honor, could you remind

3   me, please, of those points?

4         THE COURT:  Sure.  We may need to fall back on

5   Mr. Beller too.  So in the third paragraph, Mr. Beller thought

6   that there was some duplicative language when compared to some

7   other portions of this particular instruction, although I can't

8   remember exactly where that is.

9         Mr. Beller, go ahead.

10        MR. BELLER:  Yeah, if I may have a moment, and I am

11   happy to show Ms. Cheng exactly what I am looking at, if that

12   would be helpful.

13        THE COURT:  I see it now too.  But go ahead,

14   Mr. Beller.  Why don't with you explain it just for the record.

15        MR. BELLER:  I will.  So, Your Honor, I am looking

16   at -- now we are working off of, I assume, Ms. Carwile's?  For

17   purposes of pagination, I just want to make sure I am

18   referencing the Court to the right paragraph and right pages.

19        THE COURT:  Why don't you refer to the Court's version

20   if that's happy.

21        MR. BELLER:  I will.  Thank you, Your Honor.

22        And I am looking on Page 24.  This is the first

23   complete paragraph that starts, "If you find that one or more

24   of the defendants," and that particular sentence ends with

25   "their objective is no defense."  So first I would point out

1    that that particular language does not seem to apply factually.

2    I recognize where that may come in in other antitrust

3    violations, but here there has simply been no evidence to

4    support the giving of such an instruction and I think that that

5    risks potentially confusing the jurors.

6         But I also note if we look to the next page, which is

7    Page No. 25, this is the top paragraph, an incomplete

8    paragraph, and I am looking at the sentence that starts with,

9    "Or such evidence may show."  And then again at the end of that

10   particular sentence, it finishes with "that the whole scheme

11   was unwise and should be abandoned."

12        Again, that seems duplicative of the language that I

13   had just referenced in the preceding page, No. 1; and No. 2

14   also strikes me equally as not having factual support in this

15   particular case and trial.  So I would ask that both paragraphs

16   be removed.

17        If the question is simply one of being duplicative,

18   Your Honor, I would ask that paragraph No. 2 be removed, only

19   because that's easiest to excise and still keep the rest of the

20   thought in context.  By No. 2, I meant the second clause, the

21   second reference.

22        THE COURT:  Yeah, the second reference being that

23   partial paragraph on the top of Page 25.

24        MR. BELLER:  That's correct.

25        THE COURT:  Ms. Cheng?

1          *MS. CHENG:*  Your Honor, we agree that the language is

2    duplicative here and would have a preference for keeping it in

3    the first paragraph to make it clear that there is no -- I

4    believe the purpose of the paragraph is to make it clear that

5    there is no overt act requirement that's at issue here, and

6    including it earlier I think would be more helpful for the jury

7    to establish that, but obviously I would defer to the Court.

8          *THE COURT:*  Okay.  So just to make sure that I am not

9    misunderstanding you, Ms. Cheng, are you suggesting that we

10   remove the entirety of that second sentence -- sorry, second

11   paragraph, the one that begins at the bottom of Page 24 and

12   carries over to the top of 25?

13         *MS. CHENG:*  We would like to keep the paragraph that

14   begins, "If you find that one or more."

15         *THE COURT:*  Yes, I understand that.  But you keep that

16   and then would we remove the paragraph that starts on the

17   bottom of Page 24?

18         *MS. CHENG:*  We would keep the paragraph with the

19   exception of the sentences that begin with "Or such evidence"

20   through the end of the sentence -- through the evidence of the

21   paragraph.

22         *THE COURT:*  Could you repeat that last sentence?

23         *MS. CHENG:*  So we would remove where the sentence

24   begins "Or such evidence" on the top of Page 25.

25         *THE COURT:*  Okay.  Mr. Beller, why don't we get your

1    reaction first, then I will ask other people.

2         MR. BELLER:  Your Honor, my reaction is I don't think

3    either paragraph is appropriate, but if one is going to be

4    excised and removed, I am perfectly comfortable with the

5    government's position that that be the second paragraph -- or

6    the second, I guess, repeat of the clause on Page 25.

7         THE COURT:  Okay.  Other reactions to Ms. Cheng's

8    proposal that we address the duplication argument, not

9    Mr. Beller's factual argument, by basically striking at the top

10   of Page 24 that part of the paragraph that begins, "Or such

11   evidence" down to the end, but we would retain the first two

12   sentences.

13        Mr. Fagg?

14        MR. FAGG:  I think you mean the top of Page 25, Your

15   Honor.

16        THE COURT:  Yeah, sorry, at the top of 25 where in the

17   first full sentence that says, "Or such evidence," strike that

18   down to the end of the paragraph, but retain the two sentences

19   that begin that paragraph that starts on bottom of Page 24.

20        MS. CHENG:  Your Honor, I apologize.  I misspoke

21   earlier when I said through the end of the paragraph.  I didn't

22   realize there was a separate sentence which begins

23   "Regardless," which the government does want to keep in the

24   instruction.  So it simply would be the sentence that is

25   duplicative that we would want to remove, just the single

4640

1    sentence that begins, "Or such evidence."

2         THE COURT:  I understand.  But if we make the sentence

3    that brief, given the fact we ended the sentence Mr. Beller was

4    talking about on Page 24, it seems to be the same concept or

5    similar at least, not exactly the same concept.

6         Anyone else have any comments, Mr. Fagg?

7         MR. FAGG:  No, Your Honor.  I was just going to say to

8    the extent that the sentence -- the two sentences, the first

9    which begins at the top of Page 25 "Or such evidence," and then

10   through the end of that paragraph, if that is proposal, we

11   don't have an objection with those being removed.

12        THE COURT:  Ms. Cheng?

13        MS. CHENG:  Your Honor, again I want to emphasize that

14   the government would like to keep the sentence beginning

15   "Regardless."  Perhaps because now the paragraph is shorter, we

16   could remove the word "Regardless" and simply say, "if the

17   conspiracy as charged existed, it was lawful."  I don't believe

18   it should be swept into removal due to duplication because that

19   same sentence is not duplicated in the same way at the bottom

20   of Page 23.

21        THE COURT:  Okay.  Yeah, I am going to -- I think that

22   we should go ahead and we'll strike the language beginning with

23   "Or such evidence" down to the end of it.  Because we've

24   already stated in the per se violation instruction, we state

25   the same thing at the bottom of that instruction, "If there was

1    in fact a conspiracy, it was illegal," and so that's the same

2    concept.  So I think that it would not remove anything, that

3    concept from the jury.

4            Now, let's get back to -- Ms. Cheng, did you want to

5    bring up anything about Mr. Beller's factual issue with the

6    paragraph on the top of Page 24?

7            *MS. CHENG:*  Your Honor, I believe it is part of the

8    standard instruction to show that there is no overt act

9    requirement in the Sherman Act.  And for similar reasons as the

10   Court ruled for why the standard instruction for bid-rigging

11   should come in, even though there might not necessarily be

12   facts in the case that indicate this, I think it's important to

13   include it, especially if defense counsel do decide to make

14   arguments related to these points.

15           *THE COURT:*  I am going to overrule Mr. Beller's

16   suggestion.  I do think it's appropriate language.  There I

17   think is -- jurors may -- a reasonable jury could decide that

18   perhaps they didn't live up to the agreement, but there was an

19   agreement to rig bids, so I think that that would be

20   appropriate language to include.

21           Anyone else?  I guess have we talked about Ms. Henry's

22   suggestion that to the paragraph that starts at the bottom of

23   Page 25, "The fact that competitors exchange price information

24   or bid information does not necessarily establish"-- that's

25   right, Ms. Cheng brought that point up more recently.  And I

1    don't think we have a ruling on that; is that right?

2        *MS. CHENG:*  Your Honor, I believe what we previewed

3    yesterday was related to the preceding paragraph on exchanging

4    similar -- engaging in similar or parallel pricing because the

5    evidentiary record here does not support a situation where the

6    defendants can use a form of follow the leader as it was in

7    some -- in *Lischewski* or in cases where pricing was publicly

8    available.

9        In fact, in this case we are hard pressed to see how

10   there could be some type of legitimate follow the leader in

11   these bilateral sequential bids that are meant to be

12   confidential.  And we have had multiple customers testify as to

13   the confidentiality of these rounds of bidding, so the mere

14   fact of reaching out to a competitor in order to acquire a

15   pricing list I think is far from the situation of simple

16   parallel pricing that you see in the cases or the typical

17   situations where a gas station looks across the street and

18   sees, you know, the price of its competitor or tuna on the

19   shelf as in the case of *Lischewski*.

20       *THE COURT:*  Mr. Fagg?

21       *MR. FAGG:*  I don't think we need to look any further

22   than the testimony from just yesterday, Ms. Warble, or the

23   other witness from George's who was talking about -- or perhaps

24   it was Ms. Ray, but talking about how it was all over the

25   market about Pilgrim's pricing and how that information was

1    being shared.

2        THE COURT:  Yeah, that's not bid information.  The

3    government is not worried about the term price information.  So

4    the question would be whether or not the exchange of bid

5    information.  Of course, we got into that a little bit in terms

6    of which -- was it Golden Corral that used the confidentiality

7    agreement?  I can't remember.  But as you will recall, we

8    talked a little about that and whether it was a violation of

9    the agreement to exchange your bid with someone else.

10       And even in terms of that confidentiality agreement, I

11   held that the confidentiality agreement did not prohibit that

12   because it was the bidder's own information.  The price that

13   they are going to bid belongs to them.  It's not some type of

14   protected information under those agreements.

15       And it is true that the government introduced evidence

16   that would, you know, in fact, through Mr. Lewis, for instance,

17   that the only way that the bid process would really work the

18   way that the chicken consumers or the companies -- that would

19   work from their perspective would be if other bidders weren't

20   privy to the bid information.  So I think that that's the issue

21   here, whether bid information would be a different category of

22   information and thereby be inappropriate to work into the first

23   sentence of the last paragraph on Page 25.

24       MR. FAGG:  The bid information would be

25   inappropriate -- I need to look at the language.  I apologize.

1        THE COURT:  Sure.

2        MR. FAGG:  What page was it, Your Honor?  I'm sorry.

3        THE COURT:  Let me make sure I am looking at the right

4   one.  Yeah, the Court's version, Page 25, the last partial

5   paragraph beginning with, "The fact that competitors exchanged

6   price information."  The proposal was we modify that to say,

7   "The fact that competitors exchanged price information or bid

8   information does not necessarily establish an agreement to fix

9   prices or rig bids."

10       MS. HENRY:  Ms. Carwile's proposal suggested

11  eliminating that sentence in its entirety in that it was

12  covered by the next two points, which would be the *Itracorp*

13  case and the *Suntar* case, but that may be just another sort of

14  way to look at this.

15       THE COURT:  True.  I didn't notice that, but that's

16  true.

17       MS. HENRY:  It might be also why we are having trouble

18  finding it.

19       MR. FAGG:  A couple points on that, Your Honor.  In

20  the event that the Carwile motion is not accepted, that the

21  *Suntar Roofing* case goes exactly to -- it does address bids if

22  you look at Footnote 31 at the bottom of Page 26.  And two, in

23  the scenarios that Your Honor went through just a moment ago

24  talking about Mr. Lewis, there has certainly been testimony in

25  this case about the customers themselves who were supplying

1    information to the suppliers over and over again.

2         THE COURT:  And to tell you the truth, you'd have to

3    go back to *Suntar* and *Suntar* I think describes the law.  So one

4    idea that you might want to think about, Ms. Cheng, is just

5    whether we go with what we are now calling -- are we calling it

6    the Carwile variation?

7         MS. CARWILE:  Whatever you would like to call it, Your

8    Honor, is fine by me.

9         THE COURT:  Perhaps given the fact that I have already

10   adopted the two suggestions about the case, that we just

11   eliminate that sentence.

12        MS. CHENG:  No objections to that, Your Honor.

13   Perhaps I got confused here about the paragraph we were talking

14   about.  What I was trying to raise was not about the price

15   exchange paragraph, but rather the paragraph immediately before

16   that which talks about conscious parallelism or basically when

17   defendants have engaged in similar or parallel pricing.  And I

18   think part -- I think this discussion illustrates that there is

19   some duplication or overlap here between this concept of

20   permissible parallel pricing and this concept of price exchange

21   that is legitimate.

22        And just to avoid any doubt, I am looking at Page 25.

23   I am looking at the first full paragraph and that's the one

24   that I am looking at from the Court's instruction, not --

25        THE COURT:  I am sorry, but what suggestion do you

1    have for that one?

2           MS. CHENG:  We object to the inclusion of the entire

3    paragraph.  So the government's proposal would be to remove the

4    paragraph entirely because there is no evidence of parallel

5    pricing where, you know, because of the reasons mentioned

6    earlier, because the pricing lists are not private, because

7    they are bilateral confidential bids, because we have testimony

8    indicating that the pricing would be confidential and there

9    would be therefore no way for the competitors to legitimately

10   copy each other's price lists or future bids.  And as a result,

11   I think simply having the price exchange paragraph should be

12   sufficient to address any concerns that are actually in the

13   record about what defendants believed was legitimate activity.

14          THE COURT:  Okay.  Ms. Henry?

15          MS. HENRY:  Your Honor, we strongly disagree.  That is

16   simply not the law.  Parallel pricing is a separate concept.

17   The government is specifically arguing in this case the issue

18   of alignment of prices.  It could not be more relevant directly

19   to the facts in this case.

20          THE COURT:  Mr. Beller?

21          MR. BELLER:  I guess only to the extent it's

22   necessary, I would remind the Court that Mr. Skalak testified

23   that Chick-fil-A frequently shared competitors' pricing with

24   other competitors.  Mr. Ledford testified that he frequently

25   shared pricing information of other competitors.  His testimony

1    was to the fourth decimal point.  He also testified that he

2    frequently offered percentages.  You are X number of percentage

3    off from a competitive offer.  We spent some time talking about

4    whether that was the lowest offer he had or something along

5    those lines, something different than that.

6           Mr. Brink testified and there is an exhibit in place

7    that says to one competitor over another you will match the

8    price of the competitor.  Now, to be fair he also said that he

9    did not intend them to compare prices.  But the reality is

10   there is a significant amount of information in front of this

11   jury that would warrant and/or justify many of these suppliers

12   having either the same or similar pricing, including that

13   several of the bids simply repeated the same price from the

14   year prior, and also including the fact that in certain

15   circumstances the models themselves have bulleted instructions

16   that specifically say what price to actually input.

17          And so none of this is to argue the closing to the

18   Court, but rather to say that there is certainly factual

19   support for the argument as to why this parallel pricing

20   instruction should be included because the jury does need to,

21   in fact, determine the facts for themselves and know how to

22   apply those facts to the law as instructed by the Court.

23          THE COURT:  Ms. Pletcher?

24          MS. PLETCHER:  Thank you, Your Honor.

25          The legal point, parallel pricing is not limited to

1    situations where the pricing is only obtained through public

2    means.  And *Suntar* was clear that the exchange of bid

3    information, for example, could also constitute parallel

4    pricing.  Thank you.

5          THE COURT:  Anyone else?  Then I will allow Ms. Cheng

6    to respond.

7          Mr. Pollack?

8          MR. POLLACK:  Yes, Your Honor.  For all the reasons

9    stated, I do think it is very important to have this paragraph

10   in there.  I was actually going to propose expanding it with a

11   proposal that was in our original proposed instructions that

12   fell out in the Court's instructions, and I don't know if

13   that's because the Court had considered it and rejected, but I

14   did want to raise it.  We had language to the effect that, "You

15   should consider whether the different persons adopting similar

16   practices did so because of their own independent judgment as

17   what was in their own best economic interest.  In deciding

18   this, you should consider whether the practices employed made

19   sense in light of the industry conditions and whether the

20   benefits from those practices were dependent on other persons

21   doing the same thing."

22         And we cited as authority Modern Federal Jury

23   Instructions.  It's Criminal Instruction 58.01.

24         THE COURT:  Okay.  Yeah, I am not going to give that

25   one.  I think it could potentially confuse the jury and suggest

1    that they use an economic cost benefit analysis in order to

2    perform their evaluation of the evidence, so I had some

3    concerns about that.

4         MR. POLLACK:  Thank you, Your Honor.

5         THE COURT:  Thank you, Mr. Pollack.

6         Ms. Cheng, go ahead.

7         MS. CHENG:  Your Honor, I want to emphasize again that

8    this is just simply -- this idea of parallel pricing is simply

9    not what we are talking about in this case.  The suppliers were

10   not engaged in parallel pricing techniques with each other.

11   Within the industry it's hard to imagine what parallel pricing

12   would look like among the competitors that is distinct and not

13   captured by the instruction on information exchange.  The

14   example Mr. Beller gave about Chick-fil-A and Mr. Skalak was

15   precisely him exchanging prices.  The idea of conscious

16   parallelism where one supplier follows another supplier is just

17   simply not at issue in this case.

18        THE COURT:  What if the words "or parallel" were

19   removed?  Would the rest of the paragraph be find with you?

20        MS. CHENG:  As in simply the words "or parallel

21   pricing" on the first sentence?

22        THE COURT:  No, the words "or parallel."  In other

23   words it would say, "The mere fact that some or all of the

24   defendants may have engaged in similar pricing does not by

25   itself establish."

