1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants
   _____
13
                  REPORTER'S TRANSCRIPT
14                Trial to Jury, Vol. 24
   _____
15

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 7:30 a.m., on the 8th day of December,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

Michael Koenig, Carolyn Sweeney, Heather Call and Paul Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng, U.S. Department of Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing for Plaintiff.

Anna Tryon Pletcher and Michael Tubach of O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111-3823;

Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street N.W., Washington, DC 20006, appearing for Defendant Penn.

David Beller, Richard Kornfeld and Kelly Page of Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, CO 80202, appearing for Defendant Fries.

Bryan B. Lavine of Troutman Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

Laura Kuykendall and Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219, appearing for Defendant Brady.

Michael Felberg of Reichman, Jorgensen, Lehman, Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY 10017;

APPEARANCES (Continued)

1

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1              APPEARANCES (Continued)

 2         Craig Allen Gillen and Anthony Charles Lake of

 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4    Atlanta, GA 30339;

 5         Richard L. Tegtmeier of Sherman & Howard, LLC,

 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7    for Defendant Roberts.

 8         Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                   PROCEEDINGS

16         THE COURT:  Back on the record in 20-CR-152.  The jury

17    is not present.

18         We are just going to make sure that the changes we

19    talked about in the jury instructions have all been made.  The

20    United States filed a red-lined version.  Did everyone get

21    that?  Okay.  Why don't we go through that first, and then we

22    will go back through anything that the defendants want to

23    raise.

