1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn II
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GARY BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                   REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 6

15 _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:02 a.m., on the 2nd day of March,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

1               APPEARANCES

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3     Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,

4     Washington, DC 20530, appearing for Plaintiff.

5          Anna Tryon Pletcher and Michael Tubach of

6     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7     San Francisco, CA 94111-3823;

8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9     N.W., Washington, DC 20006, appearing for Defendant Penn.

10         David Beller, Richard Kornfeld and Kelly Page of

11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12    CO 80202, appearing for Defendant Fries.

13         Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

15          Laura Kuykendall and Megan Rahman of Troutman Pepper

16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

17    appearing for Defendant Brady.

18         Michael Felberg of Reichman, Jorgensen, Lehman,

19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

20    10017;

21

22

23

24

25

1                        APPEARANCES (Continued)

2             Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5             Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7             Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3  Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4  Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6  633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7  for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9  & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10 DC 20006;

11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13 for the Defendant Blake.

14

15                    PROCEEDINGS

16          THE COURT:  We are back on the record in 20-CR-152.

17 The jury is not present.  And I believe our agenda is to talk

18 about summary exhibits.  I think we left off at Exhibit 12.

19 And Mr. Tubach had started off talking about a gap, but I will

20 let you take it from there, Mr. Tubach.

21          MR. TUBACH:  Thank you, Your Honor.  Good morning.

22 There are actually two documents on Exhibit 12 that really

23 don't belong on here, the first and the last.  The purpose of

24 this chart is to show that RSCS, Mr. Lewis, e-mailed all the

25 suppliers and said we are making good progress and give us your

1   information by Tuesday, Wednesday of next week.  Then the

2   government has a series of phone calls on the Wednesday

3   following that e-mail and that's what the chart is trying to

4   show.

5         But the entry immediately prior to that is this phone

6   call from Mar-Jac to Jayson Penn.  It has nothing to do with

7   that e-mail from Bob Lewis because it predates the e-mail.  It

8   has nothing to do with these other phone calls, so that just

9   doesn't belong on here.  It's pure argument.  They may want to

10  argue that's somehow related.

11        THE COURT:  Which one are you talking about now,

12  Mr. Tubach?

13        MR. TUBACH:  The very first entry.

14        THE COURT:  The one before.  Okay, got it.

15        MR. TUBACH:  Yes.  The very first one just doesn't

16  belong on the chart.  They may want to argue there is a

17  connection there.  They can certainly argue it relates to KFC

18  generally.  But the purpose of this whole chart if you look at

19  the whole thing is the e-mail from Mr. Lewis and then the

20  series of phone calls on the following Wednesday.  And I have a

21  copy of the chart for the Court.

22        THE COURT:  I have got one.

23        MR. TUBACH:  So the first one should just come off as

24  argument.  The last one should come off also as argument.  It

25  is two weeks after the -- it comes two weeks after that long

1   series of phone calls they put on the chart and doesn't relate

2   to the purpose of this chart at all.  Again, it's argument.

3   They can make the argument, but it shouldn't be on here.

4   Neither the sender nor the recipient of that last e-mail is

5   anywhere else in this chart and neither is Mr. Penn at the

6   beginning, so we'd ask that the first and the last entries be

7   removed.

8         THE COURT:  I didn't take a look at 955, but what's

9   the reference, as far as you can tell, to one at a time?

10         MR. TUBACH:  One at a time is presumably, I believe

11   relates to references to other customers, what other customers

12   are we going to try to increase the prices to.  And I don't

13   have the e-mail in front of me, but I believe it's something

14   like that.  And Mr. Stiller says, "One at a time.  Got KFC and

15   BM.  Rest still to come," something like that.

16         THE COURT:  Thank you, Ms. Tubach.

17         Ms. Call?

18         MS. CALL:  Good morning, Your Honor.  First off as to

19   just timeliness, I will note that neither of these objections

20   were raised in the two motions that were pending regarding the

21   exhibits as of February 10th.

22         As to the first one, Exhibit 9672, which is the

23   excerpt of the Mar-Jac call, you may recall, or I at least do,

24   Mr. Tubach made this same argument during the last trial about

25   this phone call.  And Your Honor rejected it finding that the

1  government had a good faith basis for including that phone call

2  in the summary because it is the morning of what we all now

3  know was then later reflected in Mr. Pete Martin's handwriting

4  in Exhibit 1030 from this very same day.  So the good faith

5  basis being, of course, that this phone call is the call with

6  Pete Martin in which he spoke to Defendant Penn leading to his

7  handwritten notes about the price increase that Pilgrim's was

8  seeking for KFC.

9        I will note that after February 10th the government

10  did add Exhibit 1030 into Exhibit 12 based on the Court's

11  ruling I think after February 10th on the VTC motion in our

12  anticipation that Ms. Becker would be testifying and would be

13  authenticating 1030.  We did remove it based on your Court's

14  instruction that only edits as of February 10th would be

15  timely.  But we would seek now based on the testimony and the

16  admission of the document to include 1030 in this chart right

17  after this 7:50 a.m. call and based on the date that is written

18  on the top of Exhibit 1030 of August 29, 2014.

19        And then I will just respond to the second point which

20  is Exhibit 955, which as I note again was not mentioned in

21  either of Mr. Tubach's motions, but he did raise in court I

22  believe yesterday or the day before.  It is clearly related.

23  As I think Mr. Tubach acknowledged, the "one at a time" is a

24  reference to basically one customer at a time, which

25  corroborates Mr. Bryant's testimony that Pilgrim's had a

1    strategy of seeking the price increase first with KFC and

2    moving on from there one customer at a time.

3            So I believe this e-mail chain started with securing a

4    price increase for Boston Market.  That's the BM reference.

5    And individuals within Pilgrim's were congratulating each other

6    on like I think a 17-cent price increase.  Mr. Stiller then

7    responded, "One at a time.  Got KFC and Boston Market, rest

8    still to come."

9            I think it's very relative to the materials in this

10   summary which is essentially the conclusion of those KFC

11   negotiations in 2014 starting with the Mar-Jac call and

12   Mr. Lewis' e-mail and followed by calls that followed right

13   around the deadline for the final bid submission and then this

14   sort of congratulatory message that followed that.

15           I think in the government's *James* submission, we noted

16   the admissibility under 801(d)(2)(E) of these kinds of

17   conversations congratulating conspirators on the goals that

18   were achieved or even the receipt of payments from

19   conspiratorial objectives.  Your Honor of course ruled this

20   Exhibit 955 admissible on that basis under 801(d)(2)(E).  And

21   we think it's appropriate in this summary based on the subject

22   matter and the timing.

23           *THE COURT:*  Mr. Tubach?

24           *MR. TUBACH:*  Your Honor, Ms. Call is confusing the

25   question of admissibility and relevance with whether it belongs

1    on the chart.  We are not arguing that this Exhibit 955 is not

2    relevant to the case.  We are arguing it doesn't belong on this

3    chart.  She got up and made an argument.  That's exactly what

4    she is entitled to do. She shouldn't be doing it on this chart.

5         And we absolutely object to Exhibit 1030 being

6    included now.  The Court has made very clear February 10 was

7    the deadline to get it in.  We believe that the phone call

8    should come off because it's not related to the subject matter

9    of this chart and we absolutely object to the admission.

10        THE COURT:  Based on -- I don't remember exactly.

11   During the first trial Ms. Call said that I allowed it because

12   it was related in some way.  What was your recollection of that

13   relation?

14        MR. TUBACH:  I don't have a recollection of the

15   relation, only that it relates to KFC, but there are thousands

16   and thousands of documents that relate to the KFC negotiations

17   generally.  The point is this chart is about this specific

18   episode between August 29th when the customer says get us your

19   bids by next Wednesday and the phone calls next Wednesday.

20   That's what this chart is.  Everything else just relates

21   generally to KFC.  And if the standard is simply relevance to

22   let something in that's relevant to the case, then we have

23   eliminated the basis for not arguing in summary exhibits.

24        THE COURT:  Thank you, Mr. Tubach.

25        Ms. Henry?

1          *MS. HENRY:*  Your Honor, we have serious concerns with

2     the concept of the government wanting to add in any new exhibit

3     after Ms. Evans has testified about these charts.  It just

4     seems entirely inappropriate and again just doesn't -- we are

5     not here to add in more things.  And even with regard to the

6     arguments, Ms. Becker testified before Ms. Evans did.  Thank

7     you.

8          *THE COURT:*  Mr. Fagg?

9          *MR. FAGG:*  Good morning, Your Honor.  We have raised

10    another objection in our brief as it relates to Summary Exhibit

11    12 regarding Exhibit 1256.  We are withdrawing that objection.

12    1256 doesn't appear on Government Exhibit 12 and we are

13    withdrawing our objection to it.

14         *THE COURT:*  Thank you, Mr. Fagg.  Anyone else?

15         Ms. Call, one last word?  Explain to me again on the

16    first entry and also as to 1030, I don't remember my ruling

17    before, but what was the connection between the Mar-Jac phone

18    call and 1030 and then Mr. Lewis' e-mail that comes later that

19    afternoon?

20         *MS. CALL:*  Yes, Your Honor.  This call preceded or was

21    as the second round of negotiations started with KFC, so

22    negotiations weren't -- were underway.  It's not like the

23    August 29th at 2:00 o'clock Mr. Lewis e-mail was the first any

24    of these suppliers had heard of them.  So essentially, you

25    know, the companies had already proposed these historic price

1    increases.  On August 29th, which winds up the day KFC sends a

2    formalized request for second bids, is when likely Mr. Martin

3    from Mar-Jac reaches out to Defendant Penn.  And then we see

4    then in Exhibit 1030 the lower half of the handwritten notes.

5            Ms. Pearce, could you pull up Exhibit 1030?

6            So there is a couple items on here that Your Honor

7    based your *James* ruling on.  But first, the subject matter

8    being KFC is clear from the name Steve Campisano appearing at

9    the upper right-hand side, who is one of the employees of RSCS.

10           Second, you have this August 29th date, which is the

11   same date we are talking about on the summary here written at

12   the very upper left-hand side.  And then the bottom portion of

13   the document you see Mr. Martin's notes about discussions with

14   competitors.  You have a reference to Mitch, who is Mitch

15   Mitchell.  And "They are up 19 and holding," a reference to

16   increasing 19 cents and holding on that price increase.

17           Then you have several other competitors including

18   Tyson, Claxton, and then "Talk to Jayson Penn," plus 8 cents --

19   or plus eight cost, I think, plus 11 margin, clearly a

20   reference to their price increase for KFC.  So this is clear

21   evidence coupled with the phone call that on this day as the

22   second round of bidding was beginning that Mar-Jac was reaching

23   out to its competitors and discussing this price increase and

24   the stance the competitors were taking in this second round

25   even, so the fact that they would be holding.  Because, of

1   course, you already submitted your first round bid.  There is

2   now this request for a second round bid coming in and the

3   competitors are holding on their initial offer.

4           So it's clearly interrelated with this second round of

5   bidding and the conclusion of the negotiations that is

6   described throughout this exhibit.

7           THE COURT:  I am going to sustain both of Mr. Tubach's

8   objections to it.  I think he is right that the purpose of the

9   summaries is to summarize voluminous information and they can't

10  be argumentative.  The standard is not whether or not there is

11  some admissible evidence, because those -- the Mar-Jac to Penn

12  call and 1030 are both relevant and so for that reason as 955.

13          But the fact they may be relevant to some issue

14  doesn't necessarily mean that they fall within some proper

15  relationship to what is contained on a summary.  So, of course,

16  Mr. Lewis sends out the e-mail.  It's not the first one.  He is

17  talking about making good progress.  As Ms. Call said, this is

18  not the opening of the whole process.  But then, of course,

19  what follows then is a flurry of phone calls.  That's all

20  appropriately included on the chart because that helps to

21  summarize all those different calls.

22          But then to have a big gap for the last entry coming

23  some 16 days later, that I do find, even though once again it

24  may be part of that whole process, falls into a category of

25  argument.  So I will order that the first and last entries be

1    excluded and 1030 is not appropriately added either.

2         All right.  Exhibit 15?

3         Mr. McLoughlin?

4         MR. McLOUGHLIN:  Your Honor, we started with 12, but

5    we do have if we are going to go -- we also have an objection

6    with respect to Exhibit 9.  I don't know how you want to do the

7    numerical order.

8         THE COURT:  Well, that wasn't in 1106, so I think we

9    are going to stick with 1106.  We are going to take them in

10   that order.

11        Mr. Tubach?

12        MR. TUBACH:  I guess perhaps what I should do is just

13   say that we've made our points clear in 1106.  And I am happy

14   to repeat them, but perhaps it would be easier to have Ms. Call

15   explain why we are not right.

16        THE COURT:  Sure.  Let's do that.

17        Ms. Call?

18        MS. CALL:  Yes, Your Honor.  I think based on the

19   Court's instruction last time we talked about the summaries

20   regarding modified excerpts following February 10th, the

21   government can remove the added excerpts from Exhibit -- I

22   believe it's 1584 and 1501.  So for 1584 that's the reference

23   to injected dark meat.  And from 1501 it's the content aside

24   from the subject line of that e-mail.  So we will remove those.

25        And I think that puts the only pending objection on 15

1    to be Ms. -- Kantola's regarding 1519, 1521 and 1521-1, which

2    is what the government briefed in its filing on 801(d)(2)(E).

3              THE COURT:  Mr. Tubach?

4              MR. TUBACH:  For clarity sake, the chart is going to

5    go back to the way it was on February 10th with respect to the

6    issues we argued in 1106, and now the only issue we have

7    outstanding is the MacKenzie.  That's what I understood the

8    government to say.

9              THE COURT:  I am sorry, what was that last part?

10             MR. TUBACH:  The only outstanding issue on this one,

11   then, is the Bruce MacKenzie issue.

12             THE COURT:  Right.  We are not going to take that up

13   right now, but we do need to take that up so we can iron that

14   out.  Maybe we should take that up right now.  Why don't we

15   take that up right now.

16             Ms. Henry, go ahead.

17             MS. HENRY:  Your Honor, I have had a chance to look at

18   the cases that were cited in the government's brief, and none

19   of them have anything that is going to contradict the basic

20   issues that we presented earlier about why these exhibits

21   cannot be admitted under 801(d)(2)(E).

22             THE COURT:  Ms. Henry, do you mind just to make the

23   record repeating what those exhibit numbers are?

24             MS. HENRY:  They are Exhibit 1519, 1521 and 1521-1.

25             THE COURT:  Go ahead.

1          *MS. HENRY:*  And they are exhibits where Bruce

2     MacKenzie is the declarant.  And as we discussed previously

3     where Bruce MacKenzie is the declarant, he is the individual

4     who must be shown to have beyond a -- by a preponderance of the

5     evidence be shown to be a conspirator.

6          And *In Re: Japanese*, the case there, they have it very

7     clearly -- the trial court held in that case that before it

8     could admit co-conspirator statements under Rule 801(d)(2)(E),

9     it must find by a preponderance of the independent evidence

10    that the conspiracy relied upon for admissibility existed for

11    each party against whom it was being shown and each party must

12    have been a member of that conspiracy.

13         Ms. Call apparently has this notion that because

14    Mr. Kantola and Mr. MacKenzie were both employees of Koch

15    Foods, that that is a sufficient conspiracy under 801(d)(2)(E).

16    And as I said previously, we have found absolutely no case law

17    that supports the concept that because you are a member of the

18    same company, you are suddenly -- everybody in the company is

19    now a co-conspirator if one of them is somehow involved.

20         *Kendall*, the case *Kendall*, they were concerned in that

21    case, it was all about whether the conspiracy had to be

22    illegal.  There was no challenge to the fact that everybody who

23    was involved was the same people, et cetera, but that the

24    conspiracy became illegal only at a time when the statute came

25    into effect even though the conspiracy had lasted previously, a

 1   very different type of a situation.

 2           In *El-Mezain*, again the agreement -- the issue was

 3   whether the agreement between the co-conspirators needed to be

 4   unlawful.  It did not go to the issue.  There was independent

 5   evidence that the defendants and the declarant in that case all

 6   had the common goal to support HAMAS and that was the issue in

 7   that case.

 8           THE COURT:  And I think they were part of the same

 9   group.  It was just the -- there is continuity earlier that

10   they were members of the same conspiracy.

11           MS. HENRY:  And that was true also in *Anderson* when

12   all five defendants were in a relationship in furtherance of

13   the issues, that the statements were made in furtherance of

14   that issue that all the five defendants were involved in.  Here

15   the government hasn't even articulated what in the world this

16   conspiracy is that Mr. MacKenzie would have been a part of.

17   And certainly nothing in it could possibly relate to all of the

18   defendants here.

19           In his interview, Mr. MacKenzie explicitly stated that

20   his actions were in furtherance of his competitive spirit,

21   which is precisely the opposite of the goals and objectives

22   that the government is alleging Mr. Kantola or all of these

23   defendants purportedly had.  So we are really back to looking

24   at what the record is here and the record is very clear with

25   regard to Mr. MacKenzie.

988

1          THE COURT:  Relying, as you had argued before, that

2     the interview memo undercut the basis for the Court's ruling in

3     the *James* hearing as to these exhibits.

4          MS. HENRY:  It is very much a changed circumstance

5     once that information has become available.  And as I said, any

6     issues on credibility are really for Your Honor to decide if

7     there are any, which I don't believe that the government has

8     actually articulated that.  Thank you.

9          THE COURT:  Thank you, Ms. Henry.

10         Ms. Call?

11         MS. CALL:  Yes, Your Honor.  I think we can, you know,

12    distinguish the particulars of each of these cases all that we

13    want, but the law is established.  You can look at any

14    evidence, textbook, McCormick, Wright & Miller, and they all

15    talk about this joint venture application of 801(d)(2)(E) and

16    how it is not limited to the charged conspiracy and that

17    801(d)(2)(E) for hearsay purposes relates to common

18    undertakings, joint undertakings between individuals regardless

19    of a criminal purpose.  And it's not unheard of -- well, it's

20    actually common this being applied in criminal cases to apply

21    to a joint venture that's something separate than the charged

22    crime.

23         I think we cited several in our brief, but some of the

24    circumstances include, you know, a ship logbook being

25    admissible under 801(d)(2)(E) in like a piracy case even if

1  every member of the boat wasn't a part of whatever this crime

2  was.  An example of that is *United States v. Postal*, which is

3  589 F.2d 862 in the Fifth Circuit, and that's just finding that

4  joint venture being the voyage of the ship.

5       THE COURT:  What troubles me is what's the limiting

6  principle?  Because if that were true, it would seem to be

7  rather convenient.  It would be such a huge exception to the

8  hearsay rule that in any case you'd just say, hey, part of the

9  same company.  Company is the conspiracy, lawful, but every

10  statement is a part of that and everything comes in.

11       MS. CALL:  Yes, Your Honor.

12       THE COURT:  You don't see any cases like that.

13       MS. CALL:  I think that is what the Third Circuit

14  addressed in *In re: Japanese Electronic Products* antitrust

15  litigation which Ms. Henry had noted and that is 723 F.2d 238

16  in the Third Circuit 1983.  And when they were addressing this

17  joint venture theory, they said the real limitation is that

18  Rule 402 and that's what protects against this breadth concern

19  Your Honor has.  They said Rule 402 affords adequate protection

20  against admission of statements in furtherance of joint

21  undertakings that are remote and unrelated to the conspiracy

22  relied upon as a basis for liability.

23       Here it's not remote and unrelated.  We have

24  Mr. MacKenzie working with Mr. Kantola in furtherance of this

25  KFC business as part of a joint undertaking with him, so at

1   least we know these documents are admissible against

2   Mr. Kantola.  But on top of that, from all the other evidence

3   in this case and the charged crime, we know that these

4   competitors were actually working together for that business.

5   They weren't competing.  They were working together on price.

6   And Mr. MacKenzie was inherently a part of that because of his

7   association with Mr. Kantola.

8        And, you know, credibility issues aside with his

9   interview, you know, there was this common goal among the

10  businesses in their price negotiations.  And they were under a

11  larger joint venture which is the charged conspiracy.  But

12  this, you know, subset of Koch of just the colleagues there is

13  certainly intertwined in the facts and in the charge of this

14  case and not remote, which is what the Third Circuit held as

15  kind of the bounds of 801(d)(2)(E) in this application.

16       THE COURT:  Okay.  I am going to sustain Mr. Kantola's

17  objections to those.  First of all, it is unusual to have a

18  situation where the basis for the *James* ruling would be somehow

19  a changed circumstance because, for one thing, the standard is

20  not high when it comes to the *James* hearing.  And there was

21  certainly a basis for that based upon the testimony of Special

22  Agent Taylor.

23       However, I-683 is a 302 from the FBI where

24  Mr. MacKenzie, who is the declarant in each of those exhibits,

25  is interviewed and makes various statements that I find are

1    sufficient to indicate that the basis that Special Agent Taylor

2    had at the time of the *James* hearing before this interview ever

3    took place is now substantially different.  And the government

4    today does not argue otherwise.

5        And, for instance, the 302 says MacKenzie never had a

6    competitor tell him the competitor's price.  MacKenzie never

7    heard a competitor tell his, MacKenzie's co-workers, that

8    competitors' prices -- tell his, MacKenzie's co-workers, the

9    competitors' price.  MacKenzie never told to competitors Koch's

10   pricing.

11       And the memorandum says such things as:  In the e-mail

12   MacKenzie was telling Grendys where Koch fell within the

13   rankings.  Ultimately Grendys set the price for what he thought

14   the wings were worth.  MacKenzie had no recollection of Kantola

15   giving him competitive pricing and did not know where he was

16   getting the pricing.  That's just some of them.

17       So I do believe that the interview that took place of

18   Mr. MacKenzie later on does change the basis, and there is not

19   a basis to find that Mr. MacKenzie was part of the charged

20   conspiracy at this point in time.

21       Then we get to the government's claim that these

22   documents should be admissible based upon the joint venture

23   exception to the hearsay rule.  And Ms. Call is right that it

24   doesn't have to be a criminal enterprise.  It does not have to

25   be -- and there are at least some cases that suggest it can be

1    a different conspiracy.  But as Ms. Call acknowledged, it has

2    to be temporally related.  It has to be related.

3           Now, temporally, it is taking place at the same time,

4    so that condition is met.  However, it's not otherwise related.

5    Ms. Henry makes a good point.  To say that Mr. MacKenzie and

6    Mr. Kantola were engaged in working on these contracts

7    together, which is a -- we know from the MacKenzie interview

8    memo is for competitive purposes, but also then that means that

9    it's related to the charged conspiracy, which is

10   anti-competitive, I think is much too much of a stretch to

11   claim that there is some type of relation to that.

12          And so I can't find that, No. 1, there is that type of

13   relationship.  But second, even if there were some type of

14   relationship, I don't believe that it would be admissible

15   against anyone else, so it only would be potentially admissible

16   against Mr. Kantola, but as I said, I don't find any

17   relationship.  So I don't find a basis to admit the hearsay for

18   Mr. MacKenzie in Exhibits 1519, 1521 or 1521-1.

19          How do we look juror-wise?  We're good?  Okay.  Anyone

20   want to take a brief break before we bring the jury back in?

21          Mr. Tubach?

22          *MR. TUBACH:*  I have one very brief issue to raise with

23   regard to Mr. Suerken before he retakes the stand.  It will

24   take 30 seconds.

25          *THE COURT:*  Go ahead.

1          MR. TUBACH:  There are three exhibits that the

2    government has indicated they intend to use with Mr. Suerken.

3    They are contracts, KFC contracts.  They have continued to not

4    redact the first page entirely.  I am just stunned, honestly.

5    It's like the eighth time we have raised this.  I give the

6    Court the exhibit numbers.  1728-1.

7          THE COURT:  They will have to be -- we can't display

8    those and they will have to be redacted, obviously.

9          MR. TUBACH:  Thank you, Your Honor.

10          THE COURT:  So why don't we take five minutes.  I

11    don't want to take any longer than that.  And then we will

12    bring the jury back in.  It's really great that the jury is

13    showing up on time, so I don't want to disincentivize them.

14          MR. McLOUGHLIN:  At some point we would like to be

15    heard on Exhibit 9.  It's particularly relevant now that

16    Mr. Ledford is off the stand.  And on the larger issues that we

17    flagged for Your Honor, we see that time is speeding by, so we

18    will file a short brief with Your Honor later this morning on

19    the bigger picture issues with respect to the summary charts,

20    particularly the confrontation clause issues and some of the

21    Ray and Brooks issues that arise from those, so hopefully it

22    will be more time efficient.

23          THE COURT:  Okay.  We will be in recess.

24       (Recess at 8:35 a.m.)

25       (Reconvened at 8:42 a.m.)

Pete Suerken - Direct

1        THE COURT:  Do we have Mr. Suerken?

2        Let's bring the jury in.

3        (Jury present.)

4        THE COURT:  Good morning, ladies and gentlemen.  Once

5    again, thanks for being on time.  I apologize for us starting a

6    little late.  That's my fault.  I wanted to talk to the

7    attorneys about some things, so I apologize.  I will try to

8    avoid that.  As you will recall, we had just started the direct

9    examination of Mr. Suerken and we will continue with that now.

10        Mr. Torzilli, go ahead.

11        MR. TORZILLI:  Thank you, Your Honor.

12        (**Pete Suerken** was previously sworn.)

13                    **DIRECT EXAMINATION CONTINUED**

14   BY MR. TORZILLI:

15   Q.  Morning, Mr. Suerken.

16   A.  Good morning, sir.

17   Q.  Just to go back to -- we had just started your testimony

18   late yesterday afternoon.  Just a couple of things that we had

19   covered just to remind ourselves.  You said that Mr. Ledford

20   left in approximately mid 2014?

21   A.  Spring to summer of 2014, yes, sir.

22   Q.  When he left you assumed his responsibilities?

23   A.  Yes, sir.

24   Q.  And did that include responsibility for heading up the team

25   at RSCS to negotiate the annual contracts with the

Pete Suerken - Direct

1   chicken-on-the-bone suppliers?

2   *A.*   It did.

3   *Q.*   When did those contract negotiations commence?

4   *A.*   The summer of 2014.

5   *Q.*   And when were they completed, approximately?

6   *A.*   The fall of -- the fall of 2014.

7   *Q.*   And when those contracts were completed, were the prices

8   that you all negotiated higher or lower or the same as the

9   prices that had been placed as a result of the negotiations the

10  prior year?

11  *A.*   Higher.

12  *Q.*   With how many of the suppliers was it higher?

13  *A.*   I believe all seven.

14  *Q.*   All seven suppliers higher prices?

15          Approximately was it a small price increase or a large

16  price increase or something else?

17  *A.*   Very large.

18  *Q.*   Could you explain how large the price increase was in 2014?

19  *A.*   15, 20, 25 percent.

20  *Q.*   15 to 25 percent compared to the prior year?

21  *A.*   Yes.

22  *Q.*   You mentioned that there were seven suppliers.  Could you

23  identify them, please?

24  *A.*   Case Farms, George's, Claxton Poultry, Mar-Jac, Tyson,

25  Pilgrim's, Koch Foods.

Pete Suerken - Direct

1    *Q.*  And who at -- did you have someone at Pilgrim's Pride that

2    was your primary person that you negotiated with?

3    *A.*  Roger Austin.

4    *Q.*  And how about at Claxton?

5    *A.*  Mikell Fries and Scott Brady both.

6    *Q.*  And Tyson?

7    *A.*  Brian Roberts.

8    *Q.*  And Koch Foods?

9    *A.*  Bill Kantola.

10   *Q.*  Case Farms?

11   *A.*  Kevin Phillips, and I believe the gentleman's name is Mitch

12   Mitchell.

13   *Q.*  How about Mar-Jac, who did you negotiate with at Mar-Jac?

14   *A.*  I didn't do much direct negotiation with Mar-Jac.

15   *Q.*  Who did -- who on your team did do direct negotiation with

16   Mar-Jac principally?

17   *A.*  Bob Lewis.

18   *Q.*  And did you do much direct negotiation with anyone at

19   George's?

20   *A.*  Yes, sir, Charles George.

21   *Q.*  You mentioned Mr. Lewis.  Was he a member of the team that

22   you had in place to conduct the negotiations?

23   *A.*  Yes, he was.

24   *Q.*  What was his role?

25   *A.*  Mr. Lewis was brought in after Mr. Ledford left to serve as

997

Pete Suerken - Direct

1   our poultry expert.

2   Q.  Could you bring the mic closer to your mouth?  Could you

3   repeat that answer, please?

4   A.  We brought Mr. Lewis in to serve as our poultry expert

5   after Mr. Ledford left.  Bob Lewis had bought poultry -- bought

6   eight-piece cut-up chicken for KFC for 20 years, 20-plus years.

7   Q.  And what had he been doing before he came back in 2014?

8   A.  He had retired.

9   Q.  He had retired from the industry entirely?

10  A.  Yes, sir.

11  Q.  And came back to help with the negotiations?

12  A.  He did.

13  Q.  Besides Mr. Lewis, who else was on your team?

14  A.  Steve Campisano, Rich Eddington later on in the process and

15  myself.

16  Q.  What was Mr. Campisano's role?

17  A.  Mr. Campisano did a lot of analytics on the offers coming

18  in, but mainly focused on distribution logistics, where the

19  plants were, how many loads each supplier had, and coordinating

20  those back and forth.

21  Q.  And when did Mr. Eddington come aboard RSCS approximately?

22  A.  Late summer, summer 2014.

23  Q.  What was his role?

24  A.  To serve as our poultry expert.

25  Q.  And you were the leader of that team?

998

Pete Suerken - Direct

1   A.  I was the leader of the team, yes, sir.

2   Q.  What was the duration of the contracts that you negotiated

3   with the seven chicken suppliers in 2014?

4   A.  Three years.

5   Q.  So it covered calendar year '15, '16, '17?

6   A.  Yes, sir.

7   Q.  Was it common or uncommon to -- for RSCS to do a three-year

8   contract for chicken-on-the-bone supply?

9   A.  I can't really speak to that.  I didn't -- I hadn't

10  negotiated chicken to that point, so therefore I don't know the

11  duration of the contracts previous to that.

12  Q.  Are you familiar with the contract that was in place during

13  calendar year 2014?

14  A.  Not particularly.

15  Q.  Okay.  So the contract that you negotiated, the three-year

16  contract was going to be up at the end of calendar year 2017?

17  A.  Yes, sir.

18  Q.  Were you involved in the negotiations for the next

19  contract, so the contract that would start when the three-year

20  contract ended?

21  A.  I was.

22  Q.  When did negotiations commence for that subsequent

23  contract?

24  A.  The fall, late fall 2017, early winter 2017.

25  Q.  Late fall of what year?

1    *A.*  Are you asking -- repeat the question.

2    *Q.*  Sure.  When did the contract negotiations for that

3    subsequent contract, so the one that ended at the end of the

4    calendar year 2017, when did that one begin?

5    *A.*  Fall of 2016, winter -- beginning of the winter in 2016.

6    *Q.*  So 11 to 13, 14 months before the expiration?

7    *A.*  Yes, sir.

8    *Q.*  Why so far out from the end of the contract?

9    *A.*  Because the feeling was that the market had changed a

10   little bit.  There was a few more loads around.  And we felt

11   like we had more leverage and would be able to get our prices

12   lower and pull that into 2017 and get some relief on the

13   inflation we experienced in 2014.

14   *Q.*  So is it fair to say the purpose was to try to negotiate

15   lower prices than you had in place?

16   *A.*  Yes, sir.

17   *Q.*  And what was your role in those subsequent negotiations?

18   *A.*  I set the strategy and we kind of got started.

19   *Q.*  You said in your previous answer that the market had

20   changed.  Could you explain what you mean by the market had

21   changed?

22   *A.*  There was more loads showing up.  There were more loads

23   available.  In 2014 we couldn't buy chicken.  There just didn't

24   seem to be any.  2016 there was loads available.  People had

25   extra loads all of the sudden.  There was another supplier that

1000

Pete Suerken - Direct

1   was wanting to enter the marketplace.  So there just seemed to

2   be more loads available all of the sudden.

3   Q.   What supplier was wanting to enter the marketplace?

4   A.   OK Foods.

5   Q.   Was that in the market for the type of bird that KFC

6   requires?

7   A.   Yes, sir.

8   Q.   What type of bird does KFC require?

9   A.   Small bird.

10  Q.   So KFC was reviewing the possibility of purchasing from OK

11  Foods?

12  A.   Yes, sir.

13       MR. KORNFELD:  Objection, Your Honor, foundation.

14       THE COURT:  Sustained.

15  BY MR. TORZILLI:

16  Q.   Were you evaluating the possibility of purchasing from OK

17  Foods?

18  A.   We were.

19  Q.   And did you, in fact, purchase from OK Foods?

20  A.   I can't answer that question.

21  Q.   Why is that?

22  A.   I was relieved of my duties in late February of 2017.

23  Q.   So you were -- you started the process of the negotiations

24  for the contract, but you departed from RSCS before they

25  concluded?

1001

Pete Suerken - Direct

1   A.  Yes, sir.

2   Q.  If you can on the screen -- if we can call up Government

3   Exhibit 1801.  That should come up onto your screen, sir.

4        Do you see government Exhibit 1801 on the screen in

5   front of you?

6   A.  No, sir.  There it is.

7   Q.  Do you recognize this?

8   A.  I do.

9   Q.  What is it?

10  A.  It appears to be an e-mail that I wrote to the

11  chicken-on-the-bone suppliers in February of 2017.

12  Q.  Had you met with chicken suppliers for purposes of

13  negotiating a new contract prior to writing this e-mail?

14  A.  I don't remember exactly who I had met with and who I

15  hadn't, sir.

16  Q.  What was the purpose of the e-mail that you wrote that

17  appears in Government Exhibit 1801?

18  A.  If you wouldn't mind, I would like to read the e-mail.

19  Q.  Sure.

20  A.  Okay.

21  Q.  What was the purpose of the e-mail that you wrote in --

22  that appears in Government Exhibit 1801?

23  A.  Letting the suppliers know where we were in the process,

24  that we had already contracted for a few loads, and that our

25  expectation was that they put their best prices forward and

Pete Suerken - Direct

1   that we would be closing out the negotiations very quickly.

2   Q.  Who was the e-mail that you wrote that appears in 1801 sent

3   to?

4   A.  I don't remember specifically who it would have been sent

5   to, sir.

6   Q.  Do you remember generally?

7   A.  Yes, sir.

8   Q.  And what do you remember generally about who this was sent

9   to?

10  A.  That would have gone to representatives of all seven of the

11  incumbent chicken-on-the-bone suppliers, as well as maybe OK

12  Foods.

13          MR. TORZILLI:  Government moves to admit Exhibit 1801.

14          THE COURT:  Any objection to 1801?

15          Exhibit 1801 will be admitted.

16          MR. TORZILLI:  Thank you, Your Honor.  Permission to

17  publish?

18          THE COURT:  You may.

19          MR. TORZILLI:  Thank you.

20  BY MR. TORZILLI:

21  Q.  So Mr. Suerken, I would like to direct your attention in

22  the first paragraph to the second to the last sentence, so it's

23  the fourth line down in the middle.

24          JUROR:  It's not working and it's too blurry on that

25  one.

Pete Suerken - Direct

1    THE COURT:  That's a problem.  Let's see if we can try

2   our document viewer real quick.  Can you switch it over,

3   Ms. Grimm?  Did you?

4    JUROR:  Some of the monitors have static.  Now we can

5   see it better on that screen.

6    THE COURT:  Some of your monitors are working?

7    JUROR:  Yeah.

8    THE COURT:  But some aren't.

9    JUROR:  Yeah.

10    THE COURT:  And I imagine it's a long view.  How many

11   of you cannot see the flat panel monitor and have a monitor

12   that doesn't work?

13    JUROR:  I can see that, but this doesn't work.

14    THE COURT:  What was that?

15    JUROR:  I can see that one, but this monitor.

16    THE COURT:  Mr. Kramer, you are too far away.

17    JUROR:  Our monitors are working.  These are not.

18    THE COURT:  Can everyone see the flat panel at least?

19   I think it's good we have got it blown up the way that we do.

20   Let's go ahead and proceed.

21   BY MR. TORZILLI:

22   Q.  So Mr. Suerken, on the first paragraph of government

23   Exhibit 1801, I want to direct your attention on the fourth

24   line to a sentence in the middle that says, "So that everyone

25   is aware, we have bought some loads in our initial meetings."

Pete Suerken - Direct

1    Do you see that?

2    A.  Yes, sir.

3    Q.  What were you trying to tell the recipients of this e-mail

4    with that sentence?

5    A.  That we had contracted for loads in our additional -- in

6    our initial meetings.  And when I say contracted for, that

7    means we had contracted for chicken for the next two or three

8    years in those initial meetings with those suppliers.

9    Q.  And what were the -- did you negotiate also prices?

10   A.  Yes, sir.

11   Q.  When were those prices to take effect?

12   A.  I can't remember, sir.

13   Q.  Was it in the near term or was it going to be at the end of

14   the contract that was going to be over in 2017?

15   A.  I can't say definitely.

16   Q.  Okay.  But what was your purpose of telling everyone that

17   you had already bought some loads after the meetings?

18   A.  We were trying to be fair with all of our incumbent

19   suppliers.

20   Q.  What do you mean by fair?

21   A.  We didn't want them --

22        MR. KORNFELD:  Object, Your Honor, objection based on

23   the Court's ruling yesterday and Docket 1069 as to "fair."

24        THE COURT:  Sustained.  If you can rephrase the

25   question.

Pete Suerken - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  What was your purpose for -- or what did you want the

3   suppliers to do in response to the sentence that we're focused

4   on here in 1801?

5          *MR. KORNFELD:*  Objection, foundation as to suppliers,

6   plural.

7          *THE COURT:*  Overruled.

8   *BY MR. TORZILLI:*

9   *Q.*  Go ahead, sir.

10  *A.*  I wanted to make our incumbent suppliers aware that there

11  were loads that we had bought that were no longer available for

12  them to sell us.

13  *Q.*  Why did you want to make the incumbent suppliers aware of

14  that?

15  *A.*  So they would ultimately lower their price to assure that

16  they got the loads that they needed to sell us.

17  *Q.*  You wanted to spur them to submit lower prices?

18          *MR. KORNFELD:*  Objecting, leading.

19          *THE COURT:*  Overruled.

20  *A.*  Yes.

21  *BY MR. TORZILLI:*

22  *Q.*  Later in that first paragraph and at the end of that first

23  paragraph, you say, "The offers we bought were fair and

24  reasonable and were consistent with our goals of building our

25  partnership together via quality and reinvestment back in small

1006

Pete Suerken - Direct

1    bird production."

2              Do you see that?

3    A.  Yes, sir.

4    Q.  Okay.  And what did you mean by goal of building a

5    partnership together via quality and reinvestment back in the

6    small bird production?

7    A.  The KFC business as a whole is dependent upon small birds.

8    Without a consistent supply of small birds, KFC wouldn't be in

9    business.  It's 50 percent of what they sell approximately at

10   the time, I believe.  And we were looking for partners that

11   would assure us reasonable prices that we could operate our

12   stores and at the same time provide us a food-safe quality

13   product and assure us supply so we could run our stores.

14   Q.  Did you want to ensure that small bird suppliers remained

15   in the market to sell small birds?

