1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn III

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,
     MIKELL REEVE FRIES,
8    SCOTT JAMES BRADY,
     ROGER BORN AUSTIN,
9    WILLIAM WADE LOVETTE,

10       Defendants
     _____

11                       REPORTER'S TRANSCRIPT
12                       Trial to Jury, Vol. 1

     _____
13

14            Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:01 a.m., on the 6th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel Loveland, U.S. Department of Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing for Plaintiff.

Anna Tryon Pletcher and Michael Tubach of O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111-3823;

Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street N.W., Washington, DC 20006, appearing for Defendant Penn.

David Beller, Richard Kornfeld and Kelly Page of Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, CO 80202, appearing for Defendant Fries.

Bryan B. Lavine and Laura Anne Kuykendall of Troutman Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

Megan Rahman of Troutman Pepper Hamilton Sanders, LLP, 1001 Haxall Point, Richmond VA 23219, appearing for Defendant Brady.

Michael Felberg of Reichman, Jorgensen, Lehman, Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY 10017;

Laura F. Carwile of Reichman, Jorgensen, Lehman, Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores, CA 94065; appearing for Defendant Austin.

```
 1                    APPEARANCES (Continued)

 2           Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

 3   South, Suite 720, Denver, CO 80209;

 4           John Anderson Fagg, Jr. and Frank Schall of

 5   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

 6   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

 7                    *    *    *    *    *

 8                         PROCEEDINGS

 9           THE COURT:  The matter before the Court is United

10   States of America versus Jayson Jeffrey Penn, et al.  This is

11   Criminal Case 20-CR-152.

12           I will take entries of appearances, first of all, on

13   behalf of the United States.

14           MR. HART:  Good morning, Your Honor, Kevin Hart joined

15   with Leslie Wulff, Paul Torzilli, and Daniel Loveland.

16           THE COURT:  Great.  Good morning to each of you.

17           On behalf of Mr. Penn?

18           MR. TUBACH:  Michael Tubach on behalf of Jayson Penn

19   who is present.  With me is Anna Pletcher and Brian Quinn.

20           THE COURT:  Good morning to each of you.

21           On behalf of Mr. Fries?

22           MR. KORNFELD:  Good morning, Your Honor, Rick

23   Kornfeld, David Beller, Kelly Page on behalf of Mr. Fries.

24           THE COURT:  And he is present.  Good morning to each

25   of you.
```

1          On behalf of Mr. Brady?

2          *MR. LAVINE:*  Bryan Lavine, Laura Anne Kuykendall, and

3   Mr. Brady is present, and Megan Rahman will be joining us on

4   probably Monday.

5          *THE COURT:*  That's great.  Good morning to each of

6   you.

7          On behalf of Mr. Austin?

8          *MR. FELDBERG:*  Michael Feldberg, Julie Withers, and

9   Laura Carwile on behalf of Mr. Austin, and Mr. Austin is

10  present.

11         *THE COURT:*  Good morning.

12         On behalf of Mr. Lovette?

13         *MR. FAGG:*  John Fagg, Dru Nielsen, and Frank Schall

14  here on behalf of Mr. Lovette who is here with us.

15         *THE COURT:*  Good morning to each of you as well.

16         So we are here today for the first day of the trial.

17  Here we are, back in masks again, unfortunately, but as recent

18  things demonstrated, it's probably a good idea.  We just need

19  to get through the trial and hopefully do so without an

20  interruption.  I did add that other juror.  Of course, if the

21  jurors don't wear masks in the jury room, it may not make any

22  difference how many alternates we have, but perhaps that may

23  give us a little bit of extra coverage.  That alternate seat

24  for the third will be seat No. 13, so if you would note that,

25  seat No. 13.

1          So the alternate seats are seats 4, 9, and 13.

2          Also just kind of randomly, while I think of it, since

3     we could have some warm weather, you know, if you think that

4     the temperature in the courtroom is uncomfortable, it seems a

5     little bit warm right now, I am not sure, so maybe let's

6     mention that.  Let's try to cool it down just a bit, but

7     certainly let us know that so we make sure that, especially

8     jurors, we don't want jurors to be nodding off because it's too

9     warm.