4650

1              MS. CHENG:  If I can have one moment to confer.

2         Your Honor, if the Court is inclined to keep this

3    paragraph in, we would -- we agree with removing the "or

4    parallel" portion of the first sentence.  And we would also ask

5    if the Court could please add as shown in our proposed red-line

6    a statement to the beginning of the sentence that begins with,

7    "A business may lawfully copy its competitors price lists."

8    And either change -- let me take a step back.

9         So looking at that sentence which begins, "A business

10   may lawfully copy its competitors' price lists," I will start

11   by expressing our concern with this clause which is that

12   because there is testimony that these prices were confidential

13   and because the government was prohibited from introducing

14   confidentiality agreements related to sharing price lists and

15   bid information, the government really believes that it would

16   be prejudicial to keep that phrase in as is and would

17   recommend --

18             THE COURT:  I am sorry, which phrase?

19             MS. CHENG:  "A business may lawfully copy its

20   competitor's price lists," simply because we have so much

21   testimony in this case that it was an improper thing to share

22   your bid information and because we were not permitted to

23   introduce confidentiality agreements that explained that it was

24   not in line with those agreements to be sharing this

25   information.  And so we would suggest either removing that

1    portion of the sentence or at least making it clear by starting

2    the sentence with, "If, in fact, there were prices that are

3    publicly available."

4        THE COURT: However, that doesn't have anything to do

5    with the word "parallel," right?

6        MS. CHENG: No, Your Honor, but I think the reason for

7    its inclusion perhaps or the reason I think it fell within this

8    paragraph on this concept of parallel or conscious parallelism

9    is that typically that is how conscious parallelism would be

10   done within an industry.  So, you know, an airline would see

11   that a competing airline was going to have a promotion next

12   week and might decide independently it also would like to do a

13   promotion.  That's the kind of situation where you would be

14   copying off what your competitors are doing in a more

15   legitimate way than what's happening in this case where

16   defendants are possibly going against the spirit of a

17   confidentiality agreement or otherwise not -- within this

18   industry sharing bid information would not be a legitimate

19   business practice.

20       THE COURT: Okay.  Ms. Henry?

21       MS. HENRY: Your Honor, the law is parallel pricing.

22   The government has offered nothing to suggest that that is not

23   an appropriate way of looking at it.  As for their concept that

24   somehow the prices have to be publicly available before a

25   business can do parallel pricing, they have offered absolutely

1    no legal support.  And Mr. Beller has already explained why on

2    the facts of this case it would be entirely inappropriate to

3    not give that.

4        The government, if they want to stipulate that they

5    are never going to argue that the prices are aligned in some

6    manner, maybe we could consider a different instruction, but I

7    haven't heard that stipulation yet.  And that's their case.

8    What they are arguing here has absolutely no foundation in the

9    law or in the facts.

10       THE COURT:  All right.  Anything else on the points

11   that Ms. Cheng just mentioned both on the parallel -- you used

12   the word "parallel," but also removing that sentence that says,

13   "A business may lawfully copy its competitors' price lists."

14       MR. BELLER:  Your Honor, a business lawfully copying a

15   competitor's price is, in fact, the law in criminal law.  I

16   think as I understand the government's perspective, and that is

17   that there may have been a contract dispute, whether or not

18   there were confidentiality contracts and whether they were

19   enforceable is a completely different subject.  And as the

20   Court knows, they may be or could be handled through the civil

21   litigation.  We certainly believe that that is not, in fact,

22   the case as to my client.

23       So a business may lawfully copy its competitors' price

24   list is absolutely true even with a confidentiality agreement

25   in place only because what we're doing is trying to take a

 1    civil issue and import it as to the criminal analysis.  And the

 2    reality is in this case with the criminal analysis, the

 3    instruction as written is, in fact, an accurate statement of

 4    the law and I believe an accurate statement of the facts as

 5    provided to this jury.

 6              THE COURT:  Thank you.

 7              Ms. Cheng, go ahead.

 8              Mr. Fagg, did you have a point?

 9              MR. FAGG:  Sorry, just one last point.

10              THE COURT:  All right.  Then I will allow Ms. Cheng.

11              MR. FAGG:  Thank you, Your Honor.

12              On the point about parallel pricing, that is exactly

13    what Ms. Ray testified about yesterday.  And that e-mail that

14    was at issue there is an e-mail that the government introduced

15    as an 801(d)(2)(E) -- or 803(d)(2)(E) statement of

16    co-conspirators.  And the notion that somehow or another that

17    was not parallel action is just not supported by the record.

18              THE COURT:  Ms. Cheng, last word.

19              MS. CHENG:  Nothing further, Your Honor.  We will rest

20    on our prior.

21              THE COURT:  I am going to overrule the government's

22    objections.  I am going to leave in the words "or parallel."  I

23    think we can get caught up a little bit because we, as lawyers,

24    know the typical parallel cases, but I think that a jury would

25    find the term helpful.  And I do think that there is evidence

1    of not just similar, but adopting others' prices.  So parallel

2    I think would convey that concept that they could be the same.

3         The phrase, "A business may lawfully copy its

4    competitors' price lists," that is not specific to this case.

5    It's examples of the type of exchanges that are lawful.  And as

6    an example, I think it's appropriate to leave that in.  And I

7    also think more generally the government objected to the

8    inclusion of the entirety of the paragraph, and I will overrule

9    that objection as well.  I think that that is appropriate to

10   include this paragraph.  It's an appropriate statement of the

11   law.

12        Okay.  Have we -- any other problems with this

13   instruction?

14        I better quickly move to the next one which is the one

15   that begins on courts --

16        MS. CHENG:  Your Honor, as quick as I think the next

17   instruction will be, I do want to ask because the Court

18   mentioned we could discuss the "must" versus "should" language.

19        THE COURT:  Yeah, go ahead.

20        MS. CHENG:  Over lunch we had a chance to look into

21   this issue.  And we have some case law that we can -- or

22   excerpts from cases that we can pass around where the 10th

23   Circuit in other cases upheld the use of "must find him

24   guilty."  And probably the best evidence of this point I can

25   cite -- or not evidence, but the best point I can cite for that

1    is to look at the 10th Circuit pattern jury instruction on

2    reasonable doubt.  That's pattern 1.05 where the 10th Circuit's

3    pattern jury instruction reads:  If based on your consideration

4    of the evidence you are firmly convinced that the defendant is

5    guilty of the crime charged, you must find him guilty.

6         As a result, for symmetry, if the defendants intend to

7    change the "shoulds to" "musts," the government would like to

8    do the same in parallel for the equivalent instruction.  And I

9    will pass up the excerpt as well with your permission.

10        THE COURT:  Yes, go ahead.

11        So what we are talking about, then, is on the elements

12   instruction we've already made the change to say that, "If you

13   find that the government has not proved the elements, you must

14   find the defendant not guilty."  And then the question is

15   whether to be parallel in the paragraph immediately above it,

16   we should also say, "Then you must find the defendant guilty."

17        Anyone, have you had a chance to look at the

18   government's authority?  Anyone want to weigh in on that?

19        Mr. Beller?

20        MR. BELLER:  Your Honor, I am hoping that the Court

21   may just perhaps take on the next instruction and give us a few

22   minutes.

23        THE COURT:  Yeah, that's no problem.  We can come back

24   to it because we deferred it for a while anyway.  Obviously,

25   Ms. Cheng just didn't want to let that one go by, so why don't

1    we then switch over to the next instruction which is the

2    Multiple Conspiracies.  And the government has a proposal on

3    that one.

4         Ms. Cheng, why don't you go ahead and say anything

5    that you wish on your particular version, and then we'll take

6    up other comments in just a bit.

7         *MS. CHENG:*  Sure, Your Honor.

8         Let me begin with a statement of how as written the

9    instruction may be confusing for the jury.  The instruction

10   tells the jury to decide whether there is an overarching

11   conspiracy or multiple conspiracies and give very specific

12   instructions on, for example, what the repercussions are.  For

13   example, if they find they are separate conspiracies and not

14   the overarching one unless it's fully contained, they cannot

15   find the defendants guilty.

16        But as it stands there is not any guidance of how the

17   jury should make that determination in a sense that a juror

18   doesn't really have any legal framework or way to assess what

19   exactly counts as multiple conspiracies and when it is one

20   overarching conspiracy.  And the reason that's important to

21   give the jury a proper legal framework is that absent this

22   framework, the concern is that the jury might think that every

23   agreement or subpart of the agreement or the different means of

24   committing the conspiracy or the overarching conspiracy are

25   each in and of themselves sufficiently separate conspiracies

4657

1     that preclude some type of overarching conspiracy.

2          But the 10th Circuit has been clear in both *Mobile*

3     *Materials* and *Beachner*, which I cited to the Court yesterday,

4     that in a Sherman Act case the proper implication for -- the

5     proper finding should be whether there is interdependence among

6     the conspirators because and due to a shared common objective.

7     Interdependence is really the focal point of the analysis.  And

8     we don't say the word "interdependence" because it might be too

9     much a legal concept for the jury instruction, but it is really

10    important in our view to explain to the jury how you can find

11    an overarching antitrust conspiracy.

12         And absent this inclusion, I think the jury will be

13    really confused into thinking that, oh, because these contracts

14    are with different customers or in different time periods, then

15    they aren't related and therefore they are separate

16    conspiracies and I cannot find an overarching conspiracy.  But

17    that is not the case.

18         And we have in *Mobile Materials* where the Court -- the

19    10th Circuit said that the jury instruction there that was

20    given correctly noted that the jury was not required to find

21    that every project in which defendants were involved were part

22    of that bid-rigging conspiracy.  These are merely different

23    means of achieving the same goal of suppression of competition.

24    And *Beachner* is the 10th Circuit case that is exactly on point

25    with the question we are determining.

4658

1              In that case, the Court was deciding is there a single

2     antitrust conspiracy or were there multiple conspiracies?  And

3     the 10th Circuit explained that the pertinent inquiry and the

4     ultimate inquiry in deciding if they are separate conspiracies

5     or one is whether the record is sufficient to establish that

6     all conspirators had a single, common and continuing objective.

7     And in that case they found sufficient for that continuing

8     objective to be the suppression of competition or the increase

9     of the business profits as a result of that suppression.

10             As a result, we think it is really important that we

11    explain to the jury how exactly they can get there.  Otherwise,

12    I think it's just an abstract instruction for a member who has

13    not -- a member of the jury who has presumably not read

14    *Beachner*, which I assume is probably all the jurors.

15             THE COURT:  How do you think, then, that your language

16    solves that problem?

17             MS. CHENG:  So the language that we've added includes

18    finding whether conspirators had a single, common and

19    continuing objective, including an objective to suppress or

20    circumvent price competition.  I think that is really important

21    guidance for the jury in this case.  Without this kind of

22    instruction, they are sort of left to their own devices to

23    figure out, you know, what is the right way for me to reconcile

24    these different contracts period, these different companies.

25    And this provides overarching framework, which is the correct

1   legal framework when the 10th Circuit considered a Sherman Act

2   criminal case, for deciding whether there is one overarching

3   conspiracy.

4          So I think that our proposed instruction, especially

5   in the fourth paragraph here, provides that important guidance

6   for the jury to help them make an otherwise abstract

7   determination of what constitutes a single versus multiple

8   conspiracies in this case.

9          THE COURT:  Ms. Henry, go ahead.

10          MS. HENRY:  So, Your Honor, here we have a number of

11   things to unpack.  And I am going to go first to the

12   instruction itself rather than to the government's additional

13   whatever.  We strongly believe that the only appropriate

14   instruction here is the 10th Circuit pattern instruction on

15   Evidence of Multiple Conspiracies.

16          And to that end taking the Court's latest instruction,

17   I believe it's on Page 27 at the end of the third paragraph, we

18   would take out "or is fully contained within."  And then on the

19   fourth paragraph, it should read the last sentence, "This is

20   because proof that a defendant was a member of some other

21   conspiracy is not enough to convict."  That is directly taken

22   from the 10th Circuit pattern instruction.

23          The law in the 10th Circuit is very clear.  The *Evans*

24   case talks directly to this issue.  "The government made a

25   tactical decision to charge all of the defendants with

1    involvement only in a single large conspiracy, rather than a

2    series of separate smaller conspiracies.  The tactic of

3    charging many defendants with a single massive conspiracy is

4    fraught with the potential for abuse.  Here, however, the

5    government is hoisted with its own petard.  Having chosen to

6    allege that the defendant joined a single large conspiracy,

7    that is what the government obligated itself to prove."

8         That law remains the law in the 10th Circuit,

9    August 24, 2021, in *United States v. Cushing*,

10   10 F.4th 1055, the 10th Circuit reinforced the finding of

11   *Evans*.  "The government had the burden of proving beyond a

12   reasonable doubt the single conspiracy as alleged, and that the

13   evidence should be considered separately as to each individual

14   defendant."

15        It went further and said that the jury instructions

16   must be consistent with the one single conspiracy and that they

17   were throughout the document.  Again, *Davis* was consistent with

18   that again.  *Davis* was May 3rd of this year, "A multiple

19   conspiracy charge instructs the jury to acquit if it finds that

20   the defendant was not a member of the indicted conspiracy but

21   rather was involved in another conspiracy."  And again it cites

22   *Evans* for the proposition that, "The government has the burden

23   of proving beyond a reasonable doubt the single conspiracy it

24   has alleged."

25        The issue of variance is a very serious one and it

1    goes to two points.  One is the issue of notice and the other

2    is the issue of causing confusion among the jurors both with

3    regard to association issues, guilt by association, and

4    particularly regarding the limited use of certain evidence.

5              In this case we held it seemed like two days' worth of

6    *James* hearings on the basis of a single conspiracy.  And there

7    were rulings made and evidence put into this case on the basis

8    that that evidence came in only because the evidence was linked

9    with a single conspiracy and therefore could come in against

10   all the defendants.  If that is not -- if you end up with a

11   single narrower conspiracy, that evidence is no longer

12   appropriate and can no longer be considered against each of the

13   defendants.

14             There are other instructions which are based here on

15   this concept of a single conspiracy.  The government has chosen

16   the single conspiracy and it is obligated to prove it.  It

17   cannot prove a narrower conspiracy and then just say fine.  The

18   prejudice here in this case where we have 300 documents that

19   were admitted under 801(d)(2)(E) because of the single

20   conspiracy allegation are totally called into question.  That

21   evidence is no longer appropriately considered as to each of

22   the defendants if they find some sort of narrower conspiracy.

23             *Kotteakos*, if I pronounce the case correctly, makes it

24   clear that the prejudice in those types of circumstances is

25   clear error and even plain error.  There are other cases.

4662

1          But let me go now separately to the issue that the

2    government has raised here where they basically want to put in

3    additional language and more concepts on just talking about

4    conspirators and what is the difference between a single and

5    multiple conspiracy.  First of all, I think it was less than a

6    half hour ago, but we heard the government say that all these

7    cases were not relevant to this case, because the highway

8    bid-rigging cases really involve very different factual

9    predicates.

10          In each of those cases, the issue of meaningful

11    interdependence between the separately charged conspiracies was

12    the issue.  And they had -- so there are -- these cases came up

13    under double jeopardy issues.  And there is certainly, even in

14    these bid-rigging cases, there is some language I think that

15    gets almost directly to the *Evans* case as well, the

16    *Ashland-Warren* case, "The vagueness of conspiracy may make it

17    the darling of the prosecutor's nursery, but substantive law is

18    not an empty container whose content the Antitrust Division may

19    regulate at its pleasure. This is not a matter of prosecutorial

20    discretion; the prosecutor has nearly unbounded discretion as

21    to whom to charge with what, and the Court has no quarrel with

22    that proposition. But the prosecutor has no discretion to

23    tinker with substantive law as the circumstances warrant, and

24    the Antitrust Division cannot expect the courts to apply

25    principles of conspiracy law as it sees fit. Having chosen its

1   bed, the Antitrust Division must now sleep in it."

2          And that is specifically with reference to single

3   versus narrow conspiracies.  In those highway bid-rigging

4   cases -- it's a long time ago for me.  I was a much younger

5   person -- but the issue was that the interdependence aspect of

6   the bid-rigging and particularly the complimentary nature of

7   many of the bids where you would forego having the bid in

8   exchange for a chip or a mark, I think it was called in one of

9   the cases, where that would be some future obligation that was

10  created and created this functional interdependence among the

11  separate incidents was the key issue of whether it was there or

12  whether it wasn't there, and that's what the cases looked at.

13         In this case, as we just heard literally within the

14  hour, that doesn't exist.  We don't have that type of

15  allegation.  We do not have that type of interdependence.  And

16  in the 10th Circuit there is a lot of case law that basically

17  talks about how the issue of whether it's a single or a

18  multiple conspiracy does, in fact, depend on this

19  interdependence element, that that is the crux of the decision

20  making.

21         Essentially, we object to the government's redoing of

22  this instruction.  And we feel very strongly that the pattern

23  instruction is the law and should be given and particularly in

24  this case and particularly with the facts of this case.