24         So I think that the first change the government

25    proposes is on Instruction 14, which is the Elements of the
```

1    Offense to add the term "and bid-rigging."

2          Anyone have a problem with that?  That seems

3    appropriate.  We will make that change.

4          The next one is On Instruction 16 where the word

5    "products" was put in and the "s" dropped from chickens.

6    Anyone have any problem with that?

7          All right.  The next one, this is what we talked about

8    and I was not quite connecting between Ms. Pletcher and

9    Ms. Cheng.  This is Instruction No. 17 and this is the language

10   from *Llacua*, *Llacua*, I think it is, and the government is

11   proposing to strike the second sentence.

12         Ms. Cheng, do you want to briefly comment on that?

13   Then I will allow Ms. Pletcher to respond.

14         *MS. CHENG:*  Sure, Your Honor.  We appreciate Your

15   Honor letting us address this point with the Court.

16         *THE COURT:*  Just for the record, Ms. Pletcher proposed

17   some language and I thought the language seemed fine.  And then

18   we were talking about where to put it, and we never quite

19   decided exactly where, although we had talked about the

20   possibility of putting it into this instruction.

21         So anyway, go ahead, Ms. Cheng.

22         *MS. CHENG:*  That's correct, Your Honor.  When we left

23   court yesterday, we were under the impression that defense

24   counsel's intention or proposal was to include only a quotation

25   directly from the case law from *Llacua* specifically.  And

 1    defense counsel in court did cite *Llacua*, but followed up with

 2    an independent statement which is not from *Llacua* and instead

 3    was her view or reading of the cases that she was describing.

 4    So when we received the instructions from the Court yesterday,

 5    we noticed that the second statement which is not a quotation

 6    but instead defense counsel's view of the law or argument was

 7    included.  And so we pointed that out to the Court.

 8          We object vehemently to its inclusion, to the

 9    inclusion of defense counsel's argument.  It is simply not the

10    law.  It is not a quote from the case.  It is argument.  And

11    the first sentence is from *Llacua*, and as we mentioned to the

12    Court yesterday, although we disagree with its inclusion in the

13    first place, we understand that the Court has ruled on this, on

14    this topic.  But with regard to the second sentence we

15    absolutely object to its inclusion.  We think it would be an

16    inaccurate statement of the law which would effectively cripple

17    the effect of the Sherman Act by confusing the jury to thinking

18    that it cannot draw inferences from overall business conduct or

19    circumstantial evidence that is consistent with business

20    conduct, which is a point that Your Honor raised yesterday

21    about the type of confusion that might be caused.

22          I don't want to get into --

23          *THE COURT:*  We don't have time.  It has to be real

24    quick.

25          *MS. CHENG:*  I actually won't, but I will just say -- I

1    can say more if the Court would like or depending on what

2    Ms. Pletcher is getting into, but our request is basically --

3    simply that it be removed because it is not a statement from

4    the law.  It is language that is not taken from the case and

5    instead is just defense counsel's argument.

6            THE COURT:  All right.  Ms. Pletcher, go ahead.

7            MS. PLETCHER:  Your Honor, I think the government may

8    have failed to read the sentence above the previous one that I

9    quoted in *Llacua* which reads at Page 1179.

10           THE COURT:  In *Llacua* you are talking about?

11           MS. PLETCHER:  Yes.

12           THE COURT:  Sorry, let me go to that because I have a

13   copy.  Go ahead.

14           MS. PLETCHER:  Let me read this.  The quote is, and

15   this is directly from *Llacua*, Page 1179.  "An inference of

16   conspiracy is impermissible if the defendants had no rational

17   economic motive to conspire, and if their conduct is consistent

18   with other, equally plausible explanations."

19           The quote that I proposed to the Court is a near

20   direct quote including the language, "It is impermissible,"

21   particularly that word, "if their conduct is consistent with

22   other, equally plausible explanations."  So the proposed quote

23   is actually near a direct quote of the law.  And for that

24   reason I see no reason why it should be taken out.  In fact,

25   it's --

1           THE COURT:  Here is the question.  What does the

2    second sentence add that the first sentence doesn't have?

3           MS. PLETCHER:  The second sentence makes it very clear

4    to the jury what is permissible and what is not permissible in

5    terms of where to draw the inferences.  It's a direct quote

6    from the law, so for that reason alone it gives the jury the

7    complete picture of how to treat circumstantial evidence, and

8    if not included I think would take away this important piece

9    that the Court clearly felt was critical.  This concept of

10   what's permissible and what's not permissible gives the jury a

11   brighter line that is directly straight from the law, Your

12   Honor.

13          THE COURT:  Okay.

14          MS. PLETCHER:  I think it's important to have the full

15   context in front of the jury.

16          THE COURT:  Anyone else want to weigh in real quick?

17   I agree with the government's change.  I don't see --

18   Ms. Pletcher is right that this is a paraphrase, the second

19   sentence is a paraphrase of something, but I think that what is

20   very important for the concept is standing alone.  And I don't

21   see where the second sentence adds anything, but the first

22   sentence I think is important and that really encapsulates the

23   law from *Llacua*, so I will strike the sentence, second

24   sentence.

25          The next change is on Page 23, and once again, it's

 1 | just to conform by putting "chicken products."  Anyone have a

 2 | problem with that?

 3 |       Okay.  And then on Instruction No. 20 at the top, I

 4 | don't recall, but people might be able to refresh my memory, I

 5 | know that I talked about potentially striking that part, but I

 6 | don't think we agreed on it.  So anyway, I am not going to make

 7 | that change.  And I think that that was all of the things that

 8 | the government flagged.

 9 |       Any of the defendants find anything to raise?

10 |       Mr. Beller?

11 |       *MR. BELLER:*  Your Honor, excuse me.  I was quickly

12 | looking for the reference, but the very first change which was

13 | the addition of bid-rigging.

14 |       *THE COURT:*  In the elements?

15 |       *MR. BELLER:*  In the elements, Your Honor.  A very

16 | minor change, but earlier in that instruction bid-rigging is

17 | first and price-fixing is second, so my very minor request

18 | would be that we put bid-rigging first to be consistent with

19 | the rest of the instruction.

20 |       *THE COURT:*  I thought that we always had bid-rigging

21 | second.  Oh, well, in that one that is true, it's not.  Yeah,

22 | we will switch the order because you are right, it's at the top

23 | or we could switch it at the top.

24 |       *MR. BELLER:*  Either way, so long as it's consistent.

25 |       *THE COURT:*  Why don't we switch it in the top.

1           You see that, Ms. Butler?  So in the third line of the

2    instruction.  It's usually fix prices, rig bids, but why don't

3    we switch that around so we are consistent.

4           Anyone else find anything?

5           Let's talk about the statements -- or theories of the

6    defense.  I only found two things.  First of all, on Mr. Penn's

7    theory of the case, that last sentence is really an instruction

8    of the law and I am going to strike it.  Otherwise, it's fine.

9    All of the other ones are fine.  There was a typo in

10   Mr. Brady's in the third line from the bottom and I've

11   corrected that, but otherwise everything looks good.

12          Mr. Fagg?

13          MR. FAGG:  Thank you, Your Honor.  I have a couple

14   other changes that I believe we --

15          THE COURT:  Sure, go ahead.

16          MR. FAGG:  On the old instruction regarding the

17   non-testifying defendants.

18          THE COURT:  Which instruction number is that?  Do you

19   have the page?  You might not.

20          MR. FAGG:  I believe it's Instruction 8, Your Honor,

21   on page --

22          THE COURT:  If it's Instruction 8, I can find it.

23          MR. FAGG:  Page 10.

24          THE COURT:  Yes.

25          MR. FAGG:  At the very end, Your Honor, the Court had

1    added "or call any witness -- witnesses," and I believe what I

2    had proposed and I thought the Court had accepted was "or

3    present any evidence."

4         THE COURT:  We'll add that.  Yeah, is that the

5    pattern?  We had talked about that generally, but I think that

6    that makes sense, sure.

7         MR. FAGG:  Thank you, Your Honor.

8         THE COURT:  So we will substitute that in.  "Or

9    present any evidence" was the language?

10        MR. FAGG:  Yes, Your Honor.

11        THE COURT:  That's fine.

12        Anyone else?

13        Okay.  Then did you get any -- not all the people that

14   are probably giving the closings are necessarily here, but did

15   anyone want to bring up time issues?  One thing that we need to

16   talk about is are the defendants going to go in order or is the

17   order to be determined among themselves, those types of

18   practical issues.

19        Mr. Fagg?

20        MR. FAGG:  Sure, Your Honor.  I actually have one

21   request of the Court.

22        THE COURT:  Yes.

23        MR. FAGG:  We have been coordinating amongst

24   ourselves, among the 10 defendants, and would respectfully ask

25   that the defendants be allotted 10 extra minutes than what the

 1   Court previously allotted.  That will go to the party who is

 2   going first who is covering some broader information that

 3   covers for us all of the defendants and would -- I don't think

 4   it will mess up the calendar in terms of when it goes to the

 5   jury.  It's just 10 minutes across all defendants.

 6        THE COURT:  I am sorry, so I don't quite understand

 7   that.  So the very first person who makes the closing has 10

 8   extra minutes?

 9        MR. FAGG:  That's correct, Your Honor.

10        THE COURT:  But everyone else 45?  Yeah, that's fine.

11        MR. FAGG:  Great.  Thank you.

12        MR. KORNFELD:  Your Honor, in terms of the order of

13   closing, and my colleagues will correct me if I'm wrong, I

14   believe we are going in the order Of indictment with this

15   exception.  Mr. Fries is No. 2, Mr. Brady is No. 3 in order of

16   Indictment, and we are going to flip that so it's going to be

17   Mr. Penn, then Mr. Brady, then Mr. Fries, and then order of

18   Indictment.  And in terms of I am giving the closing on behalf

19   of Mr. Fries, I would appreciate from the Court a five-minute

20   warning.

21        THE COURT:  Sure.  Let me just make sure that I just

22   keep track of all that.  Okay.

23        MR. KORNFELD:  Thank you.

24        MR. FELDBERG:  May I also have a five-minute warning,

25   please?

1          THE COURT:  You certainly may.  And as I said before

2   with the openings, if you get to the point where you are about

3   to run over, I will give you a warning regardless.

4          But Ms. Johnson?

5          MS. JOHNSON:  Your Honor, I would also like a

6   five-minute warning.

7          THE COURT:  Of course.

8          Mr. Gillen?

9          MR. GILLEN:  A five-minute warning would be

10  appreciated, Your Honor.  Thank you.

11         THE COURT:  We'll do.

12         MR. FAGG:  The same, five minutes for Mr. Lovette,

13  thank you.

14         THE COURT:  Yeah, of course.

15         Ms. Henry?

16         MS. HENRY:  The same also for Mr. Kantola.  Thank you

17  very much.

18         THE COURT:  Sure.  Ms. Call?

19         MS. CALL:  No warning needed for the government, but I

20  did want to clarify one thing.  I believe Your Honor said we

21  could allocate our time between the closing and the rebuttal

22  and I want to make sure.  I think we anticipated it will be

23  about two hours with closing and 30 minutes for rebuttal, but

24  whatever we don't use in closing can we pass on to rebuttal?

25         THE COURT:  Yes.

 1          MS. LaBRANCHE:  I just received word from Ms. Prewitt

 2   that she also would like a five-minute warning.

 3          THE COURT:  Yes.  I will do that.

 4          Anything else that we should talk about?

 5          Okay.  Then I think that we've got -- I think we are

 6   in pretty good shape in terms of the instructions being all

 7   manufactured.  We will substitute in those changes and I think

 8   that we should be on target to begin at 8:30.  So we will plan

 9   on starting then and we will be in recess until that point.

10          Thank you.

11      (Recess at 7:46 a.m).

12      (Reconvened at 9:04 a.m.)

13          THE COURT:  We are back on the record.  The jury is

14   not present.  I am about ready to read the instructions to the

15   jury.

16          Let me bring up this, and that is oftentimes in trials

17   the parties will waive the court reporter's recording of my

18   reading of the instructions.  You don't have to, but anyone

19   want Ms. Coppock to report the reading of the instructions?

20          MR. BELLER:  No, Your Honor, if the Court would simply

21   after the reading look up and if there is a change, we can go

22   on side bar quickly to address that.

23          THE COURT:  Excellent point.  Yeah, that's fine.  So

24   people should pay attention.  Just in case there is some

25   discrepancy, we'll do that.  I think that what we'll do because

1   of the timing is we'll take a break after my reading of the

2   instructions and that will give us an opportunity to clarify

3   anything that we need to and correct it with the jury.  But I

4   will give you that opportunity before we actually break, too,

5   if I remember; but if I forget, the break will give us an

6   opportunity to bring that up.

7        Anything else that we should take up before we bring

8   the jury in?

9        Yes, Mr. Fagg.

10       *MR. FAGG:*  Your Honor, you asked us yesterday to talk

11  among the defendants about Friday.  We did.  There are no

12  conflicts for Friday.  It would be our preference that the jury

13  deliberate if they choose to; and if possible, it would be

14  helpful to know today from the jury.

15       *THE COURT:*  Yes.  What I will do is my intention is to

16  ask them -- is to mention that right before the lunch break and

17  allow them to discuss that among themselves and decide what the

18  preference is, and then to let me know by the end of today

19  whether they intend to do that or not.

20       *MR. FAGG:*  Thank you, Your Honor.

21       *THE COURT:*  Okay.

22       Let's go ahead and bring the jury in.

23       (Jury present.)

24       *THE COURT:*  Good morning, ladies and gentlemen.

25       You can see that Ms. Grimm has given you a set of jury

1    instructions.  So let me mention a couple of things about what

2    we're going to be doing this morning and today.  First order of

3    business will be my reading of the jury instructions to you.

4    And while I read the instructions to you, I would like for you

5    to do one of two things.  One, either look at me while I read

6    you the instructions or, No. 2, you can follow along as I read

7    the instructions to you.

8         What I don't want you to do is read ahead while I am

9    reading you the instructions because that would by definition

10   mean that you're not paying attention to my reading of the

11   instructions, okay?

12        Also I think after I read you the instructions, we

13   will probably take a break.  The break schedule today will be a

14   little bit unusual.  The reason for that is I don't want to

15   interrupt the various closing arguments today and have like a

16   break in the middle of anyone, so I will try to time it.  And

17   we might take, for instance, just a 10-minute break but take

18   two in the morning or two in the afternoon, something of that

19   nature, so they might be a little bit different than you're

20   used to.

21        So with that, ladies and gentlemen, let me then

22   commence with the reading of the instructions.

23        (Jury instructions were read by the Court.)

24        Anything that we should take up before we take a

25   break?

1          All right.  Then ladies and gentlemen, before we begin

2    with the first closing argument, why don't we go ahead and take

3    a 10-minute break, all right?  Why don't we plan on

4    reconvening, ladies and gentlemen, at 10:15.  Once again, keep

5    all the admonitions in mind.  Why don't you leave your jury

6    instructions in your seats for the time being, all right?

7          The jury is excused and we will reconvene at 10:15.

8          (Jury excused.)

9          Anything to take up?

10          Mr. Beller, go ahead.

11          Take a seat, ladies and gentlemen.

12          *MR. BELLER:*  Thank you, Your Honor.  Your Honor, there

13    was a typo on Mr. Fries' theory of defense Instruction No. 31.

14    And I apologize, I did not hear it until the Court read it, and

15    that is the very last line states October of 2015 instead of

16    June of 2015.

17          *THE COURT:*  Oh, I see, yes.

18          *MR. BELLER:*  And that's inconsistent with Instruction

19    No. 24.

20          *THE COURT:*  Yes.

21          *MR. BELLER:*  So my request would be to not re-read the

22    entire instruction, but simply say there was a typo.  October

23    should be read as June.  And then obviously the June

24    instruction is what would go back with the jury.  And my

25    apologies.

1    THE COURT:  What I will do, they will each have a copy

2    of the instructions.  I will ask them to interlineate the

3    change in the theory and then they'll be able to take those

4    back.  I appreciate your mentioning that.

5            MR. BELLER:  Thank you, Judge.

6            THE COURT:  Anything else by anyone?

7            All right.  We will be in recess until 10:15.  Thank

8    you.

9        (Recess at 10:06 a.m.)

10       (Reconvened at 10:18 a.m.)

11           THE COURT:  I should have thought of this, but we are

12   working on trying to establish the overflow courtroom.  I know

13   it's a little crowded out there, but I don't want anyone

14   standing up.  Everyone is seated right now.  But assuming we

15   can establish the overflow courtroom, I will let you know when

16   that's set up.  So if you prefer to use that courtroom as

17   opposed to being in here, you can.

18           Are we ready to bring the jury back in?

19           All right.  Let's bring the jury in.

20           (Jury present.)

21           THE COURT:  Ladies and gentlemen, as our first order

22   of business, I am going to have you make a correction to the

23   instructions.  So if you have a pen or could borrow one, if you

24   don't mind, could you please turn to Instruction No. 31.  You

25   will see in the very last line the word "October."  Can you

1    cross that out and put "June"?  It's a typographical error.

2         Did everyone do that?  Okay, great.

3         Ladies and gentlemen, you are about ready to hear the

4    closing arguments at this time.  First will be from the United

5    States and then after that from each of the defendants.

6    Because the United States has the burden of proof, the

7    government also has the ability to do a rebuttal closing

8    argument.

9         So at this time closing on behalf of the United

10   States.

11                        **CLOSING ARGUMENT**

12        *MS. CALL:*  Good morning.  Over the past several weeks

13   you've seen the mountain of evidence in this case.  You've seen

14   the defendants' and their conspirators' e-mail.  You have seen

15   their text messages.  You've seen their phone calls and you've

16   seen though summary exhibits that put it all together in

17   context.  Now, at the beginning of this trial, you also heard

18   from an insider in this conspiracy who told you how it worked,

19   Mr. Robert Bryant.

20        And now, ladies and gentlemen, is the time that we get

21   to talk about what all of that evidence showed you, and it's

22   all very simple.  Year after year all 10 defendants in this

23   courtroom conspired to fix the prices and rig the bids on some

24   of the most important contracts that their companies were

25   negotiating, KFC, Church's Chicken, Popeye's, Chick-fil-A.

4767

1    These defendants, these competitors in this courtroom, they

2    didn't compete.

3           Now, let's take a step back and let's talk about

4    competition.  Let's talk about what it's supposed to be and

5    let's talk about what happened in these defendants' world of

6    friendly competitors.  Throughout the trial you heard from the

7    customers and you heard from Roberts Bryant about what

8    competition is supposed to be.  You heard about KFC, how they

9    had a blind bidding process, how they had multiple rounds of

10   bidding all designed to get the lowest bid possible, the lowest

11   competitive bid.  That's how competition is supposed to work,

12   but that's not what happened here.

13          Talk about another thing about competition.  What is

14   supposed to happen, what is supposed to happen when a supplier

15   thinks the laws of supply and demand justify a price increase?

16   If a supplier independently thinks a price increase should

17   happen, you heard that there is a risk that when those prices

18   go up, that a competitor may come in, undercut them on price,

19   especially if you're seeking those high price increases you

20   heard about this in this trial in 2014.  That's just common

21   sense.  That's competition.  And that's not what happened here.

22          Now, you didn't just hear about competition.  You also

23   saw it in the documents.  Let's look at Government's

24   Exhibit 3028 and 3074.  These are the contracts for Church's

25   Chicken, one of those customers you've seen documents for that

1    was cheated by this conspiracy.  You will see the customers

2    told some of these defendants.  Here you have Defendant

3    Roberts, Defendant Penn signing these contracts certifying

4    that, promising their customers that the prices of their

5    products were arrived at independently.  Not just that.  They

6    swore that there were no communications about price with their

7    competitors.  Do you think they were telling the truth when

8    they signed these contracts?  You saw the evidence in this

9    trial.  They weren't.  That's not what happened here.

10          So now let's talk about what really happened here.

11   You saw it in the document and you heard from Robert Bryant how

12   this conspiracy worked.  We'll talk through it in detail as we

13   move forward, but at a high level these defendants, they robbed

14   their customers of competition.  They conspired to raise their

15   prices and they conspired to hold strong as a united front

16   together against the request of their customers to go down on

17   price, against those customers who just thought that they were

18   in a fair negotiation.

19          But they were fooled.  The defendants cheated.  The

20   defendants, they weren't competing.  Instead, what happened,

21   what were supposed to be those one-on-one confidential private

22   negotiations with their customers, they were the customer

23   versus the industry together, the customer versus a united

24   front together working against those customers in those

25   negotiations, together refusing to negotiate, not moving on

1   price together so that they could seal the deal on those

2   contracts at the prices they wanted.

3          It was a secret network among the defendants and their

4   conspirators that were supposed to be competing, a secret

5   network that they could plug into whenever they wanted to hike

6   up the price of chicken.

7          Now, let's look at -- let's take a step back and set

8   the stage and look at some of the very first evidence and very

9   last evidence you saw in this trial.  Look at Government

10  Exhibit 3037.  Now, you heard about some of this e-mail chain

11  on Monday from the defendant's co-conspirator, Ms. Brenda Ray.

12  You saw how she said in the bottom e-mail here, "I received a

13  call today from a friendly competitor telling me it's all over

14  the market that Pilgrim's is taking contract pricing up.  They

15  thanked us for taking the lead and told me that contrary to

16  what we may be hearing regarding their company, they are

17  following as are others."

18         So here the defendants' co-conspirator, Ms. Ray, said

19  that a competitor, Pilgrim's competitor, thanked Pilgrim's

20  Pride for taking their pricing up, and not just that, assured

21  her that they would follow suit.

22         Now, you saw another e-mail, and this is what you saw

23  on Monday, Exhibit 6158, where you saw a follow-on chain from

24  that saying who that friendly competitor was, that it was

25  George's.  And you heard that it wasn't necessarily Defendant

1    Blake from George's.

2           To move on, you heard Ms. Ray's testimony.  And ladies

3    and gentlemen, you are the judges of her credibility.

4    According to what she told you, she got a call from a

5    competitor.  They thanked Pilgrim's, assured her that they

6    would follow suit and basically she just hung up.  She hung up

7    and it was such a nothing to her, that she decided to e-mail

8    all her colleagues and her supervisor, Defendant Penn.  You can

9    assess her credibility about that statement.

10           But you also know what this e-mail was about because

11   you have Defendant Penn's own response from the time in

12   Government's Exhibit 3037.  You see, he got this e-mail from

13   his subordinate, Ms. Ray.  And what did he say?  Did he respond

14   to her and say what are you doing?  We shouldn't be

15   coordinating our pricing with our competitors?  No, he

16   forwarded it on to another subordinate saying, FYI, do not

17   forward, not exactly a legal conversation.  These are Defendant

18   Penn's words you have from that time showing you the existence

19   of this conspiracy.

20           Now, that's all the way back in 2012 during the

21   beginning of this charged period.  So now that we talked about

22   what competition is supposed to be and what happened here,

23   let's just orient ourselves for a moment.  I am going to pull

24   up a list of the defendants and the competing suppliers where

25   they worked.  Here it is.

1          Now, it's simple, ladies and gentlemen, that to

2    convict all 10 of these defendants in this courtroom for the

3    crime charged, what happened in 2014, those sky-high price

4    increases you heard their companies achieved that year, that's

5    all the evidence you need.  That year you saw the conspiracy in

6    overdrive.  And you saw each of these defendants, not just

7    knowing, but active and enthusiastic participation.  That's

8    what the evidence established.

9          Now, before we go into the evidence, let's just talk

10   about the roles in this conspiracy because just like in any

11   conspiracy, each of the defendants, they had different roles.

12   Some were the salespeople, Defendant Brady, Defendant Austin,

13   Defendant Mulrenin, Defendant Little, Defendant Blake, those

14   were the ones you saw working the phone lines, directly

15   reaching out to their competitors, coordinating their prices

16   and reporting it up within their company.

17          Others, Defendant Penn, Defendant Lovette, Defendant

18   Fries, Defendant Roberts, and I am sure I am missing one,

19   others were the supervisors.  They were the ones that had those

20   coordinated prices reporting up to them and they acted on it.

21   They approved it.  They incentivized it.  Sometimes they asked

22   for more.  And that's just not it.  These supervisors in this

23   courtroom, they directly participated themselves as well,

24   reaching out to their competitors as well about their prices.

25          Now, as I said, 2014 is all you need, but that's not

1    all the evidence established because you saw -- we will walk

2    through today -- this conspiracy was underway for years before

3    and years after 2014.  And the defendants -- the Indictment

4    charges the defendant for their participation in that

5    conspiracy.  It was a conspiracy to fix the prices of one of

6    the most important staples of the American diet.

7          Now, before we walk through the evidence, I want to

8    give you a road map of our time together today.  So let's first

9    talk about the elements of the charge.  Judge Brimmer, he

10   already instructed you right now and you have those elements

11   before you.  There is essentially three things, three elements

12   the government must prove for you to find the defendants guilty

13   of this crime.  First, that the conspiracy charged existed;

14   second, that each defendant knowingly joined that conspiracy;

15   and third, you need to prove something called interstate

16   commerce.

17         Here is what we are going to do in our time together

18   today.  First, we are going to walk through several of those

19   negotiations that you saw the evidence of that was affected by

20   the conspiracy, KFC, Church's, a couple of those customers.

21   And that evidence, that's going to show you both the existence

22   of that conspiracy and each defendant's participation.

23         Now, after that, after that we're going to go through

24   that third element, interstate commerce, and talk about some

25   other things the government must prove like venue, statute of

1    limitations.  And after that I am going to show you some

2    tables.  They are going to be tables showing you some of the

3    key evidence attributed to or against each of the 10 defendants

4    in this courtroom.

5            So while we are going through today, you can take

6    notes if you'd like.  You can write down some of the exhibits

7    and I will point you to some important ones.  But at the end

8    when we go to each defendant, you will have the opportunity to

9    see a list pointing you to some of that key evidence that you

10   can write down for when you deliberate.

11           So let's start going through that evidence, the

12   existence of the conspiracy and each defendant's participation.

13   But before, right before we start that, I just want to talk

14   about that law for a moment about the existence of a

15   conspiracy.  Now, Judge Brimmer, he told you that a conspiracy,

16   it requires an agreement.  Sounds formal, but it's not.  All

17   that an agreement is is a mutual understanding.

18           Ladies and gentlemen, you can find that from a course

19   of dealing over the years, from the defendants's words, from

20   their acts, how they operate together over a course of a period

21   of time just to have some sort of mutual understanding.  Now,

22   what is this understanding?  It's an understanding to fix

23   prices and to rig bids.  What does that mean?  Do you have to

24   agree to a specific price?  No, you don't.  It can just be an

25   agreement to raise prices or an agreement to hold strong on

 1    price.  It's an agreement to price in some form whether it's

 2    giving a new discount or agreeing to payment terms.  The prices

 3    are fixed, the bids are rigged, simply because they are agreed

 4    to in some way.

 5          Now, you saw this agreement throughout the conspiracy.

 6    Like I described earlier, sometimes these defendants, sometimes

 7    they conspired to raise prices.  Sometimes they conspired just

 8    to hold strong as a united front against their customer against

 9    the push-back they were receiving to lower their prices.  And

10    sometimes they just agreed on some sort of component of price,

11    whether to give a discount, whether to charge a new cost,

12    whether to give a payment term.  And you saw that throughout

13    the evidence in this trial, but like I said, we are about to

14    walk through some of it.

15          There is a couple more elements.  We talked about them

16    a moment ago and we will talk about them later, but at its core

17    the conspiracy charged here requires you to find an agreement,

18    a mutual understanding between competitors that the defendants

19    were a part of.

20          Now let's turn to the evidence that shows you that

21    this conspiracy existed and each defendant's participation.  So

22    we are going do walk through several of those negotiations that

23    I mentioned, not all of them.  You are going to have all the

24    evidence that was admitted back with you, but we are going to

25    walk through several of those negotiations today, KFC,

1    Chick-fil-A, Pollo Tropical, Church's.  And for each of these

2    episodes you're going to have one of those summary exhibits

3    that was put into evidence.

4           Here on your screens in a moment, here are some of

5    those summary exhibits.  This is 10-1, 10-2 and 10-3.  Those

6    all relate to the 2014 negotiations with KFC.  And what's

7    simple is when you go back to deliberate, ladies and gentlemen,

8    those summaries are going to be the first 20 exhibits from the

9    government that you would have in front of you, 1-1, 2-1 all

10   the way to 20-1.

11          Now, remember, Judge Brimmer, he instructed you about

12   these summaries.  He told you that the actual evidence is those

13   exhibits, those exhibit numbers you see on the right-hand

14   column in each, and those are all in evidence.  But these

15   summaries, they are also in evidence and you will have them

16   when you deliberate because they may assist you in

17   understanding that evidence because they put it in context

18   together.

19          Now, let's turn and just look at one of those

20   summaries just briefly, Government Exhibit 10-2.  And

21   Mr. Koenig is going to be assisting me a bit in putting these

22   summaries up.  Now, you heard from the testimony of Ms. Evans

23   who testified about these summaries, and I will just explain it

24   quickly in case you don't remember.  So there is some color

25   coding here.  Let me just remind you what that is.  Green,

4776

1   that's an e-mail, a text message, a handwritten document.  That

2   orange color you see, that's the calls between competitors.

3   And you are going to see those all over these summaries.  The

4   blue, that's calls between a chicken supplier and their

5   customer or an employee of a chicken supplier and another

6   employee of that same company.

7           Now, you may recall during opening statements, and

8   opening statements, they are not evidence, but my colleague

9   Mr. Koenig, he told you that when the evidence came in in this

10  case, you would see a pattern emerge and it would come together

11  like a puzzle.  These summaries, they show you that puzzle and

12  that pattern coming together.  And what you will generally

13  see -- this first one here is four pages so you won't see it

14  all at once, but you will see that pattern.  You will see first

15  a request from a customer like a pricing deadline or a request

16  to go down on price.

17          Then you will see what that request triggered.  You

18  will see the calls between the competitors reaching out to each

19  other right after the e-mail or on the day those bids are due.

20  And then at the end you will see how you know what happened on

21  those phone calls.  You'll see the e-mail, the text messages

22  that these defendants and their conspirators were exchanging at

23  that time showing you, telling you exactly what they were

24  telling each other, how they were coordinating their prices

25  against those requests from the customer.  You're going to see

1    this pattern repeat itself time and time again.

2         And throughout my closing remarks today, I will be

3    referring to these summaries just like you can do when you

4    deliberate.  Now, let's start walking through that evidence and

5    we are going to start with what happened to KFC in 2014.  You

6    heard about 2014 at the very beginning of this trial.  You

7    heard from Mr. Olson, the KFC franchisee.  You heard from

8    Mr. Lewis, the negotiator or one of the negotiators for KFC.

9    And you heard from Robert Bryant, the insider about this

10   conspiracy who told you about the agreement to fix prices.

11        Now, what happened in 2014?  Like I said earlier, all

12   10 of these defendants that year, they banded together to hike

13   up the price of chicken from day one of those negotiations with

14   the competitors together against KFC coordinating their he

15   increases, coordinating holding strong so they could get those

16   prices that they wanted.  And it wasn't just KFC that year, but

17   it all started with KFC and then across the industry customer

18   after customer after customer.

19        You see, in 2014 the defendants and their

20   conspirators, they set out together to change the small bird

21   industry.  That's what was said in a conversation between

22   Defendant Penn and his conspirator, Jason McGuire at Pilgrim's.

23   You see in early August just at the beginning of these

24   negotiations with KFC, they were discussing how they were going

25   to change the small bird industry.  And how were they going to

1   do it?  Well, Robbie Bryant, he told you at the beginning of

2   this trial, he told you Pilgrim's decided they wanted to

3   increase their prices and that they were going to blitz the

4   customers.  He said they would blitz the customers and that

5   when they started that blitz, that the customers began to push

6   back hard.

7           Of course, it was a giant price increase.  And then

8   you heard that Defendant Austin was directed to put it out to

9   the industry what Pilgrim's was going to do.  And Robert

10  Bryant, he told you his understanding that that meant to put

11  out to the industry, meaning Pilgrim's competitors, that

12  Pilgrim's would raise its prices and the story that they were

13  telling their customers about why they needed this price

14  increase.

15          Now, let's look at some of the words of the

16  defendants' co-conspirators at the beginning of that summer as

17  they took out to change the small bird industry.  And you have

18  that right here.  Once KFC is inked, we'll be hitting these

19  others starting next week.  Everybody will be paying through

20  the nose.  One at a time.  Got KFC and BM.  That's Boston

21  Market.  Rest still to come.  Everybody is getting that price

22  increase.  You see, these conspirators knew everybody was

23  getting that increase because they were coordinating it with

24  their competitors to ensure that they all got that price

25  increase.

 1          Now let's talk for a moment about the chicken supply

 2    situation that year because you heard a lot about it during the

 3    course of this trial.  You heard about the supply crisis that

 4    was going on, how KFC, Kentucky Fried Chicken, ran out of

 5    chicken on Mother's Day in 2014.  You heard a lot about that.

 6    But what really happened in 2014?  For the defendants it was

 7    carpe diem.  They seized the day.  They seized this opportunity

 8    to raise their prices together.  Was it a crisis for these

 9    defendants in 2014?  No.

10          You saw in Government's Exhibit 2000 what Defendant

11    Penn called 2014.  Defendant Penn called it chicken nirvana.

12    Those are his words, not mine, ladies and gentlemen.  It was

13    chicken nirvana because of those historic price increases the

14    defendants and their conspirators got together that year.

15          So what was really going on with supply?  Was it

16    really a crisis?  Well, you see for these defendants, they

17    couldn't let a good crisis go to waste.  You don't let a good

18    crisis go to waste.  So they worked together to increase their

19    prices and make sure that they all got it together with their

20    conspirators.  The conspiracy had kicked into overdrive that

21    year.  The defendants, they cheated.  They conspired.  They

22    plugged into that network.  As you heard, Defendant Austin, he

23    put it out to the industry what Pilgrim's was going to do.

24          And Robert Bryant, he told you how Defendant Austin

25    did just that.  He told you how he overheard Defendant Austin

1    in his office in Louisville calling Defendant Brady and

2    Defendant Kantola to tell them Pilgrim's negotiating position,

3    how he heard him say, "The price is the price."  That's the

4    stance that Pilgrim's was taking against its customers.  And he

5    told him that with the understanding that they wouldn't use

6    that information to undercut Pilgrim's.  See, Pilgrim's was

7    holding strong on price and they told their competitors that

8    they would do it together.

9          And Defendant Austin, he wasn't the only one spreading

10   that message at Pilgrim's.  You also heard how Defendant Little

11   that year told his customer, "The price is the price."  He told

12   that to Joe Brink, the buyer from Pollo Tropical that you heard

13   from.  This customer wasn't the only one Defendant Little was

14   spreading that message to.

15         You saw in Government's Exhibit 9740 how Walter

16   Cooper, Defendant Little's competitor at Claxton who was

17   responsible for that same Pollo Tropical business, how the same

18   day that Defendant Little delivered that message to the buyer

19   that the price is the price, that afternoon his competitor

20   tells Pollo Tropical, I bet or I guess Pilgrim's has or is

21   about to tell you the price is the price.  No negotiation.