16   A.  Yes, sir.

17   Q.  And how did that -- how did that aspect of your approach to

18   the negotiations at this time figure into the prices you were

19   willing to negotiate with them?

20   A.  Could you repeat the question?

21   Q.  Sure.  How did the idea of wanting to keep the small bird

22   suppliers in the small bird market factor into, if at all, the

23   prices you were willing to agree to with the suppliers during

24   these negotiations?

25   A.  We were willing to pay a slightly higher or a little bit

Pete Suerken - Direct

1   more margin to entice them to stay in business.

2           MR. TORZILLI:  We can take this document down.  Thank

3   you.

4   BY MR. TORZILLI:

5   Q.  Mr. Suerken, I would like to go back now to 2014 and talk

6   about that a little more.  You mentioned seven chicken

7   suppliers that you were negotiating with in 2014.  Did you

8   consider those seven suppliers to be competitors of each over

9   for RSCS contracts?

10  A.  Yes, sir.

11  Q.  And in what way or in what ways were those seven chicken

12  suppliers competitors of each other from your perspective?

13  A.  They were competing with each other to sell us product.

14  Q.  And what were the aspects of competition that were

15  important to you during these negotiations?

16  A.  Supply assurance, food safety and quality and price.

17  Q.  Could you explain what food safety -- how food safety and

18  quality was an aspect of the competition that you were looking

19  for in 2014?

20  A.  It's table stakes.  Without that they wouldn't be able to

21  supply us chicken on a regular basis.

22  Q.  What do you mean by table stakes?

23  A.  If you don't have quality product that's food-safe, we

24  can't buy it regardless of price, regardless of supply.

25  Q.  In essence a bare minimum?

Pete Suerken - Direct

1   A.   Yes, sir.

2   Q.   How about supply assurance, how did that factor into the

3   competition among suppliers in 2014?

4   A.   To operate a KFC, you have to have consistent supply of

5   product.  And if you don't have consistent supply of product,

6   you can't operate a store.  Therefore, supply assurance when

7   you order it, you get it.  If you're contracted for 20 loads,

8   you ship us 20 loads.

9   Q.   Was supply assurance particularly important for you in 2014

10  because of the supply shortages you testified to yesterday that

11  occurred?

12  A.   Yes, sir.

13  Q.   Earlier in 2014?

14  A.   Yes.

15  Q.   And how about price?  How did price factor in in the

16  competition between the chicken suppliers in 2014?

17  A.   Obviously, we were trying to buy the lower cost.

18  Q.   And what do you mean by lower cost?

19  A.   Lower priced per-pound basis.

20  Q.   Why?

21  A.   Because at a lower cost structure our KFC stores would be

22  more profitable.

23  Q.   Were KFC stores challenged from a profitability point of

24  view in the 2014 time frame?

25  A.   Yes, sir.

Pete Suerken - Direct

1    Q.  Could you explain?

2    A.  We had operators going out of business.  I think it's a

3    public fact we were closing restaurants year every year, on a

4    year-every-year basis.

5    Q.  Was price a particularly important aspect of competition in

6    2014?

7    A.  Yes, sir.

8    Q.  Did you and your team have a process by which you

9    negotiated the contracts in 2014?

10   A.  We issued a closed envelope or blind bid RFP, which is

11   request for proposal or request for purchase.  It was a

12   Excel-based spreadsheet in which the suppliers were to fill out

13   different components of their pricing to allow us to build up

14   to a per-pound basis that we were going to buy those chickens

15   at.

16   Q.  Prior to the chicken suppliers submitting their Excel

17   spreadsheets with the closed envelope bids, did you and your

18   team have meetings with the chicken suppliers?

19   A.  We did.

20   Q.  When did those meetings occur, approximately?

21   A.  Late summer of 2014.

22   Q.  What was the purpose of these meetings?

23   A.  This was my first go-around within the category.  I didn't

24   really know the players involved as well as I should have.  It

25   was an opportunity to do a meet-and-greet.

Pete Suerken - Direct

1   Q.  Did you personally meet with all the chicken suppliers?

2   A.  I did.

3   Q.  All seven?

4   A.  Yes.

5   Q.  Did the rest of your team meet with them as well?

6   A.  I can't remember who was in and out of those meetings at

7   the time, but I know I was.

8   Q.  Was it part of Mr. Lewis' job responsibilities at the time

9   to attend?

10  A.  Yes, sir.

11  Q.  And would the same be true for the most part for

12  Mr. Campisano?

13  A.  Yes, sir.

14  Q.  Do you know whether Mr. Eddington had arrived at RSCS yet?

15  A.  I don't believe he had at that point.

16  Q.  So you met with all the chicken suppliers including

17  Pilgrim's Pride?

18  A.  Yes, sir.

19  Q.  Who did you meet with from Pilgrim's Pride?

20  A.  Roger Austin and a very large contingent from a group of

21  people from various production facilities.

22  Q.  What do you mean by very large group of people?

23  A.  It stood out to me that they were the only group that

24  brought eight, nine people to the meeting.  I mean, they came

25  in numbers.

Pete Suerken - Direct

1    Q.  Do you remember specifically anyone who attended other than

2    Defendant Austin?

3    A.  I remember one gentleman from Mayfield, Kentucky, but

4    that's about it.

5    Q.  And why is Mayfield, Kentucky memorable to you?

6    A.  Because Mayfield, Kentucky is a cost advantage facility for

7    KFC, and it's located in the state that we were in.

8    Q.  And can you explain what you mean by a facility?

9    A.  Eight-piece, chicken-on-the-bone production site.

10   Q.  So the manufacturing plant where the chickens are

11   processed?

12   A.  Yes, sir.

13   Q.  What do you remember about the meeting with Defendant

14   Austin and others from Pilgrim's?

15   A.  They made a presentation around all that they do for KFC

16   and then explained to us how and why prices were going to move

17   higher.

18   Q.  What do you recall them saying about how prices were going

19   to go higher?

20   A.  That I didn't have a choice.

21   Q.  Didn't have a choice in what?

22   A.  The prices were going to move higher.

23   Q.  Did they say anything else that you recall about prices?

24   A.  No, I don't remember anything else, sir.

25   Q.  What, if anything, did you say in reaction to the

Pete Suerken - Direct

1    presentation that was provided at that time?

2    A.   I can't remember my exact commentary, but our strategy was

3    to basically make ourselves attractive by giving them longer

4    term contracts and a fair margin structure.  And the fact that

5    KFC when -- we take loads every week.  You don't -- there is no

6    risk.  You don't have to worry about the back half of the bird.

7    You don't have to worry about anything else.  You just ship our

8    product every week.  So we were a good consistent supplier --

9    good consistent buyer that pays its bills.  We are willing to

10   do a long-term contract and we are willing to pay a fair

11   margin.

12   Q.   You said -- was it a slide presentation?

13   A.   I believe it was a PowerPoint deck.

14   Q.   Did someone present, sort of do the oral presentation

15   walking through the deck?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Roger led the discussion.

19   Q.   So you mentioned an RFP process that included a closed

20   envelope bid.  Could you -- or did you also call it something

21   else?

22   A.   Closed envelope, blind bid.

23   Q.   Are those synonymous?

24   A.   Yes.

25   Q.   Can you explain what a closed envelope or blind bid means?

Pete Suerken - Direct

1   *A.*   The buyer and the seller keep the information contained

2   within the RFP confidential between one another.  It's not to

3   be shared beyond the two.

4   *Q.*   Why did you and the team -- did you and the team choose to

5   proceed with a closed envelope bid?

6   *A.*   Yes, we did.

7   *Q.*   Why did you and the team choose to proceed with a closed

8   envelope bid?

9   *A.*   Because that's the custom in procurement.  That's what's

10  always done.

11  *Q.*   Are you talking about beyond RSCS?

12  *A.*   Yes, sir.

13  *Q.*   So you are familiar with that based on your experience

14  working elsewhere?

15  *A.*   Yes, sir.

16  *Q.*   So you requested -- you had an RFP which stands for?

17  *A.*   Request for proposal or request for purchase.

18  *Q.*   So you and the team sent those out.  Who would have been

19  responsible for -- primarily responsible for sending the RFP

20  information out?

21  *A.*   Bob Lewis would have been at that time.

22  *Q.*   And did Mr. Lewis to your knowledge set a deadline to

23  receive back the RFPs?

24  *A.*   He did.

25  *Q.*   And approximately when -- what was date associated with

Pete Suerken - Direct

1    that?

2    A.   It would have been in late -- mid to late August.

3    Q.   Of 2014.

4    A.   Of 2014, yes.

5    Q.   Is there any advantage to competition to using a sealed

6    envelope bid versus another bid methodology?

7            MR. KORNFELD:   Objection, Your Honor, foundation.

8            THE COURT:   Overruled.

9    A.   Yes, there is.

10   BY MR. TORZILLI:

11   Q.   Could you explain?

12   A.   When -- only true price discovery can take place between a

13   buyer and seller when they negotiate one on one together.  It

14   would defeat the purpose of a competitive negotiation if all

15   the competitors talked to one another regarding their offers.

16   Q.   What do you mean by true price discovery?

17   A.   Establishing what eight-piece chicken on the bone was truly

18   worth at the time.

19   Q.   Okay.  So the RFPs were due back in mid to late August of

20   2014.

21   A.   Yes.

22   Q.   And did the chicken suppliers, in fact, submit bids on or

23   around that time?

24   A.   Yes, sir.

25   Q.   Now, you mentioned the meetings that you had, kind of

Pete Suerken - Direct

1    meet-and-greet, I think you called them, type meetings.  And

2    you met with all seven of the chicken suppliers in that

3    meet-and-greet type format?

4    *A.*  We did.

5    *Q.*  So you met with Tyson as well?

6    *A.*  We did.

7    *Q.*  And who from Tyson did you meet with?

8    *A.*  Brian Roberts, and I can't remember if there was another

9    person there.  I don't know.

10   *Q.*  Between the time that you met with Defendant Roberts in

11   Tyson and the deadline for the bids due, did you ever ask

12   Defendant Roberts to call anyone at any competing chicken

13   supply company?

14   *A.*  No, sir.

15   *Q.*  Did you meet with Claxton Poultry in the meet-and-greet

16   setting?

17   *A.*  I did.

18   *Q.*  And who were the people you met with at Claxton?

19   *A.*  Mikell Fries and Scott Brady.

20   *Q.*  Between the time you met with Defendant Brady in Claxton

21   and the time that the deadline for the bids were due, did you

22   ask Defendant Brady to call any of his competitors?

23   *A.*  I did not.

24   *Q.*  Why not?

25   *A.*  Because it would have destroyed the competitive element of

Pete Suerken - Direct

1  the RFP process.

2  Q.  How so?

3        MS. HENRY:  Objection, Your Honor, 702.

4        THE COURT:  Let's have a side bar.

5     (At the bench:)

6        THE COURT:  The objection was 702.  I really don't

7  think it's 702, but Mr. Torzilli, I want to understand, you

8  were asking about, you know, whether -- you asked him to -- or

9  asked the suppliers to contact one another.  Is your intention

10  to do that for every time period as to each defendant or each

11  company?

12        MR. TORZILLI:  No, at least for this time period.  The

13  prebid or the pre-RFP period, I was actually done with those

14  questions.  That was my last question on this, and then I was

15  going to move on to the next period of time.

16        THE COURT:  Well, that's my question.  You know,

17  obviously the government could slice and dice the time periods

18  and ask that same repetitive question every single time, but my

19  suspicion is the answer is he never asked any supplier to ever

20  talk to the competitors.  And that's why you need to limit it

21  to just one question for the entire time period because

22  otherwise it's just a rhetorical device to keep reiterating

23  something that raises a specter.

24        So I am not going to allow you to continually ask him

25  that same question over and over again for each various time

Pete Suerken - Direct

1    period.  If you want to do it once, that's fine; once for each

2    supplier that's okay.  But then you should broaden the question

3    so it includes the entire bid negotiation, all right?

4         *MR. TORZILLI:*  Your Honor, can I inquire about that?

5    That's understood.  So would it be then appropriate for me at

6    the end of the examination to just ask about the entirety of

7    the bidding process and negotiation process with respect to,

8    you know, all seven suppliers and just do it that way?

9         *THE COURT:*  That's the best way.

10        *MR. TORZILLI:*  Okay.  I will plan on that.  Thank you.

11        *MS. HENRY:*  Your Honor?

12        *THE COURT:*  I can't hear you, Ms. Henry.

13        *MS. HENRY:*  With regard to the issue of asking this

14   witness about what is competitive and what is not competitive

15   and how something fits into a competitive structure, we do

16   object.  This is supposed to be a per se case, at least

17   according to the government, and not a case where they are

18   trying to get at the issue of what is competitive or not

19   competitive with regard to information sharing.  They are, in

20   fact, trying to get into a rule of reason case and they have

21   explicitly disclaimed that this is a rule of reason case.

22        This line of questioning is irrelevant under a per se

23   case.  And they're asking very specific questions that get into

24   expert areas and lay testimony that this witness has not been

25   qualified to answer, so we would object to that.

Pete Suerken - Direct

1          THE COURT:  Mr. Torzilli, how much more do you plan to

2    ask or how many more questions do you have of Mr. Suerken to

3    explain this competitive process?

4          MR. TORZILLI:  I think he has explained the

5    competitive process at this point, and now it's a matter of

6    kind of having him lay out how the process played out, you

7    know, how it was executed.

8          THE COURT:  And what do you mean by played out?

9          MR. TORZILLI:  That RFPs came in at or around the

10   deadline.  Him and the team evaluated them, what the team's

11   evaluation was, what they did next, negotiate with the

12   suppliers, what happened in those negotiations, what meetings

13   took place during those negotiations, what happened during

14   those meetings, and then what ultimately resulted in the

15   negotiation of the contracts.

16         THE COURT:  Okay.  All of that sounds perfectly fine.

17   However, you know, it's well established that RSCS has used

18   this blind bidding process.  That has been explained both by

19   Mr. Ledford and now by Mr. Suerken.  So it doesn't seem as if

20   that process needs to be described any more.

21         What I am worried about is that continually asking him

22   about that process and how it works with competition is going

23   to cause Mr. Suerken to then express an opinion, and we are

24   going to get into that fairness issue that we talked about last

25   night and I am worried about that.  So it seems as if he has

1019

Pete Suerken - Direct

1    explained the process.  Mr. Ledford explained the process.  The

2    process doesn't seem to be any different.  So hopefully we are

3    not going into any of those matters where we run a risk with

4    Mr. Suerken's response.

5         *MR. TORZILLI:*  Your Honor, I agree with that and that

6    sounds entirely fair.  Just to kind of clarify one point, we

7    needed to get into and establish the point with Mr. Suerken, of

8    course, because Mr. Ledford wasn't there in 2014.  So we needed

9    to establish what the process was in 2014, and I think we have

10   established now that the closed envelope or blind bidding was

11   in place for 2012, 2013 and 2014.

12        *THE COURT:*  Right.  Yeah, there weren't objections.

13   That's perfectly appropriate.  I am just saying now it seems as

14   if he has made his -- or you've made that point through his

15   testimony.

16        *MR. LAVINE:*  Your Honor, this is Bryan Lavine.  The

17   question, Your Honor, is:  Is the government planning on going

18   into 2017 also?

19        *THE COURT:*  I got the impression that he has already

20   described that process for 2017.  Is that right, Mr. Torzilli?

21        *MR. TORZILLI:*  I don't think there is going to be very

22   many more questions on 2017, at least not on direct

23   examination.  Of course, depending on what, you know, happens

24   on cross-examination, we reserve the right to get back into it

25   on redirect as appropriate.

1          MR. LAVINE:  My question goes to 2017 in light of the

2   fact that this man left and was not there for most of the

3   negotiations for 2017.

4          THE COURT:  Right.  We will play it by ear on that

5   one.

6          MS. PREWITT:  On behalf of Mr. Mulrenin, I want to

7   clarify, Your Honor, the prosecutor elicited that Mr. Suerken

8   did not ask Mr. Roberts to call on any competing chicken

9   supplier, and he also elicited that vis-a-vis Mr. Brady and

10  Mr. Fries.  I want to be sure he is not going to try to elicit

11  that a second time because he has already covered that.

12  Mr. Torzilli has already covered that territory.

13         THE COURT:  True, but that would be an awkward

14  question if he is going to ask kind of the grand finale type

15  question.  So even though it may be duplicative, I am going to

16  allow him to do that.

17         MS. JOHNSON:  Your Honor, Wendy Johnson on behalf of

18  Mr. Blake.  I think where the objection started and where the

19  side bar started was when Mr. Torzilli asked -- he asked if

20  there was a call.  And then he followed up and he said, Why

21  not?  And then he followed up again after Mr. Suerken said,

22  Because it would have destroyed the competitive element of the

23  RFP process.  And Mr. Torzilli said, How so?  And Your Honor, I

24  think that's where the concern lies.

25         And I just want to be clear that we are not going to

Pete Suerken - Direct

1    plow the same ground based on what the Court's order was from

2    yesterday because defining how that would be problematic to the

3    competitive process is the very issue we were talking about.

4         THE COURT:  Yeah, I am going to sustain my own

5    objection to that last question.

6         MS. NIELSEN:  Your Honor, Dru Nielsen on behalf of

7    Mr. Lovette.  I am going to object under 401 and 403 to this

8    entire line of questioning and any more questions because there

9    is no evidence that Mr. Suerken had personal knowledge about

10   whether any of the defendants had a legitimate or an

11   illegitimate reason for sharing information or whether they

12   shared information at all.  Thus, none of the testimony is

13   relevant to the jury's determination here.  And we'd ask that

14   the Court consistent with its prior rulings bar this witness

15   from describing price sharing as wrong, immoral, or something

16   even that he didn't expect or want.

17        THE COURT:  Well, I have already ruled to that effect.

18   The questions that Mr. Torzilli has asked so far have been

19   appropriate.  And he has indicated he is not going to go into

20   it any more except for that kind of grand finale close-out

21   question.

22        Thank you.

23     (In open court:)

24   BY MR. TORZILLI:

25   Q.  Mr. Suerken, did there come a time when the chicken

Pete Suerken - Direct

1    suppliers actually sent to RSCS their RFP responses?

2    *A.*  Yes, sir.

3    *Q.*  Was that something that Mr. Lewis for the most part would

4    have received?

5    *A.*  It would have been.

6    *Q.*  And then what did Mr. Lewis do with the RFP responses once

7    he received them?

8    *A.*  Consolidated them all, compared them all and kind of did an

9    executive summary as to the highlights, the low points, all the

10   pieces involved.

11   *Q.*  Shared that work with you and the rest of the team?

12   *A.*  Yes, sir.

13   *Q.*  And then what happened next?  Let me withdraw that question

14   and ask a little bit better question.

15          Did you and the team evaluate the RFP responses once

16   Mr. Lewis consolidated and did his work on it?

17   *A.*  Yes, sir.  We would have gone -- we went through all of the

18   awards and all of the numbers and tried to put together some

19   sort of a negotiation strategy.

20   *Q.*  What negotiation strategy did you put together?

21   *A.*  The only real strategy that we had at the time was to -- we

22   were going to have to pay a higher margin to keep people in the

23   business, to assure supply.  We wanted to make sure that we

24   gave them a long-term contract so they were comfortable with

25   the KFC business was going to be there for a while and that our

Pete Suerken - Direct

1    business because we paid our bills had little to no risk to it.

2    Q.  You said you knew you would have to pay a higher margin.

3    Can you explain what you mean?

4    A.  At the time small bird production was dwindling, was

5    getting smaller, and large bird production was getting larger.

6    So therefore, our margins with the small bird production had to

7    get better or slightly better to compete with the large birds.

8    Q.  Did you have a goal or an expectation of the increase in

9    margin that you would be paying going into the RFP process?

10            MR. KORNFELD:  Objection, foundation.

11            THE COURT:  Overruled.

12   A.  Yes, we did.

13   BY MR. TORZILLI:

14   Q.  And it was -- what was it?

15   A.  It would have been 2 to 3, 4 cents a pound, something of

16   that nature.

17   Q.  So a 2- to 4-cent increase in the price?

18   A.  Yes, sir.

19   Q.  Just to give us a sense, where approximately did the RFPs

20   come in in terms of an increase, if at all?

21   A.  Three and four times that.

22   Q.  Three to four times larger?

23   A.  It was anywhere from 12 cents to almost 20 cents a pound.

24   Q.  Had you in your experience seen increase or proposed

25   increases of that magnitude?

Pete Suerken - Direct

1    *MR. KORNFELD:*  Objection, Your Honor, foundation.   The

2   witness testified this is his first go-around with chicken

3   bidding.

4    *THE COURT:*  Sustained.   If you can lay foundation,

5   Mr. Torzilli.

6   *BY MR. TORZILLI:*

7   *Q.*  Besides 2014, in your career have you purchased chicken?

8   *A.*  Yes, sir.

9   *Q.*  Can you give us approximately how many years you have

10  purchased and negotiated for the purchase of chicken?

11  *A.*  12, 15.

12  *Q.*  Of those -- drawing on those 12 to 15 years' experience

13  actually purchasing and negotiating for the purchase of

14  chicken, how did the RFP results that you received in the

15  August 2014 time frame compared to price increases you might

16  have seen elsewhere in your career?

17   *MR. LAVINE:*  Objection, Your Honor, foundation.   He

18  hasn't stated whether he has anything to do with fresh chicken

19  at all, which is what this is about, and I don't think he has

20  any experience in fresh chicken.

21   *THE COURT:*  I will sustain that.   If you can lay that

22  foundation.

23  *BY MR. TORZILLI:*

24  *Q.*  Does your experience include chicken on the bone?

25  *A.*  It does.

Pete Suerken - Direct

1  Q.  And approximately how many years have you either purchased

2  or negotiated for the purchase of chicken on the bone?

3  A.  Three.

4  Q.  And in those three years, have you seen a price increase of

5  the same or similar -- or how does it compare to what you saw

6  in 2014?

7  A.  I have never seen an increase of that magnitude.

8  Q.  After you and the team devised your strategy to go forward

9  after you received the RFP responses, what did you and the team

10 do?

11 A.  Put together a negotiation strategy and went out to try to

12 negotiate lower prices.

13 Q.  And what form did the negotiation or effort to negotiate

14 lower prices take?

15 A.  We negotiated basically what I had said earlier, which is

16 three-year contracts, a little bit better margin.  KFC is a

17 great customer, going to be there every day.  We started with

18 the lowest priced suppliers and worked our way up from there.

19 So whatever we could get contracted on the lower end, we got

20 contracted on the lower end, and then worked our way up.  So we

21 bought as much on the low end price as we could and then worked

22 our way up.

23 Q.  Did you actually have physical face-to-face meetings to

24 negotiate the agreements?

25 A.  In some occasions, yes.

Pete Suerken - Direct

1   Q.  Okay.  And on occasions where it wasn't face to face, how

2   did the -- what was the form of the communication?

3   A.  It could have been done over e-mail or phone call or

4   something of that nature.

5   Q.  Did you meet with representatives from Claxton Poultry and

6   negotiate a contract?

7   A.  I don't remember if -- I don't remember if I had a

8   secondary meeting with them.

9   Q.  But you did meet with Defendant Mikell Fries and discussed

10  contract negotiations?

11  A.  Yes.

12  Q.  What do you recall from the meeting that you had with

13  Defendant Fries regarding the contract negotiations in 2014?

14  A.  His odd negotiation style.

15  Q.  Okay.  Could you describe what you mean by odd negotiation

16  style?

17  A.  He told us -- he told us to keep his price not quite at the

18  top, but above the middle of the range.

19  Q.  And what makes that odd in your experience?

20  A.  I have never had a supplier inform me as to what price --

21  to keep him at the top of the range above a group of competitor

22  suppliers.  I have never had that happen.

23  Q.  You said you met with representatives of Mar-Jac as well?

24  A.  Yes, sir.

25  Q.  Did you meet with them to negotiate a contract?

Pete Suerken - Direct

 1    A.   Yes, sir.

 2    Q.   I am going to show you what has been marked as Government

 3    Exhibit 9992.   Sir, do you see the exhibit up in front of you

 4    on the screen?

 5    A.   I do.

 6    Q.   Do you recognize it?

 7    A.   I do.

 8    Q.   What is it?

 9    A.   That's an Outlook meeting notification of a specific

10    meeting that took place in our boardroom.

11    Q.   Who wrote up the invitation?

12    A.   It says the organizer is me, but that would have most

13    likely been my administrative assistant serving as me.

14    Q.   What was the -- or who was the meeting with?

15    A.   Mar-Jac Poultry.

16    Q.   And when was it?

17    A.   8/27.

18    Q.   And what was the purpose of this meeting?

19    A.   It would have been to negotiate prices on

20    chicken-on-the-bone supply.

21    Q.   So the negotiation -- it was a meeting that was part of the

22    negotiations that we're talking about?

23    A.   Yes, sir.

24         MR. TORZILLI:  Your Honor, government moves to admit

25    9992.

Pete Suerken - Direct

1       THE COURT:  Any objection to the admission of 9992?

2            That exhibit will be admitted.

3       MR. TORZILLI:  Thank you.

4   BY MR. TORZILLI:

5   Q.  Do you recall who specifically you met with?

6            MR. TORZILLI:  And we can take that down.  Thank you.

7   BY MR. TORZILLI:

8   Q.  Do you remember who specifically at Mar-Jac you met with?

9   A.  A gentleman by the first name Pete, but I can't remember

10  his last name.

11  Q.  First name is Pete, but you don't remember Pete's last

12  name?

13  A.  Yes, sir.

14  Q.  Do you remember his role at Mar-Jac at the time?

15  A.  Very high up.  He was president, executive vice-president,

16  something of that nature.

17  Q.  Do you recall anyone other than the individual Pete that

18  you identified coming from Mar-Jac to the meeting?

19  A.  There was a sales rep with him.

20  Q.  Do you remember who that sales rep was?

21  A.  I don't remember his name, sir.

22  Q.  And you said the meeting occurred at the -- I think you

23  said the boardroom?

24  A.  Yes.

25  Q.  Whose boardroom?

Pete Suerken - Direct

1    A.  It would have been the RSCS boardroom.

2    Q.  And where is RSCS located?

3    A.  Louisville, Kentucky.

4    Q.  So the meeting with Mar-Jac took place in late August of

5    2014.  At that time how much success were you having, if at

6    all, with your strategy of negotiating lower prices off the RFP

7    prices you received?

8    A.  Little to none.

9    Q.  Why?

10        MS. NIELSEN:  Objection, foundation.

11        THE COURT:  Overruled.

12   A.  Suppliers were unwilling to change price.

13   BY MR. TORZILLI:

14   Q.  They were unwilling to come down?

15   A.  Yes, sir.

16   Q.  Did there come a time when you evaluated the possibility of

17   moving volume from one supplier or some suppliers to other

18   suppliers?

19   A.  Yes.  Part of our strategy would have been to contract as

20   much as we could from the lower cost suppliers that had smaller

21   birds and eliminate as much as we could from the highest cost

22   suppliers that had larger birds.

23   Q.  Did there come a point in time when you made a decision

24   about moving volume from a higher priced supplier to other

25   suppliers?

Pete Suerken - Direct

1  *A.* Yes.

2  *Q.* Could you explain what you decided?

3  *A.* There was a decision made to expand production with anyone

4  that we could below our highest cost supplier and take loads

5  away from that higher cost offer, which would have been

6  Pilgrim's Pride.

7  *Q.* So you decided to move volume away from Pilgrim's Pride

8  which you identified as your highest cost?  And who did you

9  move the volume towards?

10 *A.* That would have been several companies; Tyson, Koch, and I

11 believe George's.

12 *Q.* And approximately how much volume was shifted?

13 *A.* Approximately, 20 trucks loads.

14 *Q.* Could you give us a sense of how much chicken 20 truckloads

15 is?

16 *A.* About 10 percent of what KFC uses on a weekly basis.

17 20 truckloads is 8 million pounds, I believe, a week.

18 *Q.* So when you are referring to 20 truckloads, you are talking

19 about 20 truckloads each and every week?

20 *A.* Yes, sir.

21 *Q.* And you said -- I think you said that was -- what percent

22 of the total?

23 *A.* About 10 percent of what KFC needs every week.

24 *Q.* So at that time KFC needed about 200 truckloads per week?

25 *A.* That is correct.

Pete Suerken - Direct

1   Q.  And you said that one of the competitors that you shifted

2   loads towards was Tyson?

3   A.  It was.

4   Q.  Do you know approximately how much of the 20 went to Tyson?

5   A.  I don't remember how many.

6   Q.  And why did you shift loads from Pilgrim's to Tyson?

7   A.  Because they were cost advantaged.  They had a slight cost

8   advantage.  The bird was a little bit smaller.  And their

9   locations allowed us to have freight pickups moving into

10  multiple markets.

11  Q.  So I would like to break that down a little bit.  You said

12  their locations were better locations.  Can you explain what

13  you mean by Tyson having better locations?  Better locations

14  than Pilgrim's, I take it?

15  A.  Yes, sir.

16  Q.  Could you explain what you mean?

17  A.  Tyson had a facility in Seguine, Texas, which is really far

18  from where the Pilgrim's Pride facilities are.  And we could

19  ship that product into the Rio Grande Valley or to San Antonio

20  with basically no freight cost.  So from a freight savings

21  perspective, it was a great location to have; whereas a lot of

22  the production that Pilgrim's had was in north Georgia and was

23  in geographic areas that were challenged because you had to

24  drive back past another plant to get it to the consumer.  So it

25  was a bad location because it cost more to get it out to where

Pete Suerken - Direct

1    you needed it.

2    Q.  Okay.  So you got -- and that resulted in freight savings?

3    A.  Yeah.  It could have been anywhere from 2 cents to 2-1/2

4    cents, something like that.

5    Q.  You mentioned the bird being smaller.  You meant Tyson's

6    bird was smaller?

7    A.  My recollection was that Tyson's bird was slightly smaller,

8    yes.

9    Q.  Could you explain why Tyson having a smaller bird -- I take

10   it smaller than Pilgrim's?

11   A.  Yes, sir.

12   Q.  Why that would be advantageous?

13        MR. GILLEN:  Your Honor, we object.  Can we have a

14   side bar, please.

15        THE COURT:  Yes.

16      (At the bench:)

17        THE COURT:  Go ahead, Mr. Gillen.

18        MR. GILLEN:  Your Honor, I believe they are getting

19   into this area of his recollection.  I think we were talking

20   about this earlier last night.  We have to deal with what he

21   thought and knew at the time rather than his now recollection

22   or thoughts in retrospect.  I mean, this is in violation of the

23   Court's ruling yesterday.

24        THE COURT:  I don't know exactly what that means, but

25   let me ask Mr. Torzilli, do you know what Mr. Gillen means?

Pete Suerken - Direct

1          MR. TORZILLI:  I don't.  I think it's pretty clear

2     from the questions that we're asking about his personal

3     knowledge of what happened in 2014 and he is answering.  There

4     was a competitive event here and Tyson got additional volume as

5     a result of that.  And they had more advantageous competitive

6     characteristics and I am asking him about what they are.

7          THE COURT:  Mr. Gillen, what makes you suspicious

8     about the source of Mr. Suerken's testimony?

9          MR. GILLEN:  Your Honor, in his recorded interview

10    with the FBI and starting there, I don't believe there is any

11    mention concerning this issue about whether or not Tyson had

12    smaller birds or not.  The issues that he talked about then

13    dealt with the fact that he believed that they were selling at

14    a lower price, that he wanted to move business to Tyson, give

15    them more volume.  They were cheaper.  And now he has added

16    this component having to do with the size of the bird that I

17    think is a recent "recollection" that probably resulted from

18    his interviews with the government preparing for trial.

19          THE COURT:  Mr. Torzilli?

20          MR. TORZILLI:  When we've talked to him, we hadn't

21    talked to him for a long time.  And incidentally, Your Honor, I

22    will remind everyone here that we learned yesterday that

23    Mr. Gillen had prepared Mr. Suerken as a witness in the fall,

24    so -- and we don't know what information he might have been

25    exposed to at that time.  But since we have been speaking to

Pete Suerken - Direct

1  him in the recent weeks, I think we have talked to him three

2  times, he has explained that this was the situation that was

3  going on in 2014.

4          THE COURT:  All right.  I haven't heard enough to make

5  me think that Mr. Suerken's memory is being -- is based on

6  something that he learned after the Indictment came out.  The

7  fact that he may not have mentioned this in his FBI interview

8  is not dispositive of what his memory may be.  So I will

9  overrule the objection and we'll see what happens.

10          All right.  Thank you.

11      (In open court:)

12          MR. TORZILLI:  Your Honor, may I ask for a read back

13  of the pending question?

14          THE COURT:  Yes, you may.

15          (The record was read by the court reporter.)

16  A.  KFC sells by the piece and buys by the pound.  Therefore,

17  the revenue generated off of a piece is stagnant.  It's the

18  same.  But if you're paying by the pound and the piece is

19  bigger, you're paying more for the input.  Therefore, the

20  margin is less at the store.  Therefore, the smaller the bird,

21  the better it is for the profitability of the store.  Plus you

22  get to a size in which the fryers won't work.

23  BY MR. TORZILLI:

24  Q.  So it was good for -- just so I understand, it was good for

25  KFC to shift some volume from Pilgrim's to Tyson because of the

Pete Suerken - Direct

1   smaller bird issue because the Kentucky Fried Chicken operators

2   might get a little more margin?

3          MR. TUBACH:  Leading.

4          MR. FELDBERG:  And also incomplete.  He gave a variety

5   of reasons why volume was shifted from Pilgrim's to Tyson

6   including price.

7          THE COURT:  Sustained as to leading.

8   BY MR. TORZILLI:

9   Q.  So what was the -- what, if any, impact did -- what, if

10  any, advantage to KFC operators would occur from the shift from

11  Pilgrim's to Tyson with Tyson having a smaller bird size than

12  Pilgrim's?

13  A.  They would have paid less for chicken and generated the

14  same amount of revenue.

15  Q.  Any other -- so you mentioned freight and you mentioned the

16  bird size.  Any other factors that went into your decision to

17  shift volume from Pilgrim's to Tyson?

18  A.  Price obviously.

19  Q.  And could you explain what you mean by price?

20  A.  They were slightly lower in cost.

21  Q.  Slightly lower?  Can you give us a sense of what you mean

22  by slightly?

23  A.  I don't remember.  They were 2, 2 and a half, 2 cents,

24  something like that, lower cost than Pilgrim's.

25  Q.  2 cents per?

Pete Suerken - Direct

1   *A.*   Per pound.

2   *Q.*   And what was the approximate magnitude of the price

3   increases at the time you were deciding to shift the volume

4   from Pilgrim's to Tyson?  So that's 2 cents on what magnitude?

5   *A.*   18 to 20 cents, approximately.

6   *Q.*   So about 10ish percent?

7   *A.*   Yes, sir.

8   *Q.*   You also said you decided to shift some volume from

9   Pilgrim's over to Koch.

10  *A.*   Yes, sir.

11  *Q.*   Could you explain what made you decide to move from

12  Pilgrim's to Koch?

13  *A.*   The only thing I remember is their price was slightly

14  better.

15  *Q.*   And by price are you talking about the FOB or landed or

16  something else?

17  *A.*   The FOB price.

18  *Q.*   Okay.  And FOB stands for?

19  *A.*   Freight onboard.

20  *Q.*   And is that a delivered price?

21  *A.*   No, sir.  That is FOB the plant, freight onboard loaded on

22  a truck at the facility that it was manufactured.

23  *Q.*   And you said you decided to move some volume from Pilgrim's

24  over to George's?

25  *A.*   Yes, sir.

1  *Q.*  And what made you do that?

2  *A.*  Great locations, the best bird size of the entire group, as

3  well as their price.

4  *Q.*  Okay.  So by location you mean plant locations relative to

5  the KFC restaurants?

6  *A.*  Yes, sir.

7  *Q.*  Did you have any other meetings other than the one you

8  testified to with Defendant Roger Austin about the 2014

9  contract negotiations?

10  *A.*  Yes, sir.

11  *Q.*  How many?

12  *A.*  I don't recall how many, sir.

13  *Q.*  Do you recall any specific meetings you had with him?

14  *A.*  I do.

15  *Q.*  Could you identify those for us, please?

16  *A.*  There was a meeting late in the process in which we met for

17  lunch, and I was going to tell him that we were going to pull

18  the 20 truckloads of chicken away from Pilgrim's Pride.

19  *Q.*  What do you mean by late in the process?  Can you give us a

20  month or a range?

21  *A.*  I can't tell you -- it would have been very late because at

22  that point I had secured loads across the rest of the

23  suppliers.  So I would have negotiated basically everything

24  else, so it would have been very late in the process.

25  *Q.*  So at this time as you're going into the lunch meeting with

1038

Pete Suerken - Direct

1  Defendant Austin, you had already secured available volume

2  from, for example, the companies that you mentioned a moment

3  ago that you had shifted loads to?

4  A.  I believe I had, yes.

5  Q.  Where did the lunch take place?

6  A.  Mama's Barbecue in Louisville, Kentucky.

7  Q.  Why is that memorable to you?

8  A.  Roger's reaction was memorable and that's why it was

9  memorable.

10  Q.  So you go into the lunch meeting at Mama's Barbecue in

11  Louisville.  And had you walking into that meeting firmly

12  decided you were going to move the loads away from Pilgrim's?

13  A.  I can't remember whether we were firm on that decision or

14  not.

15  Q.  Okay.  You were -- it sounds like having a recipient for

16  the loads, would it be fair to say you were at least close?

17  A.  We were prepared to, yes.

18  Q.  So tell us what happened at the lunch meeting at Mama's in

19  Louisville.

20  A.  I informed Roger that our plan was to take 20 truckloads of

21  chicken from Pilgrim's Pride.  And he told me that it wasn't

22  possible, that I couldn't do it.  I was going to run KFC out of

23  chicken.

24  Q.  Did you have an understanding of what he meant by that?

25          MR. FELDBERG:  Objection.  No objection to the

1039

Pete Suerken - Direct

1    conversation, but an interpretation.

2           THE COURT:  I will sustain the objection.

3    BY MR. TORZILLI:

4    Q.  What else did he say to you about it not being possible, if

5    anything?

6    A.  That he knew where all the loads were and that there was no

7    way that I had 20 extra truckloads of chicken.

8    Q.  What did you understand him to mean when he said he knew

9    where all the loads were?

10          MR. FELDBERG:  Same objection, Your Honor.

11          THE COURT:  Overruled.

12   BY MR. TORZILLI:

13   Q.  You can answer.

14   A.  Somehow, some way, he believed that I didn't have the

15   20 truckloads of chicken, that he had been talking to somebody

16   that was telling him information.

17   Q.  Who knows --

18          MS. NIELSEN:  Your Honor, I am going to object.  That

19   calls for speculation and I ask that it be stricken.

20          THE COURT:  I will deny the request.

21   BY MR. TORZILLI:

22   Q.  Who knows how many truckloads of chicken from each chicken

23   supplier are going into KFC restaurants at any given time?

24   A.  The staff at RSCS would have known that information.

25   Q.  Anyone else?

1   A.  Well, no.  It would have been the staff at RSCS.

2   Q.  Do KFC franchisees know that information?

3   A.  They know who they are buying from, but they don't know how

4   many loads are going where.

5   Q.  Does chicken -- at least some chicken delivered to KFC

6   restaurants go through distributors?