10          Okay.  And also on the masks, for the benefit of those

11     new government attorneys, you can take your mask off briefly

12     to, you know, during jury selection, if you want to, let people

13     see you.  I'll try to remember to tell the jurors if they want

14     to do that, once again, don't talk during the time that they

15     were doing so, they can.  The experience in the past is that

16     they have not availed themselves of that opportunity, but you

17     certainly can do so if you wish.

18          All right.  So we talked about the instructions that

19     I'll read.  The statement of the case, that very brief intro,

20     is going to be the same one that I gave last time.  You'll see

21     that in the introductory instruction.

22          Voir dire will be 50 minutes per side.  If we have a

23     juror who wants to speak out of the presence of the entire

24     courtroom, we'll have that juror come up in this area over here

25     near the witness stand and use the transceiver system.  And so

1   each table should have a transceiver.  And just as a reminder

2   on the transceiver, you don't have to speak very loudly at all.

3   In fact, it can really pick up whispers, not that I necessarily

4   recommend that you whisper, but you can speak very softly and

5   it will pick up.

6          Because one thing that's a little bit hard to

7   remember, especially for the attorney who is conducting an

8   examination, an issue comes up, is that there is a tendency to

9   stand at the podium.  And the problem is that the microphone

10  may then amplify your speaking into the transceiver.  So it's

11  best to move away from the podium if you can remember to do so.

12         Also when it gets to that point where defendants are

13  going to ask questions of the prospective jurors, I will

14  mention as I did last time that for practical purposes the

15  defendants have agreed to have two people ask questions on

16  behalf of all of them.  I assume we are going to still do that,

17  two people; is that right?  Yeah, okay.

18         And then once we get to the point where we're ready to

19  exercise peremptories, I'll give -- I think I gave 20 minutes,

20  was that it, last time for the attorneys to confer with each

21  other before they exercise their peremptory challenges?  Was it

22  20 minutes or --

23         *MR. BELLER:*  Your Honor, my memory, and please don't

24  quote me on this, is that we had asked for an hour and the

25  Court granted us 45 minutes.

1          *THE COURT:*  Was 45 minutes?  How much did we use last

2     time?  Did you need that much time?

3          *MR. BELLER:*  We did, Your Honor.

4          *THE COURT:*  Then we will do 45 minutes.  If you wish,

5     you can use my courtroom if the defendants wish just because

6     there are more of them.  Mr. Hart, will the government be able

7     to do so in one of the side rooms here, or would you like for

8     us to arrange a different location?

9          *MR. HART:*  I think this should be sufficient.

10         *THE COURT:*  Yeah, okay.  That's fine.

11         We will talk about since we are not at the point of

12    openings yet, we will hold off on determining how much time

13    each defendant wants for openings.

14         When you're -- just as a reminder, this is not going

15    to come up quite yet, but during your examinations, whether on

16    cross or direct, do not call the witness who is being examined

17    by first name only.  However, I do have allowed in openings and

18    closings if the defendants wish to refer to their client by

19    just a first name, that's acceptable; but otherwise, you should

20    use -- be more formal about it.

21         And then once again, for the benefit of new counsel,

22    during openings we have so many tables in here, you don't have

23    much room to maneuver, but generally things will always be

24    handed up to the witness or to the Court by Ms. Grimm.  So if

25    you want something handed up, you just ask that it be, and then

1    Ms. Grimm will get it from you and hand it up.

2          We can reorient the podium so it faces the jury during

3    openings, and that's what a lot of people have done, but you're

4    not -- you can move, you know, around the podium and present

5    more of yourself if you wish to do so.

6          Also, occasionally there is situations, sometimes

7    there are just practical ones, where we have needed to use the

8    document viewer in the back there, and sometimes that works

9    best, a tag team on that, another person from the team go over

10   there to be able to display things if, for instance, there is

11   an electronic glitch or something of that nature.

12         And also to make a better record, if you want to

13   confer with opposing counsel about something, just ask for

14   permission to do so as opposed to audibly asking them about an

15   exhibit or something of that nature that's not intended to be

16   directed to the Court or to the jury, but that way our court

17   reporters will know that that's not a conversation that needs

18   to be recorded.

19         Any -- I know we have gotten some new witness lists,

20   and that's good.  Any other changes to the witness list that I

21   should be aware of before I read the alphabetical list of

22   potential witnesses to the jury?

23         *MR. HART:*  Nothing from the government, Your Honor.