25         THE COURT:  Thank you, Ms. Henry.

1          MS. HENRY:  And I will leave it with that.

2          THE COURT:  Okay.  Yes, go ahead, Ms. Cheng.

3          MS. CHENG:  Your Honor, so I will plan to address the

4    narrower conspiracy point and then talk about some of the cases

5    that were cited, such as *Evans* in which the 10th Circuit cites

6    *Windrix*, *Ailswoth* and *Carnagie*, which are all drug conspiracy

7    cases.  And then I am going to talk about and address this idea

8    that the government is somehow disputing or shying away from

9    our burden.

10         So first the idea that there can be a narrower

11   conspiracy proved, which the Court has I believe recognized in

12   its proposal of the jury instruction and which the Court has --

13   in which I believe we discussed briefly yesterday, and I can

14   start by citing the *Consolidated Packaging* case from the

15   Seventh Circuit, which *Beachner* in the 10th Circuit adopted the

16   reasoning of.  And in *Consolidated Packaging*, they cited

17   *Kotteakos* -- I am probably mispronouncing that too -- to say

18   that to establish this, and in that case it was a price-fixing

19   case, To accomplish the purpose of the price-fixing case,

20   "there were spawned numerous other lesser conspiracies related

21   to specific bids does not create a variance," citing *Kotteakos*,

22   the Supreme Court case.

23         So that's one case in which expressly addresses the

24   *Kotteakos* case saying that there is no variance simply because

25   there are multiple lesser conspiracies that are related as part

4665

1    of one overarching price-fixing conspiracy.  And I can cite

2    more.  In this case, this was *Mobile Materials*, 10th Circuit,

3    1989, the Court said, "That jury instruction was an incorrect

4    statement of the law to the extent that it required the jurors

5    to find that every project listed in the bill of particulars

6    supplied by the government was part of the Sherman Act

7    conspiracy.  As noted, the government may prove a narrower

8    scheme than alleged.  The instruction given correctly noted

9    that the jury was not required to find that every project in

10    which defendants were involved was part of the conspiracy."

11        And then I will give one more case and stop after

12    this.  So if we look at Carnegie, which is a drug case and not

13    even a Sherman Act case, it said, "When a narrower scheme than

14    the one alleged is fully included within the indictment and

15    proved, we have repeatedly held that a defendant's substantial

16    rights are not prejudiced."

17        So this idea that the government can show a narrower

18    conspiracy fully contained is a correct statement of the law

19    and I think very important in this case for the reasons I

20    alluded to earlier about a misconception the jury might have if

21    the government's proposed instructions were not included that

22    somehow having separate and unrelated in their minds or that

23    the defendant argues is unrelated bids, I worry that they would

24    not be able to reconcile that to recognize an overarching

25    conspiracy.  That's on the narrower point.

1          And now with regard to the cases that Ms. Henry cited,

2     *Evans* was a drug conspiracy case.  And in that case the facts

3     are highly distinguishable from how to analyze interdependence

4     in a Sherman Act case.  In that case, the 10th Circuit

5     ultimately held that a buyer of certain drugs should have been

6     acquitted because they were not part of the broader overarching

7     conspiracy.  And that is the only evidence linking this

8     particular person, this particular defendant was that she had

9     once borrowed scales to weigh some of the drugs and that she

10    had once been a buyer and that's it.  And the Court decided in

11    that case that interdependence require that she share the

12    common objective in distribution or selling the drugs at issue

13    and not simply otherwise being parallel to it.

14         In contrast here, I think the correct analysis is

15    given in *Beachner* because although Ms. Henry said it was a

16    double jeopardy instruction, it cited and adopted the reasoning

17    of the *Consolidated Packaging* Seventh Circuit and said it is

18    the same inquiry where the Seventh Circuit was analyzing the

19    question of whether there was a single or multiple conspiracies

20    not in the context of double jeopardy, but just generally in a

21    Sherman Act criminal case.

22         And the conclusion of the court in *Beachner* was again

23    to look at the -- to assess this idea of interdependence among

24    the co-conspirators by looking at what the Sixth Circuit later

25    called the *Beachner* factors.  These factors are not currently

1    in the proposed instruction, but I am just illustrating here

2    why it's so different and that we can't simply apply the logic

3    of *Evans* in a drug conspiracy case to this idea of

4    interdependence in a Sherman Act case when interdependence will

5    look different for every type of conspiracy that exists.  And

6    because we have a Sherman Act case on interdependence, that's

7    where the Court should be looking.

8         In *Beachner*, for example, the Court went through a

9    list of factors that it found compelling which the district

10   court used such as the shared common objectives by all common

11   participants, a common method in that case of setting up a job,

12   the fact that there was no fear when different contractors were

13   approaching each other to rig a bid, that there were mutual

14   interdependent obligations, and that the scheme was

15   self-perpetuating in nature and could be "plugged into" at any

16   time.

17        So I think under *Beachner* the government has at least

18   met its burden under *Beachner* in to show a single conspiracy,

19   but there is certainly sufficient facts in evidence for the

20   jury to find the conspiracy as alleged.  But without the

21   addition we are proposing and when left to the devices of the

22   10th Circuit instruction on its own, I think it is quite

23   confusing for a jury to know, how do I reconcile these

24   different types of customers?  What is the lodestar question?

25   What is the ultimate guidance and question we should be looking

1    at.

2         And in a Sherman Act conspiracy case, that ultimate

3    question is whether there was a common objective.  And in the

4    case of *Beachner*, the Court said "A common objective can be to

5    eliminate price competition and ensure higher individual

6    profits."  And that's a direct quote from *Beachner* at

7    Page 1282.

8         And then finally, because Ms. Henry mentioned that

9    *Beachner* was a double jeopardy case, I think that point

10   certainly helps show that in our instance, I mean, really if

11   the defendants' view that somehow each of these comprised

12   separate conspiracies were the case, then it seems as if the

13   defendants are saying, well, if later on the government

14   investigates and finds Chick-fil-A 2020 -- or maybe not 2020

15   because it's after this in case was brought -- but say we find

16   Chick-fil-A 2011 or 2013 or something that doesn't currently

17   exist and we develop evidence on it, I believe the defendants'

18   argument wouldn't be, go ahead.  It's a separate conspiracy.

19   Come on over and bring a separate indictment.

20        So we believe we do have the facts that show it is a

21   separate -- that it is one overarching conspiracy.  And we

22   believe it's very important in light of *Beachner* and *Mobile*

23   *Materials* which analyze this precise issue to explain to the

24   jury how they can make sense of these different agreements that

25   are all a different means of achieving the overarching

1    conspiracy.

2         THE COURT:  Yeah, I am wondering, Ms. Cheng, why some

3    of those things you just talked about aren't already part of

4    the instruction currently called First Element - Conspiracy

5    where, for instance, at the top of Page 22 of the Court's

6    version, it talks about a conspiracy could vary in terms of its

7    membership, may be formed without all parties coming to an

8    agreement at the same time, knowing all the details or knowing

9    who all the members are.  Because I am wondering -- it's

10   difficult for me to understand exactly what the theoretical

11   possibility of the separate conspiracy is.

12        Now, admittedly the 10th Circuit has -- there is lots

13   of support for giving an instruction talking about separate

14   conspiracies, but it would seem to me that the definition of a

15   conspiracy already addresses many of the concerns that the

16   United States has just articulated.

17        MS. CHENG:  Your Honor, is the suggestion in that case

18   that because it's already subsumed in that instruction, there

19   is no need to have a evidence of multiple conspiracy

20   instruction separately?

21        THE COURT:  No, not necessarily.  But what I am

22   wondering is why the proposed government instruction

23   accomplishes your purpose?  Given all the worries that the

24   government has, why does the government's proposed revisions

25   address those problems as opposed to other instructions that we

1    have already talked about?

2         MS. CHENG:  Your Honor, to clarify the government's

3    position, and I should have done this at the beginning, is

4    actually to object to the multiple conspiracies instruction in

5    its entirety for the reason that it creates jury confusion of

6    how -- it effectively invites the jury to start thinking, well,

7    what are these separate conspiracies?

8         And without guidance, without legal guidance that

9    explain to them how they can decide what these separate

10   conspiracies could be, the concerns that the jury might be

11   misled into thinking that, okay, then KFC is a separate

12   conspiracy, Chick-fil-A is a separate KFC, which is simply not

13   the law of the 10th Circuit under *Mobile Materials*.  That is

14   not the requirement.  That is not the burden the government has

15   to meet, that every single one of the agreements that comprise

16   the overarching conspiracy has to be somehow proven.

17        THE COURT:  Right.  But why wouldn't the government

18   just be able to go back to the elements instruction and say

19   that's the definition of the conspiracy?

20        MS. CHENG:  Certainly, Your Honor.

21        THE COURT:  So to the extent the defendant tried to

22   make that argument, you just go back to the elements

23   instruction and say that's the conspiracy.

24        MS. CHENG:  Certainly, Your Honor.  And I think that

25   is -- of course, our goal is to prove the elements and that

1    would be what we point to, but I just at least from our

2    perspective this instruction is more confusing than not.  And

3    if it were to be included to sort of right the confusion, I

4    think we do need to include something that explains it.  And

5    the reason we believe this proposed language helps provide that

6    framework is because really the inquiry of whether there is a

7    single or multiple conspiracy is this idea of interdependence.

8    Was there a common and continuing shared objective?

9          And without that, I just think they are left to their

10   own devices.  The jury might speculate to think, well, where

11   can we find this separate multiple set of conspiracies?  And

12   that will lead us into -- down the wrong path at least under

13   the law of the 10th Circuit.

14         THE COURT:  We are going to go ahead and take a break

15   right now because we have been going since 1:00 and Ms. Coppock

16   has been working hard.  There has been a lot of words.  And I

17   will have Ms. Butler hand out a proposed verdict form too

18   because we will get to that eventually.

19         So why don't we plan on taking 15 minutes.  If you

20   have anything more for Ms. Grimm, give it to here real quick,

21   because Mr. Keech is going to substitute for her for the rest

22   of the afternoon.  So if you have anything, some issue

23   regarding exhibits or something of that nature, you might have

24   just a minute or two to talk to her, all right?  Why don't we

25   plan on reconvening 25 minutes to 4:00, all right?

1        The Court will be in recess.

2      (Recess at 3:17 p.m.)

3      (Reconvened at 3:40 p.m. reconvened.)

4        THE COURT:  Mr. Koenig?

5        MR. KOENIG:  Just for Your Honor's information, I set

6   up a few of the boards back there and then kind of, you know,

7   at the end of the day when there aren't as many people we will

8   set them up in the other pews and then people can inspect them.

9   Does that seem okay?

10       THE COURT:  Yes.  So we have to keep things in

11  perspective today.  We are not making good progress unless we

12  anticipate rapidly getting through the remaining instructions

13  and we have got to.  The problem is once we get through all of

14  the instructions, I have got to incorporate them all into a

15  revised set, get it out to you so you can double-check it.  And

16  it's only then that we can start copying those instructions,

17  which takes a long time as it is.

18       And because we can't go past 6:00 tonight, we have the

19  constraint of the court security officers having a shift, the

20  only alternative is to come in really early.  But even then it

21  doesn't really solve the problem because we have this looming

22  deadline of people coming in at 8:30 and things are going to

23  slip.  So I don't want to deter people from making comments,

24  but we need to be very efficient.  We need to make a lot of

25  progress between now and 6:00 p.m.

4673

1          All right.  Ms. Henry -- sorry, let me take Ms. Henry

2     first and then Ms. LaBranche.

3          Go ahead.

4          MS. HENRY:  Sorry, Your Honor, I will try to be quick

5     about this.  First of all, the government had no answer

6     whatsoever for the problem if there were the issue on narrower

7     conspiracies that we have the 300 documents that were admitted

8     only on the principle that there was a single conspiracy.  I do

9     want to go back and say the 10th Circuit pattern instruction is

10    clear on its face.  I didn't see anything that's all that

11    confusing about it.

12         There is nothing about this case that distinguishes it

13    from the concept that interdependence is the way of determining

14    the focal point of the analysis of whether a single conspiracy

15    exists is whether the alleged conduct exhibited

16    interdependence.  That is the issue.  On the other hand, if we

17    want to go back to the conscious commitment to a common scheme,

18    we can reargue that issue again, but I think that one was

19    pretty thoroughly hashed out earlier in conjunction with other

20    instructions where that description of how you find a single

21    conspiracy is already well put forth within the other

22    instructions.  So unless you have further questions.

23         THE COURT:  I don't.  Thank you, Ms. Henry.

24         Ms. LaBranche?

25         MS. LaBRANCHE:  I apologize, I didn't realize we were

1    still on that.  I have a different issue.

2          THE COURT:  Yeah, we are still on that.  So

3    Ms. Pletcher?

4          MS. PLETCHER:  Very briefly, Your Honor.  I want to

5    add one additional concern about prejudice on this point.  If

6    the phrase about having a narrower -- allowing the jury to find

7    a narrower conspiracy comes in, there is a concern there that

8    implicates the statute of limitations where because of the

9    length of this conspiracy if the jury were to find that the

10   narrower conspiracy within the larger one that they find all of

11   the defendants joined were, say, a very early conspiracy like

12   were an agreement from, say, 2011 or KFC 2012, then that might

13   cause problems with respect to figuring out the statute of

14   limitations.  And it may be that we need to go to the verdict

15   form, think about an interrogatory there.  I think it would be

16   unnecessary complicated.  And I -- for that reason, I am also

17   concerned about having that language in here, and I support

18   Ms. Henry's argument about just sticking to the 10th Circuit.

19         THE COURT:  All right.  Ms. Cheng, go ahead.

20         MS. CHENG:  Very quick point on statute of limitations

21   argument.  We presume that the jury follows the instructions.

22   And merely because there is a multiple conspiracies instruction

23   here that we presume they might follow doesn't mean that the

24   jury will -- we can assume the jury will neglect to follow the

25   statute of limitations instruction.  I think the correct

4675

1    assumption in a situation where we have both instructions is

2    the jury will remain faithful and follow the law with regard to

3    both instructions.

4         *THE COURT:*  Okay.  Yeah.  I am going to stick with the

5    instruction that I proposed, and I am going to overrule the

6    objections of both the various defendants and also the

7    government.

8         Let me start with the government.  I don't think that

9    the proposed language that the government has really addresses

10   the concerns that the government has because as I mentioned in

11   colloquy with Ms. Cheng, I think that other principles that are

12   found within the definition of what a conspiracy is really

13   satisfies a lot of those.  Moreover, the elemental instruction

14   defines what the charged conspiracy is.  So that is really the

15   best retort were someone to try to argue that the conspiracy

16   consists of specific things and that therefore those are

17   separate conspiracies.  The scope of the conspiracy is defined

18   already.

19        The Court's instruction does admittedly vary from the

20   pattern instruction because it does include the language about

21   a narrower conspiracy, but that language talks about one that

22   is fully contained within the charged conspiracy.  And it also

23   includes the unanimity language as well.  And so therefore, all

24   of the different arguments about interdependence and whatnot I

25   really don't think are pertinent because the 10th Circuit for

1    one thing is quite clear and in the context of Sherman Act

2    cases it's possible that a narrower conspiracy can result in a

3    conviction.

4           As a practical matter, I'm not sure how this is going

5    to play out.  I'm not even sure exactly what the argument may

6    be, but that narrower conspiracy has to be fully contained

7    within the charged conspiracy.  And all the other aspects of

8    the conspiracy have to be satisfied as well, so as a result, I

9    think that the -- the Court's instruction is a correct

10   statement of the law.  It appropriately informs the jury about

11   the possibility of a conviction for a narrower conspiracy, and

12   so I will overrule the objections.

13          Ms. Henry, real quick.

14          *MS. HENRY:*  Your Honor I just feel that I was being so

15   quick that I failed to really address the *Mobile Materials*

16   issue there.  In *Mobile Materials* they did find, in fact, the

17   evidence of a single conspiracy and they relied on *U.S. v.*

18   *Miller*, 471 U.S. 130, for the concept that you could have a

19   narrower included conspiracy.

20          In that case, the Supreme Court basically said the

21   offense that formed the basis of the conviction was clearly and

22   fully set out in the indictment and the only thing that they

23   said that it was okay to withdraw were independent and

24   unnecessary allegations in the indictment.  And it was okay to

25   drop from the indictment those allegations that were

1    unnecessary to an offense that is -- to the offenses alleged.

2        In the *Mobile Materials* case, the point that was made

3    was the instruction that was requested was one that said you

4    have to find every single project on the bill of particulars to

5    be able to convict.  That's not the same as saying that you can

6    convict with a narrower conspiracy.

7        The narrower conspiracy here would be any one of these

8    episodes that the government has charged.  They are now saying

9    that they can actually convict on the basis of that even though

10   those 300 documents were put into evidence solely on the basis

11   that they connected to a single conspiracy when many of those

12   documents related to a separate and independent incident.

13       This is not a situation where we are saying that you

14   can't convict unless you find every single one of the things

15   happened.  What we're saying is that you have to find a

16   single -- the single conspiracy alleged, not that it has to

17   contain all the means and methods of that single conspiracy,

18   but it has to be that single conspiracy because that is the

19   premise upon which the evidence came in and that is the premise

20   that we were put on notice of.