22         You see Walter Cooper, he knew that that was the

23   position that Pilgrim's was taking because Defendant Little had

24   a phone call with him that afternoon and told him that exact

25   thing.  We will go through that a little more in a moment in

1    Government's Exhibit 5-1 when we get to it, but the price is

2    the price, that message was being spread across the industry.

3            Now let's focus on those KFC 2014 negotiations a

4    little more.  As I said, together the defendants raised their

5    price and they held strong throughout those negotiations.  From

6    the very beginning you heard from Mr. Lewis how he met with his

7    suppliers one by one at the beginning of August.  Do you think

8    those defendants and their conspirators were competing at that

9    time?  They weren't.

10           Do you see Government's Exhibit 10-1, the one up here

11   now up on your screen.  This is the beginning of these

12   negotiations.  And we will get to all those phone calls in a

13   minute, but at the top you have this message from Mr. Lewis to

14   his suppliers on August 7 just as he was finishing those

15   meetings.

16           Let's turn to the next slide and see what was going on

17   around those meetings.  And ladies and gentlemen, these slides

18   like this that show you the photos and the phone calls, the

19   underlying evidence, those photos, the records of those phone

20   calls, they are in evidence.  But when you back and deliberate,

21   it's not going to look like this.  This is just meant to help

22   us all understand the order of the calls and the participants.

23           So August 7 Defendant Kantola had his meeting with

24   KFC.  And from the get-go right before that meeting he called

25   Defendant Little.  You see that call was 17 minutes.  He was

1   practically on the phone with his competitor until the moment

2   he walked into the doors to negotiate for KFC.  And right after

3   the meeting, he called him right back.  He called him right

4   back, Defendant Little and Defendant Kantola, to share how they

5   were going to negotiate with KFC, the price increases they were

6   proposing, to coordinate to ensure that they would get it

7   together.

8           And I'll try to remember to note as I talk today

9   certain things that won't be in your summaries.  So these calls

10  right here, those aren't in Exhibit 10-1, but we can talk about

11  them now.  And the underlying phone records, those are in

12  evidence.  Now, let's go back to 10-1, the first page.  So

13  Mr. Lewis at the top of this summary right here, he gives an

14  August 19 bidding deadline for those first round bids for KFC.

15  Now, just like before, ladies and gentlemen, do you think that

16  these competitors were competing now?  They weren't.

17          You see call after call in these summaries, and this

18  is just the first page because there is more.  You see nine of

19  the defendants in this courtroom all calling each other on the

20  two business days before those bids were due, that's August 15

21  and August 18.  I said nine, so Defendant Lovette, he wasn't

22  involved in those phone calls.  He wasn't in his corporate

23  office working the phone lines with his salesmen, but he got

24  updated on this conspiracy and you will see that in a moment.

25          Let's turn to the second page of Exhibit 10-1.  As I

 1   will note, there is a lot of phone calls here, but the only one

 2   I am going to point you to right now is the one at the very

 3   bottom.  That's between Defendant Austin and his conspirator at

 4   Pilgrim's, Jason McGuire.  And it's at 5:56 p.m. on August 18,

 5   the day before those first round bids are due.  You see call

 6   after call after call followed by that.

 7         Now let's find out what Defendant Austin told

 8   Mr. McGuire in that call.  Go to the third page here of 10-3.

 9   This is that pattern.  That is the bottom, the e-mail that

10   tells you what happened.  I am not going to show you the

11   summary right now.  Let's look at the actual exhibit.  Start

12   with 1035 and 1036.

13         Here five minutes after that call between Defendant

14   Austin and his conspirator, Jason McGuire, Jason McGuire sent

15   Defendant Penn this spreadsheet.  And this spreadsheet, it's

16   just Pilgrim's pricing model for KFC, but what did you see in

17   the lower left-hand corner?  The prices, the margins, meaning

18   the profits of five of Pilgrim's competitors, Koch, Case,

19   Claxton, George's, Mar-Jac, not just their current margins, but

20   their new margins, their margins they are bidding the very next

21   day all put together in this spreadsheet.

22         And that's not it.  You see, there is another exhibit,

23   Government Exhibit 1074 from just about 30 minutes later.

24   Mr. McGuire, he replied with to his own e-mail with more

25   information.  So let's look at what's going on here because

1    Government Exhibit 1074 is important.  You see at the very top.

2    You see what's going on, the subject line, KFC.  They are

3    talking about Pilgrim's figuring out their bid.  And in this

4    highlighted portion right in the middle of the page, you see

5    what happened on all those phone calls.

6         Roger did some checking around today, and I included

7    the below regarding the range of the total increases, margin

8    and costs, so profit and costs, that folks are going in with.

9    And then again you have those five competitors, Koch, Case,

10   Claxton, George's, Mar-Jac.  And then you see how Pilgrim's is

11   using it.  This isn't, hey, here is our competitors' prices so

12   we can undercut them.  Here is our competitors' prices so we

13   can compete.  It's considering the numbers above and the fact

14   that we wanted to be the leader, this puts us in at about a

15   16-cent increase.

16        You see, in those calls these competitors, they were

17   swapping their prices.  They were swapping their margin.  They

18   were swapping their price increases with the understanding that

19   they were coordinating their prices together and that Pilgrim's

20   would be the leader.

21        Now, let's look at how the information got into this

22   e-mail.

23        Your Honor, may I approach the screen just to kind of

24   point?

25             THE COURT:  Yes.

1          *MS. CALL:*  Thank you.

2          Ladies and gentlemen, the truth is usually the

3  simplest explanation.  You see Koch at the top here, their

4  price increase.  Well, you saw Defendant Kantola at Koch, he

5  spoke to Defendant Little who then spoke to Roger Austin when

6  he did his checking around, spoke to Jason McGuire.  So when

7  Defendant Kantola spoke to Defendant Little, you know he was

8  sharing his margin, his profit and his price increase that was

9  due to KFC just the day after this e-mail.

10          Defendant Blake at George's, he spoke to Carl Pepper.

11  And you heard a little bit about Carl Pepper.  He worked at

12  Tyson.  He was in the sales group with Defendant Roberts, who

13  was his supervisor, and Defendant Mulrenin.  And Defendant

14  Blake, he shared his price increase with Carl Pepper who then

15  shared it with Defendant Little, same flow of information

16  there.  And that's how George's information wound up in

17  Exhibit 1074 and then 1036 that we were just looking at.

18          Same thing with Claxton.  Defendant Brady, he spoke

19  directly to Roger Austin and he did his checking around.  He

20  called Scott Brady.  Scott Brady told him his price increase.

21  They coordinated it together.

22          Now, there is this last call here at the top to

23  George's.  That's the George's corporate line.  And it was

24  August 18, the day before that bid was due.  Now, you might ask

25  who Roger Austin thought he was calling when he called that

1    number.  Well, ladies and gentlemen, you know who he was

2    calling because you have Defendant Austin's contact list in

3    evidence.  And guess who that number for George's is saved as

4    in his contact list and only as this one person.  It's

5    Defendant Blake.

6           Now, Defendant Blake, you have seen some evidence, he

7    may have actually been out of office that day, not the Friday

8    before when he spoke to Carl Pepper, but on that Monday.  But

9    what's important here is when Defendant Austin did his checking

10   around to find out the price increases that his competitors

11   were going in with, that's who he called.  And at the end of

12   the day, he got Defendant Blake's information anyways because

13   he got it from Carl Pepper and Defendant Little.

14          Now, Exhibit 1074, I want you to know one thing about

15   this because you will have this with some of the other evidence

16   in this case.  What you have here is it's an e-mail between

17   conspirators at Pilgrim's.  But what it does is it gives you a

18   window into the operation of this conspiracy.  And you can take

19   that as evidence against the other defendants, these other

20   defendants whose information wound up in this document.  You

21   see what was happening from the words of these conspirators at

22   Pilgrim's, but you know where the information came from.  You

23   will see that with some of the other evidence in this case.

24          Now, why were they doing this?  Let's look at

25   Exhibit 1058.  Why?  $400,000 a week is what Pilgrim's was

1    making from this price increase.  Now, that's not Defendant

2    Penn's only response.  Let's go back to 1074.  Because after

3    receiving his competitors' prices the night before those first

4    round bids were due for KFC, he says, I am good.  Will review

5    with Bill, meaning Defendant Bill Lovette, in the morning.

6         Now, you know when he said that, he means I'm going to

7    tell Bill Lovette the price increases our competitors have told

8    us and how we are going to use that together to increase prices

9    because this plan, how they were going to increase prices in

10   2014, this was important to Pilgrim's.  This is something the

11   CEO would have buy into and he would want to make sure that his

12   team had a strategy for how they were going to obtain it.  When

13   you saw here in summary Exhibit 10-1, that's the strategy,

14   doing it together with your competitors.

15        Now, I want to talk about one other thing with

16   Exhibit 1074.  You heard a little bit in this trial about some

17   quasi-legitimate reasons that these individuals might have

18   their competitors' prices.  You heard that sometimes they

19   covered shortages.  They purchased product from each other.

20   They used industry benchmarking services, something called

21   AgriStats.

22        Now, when you look at the evidence in this case,

23   ladies and gentlemen, I want you to ask yourself is any of that

24   what's actually going on here in this evidence?  There is no

25   shortage mentioned here.  You saw some sales files about

1    shortages.  None of them were from this time.  None of them

2    were from this day.  You heard from the witnesses.  You heard

3    from Mr. Campbell, that pricing guy at Tyson, just Monday.  He

4    told you those sources, AgriStats, EMI, Georgia Dock, those

5    don't tell you your competitors' bids.  They don't even tell

6    you your competitors' current pricing for a customer.

7         They are much more higher level than that.  And they

8    cannot be used to figure out this kind of information that you

9    are seeing in the evidence in this case.  None of that is

10   what's happening here.  This came from the defendants'

11   conspirators who told it to them with the understanding it

12   would be used to raise their prices together and not to

13   compete.

14        And like I said earlier, ladies and gentlemen, the

15   simplest explanation is usually the correct one.  So if they

16   could get their prices from their customers, if they could get

17   their prices from their traders, from these other sources, why

18   were they all calling each other?  Why were they all calling

19   each other and then immediately afterwards putting their

20   competitors' prices in their e-mails?  It's not a coincidence,

21   ladies and gentlemen.  It's a conspiracy.

22        Now, you may have noticed Tyson Foods' bid isn't in

23   here where Defendant Roberts and Defendant Mulrenin work.  As

24   you saw in Exhibit 10-1, their bid was submitted August 11, a

25   couple days before that first bid deadline was actually due.

1  But first, you saw in 10-1 Defendant Roberts spoke to his

2  competitor Scott Brady that very afternoon.  He submitted that

3  first round bid.  So here is that bid, August 11.

4        Let's go to Exhibit 9703.  Now, what did Defendant

5  Roberts hear back from his customer after he submitted that bid

6  that same day?  He told him, "You trying to get me fired?"

7  That's the reaction that KFC had.  That's the push-back they

8  gave to that initial bid from Tyson, how ridiculously high it

9  was.

10        Now, let's move on later in the week, Government's

11  Exhibit 1175.  This is an e-mail to Defendant Mulrenin from the

12  KFC -- one of the KFC negotiators asking for a call the next

13  day to discuss the pricing model they submitted.  Now, what did

14  Defendant Roberts and Defendant Mulrenin do when they were

15  waiting to receive this probably more negative feedback from

16  KFC?  Well, the very next day, that August 15, so two business

17  days before the other defendants were going to submit their

18  pricing, they were on those phone calls too.  You see,

19  Defendant Roberts, he spoke to Defendant Brady and Defendant

20  Penn at Pilgrim's.  Defendant Mulrenin, he also spoke to

21  Defendant Scott Brady.  You see, they were talking to their

22  competitors to coordinate holding strong, making sure that when

23  they got that push-back from KFC, that they would hold strong

24  together with their competitors.

25        Now, you also may have heard that Defendant Roberts

1    and Mulrenin, they didn't have an influence on price.  They

2    weren't those guys with the calculators coming up with the

3    pricing models, like Mr. Campbell and Mr. Bowlin who was in

4    charge of the profits at Tyson.  You know their job was to make

5    sure they got those prices that Tyson wanted.  They were the

6    salesmen.  That was their job.

7            And you know what?  You also saw in Government

8    Exhibit 959, Defendant Roberts, he did have an influence on

9    price.  You see here, Defendant Roberts -- and this is the

10   Popeye's negotiation that year -- he e-mails Brandon Campbell,

11   that pricing guy that you heard from, saying Popeye's is done.

12   Then you see what else he says.  He says, "Almost a 14-cent

13   increase.  Yes, Brandon, I changed the margin line," the margin

14   meaning the profit, and, "Yes, it's up from what you gave me."

15   He had an influence on price.  And ladies and gentlemen, this

16   one isn't in the summary and I'll try to keep pointing that

17   out.

18           You know what's crazy about what Tyson did during

19   those negotiations, had they led the pack out getting their bid

20   in first, their price increase in first for KFC?  You heard

21   they didn't budge one penny during three months of negotiation

22   with KFC, three rounds of bidding.  You heard a little how they

23   wanted to change their pricing model, get paid for everything

24   in the box.  KFC said no.  What do they do?  They turn around,

25   put that increase there just back into their profit because

1   they knew they were getting that price increase whatever it

2   took.  No negotiation.

3        This shows you that August 111th round bid and the

4   September 30th final contract, how their margin, their profit

5   increased during the negotiations.  You heard from Brandon

6   Campbell how that 19-cent overall increase they were seeking

7   that he first proposed in June, that was exactly what they got

8   at the end of those negotiations.  They knew that KFC didn't

9   have a choice.  They knew it because they were coordinating

10  their competitors.

11        Now, that's just the first round of bidding.  Do you

12  think this coordination continued until those contracts were

13  signed at those historic price increases?  Of course, it did.

14  Let's go to Government Exhibit 1051.  Here you have Defendant

15  Roger Austin summarizing his call with a KFC buyer after those

16  bids were due.  You heard KFC, they told Tyson, trying to get

17  me fired?  Well, they told Defendant Austin stores would close

18  if they paid what he had proposed.

19        And what did these co-conspirators do when they got

20  this push-back from their competitors or from their customers?

21  They plugged into the network.  They cheated.  And you see this

22  in Government Exhibit 10-2.  That's the second round of

23  negotiations with KFC.  You see, those phone lines between

24  these conspirators, they stayed open throughout those

25  negotiations.  And you see how they held firm together here in

1    Exhibit 10-2.

2         Let's turn back to 1051 again because I want to start

3    and show you what happened after this conversation with the KFC

4    buyer.  You see, the buyer, he told Defendant Austin that some

5    other competitors had been aggressive with their pricing.  But

6    Defendant Austin, he said we would stand firm with our number

7    when he reported up to Defendant Penn.  And Pilgrim's, he knew

8    they could hold first because he knew exactly what his

9    competitors were doing.

10        Let's look at what happened that same day and how he

11   knew, how Defendant Austin knew that Pilgrim's would stand

12   firm.  So this same day after this e-mail was sent, the buyer

13   for KFC, he called Defendant Austin.  Defendant Austin then

14   calls Defendant Penn, his boss, to tell him about the push-back

15   he was still receiving from KFC.

16        Now, it doesn't take much to figure out what happens

17   next.  Defendant Penn, Defendant Lovette, who both work in

18   Greeley in the same office, Defendant Penn tells Defendant

19   Lovette what happened.  And Defendant Lovette, who is the CEO

20   of the company, he then calls the salesmen, calls Defendant

21   Austin and talks to him for quite some time.

22        And what happens after that?  Within an hour Defendant

23   Austin reaches out to his competitors, Scott Brady.  He reaches

24   out to him.  And you know what he said on the call because

25   Defendant Brady reported it up in a text message to Defendant

1    Fries at Claxton.  You see, he says, I talked to Roger, meaning

2    Defendant Austin, about KFC.  And Greeley, meaning Defendant

3    Lovette, Defendant Penn, Greeley told him not to come down on

4    price.  So this is Roger Austin telling his competitor, Scott

5    Brady, that he is not going down on price.

6         How did Defendant Fries respond when Defendant Brady

7    told him this?  He says, What are you doing coordinating with

8    our competitors about holding firm on price.  You shouldn't be

9    sharing this information with our competitors?  No.  He says,

10   Wow.  And it's not wow, I can't believe you are talking to

11   Defendant Austin about pricing.  It's wow, what an opportunity.

12   Wow, we can hold strong together.  And you know that because of

13   what happened later.

14        You see, that next morning Defendant Fries personally

15   reached out to a competitor, Greg Tench, at Mar-Jac.  Scott

16   Brady then reached out to Defendant Kantola at Koch.  And you

17   know what happened because again they tell you in their text

18   messages in Exhibit 1238.  Defendant Brady, he reports, "Koch

19   is not moving either."  And then Defendant Fries, he says,

20   "Tinch is at 11.  They are agreeing to anything today.  Just

21   listening."  And you know because he said "just listening" that

22   they are not agreeing to anything today.  So this is Defendant

23   Brady, Defendant Fries, Defendant Austin, Defendant Kantola,

24   all coordinating their negotiating position with KFC in this

25   second round of negotiations that they are not moving, that

1    they are not coming down on price, and they are all telling

2    each other so that they do it together.

3           Now, the same pattern that you saw in the first round

4    of bidding you have now seen in the second round of bidding it

5    happens.  Again, in the third round of bidding, and you have

6    that in Government Exhibit 10-3.  First, here is a summary and

7    here you see the pattern again.  It's on your screens at the

8    moment.  It will up on the easel in a second.

9           So Mr. Lewis, one of those negotiators for KFC, he

10   reached out to those suppliers and gave them a deadline for

11   their final bid for Tuesday or Wednesday of next week.  That's

12   September 3rd.  Now, this is the finalization of those

13   contracts at those sky high prices the defendants were asking

14   for.  So do you think that these defendants and their

15   competitors competed now?  No, they didn't.

16          What you see in Government's Exhibit 10-3 is those

17   same phone calls the day those bids are due, September 3rd,

18   call after call after call involving Defendant Brady, Defendant

19   Mulrenin, Defendant Roger Austin, Defendant Ric Blake,

20   Defendant Fries, Defendant Bill Kantola, all syncing up with

21   their competitors as those final round bids are due.

22          Now, let's move on and just see this so you can see

23   the participants.  This is just that morning, a call with KFC,

24   and then you see Defendant Brady, Kantola, Fries and Austin all

25   syncing up.  And then there is more.  Midday you have another

1    call with a KFC buyer and call after call, Defendant Mulrenin,

2    Austin, Blake and Brady here, all on the day that those final

3    bids are due.  And there is more.

4           Later that afternoon Defendant Brady, Kantola, Fries,

5    Austin, all the way until the end of that day they are syncing

6    up and coordinating, holding strong on price.  And once again,

7    you know it because you have a text message from Defendant

8    Brady to Defendant Fries telling you what happened on some of

9    those calls.  You see at the end of the day he reports, Roger

10   and Bill are not moving.  Roger meaning his competitor,

11   Defendant Roger Austin and Bill, meaning Defendant Bill

12   Kantola, his competitor at Koch.  You see they are

13   coordinating, not moving together, to hold strong and get those

14   price increases.  Now, that's the end of the negotiations of

15   KFC in 2014.

16          You also saw how KFC reacted.  Did they think that

17   that supply crisis justified these price increases they were

18   given?  Were they happy with it?  Ladies and gentlemen, you can

19   only consider this Exhibit 9704 as against Defendant Mulrenin

20   and Roberts.  But this is their understanding, their state of

21   mind on that final day as those bids came due.  You see the

22   buyer for KFC, he wrote an agenda for the meeting they were

23   having.  And this is the customer telling him, you're telling

24   me that really I am screwed.  That's how KFC felt at the end of

25   these negotiations.  Defendants Roberts and Mulrenin, as you

1    heard, they did not budge on their price.

2         Now, in a nutshell, that's what happened with KFC in

3    2014.  You have seen the calls.  You have seen the e-mails.

4    You have seen the text messages telling you exactly what

5    happened, how all 10 of these defendants were involved in

6    coordinating that price increase together that year.  Now, as

7    you heard, 2014, it was chicken nirvana.  It wasn't just KFC.

8    It was customer after customer after customer.

9         Let's talk about Pollo Tropical.  You heard from Joe

10   Brink, the buyer for Pollo Tropical, about how he was shocked

11   about the price increases that were proposed to him.  Let's

12   look at the summary and show you what was happening during

13   those negotiations.  This is Government Exhibit 5-1 coming up.

14   Now, just like these negotiations with KFC, you see that same

15   pattern.  From the get-go do you think Pilgrim's and Claxton

16   here are competing?  No.

17        You see, first you heard from Mr. Brink about the

18   lunch he had with Defendant Little at Pilgrim's when he first

19   heard about that price increase.  He told you they met for

20   lunch at Pollo Tropical and Defendant Little then told him the

21   price increase would begin with a two, a 20 cent increase.  You

22   know what?  Was Defendant Little coordinating with his

23   competitors for this contract?  He was.  Because just before

24   that meeting, and this is the top of the page here on

25   August 14, you see Defendant Little calling Walter Cooper, his

1    competitor at Claxton, immediately before that lunch.  And then

2    after the buyer left maybe while Defendant Little is still

3    sitting at that table, he calls his competitor and checks in

4    again to tell him exactly how those negotiations are going.

5         And that's not it.  You see, every step of these

6    negotiations Defendant Little was in lockstep with his

7    competitors.  That blue line in the middle of the page on

8    September 22nd, you heard from Mr. Brink about this too.  He

9    told you how he had a conference call with Defendant Little

10   where he was told really what a more accurate estimate of that

11   price increase would be.  Right after that call within minutes

12   you see Defendant Little again calling his competitor, Walter

13   Claxton (sic), to share with him the message he conveyed.  This

14   is what we talked about a little earlier.  In this phone call

15   is where Defendant Little said, "The price is the price."  And

16   he gave Joe Brink until that afternoon to secure their volume.

17        Now, you know that Defendant Little then told his

18   competitor exactly what he told Pollo Tropical because you saw

19   that in Government Exhibit 9740.  And that's not in this

20   summary, but that's the document you looked at earlier today

21   where Walter Cooper said, I bet Pilgrim's is telling Pollo

22   Tropical the price is the price, no negotiation.  He knows that

23   because Defendant Little told it to him on the phone that

24   afternoon.

25        Now, let's go to the second page because it continued.

4798

1    You see, and let me look at the exact day, on October 2nd,

2    which is the second page of Government Exhibit 5-2, Mr. Brink,

3    he tells Defendant Little, this pricing is not going to work.

4    Pilgrim's has to match its competitors.  You heard how from

5    Mr. Brink there was a third competitor in these negotiations

6    and their price was 10 cents lower.  Mr. Brink was saying match

7    your competitor.

8         So what did Defendant Little do when he was told to

9    match his competition?  He reached out to them to coordinate

10   again.  You see that very next morning he calls Walter Cooper

11   again and the next day -- sorry, I think that same morning

12   calls Walter Cooper.  Then the next day he e-mails Joe Brink

13   saying, "We are going to hold on our pricing," because he had

14   agreed to hold on his pricing with his competitor.

15        It wasn't just KFC.  It wasn't just Pollo Tropical.

16   You heard it from another witness, Mr. Telly Smith from Golden

17   Corral, about how he was shocked about those price increases

18   that year.  And you have Government's Exhibit 4-1 showing you

19   the coordination that was happening around those negotiations.

20   And we're going to get to some of that evidence a little later,

21   but that's 2014, customer after customer receiving these

22   historic price increases and the defendants and their

23   conspirators coordinating the whole time.

24        And remember, the money, the money was the driver in

25   2014.  And boy, was it.  Let's look at some of the evidence you

1   saw.  Government Exhibit 940, and this is -- I think you have

2   seen one before, but I should have noted it.  You have these

3   text messages in evidence, but they are going to look a little

4   different.  They are charts.  Some of them are one page per

5   message.  This is just to help you understand who the

6   participants are and the order of the conversation.

7        Here you have Defendant Penn congratulating his

8   conspirator, Jayson McGuire, saying he called him out at a

9   board meeting for leading the industry with $70 million in

10  profits YoY.  That's year after year.  Defendant Kantola, he

11  was doing the same thing.  You saw Government Exhibit 901 where

12  he was bragging about those price increases to his boss at

13  Koch.  And you saw the prices, Church's, $25 million in

14  increases; Popeye's, $5 million; KFC, $15 million.

15       Ladies and gentlemen, what happened in 2014 is proof

16  beyond a reasonable doubt that this conspiracy existed and it

17  shows you each and every defendant's active and enthusiastic

18  participation that year.  But as I said earlier, you don't have

19  to rely on 2014 alone because this conspiracy, it was well

20  functioning back in 2012 and years into the future into 2017.

21  You see this same exact pattern we just went through year after

22  year after year.

23       Now, let's turn and just look at a couple more of

24  those negotiations outside of 2014.  We are going to start by

25  going back, going back to 2012 to KFC that year.  You heard a

1    lot about KFC in this trial.  KFC, they were an important

2    customer.  They were a big customer.  That's when these

3    defendants and their conspirators chose to coordinate because

4    it mattered, because it meant millions.  So just like you saw

5    in 2014, in 2012 you see round after round after round of

6    bidding of the defendants and their conspirators coordinating

7    their prices as a united front together.

8         Here you have Government Exhibit 14-1.  For 2012 you

9    have 14-1, 14-2 and 14-3.  What you see here is Defendant

10   Blake, Austin, Little, Brady and Defendant Kantola all talking

11   to their competitors during that first round of bidding.  And

12   after these calls they submitted their pricing.  You see that

13   on the next page of 14-1.  Now, let's see how we know what they

14   were talking about on those phone calls.

15        Here you see the six defendants in this courtroom that

16   were coordinating as those first round bids were due.  Then you

17   see the pricing they submitted.  You see how three of them,

18   Koch, Claxton and Pilgrim's, all submitted their dark meat bid

19   at .30 back.  Others were higher.  Now, and .30 back you may

20   remember there is a little math involved.  It's the amount back

21   of the eight-piece price, so you have eight-piece, 30 cents

22   back of it, 30 cents less.

23        Let's go to the next slide.  Here you have Defendant

24   Kantola's own words.  You see on the day that that first round

25   bid was due after speaking to four of his competitors,

1    Defendant Kantola e-mailed around within Koch saying, hey,

2    let's increase our dark meat price just to see if we can pull

3    it off.  You know here he knew that he could pull it off

4    because he had just been talking to four of his competitors.

5         And it continued into these negotiations.  After the

6    first round you see at the top here from Defendant Austin, and

7    this is Government Exhibit 14-2, that seconds round of

8    negotiation, Defendant Austin said that the KFC buyer, he was

9    pushing back on price.  He wanted his suppliers to go to 31

10   back of that dark meat price, that price that Defendant Kantola

11   had just increased on the day bids were due.  And did these

12   defendants and their conspirators coordinate more on the second

13   round?  Yes.  You see it right here, these calls between

14   competitors, and once again, you know what was going on.

15        Here in the middle of the page, 14-2, you see

16   Government Exhibit 1519.  You see at Koch they are saying we

17   are fifth out of sixth on price.  Bill is getting us pricing.

18   You know what that means because you see the phone calls

19   Defendant Bill Kantola was making that day, calling his

20   competitors, calling Defendant Austin, Defendant Ric Blake and

21   Defendant Scott Brady getting their pricing.

22        And you see it repeat itself later that month as that

23   bidding continued in round two, more coordination.  Let's look

24   at exactly what happened again.  Here you see call after call

25   between competitors.  Let's look at what happened.  So that

1    third line down, Defendant Scott Brady and Defendant Ric Blake,

2    you see them having a phone call, five minutes.  Now, the

3    minute that Defendant Brady hangs up on that phone call, he

4    sends a text message to Defendant Fries.  Government Exhibit

5    1427, George's is .30 back on dark meat.  So you know here they

6    were coordinating their pricing for KFC.

7         Then 4:23 p.m. the call between Defendant Scott Brady

8    and Defendant Austin.  You see here that's 13 minutes.  And

9    let's see, about nine minutes later while Defendant Brady is

10   still on the phone with Defendant Austin, he is texting

11   Defendant Fries.  Here is what he says.  Pilgrim's is .30 back

12   and Tyson is 31 back.  Defendant Fries says, Ol Mike, he

13   bluffing hard.  He knows the KFC buyer is bluffing because they

14   went out to their competitors and got their pricing.  They now

15   have better information.  They know.  You see more.  Defendant

16   Austin, he shared his bid pricing.

17        And then pay attention to the bottom of this text

18   message, ladies and gentlemen, because this is important.

19   Government's Exhibit 1427.  You see Defendant Brady tells

20   Defendant Fries, he, meaning Roger, meaning Defendant Roger

21   Austin, he said to raise our prices on wings.  He is market and

22   market plus 10.

23        That's a price.  Now, here how does Defendant Fries

24   respond?  Does he say stop?  Does he say you shouldn't be

25   coordinating price increases with your competitors?  No.  He

1   says, Tell him we are trying.  Tell him we are trying.

2        This shows you part of this agreement between the

3   competitors, Defendant Brady, Defendant Austin, Defendant Fries

4   agreeing on their bids to raise prices for KFC.  Now, this is

5   the second round of bidding.  Once again, do you think this

6   coordinating continued into the third round as those contracts

7   got finalized?  Of course, it did.  So let's look now at

8   Government's Exhibit 1427.  And Mr. Koenig will put up Exhibit

9   14-3, which is the summary for that third round of bidding.

10        Here you see another e-mail from Defendant Austin to

11   others at Pilgrim's just summarizing the conversation he had

12   with the buyer for KFC.  And this is where -- this is where the

13   buyer tells him that some other suppliers had been aggressive

14   with their pricing for one of the products.  So what do you

15   think Defendant Austin did when he was told that his

16   competitors were actually competing?  He says it at the bottom

17   right there.  He says he is going to make some calls and get

18   the pulse.

19        Now, let's see what he did.  Here is the first page of

20   Government's Exhibit 14-3.  Let's look at this in another way.

21   Let's see how Defendant Austin got the pulse.  You see later

22   that afternoon Defendant Austin, he called Defendant Ric Blake

23   at George's, Defendant Scott Brady at Claxton, Defendant Bill

24   Kantola at Koch.  That's how he got the pulse.  And that's not

25   it.  You see more.

1          You see he follows up with his conspirator at

2    Pilgrim's telling him after those phone calls, I have some

3    better information.  He calls his conspirator, the same guy he

4    is e-mailing, and tells him exactly what he learned on those

5    calls, his competitor's bid for KFC.  And then you saw, and

6    this is Government Exhibit 1538 and 1539, those competitor

7    prices getting reported up by that conspirator within

8    Pilgrim's.

9          You see it's the eight-piece quote, that main product

10   at KFC quote, meaning their bids, that Defendant Austin got

11   from his competitors that afternoon, George's from his call

12   with Defendant Blake, Koch from his call with Defendant

13   Kantola, and Claxton from his call with Defendant Brady.  And

14   that's not all you even saw that day.  He followed up with a

15   call to another competitor.  And this is all in that summary

16   14-3.

17         He called his competitor Eric Oare at Marshall Durbin

18   and he e-mailed his conspirators again, so you can put Marshall

19   Durbin in at .9660, then send to Jayson, Jayson meaning

20   Defendant Penn, because he knows that Defendant Penn expects

21   these updates, these reports on his conspiring with the

22   competition.  Just like you saw in 2014 in Exhibit 1074 that

23   got sent on to Jayson Penn, you see it here.

24         Now, then you saw Government's Exhibit 1522 and 1523

25   where that spreadsheet gets sent up first to Defendant Penn and

1    Defendant Austin.  Defendant Austin is the one who got the

2    information.  And how does Defendant Penn respond when he gets

3    this information from his subordinate?  Does he say, what are

4    you doing with your competitors' quotes before these bids are

5    due?  No.

6         You see here he asks for more.  He says, Do we have a

7    Tyson price idea?  He asks for more.  So this is how you know

8    in 2014, two years later when Defendant Penn called Defendant

9    Roberts, that he is getting their price because in 2012 he

10   expected it then too.  Later he went out and got it himself.

11   What else did Defendant Penn do after he got this e-mail?

12        Well, you saw in government Exhibit 1522, he forwards

13   it on to Defendant Lovette.  So like I said earlier, here you

14   see him directly forwarding on the competitors' prices that

15   Defendant Austin was getting through his coordination to

16   Defendant Lovette.  That's how you know in 2014 when he says

17   he'll review it with Lovette, that he actually would, and he

18   did.  Defendant Lovette, he expected these same kind of updates

19   that Defendant Penn was getting.  Now, this is the agreement.

20   This is the conspiracy.  This is coordinating on prices with

21   your competitors.  Let's move on.

22        So we talked about KFC in 2014, other fast-food

23   customers in 2014.  Going back to 2012 to talk about KFC again,

24   let's talk about the middle there, 2013.  Do you think in those

25   contract negotiations that KFC was cheated again?  They were.

1    You have this, ladies and gentlemen, in Government's Exhibit

2    17-1.  You see here once again the defendants and their

3    conspirators reached out to each other to coordinate their

4    pricing.  So you see the same pattern, a request from a

5    customer, the calls, the text messages showing you exactly what

6    was happening, exactly how they were cheating.

7            Here on 17-1 you see a lot of those calls, and you see

8    the pattern here all in one page.  Let's show -- let's talk

9    about what was going on at this time.  First, let's turn to

10   Government Exhibit 1700.  And this, ladies and gentlemen, you

11   can only consider this document against Defendant Brady.  You

12   see, after getting his first round feedback from KFC, he

13   e-mails Defendant Fries saying, I will make some calls.  You

14   know what that means because you see those calls on that same

15   day at the beginning of Government Exhibit 17-1.

16           Now is he the only one of these defendants that had

17   that response when he got KFC push-back this year?  No.  You

18   have Government Exhibit 1713 up on your screen with Defendant

19   Austin having that exact same response.  We can talk in the

20   morning after I do some scouting.  And then you see in the

21   bottom half of this page here on 17-1 what he meant, how he was

22   calling with his competitors to coordinate price.

23           And you know that that's what was happening on those

24   phone calls because you have the text messages, Government's

25   Exhibit 1734.  So you see here Scott Brady once again giving

1    up-to-the-minute reports on the actions of this conspiracy to

2    Defendant Fries saying, Just an FYI, last year we were at 32

3    back on dark meat and this year we are at 30 and a half back.

4    FYI, we raised our prices between last year and this year with

5    KFC.

6           Look at these text messages because they are both at

7    the same time.  They are both at 1:31 p.m.  So Defendant Fries,

8    you read that first text message and he starts writing a

9    response.  He says, oh, we went up on price?  Maybe let's

10   negotiate a little.  Maybe let's compete.  We can do 31 if you

11   want.  We can go down on price.  But read the second message.

12   Roger is at .30 back and not moving.  Defendant Austin is at

13   .30 back and not moving.  So he reads that and then he knows

14   what to do.  He is not using this information to compete.  He

15   is using it to raise their prices, to hold strong, stay at 30

16   and a half back.  If Roger is doing it, we are going to do it

17   too.

18          So we have covered KFC for 2012, 2013 and 2014.  Let's

19   move on to some other customers for a minute.  So these

20   negotiations we talked about, they were all about yearly

21   contracts, but the conspiracy, it wasn't always about that.  As

22   I said earlier, sometimes it was about discounts or payment

23   terms.  And you saw that in the negotiations with Church's and

24   Chick-fil-A.

25          And we are going to start with Church's and with

4808

1    Government's Exhibit 1-1.  So what happened at Church's, and

2    this is in the beginning of 2013 in May, Church's, they wanted

3    to have some backup product.  So sometimes in the supply chain

4    with chicken, sometimes you run out.  Sometimes there is a