7   A.  Yes.

8   Q.  Do distributors know what volume of chicken from each of

9   the suppliers is going into KFC restaurants?

10  A.  Once the contracts would have been assigned and contracted,

11  yes, they would have.

12  Q.  But while they were being negotiated?

13  A.  No, sir.

14  Q.  Okay.  Who else was at the meeting, if anyone, besides you

15  and Defendant Roger Austin at Mama's Barbecue in Louisville?

16  A.  Todd Imhoff.

17  Q.  Who is Todd Imhoff?

18  A.  At the time he was the chief procurement officer at RSCS.

19  Q.  Did you report to Mr. Imhoff?

20  A.  I did.

21  Q.  Was Mr. Imhoff the No. 2 person at RSCS at the time?

22  A.  I believe so, yes.

23  Q.  Anything else that you recall about the meeting that you

24  had with Defendant Austin?

25  A.  How emotional and irrational he was.

1041

Pete Suerken - Direct

1   *Q.*   How did the meeting end?

2   *A.*   We both agreed to go our separate ways.

3   *Q.*   Did you and -- did you have any communications with

4   Defendant Bill Lovette regarding the 2014 RSCS negotiations?

5   *A.*   I did.

6   *Q.*   Did you have a telephone call?

7   *A.*   I did.

8   *Q.*   When approximately did the telephone call with Defendant

9   Lovette occur?

10   *A.*   It would have been August or September of 2014.

11   *Q.*   Can you relate that in comparison to the point in time

12   where you were -- you had decided to move 20 loads of chicken

13   away from Pilgrim's?  So was this before or after you made

14   that --

15   *A.*   It would have been previous to that.

16   *Q.*   But it was under consideration at the time by you?

17   *A.*   It could have been, yes.

18   *Q.*   And so you and Mr. Lovette had a call.  Anyone else on the

19   call?

20   *A.*   Steve McCormick.

21   *Q.*   Who is Mr. McCormick?

22   *A.*   President and CEO of RSCS at the time.

23   *Q.*   So Mr. Imhoff's boss?

24   *A.*   Yes, sir.

25   *Q.*   And he is the No. 1 person at RSCS?

Pete Suerken - Direct

1    *A.*  Yes, sir.

2    *Q.*  In your experience, how common is it for -- or was it for

3    Mr. McCormick to be involved in the negotiations for the supply

4    of any product?

5    *A.*  It wasn't.

6    *Q.*  How about the chicken?

7    *A.*  It wasn't.

8    *Q.*  And anyone else besides you three on the call?

9    *A.*  No, sir.

10   *Q.*  And where did the call -- where were you when the call took

11   place?

12   *A.*  Setting at Steve McCormick's table in his office at RSCS.

13   *Q.*  RSCS headquarters in Louisville?

14   *A.*  Yes, sir.

15   *Q.*  Tell us what happened on the call that you and

16   Mr. McCormick had with Defendant Bill Lovette.

17   *A.*  Mr. McCormick explained the devastating effect that these

18   cost increases were going to have to KFC and how we couldn't

19   possibly stomach these and weren't sure what it would do to the

20   restaurants.  And Mr. Lovette explained that that's the price

21   that they had to have and the price was what it was.

22   *Q.*  Did Mr. McCormick or you say anything in response to the

23   remarks that Defendant Bill Lovette made?

24   *A.*  I am sure we would have, but I don't remember specifics,

25   sir.

Pete Suerken - Direct

1    Q.   Anything else that you recall happened on that call?

2    A.   Mr. Lovette did not change his price.

3    Q.   Okay.  Did there come an occasion where you had a

4    face-to-face meeting with Defendant Bill Lovette regarding the

5    RSCS negotiation in 2014?

6    A.   Yes, sir.

7    Q.   When did that occur?

8    A.   Late in the process.

9    Q.   Was it before or after the telephone call we just talked

10   about where you were in Mr. McCormick's office?

11   A.   It was after.

12   Q.   And where did that meeting take place?

13   A.   At JBS Pilgrim's Pride headquarters in Greeley, Colorado.

14   Q.   So you flew out from Louisville to Greeley?

15   A.   Yes, sir.

16   Q.   Did anyone else from RSCS company?

17   A.   Todd Imhoff.

18   Q.   And you met with Defendant Lovette.  Did you meet with

19   anyone else from Pilgrim's?

20   A.   No, sir.

21   Q.   So it was just the three of you?

22   A.   Yes, sir.

23   Q.   And it was in his offices or the corporate offices?

24   A.   It was in their corporate dining room or their food

25   innovation center, sir.

Pete Suerken - Direct

1    Q.  What was discussed at that meeting?

2    A.  The fact that we were going to remove 20 truckloads of

3    chicken, as well as their pricing structure.

4    Q.  What was the discussion around the pricing structure?

5    A.  We were trying to negotiate a lower cost.

6    Q.  Anything else?

7    A.  Trying to negotiate a lower cost.  That's it pretty much.

8    Q.  What, if anything, did Defendant Lovette say in response to

9    the remarks that you and Mr. Imhoff were making?

10   A.  He told us that he wasn't going to move on price, that it

11   was great to have customers like Chick-fil-A because he could

12   get on his earnings calls with customers like Chick-fil-A

13   because their business was always growing and they would pay

14   whatever it took.  And the customers like KFC was a dying breed

15   and that our restaurants were shrinking and the margin wasn't

16   attractive enough for them to continue to be in that business.

17   Q.  Was Defendant Lovette informed about the negotiations

18   between Pilgrim's and RSCS?

19   A.  Yes, sir.

20   Q.  Did he have -- based on your discussion, did he have all

21   the factual information to know what was going on?

22   A.  Absolutely.

23   Q.  Anything else that you recall from the in-person in

24   Greeley?

25   A.  No, sir.

Pete Suerken - Direct

1  *Q.* You had mentioned both at the in-person meeting and the

2  phone call in Mr. Lovette's office requests for Pilgrim's to

3  lower its price?

4  *A.* Yes.

5  *Q.* Who was the decision maker at Pilgrim's to decide whether

6  the price was --

7          *MS. NIELSEN:* Objection, foundation.

8          *THE COURT:* He hasn't finished his question yet.

9          Go ahead and finish your question, Mr. Torzilli.

10 *BY MR. TORZILLI:*

11 *Q.* Do you know who at Pilgrim's was the decision maker for

12 whether the price offer, Pilgrim's price offer could come down?

13 *A.* Yes, I did.

14 *Q.* How do you know that?

15 *A.* Roger Austin made it very apparent as to who the final

16 decision maker was.

17 *Q.* Who was, in fact, the final decision maker?

18 *A.* Bill Lovette.

19 *Q.* During either the phone call or the in-person meeting, did

20 Defendant Bill Lovette express any flexibility in being able to

21 come down on price?

22 *A.* No, sir.

23          *MR. TORZILLI:* If we can have 9704.

24 *BY MR. TORZILLI:*

25 *Q.* Mr. Suerken, if it's easier to work through the binder as

Pete Suerken - Direct

1   opposed to the screen, it's binder Tab 30.

2   A.  Okay.  I'm good.

3          MR. TORZILLI:  Moment to confer, Your Honor?

4          THE COURT:  You may.

5   BY MR. TORZILLI:

6   Q.  Before we discuss 9704, just a couple follow-ups.

7          So if we could go back to the number of loads in 2014.

8   How many total loads was KFC purchasing and negotiating for in

9   2014?

10  A.  Approximately 200 to 210, something like that.

11  Q.  And how many of those 200 in 2014 did Pilgrim's Pride

12  supply?

13  A.  About a hundred.

14  Q.  And you -- so from those 100 loads, how many loads were you

15  taking from Pilgrim's Pride?

16  A.  20.

17  Q.  So they were going to go from a hundred loads down to 80

18  loads?

19  A.  Yes, sir.

20  Q.  I also want to go back to you were describing your meeting

21  with Defendant Roger Austin at Mama's Barbecue in Louisville.

22  A.  Yes.

23  Q.  Just a couple follow-ups on that.

24          First, was there a discussion about whether Pilgrim's

25  had any flexibility in being able to reduce its price?

Pete Suerken - Direct

1   A.   Yes.

2   Q.   And was there a request made by RSCS, by you, for a lower

3   price?

4   A.   Yes.

5   Q.   At that meeting?

6   A.   Yes.

7   Q.   And what -- did Defendant Austin have a response to your

8   request?

9   A.   No.

10   Q.   He did not respond?

11   A.   No.  They weren't going to lower price.

12   Q.   What did he say?

13   A.   I don't remember his exact words, but I was left with at

14   that point that they were not going to lower their price to us.

15   Q.   Anything else you recall about his reaction to your

16   request?

17   A.   No, other than it was just I rarely had a supplier react

18   that way.

19   Q.   Can you explain what you mean by that?

20   A.   Emotionally irrational and stated that I couldn't do what I

21   was doing.  I was going to run this system out of chicken.  It

22   was a dangerous move, things like that.  I just never had a

23   supplier tell me that.

24   Q.   What do you mean by emotional and irrational?  What were

25   you perceiving that leads you to say that?

Pete Suerken - Direct

1   A.  He was upset.

2   Q.  Do you know what the cause was or did he say what the cause

3   was?

4   A.  The fact that we were taking 20 truckloads of chicken away

5   from him.

6   Q.  Which is 20 percent of the volume?

7   A.  Yes.

8   Q.  Okay.  Now, if we can now look at Exhibit 9704.  Do you see

9   9704 on the screen in front of you?

10  A.  I do.

11  Q.  Do you recognize it?

12  A.  I know what it is.

13  Q.  Okay.  What is it?

14  A.  It looks like a meeting request --

15          MR. GILLEN:  Your Honor, objection.  It looks like.

16  This is not a document that deals with RSCS.  It's an internal

17  Tyson document.  And I would object because this witness would

18  not have personal knowledge of this document.

19          THE COURT:  Sustained.

20  BY MR. TORZILLI:

21  Q.  Did you write this document?

22  A.  No, sir.

23  Q.  Was it forwarded to you?

24  A.  No, sir.

25          MR. TORZILLI:  Can we look at the whole document?

Pete Suerken - Direct

1    *BY MR. TORZILLI:*

2    Q.  Do you see about halfway down the page where that solid

3    line is?

4    A.  Now, yes.  Previously I was looking at the top.

5    Q.  So just to be clear, the top part of the document is not

6    something that you wrote.  The bottom part of the document is

7    something you wrote.

8    A.  That is correct, yeah.  My monitor keeps flashing, but yes,

9    the bottom I wrote.

10              *MR. TORZILLI:*  May I proceed?

11              *THE COURT:*  Yes.  Go ahead.

12   *BY MR. TORZILLI:*

13   Q.  Okay.  So you wrote the bottom portion of this document.

14   So if we can focus on that.

15   A.  Do you mind telling me what page it's on because the

16   monitor is going on and off.

17   Q.  Yeah, it's Tab 30.  Do you see it?

18   A.  Yes, sir.

19   Q.  So the bottom portion of the document you wrote?

20   A.  Yes, sir, I did.

21   Q.  When did you write it?

22   A.  Wednesday, September 3rd.

23   Q.  Who did you write it to?

24   A.  Brian Roberts.

25   Q.  And what is the topic?

Pete Suerken - Direct

1   *A.*  It was regarding a meeting that we had had.

2   *Q.*  It was a meeting that you were planning to have?

3   *A.*  I believe we had had it at that point.

4   *Q.*  Okay.  So this was after a meeting that you had -- that had

5   already occurred?

6   *A.*  Yes, sir.

7   *Q.*  And what was the -- what was the subject of the meeting?

8   *A.*  Chicken-on-the-bone pricing.

9   *Q.*  And so you wrote this.  Is this an accurate reflection of

10  what you wrote?

11  *A.*  It is an accurate reflection.

12  *Q.*  Can you lean into the mic a little bit?

13  *A.*  It is an accurate reflection.

14        *MR. TORZILLI:*  At this time, Your Honor, the

15  government moves to admit the lower portion or the portion that

16  Mr. Suerken wrote of 9704.

17        *THE COURT:*  Any objection to the lower half of

18  Exhibit 9704?

19        *MR. GILLEN:*  No objection, Your Honor.

20        *THE COURT:*  Exhibit 9704, just the lower half is

21  admitted.

22        *MR. TORZILLI:*  Thank you, Your Honor.  If we could

23  publish the lower half, so the admitted half of the document.

24        *THE COURT:*  We'll try.  We are having trouble with the

25  document viewer's image too.  Okay.  That may -- we can try to

Pete Suerken - Direct

1    publish that at this time.

2         *MR. TORZILLI:*  Thank you, Your Honor.

3    *BY MR. TORZILLI:*

4    *Q.*  So Mr. Suerken, could you explain what's going on in the

5    message you wrote in 9704?

6    *A.*  It is a recap of a meeting that we had regarding the

7    pricing discussions that RSCS and Tyson were having on chicken

8    on the bone.  Obviously, there was a little bit of playful

9    banter between friends that went on in that.

10   *Q.*  So you had a meeting with Tyson in the early September 2014

11   time frame?

12   *A.*  Yes, sir.

13   *Q.*  Okay.  And what happened at that meeting?

14   *A.*  We were discussing chicken-on-the-bone prices.  Tyson

15   wanted a really high price for chicken.  They stuck to their

16   pricing structure of what they wanted.  We asked for a lower

17   price.  They politely told us no.

18        I informed that we had to already buy some priced --

19   chicken that I considered ridiculously high priced, but it was

20   lower than theirs.  And that's where we left it.

21   *Q.*  Is this before or after the point in time where you decided

22   to move volume to Tyson?

23   *A.*  I can't remember, sir.

24   *Q.*  Okay.  Do you know whether Tyson at any point lowered its

25   FOB price so its bid in order to obtain the additional loads

1    that you ultimately gave to them?

2    A.   I don't remember, sir.

3    Q.   Ultimately you came to an agreement with Tyson?

4    A.   We did.

5    Q.   And do you recall approximately what the agreed to price

6    was?

7    A.   It was a little bit lower cost than Pilgrim's Pride, plus

8    they were going to give me some incremental loads out of better

9    locations.

10   Q.   Just sticking with the FOB price for a moment, the FOB

11   price was a little bit lower?

12   A.   A little bit lower, a couple cents, 2, 2-1/2 cents,

13   something like that.

14   Q.   Let's look a little bit at your message.  You mentioned a

15   moment ago the buying poultry at ridiculous prices from others.

16   Was that as a result of the 2014 contracting process?

17   A.   It would have been as a result of Mother's Day, as well as

18   the 2014 process.

19   Q.   And so what did you mean by that?  Who were you buying the

20   poultry from ridiculous prices and who were you buying it from?

21   A.   At that point in time, it would have been one or two of the

22   lower cost guys that we were -- we would have contracted with

23   already.  And when I say lower cost, I still believed it was a

24   ridiculous cost.

25   Q.   And then item No. 4 there, you say:  Tyson informed RSCS

Pete Suerken - Direct

1  --- Really, YOU ARE SCREWED, and in all caps?  What was the

2  message you were trying to deliver there?

3  A.  That basically we were going to end up paying ridiculous

4  prices for chicken.

5       MR. TORZILLI:  Moment to confer, Your Honor?  Thank

6  you.

7  BY MR. TORZILLI:

8  Q.  Just one last question, Mr. Suerken.  During the 2014

9  negotiation process, did you ever ask any of the chicken

10  suppliers you were negotiating with to contact any other

11  competing chicken supplier regarding the bids or negotiations?

12  A.  No, sir.

13       MR. TORZILLI:  Nothing further, Your Honor.

14       THE COURT:  Why don't we go ahead and take our

15  mid-morning break since we are at a natural breaking point,

16  ladies and gentlemen.  And why don't we plan on reconvening,

17  since it's a little bit past, why don't we plan on reconvening

18  at the normal time at 10:30.

19       Keep the admonitions in mind.  The jury is excused.

20       (Jury excused.)

21       Mr. Suerken, you are excused for the break.

22       Mr. Koenig?

23       MR. KOENIG:  Yeah, just I am told that the ninth floor

24  courtroom, your courtroom is locked.  Can we use the witness

25  rooms?

Pete Suerken - Cross

1           THE COURT:  You can use mine.  Yeah, that's Judge

2    Krieger's, so I don't control that.  We closed it because there

3    were only two people up there.

4           MR. KOENIG:  Is seven?

5           THE COURT:  Yeah, seventh floor, you can do that.  And

6    if it's locked for some reason, just buzz at the door and we'll

7    open that up for you or the courtroom too.

8           MR. KOENIG:  Thank you very much.

9           THE COURT:  Anything else real quick?

10          MS. HENRY:  May we also have use of the attorney

11   conference room that's there with your chambers courtroom?

12   There is the witness room and the attorney conference room.

13          THE COURT:  Right, either of those two no problem.

14   And if those are otherwise occupied or you want to use the

15   courtroom, just ask.  There is no problem.  We will be in

16   recess.  Thank you.

17       (Recess at 10:13 a.m.)

18       (Reconvened at 10:35 a.m.)

19          THE COURT:  Let's bring the jury back in.

20          (Jury present.)

21          THE COURT:  Cross-examination.

22       Mr. Gillen?

23          MR. GILLEN:  Thank you, Your Honor.

24                      **CROSS-EXAMINATION**

25   BY MR. GILLEN:

Pete Suerken - Cross

1   *Q.*  Good morning.  Still morning, Mr. Suerken.  How are you?

2   *A.*  Good.

3   *Q.*  I am Craig Gillen.  I represent Brian Roberts.  A few

4   question.

5          First, when you first started your examination, you

6   were talking about the bidding that took place in late 2016 for

7   2017.  Do you remember that?

8   *A.*  Yes, sir.

9   *Q.*  Now, Brian Roberts was no longer at Tyson during that, was

10  he?

11  *A.*  That is correct.

12  *Q.*  He left in February of 2016?

13  *A.*  I don't exactly know when he left, but he was not with

14  Tyson.

15  *Q.*  He was gone by then?

16  *A.*  Yes, sir.

17  *Q.*  Let's talk a little bit about -- let's now get into 2014

18  and talk a little bit about what happened there.

19          Now, your position with RSCS, you know, it was more --

20  you were more of a generalist because you handled a broad

21  spectrum of protein purchased for RSCS, didn't you?

22  *A.*  Yes, sir.

23  *Q.*  And in the area -- let's just call it kind of the

24  specialist area of the chicken or the chicken on the bone, in

25  the spring of 2014 that person was Mr. Ledford, correct?

Pete Suerken - Cross

1    A.   It was.

2    Q.   So what happened is that Mr. Ledford decided to take

3    another offer where he went to Chick-fil-A, correct?

4    A.   I believe so, yes, sir.

5    Q.   And gave you essentially a couple weeks' notice?

6    A.   Yes, sir.

7    Q.   And then suddenly you are then put into a situation in

8    which you then have to then handle the emergency that's going

9    on in the KFC chicken situation, right?

10   A.   Yes.

11   Q.   Now, you're there in the spring, early summer of 2014 and

12   the plan was I believe you said to have Mr. Lewis come out of

13   retirement and help in the negotiations for RSCS, correct?

14   A.   That was the plan, sir.

15   Q.   And he had been in retirement for five years at that time;

16   is that right?

17   A.   I can't -- I don't recall how many years that he had been

18   in retirement other than he was just in retirement, that's all.

19   Q.   Several years?

20   A.   Yes.

21   Q.   And then in addition to adding Mr. Lewis to assist you in

22   these negotiations, what also happened is that RSCS made an

23   offer to Mr. Eddington, Rich Eddington, and he accepted that

24   offer, correct?

25   A.   That is correct.

Pete Suerken - Cross

1  Q.  Now, the offer to Mr. Eddington was made.  And at that time

2  when the offer was made to him, Mr. Eddington worked at

3  Mar-Jac, correct?

4  A.  I don't recall where he worked at the time, sir.

5  Q.  Do you recall that he worked for a supplier?

6  A.  I recall that he did work for a chicken processing company,

7  yes.

8  Q.  So he was hired to kind of fill that position for

9  Mr. Ledford because of his area of specialization in chicken,

10  correct?

11  A.  Yes, sir.

12  Q.  And so what we have here is we have a situation where

13  Mr. Lewis is coming out of retirement.  Mr. Eddington has been

14  hired, but he doesn't come until right around the first of

15  August, right?

16  A.  I believe so, yes.

17  Q.  So you are now there dealing with the crisis that you

18  discussed a little bit on cross-examination concerning Kentucky

19  Fried Chicken and chicken products right around the Mother's

20  Day period, correct?

21  A.  Yes, sir.

22  Q.  Now, we've talked about the problem that -- some stores ran

23  out of chicken, right?

24  A.  Yes.

25  Q.  And, for example, what happened is when the chicken ran out

1   or the supply was running out, that was a combination of a

2   number of different market forces, wasn't it?

3   A.  There were market forces at play, yes, sir.

4   Q.  The market forces that were in play were that you had

5   additional people buying the small bird like the Wal-Marts and

6   the Krogers and the delis, correct?

7        MR. TORZILLI:  Objection, foundation.

8   BY MR. GILLEN:

9   Q.  If you know.

10        THE COURT:  Overruled.  He can answer if he knows.

11   A.  I can't attest to Kroger or Wal-Mart's demand.  I didn't

12   buy for them.

13   BY MR. GILLEN:

14   Q.  But you were aware of what was going on in the marketplace

15   in terms of who was buying chicken, correct?

16   A.  There was other people buying chicken.  I couldn't tell you

17   who exactly was buying what when.

18   Q.  And you also were aware that there was a concern that

19   within the small bird chicken environment or industry, there

20   was a concern about folks that were not making enough money or

21   making money on small bird that might go to big bird, correct?

22   A.  That's correct.

23   Q.  So what happens there, and I know that you are aware of

24   this and the jury has heard some of it, but just to kind of

25   flesh it out, what you have is a small bird plant and that's

1059

Pete Suerken - Cross

1    going to take a certain size bird, correct?

2    A.  Yes, sir.

3    Q.  It's going to then harvest that bird for production to KFC

4    or whatever other fast-food place it might be, whether it's

5    Popeye's or chickens, correct -- or Church's?

6    A.  Yes, sir.

7    Q.  And what happens there is that within that plant you may

8    have additional -- for example, one plant may have a certain

9    machinery that cuts for KFC product, correct?

10   A.  That is correct.

11   Q.  And so even though it's a small bird plant, you can't just

12   flip a switch and then make it a small bird plant for somebody

13   else.  It takes moving equipment in to the specs for that

14   particular buyer, correct?

15   A.  That is correct.

16   Q.  And so what we had during this period of time is we had a

17   shortage for -- because some of the small bird plants were

18   being transformed into big bird plants, correct?

19   A.  Yes, sir.

20   Q.  And one of the things that -- putting yourself back during

21   that time period, I believe that you had indicated that if you

22   had been in the small bird business, you wouldn't have even

23   been in the small bird business during that period of time,

24   correct?

25   A.  That's correct.

Pete Suerken - Cross

1  Q.  So what you are saying is you weren't in the small bird

2  business.  You were working for RSCS, right?

3  A.  That's correct.

4  Q.  But had you been in the small bird business in the summer

5  of 2014 given the dynamics of the economics of big bird/small

6  bird, you wouldn't have been in small bird.  You would have

7  gone to big bird, right?

8  A.  If it was my plant, yes, sir.

9  Q.  And that's because not only was there on -- the margin of

10 profit per pound was much, much greater for a big bird than it

11 was for a small bird; is that right?

12 A.  That's correct.

13 Q.  That's why if you had been a supplier in the summer of

14 2014, what you would have done is you would have said, all

15 right.  It's in my economic interest or the interest of my

16 shareholders to move from small bird to big bird to make more

17 money because that's what the marketplace is telling me.

18 A.  Yes, sir.

19 Q.  So the marketplace is telling you that this is what we have

20 to do, but some of the folks -- I think one of the things that

21 you said, the pitch for people to kind of stay in small bird

22 was that it could be a stable part of their business portfolio,

23 correct?

24 A.  Yes, sir.

25 Q.  And by that what you mean is that you're saying that if --

Pete Suerken - Cross

1  you're saying, well, I'm trying to convince you to stay in

2  small bird.  Don't go to big bird.  If you stay in small bird,

3  at least you know there is going to be a steady demand for

4  small bird even though the profit that you get might be or

5  would be smaller, right?

6  A.  The risk that you take in small bird was much lower than in

7  big bird, yes.

8  Q.  Because then -- but the return, as you indicated, the

9  return would be substantially less, correct?

10  A.  Yes, sir.

11  Q.  So you as sort of the representative of the purchasing

12  entity that wanted to get small bird, one of the things that

13  you would tell the folks to convince them not to move their

14  plant from small bird to big bird, it's like buying a

15  portfolio.  You know, it's like buying bonds in a portfolio.

16  It's just not a great return, but it's safe.

17  A.  Yes, sir.

18  Q.  So that's the environment that we have setting up for the

19  negotiations which begin in the summer.  Now, what happens is

20  that after the Mother's Day situation, RSCS and you began

21  making calls to try to buy chicken at really high prices,

22  correct?

23  A.  Yes, sir.

24  Q.  As a matter of fact, what you were doing is you were

25  calling around, and this is in the May, June time period of

Pete Suerken - Cross

1  2014, correct?

2  A.  Yes, sir.

3  Q.  Now, what you are trying to do is you are calling people

4  and you are calling the suppliers and you are saying, I'm

5  willing to pay you $1.30 for a pound of chicken, correct?

6  A.  Yes, sir.

7  Q.  And even at that price -- and to make the jury understand

8  kind of what that means is, for example, do you remember that

9  the final highest bidder on this 2014 contract was Pilgrim's

10  and they ran it like FOB like $1.08, correct?

11  A.  Correct.

12  Q.  So what you have is prior to the negotiations starting,

13  you're calling around to the very suppliers that you are going

14  to be negotiating with within a few months or a few weeks and

15  telling them that you're prepared to purchase chicken at $1.30,

16  and I think at some stage it went up to $1.45, didn't it?

17  A.  I don't remember exactly, but yes, it was substantially

18  higher than the marketplace.

19  Q.  And what happened is even at that price you couldn't buy

20  chicken because there just wasn't anything out there, right?

21  A.  We bought a few loads, but not enough.

22  Q.  And so what you were trying do is to say, we're in real

23  trouble here.  And you were calling people and people really

24  wanted to, you know, to have a good relationship with KFC, so

25  they are like we can't do it because we don't have it.  It's

Pete Suerken - Cross

 1  been committed to other people, right?

 2          *MR. TORZILLI:*  Objection, calls for hearsay.

 3          *THE COURT:*  Overruled.

 4  *A.*  It just wasn't available.

 5  *BY MR. GILLEN:*

 6  *Q.*  Okay.  Well, it wasn't available.  And that's kind of the

 7  way that you were going about trying to handle that.  So then

 8  what we have is we've got the situation where you have -- now

 9  Mr. Lewis is on, is kind of in the June, July period, Mr. Lewis

10  has come out of retirement, put away the golf clubs for a while

11  and is going to help you in these negotiations, right?

12  *A.*  Yes, sir.

13  *Q.*  So what happens is you go about trying to have meetings to

14  sort of get everyone together and to try to get the suppliers

15  onboard for a three-year contract, correct?

16  *A.*  That is correct.

17  *Q.*  And the reason why you did a three-year contract is because

18  you're thinking we're doing these things on a one-year

19  contract.  We've run out of chicken.  We need to have something

20  that we can rely upon for a three-year period, correct?

21  *A.*  That's correct.

22  *Q.*  So in an environment where you had been calling around and

23  asking for chicken at $1.30, the negotiations begin, correct?

24  *A.*  But I also had 189, 190 loads contracted at .90 cents.

25  *Q.*  But you were asking to --

1064

Pete Suerken - Cross

1   A.   In the stock market --

2   Q.   I don't want to say begging, but you were pleading for

3   chicken at $1.30.  Yes or no?

4   A.   I was begging would be a good -- yes, we were begging for

5   chicken.

6   Q.   Okay.  You are begging for chicken at $1.30.  And that --

7   during that same time period is when you begin discussing what

8   people are going to be -- the suppliers are going to be asking

9   you because you already know what the marketplace is on your

10   end of the stick, right?  You know what's going on.  You're

11   running out of chicken, right?

12   A.   I don't know that I agree with your time line.

13   Q.   Okay.  Well, you begin talking with suppliers in July of

14   2014, don't you?

15   A.   Yes, sir.

16   Q.   Okay.  And the Mother's Day and following the Mother's Day

17   is when you were calling around asking for $1.30, right?

18   A.   It would have been right after that, I believe.

19   Q.   So right around in that time period, Mother's Day and the

20   early summer is when you were making these calls, right?

21   A.   It would have been late spring, possibly.  I don't exactly

22   remember, but yes.

23   Q.   Then what you did is you went around and you began -- you

24   and Mr. Lewis would meet with folks in sort of an introductory

25   situation because you, as we've established, you have been

Pete Suerken - Cross

1    thrown into the breach frankly, right?

2    A.   It was not a good situation, yes, sir.

3    Q.   So you are doing your best to get drilled down into this

4    protein specific area of chicken with Mr. Lewis in a very, very

5    bad emergency situation for KFC, correct?

6    A.   That's correct.

7    Q.   And what you did is you and Mr. Lewis would then meet with

8    folks.  You met with some folks in July, didn't you?

9    A.   I believe so.

10   Q.   Yeah.  As a matter of fact, you met with -- you asked to

11   meet with and you all met with the Tyson people, didn't you, in

12   July of 2014?

13   A.   I met with all the suppliers in July and August of that

14   year, so it could have been July for the Tyson team, yes, sir.

15   Q.   Okay.  Well, did you receive in July on July the 10th an

16   e-mail from Mr. Roberts forwarding to you and Mr. Lewis Tyson's

17   model that they wanted KFC to consider?

18   A.   I don't remember the date, but I knew that they were one of

19   the earlier -- earlier submissions.

20   Q.   I am going to ask you, if you would, if you would look

21   at -- let's see where I have this.

22        MR. GILLEN:  Can we see government's 1163 on the

23   screen, please?

24        THE COURT:  Tab 9.

25   BY MR. GILLEN:

Pete Suerken - Cross

1    *Q.* Do you recognize this document, Government Exhibit 1163?

2    *A.* Yes. I don't remember it, but I know what it is.

3    *Q.* And is this the e-mail that you received from Mr. Roberts

4    about the meeting that you were going to be having with Tyson?

5    *A.* Yes, sir.

6         *MR. GILLEN:* Your Honor, I would move for the

7    admission of Government's 1163.

8         *THE COURT:* Any objection to the admission of 1163?

9         *MR. TORZILLI:* It's hearsay.

10        *THE COURT:* Sustained.

11   *BY MR. GILLEN:*

12   *Q.* Well, let me -- let's put that down. Let's go to 1164 and

13   I will ask you if -- just one moment. I want you to take a

14   look at this and ask you whether or not you recognize that

15   document. And we can scroll through it a little bit. Do you

16   recognize that document? A little too fast?

17   *A.* I know what it is, but I don't recognize -- I don't

18   remember reading it in the summer of 2014, although I would

19   have.

20   *Q.* Do you remember reading in the summer of 2014 a proposal by

21   Tyson prior to any bid going out at all?

22   *A.* I remember that they were earlier than the other

23   submissions, but I don't remember specifics.

24   *Q.* So you don't specifically remember this exhibit as

25   something that you received on July the 10th being sent to you

Pete Suerken - Cross

1    by Mr. Roberts.

2    A.   No.

3    Q.   But what you do remember is that prior to -- is that there

4    were meetings.  And do you remember models being shown to you

5    and Mr. Lewis what the KFC model was going to be, their offer

6    was going to be as early as in July of 2014?

7    A.   I don't remember specific models.  I know that they had

8    submitted an RFP or they had submitted an offer in that time

9    frame.

10   Q.   The RFP went out on August the 7th.  Do you remember that?

11   A.   Yes, sir.

12   Q.   So I am talking about before any RFP goes out, you had

13   meetings in July of 2014 with Mr. Roberts and members of Tyson,

14   didn't you?

15   A.   Yes, sir.

16   Q.   And during those meetings with Mr. Roberts and Tyson, they

17   presented to you their vision or their cost model for the

18   chicken that they were going to be ultimately later on that

19   summer proposing, correct?

20   A.   They submitted an offer, yes, sir.

21   Q.   So what happened is there was then a meeting that you have

22   in early August with virtually everybody including Tyson's.

23   And during that meeting -- after that meeting then there is a

24   request for a bid which asked for August the 19th to get your

25   bids in at that time, right?

Pete Suerken - Cross

1  *A.*  I can't attest to the date, but that would have been

2  approximately about right.

3  *Q.*  What you do remember is that the Tyson bid after RSCS sent

4  out its request for bid for everything to be in on August the

5  19th, the Tyson bid came in eight days before everyone else's

6  bid was due on August the 11th.  Don't you remember that?

7          *MR. TORZILLI:*  Objection, foundation.

8          *THE COURT:*  Overruled.  He can answer if he remembers.

9  *A.*  I don't remember eight days, but I remember that there was

10  a submission made previous to the rest of the group.

11  *BY MR. GILLEN:*

12  *Q.*  And that submission was by Tyson.

13  *A.*  Yes, sir.

14  *Q.*  In addition to submitting early that you just testified to,

15  the Tyson model had something else which was different from all

16  of the rest of them, isn't that right, in terms of their model?

17  *A.*  I don't remember that specifically.  There was something

18  about the green weight, tare weight, marination, something of

19  that nature.

20  *Q.*  Precisely.  Let me ask you a few questions and see if we

21  can work on this.

22          Now, the issue regarding marination so we can explain

23  to the jury what we mean by that, marination is when the

24  marinated liquid is added to the chicken which would be

25  specific to the KFC model, correct?

Pete Suerken - Cross

1    A.   Yes, sir.

2    Q.   And so what KFC wanted to do is they did not want to pay

3    for the additional weight that the marination added to the

4    weight of the chicken, right?

5    A.   I don't remember the specifics of what their difference

6    was.  I just remember that was the item that was kind of over,

7    that's it.

8    Q.   Well, let me ask you a second point.  Also do you remember

9    whether or not Tyson unique from all the rest of them wanted to

10   take away or to do away with the tare weight of the liquid in

11   the box?

12   A.   I just know that there was an issue having to do with

13   marination and how Tyson wanted to account for it.  I don't

14   remember the specifics around it.

15   Q.   Which was different from everyone else, correct?

16   A.   Yes, sir.

17   Q.   So we have the uniqueness of a Tyson bid which had

18   components in it that nobody else did, right?

19   A.   Yes.

20   Q.   About how -- what KFC would pay for and what they wouldn't

21   pay for, right?

22   A.   Yes.

23   Q.   Now just for the edification of the jury, if you can tell

24   the jury what we mean by tare weight so they can understand

25   what that term means.

Pete Suerken - Cross

1    A.    Tare weight is what essentially is what you pay off of.

2    Q.    Well, when a chicken goes through the process and is frozen

3    and then liquid comes out and it's in the box, KFC doesn't want

4    to pay for the weight of the liquid that's in the box; is that

5    right?

6    A.    That's typical, yes.

7    Q.    And do you remember that Tyson's proposal in addition to

8    the marination issue said, well, we want to be paid for the

9    weight of the box, not -- we don't want to have to subtract out

10   the weight of the liquid that may come out of the chicken.

11   A.    Once again, I don't remember the specifics of the exact

12   ask.

13   Q.    I understand, because again at this stage you are learning

14   on the fly because you have been in a situation where you're

15   buying beef, you're buying pork, you're buying everything in

16   the spectrum for RSCS, and then suddenly into the breach for

17   you where you have got to drill down on chicken, right?

18   A.    Yes, sir.

19   Q.    So as a result, then Mr. Eddington comes in and Mr. Lewis

20   was there, and these are things that they would deal with in a

21   more specific and experienced way because that's what they

22   basically did, right?

23   A.    Absolutely.

24   Q.    So that's the reason why Mr. Eddington was hired, to come

25   in to sort of be once he got there the hands-on guy on the

Pete Suerken - Cross

1    specifics of a lot of this stuff.

2    A.   Yes, sir.

3    Q.   Now, so then what we have, the situation is we've got the

4    early Tyson bid.  Do you remember, do you remember that Tyson

5    or do you remember whether Tyson actually wanted to close the

6    deal with RSCS the same week that they had submitted eight days

7    early?  Do you remember that at all?

8    A.   They did.

9    Q.   So what Tyson wanted to do before all the rest of these

10   folks got their bid in is they wanted to get their bid in early

11   and say let's make a deal before all the rest of these people

12   even bid, right?

13   A.   They did.

14   Q.   And RSCS said, well, we're going to look at everybody's bid

15   and then we'll work it that way, right?

16   A.   Yes.

17   Q.   But it was the intent and the desire of Tyson to close out

18   negotiations with RSCS before any of the other bids came in.

19   A.   That is my recollection, yes, sir.

20   Q.   Okay.  Now, what we have is that you then had a strategy.

21   You explained your strategy on direct examination where RSCS

22   when you come in, suddenly you are looking at a situation where

23   you have got 200 to 200 loads a week you've got to get covered,

24   but Pilgrim's had about a hundred of those loads, correct?

25   A.   That is correct.

Pete Suerken - Cross                                                      1072

1   Q.  So is it fair to say that in the negotiating leverage

2   issues worked very strongly in favor of Pilgrim's because of

3   the share, the market share they had in your business.

4   A.  Yes, sir.

5   Q.  And your strategy was to try to diversify that, those

6   loads, so that you would then be able to have -- be in a better

7   situation either that year or down the road to negotiate.

8   A.  The original strategy didn't include diversification.

9   Q.  Okay.  Well -- it did not include diversification.

10  A.  No, sir.

11  Q.  So your original strategy, whoever it is, I am going to go

12  with whoever gives me the lowest price.

13  A.  I am going to see what the lowest costs are, best

14  available, and then go from there.

15  Q.  So what we have is a situation where you then are seeing

16  the bids come in.  And you are then put in a situation where

17  you then begin speaking with other folks about, you know, how

18  you are going to negotiate the bids, right?

19  A.  Yes.

20  Q.  Now, to be clear, you, because you are at RSCS, have -- I

21  assume that you had no idea about how the decision making

22  within Tyson of setting prices is made or made in 2014.

23  A.  No, sir, I do not.

24  Q.  So you have no idea about the relationship between the

25  business unit in Tyson, the pricing unit in Tyson and how

Pete Suerken - Cross

1    prices are set on these bids to RSCS or other customers,

2    correct?

3    A.  Not within the poultry space.

4    Q.  Okay, not within the poultry space.  So we are dealing with

5    the poultry space now --

6    A.  Yes, sir.

7    Q.  -- in the summer of 2014.  So now we have a situation where

8    you have to then begin taking some action and deciding how you

9    are going to kind of get this thing wrapped up.  So what you --

10   I believe what you indicated on direct examination is what you

11   wanted to do is you wanted to buy at the low end, take a look

12   at whoever was the lowest, correct?

13   A.  Yes, sir.

14   Q.  Buy or get a commitment and then work your way up, right?

15   A.  Whoever could drive the most value, lowest landed, right

16   size, yes, sir.

17   Q.  And so what you were doing there, you have got these seven

18   folks or seven entities that are bidding.  And you are looking

19   to say, all right.  I think you said Case and who was -- it was

20   Tyson and was it George's?  Who were the three that you were

21   focusing on at that time to try to get them squared away?