24         *THE COURT:*  I assume nothing from the defendants

25   either.

```
 1              One question I had.  As a pronunciation, is it Wayne
 2   Guay or -- G-U-A-Y?  Do we know how that's pronounced?
 3              MR. TUBACH:  It's Wayne Guay.
 4              THE COURT:  Got it.
 5              MR. LOVELAND:  Your Honor, on this point, there has
 6   been an agreement reached on the defendants experts, Guay and
 7   Daines.  If you would like, I am happy to make a record in
 8   terms of compensation evidence.
 9              THE COURT:  Will they be called potentially?  Right
10   now we have to worry about whether we read the names.
11              MR. LOVELAND:  The agreement reached is they will not
12   be called, and the government does not introduce evidence of
13   personal financial compensation of the defendants.
14              THE COURT:  Okay.  So can I strike Mr. Guay's name?
15              MR. TUBACH:  You can strike Mr. Guay's name and
16   Mr. Daines.
17              THE COURT:  Robert Daines, right.  Okay, great.
18              MR. TUBACH:  We are going to file an amended witness
19   list later.
20              THE COURT:  No problem.  That was one of my -- I was
21   going to ask whether the Court still needed to rule on that
22   motion.  It sounds like not.
23              One thing I'll mention at this time, and that is --
24   and this pertains to Docket No. 1367, which is the government's
25   notice of exhibits that would be introduced without a
```

1    sponsoring witness, so just generally at the last trial I think

2    that some exhibits were maybe admitted but not displayed to the

3    jury at that time.  The problem is that if one of those

4    exhibits comes with a limiting instruction, then all of the

5    sudden it creates a problem, because then we just have to very

6    carefully track and make sure that at some point in time that

7    exhibits published -- I think it's a lot better for any exhibit

8    that comes with a limiting instruction that at the time it's

9    admitted it gets published.  That way we just don't have to

10   worry about that problem of tracking something that has been

11   admitted, not published, but it comes with a limiting

12   instruction.  So I think it's -- if the government can try to

13   publish at the same time, that's going to make everyone's life

14   much easier.

15          Right now let's talk about the length of the trial.

16   So the defendants' new witness list, and maybe it's a little

17   bit shortened now because the executive compensation experts

18   will not be factored in, but we will end on July 14th, but the

19   defendants estimate that they would probably call their last

20   witness on July 8th.  So think about whether we should tell the

21   jury the trial will end no later than July 14th, but

22   deliberations don't have a time limit or whether we should tell

23   the jury that maybe it would end a week earlier or something

24   like that.

25          Any thoughts on that subject?

1          *MR. TUBACH:*  Your Honor, the only thought I would have

2   is I would have to have the jury have an avoidable conflict at

3   the end.

4          *THE COURT:*  They probably wouldn't, but if we don't

5   know yet, I think it's better that we leave it where it is.

6   You know, if we were to end, like, before the Fourth of July

7   weekend, that would make a tangible difference I think in terms

8   of people saying, Yeah, no, I'm good, but since that's not

9   going to happen, I am not sure it would be such a big deal.  So

10   we'll go ahead and keep with what we have scheduled.

11          Okay.  A number of things were filed at the last

12   minute despite my telling people not to do that.  Some of them

13   were helpful things like stipulations, and that's great.  The

14   other things I am not going to deal with until after we get the

15   jury.  We may need, as Mr. Feldberg noted in an e-mail, take

16   something up before openings in the event, for instance, that

17   the United States would want to display the summary, but I

18   don't know about that.  Does the government intend to do that?

19          *MR. HART:*  The government does not intend to display

20   that during opening.

21          *THE COURT:*  So maybe that's not so important right at

22   the offset, but maybe Mr. Hart and Mr. Feldberg can talk on a

23   break about that.

24          Anything else that we should talk about before we

25   recess to wait for the jurors to be seated?  Mr. Beller?

1          *MR. BELLER:*  Thank you, Your Honor.

2          Your Honor, I did notify the government.  There is a

3     gentleman, a prospective juror, by the name of Parker Smith.

4     It's a relatively common name; however, I did notify the

5     government that there is an attorney named Parker Smith who is

6     an associate or was an associate of Polsinelli.  He and I had

7     some contact on a mutual case regarding a mutual client.  I

8     can't say how long ago.  Everything before COVID is a blur.