21       THE COURT:  Okay.  Mr. Beller, real quick.

22       MR. BELLER:  Your Honor, specific to this instruction,

23   and I am going to draw the Court's attention to the last

24   paragraph, Your Honor, I believe that this paragraph perhaps

25   unconsciously or not purposefully reduces the government's

1    burden.  I would ask after the words "returning a guilty

2    verdict," that the Court interlineate the words "but only" if

3    the government proves or proved, and I would ask for "beyond a

4    reasonable doubt" to be inserted.

5         THE COURT:  I am sorry, so how does that sentence

6    start off?

7         MR. BELLER:  Your Honor, it starts off with, "But

8    proof that a defendant was a member."

9         THE COURT:  I don't have mine starting off with,

10   "But."  It says "Proof," I think.

11        MR. BELLER:  Excuse me, "Proof."  The word "But" was

12   removed.  After the words "guilty verdict," I would ask "but

13   only" be inserted, "but only if the government proved," and

14   then inserted "beyond a reasonable doubt."

15        MS. LaBRANCHE:  Your Honor, I think Mr. Beller is

16   talking about the bottom paragraph on Page 27, not the second

17   one.

18        THE COURT:  Yes.  I am following along, yeah.

19        Go ahead, Mr. Pollack.  Do you have a related point?

20        MR. POLLACK:  Another point on this same instruction.

21        THE COURT:  I am going to overrule the objection.  Of

22   course, the burden of proof we know of, so there is a little

23   bit of a danger that if you emphasize it here, what if you use

24   the term "otherwise."  So because the burden of proof is beyond

25   a reasonable doubt with the exception of our one instance with

1    the statute of limitations, I am not going to do that.  I think

2    it's clear enough, so I will overrule that particular

3    suggestion.

4          Mr. Pollack, go ahead.

5          MR. POLLAK:  Your Honor, this relates to the preceding

6    paragraph from the one Mr. Beller was just addressing, the one

7    that starts, "If you find the defendant was not a member of the

8    conspiracy charged."

9          THE COURT:  Go ahead.

10          MR. POLLACK:  "Then you must find the defendant not

11    guilty, even though the defendant may have been a member of

12    some other conspiracy."  And I would add, "and even if the

13    other conspiracy you find existed had a purpose and/or

14    membership similar to the conspiracy charged in the

15    indictment."  And that again is from Sand Instruction 58.01.

16          THE COURT:  Can you repeat that language one more

17    time, Mr. Pollack?

18          MR. POLLACK:  Sure.  So this would go after "may have

19    been a member of some other conspiracy, and even if the other

20    conspiracy you may find existed had a purpose and/or membership

21    similar to the conspiracy charge in the indictment."

22          THE COURT:  A purpose and/or?

23          MR. POLLACK:  Membership similar to the conspiracy

24    charged in the indictment.

25          THE COURT:  Okay.  Ms. Cheng?

1          *MS. CHENG:*  Your Honor, I will be very brief.  We

2    object to that addition.  It's too suggestive that there would

3    be an existence of some other conspiracy, that we would expect

4    the jury to find some other conspiracy.  And we believe that it

5    seems inconsistent with the *Mobile Materials* decision in which

6    the 10th Circuit upheld a single conspiracy and in part

7    because, "The evidence reflects significant overlap in

8    personnel, method of operation and purpose."

9          *THE COURT:*  Mr. Pollack?

10         *MR. POLLACK:*  Yes, Your Honor.  I don't think it's at

11   all suggestive.  It's in the conditional.  It's if you find

12   that.  But the point is not that you couldn't find that it's a

13   single conspiracy, but if you find a separate conspiracy, it is

14   a separate conspiracy even if the membership and purpose is

15   similar to the charged conspiracy.  So I think it's a distinct

16   point and it's straight out of the Sand model instruction.

17         *THE COURT:*  I am going to overrule that particular

18   suggestion.  I think the language in the second paragraph, it

19   states that the jury has to determine whether, "the single

20   conspiracy as charged in the indictment." The jury doesn't, of

21   course, have to find that the membership included everybody.

22   It could find that some people were not part of the conspiracy.

23   And I understand that the proposed language talks about a

24   similar one, but I do think that that could interject some

25   ambiguity into it, and for that reason I am not going to adopt

1      it.

2                  *MR. POLLACK:*  Thank you, Your Honor.

3                  *THE COURT:*  Thank you, Mr. Pollack.

4            All right.  So let's switch over, then, and take up

5      the second -- yeah, the second element, if I can find it, yeah,

6      Knowingly Joined.

7                  Mr. Beller, or whoever wants to begin.

8                  Mr. Fagg, go ahead.

9                  *MR. FAGG:*  Thank you, Your Honor.

10           So for this at the end of the first paragraph in the

11     last sentence that begins with therefore, "Therefore, before

12     you may convict a defendant, the evidence must establish that

13     the defendant joined the conspiracy with the intent to advance

14     the objective of the conspiracy - here, price-fixing and

15     bid-rigging."  A couple of proposed changes to that sentence,

16     the first of which is we would propose to say, "The evidence

17     must establish that that particular defendant" and then

18     "knowingly joined," which is from the earlier instructions.

19     And then we also think it's important here since the objective

20     of the conspiracy is being described, at the very end of this

21     sentence we would say, "here, price-fixing and bid-rigging for

22     broiler chicken products."

23           There are -- this isn't a case where the Indictment is

24     going back to the jury, and we think it's important to be clear

25     what the objective of the conspiracy was.

1          THE COURT:  Okay.  Sorry, Mr. Fagg, can you describe

2     once again the first suggestion that you made?

3          MR. FAGG:  Sure.  "The evidence must establish that

4     particular defendant."

5          THE COURT:  I am going to overrule that one because we

6     have used the convention or at least I've used the convention

7     if we describe "a defendant" and then refer to the defendant

8     after that, I use the term "the."  So I think that is clear

9     enough and it follows the convention I have used elsewhere.

10          Next point was?

11          MR. FAGG:  Next one was after "the defendant" putting

12     "knowingly."

13          THE COURT:  I am going to overrule that one too

14     because we previously defined what it means.  Oh, well, this is

15     the Knowingly Joined.  Yeah, Knowingly Joined.

16          Ms. Cheng, any problem with that?

17          MS. CHENG:  Yeah, it seems circular to define

18     knowingly joined with knowingly when in the prior sentence we

19     explained what knowingly joined means and here is a definition

20     of what is knowingly joins, which the intent is to advance the

21     objective of the conspiracy.  So it seems quite -- almost odd,

22     almost circular.  And to knowingly join a conspiracy with the

23     intent seems to add two layers of knowledge which I don't think

24     is our burden.

25          MR. FAGG:  Your Honor, "knowingly means to act

1    voluntarily and intentionally," and then here -- so we think

2    knowingly is appropriate.  And then it talks about joining

3    "with the intent to advance the objective of the conspiracy."

4    And so we do think it is appropriate.

5            THE COURT:  Yeah, it almost makes -- I think that you

6    both make good points.  It almost suggests that the language

7    that says, "Therefore, before you may convict a defendant," is

8    inappropriate; and instead perhaps the sentence should begin

9    with, "The evidence must establish that the defendant" -- you

10   could say "knowingly joined the conspiracy with the intent to

11   advance the objective of the conspiracy."

12           In other words, the "therefore" isn't part of the

13   grand summary because it introduces the additional concept that

14   the defendant has to also have the intent to advance the

15   objective of the conspiracy in addition to voluntarily and

16   intentionally acting -- sorry.  We previously said the

17   defendant had to knowingly join, but I am happy to add the term

18   "knowingly" because we use that up above.

19           I don't think it's quite the situation that Ms. Cheng

20   described.  I don't think it's duplicative because we define

21   knowingly to mean acting voluntarily, intentionally.  We also

22   then talk about knowingly joined.  So knowingly joined again, I

23   don't think that's part of the definition because we introduce

24   then another concept, namely knowingly joined the conspiracy

25   and also with the intent to advance the objective of it.

1          Anything else on that, Ms. Cheng?

2              MS. CHENG:  Nothing further, Your Honor.

3              THE COURT:  All right.  So I will add "knowingly"

4      before "joined" as suggested by Mr. Fagg.

5              Any problem, Ms. Cheng with adding "for broiler

6      chicken parts" after the end of the word "rigging"?

7              MR. FAGG:  Broiler chicken products.

8              THE COURT:  Sorry, I had written down products, but I

9      read parts.  Broiler chicken products?

10             MS. CHENG:  No objection to that.

11             THE COURT:  We will add that too.

12             Mr. Beller.

13             MR. BELLER:  Your Honor, I will be quick.  On the

14     first line of the second paragraph, "Mere knowledge of a

15     conspiracy is also insufficient."  I think the word "also" is

16     superfluous and I would ask that be removed.

17             THE COURT:  Yes.

18             Any problem with that, Ms. Cheng?

19             MS. CHENG:  No objection.

20             THE COURT:  Go ahead, Mr. Beller.

21             MR. BELLER:  Finally on the last paragraph, this is

22     Page 29 of the Court's instructions, "If you find that a

23     defendant joined," again I would ask that the Court add the

24     element of knowingly, please.

25             THE COURT:  I think that's appropriate so we keep the

4685

1    parallel nature of it.

2            Mr. Pollack?

3            *MR. POLLACK:*  Thank you, Your Honor.

4            There are a couple of concepts that are not included

5    in this instruction that I think should be and I think it is in

6    the paragraph that begins with, "The mere knowledge of a

7    conspiracy" that they might best fit.  One is, "The person who

8    has no knowledge of the conspiracy, but happens to act in a way

9    that furthers some object or purpose of the conspiracy, does

10   not thereby knowingly become a member of the alleged

11   conspiracy."  And the authority for that is *United States v.*

12   *Horn*, a 1991 10th Circuit case at 946 F.2d 738 at Page 741.

13           I would also cite *United States v. Fox*, 902 F.2d 1508

14   at 1514.  That's a 1990 10th Circuit case.  I have others.  I

15   don't know if you want to have the government respond to that

16   or if I should go through my list, whatever your preference is.

17           *THE COURT:*  Why don't you go through your list.

18           *MR. POLLACK:*  The other concept is in the next

19   paragraph we talk about the fact that once a determination has

20   been made that you joined the conspiracy, you are responsible

21   for the actions of your co-conspirators.  I think it's

22   important to make the point, however, that in determining

23   whether or not a defendant joined the conspiracy, that has to

24   be judged on the actions of that defendant, not on the actions

25   of the co-conspirators.

1          So I would again suggest in that preceding paragraph,

2    "Your determination whether each defendant knowingly joined the

3    conspiracy must be based solely on the actions of each

4    particular defendant.  You should not consider what others may

5    have said or done.  The membership of each defendant in the

6    conspiracy must be established by evidence of his own conduct,

7    by what he said or did."  And that is again straight from the

8    sand instruction 58.01.

9          THE COURT:  All right.

10         MR. POLLACK:  Continuing on in the next paragraph, "A

11   person who knowingly joins an existing conspiracy, with

12   knowledge of the overall conspiracy," I think it should say

13   "and with the intent to advance its objectives."

14         THE COURT:  Where are you right now, Mr. Pollack?

15         MR. POLLACK:  I am sorry, in the paragraph that

16   begins, "A person who knowingly joins an existing conspiracy,"

17   I think it's a person who knowingly joins with knowledge of the

18   overall conspiracy, "and with the intent to advance its

19   objectives," parallelling what you've done earlier in the

20   instruction.

21         THE COURT:  Got it.

22         MR. POLLACK:  That's it.  Those are the three points I

23   had, Your Honor.

24         THE COURT:  Thank you.

25         Ms. Cheng, go ahead.

1          MS. CHENG:  Your Honor, I believe that all of the

2    proposed additions are sufficiently accounted for with the

3    instruction which says, "Before you may convict a defendant,

4    the evidence must establish that the defendant joined the

5    conspiracy with the intent to advance the objective of the

6    conspiracy," and that appears two sentences before the proposed

7    addition which in the sentence begins, "But a person."  So it

8    would be unnecessary from our perspective to add it again

9    there.

10         Likewise the cases for which Mr. Pollack cited, *Horn*

11   and *Fox* -- sorry, the sentence which Mr. Pollack cited, *Horn*

12   and *Fox*, I believe makes the point -- I don't have the precise

13   language before me, but I believe the argument there was -- or

14   the proposed sentence was something to the effect of, "If you

15   happen to act in furtherance of the conspiracy, that's

16   insufficient."  But again, this instruction begins by telling

17   you that before you convict, you must find intent to advance.

18   So it would again be duplicative of the purpose of the

19   instruction which is to explain this element of knowledge and

20   to explain that the intent to advance the objective of the

21   conspiracy is important.  And I think just repeating it

22   multiple times is unnecessary and duplicative.

23         And then finally I believe the proposal was to add to

24   the very end of the instruction if the defendant joined, they

25   have to be judged on the actions of that defendant.  So the

4688

1    very -- the sentence immediately preceding that begins with,

2    "If you find that a defendant knowingly joined the

3    conspiracy "-- or "joined the conspiracy," so I think it's

4    pretty clear what the sequence of the findings needs to be.

5         You must first find they joined the conspiracy before

6    you can hold them responsible for actions taken by

7    co-conspirators, so I think it would be unnecessary because

8    it's implied by the meaning of the word "if" that that is a

9    condition of applying the second half of that sentence.

10        *THE COURT:* Mr. Pollack?

11        *MR. POLLACK:* Yes, Your Honor.  I agree with Ms. Cheng

12   that the instruction does tell the jury already that they must

13   find the defendant had the intent to advance the objectives of

14   the conspiracy, but what the first proposed additional language

15   is intended to address is the fact that they can't infer that

16   intent from the fact that the defendant did something that

17   advanced the objectives of the conspiracy.

18        So as an example, if a competitor chatted up Mr. Blake

19   and got Mr. Blake to tell him what George's is bidding, and

20   then the competitor used that information in formulating its

21   bid in some anti-competitive way, the fact that Mr. Blake did

22   do something to advance the goals of the conspiracy is not an

23   act from which you can infer that he intended to become a

24   member of the conspiracy, so that's what the language says.  "A

25   person who has no knowledge of the conspiracy, but happens to

4689

1   act in a way that furthers some object or purpose of the

2   conspiracy, does not thereby knowingly become a member of the

3   alleged conspiracy."  So I don't think that point is made

4   elsewhere in the instruction as it's currently drafted.

5        Secondly, again Ms. Cheng is right that there is the

6   conditional if you find that the person joined the conspiracy,

7   then they're responsible for the actions of others.  But what

8   the jury is not told as it is presently drafted is that in

9   making the finding about whether the defendant joined the

10  conspiracy, they have to focus on what that defendant did as

11  opposed to infer that they were a member of the conspiracy

12  based on actions of people other than the defendant.

13       THE COURT:  Anything else, Ms. Cheng?

14       MS. CHENG:  Very briefly, Your Honor.

15       Just regarding the point Mr. Pollack made with the

16  hypothetical where Mr. Blake might not have been aware that a

17  co-conspirator was potentially using information in a

18  competitor's pricing bid, I think that is sufficiently

19  accounted for by the second sentence in this instruction which

20  explains what to act knowingly means, that you are acting

21  voluntarily and intentionally and not because of ignorance

22  that, for example, your co-competitor will be using the price

23  information a certain way or because of mistake or accident.

24  And that in our view is sufficient combined with the

25  sentence -- the following sentence which says that there must

1    be an intent to advance the objective of the conspiracy.  That

2    would take care of the hypothetical that Mr. Pollack proposed.

3             THE COURT:  Mr. Pollack?

4             MR. POLLACK:  Your Honor, I don't think I have to

5    belabor the point.  I think this is -- this language is not

6    repetitive of anything else that's in the instruction and I

7    think it's important.

8             THE COURT:  So I am going to overrule Mr. Pollack's

9    first and second points.  I do believe that the instruction

10   already adequately addresses those concerns of Mr. Pollack.

11   It's true that what you might call the flip-side of the coin is

12   not actually articulated, but this instruction does indicate

13   that the jury has to find that someone knowingly joined the

14   conspiracy.  I think that Mr. Pollack's second point is -- or

15   someone acting just coincidentally, but not as part of the

16   conspiracy, but taking an action that may be deemed consistent

17   with it is taken care of by the second sentence of the

18   instruction.  So therefore, I am going to overrule both of

19   those.

20            I will adopt Mr. Pollack's third suggestion which is

21   to add in the language after the words "overall conspiracy and

22   with the intent to advance its objectives."  I think that was

23   your suggestion, wasn't it, Mr. Pollack?

24            MR. POLLACK:  That's correct, Your Honor.

25            THE COURT:  Because that's parallel to the first

1    paragraph, and I think that that's an appropriate addition to

2    it.

3            MR. POLLACK:  Thank you, Your Honor.

4            THE COURT:  All right.  Anything else on the Knowingly

5    Joined?

6            Ms. Pletcher.

7            MS. PLETCHER:  Yes, Your Honor.

8            I was just wanting to confirm whether the Court was

9    going to include or consider including the government's

10   proposed addition with respect to deliberate ignorance or not.

11   I believe it was going to be inserted in this instruction.

12           MS. CHENG:  Your Honor, we proposed adding it to as

13   part of this second element.

14           THE COURT:  Good point.  I will hear from you real

15   briefly because I am disinclined to use that language, but I

16   want you to be able to make your record, Ms. Cheng.  Go ahead.