5    snowstorm or a truck gets delayed.  So Church's, they told

6    their suppliers, hey, we want our distribution centers to have

7    some frozen product on hand so if we run out of chicken, we can

8    thaw the frozen and cook it up.

9         In May they reached out to their suppliers with this

10   request and they asked.  They said, What are you thinking on

11   pricing for frozen?  The immediate response you see about five

12   minutes after Carl Pepper at Tyson received this e-mail, he

13   reaches out to Defendant Kantola at Koch and Defendant Little

14   at Pilgrim's to coordinate how they would respond to this

15   pricing request from Church's.

16        You know what was said because you have the e-mails.

17   You have Government's Exhibit 120.  This one is it from Carl

18   Pepper to his bosses -- or his boss, Defendant Roberts, and his

19   Conspirator Defendant Mulrenin at Tyson.  He told them exactly

20   what he found out.  He said Pilgrim's, meaning Defendant

21   Little, tell me what they are thinking and Koch, Defendant

22   Kantola, who he had just spoken to, tell me what they were

23   thinking.  They are coordinating how they are going to respond

24   in terms of their price to Church's.

25        You also saw what Defendant Little did here.  First

1    you have Government Exhibit 109.  And this one, ladies and

2    gentlemen, this one is not on the summary.  Defendant Little

3    does at first what you would expect.  He reaches out to his

4    pricing guys.  He says, hey, Tommy, when will we have this

5    pricing?  And the pricing guy tells him Monday, but he doesn't

6    wait until Monday to respond to Church's.

7         So you have Government Exhibit 108.  And this is not

8    on the summary either and you can only consider this as to

9    Defendant Little.  But after speaking to his competitors, after

10   speaking to Carl Pepper, speaking to Defendant Kantola, that's

11   how he makes the decision on whether Church's is going to have

12   to pay.  He says there is going to need to be a freezing charge

13   for both because he talked to his competitors and decided

14   rather than compete, they would be charging for this together.

15        And then you saw the exact same thing repeat itself

16   later that year for Church's when they changed their

17   specification, the quality assurance on how you make the

18   chicken.  And you have this in Government Exhibit 2-1.  So here

19   Church's changes their requirements, and then Carl Pepper at

20   Tyson, and this is the third thing down on the page, he tells

21   Defendant Mulrenin exactly what they're going to do.

22        They get mad that Church's changed their pricing in

23   the middle of the year outside of this contract negotiation.

24   They get mad.  They are like, how will the other suppliers

25   react?  Carl Pepper says what he will do.  I might call a

1    couple and ask.  Then you see this exact same pattern.  Carl

2    Pepper calls Defendant Little.  Defendant Little then calls

3    Defendant Kantola.

4         And again, you know what happened on those calls.  You

5    know they were coordinating their prices because Defendant

6    Kantola this time tells you -- you have Government Exhibit 6134

7    where he writes to his colleagues at Koch telling them the next

8    month the future pricing for both Pilgrim's and Tyson.  We have

9    just spoken to Defendant Little and Carl Pepper.

10        You also have Carl Pepper's words telling you what was

11   discussed on those calls.  You have Government's Exhibit 221

12   where Carl Pepper told Defendant Roberts and Defendant Mulrenin

13   exactly what he said.  He said, Talked to Jimmie Little and he

14   said they were planning on adding to their cost to do this.  So

15   you know that on those phone calls they were coordinating

16   whether they were going to charge Church's for this change.

17        Let's move to another customer, Chick-fil-A.  This is

18   the beginning of 2014.  You are heard from Meyer Skalak from

19   Chick-fil-A during this trial.  He told you about how

20   Chick-fil-A in 2014, they changed to an antibiotic-free

21   chicken.  And you heard how that meant more cost to the

22   supplier.  He told you that he asked for pricing from the

23   supplier and he expected it to be competitive, just like every

24   customer told you during this trial, they expected their

25   suppliers to compete on prices.  Pretty much common sense.

1          You have Government Exhibit 3-1 showing you what

2     happened in these negotiations.  But first, let's just see

3     Defendant Mulrenin's own words from this time.  You see the day

4     Chick-fil-A released that press release about the

5     antibiotic-free chicken, he says to his colleagues at Tyson,

6     Our conversations at Chick-fil-A are, of course, confidential.

7     But were they really?  No.

8          You have Government's Exhibit 3-1.  You see Defendant

9     Mulrenin here calling Defendant Brady and you know what it is

10    about because again you have a text message, and that's

11    Government's Exhibit 355.  And that e-mail from Defendant

12    Mulrenin can only be considered against Defendant Mulrenin.

13    But this you can consider against both of them.  And Defendant

14    Brady tells you again exactly what happened on that call.  I

15    talked to Tim today at Tyson, meaning Defendant Mulrenin, for

16    ABF.  It's a long way of saying they told me their pricing.

17         And then Defendant Fries, he asked for more.  He said,

18    Did he say what their finished increase, their finished price

19    increase would be?  Defendant Brady responds, Work in progress,

20    but that I reciprocated.  I told him what we were doing and

21    Perdue and Pilgrim's, all coordinating their pricing for this

22    request.

23         Now, we talked about 2012, 2013, 2014.  You heard how

24    those contracts, they were three-year contracts, so let's skip

25    ahead to 2017 for the KFC negotiations then.  Now, do you think

 1    when those contracts that were negotiated at those sky high

 2    prices in 2014, when they came due to be negotiated, do you

 3    think this coordination between these competitors continued?

 4    Of course, it did.  And Robbie Bryant, he told you about it

 5    that year.  He told you that the KFC buyer came in with a

 6    baseball bat to hit them down, to beat them down on price to

 7    get a competitive price in those negotiations.

 8          He told you that's not what happened.  He said that

 9    they worked together to undermine the bidding process, to work

10    in our best interests.  And he told you what he meant when he

11    said our best interests.  He said the industry, the conspiracy.

12    They were working together to hold strong on price as a united

13    front.  And you have it in the documents.  You have

14    Government's Exhibit 18-1, the summary you have up right now.

15          Now, KFC reached out, gave push-back.  They wanted to

16    go down on price.  And from the get-go once again you have the

17    competitors coordinating.  You saw in Exhibit 18-1 here right

18    at the middle of the page how Defendant Austin says Claxton

19    meets with them, meaning KFC or RSCS, Thursday, and I will get

20    a blow by blow Friday morning.  Koch meets with them on Friday.

21          And then you have text messages showing you this

22    coordination once again.  You have Government's Exhibits 1846

23    to 1849.  This is between Conspirator Tim Stiller at Pilgrim's

24    and Defendant Austin.  So they are talking about these KFC

25    negotiations wondering what other suppliers will do.  Tim

1    Stiller says, Can you find out about others?  And you see these

2    same words you've seen from Defendant Austin other years when

3    he was cheating KFC.  I'll do some scouting.  I'll see what the

4    pulse is.  And you see him do it.

5         And you see the results of this scouting.  Robbie

6    Bryant, he told you about the notes he took from a phone call

7    he had with Defendant Austin during these negotiations.  You

8    saw that in Government's Exhibit 1919.  Robbie Bryant told you

9    how Tim Stiller was disappointed when they didn't have their

10   competitors' pricing during these negotiations, so Roger

11   Austin, he went out and got it and he told it to Robbie Bryant.

12        And you have here the pricing both for the eight-piece

13   and for the dark meat for Koch, Claxton, Mar-Jac Tyson and

14   George's.  And Robbie Bryant, he thought they were bids.  You

15   may have seen some documents that showed maybe this was their

16   current pricing.  It maybe matched some of their current prices

17   that were under the current contract.  But it doesn't matter.

18        The whole point of the conspiracy right now is

19   resisting KFC's attempts to go down on price.  So when you're

20   coordinating with your competitors, yeah, maybe you find out

21   their current prices because that's what you're coordinating,

22   staying strong at that current price.  Whether this is a

23   current price or a bid doesn't make a difference because they

24   were coordinating, holding strong in these negotiations with

25   KFC.

1          Government's Exhibit 1825.  When these first round

2     bids for KFC came due from Defendant Austin, this is his first

3     round bid, you see after he had been cheating KFC from 2012 to

4     2013, 2014 and then in 2017, he says in his submission, We

5     promised you that we would be competitive and we hope you find

6     this to be just that.  Are you kidding me?  This wasn't

7     competitive.  You saw he had been cheating KFC every year

8     during their negotiation.

9          Now, let's move on to Government Exhibit 18-3, and

10    this is the next summary showing the next round of bidding with

11    KFC that year.  You see on your screens at the top here, the

12    KFC buyer, he was responding to those bids.  And in response

13    you saw Defendant Austin, he was told to tell the industry we

14    are going to hold, the industry, once again, meaning tell our

15    competitors that we're going to hold on pricing for KFC.

16         What do you think he did?  He cheated.  It's what you

17    see here in 18-3 what you see up on your screens now.

18    Defendant Austin reached out to Defendant Brady, Kantola, Blake

19    and others.  And you have the text message showing you what

20    happened here on the left-hand side.  Well, you have the

21    instruction.  Need you to tell the industry we are going to

22    hold and then checking in later.  Give you some time to do your

23    due diligence.  You have that all in your summary.  So right

24    after that text message telling him to do his due diligence,

25    that's when you see these phone calls.

1            Now, following that, all this intel that Defendant

2       Austin gathered from his competitors about holding strong on

3       price, once again you see it makes its way up the chain at

4       Pilgrim's.  You see here Defendant Austin told Robbie Bryant,

5       because they had a phone call.  Mr. Robert Bryant then met with

6       Tim Stiller.  Then Tim Stiller met with Jayson Penn.  Come to

7       BL office.  Let's discuss KFC.  That's come to Bill Lovette's

8       office.  Let's discuss KFC.  And you betcha they are going to

9       talk about those phone calls that were just had that day with

10      their competitors about the pricing.

11           And then Defendant Lovette, because we talked about

12      him a little, you see him getting the reports from another --

13      for the prices of their competitors during those bids.  But you

14      also saw Defendant Lovette personally participating, personally

15      reaching out to his competitors too.  You have that in

16      Government Exhibit 803.

17           You heard from Melissa Hoyt during this trial who

18      worked at Sysco.  She told you about those payment term changes

19      that Sysco was seeking, how they wanted extended payment terms

20      which is a part of price from their suppliers.  And you see,

21      you heard what a large customer Sysco was.  You heard they were

22      maybe a behemoth.  For a customer that large, this

23      coordination went up to the top of the company.  So here in

24      Exhibit 803 is Joe Grendys, the top of Koch, Defendant

25      Kantola's boss, you have him coordinating directly with Bill

1    Lovette saying, Did you hear about this payment term change?

2    Defendant Lovette says, We told them no.

3         And Mr. Grendys' response, I am a hundred percent

4    onboard.  If that changes, will you tell me?  Defendant Lovette

5    agreed.  This is coordinating with a competitor about price.

6    This is a part of this conspiracy.  This is Defendant Lovette

7    actively and enthusiastically participating himself.  Now,

8    that's the episodes, the negotiations I wanted to walk through

9    with you all today.  That's the existence of this conspiracy.

10   It shows you all 10 of these defendants' active participation.

11        There is one thing else I want you all to consider

12   during your deliberations when you are thinking about whether

13   this conspiracy existed.  It's the secrecy.  You see, when

14   these defendants and their conspirators thought about it, they

15   thought maybe we shouldn't put this in writing.  You saw

16   sometimes they did, but other times -- let's see what else you

17   saw.

18        Let's look at Government's Exhibit 3039.  Here you

19   have Conspirator Tim Stiller telling Robbie Bryant, No comp

20   names in e-mail.  That means no competitors' names in e-mail.

21   And you saw people did just that.  Government Exhibit 6282,

22   this is an e-mail between Defendant Scott Brady and his

23   competitor, Brian Roberts.  And you see no comp names in e-mail

24   here, but it's really not that hard to figure out.  P, Perdue;

25   Pil, Pilgrim's; C, Claxton; sharing their competitors' pricing

1    and hiding the names from this e-mail.

2            And then I told you I would get back to Golden Corral.

3    And you saw what happened at the end of 2014 with the Golden

4    Corral negotiation.  As I said, these text messages when you

5    look at the underlying exhibits, Exhibits 433 to 447, it's

6    going to be one message per page.  It's a little hard to read,

7    but let me put it this way for you.  So the Conspirator Tim

8    Stiller, he is telling Defendant Penn about those Golden Corral

9    negotiations at the end of 2014.  These companies, these

10   conspirators are all getting those giant price increases.

11           You see in the middle of the page, he says, We know

12   Mar-Jac, it's one of their competitors, their biggest supplier,

13   2 cents higher than us and they are not going to negotiate.  He

14   is telling Defendant Penn Mar-Jac's negotiating position

15   because they know it because they spoke to Mar-Jac.  And then

16   Mr. Stiller said, They are listening to my direction.

17           The question now and what Defendant Penn asks is, Who

18   is they?  Is they Mar-Jac, your competitor, our competitor?

19   Are they listening to your direction?  Then he stops himself.

20   You see, this time he says, If they is illegal, don't tell me;

21   not don't do it, don't tell me.  That's what he says to his

22   subordinate at the end of 2014 after all this conspiring you

23   saw happen that year.

24           Now, as I stated earlier, after we've gone through all

25   these episodes, I want to talk about that last element and a

1    couple other things the government has to prove before I show

2    you those tables I promised I would show you with some key

3    exhibits relating to each defendant.  So let's talk about those

4    other things right now.

5         So as we talked about at the beginning, three elements

6    the government must prove for this conspiracy.  First, that the

7    conspiracy existed; second, each defendant's knowing

8    participation; and third, interstate commerce.  Let's talk

9    about interstate commerce.  What that requires you to find or

10   one way you can find it is basically that the products that

11   were affected by this conspiracy that they traveled across

12   state line.

13        It's really simple and it's really easy here.  You

14   heard it from almost every customer witness.  Mr. Olson at the

15   very beginning told you his company had 300 locations across

16   the midwest including 50 right here in Colorado that bought the

17   eight-piece chicken from KFC that was negotiated in 2014 you

18   heard a lot about.  And he told you how that chicken came from

19   the suppliers, the distribution centers, the franchises, and it

20   crossed state lines.  You heard that similar testimony from

21   other customers about their purchases of the chicken that you

22   now know was affected by this conspiracy.  You heard from Mr.

23   Lewis, Ms. Fisher, Mr. Smith, Mr. Skalak, and that's more.  But

24   interstate commerce, it's simple, and it's been proven beyond a

25   reasonable doubt.

1          So let's talk about two other things:  First, statute

2     of limitations.  You are instructed that you need to find that

3     this conspiracy continued into the five-year statute of

4     limitations.  So for the earliest of the defendants that was

5     June 2020, so you need to find that the conspiracy continued

6     into at least June of 2015.  First, those contracts from 2014

7     were a big part when this conspiracy was in overdrive, you

8     heard how those contracts lasted all the way into 2017.  That's

9     well within the statute of limitations.

10         But then you also saw evidence in 2017 of the

11    conspiracy, those KFC negotiations we talked about, and then

12    more we didn't go through with Popeye's in 2017, and there is

13    others.  But all of that conduct falls squarely within the

14    statute of limitations.

15         The last thing I want to note before we get to each

16    defendant is venue.  You are instructed on that, but basically

17    you need to find that this crime occurred in some way in

18    Colorado.  That's really simple.  Pilgrim's Pride where four of

19    these defendants worked, it's headquartered right up north in

20    Greeley.  Defendant Penn, Defendant Lovette, Robbie Bryant who

21    told you about his participation in the conspiracy, they all

22    worked in Greeley right here in Colorado.

23         Now, let's get to each defendant's knowing

24    participation.  The standard is knowing participation,

25    knowingly joining this conspiracy, and that just means that

1    it's voluntarily and intentionally and not by accident.  As I

2    said, what the evidence shows was not just knowing

3    participation, but active and enthusiastic participation by

4    each of these 10 defendants.

5           Now, if you would like to write down exhibit numbers

6    for when you deliberate, get your pens ready now because I am

7    going to show you those tables that will lay out some of the

8    key evidence for you for each defendant.  And let's turn to the

9    first one.  We are going to start with Defendant Brady and

10   Defendant Fries at Claxton.  If we could turn to the table.

11          Before you write everything down, I can make it a

12   little simple.  Those summary exhibits, those numbers in the

13   middle for each, those will direct you to most of those

14   underlying exhibits on the right.  And what we have done is

15   we've bolded ones that won't appear in the summaries.  So if

16   you want to write these down for when you deliberate, you can

17   write just the summary numbers and then the bolded ones, and

18   that should point you to all the evidence that you're seeing in

19   front of you right now.

20          What you'll see generally -- and I will talk as you

21   are writing -- what you will see generally, what this evidence

22   is, some of it is just going to be those conversations, those

23   defendants' own words showing participation in this conspiracy.

24   So here you have a lot of those text messages between Defendant

25   Brady and Defendant Fries showing you their coordination,

1     Exhibit 355, 982, 1238, 1427.  There is a few of them like the

2     ones where Roger said to raise our prices.  Tell him we are

3     trying.

4            Others, others are going to be that window into the

5     conspiracy from another side, like Government's Exhibit 1074,

6     1035, which is those e-mails we saw going on at Pilgrim's

7     showing you what was happening, showing you the coordination on

8     price involving these defendants or at times their

9     subordinates.

10            Now, I am not going to detail the evidence against

11     each defendant aside from this because we have already talked

12     about it today.  But Scott Brady and Mikell Fries, they were

13     constantly in sync throughout this conspiracy and you see that

14     in these documents.  And you heard it from Robbie Bryant.  He

15     told you Scott Brady, he was one of those names he heard about

16     all the time in this conspiracy as someone who was reached out

17     to when you needed a competitor's price.  And he told you about

18     the existence of this agreement.

19            The one thing I do want to note about Claxton, you

20     heard a lot of things about 2014 and this move to big birds,

21     about the supply crisis.  What's crazy about what Defendant

22     Brady and Defendant Fries did that year, you heard how Claxton,

23     they only made small birds.  They only had one plant.  And you

24     heard about the process and the money involved to convert from

25     small bird to big bird.  Claxton was never going to convert to

1   big bird.  They had no business putting in their first round

2   bid a big bird profitability item.  You saw that during

3   Mr. Lewis' testimony, how Claxton's first round bid, 10 percent

4   of it was attributed to big bird profitability for a product

5   they didn't even make.

6          They asked for that price increase because they knew

7   their competitors were doing it too and because they were

8   coordinating.  You know what, Defendant Fries, he didn't even

9   believe in this big bird shift.  You have -- I am not going to

10  show it now, but you have Government Exhibit 900.  That's board

11  meeting minutes from Claxton.  And Defendant Fries in that

12  board meeting in August of 2014 when negotiations were underway

13  said big birds were a fad.  He said the customer -- the

14  fast-food customers, they are willing to pay a 10 cent

15  increase, but the industry, meaning our competitors, are saying

16  we want 20.  And then Claxton, Defendant Brady and Fries, they

17  asked for that price increase along with their competitors.

18         Ladies and gentlemen, the evidence has shown that

19  Defendant Brady and Fries were active and enthusiastic

20  participants in this conspiracy.  As we go through the tables

21  just to keep track, we will mark each defendant as we go.  But

22  let's move on from Claxton to Koch, to Defendant Kantola.

23  Let's move to his table.  You can write down if you would like

24  the summary numbers, some of those bolded exhibit numbers.

25         Defendant Kantola was a salesperson at Koch.  Just

4823

 1   like Defendant Brady, just like Defendant Little, just like

 2   Defendant Austin, just like Defendant Blake and the other

 3   salesmen, you saw his active participation working those phone

 4   lines during this conspiracy.  You saw Church's that we talked

 5   about today calling up Carl Pepper, Defendant Little,

 6   coordinating those prices, and you saw it in those KFC

 7   negotiations as well.  You saw his own words when he raised his

 8   dark meat prices after coordinating with his competitors the

 9   day the first round bids were due back in 2012.

10        And just like Defendant Brady, you also heard from

11   Robbie Bryant about Defendant Kantola's participation.  You

12   heard from him how when Defendant Austin was told to put it out

13   to the industry what Pilgrim's was doing, how Defendant Kantola

14   was one of those people he heard Defendant Austin call and say

15   the price is the price, sharing their position with each other.

16   The evidence throughout this trial shows Defendant Kantola's

17   active participation in this conspiracy.

18        Now, we talked about Claxton.  We've talked about

19   Koch.  Let's move over to Tyson Foods and discuss Defendant

20   Mulrenin and Defendant Roberts.  And here is the evidence

21   regarding them, but I will keep going as you write it down.

22   Now, like some of the other higher up salespersons in this

23   case, you saw them receiving reports from someone below them in

24   their sales group, Mr. Carl Pepper, about his actions in the

25   conspiracy because he was their arm reaching out to

1    competitors, getting their pricing and reporting it up.  You

2    saw some of that in Government's Exhibit 114, 221, 224, 617.

3    And did you see them respond, What are you doing?  We shouldn't

4    be coordinating with our competitors?  You didn't.

5         You saw Defendant Mulrenin once go and direct Carl

6    Pepper exactly what to do when he had his competitors'

7    information.  We didn't review that today, but that's

8    Government Exhibit 617 and then 752 to 758.  In those text

9    messages, Carl Pepper told Defendant Mulrenin, Got a general

10   idea what George's is doing.  That's after Carl Pepper had

11   spoken to Ric Blake.  And Defendant Mulrenin, he says, Call

12   Cullen.

13        You heard about who Cullen was from one of those Tyson

14   employees.  He was one of the pricing people at Tyson.  And

15   Carl Pepper goes and coordinates with his competitors, then

16   Mulrenin directed him to tell the pricing people so that they

17   could price in line with their competition.

18        But Defendant Mulrenin and Roberts, they didn't just

19   participate as supervisors.  They didn't just receive these

20   reports from Carl Pepper.  They both directly reached out to

21   their competitors too.  You saw this in 2014 in August

22   surrounding Tyson's first round bid how Defendant Roberts

23   reached out to Defendant Penn and Defendant Brady, how

24   Defendant Mulrenin did the same reaching out to Defendant Brady

25   as well.  And you saw some of those windows finding out what

4825

1    happened in some of those calls.  Like in Exhibit 355, I talked

2    to Tim today at Tyson, during that Chick-fil-A negotiation.

3            And as you heard from Mr. Olson, he was a KFC

4    franchisee you heard from, he told you about the state of play

5    in those negotiations in 2014 with Defendant Roberts.  He told

6    you how he remembered how uncharacteristically inflexible

7    Defendant Roberts was that year, but not just him, Defendant

8    Blake as well.  He told you out of all the meetings in his

9    life, he remembered these two because of how strikingly similar

10   they were.  No negotiating.

11           Now, I want to note one thing for you, and that is

12   Defendant Mulrenin's participation with KFC in 2014.  You heard

13   in opening statements -- and I will note, the defendants, they

14   don't need to put on any case.  That is the government's

15   burden.  In opening statement, opening statements, they are not

16   evidence.  But Defendant Mulrenin chose to make one and what

17   you heard was he had nothing to do with those KFC negotiations

18   in 2014.  You can look at what you saw in the evidence, ladies

19   and gentlemen, because his name was all over those

20   negotiations.  He was all over the documents.  He was in the

21   meetings.  You have Exhibit 1190, 1175 and others showing his

22   direct participation in those exact negotiations for the

23   defendants and their conspirators cheating.

24           You saw Defendant Roberts' and Defendant Mulrenin's

25   participation in this conspiracy from the report they received

1    up from their conspirator, Carl Pepper at Tyson Foods, but also

2    from their direct reach out and coordination with their

3    competitors too.  That's what's happening at Tyson.

4         Let's move on to Defendant Ric Blake at George's and

5    let's show you his table.  Take a moment to write this down.

6    You saw Defendant Blake in the mix working those phone lines as

7    well throughout this conspiracy just like the other salesmen,

8    KFC in 2012, 2014, 2017.  You saw him when Defendant Brady

9    reported George's is .30 back on dark meat the second he hung

10   up the phone with Defendant Blake during the negotiations.

11        And you saw how Defendant Austin got better

12   information from Defendant Blake during those 2012 negotiations

13   as well.  You saw that in Exhibit 1538 and 1539 and Defendant

14   Blake's prices were reported up after that.  He was also, as we

15   just noted for the Tyson defendants, he was on line with Carl

16   Pepper right before he said, Got a general idea what George's

17   is doing, and was reported to go tell it to the pricing guys.

18        Now, for Defendant Blake a lot of what you see is

19   those windows into his operation in the conspiracy from others,

20   from those at Pilgrim's, from those at Claxton.  What do you

21   see in Defendant Blake's own files?  Let's look at Government

22   Exhibit 6089.  This is a spreadsheet Defendant Blake kept

23   tracking his competitors' prices for years and years, months

24   and months, KFC, Popeye's, each and every one of his

25   competitors.

1           And Robbie Bryant, he told you how this information

2    was useful in this conspiracy.  He told you how Defendant

3    Austin did the same thing to keep score on a competitor, make

4    sure they lived up to their agreement, that their prices were

5    in line with each other.  Defendant Blake, he was an active

6    part of this conspiracy too.

7           Now, we talked about Claxton, Tyson, Koch and

8    George's.  Let's move on to what was happening at Pilgrim's

9    during this conspiracy.  We'll start with Defendant Little, one

10   of the salesmen.  Like the other salesmen, you saw Defendant

11   Little working the phone lines, coordinating with his

12   competitors, putting out the word of what Pilgrim's was doing.

13   The price is the price.  You saw that in those Church's

14   negotiations we talked about today.  You saw it in KFC.

15          Now, you may have heard that Defendant Little, he

16   wasn't the account owner for KFC.  He wasn't the direct contact

17   for that customer.  His boss, Defendant Austin, was.  And you

18   know that they would be in line with each other because KFC's

19   pricing, you heard how it affected the rest of those accounts.

20   It affected Defendant Little's customers.

21          So in the summer of 2014 when those price increases

22   kicked off at KFC, Defendant Little was going to know exactly

23   what position Pilgrim's was taking.  You know he was spreading

24   that same word out to the industry, the price is the price,

25   from Exhibit 9740.  And you saw his coordination with Walter

1    Cooper during that year.

2         Now, I will point you to one exhibit where his name

3    specifically, Exhibit 221, Talked to Jimmie Little and he said

4    they are planning on adding to their cost to do that.  That's

5    one of those Church's episodes.  These exhibits, ladies and

6    gentlemen -- and the testimony you heard, Robert Bryant, he

7    told you Defendant Little also was trusted to contact

8    competitors.  That all establishes Defendant Little's active,

9    enthusiastic participation in this conspiracy.

10        Let's move on to Defendant Austin at Pilgrim's.  Let's

11   show you his chart.  Year after year you saw Defendant Austin

12   checking around, doing some scouting, getting the pulse,

13   coordinating with his competitors during his negotiations with

14   his customers.  And you know what happened because the

15   information was circulated within Pilgrim's.

16        In addition to just seeing it all over these

17   documents, you heard it from Robbie Bryant as well.  He was the

18   one that told you that Defendant Austin was told to put it out

19   to the industry what Pilgrim's was doing and how he overheard

20   those phone calls that Defendant Austin was having.  And it

21   wasn't just 2014.  He told you about 2017 as well.  And just

22   like Defendant Blake, in Defendant Austin's own files you saw

23   him keeping score on his competitors' prices.  And Robbie

24   Bryant told you Defendant Austin told him that he did this to

25   keep score, but he hadn't seen the document.

1            Let's turn to Government Exhibit 7046 because here is

2    where you saw -- and this is just a screen-shot of it.  There

3    is more tabs -- here is where you saw Defendant Austin keeping

4    score on his competitors' pricing going all the way back to

5    1999.  This is all active and enthusiastic participation by

6    Defendant Austin.

7            Now, were the sales guys, were Defendant Little and

8    Defendant Austin acting alone at Pilgrim's?  Of course not.

9    Just like Defendant Brady, just like Carl Pepper, they were

10   reporting up their acts in this conspiracy up to their

11   supervisors, Defendant Penn and Defendant Lovette.  Let's start

12   with Defendant Penn and let's move to his table.

13           Defendant Penn was a supervisor of the sales group

14   during those 2014 negotiations.  And you saw how in 2014 and

15   2012 how in the middle of those negotiations their important

16   customer, KFC, he was receiving those updates from his

17   subordinates with the quotes, with the bids, with the margins,

18   the profits of Pilgrim's competitors before those bids were

19   ever due.

20           And in addition to receiving those reports, you saw

21   Defendant Penn reach out to competitors himself.  You saw him

22   reach out to Defendant Roberts in 2014 during the negotiations.

23   You saw him reach out to someone at Mar-Jac, one of your other

24   summaries.  He was doing the same thing himself and he was

25   receiving the reports from his underlings.  He wasn't just

1   receiving it.  He was asking for more.  You saw, Have a Tyson

2   price idea?  You have another, Government Exhibit 1547 and

3   1721.  1721 when he receivers his competitor's pricing, he

4   says, What about the rest of the players?  He is asking for

5   more because he expects this information and he was in on this

6   conspiracy.  That is Defendant Penn's active and enthusiastic

7   participation.

8          Let's move on to Defendant Lovette, who is the CEO of

9   Pilgrim's Pride.  Now, you know, I will show you from this

10   table, you know that Defendant Lovette, he was an active and

11   knowing participant in this conspiracy for the same reasons you

12   know Defendant Penn was.  He received those reports from his

13   subordinates with his competitors' pricing in the middle of

14   negotiations and that he went out and did it himself.  The

15   reports, you have Exhibit 1074, 1035, 1036.  And going out and

16   doing it himself, that's that Sysco conspiring we talked about,

17   reaching out to the head of Koch in Government Exhibit 803.

18   You know from all of this that Defendant Lovette, he was an

19   active participant in this conspiracy too.

20          Now, that, ladies and gentlemen, is the participation

21   by all 10 defendants in this courtroom.  And when you

22   deliberate, I will note it's going to be easy to find the

23   evidence.  I am going to point you to this really quickly, but

24   really you can use your summaries.  So for summary 1-1, that's

25   the Church's frozen.

1           And you can move to the next slide, please.

2           Summary 1-1, all the exhibits or most of the exhibits

3      relating to those negotiations are in the 100s.  Same for 2-1,

4      it will be in the 200s.  3-1 will be in the 300s.  So if you

5      want to look at the underlying evidence relating to any

6      negotiation, you can just key up the summary and then look at

7      the underlying exhibits in that range.  And that, ladies and

8      gentlemen, is going to conclude our time together today.

9           But let's go back to the core question in this case,

10     the bottom line.  Were these defendants, all 10 of them, part

11     of a conspiracy, an agreement, a mutual understanding to fix

12     prices and rig bids?  The answer is absolutely yes.  Each and

13     every one of these defendants knew that when they were swapping

14     their prices, when they were swapping their bids, when they

15     were swapping their margins, their profits with their

16     competitors, that they were doing it not to compete, not to

17     undercut each other on price, but to act as a united front to

18     raise their prices together, to withstand push-back from their

19     customers together, to hold firm on price.

20          And those supervisors, they acted on that information.

21     They encouraged it and they directly did it themselves.  There

22     is a reason it was all being sent to them.  They were in on

23     this conspiracy and they were participating too.  You can use

24     your common sense, ladies and gentlemen.  This just doesn't

25     happen year after year over and over and over if there isn't an

1    understanding between these defendants and their conspirators.

2    The defendants and their conspirators, they seized at every

3    opportunity they could to hold strong together.  And they could

4    do it, they could hold strong, they could raise their prices

5    because they had that understanding that they wouldn't compete.

6         Ladies and gentlemen, that's price-fixing.  That's

7    bid-rigging.  That pattern that you have seen in the evidence

8    today and that you will have more in front of you when you

9    deliberate, those calls, the e-mails, the text messages, it's

10   really a simple pattern and you see it repeat itself time and

11   time again.

12        The government has proven every element of this case

13   beyond a reasonable doubt to all 10 of these defendants.  And

14   we ask that you check that line on your verdict form guilty at

15   the conclusion of your deliberations.

16        Thank you.

17        THE COURT:  All right.  Thank you, Ms. Call.

18        Ladies and gentlemen, we are going to go ahead and

19   take the lunch break now, but I do want to mention one thing to

20   you.  The closings are going to take the remainder of the day

21   and they will actually go into tomorrow, but at some point I

22   believe tomorrow afternoon I will release you to commence your

23   deliberations.  As you know, our schedule for this week was to

24   be four days.  However, if you would like, you can deliberate

25   on Friday as well.

 1              Now, I realize that because you didn't anticipate

 2       that, one or more of you may not be able to do that and that's

 3       okay.  If the jury can't deliberate on Friday, that's perfectly

 4       understandable.  But I would ask you to at least confer amongst

 5       yourselves, you can do that, to determine whether you would

 6       like to deliberate on Friday.  And if so, you don't have to do

 7       it now, obviously, but if you could let me know by the end of

 8       the day what your decision on that is, okay?

 9              We are going to take an hour and 15 minutes.  So why

10       don't we plan on reconvening at 1:30.  Keep all the admonitions

11       in mind.  You obviously can't deliberate except to discuss that

12       one issue I mentioned among yourselves.  Don't look up any

13       information.  Keep your yellow juror buttons visible and the

14       jury is excused for lunch.  Thank you.

15          (Jury excused.)

16              So ladies and gentlemen, for those of you in the

17       gallery, we have courtroom 901 available as an overflow

18       courtroom if you prefer to listen to the closings there as

19       opposed to in somewhat more crowded circumstances here.

20              Anything that we should talk about before we recess

21       for lunch?

22          MR. TUBACH:  Your Honor, just briefly, I appreciate

23       the Court's indulgence in giving me an extra 10 minutes for the

24       closing.  I have in the meantime also begged, borrowed and

25       stole five more minutes from another defendant, so I have an

 1   hour total, just so the Court is aware.  And I would appreciate

 2   the five-minute warning that the Court said it would give.

 3          THE COURT:  Yes, I will do so.

 4          Anyone else who hadn't indicated he wanted a

 5   five-minute warning or she wanted a five-minute warning?

 6          MR. LAVINE:  Your Honor, I would like one.

 7          THE COURT:  No problem.  We will do.  And then who are

 8   you borrowing the time from?  Mr. Byrne, okay.  Got it.

 9          MR. BYRNE:  I was afraid you were going to ask that.

10          THE COURT:  I am going to hold you to it strictly,

11   Mr. Byrne.

12          MS. PREWITT:  Two minutes from Defendant Mulrenin,

13   Your Honor.

14          MR. GILLEN:  And two minutes from Defendant Roberts,

15   Your Honor.

16          THE COURT:  I am sorry, maybe I am misunderstanding

17   this.

18          MR. TUBACH:  I will take it all, Your Honor.

19          THE COURT:  So we are not talking now about two-minute

20   warnings.  It's rather we are swapping minutes back and forth?

21          MR. TUBACH:  That's what they understood, Your Honor.

22   I had been in coordination with them before.  And Mr. Byrne had

23   gracefully given five and they had each given two, so I have

24   nine.  The Court's given me 10, so I'll actually have 19.  I

25   don't anticipate needing all that for sure, but that, I guess,

1   is the maximum.

2         THE COURT:  So for my purposes of my warnings, I have

3   got to make sure I am very clear on these things.  So --

4         MS. PREWITT:  Your Honor, let me say if Mr. Tubach

5   does not use that two minutes, I will happily take them back,

6   Your Honor.