22   A.  George's would have been first.  Case would have been in

23   the top -- in the front.  Tyson would have been in the front,

24   but I don't remember the exact order of the pack.

25   Q.  So you've got basically those three that you're going to

Pete Suerken - Cross

1    try to make a deal with.  And then from there you're going to

2    then kind of expand out and then decide what you can do because

3    you have already gotten a handshake deal, correct?

4    A.  Correct, yes.

5    Q.  When I say by handshake deal, what I mean by that is that

6    what you would do is you would go to folks and you would say,

7    all right.  Do we have a deal on A, B, C and D?  And before the

8    lawyers have drafted up any of the documents or they get signed

9    months later, if you have a handshake deal with somebody,

10   that's something you felt like you could rely on during this

11   period of time, correct?

12   A.  Yes, sir.

13   Q.  So what you did is you were going to try and find those

14   three areas that you thought was the best deal and then

15   particularly as it relates to volume, that would then allow you

16   to realize and understand I have got a handshake deal on volume

17   with these folks so that I can tell other people like Pilgrim's

18   that I am going to cut their volume, right?

19   A.  Yes.

20   Q.  Okay.  So what you do is you have gone to Tyson and to Case

21   and to George's.  And they were all attractive for different

22   reasons.  One of the attractive nature of the Tyson was you

23   mentioned price was a little bit lower than Pilgrim's, correct?

24   A.  Yes, sir.

25   Q.  So the price was a little bit lower.  The profit margin

Pete Suerken - Cross

1   that the company had projected was a little bit lower too,

2   right?

3   A.  I wouldn't have paid attention to their profit margin.

4   Q.  And then geography.  And you explained I think and gave the

5   example of the plant in Texas.

6   A.  Yes, sir.

7   Q.  You have got a plant in Texas.  And you are saying, all

8   right.  If my FOB prices, I will just say $1.08, which I think

9   is what the FOB price was for Pilgrim's in this deal at the

10  end, if it's $1.08, then I am looking at the Tyson plant in

11  Texas.  And I know from picking it up at the plant and taking

12  it a very short geographic area my freight costs are going to

13  be much, much lower, right?

14  A.  Yes, sir.

15  Q.  So when you are looking at it, you are looking at it from

16  sort of a bottom line.  Hey, this is FOB.  That's one thing.

17  And then I have got to figure out what plant I am going to get

18  it from.  And from there I am then going to be able to say to

19  my franchisees, okay, this is what we got, right?

20  A.  Yes.

21  Q.  What you want to do is you want to be in a situation -- the

22  franchisees don't want to buy chicken that got shipped in from

23  Alaska.  An exaggeration, of course.

24  A.  The franchisees didn't care where it came from as long as

25  it was within specification.  It was the lowest landed possible

Pete Suerken - Cross

1    cost.

2    Q.   And did the franchisees pay for the freight?

3    A.   Yes, sir.

4    Q.   Okay.  So it does matter to them whether or not you are

5    shipping it from a plant 50 miles away or whether you are

6    shipping it from Alaska.

7    A.   No, it doesn't matter.

8    Q.   It doesn't.  How come?

9    A.   If the FOB cost at a further location was lower and you

10   could pay the freight and bring it in, it would have been lower

11   landed at the store.  It's a combination of price as well as

12   freight cost.

13   Q.   Sorry to interrupt you.  Okay.  I have got it.  But at the

14   same FOB, if you have got the identical FOB, and freight is a

15   big deal.

16   A.   Yes.

17   Q.   Sorry.

18   A.   Even to an extent if somebody was more expensive, you would

19   have paid that if they had enough of a freight pickup to offset

20   it.

21   Q.   Gotcha, gotcha.  And so what we are then doing is we are in

22   a situation where you're doing the negotiation.  And let's see,

23   I think you talked about 9704.  Could we bring that up, please?

24   Now, this is what the government showed you.  And can we expand

25   on that lower e-mail, blow that up a bit, please?  A little bit

Pete Suerken - Cross

1077

1     more.  Okay.  There we go.

2              Now, this is something that was sent from you to

3     Mr. Roberts, correct?

4     A.   That is correct.

5     Q.   And so it says where -- "Brian to call Pete," and you think

6     this was as a result of a meeting or was it a meeting or a

7     telephone call?

8     A.   It looks like a telephone call.

9     Q.   At this stage --

10              MR. GILLEN:  Your Honor, I am sorry, could we publish

11    9704 to the jury?

12              THE COURT:  Only the lower half has been admitted.

13    What's being displayed right now can be displayed to the jury.

14              MR. GILLEN:  Thank you, Your Honor.

15    BY MR. GILLEN:

16    Q.   So now let's remember what's happened here at this stage.

17    At this stage RSCS has gotten the Tyson bid eight days early,

18    right, early on August the 11th, right?

19    A.   Earlier, yes, sir.

20    Q.   And then wanted to close out within the week and you all

21    said no, right?

22    A.   Correct.

23    Q.   So you say no to that.  And then there is a request for --

24    you know, contained within the Tyson model as we established

25    was unique from all the rest of them and KFC said we are not

Pete Suerken - Cross

1    going to -- we're not going to buy into the marination issue or

2    the tare weight issue.  That's for another day.  We are not

3    doing that now, right?

4    A.  Yes, sir.

5    Q.  So when RSCS says to the model initially that had the

6    issues about marination and tare weight, nah, we are not

7    interested in that, suddenly then kind of Tyson then adjusts

8    its model to compensate for what they think to be the weight

9    they are going to lose because of marination and tare weight,

10   right?

11   A.  They adjusted the model because of whatever that issue was,

12   yes.

13   Q.  Right.  So they adjust the model.  You are talking to all

14   sorts of people.  By this time, this is on September the 3rd,

15   you have spent a great deal of time talking with Mr. Roberts,

16   with a number of other.  People, probably might have been one

17   of the first times that you had engaged in discussions with any

18   of them regarding chicken, correct?

19   A.  Yes, sir.

20   Q.  But as it relates to Mr. Roberts, now, this e-mail I think

21   you said on direct examination because it reads like you're

22   angry and you're all upset, Tyson wants a ridiculous price.

23   RSCS says no.  RSCS shamefully tells Tyson that we have bought

24   poultry at a ridiculous price from others.  Tyson informs RSCS,

25   really, you are screwed.  Go from there.  That's what you are

Pete Suerken - Cross

1   sending to Mr. Roberts, right?

2   A.   I did send that to Mr. Roberts.

3   Q.   Not in anger.  It wasn't in anger, was it?

4   A.   No, sir.

5   Q.   As a matter of fact, I think the way you described it on

6   direct examination was that it was basically friendly -- or

7   banter or friendly banter between friends is what you said.

8   A.   Yes, sir.

9   Q.   And among the other folks that you had been negotiating

10  with or talked with, you felt like you could send this sort of

11  kind of I don't want to say funny, but sort of friendly banter

12  to Mr. Roberts.  And you felt more comfortable because of your

13  relationship knowing him than you did with the others, right?

14  A.   We had negotiated multiple contracts in multiple arenas,

15  beef, tortillas, all kinds of other products.

16  Q.   So you knew Mr. Roberts.  You had been involved with beef

17  with him before.  You had been involved with -- what did you

18  say?

19  A.   Pizza Hut.  I probably did eight, $900 million worth of

20  business with him.

21  Q.   Exactly.  So a wide spectrum of things that Mr. Roberts had

22  interactions with you on well before you got thrown into the

23  breach in the summer of 2014.

24  A.   Yes, sir.

25  Q.   So here this is what you are saying to him.  But what

Pete Suerken - Cross

1    happens is that ultimately RSCS comes to terms with a Tyson on

2    a number that was, as you indicated earlier, lower than

3    Pilgrim's and geographically advantageous to you, correct?

4    A.   Yes.

5    Q.   So that even after this e-mail which was on September the

6    3rd, you sent an e-mail to him the next day asking whether if

7    you meet his price, whether or not he can get you an additional

8    11 loads.  Do you remember that?

9    A.   I don't remember the e-mail, sir.

10        MR. GILLEN:  Your Honor, I do have a copy.  And if I

11   may approach the -- I just have a hand copy.

12   BY MR. GILLEN:

13   Q.   Not to be published to the jury, do you recognize what has

14   been marked as G-508?

15   A.   Yes.  This is an e-mail I sent to Brian Roberts.

16   Q.   And did you send this e-mail to him in the ordinary course

17   of business on behalf of RSCS?

18   A.   Yes, sir.

19   Q.   And is this document, this sort of document that is kept

20   within RSCS as a business record within RSCS?

21   A.   I can't attest to what they keep and don't keep.

22   Q.   But the e-mails that you would send that had a business

23   duty would -- to your understanding would be kept within RSCS,

24   correct?

25   A.   Yes, sir.  They should have a copy.

Pete Suerken - Cross

1    *Q.* And this was done during the normal course of business

2    activity on your behalf sending this to Mr. Roberts, correct?

3    *A.* Yes.

4          *MR. GILLEN:* Move the admission of G-508.

5          *THE COURT:* Any objection to the admission of G-508?

6          *MR. TORZILLI:* It's hearsay. And to the extent that

7    Your Honor rules the business record exception, the middle of

8    the e-mail applies to Mr. Roberts would be hearsay as well.

9          *THE COURT:* Response?

10         *MR. GILLEN:* I don't mind taking the e-mail from

11   Mr. Roberts down. It's a business record of Mr. Suerken's, so

12   I would ask for the admission and publication of the top part.

13         *THE COURT:* Hold on one second. Okay. So Mr. Gillen,

14   you are just moving the very top e-mail from Mr. Suerken to

15   Mr. Roberts?

16         *MR. GILLEN:* Yes, Your Honor.

17         *THE COURT:* Mr. Torzilli, just so we are clear, any

18   objection to the admission of just that top e-mail on G-508?

19         *MR. TORZILLI:* Just so I understand, the motion would

20   be to admit only the top e-mail, but not to admit the bottom

21   two e-mails?

22         *THE COURT:* I believe that that is -- is that correct,

23   Mr. Gillen?

24         *MR. GILLEN:* That's fine. Yes, Your Honor.

25         *MR. TORZILLI:* Then we have no objection.

Pete Suerken - Cross

1          *THE COURT:*  Then just the top e-mail in G-508 from

2    Mr. Suerken to Mr. Roberts will be admitted.

3          *MR. GILLEN:*  May we publish, Your Honor, to the jury?

4          *THE COURT:*  You may.

5    *BY MR. GILLEN:*

6    *Q.*  So to set the stage, in Government's 9704, that's the one

7    where you are saying let me get this straight and we go through

8    all that stuff, right?  And then the next day you then send an

9    e-mail to Mr. Roberts saying, I am moving stuff around.  I need

10   an additional 11 loads.  If I hit your number, can you get me

11   to 31, right?

12   *A.*  Yes, sir.

13   *Q.*  So what you're saying is if I pay the price that Tyson

14   wants to be paid, I will do that if you can give me more loads

15   and get me up to 31 truckloads per week, right?

16   *A.*  Yes, sir.  That's what that states.

17   *Q.*  And that was because at that point you had been -- you were

18   satisfied with the Tyson price.  And that you were prepared to

19   tell him if I hit that price, I want more volume from you,

20   right?

21   *A.*  Yes, because it was lower cost than others.

22   *Q.*  Yeah.  So you say, hey, if I give you that price, I want --

23   can you get me 11 more trucks a week, correct?

24   *A.*  Yes, sir.

25   *Q.*  Now, we talk about -- when we talk about pennies and things

Pete Suerken - Cross                                              1083

 1   like that within this three-year contract, a penny's difference

 2   in the prices that would be paid to Pilgrim's or 2-1/2 cents or

 3   a penny, any of that is a whole lot of money, isn't it, over a

 4   three-year period?

 5   A.  Yes, sir, millions and millions.

 6   Q.  It would add up to tens of millions of dollars.

 7   A.  Yes, sir.

 8   Q.  So if somebody like Pilgrim's is a penny more or 2-1/2

 9   cents or let's just say a penny, a penny more on their FOB, in

10   the end over three years that could be a big difference between

11   what Pilgrim's gets and what Tyson gets in terms of the money

12   for their chicken, right?

13   A.  Yes, sir.

14   Q.  Now, I want to ask you a little bit about the -- you

15   testified about -- I am going to let others get into this in

16   more detail, but I want to address it now.  You said you had an

17   issue where you met with Mr. Austin and felt that he was

18   letting you know that he thought that he knew where all your

19   loads were going, right?

20   A.  Yes, sir.

21   Q.  But he didn't, did he?

22   A.  He did not.

23   Q.  He didn't know, did he?

24   A.  He did not.

25   Q.  He thought he knew, but you knew that he was wrong.

Pete Suerken - Cross

1    A.   That is correct.

2    Q.   So he was either bluffing to you or somebody was giving him

3    false information, right?

4    A.   I can't attest to why he did what he did.

5    Q.   And then dealing with -- ultimately the contracts are

6    signed.  Now, during this, and I am asking you about what you

7    did during this time period and what you thought during this

8    time period.  You actually called up Mr. Roberts on the phone

9    after the bids were in, correct?

10   A.   Yes, sir.

11   Q.   And you were concerned for him personally because of Tyson

12   being a little lower or low and you were concerned about how

13   that might have an impact on him at Tyson.

14   A.   It was unusual that Tyson was that much lower than the

15   other big guy.

16   Q.   And that caused you to call him up to express your personal

17   concern to him about frankly whether he might be in jeopardy at

18   Tyson over the bottom line.

19   A.   My exact words were, "You going to be all right with this?"

20        MR. GILLEN:  That's all I have, Your Honor.

21        THE COURT:  Thank you, Mr. Gillen.

22        MS. NIELSEN:  May I hand up some binders to the Court

23   and the witness, please?

24        THE COURT:  Yes, you may.

25                          **CROSS-EXAMINATION**

Pete Suerken - Cross

1  *BY MS. NIELSEN:*

2  *Q.*  Good morning, Mr. Suerken.

3  *A.*  Good morning, ma'am.

4  *Q.*  My name is Dru Nielsen and I represent Bill Lovette.

5        You and I have never spoken before, correct?

6  *A.*  That is correct.

7  *Q.*  You have talked with Mr. Torzilli and his team over here

8  several times, correct?

9  *A.*  Correct.

10  *Q.*  You talked to them in preparation for your testimony today.

11  *A.*  Correct.

12  *Q.*  Okay.  I want to start by taking you back to about a year

13  ago, okay, to March of 2021.

14  *A.*  Okay.

15  *Q.*  In March of 2021 two federal agents showed up at your home,

16  correct?

17  *A.*  That is correct.

18  *Q.*  And when the two federal agents showed up at your home,

19  that was the first time you had spoken to anyone from the

20  government about this case.

21  *A.*  That is correct.

22  *Q.*  Okay.  Now, when the agents came to your home that day,

23  they hadn't called in advance to schedule a meeting with you,

24  correct?

25  *A.*  No, ma'am, they had not.

Pete Suerken - Cross

1  Q.  They showed up unannounced.

2  A.  Yes, ma'am.

3  Q.  And even though these two federal agents showed up at your

4  house unannounced, your wife actually invited them into your

5  home, correct?

6  A.  She did not.

7  Q.  They came into your home?

8  A.  They did.

9  Q.  And one of the agents that showed up at your home that day

10  was Agent Taylor who is sitting right here, correct?

11  A.  Yes, sir -- yes, ma'am, sorry.

12  Q.  No problem.  And the other agent was from the Department of

13  Commerce, correct?

14  A.  Yes.

15  Q.  The federal agents that showed up that day never asked for

16  your permission to tape-record the interview they did of you,

17  correct?

18  A.  They did not.

19  Q.  Even though they were invited into your home.

20  A.  They did not ask for my permission, no.

21  Q.  And you weren't aware at the time that they were taping

22  you, correct?

23  A.  That is correct.

24  Q.  So they secretly recorded you in your own home.

25  A.  They did.

1087

Pete Suerken - Cross

1  Q.  Now, when the federal agents showed up at your home that
2  day, they wanted to talk to you about the price increases in
3  the 2014 time frame, correct?
4  A.  Yes, ma'am.
5  Q.  Let's set the stage for the 2014 negotiations for the 2015
6  contracts, okay?  In 2014 you expected an increase on the price
7  of small bird chicken, correct?
8  A.  Yes, ma'am.
9  Q.  Now, let's be clear about that.  You went into the 2014
10  price negotiations for the 2015 contracts knowing that RSCS was
11  going to take a beating that year.
12  A.  Yes.
13  Q.  Let's talk about some of the reasons why you knew chicken
14  prices were going to go up, okay?  You understand supply and
15  demand economics, correct?
16  A.  Yes, ma'am.
17  Q.  And in 2014 the chicken suppliers weren't producing as much
18  small chicken as they had in the past, correct?
19  A.  The supply had been -- the supply over time had been lower
20  and lower, yes.
21  Q.  And you understood at the time that small bird economics
22  had completely changed, correct?
23  A.  Yes.
24  Q.  And part of the reason why there was this change is that
25  big bird had become much more profitable than small bird,

Pete Suerken - Cross

1    correct?

2    A.  Yes, yes, ma'am.

3    Q.  You knew that the chicken suppliers were making 70 cents to

4    a dollar per big bird, correct?

5    A.  I can't -- I don't remember saying that and I don't

6    remember those numbers.

7    Q.  Okay.  Can you open your binder there to the first tab,

8    I-558?  This is a transcript of that interview that the agents

9    secretly recorded.  And if you can look at Page 79.

10         MR. TORZILLI:  Your Honor, I object to improper

11   refreshment.

12         MS. NIELSEN:  Your Honor, I am impeaching him.

13         THE COURT:  Overruled.

14         MR. TORZILLI:  He said, Your Honor, he couldn't

15   recall.

16         THE COURT:  Well, either way she can direct him to a

17   page.

18   BY MS. NIELSEN:

19   Q.  Did you find Page 79?

20   A.  I do.

21   Q.  If you look at the bottom of that page, Line 24 and 25, you

22   told the agents:  I want to say they were making like a buck a

23   bird or something, 70 to 80 cents to a buck on the large birds.

24         Correct?

25   A.  That is the way it reads, yes.

Pete Suerken - Cross

1  Q.  And that is what you said, correct?

2  A.  Yes.  But I think my clarifying statement was I want to

3  say.  I don't know that that was the fact.

4  Q.  Well, does that sound right to you, about 70 cents to a

5  dollar?

6  A.  I don't honestly remember, ma'am.

7  Q.  Okay.  And contrast that to small bird where the chicken

8  suppliers were only making 10 to 20 cents per small bird,

9  correct?

10  A.  It would have been much, much less, in that range.

11  Q.  And that's in fact what you told the agents, 10 to 20

12  cents, correct?

13  A.  Yes.

14  Q.  Now, you also told the agents that the fundamentals of the

15  industry said there should have been a higher price paid at

16  some point just to be competitive with the large bird, correct?

17  A.  Yes, ma'am.

18       MR. TORZILLI:  Objection.  Calls for hearsay.  Can we

19  have a side bar?

20       THE COURT:  Yes.

21    (At the bench:)

22       THE COURT:  Go ahead, Mr. Torzilli.

23       MR. TORZILLI:  We had an extended discussion --

24       THE COURT:  Sorry, Mr. Torzilli.  Go ahead.

25       MR. TORZILLI:  Thank you, Your Honor.  We had an

Pete Suerken - Cross

1    extended discussion yesterday, the upshot of which I had

2    understood was that the focus of the examination of this

3    witness which I had understood to include direct, cross and

4    redirect would be what he knew at the time as opposed to

5    getting into in the first instance at least what he told the

6    agents.  And it seems like the questioning that's proceeding

7    now is more along the lines of the prohibited, the latter of

8    getting into what he told the agents as opposed to what he

9    actually knew from personal knowledge in 2014.

10              THE COURT:  Ms. Nielsen?

11              MS. NIELSEN:  Your Honor, I am happy to rephrase and

12   just ask him what he knew.

13              THE COURT:  Yeah.  I agree with Mr. Torzilli

14   completely.  You know, No. 1, that was improper impeachment.

15   He just indicated that he had a failure of recollection and now

16   you're just quoting him parts of what he told the agents which,

17   of course, is based upon what his memory was at the time of the

18   interview.  Once again, in order to comply with the Court's

19   directive at the end of the day yesterday, he needs to be asked

20   about what he knew at the time, not at the time of his

21   interview with the FBI.

22              MS. NIELSEN:  Yes, Your Honor.

23              THE COURT:  Thank you.

24   BY MS. NIELSEN:

25   Q.  Mr. Suerken, you understood that the fundamentals of the

Pete Suerken - Cross

1   industry said there should have been a higher price paid at

2   some point, correct?

3   *A.*   Yes, ma'am.

4   *Q.*   And you understood that that change needed to happen just

5   to be competitive with large bird, correct?

6   *A.*   Yes, ma'am.

7   *Q.*   In fact, as you said, you wouldn't have raised small birds

8   because it didn't make any sense, correct?

9   *A.*   That is correct.

10  *Q.*   And that low supply of small birds became very apparent on

11  Mother's Day of 2014, correct?

12  *A.*   That is correct.

13  *Q.*   And as you said, Mother's Day is a huge day for KFC,

14  correct?

15  *A.*   That is correct.

16  *Q.*   In fact, historically it's the biggest day for KFC chicken

17  sales, correct?

18  *A.*   It is.

19  *Q.*   And on Mother's Day of 2014, KFC ran out of chicken,

20  correct?

21  *A.*   We didn't have enough loads, yes, ma'am.

22  *Q.*   And at the time that KFC ran out of chicken on Mother's

23  Day, around Mother's Day, 2014, KFC had contracts to get

24  chicken on the bone from seven different chicken suppliers,

25  correct?

Pete Suerken - Cross

1    A.  I believe so, yes, ma'am.

2    Q.  But in May of 2014, KFC needed more chicken than the

3    chicken it had contracted with from all seven suppliers,

4    correct?

5    A.  I didn't write the original contracts, ma'am, and I am not

6    familiar with the volume commitments that were in those

7    contracts.  I just know we did not have enough chicken from

8    approved suppliers.

9    Q.  You didn't have enough chicken, right?

10   A.  Yes.

11   Q.  Among seven suppliers?

12   A.  Yes, ma'am.

13   Q.  So RSCS had to buy what was called incremental loads of

14   chicken, correct?

15   A.  Correct.

16   Q.  This means additional loads of chicken on top of the

17   chicken that KFC had already contracted to buy, correct?

18   A.  Correct.

19   Q.  And so we're clear, when we're talking about loads of

20   chicken, we are talking about truckloads of chicken, correct?

21   A.  Correct.

22   Q.  18-wheeler semi truckloads of chicken, correct?

23   A.  Correct.

24   Q.  And you know that each truckload of chicken is about

25   33,500 pounds, correct?

Pete Suerken - Cross

1   A.   About that.

2   Q.   Now, in 2014 KFC had contracts to buy chicken on the bone

3   for prices between 9202 cents to 9299 cents per pound, correct?

4   A.   I can't recall the exact pricing, ma'am.

5   Q.   Okay.  Do you recall meeting with Mr. Torzilli back on

6   February 18, 2022?

7   A.   Yes, ma'am.

8   Q.   And he showed you a document at that time, correct?

9   A.   He showed me lots of documents.

10  Q.   Oh, he did?  How many documents did he show you?

11  A.   I can't remember, ma'am.

12  Q.   More than 10?

13  A.   No, it was less than that.

14  Q.   Somewhere between one and 10?

15  A.   Somewhere in there, yes.

16  Q.   If you can open up your binder and in the pocket there,

17  this is one of the documents that Mr. Torzilli showed you in

18  that meeting, correct?

19  A.   It appears to be, yes.

20  Q.   Okay.  And if you look at that first column, 2014 contract

21  price, does that refresh your recollection about the range of

22  prices in 2014?

23  A.   I don't remember, ma'am.  I didn't write those contracts in

24  2014.

25  Q.   Okay.  Fair enough.  Now, you were paying a third more than

Pete Suerken - Cross

1 the contract price for those incremental loads that you

2 purchased in May of 2014, correct?

3 A. We were trying to, yes.

4 Q. Because for those additional loads, RSCS offered to pay

5 $1.30 for the additional incremental loads, correct?

6 A. Correct.

7 Q. And that was nearly 40 cents per pound more than what you

8 were paying for chicken at that time, correct?

9 A. Yes, ma'am.

10 Q. Now, even though you were willing to pay this increased

11 price, 30 percent more, 40 cents per pound, you were still

12 having a really hard finding chicken during this time, correct?

13 A. That is correct.

14 Q. But you did find some incremental loads, correct?

15 A. There was a few loads around at those prices.

16 Q. And you found some loads from Pilgrim's, correct?

17 A. I can't remember who I bought from, ma'am.

18 Q. Okay.  If you can turn to I-828 in your binder.

19        MR. TORZILLI:  Your Honor, we object to the improper

20 refreshment.

21        THE COURT:  Let me take a look at I-828.

22        MS. NIELSEN:  Your Honor, I am not aware of any

23 document -- any document can refresh recollection if it, in

24 fact, refreshes his recollection.

25 A. You are going to have to help me find -- there it is.

1095
Pete Suerken - Cross

1    *BY MS. NIELSEN:*

2    *Q.*  Me too.  I can't find mine either.

3    *A.*  There it is.

4         *THE COURT:*  Hold on.  Let me take a look at the

5    document.  Objection is overruled.  He can look at it.

6         *MS. NIELSEN:*  Thank you.

7    *BY MS. NIELSEN:*

8    *Q.*  Do you have I-828 pulled up there?

9    *A.*  I do.

10   *Q.*  Did you have a chance to review it?

11   *A.*  I have.

12   *Q.*  And did that refresh your recollection about whether you

13   found some incremental loads from Pilgrim's?

14   *A.*  No, ma'am.  I don't remember buying extra loads from

15   Pilgrim's.  I apologize.  This says we did.

16   *Q.*  Okay.  Well, you were copied on the e-mail, correct?

17   *A.*  Yes, ma'am.

18   *Q.*  Probable that you got some loads from Pilgrim's?

19   *A.*  According to this e-mail, we did.

20        *MR. TORZILLI:*  Objection, this is improper --

21        *THE COURT:*  Sustained.

22        *MR. TORZILLI:*  Your Honor, also the previous exhibit

23   that was shown to the witness, not I-828, but the previous one

24   wasn't marked for identification purposes.  We would request

25   defendants mark it for identification purposes.

Pete Suerken - Cross

1    MS. NIELSEN:  Your Honor, we didn't move to admit it.

2  It was just to refresh and it didn't refresh his recollection.

3    THE COURT:  It should be marked and we will include

4  that in the record.  It doesn't obviously have to be further

5  identified, but we should do that for the record.

6    MS. NIELSEN:  Sorry about that, Your Honor.  We will

7  get that done.

8    THE COURT:  That's all right.  Go ahead.

9    MS. NIELSEN:  Actually, Your Honor, we do have it

10 marked as I-863.

11   THE COURT:  Thank you.

12   MR. TORZILLI:  Can I ask counsel to repeat?

13   MS. NIELSEN:  I-863.

14 BY MS. NIELSEN:

15 Q.  You were paying that price, that $1.30 per pound, to try to

16 secure chicken.  You paid the increased price because the

17 supply was really tight at that time, correct?

18 A.  We didn't have enough chicken.

19 Q.  Right.  Which means the supply is even more than tight,

20 right?

21 A.  Typically.

22 Q.  Okay.  Now, you testified on direct that you only expected

23 a 4-cent increase in 2014, correct?

24 A.  I believe I gave a range, ma'am.

25 Q.  Okay.  What was that range?

Pete Suerken - Cross

 1   A.  2, 3, 4, 5 cents, something like that.

 2   Q.  Okay.  But at this time in May of 2014, you were paying 40

 3   cents more per pound, correct?

 4   A.  Correct.

 5   Q.  And at the same time that the small bird supply was low,

 6   the demand was high, correct?

 7   A.  I can't -- I wasn't selling chicken, so I can't attest to

 8   the demand side of the pricing equation.

 9   Q.  Okay.  Well, as you said, the production of small bird

10   chicken was dwindling, correct?

11   A.  Yes, ma'am.

12   Q.  And there were more purchasers than there was chicken,

13   correct?

14   A.  I didn't state that.

15   Q.  Okay.  You knew at the time that RSCS was competing with

16   other big purchasers like Popeye's, correct?

17   A.  Yes, ma'am.

18   Q.  Church's, correct?

19   A.  Yes, ma'am.

20   Q.  Chick-fil-A?

21   A.  Yes, ma'am.

22   Q.  Okay.  And you're competing with all of these other big

23   companies to get the very scarce chicken, correct?

24   A.  Yes, ma'am.

25   Q.  Now, in fact, in the summer of 2014, RSCS hired a

1098

Pete Suerken - Cross

1  consulting company called McKenzie to help come up with some

2  ideas to address the small bird supply issue, correct?

3          *MR. TORZILLI:*  Objection, scope.

4          *THE COURT:*  Overruled.

5  A.  Yes, ma'am.

6  *BY MS. NIELSEN:*

7  Q.  The hiring of the McKinsey consultants by RSCS was approved

8  by the RSCS board of directors, correct?

9  A.  I can't -- I don't know, ma'am.

10  Q.  Well, you went to the board of directors meeting, correct?

11  A.  I may or may not have been in the room when that was

12  discussed.

13  Q.  Okay.  We can talk about that.  You are familiar with

14  McKinsey, correct?

15  A.  Yes, ma'am.

16  Q.  It's one of the premier consulting firms in the country,

17  correct?

18  A.  Correct.

19  Q.  And starting in June of 2014 and for the next six weeks,

20  you helped McKinsey with their study of the small bird supply

21  issue.

22  A.  We worked with them on a project, yes, ma'am.

23  Q.  And you were communicating with the McKinsey consultants,

24  correct?

25  A.  Yes, ma'am.

Pete Suerken - Cross

1    Q.  And you provided your input and guidance to McKinsey in

2    their efforts to study and address this problem, correct?

3    A.  I would have been interviewed, yes, ma'am.

4    Q.  And that was ongoing.  They would e-mail you a question.

5    You would respond, correct?

6    A.  I don't remember the specifics.

7    Q.  Okay.  Now, while you were working with McKinsey on this

8    study of the problem of the small bird supply problem, you

9    asked some of the chicken suppliers to present information to

10   McKinsey about the small bird market, correct?

11          MR. TORZILLI:  Objection, foundation.

12          THE COURT:  Overruled.  He can answer if he knows.

13   A.  I don't know if I did, ma'am.

14   BY MS. NIELSEN:

15   Q.  But you know that happened, correct?

16   A.  RSCS would have requested that.  I don't know that I did

17   that.

18   Q.  Okay.  Well, you recall that you and your colleagues at

19   RSCS along with the McKinsey consultants asked Pilgrim's

20   employees to discuss the conditions of the small bird market

21   with you, correct?

22   A.  I don't remember that specific meeting, ma'am.

23   Q.  Let's turn to I-829 and see if that refreshes your

24   recollection.

25          MR. TORZILLI:  We object.  Improper refreshment.

Pete Suerken - Cross                                    1100

1          THE COURT:  Let me take a look at the exhibit.

2    Overruled.  He can look at it.

3    BY MS. NIELSEN:

4    Q.  Did you find I-829 in the binder?

5    A.  I found that one.

6    Q.  And that is a calendar invite from you, correct?

7    A.  My admin could have done that.

8          MR. TORZILLI:  Objection, improper refreshment.

9          THE COURT:  Agreed.  He should look at the document

10   and then ask whether it refreshes his recollection.

11   BY MS. NIELSEN:

12   Q.  Can you take a look at that and see if that refreshes your

13   recollection about whether there was a meeting with Pilgrim's

14   employees?

15   A.  It does, ma'am.

16   Q.  Okay.  And you did, in fact, have a meeting, correct?

17   A.  Yes, ma'am.

18   Q.  And that was on June 11th of 2014, correct?

19   A.  Yes.

20   Q.  And that was held at RSCS in the bell grande conference

21   room, correct?

22   A.  Grande.

23   Q.  Grande, thank you.

24   A.  You need to spend more time in Taco Bell.  Yes, ma'am.

25   Q.  And at this meeting in June, you and your colleagues at

1101

Pete Suerken - Cross

1   RSCS along with the McKinsey consultants met with Pilgrim's as

2   you had requested, correct?

3   A.  Yes, ma'am.

4   Q.  And at that meeting that RSCS and McKinsey had requested,

5   Pilgrim's discussed with you the small bird market conditions,

6   correct?

7           MR. TORZILLI:  Objection, calls for hearsay.

8           THE COURT:  He can answer yes or no.

9   A.  Pilgrim's brought their economist is what I can remember.

10  And I don't remember the specifics of the -- I remember the

11  meeting, but I don't remember the specifics of what was said

12  within the meeting.  The only reason I remember is because it's

13  the first time I ever met Jayson Penn.

14  BY MS. NIELSEN:

15  Q.  Okay.  They showed you a PowerPoint, correct?

16  A.  Very well could have.

17  Q.  Would looking at a PowerPoint refresh your recollection as

18  to whether they showed you a PowerPoint?

19  A.  Sure.

20  Q.  If you could please turn to D-445.  And you can flip

21  through that.  It's pretty long, huh?

22  A.  I can look at this all day.  I don't remember this.  I

23  remember they had their economist.  I remember thinking that he

24  was credible, knew what he was talking about, and walked us

25  through a lot of stuff.  That's it.

Pete Suerken - Cross

1   Q.  Okay.  So in that meeting you talked about the market,

2   correct?  Fair to say?

3   A.  If their economist --

4          MR. TORZILLI:  Calls for hearsay.

5          THE COURT:  He can answer yes or no.

6   A.  I don't remember that, but...  I don't remember the

7   specific conversation that took place.

8   BY MS. NIELSEN:

9   Q.  Okay.  Now --

10          MR. TORZILLI:  Request to have the document removed.

11   Thank you.

12   BY MS. NIELSEN:

13   Q.  As you indicated already, you were providing McKinsey with

14   your input and feedback as they were studying the small bird

15   supply issue, correct?

16   A.  RSCS and myself would have been, yes.

17   Q.  Okay.  And in addition to participating in conversations

18   and meetings with McKinsey, you also reviewed drafts of the

19   McKinsey presentation, correct?

20   A.  I would have.

21   Q.  Okay.  And in your work with McKinsey, you became aware

22   that RSCS was still underpaying compared to other competitors,

23   correct?

24   A.  I don't remember that.

25   Q.  Would looking at an e-mail from this time period refresh

Pete Suerken - Cross

1   your recollection?

2   A.  I don't know if it will or not, but let's try.

3   Q.  Great?  Can you please turn to C-851.

4          Does that refresh your recollection as to what you

5   were talking to McKinsey about in this time period?

6   A.  I don't remember a lot of the entire McKinsey study.  I was

7   focused on trying to find chicken.

8   Q.  And that's what McKinsey was helping you with, correct?

9   A.  They weren't helping us find chicken in the spot market,

10  no, ma'am.

11  Q.  They were helping you with the negotiations that you did in

12  2014 for the 2015 contracts, correct, that you were the team

13  leader of.

14  A.  They were not setting negotiation strategy, no, ma'am.

15  Q.  That wasn't the point of the McKinsey study, to help you

16  set your strategy going into the 2014 negotiations for the 2015

17  contracts?

18  A.  I remember the McKinsey study was about making sure that

19  we -- assuring supply over a long period of time.

20  Q.  Okay.  And that was a big point of the 2014 contracts that

21  you were negotiating for 2015, correct?

22  A.  It would have been a part of the strategy, yes.

23  Q.  And you utilized the information that McKinsey was giving

24  you when you went into those negotiations, correct?

25  A.  I don't remember that.

Pete Suerken - Cross

1    Q.  You don't recall reading and using the McKinsey report that

2    was hired specifically for this purpose?

3    A.  I remember reading it.

4    Q.  But you didn't rely on it or implement the policy that was

5    adopted by RSCS?

6    A.  There was pieces of it that we -- yes, ma'am, that we did.

7    Q.  Okay.  Let's talk about some of those pieces.  You became

8    aware that RSCS was underpaying compared to your competitors,

9    correct?

10   A.  That's what the e-mail says, yes, ma'am.

11          MR. TORZILLI:  Your Honor, the witness is referring to

12   a document that's not in evidence.  I ask it be removed from

13   his view.

14          THE COURT:  It should be.

15          MS. NIELSEN:  Can you close up your binder, please?

16   BY MS. NIELSEN:

17   Q.  Did you become aware in your conversations in your work

18   with McKinsey that RSCS was underpaying compared to your

19   competitors?

20          MR. TORZILLI:  Calls for hearsay.

21          THE COURT:  Overruled.

22   A.  I believe -- I don't remember when I became aware of that,

23   whether it was the McKinsey survey, the McKinsey work or

24   previous to the McKinsey, I don't know when I became aware of

25   that, ma'am.

1105

Pete Suerken - Cross

1    *BY MS. NIELSEN:*

2    *Q.*   But you became aware that RSCS was underpaying compared to

3    your competitors, correct?

4    *A.*   I became aware that we were paying a lower cost.

5    *Q.*   Okay.  You also became aware that RSCS was perceived as

6    being difficult to work with, correct?

7    *A.*   Yes, ma'am.

8    *Q.*   Now, let's talk about when the McKinsey report was

9    presented, okay?  You attended the RSCS board meeting on

10   July 21st and July 22nd of 2014 in Chicago, correct?

11   *A.*   I don't remember that, ma'am.

12   *Q.*   Okay.  Would looking at a copy of the board minutes refresh

13   your recollection?

14   *A.*   Sure.

15   *Q.*   If you could turn in your binder to I-492.  And if you can

16   look at Page 1, middle paragraph, and Page 3, the large middle

17   paragraph.

18   *A.*   What was the other page, ma'am?

19   *Q.*   Page 3, the large middle paragraph.

20   *A.*   Okay.

21   *Q.*   Does that refresh your recollection as to whether you were

22   at the board meeting in July 21st and 22nd of 2014?

23   *A.*   I remember a board meeting, but I thought it was in

24   Louisville, Kentucky.

25   *Q.*   Okay.  But you remember being at a board meeting at this

Pete Suerken - Cross

1  time, correct?

2  A.  Yes, ma'am.

3  Q.  You are just mistaken on the location?

4  A.  You said Chicago.  I don't remember being in Chicago.

5  Q.  My fault.  But do you have any reason to doubt it was in

6  Chicago?

7  A.  I have no idea where it was.

8  Q.  Okay.  But you know you were at a board meeting, correct?

9  A.  According to this, I was, yes, ma'am.

10  Q.  And can you close that up again?

11        And you know that at that board meeting the McKinsey

12  report was presented, correct, to the board of directors?

13  A.  I don't remember the -- once again, I don't remember the

14  specifics of the board meeting.

15  Q.  You don't remember, in fact, presenting with McKinsey on

16  the findings in the report?

17  A.  I remember it was a perfectly miserable board meeting for

18  me.

19  Q.  Okay.  And it was miserable because --

20  A.  I had to tell the KFC operators they were about ready to

21  pay through the nose for chicken.

22  Q.  Because prices had gone up, correct?

23  A.  Yes.

24  Q.  And the purpose of the McKinsey report and you helping with

25  the McKinsey report was to develop a strategy of how you are

Pete Suerken - Cross

1  going to deal with this situation, correct?