9          *THE COURT:*  He is an attorney, right.

10         *MR. BELLER:*  So approximately five years ago is when I

11    imagined that I had contact with him.  He was not my primary

12    point of contact.  We did have a limited working relationship.

13    There is certainly nothing about that relationship that causes

14    me any concerns, but in full disclosure, I did want to make

15    sure that both the Court and government counsel is aware of

16    that relationship.

17         *THE COURT:*  Yeah, okay.  Thank you, Mr. Beller.

18         Anything else that we should bring up at this time?

19    Ms. Nielsen.

20         *MS. NIELSEN:*  Thank you, Your Honor.

21         One logistical request, and that is when the Court is

22    doing introductions I would like to sit over at table Lovette,

23    but I would request permission when jury selection starts to

24    move over and sit with Mr. Beller.

25         *THE COURT:*  Yes.

1      *MS. NIELSEN:*  And I would ask if the Court could give

2  some explanation to the jury as to why I am moving and give me

3  that opportunity.

4      *THE COURT:*  At what point are you going to move?

5      *MS. NIELSEN:*  I would like to move at the beginning of

6  the Court's questions to the jury.

7      *THE COURT:*  Right.  So at the time that you relocate,

8  that should cue me, and I will try to remember to do that;

9  otherwise, of course, you know, it's just going to be a sea of

10  blue suits.

11      *MS. NIELSEN:*  I understand.

12      *THE COURT:*  They won't have any idea what camp someone

13  is going to, but, yeah, I will try to do that just so they know

14  why you are getting up and sitting somewhere else.

15      *MS. NIELSEN:*  Thank you, Your Honor.

16      *THE COURT:*  Sure.

17      Anything else that we should talk about at this time?

18      Mr. Hart?

19      *MR. HART:*  Nothing from the government, Your Honor.

20      *THE COURT:*  Okay.  All right.  Then we will be in

21  recess until such time as we have the prospective jurors

22  seated, all right?  Thank you.

23      (Recess at 8:19 a.m. until 8:50 a.m.)

24      *THE COURT:*  All right.  Welcome, everyone, to the

25  United States District Court for the District of Colorado.  My

1   name is Philip Brimmer, and I am the judge who is presiding

2   over this trial.

3          First of all, let me thank each of you for being

4   present today.  Jury service is one of the most important civic

5   obligations that an American citizen has, and it guarantees

6   that the parties to a dispute have people that are drawn from

7   the community who can resolve that particular dispute.  So I

8   know that it takes you, jury service takes you away from

9   perhaps your job, your families, other obligations that you may

10  have, but I do appreciate you being here because of its

11  importance.

12         Just to give you a sense of really how important it is

13  and what trust the American jury system places in jurors, think

14  about the following.  Some of you may have heard of a trial

15  that was going on I forget how many years ago now, but it was

16  *Apple v. Samsung*, and it had to do with patents for the iPhone.

17  And that case was tried in federal court in the Northern

18  District of California in San Francisco.  And I don't think

19  that there were any software engineers or anyone who knew

20  anything about patents on that particular jury, and yet that

21  jury decided a dispute that was worth hundreds of millions of

22  dollars.  And no one thought that that was inappropriate or

23  unfair.

24         And that jury deliberated and reached a verdict, so,

25  you know, that's the -- that's how much trust our system places

1    in ordinary citizens drawn from the community.

2            Another example, ladies and gentlemen, just to give

3    you a sense of how important jury service is, and that is every

4    single person in this courtroom, including me, is just one

5    traffic accident away from either being a plaintiff in a case

6    or a defendant in a case.  And certainly if it was your trial,

7    first day of your trial and we were about ready to start jury

8    service, you would want those persons who showed up for jury

9    service to take it seriously, not just try to get off of jury

10   service, and to answer the questions that were asked of you

11   during jury selection truthfully so that your trial would be

12   conducted in a fair manner.

13           So that is just by way of introduction and thanking

14   you for being here today.