17           MS. CHENG:  Thank you, Your Honor.  Give me one

18   moment.

19           All right, Your Honor.  So in this situation or

20   generally a deliberate ignorance instruction is warranted if a

21   defendant chose to be -- was deliberately ignorant, a fact that

22   plainly indicate the nature of the conspiracy that was

23   happening.  In this case we have an Exhibit 441, a statement

24   from Defendant Penn, who says, "If they is unlawful, don't tell

25   me," when told by a co-conspirator that another entity or

4692

 1    person was following their instruction.

 2          And, of course, Mr. Penn -- of course, Mr. Stiller,

 3    who was the co-conspirator then, clarified who he was talking

 4    about.  But I think that is a deliberate act, one example of a

 5    deliberate act that shows Mr. Penn in that example acting to

 6    turn the other cheek to information that might possibly

 7    implicate him.

 8          And the purpose of these type of deliberate ignorance

 9    instructions is really to make sure, if there is direct and

10    circumstantial evidence that warrant it, is to make sure that

11    defendants can't simply turn a blind eye to facts indicating

12    illegal activity or the unlawful purposes of the conspiracy and

13    in that way ensure that their activity avoids some type of

14    detection.  So that's one example at least from the record that

15    we can point to which qualifies as a deliberate act for the

16    purpose of remaining deliberately ignorant.

17          THE COURT:  Right.  Obviously, ignorance of the law is

18    no excuse.  And I think that the e-mail from Mr. Penn that

19    you're talking about, isn't that more in the nature of

20    ignorance of the law as opposed to ignorance of a fact?  I am

21    not sure what fact would be at issue in that particular e-mail.

22          MS. CHENG:  So in that exchange my understanding is

23    that the conspirator had told Mr. Penn, they is listening to my

24    direction, in the context of an ongoing act of negotiation.

25    And the fact would be don't tell me if competitors are

         1     following your direction.  Don't tell me if competitors are

         2     simply listening to Pilgrim's lead.  That would be the fact to

         3     which he might choose to be deliberately ignorant or just in

         4     general about the goals of the conspiracy was just to suppress

         5     competition.

         6             And, for example, the 10th Circuit held that it was

         7     appropriate to give a deliberately ignorant instruction when

         8     the defendant was deliberately ignorant of fact plainly

         9     indicating the fraudulent nature of a business.  Similarly

        10     here, there are many facts from which a jury might decide that

        11     certain defendants chose not to confront the nature of the

        12     conspiracy.

        13             THE COURT:  Ms. Pletcher, briefly.

        14             MR. FAGG:  Your Honor, may I just have one point of

        15     privilege for a moment?  Can Mr. Lovette and Ms. Nielsen be

        16     excused?

        17             THE COURT:  Of course, they may.  No problem

        18     whatsoever.

        19             MS. PLETCHER:  Yes, briefly, Your Honor.  We obviously

        20     disagree with the government's interpretation of Mr. Penn's

        21     exchange with Mr. Stiller.  Mr. Penn was asking, who is they?

        22     He was clarifying a misunderstanding in a text exchange that

        23     had two clear conversations in it, and Mr. Stiller clarified in

        24     the next sentence exactly what he meant by who was they.

        25             I think this is a far cry from the factual predicate

4694

1    that's required in order to justify a deliberate ignorance

2    instruction.  In particular the 10th Circuit in the pattern

3    instructions in the comment say this instruction is discouraged

4    and should only apply when the government presents evidence

5    that the defendant purposefully contrived to avoid learning all

6    the facts in order to have a defense in the event of

7    prosecution.

8            To Your Honor's point, the action taken by the

9    defendant has to go clearly to avoiding learning the facts.

10   And in addition, the exchange with Mr. Penn would assume that

11   there was a conspiracy that he avoided learning.  And I think

12   the facts shown at trial prove clearly that there was no such

13   conspiracy on top of the ambiguity of Mr. Penn's comments.  So

14   for those reasons I think that -- and the ones that we

15   presented to the Court in our brief today, this deliberate

16   ignorance instruction is not warranted.

17           Thanks.

18           THE COURT:  I don't want to go into too many comments,

19   but if you have a real brief point, it can be made because,

20   once again, I am disinclined to adopt it.

21           MR. POLLACK:  In that case, I will be very brief.

22   While I agree there is insufficient evidence against Mr. Penn

23   to warrant this instruction, it would be particularly

24   prejudicial given the government in its presentation only said

25   that this would be true as to certain defendants, so it would

1    be very prejudicial to defendants for whom there is no such

2    evidence.

3              THE COURT:  Thank you, Mr. Pollack.

4              Okay.  Ms. Cheng, last word.  Go ahead.

5              MS. CHENG:  To the extent the defendants think that it

6    would be prejudicial, the government is open to a limiting

7    instruction that it be applied against Mr. Penn.  In this case

8    too, I would like to just explain because I feel the defendants

9    have somewhat increased the burden that's required at this

10   stage to use this type of instruction.  In *U.S. v. Espinoza*,

11   10th Circuit case, 244 F.3d 1234, the Court says explicitly

12   that, "We have been clear that the district court need not

13   insist upon direct evidence of conscious avoidance of a fact

14   before tendering a deliberate avoidance instruction," and

15   that's citing a prior 10th Circuit case.  "Rather, in

16   establishing the defendant's deliberate ignorance, the

17   prosecution is entitled to rely on circumstantial evidence and

18   the benefit of the favorable inferences to be drawn therefrom."

19             So our position is that it's a test or a message --

20   sorry, it was an e-mail to the effect of, "If they is illegal,

21   don't tell me."  That absolutely would satisfy the factual

22   predicate for giving a deliberate ignorance instruction.  This

23   is not simply a situation where even a person walked away which

24   has been held to be sufficient in other circumstances.

25             This is a situation where we have an executive who

1    expressly, when confronted with potential illegal activity,

2    said no, no, don't tell me.  I don't want to learn it.  And I

3    think part of the purpose for this type of instruction and the

4    basis in the law for deliberate ignorance is that we don't want

5    situations where defendants can simply choose to plug in their

6    ears and turn the other direction.  And in this case we have

7    direct and circumstantial evidence that such a thing was

8    occurring.

9         THE COURT:  All right.  I am going to reject the

10   government's proposed language.  It's true there is that one

11   e-mail, but nonetheless, that to me is a slim read to hang the

12   argument on.  I don't believe the factual predicate exists to

13   give a deliberate indifference instruction in this particular

14   case, so I am not going to include the government's proposed

15   language.

16        Anything else on the Second Element instruction?

17        Ms. Cheng, go ahead.

18        MS. CHENG:  Just a quick point.  There is no need for

19   the Court to address it now.  We can wait until we see the

20   final language, but I did want to flag that with regard to the

21   argument about inferences that can be drawn from the type of

22   legitimate or the type of business conduct at issue from

23   Matsushita, the government has had a chance to look more

24   closely at those cases over lunch and the break.  And we wanted

25   to flag that we would object to that instruction, and we can

1    handle that at a later point, and I am not sure at the moment

2    where it would go in the elements, but wanted to red-line with

3    you the government did want to flag that we would object to

4    that language.

5         THE COURT:  Let's switch our attention, then, to the

6    Third Element - Interstate Commerce.  I think the government

7    had some -- no, I guess not, sorry.  Anyone have any additions

8    on interstate commerce?

9         Okay.  Let's turn to the one after that on Venue.  Any

10   comments on venue?

11        Okay.  How about Consider Only the Crime Charged?

12        MR. FAGG:  Your Honor?

13        THE COURT:  Yes.  Go ahead, Mr. Fagg.

14        MR. FAGG:  For this one, the only thing we would

15   suggest is removing the phrase "in the indictment."  We don't

16   think it's necessary in the first paragraph.  I think it's

17   sufficient to say, "The defendant is not on trial for any act,

18   conduct or crime not charged," given that the jury is not going

19   to have the Indictment.

20        THE COURT:  Ms. Cheng, what do you think about that

21   proposal?

22        MS. CHENG:  To clarify, we are on the instruction

23   entitled Consider Only Crime Charged?

24        THE COURT:  Yes.  And in the first paragraph, Mr. Fagg

25   is suggesting striking the last three words of the second

1    sentence.

2         MS. CHENG:  We would have no objection to that.

3         THE COURT:  Is everyone okay with that?  Okay.  We can

4    do that.

5         Anyone else have any other comments on this

6    instruction?

7         Let's turn over to Statute of Limitations, then.

8         Mr. Tegtmeier, go ahead.

9         Mr. Pollack, go ahead.

10        MR. POLLACK:  Your Honor, in the third paragraph, the

11   Court says, "One way the government can prove the conspiracy

12   existed."  I don't believe that's appropriate.  I think the

13   government -- this is the only way the government can prove it.

14   To prove the alleged conspiracy existed within the statute of

15   limitations, the government must prove beyond a reasonable

16   doubt that one or more members of the conspiracy performed the

17   act on these dates.

18        And the language that I'm proposing in lieu of the one

19   way the government can prove it is directly from *Lischewski*

20   which the Court cites.  It's Instruction No. 29 in the

21   *Lischewski* case.  So I would strike, "One way the government

22   can prove the conspiracy existed," and I would say, "To prove

23   that the conspiracy existed within the statute of limitations,

24   the government must," and then go on from there.

25        THE COURT:  Okay.  Mr. Fagg, go ahead.

1         MR. FAGG:  Just on the *Lischewski* instruction, we

2    would also just propose, Your Honor, that the ends of the

3    sentence mirror what is in *Lischewski*, which says "in

4    furtherance of the objective of the conspiracy."  As it

5    presently reads, it just reads "in furtherance of the

6    conspiracy," and we would simply --

7         THE COURT:  I am going to overrule that suggestion.  I

8    think that it should appropriately say "in furtherance of the

9    conspiracy," so that there is not a differentiation of some

10   part of the conspiracy, namely the objectives of the

11   conspiracy.  I would worry about that.  I think it might

12   introduce some confusion on the jury's part.

13        MR. FAGG:  Thank you, Your Honor.

14        THE COURT:  Okay.  Mr. Beller, go ahead.

15        MR. BELLER:  Thank you, Your Honor.

16        Your Honor, as to sentence two, "The grand jury

17   returned a superseding indictment against all defendants."  I

18   recognize that that is factually true.  However, for purposes

19   of the jury understanding the statute of limitations coupled

20   with reference to both indictment and superseding, it is my

21   request that the Court leave sentence No. 1 as written, and

22   then sentence No. 2 be modified to mirror sentence No. 1.  And

23   that being, "The grand jury returned an indictment against,"

24   and then listing the additional six defendants, Mr. Mulrenin,

25   Kantola, Little, Lovette, Roberts and Blake on October the 6th.

1          I think that will assist the jury in understanding

2   this instruction and specifically down at the bottom in the

3   last sentence.  The instruction currently reads "performed some

4   act after June '15 or October '15 in furtherance."  I would ask

5   again that we mirror the language and say, "some act after

6   June '15 as to Mr. Penn, Fries, Brady and Austin or October '15

7   as to Mr. Mulrenin," et cetera, "in furtherance of the

8   conspiracy."

9          THE COURT:  Okay.

10         Ms. Henry, go ahead.

11         MS. HENRY:  Your Honor, the defendants also propose to

12   add in the language, "Moreover, if any defendant joined the

13   conspiracy but abandoned it or withdrew before the statute of

14   limitations period applicable to that defendant, you must find

15   that defendant not guilty.  Abandonment may be shown by

16   affirmative acts inconsistent with the object of the alleged

17   conspiracy and communicated in a manner reasonably calculated

18   to reach the other conspirators."  That language is directly

19   out of the Supreme Court case in *Gypsum*.

20         THE COURT:  It's an affirmative defense.  Did

21   Mr. Kantola plead it?

22         MS. HENRY:  Yes.

23         THE COURT:  But how many of the other defendants did?

24         MS. HENRY:  I believe that there is at least two

25   defendants that have pled it.

1            *MR. TEGTMEIER:*  Also Mr. Roberts.

2            *THE COURT:*  And what evidence is there of withdrawal?

3            *MS. HENRY:*  The evidence of withdrawal actually is

4    also --

5            *THE COURT:*  Don't interrupt me, Ms. Henry.

6            *MS. HENRY:*  I am sorry.

7            *THE COURT:*  What evidence is there of withdrawal?

8            *MS. HENRY:*  The evidence of withdrawal is that there

9    was a resumption of competition or that there was competition.

10   That is the evidence of withdrawal which is actually also in

11   the *Gypsum* case cited as potentially the evidence that can

12   affirmatively demonstrate withdrawal.

13           *THE COURT:*  What evidence is there of resumption of

14   competition?

15           *MS. HENRY:*  The evidence of competition is that the

16   bids that he put in were competitively derived.  That is our

17   theory of the defense.

18           *THE COURT:*  But what evidence?  Who testified about

19   what?  Where did that come in?

20           *MS. HENRY:*  I believe the bids themselves and the

21   results of those bids affirmatively show that aggressive

22   competition.  There was also documentation of aggressive

23   competition by Mr. Kantola or by Koch Foods.

24           *THE COURT:*  Okay.

25           Mr. Tegtmeier?

1          *MR. TEGTMEIER:*  Thank you, Your Honor.

2          Particularly regarding Mr. Roberts, we have

3   competitive bidding.  The evidence is clear that Mr. Roberts

4   did not make the decision on pricing during the end of 2014.

5   And then the evidence of the competition between Pilgrim's and

6   Tyson is extremely clear, allegations in the e-mails of Tyson

7   being cheaper, allegations that they're not going to help out

8   with Tyson's shortages.  It's obviously extremely competitive

9   between Pilgrim's and Tyson.

10         Throughout that period of time at the end of 2014,

11  there is no other action and no other evidence that Mr. Roberts

12  engaged in any kind of activity after the contract was

13  initiated and completed at the end of 2014 for the 2015 year.

14  And so this is clearly appropriate for Mr. Roberts.

15         *THE COURT:*  And Mr. Tegtmeier, you said Mr. Roberts

16  pled withdrawal for an affirmative defense, did he?

17         *MR. TEGTMEIER:*  Pled withdrawal, yes.

18         *THE COURT:*  Anything else, Mr. Tegtmeier?  I didn't

19  mean to interrupt you.

20         *MR. TEGTMEIER:*  No, Your Honor.  No, Your Honor.

21         *THE COURT:*  Thank you.

22         Ms. Cheng, go ahead.

23         *MS. CHENG:*  Let me begin with the withdrawal point.

24         It seems that the arguments that we've heard on the

25  factual predicate withdrawal is simply a theory that they never

1   participated in the conspiracy in the first place.  If the

2   theory for, say, Mr. Kantola is simply that he was consistently

3   bidding at competitive rates, then it's -- to me it's not as if

4   he started and stopped and withdrew.  That's just the theory of

5   the defense and it doesn't seem to me to be related at all to

6   the concept of withdrawal.

7           Also in the 10th Circuit is an affirmative defense

8   which the defendant bears the burden of proving and mere

9   cessation -- and I will quote the 10th Circuit in *Hughes*,

10  191 F.3d 1317, "Mere cessation of one's participation in a

11  conspiracy is insufficient to demonstrate withdrawal."  To

12  instead -- and this is from another 10th Circuit case, *Powell*,

13  at 982 F.2d 1422.  "To withdraw from a conspiracy an individual

14  must take affirmative action, either by reporting to the

15  authorities or by communicating his intentions to his

16  coconspirators."

17          We have no evidence that either Mr. Roberts nor

18  Mr. Kantola took either of these actions.

19          *THE COURT:*  Okay.

20          *MS. CHENG:*  So that's on withdrawal.  Should I address

21  some of the other points now?

22          *THE COURT:*  Yeah, you can go ahead.

23          *MS. CHENG:*  So with regard to the change -- we don't

24  have objection, I believe, to the proposal that we -- to the

25  first two sentences where they repeat and then list the

1    specific defendants by name.

2         With regard to the sentence or the proposed addition

3    to the final paragraph so that it would read, "One way the

4    government can prove the conspiracy existed within the statute

5    of limitations," so changing it to, "the government must prove

6    that one or more members of the conspiracy performed some act,"

7    I think that change which we oppose highlights especially why

8    it is important that we add the proposed couple of sentences

9    that the government wanted to include.

10        If we say that the only way that the government can

11   prove that it meets the statute of limitations is by showing

12   the performance of some act, I think that implies with it --

13   the performance of some act seems very active and affirmative

14   when really even the receipt of payments on colluded contracts

15   qualifies as the type of performance of some act.  There is no

16   overt act requirement in the Sherman Act, and what is required

17   for the statute of limitations can be simply receipt of

18   payments on a colluded bid or executing on a colluded contract.

19        So that's why that actually highlights how important

20   it is, especially if the statement is modified to suggest that

21   this is the only way is by performance of some act, it becomes

22   especially important that the government can include its

23   proposed additional sentences.

24        THE COURT:  Ms. Cheng, I am sorry, what was your

25   response to Mr. Beller's suggestion about the first two

1    sentences?

2        *MS. CHENG:*  We don't object to the change.  As I

3    understand, it would simply be a repeat of the first sentence

4    and naming the additional defendants that were included in the

5    superseding.

6        *THE COURT:*  Yeah, although we would take out the word

7    "superseding," I think.