7         THE COURT:  You are making my timing duties very, very

8   difficult.

9         So Mr. Roberts is giving up two minutes, right?

10        MR. GILLEN:  That's correct, Your Honor.

11        THE COURT:  And Mr. Mulrenin is giving up two.  And

12  how many minutes -- Mr. Little is giving up five.  Okay.  I

13  think I can handle that.

14        All right.  Anything else that we should talk about?

15        MR. KOENIG:  Just to make sure we are in sync, by our

16  clock Ms. Call took an hour 49, which by our calculations would

17  be 41 minutes for rebuttal?

18        THE COURT:  I didn't add the total up.  She started at

19  10:21 and ended at 12:10, by my calculation.

20        MR. KOENIG:  I think that's exactly.

21        THE COURT:  All right.  We will be in recess, then,

22  for lunch.  Thank you.

23     (Recess at 12:17 p.m.)

24     (Reconvened at 1:30 p.m.)

25        THE COURT:  Are we ready to bring the jury back in?

1              MS. CALL:  Very briefly before the jury comes in, we

2    wanted to raise one item we noted in two of the defendants'

3    instructions regarding the fact that the government has not

4    alleged nor proved that a particular defendant personally

5    committed any act within the statute of limitations period.  We

6    just wanted to flag that.  Of course, if it were argued that

7    the jury could not convict based on one defendant not

8    committing an act within the statute of limitations period,

9    that would be inconsistent with the law.  We, of course, don't

10   want to object during closing arguments and wanted to make sure

11   that that was not actually going to be argued before the jury.

12             THE COURT:  I am sorry, that what?  It wouldn't be

13   argued?

14             MS. CALL:  Yes.

15             THE COURT:  Mr. Beller?

16             MR. BELLER:  Your Honor, I am guessing that that's a

17   reference to our theory of the defense.  I can assure the Court

18   and Ms. Call that I don't believe we plan on making any

19   argument that would be in violation of any of the instructions.

20   So I hear her concern and I do not think that it's a ripe one

21   at this point nor am I anticipating it becoming a ripe one.

22             THE COURT:  Mr. Pollack?

23             MR. POLLACK:  Your Honor, I would like to flag an

24   issue for you briefly, and we can certainly take it up later at

25   that's the Court's preference.  But as the Court may recall, in

1    the instruction that became Instruction 20 where you instructed

2    once someone has joined the conspiracy, they are responsible

3    for the statements and actions of others, I had asked for

4    additional language from the Sand instruction saying that while

5    that was true, your determination as to whether or not a

6    particular defendant knowingly joined the conspiracy had to be

7    based on that defendant's actions and that defendant's

8    statements, not on the actions and statements of others.

9           In Ms. Call's closing when she got to the point in the

10   closing where she went through each individual defendant to

11   discuss how the jury is supposed to know that that individual

12   defendant joined the conspiracy, she specifically said that you

13   should look at the actions of others, those from Pilgrim's and

14   those from Claxton, in making -- as a window into your

15   determination with respect to Mr. Blake.

16          In light of that, I am going to ask the Court if the

17   Court would consider giving a supplemental instruction along

18   the lines that I had asked for originally.

19          THE COURT:  Yeah, I am going to reject that request.

20   Of course, as I have instructed the jury, closings are not

21   evidence and the jury has been instructed.  And so the jury

22   can -- will have to match up the facts with the instructions as

23   their guide in reaching their verdict.

24          MR. POLLACK:  Thank you, Your Honor.

25          THE COURT:  All right.  Thank you, Mr. Pollack.

1          Let's go ahead and bring the jury back in.

2          (Jury present.)

3          Ladies and gentlemen, I think I know the answer

4    because Ms. Grimm mentioned it, but sounds like Friday no; is

5    that right?  Okay.  Friday you will not be deliberating.

6          All right.  Ladies and gentlemen, we will now continue

7    with the closing arguments, and the first will be closing

8    argument on behalf of Mr. Penn.

9          Mr. Tubach, go ahead.

10         *MR. TUBACH:*  Thank you, Your Honor.

11                         **CLOSING ARGUMENT**

12         *MR. TUBACH:*  In 2014 Tyson took a lot of business away

13   from Pilgrim's, but promised its customers more chicken than it

14   could deliver.  When Tyson ran out of chicken, it came to

15   Pilgrim's and asked them to bail them out.  Jayson Penn said

16   no.  Tyson should pay for being short.  It costs money for them

17   to fill orders which they don't have chickens.  They have been

18   adding market share and still trying to do selling cheap

19   chicken and being short.

20         He refused to bail out Tyson because he wanted to take

21   the business away from them.  And that strategy worked.

22   Pilgrim's took the business away from Tyson.  Mr. Bryant, the

23   government's own witness, called this hard-nosed competition.

24   The government called it price-fixing and charged Mr. Penn with

25   a serious felony.  That has been the story of this case

1    throughout.  Over and over again the government has taken

2    things out of context, shown you cherry-picked sound bites and

3    not given you the whole story.

4         Let me give you another example.  The government

5    introduced an e-mail from Brenda Ray and Mr. Penn with no

6    context and no witness apparently hoping that they could just

7    argue there was something sketchy going on.  So we called

8    Brenda Ray as a witness.  And she was crystal clear.  You heard

9    yourself what she said on that witness stand.  The phone call

10   she referenced in her e-mail was not part of any agreement do

11   fix prices or rig bids and Jayson Penn had nothing to do with

12   that phone call.

13        Here is another example.  The government at the very

14   beginning of its closing put up a Church's confidentiality

15   agreement and said somehow that's relevant to what's going on

16   here.  This is not a breach of contract action.  If that were

17   the case, Church's would be a plaintiff and this would be a

18   civil action.  This is a criminal action.  But more

19   importantly, they didn't show you any evidence that Mr. Penn

20   even violated that provision.  Where was that evidence?  It's

21   classic sound bite cherry-picking.

22        And this points out an obvious and enormous problem in

23   the government's case.  Where are the witnesses?  The

24   government introduced exhibit upon exhibit upon exhibit without

25   a sponsoring witness, without anyone who could explain what

1    these documents actually mean.  There are 614 exhibits in

2    evidence in this case and there are hundreds of people

3    referenced in those exhibits who could have been called.  These

4    are the people from the suppliers who could actually say

5    whether there was price-fixing going on.  So how many of those

6    hundreds of people did the government call?  One, one witness,

7    Robert Bryant.  I will come back to him in a minute.

8         But where are all the witnesses?  Why didn't the

9    government call any of them?  We know why they didn't call

10   Ms. Ray.  They interviewed her.  They didn't like what she had

11   so say, so you just pretend that she didn't exist.  But what

12   about all the others?  The government has names of all these

13   people.  They have the documents.  The government has been

14   investigating this case for a long time, and it has the power

15   to bring witnesses to court and even to give them immunity if

16   they require that before they testify.  And they've conducted a

17   lot of witness interviews in this case.  They interviewed

18   Robbie Bryant 20 times alone.  And they chose not to bring any

19   of those people onto that witness stand.

20        You can be sure that if the government had found any

21   witness among any of those people who would have supported the

22   government's case, they would have been up there testifying and

23   telling you about it.  But they didn't because there are no

24   such witnesses.  And that's all you need to know about the

25   government's case.

1          So what about the one witness who could have had

2   knowledge about whether Mr. Penn participated in a conspiracy,

3   the one they did call, Mr. Bryant?  His testimony about

4   Mr. Penn could not have been clearer.  He testified without any

5   hesitation that he had no knowledge of Jayson Penn agreeing

6   with a competitor to fix prices or rig bids.  He had no

7   knowledge of Jayson Penn telling anyone to fix prices or rig

8   bids.  He had no knowledge that Jayson Penn instructed anyone

9   to coordinate prices or bids with a competitor.  And he had no

10   knowledge that Jayson Penn knew of anyone fixing prices or

11   rigging bids.  That's the government's conspiracy insider.

12          So the government's case is not based on the testimony

13   of Mr. Bryant.  In fact, it's not based on the testimony of any

14   witness.  So what is it based on?  Here it is, two spreadsheets

15   without competitor pricing information in them, two random

16   phone calls with competitors with no context and a few stray

17   e-mails.  That's it.  Literally, that's it.  That's the

18   evidence the government wants you to believe justifies

19   convicting Mr. Penn of an eight-year price-fixing conspiracy.

20          It is disturbing that the government would bring a

21   serious criminal charge like this against anyone based on such

22   flimsy evidence.  The government has enormous power to destroy

23   someone's life when filing such serious charges, and they

24   should not use that power unless they have evidence to back it

25   up.  They didn't have that evidence when they filed the

1   evidence against Mr. Penn and you didn't hear any such evidence

2   in the six weeks you've been here.  The truth is Jayson Penn

3   never fixed prices with anyone, period.  He is not guilty.

4          Now, let me give you a road map of what I am going to

5   talk about today.  First, I am going to go through a couple of

6   legal concepts.  Then I am going to talk about the three KFC

7   bids that the government alleges Mr. Penn was involved in, talk

8   about Golden Corral, a couple of stray e-mails, and then the

9   Tyson covers and shorts, and then I will wrap up, okay?

10          First, let's talk about some legal concepts.  I want

11   to remind you of two important instructions the Court gave you

12   this morning.  Of course, you should follow all of the Court's

13   instructions, but I want to highlight two of them.  First, the

14   government has charged Mr. Penn with agreeing with his

15   competitors to fix prices and rig bids, but let's be absolutely

16   clear about one thing.  It is not illegal to get and use

17   competitor pricing information in making your own pricing

18   decisions.

19          Here is the instruction the Court gave you.  It is not

20   illegal for a competitor to obtain, rely upon, and act on

21   pricing and other information received from competitors and

22   others so long as there is no agreement to fix prices or rig

23   bids.

24          Why is it so important?  Because the government spent

25   most of its time introducing evidence that competitors

1    sometimes shared information and some customers didn't want

2    competitors talking.  You heard that some customers actually

3    didn't care that much whether competitors talked.  Mr. Ledford

4    didn't seem to mind it so much.  Others went so far to say it

5    was in violation of their moral standards.  But what the

6    customers thought about competitors exchanging information

7    doesn't matter.

8            We are in a court of law and you have to apply the law

9    as the Court gave it to you.  And this instruction from the

10   Court is perfectly clear.  It's appropriate and proper to get

11   competitor information even from competitors and to rely and to

12   act on it as long as you don't have an agreement on price.

13   That's the law.

14           And you saw this principle in action over and over

15   again.  Pilgrim's employees got information from all kinds of

16   sources, including sometimes each other.  And there are a

17   handful of instances where that information was sent to

18   Mr. Penn as part of a decision-making progress within

19   Pilgrim's.  And when the Pilgrim's employees sent that to

20   Mr. Penn, he was absolutely entitled to rely on that

21   information in helping him to make the best decision he could

22   make for Pilgrim's.

23           Now, there is two things about this instruction.  The

24   government seems to think that if you get competitor

25   information, the only way you haven't colluded is if you offer

4844

1   a lower price.  Repeatedly the government said in its closing

2   argument you have to have a lower price; otherwise, you are not

3   competing.  That's not in the instruction.  That's nowhere in

4   the law.  They just made that up.  You are not required to

5   offer a lower price in order to not be colluding.

6          Second, at the very end of the closing, the government

7   said we know Mr. Penn's guilty because he acted on the

8   information that he got from the competitor information that

9   was sent to him on these two occasions.  Look at the

10  instruction.  It is not illegal to act on pricing information

11  received from competitors.  She quoted the language that says

12  it's not illegal.

13         Second principle I want to get to is this.  There are

14  10 defendants here.  You probably noticed that.  And you have

15  to treat each of us, each of the defendants, separately.  The

16  rights of each of the defendants are separate and distinct.

17  You must separately consider the evidence against each

18  defendant and return a separate verdict for each.  Your verdict

19  as to one verdict whether it's guilty or not guilty should not

20  affect your verdict as to any other defendant.  Companies are

21  not on trial here.  Other people aren't on trial here.  You

22  are, for our purposes, you are evaluating the case against

23  Mr. Penn.  And in doing so, you should look at the evidence

24  that relates to Mr. Penn, not everybody else.

25         All right.  Let's get on to the evidence itself.  The

1    government focused much of its time on KFC pricing for 2015, so

2    let me start there.  Because I am up first in closings here for

3    the defense, I am going to give you a little background.  You

4    have heard a lot by now, basically becoming chicken experts.

5    The big picture is that everyone in the chicken business knew

6    that prices were going up in 2015, and that's exactly what

7    happened.  In fact, Mr. Bryant, the government's witness, said

8    anyone in the chicken business who didn't know prices were

9    going up shouldn't be in the chicken business.  And it was

10   market forces that drove those prices up.  It was the basic law

11   of supply and demand.

12        Now, for a long time as you've heard, big birds have

13   been more profitable than small birds.  It is not a one-year

14   phenomenon.  It's a long-term trend.  And you heard that

15   consistently throughout the trial.  In fact, you heard that as

16   a result of that, a small bird plants were shifting over to big

17   bird plants, right?  And Mr. Olson testified that there were 40

18   small bird plants in the country and 25 percent of them shifted

19   over to big birds because you could make more money.  And so

20   there was a 25 percent drop in small bird plants in the 10

21   years prior to 2014.

22        At the same time demand for small birds was going up,

23   rotisserie chickens at Wal-Mart and grocery store, those

24   precooked rotisserie chickens.  Chick-fil-A was buying a lot

25   more chicken, Popeye's was growing.  And all of these were

1    long-term trends.  And so you had a situation where supply was

2    going down and demand was going up.

3             Now, this did not look good at all for KFC.  KFC's

4    whole business model is built around small birds, right?  It's

5    how long you cook the chicken, how many pieces you can get into

6    a bucket, and what the customers expect when they get in the

7    bucket.  They don't want a chicken piece this size.  They want

8    the chicken they are used to.

9             But it's even worse than that for KFC because KFC dug

10   itself into a hole.  KFC was struggling to attract customers.

11   Mr. Ledford, who used to work for RSCS and bought chicken, told

12   you that KFC was closing hundreds of stores every year.  That

13   meant that KFC was buying less and less chicken, but they are

14   still being really hard on their suppliers.  They were

15   demanding in 2014 and got pricing that was 14 percent below the

16   market.  So KFC sort of lost its luster, but it was still

17   acting like it was the top chicken buyer around.

18            And then came Mother's Day 2014 and the unthinkable

19   happened.  Mr. Olson, remember Jim Olson, he owned a lot of KFC

20   stores, he told you they actually had to close stores because

21   they ran out of chicken.  Imagine that, Kentucky Fried Chicken

22   ran out of chicken.  Mr. Olson called it a "disaster."

23   Mr. Lewis who was brought out of retirement to help fix this

24   mess, his words were the supply shortage was a "crisis

25   situation" for the franchisees in RSCS.  And as a result, RSCS

1   was in a "state of near panic."  This was Defcon 5 over at KFC

2   because if they run out of chicken, it's over.

3        So what was Mr. Lewis' first task when he was brought

4   back out of retirement to help fix this mess?  It was to try to

5   buy more chicken to prevent a store closure from happening

6   again.  And that's exactly what he did.

7        Now, remember, the contract price in effect when he

8   went out to do that for KFC was between 92 and 93 cents

9   depending on the supply.  It was a very narrow range.  It was

10  exactly what Mr. Ledford wanted.  So he went out to buy those

11  loads.  How much did he pay?  He told you he paid $1.40 a pound

12  to buy from Mar-Jac.  And that's the only one he remembered.

13  He said he bought 10 insurance loads, remember that, from

14  Mar-Jac at $1.40 at a pound, but then it turned out he also

15  bought loads from others, from Pilgrim's earlier this month.

16  This is Mr. Lewis' e-mail.  You agreed to produce 12

17  incremental loads of purple eight-piece over a three-week

18  period at $1.30 a pound.

19       And also here is Mr. Lewis talking to Darrell Keck at

20  George's.  This will confirm our agreement that George's will

21  produce an additional two truckloads for six weeks -- that

22  meant 12 truckloads -- at $1.30 a pound.  Now, the government

23  does not allege that any of these purchases were the result of

24  price-fixing.  These were 40 and 50 cents a pound over the

25  contract price, and they were negotiated shortly before the

1    2015 negotiation began.

2         Now, McKinsey, remember they brought McKinsey in

3    because they were so worried about what was going to happen,

4    they figured they needed some expert advice.  So they hired

5    this premier consulting firm called McKinsey.  And they paid

6    them $1 million to study the chicken industry.  What did

7    McKinsey them?  You're right.  Demand is up.  Supply is down.

8    You are in trouble.  And here is something important, the

9    difference between small birds and big bird profits, 20 cents

10   per pound, 20 cents per pound.

11        All of this showed you that KFC was in serious trouble

12   unless they could convince the small bird suppliers to stay in

13   the market.  As Mr. Olson put it, Jim Olson, if this trend

14   continued, it could have, quote, an absolutely devastating

15   effect on KFC's business.

16        Now, based on these market dynamics, RSCS decided to

17   do three things they had never done before in the history of

18   their negotiations.  They decided to negotiate early.  Rather

19   than do it later and run the risk that others would take up all

20   the supply, they moved up the time to negotiate early.  So all

21   those e-mails about, oh, let's get KFC wrapped up and then we

22   are going to go for the others, that wasn't the suppliers'

23   choice.  That was KFC's choice or RSCS's choice.

24        Second thing is they wanted to negotiate a three-year

25   contract.  They had never done a three-year contract before,

4849

1    the first time ever.  Why?  They wanted to lock up the supply

2    and they wanted to address the imbalance between big bird and

3    small bird profitability, first time they had mentioned that.

4         So in early July about a month before they sent out

5    the request, RSCS sent the same e-mail to each of the suppliers

6    and they asked the suppliers to address a series of questions,

7    topics.  I just have two up here.  This is the e-mail that was

8    sent to Pilgrim's, but it was sent to all of them.  As

9    mentioned, we will schedule a conference call sometime within

10   the next two weeks to discuss the following.  First, update

11   your margin over feed model to reflect current cost.

12        What does that mean?  They knew full well that they

13   had been beaten down by the suppliers so bad that the cost in

14   those cost models we see didn't actually reflect their actual

15   cost.  They said, look, make it your actual costs.  Secondly,

16   they said profit margin needed and how that compared to big

17   bird profitability.  I want to focus on that for a moment.

18        Here is the buyer saying, what profit margin do you

19   need to stay in this business?  And by the way while you're

20   evaluating that, I am going to tell you what benchmark I think

21   you should use.  It's the big bird benchmark, big bird profits.

22        So here is a summary of where things were.  What was

23   the state of play as we went into these negotiations for 2015

24   pricing?  A historic shortage, that's the way the witnesses

25   described it, increasing demand, a Mother's Day fiasco, panic

1   buying at $1.30 and $1.40 a pound, profit margin needed and how

2   that compares to big bird.

3        There is no evidence, no evidence that any of these

4   factors are the result of any kind of agreement or collusion

5   among suppliers.  It was just the market reality that KFC was

6   facing going into the 2015 negotiations.

7        I should also say at this point there isn't any

8   evidence that Jayson Penn was involved in any of this.  I am

9   presenting this to you now because I am the first one.  So in

10  early August 2014 RSCS asked the suppliers to submit their bids

11  for pricing in 2015.  At Pilgrim's the professionals put

12  together the bid and they sent a draft bid to Mr. Penn.  The

13  draft bid updated the costs just like RSCS had asked them to

14  do.  And some costs went up, some costs went down, but overall

15  it was about a 6 cent increase per pound.  And the proposed

16  margin increase that they had asked for, 10 cents.

17       Mr. Penn, what did he do?  He reviewed the draft.  He

18  looked at the supporting data.  He spoke with those who

19  prepared the bid.  And he conferred with Mr. Lovette.  And

20  Mr. Lovette approved that 10-cent increase in margin.  That was

21  an independent decision based on what was in Pilgrim's best

22  interests, based on the objective data, and that's the bid that

23  they submitted.  You can see there this is a call out from the

24  bid.  The current margin was .1175 cents.  Proposed is .2175.

25  So that's a 10-cent margin increase.  Now, why 10 cents?

1        Remember, Pilgrim's whole strategy was to get small

2    birds closer to big bird profitability.  That had to happen or

3    Pilgrim's is going to get out of the small bird market all

4    together.  The difference in profits between small bird and big

5    bird, 20 cents.  So Pilgrim's split the difference.  They met

6    RSCS halfway.  That is a reasonable position.

7        Second, Pilgrim's had already told RSCS to expect a

8    10-cent margin increase before the bids even began.  Here is

9    how Mr. McGuire described it in the e-mail he sent with his

10   recommendation.  I believe we should do the 10-cent per pound

11   because we have been prepping them for that for the last few

12   meetings.

13       Now, you may recall that Mr. Lewis testified that he

14   was surprised and shocked at the increased price in the bids,

15   but honestly that just doesn't make a lot of sense.  He had

16   just bought chicken at $1.30 and $1.40 a load, and the bid that

17   Pilgrim's submitted, $1.10.  So what this evidence shows is

18   that Pilgrim's was calculating its own bid using its own

19   numbers based on its own view of what it needed to charge.

20       Did Pilgrim's look at what other companies were doing?

21   Absolutely.  It's not just legal; it's smart business.  So

22   where did this all end up?  Did the suppliers all end up at the

23   same price?  That's certainly what you would expect if there

24   was price-fixing going on or bid-rigging.  So we looked at all

25   the contracts and here is what we found.

1          Here are the final prices for all of the contracts.

2     These are all of the -- you can see these prices are nowhere

3     near the same.  They go from $1.03 to 1.08 and a half.  You

4     have been doing chicken long enough that you know that's a huge

5     difference.  Well, that tells you that there is no price-fixing

6     going on because the prices aren't the same.  And the

7     government's witness, Mr. Lewis, said exactly that.  He

8     testified, he told you if the prices were fixed, he would have

9     expected the contract prices to be closer together.

10          So what else can we look at?  We also looked at

11    whether maybe they didn't succeed in fixing prices.  Maybe the

12    prices just got closer together in 2015 than they did in 2014

13    because then you could say, well, at least they tried.  They

14    just didn't totally succeed.  So we looked at that.  And here

15    you can see the 2014 prices are a very narrow range, less than

16    1 percent.  That's exactly what Mr. Ledford wanted, a narrow

17    range so he doesn't have his franchisees complaining to him

18    about paying different prices.

19          The following year it's 5 and a half cents.  So not

20    only are they different, they got farther apart in 2015 than

21    they were in 2014.

22          The government talked about margins, so maybe they all

23    had the same margin even if they had different prices.  So we

24    looked at that too.  The margins aren't the same.  They are not

25    even close to the same.  And for Pilgrim's that margin increase

4853

1    is only half of the difference between big birds and small

2    birds.  So finally, what about volume, how much chicken they

3    sold?  Because what you would expect is if there is a

4    price-fixing agreement going on, the volume would stay about

5    the same because who in the world is going to enter into a

6    price-fixing agreement where the deal is that the other guy

7    steals all my business away.  That doesn't make any sense.

8         So what happened to Pilgrim's volume?  Pilgrim's ended

9    up with the highest price.  Under the 2014 contract Pilgrim's

10   was to supply 80 loads of eight-piece chicken-on-the-bone per

11   week, 80.  In the 2015 contract, it dropped to 63.  That's a

12   20 percent drop in volume.  That's a loss in revenue every week

13   of $500,000.

14        What does this tell you?  That the suppliers were

15   following different strategies in these negotiations.  This is

16   a hallmark sign of no collusion.  Ask yourself why would

17   Pilgrim's enter into a price-fixing agreement when the result

18   is that they lose $500,000 in revenue a week?  The government

19   has no answer to that.

20        So to recap, the government wants you to believe that

21   there was price-fixing going on when the prices were different.

22   They got more different.  The margins were different.  And

23   people took business away from each other.  There is really

24   nothing common about these bids.  Those are the undisputed

25   facts and they show there was no agreement.

1          So what's the evidence that Mr. Penn was involved in

2     some alleged price-fixing agreement?  The government points to

3     basically three facts relating to this incident.  Some

4     Pilgrim's employees obtained competitor information and shared

5     that with him as part of their recommendation about what to

6     bid.  Second, Mr. Penn had a phone call with Brian Roberts.

7     Third, some unknown person at Mar-Jac called Mr. Penn after the

8     bids had been submitted.  That's it.  That's the sum total of

9     the evidence that they have about Mr. Penn relating to this

10    period.  None of this evidence comes close to establishing that

11    Mr. Penn fixed prices or rigged bids.

12          First, the government makes a lot about this e-mail

13    and this spreadsheet that Mr. McGuire sent him and this

14    checking around, that Roger did some checking around.  And in

15    an e-mail he said Mr. Austin did some checking around and they

16    list some pricing information.  The e-mail doesn't say where

17    Mr. Austin got it, but notice all of the suppliers' proposed

18    increases are expressed in exactly 2-cent ranges.  Why is that?

19    Does that suggest that maybe it came from someone who didn't

20    want Mr. Austin to know exactly what others were bidding?  We

21    don't know.  Honestly, nobody knows where this information came

22    from.

23          The government also points to a spreadsheet, but it's

24    just more information of the same.  It's already contained in

25    the e-mail.  And think about this.  As part of this he says,

4855

1    all right.  Here's the information.  And he gives his

2    recommendation about what he thinks Pilgrim's should do,

3    Mr. McGuire.  So where is the evidence of the agreement?  Why

4    isn't it like this is the deal or here is what we're doing?

5    They had competitor pricing, but they make their own decision.

6    Pilgrim's was simply doing what every good company does, gather

7    as much information as you can from wherever you can get it and

8    use it to make your own decision.

9         Mr. Penn was absolutely entitled to get that

10   information and to rely on it and to act on it under the jury

11   instruction I showed you in making his own decision.  So what

12   did he do?  He talked to Mr. McGuire.  He spoke to Mr. Austin.

13   He spoke to Lovette.  He initially said he was good, but then

14   he wanted to have a conference call.  And all of this shows

15   that if there is no agreement, there would have been no purpose

16   in having any sort of conferring and deliberation if the fix

17   was in.  What this shows is that they were using this

18   information to make their own decision in Pilgrim's best

19   interests.

20        Now, other than this e-mail from Mr. McGuire, the

21   government points to a phone call that Mr. Penn had with Brian

22   Roberts at Tyson.  The government wants you to speculate that

23   this phone call was about the KFC bid.  There would have been

24   nothing wrong if they did have a phone call about the bid, but

25   in fact, this phone call had nothing to do with that bid.

1          First, the government puts three phone calls on this

2    chart, maybe because they want you to think that they talked a

3    lot that day, Mr. Roberts and Mr. Penn.  But what we know is

4    that the first phone call they allege was zero seconds long.

5    The second phone call was 38 seconds long.  And then they

6    finally spoke, so there is one phone call.

7          Here is something else the government didn't tell you.

8    That phone call on August 15, 2014 was the first time Jayson

9    Penn and Brian Roberts had ever spoken on the phone before.

10   They have all the phone records here.  They can look it up all

11   they want.  No evidence they had ever spoken on the phone

12   before.  So what did Mr. Penn and Mr. Roberts talk about?  We

13   have no idea.  But we can be pretty sure it wasn't about KFC.

14   Why?  Let's take another look at that e-mail I showed you

15   before that had the competitor pricing information in it and

16   Mr. McGuire's recommendation about the price.

17         Look at those companies.  What company don't you see

18   there?  Tyson.  That's where Brian Roberts worked.  In fact,

19   there isn't any Tyson anywhere in this recommendation.  So if

20   Mr. Penn had gotten information from Brian Roberts and somehow

21   wanted to use it, it would be surely reflected in the

22   recommendation that was being made for the bid.  So there is

23   literally not a shred of evidence that that phone call with

24   Brian Roberts related to the KFC bid.

25         Now, finally there is this -- the government included

1    it on one of its summary charts and the government mentioned it

2    briefly in closing.  They actually misspoke.  They said that

3    Mr. Penn reached out to Mar-Jac.  It's actually the other way

4    around.  Someone at Mar-Jac, someone at Mar-Jac from the

5    general line called Mr. Penn, someone.  Why do I say someone?

6    Because Mar-Jac has 1300 employees, and they have no idea who

7    among those 1300 employees called Mr. Penn.  They have no idea.

8    This called happened a week after the bids had already been

9    submitted.

10         So what is the government doing here?  They want you

11   to conclude that Mr. Penn was involved in a bid-rigging scheme

12   because the evidence showed some unidentified person among

13   Mar-Jac's 1300 employees called him.  That is quite simply

14   absurd.  So that's it.  Mr. Penn received an e-mail with a

15   recommended price increase.  He agreed with the recommendation.

16   And he had two phone calls with competitors, one of whom we

17   don't even know who it is.

18         Let me pause for a moment and talk about Mr. Bryant.

19   Perhaps one of the most remarkable facts in this whole case is

20   that Mr. Bryant is the only witness the government put up who

21   they said was a conspiracy insider.  As Mr. Penn is concerned,

22   there is only one thing you need to know about Mr. Bryant.  He

23   testified without hesitation unequivocally that Mr. Penn was

24   not involved in any agreement to fix prices or rig bids of any

25   kind.

1            Mr. Bryant testified about some very specific

2    incidents.  First, he testified about a July '14 meeting at

3    Popeye's where Mr. McGuire ostensibly told Mr. Austin to put

4    out the news to the industry that Pilgrim's was increasing its

5    pricing.  So I asked him about that.  I said there is this

6    July 2014 meeting.  You testified about Popeye's.  That's got

7    nothing to do with Jayson Penn, right?

8            That's correct.

9            There is also an incident where he overheard

10   Mr. Austin speaking to other competitors about the price is the

11   price or something.  So I asked him about.

12           And the August 1st, 2014 meeting, Mr. Penn wasn't at

13   that meeting, right?

14           Not that I recall, no.

15           He wasn't invited to the pre-meeting?

16           No.

17           He was not on a conference call in some way, right?

18           Not that I can remember.

19           And he didn't attend the post meeting, did he?

20           Not that I can remember.

21           The third one related to communications in 2017 about

22   some boneless project for US Foods.  You testified earlier

23   about asking Scott Tucker to call Mar-Jac about some price

24   increase related to US Foods.  Do you remember that?

25           He said:  I do.

1          That had nothing to do with Jayson Penn, right?

2          That's correct.

3          And the final one relates to this February 2017 phone

4     call with Roger Austin.  Now, the 2017 I asked him, the 2017

5     negotiations with KFC, you participated in those.

6          That's correct.

7          And Mr. Penn was not involved in those negotiations at

8     all, was he?

9          Not that I can recall, no.

10         He didn't attend that January 27 meeting?

11         No.

12         He did not attend, as far as you know, any internal

13    meetings at Pilgrim's about this?

14         Not that I can recall.

15         That's Mr. Bryant's testimony about Mr. Penn.

16         Now, finally, the government put up this slide.  And

17    what this is, this is Mr. Penn sending a text to Mr. McGuire

18    saying, I called you out in our board meeting today for leading

19    the industry to higher '15 prices in fresh food service and

20    75 million higher year over year pricing.  Now, that is

21    impressive.

22         What the government is suggesting is that when

23    Mr. Penn went to the board of directors of a public company and

24    praised one of his employees, that was part of the price-fixing

25    conspiracy.  Are they now suggesting that the entire board of

1   directors of this public company was conspiring?  That makes no

2   sense.  This is simply a compliment he is paying to a worker

3   for doing good work.  That's it on the 2015 issue.

4        I want to turn to the 2013 KFC pricing.  The

5   government talked about that as well.  What evidence is there

6   to suggest that Mr. Penn was involved in price-fixing relating

7   to this topic?  Now, the government, they put up all kinds of

8   allegations out here.  This is just one of them.  Their charge

9   is like a yard sale of allegations.  There is stuff about

10  credits.  There is about QA, KFC here, Golden Corral over

11  there, you name it, boneless projects at US Foods.  How this

12  all adds up to one eight-year conspiracy is beyond me.  All I

13  can tell you is that the evidence that the government

14  introduced as to Mr. Penn is essentially non-existent.

15       First, the government talked about this 2013 KFC.  I

16  want to talk about that.  They allege that he was somehow

17  involved in this incident to fix prices.  And those allegations

18  make no sense.  These negotiations follow the usual pattern at

19  RSCS.  They -- at this point it was called UFPC, right, rounds

20  of negotiations.  And here is what happened to Pilgrim's.  On

21  the eight-piece pricing Pilgrim's bid went from .9885 to .9778

22  for .9698.  Why?  Because that's what Mr. Ledford, the lead

23  negotiator, wanted.  And frankly, he sort of bullied and

24  bluffed them into doing it.

25       What was Mr. Penn's involvement in this?  He approved

4861

1     the price reductions that Mr. Austin recommended.  Seriously,

2     that's it.  So why does the government think this is part of

3     price fixing?  Because it was part of one of those bid

4     reductions when Mr. Austin was recommending a price increase,

5     he included prices from other suppliers.

6          You can see here on the right there, it may be a

7     little difficult to see, it had the information about what

8     others might be bidding.  Good guys, I suppose that's Pilgrim's

9     in there, four others.  Mr. Penn looking at this certainly had

10    no idea where this information came from, but it doesn't matter

11    where the information came from because it plainly wasn't any

12    part of any bid-rigging or price-fixing agreement.  It's

13    perfectly lawful to obtain this information and use it, and

14    that's what exactly what Mr. Penn did.  And the effect was they

15    reduced the price.

16         One thing else the government focused on, they said,

17    well, when Mr. Penn got this, he responded to Mr. Austin.  He

18    said, hey, do we have Tyson price idea?  Because if you look at

19    the prior slide, Tyson's price isn't on there.  But the

20    government didn't show you the response.  They just moved on

21    and pretended there was no response.  Why did they do that?

22         Here is the response from Mr. Austin.  I can give you

23    an educated guess.  They are currently a quarter cent below

24    George's, so I would guess they are about 96 flat.  Well, we

25    know this information didn't come from Tyson because then it

1    wouldn't have been a guess.  He would have known.  And

2    secondly, now that we've been able to go back and look at this

3    stuff, it wasn't 96 flat.  Tyson was considerably higher.  So

4    Mr. Austin was just wrong.  So that's it.

5           Mr. Penn received this spreadsheet with some

6    competitor pricing information, the point of which was to

7    convince Mr. Penn to lower the price, and that's exactly what

8    he did.  That's not price-fixing.  That's competition.  So we

9    know Mr. Penn wasn't engaged in any price-fixing or bid-rigging

10   about this incident, but beyond this obvious fact, what is so

11   troubling is that the government knows all these facts that I

12   told you.

13          As it relates to Penn, the only thing the government

14   put into evidence was that spreadsheet that they want you to

15   look at.  They don't want you to know that the purpose of the

16   information was to reduce price.  They didn't want you to know

17   that it actually resulted in a lower price.  And they didn't

18   want you to see that when Mr. Penn asked Mr. Austin whether he

19   had an idea about Tyson price, he wasn't telling him to go out

20   and fix prices with Tyson.  He was asking for information and

21   he got an educated guess.

22          Why didn't the government show you any of these

23   documents?  More broadly, this is a price-fixing agreement, a

24   bid-rigging case, right?  That's what the government is

25   alleging.  Why aren't they showing you any contracts and bids?