2  A.  Yes, ma'am.

3  Q.  Okay.  And you knew that it was important for you in that

4  board meeting to present accurate information to the board,

5  correct?

6  A.  Yes.

7  Q.  And you knew that the RSCS board would rely on the

8  information you presented in that board meeting, correct?

9  A.  Yes.

10  Q.  And you reported on the fact that the small bird supply

11  would continue to become tighter, correct?

12  A.  That was my belief, yes.

13  Q.  And that big birds would continue to become more profitable

14  for suppliers, correct?

15  A.  That was my belief, yes.

16  Q.  And you also reported that RSCS had historically managed

17  chicken-on-the-bone procurement focused on low cost, correct?

18  A.  Correct.

19  Q.  But that now RSCS needed to change its focus to assure

20  supply, correct?

21  A.  Yes, ma'am.

22  Q.  And you knew at the time that you are at the board that

23  there are boards minutes taken at the time, correct?

24  A.  Yes.

25  Q.  And those board minutes memorialized what was discussed at

Pete Suerken - Cross

1    that meeting, correct?

2    A.   Correct.

3    Q.   And to your knowledge, board minutes are prepared at every

4    board meeting, correct?

5    A.   Yes, ma'am.

6    Q.   And as executive vice-president, you know it's important

7    that those board minutes are accurate, correct?

8    A.   Yes, ma'am.

9    Q.   Because you know that RSCS relies on the meeting minutes in

10   its regular course of business, correct?

11   A.   That is correct.

12   Q.   And you relied on the McKinsey report as well, correct?

13   A.   I used it as a data point.  I wouldn't use the word relied.

14   Q.   Okay.  You used it as a data point, a data point in the

15   negotiations in 2014, correct?

16   A.   Yes.

17            MS. NIELSEN:  Your Honor, I would move for the

18   admission of I-492.

19            THE COURT:  Any objection to the admission of I-492?

20            MR. TORZILLI:  Hearsay and foundation.

21            THE COURT:  Response?

22            MS. NIELSEN:  Your Honor, it's not hearsay because

23   it's something that this witness relied upon, and it goes to

24   his state of mind at the time of the negotiations and the

25   effect on the listener.  So first of all, it's not hearsay.

1109

Pete Suerken - Cross

1  Second of all, we have established that it is a business

2  record.

3          THE COURT:  Any response on business record point?

4          MR. TORZILLI:  There is no testimony the witness ever

5  relied on these minutes in any form or fashion.

6          THE COURT:  From the business record point?

7          MR. TORZILLI:  This is -- a business record exception

8  hasn't been established through this witness.

9          THE COURT:  Why not?

10         MR. TORZILLI:  Because he didn't prepare them and

11 doesn't have knowledge of the preparation of it.

12         THE COURT:  All of the objections are sustained.

13         It's noon, Ms. Nielsen, so we will go ahead and break

14 at this time.

15         MS. NIELSEN:  Thank you, Your Honor.

16         THE COURT:  Ladies and gentlemen, we will go ahead and

17 recess for lunch.  Keep your yellow juror buttons visible.

18 Don't talk amongst yourselves about the case.  Obviously, way

19 premature.  And we will reconvene at 1:30.  Thank you.

20         (Jury excused.)

21         We will be in recess.  Thank you.

22     (Recess at 12:00 p.m.)

23     (Reconvened at 1:35 p.m.)

24         THE COURT:  Are we ready to bring the jury back in?  I

25 take that as a yes.

Pete Suerken - Cross

1          (Jury present.)

2          *THE COURT:*  Ms. Nielsen.  Go ahead.

3     *BY MS. NIELSEN:*

4     *Q.*  Good afternoon, Mr. Suerken.

5     *A.*  Good afternoon.

6     *Q.*  When we left off, we were talking about the McKinsey

7     report, correct?

8     *A.*  Yes, ma'am.

9     *Q.*  Which you testified you used as a data point in your 2014

10    negotiations, correct?

11    *A.*  Yes, ma'am.

12    *Q.*  And to be clear, the first round of bidding with most of

13    the chicken suppliers in 2014 was after the McKinsey report had

14    been done, correct?

15    *A.*  Ma'am, I barely remember that McKinsey report and the time

16    line against it.  I don't know.

17    *Q.*  Okay.  Well, you have testified that most of the

18    negotiations with the chicken suppliers was in August of 2014,

19    correct?

20    *A.*  Yes, ma'am.

21    *Q.*  And you also testified that you were at the board meeting

22    where the McKinsey report was presented in July of 2014,

23    correct?

24    *A.*  Yes, yes, ma'am.

25    *Q.*  So here is kind of what you knew going into the

Pete Suerken - Cross

1  negotiations in 2014 for the 2015 contracts.  You knew that

2  chicken-on-the-bone supply had been tight for the last year and

3  was getting even tighter, correct?

4  A.  I knew it was tight and I knew there was a possibility it

5  could get tighter.

6  Q.  Okay.  And you knew if current trends -- sorry, you knew if

7  current trends of available supply continued, KFC ran a

8  significant risk of shortages over the next three years,

9  correct?

10  A.  That is correct.

11  Q.  You knew that KFC prices were below market price at that

12  time, correct?

13  A.  I knew we were paying less than others.  To define what a

14  market price is is really hard to do.

15  Q.  Fair enough.  But KFC was paying less than its competitors,

16  correct?

17  A.  We were -- we believed we were paying less than our

18  competitors according to the McKinsey report.

19  Q.  Which meant if a chicken supplier could sell their chicken

20  elsewhere, the supplier may be better off doing that, correct?

21  A.  Yes, ma'am.

22  Q.  In 2014 the chicken suppliers felt like RSCS was not a

23  partner because they had been negotiated down to almost no

24  margin, correct?

25          MR. TORZILLI:  Objection, foundation.

Pete Suerken - Cross

1          MS. NIELSEN:  I am talking about what he knew, Your

2     Honor.

3          THE COURT:  He can answer if he knows.

4     A.  I didn't do any of the negotiations prior to 2014, so I

5     don't know what margin was there or wasn't.

6     BY MS. NIELSEN:

7     Q.  Okay.  Do you remember talking to the agent, the one from

8     the Department of Commerce, on February 25th, 2022?

9     A.  Was that the one in my house?

10    Q.  No, just five days ago.

11    A.  Okay.  Yes, yes.  I apologize.

12    Q.  You are right, he was the same guy that came to your house,

13    right?

14    A.  Okay, yeah.

15    Q.  And you sat down with that agent, correct?

16    A.  Yes, ma'am.

17    Q.  And you were talking to him about what was going on in

18    2014, correct?

19    A.  Yes, ma'am.

20    Q.  And you were talking to him about what you knew, correct?

21    A.  Yes.

22    Q.  And you told him that in 2014 suppliers felt like RSCS was

23    not a partner because of being negotiated down to no margin,

24    correct?

25         MR. TORZILLI:  Objection.  Can we have a side bar,

Pete Suerken - Cross

 1    Your Honor?

 2           THE COURT:  Yes.

 3       (At the bench:)

 4           THE COURT:  Go ahead, Mr. Torzilli.

 5           MR. TORZILLI:  Your Honor, I object to these types of

 6    questions on the grounds that they were barred by Your Honor's

 7    order of yesterday.  What's being asked of the witness is being

 8    asked what he told the federal agent about what he thought

 9    suppliers were feeling.  So not only is this barred by Your

10    Honor's prior order, but also it gets into the feelings and

11    beliefs evidence that Your Honor ruled was irrelevant.  So I

12    object both on the prior order and relevance grounds.

13           THE COURT:  Response, Ms. Nielsen?

14           MS. NIELSEN:  Your Honor, I didn't understand the

15    Court's order to bar me from asking about an inconsistent

16    statement.  I am simply impeaching under Rule 613.

17           THE COURT:  Well, what we talked about yesterday at

18    the end of the day was that we did not want his opinion things

19    currently to come in, but rather only what he remembered at the

20    time.  So the questions need to be phrased in that respect.

21    Now, Ms. Nielsen did in the course of her question ask him, you

22    know, if he was talking about that at the time, but, you know,

23    I don't know whether or not what he told the special agent five

24    days ago is based upon what his memory was at the time.  I

25    doubt seriously his -- anything that the special agent told him

1114

Pete Suerken - Cross

1   was conditioned on that particular memory, so there is a

2   distinct risk that there is -- that he answer not based upon

3   his memory at the time, but perhaps based upon his memory as

4   supplemented by more recent review of documents.  That's the

5   danger.

6        *MS. NIELSEN:*  Your Honor, first of all, I phrased this

7   whole chapter as let's talk about what you knew going into the

8   negotiations in 2014.  I would also suggest to the Court that

9   that's something that could be explored on redirect if the

10  government wanted to, but I should be able to impeach under

11  613.  And the government's objection goes more to weight than

12  the admissibility of this prior statement.

13       *THE COURT:*  I am going to rule that any reference to

14  what he may have told the agents either when they came by his

15  house or more recently be explicitly prefaced as, okay, and in

16  2014 you thought this or something so that we avoid that risk

17  that we talked about last night.  If there is some statement

18  that there is just no reason to believe had been colored by a

19  review of other documents, an inconsistent statement, then it

20  may be fine.  I can't tell that off the bat.  But anything that

21  may be different now because of exposure to documents and, you

22  know, who knows, it can be a lot of different things, I think

23  that it has to be conditioned.  And impeachment with a

24  statement that wasn't conditioned in that way by the special

25  agent asking questions even if five days ago I think is --

Pete Suerken - Cross

1    would potentially run afoul of what we talked about last night

2    and what I ordered, all right?

3             So I don't know where that leaves us other than the

4    fact, Ms. Nielsen, I think you should rephrase the question,

5    all right?

6             MS. NIELSEN:  Yes, Your Honor.

7             THE COURT:  Thank you.

8        (In open court:)

9    BY MS. NIELSEN:

10   Q.  Mr. Suerken, I am asking you specifically about what you

11   knew going into the 2014 negotiations for the 2015 contracts,

12   okay?  You knew at that time that suppliers felt like RSCS was

13   not a partner because of being negotiated down to no margin.

14            MR. TORZILLI:  Objection, foundation.

15            THE COURT:  Overruled.

16   A.  I knew that our suppliers did not feel like partners

17   because we had been very hard on them in the past.  I cannot

18   attest to the margin structure that we negotiated in the past

19   because I didn't negotiate those contracts.

20   BY MS. NIELSEN:

21   Q.  Okay.  Fair enough.  Thank you.

22            As you indicated on direct, you met with Pilgrim's

23   representatives prior to Pilgrim's submitting their bid,

24   correct?

25   A.  Yes, ma'am.

Pete Suerken - Cross

1   *Q.* And let's talk about the August 2014 meeting with

2   Pilgrim's, okay?

3   *A.* Yes.

4   *Q.* The date that you were going to meet with Pilgrim's was

5   August 1st, 2014, correct?

6   *A.* I don't remember the specific date.

7   *Q.* Okay. If you could please turn to Exhibit E-158 in your

8   binder. Did you find it?

9   *A.* Yes, ma'am.

10  *Q.* You are faster than me.

11         This is a calendar invite, correct?

12  *A.* Yes.

13  *Q.* And it shows the date of the meeting with Pilgrim's,

14  correct?

15         *MR. TORZILLI:* Objection, improper refreshment.

16         *THE COURT:* Sustained. He should be shown the

17  document and then asked if that refreshes his recollection.

18  *BY MS. NIELSEN:*

19  *Q.* Sure. Does that refresh your recollection as to when that

20  meeting with Pilgrim's occurred?

21  *A.* It does.

22  *Q.* And did the meeting with Pilgrim's occur on August 1st of

23  2014?

24  *A.* Yes, ma'am.

25         *MS. NIELSEN:* Your Honor, I would move for admission

Pete Suerken - Cross

1    of E-158.

2            THE COURT:  Any objection to the admission of E-158?

3            MR. TORZILLI:  No, Your Honor.

4            THE COURT:  E-158 will be admitted.

5    BY MS. NIELSEN:

6    Q.  Now, the purpose of this meeting was to discuss the 2015

7    contracts before the first round of bids were actually

8    submitted, correct?

9    A.  It was.

10   Q.  Bill Lovette wasn't at this meeting, correct?

11   A.  Not to my recollection, no, ma'am.

12   Q.  Now, I want to show you what is marked as Exhibit 1073.

13   And we can maybe pull that up on the screen if that's easier.

14   This is an e-mail that you sent to Roger Austin about that

15   meeting on August 1st, correct?

16   A.  Yes, it is.

17           MS. NIELSEN:  Your Honor, I would move for admission

18   of 1073.

19           THE COURT:  Any objection to the admission of

20   Exhibit 1073?

21           MR. TORZILLI:  No objection.

22           THE COURT:  All right.  And is that the entirety,

23   Ms. Nielsen, what's being shown on the screen?

24           MS. NIELSEN:  Yes, Your Honor.

25           THE COURT:  1073 will be admitted.

Pete Suerken - Cross

1118

1       MS. NIELSEN:  Thank you.

2    BY MS. NIELSEN:

3    Q.  Now, during this meeting Pilgrim's made a presentation to

4    RSCS, correct?

5    A.  Yes, ma'am.

6    Q.  And once again, Pilgrim's gave you a written deck

7    presentation, correct?

8    A.  That's what I remember, yes.

9       MS. NIELSEN:  Your Honor, before we do that, I

10   neglected to publish the exhibit for the jury.

11      THE COURT:  And it may be displayed.

12      MS. NIELSEN:  Thank you.

13      THE COURT:  Ladies and gentlemen, when we have a

14   witness on the witness stand, we don't do the look at me

15   routine, so you don't have to worry about that, just when we

16   don't have a witness on the stand, but the one party or the

17   other wants you to take a look at something.  Go ahead,

18   Ms. Nielsen.

19      MS. NIELSEN:  Thank you, Your Honor.

20   BY MS. NIELSEN:

21   Q.  Going back to what was presented at the meeting, Pilgrim's

22   gave you a written deck presentation during this meeting on

23   August 1st, correct?

24      MR. TORZILLI:  Objection, misstates prior testimony.

25      MS. NIELSEN:  Your Honor, I am not sure how to

Pete Suerken - Cross

1    respond.

2         *THE COURT:*  I am not sure, but Mr. Suerken can answer

3    it if he thinks it's accurate.

4    A.  My belief is they did, yes, ma'am.

5    *BY MS. NIELSEN:*

6    Q.  Can you turn to D-917 in your binder, please?  I just want

7    to know if that looks like the presentation that was made to

8    you during that August 1st meeting by Pilgrim's.

9    A.  I don't remember the deck, but it sure looks like that was

10   it.

11   Q.  Okay.  Thank you.  Now, Pilgrim's submitted its bid to RSCS

12   in late August of 2014, correct?

13   A.  I don't know when they specifically submitted their bid.

14   Q.  Okay.  You met with them August 1st.  Does it sound right

15   around the end of August?

16   A.  It would have been that time line, yes.

17   Q.  Now, after Pilgrim's submitted its bid is when you had this

18   conversation with Roger Austin about Pilgrim's lowering its

19   price, correct?

20   A.  Which conversation are you specifically relating to, ma'am?

21   Q.  I am talking about a conversation with Roger Austin that

22   you had that was after Pilgrim's had submitted the bid,

23   correct?

24   A.  We had multiple -- I would assume I had multiple

25   conversations with Roger around that time line.

Pete Suerken - Cross

1   Q.   Okay.  You were displeased with the price that Pilgrim's

2   submitted in their bid, correct?

3   A.   Yes, ma'am.

4   Q.   And you conveyed that to Mr. Austin, correct?

5   A.   Yes.

6   Q.   And when Mr. Austin wouldn't lower the price, you informed

7   your boss, Mr. McCormick, correct?

8   A.   Yes.

9   Q.   And Mr. McCormick was the CEO of RSCS, correct?

10  A.   Yes.

11  Q.   And based on what you told Mr. McCormick, he wanted to have

12  a conversation with Bill Lovette, correct?

13  A.   Yes, ma'am.

14  Q.   Roger Austin coordinated that call with Bill Lovette,

15  correct?

16  A.   I believe so.

17  Q.   Okay.  Well, you didn't call up Bill Lovette, correct?

18  A.   No, I didn't.

19  Q.   And as you said, that call with Bill Lovette was in late

20  August or early September of 2014, correct?

21  A.   I don't believe I stated if it was August or September,

22  ma'am, because I don't remember the time line.

23  Q.   Does that sound about right, August or September of 2014?

24  A.   It could have been September, October, for all I remember.

25  It would have been late August, September, October.

Pete Suerken - Cross

1    *Q.* Fair enough.  During that call that you had with Bill

2    Lovette, Mr. Lovette explained to you and Mr. McCormick the

3    reasons why Pilgrim's prices were going up, correct?

4    *A.* Yes, ma'am.

5    *Q.* And as you were on the call, you heard Mr. Lovette give a

6    very methodical economic case, correct?

7    *A.* Yes, ma'am.

8    *Q.* In fact, Bill Lovette's explanation was tough to argue

9    with.

10   *A.* Yes, ma'am.

11   *Q.* Because Bill Lovette's methodical economic case was exactly

12   what Mr. Lovette said.

13   *A.* Is there a question there?

14   *Q.* Yeah.  Bill Lovette was saying what the case was, correct?

15   His methodic economic case that he made to you was how you

16   perceived the situation.

17        *MR. TORZILLI:* Object to form.

18        *THE COURT:* Overruled.

19   *A.* It made sense.

20   *BY MS. NIELSEN:*

21   *Q.* Thank you.  Now, based on Pilgrim's position, RSCS put

22   together a plan on how to respond to Pilgrim's, correct?

23   *A.* Yes, ma'am.

24   *Q.* And that plan involved trying to get chicken suppliers

25   other than Pilgrim's to increase their volume to RSCS, correct?

Pete Suerken - Cross

1    A.   Yes.

2    Q.   And to achieve this goal, you went out and talked to

3    Pilgrim's competitors, correct?

4    A.   Yes, ma'am.

5    Q.   And you talked to Pilgrim's competitors about providing

6    more chicken, more volume to RSCS, correct?

7    A.   Yes.

8    Q.   And as you told Mr. Gillen, you got it, right?

9    A.   We did get some additional loads, yes.

10   Q.   Okay.  From Pilgrim's competitors, correct?

11   A.   Yes.

12   Q.   And that meant you took away significant volume from

13   Pilgrim's, correct?

14   A.   Yes.

15   Q.   So Pilgrim's lost business to its competitors, correct?

16   A.   Yes, ma'am.

17   Q.   For the 2015 contracts you took loads away from Pilgrim's

18   and they went to four of Pilgrim's competitors, correct?

19   A.   I don't remember four, ma'am, but it could have been.

20   Q.   Tyson, correct?

21   A.   I remember that one.

22   Q.   Koch Foods, correct?

23   A.   I remember that one.

24   Q.   George's, correct?

25   A.   I remember that one.

1123

Pete Suerken - Cross

1    Q.   And Case Farms, correct?

2    A.   Could have been.

3    Q.   Okay.  Now I want to talk to you specifically about your

4    interactions with Bill Lovette, okay?  There is two of them,

5    right?

6    A.   That I remember, yes.

7    Q.   You participated in the one phone conversation that we've

8    just talked about, correct?

9    A.   Yes.

10   Q.   And then you had one in-person meeting with Mr. Lovette,

11   correct?

12   A.   Correct .

13   Q.   And you testified for that one in-person meeting that you

14   had with Mr. Lovette, you came out to Pilgrim's headquarters in

15   Colorado, correct?

16   A.   Yes.

17   Q.   And Mr. Imhoff, your boss, was with you, correct?

18   A.   Yes.

19   Q.   And you testified on direct that that meeting occurred in

20   the corporate dining room.

21   A.   I believe so, yes.

22   Q.   It was a lunch meeting, correct?

23   A.   Yes.

24   Q.   And that meeting with Mr. Lovette, the one meeting you had,

25   occurred in September of 2015, correct?

Pete Suerken - Cross

1    A.   September of 2015?

2    Q.   Uh-huh.

3    A.   I don't know, ma'am.

4    Q.   Okay.  You don't have your notes anymore unfortunately,

5    correct?

6    A.   I don't.

7    Q.   And you no longer work at RSCS, correct?

8    A.   That is correct.

9    Q.   Would looking at some calendar invites and an e-mail

10   possibly refresh your recollection as to when that one meeting

11   occurred?

12   A.   Certainly.

13   Q.   Great.  If you could please turn in your binder to two

14   documents, I-039 and I -- I am sorry, let me restate that,

15   I-839 and I-830.

16   A.   Yes, ma'am.

17   Q.   Just looking at the dates on those two documents, does it

18   refresh your recollection of when that meeting occurred?

19   A.   It doesn't refresh my recollection, but it proves when it

20   did occur.

21   Q.   And when is that?

22        MR. TORZILLI:  Objection, Your Honor.

23        THE COURT:  Sustained.

24   BY MS. NIELSEN:

25   Q.   Well, Mr. Suerken, is it possible that one meeting occurred

Pete Suerken - Cross                                              1125

1    in 2015?

2    A.  It could have, yes, ma'am.

3          MR. TORZILLI:  Objection.

4          THE COURT:  Overruled.

5    BY MS. NIELSEN:

6    Q.  And one of the purposes of that meeting that you had with

7    Mr. Lovette was that RSCS planned once again to reduce

8    Pilgrim's volume, correct?

9          MR. TORZILLI:  Objection.

10         THE COURT:  Overruled.

11   A.  Yes, ma'am.

12   BY MS. NIELSEN:

13   Q.  Okay.  Now, you knew that when you cut Pilgrim's volume,

14   this would impact Pilgrim's chicken processing plants, correct?

15   A.  Yes, ma'am.

16   Q.  Because you knew that certain processing plants produced

17   chicken specific to KFC's specifications, correct?

18   A.  Yes.

19   Q.  So you knew that if you continued to take volume from

20   Pilgrim's and give it to its competitors, the risk to you was

21   that Pilgrim's may stop supplying chicken to KFC from certain

22   plants, correct?

23   A.  That is correct.

24   Q.  Okay.  Now, you testified on direct about your knowledge of

25   chicken processing plants, correct, and how certain plants are

Pete Suerken - Cross

1    more valuable because of their location?

2    *A.*  I didn't testify about the plant.  I testified about the

3    geography and the freight spreads.

4    *Q.*  You are correct, the geography of the plant, correct?

5    *A.*  Yes.

6    *Q.*  And you are aware that Pilgrim's had a plant in Mayfield,

7    Kentucky, correct?

8    *A.*  Yes, ma'am.

9    *Q.*  And the Pilgrim's Mayfield, Kentucky plant was a honey

10   hole, correct?

11   *A.*  Yes, ma'am.

12   *Q.*  It was a honey hole because of its geography, correct?

13   *A.*  Yes.

14   *Q.*  And it was a honey hole meaning it was a good plant for

15   RSCS, correct?

16   *A.*  It was.

17   *Q.*  Now, during your meeting with -- your in-person meeting

18   with Bill Lovette, he informed you that if you cut volume, it

19   would force Pilgrim's to convert the Mayfield, Kentucky plant,

20   correct?

21   *A.*  Can you elaborate on convert?

22   *Q.*  That it would no longer produce chicken for RSCS.

23   *A.*  For KFC?

24   *Q.*  I am sorry, I am using those interchangeably.

25   *A.*  Yeah.  Yes, he would convert the plant away from KFC.

Pete Suerken - Cross

1  Q.  He would convert the honey hole.

2  A.  Yes, ma'am.

3  Q.  He said that that plant would be converted to a Chick-fil-A

4  plant, correct?

5  A.  Yes.

6  Q.  And that's, in fact, what he did.

7  A.  I can't attest to what he did within the facility.

8         MS. NIELSEN:  No further questions, Your Honor.

9         THE COURT:  Thank you.

10        Additional cross-examination?

11        Mr. Feldberg.

12                       **CROSS-EXAMINATION**

13 BY MR. FELDBERG:

14 Q.  Mr. Suerken, good afternoon.  I am Michael Feldberg.  I am

15 Roger Austin's lawyer.  I want to ask you a couple questions

16 about your dealings with Pilgrim's in August and September of

17 2014, okay?

18 A.  Yes, sir.

19 Q.  You got bids around that time from the various chicken

20 suppliers at different price points, correct?

21 A.  I can't remember the specifics, but yes, there was delta

22 between -- there was delta between the offers.

23 Q.  And as a result, you took loads away from Pilgrim's and

24 gave those loads to other suppliers, correct?

25 A.  Ultimately, that is what happened.

Pete Suerken - Cross

1   Q.   And that was about 20 loads a week, correct?

2   A.   I believe so, yes, sir.

3   Q.   And then you had a lunch with Mr. Austin at a barbecue

4   restaurant, correct?

5   A.   I don't think then -- I think your statement earlier would

6   have been incorrect.

7   Q.   Okay.  But you did have a lunch with Mr. Austin at a

8   barbecue restaurant in Louisville, correct?

9   A.   Yes, sir.

10  Q.   And at that lunch Mr. Austin said to you in substance that

11  he didn't think you had 20 loads from other sources, correct?

12  A.   That is correct.

13  Q.   But at the time you did have 20 loads from other sources,

14  correct?

15  A.   I absolutely did.

16  Q.   So it turned out that Mr. Austin was wrong in what he said

17  to you and you were right, correct?

18  A.   Yes, sir.

19        MR. FELDBERG:  Thank you.  Nothing further.

20        THE COURT:  Thank you.

21        Additional cross-examination?

22                    **CROSS-EXAMINATION**

23  BY MR. KORNFELD:

24  Q.   Hello, Mr. Suerken.  My name is Rick Kornfeld.  I represent

25  Mr. Fries.  I want to ask you a couple questions to clarify.

Pete Suerken - Cross

1   The first is you testified -- if I understand your testimony on

2   direct, 2014 was the first time you were negotiating for fresh

3   chicken; is that correct?

4   A.   It was the first time I had participated within the

5   eight-piece chicken-on-the-bone cut-up with KFC, yes, sir.

6   Q.   And you talked about you had three years of experience

7   negotiating chicken, but that's the -- and I am talking

8   specifically about fresh chicken, chicken on the bone.  That

9   came -- that was the three years '14 through '17, correct?

10  A.   Yes, sir.

11  Q.   So when you met with Mr. Fries and negotiated with

12  Mr. Fries, that was in 2014, your first year of negotiating

13  fresh chicken-on-the-bone product, correct?

14  A.   Yes, sir.

15  Q.   And you had testified -- excuse me, on direct that I think

16  the word you used was odd in describing Mr. Fries' negotiating

17  style.  Do you remember that testimony?

18  A.   Yes, sir.

19  Q.   And it's true, is it not, that you're talking about the

20  2014 negotiating period with Mr. Fries, correct?

21  A.   Yes.

22  Q.   Your first year, right?

23  A.   Yes, sir.

24  Q.   Your first year ever negotiating with Mikell Fries,

25  correct?

Pete Suerken - Cross

1   A.   Yes, sir.

2   Q.   So you had no prior experience negotiating with Mr. Fries

3   before 2014 when you took over for Mr. Ledford, correct?

4   A.   None.

5   Q.   Okay.  So you had therefore no understanding of what his

6   negotiating style was because you had never negotiated with him

7   before, correct?

8   A.   That's correct.

9   Q.   And are you aware of the fact -- I think you testified, and

10   I want to make sure I understand this, that what you thought

11   was odd was that Claxton didn't want to be the top price,

12   didn't want to be the low price.  They wanted to be in the

13   middle.  That was odd to you?

14   A.   That was part of what was odd, yes, sir.

15   Q.   Okay.  And you understand, do you not, or you understood

16   then in 2014 that Claxton's a regional supplier, correct?

17   A.   Yes, sir.

18   Q.   That they were well positioned as a regional supplier in

19   southern Georgia to supply in Florida in particular, correct?

20   A.   Yes, sir.

21   Q.   You knew that they had a small market share, correct?

22   A.   Yes, sir.

23   Q.   And you knew that until Mr. Ledford left, Mr. Ledford was

24   the primary negotiator for RSCS.

25   A.   Yes, sir.

Pete Suerken - Cross

1    Q.  Would it surprise you that Mr. Ledford who negotiated with

2    Mr. Fries on many occasions before you ever did testified that

3    the marketing strategy you found to be odd was, in fact, the

4    marketing strategy of Claxton Poultry?

5              MR. TORZILLI:  Objection, foundation.

6              THE COURT:  It's also objectionable as to form.

7    Sustained.

8    BY MR. KORNFELD:

9    Q.  Well, let me ask you this.  When you took over -- there was

10   an overlap with Mr. Ledford of about two weeks, I think you

11   said?

12   A.  Yes.

13   Q.  Did Mr. Ledford kind of give you the scouting report on the

14   various suppliers that you would be negotiating with?

15   A.  He apologized for leaving me the mess.

16   Q.  Okay.  Fair enough.  But did he say in essence, hey, this

17   is how Pilgrim's does it.  This is how Tyson does it.  This is

18   how Claxton does it?

19   A.  I don't remember specific negotiation tactics or points

20   that we would have talked through.  He would have walked me

21   through the suppliers, geographic base, who they served, what

22   they were good at.  That's about it.

23   Q.  So in 2014 were you aware of the fact that it was known, at

24   least to Mr. Ledford, that Claxton's strategy was to be

25   somewhere in the middle of the suppliers?

Pete Suerken - Cross

1    *MR. TORZILLI:* Objection, foundation.

2    *MR. KORNFELD:* I am asking if he knows, Your Honor.

3    *THE COURT:* Overruled. He can answer.

4    *BY MR. KORNFELD:*

5    *Q.* Did you know that?

6    *A.* No, sir, I did not.

7    *Q.* Well, bottom line is, sir, it's true, is it not, I mean,

8    again you never negotiated with anyone at Claxton Poultry prior

9    to your interaction with Mr. Fries in '14, correct?

10   *A.* That is correct.

11   *Q.* You weren't aware of the internal market and business

12   dynamics at Claxton. You didn't know internally what their

13   strategy is, did you?

14   *A.* No, sir.

15   *Q.* You didn't know what their goals were business or

16   otherwise, did you?

17   *A.* No, sir.

18   *Q.* And you didn't know anything about effectively internally

19   how they do their own pricing, right?

20   *A.* No.

21   *Q.* And yet you found this wanting to be somewhere in the

22   middle to be odd.

23   *A.* Still do.

24   *MR. KORNFELD:* Okay, nothing else.

25   *THE COURT:* Thank you, Mr. Kornfeld.

Pete Suerken - Cross

1    Ms. Henry.

2                          **CROSS-EXAMINATION**

3    *BY MS. HENRY:*

4    *Q.*  Good afternoon, Mr. Suerken.  My name is Roxann Henry and I

5    represent Mr. Bill Kantola.

6         I want to take you back to 2014, the Mother's Day time

7    frame when you first started getting involved with what seemed

8    to have been a bit of a mess, I think you just said, with the

9    purchasing of eight-piece for KFC.  There was a panic really

10   going on at that time, right?

11   *A.*  Yes, ma'am.

12        *MS. HENRY:*  Can we pull up on the screen just for the

13   lawyers and the witness C-440?  And can you scroll up there a

14   little bit?

15   *BY MS. HENRY:*

16   *Q.*  This is an e-mail that you wrote at that time?

17   *A.*  Yes, ma'am, it is.

18   *Q.*  Is this about the time -- it's the first time you really

19   had any contact at all with Mr. Kantola, correct?

20        *MR. TORZILLI:*  Objection.  The witness is being

21   questioned on a document not in evidence.

22        *THE COURT:*  Overruled.  He can answer as to that

23   question.

24   *A.*  I don't recall if this is my first meeting with Mr. Kantola

25   or not, but it would have been first, second, third.

1134

Pete Suerken - Cross

 1  *BY MS. HENRY:*

 2  *Q.*  So this document, this e-mail that you were working on,

 3  this was prepared in your regular business as part of the work

 4  that you were doing for RSCS?

 5  *A.*  Yes, ma'am.

 6  *Q.*  And this is the type of document that RSCS would keep in

 7  its ordinary course of business?

 8  *A.*  Yes, ma'am.

 9          *MS. HENRY:*  We move to admit C-440.

10          *THE COURT:*  The entirety of it, Ms. Henry?

11          *MS. HENRY:*  Yes.  I believe the only part that's not

12  Mr. Suerken's is not being offered for the truth of anything,

13  so it's ...

14          *THE COURT:*  Response?  Any objection to the admission

15  of C-440?

16          *MR. TORZILLI:*  Yes, Your Honor.  The e-mail is not a

17  business record, but we don't object to the admission of the

18  lowest e-mail on the chain, the one that Mr. Suerken wrote at

19  the bottom.  But we object to the remainder on hearsay grounds

20  and foundation grounds.

21          *THE COURT:*  All right.

22          *MS. HENRY:*  I would be happy to amend and ask to admit

23  just the lower portion.

24          *THE COURT:*  Okay.  Just the lower portion, the e-mail

25  from Mr. Suerken; is that right, Ms. Henry?

1135

Pete Suerken - Cross

1    *MS. HENRY:*  Yes, please.

2    *THE COURT:*  With that amendment to what is being

3    offered, any objection to C-440?

4    *MR. TORZILLI:*  No objection to that.

5    *THE COURT:*  That portion of C-440 will be admitted.

6    *MS. HENRY:*  May we please publish it to the jury?

7    *THE COURT:*  You may.

8    *BY MS. HENRY:*

9    *Q.*  Now, you had a call with Mr. Kantola in conjunction with

10   this e-mail, correct?

11   *MR. TORZILLI:*  Objection, foundation.

12   *THE COURT:*  Overruled.

13   *A.*  I don't remember the call, ma'am.

14   *BY MS. HENRY:*

15   *Q.*  Perfectly fair.  In this e-mail you told Mr. Kantola that

16   you did have a problem with the current COB situation, correct?

17   *A.*  Yes, ma'am.

18   *Q.*  And the purpose of this was really to get some feedback on

19   what in the world you could possibly do given that you had this

20   problem?

21   *A.*  Yes, ma'am.

22   *Q.*  And you told him that, "We are open to evaluating about

23   anything;" is that correct?

24   *A.*  That's the way it reads, yes.

25   *Q.*  And Mr. Kantola replied to you with a lengthy e-mail; is

1136

Pete Suerken - Cross

1    that correct?

2           *MR. TORZILLI:*  Objection, calls for hearsay.

3           *THE COURT:*  That doesn't call for hearsay.  He can

4    answer yes or no.

5    *A.*  I don't know.

6    *BY MS. HENRY:*

7    *Q.*  Do you remember that?

8    *A.*  No, ma'am.

9           *MS. HENRY:*  Can we pull up just for the witness to see

10   if we can refresh your recollection on that C-320 and the

11   Court?  Can we scroll down through that for the witness?

12   *A.*  What's your question, ma'am?

13   *BY MS. HENRY:*

14   *Q.*  My question is does this refresh your recollection that you

15   received a response from Mr. Kantola?

16   *A.*  No.

17   *Q.*  This meeting, this communication that you had with

18   Mr. Kantola where you send him the e-mail, that took place

19   prior to the start of any of the bid negotiations, right?

20   *A.*  Yes.

21   *Q.*  And during those negotiations Mr. Kantola told you that

22   Koch Foods was increasing its capacity for small birds; isn't

23   that correct?

24          *MR. TORZILLI:*  Objection, calls for hearsay.

25          *THE COURT:*  Sustained.

1137

Pete Suerken - Cross

1   A.  He made us an offer.

2           THE COURT:  I sustained the objection, Mr. Suerken, so

3   you can't answer.

4   BY MS. HENRY:

5   Q.  Was it your understanding that Koch Foods was increasing

6   its capacity for small birds?

7   A.  He made us an offer to do that.  They were willing to do

8   it.

9   Q.  And did you ask him about how much more volume Koch Foods

10  could provide to KFC?

11  A.  I am sure I did.

12          MS. HENRY:  That's all I have.  Thank you very much,

13  sir.

14          THE COURT:  Thank you, Ms. Henry.

15          Ms. Johnson.

16          MS. JOHNSON:  Thank you, Your Honor.

17                      **CROSS-EXAMINATION**

18  BY MS. JOHNSON:

19  Q.  Good afternoon, Mr. Suerken.  My name is Wendy Johnson.  I

20  represent Ric Blake.  Do you know Mr. Blake?

21  A.  I know his name.

22  Q.  Right.  I am glad to get to speak with you.  Mr. Blake used

23  to work at George's.  You are familiar with George's, right?

24  A.  Yes, ma'am.

25  Q.  And on your direct examination the government really didn't

Pete Suerken - Cross

1  ask you many questions about George's, did they?

2  A.  I don't -- we've talked about George's today, but I don't

3  remember who has asked what about them.

4  Q.  Fair.  I want to talk about George's and your dealings and

5  negotiations with them for the 2014 time period and some other

6  periods.

7        MR. TORZILLI:  Objection, outside the scope.

8        THE COURT:  I think it was the 2014 time period, so

9  that's fine.  I am not sure -- what was the very last part of

10  the question?

11        MS. JOHNSON:  For the 2015, the bids and contracts for

12  2015.

13        THE COURT:  Overruled.

14  BY MS. JOHNSON:

15  Q.  Mr. Suerken, going into the 2015 contract negotiation

16  process, RSCS altered its strategy, did it not?

17  A.  Yes, ma'am.

18  Q.  They sought long-term contracts because they knew there

19  would be cost increases in the small birds due to diminishing

20  supply, correct?

21  A.  Yes, ma'am.

22  Q.  RSCS wanted to protect itself against future price

23  increases, right?

24  A.  Wanted to protect KFC.

25  Q.  Yes, sir.  And I apologize if I say RSCS instead of KFC.  I

Pete Suerken - Cross

1   mean the same thing.

2   *A.*  I understand.

3   *Q.*  So please correct me.  Thank you.  So you're an economist

4   by trade, right?

5   *A.*  It's what my degree is in.

6   *Q.*  You knew there would be a price increase coming in 2015, as

7   did most of the folks at RSCS, right?

8   *A.*  Yes.

9   *Q.*  And you believed that that price increase was deserved,

10  right?

11          *MR. TORZILLI:*  Objection.

12          *THE COURT:*  Overruled.

13  *A.*  I believe a price increase was deserved.

14          *MR. TORZILLI:*  Your Honor, can we have a brief side

15  bar?

16          *THE COURT:*  Yes.

17     (At the bench:)

18          *THE COURT:*  Go ahead, Mr. Torzilli.

19          *MR. TORZILLI:*  Your Honor, it was my understanding

20  that witnesses including Mr. Suerken weren't to be asked about

21  their beliefs.  I thought that Your Honor had ruled that

22  beliefs were irrelevant and the witness was just asked his

23  belief with respect to price increases.

24          *THE COURT:*  I don't think Ms. Johnson was trying to do

25  that, but on the other hand, the use of a valued term like

Pete Suerken - Cross

1  deserved is a little bit dangerous, so I think there probably

2  could be a way to rephrase that.  But I don't think that

3  Ms. Johnson was trying to step into that territory, but I do

4  agree with Mr. Torzilli that those types of terms as opposed to

5  something like you believe that -- or you anticipated that

6  prices would be going up, that type of thing, is probably a

7  safer way to do that.