15           So, ladies and gentlemen, we are here today for a

16   trial in a matter, and let me read to you the caption of the

17   case.  It's entitled United States of America v. Jayson Jeffrey

18   Penn, Mikell Reeve Fries, Scott James Brady, Roger Born Austin,

19   and William Wade Lovette.  And it is Case No. 20-CR-152.  So,

20   ladies and gentlemen, this is a criminal case and that -- there

21   is an Indictment in this case.  The Indictment is a charging

22   instrument.  It charged the defendants.  And the Indictment in

23   this case charges each of the defendants with a conspiracy to

24   suppress and eliminate competition by rigging bids and fixing

25   prices in the broiler chicken industry, a broiler chicken and a

1   chicken produced for human consumption.

2          Each of the defendants denied that he agreed or

3   conspired with anyone to rig bids or to fix prices for broiler

4   chicken products.

5          Keep in mind, ladies and gentlemen, that that is only

6   a charge.  Each of the defendants is innocent unless proven

7   guilty.

8          Now, ladies and gentlemen, let me read to you an

9   instruction.  At the end of the case, the jury will be read a

10  number of instructions, but because it's possible that the

11  concepts or the topic of these particular instructions may come

12  up during jury selection, let me go ahead and read those to you

13  at this time.

14         The government has the burden of proving each

15  defendant guilty beyond a reasonable doubt.  The law does not

16  require a defendant to prove his innocence or produce any

17  evidence at all.  The government has the burden of proving the

18  defendant guilty beyond a reasonable doubt.  And if it fails to

19  do so, you must find the defendant not guilty.

20         Proof beyond a reasonable doubt is proof that leaves

21  you firmly convinced of the defendants' guilt.  There are few

22  things in this world that we know with absolute certainty, and

23  in criminal cases the law does not require proof that overcomes

24  every possible doubt.  It is only required that the

25  government's proof exclude any reasonable doubt concerning the

1   defendants' guilt.

2          A reasonable doubt is a doubt based on reason and

3   common sense after careful and impartial consideration of the

4   evidence in the case.  If, based on your consideration of the

5   evidence, you are firmly convinced that the defendant is guilty

6   of the crime charged, you must find him guilty.

7          If, on the other hand, you think there is a real

8   possibility that he is not guilty, you must give him the

9   benefit of the doubt and find him not guilty.

10          Here is another instruction as well, ladies and

11   gentlemen.  Some or all of the defendants may not testify.  And

12   I remind you that you cannot consider each defendant's decision

13   not to testify as evidence of guilt.  You must understand that

14   the Constitution of the United States grants to a defendant the

15   right to remain silent.  That means the right not to testify.

16   That is a constitutional right in this country.  It is very

17   carefully guarded.  And you must not presume or infer guilt

18   from the fact that a defendant does not take the witness stand

19   and testify or call any witnesses.

20          All right.  Ladies and gentlemen, we are going to be

21   selecting 15 persons today for the jury, 12 regular jurors and

22   three alternate jurors.

23          Before we begin with that process, let me introduce,

24   first of all, the members of my court staff.  So Ms. Sabrina

25   Grimm is our courtroom deputy, maybe she can raise her hand

1    there.  Sitting next to her is Emily Buchanan.  There is Emily.

2    So both of them will be with us today, but then for the next

3    week Ms. Buchanan will be handling things, and then after that,

4    Ms. Grimm will be back, and she will handle the rest of the

5    trial.

6            And then sitting next to Ms. Buchanan is Ms. Virginia

7    Butler.  She is my law clerk, and she will be going in and out

8    of the courtroom as she needs to do.  Seated right in front of

9    me we have our court reporters, first of all, Ms. Janet

10   Coppock, of course, she is a little bit conflicted because she

11   is trying to take down the testimony or what I am saying, and

12   then right kind of in front of her is Ms. Joy Schaffer who is a

13   court reporter as well.

14           That -- because they are taking down what is said in

15   court, ladies and gentlemen, during the course of jury

16   selection we are going to make sure to try to make sure that

17   whatever you may say in the course of jury selection is

18   audible, so not only that everyone else in the courtroom is

19   able to hear it, but most importantly the court reporters can

20   hear what you have to say.  So we have got, you will see we

21   have got a cordless microphone over there.  So during the

22   course of jury selection, we will try to remember to pass that

23   cordless microphone around so that when you may be asked a

24   question, if you can -- we will try to pass that microphone to

25   you so that you can use it, and we will make sure to be able to

1    hear you.