8        *MS. CHENG:*  Correct.

9        Mr. Fagg, go ahead.

10       *MR. FAGG:*  Thank you, Your Honor.  I just want to

11   respond on the last points that Ms. Cheng raised.  It doesn't

12   say it has to be an affirmative act or overt act.  It just says

13   there has to be some act.  If you look at the language the

14   government is proposing to be added, it actually talks about

15   some act.  And the hypothetical that Ms. Cheng gave, obviously

16   there was a co-conspirator who sent money to someone who

17   received it.  There had to be some sort of act that occurred.

18   So we don't think that the additional language is sufficient

19   and believe that this language that Mr. Pollack had proposed is

20   appropriate and in accord with the law.

21       *THE COURT:*  So the United States -- and this was an

22   instruction tendered yesterday.  I think you have it, but it

23   proposes additional language.  So why don't we take that

24   language up which we may not have.  I may not have triggered

25   that when we initially started talking about that instruction,

1        so hopefully people have that paragraph.

2               Do you have that, Mr. Pollack?  It was passed out

3        yesterday.

4               MR. POLLACK:  I think I may be a little lost.  The

5        additional language that the government proposes, at least as

6        far as I can tell, really doesn't have anything to do with the

7        change that I proposed.

8               THE COURT:  No, that's true.

9               MR. POLLACK:  I could see it relating to the

10       withdrawal issue, and I will let the defendants who are arguing

11       withdrawal address that, but --

12              THE COURT:  Do you have this copy, Mr. Pollack?  It

13       contains a fairly lengthy additional paragraph.

14              MR. POLLACK:  Let me see if I am looking at the right

15       language.  Yeah, yeah.  So apparently I do have the correct

16       language.  Nonetheless, I just don't see the relationship

17       between it and the language that I had proposed.

18              I think that the government has to prove the

19       conspiracy within the statute of limitations period.  It's not

20       one way the government can prevail.  It's the only way the

21       government can prevail.  That's my point.  I think that the

22       point the government is making is how long does the conspiracy

23       continue to exist, which to me ties in more closely to the

24       issue is anybody claiming that at some point they withdrew from

25       the conspiracy.

1          I mean, there has to be some act within the

2     limitations period for it to be timely.  I think it's a

3     separate question about whether or not some individual

4     withdrew.

5          THE COURT:  Okay.  Ms. Cheng?

6          MR. TEGTMEIER:  Your Honor, may I correct something

7     before?

8          THE COURT:  Yes, go ahead.

9          MR. TEGTMEIER:  I stated that we pleaded that

10    affirmative defense.  I think I was mistaken about that and

11    that we have not affirmatively joined by a pleading to that

12    affirmative defense.

13         THE COURT:  Okay.  Thank you, Mr. Tegtmeier.

14         Ms. Cheng?

15         MS. CHENG:  Your Honor, I apologize if I was unclear

16    before about drawing that connection, so I will do so now.  The

17    reason there is a connection between making the only way that

18    the government can show that the existence of the conspiracy is

19    the performance of some act and the addition that the

20    government is proposing is that the government's proposal

21    elaborates on what that some act can be, what the performance

22    of the act can look like, which includes in the 10th Circuit

23    merely receipt of payments at colluded prices.

24         And the reason that's important to include is that

25    it's not necessarily intuitive to a juror perhaps that this

4708

1    would qualify as performing some act.  In the instance of mere

2    receipt of something under *Kemp*, the 10th Circuit case, it has

3    been sufficient to satisfy the some act requirement, including

4    it is important because otherwise performing some act the jury

5    might believe would not include receipt of these -- would not

6    include receipt in the way that I was just discussing.

7         THE COURT:  Okay.  Mr. Pollack?

8         MR. POLLACK:  So, Your Honor, I think it is an

9    independent point.  I don't think it's a reason not to make the

10   suggested change that I had suggested.  Nonetheless, if I am

11   invited to weigh in on this independent point, I just don't

12   think that there was evidence in terms of when payments were

13   received.  And, of course, again the corporate entities are not

14   on trial.  The individuals weren't receiving payments.  So it

15   doesn't strike me as it lines up very well with the facts in

16   this case.

17        THE COURT:  I can't remember, but maybe Mr. Pollack

18   and Ms. Cheng know the answer to this, but the government's

19   language is consistent with the case law.  And accepting

20   payments, the cases have said that can be considered as part of

21   the statute of limitations.  I doubt seriously that those

22   cases, but I can't remember, involved a defendant accepting the

23   payments as opposed to an entity, but perhaps the entities were

24   also charged.  I just don't recall that.

25        So let's ask Ms. Henry.  I think she may recall.

1      MS. HENRY:  In both of those cases, the entities were

2    charged.  And they were the ones who received the payments,

3    yes.  And there is also in those cases evidence that the

4    payments were inflated as a result of the conspiracy, which is

5    a key part of the whole holding, because the case law is very

6    clear that the mere payments themselves are not really the

7    continuation.  It's that concept that an inflated payment going

8    back to a co-conspirator is what is the issue when it's the

9    defendant that received the payment.

10      THE COURT:  Okay.  Thank you.

11      Ms. Cheng?

12      MS. CHENG:  Just a quick point, Your Honor, that the

13    company would be co-conspirators too.  So even if the Court

14    took the position that somehow the defendants would not satisfy

15    the statute of limitations because it is their employer rather

16    than them as an individual, the employers would be considered

17    co-conspirators as well.

18      THE COURT:  Mr. Pollack?

19      MR. POLLACK:  Your Honor, just on that last point, at

20    the *James hearing* the government did not identify corporate

21    entities as unindicted co-conspirators and did not put on

22    evidence to establish that unindicted co-conspirators were --

23    that entities were unindicted co-conspirators and the Court

24    made no such finding.

25      THE COURT:  Mr. Beller?

1          MR. BELLER:  Only on the broader point, which is while

2     I understand we certainly may all have a general understanding

3     and awareness that payments were made, I do not believe that

4     there was actually any evidence in front of the record that

5     payments were made.  So I guess that's the broader question

6     here that has to be established and that is the state of the

7     evidence in front of the jury.

8          THE COURT:  Ms. Pletcher?

9          MS. PLETCHER:  Your Honor, to follow up on that point,

10    this requested instruction very specifically refers to the

11    evidence in a very specific way of identifying whether the

12    evidence presented at trial has met this particular requirement

13    in terms of furthering the conspiracy.  And I think that's not

14    appropriate.  The instruction should be in a more general level

15    that -- it should state the law in more general terms as

16    opposed to saying that if you find it existed, that one or more

17    of these acts, identify specifically the particular acts.  And

18    I think that's just too specific and inappropriate in addition

19    to the objections that have already been made.

20          THE COURT:  Okay.  Ms. Henry?

21          MS. HENRY:  Your Honor, also while *Evans* and *Kemp* and

22    *Inryco* do, in fact, allow for an inflated payment to continue

23    in the conspiracy, there is nothing in those cases that says

24    merely performing on the contracts that were the subject of the

25    conspiracy somehow continues the conspiracy.

1          THE COURT:  Here is what we are going to do.

2    Mr. Pollack, on your proposal, this goes back to the paragraph

3    that you initially talked about, what was the language that you

4    proposed to add the defendants' names after those two different

5    dates, in other words, some act after June 2015, was it by and

6    then name the four?  Do you remember that?

7          MR. POLLACK:  No, Your Honor.  I had just suggested

8    striking, "One way the government can prove the conspiracy

9    existed," and instead start the sentence with, "To prove that

10   the conspiracy existed within the statute of limitations," --

11         THE COURT:  Yeah, I have got that part.

12         MR. POLLACK:  -- "the government must strike these to

13   prove beyond a reasonable doubt that one or more members of the

14   conspiracy performed some act after June 2015 or October 2015."

15   And I didn't suggest additional language there.  I mean, I

16   guess I understood that that --

17         THE COURT:  That's fine.  I wasn't sure if you did or

18   not.

19         MR. POLLACK:  The first paragraph --

20         THE COURT:  Right.  The reference back I think I

21   misconstrued as a suggestion to add.  Okay.

22         And then Mr. Beller, do you mind reiterating your

23   suggestion for the amendment to the second sentence of the

24   first paragraph?

25         MR. BELLER:  Yes, Your Honor.  And so what I had

1    suggested is that the paragraph read, "The grand jury returned

2    an indictment against Mr. Mulrenin, Kantola, Little, Lovette,

3    Roberts and Blake on October the 6th, 2020."

4         Your Honor, your question of Mr. Pollack regarding

5    that final paragraph, I think it was my suggestion or my

6    request that the language be included in addition to what

7    Mr. Pollack is arguing to say, "some act after June 2015 as to

8    Mr. Penn, Mr. Fries, Mr. Brady and Mr. Austin or October 2015

9    as to," and then the remaining.

10        THE COURT:  Yeah, I think Ms. Cheng did not disagree

11   with that.

12        Okay.  Then what I am going to do is I am going to

13   adopt Mr. Pollack's change to that paragraph and I am going to

14   reject the government's language.  I do think that the -- while

15   it's true that in some cases mere acceptance of payments could

16   be construed as an act within the limitation period, here we

17   don't have that factual situation that the corporation that

18   accepted the payment has not been charged.  The fact that you

19   could even consider them an unindicted co-conspirator is

20   something that's certainly not within the purview of the jury,

21   and that in and of itself I don't think would be sufficient as

22   to these defendants.

23        And therefore, I think that -- and moreover, I also

24   agree I am not sure that there is even any factual basis for

25   the acceptance of payments, so I think that under those

1    conditions that Mr. Pollack's proposed amendment to that

2    paragraph beginning -- that used to begin with "One way the

3    government can prove" is appropriate, and I will make that

4    particular change.

5         I will make the changes that Mr. Beller suggested to

6    the second sentence of the first paragraph and also make the

7    changes that Mr. Beller has suggested to the third paragraph

8    after the dates, namely to add the phrase "as to" and then name

9    the four, and then "after October 2015 as to," and then name

10   the additional six.

11        And then I think, but correct me if I'm wrong, it

12   sounds like perhaps maybe only Mr. Kantola has pled an

13   affirmative defense of withdrawal, but at least Mr. Kantola.

14        *MS. HENRY:*  Your Honor, we did raise the affirmative

15   defense in the motion to dismiss and Rule 29 motion, and I

16   think that counts as pleading it.

17        *THE COURT:*  It may.  Up until now no withdrawal

18   instruction was tendered.  I am going to have to take a look at

19   the withdrawal instruction.  I know that you read some

20   language, but can you reduce that to writing?

21        *MS. HENRY:*  It's in the defendants' --

22        *THE COURT:*  It's in the packet?  Which instruction is

23   it?

24        *MS. HENRY:*  It is Instruction No. 27.  It's on Page 46

25   at the bottom.  It's pretty simple.

1          *THE COURT:*  Okay.  Hold on.

2          *MS. HENRY:*  It's Docket 592.

3          *THE COURT:*  Which one was it again?

4          *MS. HENRY:*  Instruction No. 27 on Page 46 of Docket

5     No. 592.

6          *THE COURT:*  Ms. Cheng?

7          *MS. CHENG:*  Your Honor, we don't believe that

8     Mr. Kantola is entitled to an instruction on withdrawal simply

9     because he pleads it when there is no evidence of withdrawal

10    within the record based on the 10th Circuit requirements for

11    the affirmative defense, but to the extent the Court ultimately

12    is inclined to give that instruction, we would request that it

13    be limited to Mr. Kantola.

14         *THE COURT:*  Ms. Henry, I don't think that he is

15    entitled to the instruction.  You will have to take a hard look

16    at that, the 10th Circuit pattern instruction on withdrawal.

17    And I have looked at this in a different context, in the

18    context of a drug conspiracy.  It really requires much more

19    than -- it requires some affirmative act.  If you look at the

20    pattern instruction which is 2.22, it requires something that

21    is a lot different than what you have articulated on that.

22         So I will give you -- if you want to think about it

23    some more, but I don't think that there is sufficient evidence

24    to warrant giving a withdrawal instruction as to Mr. Kantola.

25         *MS. HENRY:*  Your Honor, the withdrawal defense is

1   based on the information that I think we've laid out basically

2   in our pleadings where there is the issue of aggressive

3   competition and is undercutting competitors.

4       THE COURT:  Yeah, I am going to reject that.  I don't

5   think that there is a sufficient factual predicate to give a

6   withdrawal instruction as to Mr. Kantola.

7           Anything else on Statute of Limitations?

8           Let's switch over to our Confidential Documents.  I

9   know Mr. Tubach talked about this and some of the documents may

10  have the markings taken off them, but I am not sure about the

11  government's pages.  So my inclination would be to leave it in,

12  unless we know that we've removed it from all.

13          Thoughts on that, Mr. Beller?

14      MR. BELLER:  Your Honor, based on my understanding of

15  the government's statement of their inability to be able to

16  make those redactions, the defense has gone through every one

17  of those and has redacted every single one.

18      THE COURT:  I know that Ms. Grimm told me that that's

19  true as to defense exhibits.  Has that been performed as to

20  government exhibits too?

21      MR. BELLER:  It has been done as to government

22  exhibits.  The defense has also volunteered to print all of

23  those exhibits with the redactions for the government.  My

24  understanding is that the government has declined that request

25  and instead wishes that the documents be admitted with the word

1    "confidential" in them.  And I raise this, and my intention is

2    not at all to be accusatory because I am not the person who has

3    been having these communications with the government, but my

4    understanding is that the defense does have both the ability to

5    make those redactions and the willingness to do so in order to

6    assist the government in preparation of their exhibits.

7            THE COURT:  Okay.  Mr. Koenig?

8            MR. KOENIG:  Can I just address I guess the factual

9    matter?

10           THE COURT:  Yeah.

11           MR. KOENIG:  You know, there is a lot that goes into

12   getting these exhibits together and printed and stuff, and we

13   have to assure ourselves that we've got the correct copy of

14   everything.  And I don't believe there is any chance they would

15   do anything intentionally, but we just don't feel like we are

16   comfortable having the defendants print our exhibits for us,

17   which is just an extra step.  We have already put in a

18   substantial amount of time going through our exhibits to make

19   sure we have got -- in fact, we are done -- going through and

20   making sure.  And now what we would have to do is another step

21   of side-by-side matching with theirs.

22           To be fair, I don't want to steal Ms. Cheng's thunder,

23   but those confidentiality markings have been on just about

24   everything.  And I don't even know what conclusion would be

25   drawn from that, but in any event, we do presume that the

1    jurors follow the Court's instructions.  So I just don't think

2    it's necessary to take all these extra steps.

3              THE COURT:  Okay.  Here is one thing to keep in mind,

4    and I am going to leave the instruction in there for now, but

5    the instructions won't go back until sometime on Thursday.  And

6    Ms. Grimm tomorrow while the closings are going on has the

7    ability to assemble.  So that would also give, for instance,

8    the United States the ability to compare, you know, even

9    tomorrow night.

10             So, you know, if there is a cleaned-up version and

11   it's just noncontroversial, we can probably substitute them in.

12   But it really is not that big of a deal and I don't want to

13   cause lots of logistical problems nor would it warrant trying

14   to do some last minute change in the instruction packet because

15   it's just -- it's just not worth it.  So I am going to leave it

16   in for now.

17             If anyone has any proposed changes to it, we should

18   talk about that now, but otherwise we will leave it in.  But I

19   do appreciate the offer of the defendants to clean those up.

20   And I know that the defense exhibits have been redacted

21   accordingly, but I don't want to add an extra burden.

22             Ms. Cheng, did you have anything else?

23             MS. CHENG:  Just yes, a quick point, Your Honor.  I

24   believe some of the markings may be at the top of the page

25   instead of at the bottom.

4718

1          THE COURT:  The only ones I noticed that on, but I

2     could stand corrected, were on some defense exhibits that were

3     introduced yesterday, so I presume those have been cleaned up.

4          MS. CHENG:  Understood.  To the extent -- all right.

5     Nothing further.

6          THE COURT:  If you find a contrary example, because my

7     guess is that it's probably a rare one, that might be one of

8     the ones to compare, do the side-by-side real quickly and use

9     the defense cleaned-up copy.

10          MS. HENRY:  If I can just put a comma after "similar"

11     and say "generally on the bottom of the page."

12          THE COURT:  What was that one again, Ms. Henry?

13          MS. HENRY:  On the second line where it says "or with

14     something similar, generally on the bottom of the page," just

15     add the word "generally," that might -- just in case we missed

16     something somewhere.

17          THE COURT:  That's fine.  Okay.  Let's switch over to

18     Summaries and Charts in Evidence.  So this doesn't exactly

19     match what I said because I think that they were seeing these

20     things contemporaneously, but otherwise I tried to match the

21     language.

22          Ms. Henry, go ahead.

23          MS. HENRY:  We just want to preserve again the

24     objections which have been more than thoroughly, I think,

25     explored previously, but we want to make certain that we raise

1    them here again.  Thank you.

2         THE COURT:  Yes.  And I will make the exception.

3    Normally we would need to articulate more thoroughly, but in

4    the interests of time, I will incorporate all those various

5    objections to the summary exhibits because that was a topic of

6    some discussion.