```
 1    Because they don't want you to see the whole story.  They don't

 2    want you to see the context.  This is just another example of

 3    sound bite tactics.

 4         I want to shift gears and talk about 2017.  The

 5    government introduced a few snippets of evidence trying to show

 6    that Mr. Penn was somehow involved in the 2017 negotiation and

 7    somehow price-fixing involved in this.  According to everyone

 8    who testified, Mr. Penn was not involved.  He didn't attend the

 9    customer meetings.  He didn't attend the pre-meetings.  He

10    didn't attend the post-meetings.  He didn't negotiate the

11    prices with the customers.  He didn't have responsibility for

12    the pricing decisions.

13         Instead, the government introduced two texts that

14    relates to Mr. Penn.  The first is from an employee named Tim

15    Stiller to Mr. Penn.  Here is what it says.  Want a 2-minute

16    KFC update?  There is no response.  This is Friday evening.

17    There is no phone call response from Mr. Penn.  There is no

18    e-mail response.  There is no nothing indicating -- no phone

19    call, no text, nothing.

20         Instead, what happens 40 minutes later after having

21    not spoken to Mr. Penn, Mr. Stiller sends something to

22    Mr. Austin, saying, hey, I need you to tell the industry to

23    hold.  That had nothing to do with Mr. Penn.  There is zero

24    evidence that any of this had to do with Mr. Penn.  And the

25    government knows this, but they still chose to put that in
```

4864

1    because they think somehow it might mean something.

2          The only other evidence they have of Penn's

3    involvement in the 2017 negotiations is one more text where he

4    says three days later, come to BL office.  Let's discuss KFC.

5    Okay.  So this means that Mr. Stiller and Mr. Lovette and

6    Mr. Penn discussed KFC on February 21st.  The three of them

7    work at Pilgrim's and KFC is a customer.  There is nothing

8    remotely nefarious about that.  If the government had any

9    actual evidence of price-fixing by Mr. Penn related to these

10   negotiations, they would have shown it to you.  They didn't

11   because it doesn't exist.

12         I want to talk about Golden Corral.  The government

13   somehow suggested that Mr. Penn was involved in price-fixing

14   related to Golden Corral, but there is just no evidence of

15   that.  In fact, there really isn't any evidence of price-fixing

16   related to Golden Corral at all.  The only reason the

17   government brought this up is because they want to show you a

18   couple of cheap sound bites.

19         The first is this text exchange between him and

20   Mr. Stiller.  And the text exchange which you have now seen

21   several times is, you know, who's negotiating with Golden

22   Corral?  And he says, Scott and Roger.  Those are people at

23   Pilgrim's.

24         Okay, thanks.

25         We know Mar-Jac, the biggest supplier, is 2 cents

1    higher than us and they are not going to negotiate.  Good deal.

2    Last time they did cave a cent or two.  They are following my

3    direction.

4         So Mr. Penn says, who is they?  Because that's

5    Mar-Jac.  That's very different than any other communication we

6    have seen here in this case at all.

7         If they is illegal, don't tell me.

8         Maybe there is a problem here.  But look, the

9    government stopped -- when they presented this evidence to you,

10   they stopped it right there.  They didn't show you anything

11   else.  Here is what Mr. Stiller said, was referring to Roger

12   listening, Roger Austin, the man who works for him.

13        Sorry, thought you were referring to Roger caving.

14   Got you on Mar-Jac, et cetera, et cetera.  He says, well, the

15   buyer said we were 7 cents high, so that must be Tyson.  They

16   are morons.  And there is more discussion.  So there is nothing

17   here remotely nefarious or illegal.  It was just a

18   miscommunication that was cleared up within 30 seconds.  And

19   the government didn't show you that.

20        The second text is equally meaningless, but the

21   government wanted to show it to you because they want to show

22   you that Mr. Penn called one of the customers an A-hole.  Let

23   me remind you the background of this story.  Remember the year

24   before the buyer for Golden Corral, Telly Smith, he insisted on

25   getting flat pricing for wings.  Remember the story Mr. Smith

4866

1   testified here?  And why did he want the flat pricing?  Because

2   McDonald's, they were going to come out with the mighty wing.

3   So they were quietly going around buying up all these wings and

4   freezing them in anticipation of this great launch.

5         In fact, he told Pilgrim's that he would not do the

6   deal unless he got flat pricing.  It was his word, quote, deal

7   breaker.  So Pilgrim's gave him what he wanted, flat pricing

8   for wings $2 and a half a cent per pound, 6 million pounds.  So

9   then do you remember what happened?  The mighty wing bombed.

10  Nobody liked it.  Maybe some of you remember it.  Apparently,

11  it didn't do very well.  And so what happened?  McDonald's

12  wasn't going to be buying a lot of wings and they had all these

13  frozen wings they had to unload on the market, so the prices

14  dropped.

15        Mr. Smith, who had just had a deal breaker wanting to

16  get a flat pricing, less than six months later came to

17  Pilgrim's and said, hey, I want to renegotiate this deal.  I

18  want a different deal.  People at Pilgrim's were shocked.  A

19  deal is a deal.  But Mr. Smith didn't care.  He just refused to

20  honor the contract.  He backed out, went to other suppliers and

21  bought wings from them at a lower price.

22        If you can imagine, that poisoned the well between

23  Pilgrim's and Golden Corral.  Golden Corral became a customer

24  you couldn't trust.  Now, Mr. Smith, when he was on the stand

25  and I was cross-examining him, he tried to say, well, yeah, we

1   got past it.  We sort of patched it up.  We got past it.  Not

2   exactly.  Because after 2015, Pilgrim's never sold to Golden

3   Corral again and to this day they haven't sold to Golden

4   Corral.

5        So during these later negotiations, then, in 2014,

6   Mr. Penn had an e-mail exchange or a text exchange with Fabio

7   Sandri, chief financial officer, and Bill Lovette.  And

8   frankly, this exchange was juvenile.  I am just going to say

9   it.  Here it is in all its glory.  Mr. Sandri takes a photo of

10  food at Golden Corral and says, One in the plate and three in

11  the trash.  Take that losers.  And Penn says, I am a marketing

12  guy at heart.  I raised OK corral 15 cents per pound.

13        And then Mr. Lovette had a long thing about how he is

14  going to call his psychiatrist on the emergency number, et

15  cetera, et cetera.  And then Penn says, keep calm and market

16  on.  Note OK Corral's key customer status.  Telly Smith and his

17  crew will pay market price plus the special A-hole premium.

18        Fine.  But you can see -- you won't be able to see

19  because you will have to go back and look at the evidence, at

20  the very bottom there is this chart, at the very bottom there,

21  there is a list of customers, whether they are key customers,

22  not key customers, at the very bottom Golden Corral, no trust.

23  This has nothing to do with price-fixing.  Why did the

24  government show you this?  Why did they introduce it into

25  evidence?  All they really could do was succeed in embarrassing

1    Mr. Penn in a public trial.

2         So I have addressed now all of the bids that the

3    government alleges are somehow price fixed with respect to

4    Mr. Penn.  There are a couple of stray e-mails that the

5    government has introduced in evidence and claims somehow, you

6    know, involve price-fixing.  These are just these free-floating

7    e-mails the government introduced without any witness, but I

8    want to address them now.

9         The first one I want to address is Brenda Ray's

10   e-mail.  She was one of the last witnesses who testified.  And

11   she wrote this e-mail back in 2012 in which she was

12   congratulating her team for, as she put it, stirring it up.

13        The government, of course, wants to focus on

14   Mr. Penn's not exactly legal conversation.  This is one of

15   those sound bites the government jumped all over because it

16   sounds like there was something sketchy going on.  Because as

17   usual, the government focused on a sound bite and didn't want

18   you to know what was actually happening.  So what happened?  We

19   brought Brenda Ray in here and she told you.  Brenda Ray told

20   you that she got a call out of the blue from Greg Nelson at

21   George's telling her that it was all over the market that

22   Pilgrim's had taken up contract pricing.

23        She told you exactly what that conversation was about.

24   Remember, it had to do with halal meat in the northeast market.

25   She also told you that Jayson Penn had nothing to do with

4869

1    taking up that contract pricing and that she already had the

2    contract pricing in place before she got the call from

3    Mr. Nelson.  She was absolutely clear.  It had nothing to do

4    with bid-rigging, nothing to do with price-fixing, no

5    agreements with competitors whatsoever.  She had just gotten,

6    as she put it, market intelligence and passed it on to her team

7    and copied Mr. Penn.

8         And maybe Mr. Koenig on cross-examination tried to get

9    her to admit, oh, hey, you took up prices together, huh?

10   Ms. Ray said no, no, no, I took up my contract pricing.  When I

11   was done, I didn't know what George's did.  The government

12   says, well, you should assess her credibility.  You saw her on

13   the witness stand.  She had nothing to gain, nothing to lose.

14   She came in and told you exactly what she did.  I want you to

15   assess her credibility because she was an unbelievably credible

16   person.

17        The government in its closing called her a

18   co-conspirator, Co-conspirator Brenda Ray.  Well, what's that

19   based on, that testimony?  Come on.  So now Mr. Penn forwarded

20   the e-mail to someone else at Pilgrim's and characterized it as

21   not exactly a legal conversation.  But as we now know because

22   we have seen Brenda Ray, he was just wrong.  He knew nothing

23   about this.  This had nothing to do with him and he just read

24   it and he was wrong.

25        So the worst part about all this, the government knew

1    all of this.  They know this.  They interviewed Brenda Ray.

2    They showed her this document and they didn't like what she had

3    to say.  And they were perfectly content to just show you that

4    e-mail and try to pretend it's about price-fixing.  That's

5    shameful.  It's shameful.

6          The next e-mail the government showed you was a stray

7    e-mail the government talked about Pilgrim's was getting its

8    act together and was thanked by some other competitors.  The

9    government wants you to believe it has something to do with

10   price-fixing, but it just doesn't.  Here is what Mr. Penn said.

11   He said 2013, this is now a year later because the e-mail is in

12   August 2014, I had a few owners of small bird companies thank

13   us via me for getting our act together.  I guess it will happen

14   again.  Good work.  Forward.  Okay.  But what was this e-mail

15   chain about?  It wasn't even about -- it certainly wasn't about

16   price-fixing.  It wasn't even about this price.

17         Mr. Penn had gone to meet with a customer called H-E-B

18   to try to convince them to increase the bird weight that

19   they're buying.  Why?  Because that's good for everyone.  It's

20   good for Pilgrim's because they make more money selling bigger

21   birds and they thought it would be good for H-E-B in the

22   business they were conducting.  And it would be better for

23   other suppliers because they could sell bigger birds to H-E-B

24   also.

25         This is the attachment to that e-mail.  What it shows

4871

1    is the proposal to shift the curve to the right, in other

2    words, to shift that whole curve to the right and start selling

3    bigger birds to H-E-B.  So this whole incident doesn't have to

4    do with price-fixing.  It doesn't even have to do with a price.

5    So when Mr. Penn told someone else at Pilgrim's that this was

6    in the context of trying to -- they've gotten their act

7    together, this is just a competitor recognizing what Pilgrim's

8    had done.

9         Remember, Pilgrim's had been in bankruptcy, had just

10   come out, and they were a mess.  They were a public company.

11   They report their results.  And so if a competitor looks at

12   those publicly available results and thanks or congratulates

13   Mr. Penn on having started to turn around Pilgrim's, that's not

14   price-fixing.  Again, we had to show you this because the

15   government didn't.  It's the theme in this case.

16        Finally, the government didn't talk about this in

17   closing, but they have rebuttal closing, and I don't want to

18   miss the opportunity to mention it.  They introduced in

19   evidence an e-mail from Mr. Penn to Mr. Lovette saying,

20   Apparently your boy was not listening to your illegal spiel on

21   forward pricing at the NCC.  Tyson submitted eight-piece

22   pricing to Albertson's and Super Valu for upcoming bid on grain

23   pricing.  Our price today is 96, Tyson in the mid 70 on corn.

24   The government again just introduced this document into

25   evidence, no context whatsoever, no witness to explain what it

1     is.

2              So what is the evidence about this?  What is it that

3     Mr. Lovette said at this NCC?  It's called the National Chicken

4     Council.  It's a large national trade organization.  We have no

5     idea what entity conference was that Mr. Lovette was speaking

6     at.  Why?  Because the government didn't bother to investigate.

7     They didn't bother to find out what this was about or whether

8     Mr. Penn was just ribbing his boss because Tyson's price is so

9     much lower than Pilgrim's.

10             You shouldn't have to speculate about what this is

11     about because the government has the FBI.  It's called the

12     Federal Bureau of Investigation.  They can investigate what

13     happened.  How hard would it have been to send Mr. Taylor here,

14     Special Agent Taylor, to Washington DC and go ask the National

15     Chicken Council, hey, did Mr. Lovette make a speech in

16     July 2013?  Can you just give me a copy of that?  They couldn't

17     be bothered.  They just introduced this into evidence.  Well,

18     if they can't be bothered, you shouldn't be bothered either.

19     More prosecution by sound bite.

20             Now I want to talk to you about Tyson shorts.  This is

21     without a doubt the strangest part of this case because the

22     government is trying to take something and turn it into

23     literally the opposite of what it is.  Here is what happened.

24     In 2014, Tyson took away a lot of business from Pilgrim's.  In

25     particular, they took away Wal-Mart.  You have probably heard

1    of Wal-Mart.  They buy a lot of chicken.  That was a big loss

2    to Pilgrim's, but that's how competition works, right?

3          The problem was Tyson had agreed to sell more chicken

4    than they could produce.  So what did Tyson do?  They took care

5    of their new big customer, Wal-Mart.  You probably don't want

6    to make Wal-Mart mad.  And then they went to Pilgrim's and Say,

7    Hey, could you guys cover our shorts for these other customers?

8    And Mr. Penn said, No, I'm not going to do that.  Here is what

9    Mr. Penn said.  We don't have to guess about what he said

10   because he wrote it down.

11         Thoughts on deli strategy to King Soopers?  We are

12   covering Tyson shorts.  Continue and let King Soopers know we

13   are helping or start to have Tyson feel the pain across their

14   system so they can start making decisions commensurate with a

15   profitable venture and not a philanthropic organization.  In

16   other words, you can sell all the chicken you want, but don't

17   expect me to bail you out if you can't do it.  What was

18   Mr. Lovette's response?  No question in my mind.  Tyson should

19   have to live with the decision they made.  We made ours and are

20   dealing with it.  Why should it be different for them?  We

21   should not help them one micron.

22         So what happened?  They didn't bail out King Soopers.

23   They didn't bail out Tyson.  They didn't cover for them and

24   sell to King Soopers.  And guess what, King Soopers took all of

25   its business and gave it to Pilgrim's.  That's exactly what

1    happened.  That's what Mr. Bryant told you.  Pilgrim's swooped

2    in and took that business.  That is the epitome of competition,

3    not price-fixing.

4         And this wasn't the only time that Pilgrim's used this

5    strategy.  They used it enough that it became known as the Otis

6    strategy, Otis, the town drunk on the Andy Griffith show.  Time

7    and again Pilgrim's used this and it was used for the express

8    purpose of taking business away from the competitors.  And it

9    was successful and they use it to this day.

10        Here is Mr. Penn again.  For Thanksgiving should we

11   give Otis a bottle of Crown, a/k/a loads of chicken, or take

12   him to AA, a/k/a make him face the shortage music?  We are

13   straight up taking Otis to AA.  No juice for Otis.  Otis must

14   face the music for his misguided actions.  Selling cheap in a

15   short market - no bail out for you.

16        The government's theory is that -- honestly, I am not

17   what the theory is, that somehow this is payback for some

18   prior -- I don't know what it is, but they put it in here.

19   They have one of those summary charts that has all this in

20   there.  I urge you to read it.

21             THE COURT:  Five minutes, Mr. Tubach.

22             MR. TUBACH:  Thank you, Your Honor.

23        But their own theory is contradicted by their own

24   witness, Mr. Bryant.  He testified the Otis strategy was

25   hard-nosed competition.  And he expressly said it was not

4875

1    limited to Tyson.  They used this wherever they could.  Now, if

2    you sense a little extra aggression there between Mr. Lovette

3    and others, you were right.

4         Here is Mr. Lovette talking about Tyson:  I hate that

5    company and everything about it.

6         Here is Mr. Penn:  I hate Tyson, but I hate Sanderson

7    more.

8         It's another large chicken supplier.

9         Here is Mr. Penn.  He is sending an e-mail to

10   Mr. Lovette.  He says:  Best week we have had as a company.  We

11   have much, much more to get.  Personal mission is to send

12   Sanderson into a tailspin.  He says, No need to mess with Tyson

13   because they have taken their own poison pill.  Foot on the

14   throat.  Both of these boys will be going down.

15        This is in the middle of when the government says

16   Mr. Penn was conspiring with these companies.  The government

17   also talked about chicken nirvana.  They mentioned it again.

18   They said it in opening and they said it again.  Now you know

19   2014 was chicken nirvana for the suppliers.  Absolutely, it

20   was.  There is nothing wrong with recognizing that.  And the

21   reason that whole e-mail is making fun of Tyson for not doing

22   well even when the market is so good.

23        The government bears the burden to prove Mr. Penn

24   guilty beyond a reasonable doubt.  If you have a doubt for

25   which you can give a reason, there is reasonable doubt, and you

1    must find Mr. Penn not guilty.  From what you have heard in

2    this case, there are many reasons to doubt.  The government's

3    whole case is made up of inferences, sound bites showing you

4    little bits but not the whole thing.  This is what the

5    government did time and time again.  They should not be

6    cherry-picking and not giving you the whole evidence.

7            They are the Department of Justice.  They are supposed

8    to be serving justice here.  That's not what the government is

9    doing.  They are not seeking justice.  They are just seeking

10   convictions.  Remember, the government brought this case

11   without having interviewed a single person at Pilgrim's Pride.

12   And they brought this case without having a single witness that

13   said Mr. Penn did anything wrong.  In these six weeks you

14   haven't heard testimony from a single witness who said he did

15   anything wrong.

16           It's honestly anyone's worst nightmare.  There you are

17   working at your job trying to do the best you can.  And the

18   government swoops in with no warning and destroys your life in

19   a day.  A not guilty verdict will not give Mr. Penn back the

20   reputation that he worked 30 years to earn, but it will at

21   least show that this system in our country works because a

22   prosecutor in this country can't just label someone a criminal.

23   They have to prove it in court with evidence to a jury.  Give

24   Mr. Penn his life back.  Return the only verdict that the facts

25   support, not guilty.

1          Thank you very much.

2          THE COURT:  Thank you, Mr. Tubach.

3          Mr. Lavine?

4                    **OPENING STATEMENT**

5          MR. LAVINE:  Your Honor, defense counsel, government

6     counsel, members of the jury.  In Mr. Brady's opening statement

7     six weeks ago, I told you there was only one question for you

8     to decide, and that question is the same today as it was at the

9     very beginning of this case.  Did the government prove beyond a

10    reasonable doubt that Mr. Brady conspired with anyone to fix

11    prices and rig bids.  The answer is no.

12         The question isn't whether prices were shared with

13    competitors because they were or whether competitors talked to

14    one another because they did.

15         Would you put up Demonstrative No. 1, please.

16         Judge Brimmer informed you in Instruction No. 18 about

17    the exchange of pricing information and this is what he said.

18    Mere exchanges of information, even regarding prices, are not

19    necessarily illegal, in the absence of additional evidence that

20    an agreement to engage in unlawful conduct resulted from, or

21    was a part of, the information exchange.  It is not unlawful

22    for competitors to meet and exchange information necessary to

23    preparation of a bid or discuss common aims or objectives or

24    exchange information on independently derived prices.

25         Would you put up Demonstrative No. 2, please.

1          He also instructs you in the same instruction that

2     there may be legitimate reasons that would lead competitors to

3     exchange price information other than fixing prices or rigging

4     bids.  It is not illegal for a competitor to obtain, rely upon,

5     and act on the pricing and other information received from

6     competitors, so long as there is no agreement to fix prices or

7     rig bids.  And that is why the question for you isn't whether

8     prices were shared with competitors or whether competitors

9     talked because in the absence of an agreement to fix prices or

10    rig bids, neither is illegal.

11         You have now heard all the evidence and it should be

12    clear the government has not proven beyond a reasonable doubt

13    that Mr. Brady entered into an agreement with anyone to fix

14    prices and rig bids for broiler chicken products.  The

15    government simply has not met its burden.

16         You heard their case.  While they have a right to

17    present their case in any way that they see fit, they only told

18    you half the story.  You will see the government was very

19    selective in who they called, what questions they asked, how

20    this admitted documents without witnesses, and finally the

21    creation of summary charts which were manufactured by

22    government counsel by cherry-picking e-mails, text messages and

23    the selective placement of telephone calls to support their

24    narrative.  And any fact that did not support that narrative

25    was excluded.

1          Now, the government counsel just spent a lot of time

2     talking about these exhibits.  I anticipate they are going to

3     do it again later.  But I want to remind you as Judge Brimmer

4     instructed you when you first saw them and just instructed you

5     again in Instruction No. 26, you may give a summary exhibit

6     enough weight, some weight or no weight at all depending on

7     your assessment of the underlying material and the accuracy of

8     the summary.  We suggest giving them no weight.

9          So let's now start to talk about the evidence.

10    Mr. Brady has been at Claxton since August of 2012.  He is a

11    salesman responsible for certain of Claxton's national

12    accounts, including Chick-fil-A, Popeye's and KFC.  Mr. Brady

13    sells chicken for Claxton.  You heard Mr. Ledford, Mr. Lewis,

14    Ms. Fisher talk about negotiating contracts with Mr. Brady.

15    And as Mr. Ledford and Mr. Lewis testified, Mr. Brady

16    negotiates and signs contracts on behalf of Claxton, but he

17    does not have the pricing authority.

18         You also heard Ms. Warble from George's discuss buying

19    and selling chicken from Claxton and her interactions with

20    Mr. Brady during that process.  Mr. Brady spends a lot of time

21    on the phone to do his job, time spent talking to his customers

22    and suppliers.  You have seen some of the government's summary

23    charts with these phone records.  All of Mr. Brady's phone

24    records are in evidence.

25         And even as Mr. Ledford and Mr. Skalak testified,

1    suppliers must communicate to improve product specification,

2    share best practices, cover product shortages, to purchase

3    ingredients, discuss quality decisions, product consistency and

4    customer specifications and to manage other various logistical

5    issues.  Mr. Brady does this all day long.

6          Now, the government produced over 15 million documents

7    in this case.  They admitted approximately 320 documents into

8    evidence not including the phone records.  Of those 320

9    documents, Mr. Brady was on 28 of them as either sending or

10   receiving an e-mail, a text message, or a signatory to a

11   contract.  Now, the government is trying to attribute to

12   Mr. Brady documents that he neither authored or received.  And

13   they put you in an exhibit and just this morning told you that

14   that was evidence of Mr. Brady's participation in the

15   conspiracy.  That simply is wrong.

16         Now, of the 28 that he actually had something to do

17   with, 16 were customer communications.  That leaves nine

18   documents as evidence of Mr. Brady's participation in the

19   conspiracy, nine documents over an eight-year period.  And we

20   are going to discuss all nine documents with you today.

21         Now, you have seen in this trial Mr. Brady sells to

22   KFC, Chick-fil-A and Popeye's.  Mr. Brady has nothing to do

23   with four of the seven customers you have heard about during

24   this trial.  He does not negotiate with or sell chicken to

25   Golden Corral, Church's, Sysco or Pollo Tropical.  And of the

4881

1    nine fact witnesses the government presented, Mr. Brady was not

2    involved and did not interact with almost half of them,

3    including Mr. Brink, Mr. Olson, Ms. Hoyt and Mr. Smith.  So

4    members of the jury, tell me where the mountain of evidence is

5    because that's what the government said this morning.

6           The government's story starts with the 2012

7    negotiations for the 2013 KFC contract.  When you review the

8    facts, there are two things that are clear beyond any

9    reasonable doubt.  There was no agreement to raise any prices.

10   And Mr. Brady, as he always did, followed the directional

11   guidance of Mr. Ledford and lowered Claxton's prices during the

12   negotiations.  RSCS awarded Claxton additional volume most of

13   the time.

14          Now, you heard a lot during the trial about the market

15   conditions in 2014.  I want to spend a couple minutes to talk

16   with you about the market conditions in 2012.  The market

17   conditions, as you have heard, always have an impact.

18   Sometimes they help the customer.  Sometimes they help the

19   supplier, but they always matter.  So let's look at the market

20   conditions for wings in 2012.

21          You recall hearing from Mr. Ledford.  He testified

22   that the market for wings at this time was going through the

23   roof.  In 2012 the wing market had record highs in the last

24   half of the year and suppliers were receiving significantly

25   less than the market as a result of their contracts with RSCS.

1    The suppliers could make about 80 cents more per pound for

2    their wings on the open market.

3           So with that understanding, now let's turn to the

4    actual negotiations for the 2013 KFC contract and let's just

5    cut to the chase on this.  We are discussing this negotiation

6    because of a text message between Mr. Brady and Mr. Fries which

7    the government alleges is evidence of price-fixing.  However,

8    nothing could be further from the truth.

9           In order to understand the negotiations and this text

10   message, we need to look at the bid submissions.  All of the

11   bid submissions and contracts have been admitted into evidence

12   and you can review every single one of them.  We had to admit

13   them in the evidence during the cross-examination of

14   Mr. Ledford.  And as Judge Brimmer instructed you in

15   Instruction No. 18, you can consider evidence of bids and

16   prices actually submitted in deciding whether there was an

17   agreement to fix prices and rig bids.

18          The government believes that phone calls and text

19   messages as they take them together in their summary charts is

20   sufficient evidence of an agreement because they don't believe

21   the underlying facts of what happened during the negotiation

22   mattered.  As a result, they ignored the facts.  They excluded

23   the facts.  But reason and common sense will tell you you

24   cannot ignore the facts.  So the defense had to show you all

25   the facts and now I want to begin reviewing them with you.

1          Remember, Mr. Brady had joined Claxton, and this is

2     his first negotiation with Mr. Ledford for fresh chicken.  Now

3     let's look at this text message.  This is the first document of

4     nine.

5          If you would display Exhibit 1427, please.

6          Now, you have seen this before in the government's

7     manufactured summary charts.  The text message is discussing

8     two different pricing formulas.  The top half deals with the

9     current formula for dark meat pricing.  The second part of the

10    text message addresses the formula for wings.  And please

11    understand, I am saying formula.  I am not saying price.  And

12    there is a reason I am saying this.  So let's start with the

13    top half of this.

14         Mr. Brady tells Mr. Fries the dark meat formula for

15    George's, Pilgrim's and Tyson's.  Mr. Ledford testified that to

16    know the actual price of dark meat, one must know the

17    eight-piece price.  Knowing the dark meat formula is similar to

18    knowing that an item is on sale for 20 percent off, but if you

19    don't know what the original price is, you have no idea what

20    the sale price is once you apply the 20 percent.  Here,

21    Mr. Brady only has the dark meat formulas.  He has no

22    information that would enable Claxton to determine the actual

23    dark meat price of its competitors.  And the government does

24    not care.

25         Second, as you can see for yourself from the bid

1    submissions for 2013 and the contracts already in place in

2    2012, all of which we put into evidence during the

3    cross-examination of Mr. Lewis and Mr. Ledford, these formulas

4    that you are looking at in the top portion of this text is not

5    the 2013 bid submissions.  They were, in fact, current dark

6    meat formulas for 2012 based off of 2012 eight-piece current

7    pricing already negotiated to and agreed upon by the customers

8    and suppliers months earlier.  This is not future pricing.

9         Let's not forget that Mr. Ledford testified that he

10   was not concerned about the possibility of suppliers knowing

11   each other's current period pricing because in his opinion it

12   would have no meaningful impact on the competitiveness of the

13   bid process to obtain a future contract, nothing more than

14   market intelligence.

15        And as Judge Brimmer instructed you in Instruction No.

16   18, in the absence of an agreement, it is not unlawful for

17   competitors to exchange pricing information.  It is perfectly

18   okay.

19        Continuing to read the text message, Mr. Brady tells

20   Mr. Fries additional information about more current pricing,

21   this month for Pilgrim's.  He then tells Mr. Fries that

22   Mr. Austin said raise our prices on wings.  He is market and

23   market plus 10.

24        Mr. Fries responds, tell him we're trying.

25        And Mr. Brady says, will do.

4885

1          But are they really trying?  There is no call between

2    Mr. Brady and Mr. Austin after this text exchange to indicate

3    any response or follow-up from Mr. Brady or Mr. Austin.

4          If you put up 2013, the demonstrative, please.

5          If you look at the demonstrative, Claxton's wings come

6    down during each round of the negotiations.  Now, in reference

7    to the formula for wings precount, Mr. Ledford told you when he

8    testified that the charging of 10 cents more precount is

9    industry standard.

10          Now, if we look at the second round bid on

11   November 14, 2012 for wings, which is the day after the text

12   message exchange, it is based off the Urner-Barry market.

13   Mr. Brady did request for his wings formula when he e-mailed

14   Mr. Ledford to be at market and market plus 10 for the

15   precount.  And yes, members of the jury, that is the same as

16   Pilgrim's formula, but the actual price calculated on that

17   formula, if you will look, is a decrease from Mr. Brady's first

18   round submission, not an increase as you can see.

19          And Mr. Ledford testified that the actual wing prices

20   submitted by Claxton and Pilgrim's on this submission were

21   different.  The prices of the other products stayed the same.

22   There is no increase.  Even though you have that text message,

23   there is no increase here at all.  And that submission, as I

24   said, is after the text exchange with Mr. Fries.

25          Now, Mr. Ledford told you that the market and market

4886

1    plus 10 is a fair way to begin negotiations.  He didn't have a

2    problem with it.  Mr. Ledford testified that on December 3rd,

3    2012 at 4:53 p.m., Mr. Brady submitted a third round bid

4    changing only the case weight.  Now, I am specific as far as

5    timing because I think it's very important to see the reaction

6    of Mr. Brady to Mr. Ledford.

7         Four hours later Mr. Ledford sends Mr. Brady an

8    e-mail.  He told Mr. Brady, if these are Claxton's final

9    numbers, Claxton will likely lose volume.  Obviously, he

10   exercised his leverage.  Within one hour of that e-mail from

11   Mr. Ledford, one hour, members of the jury, Mr. Brady submitted

12   a revised third round bid.  And what happened?  While the

13   eight-piece price stayed the same, the wing prices came down

14   and Claxton changed its dark meat formula to 30 and a half

15   which reduced its dark meat price.  While the eight-piece

16   didn't change, Mr. Ledford testified that the fact that the

17   eight-piece price remained the same during all of the

18   submissions would have been the result of feedback that he gave

19   to Mr. Brady and Mr. Fries.

20        Claxton never increased its prices during the

21   negotiations for the 2013 KFC contract.  And it makes no

22   difference what's on that text message because there are the

23   facts.  The numbers always go down.  There has never been an

24   increase in that year.  And Mr. Ledford said that the .005

25   increase at the end on the COB was his own sourcing fee and

1    that's why that increase was there.

2          But the government wants you to rely on a text message

3    between Mr. Fries and Mr. Brady to find that they entered into

4    some agreement to raise prices with Pilgrim's.  There was no

5    increase there, ladies and gentlemen.  The government argues

6    that the text message shows an agreement that likely ignores

7    the facts of reality of what actually happened.  Use your

8    reason and your common sense.  The price never went up during

9    the negotiations, not once.

10         Mr. Brady on behalf of Claxton followed the

11   directional guidance of Mr. Ledford and reduced the price.

12   Claxton did not hold firm as the government tried to insinuate

13   this morning.  There is no evidence of any agreement to raise

14   prices or fix a bid.  The market conditions dictated the

15   pricing.  And the government did not provide you the entire

16   story because the actual facts don't fit their narrative.  It

17   doesn't fit their story.  Members of the jury, this is

18   unacceptable, and Mr. Brady deserves better from our

19   government.

20         You can take down the demonstrative, please.

21         Now, as you heard from Mr. Ledford, RSCS thought these

22   negotiations were a huge success.  The government would have

23   you believe the success of the negotiations does not matter

24   because it doesn't fit their narrative, but it's a fact that

25   you should consider in your determinations.  And once again,

1    the defense is presenting you the facts while the government

2    only showed you half the story.

3         A key point as stated by Mr. Ledford.  He wanted the

4    flat price on wings because the wing market in 2011 and 2012

5    was extremely unstable and unpredictable, and the flat price

6    provided stability and stable pricing for RSCS and the

7    franchisees.  And members of the jury, he got it.  RSCS's

8    success in negotiation is because of competition in the

9    marketplace.  And yet the government wants you to believe that

10   they have proven beyond a reasonable doubt that Mr. Brady

11   entered into an agreement to fix or raise prices because of

12   five off-the-cuff words from Mr. Brady in exchange with his

13   boss seven years ago.  One document down, eight to go.

14        So let's move into 2013 where we are going to discuss

15   the reduced weight request and the negotiations for the 2014

16   KFC contract, both of which were handled by Mr. Ledford.  Now,

17   the reduced weight request brings us to our second document,

18   the next text message that the government wants you to draw an

19   inference from reading an alleged agreement.  At least this

20   text message actually has the word "agreement" in it.  I

21   congratulate the government on that.

22        The government showed you this text message on

23   Government Exhibit 16-1.  I want to show you our version for

24   demonstrative purposes.

25        If you could pull up our demonstrative, please.

1          The difference between the two is that our version

2   includes all of the relevant facts for your consideration.

3   What you see on the screen is the government's version of 16-1,

4   one of their summary charts.  Now, Mr. Ledford testified about

5   his request to the suppliers for a reduced weight bird.  That

6   is he asked what would it take for your company to supply KFC

7   with a 2-pound, 4-ounce eight-piece bird at current volumes?

8   Remember, he said this was a laughable request, a big ask, a

9   research project, and importantly not a request for a contract.

10  In fact, what he was asking he knew could not be done.  As

11  Mr. Ledford testified, it was a cost savings initiative.

12         Now let's look at what really happened.  The

13  government didn't include the fact that Mr. Ledford had made

14  similar requests of just Mr. Austin almost a week ago.  And

15  Mr. Austin a week ago earlier told him he didn't have any of

16  those size birds.  The request was impossible.  Nevertheless,

17  Mr. Ledford at the insistence of consultants made the request

18  of all the suppliers again.  As you can see in our version of

19  the chart, Mr. Brady at 1:06 p.m. on March the 8th responded to

20  Mr. Ledford and told him Claxton did not have any of those size

21  birds, but Mr. Ledford should call him if he had any questions.

22         After sending this response to Mr. Ledford, Mr. Austin

23  and Mr. Brady spoke.  Now, probably only once, only for the

24  first call -- sorry, probably only once as the first call from

25  Mr. Austin and Brady was a minute and we know that Verizon

1    rounds up.  And after speaking with Mr. Austin, Mr. Brady

2    texted Mr. Fries and said, to Roger about the KFC sizes and he

3    is in agreement with us.

4          But they want you to take that text message and say

5    that that proves beyond a reasonable doubt of entering into an

6    agreement to fix or rig a price.  As is predictable, the

7    government doesn't care about the facts, just the term

8    "agreement" was used and therefore wants you to assume that

9    there must have been an agreement to fix prices or rig bids.

10          However, when you look at the facts and the evidence,

11   a different picture evolves.  Look at the evidence.  Mr. Austin

12   and Mr. Brady had both independently responded to Mr. Ledford

13   before even speaking with one another about the request.  There

14   was no pending request.  Any so-called agreement that Mr. Brady

15   might be referring to is, one, not about price, and two, is a

16   reference to the fact that they both had already independently

17   assessed the request and told Mr. Ledford that neither Claxton

18   nor Pilgrim's had any birds available of that size.

19          And Mr. Austin agreed with the assessment that Claxton

20   had already made and reported to Mr. Ledford, that is, there

21   were no small birds.  There is no agreement here to rig a bid

22   because there is no bid nor to fix or to maintain a price

23   because there is no price.  And quite simply, there is just no

24   agreement.

25          The government has the burden of proof to prove beyond

1    a reasonable doubt that Mr. Brady entered into an agreement to

2    rig bids and raise prices.  For this they have utterly failed.

3    And this is no inference the government can ask you to draw

4    from these documents that will allow them to meet their burden.

5    And the simple reason why is because Mr. Brady never entered

6    into any such agreement.  No such agreement ever existed.  Two

7    down, seven to go.

8         So now let's look at the other event in 2013, the

9    negotiations for the 2014 KFC contract.  This brings us to the

10   third text message between Mr. Fries and Mr. Brady, Document 3

11   of 9.  As you may recall, during Mr. Ledford's direct

12   examination, the government did not ask Mr. Ledford a single

13   question about this contract negotiation.  No surprise there.

14   However, we wanted you to know all the facts and have the

15   opportunity to review all the relevant documents, so we asked

16   Mr. Ledford to explain his negotiations during the

17   cross-examination.

18        So what is this text message all about?

19        If you would put up Government Exhibit 1734, please.

20        In the text message which was also contained in a

21   manufactured summary chart, Mr. Brady tells Mr. Fries that we

22   were 32 back on dark meat last year and this year we're at 30

23   and a half back.  Mr. Brady also said that, Roger is at .30

24   back and not moving.  And Mr. Fries said, K.  Can do .31 if you

25   want.  And then Mr. Fries texts, stay at .305.  Just like 2012,

1    we are again talking about a formula for dark meat, not the

2    actual price.

3         Mr. Ledford testified and we discussed -- Mr. Ledford

4    testified and we discussed already to know the actual price of

5    dark meat, one must know the eight-piece price.  All this text

6    message shows is Mr. Brady learned of Pilgrim's dark meat

7    formula that is .30 back and Mr. Fries considered that formula

8    in his independent decision as to what Claxton's dark meat

9    formula will be.  There is no agreement here whatsoever.

10        Members of the jury, use your reason and common sense.

11   The government can argue all day long that Mr. Brady talked

12   with suppliers, but we already told you that and we told you he

13   did.  And that was not the question for you to answer.  The

14   government can also argue that suppliers share pricing

15   information.  Again, we told you that's not the question

16   either.  And why are these not the questions?  Because talking

17   to suppliers and sharing pricing information is not illegal as

18   long as there is no agreement.

19        Three down, six to go.

20        We've talked a lot about KFC so far.  We have now

21   entered 2014 and let's take a stop at Chick-fil-A.  Mr. Skalak,

22   you heard the government refer to him this morning, testified

23   about CFA's conversion to NAE chicken or no antibiotics ever.

24   The government contends that Mr. Fries, Mr. Brady and

25   Mr. Mulrenin conspired to raise prices for the conversion to

4893

1    NAE chicken.  But what was this evidence all about?  Where is

2    the evidence?  A witness with limited knowledge, a terrible

3    recollection of events and another manufactured summary chart.

4         If you pull up Government Exhibit 3-1, please.

5         This is another summary chart of the government.  You

6    have your press release issue about what Chick-fil-A did on

7    February 11 announcing the conversion.  Two months later there

8    is a call between Mr. Mulrenin and Mr. Brady.  And this is one

9    of the few instances where we actually know what was discussed

10   on the phone because Mr. Brady sends Mr. Fries a text message

11   and tells him that he talked with Mr. Mulrenin and what it was

12   about.

13        The text message is Document 4 out of 9.  Based on

14   this text message, the government wants you to infer that there

15   was an agreement to raise prices for Chick-fil-A on NAE between

16   Mr. Mulrenin, Mr. Fries and Mr. Brady even though Mr. Mulrenin

17   had not given Mr. Brady Tyson's finished price.  The text

18   message was about ABF conversion and not NAE costs.  And there

19   are no communications about pricing information or other

20   testimony about what was actually going on.  What is missing

21   from this chart?  All of the pricing.

22        Remember, Mr. Skalak told you that you cannot

23   determine the price of chicken just knowing the NAE cost.  And

24   where are the bid submissions?  Where are the contracts?  Where

25   is any communication between suppliers and Chick-fil-A?  So

1    where does that leave us?  With a text message that does not

2    contain a price for chicken, no information about the suppliers

3    provided to Chick-fil-A about their cost, and a witness who was

4    brought in to testify who the government knew could not answer

5    any of the questions as to any cost estimates, contract prices

6    or any interactions with suppliers.

7          He didn't even know what Chick-fil-A may have told

8    Claxton or Mr. Brady or Mr. Fries or what Mr. Fries or

9    Mr. Brady may have discussed with Chick-fil-A.  And this is

10   supposed to prove to you beyond a reasonable doubt that

11   Mr. Brady and Mr. Fries and Mr. Mulrenin conspired to raise

12   prices of NAE chicken for Chick-fil-A?  Use your common sense

13   and reason.  This does not add up, members of the jury.  It

14   just doesn't add up.

15         That brings us to Document No. 4.  Back to KFC.  Here

16   is where the government said the conspiracy went into

17   overdrive, the 2014 negotiations for the 2015 KFC contract.

18   You have heard a lot about these negotiations and my colleague,

19   Mr. Tubach, addressed the 2014 negotiations for 2015, and I am

20   sure others will also.  And there is no question that the

21   market conditions drove the pricing during that time period.

22   But let me tell you what is important for Mr. Brady with

23   respect to the 2014 negotiations.

24         Let's start with Mr. Bryant, the government's alleged

25   insider.  First and most importantly, Mr. Bryant offered no

1    testimony implicating Mr. Brady in the charged conspiracy.