8          Anything else on this one?

9          MR. TORZILLI:  No, thank you, Your Honor.

10          THE COURT:  Ms. Johnson?  I can't hear you if you are

11  talking.

12          MS. JOHNSON:  I just wanted to make clear pursuant to

13  the Court's order we are strictly talking about the

14  negotiations for 2014 and 2015 and his thoughts and impressions

15  at that time.  I am not talking about anything in the future so

16  I wanted to be clear and I will rephrase that.

17          Thank you, Your Honor.

18          THE COURT:  Yeah, thanks.

19      (In open court:)

20  BY MS. JOHNSON:

21  Q.  So Mr. Suerken, we were talking about the anticipated price

22  increase for 2015; is that correct?

23  A.  Yes.

24  Q.  And as you look at supply and demand economics, the small

25  bird economics had completely changed, had they not?

Pete Suerken - Cross

1    A.  Yes, ma'am.

2    Q.  And this was a result of a couple of things.  Small bird

3    production was down, agree?

4    A.  The economics wouldn't be related to the amount of birds

5    being produced relative to the way you are stating it.

6    Q.  Demand was up for both RSCS and other quick-service

7    restaurants?

8    A.  Once again, I can't serve what other quick-serve

9    restaurants were doing and not doing.  I didn't buy chicken for

10   them.

11   Q.  Sure.  So the fundamentals of the industry going into 2015

12   dictated a higher price?

13   A.  Something had shifted that warranted a higher price.

14   Q.  You did not initially know what the price was going to be,

15   right, the higher price?

16   A.  No, ma'am.

17   Q.  And I believe you were surprised at the increase; is that

18   fair?

19   A.  Shocked.

20   Q.  Shocked.  And you discussed this on direct.  I believe you

21   told the government or pursuant to their questions that

22   suppliers went up 15 to 25 percent.  Do you recall that

23   testimony?

24   A.  Yes, ma'am.

25   Q.  The government didn't ask about each individual supplier,

Pete Suerken - Cross

1    did they?

2    A.   No, ma'am, they did not.

3    Q.   In fact, George's did not go up by that margin or that

4    percentage; is that correct?

5    A.   I don't remember the exact percentage that they went up by.

6    Q.   Okay.  That's more than fair.  I know it's been several

7    years, so let's look.  Would it be fair to look at the

8    '14 contract versus the '15 contract and decide and determine

9    that percentage increase?

10             MR. TORZILLI:  Objection.

11             THE COURT:  Overruled.

12   A.   Yes.

13             MS. JOHNSON:  Okay.  Let's do just that.  Thank you.

14             If we could pull up F-761.

15             I know these documents have been on a previous

16   attachment pursuant to the parties' agreements, but I have a

17   copy for the Court, if you would like it, and one for the

18   government.

19             THE COURT:  Sure.  That's fine.

20   BY MS. JOHNSON:

21   Q.   Mr. Suerken, do you recognize, is this the type of contract

22   that you are used to seeing when you were working at RSCS?

23   A.   As it relates to chicken on the bone, yes, ma'am.

24   Q.   Yes, sir.  And on Page 3 of this document, who signed this

25   document on behalf of George's?

Pete Suerken - Cross

1   *A.*  I believe that's Charles' signature, Charles George, I

2   believe.

3   *Q.*  And you know Mr. Charles George?

4   *A.*  Yes, ma'am.

5   *Q.*  You negotiated the '14/'15 -- or the '15 contract with him;

6   is that right?

7   *A.*  Yes, ma'am.

8   *Q.*  Along with I think you met his brother Carl?

9   *A.*  Yes, ma'am.

10  *Q.*  You know them to be the co-owners of George's?

11  *A.*  I don't know the structure, but yes, yes, I think.

12        *MS. JOHNSON:*  Your Honor, I don't know if this has

13  been previously admitted, but I think it's been agreed to.

14        *THE COURT:*  Let me just double-check.

15        *MR. TORZILLI:*  Your Honor, a moment to confer with

16  counsel?

17        *THE COURT:*  Sure.

18        *MS. JOHNSON:*  Your Honor, there may be a separate

19  version of this.  And after conferring with the government, I

20  don't believe there is an objection.  We would move to

21  introduce F-761 because I am not entirely sure there is another

22  version that's been admitted.

23        *THE COURT:*  Okay.  Would that include the first page

24  of that too or would that be Pages 2 through the end of the

25  document?

Pete Suerken - Cross

1        MS. JOHNSON:  It would include the entire document

2   subject to the Court's previous orders on redaction.

3        THE COURT:  Okay.  Then any objection to the admission

4   of F-761?

5        MR. TORZILLI:  There is no objection, Your Honor.

6        THE COURT:  That will be admitted.

7        MS. JOHNSON:  Thank you, Your Honor.

8        And could we publish Page 3 to the jury?

9        THE COURT:  You may.

10  BY MS. JOHNSON:

11  Q.  Mr. Suerken, can you see this on your screen?

12  A.  I can.

13  Q.  And the total FOB plant cost, was it .9215?

14  A.  Are you talking purple label or orange label?

15  Q.  Yes, sir.  Back on the first page, I believe that would be

16  purple label?

17  A.  It appears to be .9215 for purple label, yes.

18       MS. JOHNSON:  So then if we could leave that up on one

19  side and bring that document 1121.

20       Your Honor, similar to the first document, we would

21  move to introduce Government's Exhibit 1121.  I believe it's

22  been previously agreed to.

23       THE COURT:  And that has already been admitted.

24       MS. JOHNSON:  Yes.  Thank you.  And may we publish it,

25  Page 3, of that document as well?

1145

Pete Suerken - Cross

1    THE COURT:  You may.

2    BY MS. JOHNSON:

3    Q.  Mr. Suerken, this was the contract negotiated by yourself.

4    Who signed on behalf of RSCS?

5    A.  I have no idea who that signature is.

6    Q.  Okay.  What is the total FOB plant cost for the 2015

7    contract with RSCS and George's?

8    A.  $1.03 is what the sheet says.

9    Q.  Okay.  Now, I don't know that you have a calculator.

10   A.  There is a problem with that.  I don't know the feed cost

11   that went into that $1.03.  Are they held constant?

12   Q.  Sure.  I am just looking at the total FOB plant cost.  We

13   are just going to discuss the two and compare.

14   A.  You can't compare the two.

15   Q.  And why is that?

16   A.  Because I don't know the feed cost component that was used

17   in the 2013 contract versus the 2014 contract.

18   Q.  Okay.  But based on what you have in front of you, the

19   total FOB cost, can we compare those two?

20   A.  You can, but it's not a relevant comparison because

21   commodity costs will move.

22   Q.  Sure.  They are going to fluctuate; is that right?

23   A.  Yes, ma'am.  And I don't know what commodity costs were

24   utilized in either one of these documents.

25   Q.  Understood.  But as these documents stand as they are

Pete Suerken - Cross

1    introduced in court today, I just want to compare the FOB plant

2    cost from the previous year to 2015 just as they are written.

3    A.   Sure.

4    Q.   So if we subtract the two, the difference would you agree

5    with me is .1092?

6    A.   Yeah, that would be pretty close.

7    Q.   And just one other piece of math here.  If we divide that

8    by the 2014 contract, the .9215, and I am happy to hand you my

9    calculator on my phone, but would you agree with me that it's

10   11.85 percent?

11   A.   That would be about right.

12   Q.   So just to be clear, that's not 15 percent, right?

13   A.   It's not, but I don't know the grain cost.  These contracts

14   are based on models, not specific pricing at the end of the

15   day.  I have no idea -- I can't answer your question.  I don't

16   know.

17   Q.   No, I understand that.  We just went through the math.  And

18   it's certainly not 25 percent, right?

19   A.   No, ma'am, it's not.

20   Q.   Okay.  You recall back in 2015 reviewing all the bids, the

21   proposals from several different suppliers, right?

22   A.   2014?

23   Q.   It's in 2014 for the 2015 contract.

24   A.   We would have reviewed those that late summer, fall of

25   2014, yes.

Pete Suerken - Cross

1    Q.  Yes.  And you described George's as a complete outlier

2    because of how low their bid was compared to the other

3    suppliers, didn't you?

4    A.  I did.

5    Q.  There was a gap between the suppliers on the high end and

6    the suppliers on the low end; is that correct?

7    A.  That is correct.

8    Q.  And George's was one of the lowest, if not the lowest

9    bidder; is that correct?

10   A.  My memory is that they were the lowest.

11   Q.  And out of what, eight?  Was there eight total bidders?

12   A.  I only remember seven.

13   Q.  Okay.  We will go with seven.  I am not sure about that.

14   So it's fair to say that if they are the lowest, everyone

15   else's bids were higher than George's.

16   A.  Yes, ma'am.

17   Q.  George's had the best chicken because of the quality and

18   the small size of their chicken; would you agree?

19   A.  Yes, ma'am.

20   Q.  And the fact that, according to you, it was 2 cents cheaper

21   than everyone else; would you agree?

22   A.  I don't remember the exact delta, but if I said that, then

23   it was pretty close.  Plus they had a geographic pickup on

24   everybody because their plants were in great locations.

25   Q.  And we are going to get to that, but that's part of why you

Pete Suerken - Cross

1    felt that way, right?

2    A.   Yes, ma'am.

3    Q.   In fact, you told the government that when you were

4    interviewed.

5    A.   Yes.

6    Q.   And that's important because as you've testified, KFC sold

7    chicken by the piece, but they bought by the pound, right?

8    A.   Yes.

9    Q.   George's had the lowest case weights in the system because

10   their birds were the smallest; is that right?

11   A.   I can't attest to the lowest case weight statement, but

12   their birds were historically always on the smallest size,

13   either first or second.

14   Q.   Okay.  And at one point based on your experience with

15   George's during this 2014 time period for 2015 contract, you

16   described George's as the pot of gold at the end of the

17   rainbow.

18   A.   That doesn't sound like something I would say, but I did

19   feel that way.

20   Q.   That's fine.  Would it help you to remember that statement

21   if you were able to review something?

22   A.   I can tell you that I thought George's did a wonderful job

23   for us and they were absolutely amazing at what they did.

24   Q.   Perfect.  That's -- we will move on.

25   A.   I don't know I need to review it.

Pete Suerken - Cross

1    Q.   That's fair.  Thank you.

2             Ms. Nielsen talked about the Mayfield plant being a

3    honey hole.  And I am from Arkansas.  I know what that means.

4    I just want to make sure the jury knows what you meant by a

5    honey hole.

6    A.   It had a geographic pickup versus other facilities moving

7    into various KFC markets.

8    Q.   So it was prime.  Would it be fair to say it was an

9    attractive place for RSCS to conduct their business with?

10   A.   It was an attractive location to buy chicken out of for

11   eight-piece chicken for KFC, yes.

12   Q.   Mayfield, Kentucky was not the only place you listed as a

13   honey hole, was it?

14   A.   Absolutely not.

15   Q.   Was George's and their operations in that honey hole

16   category?

17   A.   Absolutely.

18   Q.   George's allowed you to cover -- to better cover, I should

19   say, important geographic locations like the upper midwest and

20   the northwest?

21   A.   I don't know where they shipped their chicken, but they --

22   their location would have given them huge pickups to the upper

23   midwest, northwest and California.

24   Q.   And so George's is on the Mayfield honey hole list.  And I

25   think in your direct testimony you described that as a cost

Pete Suerken - Cross

1    advantage facility; is that fair?

2    *A.*  Are we talking about the George's facility or the Mayfield

3    facility?

4    *Q.*  I am talking about George's, but I thought they were both

5    in the same category, but please clarify.

6    *A.*  No, I would consider George's a better location.

7    *Q.*  And as a result, during these negotiations you actually

8    awarded George's more volume through additional weekly loads

9    because of how attractive they were as a producer; is that

10   fair?

11   *A.*  Yes.

12   *Q.*  We talked about this a little on direct.  The jury heard

13   the government's questions and they focused on Tyson for these

14   extra loads, didn't they?

15   *A.*  Yes.

16   *Q.*  But, in fact, and you offered this I believe on your

17   direct, who was the first choice for these extra loads?

18   *A.*  George's.

19   *Q.*  You actually had told the government this, that they were

20   the first choice for these loads prior to being here today,

21   right?

22   *A.*  I believe so.

23   *Q.*  And that's because George's business in 2015, they were the

24   cheapest, right?

25          *MR. TORZILLI:*  Objection, misstates prior testimony.

Pete Suerken - Cross

1      *THE COURT:*  Overruled.  He can answer if he

2  understands the question.

3  *BY MS. JOHNSON:*

4  Q.  Please correct my mistake.

5  A.  The negotiations were being held in 2014 for the 2015

6  contract.  Now what's your question?

7  Q.  When these loads were transferred away from other suppliers

8  to George's it's because they were the cheapest.  And I think I

9  said 2015.  Was that during 2014?

10  A.  It would have been 2014 for the 2015 contracts.

11  Q.  That's what I thought.  I think we are all clear now, so

12  thank you.

13  A.  I don't like to use of the word cheapest.  They provided

14  the most value.

15  Q.  That's very good, and I will seek to say the most value.

16  They probably don't like being called cheap either.

17  A.  I wouldn't think so.

18  Q.  As a result of this, George's actually increased production

19  at their Carthage, Missouri plant to fill this new volume.  Are

20  you aware of that?

21  A.  Yes, ma'am.

22  Q.  So going into these 2015 negotiations, would you agree with

23  me that George's would have been in a position to come in with

24  not only a demand for a higher price, but even higher than they

25  asked for?

1152

Pete Suerken - Cross

1    *A.* I don't know what position they would have been in from a

2    corporate standpoint, ma'am. Could they have charged higher

3    prices? Probably.

4    *Q.* Sure. You indicated you built your business around

5    George's. That was your intent?

6    *A.* Yes, ma'am.

7    *Q.* Because of the manner in which they handled the 2015

8    negotiations; is that right?

9    *A.* Yes, ma'am.

10   *Q.* During those negotiations would you describe George's

11   handling of those negotiations as professional?

12   *A.* Yes, ma'am.

13   *Q.* Appropriate?

14   *A.* Yes, ma'am.

15   *Q.* Diligent?

16   *A.* Yes, ma'am.

17   *Q.* Let's go back just a little bit to the contracts briefly.

18   You testified on direct -- and this was as a result of the

19   government's questions to you about the suppliers. Again, I

20   just want to talk about George's. But I believe you testified

21   on direct that the suppliers did not move in these

22   negotiations. Do you recall that?

23   *A.* I did.

24   *Q.* But with respect to George's, that's not correct, is it?

25   *A.* That is not correct.

Pete Suerken - Cross

1    Q.  Can we look at Exhibit 1008?

2           MS. JOHNSON:  Your Honor, I have a copy for the Court

3    if you would like.

4           THE COURT:  Yes.  Ms. Grimm will hand that up.  Thank

5    you.

6           MS. JOHNSON:  Your Honor, to move to the other

7    exhibits, I believe this has been previously agreed to.

8           THE COURT:  And you move its admission at this time?

9           MS. JOHNSON:  Yes, Your Honor, I would.

10          THE COURT:  Any objection to the admission of

11   Exhibit 1008?

12          MR. TORZILLI:  Your Honor, may we have a moment?

13          THE COURT:  You may.

14          MR. TORZILLI:  No objection, Your Honor.

15          THE COURT:  Exhibit 1008 will be admitted.

16          MS. JOHNSON:  Thank you, Your Honor.

17   BY MS. JOHNSON:

18   Q.  Mr. Suerken, I believe you just saw what would be a cover

19   sheet.  Does that look familiar to you?

20   A.  No.

21   Q.  It doesn't.

22   A.  No.

23          MS. JOHNSON:  Okay.  This has been introduced.  And

24   has this been published?  If not, I would ask that it be

25   published to the jury?

Pete Suerken - Cross

1    THE COURT:  If you could just indicate what pages you

2    are displaying.  It may be shown to the jury.

3        MS. JOHNSON:  I would like to display Page 12 -- well,

4    actually let me just give the Bates number to Mr. Brian, ends

5    in 16228.  It's really tiny font.

6    BY MS. JOHNSON:

7    Q.  Can you see that, Mr. Suerken?

8    A.  I can.

9    Q.  So I think you saw on the cover page it was August 12th.

10   Was that about the time that you were meeting with the various

11   companies and they were beginning to submit their proposals?

12   A.  Yes, ma'am.

13   Q.  Okay.  So if we look at this page that ends in Bates

14   No. 6628, this is titled a Realistic Cost Model - Option 1.

15   Can you tell the jury what George's started out their proposal

16   with?  Is it 1.0913?

17   A.  I don't remember that, but that's what that sheet says.

18   Q.  Sure.  That's what this document 1008 on their proposal,

19   that's what it shows; is that correct?

20   A.  The total FOB cost for purple label option one is $1.0913.

21       MS. JOHNSON:  Now, if we can display -- keep that.  If

22   we can move it over a little bit, Mr. Brian.  Can we show the

23   final contract which is Exhibit 1121?

24       Your Honor, I think this has already been admitted.

25       THE COURT:  It has.

Pete Suerken - Cross

1        MS. JOHNSON:  I would ask to show Page 3 of this

2    contract.

3    BY MS. JOHNSON:

4    Q.  What's the final FOB cost on that?

5    A.  It's -- can I see the feed cost on that page?

6    Q.  Can you see the feed cost?

7    A.  Yeah.  Could you scroll up and let me see Page 1 of the

8    second sheet.

9    Q.  Okay.

10   A.  Could you make this a little smaller next time?  Could you

11   move the second part up so I could see the second part of it?

12       MS. JOHNSON:  Sure.  If you could go up one page,

13   Mr. Brian?

14       THE COURT:  Do we have a hard copy for Mr. Suerken?

15       THE WITNESS:  It's okay, Judge.  I can see it.

16       MS. JOHNSON:  Yes, we can provide that.

17   A.  Yes, ma'am.  What's the question?

18   BY MS. JOHNSON:

19   Q.  So they started, they, George's, started at $1.0913?

20   A.  Uh-huh.

21   Q.  And the final contract is $1.0307?

22   A.  Yes.

23   Q.  Is that a 6-cent decrease?

24   A.  Yes.

25   Q.  So it's fair to say they actually moved down throughout the

Pete Suerken - Cross

1 negotiations, right?

2 A.  Yes.  They were the only supplier that moved pricing.

3 Q.  Precisely.  Thank you.  And so the testimony about the

4 price is the price, we're not moving, did not apply to

5 George's?

6 A.  Charles George never uttered those words to me.

7 Q.  Thank you, sir.

8         Now, you testified to the jury that a penny is a whole

9 lot of money when it comes to these huge chicken contracts; is

10 that right?

11 A.  Yes.

12 Q.  So 6 cents would be six times that whole lot of money.  Is

13 that fair to say?

14 A.  That's a substantial amount of money.

15 Q.  Thank you.  Throughout these negotiations for the 2015

16 contract, Mr. Suerken, you negotiated with, I think you said,

17 Charles and Carl George; is that right?

18 A.  Yes.

19 Q.  Did you negotiate some or communicate some with Darrell

20 Keck?

21 A.  A limited amount.

22 Q.  But you did not negotiate or communicate with Mr. Ric

23 Blake; is that right?

24 A.  No, ma'am.

25 Q.  Now, you were also involved in early 2017 with the

Pete Suerken - Cross

1   negotiations for the 2018 through 2020 contract just before

2   your departure; is that right?

3   A.  Yes, we had started.

4   Q.  And who were involved from George's perspective in those

5   initial negotiations while you were there?

6   A.  It would have been Charles and Carl.

7   Q.  So if a meeting planner for a meeting with RSCS was sent to

8   Ric Blake, did you ever negotiate with Ric Blake?

9   A.  No, ma'am.

10  Q.  Okay.  And, in fact, you've told the government you never

11  negotiated with Ric Blake, didn't you?

12       MR. TORZILLI:  Objection, Your Honor.  May we have a

13  brief side bar?

14       THE COURT:  Sure.

15     (At the bench:)

16       THE COURT:  Go ahead, Mr. Torzilli.

17       MR. TORZILLI:  Thank you, Your Honor.  I object to

18  questions talking about what the witness told the government

19  unless Your Honor is going to permit us to go into it on

20  redirect what he told the government including the FBI agents.

21  This is completely inappropriate based on the extended

22  discussion we had yesterday in court where the focus was

23  supposed to be what this gentleman's personal knowledge in 2014

24  was.  And Your Honor, I think you've got to put an end to it.

25       THE COURT:  Ms. Johnson?

Pete Suerken - Cross

1    MS. JOHNSON:  Your Honor, yesterday's discussion and

2    the Court's order was very specific and it related to

3    inconsistent statements and how those may or may not have been

4    affected by documents that the government or anyone else

5    presented to this witness.  Your Honor, this has nothing to do

6    with that.  I am trying to make the point which is absolutely a

7    relevant point that the government knew all that this witness

8    was testifying about long before he came to this courtroom.

9    And we are entitled to make those arguments, tie those up later

10   in our trial that they knew this.  And we can argue about that.

11   It has nothing to do with inconsistent statements or

12   impeachment or anything that the Court specifically addressed

13   yesterday.

14   THE COURT:  Yeah, I am going to sustain the objection.

15   While it's true that what we were talking about yesterday is

16   the danger of him having his memory different because he

17   observed other documents, once the witness testifies as to a

18   particular position to then ask him and you told the government

19   that is essentially in my mind irrelevant.

20        I think that Ms. Johnson believes that there is a

21   separate theory that goes to what the government knew, but that

22   then raises its own issues about, you know, if the government

23   wants to rebut that, then it would open a can of worms in my

24   opinion about the rest of the FBI interview.  So I am going to

25   sustain that objection given the fact that he has already

Pete Suerken - Cross

1   indicated -- he has made a statement.  To have him then be

2   asked and you told that to the government I think is -- I am

3   going to bar those types of questions.

4           *MS. JOHNSON:*  Thank you, Your Honor.

5      (In open court:)

6   *BY MS. JOHNSON:*

7   *Q.*  Just a couple more questions, Mr. Suerken.

8           When you were discussing, and I believe your testimony

9   was you were going to try and build your program around

10  George's, was that because the price was great?

11  *A.*  They provided the best value.

12  *Q.*  The best value, not cheapest, but the best value.  They

13  were family run.  Did that weigh into your decision?

14  *A.*  They were culturally a good fit for our organization.

15  *Q.*  They didn't have the same capital requirements as a public

16  company.

17  *A.*  I don't know what their capital requirements are.

18  *Q.*  They had good quality assurance?

19  *A.*  They were an approved supplier.  I don't remember -- I

20  don't want to put an adjective to it because I don't remember.

21  *Q.*  And they were strategically in good locations.

22  *A.*  Yes, ma'am.

23  *Q.*  On direct you talked about -- I believe the quote was

24  aspects of competition.

25  *A.*  Yes.

Pete Suerken - Cross

1   Q.  And what was important to you was supply assurance, food

2   safety, quality and price.  Did I get that right?

3   A.  Yes, ma'am, I believe so.

4   Q.  During 2014 going into the 2015 negotiations, were these

5   aspects met to your satisfaction in your negotiations with

6   George's?

7   A.  Yes, ma'am.

8   Q.  So Mr. Suerken, would you agree with me that despite,

9   despite the increase in price, you were pleased with the

10  outcomes of the 2015 contract negotiations with George's?

11          MR. TORZILLI:  Objection as to his being pleased or

12  displeased.

13          THE COURT:  Overruled.

14          MS. JOHNSON:  You can answer, sir.

15  A.  I don't want to use the word pleased.  I wasn't pleased

16  with any of the prices.

17  BY MS. JOHNSON:

18  Q.  Were you satisfied?  How about that?

19  A.  No, I wasn't satisfied.  That's the worst RFP I have ever

20  run in my career.

21  Q.  Very well, sir.  As compared to the other aspects of the

22  other negotiations, were you able to adequately negotiate with

23  George's and come to an agreement that you could live with?

24  A.  I felt like George's had the potential to be a long-term

25  partner to the system, and I think that they conducted

Pete Suerken - Cross

1    themselves above board and did a great job for the system.

2            *MS. JOHNSON:*  Thank you.  That's all I have, Your

3    Honor.

4            *THE COURT:*  Thank you.

5            Additional cross?

6            Mr. Lavine, go ahead.

7                        **CROSS-EXAMINATION**

8    *BY MR. LAVINE:*

9    *Q.*  Mr. Suerken, my name is Bryan Lavine and I represent Scott

10   Brady.

11           How are you today?

12   *A.*  Good, sir.

13   *Q.*  Good, thanks.

14           I just want to go over two documents.  And I want to

15   bring them up because I am not going to challenge your memory

16   considering you are talking about '14, which is about eight

17   years ago.  So what I want to look at is the first bid for

18   Claxton during the negotiations of '14 for the 15-year

19   contract, and then I want to look at the final contract, all

20   right?

21   *A.*  Okay.

22           *MR. LAVINE:*  So if we could bring up Government

23   Exhibit 1133, please.  And I believe, Your Honor, this has been

24   admitted.

25           *THE COURT:*  Sounds familiar.  Let me just double-check

Pete Suerken - Cross 1162

1   it.

2           *MR. LAVINE:*  Yes, sir.

3           *THE COURT:*  Yes, it has.

4   *BY MR. LAVINE:*

5   *Q.*  Can you see that, Mr. Suerken?

6   *A.*  I can.

7   *Q.*  All right.  If you can --

8           *THE COURT:*  Mr. Lavine, do you want that displayed to

9   the jury, too?

10          *MR. LAVINE:*  If I could, please, Your Honor.

11          *THE COURT:*  Yes, of course.

12  *BY MR. LAVINE:*

13  *Q.*  Mr. Suerken, what is the FOB price for the COB for this

14  first round bid?

15  *A.*  It's -- this is the first round bid?

16  *Q.*  Right.  Would it be fair to say it's 1.1099 cents?

17  *A.*  It's $1.10, yes, sir, almost $1.11.

18  *Q.*  And that would be the first round bid for Claxton for the

19  negotiations that you did in 2014 for the 2015 contract.

20  *A.*  I can't -- I don't know whether this is the first

21  submission, third submission or fourth.

22  *Q.*  Will you take my representation this is the first bid?

23  *A.*  If you say so.

24  *Q.*  Okay.  Thank you, sir.

25          *MR. LAVINE:*  If we could bring up Government Exhibit

Pete Suerken - Cross

1    1119.  It's 1119, Your Honor, and I believe that's also been

2    admitted.

3           If you could take that down and put the other up

4    first, and then I want to do a comparison, please.

5           THE COURT:  Yes, it has been admitted.

6           MR. LAVINE:  Thank you.

7    BY MR. LAVINE:

8    Q.  Now, Mr. Suerken, if you would take a look at this, you can

9    see that -- can you tell who signed off on this on behalf of

10   RSCS?

11   A.  Sad to say, I still don't -- I don't recognize that

12   signature and I don't --

13          MR. LAVINE:  Your Honor, could I publish this to the

14   jury?

15          THE COURT:  You may.

16   BY MR. LAVINE:

17   Q.  But this is signed off on behalf of RSCS, is it not?

18   A.  Yes, sir.

19   Q.  And can you tell who signed it on behalf of Claxton?

20   A.  It looks like the first is Mikell.

21   Q.  Would that be Mikell Fries?

22   A.  It looks -- yes, that looks like Mikell Fries.

23   Q.  All right.  Can we scroll up to the second page, please?

24          Now, can you tell me, sir, what the FOB price is on

25   this contract?

Pete Suerken - Cross

1    *A.*  I believe at the end it's $1.0669.

2    *Q.*  Can we put both up, the Government Exhibit 1133 and the

3    Government Exhibit 1119, the second page of both, please.

4           Mr. Suerken, please bear with me.  I think we just

5    have to look at the documents.  I am not going to you ask to do

6    it by memory.  Now, sir, it appears if you look at these two

7    documents the first bid to the final contract, the first bid is

8    1.1099.  And the final is 1.0669?

9    *A.*  Yes, sir.

10   *Q.*  That would show a decrease of 4 cents over the negotiation

11   process.  Would that be true, sir?

12   *A.*  As long as the other inputs were held constant, yes, sir.

13   *Q.*  Right.  I am just looking at the COB price.  I understand

14   your position as far as the grain price and everything, but

15   because you have made a comment I think on direct that nobody

16   came down and you made a comment to Ms. Johnson when she was

17   questioning you about George's that George's was the only

18   supplier that moved pricing during the negotiations.  That's

19   not really true, is it, sir?

20   *A.*  By the looks of that, that's incorrect.

21   *Q.*  Right.  And I understand that this is eight years ago, so I

22   wouldn't expect you to remember everything.  That's why I

23   wanted to put the documents up.  But it clearly shows that

24   Claxton came down over 4 cents during the negotiation process;

25   isn't that true, sir?

1165

Pete Suerken - Redirect

1   A.  It shows the final price was 4 cents, approximately 3 and a

2   piece cents lower, yes.

3           MR. LAVINE:  Correct.  If I can have one moment,

4   please.

5           THE COURT:  You may.

6           MR. LAVINE:  Mr. Suerken, thank you very much.

7           THE COURT:  Thank you, Mr. Lavine.

8           Additional cross?

9           Redirect?

10           MR. TORZILLI:  May I have a moment to confer?

11           THE COURT:  You may.

12                    **REDIRECT EXAMINATION**

13   BY MR. TORZILLI:

14   Q.  Good afternoon, sir.  Just a couple of quick follow-up

15   questions.  First, you were asked this morning with respect to

16   Tyson and your dealings with them in 2014 contract negotiations

17   about an early conversation with them and a contract offer

18   associated with that.  Do you remember that?

19   A.  Yes, sir.

20   Q.  Okay.  Did you when you were offered by Tyson that contract

21   offer, did you accept it at the time it was offered?

22   A.  No.

23   Q.  How long after that offer was extended did you actually

24   sign a contract with Tyson?

25   A.  Well after the initial RFPs were due.

Pete Suerken - Redirect

1   Q.  So would it be fair to say months after that initial offer

2   was extended to you?

3   A.  I don't remember exactly when.  It was -- it would have

4   been September, October.

5   Q.  And when was the offer initially extended to you?

6   A.  I believe June and July.

7   Q.  So about three, four months?

8   A.  Yes, sir.

9   Q.  Okay.  Also I want to ask you about some questions you were

10  asked on cross-examination regarding the purchase of loads and

11  the approximate $1.30 per pound price range.  Do you remember

12  those questions?

13  A.  Yes.

14  Q.  Can you explain how many loads of chicken were purchased in

15  that approximate price range?

16  A.  I have no idea.

17  Q.  How many loads of chicken was RSCS purchasing under its

18  then existing contracts on a weekly basis?

19  A.  I believe it was approximately 200.

20  Q.  200 loads that were contracted.  Can you give us at least a

21  relative sense of how many loads were being purchased in that

22  $1.30 price range?

23        MR. TUBACH:  Objection, lacks foundation, asked and

24  answered.

25        THE COURT:  Overruled.  You can ask him that he has a

Pete Suerken - Redirect

1    basis to.

2    *A.*  A very small amount.

3    *BY MR. TORZILLI:*

4    *Q.*  And what's that based on?

5    *A.*  Our ability to pay $1.30 or $1.40 or $1.45 is that we cost

6    average those in across the entire 200 truckloads of chicken.

7    Therefore, one, two, three truckloads at $1.45 or $1.30 or

8    $1.40 when you've got 197 others bought at 92, 93 cents doesn't

9    matter.  It's irrelevant.  It's not that much money when you

10   look at cost averaging across the system.  That's why we were

11   doing.

12   *Q.*  And last, sir, in response to a question you were asked on

13   cross-examination, you stated that it was the worst RFP you had

14   ever conducted?

15   *A.*  Yes.

16   *Q.*  Would you explain why?

17   *A.*  I have never delivered results that poorly.

18   *Q.*  Results that poorly with respect to the 2014 contract

19   negotiations?

20   *A.*  In any recollection that I have of any contract that I have

21   negotiated from produce to beef to paper cups, I have never had

22   that much inflation in a single category driven off of margin.

23           *MR. TORZILLI:*  Moment to confer, Your Honor?

24           *THE COURT:*  You may.

25           *MR. TORZILLI:*  No further questions.

Pete Suerken - Redirect

1    THE COURT:  All right.  Is Mr. Suerken subject to

2  recall?

3           Thank you, Mr. Suerken.  You are excused.

4           The United States may call its next witness.

5    MS. CALL:  Your Honor, before the next witness the

6  government has five previously admitted documents that have not

7  yet been published that it would seek to publish.

8    THE COURT:  Right.  Not a witness, but some documents

9  to admit.

10   MS. CALL:  Correct.

11   THE COURT:  Go ahead.

12   MS. CALL:  The first is Government's Exhibit 1074.

13   THE COURT:  Yes.  And you may display that to the

14  jury.  And ladies and gentlemen, we will use that eye system.

15  So once you have had a chance to take a look at the exhibit, if

16  you don't mind looking at me, then I will know when everyone is

17  done.

18   MS. CALL:  Yes, Your Honor.  We will perhaps zoom in

19  on the bottom half to make it readable from the screen.

20   THE COURT:  Sure.  Okay.  Thank you.

21   MS. CALL:  Thank you.  Ms. Pearce, could you zoom into

22  the top e-mail in the chain?

23   THE COURT:  All right.

24   MS. CALL:  We would now seek to display Government

25  Exhibit 1035.

1169

Pete Suerken - Redirect

 1           THE COURT:  Yes, you may.

 2           MS. CALL:  Thank you.

 3           THE COURT:  All right.

 4           MS. CALL:  Now Exhibit 1036 which is a native Excel

 5    file.

 6           THE COURT:  You may.  All right.

 7           MS. CALL:  The government next seeks to publish

 8    Government Exhibit 1238.

 9           Ms. Pearce, if you could, please, once we publish,

10    magnify the portion for content.

11           THE COURT:  You may do so.

12           MS. CALL:  Thank you.  One more, Your Honor.  The

13    government seeks to publish Government's Exhibit 953.

14           THE COURT:  All right.  And you may do so.

15           MS. CALL:  Thank you, Your Honor.  We will publish the

16    lower portion of the chain first.

17           THE COURT:  Let's -- you are going to scroll up now?

18           MS. CALL:  Yes, Your Honor.

19           THE COURT:  Let's have a brief side bar if we could.

20       (At the bench:)

21           THE COURT:  I think that there is a limiting

22    instruction associated with 953 in regard to Mr. Slider that

23    his statements can only be considered for the effect on the

24    listener, but not as to the truth of the matters asserted.  Do

25    you agree with that, Mr. Tubach?

Pete Suerken - Redirect

1    MR. TUBACH:  Yes, Your Honor.  That's my recollection

2    as well.

3        THE COURT:  Anyone else have a different recollection?

4        Ms. Call, do you agree?

5        MS. CALL:  Your Honor, I am checking my records right

6    now.  Yes, you are correct, Your Honor.  I apologize for not

7    flagging it.

8        THE COURT:  I am going to go ahead and give that

9    limiting instruction to the jury at this time.  And is the next

10   witness Mr. Pepper?

11       MS. CALL:  It is, Your Honor.

12       THE COURT:  Any request to take -- once the jury is

13   finished looking at this, should we go ahead and take our

14   afternoon break in case there is some Pepper things that we

15   need to deal with given what he may testify about for the rest

16   of the afternoon?  I think there is some head nodding.  Is that

17   all right with you, Ms. Call?

18       MS. CALL:  Yes, it is, Your Honor.

19       THE COURT:  We will do that.  Thank you.

20     (In open court:)

21       THE COURT:  Ms. Call, do you mind putting back up 953?

22       MS. CALL:  Yes, Your Honor.

23       THE COURT:  Let's display that to the jury.

24       So ladies and gentlemen, I am going to give you what's

25   called a limiting instruction.  So as you undoubtedly noticed,

1171

Pete Suerken - Redirect

1   there are a couple of e-mails from an individual named Jason

2   Slider.  So Mr. Slider's statements can be considered by you

3   not for the truth of the matters that Mr. Slider is asserting,

4   but rather for the effect that what he is saying may have on

5   what we will call the listener, in other words, someone who may

6   then read his response, okay?  So if you keep that in mind.

7           All right.  And ladies and gentlemen, why don't we at

8   this time since we are almost at the break point, why don't we

9   plan on going ahead and taking our afternoon break at this

10  time.  Why don't we plan on reconvening at 3:25 all right?  The

11  jury is excused.

12          (Jury excused.)

13          Anything we should take up regarding Mr. Pepper who I

14  understand will be the next witness at this time?

15          *MR. GILLEN:*  Your Honor, I believe we did earlier a

16  few days ago object to the lateness of the summaries that were

17  attached as exhibits that would be utilized with Mr. Pepper.

18  And I don't believe in our discussions on the summaries that we

19  ever addressed those particular documents, but we would again

20  renew our objection.

21          *THE COURT:*  Yeah, I don't remember that too well.

22          Ms. Call, on that point?

23          *MS. CALL:*  Yes, Your Honor.  I believe the

24  representation that had been made at this time is these were

25  demonstratives, not summaries that would be used with the

Pete Suerken - Redirect

1    witness.  And I don't believe there has been any agreement to

2    the parties as to demonstratives, but we did share them in

3    advance with counsel.  Counsel just yesterday with Mr. Ledford

4    used demonstratives that I don't believe were notified to the

5    government.  So we will provide them in advance like we have

6    been doing, but I don't see an issue, particularly since we are

7    not offering these into evidence.

8         MR. TUBACH:  Your Honor, there is obviously a

9    difference between what we decide to do on cross-examination

10   and what we are supposed to be providing to opposing counsel

11   for use in direct examination.  And if the government is

12   reading the agreement that we have narrowly to include only

13   demonstrative exhibits and not documents to be admitted, we

14   will need to revisit that -- revisit the entire agreement with

15   the government.

16        MS. CALL:  I will note that it now has also been over

17   two days, so it would be in accordance with the agreement if

18   the bounds did cover that, so I am not sure what the objection

19   is based on.

20        THE COURT:  Yeah, I think we'll have to see how it

21   plays out.  If indeed it's only going to be used as a

22   demonstrative and if -- you know, I don't know how he has

23   knowledge of the phone calls.  I mean, how would that be

24   handled?

25        MS. CALL:  Your Honor, these are all phone calls that

Pete Suerken - Redirect

1   Mr. Pepper was on.

2          THE COURT:  I know, but what's his knowledge?  He can

3   asked by each of these calls by looking at what he remembers

4   them or his phone bill or how is he going to be --

5          MS. CALL:  Yes.  Ms. Sweeney can provide some

6   clarification, but I think one point is this is simply a matter

7   of efficiency with presentation of evidence that pulling up 20

8   phone excerpts would take quite an amount of time as opposed to

9   showing demonstratives containing these toll records.

10          THE COURT:  Right.  But you still have to have some

11   foundation.  For instance, the demonstratives that were used

12   previously in the trial, someone looked at it, said yes, that's

13   it, confirmed, shown, that type of thing.  But it doesn't sound

14   like that process is going to be used for the witness.

15          MS. SWEENEY:  Your Honor the government believes

16   Mr. Pepper will testify that he has reviewed his own phone

17   records and has confirmed that the information contained in the

18   demonstratives is accurate.

19          THE COURT:  Okay.  Ms. Prewitt?

20          MS. PREWITT:  Your Honor, I have them here if you

21   would like to look at them.