2         All right.  Now, let us have each of the parties

3    introduce themselves, and we will start, first of all, with the

4    United States.  Ms. Wulff?

5         *MS. WULFF:*  Good morning.  My name is Leslie Wulff.  I

6    am joined today by my colleagues Kevin Hart, Daniel Loveland,

7    Paul Torzilli.  We are joined with paralegals Mathiew Ackaouy,

8    Jesse Friedson.  Also we may be joined with Special Agent

9    LaNard Taylor by the FBI.  Thank you.

10        *THE COURT:*  Ladies and gentlemen, they have dropped

11   their masks.  I have given them permission to do that when they

12   introduce themselves.  And if you -- when I ask you questions,

13   you can drop your mask if you can, but you don't have to.  It's

14   going to be up to you.

15        Also, ladies and gentlemen, I will explain more about

16   the masks in just a minute, but now why don't we continue with

17   the introductions, and we will have introductions for Mr. Penn.

18        *MR. TUBACH:*  Good morning, ladies and gentlemen.  My

19   name is Michael Tubach, and Mr. Penn.  With me today are Anna

20   Pletcher and Brian Quinn.

21        *THE COURT:*  All right.  Thank you.

22        And on behalf of Mr. Fries.

23        *MR. KORNFELD:*  Good morning, everyone.  My name is

24   Rick Kornfeld.  This is Mr. Mikell Fries.  With me, David

25   Beller and Kelly Page.

```
 1              THE COURT:  Thank you.

 2              And on behalf of Mr. Brady?

 3              MR. LAVINE:  Good morning.  My name is Bryan Lavine.

 4   I represent Mr. Brady who is here today along with Laura Anne

 5   Kuykendall, and John Ospina.  And we will also have one

 6   additional lawyer, Megan Rahman, joining us later.

 7              THE COURT:  Thank you.

 8              On behalf of Mr. Austin?

 9              MR. FELDBERG:  Thank you, Your Honor.

10              Ladies and gentlemen, I am Michael Feldberg.  This is

11   Mr. Austin, my colleagues Julie Withers and Laura Carwile with

12   me.

13              THE COURT:  All right.  Thank you.

14              And then on behalf of Mr. Lovette.

15              MR. FAGG:  Thank you, Your Honor.

16              Good morning, ladies and gentlemen.  My name is John

17   Fagg, and this is Bill Lovette and also joined by my colleagues

18   Dru Nielsen and Frank Schall.

19              THE COURT:  Thank you.

20              Ladies and gentlemen, the trial in this matter is set

21   for 19 days.  The trial is expected and will be over no later

22   by July 14th.  Keep in mind, ladies and gentlemen, that even

23   though the trial will end no later than July 14, that there is

24   no limit on jury deliberation, so the jury could, if it needed,

25   continue to deliberate after that date.
```

1            The hours of the trial are generally beginning at

2     8:30 and continuing until noon.  At noon we will take a recess

3     of an hour and a half, resume at 1:30, and then go until 5:00.

4     The trial generally right at 5:00 will end.  For instance, if

5     we are just about ready to finish up a witness and maybe the

6     witness is going to catch a plane or something, we may go a few

7     minutes after 5:00, but generally we are going to end at 5:00.

8     That's important during the Rockies season because the parking

9     lot rates go up dramatically sometime after 5:00 if there is a

10    night game.  So anyway, we will -- that will be the schedule.

11           We will take a break usually at 10:15 for 15 minutes

12    and then in the afternoon at 3:15 once again for 15 minutes.

13    That break schedule today may be and the lunch schedule today

14    may vary a little bit depending on where we are with jury

15    selection.  So we probably will not take a break until 10:15,

16    but jury selection is not an endurance contest, so if someone

17    really needs to take a break, just raise your hand.

18           Keep in mind, and I am not trying to deter you from

19    raising your hand, but keep in mind that if one person takes a

20    break, we all take a break because you can't have someone slip

21    out quietly and take a break and not hear what's going on in

22    the courtroom, so we'll have to have you -- we will all take a

23    break, but I don't want to make anyone really uncomfortable, so

24    let me know if you need to take a break.

25           When we do take a break, ladies and gentlemen, what

1    we'll do is as follows.  I will have the attorneys use the

2    bathrooms on the fourth floor or higher, and I will have the

3    jurors use the bathrooms on the first and second floors, okay,

4    so you can spread out a little bit and try to get to a bathroom

5    that maybe doesn't have quite as many people headed towards it.