7         Mr. Beller?

8         MR. BELLER:  Thank you, Your Honor.

9         I would ask that this be modified slightly to state,

10   "During the trial, certain summaries prepared by the government

11   were admitted in evidence," so that there is not a question as

12   to who prepared these particular summaries or admitted them.

13        THE COURT:  Any objection to that, Ms. Cheng?

14        MS. CHENG:  Your Honor, just to confirm in the record

15   or perhaps one of the defense counsel can confirm that there

16   were no summary charts that were entered into the record by the

17   defense?

18        THE COURT:  No, they weren't entered.  They were used

19   only as demonstratives.

20        MS. CHENG:  Your Honor, we think it's unnecessary

21   because I think the source of the summary exhibits is otherwise

22   quite clear and it contains accurate information.  I believe --

23   I am not really sure what this additional phrase does other

24   than to insinuate that somehow they are less credible because

25   it's prepared by one of the parties because it's not the

1    convention to include it.  We would oppose that inclusion.

2          THE COURT:  I will overrule that objection.  I think

3    it's factually accurate to indicate that they were prepared by

4    the government.

5          Let's switch over to the Corporate Officer -

6    Individual Liability instruction.

7          MS. PLETCHER:  Thank you, Your Honor.

8          We would ask the Court interlineate one word in the

9    first line.  So where it reads, "A person is responsible under

10   the criminal law for," I would ask for the Court to insert

11   "unlawful acts he performs or causes to be performed," et

12   cetera.  And the reason for that is that without that

13   modification, this can be read for a defendant who is a

14   corporate officer to potentially be responsible under the

15   criminal law for one of the many acts they perform on behalf of

16   the corporation, so I think that would help clarify.

17         THE COURT:  Ms. Cheng, any objection to that?

18         MS. CHENG:  Your Honor, we would object.  I think

19   including the word that a defendant is responsible only for

20   unlawful acts he performs implies to the jury that unless an

21   action standing alone is unlawful, he cannot otherwise be held

22   responsible for it.  And in an instance where there is

23   cumulative evidence that shows the totality of the act is what

24   makes it unlawful, we think it's important that there is no

25   limitation on the types of actions for which he is responsible.

1          *THE COURT:*  Mr. Fagg?

2          *MR. FAGG:*  Sure, Your Honor.

3          One, as Ms. Cheng just said, is that the cumulative

4    nature of it is what makes it unlawful or illegal, and so under

5    the criminal laws someone is not going to be responsible for

6    anything other than unlawful acts.

7          I'd also note that in the second paragraph it talks

8    about responsible for the illegal acts of another.  It's

9    essentially the same thing there, but just talking about it in

10   the negative.  So an alternative would be that if the

11   government doesn't like the word "unlawful," we could insert

12   the word "illegal."

13         *MS. CHENG:*  We believe in the jury instructions when

14   it describes the type of acts that can comprise a conspiracy,

15   that individual lawful acts can on their own together --

16   individual acts can make up an unlawful conspiracy even if the

17   individual acts are themselves lawful.

18         And in this case the concern we would have is if we

19   say that -- if a defendant is responsible only for an unlawful

20   act, that would make it seem as if, for example, if a defendant

21   exchanged a call with a competitor, standing alone somehow the

22   jury might believe based on this instruction that that

23   defendant cannot be held responsible if it's done as part of

24   his duty within the corporation which is not accurate.

25         Another point I will make briefly is that it's

4722

1    unnecessarily duplicative to say that he is responsible under

2    the criminal law for a criminal act.  But regardless I think

3    the key point for us is that it seems to limit the spirit of

4    responsibility only to acts that standing alone are unlawful,

5    and we want to avoid that implication with the jury.

6         THE COURT:  Ms. Pletcher, did you have anything else?

7         MS. PLETCHER:  I think I stated my --

8         THE COURT:  We have to keep in mind what this

9    instruction is about.  It's to inform the jury that simply

10   because someone works for a corporation does not necessarily

11   cause them to be -- to avoid criminal liability.  And as Ms.

12   Cheng correctly noted, other instructions inform the jury that

13   a person, you know, can be guilty of the charge in the

14   Indictment even based on certain acts that may individually be

15   lawful.  And for that reason I don't think that the proposal of

16   Ms. Pletcher somehow misstates the law, so I am going to insert

17   the word as she suggests.

18         I think that as Mr. Fagg points out, it does seem to

19   be the flip-side of the coin on the next paragraph where the

20   term "illegal" is used.

21         Any other comments on this instruction?

22         Then how about Punishment?  Any comments or objections

23   to that?

24         Multiple Defendants?  We have moved that instruction,

25   but we didn't actually talk about whether there were any

1    proposed changes to it.  Anyone have any proposed changes to

2    that?

3         All right.  Equal Consideration, I think that that's a

4    stipulated instruction.  Anyone have any comments about that?

5         All right.  How about the Duty to Deliberate, the

6    stock one that is the very last instruction?

7         All right.  Ms. Cheng, did you have anything?

8         *MS. CHENG:*  I did, unfortunately, but hopefully this

9    will be quick.  In the red-line that the government sent the

10   Court yesterday, we included an instruction about interview of

11   witnesses prior to trial.  The reason we included it is that

12   there are moments throughout the trial and within the

13   transcript where we believe defense counsel had insinuated in

14   some way that it was improper for the government to have

15   interviewed the various witnesses that have put on otherwise,

16   and I have an example here in one of the transcripts, and this

17   is a certified transcript, so I will quote the question.

18        After asking whether Mr. Bryant met with the same

19   people who are sitting right there at counsel table, Ms.

20   Pearce, Agent Taylor and Mr. Koenig, he answered.  And then

21   later follows with a subsequent question:  Mr. Bryant, are you

22   consulting with the government on the trial of this case?

23        And that's just one example of various questions that

24   have been asked that somehow insinuate that there is something

25   improper about the fact that the government has interviewed

4724

1    witnesses or had some type of special act and that the

2    defendants could not themselves reach out to witnesses for

3    interviews, assuming the witness consents, of course.

4         And just to confirm, I misspoke earlier when I said

5    before trial.  I meant before testifying because we did have

6    interviews during the trial period.  The language of the

7    instruction that we've proposed is taken straight from two

8    antitrust cases.  The first sentence is from the *B&H*

9    bid-rigging case in this district.  The second one is from

10   Page 33 of *Tokai Kogyo*, which is a price-fixing case which we

11   believe we have cited.  And with that I will --

12        THE COURT:  Do you want to mark that as a tendered

13   instruction, government instruction?

14        MS. CHENG:  Certainly, Your Honor.

15        THE COURT:  If you have a separate copy of it, why

16   don't you mark that.

17        I am going to reject it.  I don't believe that the

18   jury would infer that merely talking to a witness beforehand

19   would be improper.  For instance, Ms. Johnson yesterday in

20   conducting her direct examination mentioned talking to people

21   on the telephone, meeting -- met with one of the witnesses the

22   night before.  And there wasn't -- I can't remember, I am

23   blanking at his name now, but other witnesses, not Mr. Bryant,

24   but who met with the government on numerous occasions, there

25   was not any implication that his having done so was by any

1    means improper.

2         It's true that certain accusations were made about

3    some witnesses meeting with the prosecution and the FBI and

4    things of that nature, but it wasn't universal in regard to

5    witnesses who may have met with the government on numerous

6    occasions.  And, of course, a lot of them did, so I don't think

7    that the jury would draw an inference that merely meeting with

8    or interviewing with the government was somehow improper.

9         *MS. CHENG:*  Understood, Your Honor.  I will state that

10   the government's position would be that the defendants wouldn't

11   be able to make the same types of insinuations that it's

12   improper to interview during closing as well.  And I do have --

13        *THE COURT:*  What I am suggesting is that I am not

14   going to try to limit people's arguments, but were they to do

15   so, the easy retort would be that some of the witnesses met

16   with at least some defense counsel too, so...

17        *MS. CHENG:*  Understood, Your Honor.

18        *THE COURT:*  Do you have that instruction, Ms. Cheng?

19   If you could give it to Mr. Keech.  We will mark that as

20   government tendered No. 1 rejected.

21        Okay.  So but Ms. Cheng, did you have any comments on

22   the Duty to Deliberate?

23        *MS. CHENG:*  No, Your Honor.

24        *THE COURT:*  Okay.  Did anyone?

25        Okay.  So yes, now, just as Ms. Cheng did, would be

1    the opportunity.  If you have any additional instructions to

2    tender, now is the time.

3              Mr. Fagg.

4              MR. FAGG:  Thank you, Your Honor.  We would tender

5    defendants' theories of the case.

6              THE COURT:  Oh, that's great.

7              MS. LaBRANCHE:  Before we do that, is there one thing

8    I can address real quick?

9              THE COURT:  Yes.

10             MS. LaBRANCHE:  So, Your Honor, I think there was

11   still an outstanding issue on the Elements of the Offense

12   instruction, Page 16 and 17 on the Court's version going back

13   and forth on "should" and "must."

14             THE COURT:  Yes.

15             MS. LaBRANCHE:  I think I may have an easy solution.

16   That is I went back and looked at the 10th Circuit pattern

17   instructions.  And in looking at all of those instructions, and

18   by way of example, 2.10, 2.16, 2.19, when it is an instruction

19   that's just the elements of the offense instruction, the last

20   two sentences that are on Page 17 aren't given.  That's not how

21   the 10th Circuit pattern reads.

22             All the 10th Circuit pattern has, and this is across

23   the board for all of the elemental instructions as it relates

24   to all of the criminal cases -- or criminal charges, is what's

25   contained on 16 which is those first two paragraphs and

4727

1   whatever the elements are.  So I would suggest we just get rid

2   of the two sentences that are on 17 instead of fighting about

3   "should" and "must."

4        THE COURT:  Mr. Pollack?

5        MR. POLLACK:  Your Honor, I would not on behalf of

6   Mr. Blake join that proposal.  I do think that it is

7   appropriate for the jury to be instructed that after their

8   consideration of all the evidence if the elements have not been

9   proven beyond a reasonable doubt, that they must find not

10  guilty.  I think that's consistent with the Court's earlier

11  instruction at Page 6 on Presumption of Innocence-Burden of

12  Proof-Reasonable Doubt.  It says at the end of that

13  instruction, "If on the other hand, you think there is a real

14  possibility that he is not guilty, you must give him the

15  benefit of the doubt and find him not guilty."  So you used the

16  "must" language there and I think that is appropriate.

17       I don't think there can be any suggestion that the

18  jury has discretion to convict somebody if all the elements

19  have not been met beyond a reasonable doubt.

20       THE COURT:  Yeah, the real play is whether, as

21  Ms. Cheng pointed out, we would then to be parallel include the

22  "must" language in the second to the last sentence.

23       MR. POLLACK:  Your Honor, I do not think that there is

24  any requirement or is it desirable for it to be parallel.  I

25  think there is no circumstance under which the Court should be

4728

 1    essentially directing a verdict of guilt.  I think that the

 2    Court can certainly instruct that they should find the

 3    defendant guilty if all the elements are met, but I do not

 4    think it's appropriate to instruct that they must find the

 5    defendant guilty.  While obviously the Court doesn't give any

 6    explicit instruction to this effect, the jury is free to acquit

 7    for whatever reason the jury sees fit to acquit.  I think it

 8    comes dangerously close to a directed verdict.

 9             THE COURT:  Ms. Cheng?

10             MS. CHENG:  Your Honor, I believe what was just

11    described was jury nullification which the 10th Circuit has

12    repeatedly explained it wants to avoid.  There is already an

13    instruction in this Court's proposed reasonable doubt

14    instruction which says based on the 10th Circuit pattern, "If,

15    based on your consideration of the evidence, you are firmly

16    convinced that a defendant is guilty of the crime charged, you

17    must find him guilty."  And this is in the pattern.  So there

18    is nothing improper at all about telling the jury that they

19    must follow the law.  And it's not unidirectional.

20             It's not simply that if you find that they are guilty

21    beyond a reasonable doubt, then you should find the defendant

22    guilty, but you have a choice.  On the other hand, you must

23    acquit.  And I think that they really should be parallel and

24    symmetrical.  And that's what the 10th Circuit pattern has and

25    that same pattern instruction has been upheld at least twice by

1    the 10th Circuit.

2            THE COURT:  Mr. Pollack?

3            MR. POLLACK:  Obviously I am not advocating that you

4    instruct the jury that they can do whatever they want.  You are

5    instructing them what they should do.  I just think that it is

6    not a parallel situation between finding guilt and finding not

7    guilty and there are obviously constitutional ramifications to

8    that.  So I think there is nothing inappropriate about it as

9    drafted and there is no need for the two to use identical

10   language.

11           THE COURT:  Ms. LaBranche?

12           MS. LaBRANCHE:  Very quickly, Your Honor.  The

13   government is right, it does say "must" in the presumption of

14   innocence.  And that's exactly why it doesn't need to be

15   anywhere on Page 17 and why the pattern instructions don't have

16   it, why it should come out either way.  I object on behalf of

17   my client to now the jury being told twice that they must do

18   something.

19           THE COURT:  I am going to overrule the objections or

20   the suggestions of Mr. Pollack and also Ms. LaBranche, and I am

21   going to use in the second to the last sentence the term

22   "must."  I think that is appropriate.  That does follow the law

23   and I'll revise that instruction that way.

24           Additional instructions to tender other than the

25   theories of defense?

4730

1          MR. POLLACK:  I just want to clarify, the Court is

2    also using "must" with respect to the last sentence.

3          THE COURT:  Absolutely.

4          MR. FAGG:  I did have one slight wordsmithing issue.

5    That is as it relates to the Elements of the Offense, which I

6    believe is on Page 20, Your Honor.

7          THE COURT:  It's on 16 of the Court's version, I

8    believe, but go ahead.

9          MR. FAGG:  So in the third sentence in the top

10   paragraph, this is the one other time in the instructions where

11   it seems to really describe the actual conspiracy at issue in

12   this case.  And so we would propose to make a similar revision

13   that we've made earlier on the third line so that it says --

14   "charges the defendants with conspiring to rig bids and fix

15   prices for broiler chicken products," and then say "beginning

16   at least as early."  I think that's more accurate.  It tracks

17   to the Indictment as opposed to "in the broiler-chicken

18   industry."

19         THE COURT:  Okay.  Ms. Cheng is taking a look at the

20   Indictment right now.  What do you think of that proposal,

21   Ms. Cheng?

22         MS. CHENG:  Give me one moment.  We will quickly

23   confirm with the Indictment.  No objections Your Honor.

24         THE COURT:  That's a good catch, not the jury has the

25   Indictment, but I think it's appropriate.  But it is consistent

1   with the term that we've used added elsewhere.

2          Okay.  Additional instructions to tender other than

3   the theories of defense?

4          Mr. Beller, go ahead.

5          MR. BELLER:  Thank you, Your Honor.

6          This morning we had a brief discussion regarding

7   references to the word "Indictment."  I told the Court that I

8   would draft something.  I do have a copy to tender to the Court

9   that I would request either be an independent instruction or

10  placed in the Evidence Defined instruction.  If I may offer it

11  to Mr. Keech.

12         Your Honor, I have handwritten out based on the

13  Court's ruling on the other instruction regarding statute of

14  limitations, I have crossed out the words "in the superseding

15  indictment."

16         THE COURT:  Right.

17         MR. BELLER:  Thank you.

18         THE COURT:  I think we -- there is language in the

19  introductory instruction which I can't lay my hands on right

20  now that talked about what an indictment was.  I don't think

21  that this language is the same.  I would suggest that in the

22  consideration of including some language once again explaining

23  what the indictment is, that we have parallel language.

24         So assuming that's the case, Ms. Cheng, reaction to

25  that?

1           MS. CHENG:  Your Honor, we have no objection to the

2      parallel -- the instruction the Court has already given.

3           THE COURT:  I think it would be fine.  So we will need

4      to find the introductory instruction and then we will use

5      parallel language.

6           And Mr. Beller, where did you suggest placing that

7      instruction?

8           MR. BELLER:  Your Honor, my thought was to add it in

9      the Evidence Defined instruction only because this says that

10     indictment is not evidence.  I will admit to the Court I don't

11     have a strong feeling or a strong preference, so if there is

12     thought it should go somewhere else, that's okay with me.

13          THE COURT:  I think maybe we should do it after

14     Presumption of Innocence and before Evidence Defined.  I will

15     go ahead and add it there.

16          MR. BELLER:  That's fine.  And Your Honor, if I need

17     to pull the transcript, I am happy to do that too if it would

18     assist your clerks.

19          THE COURT:  Here is what that language says.  "The

20     indictment is simply the description of the charges made by the

21     government against the defendants.  It is not evidence of guilt

22     or anything else."  Let me compare that to what Mr. Beller

23     handed out.  Yeah, I would propose giving that one sentence,

24     then.  And I will include that as a separate instruction, but

25     will put it where I indicated.

1          Is that all right with the government?

2          MS. CHENG:  Yes, Your Honor.  No objection.

3          THE COURT:  We will break that out and will include

4    that sentence.

5          MR. BELLER:  Thank you, Your Honor.  Would the Court

6    consider simply marking this instruction?