2    Mr. Bryant specifically testified that he did not enter into an

3    agreement with Mr. Brady to rig bids and fix prices and he

4    never spoke to Mr. Brady about pricing or volume.  In fact,

5    Mr. Bryant admitted that he had no knowledge that Mr. Brady or

6    anyone at Claxton, whether it be Mr. Brady or Mr. Fries, was

7    actually involved in the conspiracy.

8          Further, Mr. Bryant acknowledged that he had no

9    knowledge of Claxton's intentions regarding pricing, that he

10   never spoke to anyone at Claxton about pricing negotiations,

11   and that he knew nothing about Claxton's internal process of

12   setting its prices.

13         Mr. Bryant's specific testimony about Mr. Brady with

14   whom he had not spoken since at least 2012 was extremely,

15   extremely limited.  Mr. Bryant testified about overhearing a

16   phone call during supposedly the KFC bid in 2014, but his

17   recollection of the phone call was void of details.  Judge

18   Brimmer instructed you in Instruction No. 10 to consider the

19   testimony of Mr. Bryant with greater care and caution than the

20   testimony of an ordinary witness, and I think after listening

21   to him that instruction is very appropriate.

22         Specifically, Mr. Bryant admitted the only thing he

23   recalled overhearing from his conversation eight years ago is

24   Mr. Austin saying something to the effect, The price is the

25   price.  I just need to know how many loads they want at the

1    price.  He did not hear anything Mr. Brady said on the call,

2    that he was not even present for the entire conversation.  He

3    was walking in and out of the room during the call.  He was not

4    on the call.  He didn't talk to Mr. Brady.  He also

5    acknowledged that Mr. Austin did not ask Mr. Brady on that call

6    to agree with Mr. Austin on anything and no discussion about

7    future prices occurred.

8            Next, the government's summary charts related to these

9    negotiations contain numerous phone calls between Mr. Brady and

10   other suppliers.  They put them up there this morning.  Just as

11   with all of the phone calls cherry-picked by the government,

12   there is no evidence of what was said on these phone calls.

13   Who is he talking to, Brian Roberts, Carl Pepper, Tim Mulrenin,

14   who you have heard have no input in the pricing decisions of

15   Tyson, and Jimmie Little who doesn't even negotiate with KFC on

16   behalf of Pilgrim's?

17           He also talked to Roger Austin.  And the government

18   wants you to infer that Mr. Brady provided Claxton's pricing

19   information to Mr. Austin.  Let's look at Government Exhibit

20   10-1, Page 3, please.  Government counsel referred to this

21   e-mail that is referenced here in which -- I think it's

22   Exhibit 1744 as very important and "a window into the

23   operations of the conspiracy."

24           Well, let's look at the numbers on this chart.  At the

25   top of the chart Claxton's current margin was not .0675.  And

1    we know numbers are carried out to the fourth decimal point and

2    they are very specific.  The contract is in evidence at

3    Exhibit 1728.  The margin was actually .0673.  Let's look at

4    the ranges that Claxton was allegedly going in with.

5             This e-mail was dated August 18th.  We know from the

6    testimony of Mr. Lewis that Claxton submitted its first round

7    bid on August 19th, the very next day.  And what was the total

8    increase it went in with?  It wasn't 14 cents.  It wasn't 16

9    cents.  It was almost 19 cents.  The bids and the current

10   contracts are both in evidence and confirm this fact.  The

11   information Pilgrim's had about Claxton was just plain wrong.

12   How they got it, where they got it, no idea, but it was not

13   correct.

14            Let's look at Government Exhibit 10-2, please.  We

15   have here Document 5 of 9, a text message involving Mr. Brady

16   and Mr. Fries where they are discussing the meetings that

17   Mr. Lewis testified that he had with the suppliers at the

18   submission of the first round bids.  They are not exchanging

19   pricing information and there is no agreement.  In fact, it is

20   clear that Mr. Fries was surprised that Pilgrim's did not seem

21   to be responding to the directional guidance of the customer.

22   And Tinch is at 11 refers to a meeting time and not a price.

23            Government counsel said that this is an example of

24   coordination of holding price, but where is the coordination?

25   I don't see it.  Do you?  This is clearly nothing more than

1    market intelligence.

2            Let's look at Government Exhibit 10-3, please.

3    Finally, Government's Exhibit 10-3 shows more calls between

4    Mr. Brady and the customer, Mr. Brady and Mr. Fries and

5    Mr. Brady and other suppliers.  This also references 5 of 9

6    documents involving Mr. Brady which is a continuation of the

7    exhibit from 10-2.  He confirms with Mr. Fries that he agreed

8    to reduce the price 2 cents for the 2015 KFC contract, which

9    appears to be contrary to what Pilgrim's and Koch are doing,

10   and Mr. Brady clearly doesn't know what George's is doing.  The

11   government told you that this text was an example of the

12   suppliers holding firm, yet did not tell you that Claxton had

13   agreed to reduce their price.  This was not coordination.  This

14   is nothing more than market intelligence.

15           And we know that Mr. Brady and Claxton ended up coming

16   down an additional 2 cents even though it's not in the chart

17   for a total reduction from its initial bid of 4 cents.  And not

18   only do they come down 4 cents, but Claxton is granted

19   additional volume.

20           But that's not the end of the story.  Because even

21   though Claxton had a three-year contract with RSCS containing,

22   as the government calls them, historic price increases, the

23   very next year in 2015, Claxton, following the directional

24   guidance of RSCS, dropped its price another 3 cents for the

25   last two years of the contract.

1          If you can bring up Exhibit 754, please, and go to

2   Page 2.

3          So Claxton renegotiated its contract, not for higher

4   prices, but Claxton decreased its price to the contract price

5   and ended up dropping a total of 7 cents from the initial price

6   it offered RSCS in 2014.  What is it that's in the government's

7   charts?  It's not in the government's charts because Claxton

8   did not hold firm.  They did not hold firm during the 2014

9   negotiations.  They did not hold firm when they renegotiated

10  the 2015 contract the very next year.  It's not in the

11  government's charts because it doesn't fit their narrative and

12  that's the only reason it's not there.  Five documents down,

13  four to go.

14         So now we come to 2017, almost two and a half years

15  after the government's last evidence of Mr. Brady's alleged

16  involvement in the conspiracy.  Coming off of what the

17  government likes to call the historic prices of 2015, there was

18  a shift in the landscape leading to more favorable market

19  conditions for the buyers and reduction in prices.  The market

20  conditions had changed and leverage has once again shifted.

21         You heard from Ms. Fisher who participated in the

22  negotiations in 2017 on behalf of RSCS.  Ms. Fisher told you

23  these negotiations began -- on behalf of RSCS.  Ms. Fisher told

24  you these negotiations began earlier than typical negotiations

25  that started in the summer or fall.  After initial meetings in

4900

1    January with the suppliers, which had never occurred before in

2    any negotiations with RSCS, RSCS asked for cost proposals,

3    because as Ms. Fisher testified, there were no offers or prices

4    exchanged at the January meetings.

5          So whatever the blow-by-blow Mr. Austin was

6    referencing in his e-mail that he was to receive from Mr. Brady

7    arguably was the result of the strange timing of these meetings

8    which did not involve the exchange of pricing information,

9    obviously just market intelligence.

10         Let's look at government's chart 18-3.  There is not a

11   single text message or e-mail involving Mr. Brady in 2017 with

12   any information about competitors, not that that would have

13   been illegal.  There just weren't any.  You can see on the

14   first part of this chart that Tim Stiller from Pilgrim's and

15   Mr. Austin did exchange some texts in early February regarding

16   meetings with KFC.  In exchange, Mr. Stiller expressed

17   frustration that KFC was asking Pilgrim's to agree to $49 a

18   case and a 7-cent reduction.

19         So now with the backdrop represented to you by the

20   government, let's look at what actually happened after this

21   exchange.  Less than two weeks later Claxton submitted revised

22   pricing on March the 2nd.  You can see that on Exhibits F-915

23   and 916.  Not only did Claxton offer RSCS the $49 case price

24   that they wanted, it also reduced its initial price by 6 cents.

25   Now, if you look at the contract and you want to see how you

1    come up with 49, you take the eight-piece price of .9334 and

2    you multiply it by the case weight of 52.5.  This is exactly

3    what Pilgrim's was not willing to do.

4         But by May RSCS responded by offering a stair-step

5    decrease asking Claxton to decrease its price every year over

6    three years.  And what did Claxton do?  What it always does, it

7    agreed.  And starting in the middle of last year of its already

8    negotiated year contract, Claxton came down 10 cents over three

9    years.  Now, there is no evidence that Claxton ever resisted

10   decreasing its price during these negotiations, and in fact, it

11   is just the opposite.  But the government doesn't think it's

12   important for you to know.  They never asked Ms. Fisher

13   anything about the pricing actually submitted by the suppliers

14   during the negotiation period or the contract, and they never

15   asked about Claxton's request for additional volume.

16        THE COURT:  Five minutes, Mr. Lavine.

17        MR. LAVINE:  Thank you.

18        There are four documents left.  The first is

19   Government Exhibit 982, a text exchange between Mr. Fries and

20   Mr. Brady, talking about a grain model for CFA.  What is this

21   all about?  Well, the government introduced absolutely no

22   evidence about this other than the text message, so that's a

23   good question.  There is no pricing, no contract, no bid

24   submission, nothing.  And Mr. Skalak testified that Claxton was

25   on a different model for CFA, and comparing pricing across

1    models was an apples-to-oranges comparison.  Consider lack of

2    evidence, members of the jury, for the lack of proof.

3          Three documents left.  Government Exhibit 1700, when

4    Mr. Brady tells Mr. Fries he will make some calls after Claxton

5    received feedback on a bid in 2013 from KFC.  The government

6    has shown you calls Mr. Brady made to competitors, but did not

7    show you any calls Mr. Brady made or would have had with

8    customers.  They just want you to assume his calls with other

9    suppliers were about the bid, but there is no evidence that

10   Mr. Brady had any pricing information whatsoever.  Consider the

11   lack of evidence a lack of proof.

12         And now the last two documents, Government

13   Exhibit 6047 and 6282.  They contain nothing but period

14   pricing.  And remember what Mr. Ledford said about period

15   pricing?  It had no impact on negotiations.  And if you look at

16   the date on these e-mails, neither was the negotiations for

17   anything.  When the government lacks proof, they beg you to

18   speculate.  And that, ladies and gentlemen, is 9 of 9

19   documents.

20         So where does that leave us?  Quite simply, the

21   government has failed to produce evidence sufficient to prove

22   that Mr. Brady knowingly and intentionally entered into an

23   agreement with anyone with the objective of rigging bids and

24   fixing prices.  As Judge Brimmer instructed you in Instruction

25   No. 17, Mr. Brady and Mr. Fries cannot conspire amongst

1    themselves only.  Notably despite an investigation by the

2    government over the course of two years, multiple interviews of

3    every witness who testified in this case and the review of over

4    15 million documents, not a single piece of direct evidence

5    exists to show that Mr. Brady knowingly and intentionally

6    entered into an agreement to rig bids or fix prices.

7         The government tries to overcome this problem by

8    attempting to characterize every routine business interaction

9    among competitors and their customers as in furtherance of the

10   conspiracy and by attempting to draw inferences from text

11   messages and phone conferences where none are warranted.  When

12   the government is unable to produce evidence demonstrating

13   beyond a reasonable doubt that Mr. Brady did anything other

14   than on less than a handful of occasions over eight years

15   received pricing information from competitors and participated

16   in phone calls with his competitors that lacked context and

17   content, the government has failed to meet its proof.

18        I will leave you where I started with one question,

19   and that question is the same today as it was at the very

20   beginning of this case.  Did the government prove beyond a

21   reasonable doubt that Mr. Brady conspired with anyone to fix

22   prices and rig bids?  And the answer unequivocally is no.

23        There is only one verdict that can be returned in this

24   case against Mr. Brady, and that is the finding of not guilty.

25   Members of the jury, we ask that you find Scott Brady not

1    guilty.

2            Thank you.

3            THE COURT:  Thank you, Mr. Lavine.

4            Ladies and gentlemen, we will go ahead and take our

5    mid-afternoon break.  We will go for 15 minutes.  Why don't we

6    plan on reconvening 20 minutes until 4:00.  Keep the

7    admonitions in mind.  The jury is excused for the mid-afternoon

8    break.

9            (Jury excused.)

10           One thing I noticed is that Mr. Tubach was trying to

11   see the monitor.  It's a little bit tough from the podium.  I

12   am not sure, Mr. Kornfeld or Mr. Feldberg, whether you may also

13   intend on looking at it.  But we've got IT, I think, ready.

14   And I think they will try to put a monitor on Ms. Coppock's

15   table there.  Ms. Coppock does not know that, but that might

16   assist you just to know what's being displayed to the jury.

17           MR. FELDBERG:  Very much appreciated, Your Honor.

18           THE COURT:  We will be in recess.  Thank you.

19       (Recess at 3:25 p.m.)

20       (Reconvened at 3:41 p.m.)

21           THE COURT:  All right.  Let's go ahead and bring the

22   jury back in.

23           (Jury present.)

24           THE COURT:  All right.  And I think that Mr. Fries is

25   going to go next; is that right?  Mr. Kornfeld, go ahead.

1          MR. KORNFELD:  Thank you?  May I proceed, Your Honor.

2          THE COURT:  Yes.

3                        **CLOSING ARGUMENT**

4          MR. KORNFELD:  Crystal clear.  The government in their

5     opening statement said that the evidence of the agreement in

6     this case, that Mr. Fries' participation in it would be crystal

7     clear to you.  They talked about a pattern that would be

8     crystal clear.  Clear as day were Mr. Koenig's words.  The only

9     pattern, ladies and gentlemen, after six weeks of trial that is

10    crystal clear is the pattern of failure on the part of the

11    government, failure to adequately investigate this case,

12    failure to understand the chicken industry, failure to

13    understand Claxton's role within the broader chicken supply

14    chain, failure to deliver on the promises they made to you in

15    their opening statement.

16         The only thing that's crystal clear is that it took

17    the government almost two hours this morning to attempt to

18    explain its case to you.  If they didn't do that in the last

19    six weeks, then they have failed to prove this case to you

20    beyond a reasonable doubt.

21         The government brought this case against Mr. Fries, my

22    client, and these other nine defendants, but they brought it

23    against each of them individually as Judge Brimmer has

24    instructed you and they charged all of them, including

25    Mr. Fries, as an individual.  So when you are considering the

4906

1    evidence, you have to look to whether the government proved its

2    case beyond a reasonable doubt as to Mr. Fries the individual,

3    not Claxton Poultry, not the other defendants, not the other

4    people you've heard about, him and him alone in terms of your

5    individual consideration of the evidence as to him.

6         And the evidence, members of the jury, and the lack of

7    evidence clearly establishes that Mr. Fries is not guilty.  His

8    actions demonstrate that he didn't participate in an illegal

9    price-fixing conspiracy.  He didn't order others to participate

10   in an illegal price-fixing conspiracy, and he wasn't aware of

11   an illegal price-fixing conspiracy.

12        But the government long ago decided on a narrative, on

13   a theory, on a conclusion.  And then it took out its scissors

14   and it sliced and diced 15 or 16 million documents, 99,000

15   pages of phone records, to come up with bits and pieces,

16   snapshots, a text here, an e-mail there, a phone record there

17   to support its narrative.  They called 30 witnesses up to that

18   stand.  Remember the parade, the seemingly endless parade of

19   the records custodians.  Out of 30 witnesses, only nine knew

20   anything about anything having to do with this case.

21        The government didn't call -- and this is important --

22   not a single witness walked up to that stand, took an oath to

23   tell the truth, looked you in the eye and told you that Mikell

24   Fries committed an illegal act, not a single one.  The

25   prosecution nevertheless, the Department of Justice decided

1    that this man and these other nine men were guilty, but in the

2    case of Mr. Fries, they made that decision, and you heard this,

3    they didn't interview a single witness from Claxton Poultry,

4    not a single employee, not a single executive to determine some

5    things that might be relevant to this case and are relevant to

6    this case, like how Claxton prices its chicken, how it deals

7    with its customers, and how is a small regional producer with

8    less than 1 percent of the overall chicken market in this

9    country, how it interacts within the greater chicken supply

10   chain.

11        And what did Mr. Fries' own customers or Claxton's own

12   customers that got up on that stand, what did they tell you

13   about Mr. Fries and Claxton?  Mr. Olson of KFC, remember him,

14   the first witness, the guy who actually knows the colonel or

15   knew the colonel?  He said, I really don't know Mikell Fries.

16   I really don't know anything.  He certainly had nothing bad to

17   say about him.

18        Mr. Lewis of RSCS said Mr. Fries was always willing to

19   negotiate, never threatened to take his business elsewhere.

20   Mr. Ledford also of RSCS, the person who undoubtedly knows the

21   most about the chicken industry and has been in it the longest

22   of anybody you heard from, what did he tell you?  Mikell Fries

23   responds to my directional guidance every single time.  And

24   remember, he was asked, well, we are assuming your directional

25   guidance is to always lower prices, never to increase prices,

4908

1    right?  Of course.

2        Mr. Brink of Pollo Tropical said Claxton gave them

3    stair-step pricing in order to ease in the price increases.

4    And he admitted to you the obvious, which is the stair-step

5    pricing benefited Pollo Tropical financially and hurt Claxton

6    financially.

7        And Mr. Skalak of Chick-fil-A, frankly, he didn't know

8    a lot, but he provided no testimony implicating Mr. Fries or

9    indicating that Tyson or Claxton altered their prices in any

10    way to take advantage of Chick-fil-A's decision to go no

11    antibiotics ever, to go antibiotic-free.

12        But despite the testimony of these witnesses, the

13    Department of Justice wants you to look at those summaries and

14    basically shrug your shoulders and say, well, it's good enough.

15    It's good enough to sustain a federal felony conviction.  It's

16    not good enough.  It's not good enough for you; and, more

17    importantly, it's not good enough for Mr. Fries.  He deserves

18    better.  You deserve better.  But today and in the next few

19    days when you deliberate, you stand between the government's

20    baseless theory and justice for Mr. Fries.

21        There was no conspiracy.  There was no agreement.

22    Mikell Fries is innocent.  He didn't lie.  He didn't cheat.  He

23    didn't steal, not from KFC, not from Chick-fil-A, and not from

24    anybody else.  Over the course of the last six weeks, what the

25    evidence has clearly established is exactly what we told you it

4909

1    would in our opening statement.  First, we said not a single

2    witness would implicate Mr. Fries from the witness stand.

3    That's clear as day.

4         Not a single witness said they had personal knowledge

5    of Mr. Fries entering into an agreement to fix prices.  Even

6    the so-called insider, Mr. Bryant, told you he had no knowledge

7    of Mr. Fries participating in a conspiracy, ordering others, or

8    even that Mr. Fries knew about an illegal conspiracy.  In fact,

9    he testified he had no knowledge of anybody at Claxton doing

10   anything illegal.

11        Second, Claxton lowered its price at the direction of

12   its customers without exception every time they asked, every

13   single time.  That is clear as day.  Lowering prices at the

14   risk of stating the obvious is the polar opposite of secretly

15   raising your prices and it's also inconsistent with the

16   government's theory of holding firm.  Down is down.  Up is up.

17        Third, we told you Claxton's pricing was the result of

18   independent decision making in the best interest of Claxton,

19   and not a single witness on that stand or a single piece of

20   paper out of 15 or 16 million says otherwise.  And finally, we

21   told you that Mr. Fries' actions would speak loud and clear

22   throughout this trial, much louder and much clearer than the

23   cherry-picked text, phone records, e-mails.

24        After six weeks of testimony, the government stands

25   before you this morning and asks you to find Mr. Fries guilty

1    of participating in an overarching, wide-ranging eight-year

2    conspiracy with nine other individuals, many of whom he didn't

3    know and never talked to, involving a handful of customers,

4    many of which Claxton doesn't even sell to.  They ask you to

5    base the conviction on the snapshots here and there without --

6    and this is important too -- without considering all that you

7    have learned about how the chicken industry actually works.

8         Day after day they paraded paper after paper after

9    paper before you.  They threw it up on your screen without a

10   witness, without a witness that could explain it to you, that

11   could testify about it, that could give it context or that

12   could be questioned by the defense.  And instead of relying on

13   witnesses with actual knowledge of Mr. Fries, what did they do?

14   They asked you to stare at your screen, look at the paper and

15   brand Mr. Fries a felon for the rest of his life.

16        Time after time the government focused on questions

17   that have nothing to do with this case.  The government's

18   favorite question, they asked the customers, well, did you want

19   people talking?  Did you expect that they were talking?

20   Suppliers I should be specific about.  Some said, I didn't want

21   that.  Some said, It doesn't surprise me.  That was their

22   favorite question.

23        But nowhere, nowhere in the jury instructions, which I

24   thought I had up here -- I do, and more importantly, you are

25   going have them with you.  If you flip through these jury

1    instructions, nowhere will you find the phrase "customer wants,

2    customer desires, customer needs, customer preferences."  Why?

3    That has nothing to do with the questions that you need to

4    determine, the legal question.  It is utterly irrelevant what

5    the customers wanted, what they liked, what they didn't like,

6    what they cared about, what they didn't care about.  It doesn't

7    matter.  Search for customer desires, you are not going to find

8    those words.

9            And the Court instructed you as you have seen in

10   Mr. Tubach and Mr. Lavine's presentation, No. 18.  You are

11   going to hear a lot about it because it's important.  It's not

12   illegal to receive, rely upon and act on pricing information

13   from competitors.  So that doesn't matter.  It's a red herring.

14   They failed to address that customers frequently shared costs.

15   The government failed to address that the suppliers learned

16   costs all the time through covers and shorts.  The government

17   this morning tries to kind of give short shrift to covers and

18   shorts.  Two problems with that.  No. 1, it explains a lot of

19   communication; and No. 2, it undermines their theory.  It

20   happened all the time.

21           Sometimes, as you heard from Mr. Tubach, companies

22   said no.  And other times, as you heard from different

23   witnesses, they said yes.  But the point is if the government

24   bothered to learn about the chicken industry, it's an everyday

25   affair.  And there is this thing, and Ms. Call talked about it

1        this morning, well, there was an expectation of the customer

2        that the bid should be sealed.  Well, we told you in our

3        opening statement, this isn't sealed bids.  That's not what

4        this industry is about.  This isn't the construction industry

5        where one person wins and everybody else loses.

6               The only person that you heard about a sealed bid from

7        was Mr. Bryant, the guy who got up here and was singing for his

8        supper, who by the way works for a supplier, not a customer.

9        So regardless, the expectations of the customer is not the law

10       and it's not relevant.  And even if the customers considered

11       the bids to be confidential, that is not an element of the

12       charged crime in this packet and therefore it is irrelevant.

13              These questions about facts are not just relevant to

14       the case -- that aren't relevant to the case, excuse me.  They

15       are a ploy to distract you from what is relevant and from the

16       legal questions you need to answer.  And what is crystal clear,

17       and we told you this in our opening too, what is crystal clear

18       about the evidence is there was much more to the story than the

19       government would present to you, much more to Mikell Fries'

20       story.

21              So let's talk about the allegations against Mr. Fries

22       in particular because the government has thrown a bunch of

23       allegations against the wall, many of which have zero to do

24       with Claxton or Mr. Fries.  You heard about Boston Market.  You

25       heard about Church's.  You heard about Sysco.  You heard about

1    US Food.  You heard about the Cheesecake Factory.  You heard

2    about King Soopers.  You heard about Golden Corral.  That's all

3    subterfuge as it affects Mr. Fries because it doesn't affect

4    Mr. Fries.  It had nothing to do with Mr. Fries.  There is no

5    evidence that Claxton ever sold to any of these companies.

6          While the government makes a big deal about Mr. Fries'

7    position as the president and the fact that Mr. Brady reports

8    up the chain to Mr. Fries because Mr. Fries is the president of

9    Claxton, the evidence has established that Mr. Fries didn't

10   become the president until 2016, after all the allegations

11   involving him occurred.

12         So as to Mr. Fries there are five different

13   allegations involving two customers, KFC and Chick-fil-A.  So

14   let's talk -- and they are up on the screen.  Let's talk about

15   them.  The government's opening and presentation started in

16   2015 with the historical increases, but in order to understand

17   Mr. Fries' story, you have got to start at the beginning which

18   for him is the fall of 2012 with his negotiations for 2013.

19         Let's talk about the first allegation, the KFC

20   contract eight-piece, dark meat and wings.  This allegation

21   involves three different products.  Those are three completely

22   different things; eight-piece, which is the whole chicken,

23   wings and dark meat.  But the government tried to keep you

24   focused only on wing prices for this contract.  And the

25   government chose not to put in front of you all the rounds of

1    bidding or Claxton's final contract.

2          And most importantly, here is what they didn't want

3    you to know and they didn't put in front of you, Claxton's

4    price went down.  It's not great evidence if you are alleging a

5    price-fixing conspiracy to raise prices.  The government asked

6    witnesses questions consistent with their alleged pattern.  Did

7    you want them -- ask them to submit identical prices?  Did you

8    want them to discuss pricing?

9          But did the government show you that the prices were

10   identical?  No, they did not, because they couldn't because

11   they weren't.  Because -- and this is critically important to

12   us, and it should be critically important to you -- the reason

13   is Claxton reduced its wing price significantly in this bidding

14   process from the first round to the final contract.  And the

15   so-called identical price they asked you to focus on, that is

16   market price, market plus 10.

17         And Mr. Ledford explained this to you way better than

18   I ever will be able to, but here's the points that Mr. Ledford

19   made on this.  No. 1, he told you market is a fair and

20   reasonable place to start.  Makes sense.  No. 2, he told you

21   that the cost-plus model that he uses tells the supplier to put

22   in their price submissions.  And No. 3 -- this is the direction

23   or what you have in front of you is the directions to put in

24   your price submissions.  And No. 3, and this is the most

25   important thing, is the exact instructions on the model sent by

1    the customer tell the supplier to put in the market wing price,

2    market price.

3            Has it been any surprise that Claxton and Pilgrim's

4    did what they were told and put in the market price?  Is it a

5    surprise that market price was the same?  No.  It's the market

6    price.  You can look it up.  And you'll see when we highlight

7    this, and I think we can highlight it, you see please enter

8    Urner-Barry first quarter wing meat block price using your wing

9    cost model to calculate first quarter wing price.  They did

10   what they were told.  And, of course, the market price is the

11   market price because they looked it up on Urner-Barry.

12           Did the government show you evidence, then, that there

13   then was an agreement to raise prices or have they just

14   established some knowledge that Pilgrim's and Claxton may have

15   known each other's prices?  They didn't show you any agreement

16   because there is no agreement.  Instead, they pull out the

17   "tell him we're trying" text message.  It's on Summary Exhibit

18   14-2, and Mr. Lavine went over it in great detail.

19           But I want to just highlight a couple things, and I

20   know you have read this exhibit and you have got it before you.

21   The string of text messages, as I said, is kind of one of the

22   government's crown jewels in this case.  Tell him we're trying.

23   But they provided no explanation to you.  It's just fly by, you

24   know, pick a sentence out of 16 million documents and call it

25   good.  They ask you to look at the sharing of prices.  They

1    love the buzz words, Tell him we're trying.  And they want you

2    to find the aha moment.  But at no point in their closing did

3    they actually talk to you about the bids surrounding this text.

4         Members of the jury, you have sat through six weeks of

5    trial.  You can break this message down better than I can and

6    better than the government did, and the government had it for

7    several years.

8         So let's start with the exchange of the dark meat

9    formula.  Mr. Ledford told you -- and you've heard this

10   already, but it's important -- told you that you don't know the

11   actual price if you don't know the eight-piece price.  Knowing

12   one supplier is .30 back is not telling me what my competitor

13   is charging.  I only know it's .30 back of whatever the

14   eight-piece price is.  He told you there is no way to know the

15   actual dark meat price without knowing the eight-piece price.

16   And in a business that has, you know, tight -- relatively tight

17   numbers, numbers make a difference.  It's not all the same.

18        What else do we know about the dark meat formula?  We

19   know Pilgrim's and George's are .30 back, but that's current

20   dark meat formula.  And while in the course of that bid,

21   George's and Pilgrim's did end up at .30 back, Claxton lowered

22   its price to .3050, half a cent lower.  This information with

23   Church's, what Pilgrim's was doing was a data point that

24   Mr. Fries used to reduce his price, not to raise it, not to

25   match it, not to hold firm, completely inconsistent with the

1    government's theory.

2         Let's go to the next part of the allegedly nefarious

3    text, a text message that refers to this month.  This month, as

4    you've heard, is not future pricing.  It's current period

5    pricing.  You heard witnesses tell you that it's suggested on a

6    monthly basis for a variety of reasons, cost-related reasons,

7    this month, not next year, this month.  It's right there.

8         And finally, the part in there that said, He said to

9    raise our prices.  Tell him we're trying.  In a vacuum, maybe

10   not a bad piece of evidence if you are in the antitrust

11   prosecution business.  When you draw the lines back and you

12   actually look at all the evidence, what do you find out?  You

13   find out the very next day Claxton Poultry reduces its prices

14   on wings from its first submission.

15        What happens on the December 3rd submission?  Claxton

16   reduces its prices on wings and dark meat.  And what happens by

17   doing that?  They undercut Pilgrim's.  They undercut their

18   competitor.  That is not price-fixing.  That is pro-competitive

19   behavior.

20        Now, it took me a couple minutes to go through this

21   with you to discover that this exchange was nothing more than

22   market intelligence later used to formulate an independent bid.

23   The government didn't spend a couple minutes with you putting

24   this into context.  They didn't spend any time putting in the

25   broader exhibits.  They just focused on "Tell him we're

1    trying," and they ask you to convict Mikell Fries.

2         What else did the testimony establish about Claxton

3    and the 2012 negotiations for the 2013 contract?  Mr. Ledford

4    told you that Pilgrim's Pride had 40 percent of the QSR market

5    in this country; Tyson's 21 percent; Claxton, less than

6    1 percent.  The government's narrative completely fails to

7    consider the very obvious question.  Why would a company with

8    40 percent market share or one with 21 percent market share for

9    that matter conspire with a regional producer with less than

10   1 percent?

11        Mr. Ledford told you, well, I needed Claxton and I

12   used Claxton as leverage against the big boys.  That is crystal

13   clear.  What is not crystal clear is why these companies would

14   be -- why anyone would be conspiring with a 1 percent market

15   share producer.

16        Mr. Ledford told you the suppliers had to talk all the

17   time to cover for each other.  That is crystal clear from the

18   evidence.  Mr. Ledford told you he would -- he would threaten

19   to take away volume and he would indeed take away volume from a

20   supplier that didn't follow his directional guidance.  Now,

21   Claxton always did.  That is crystal clear from the evidence.

22        And what do we see at the end of these negotiations?

23   At the end of these negotiations, what's crystal clear is

24   prices coming down, not remaining stagnant, not coinciding with

25   the competitors, certainly not going up.  Ms. Call told you

1    this morning that truth is often the simplest explanation.  The

2    numbers don't lie.  That is crystal clear.

3            And Mr. Ledford told you he was pretty happy with the

4    negotiations, saved himself $5-1/2 million in 2012 going into

5    2013 at a time, as you saw from Mr. Tubach, 25 percent of small

6    bird factories had gone bankrupt or out of business.  There was

7    a reduction in the supply of small birds.  There were negative

8    margins for the chicken suppliers.  And what does he do, what

9    does Mr. Ledford do as a result of Claxton going down?  He

10   awards the top three lowest price suppliers with additional

11   volume including Claxton, and he reduced the volume from some

12   of the highest priced suppliers, Pilgrim's, Tyson, Mar-Jac.

13   That is crystal clear.

14           And more importantly, that is not collusion.  That is

15   competition.  This is a tough business and that is competition.

16   No one is colluding with each other, as Mr. Tubach suggested,

17   no one is colluding with each other in order to compete over

18   volume.  You are competing or I guess you are colluding, but

19   you are not doing both.  And here the facts don't lie and

20   neither did Mr. Ledford's actions.

21           And maybe this would have been crystal clear to the

22   government if it bothered to interview Mike Ledford prior to

23   October 2020, five months after they indicted Mr. Fries, but

24   maybe that's giving the Department of Justice too much credit.

25   Because after talking to him twice, interviewing him twice and

4920

1    hearing this and listening to him on the stand under oath, they

2    persist in their fundamental misunderstanding of this

3    allegation against Mr. Fries.

4            So let's go to the next allegation, the KFC reduced

5    weight in 2013.  What the government's articulated is an

6    overarching conspiracy to rig bids and fix prices.  But

7    Mr. Ledford's request for a reduced weight bird was a research

8    product, his words, not mine.  He was trying to find out if it

9    was even possible.  And Mr. Ledford told you based on his

10   experience it was a laughable request.  Why was it a laughable

11   request?

12           You will remember this exhibit that's about to be put

13   up, the bell curve, and there is a lot of testimony about it.

14   And this is the bell curve for small birds.  It tells you the

15   average size is around 2.75 to 2.8, right around there, which

16   means a bunch of birds are bigger than that and a bunch of

17   birds are smaller than that.  If you move the curve to the left

18   to get to KFC's request of 2.4, you know, something like half

19   the birds are going to be to the left of 2.4.  And Mr. Ledford

20   told you these aren't chickens.  They are effectively pigeons

21   at this point, and there is no market for birds that small.  So

22   it was a laughable request because it was effectively an

23   impossible request.

24           Instead of focusing on the impossibility of this

25   request, the government latches onto the "agree" text message,

1      another one of their buzz words.  You heard about it.  What was

2      Roger in agreement with?  Roger was in agreement that this is

3      crazy.  It's not doable.  It makes no sense.  It's impossible.

4              Let's go to the next allegation, the third allegation

5      against Mr. Fries.  This is the KFC dark meat 2014.

6      Mr. Ledford told you that in the fall of '13, it was a much

7      more ideal time to buy chicken.  This gave him more leverage,

8      Mr. Ledford, and he used it.  He took advantage of it.  And

9      over the six-week period of negotiations, Mr. Fries and Claxton

10     reduced their eight-piece price by 4 cents in response to

11     Mr. Ledford's directional guidance.

12             And you are now chicken experts.  You now know 4 cents

13     is a big deal.  Again, the numbers don't lie.  Sometimes the

14     simplest explanation is the truth.  That is numbers going

15     south.  That is not numbers going north.  This 4-cent decrease

16     decreased dark meat price by 4 cents because of the formula.

17     The bottom line is the price went down.  RSCS enjoyed another

18     successful negotiation, but the government didn't tell you

19     about that because it undermines their narrative.

20             Mr. Bryant, the conspiracy insider, the guy who was

21     interviewed 20 times, he didn't mention the 2014 contract.

22     Instead, the government asks you to find a conspiracy involving

23     this incident by parading in front of you summary Exhibit 17-1.

24     And I just want to touch on that briefly.  You have seen this a

25     bunch of times.

1          The bottom line is it included Tyson, George's and

2    Koch, and yet not even one of their bid submissions is on this

3    summary.  The summary doesn't include phone calls.  It doesn't

4    include e-mails.  It doesn't include texts between Mr. Fries

5    and Mr. Ledford, and Mr. Ledford told you that's how we

6    communicated during our negotiations.  He told you, I

7    specifically remember sharing a text message with Mr. Fries

8    about the bidding process in the fall of 2013.  None of those

9    are there.  The government is the one that produced those.

10   They are not there because they don't help the government's

11   narrative.  They don't want you to focus on them.

12         And don't be seduced.  Don't just go back in that jury

13   room, pull out the summaries, look at the summaries and now

14   your job is done.  It's not done because you know, you've heard

15   it before me and you are going to hear it after me, these

16   summaries are not accurate.  They are not a fair reflection.

17   They are cherry-picked.  If all of us had a dime for every time

18   we hear the term cherry-pick, we will be rich by the end of

19   this trial.  And they are not an accurate reflection of the

20   evidence.

21         So what's happening is Claxton wasn't matching the

22   eight-piece price with Pilgrim's.  It wasn't matching dark meat

23   price with Pilgrim's.  It wasn't matching Pilgrim's dark meat

24   formula.  It was simply using that number as a data point, just

25   like we said in opening that that's how they did it.

4923

1          And what happens is in spite of holding the dark meat

2     formula at .30 back, four hours after this text exchange

3     between Mr. Brady and Mr. Fries, Claxton submits an eight-piece

4     price that is 2 cents lower than the day before.  They continue

5     to follow the directional guidance that is counter to the

6     government's allegation that is consistent with what you heard

7     from Mr. Ledford up on that stand.

8          The actions of Claxton are what they are.  They

9     reflect a business making business decisions to undercut its

10    competition to maintain its relationship with an important

11    customer and to follow the directional guidance of a buyer who

12    has proven, not just threatened, but proven he will take away

13    business if they don't respond to him in the way he wants them

14    to.

15         And while the government didn't want you to hear the

16    story of '13- '14, it was these negotiations where Claxton

17    reduced its eight-piece price by a significant 4 cents that are

18    one piece, important piece to the 2015 puzzle.  But before we

19    talk about that, because we are going in order, let's briefly

20    talk about the Chick-fil-A NAE incident.

21         The government told you that Mr. Fries, Mr. Brady,

22    Mr. Mulrenin conspired to raise prices in 2014 when Chick-fil-A

23    decided to go antibiotic-free.  But how are you supposed to

24    find a conspiracy to raise prices when the government fails to

25    introduce any of the prices?  They didn't do that.  That's

1     their burden.  It's not our burden.  That's their burden.  They

2     didn't put in the contracts for Pilgrim's, Tyson, Claxton.

3     They didn't put in the price estimates for NAE.  They didn't

4     show you when these price estimates were submitted.  They

5     didn't submit any documentation about which model the suppliers

6     were using, grain-based or breast model.  You heard about both.

7            And they didn't even call a witness who knew anything

8     about the prices.  What do they do instead?  Meyer Skalak takes

9     the stand.  He is up there for maybe 15 minutes, which is warp

10    speed in this case.  They ask him the old, Do you want the

11    suppliers talking?  Did you know they were talking?  Would it

12    surprise you if they were talking?  That's all they wanted to

13    ask him.  And they didn't even ask -- they didn't even bring in

14    the person who was the day-to-day NAE person at Chick-fil-A.

15    That person is David Rothmeier.  Where was Mr. Rothmeier?

16           But when you look at the cross of Mr. Skalak and some

17    of the other evidence, you find out the real story.

18    Chick-fil-A didn't know anything about NAE.  They had to google

19    what that meant.  Chick-fil-A hadn't decided between NAE and

20    antibiotic-free.  Those are two different things under the USDA

21    guidelines you heard.  Tyson submitted its estimate in

22    January 2014, well before Mr. Brady submitted Claxton's.

23    Pilgrim's submitted its in January '14, well before Claxton

24    submitted its through Mr. Brady.

25           Claxton had no experience.  Chick-fil-A told the

4925

1    suppliers to reach out to Perdue because they did have

2    experience, and that he has no evidence that Claxton or Tyson

3    took advantage of that situation to try to jack up their

4    prices, no evidence whatsoever.  He did know that comparing

5    prices for grain based and breast-based models is like

6    comparing apples to oranges.  He did know Chick-fil-A shared

7    competitor pricing.  And he did know that Chick-fil-A wanted

8    suppliers to confer with each other about quality and best

9    practices.

10         All they did this morning is put up summary 3-1 and

11   read it to you.  That's it.  You can read it yourself.  If

12   you've done nothing in the last six weeks, you've done a lot of

13   reading.  They didn't produce anything.  They didn't explain

14   anything.  They didn't show a single underlying exhibit.  They

15   read you summary 3-1 and they called it good.  It's not good

16   enough.

17         Let's talk about the fifth allegation against

18   Mr. Fries.  This is the 2015 when things really ramped up, when

19   the conspiracy went into overdrive, when everyone agreed on 15

20   cents, when the producers wouldn't budge.  What do the exhibits

21   demonstrate?  They demonstrate Claxton reduced its prices yet

22   again 4 cents.  Down is down.  Up is up.  Claxton went down.

23         They showed you summary Exhibit 10-3.  We are not

24   going to put it up again, the only text between Mr. Fries and

25   Mr. Brady where Claxton is exchanging its own prices noting

1    that Mr. Brady told Bob Lewis, its customer, that it would

2    reduce its prices.  So it wasn't just responding to

3    Mr. Ledford.  Claxton responds to its customers.

4         What did the testimony establish?  Mr. Lewis told you

5    Mr. Fries and Mr. Brady responded to directional guidance.  You

6    already know that.  That they always have been willing to

7    negotiate, you already know that from the numbers.  That they

8    never threatened to walk away from negotiations, you already

9    know that.  They are a 1 percent regional supplier.  That he

10   has no personal knowledge of Mr. Fries or Mr. Brady being

11   involved in a conspiracy, you already know that because you

12   never heard anyone, including Mr. Lewis, implicate either of

13   those men from the witness stand.

14        The government says this morning, well, wait a second.

15   Why does Claxton, a small bird producer, get the big bird

16   premium?  Well, the government is asking a question that they