22          THE COURT:  I found them.  Thanks very much.  I think

23   I found the relevant ones, so now I remember what they were.

24   Well, we will see how this goes.

25          Ms. Henry?

Pete Suerken - Redirect

1           MS. HENRY:  I just wanted to understand when we are

2   told that Mr. Pepper has looked at them, is this something that

3   was done contemporaneously?  Did he have any knowledge of his

4   phone records while he was employed at Tyson?

5           THE COURT:  My guess is I doubt it, but this is some

6   after the fact review of phone records; is that right?

7           MS. SWEENEY:  He has reviewed the phone records after

8   the fact.  He does remember having these phone calls.  And so

9   his review of the toll records, my understanding was to put

10  them in time, but he is confirming his memory that he had

11  before he looked at the phone records.

12          MR. TUBACH:  Just to be clear, the witness is going to

13  testify that he remembers each of the phone calls that are on

14  that summary and he then refreshed his recollection looking at

15  the phone logs.  We will see how that goes.

16          THE COURT:  Yeah, I think we will have to see how that

17  goes.

18          All right.  We will be in recess.  Thank you.

19      (Recess at 3:17 p.m.)

20      (Reconvened at 3:35 p.m.)

21          THE COURT:  All right.  Let's bring the jury in.

22          (Jury present.)

23          THE COURT:  Ms. Sweeney, the United States may call

24  its next witness.

25          MS. SWEENEY:  The government calls Mr. Carl Pepper.

Carl Pepper - Direct

1    (**Carl Pepper** was sworn.)

2          *THE WITNESS:* Yes, ma'am.

3          *COURT DEPUTY CLERK:* Please state your name and spell

4    your first and last name for the record.

5          *THE WITNESS:* My name is Carl Pepper, C-A-R-L,

6    P-E-P-P-E-R.

7                    **DIRECT EXAMINATION**

8    *BY MS. SWEENEY:*

9    *Q.* Good afternoon, Mr. Pepper.  I would like to direct your

10   attention to the years 2012 to 2019.  During those years did

11   you work at a chicken supplier?

12   *A.* Yes, ma'am.

13   *Q.* Which supplier?

14   *A.* Tyson Foods.

15   *Q.* When did you start at Tyson Foods?

16   *A.* 1989 January.

17   *Q.* When you started at Tyson Foods, did you start at a company

18   called Tyson Foods?

19   *A.* No, ma'am.

20   *Q.* What was it called?

21   *A.* McCarty Farms.

22   *Q.* So how did you end up working at Tyson Foods?

23   *A.* Tyson Foods bought them.

24   *Q.* Mr. Pepper, did you receive any education after high

25   school?

1176

Carl Pepper - Direct

| | |
|---|---|
| 1 | A.   Yes, ma'am. |
| 2 | Q.   What did you study? |
| 3 | A.   Delta State. |
| 4 | Q.   And what did you study? |
| 5 | A.   Education and science. |
| 6 | Q.   Did you receive a degree? |
| 7 | A.   Yes, ma'am. |
| 8 | Q.   What was your first job after college? |
| 9 | A.   Coaching job at middle school down in Florida. |
| 10 | Q.   How long were you coaching at a middle school in Florida? |
| 11 | A.   A couple years. |
| 12 | Q.   And what job did you have after that? |
| 13 | A.   Went to high school, was a football and baseball coach. |
| 14 | Q.   How long were you a football and baseball coach for high |
| 15 | school? |
| 16 | A.   Until 1979. |
| 17 | Q.   The job that you had after that, what was that? |
| 18 | A.   After that I worked for an aluminum curtain wall company in |
| 19 | Jackson, Mississippi. |
| 20 | Q.   And how long did you work at that aluminum job? |
| 21 | A.   Until 1988. |
| 22 | Q.   What is your most recent position within Tyson? |
| 23 | A.   National sales account manager. |
| 24 | Q.   What positions did you have before then? |
| 25 | A.   Territorial manager and regional manager. |

Carl Pepper - Direct

1    *Q.*  What group did you work in within Tyson?

2    *A.*  Sales group.

3    *Q.*  Was there a name for the sales group?

4    *A.*  Yes, ma'am.  National accounts.

5    *Q.*  Are you familiar with the term food service?

6    *A.*  Yes, ma'am.

7    *Q.*  What do you understand food service to mean?

8    *A.*  Basically fast-food companies, QSRs, fast-food companies.

9    *Q.*  Can you describe to the Ladies and Gentlemen of the Jury

10   what a QSR is?

11   *A.*  It's a quick-service restaurant.

12   *Q.*  Are you familiar with the term fast-food?

13   *A.*  Yes, ma'am.

14   *Q.*  How is fast-food if at all related to QSRs?

15   *A.*  It's basically the same thing.

16   *Q.*  And in your role in the sales group, what, if any, relation

17   did it have to food service or QSR or fast-food?

18   *A.*  Can you ask that again, please?

19   *Q.*  Sure.  In your position in the sales group, what, if any,

20   role did you have in sales to fast-food or QSRs or food

21   service?

22   *A.*  I dealt with the buyers of the different fast-food chains

23   that I worked with.  I worked with the pricing group,

24   transportation group, quality control group, production group.

25   *Q.*  And what fast-food chains did you work with?

1178
Carl Pepper - Direct

1   *A.*  Kentucky Fried Chicken, Popeye's Fried Chicken, Church's

2   Fried Chicken and Boston Market.

3   *Q.*  Now, Mr. Pepper, did Tyson sell fresh chicken to QSRs aside

4   from KFC, Popeye's, Church's and Boston Market that you just

5   described?

6   *A.*  Yes, ma'am.  There was other ones.

7   *Q.*  Are you familiar with one by the name of Chick-fil-A?

8   *A.*  Yes, ma'am.

9   *Q.*  Who within Tyson had responsibility for Chick-fil-A?

10  *A.*  I believe at that time frame Tim Mulrenin did.  I am not

11  100 percent sure if he did the entire time, when he actually

12  started with Chick-fil-A.

13  *Q.*  Let's focus back to the customers you had responsibility

14  for.  For those customers, KFC, Popeye's, Church's and Boston

15  Market, were you responsible for those customers the entire

16  time that I asked about, 2012 to 2019?

17  *A.*  Yes, ma'am.

18          *MR. LAVINE:*  Leading.

19          *THE COURT:*  Overruled.

20  *BY MS. SWEENEY:*

21  *Q.*  What were your responsibilities 2012 to 2019 with regard to

22  those four customers?

23  *A.*  I dealt with the buyers.  I dealt with our pricing group,

24  transportation group, also the quality control group, our

25  production group.

Carl Pepper - Direct

1    *Q.*  And did you have any responsibilities with regard to

2    interfacing with the customers?

3    *A.*  Yes, ma'am.

4    *Q.*  What were those responsibilities?

5    *A.*  Those responsibilities was any kind of issues that would

6    arise, I was usually the one that would take care of that.

7    Also in the contract negotiation and I set with the pricing

8    group and our production group.

9    *Q.*  And you had those responsibilities for all four customers

10   that you listed?

11   *A.*  Yes, ma'am.

12   *Q.*  When you testified that you were the national accounts

13   manager, what's a national account?

14   *A.*  National account is basically the fast-food chain from one

15   end of the country to the other end of the country.

16   *Q.*  So Mr. Pepper, between 2012 and 2019 who were your

17   supervisors?

18   *A.*  Brian Roberts for a short time and then Tim Mulrenin, Toby

19   Duckworth and then Denny Woodard.

20   *Q.*  And who did your supervisors report to during that time

21   frame, again 2012 to 2019?

22   *A.*  Brian Roberts reported to the senior VP.  I can't remember

23   his name.  Tim Mulrenin reported to Brian Roberts.  Toby

24   Duckworth reported to -- I can't remember the gentleman's name.

25   It was a VP of national accounts at that time.  And Denny

Carl Pepper - Direct

1   Woodard was the same way.

2   Q.  So Mr. Pepper, let's talk about your sales responsibilities

3   in that time frame, 2012 to 2019.  What products did you sell?

4   A.  Basically fresh chicken and a little bit of frozen chicken.

5   Q.  Mr. Pepper, in your time at Tyson Foods, how long have you

6   sold to QSRs?

7   A.  Pretty close to 33 years.

8   Q.  What size fresh chicken did you sell to QSRs?

9   A.  Say that again, please.

10  Q.  What size of fresh chicken did you sell to QSRs?

11  A.  It was considered small bird, 4 pounds and down.

12  Q.  I am sorry, could you repeat that?

13  A.  It's small bird which is basically like a 4-pound and down

14  chicken.

15  Q.  Are there other sizes of chicken?

16  A.  Yes, ma'am.

17  Q.  What are the other sizes?

18  A.  It's called big bird.

19  Q.  And you gave a pound range for small bird.  Is there a

20  pound range for big bird?

21  A.  Yes, ma'am.

22  Q.  And what is that?

23  A.  They could be roughly 5 pounds all the way up to 9 pounds.

24  Q.  Your QSR customers, KFC, Popeye's, Church's and Boston

25  Market, did you sell big bird to those customers?

Carl Pepper - Direct

1   A.   No, ma'am.

2   Q.   So I am going to ask you about selling to each customer

3   individually.  Starting with KFC did Tyson negotiate chicken

4   supply contracts with KFC corporate?

5   A.   No, ma'am.

6   Q.   Are you familiar with the term RSCS?

7   A.   Yes, ma'am.

8   Q.   What is RSCS?

9   A.   It's the buying co-op for Kentucky Fried Chicken.

10   Q.   Do you have an understanding of RSCS's role in the purchase

11   of chicken for KFC?

12   A.   Yes, ma'am.

13   Q.   What's the basis of your understanding?

14   A.   Meetings, contracts, negotiations.

15   Q.   And meetings and contracts and negotiations with whom?

16   A.   With RSCS.

17   Q.   So what is your understanding of RSCS's role in the

18   purchase of chicken for KFC?

19   A.   RSCS basically had the responsibility of contract

20   negotiations for everything that Kentucky Fried Chicken needed

21   to run their restaurants.

22   Q.   Now focusing on Popeye's, did Tyson negotiate chicken

23   supply contracts with Popeye's corporate directly?

24   A.   No, ma'am.

25   Q.   Were you familiar with the term SMS?

Carl Pepper - Direct

1  A.  Yes, ma'am.

2  Q.  What is SMS?

3  A.  SMS is a buying co-op for Popeye's.

4  Q.  What was SMS's role in purchasing chicken for Popeye's?

5  A.  It was basically the same thing.  They purchased everything

6  from -- everything they needed to supply their stores.

7  Q.  What about Church's, did Tyson negotiate chicken supply

8  contracts directly with Church's corporate?

9  A.  Yes, ma'am.

10  Q.  Does Church's Chicken have a buying cooperative?

11  A.  No, ma'am.

12  Q.  And finally, the last customer we have been talking about,

13  Boston Market, did Tyson negotiate chicken supply contracts

14  with Boston Market corporate directly?

15  A.  Yes, ma'am.

16  Q.  Does Boston Market have a buying cooperative?

17  A.  No, ma'am.

18  Q.  Mr. Pepper, I would like to turn your attention again

19  staying with the years of 2012 to 2019.  Do you have an

20  understanding of generally how the contract negotiations

21  process worked for those four customers we have been talking

22  about?

23  A.  Yes, ma'am.

24  Q.  What's the basis of your understanding?

25  A.  I have been involved in contract negotiations with those

Carl Pepper - Direct

1    four different fast-food chains.

2    Q.  So generally what was the contract negotiations process for

3    those four customers?

4    A.  They would send in a -- what they called --

5         THE COURT:  One second, Mr. Pepper.

6         Mr. McLoughlin?

7         MR. McLOUGHLIN:  Objection, Your Honor, as to form and

8    time.  2012 to 2019 is too broad for changes and other things.

9         THE COURT:  I will overrule the objection.

10   BY MS. SWEENEY:

11   Q.  You can answer, Mr. Pepper.

12   A.  Each one of those organizations would send in an RFP, which

13   is a bid for their business.

14   Q.  And what would happen after the customer sent out the RFP?

15   A.  The RFP would be sent in.  It could have been myself or Tim

16   Mulrenin or Brian.  And then it would be automatically given to

17   the pricing group for that group to put a cost model together

18   and come up with what the actual costing would be to produce

19   the chicken for what they're looking for.

20   Q.  And what would happen after that?

21   A.  After the cost model basically is put together, there would

22   be some meetings back and forth between sales, production.

23   Quality control could be in there if there was any issues that

24   they wanted to discuss or change in the contract.  And then at

25   that time it would be given back to sales and sales would

Carl Pepper - Direct

1  present it to the customer.

2  Q.  And what would happen after sales would present it to the

3  customer?

4  A.  Basically at that time there would be a meeting set up with

5  the customer and the negotiations would start and a lot of

6  conversations would go back and forth.

7  Q.  What would happen after the negotiations with the customer?

8  A.  Some customers, there would be a lot of negotiation going

9  back and the forth.  Some customers there might not be but a

10  couple.  And if there was a lot, they basically would go back

11  to Tyson and sit down and have meetings with the pricing group,

12  production group and all the different groups involved to give

13  them what the feedback was when we first presented the contract

14  to them and then go from there.

15  Q.  And what was the final result of the RFP process that you

16  have been describing?

17  A.  The final result would be a finalized signed contract.

18  Q.  Now being Mr. Pepper, what group within Tyson was

19  responsible for negotiations with the customer that you just

20  described?

21  A.  The national sales group.

22  Q.  And between 2012 and 2016 who in sales was the primary

23  negotiator?

24  A.  Say that again, please.

25  Q.  Sure.  Between 2012 and 2016, who was the primary

Carl Pepper - Direct

1    negotiator?

2    A.   Brian Roberts.

3    Q.   Did others within Tyson help Mr. Roberts with the

4    negotiations?

5    A.   Yes, ma'am.

6    Q.   And who was that?

7    A.   Tim Mulrenin and myself.

8    Q.   And again focusing in on that time period, 2012 to 2019, do

9    you have an understanding of whether the sales group had the

10   authority to negotiate price above what was provided by the

11   pricing group?

12   A.   Yes, ma'am.

13   Q.   What's the basis of your understanding?

14   A.   I was involved in one particular contract that we got more

15   money than what was originally asked.

16   Q.   So did the sales group have the authority to negotiate

17   price above what was provided by the pricing group?

18   A.   Yes, ma'am.

19        MS. SWEENEY:   Your Honor, may I approach the witness

20   with a binder, with documents?

21        THE COURT:   You may.

22   BY MS. SWEENEY:

23   Q.   Mr. Pepper, I would like you to turn to Tab 14 in your

24   binder which has been marked as Government Exhibit 959.

25   A.   Yes, ma'am.

Carl Pepper - Direct

1    MS. SWEENEY:  Your Honor, I believe we need the

2    screens for counsel and the witness to be connected to our

3    computer.  Thank you.

4    BY MS. SWEENEY:

5    Q.  Do you recognize this document?

6    A.  Yes, ma'am.

7    Q.  Generally what type of document is it?

8    A.  It's an e-mail.

9    Q.  And who is it from?

10   A.  Brian Roberts.

11   Q.  Who is it to?

12   A.  To Charlie Solomon, Steven Cullen, Brandon Campbell and

13   copying Andy Lubert, Tim Mulrenin, Jared Mitchell and myself.

14   Q.  And what's the date of the e-mail?

15   A.  Friday, September the 5th, 2014.

16   Q.  What is the general subject of the e-mail?

17   A.  Popeye's 2015 pricing contract.

18       MS. SWEENEY:  Your Honor, at this time the government

19   moves to admit Government Exhibit 959.

20       THE COURT:  Any objection to the admission of 959?

21       MR. McLOUGHLIN:  No objection.

22       THE COURT:  Exhibit 959 will be admitted.

23       MS. SWEENEY:  Permission to publish to the jury?

24       THE COURT:  You may.

25       MR. TUBACH:  Can we have a brief side bar?

Carl Pepper - Direct

1              THE COURT:  Yes.

2         (At the bench:)

3              MS. PREWITT:  Your Honor, the document is up before

4    the jury right now.  Can we take it down?

5              THE COURT:  Yes.

6              MS. PREWITT:  Excuse me, Your Honor.  It is still up.

7              THE COURT:  It has been taken down.

8              Mr. Tubach, go ahead.

9              MR. TUBACH:  Your Honor, I didn't know if the Court

10   wished us to continue to say no further objections to documents

11   in which the Court already ruled provisionally under

12   admissibility.  We are happy to do that, but it would slow the

13   process.  And if the understanding of the Court is now the

14   objections we made previously are preserved as to these

15   documents.  We argued about them.  If we need to make any

16   further record, if the Court would like us to say no further

17   objections, we would be happy to do that.

18             THE COURT:  Why don't we do that and we'll see how it

19   goes.  I am not sure there is a material difference between the

20   two options that you just posited, but for some reason I think

21   it may make a good record, not that the order that I entered

22   about preserving the previous objections isn't true.  Of

23   course, it is true.  Why don't we try that for a little bit and

24   maybe -- actually, let's not do it.  I think you are right.  I

25   think that we're good on it.

Carl Pepper - Direct

1        Any position, Ms. Sweeney, on behalf of the government

2   on that?

3        MS. SWEENEY:  No position, Your Honor.

4        THE COURT:  Yeah.  So you know, defendants can do that

5   if they want just so the jury knows, but I am not going to

6   require that you do so.

7        MR. TUBACH:  Thank you, Your Honor.

8      (In open court:)

9        THE COURT:  We can go back to displaying that to the

10  jury.

11       MS. SWEENEY:  Thank you, Your Honor.

12  BY MS. SWEENEY:

13  Q.  So Mr. Pepper, on your screen we were talking about

14  Government Exhibit 959.  Do you see that?

15  A.  Yes, ma'am.

16  Q.  Now, at the time of this e-mail in September of 2014, who

17  was the primary negotiator for Tyson Foods?

18  A.  Brian Roberts.

19  Q.  Was this document related to a contract?

20  A.  Yes, ma'am.

21  Q.  Which contract?

22  A.  The Popeye's contract for 2015.

23  Q.  Can you read the e-mail, please?

24  A.  "Popeye's is done.  Here is the agreed upon model for

25  Popeye's.  Almost a 14-cent increase.  Yes Brandon, I changed

Carl Pepper - Direct

1  the margin line.  And yes it is up from what you gave me."

2  Q.  In the middle of that e-mail is the name Brandon.  Do you

3  see that?

4  A.  Yes, ma'am.

5  Q.  Who is Brandon?

6  A.  That's Brandon Campbell who was basically putting the

7  pricing together.

8  Q.  What company did Mr. Campbell work for?

9  A.  Tyson Foods.

10  Q.  What did you understand -- did you receive this e-mail?

11  A.  Yes, ma'am.

12  Q.  What did you understand from this e-mail?

13  A.  That --

14       MR. McLOUGHLIN:  Objection to form, Your Honor.  The

15  document speaks for itself.  Asking for this man's impression

16  of it is simply not relevant.

17       THE COURT:  I am going to sustain it.  If he took some

18  action based upon it, you can ask him about that, but otherwise

19  just what he understood is not relevant.

20       MS. SWEENEY:  Thank you, Your Honor.

21  BY MS. SWEENEY:

22  Q.  So Mr. Pepper, is this an example of what we were just

23  talking about?

24  A.  Yes, ma'am.

25  Q.  Can you explain how this is an example of what we were just

Carl Pepper - Direct

1    talking about?

2    A.   This was a -- we got more than what the pricing group asked

3    for for Tyson Foods.

4    Q.   So Mr. Pepper, in your experience on your accounts, was

5    sales always allowed to negotiate a higher price than was

6    provided by the pricing group?

7            MR. McLOUGHLIN:   Object to form, Your Honor.

8            THE COURT:   Overruled.

9    A.   Yes, ma'am.

10   BY MS. SWEENEY:

11   Q.   So Mr. Pepper, turning back to your customers.  Do you have

12   an understanding if Tyson was the only supplier of fresh

13   chicken to the four QSR customers that you identified earlier?

14   A.   No, ma'am, we were not the only supplier.

15   Q.   And what's the basis for your understanding?

16   A.   During the contract negotiations with each one of them, and

17   plus we couldn't supply the chicken for all of them.

18   Q.   So for KFC can you give us an estimate of how many other

19   chicken suppliers based on your understanding supplied KFC?

20   A.   Five plus.

21   Q.   And how about for Popeye's?

22   A.   Four plus.

23   Q.   And for Church's?

24   A.   Three plus.

25   Q.   And how about for Boston Market?

Carl Pepper - Direct

1    *A.*   What time frame?

2    *Q.*   Mr. Pepper, I am asking you questions about 2012 to 2019,

3    but if there is a distinction there, please let me know.

4    *A.*   I would say two plus.

5    *Q.*   Going back to contracts and again focusing in on that time

6    period, 2012 to 2019, are there terms that are typically

7    included in contracts for the supply of chicken?

8    *A.*   Yes, ma'am.

9    *Q.*   What's the basis of your knowledge?

10   *A.*   Being involved in contract negotiations.

11   *Q.*   What terms are typically included in contracts from your

12   experience?

13   *A.*   Pricing, bird size, production, availability, and credit

14   terms.

15   *Q.*   Mr. Pepper, are you familiar with the term quality control?

16   *A.*   Yes, ma'am.  Quality control could be in it if the QSR

17   happened to be asking for some different things that are not

18   normally in a contract.

19   *Q.*   Is there a time of year when these supply contracts that

20   we've been talking about typically start, typically go into

21   effect?

22   *A.*   Yes, ma'am.

23   *Q.*   And what is that time of year?

24   *A.*   Some of them usually can start as early as June, July,

25   depending how complicated they are.  Other ones might not start

Carl Pepper - Direct

1    until September, October.  And then the rest of them could be

2    somewhere in that neighborhood of October to December.

3    Q.  And Mr. Pepper, I apologize.  My question was the contracts

4    themselves, is there a time of year when the contracts

5    themselves go into effect?

6    A.  Oh, yes, ma'am.  Usually it's January of the following

7    year.

8    Q.  And you described some different time periods.  What were

9    you describing?

10   A.  I was describing when the actual RFPs would be sent out and

11   the discussions would start.

12   Q.  And in your experience, what is the -- what are the length

13   of the terms of these contracts typically?

14   A.  A lot of them are just one year, but some of them could be

15   two and three years.

16   Q.  So let's walk through the various terms in the contracts

17   that you mentioned that are typically included.  First, I

18   believe you mentioned the availability of product.  Can you

19   describe what that is?

20   A.  What I mean by availability of product, if the particular

21   one is wanting the same product or more product, that the

22   production group would have to give us answers if they could

23   take on any more business or they are willing to give up

24   business to take on more business or didn't want all the

25   business we had from the previous contracts.

Carl Pepper - Direct

1   Q.  So is that relating to the amount of chicken that's sold to

2   the customer?

3   A.  Yes, ma'am.

4   Q.  Do you consider that an important term of the contract?

5   A.  Yes, ma'am.

6   Q.  Why is that?

7   A.  Because you don't want to take on the business if you can't

8   supply it.

9   Q.  Another item that you mentioned was, I believe, credit

10  terms; is that correct?

11  A.  Yes, ma'am.

12  Q.  What is a credit term?

13  A.  Credit term is the time frame that the customer has to pay

14  for the product that they purchased.

15  Q.  Do you consider that an important term?

16  A.  Yes, ma'am.

17  Q.  And why is that?

18  A.  If we don't get paid, we don't ship it.

19  Q.  You also mentioned price; is that right?

20  A.  Yes, ma'am.

21  Q.  Can you describe what you mean when you say price is a term

22  that is typically included in these contracts?

23  A.  The price is what is -- what is agreed upon between Tyson

24  and whichever supplier it is.  And the agreement comes down to

25  that's what the agreement is to pay for the product using cost

Carl Pepper - Direct

1    models and all the information we had to put together to get

2    the price.

3    Q.  So you mentioned the word cost model and the word contract.

4    Are the two related in any way?

5    A.  Yes, ma'am.

6    Q.  How are the two related?

7    A.  The cost model is part of the contract.  That basically is

8    the main part that puts all the information together to arrive

9    at a price for the customer.

10          MS. SWEENEY:  I would like to pull up Government

11   Exhibit 1127 which, Your Honor, I believe has already been

12   admitted into evidence.  Mr. Pepper, it's behind tab 13 of your

13   binder.

14          THE COURT:  It has been admitted and it may be

15   displayed.

16          MS. SWEENEY:  Thank you, Your Honor.

17   BY MS. SWEENEY:

18   Q.  We will start with the second page of 1127.

19          So Mr. Pepper, what is this?

20   A.  This is a signed contract.

21   Q.  With what customer?

22   A.  For Kentucky Fried Chicken.

23   Q.  I am sorry, Mr. Pepper?

24   A.  Excuse me, RSCS.

25   Q.  If you could lean into your microphone as well.

Carl Pepper - Direct

1   A.   Okay.

2   Q.   What year is this contract for?

3   A.   It's for January 2015 through December of 2017.

4   Q.   And does this contract contain the price?

5   A.   Yes, ma'am.

6   Q.   Where is that price contained?

7   A.   Down at the very bottom of the page.  It's right above the

8   signatures where it says total FOB plant cost.

9   Q.   So the total FOB plant cost is your understanding of the

10  price for the contract?

11  A.   Yes, ma'am.

12  Q.   And what is the price for this contract?

13  A.   It's shown $1.0762.

14  Q.   What's the unit for that price?

15  A.   A pound.

16  Q.   Now is this the exact price that the customer pays for the

17  full term of the contract?

18  A.   No, ma'am.

19  Q.   Why not?

20  A.   Because there is different things that can change the price

21  from period to period for KFC, which basically is how they buy

22  their grain or tell us to buy their grain and soy and also

23  freight and basis.

24  Q.   So aside from grain and soy and freight and basis, is there

25  any other part of this cost model that could change the price

Carl Pepper - Direct

1  throughout the year -- throughout the term of the contract?

2  A.  No, ma'am.

3  Q.  You mentioned KFC buys it's grain, so it can change period

4  to period.  Can you describe what that means?

5  A.  KFC calls it period to period meaning it's really month to

6  month, but KFC has periods one through 13.  I am not exactly

7  where 13, how that works.  But everybody else, theirs just says

8  January through December.

9  Q.  When you say everybody else, what are you referring to?

10  A.  Popeye's, Boston Market and Church's.

11  Q.  So for those four customers, does the pricing vary over

12  every month or every period?

13  A.  They can.

14  Q.  And that's based on the feed and grain, I think you said,

15  and the freight and basis?

16  A.  Yes, ma'am.

17  Q.  We can pull this document down.

18       How do these customers know what price they are

19  supposed to pay every month?

20  A.  Our commodities group who RSCS tells them how much grain to

21  buy.  If they tell them to buy month to month or whatever it

22  is, the commodities group tells our pricing group what they

23  purchased at that time.  And then the pricing group plugs the

24  numbers in for the feed cost.  And then that's how we get

25  the -- and then they send it to me and give me the period

Carl Pepper - Direct

1   pricing.

2   Q.  How does the customer find out what they are supposed to

3   pay every month?

4   A.  I send it to the customer once I get it.

5   Q.  So at this time I would like to direct your attention to

6   Tabs 3 and 4 of your binder which is Government's Exhibits

7   9833, 9834 and 9834-1.

8        MS. SWEENEY:  And 9834-1, Your Honor, is a printed

9   version of the native which is 9834.

10  BY MS. SWEENEY:

11  Q.  So starting with the document behind Tab 3, do you have

12  that?

13  A.  Yes, ma'am.

14  Q.  Do you recognize this document?

15  A.  Yes, ma'am.

16  Q.  Generally what is it?

17  A.  It's a price -- it's an e-mail with the period pricing.

18  Q.  Who is it from?

19  A.  It's from myself.

20  Q.  Who is it to?

21  A.  To Carol Knight at RSCS.

22  Q.  What's the date of this e-mail?

23  A.  July 7th.  Friday, July 7th, 2017.

24  Q.  Is there an attachment reflected on this e-mail?

25  A.  Yes, ma'am.

Carl Pepper - Direct

1    Q.  I would like to turn your attention to Government's Exhibit

2    4.

3              THE COURT:  You mean Tab 4?

4              MS. SWEENEY:  Tab 4, I apologize, Government

5    Exhibit 9834.  And for your purposes, Mr. Pepper, 9834-1.

6    BY MS. SWEENEY:

7    Q.  Do you recognize -- is this an attachment to the prior

8    document we were just looking at?

9    A.  Yes, ma'am.

10   Q.  And how do you know that?

11   A.  Because it states RSCS Cost Plus for Period 8.

12   Q.  And what type of general document is this?

13   A.  This is the -- an e-mail with the pricing on it.

14   Q.  And this document 9834-1, what type of document is this?

15   A.  This is their -- it's an e-mail that's sent to them.

16             MS. SWEENEY:  The government moves to admit Government

17   Exhibits 9834 and 9834-1.

18             THE COURT:  Any objection to the admission of Exhibits

19   9834 and 9834-1?

20             Both will be admitted.

21             MS. SWEENEY:  Permission to publish 9834-1?

22             THE COURT:  You may.

23   BY MS. SWEENEY:

24   Q.  So Mr. Pepper, focused on 9834-1, can you describe to the

25   Ladies and Gentlemen of the Jury generally what is reflected

Carl Pepper - Direct

1    here in this document?

2    A.   It's reflected for the price that RSCS and Kentucky Fried

3    Chicken would pay for the month or for period eight.

4    Q.   What's the time period of period eight?

5    A.   It is July the 16th, 2017 through August the 12th, 2017.

6    Q.   Is this an example of the period pricing we were just

7    discussing?

8    A.   Yes, ma'am.

9         MS. SWEENEY:   We can take that down, thank you.

10   BY MS. SWEENEY:

11   Q.   So Mr. Pepper, what type of fresh chicken did KFC or RSCS

12   purchase from 2012 to 2019?

13   A.   They purchased an eight-piece cut, which is basically two

14   wings, two drumsticks, two thigh quarters and two split

15   breasts.  And they also purchased dark meat, a cut leg quarter,

16   which is a drumstick and a thigh quarter.

17   Q.   Any other types of products that they purchased in those

18   time frames?

19   A.   On the fresh side -- excuse me, on the fresh side they also

20   bought supplemental whole wings.  They bought supplemental

21   drumsticks and livers and gizzards.

22   Q.   Mr. Pepper, are you familiar with the term COB?

23   A.   Yes, ma'am.

24   Q.   What is it?

25   A.   Chicken on the bone.

1200

Carl Pepper - Direct

1  Q.  Does COB or chicken on the bone relate to any of the

2  products that you just described?

3  A.  It relates to all of it except for liver and gizzards.

4  Q.  And how are they related?

5  A.  They all got a bone in them.

6  Q.  What type of chicken did Popeye's purchase in that time

7  frame, 2012 to 2019?

8  A.  They also purchased fresh eight-piece cut, which is two

9  wings, two breasts, split breasts, two thigh quarters and two

10  drumsticks.  They also bought a cut leg quarter drum and thigh.

11  They bought supplemental wings.  They bought a supplemental

12  drumstick.  Some of them might have bought a supplemental thigh

13  quarter.  And then they bought livers and gizzards and that's

14  it.

15  Q.  What about Church's Chicken, what types of fresh chicken

16  did Church's purchase from 2012 to 2019?

17  A.  They bought a fresh eight-piece cut which is the same

18  thing, two wings, two thighs, back orders, two drumsticks, two

19  split breasts.  And they bought a cut leg quarter drum and

20  thigh, and they bought livers and gizzards.

21  Q.  And finally, Boston Market, what type of chicken products

22  did Boston Market purchase in that time frame?

23  A.  They bought a marinated whole chicken.

24  Q.  So turning your attention to a slightly different topic,

25  Mr. Pepper, did Tyson sell fresh chicken to restaurants in

1201

Carl Pepper - Direct

 1   California?

 2   *A.*   Yes, ma'am.

 3   *Q.*   Can you give an example?

 4   *A.*   They sold to a KFC distribution center in California.   And

 5   we also sold to a distribution center for Boston Market.

 6   *Q.*   Using KFC as an example, what processing plant does that

 7   chicken that gets sent to California, what processing plant

 8   does that come from?

 9   *A.*   The majority of the time it came out of Seguine, Texas.

10   *Q.*   So how did the chicken get from Seguine Texas to

11   California?

12   *A.*   It would be loaded on a Tyson long-haul truck or it would

13   be an outside carrier, and they would cross the state lines to

14   go to California.

15   *Q.*   You mentioned distribution center.   Can you describe to the

16   Ladies and Gentlemen of the Jury what a distribution center is?

17   *A.*   A distribution center is, say, for instance, RSCS, they had

18   contracts with people like McLane Food Service and they had

19   distribution centers all over the country.   And the product

20   would be produced in our plant.   And like I said, it needed to

21   be loaded on Tyson trucks or it could possibly be their trucks

22   or outside carrier.   It would be delivered directly to one of

23   their distribution centers.   And then at that time they would

24   load it on their own trucks and deliver it to their stores.

25   *Q.*   So the chicken would go from the plant to the distribution

Carl Pepper - Direct

1   center to the restaurant.

2   A.   Yes, ma'am.

3   Q.   Do all customers only use distribution centers?

4   A.   No, ma'am.

5   Q.   So how would chicken get -- how does chicken get to a

6   restaurant when distribution centers aren't used?

7   A.   Well, Tyson Foods and other folks, a few other companies

8   also had the store door deliveries.

9   Q.   What is store door delivery?

10  A.   Store door delivery is the product is being produced in the

11  plant.  And each plant would have their own what we called them

12  routes, which would have maybe 25, 30 stores on each route.

13  The product would be produced.  It would be loaded on the

14  trucks.  And then it would be shipped directly to the store by,

15  for instance, Tyson Foods with their own trucks, their own

16  drivers.

17  Q.   Sir, in that time period from 2012 to 2019, did you have

18  any responsibilities for store door delivery?

19  A.   Yes, ma'am.

20  Q.   What were your responsibilities for store door delivery?

21  A.   I basically oversaw that part of the business too.

22  Q.   So I am going to ask you some questions about the practical

23  aspects of the way chicken is ordered.  Do you know how

24  individual stores that received store door delivery ordered

25  chicken?

Carl Pepper - Direct

1  A.  Yes, ma'am.

2  Q.  And what's the basis for your knowledge?

3  A.  Being involved in it.

4  Q.  In the responsibilities you just described?

5  A.  Yes, ma'am.

6  Q.  So how did restaurants that received store door deliveries

7  order chicken?

8  A.  We had a group called customer service representatives or

9  CSRs.  And they would call the stores every day for whatever

10  route.  They had X amount of routes each CSR was responsible

11  for.  When I was talking about those routes, there was 25, 30

12  stores, whatever happened to be on there.  First thing in the

13  morning they would call the stores for the orders or the stores

14  might call and give them the orders.

15        And once they get them, they put them through to the

16  plants that are producing whatever routes that they happen to

17  be calling that day.  Then the production group would produce

18  the product.  The product would then by the end of the day

19  would be loaded on a Tyson route truck.  Paperwork would be

20  initiated so the drivers would know what they are supposed to

21  deliver to what stores.  And then some of our plants the

22  drivers would leave a lot earlier than other ones, just

23  depended on where they were going.

24  Q.  So when the restaurant needs chicken, let's again use KFC

25  as an example, what price is the restaurant paying?

Carl Pepper - Direct

1    *A.*  They are paying an FO -- like, say, for instance, if it was

2    period eight, they are paying what the FOB price is plus an

3    actual freight rate.

4    *Q.*  So it would be the price that's coming from that period

5    price we just looked at?

6    *A.*  Yes, ma'am.

7    *Q.*  And that period price is related to the contract?

8    *A.*  Yes, ma'am.

9    *Q.*  Aside from what you just described, was there any

10   additional paperwork that was included in that process of

11   getting the chicken from the plant to the restaurant?

12   *A.*  Yes, ma'am.  Once the orders are put into the system,

13   automatically a delivery ticket will be produced telling the

14   driver what they needed to -- quantities that they were

15   shipping and what stores they were shipping it also to.  And

16   then they would be put together, so they would have a packet

17   that the drivers would receive getting ready to pick up their

18   trucks.  And then, of course, there would also be a bid of

19   laden, which is basically just telling them exactly the total

20   amount of cases that's on the truck and the total weight of the

21   truck.

22   *Q.*  Back at the office was there any additional paperwork after

23   the delivery was made?

24   *A.*  Yes, ma'am.

25   *Q.*  And what was that?

Carl Pepper - Direct

1    *A.* It would be an invoice.

2    *Q.* Now, I would like to direct your attention to Tab 2 of the

3    binder, which is Government Exhibit 9816.

4         Mr. Pepper, do you recognize this document?

5    *A.* Yes, ma'am.

6    *Q.* Generally what type of document is it?

7    *A.* It's an invoice.

8    *Q.* And what company was it issued by?

9    *A.* Tyson Foods.

10        *MS. SWEENEY:* Government moves to admit Government

11   Exhibit 9816.

12        *THE COURT:* Any objection to the admission of 9816?

13        9816 will be admitted.

14        *MS. SWEENEY:* Permission to publish Government

15   Exhibit 9816?

16        *THE COURT:* You may.

17   *BY MS. SWEENEY:*

18   *Q.* So Mr. Pepper, what does this invoice show?

19   *A.* It shows the product code of the actual product.  It shows

20   the quantity shipped.  It shows what the weight that was

21   actually shipped of each product.  It shows a description.  It

22   shows a -- the price per pound and it shows the total dollar

23   amount.

24   *Q.* Does this invoice reflect a sale?

25   *A.* Yes, ma'am.

1  Q.  To who?

2  A.  This one was to KFC of Grenada.

3  Q.  And where is the KFC of Grenada?

4  A.  Grenada, Mississippi.

5  Q.  What products were sold to the KFC of Grenada?

6  A.  Chicken livers, split breasts, eight-piece cut and drum and

7  thighs.

8  Q.  And where do you see that on the invoice?

9  A.  Under the description.

10  Q.  When was the sale made?

11  A.  8/1/2017.

12  Q.  Where do you see that on the invoice?

13  A.  It's up there at the top right-hand corner.

14  Q.  Can you just say the words that are next to that?

15  A.  Order date.

16  Q.  And what's the date of the invoice itself?

17  A.  The invoice date is 8/3/2017.

18  Q.  And when were these products shipped?

19  A.  It was shipped on 8/2/2017.

20  Q.  And is the price that's paid for these products reflected

21  on the invoice?

22  A.  Yes, ma'am.

23  Q.  Where is that?

24  A.  The price is over there where it shows rate.

25  Q.  So for -- was there eight-piece that was listed on this

Carl Pepper - Direct

1    invoice?

2    *A.*  Yes, ma'am.

3    *Q.*  For the eight-piece chicken, what is the price that is

4    being sold at for?

5    *A.*  .97020.

6    *Q.*  And where does that price come from?

7    *A.*  It comes from the period -- the period -- whatever period

8    that happened to be pricing.

9         *MS. SWEENEY:*  You can take that down.  Thank you.

10   *BY MS. SWEENEY:*

11   *Q.*  Mr. Pepper, are you here under an agreement with the

12   government where you won't be prosecuted?

13   *A.*  Yes, ma'am.