6            Ladies and gentlemen, the attorneys and their clients,

7    however, during a break, if, for instance, you walk past them

8    in the hallway or something of that nature, they have been

9    instructed not to talk to you at all.  It's not because they

10   aren't friendly.  They are friendly.  It's just we don't want

11   to create an impression that they are trying to lobby you or

12   something like that outside of the courtroom, so they'll kind

13   of politely try to avoid you if at all possible, but you should

14   also not try to talk to them assuming you are able to tell who

15   they are by some means other than the fact that they may be

16   dressed in business attire, but just so you know.

17           All right.  So now let's talk about the subject of

18   masks.  No one likes to be stuck wearing a mask, but things

19   have, as you may have been reading in the newspaper, changed a

20   little bit recently.  The numbers are going up again really

21   across the country, but also just within the State of Colorado.

22   Denver had been at the lowest CDC level for a while but then

23   changed into the orange category.  Orange category does not

24   necessarily trigger mask wearing, but, you know, Boulder

25   recently went into the highest category.  And the variants that

1    are going around right now for people who are vaccinated will

2    not necessarily put you in the hospital, but that doesn't mean

3    that you won't get sick and under CDC guidelines have to

4    quarantine yourself and isolate yourself for at least five

5    days.  Well, we, obviously for this trial, can't have someone

6    who is out for five days.  That's just not going to work.

7           So, therefore, it's important that we make sure that

8    we all do what we can to remain protected and at least for

9    purposes of jury selection right now, we have got a lot of

10   people in the courtroom, so it's a really good idea for

11   everyone to wear masks.  During the course of the trial,

12   however, I am going to except witnesses who are -- when they

13   are actually testifying, so the witnesses while they are

14   testifying will not have to wear masks.

15          Let me talk to you, ladies and gentlemen, about the

16   air flow in this particular courtroom.  So way back when, it

17   seems like way back when in spring of 2020 at the beginning of

18   the pandemic, we did air-flow testing in this particular

19   courtroom.  And this courtroom has an unusual ventilation

20   system.  The vents are in the floor, so you may see some of

21   those vents in the floors.  We don't have what you commonly

22   think of or you commonly see in a lot of places some central

23   air event in the ceiling, some side air events, not that this

24   courthouse was not designed with a pandemic in mind.  In fact,

25   this type of air system is, A, designed to avoid drafts, and it

1    does a great job of avoiding drafts, and it works really well

2    for a pandemic because that air very slowly goes straight up.

3    That's great because it doesn't result in cross-currents and

4    the cross-currents can cause you to be exposed to air being

5    breathed out by someone who may be, you know, a few people away

6    from you, something like that.

7         The outtake for the air in the courtroom is actually

8    located way up in the corner here.  So even though we are going

9    to have the witness not having a mask, that air I don't believe

10   will, first of all, for those of you who will be in the jury

11   box, there is just no problem, that air is not going to get

12   over to you at all, but also we should be good, it should be

13   able to just rise straight up and be exhausted out through

14   there.

15        Also, this building has the highest category of air

16   filter that commercial buildings have, so that's also good.

17   But anyway, we do need to be protective and make sure that we

18   minimize the possibility that any of the participants,

19   especially the jurors, don't contract or communicate COVID-19

20   to others.  So I very much appreciate the -- you being real

21   careful about the mask wearing.

22        We also have, should you need it, and you can see on

23   various places we have hand sanitizer and Clorox wipes if you

24   want to use any of those too.

25        All right.  Now let me switch topics and talk about

1    another very important subject as well, and that is the fact

2    that we didn't used to have this problem, but now we do, and

3    that is cellphones.  So your cellphone, because of its internet

4    connection and its search engines have the ability to access

5    the world's knowledge, the world's knowledge in your pockets.

6    And the problem with that is that jurors have to base their

7    decision on the evidence that comes in through the trial, the

8    evidence in the form of exhibits or testimony, not through

9    things that they look up on the internet, which, as you all

10   know as we are all acutely aware, it's very frequently

11   completely unreliable, okay?