7          THE COURT:  Yes.  So I will decline that one.

8          And Mr. Keech, this will be --

9          COURT DEPUTY CLERK:  Four is the next one.

10         THE COURT:  Four, yeah.  Here is a copy of it.

11         And then any other -- Ms. Cheng, go ahead.

12         MS. CHENG:  Yes, Your Honor.  I flagged this earlier

13   about the government's objection to Ms. Pletcher's proposed

14   instruction from Matsushita.  Would now be a good time to take

15   that up?

16         THE COURT:  Sure.

17         MS. CHENG:  So we want to bring the Court's attention

18   to Matsushita itself which really was considering a predatory

19   pricing scheme as part of evidence of the existence of a

20   conspiracy.  And in that case the Court made its statement

21   about drawing inferences that are implausible on the basis of

22   the fact before it, which in that case was the cutting of

23   prices in a predatory pricing case which is basically an

24   allegation that monopolists seek to pick out its competitors by

25   pricing so low or at some amount below cost, that other

4734

1   competitors will exit the market and therefore it ascends to a

2   monopolistic position.  In that case it is with this context

3   that the Supreme Court was looking at the issues.

4        Here you can see -- so if I could just read from some

5   sections of the opinion just to emphasize how different our

6   factual situation is from *Matsushita*.  The Court began by

7   saying, we emphasize the Court -- this is the beginning of

8   section or Part B.  "We emphasized that courts should not

9   permit factfinders to infer conspiracies when such inferences

10  are implausible, because the effect of such practices is often

11  to deter procompetitive conduct." So the reason they use the

12  word "implausible" is that in that case the fact at issue from

13  which the court was drawing inferences was the cutting of

14  prices which typically leads to an inference of greater

15  competition rather than lesser.

16       And in this case it is not at all -- we don't have

17  that same level of implausibility that we are considering in

18  our case.  But if I could just continue, near the end of that

19  paragraph, the court continues, but continuing -- "But cutting

20  prices in order to increase business often is the very essence

21  of competition. Thus, mistaken inferences in cases such as this

22  one are especially costly, because they chill the very conduct

23  the antitrust laws are designed to protect."

24       This is reasoning that is highly specific to the

25  predatory conduct pricing.  It is nominally a price-fixing

1    case.  Really the conduct the court was assessing when it was

2    drawing these types of inferences was really specific to the

3    predatory pricing situation.  And if we were to adopt the view

4    that the jury cannot draw any inferences, say, from a phone

5    call standing alone, at least to an effect where the jury will

6    believe that each piece of evidence, each building block of

7    evidence cannot be considered because they are themselves

8    unlawful and therefore they cannot draw this inference, and

9    that is a real concern that we would have because it's a

10   non-accurate statement of the law.

11          And, in fact, if *Matsushita* were read so broadly to

12   say that generally these type of inferences are impermissible,

13   then it would be highly inconsistent with many circuit court

14   cases that have held that exchange of pricing information,

15   which standing alone may not be unlawful, is an example of a

16   facilitating practice or a plus factor indicating a conspiracy.

17   And that would just be -- that reading, that overly broad

18   reading of *Matsushita* is simply inconsistent with all of the

19   circuit courts that have held in that direction.

20          *THE COURT:*  Anyone else real quick on that point?

21          *MS. CHENG:*  One more quick point.  To the extent the

22   Court is inclined to include that type of instruction saying

23   that standing alone if some type of evidence could be

24   consistent with both and you can't draw an inference one way or

25   another, we do also want to add a statement to the effect of

1   "It takes only one act to join a conspiracy."  And that

2   follows --

3        THE COURT:  So why don't you -- we better be very

4   specific.  So exactly where would you propose including that?

5        MS. CHENG:  Perhaps we can say and -- I will take this

6   from a Second Circuit case, *U.S. v. Tramunti,* and I will quote

7   it directly so we follow exactly what the case said.  "A single

8   act may be sufficient for a defendant to join a conspiracy."

9   Just to make it clear that if it's the case that a single act

10  standing alone cannot be inferred to support an antitrust

11  conspiracy, it is likewise true that a single act can be

12  sufficient for an inference of conspiracy.

13       THE COURT:  What page is that on?

14       MS. CHENG:  Give me one moment to get the pin cite,

15  Your Honor.  One more point.  I don't believe we've made a

16  decision or the Court has made a decision on where that

17  instruction would go if it is ultimately given to the jury.

18  Our proposal would be that our sentence would follow

19  immediately after that.

20       THE COURT:  After what?

21       MS. CHENG:  After wherever that proposed instruction

22  would go, Ms. Pletcher's proposed instruction.

23       THE COURT:  I am really not following.  Which is

24  Ms. Pletcher's proposed instruction?

25       MS. CHENG:  So I don't believe we have a red-line of

1    it or at least the government doesn't have a copy of a red-line

2    to that effect, but I believe Ms. Pletcher early on when we

3    were talking about the charge related to direct or

4    circumstantial inferences, Ms. Pletcher brought up the point

5    that the jury would somehow not be permitted to draw an

6    inference from lawful or legitimate business activity standing

7    alone.  And she cited the *Llacua* case and the *Matsushita* case

8    for that proposition.  So we were just responding to that to

9    clarify that we do, in fact, object to such an instruction and

10   to propose an alternative additional instruction if the Court

11   is inclined to provide it.  But we did not decide ultimately, I

12   believe, on the location of it other than it would be not in

13   the -- not in the charge related to direct or circumstantial

14   evidence.

15        THE COURT:  Ms. Pletcher, maybe you can clarify.  I am

16   not following this at all.

17        MS. CHENG:  And the pin cite Your Honor is 1111.

18        MS. PLETCHER:  Briefly to address three points.  One

19   is the *Matsushita* case stands for a much broader proposition, a

20   proposition that the inference of the conspiracy is

21   impermissible if a defendant's conduct is consistent with other

22   equally plausible explanations.  And that has been adopted by

23   the 10th Circuit.  That's why I proposed the language in

24   *Llacua*.  And I believe my proposal was to include a paragraph

25   directly from *Llacua*, which I am happy to read again, but --

1          THE COURT:  Didn't I rule on this?

2          MS. PLETCHER:  You did.

3          THE COURT:  I don't know what we're doing.  That's why

4     I wasn't following things.  I think I have already ruled on

5     this one.

6          MS. PLETCHER:  That's correct.

7          THE COURT:  So Ms. Cheng's point I am not going to

8     adopt.  The Court has already ruled on this instruction.

9          Ms. Henry.

10         MS. HENRY:  Your Honor, an additional instruction that

11    we would propose to come after the language that Your Honor

12    already has on Evidence - Direct and Circumstantial -

13    Inferences is, "If the evidence regarding a defendant does no

14    more than raise a mere suspicion of guilt or requires piling

15    inference upon inference, you must find that defendant not

16    guilty."  And the language is taken directly from *U.S. v.*

17    *Dewberry,* 799 F.3d 1022 at 1028, and it's a 10th Circuit case.

18    And it's quoting *U.S. v. Mullins*, 613 F.3d 1273, 1280, also a

19    10th Circuit case, 2010.

20         THE COURT:  Once again, I am not quite following this.

21    I think on the instruction on the first element, I have already

22    made my ruling on that, so I am just not tracking these

23    suggestions.  But I think we are done with that one.

24         Additional instructions to tender?

25         Okay.  Let's take a look at the Theories of Defense.

1    They look really long.  If they are long narratives, that is

2    something that's going to be reserved for closings.  Theories

3    of the defense have got to be short and sweet, but I will take

4    a look at them.  It's just one instruction, but longer?

5        MR. FAGG:  It is one instruction, Your Honor, that

6    covers each one of the defendants.

7        THE COURT:  There are lots of problems with these.

8    For one thing, the theory of defense instructions have got to

9    be really clear.  This is a defendant's theory of the case.  If

10   a paragraph begins with, for instance, Mr. Penn's theory of the

11   case, that's good.  That sets it properly.  And the jury

12   wouldn't misconstrue the rest of the paragraph to suggest

13   otherwise.  It's just the defendant's theory of the case.  But

14   it has to be really, really clear that this is not the Court

15   instructing the jury as to anything.  This is the defendant's

16   theory of the case.

17       Also you can't include propositions of law within

18   here, and there is a lot of those in here.  Those have all got

19   to go out.  That's not -- the theory of the case instruction

20   does not, you know, substitute as an instruction of the law, so

21   anything to that effect has got to go out.

22       And also to the extent that a theory of defense

23   instruction is starting to get into the reiteration of

24   evidence, that's appropriate for closings.  I am giving

25   everyone 45 minutes, so some of these are way too detailed.

4740

1    And a lot of the paragraphs that come later on, there is no

2    clear distinction that it's even a given defendant's -- like on

3    Page 5, that it's even a defendant's theory of the case.  It's

4    just random paragraphs that talk about different things.

5         So each defendant has got to have his own distinct,

6    you know it is mister so and so's theory of the case that.  And

7    then we don't have time tonight to go through all of the

8    potential issues with this.  But at this point in time I really

9    don't think that is in sufficient shape that I would even give

10   it.  It's got to be more succinct and it's got to be very clear

11   that, you know, as to each defendant, that it's that

12   defendant's theory of the case.  I think it can be shaped up,

13   but it's not in a form that I would give at this point in time.

14        MR. FAGG:  Your Honor, I am confident that we can do

15   that.  And I think some of those issues were a function of us

16   trying to combine it into one for purposes of the discussion

17   today, but I understand the Court's indications here and we can

18   make those changes.

19        THE COURT:  I know it's a little bit vague, but

20   nonetheless, the danger for the defendants is that if it's not

21   in sufficient shape, I am not going to give it.  Having some

22   detail is okay, but, you know, some defendants have multiple

23   paragraphs and I am probably not going to do that.  It has to

24   be -- it is not the closing argument.  It just -- it's the

25   theory of the case.  It's not the defendant's closing argument

1    or summary of the closing argument.  It's the theory of the

2    case.

3              So some detail is okay, but it really should just be

4    an average size paragraph, namely one that consists of about

5    four or five sentences.  That's what it really needs to be

6    because -- and like I said, you can't -- it cannot have the

7    effect of misleading the jury into thinking that the Court is

8    somehow instructing the jury on some proposition of law or

9    even, you know, a fact.  It has to be all couched in a sense

10   that this is what the defendants, you know, believe their

11   theory of the case is.

12             MR. FAGG:  Understood, Your Honor.  Would it be the

13   Court's preference if each defendant included its theory of the

14   case in a separate instruction rather than in one summary

15   instruction?

16             THE COURT:  You can do that.  Obviously, I don't want

17   to make it logistically difficult for people to be bandying

18   things around this evening.  If it would make more sense to

19   break it out separately, I think that that's fine.  It's not

20   going to matter too much.  So perhaps that would be the best

21   way.  And then to try to e-mail it to the Court ASAP so that we

22   can consider that because, once again, we are going to be very

23   constrained in the morning.  Things are going to be happening

24   fast, real fast.

25             MR. FAGG:  Thank you, Your Honor.  We will do that.

4742

1              THE COURT:  Mr. Pollack?

2              MR. POLLACK:  Did you want them filed through ECF or

3    just sent to Ms. Grimm or Ms. Butler?

4              MS. BUTLER:  You can just e-mail to the court

5    chambers.

6              THE COURT:  E-mail to chambers would be sufficient,

7    okay.

8              MR. KOENIG:  I assume the government will be copied.

9              MR. FAGG:  Of course.

10             THE COURT:  Obviously.  So those are my general

11   comments.

12             And then anything else on theory of the defense?

13             MR. FAGG:  Not from me, Your Honor.

14             THE COURT:  Mr. Beller?

15             MR. BELLER:  Your Honor, I am not opposed by any means

16   to putting them all into a single instruction.  My concern, of

17   course, is that one defendant's instruction may be rejected and

18   I don't want my instruction to be likewise.

19             THE COURT:  I think what we are talking about is I am

20   going to do separate instructions.  I won't be trying to cobble

21   them together.

22             MR. BELLER:  In the interests of time, I do have

23   specifically Mr. Fries' instruction broken out.  I am happy to

24   tender it.  I believe that it follows all of the Court's rules.

25   To the extent the Court can take some time to look at it this

4743

1    evening, this may operate as a bit of a template to the other

2    defendants as they are drafting their instructions this

3    evening.

4         THE COURT:  Yeah, let me take a look.  It's on the

5    bottom of Page 1?

6         MR. BELLER:  Correct.

7         THE COURT:  Yeah, I think that Mr. Fries' proposed

8    language would be an acceptable theory of the defense, so to

9    the extent that that may provide some guidance, I think that

10   one is good.

11        Have you had a chance to look at the verdict form?

12   Ms. Butler passed that out, pretty simple and straightforward.

13   Any problems with that?

14        MS. CHENG:  No, Your Honor.

15        THE COURT:  Mr. Fagg?

16        MR. FAGG:  Your Honor, just perhaps one suggestion.

17   Given that the jury will not have the Indictment, I would

18   suggest that we could read one of the instructions, just say

19   strike the last three words so that it ends "in the count

20   charged."  There is only a single count and I think it's going

21   to be clear to the jury what that count is for all of the

22   defendants.

23        THE COURT:  Anyone have any disagreement with that?

24        MS. CHENG:  No objection to that, Your Honor.

25        THE COURT:  I will make that change.

1        Any other comments in the verdict form?

2        Okay.  Next question, and that is I would propose --

3  so what we'll do is we'll make the conforming changes.  At some

4  point tonight those will be e-mailed.  How did we do it last

5  night?  Did we send it to Mr. Pollack?  He didn't volunteer

6  tonight, but we could send them to one -- to the government and

7  also to one defendant to distribute.

8        MR. POLLACK:  I think it's kind of like a conspiracy.

9  Once I volunteer, it exists forever unless I withdraw so...

10        THE COURT:  The rule on withdrawal is very high, very

11  difficult to meet.

12        MR. POLLACK:  I am happy to forward it to defense

13  counsel.

14        THE COURT:  Great.  We will do that.  I would propose

15  we meet at 7:30 tomorrow.  And what I would like tomorrow is

16  for you to be prepared just to determine whether or not we've

17  conformed the instruction packet to what changes were discussed

18  and agreed to or ruled on today, okay, not to reargue

19  everything, but rather just to perform that mechanical

20  function.  Because as I warned you before, just the process of

21  manufacturing all the sets that we need and having multiple

22  copies for your tables and so forth takes more time than you

23  think.  And I don't want to disappoint the jury by once again

24  having them come in at a specific time, but they sit around for

25  a while, okay?

 1          Did anyone want to -- anyone have thoughts on me

 2   giving you a heads-up during your closings?  Once again, you

 3   can let me know tomorrow too, but as long as we have got a

 4   little bit of time now, if you wanted me to give you a

 5   heads-up, I could do so.  And, for instance, for the

 6   government, if the government wanted me to give a heads-up

 7   after a given amount of time with the initial close, once

 8   again, I could do that too.  It's totally up to you.  Any

 9   takers?  You can let me know tomorrow if you want to.

10          Okay.  Mr. Fagg, additional point?

11          *MR. FAGG:*  Sure, Your Honor, just a question.  You

12   mentioned yesterday that you were going to query the jury about

13   whether or not they would like to deliberate on Friday.  Is

14   that something that you intend to do tomorrow or do you intend

15   to wait until after the closings?

16          *THE COURT:*  I think for planning purposes it would

17   probably make sense to do that tomorrow, but I don't want to

18   create problems.  If, for instance, the people in this room

19   because of their schedule was different anticipated not being

20   around or something or, for instance, Mr. Little didn't plan on

21   being around or something, then we could always tell the jury

22   that we're not having court on Friday and that they would come

23   back on Monday to resume their deliberations.

24          Any thoughts on that?  We planned on Friday not being

25   a court day.  We'll get it to the jury and if they wanted to,

1    we could allow them to, but I don't want to, you know, keep,

2    for instance, a defendant here just in case there was a Friday

3    verdict.

4         *MR. FAGG:*  I am not aware of any issues there, Your

5    Honor, but overnight we will --

6         *THE COURT:*  Let me know first thing if you don't mind.

7    We don't necessarily have to let the jury know.  We can let the

8    jury know, for instance, right before the lunch break as to

9    that possibility at least, so you can let me know up to that

10   point.

11        Ms. Henry?

12        *MS. HENRY:*  If the government knows how long they are

13   going to allocate for their opening closing, I don't know

14   exactly how you put that, their first closing as opposed to

15   their rebuttal closing, that would be helpful for budgeting

16   purposes for tomorrow to understand timing.

17        *THE COURT:*  The government doesn't have to, but if the

18   government knows, like Mr. Koenig, of course, opening had it

19   timed out, but it's totally up to the government.

20        *MR. KOENIG:*  May we confer and then e-mail defense

21   counsel?

22        *THE COURT:*  Yeah, it's totally up to you.  You can

23   communicate as you wish.  We will have to think about those

24   little mathematical things a bit.  We are not going to break up

25   someone's closing for lunch, for instance.  We will adjust the

1    lunch hour as necessary so we don't interrupt someone's close.

2          All right.  We will be in recess, then, until bright

3    and early, 7:30 tomorrow.  Thank you.

4          (Recess at 5:52 p.m.)

5                         REPORTER'S CERTIFICATE

6          I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.  Dated

8    at Denver, Colorado, this 14th day of February, 2022.

9

10                              S/Janet M. Coppock

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25