17   have the burden to answer.  If they are saying that's part of

18   an illegal conspiracy, they have got the burden of proof to

19   show you why or how that is.  The bottom line is the witnesses

20   told you that.  They told you they needed to keep the ranges

21   tight.  They told you they needed to incentivize the small bird

22   suppliers to stay in the small bird business because big bird

23   is way more profitable.  And they told you they wanted to keep

24   the small bird suppliers from going bankrupt.

25        Members of the jury, it was no surprise to anyone that

1   Claxton is an exclusive small bird supplier.  Don't you think

2   if they snuck in 10-cent big bird premium that some of their

3   customers might have noticed, might have said what are you guys

4   doing?  What do you mean I am paying you 10 cents?  You don't

5   produce big birds.  There was no subterfuge.  There was no

6   fraud.  There was no lying, no cheating no, stealing.

7           Joe Brink from Pollo Tropical, oh, nobody ever

8   negotiates.  Nobody will -- you know, take it or leave it.

9   What did he tell you?  Claxton never refused to negotiate.

10  Claxton gave them stair-step pricing which helped Pollo

11  Tropical and hurt Claxton financially.  Claxton undercut

12  Pilgrim's by making this agreement, that the price they

13  contracted for was 15 cents less than the Urner-Barry price of

14  $1.15.

15          They didn't deal with Mr. Fries on pricing.  This

16  incident really has nothing to do with Mr. Fries.  And that

17  although Claxton honored its contract and negotiated in good

18  faith, Mr. Brink didn't because he didn't sign the contract.

19  And not only did he not honor the contract, he ends up taking

20  business away from Claxton.  No good deed goes unpunished.

21          The bottom line is that 2015 is the government's main

22  event where all the puzzle pieces are supposed to fall into

23  place because all the suppliers' prices increase.  But you

24  heard witness after witness talk to you about market

25  conditions.  And as Mr. Tubach said, even the so-called insider

 1    Mr. Bryant told you if you didn't know prices were going up in

 2    '15, then you shouldn't be in the chicken business.  This

 3    wasn't some cabal to raise prices.  These were suppliers

 4    negotiating with very experienced, very tough customers who

 5    know the business inside and out.  There was nobody who was

 6    going to pull any wool over the eyes of a Mr. Ledford or a Bob

 7    Lewis or a Joe Brink or anybody else.

 8            One of the biggest variables the government's chosen

 9    to stay in the dark about is margin.  They said it again this

10    morning.  Margin is profit.  Profit is margin.  It's not.  And

11    it's not me telling you that.  It's Mike Ledford.  Mike Ledford

12    told you this.  And let's look at this slide with his

13    testimony.

14            THE COURT:  Five minutes, Mr. Kornfeld.

15            MR. KORNFELD:  Thank you.

16            I don't need to read it to you.  You can read it

17    yourself.  The bottom line is under oath Mr. Ledford, an

18    experienced chicken person, tells you margin isn't profit.

19    It's not.  It just isn't.  And it isn't to Claxton and they

20    haven't proved otherwise.  And the other reason that margin is

21    important in this context is that in 2014 customers had driven

22    prices down to negative margins, remember?  So when they are

23    talking about the small bird premium and putting it into the

24    cost-plus model, that was a way to sort of right the ship and

25    keep people in business.

1          Here's the bottom line.  The bottom line with 2015 is

2     the government has failed to prove its allegations that

3     Mr. Fries was involved in a conspiracy, that the action, his

4     actions, Claxton's actions, prove otherwise.

5          I want to briefly talk about the burden of proof, and

6     here is the important thing.  You have heard it's proof beyond

7     a reasonable doubt.  You will see what it means in the

8     instruction.  But this is the highest burden we have in this

9     country.  It's higher than the standard used when corporations

10    sue each other over billions of dollars.  It's a higher legal

11    standard than when the State is trying to take someone's kids

12    away from them.  Because we've decided as a society that before

13    we want to brand someone as a criminal, the government has got

14    to come in and prove their case beyond a reasonable doubt.

15         And here there is a lot of reasonable doubt, not just

16    based on what the government showed you, but what they didn't.

17    What didn't you hear?  Remember, it's their burden.  You didn't

18    hear from a bunch of witnesses with knowledge, David Rothmeier,

19    Kent Kronaugue, Steve Campisano, Mary Hester, Rich Eddington,

20    Pete Suerken.  I could go on and on.  Why?  Because they don't

21    help the government.  You can bet your bottom dollar that if

22    they had something negative to say, something helpful to say,

23    the government would have brought them in and they would have

24    said it.  And don't let the government say, well, we could have

25    brought them in.  It's not our burden.  And frankly, we didn't

4930

1    need them.

2         They had no evidence about what was said on the

3    thousands of phone calls.  You heard from Mr. Ledford there are

4    173,000 people employed by the producers in this case, Tyson,

5    Pilgrim's, Koch, George's, Claxton.  The only insider they can

6    find is Robbie Bryant?  He doesn't have a thing to say about

7    Mikell Fries except maybe he went on a hunting trip with him

8    years ago.  You have no witnesses to walk you through these

9    summaries.  Instead, they put on this paralegal who had been on

10   the case for two weeks and didn't know anything about it.  The

11   best the government has is a bunch of witnesses that say, gee,

12   I wasn't happy that they were talking.  It's not good enough

13   and that's not even relevant.

14        The government in this case wouldn't let the facts get

15   in the way of their narrative.  The reasonable doubt

16   instruction talks about the burden being on the government to

17   firmly prove to you beyond a reasonable doubt that an agreement

18   existed, that Mikell Fries knowingly entered into that

19   agreement.  If you have any hesitation about that, then you

20   have to find that he was not guilty.  This isn't a scale where

21   you decide which side you believe more.  It's the government's

22   firm burden.  They have to firmly convince you.  And if they

23   don't, you must return a verdict of not guilty.

24        Now, because it's the government's burden, they get

25   the last word when we are all done in rebuttal close.  And I

1    will ask you to listen carefully to what they have to say.  Are

2    they going to argue their facts or are they going to argue

3    about our argument?  Are they going to talk about their

4    evidence or are they going to talk about Mr. Tubach and

5    Mr. Lavine and me and what we had to say and the colleagues

6    that will come after us?  Every time they talk about the

7    defense instead of their own evidence, ask yourself why.  Ask

8    yourself if that's an admission, that it's easier to argue

9    against us than it is to prove their case to you beyond a

10   reasonable doubt.

11        And don't let them argue that the reason there is so

12   little proof in this case, it's because it's a big secret.

13   It's a big secret.  They were part of a secret network.

14   Members of the jury, the government can't have it both ways.

15   They can't get up here and trot these "tell him we're trying,

16   not exactly illegal," all the other greatest hits that they

17   pull out of 16 million documents on the one hand and then tell

18   you on the other hand, well, these guys aren't stupid.  They

19   are not going to put a bunch of stuff in writing.  It's secret.

20        They can't have it both ways.  There is no secret

21   here.  They combed through 15 to 16 million documents.  They

22   combed through 99,000 pages of phone records.  They had the

23   power of the FBI, Special Agent Taylor and his colleagues of

24   other federal law enforcement agencies, none of whom, by the

25   way, took the stand.

1            They had the ability to immunize witnesses and bring

2   them in to testify.  They had years to investigate this case.

3   They had an admitted conspiracy insider who didn't implicate

4   Mr. Fries, Mr. Brady or Claxton.  The fact is, Ladies and

5   Gentlemen of the Jury, the evidence is what it is and isn't

6   what it is.  And what it isn't is proof beyond a reasonable

7   doubt of Mikell Fries' guilt.

8            The government promised you that all the puzzle pieces

9   will come together to form a picture that's crystal clear.

10  This isn't a completed puzzle.  It's a piecemeal of innuendo,

11  unsupported inferences, huge gaps in proof, unknowledgeable

12  witnesses, missing witnesses, and unfair summary exhibits.

13           Members of the jury, the only verdict that is firmly

14  supported by the evidence in this case and the lack of evidence

15  in this case is crystal clear and that is a verdict of not

16  guilty as to Mr. Fries.

17           I thank you for your attention.

18           *THE COURT:*  Thank you, Mr. Kornfeld.

19           I believe that Mr. Austin is going to go next.

20           Mr. Feldberg, go ahead.

21           *MR. FELDBERG:*  Thank you, Your Honor.

22                         **OPENING STATEMENT**

23           *MR. FELDBERG:*  Members of the jury, Your Honor, we

24  have been together in this courtroom since October 25th.  This

25  is a place dedicated to fairness, to the presumption of

4933

1    innocence, to the proposition that prosecutors cannot just

2    swoop in and upend a person's life by calling him a criminal

3    unless they have conducted a thorough investigation and can

4    prove their case beyond a reasonable doubt, a place that

5    depends upon and celebrates the elemental power of the jury to

6    guard against the power of the government to overreach.  On

7    behalf of Roger Austin and my colleagues, I thank you for the

8    careful attention you have been paying.

9         Let's discuss what the evidence in this case shows.

10   Did Pilgrim's Pride want as much information as it could get

11   about the market and what its competitors were doing?  Of

12   course, it did.  Any sensible business would.  But Pilgrim's

13   wanted that information not to collude, but to compete.  It

14   wanted that information so that it could implement its own

15   strategy and compete vigorously against its competitors.  And

16   that's exactly what the evidence shows happened.

17        An e-mail from Roger Austin in November 2012 right at

18   the beginning of what the prosecutors claim is a conspiracy

19   says it all:  We don't want them to think we are suggesting

20   meeting those prices.  It's Defendant's Exhibit D-839.  That

21   sentence written by Roger Austin to a colleague tells the story

22   of this case.  Mr. Austin did not have authority to determine

23   Pilgrim's prices and he did not want his bosses to meet

24   competitor prices.

25        You didn't see this exhibit in the prosecutor's

1    summary charts.  They didn't include it.  And while the

2    prosecutor showed you in her summation e-mails that came right

3    before and right after this, she left this one out.  In fact,

4    the evidence shows that in 2012 and throughout the alleged

5    conspiracy, Mr. Austin was urging his bosses to lower the

6    prices charged to KFC.  This is the opposite of a conspiracy to

7    fix or raise prices.

8          First, there was no agreement to fix prices or rig

9    bids.  The suppliers' bids were all different.  Their contract

10   prices were all different as you can see.  Each year of the

11   alleged conspiracy their prices were different.  They competed

12   with each other and they took volume away from each other.  The

13   chart that's in front of you now shows the decline by more than

14   50 percent of the volume of purchases by KFC from Pilgrim's

15   during the years in question here.

16         Their strategies were all different.  Please ask

17   yourselves, who agreed with whom to do what?  If you struggle

18   to answer that question, you must find Roger Austin and all of

19   the defendants not guilty.  The suppliers -- sorry, the

20   prosecutor argued in summation that the suppliers did not

21   undercut each other, but there is only one problem with that

22   argument.  The evidence shows that they did.

23         Second point.  The prosecution claims this was a

24   conspiracy from 2012 to 2019 to raise prices.  But the evidence

25   proves the opposite.  Prices declined more often than they

4935

1  increased during the years in question.  And the evidence, as

2  we all know, demonstrates that there was supply and demand

3  factors that drove the 2015 price increase.  But what's really

4  interesting is that in 2018 at the end of the so-called

5  conspiracy, Pilgrim's price to KFC was lower than it was in

6  2012 at the beginning of the so-called conspiracy.

7          Third, there is no evidence that Roger Austin agreed

8  with anyone to fix prices or rig bids.  The evidence shows the

9  opposite.  Mr. Austin was an advocate for KFC, his customer,

10  and was constantly fighting for lower prices.  Even Robbie

11  Bryant, and we'll come to him in a few minutes, the

12  prosecution's accomplice witness, a witness with every

13  incentive to say what the prosecutors wanted him to say, admits

14  that Mr. Austin was an advocate for his customer.

15          Look at this excerpt from his testimony.

16          And would it be fair to say, sir -- and this is

17  Mr. Bryant's testimony -- that in your experience Mr. Austin

18  was frequently an advocate for lower prices within Pilgrim's

19  for KFC?

20          Answer:  I would say that Roger was an advocate for

21  his customer, knew his customer well, and would have the tough

22  conversations internally that he felt -- that he felt he needed

23  to have for his customer.

24          He was an advocate for his customer; is that correct,

25  sir?

1          That's correct.

2          There is not one bit of evidence that Mr. Austin had

3    any motive or incentive to conspire.  The prosecution wants you

4    to believe that a man who spent 40 years in the industry and

5    who has an unblemished record who by all accounts was an

6    advocate for his customer committed a felony to harm his

7    customer when he had nothing to gain from it.  Does that make

8    any sense to you?

9          Fourth, the evidence shows one thing, competition.

10   Witness after witness from seasoned professionals like Mike

11   Ledford down to Robbie Bryant told you that there was

12   competition among the suppliers.  The witnesses and documents

13   demonstrate suppliers charging different prices, adopting

14   different strategies, and trying and succeeding in taking

15   business away from each other.  That's not price-fixing, as the

16   witnesses told you.  That's competition.  The slide in front of

17   you has excerpts from Mr. Ledford's testimony and Mr. Bryant's

18   testimony.  And they both say the same thing.  That's

19   competition.

20         And let's keep in mind Judge Brimmer's instructions of

21   law.  Mere exchanges of information, even regarding price, are

22   not necessarily illegal in the absence of additional evidence

23   that an agreement to engage in unlawful conduct resulted from

24   or was part of the information exchange.  And it is not

25   unlawful for competitors to meet and exchange information

1    necessary to preparation of a bid or discuss common aims or

2    objectives or exchange information on independently derived

3    prices.

4            Now let's drill down and take a close look at the

5    evidence.  Let's start with 2012, the first year of the

6    so-called conspiracy.  The bids are all different.  They don't

7    match the final contract prices which are also all different.

8    It's a little hard to read this chart, but the different colors

9    reflect different bids.  And the final bar, the purplish bar,

10   is the final contract price.  You can see they are all

11   different.

12           And we know from Mr. Austin's e-mail in November 2012

13   that he certainly was not suggesting that Pilgrim's meet other

14   suppliers' prices.  This is all about independent decision

15   making, vigorous competition, not price-fixing.  I hope when

16   you go back in the jury room you will take a look at

17   Exhibit 1523.  Mr. Tubach displayed that in his summation.  I

18   won't take your time to do it again.  It's got a heading Price

19   Reduction Spreadsheet.  And what it shows is Pilgrim's studying

20   the cost impact of reducing its prices as Mr. Ledford, the

21   customer from RSCS, demanded and as Roger Austin was urging.

22   Pilgrim's even calls itself the good guys showing that it's

23   competing against the other guys.

24           What about the prosecution's claim that there is

25   something nefarious about a text exchange between Scott Brady

1    and Mikell Fries in November 2012 where Mr. Brady says, I

2    talked to Roger this month and he's 3 cents higher than us on

3    eight-piece and his case weight is 50 and a half.  He is not

4    talking about bids as the prosecutor claimed in her summation.

5    He is talking about current pricing.  This month.  Look at the

6    words.

7         And we know from the testimony of Mr. Ledford and from

8    Bob Lewis that knowledge of current pricing, which is widely

9    available, has nothing to do with future bids.  Knowledge of

10   future bids wouldn't have any meaningful impact on the

11   negotiation.  That's Mr. Ledford's testimony.

12        And the exchange about wings, as Mr. Ledford told you,

13   market price is a fair starting point for negotiations.  And

14   the prosecution's notion that charging market prices is somehow

15   evidence of a conspiracy is nothing short of bizarre.  In any

16   event, while Pilgrim's may have wanted to charge market prices,

17   at Mr. Ledford's insistence Pilgrim's changed to a completely

18   different model based on the eight-piece price, a resolution

19   which RSCS concluded was a win for KFC.

20        And if you have any doubt about that, take a look at

21   Defense Exhibit F-808 at Page 12 where they say just that.  If

22   the customer won and got exactly what it wanted based on a

23   different formula than what Pilgrim's wanted, how could this

24   possibly be evidence of price-fixing?

25        What does the evidence show about the 2012 contract

1    negotiations?  It shows that Mr. Ledford from RSCS, the

2    customer, drove the pricing.  I call to your attention Exhibits

3    1528, 1544 and 1527, all of which show Mr. Ledford essentially

4    saying here is where your competitors are.  Here is where you

5    have to be.

6         Mr. Ledford talked about directional guidance and he

7    talked about brass tacks.  He is the customer, remember?  I

8    actually would call this a little bit more specific -- talking

9    about an e-mail exchange with Mr. Austin:

10        I actually would call this a little bit more specific

11   than directional guidance.  At this point we were, as I say

12   below, we were wanting to wrap this up yesterday.  I was really

13   getting down to brass tacks with Roger and telling him exactly

14   where I wanted him to be.

15        That's what was going on in the relationship between

16   KFC and Pilgrim's.  The customer was telling the sales

17   representative exactly where he wanted Pilgrim's to be and

18   that's where Pilgrim's went.

19        What else do we know about the negotiations in 2012

20   for the 2013 contract?  Mr. Ledford called it a successful

21   negotiation.  This is an RSCS internal document in evidence as

22   Defense Exhibit F-808.

23        Question:  You would agree with me that you negotiated

24   a savings estimated at $5-1/2 million on KFC fresh chicken?

25        Answer:  That is correct.

4940

1          This document written at the time, this isn't some

2     after-the-fact thing, this is what they said at the time in

3     which the defense, not the prosecution, put into evidence tells

4     the story of the 2012 negotiations.

5          This is RSCS talking:  Overall we believe these are

6     good numbers and better than we anticipated getting on a few

7     items.  We had anticipated there may be -- the typo is their --

8     there may be a need to have follow-up calls with a couple of

9     suppliers, Tyson and Pilgrim's.  However, they have come back

10    generally in line with where we asked them to get on their best

11    and final numbers.

12         What kind of conspiracy is this?

13         Contrast Mr. Ledford's testimony with the

14    prosecution's summary charts and see if they give you the

15    complete picture.  GX14-1 leaves out the contract prices which

16    are, of course, all different.  GX14-2 leaves out the text of

17    Exhibits 1527 and 1528, all of which show it was Mr. Ledford

18    who was communicating other suppliers' prices to Pilgrim's and

19    telling Pilgrim's where it needed to be.  And GX14-3 refers to

20    but doesn't show you Exhibit 1544, which shows Mr. Ledford

21    providing pricing information and driving prices.

22         So let's turn to 2013.  The prosecutor did not refer

23    to this incident in her summation, but the government raised it

24    in the testimony in the case and it's in one of the summary

25    charts, so I want to deal with it.  This is the request from

4941

1   Mr. Ledford to the suppliers that he called laughable, "when

2   you get up off the floor laughing" e-mail he sent to all the

3   suppliers asking if they could produce a 2-pound, 4-ounce bird.

4   And the prosecution likes the fact that the word "agreed"

5   appears somewhere in the text exchange.

6           Let's look at what actually happened.  After

7   acknowledging that this was a big ask and laughable and that he

8   would certainly understand that the suppliers would speak with

9   each other about it because it was so unusual, Mr. Ledford made

10  his request to all the suppliers on March 5th, 2013.  But what

11  the prosecution didn't tell you is that on February 26th, one

12  week earlier, Mr. Ledford made essentially the same request to

13  Mr. Austin, as Pilgrim's was KFC's largest supplier.  And the

14  next day, February 27th, Mr. Austin responded that Pilgrim's

15  had no birds available in that size.

16          So a week before Mr. Ledford made his request to all

17  suppliers, he had already communicated with Mr. Austin and

18  Mr. Austin had told him Pilgrim's had no birds available in

19  that size.  There couldn't possibly have been any collusion

20  because Pilgrim's said no before the other suppliers were even

21  asked.  And if there is any doubt in your mind, ask for

22  Mr. Ledford's testimony on this point to be read back.

23          But what's even more disgraceful about this part of

24  the prosecution's case is something else Mr. Ledford told you.

25  The prosecutors knew that Mr. Ledford had this exchange with

1    Mr. Austin a week before he made the request to other suppliers

2    because they brought it up in their prep session with him, but

3    they did not bring it out in his testimony.  They told you only

4    part of the story and a misleading part at that.  It was up to

5    the defense to fill in the actual facts and get the straight

6    story from the witness.  What kind of prosecution is that where

7    the prosecutors deliberately tell a misleading story?  And the

8    prosecutors summary chart, GX16-1, leaves all of this out.

9         Now let's look at the negotiations in 2013 for the

10   2014 contract.  The prosecution focuses on a text from Scott

11   Brady to Mikell Fries on November 19, 2013 that Roger is .30

12   back -- 30 cents back and not moving.  But what the prosecutors

13   failed to tell you is that the very next day, November 20th,

14   Pilgrim's did move and reduced its price to 30 and a half cents

15   back.

16        Whatever Mr. Austin had or had not said to Mr. Brady,

17   the fact is that Pilgrim's did reduce its price.  And we know

18   that Pilgrim's reduced its price because Mike Ledford of RSCS

19   insisted that it lower its price.  He told Mr. Austin that he

20   was disappointed, a word he frequently used with Mr. Austin, in

21   Pilgrim's pricing, and unless Pilgrim's lowered its price,

22   Mr. Austin would, quote, take away a significant amount of

23   volume.  You can look at Exhibit 1713 in which it says just

24   that.

25        Mr. Ledford wanted every supplier to be at 31 back on

4943

1    dark.  Pilgrim's compromised, reduced its price on dark to 30

2    and a half cents back.  We asked Mr. Ledford, was this a fair

3    compromise?  And he testified that he would not have accepted

4    it if it wasn't.  Mr. Ledford was the customer, the alleged

5    victim, yet time after time he got exactly what he wanted.

6    Once again, the prosecution's summary chart, GX17-1, leaves out

7    that key fact.

8          That brings us to the summer of 2014 and the

9    negotiations for 2015.  Every witness, Mr. Olson, Mr. Lewis,

10   Mr. Ledford, even Mr. Bryant told you that there was a shortage

11   of small birds, the size that KFC bought, in the summer of

12   2014; and that as a result, everyone in the industry knew

13   prices were going to go up.  I am not going to go through that

14   again.  You have heard it many, many, many times.  The laws of

15   supply and demand was forcing an increase in the price of small

16   birds.

17         And as Mr. Ledford told you, KFC was a comparatively

18   unattractive customer for the suppliers because its business

19   was shrinking and it was interested in only obtaining the

20   lowest possible price rather than establishing long-term

21   partnerships.  And the suppliers had far more attractive

22   customers such as Chick-fil-A, plus RSCS was asking for a

23   three-year contract for the first time which created additional

24   risks for the prosecution -- for the suppliers, excuse me.

25         But contrary to the prosecution's theory, let's look

1    at the facts.  Could we call up, please, 10-4?  Is it possible

2    to make this a little bit bigger?  Thank you.

3           Each supplier's price was different.  Each supplier's

4    margin was different.  And contrary to the prosecution's theory

5    as we showed you in an earlier slide, KFC reduced its volume of

6    purchases from Pilgrim's and gave that business to Pilgrim's

7    competitors.

8           The prosecution points to an e-mail from Jason McGuire

9    to Jayson Penn that says, Roger did some checking around.  But

10   what does that prove?  There is no evidence, none, of who Roger

11   checked around with.  And the fact that the other suppliers'

12   numbers were expressed in ranges of exactly 2 cents certainly

13   suggests that the information came from a single source, most

14   likely the customer.  If there was a conspiracy to fix prices,

15   you would expect exact numbers, not a range.

16          The prosecution points to Mr. Bryant's claim that

17   Mr. McGuire told Mr. Austin at a meeting at SMS to tell the

18   industry what Pilgrim's was doing.  First of all, Mr. Austin

19   wasn't even at the SMS meeting.  We know that from the calendar

20   invite.  Moreover, all Mr. Bryant said is that Mr. McGuire told

21   Mr. Austin to tell the industry Pilgrim's justification for a

22   price increase.  Even if you believe Mr. Bryant on that point,

23   it's a so what.  Everyone in the industry already knew why a

24   price increase was necessary, and there is no allegation that

25   Mr. Austin asked anyone to agree to anything.

1         There is no evidence of an agreement.  Look at Roger

2    Austin's own words in his August 26, 2014 e-mail to his boss,

3    Jayson Penn, in his discussion -- about his discussion with

4    RSCS.

5         Could we call up, please, Exhibit 1051, Page 2, the

6    last paragraph?  And if could we enlarge.

7         This is Mr. Austin reporting on his discussions with

8    RSCS in August of 2014.  We either get small birds where they

9    need to be or we have to make changes.  There is nothing about

10   collusion.  There is nothing about other suppliers.  This is

11   internal decision making within Pilgrim's.  Even if you credit,

12   for example, the prosecution's argument about the text exchange

13   between Mr. Brady and Mr. Fries in which Mr. Brady says that he

14   talked to Roger and Greeley told him not to come down on price,

15   all that happened is Mr. Austin told Mr. Brady that his bosses

16   in Greeley told him not to reduce his price and that that

17   information had already been relayed to RSCS.

18        He didn't ask Mr. Brady what Claxton was going to do

19   nor did he ask Mr. Brady to agree to anything.  Remember,

20   exchanging information, even about price, is not unlawful

21   unless there is an agreement.  And the fact is that whatever

22   Mr. Austin said or did not say to Mr. Brady, Pilgrim's did come

23   down on price in its subsequent bid and in the final contract.

24        As Mr. Lewis told you and as the contracts confirm,

25   every supplier came down on price from its first round bid.

4946

1    Pilgrim's reduced its price by 2 cents, Claxton by 4 cents per

2    pound.  Mr. Bryant's testimony, even if you believe it, does

3    not have anything to do with a conspiracy.

4         If Mr. Austin said to his customer, RSCS, "The price

5    is the price," the only question is how many loads, that says

6    nothing about collusion.  It's a one-way statement of Pilgrim's

7    position.  And even if as Mr. Bryant claims with no proof that

8    Mr. Austin said to Bill Kantola and Scott Brady, "I told them

9    the price is the price," so what?  Mr. Austin does not ask what

10   they're going to do and he doesn't ask them to agree to

11   anything.  Once again, the prosecution's summary charts omit

12   key facts.  They don't show the many calls between Mr. Austin

13   and his customer, RSCS.

14        GX10-1 claims that -- 10-1 claims that Mr. Austin

15   conspired by calling George's 800 number.  Is it the way you

16   conspire is to call another company's 800 number?  GX10-2 cites

17   Exhibit 1051, but it doesn't give you the text.  And GX10-3

18   leaves out Pilgrim's and Claxton's contract prices which are

19   different.  And it also leaves out the fact that Pilgrim's

20   reduced its price.

21        That brings us to the negotiations in 2017 for the

22   2018 contract.  The prosecutors elicited, brought out from

23   Mr. Bryant the claim that Roger Austin told him in early

24   February what each supplier was going to bid and that he made

25   handwritten notes of the conversation.  He repeated the claim

4947

1    that these were future bid prices many, many times during the

2    prosecution's questioning.   The prosecution wanted you to

3    believe that those were future bid prices that Mr. Austin gave

4    to Mr. Bryant.

5            But the prosecutors and everyone in the courtroom

6    knows that Mr. Bryant's testimony was false.   The numbers he

7    wrote down were actually current period prices, not future

8    bids.   In fact, they line up exactly with the period two prices

9    then in effect except in one case he was off by two numerals in

10   the fourth decimal.   The fourth place after the decimal point

11   he wrote it down wrong.

12           It was once again left to the defense to fill in the

13   critical fact that the numbers Mr. Bryant wrote down had

14   nothing to do with future bids, but were actually current

15   prices.   And as both Mr. Ledford and Mr. Lewis told you,

16   knowing current prices tells you nothing about future bids.

17   Mr. Bryant's testimony was provably false.

18           The 2017 story actually starts with an e-mail on

19   January 17, 2017 from Robbie Bryant to Mr. Austin.   Mr. Bryant

20   wants to know where Pilgrim's needs to be to be No. 2 in price.

21   That was Mr. Bryant's strategy going into the 2017

22   negotiations, not to match competitors' prices, but to try to

23   be No. 2.   You see that from his testimony and there is an

24   e-mail, Exhibit 1882, which says the same thing.

25           The next part of the 2017 allegation is the text

4948

1    exchange between Tim Stiller and Roger Austin late Friday night

2    February 17.  Here is the context.  RSCS's lead negotiator was

3    Pete Suerken.  Mr. Suerken was angry at Pilgrim's about

4    Pilgrim's price increase in 2015 and threatened to beat them

5    down with a baseball bat to make them lower their price.  He

6    had just told Pilgrim's that it was no longer going to be KFC's

7    largest supplier and that he was taking even more volume away

8    from Pilgrim's and giving it to other suppliers.

9         It's late on a Friday night in February and

10   Mr. Stiller is angry.  He vents to Mr. Austin to tell the

11   industry Pilgrim's is going to hold.  The evidence does not

12   establish what Mr. Stiller meant by the industry and whether he

13   was even referring to other suppliers.  Mr. Austin at 9:14 p.m.

14   on that Friday night responds with a simple, "Will do".  So

15   what happens?

16        There is no evidence that Mr. Austin tells the

17   industry, whatever that means, that Pilgrim's is going to hold.

18   And Pilgrim's does not hold.  It lowers its prices.  By

19   Tuesday, February 21, a couple days later, as Government

20   Exhibit 1894 demonstrates, Tim Stiller writes to Robbie Bryant,

21   quote, "Let's only speak fact based data when we discuss and

22   leave emotions aside."

23        Let's calm down.  Let's leave aside how excited we got

24   on Friday night when we're getting threatened with getting hit

25   over the head with a baseball bat.  Let's calm down and put

1    emotions aside.  And that's what happened and Pilgrim's lowered

2    its price, which leads to the third part of the 2017 story.

3         Sara Fisher, a key member of the RSCS negotiating

4    team, told you that from RSCS's perspective the 2017

5    negotiations were highly successful.  Prices came down.  RSCS

6    achieved substantial savings and was completely satisfied with

7    the result.  This is the so-called victim and she considers the

8    negotiations a success for her company.  Once again, the

9    prosecution's summary chart, Exhibit 18-3, leaves all of this

10   out.

11        And what about the prosecution's claim about Roger

12   Austin getting a blow-by-blow?  Even Robbie Bryant couldn't

13   make that a conspiratorial act.  He explained it as nothing

14   more than an attempt to get a feeling for how the meetings were

15   proceeding.

16        Now, I would like to say a word about Mr. Bryant.  He

17   was a most unusual witness.  He admitted that in his 20 or so

18   interviews with the prosecutors and the FBI, four of which he

19   participated in after the trial began, that he lied multiple

20   times about things having nothing to do with antitrust or any

21   of the defendants in this case.  You can go back and have his

22   testimony read to you.  He lied on multiple times about

23   multiple issues in your interviews with the prosecutors, none

24   of them having anything to do with antitrust and none of them

25   having anything to do with any defendant in this case.

1        He admitted that he knew lying to government officials

2    is a crime, a felony.  He acknowledged that he has not been

3    charged with a crime.  And the prosecutors have the sole

4    discretion on whether or not to charge him.  And that as a

5    result, he has every incentive, every incentive to say what the

6    prosecutors want him to say because, as he admitted, he would

7    rather be sitting in the witness chair than in a defendant's

8    chair.

9        And the prosecutors and agents have the power to

10   decide which chair you sit in, don't they?

11       Answer:  That's correct.

12       You have not been charged.

13       That's correct.

14       But you know they could charge you.

15       That's correct, yes.

16       It's solely within their discretion.

17       That's correct, yes.

18       Simply put, the prosecutors have sole power over

19   whether Mr. Bryant is charged or not charged with a felony, and

20   he has every incentive to say exactly what they want him to

21   say.  And yet let's look at what he said.  He had some vague

22   claims about a conspiracy, but he couldn't specify dates,

23   participants or the specifics of any agreement.  The only

24   "agreements" he talked about was something about Scott Tucker

25   and Mar-Jac, neither of whom is a defendant here, on a boneless

4951

1    project and an alleged agreement that the suppliers would not

2    take volume from each other, which we know is not true because

3    every witness testified and the documents show that suppliers

4    took volume from each other all the time.

5            Put up an example from Mr. Ledford's testimony.

6            He claims that RSCS wanted what he called blind bids,

7    but the evidence shows that RSCS told Mr. Austin what his

8    competitors were bidding.  He made some claims about something

9    Roger Austin said at a meeting with SMS, the buying cooperative

10   for Popeye's, but then was forced to concede, as the calendar

11   invite corroborates, that he was not even sure that Mr. Austin

12   was at that meeting.

13           What he mostly talked about was that suppliers

14   sometimes shared information with each other.  But as Judge

15   Brimmer has instructed you, without an agreement sharing

16   pricing information is not against the law.  And for all the

17   reasons we've talked about, we know that it is perfectly normal

18   lawful conduct.  As Mr. Skalak from Chick-fil-A testified, the

19   fact that he knows other QSR's prices doesn't make the QSR

20   business any less competitive.

21           Mr. Bryant even admitted as much.  He admitted there

22   was no agreement.  The competitors discussed and knew what each

23   other were doing though there was no agreement in place that --

24   there was no agreement in place that prevented a supplier from

25   arriving at a different price point.  You said that, correct?

4952

1          I did.

2          And you were telling the truth in that instance,

3    correct?

4          That's correct.

5          That's Mr. Bryant's testimony.  He admitted that the

6    reason Pilgrim's wanted to know what its competitors were doing

7    was so that Pilgrim's could make its own independent decision

8    about what to charge.

9          And those pricing decisions made independent -- and

10   those were pricing decisions made independently by Pilgrim's,

11   correct?

12         Correct.

13         This is Mr. Bryant's testimony.

14         And that was Pilgrim's formulating its bids

15   independently, correct?

16         Answer, that was -- yes.

17         Mr. Bryant I submit is at best -- I am trying to be

18   polite here -- a most unreliable witness.  At a minimum, he is

19   someone who has admitted lying and who has a powerful motive to

20   say whatever he thinks the prosecutors want him to say.  He is

21   full of contradictions.  He is not someone you could rely on

22   when making a decision about someone you care about.

23         The prosecution has the burden of proving its case

24   beyond a reasonable doubt, and Mr. Bryant is I submit to you

25   the definition of reasonable doubt.  Contrast him to Mike

1    Ledford, whose name the prosecutor didn't mention in her

2    summation, experienced, smart, reasonable, rational, a witness

3    whose testimony was unassailable, straight down the middle.

4           We learned a lot from Mr. Ledford.  We learned as the

5    lead negotiator for RSCS, he basically told the suppliers where

6    they needed to be on price.  There was no price fixing

7    conspiracy.  There was a customer making demands.  We learned

8    from him, as well from Mr. Lewis, that RSCS wanted the

9    suppliers' prices to be in as tight a range as possible so that

10   some franchisees would not complain that they were paying more

11   than others.

12          In fact, we learned from Mr. Lewis that if there was a

13   conspiracy to fix prices, you would expect the price range to

14   narrow.  But in 2015, the principal focus of this case, the

15   price range widened substantially to more than 5 cents per

16   pound from less than 1 cent per pound in the prior year.  And

17   going back to Mr. Ledford, we learned that he took volume away

18   from higher priced suppliers and gave it to lower priced

19   suppliers.  As he told you, that's competition.

20          THE COURT:  Five minutes, Mr. Feldberg.

21          MR. FELDBERG:  We learned from him that there is

22   nothing wrong with competitors communicating with each other,

23   just as he communicates with his competitor and friend Kent

24   Kronaugue, the principal buyer for Popeye's.  We learned he was

25   aware and encouraged suppliers to communicate with each other

1    to cover shorts, which he told you occurred frequently, and

2    that when suppliers covered shorts for each other, they could

3    learn each other's prices.  We learned from him that suppliers

4    being aware of each other's current prices told them nothing

5    about future bids, which is why the prosecutor's argument about

6    Roger Austin's spreadsheet makes no sense at all.

7         How in the world does a record of historical prices

8    from 1999 have anything to do with a bid in 2014?  It's a

9    historical record.  It's not a score card.  And we learned from

10   Mr. Ledford that contrary to the prosecution's claim that this

11   was a conspiracy to raise prices, prices came down more often

12   than they went up and all of the suppliers' prices were

13   different.  And we learned as you have heard from others that

14   the prosecutors never interviewed Mr. Ledford before they

15   brought charges and didn't even interview him until five months

16   after charges were brought.

17        One other important thing we learned.  You heard the

18   prosecutors ask a lot of customer witnesses if they wanted the

19   suppliers to communicate with each other, and the witnesses

20   said they did not want that.  Mr. Ledford explained why.  It

21   had nothing to do with collusion.  It was all about leverage.

22   If the suppliers communicated with each other, they could gain

23   leverage in negotiations.  Mr. Ledford wanted the leverage on

24   his side.  Negotiations between suppliers and customers happen

25   every day in the business world and each side wants as much

1    leverage as it can get to make a better deal.  That's what was

2    going on here and it had nothing to do with any alleged

3    conspiracy.

4           Now, in closing I want to say a few words about Roger

5    Austin.  We know that he was Pilgrim's customer guy for KFC.

6    His job was not to determine pricing.  He had no authority to

7    do that.  His job was to keep KFC happy and supplied with the

8    chicken it needed.

9           We know that he was an advocate for his customer and

10   argued with his bosses for lower prices.  We know that there

11   was no evidence of any personal or professional impropriety on

12   his part.  And we know that Mr. Austin, who has been retired

13   since August 2018 and living on his farm in Georgia, had

14   absolutely no reason or incentive to enter into a conspiracy.

15   There is not one bit of evidence showing that Mr. Austin had

16   any motive to abandon everything he has ever stood for and

17   everything that is important to him and commit a crime.  There

18   is not one bit of evidence that Mr. Austin had any financial or

19   career incentive to enter into a conspiracy.

20          He is an intelligent, mature man.  Does it stand to

21   reason that he would decide at the tail end of his career

22   suddenly to enter knowingly and intentionally into a

23   conspiracy?  I think not and I suspect you know not.

24          This case is a terrible injustice for Mr. Austin and

25   for the other nine defendants.  The fact that the prosecutors

1    are using their power this way is frightening.  These people

2    sitting here are human beings.  If there had been a real

3    investigation, this case never would have been brought and we

4    would not have been sitting here for weeks with the prosecution

5    presenting half truths and misleading evidence.

6         This misguided prosecution has imposed a terrible

7    burden on Mr. Austin and all of the defendants and wreaked

8    havoc with their lives.  This is an American courtroom and you

9    are an American jury.  And thankfully, you can right this

10   terrible wrong, lift this terrible burden and reach the only

11   verdict that justice requires, not guilty.

12        Thank you.

13        *THE COURT:*  Thank you, Mr. Feldberg.

14        Ladies and gentlemen, we will go ahead and resume

15   tomorrow at 8:30.  Keep in mind, ladies and gentlemen, all the

16   same admonitions because we're getting close, but we are not

17   there yet.  In particular, keep in mind the admonition about

18   not talking about the case.  Don't let people who may be

19   curious about where the trial is at engage you in some

20   conversation about it.  Best just to politely tell them that

21   you can't talk about that.

22        Keep in mind also that there is no time limit on your

23   deliberations.  I hope you have a good evening, ladies and

24   gentlemen.  The jury is excused.

25        (Jury excused.)

1          Mr. Tubach?

2          MR. TUBACH:  I was just curious whether the Court's

3   clock allowed me to cede any time back to the senators from

4   Tyson.

5          MR. BYRNE:  What about --

6          THE COURT:  Yeah, how was I going to be able to ration

7   that?  Yes, as a matter of fact, one minute.

8          MR. TUBACH:  I give 20 seconds to each, Your Honor.

9          THE COURT:  Ms. Call?

10         MS. CALL:  I wanted to briefly note a pattern we have

11  seen in a couple of the closings today which is references to

12  facts not in evidence particularly about the government's

13  investigation in I think almost nearly every closing so far.  I

14  think it's inappropriate.  There is certainly 10th Circuit law

15  to that effect.  And I think it should really stop to the

16  extent any additional counsel plan to.  And I understand

17  wanting to attack the government's investigation on closing,

18  but they simply can't reference facts that the jury has never

19  heard and some of which I don't believe were true.

20         THE COURT:  Of course, the government has a rebuttal

21  argument and the jury has been informed that closings are not

22  evidence.

23         Anything else we should take up?

24         One thing I would mention is I know that both sides

25  have been very good about going through the exhibits and making

1   sure that what's been admitted is in the exhibit books.  Please

2   continue that effort.  And make sure in particular that those

3   exhibits that are in the form of a native document and

4   therefore would be on a thumb drive are correct, those that

5   have been admitted we have got a thumb drive for them that is

6   well labeled so that the jury will know what's on the thumb

7   drive.

8           I hope you had an opportunity, I don't know what day

9   it was, a couple days it was, to take a look at that -- I think

10  we call it the evidence cart which would allow the jury to plug

11  something in.  I will inform the jury tomorrow that they should

12  not bring in their own device to look at those things; instead,

13  to use the evidence cart because it's clean and that it doesn't

14  have anything else on it.

15          Anything else?

16          All right.  We will be in recess until 8:30 tomorrow.

17  Thank you.

18      (Recess at 5:20 p.m.)

19

20

21

22

23

24

25

1                                    INDEX

2   CLOSING ARGUMENT

3       By Ms. Call                                       4766

4       By Mr. Tubach                                     4838

5       By Mr. Lavine                                     4877

6       By Mr. Kornfeld                                   4905

7       By Mr. Feldberg                                   4932

8                          REPORTER'S CERTIFICATE

9       I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.  Dated

11   at Denver, Colorado, this 16th day of February, 2022.

12

13                                 S/Janet M. Coppock

14

15

16

17

18

19

20

21

22

23

24

25