14   *Q.*  When you met with the government, did you provide

15   information to the government?

16   *A.*  Yes, ma'am.

17   *Q.*  Over the course of those meetings, were you hoping that the

18   government would not prosecute you?

19   *A.*  Yes, ma'am, I was hoping.

20   *Q.*  And about how many times did you meet with the government

21   before you got the agreement that we just described not to be

22   prosecuted?

23   *A.*  15-plus.

24   *Q.*  What year -- what month and year did you first meet with

25   the government?

Carl Pepper - Direct

1   *A.*   I don't -- 2019, but I am not sure of the month.

2   *Q.*   Do you recall if it was early 2019 or late 2019 or in the

3   middle?

4   *A.*   I think it was in the middle.

5   *Q.*   When did you enter into the agreement not to be prosecuted?

6   *A.*   February the 7th of 2022.

7   *Q.*   What's your understanding of what you could be prosecuted

8   for without this agreement?

9   *A.*   For antitrust violations and price-fixing and talking to

10  competitors.

11  *Q.*   So you used the word price-fixing there.  What do you

12  understand price-fixing to be?

13  *A.*   Having discussions with --

14       *MR. McLOUGHLIN:*  Your Honor, calls for a legal

15  conclusion at this point.  And there is a lack of foundation as

16  to his knowledge where that would come from.

17       *MS. SWEENEY:*  Your Honor, may we go to side bar?

18       *THE COURT:*  Yes.

19     (At the bench:)

20       *THE COURT:*  Ms. Sweeney, go ahead.

21       *MS. SWEENEY:*  Your Honor, the witness was describing

22  what he understood he could be prosecuted for, and so the

23  government is simply seeking to posit for the jury what he

24  understands that term to mean.  We are not asking him to define

25  it or to give the legal answer of what it is, but what his

Carl Pepper - Direct

1  understanding of what the term is.  The next question will be

2  what conduct he participated in that he understands is part of

3  the price-fixing that he just said that he could be prosecuted

4  for.

5       THE COURT:  Mr. McLoughlin?

6       MR. McLOUGHLIN:  Your Honor, I think the structure

7  here the government has is jumping over a lot of hurdles in

8  terms of the specificity of the facts that this witness has to

9  testify to.  Asking him to draw the conclusion about what he

10 could be prosecuted for and then describing it does invade the

11 province of the jury because it becomes his opinion after

12 having met with the government 15 or 20 times as to what he can

13 be prosecuted for, which the jury will presume came from his

14 discussions with the government and what they told him.

15      And so I would also note that in his answer he said

16 that -- he was asked what he could be prosecuted for and the

17 last phrase of his answer was for sharing prices, so clearly --

18 or sharing information.  So clearly he has already given the

19 jury one absolutely incorrect answer because he is saying I

20 could be prosecuted for sharing information, which is directly

21 contrary to the instruction the jury is going to receive which

22 will result in confusion and prejudice the defendants because

23 they are not going to hear that instruction for a long time.

24      So I think they can ask him what the facts are and

25 what did you do on Tuesday, what did you do on Wednesday and

Carl Pepper - Direct

1   all of that.  And, you know, by the way, he also said talking

2   to competitors is what he -- because I can't see the line.  He

3   said he can be prosecuted for talking to competitors which

4   clearly he cannot.  The proper way to do this is to say what

5   happened on Tuesday, what happened on Wednesday, what did you

6   say, what did he say, not ask him a legal opinion with a

7   summary.

8           THE COURT:  Ms. Sweeney, I haven't ever been real

9   clear on this, but does he have some type of written agreement

10  or is there some letter from the Department of Justice?

11          MS. SWEENEY:  Yes, Your Honor.  The Department of

12  Justice has entered a non-prosecution agreement with Mr. Pepper

13  himself, just the United States Department of Justice and

14  Mr. Pepper.

15          THE COURT:  And does that define the scope of the

16  agreement?

17          MS. SWEENEY:  Just a moment.  I can confirm, Your

18  Honor.

19          THE COURT:  Okay.

20          MR. McLOUGHLIN:  Your Honor, I would add one other

21  thing.  If the government is asking a represented individual

22  who has been negotiating through his lawyer with the government

23  for over a year and a half, asking him what his understanding

24  is which by definition comes from his discussions with his

25  lawyer is a waiver of the attorney/client privilege.  And we

Carl Pepper - Direct

 1    will assert that is a sword and shield the way it is asserted.

 2    And I am sure the government hasn't told him that because if I

 3    ask him what's the source of your understanding and he says my

 4    discussions with my lawyer, then we have a waiver.  And so, you

 5    know, we get into deep water here very quickly.

 6         THE COURT:  That's what I am trying to figure out, if

 7    there is some type of written agreement so that we have some

 8    writing that defines what the scope is because it's clearly

 9    relevant.  His understanding of what the agreement is is

10    clearly relevant.

11         MR. McLOUGHLIN:  There is an NPA.  It's been produced

12    in discovery, so there is no question.  In fact, it's an

13    exhibit.  So they can ask him, is this your NPA?  And then the

14    jury can decide from the text of the NPA what he can and can't

15    be prosecuted for because it's in the agreement.

16         THE COURT:  I assume the NPA is a non-prosecution

17    agreement?

18         MR. McLOUGHLIN:  Yes, Your Honor.  Apologies.

19         THE COURT:  Okay.  So Ms. Sweeney, how about those

20    issues?

21         MS. SWEENEY:  Your Honor, the non-prosecution

22    agreement says that it protects him for violations of federal

23    antitrust and related criminal laws involving the sale of

24    broiler chicken products, any federal investigation resulting

25    therefrom, and any litigation or other proceedings resulting

Carl Pepper - Direct

 1    from such investigation.  So it protects him from violations of

 2    federal antitrust and criminal laws involving the sale of

 3    broiler chicken products, which was exactly what I was

 4    attempting to ask him to explain to the jury.

 5              MR. KORNFELD:  If I may.  I agree with the Court.

 6    Obviously, the non-pros agreement is relevant, but the question

 7    asked was what is his understanding of the term price-fixing.

 8    His understanding of the term price-fixing is irrelevant under

 9    401(a).  That's a different issue than what his understanding

10    is of the non-pros agreement.

11              THE COURT:  Right.  Well, we still have the issue of

12    what Mr. McLoughlin brought up at the very end of that one

13    question which was talking about -- just talking to -- I can't

14    remember now, talking to competitors or something of that

15    nature too.

16              MR. LAVINE:  Your Honor, he said, quote, talking to

17    competitors, which is clearly not illegal.

18              THE COURT:  Well, and importantly it's not defined in

19    the non-prosecution agreement either.  So that's why,

20    Ms. Sweeney, I think to avoid getting into things that his

21    attorney may have told him, unless, of course, it came from the

22    government, it would seem to me that it's best to lead him with

23    the terms that are used in his non-prosecution agreement.  That

24    probably would be the most precise way to define the scope of

25    his agreement.

1    *MS. SWEENEY:*  Yes, Your Honor.  If I may, he said that

2    prosecuted for price-fixing and talking to his competitors.

3    And the point I would just like to make is talking with your

4    competitors, while not standing alone is a violation of the

5    antitrust laws, but it is certainly a means and methods of

6    violating the antitrust laws and coming to an agreement.  You

7    cannot come to an agreement if you don't communicate with your

8    competitors, so I don't think that the dichotomy that's being

9    drawn here is a fair one.

10   Second, I think I believe based on what has happened

11   in the past, I believe your ruling was that the government

12   cannot inject the term price-fixing into a witness' testimony.

13   Certainly we don't intend to do that.  It is, however, relevant

14   to -- it is his understanding of the terms of this non-pros.  I

15   do understand your ruling.  I just wanted to make those two

16   points.

17   *MR. GILLEN:*  Craig Gillen here.  One point.  In

18   reviewing his many interviews with the government -- and I

19   don't have the particular interview.  I can find it -- but he

20   essentially says that he didn't know that he did anything wrong

21   until he started talking to the government.  The government

22   apparently told him what they thought he did which was wrong

23   and this manifests itself here in the, I was talking to my

24   competitors, which is what he discussed early on in his

25   interviews back in -- and Mr. McLoughlin said a year and a

Carl Pepper - Direct

1    half.  It's two and a half years that we have been -- that they

2    have been talking with him since the summer of 2019.

3         But the problem here that we have is that he didn't

4    think that he had done anything wrong because he had been

5    talking to competitors about market intelligence.  And

6    apparently after the government met with him a gazillion times,

7    he suddenly had -- from their perspective he, quote, learned,

8    that's my word, over from the interview that he learned that

9    what he did was wrong.  He was taught in my view by the

10   government to buy into their belief that any contact with

11   competitors was, in fact, a violation of the Sherman Antitrust

12   Act, which we know from the Court's instructions is not.

13        THE COURT:  Right.  Well, I think that once again the

14   non-prosecution agreement defines the scope of the agreement.

15   And Ms. Sweeney should ask a leading question to confirm

16   because that does seem to be the scope of it.

17        Mr. Canty?

18        MR. CANTY:  Yes, Your Honor.  The issue seems to me or

19   the issue I would like to address is the idea the witness

20   characterizes the conduct as price-fixing.  And this is an

21   issue that we addressed on Mr. Bryant's examination in the

22   first trial.  It appears on Page 796 of the official

23   transcript.  And it is my understanding there was an objection,

24   a similar objection, and the Court sustained it because we

25   weren't going to have the witness invading the province of the

Carl Pepper - Direct

1    jury with respect to that term characterizing if the conduct

2    was price-fixing or not.

3              THE COURT:  Right.  It seems to me that the witness'

4    understanding of his -- the scope of his agreement has to be

5    defined by the non-prosecution agreement itself, not what he

6    may, you know, otherwise think.  And so, yeah, it sounds

7    logical that that objection in the course of Mr. Bryant's

8    testimony in the last trial would have been sustained.

9              Can you rephrase the question, Ms. Sweeney, and ask it

10   in a leading fashion the way that I suggested?

11             MS. SWEENEY:  Of course, Your Honor.

12             THE COURT:  All right.  The so objection is sustained.

13   And Ms. Sweeney will restate it.  All right.  Thank you.

14       (In open court:)

15             THE COURT:  Objection will be sustained.

16             MS. SWEENEY:  Thank you, Your Honor.

17   BY MS. SWEENEY:

18   Q.  So Mr. Pepper, do you understand that without this

19   agreement you could be prosecuted for violations of federal

20   antitrust and related criminal laws in the sale of broiler

21   chicken products?

22   A.  Yes, ma'am.

23   Q.  What actions did you engage in relating to violations of

24   antitrust and related crimes in the sale of broiler chicken

25   products?

Carl Pepper - Direct

 1           MR. McLOUGHLIN:  Objection, Your Honor.  I think the

 2    question goes to exactly the discussion we just had and

 3    effectively asks the same question.  So we object to form, lack

 4    of foundation.

 5           THE COURT:  All right.  I am going to sustain the

 6    objection to that form of the question.

 7           MS. SWEENEY:  Your Honor, may we be heard briefly on

 8    side bar?

 9           THE COURT:  Yes.

10       (At the bench:)

11           THE COURT:  Mr. McLoughlin, go ahead.

12           MR. McLOUGHLIN:  Your Honor, the question is what

13    actions did you engage in relating to violations of the

14    antitrust and related crimes in the sale of broiler chicken

15    products.  This is simply the same question in a very slightly

16    different manner because it calls for him to draw legal

17    conclusions about what conduct is, in fact, a violation of the

18    antitrust laws and related crimes.  The government -- which

19    again has all the defects that we just talked about, invading

20    the province of the jury, asking for a legal opinion, calling

21    for the advice he received from his counsel.

22           The proper way for the government to prove the

23    violation if they allege it is for them to ask him what

24    happened, who did what when, and then argue the law to the jury

25    rather than ask this man to give a conclusion and opinion about

Carl Pepper - Direct

1   what he did that was in violation of a statute.  He is utterly

2   unqualified to answer that opinion.  This is a classic expert

3   legal opinion.  What did you do in violation of the statute?

4   What are the essential elements of the statute?  What steps did

5   you take and how did you violate it?  He is unqualified to do

6   that.

7           THE COURT:  Ms. Sweeney?

8           MS. SWEENEY:  The government is seeking to ask what

9   conduct exactly as Mr. McLoughlin said, who, what, where, what

10  conduct he engaged in using words directly from the non-pros

11  that we just described to begin his description of what he

12  understands to be the conduct that led to him being in the

13  non-prosecution agreement and ultimately the conduct he engaged

14  in.

15          THE COURT:  Mr. McLoughlin is a hundred percent right.

16  He can't describe what violations of law that he committed

17  because that does invade the province of the jury.  Rather, he

18  can testify about what he did, but ultimately it's up to the

19  jury having been informed by the Court of the law to determine

20  whether or not what he did was in violation of the law.  So

21  having him testify about what he thought was a violation of the

22  law really is just stating a -- an opinion as to whether he

23  violated the law that he's got no foundation to make.  All

24  right.

25          MS. SWEENEY:  Yes, Your Honor.

Carl Pepper - Direct

1          THE COURT:  Thank you.

2       (In open court:)

3    BY MS. SWEENEY:

4    Q.  So Mr. Pepper, let's talk about what you did during that

5    time period 2012 to 2019 regarding the agreement that you just

6    testified about.

7    A.  I had conversations with other poultry companies

8    concerning --

9          MR. McLOUGHLIN:  Objection.

10          MR. TUBACH:  It calls for a narrative.

11          MR. McLOUGHLIN:  A, it calls for a narrative.  B, it's

12   not a question.  And C, what it is is basically playing the

13   tape-recording that the government made with this gentleman

14   because there is no way he could know from that question what

15   he is supposed to be saying unless he has been coached until

16   Tuesday.  This is the third time we have had to do this, Your

17   Honor.  I am going to object.

18          THE COURT:  I am going to sustain the objection

19   because of the form of it.  The last part of the question --

20   yeah, he was asked to answer in terms of the agreement.  I will

21   sustain the objection -- or actually it wasn't an objection but

22   that's an improper form of the question.  You can ask him what

23   he did in the relevant time period, but not relevant to the --

24   to some agreement.

25          MS. SWEENEY:  Yes, Your Honor.

Carl Pepper - Direct

1  *BY MS. SWEENEY:*

2  *Q.* So Mr. Pepper, again talking about that time period of 2012

3  to 2019 -- actually Your Honor may I confer for just a moment?

4       *THE COURT:* Sure.

5  *BY MS. SWEENEY:*

6  *Q.* So Mr. Pepper, what conduct -- from that time period of

7  2012 to 2019 you've described conduct relating to conversations

8  with competitors. What conduct -- what -- can you describe

9  generally the conversations with competitors between that time

10 period, 2012 to 2019?

11      *MR. McLOUGHLIN:* Objection to form, Your Honor,

12 overbroad, covers seven years, no specification as to about

13 what, so we are -- could be talking about a request for lunch.

14 The form of the question, lack of foundation and relevancy.

15      *THE COURT:* I am going to sustain the objection. It

16 does seem to call for a narrative. If you can be more

17 specific.

18      *MS. SWEENEY:* Yes, Your Honor.

19      Your Honor, again apologies. A moment to confer?

20      *THE COURT:* Sure.

21 *BY MS. SWEENEY:*

22 *Q.* Mr. Pepper, if I could focus your attention to the year

23 2014. Could you please describe the nature of your

24 communications with competitors that you mentioned earlier?

25      *MR. McLOUGHLIN:* Objection again to the form of the

Carl Pepper - Direct

1   question as for all of the reasons just stated, Your Honor, as

2   to relevancy, who, what, when, where, about.  The question is

3   vague.  It is overbroad.  It lacks a foundation.

4          THE COURT:  Overruled.

5   A.  Would you ask me that question again, please?

6          MS. SWEENEY:  May I request a read-back of the

7   question?

8          THE COURT:  Why don't you just state the question

9   again.

10  BY MS. SWEENEY:

11  Q.  Mr. Pepper, directing your attention to the year 2014, you

12  described -- if you could describe the nature of the

13  communications you had with your competitors in that year.

14  A.  The conversations I had with --

15         MR. McLOUGHLIN:  I apologize, Your Honor, for the

16  interruptions and the many objections.  A question might be --

17  describe the conversations might be appropriate, but asking a

18  question about what the nature of them is which then invites

19  conclusions and narratives is improper in form.  Objection to

20  form.

21         THE COURT:  All right.  Overruled.

22  A.  The nature of the conversation in 2014 was for the RSCS/KFC

23  2015 contract.  And it was concerning a substantial pricing

24  increase that I talked to Jimmie Little at Pilgrim's and Scott

25  Brady at Claxton and Ric Blake at George's to see if they had

Carl Pepper - Direct

1    basically heard or if they were looking to also have a

2    substantial pricing increase for the 2014 contract -- excuse

3    me, 2015 contract.

4    *BY MS. SWEENEY:*

5    *Q.*  What was your reason -- did you have a reason for talking

6    to Defendant Little or Mr. Little, Mr. Blake and Mr. Brady

7    about the 2015 contract?

8    *A.*  Yes, ma'am.

9    *Q.*  What was your reason for talking to them?

10   *A.*  It was that I knew what Tyson Foods' contract was going to

11   be pricing-wise.  And I talked to those three because I

12   could -- to see if they were basically hearing if there was

13   going to be a substantial increase on that price, and then I

14   also basically trusted what those three would tell me.

15   *Q.*  What, if any, understanding did you have, Mr. Pepper, when

16   engaging in that conduct?

17        *MR. McLOUGHLIN:*  Objection to the vagueness and form,

18   Your Honor, as to, quote, his understanding.

19        *MS. SWEENEY:*  Your Honor, I am asking if he had one.

20   It was a yes or no question.

21        *THE COURT:*  Overruled.

22   *BY MS. SWEENEY:*

23   *Q.*  Mr. Pepper, what, if any, understanding did you have?  Yes

24   or no?  Did you have an understanding when having a

25   conversation -- when -- excuse me.  Let me start again.

Carl Pepper - Direct

1      Mr. Pepper, yes or no.  What, if any, understanding --

2   did you have an understanding when you had these conversations

3   with Defendants Little, Blake and Brady?

4          *MR. McLOUGHLIN:*  Objection to form, Your Honor.

5          *MR. TUBACH:*  Vague and ambiguous question.  What does

6   understanding mean?

7          *THE COURT:*  I am going to sustain that.  Whatever the

8   understanding is not defined, so that is vague.

9          *MS. SWEENEY:*  Yes, Your Honor.  One moment to confer.

10          *THE COURT:*  Of course.

11  *BY MS. SWEENEY:*

12  *Q.*  So Mr. Pepper, at the time you said you had spoken to

13  Mr. Little, Mr. Blake and Mr. Brady, where did they work?

14  *A.*  Jimmie Little worked at Pilgrim's and Scott Brady worked at

15  Claxton and Ric Blake worked at George's.

16  *Q.*  And you said it was in relation to a KFC contract?

17  *A.*  Yes, ma'am.

18  *Q.*  Were Pilgrim's, Claxton and George's selling chicken to

19  KFC?

20  *A.*  Yes, ma'am.

21  *Q.*  Were they selling chicken to KFC -- were they selling to

22  KFC at this time in 2014 and 2015?

23  *A.*  Yes, ma'am.

24  *Q.*  And in your conversations with these -- with Mr. Little,

25  Mr. Blake and Mr. Brady, what did you -- did you come to any

Carl Pepper - Direct

1    understanding as to what they would do as a result of those

2    conversations?

3              MR. KORNFELD:  Objection, Your Honor, foundation.  The

4    objection talks about three separate conversations.

5              THE COURT:  I am going to sustain that.  If you could

6    break it down by person.

7    BY MS. SWEENEY:

8    Q.  With regard to Mr. Little, Mr. Pepper, as a result of those

9    conversations, did you have an understanding of what Pilgrim's

10   Pride would do?

11             MR. McLOUGHLIN:  Objection, Your Honor, his

12   understanding about what a company would do.  He can talk about

13   what he was told, the words, and what he said, the words, but

14   whatever gloss or imagination or anything else that he had,

15   quote, developed an understanding, which is an undecipherably

16   ambiguous phrase, is neither relevant or a proper question.

17             MR. KORNFELD:  Your Honor, I would add foundation and

18   speculation as to what Pilgrim's thought or did.

19             THE COURT:  Yeah, I am going to sustain the question

20   on grounds of vagueness.  It's not clear exactly what the --

21   would do in response to what.  It hasn't been defined.

22             MS. SWEENEY:  I am sorry, so it was sustained?

23             THE COURT:  Yes.

24   BY MS. SWEENEY:

25   Q.  So in your conversations with Defendant Little -- did you

Carl Pepper - Direct

1   have more than one conversation?

2   A.   Yes, ma'am.

3   Q.   Approximately how many?

4           MR. McLOUGHLIN:  Objection to form, Your Honor, time.

5           THE COURT:  Overruled.

6   A.   Five-plus conversations that I can remember.

7   BY MS. SWEENEY:

8   Q.   Again, we are talking about in the year 2014; is that

9   correct?

10  A.   Yes, ma'am.

11  Q.   And in the year 2014, what was that in connection with to?

12  What were these conversations in connection to?

13  A.   The conversations was concerning the KFC contract.

14  Q.   So what did you and Mr. Little talk about?

15  A.   Talked about -- basically about the substantial pricing

16  increase and was Pilgrim's looking at doing that substantial

17  pricing increase.

18  Q.   And what was the purpose of your conversation with

19  Mr. Little?

20          MR. McLOUGHLIN:  Objection.

21          THE COURT:  Overruled.

22          MR. McLOUGHLIN:  If I may, Your Honor.

23          MS. SWEENEY:  Your Honor, may we go to side bar for

24  this?

25          THE COURT:  Sure.

Carl Pepper - Direct

1       (At the bench:)

2               THE COURT:  Go ahead, Ms. Sweeney.

3               MS. SWEENEY:  Your Honor, the numerous speaking

4   objections, the defendants are putting forth their theory of

5   the case in objections and it's affecting the witness's

6   credibility and the government's ability to question.  So I

7   would ask for any of these types objections that obviously deal

8   with sensitive information, that as the defendants have pointed

9   out in the province of the jury, that these objections be made

10  on side bar as opposed to long speaking objections in the

11  presence of the jury.

12              THE COURT:  Most of them are not long speaking

13  objections.  They are just articulating a ground for the

14  objection.  The problem is that, Ms. Sweeney, you are not

15  asking the basic, you know, who, what, when, where, how

16  questions of the witness.  Instead, you are kind of vaguely

17  presuming conversations and other things.  So I think if you

18  proceeded in a -- in very small increments, specific questions,

19  then that would probably reduce the number of objections and

20  then maybe there wouldn't be speaking objections, but the

21  objections so far have been appropriately articulated.

22              Anything else, Ms. Sweeney?

23              MS. SWEENEY:  Nothing else, Your Honor.

24              MR. McLOUGHLIN:  If I may, Your Honor, on the

25  objection, the point is the question as to form really matters

Carl Pepper - Direct

 1   here.  The question, what was the purpose of your discussions,

 2   which invites him to speculate about the purpose of someone

 3   else.  He can be asked what was your purpose, but he cannot be

 4   asked the purpose where that again invites him to talk about

 5   what might be the purpose of Mr. Little or someone else.  It is

 6   within his personal knowledge as to what he intended and what

 7   his purpose was, but not with respect to Mr. Little.  And that

 8   is the basis of the form objection, Your Honor, because I think

 9   it matters.

10        THE COURT:  Yeah, it could matter.  I think that maybe

11   one question had that defect and another one didn't.  But in

12   any event, at least until some type of foundation has been

13   established for conversations with, for instance, Mr. Little, I

14   think Mr. McLoughlin is right that initially it would have to

15   be asked in the form of what was your purpose in talking to a

16   given person.

17        MS. SWEENEY:  Thank you, Your Honor.

18     (In open court:)

19   BY MS. SWEENEY:

20   Q.  Okay, Mr. Pepper.  Let's start with talking about your

21   conversations with Mr. Little.  Did you talk to Mr. Little

22   about the substantial price increase?

23   A.  Yes, ma'am.

24   Q.  What -- about how many times?  I believe you told us about

25   five?

1227

Carl Pepper - Direct

1  A.  Somewhere in that neighborhood, yes, ma'am.

2  Q.  What was discussed on those calls?

3  A.  Basically just about the contract coming up, that was in

4  the process of coming up for the KFC contract and a substantial

5  pricing increase, that it was rumored -- I mean, I knew what we

6  were doing, but -- and that was the main conversation, to see

7  if Pilgrim's was considering the same thing.

8  Q.  Now, Mr. Pepper, you said, I knew what we were doing.  Can

9  you describe what you mean by that?

10 A.  Yes, ma'am, because I saw an e-mail originally that talked

11 about what the price increase at Tyson Foods was going to be

12 for that contract year.

13 Q.  And when did you learn what Tyson Foods' price increase was

14 going to be for that contract year?

15 A.  It was early -- early June of 2014.

16 Q.  You said the purpose was to see if Pilgrim's Pride would do

17 the same thing; is that right?

18 A.  Yes, ma'am.

19 Q.  Was that the only conversation you had with Mr. Little?

20 A.  No, ma'am.

21 Q.  Is that the only conversation you had with Mr. Little about

22 the price increase?

23 A.  No, ma'am.

24 Q.  And when you say do the same thing, so the purpose was to

25 see if Pilgrim's was going to do the same thing.  What does

1228

Carl Pepper - Direct

1   that mean?

2   *A.*   A substantial pricing increase.

3   *Q.*   So in later conversations with Mr. Little, what did you

4   talk about?

5   *A.*   I talked about that I believe towards the very end of the

6   conversations we had -- it was an understanding that --

7           *MR. TUBACH:*   Objection, Your Honor.  It's not

8   describing what they talked about.  It's describing the

9   characterization of what they talked about.

10          *THE COURT:*   Ms. Sweeney -- sustained.  If you will

11  limit it to what was discussed.

12  *BY MS. SWEENEY:*

13  *Q.*   So in later conversations with Mr. Little, what was

14  discussed?

15  *A.*   It was back to the same thing.  Still talked about the same

16  contract and was it an understanding that Pilgrim's was --

17          *MR. BYRNE:*   Objection, Your Honor, again as to

18  understanding.

19          *THE COURT:*   Ms. Sweeney, if you can focus in on asking

20  a question that asks for what was discussed, and then perhaps

21  it could be relevant as to an understanding.  But first it

22  needs to be what discussion took place.

23  *BY MS. SWEENEY:*

24  *Q.*   So Mr. Pepper, if can you describe the conversation.  If

25  you can explain the conversation, what was discussed in a

Carl Pepper - Direct

1    subsequent conversation with Mr. Little.

2           MR. McLOUGHLIN:  Objection, Your Honor, lack of

3    foundation, date, time, place.

4           THE COURT:  If you could clarify, Ms. Sweeney, as to

5    whether you are talking about those same five conversations;

6    and, if so, when those occurred.

7           MS. SWEENEY:  Yes.

8    BY MS. SWEENEY:

9    Q.  So Mr. Pepper, we have been talking about a set of

10   conversations you had with Mr. Little; is that right?

11   A.  Yes, ma'am.

12   Q.  And when in time were those conversations?

13   A.  I don't remember the exact dates.

14   Q.  Do you remember generally when those conversations were?

15   A.  Yes, ma'am.  It would have been early -- somewhere between

16   June and the beginning of August.

17   Q.  Of what year?

18   A.  2014.

19   Q.  How did you have those conversations?  Were you in person?

20   Were you on the phone?  Was there some other way?

21   A.  It was on the phone.

22   Q.  And we talked about an initial conversation you had with

23   Mr. Little.  In a subsequent conversation can you describe --

24   in a later conversation can you describe what it is that you

25   talked about, please?

Carl Pepper - Direct

 1  *A.*  I can't tell you exact how the conversation was, but the

 2  conversation towards the very end was basically that --

 3       *MR. McLOUGHLIN:*  Your Honor, move to strike.  If he

 4  says he can't recall, he cannot interpret it as to what it

 5  basically was.  If he can't recall, he can't recall.

 6       *MS. SWEENEY:*  Your Honor, I believe he was giving

 7  his -- he doesn't have a specific recollection I believe what

 8  he said was of the exact conversation, but a general

 9  recollection of the conversation itself.

10       *MS. PREWITT:*  Your Honor, she is leading the witness.

11       *THE COURT:*  Yeah, it's unclear from his answer what

12  exactly his lack of recollection related to.  If you could ask

13  another question, Ms. Sweeney.

14       *MS. SWEENEY:*  Yes, Your Honor.

15  *BY MS. SWEENEY:*

16  *Q.*  So Mr. Pepper, we are talking about subsequent conversation

17  with Mr. Little; is that right?

18  *A.*  Yes, ma'am.

19  *Q.*  Do you remember the exact specific words that were

20  discussed on the conversation?

21  *A.*  No, ma'am.

22  *Q.*  Do you remember the general topic of that conversation?

23  *A.*  Yes, ma'am.

24  *Q.*  Do you remember the topics that were discussed even if you

25  don't remember the specific words?

Carl Pepper - Direct

1   A.   Yes, ma'am.

2   Q.   So what was discussed with Mr. Little in that subsequent

3   conversation?

4   A.   It was if Pilgrim's was going to do a substantial pricing

5   increase and we would -- and there would be an agreement that

6   there would be a substantial price increase.

7   Q.   When you say that we would be in agreement that there would

8   be a substantial price increase, what are you referring to?

9   Whose agreement with whom?

10          MR. FELDBERG:   Objection.   That's not what he said.   I

11   heard would there be.

12          MS. SWEENEY:   Your Honor, I apologize if I misheard.

13          THE COURT:   Overruled.   He can answer.

14          MS. SWEENEY:   Go ahead, Mr. Pepper.

15   A.   The conversation with Jimmie Little was, was Pilgrim's

16   going -- do we have basically -- I can't word the exact words

17   the way I said it, but an agreement that Pilgrim's was going to

18   have a substantial pricing increase like we were, Tyson was.

19   BY MS. SWEENEY:

20   Q.   And so can you describe when you said an agreement --

21   Pilgrim's was going to have a substantial price increase like

22   Tysons was.   Can you further explain what you mean?

23          MR. BYRNE:   Objection, Your Honor.   What he means now

24   or what he meant then?

25          THE COURT:   Can you clarify?   You are asking him his

Carl Pepper - Direct

1   understanding at the time?

2          *MS. SWEENEY:*  Yes.

3   *BY MS. SWEENEY:*

4   *Q.*  So Mr. Pepper, can you explain your understanding at the

5   time?

6   *A.*  Yes, ma'am.  My understanding towards the last conversation

7   was that Pilgrim's was going to have a substantial pricing

8   increase just like Tyson was going to have a substantial

9   pricing increase.

10  *Q.*  Did you have any subsequent conversations with Mr. Little?

11  *A.*  Did I have any what?

12  *Q.*  Any conversations with Mr. Little after what you just

13  described.

14  *A.*  I don't remember.

15  *Q.*  Now, let's talk about your conversations with Mr. Brady at

16  Claxton.  In that time period that we have been talking about,

17  2014, do you recall when you had conversations with Mr. Brady

18  about the substantial price increase?

19  *A.*  I don't remember exact dates.

20  *Q.*  Do you remember generally?

21  *A.*  Yes, ma'am.  Beginning of August.

22  *Q.*  Of what year?

23  *A.*  Of 2014.

24  *Q.*  So and approximately how many conversations do you recall

25  having with Mr. Brady of Claxton?

Carl Pepper - Direct

1    *A.* It could have been four or five. I don't remember the

2    exact number.

3    *Q.* In that initial conversation with Mr. Brady of Claxton,

4    what did you discuss?

5    *A.* We discussed the contract coming up for KFC and

6    discussed -- talked about the substantial -- about a

7    substantial pricing increase.

8    *Q.* Specifically what with regard to the substantial price

9    increase?

10   *A.* Well, at the very beginning of the conversation, we just

11   talked about that. And then towards the end it was is

12   Claxton -- an agreement basically is Claxton going to do --

13              *MR. McLOUGHLIN:* Your Honor, apologies. Objection,

14   same objection, motion to strike. We are back to basically

15   translating something because he doesn't recall what was said.

16              *THE COURT:* Overruled.

17   *BY MS. SWEENEY:*

18   *Q.* You can finish, Mr. Pepper.

19   *A.* We just -- like I said, it was multiple conversations. And

20   towards the very end of them we were still talking about that

21   specific contract and that Claxton was also going to agree to

22   have a substantial pricing increase.

23   *Q.* And Claxton was going to agree to have a substantial price

24   increase. Who was Claxton agreeing to? What was discussed?

25   *A.* We were just talking -- who was the agreement --

1    MR. LAVINE:  Objection, Your Honor.  We are talking

2 about a conversation with Mr. Brady.  We are not talking about

3 conversations with Claxton.

4    THE COURT:  Overruled.

5 A.  Would you ask that again, please?

6 BY MS. SWEENEY:

7 Q.  Yes, Mr. Pepper.  So I believe you said that Claxton was

8 going to agree to have a substantial price increase, and I am

9 asking who that agreement was between.

10 A.  Scott Brady and -- was the one that I was talking to at

11 Claxton.

12 Q.  Scott Brady and whom?

13 A.  And myself at Tyson Foods.

14 Q.  So you understood that -- I mean, the last conversation

15 there was an agreement between Scott Brady and yourself about

16 the substantial price increase?

17    MR. LAVINE:  Object to his understanding, Your Honor.

18    THE COURT:  Sustained.

19    MR. LAVINE:  Could we have a side bar?

20    THE COURT:  Well, it's almost 5:00 o'clock, so would

21 this be a convenient breaking point?

22    MS. SWEENEY:  Yes, Your Honor.

23    THE COURT:  Ladies and gentlemen, we will go ahead and

24 adjourn for the evening.  Keep the admonitions in mind.  In

25 particular, be careful about people talking to you, all right?

1    And we will reconvene tomorrow at 8:30.  Thank you.

2              (Jury excused.)

3              Mr. Pepper, you are excused for the day.  Can you be

4    back tomorrow at 8:30?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Great.

7              As I indicated I think a couple days ago, we are not

8    staying late tonight.  But I would suggest if you want to talk

9    over some issues that have recently come up, that we meet

10   tomorrow 8:00 o'clock, 8:15?  I don't know.

11             MS. SWEENEY:  Either of those works for the

12   government, Your Honor.

13             MR. TUBACH:  It's fine with us.  I don't know we have

14   that much to discuss.

15             THE COURT:  Why don't we do 8:15.  But I would say

16   this, Ms. Sweeney.  Your questions have got to be much, much

17   more precise.  They are so vague that the witness -- I don't

18   even think he knows exactly what's being asked.  But if they

19   are so general, it's just going to be some type of a narrative,

20   but if they are broken up into do you remember the day, what's

21   the date, first conversation, last conversation, that, I think

22   that -- if he doesn't know, he doesn't know, but the questions

23   themselves I think should be much more specific.

24             Mr. Koenig?

25             MR. KOENIG:  One thing I will just want to put on the

1    record is with respect to the speaking objections, I will note

2    that Mr. McLoughlin said in front of the jury that our witness

3    was coached.  And that is totally completely inappropriate and

4    it should be stricken from the record.  And the jury should be

5    told that was inappropriate and you should ignore it because

6    that is just beyond bad.

7         *THE COURT:*  Yeah, I agree.  That type of thing should

8    not ever be spoken in front of the jury, some type of

9    allegation like that.  We do a lot of side bars.  We should do

10   a side bar in that regard.

11        *MR. McLOUGHLIN:*  Your Honor, I want to be clear about

12   my statement.  I did not say this witness was coached.  There

13   is a material difference between what I said, which was playing

14   the tape based on lots of repetition and discussion versus

15   coaching.  And I will stand by my objection in that regard and

16   I did not say he was coached.  I did not accuse the lawyers or

17   the agents of getting this witness to say a falsehood.

18        *MR. KOENIG:*  Your Honor, the word coached was clearly

19   used.

20        *THE COURT:*  Yeah, that should not happen.

21        Mr. Gillen?

22        *MR. GILLEN:*  Speaking of coaching, I would hope that

23   the Court could caution the government about in the interim, in

24   the evening, about interviewing Mr. Pepper and giving him any

25   direction about what he may or may not say on the stand.

1        THE COURT:  We talked about that last time.  I have no

2    doubt that the government will follow that.

3        MS. PREWITT:  Or to his attorney, your Honor, who is

4    sitting in the courtroom.

5        MS. SWEENEY:  Your Honor, the government has no

6    intention and has not in the past or in trial to speak with the

7    witness or attempt to speak with the witness through his

8    attorney except for direct instruction of the Court.

9        THE COURT:  Yeah, I am certain of that.  And, of

10   course, it's completely appropriate that Mr. Pepper's attorney

11   would be in the courtroom.

12       MS. CALL:  It's very brief, Your Honor.  I think in

13   terms of just items to discuss in the morning, we still have to

14   get through the summaries and now the additional pending motion

15   filed given that there are three pending motions currently on

16   the summaries, so we would like to put that to rest.

17       THE COURT:  I think we better meet at 8:00.  One thing

18   we need to take up is that issue with Mr. Pepper and Special

19   Agent Koppenhaver, that one.  I can rule on that one tomorrow.

20       MS. CALL:  Yes, Your Honor.

21       THE COURT:  Mr. Tubach?

22       Mr. Feldberg, real quick?

23       MR. FELDBERG:  Sorry to trouble you, Your Honor.  I

24   just want to get an idea of the order of proof after Mr. Pepper

25   so we know how to prepare.

1    *THE COURT:*  Yeah, if you don't mind talking to

2   Ms. Call after court about that issue, all right?

3          We will be in recess until 8:00 a.m. tomorrow.

4       (Recess at 5:05 p.m.)

5                              INDEX

6   WITNESSES

7      Pete Suerken

8          Direct Examination Continued By Mr. Torzilli    994

9          Cross-examination By Mr. Gillen              1054

10         Cross-examination By Ms. Nielsen             1085

11         Cross-examination By Mr. Feldberg            1127

12         Cross-examination By Mr. Kornfeld            1128

13         Cross-examination By Ms. Henry               1133

14         Cross-examination By Ms. Johnson             1137

15         Cross-examination By Mr. Lavine              1161

16         Redirect Examination By Mr. Torzilli         1165

17      Carl Pepper

18         Direct Examination By Ms. Sweeney            1175

19                            EXHIBITS

| 20 Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|------------|---------|----------|---------|----------|-----------|
| 21 E-158   |         | 1117     |         |          |           |
| 22 C-440   |         | 1135     |         |          |           |
| 23 G-508   |         | 1082     |         |          |           |
| 24 F-761   |         | 1144     |         |          |           |
| 25 953     |         | 1169     |         |          |           |

1                            INDEX (Continued)

2                              EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 959 | | 1186 | | | |
| 1008 | | 1153 | | | |
| 1035 | | 1169 | | | |
| 1036 | | 1169 | | | |
| 1073 | | 1118 | | | |
| 1074 | | 1168 | | | |
| 1238 | | 1169 | | | |
| 1801 | | 1002 | | | |
| 9704 | | 1050 | | | |
| 9816 | | 1205 | | | |
| 9834 | | 1198 | | | |
| 9834-1 | | 1198 | | | |
| 9992 | | 1028 | | | |

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 15th day of May, 2022.


                              S/Janet M. Coppock