12          So I am going to order each of you at this point in

13   time until you are released from jury duty in this case not to

14   look up any information whatsoever about this case, and that

15   includes even terminology.  There may be -- if you are a juror

16   in this case, there may be some terminology that you are

17   unfamiliar with, and that's natural, because people come from a

18   variety of backgrounds, they may not be familiar with certain

19   legal terms.  All of those definitions will come through the

20   trial.  And if they don't, then that's -- whoever has the

21   burden of proof on that subject probably will be in trouble

22   because they didn't bother to inform you about that, but you

23   can't inform yourself about that by looking up outside

24   information.  You can't ask other people to look up information

25   for you.  You can't even use the old-fashioned way of looking

1    stuff up in a dictionary.  And I don't think, probably young

2    people don't even use encyclopedias anymore, but you can't do

3    those things either.  It's very important you don't do that.

4          Let me just give you an example of how important that

5    particular admonition is, and that is we had a trial in this

6    courthouse maybe about 10 years ago.  It involved a violation

7    of the Lacey Act.

8          The Lacey Act prohibits the importation of wild-animal

9    parts for protected species into the United States.  And the

10   case turned on whether a hunter who had a license to hunt a

11   leopard in South Africa really shot the leopard across the

12   border in Namibia.  And the border at that particular area

13   consisted of a dry riverbed, and so there was testimony about

14   where that dry riverbed was.

15         Well, despite the judge having admonished the jurors

16   that they could not look up information, nonetheless, one of

17   the jurors decided to look up information on her own, and she

18   downloaded satellite photographs of that dry riverbed and then

19   brought them into the jury room to show everyone.  And, of

20   course, other jurors, realizing that this was a complete

21   violation of what the judge told the jurors, reported that to

22   the judge.  And as a result of her doing that, the judge had to

23   declare a mistrial.

24         The question at that point was whether the juror would

25   have to pay for the cost of the retrial, the retrial involving

1    a trial where most of the witnesses were flown in from Africa

2    for the trial.  So it is really incredibly important that you

3    take that admonition very seriously.

4         All right.  So what is jury selection really?  Jury

5    selection is a process that is used to determine whether the

6    prospective jurors can be fair and impartial in this particular

7    case and whether they can commit to following the law as I

8    provide it to them as opposed to some personal notion of what

9    the law should be.

10        And to accomplish that, I am going to ask the

11   prospective jurors a series of questions, and I am also going

12   to give the attorneys an opportunity to ask some questions of

13   you as well.

14        None of the questions that I ask you or that the

15   attorneys ask you have the purpose of trying to embarrass you

16   in any way, but if for whatever reason the answer to a question

17   would embarrass you and you don't want to mention it in front

18   of all these people, let me know that, and we will then do the

19   following:

20        We have some headsets that are referred to as

21   transceivers, and I will have anyone who wants to say something

22   to me, but understand it will be heard by all the attorneys

23   too, but not everyone in the courtroom through this transceiver

24   system, I will have the juror come over here, we will put the

25   transceiver headset on the juror and then the juror can tell us

1   whatever it is that he or she wants to communicate.

2          When that happens and when we might otherwise be using

3   the transceiver system, Ms. Grimm will activate a white noise

4   system.  Maybe we can do that right now.  That kind of helps to

5   prevent people from being overheard, but that's the system we

6   will use.  So anyway, don't -- that will all work out just

7   fine, but if there is some matter that you don't want to talk

8   about in front of everyone, let me know that and we'll use that

9   transceiver system in order to do it.

10          And by the way, with that transceiver system, ladies

11   and gentlemen, you can talk very, very quietly.  It's very,

12   very good.  It picks up what you have to say.  So you don't

13   need to talk in a normal volume of voice.  You can talk at a

14   very low voice, and it will pick that up, okay?

15          Then at this time, ladies and gentlemen, before we get

16   going, I am going to have you take an oath, because just like a

17   witness, you must answer the questions that are asked of you

18   either by myself or by the attorneys truthfully and completely,

19   so at this time, I will have Ms. Grimm administer that oath to

20   you.  So would all the prospective jurors please stand and

21   raise your right hand.  And then assuming that you agree with

22   the oath, please afterwards say I do.

23          (Prospective jurors were sworn.)

24          (Jury selection was sealed.)

25

1          REPORTER'S CERTIFICATE

2       I certify that the foregoing is a correct transcript from

3  the record of proceedings in the above-entitled matter.  Dated

4  at Denver, Colorado, this 6th day of June, 2022

5

6                          S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25