1           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB

3   In Re: Penn III

4   UNITED STATES OF AMERICA,

5     Plaintiff,

6   vs.

7   JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8   SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9   WILLIAM WADE LOVETTE,

10    Defendants

11   _____

12            REPORTER'S TRANSCRIPT
             Trial to Jury, Vol. 6

13   _____

14      Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:18 a.m., on the 14th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                          APPEARANCES

2              Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5              Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10             David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13             Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16             Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19             Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22             Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25
```

1          APPEARANCES (Continued)

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3     South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5     Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6     Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                         PROCEEDINGS

9          *THE COURT:*  We are back in the record in 20-CR-152,

10    and I guess there are a couple of exhibits we are going to talk

11    about today.  Whoever wants to go first, Mr. Quinn.

12         *MR. QUINN:*  We are going to have Meg Tomlinson from

13    our team handle that.

14         *MS. TOMLINSON:*  Good morning, Your Honor.  Thank you

15    for accommodating the early start.

16         So our issues are just with Exhibit 6046 and 7046 on

17    the government's notice.

18         *THE COURT:*  Is it 7046-1?

19         *MS. TOMLINSON:*  I believe it's 7046, not -1.  Our

20    issue with these exhibits is neither was listed on the

21    government's initial notice without a sponsoring witness that

22    the Court ordered the government to file on April 25th, nor did

23    they appear on the amended notice that the government filed on

24    May 4th, so these exhibits weren't disclosed to defendants as

25    coming in without a witness until May 21st, nearly a month

1    after the deadline for that disclosure and well after the

2    defendants' May 9 deadline for filing objections.

3            So these exhibits and this issue also wasn't raised at

4    the pretrial conference, so the defendants' position is at this

5    point these exhibits simply haven't been ruled admissible

6    without a sponsoring witness for purposes of this trial.

7            And there is really just no good reason that these

8    exhibits weren't disclosed by the April 25th deadline or at

9    least sometime before our deadline to file objection.  So our

10   position is just that, you know, in the context of late

11   disclosed *James* documents, the Court has held that deadlines

12   have to mean something, and our position is that that ruling

13   applies --

14           THE COURT:  Why did I have a feeling you were going to

15   quote that?  And were these admitted in the previous trial?

16           MS. TOMLINSON:  They were.

17           THE COURT:  So it's not really a prejudice issue or is

18   it?

19           MS. TOMLINSON:  I think the prejudice is mostly the

20   late disclosure.  Defendants did in some of their objections --

21   or to some of the exhibits that did timely appear on the notice

22   that had been admitted at prior trials, defendants did raise

23   objections to some of those documents, so it's not the case

24   that we didn't object to anything that came in previously in

25   that way, so it's really a timeliness issue.

1          THE COURT:  Thank you very much, Ms. Tomlinson.

2          Mr. Loveland?

3          MR. LOVELAND:  Good morning, Your Honor, thank you.

4          So Ms. Tomlinson is correct that these were not

5    originally disclosed at the April 25th deadline.  What I didn't

6    hear was a substantive argument as to sort of why these should

7    be inadmissible.

8          What I want to emphasize for the Court is that --

9          THE COURT:  Yeah, I think hers is procedural.  She is

10   basically saying no good reason.

11         MR. LOVELAND:  Absolutely, Your Honor.  What I want to

12   flag for the Court is these were disclosed at Docket No. 1341

13   in advance of the pretrial conference on May 21st, 2022.  And

14   what we did to make sure that the parties were all aware of

15   this is put in the very front of the notice these two exhibits

16   are late.  The prior rulings and the transcript cites are here.

17   We feel that they are admissible.  They came in at the last

18   trial.

19         In terms of what these exhibits are, 6046 is an e-mail

20   chain between Mikell Fries and Scott Brady on June 20th.  Your

21   Honor previously ruled these admissible on October 5th, 2021,

22   and, again, they came in -- this e-mail came in at the last

23   trial.  7046 was authenticated by Ted Sangalis at the last

24   trial.  It is a spreadsheet of pricing that was found on Roger

25   Austin's hard drive.  It's subject to a limiting instruction

1    for that reason.

2           The authentication base is covered for both of these

3    exhibits by a stipulation between the parties, and it's been

4    three weeks, Your Honor.  And while we wish that we had

5    disclosed them on April 25th, the government would submit there

6    is no prejudice here.  Neither of these documents are new, and

7    there is really no dispute about the Court's prior rulings.

8           *THE COURT:*  Okay.  And the limiting instruction on

9    7046 is that it can only be considered against Mr. Austin.

10          *MR. LOVELAND:*  That's correct.

11          *THE COURT:*  Okay.  Ms. Tomlinson, I will give you the

12   last word if you wish to.

13          *MS. TOMLINSON:*  Sure, not much else I think other than

14   the fact that these did come in twice before sort of goes to

15   the point that they should have and could have been included on

16   the timely submissions.

17          *THE COURT:*  Thank you.

18          I am going to allow both of them in.  Ms. Tomlinson

19   is, of course, right that the -- there is no good reason, and

20   the fact that they had been used before should have been a

21   reason for them to have been considered and included in the

22   past, but there is no prejudice.  They both came in in the

23   past, and so the defendants at least had -- are familiar with

24   them even though they didn't know until the filing of Docket

25   No. 1341 that the government wanted to include them in this

1    particular trial.  But despite the late notice, I will allow

2    both of them, the government to try to get both of them in as

3    opposed to excluding them for not having been included on the

4    notice in a timely fashion.

5              Anything else we should take up before -- we are a

6    little bit early yet, but anything that we should take up at

7    this time?

8              One thing I forgot.  I talked a little bit about

9    tomorrow and how we might squeeze some time in.  I forgot I

10   have a judges' meeting over the lunch hour, so unfortunately we

11   are not going to be able to crimp into the lunch hour a little

12   bit, so let's, once again, pay close attention to what you

13   think the schedule will be.  You know, perhaps we can see if

14   the jury might be able to do a 8:00 o'clock start tomorrow.  My

15   guess is they might be able to.  We'll have to see.  Sometimes

16   people have rides or something and they can't do that, but we

17   could try to do something along those lines to get a little bit

18   of extra time, but why don't we see how we are doing on the

19   schedule later in the day.

20             Anything else that we should talk about today?  In

21   fact, other thing is that on Thursday, if we have some time

22   gaps, there are some other issues to talk about.  We could go

23   over some jury instruction issues.  We could talk about the

24   defendants' summary exhibits, and we could make use of some of

25   that time.

1          Ms. Nielsen?

2          *MS. NIELSEN:*  Thank you, Your Honor.

3          One issue while we have a little time, in anticipation

4    of Mr. Suerken's testimony later today or tomorrow, we would

5    request that the government instruct Mr. Suerken's counsel to

6    try to avoid references to JBS.  That has been the subject of

7    some prior rulings, and he did testify and used the word "JBS"

8    in the last trial.

9          *THE COURT:*  Remind me about that.  I think that that's

10   appropriate.  It doesn't seem to be at all relevant to the

11   issues that we have going on.  And the jurors that may have

12   been sensitive to that issue I think were challenged.  They are

13   removed, so I think that would be appropriate.

14         Any response by the government on that point with

15   Mr. Suerken?

16         *MS. WULFF:*  We are happy to so instruct Mr. Suerken's

17   counsel, but we don't believe it will be a concern that it's

18   likely to come up in his testimony.

19         *THE COURT:*  Yeah, I think the reference in the past,

20   it was not like it was inadvertent, but it didn't seem at all

21   material to his testimony, so that shouldn't be a problem.

22   Thank you, Ms. Nielsen.

23         Why don't we -- yes, Mr. Beller.

24         *MR. BELLER:*  Thank you, Your Honor.

25         Just a quick question if the Court has any updates

1    from the juror who suffered a loss of her family.

2         THE COURT:  No.  We haven't heard anything.

3    Ms. Buchanan?

4         COURT DEPUTY CLERK:  No, Your Honor.

5         THE COURT:  So no news may be good news.  Hopefully

6    she is able to help, but I will have Ms. Buchanan check with

7    her about the date of the funeral.  That's a good thought, so

8    we will check on that.  And given the fact that it may be good

9    for Ms. Buchanan to check on that now, we will be in recess

10   until after she has a chance to do that and the jury is ready,

11   all right?

12        Thank you.

13      (Recess at 8:28 a.m. until 8:35 a.m.)

14        THE COURT:  All right.  So as for Juror No. 5, the

15   funeral is on Monday, so that's a federal holiday, and she

16   seems to be doing fine today.

17        Are we ready for the jury?  And are we going to,

18   Mr. Loveland, start off with introducing documents?  Are you --

19   or are you going to start off with a witness?

20        MR. LOVELAND:  Yes, Your Honor, we will start off with

21   documents and move for admission of everything listed in

22   Attachment A of Docket No. 1378 and then publishing some of

23   those.

24        THE COURT:  Yeah.  Let's bring the jury back in.

25        MR. TUBACH:  Your Honor, how is that procedurally

1    going to happen?  Is Attachment A in the record, or how does

2    the jury know exactly what is being moved into evidence?

3            THE COURT:  Well, Mr. Loveland could do that any

4    number of ways.  One way as opposed to monotonously reading

5    lots of exhibits, I believe in previous trials we've used the

6    document viewer to, like, display a long list of things, so

7    anyway, we'll see.

8            (Jury present.)

9            THE COURT:  Good morning, ladies and gentlemen.  I

10   hope you had a good evening.

11           As you recall, we just finished with Mr. Bryant's

12   testimony at the end of the day, so now, Mr. Loveland, how

13   would you like to proceed?

14           MR. LOVELAND:  Your Honor, Mr. Ackaouy is going to use

15   the projector back there if we can get it to work, but at this

16   time, the government would move into evidence everything listed

17   at Docket No. 1378, Attachment A.

18           THE COURT:  Mr. Tubach?

19           MR. TUBACH:  I don't believe at least what's being

20   displayed currently on the screen would be properly viewable

21   for the jury.

22           THE COURT:  That's right.  We'll have to --

23           MR. LOVELAND:  How is that, Your Honor?

24           THE COURT:  That is a better way to do it.

25           So, ladies and gentlemen, the United States is moving

1    the admission at this time of a large number of exhibits.

2    Reading that large number would be rather monotonous.  I am not

3    sure how helpful it would be to you, but what we are going to

4    do just in case it is is we will display the exhibits that are

5    being moved.

6         And let me ask at this time, any objection to

7    admission of the exhibits that are listed in Attachment A of

8    Docket No. 1378?

9         *MR. QUINN:*  No further objections, Your Honor.

10        *THE COURT:*  Then each of those exhibits will be

11   admitted.  And now if we can just kind of somewhat quickly, but

12   systematically, just scroll through the list of exhibits

13   that -- exhibit numbers that are being admitted.

14        *MR. LOVELAND:*  Thank you, Mr. Ackaouy.

15        *THE COURT:*  All right.  So each of the exhibit numbers

16   of that group have now been shown to the jury.  And,

17   Mr. Loveland, how would the government like to proceed next?

18        *MR. LOVELAND:*  Thank you for the steady hands,

19   Mr. Ackaouy.

20        Your Honor, the government is now going to seek to

21   publish a number of those exhibits that were admitted at Docket

22   No. 1378, Attachment A.  There are also several exhibits the

23   government will move to admit and publish that come with

24   limiting instructions.

25        *THE COURT:*  Go ahead.

1          MR. LOVELAND:  So first the government would ask

2    permission to publish Government's Exhibit 6046.

3          THE COURT:  Yes, you may.

4          MR. LOVELAND:  Thank you, Your Honor.

5          And, Mr. Ackaouy, if you could just zoom in on the top

6    portion that is just the text, please.

7          THE COURT:  Ladies and gentlemen, why don't we do

8    this.  The government, it sounds like, from what Mr. Loveland

9    said, the government is going to be displaying some documents

10   to you so that you have a chance to read them.  But the

11   question is how am I going to know when you are done reading.

12   So why don't we do this.  Once you have read whatever is being

13   shown, and some of these you can't get everything on one

14   screen, so it could be that they will shift up or go to the

15   next page or whatever, but for that screening question, why

16   don't we do this.  Once you've read it, look up at me.  Once I

17   see your eyes on me, I'll know that you finished reading it,

18   and then we'll know to display the next exhibit or the next

19   page, okay?

20         Go ahead, Mr. Loveland.

21         MR. LOVELAND:  Thank you.

22         For the Court's record, this is Government's Exhibit

23   6046.

24         THE COURT:  All right.  Let me mention to Mr. Brown

25   and Mr. Collins, if it's easier if you think, if you want to

 1   shift down the row for purposes of looking at these documents

 2   so you have a screen, a smaller screen as opposed to looking at

 3   the big one here, give it a try.  That's not a problem.  So at

 4   any point in time you feel like you want to shift over there,

 5   just raise your hand and let me know, okay?

 6        All right.  I think that we can move to either the

 7   next page or next exhibit, I am not sure which.

 8        MR. LOVELAND:  Your Honor, at this point, the

 9   government would ask the Court's permission to publish

10   Government's Exhibit 6047.

11        THE COURT:  You may.

12        MR. LOVELAND:  Thank you.

13        And, Mr. Ackaouy, if we could zoom in on the text,

14   please.

15        THE COURT:  All right.

16        MR. LOVELAND:  Thank you, Your Honor.

17        At this point, we would ask permission to publish

18   Government's Exhibit 6282.

19        THE COURT:  You may.

20        MR. LOVELAND:  Mr. Ackaouy, maybe we can focus on the

21   bottom portion of this and then scroll to the top.

22        THE COURT:  All right.

23        MR. LOVELAND:  Thank you, Your Honor.

24        THE COURT:  Did you want to do the top part?

25        MR. LOVELAND:  Excuse me, yes.  Mr. Ackaouy, would you

1    publish the top part with the Court's permission.

2              THE COURT:  Yes.  All right.

3              MR. LOVELAND:  Your Honor, the government would seek

4    to admit and publish three exhibits that have limiting

5    instructions, so first Government's Exhibit 1700.

6              THE COURT:  Any objection to the admission of

7    Exhibit 1700?  That wasn't on the list, right?

8              MR. LOVELAND:  Your Honor, this was on Attachment B of

9    Government's Exhibit 1378 because it has a limiting

10   instruction.

11             THE COURT:  Sure, but it hasn't been moved yet, right.

12             MR. LOVELAND:  Correct, Your Honor.  I seek the

13   Court's permission to both admit and publish Government's

14   Exhibit 1700 subject to the limiting instruction.

15             THE COURT:  All right.  Subject to the limiting

16   instruction, any objection -- and by the way, the limiting

17   instruction I believe pertains to who this is admissible

18   against.  Any objection to the admission of Exhibit 1700?

19             All right.  1700 will be admitted.

20             Ladies and gentlemen, so as I just mentioned, this

21   does have a limiting instruction.  The limiting instruction,

22   and we can go ahead and publish this to the jury so they can

23   see what I'm talking about, so the top portion of this, namely

24   the e-mail from Mr. Brady, is only admissible against

25   Mr. Brady.  So you could not consider this e-mail against any

1    of the other four defendants, just against Mr. Brady, the top

2    portion of this only, all right?

3              MR. LOVELAND:  Thank you, Your Honor.

4              THE COURT:  All right.

5              MR. LOVELAND:  Your Honor, the government would move

6    to admit and then publish Government's Exhibit 10651, which is

7    subject to a limiting instruction.

8              THE COURT:  All right.  And the limiting instruction

9    has to do with Mr. Ledford's statements.  Any objection to the

10   admission of Exhibit 10651?

11             All right.  That exhibit will be admitted, and that

12   may be published to the jury.

13             Ladies and gentlemen, so you'll see in this exhibit

14   that there are some statements from, yeah, Mr. Ledford, I think

15   it's just at the top, the top row there and that statement from

16   Mr. Ledford can only be considered for the effect on the

17   listener, not for the truth that Mr. Ledford asserts, okay, so

18   just the effect of that on the listener, not the truth of any

19   matter that Mr. Ledford asserts.

20             All right.

21             MR. LOVELAND:  Thank you, Your Honor.

22             The government would seek to admit and then publish

23   Government's Exhibit 1713, which also has a limiting

24   instruction.

25             MR. FELDBERG:  I think there is a redaction.

1    *THE COURT:*  There is supposed to be a redaction to

2   this one at the top.

3        *MR. LOVELAND:*  The Court's indulgence and excuse us.

4        *THE COURT:*  Sure.

5        *MR. LOVELAND:*  Your Honor, as displayed, I would ask

6   if it's acceptable to the defense.

7        *MR. FELDBERG:*  Yes.

8        *THE COURT:*  Okay.

9        *MR. FELDBERG:*  Acceptable, Your Honor.

10       *THE COURT:*  Right.  Mr. Feldberg, I think that that

11  takes care of the redaction issue.  There is also a limiting

12  instruction pertaining to this one regarding Mr. Austin's

13  statements.  With that noted, any objections to the admission

14  of Exhibit 1713?

15       All right.  That will be admitted.  And we can go

16  ahead and display --

17       *MR. LOVELAND:*  Just a moment, Mr. Ackaouy.  I think

18  there is a more correct redaction, and I want to ask the

19  defense for the record if this is acceptable as well.  I am

20  sorry, Your Honor.

21       *MR. FELDBERG:*  Acceptable, Your Honor.

22       *MR. LOVELAND:*  And excuse me, Your Honor.

23       *THE COURT:*  No problem.  So we can display that to the

24  jury.

25       Ladies and gentlemen, so this particular e-mail you'll

1    see that there are some statements by Mr. Austin in it.  Those

2    statements of Mr. Austin can only be considered against him.

3    So statements of Mr. Austin in this exhibit can only be

4    considered against Mr. Austin, not any of the other defendants,

5    all right?

6              THE COURT:  All right.

7              MR. LOVELAND:  Thank you, Your Honor.

8              At this point, the government would seek to admit and

9    later publish Government's Exhibit 53 which is a summary chart.

10             THE COURT:  So what I would intend to do is, assuming

11   this is admitted, I would read to the jury an instruction about

12   how they should consider summary exhibits.  With that notation,

13   any objection to the admission of Exhibit 53?

14             Okay.  Then 53 will be admitted, and it may be

15   published to the jury.

16             Ladies and gentlemen, let me give you an instruction

17   about this type of exhibit which I will refer to as a summary

18   exhibit.  So first of all, if you take a look at the far

19   right-hand side of this particular document, you'll see that

20   there is a column that says Exhibit No., and then depending on

21   which row is at issue, you may see one or more exhibits

22   referenced.

23             So the exhibits that are referenced on the side are

24   exhibits that have been admitted.  And this particular exhibit,

25   Exhibit 53, purports to summarize exhibits that have been

1    admitted.  The summaries are being admitted because they may

2    assist you in understanding the evidence that has been

3    presented.  But keep in mind that a summary is not evidence of

4    the material it summarizes, and it is only as valid and

5    reliable as the underlying material that it seeks to summarize.

6            You may give a summary exhibit entire weight, some

7    weight, or no weight at all depending on your assessment of the

8    underlying material and the accuracy of the summary, all right?

9    And I'll -- once again, I am looking at eyes, and as a result,

10   when I say to scroll, scroll.  Don't scroll unless I say to

11   scroll.

12           MR. LOVELAND:  Thank you, Your Honor.

13           THE COURT:  So now what's being shown to the jury is

14   the bottom half of the first page, and everyone had finished

15   looking at the top page, but then I saw them looking down

16   again, and it's because we had scrolled down, but that's fine

17   for now.

18           Okay.  Another one is ready on the bottom of the first

19   page, so we can now go to the top of the second page.  All

20   right.  You can go to the lower part of the second page.  All

21   right.  All right.

22           MR. LOVELAND:  Thank you, Your Honor.

23           At this point, the government would seek the Court's

24   permission to publish Government's Exhibit 1066.

25           THE COURT:  1066 is previously admitted; is that

1    right?

2          *MR. LOVELAND:*  Yes, through the witness, Your Honor,

3    Mr. Bryant.

4          *THE COURT:*  All right.  And what's the purpose of

5    publishing 1066?

6          *MR. LOVELAND:*  Your Honor, I was under the impression

7    that documents published through a witness could be republished

8    at this time, but if that's not the case, the government is

9    happy to move on.

10         *THE COURT:*  The jury has seen it already.  Of course,

11   during closings it could be displayed to the jury, but I think

12   we should move on at this time.

13         *MR. LOVELAND:*  Certainly, Your Honor.  Then the

14   government would seek permission to publish 1249.

15         *THE COURT:*  You may.

16         *MR. LOVELAND:*  Thank you, Your Honor.

17         And, Your Honor, the government is happy to go through

18   every page.

19         *THE COURT:*  You can make -- if you want to represent

20   what this consists of and show exemplar pages or a page, that's

21   fine.

22         *MR. LOVELAND:*  Thank you, Your Honor.

23         So, Mr. Ackaouy, if you could focus in on the top

24   let's say third of this page.

25         *THE COURT:*  And that page is page 1?

1          MR. LOVELAND:  Yes, Your Honor.  And the government's

2     representation would be that these are call records from

3     Verizon Wireless.

4          THE COURT:  And how many pages is this document?  Is

5     it what's noted at the top?

6          MR. LOVELAND:  Your Honor, I believe it's three total

7     pages, but the government would be happy to only publish the

8     portion that's showing.

9          THE COURT:  All right.

10         MR. LOVELAND:  Thank you, Your Honor.

11         The government would seek next to publish a series of

12    sequential exhibits that are very short, Government's Exhibits

13    433 through 447, Your Honor.

14         THE COURT:  You may.  And, Mr. Loveland, if you would

15    just make a record as to which exhibit is being displayed at

16    the time.  Go ahead.

17         MR. LOVELAND:  Certainly.  Your Honor, this is

18    Government's Exhibit 433.  And I am happy to make a record as

19    we move through.

20         THE COURT:  Yes.  That would be fine.

21         MR. LOVELAND:  Thank you.

22         THE COURT:  Each of those may be displayed in

23    sequence, then.

24         MR. LOVELAND:  Thank you, Your Honor.

25         THE COURT:  Okay.

1          *MR. LOVELAND:*  And, Your Honor, for the Court's

2    record, this is Government's Exhibit 434.  And I would ask

3    Mr. Ackaouy to zoom in on the text at the top.

4          *THE COURT:*  All right.

5          *MR. LOVELAND:*  Your Honor, being displayed is

6    Government's Exhibit 435, and I, again, ask Mr. Ackaouy to

7    please zoom in on the top.

8          *THE COURT:*  All right.

9          *MR. LOVELAND:*  Your Honor, displayed on the screen for

10   the jury is Government's Exhibit 436, and if Mr. Ackaouy could

11   please zoom in on the top.

12         *THE COURT:*  All right.

13         *MR. LOVELAND:*  Thank you, Your Honor.

14         Now displayed is Government's Exhibit 437, and the

15   government will zoom in on the top.

16         *THE COURT:*  All right.

17         *MR. LOVELAND:*  Now displayed is Government's Exhibit

18   438, and we will zoom in on the top.

19         *THE COURT:*  All right.

20         *MR. LOVELAND:*  Now displayed is Government's Exhibit

21   439 focusing on the top.

22         *THE COURT:*  All right.

23         *MR. LOVELAND:*  Displayed now, Your Honor, is

24   Government's Exhibit 440, and we'll focus in on the top.

25         *THE COURT:*  All right.

1          MR. LOVELAND:  Displayed for the jury, Your Honor, is

2     Government's Exhibit 441, and again we will go to the top.

3          THE COURT:  All right.

4          MR. LOVELAND:  Displayed for the jury, Your Honor, is

5     Government's Exhibit 442, again at the top.

6          THE COURT:  All right.

7          MR. LOVELAND:  Now displayed for the jury, Your Honor,

8     is Government's Exhibit 443 going to the top.

9          THE COURT:  All right.

10         MR. LOVELAND:  Displayed now, Your Honor, is

11    Government's Exhibit 444 and at the top.

12         THE COURT:  All right.

13         MR. LOVELAND:  On to displaying Government's Exhibit

14    445 focusing on the top.

15         THE COURT:  All right.

16         MR. LOVELAND:  And now, Your Honor, 446 displayed and

17    again at the top.

18         THE COURT:  All right.

19         MR. LOVELAND:  Displayed now for the jury, Your Honor,

20    is Government's Exhibit 447.  This is the last one in this

21    sequence, and we are focused on the top now.

22         THE COURT:  All right.

23         MR. LOVELAND:  Your Honor, at this point, the

24    government would move to admit and then publish Government's

25    Exhibit 56, which is another summary chart, Your Honor.

1          THE COURT:  And for the record, a portion of this was

2    admitted -- I guess it was only displayed for demonstrative

3    purposes.  Okay.

4          MR. LOVELAND:  I believe that's correct, Your Honor.

5          THE COURT:  Portions of page 2 and page 1 were shown

6    for demonstrative purposes, but now any objection to the

7    admission of Exhibit 56 for -- as regular evidence, not

8    demonstrative?

9          All right.  Exhibit 56 will be admitted.

10          Ladies and gentlemen, this is another summary exhibit.

11    As you may recall, portions of it were shown to you.  Once

12    again, ladies and gentlemen, keep in mind the admonition that I

13    read to you a short while ago regarding Exhibit 53.  The

14    summaries are only -- you can consider them for the purpose

15    that they may serve in summarizing the evidence, but they are

16    only as good as the evidence that they purport to summarize.

17    And it depends on your assessment of the underlying material

18    and the accuracy of the summary.

19          MR. LOVELAND:  Your Honor, for the Court's record, we

20    are displaying the top portion of page 1 of Government's

21    Exhibit 56.

22          THE COURT:  All right.  The lower portion of page 1

23    may be displayed.

24          MR. LOVELAND:  Thank you, Your Honor.

25          THE COURT:  All right.  All right.  All right.  The

Theodore Sangalis - Direct

1    top portion of page 3 may be displayed.  All right.  Okay.

2          MR. LOVELAND:  Your Honor, at this point, the

3    government has finished the publication of documents it would

4    like to display and would call Mr. Ted Sangalis to the stand.

5          THE COURT:  All right.

6       (**Theodore Sangalis** was sworn.)

7          THE WITNESS:  I do.

8          COURT DEPUTY CLERK:  Please state your name and spell

9    your first and last name for the record.

10         THE WITNESS:  Theodore Sangalis, T-H-E-O-D-O-R-E,

11   S-A-N-G-A-L-I-S.

12         MR. HART:  Your Honor, at this time can we approach to

13   distribute some binders?

14         THE COURT:  Yes, you may.

15                   **DIRECT EXAMINATION**

16   BY MR. HART:

17   Q.  Good morning, Mr. Sangalis.

18   A.  Good morning.

19   Q.  Would you please share with the jury, where do you work?

20   A.  I work at Pilgrim's Pride Corporation.

21   Q.  How long have you worked there?

22   A.  A little over two years.

23   Q.  What is your job title?

24   A.  Corporate counsel.

25   Q.  And would you please describe your duties and

Theodore Sangalis - Direct

1   responsibilities to the jury, please?

2   A.   I handle the company's legal needs, so everything from

3   litigation to corporate governance, negotiating contracts,

4   anything in between.

5   Q.   Sir, did there come a time when you became aware of your

6   company receiving subpoenas calling for the production of

7   certain documents?

8   A.   Yes.

9   Q.   When did you become aware of this?

10   A.   Shortly after I started.

11   Q.   How did you become aware of the subpoenas?

12   A.   There is a service agent that sends us an e-mail every time

13   we have a subpoena.

14   Q.   And in connection with these subpoenas, sir, did Pilgrim's

15   produce records?

16   A.   We did.

17   Q.   Were you involved in the production of these records?

18   A.   I was involved in the process, yes.

19   Q.   Could you please describe your involvement to the jury?

20   A.   I would direct the teams to produce some of the documents.

21   I would review them, work with the vendor to make sure the

22   documents were appropriately produced.

23   Q.   Mr. Sangalis, do you see the binder in front of you?

24   A.   I do.

25   Q.   Could you open them up and look at the documents contained

Theodore Sangalis - Direct

1    in the binder?

2    A.   Yes.   Okay.

3    Q.   Do you recognize them?

4    A.   I do.

5    Q.   Were these the documents produced in response to the

6    subpoenas you just talked about?

7    A.   These were some of them, yes.

8    Q.   And have you reviewed the documents contained in the binder

9    in connection with your testimony here today?

10   A.   I did, yes.

11   Q.   For what purpose did you conduct this review?

12   A.   For the purpose of testifying.

13   Q.   I want to go over certain categories of documents contained

14   in the binder.   So, sir, does the binder contain exhibits

15   including bids that Pilgrim's Pride submitted to its customers?

16   A.   It does.

17   Q.   Does it include e-mails that transmitted these bids?

18   A.   It does.

19   Q.   Does your binder contain spreadsheet attachments that were

20   e-mailed as well?

21   A.   It does.

22   Q.   Does the binder contain redacted expense -- travel expense

23   reports?

24   A.   It does.

25   Q.   Including receipts that were submitted in connection with

988

Theodore Sangalis - Direct

1   those reports?

2   *A.*   Yes.

3   *Q.*   Does your binder include certain e-mails?

4   *A.*   Yes.

5   *Q.*   Does your binder include certain e-mails in the "from" sign

6   that says "on behalf of"?

7   *A.*   It does.

8   *Q.*   Does it also include certain Pilgrim's Pride invoices?

9   *A.*   Yes.

10  *Q.*   Does it include a PowerPoint presentation?

11  *A.*   It does.

12  *Q.*   Does the binder contain internal memoranda regarding a

13  summary of certain KFC bids?

14  *A.*   Yes, it does.

15  *Q.*   And does your binder include certain calendar invites?

16  *A.*   Yes.

17  *Q.*   Now that you have identified the records in your binder by

18  category, let's talk about what you did with each category of

19  the records in connection with your appearance here today.

20  *A.*   Okay.

21  *Q.*   In general, with respect to each document contained in the

22  binder, what did you do?

23  *A.*   In general, I would have our IT team pull the original, so

24  from whatever system we stored that original so that I could

25  compare them to what we produced.

Theodore Sangalis - Direct

1   Q.  And when you say the original and your IT person, could you

2   provide more color to the jury what you mean?

3   A.  So, for example, with an e-mail there is an archive system,

4   so the IT team would go to our archive system, send me the

5   original e-mail that I would open up in Outlook and compare it

6   to the PDF that we produced.

7   Q.  Did you conduct any comparisons between these documents and

8   the documents contained on Pilgrim's servers?

9   A.  I did, yes.

10  Q.  How did you do that?

11  A.  So, again, for an e-mail, I would pull up the original, and

12  then I would have the PDF on the other screen, and I would make

13  sure that they were the same.

14  Q.  What did you do with native documents?

15  A.  Same thing, so there was -- we would produce a native

16  Excel.  I would pull the native Excel that was attached to the

17  e-mail or however we got it, and I would look at the two side

18  by side.

19  Q.  Could you please share with the jury what a native file is?

20  A.  It means it's in its native format, so an Excel file we

21  would produce as an Excel file instead of trying to convert it

22  to a PDF or some other format.

23  Q.  Are you familiar with the term "Bates number"?

24  A.  I am.

25  Q.  How are you familiar with the term "Bates number"?

Theodore Sangalis - Direct

1    A.  My work in various litigation.

2    Q.  And will you please share with the jury what a Bates number

3    is?

4    A.  It's a number on the bottom of the document that helps

5    identify it for purposes of the litigation so everybody has the

6    same page numbers.

7    Q.  And what role, if any, did these Bates numbers have in the

8    process of comparing these records to the servers, to the ones

9    contained on the servers at Pilgrim's?

10   A.  So there is not going to be a Bates number on the original,

11   but we put Bates numbers on all of our productions.

12   Q.  Sir, let's go through the categories you identified in

13   terms of what you did.  In preparation of your testimony here

14   today, have you reviewed bid records reflected in GX-1105 and

15   D-544?

16   A.  Yes, I did.

17   Q.  Does it also include the e-mails from suppliers which

18   forwarded these exhibits to them that are reflected in GX-1104

19   and D-543?

20   A.  It does, yes.

21   Q.  Did you compare them with the originals stored on the

22   Pilgrim's servers?

23   A.  I did.

24   Q.  And what did your comparison reveal?

25   A.  That they are the same.

Theodore Sangalis - Direct

1   Q.  In preparation for your testimony here today, did you

2   review certain receipts or expenses, for instance, the one that

3   was identified in GX-9505?

4   A.  What tab number is that?  Oh, there it is.  Yes, I did.

5   Q.  And it's tab 16, sir.  And did you conduct comparisons on

6   that?

7   A.  I did.

8   Q.  What did your comparisons reveal?

9   A.  That they are the same.

10  Q.  Sir, did you also review certain e-mails and attachments?

11  A.  I did.

12  Q.  Including D-146, D-147, D-148, and D-149, as well as

13  GX-9020?

14  A.  Yes, I reviewed those.

15  Q.  Did you conduct a comparison to what exists on the

16  Pilgrim's servers?

17  A.  I did.

18  Q.  What did your comparison reveal?

19  A.  That those are the same.

20  Q.  Sir, I now want to talk about something you said earlier

21  about e-mails sent on behalf of.  Can you share with the jury

22  what you did to determine what "on behalf of" meant for certain

23  of the documents that are in the binder?

24  A.  Sure.  So there is an ability for certain people to gain

25  access to send e-mails on behalf of.  Usually it's sort of an

Theodore Sangalis - Direct

1    assistant to somebody that can send those e-mails.  So as a

2    result, we do have a field for -- a "from" field for the

3    e-mail, as well as an "on behalf of" field.

4    Q.  Sir, in connection with your testimony here today, did you

5    review certain e-mails that were sent on behalf of as

6    identified in the binder as D-543, GX-9018, GX-1547, GX-3025,

7    GX-10112, and GX-10113?

8    A.  Yes, I did.

9    Q.  And what did your comparisons reveal?

10   A.  Where it says "on behalf of" a certain person, that person

11   actually wrote the e-mail.

12   Q.  In preparation for your testimony here today, did you

13   review certain Pilgrim's e-mails -- I am sorry, certain

14   Pilgrim's invoices?

15   A.  I did, yes.

16   Q.  Identified as GX-10048 through 10054?

17   A.  Yes, I did.

18   Q.  Did you conduct comparisons?

19   A.  I did.

20   Q.  What did your comparisons reveal, sir?

21   A.  That they were the same.

22   Q.  Now, sir, you mentioned in the binder contains a PowerPoint

23   presentation.

24   A.  Yes.

25   Q.  Let's talk about that.  Where was this PowerPoint

1   presentation found?

2   A.   It was found on the home drive for Jayson Penn.

3   Q.   And could you please describe to the jury what Defendant

4   Penn's home drive is?

5   A.   So every employee has a home drive that is personal to

6   them.  It's not stored on the actual computer, it's still to

7   the company's network, but they are the only ones that have

8   access to it.

9   Q.   And as you just alluded to in the normal course, does

10  anyone at Pilgrim's other than Defendant Penn have access to

11  that home drive?

12  A.   Not in the normal course.

13  Q.   Are you familiar with the term "metadata"?

14  A.   Yes.

15  Q.   How are you familiar with this term?

16  A.   My experience producing documents for litigation.

17  Q.   And will you please share with the jury what metadata is?

18  A.   It's sort of like the statistics on a document, so when it

19  was sent, where it was sent from, who it was sent from, the

20  time, all that stuff.

21  Q.   Did you review the metadata in connection with the

22  PowerPoint found on Defendant Penn's home drive?

23  A.   I did.

24  Q.   What did that reveal?

25  A.   That it was originally created by an individual named Brian

1    Bell and last edited by Jayson Penn.

2    Q.  In preparation for your testimony here today, have you

3    reviewed the PowerPoint presentation identified in the binder

4    as GX-10106?

5    A.  I did, yes.

6    Q.  Did you conduct any comparisons with what existed on

7    Defendant Penn's home drive?

8    A.  Yes.  I compared it to an original from his home drive.

9    Q.  And what did your comparisons reveal?

10   A.  That it's the same.

11   Q.  Moving on to another category, sir.  In preparation for

12   your testimony today, did you review certain memos of customer

13   negotiations?

14   A.  I did.

15   Q.  Specifically in the binder identified as D-292?

16   A.  Yes, I did.

17   Q.  Did you conduct any comparisons?

18   A.  Yes, I compared this to the original.

19   Q.  What did your comparisons reveal?

20   A.  That it's the same.

21   Q.  And finally, sir, in preparation for your testimony today,

22   did you review certain calendar invites identified in the

23   binder as GX-1061 and 1062?

24   A.  I did, yes.

25   Q.  Did you conduct any comparisons?

Theodore Sangalis - Direct

1   A.  Yes, I compared those to the original.

2   Q.  And what did your comparisons reveal?

3   A.  That they are the same.

4   Q.  And, sir, based on your comparisons between the records in

5   the binders and that which exists on the Pilgrim's drives, did

6   you reach any conclusions?

7   A.  That what's in the binder was what is on our drives.

8   Q.  Okay.  Now that we've authenticated each of the documents

9   as being identical to those contained on Pilgrim's drive, I

10  want to discuss a smaller subset of them.  For the categories

11  of documents you identified, are you familiar with the process

12  and how some of those documents were created?

13  A.  Some of them, yes.

14  Q.  Were the bids and e-mails attaching the bids appearing in

15  the binder as GX-1104, GX-1105, D-543, and D-544, can you

16  please share with the jury how those were created?

17  A.  So those are -- those are e-mails from individuals of

18  Pilgrim's to customers containing bids for -- to sell goods.

19  Q.  Sir, are you familiar with certain versions of pricing

20  worksheets found in e-mails forwarding them in D-146, D-147,

21  D-148, and D-149?  Are you familiar with how they were created?

22          MR. QUINN:  Objection, Your Honor, foundation.

23          THE COURT:  Overruled.  He has just asked that

24  question.  Go ahead.

25  A.  Yes, I am.

Theodore Sangalis - Direct

1   *BY MR. HART:*

2   *Q.*  And could you please share with the jury how you know they

3   were created?

4   *A.*  So those are internal e-mails where someone on the pricing

5   team e-mails a pricing sheet to someone on the sales team.

6   *Q.*  And, sir, do you know how those exhibits were stored?

7   *A.*  On our e-mail archive system.

8   *Q.*  How do you know that?

9   *A.*  Because that's where I was able to pull the originals.

10  *Q.*  Sir, for these smaller group of categories of exhibits we

11  just talked about, the bids and e-mails attaching the bids, the

12  invoices, the receipts, expenses and the version of the price

13  worksheets you just talked about, were they made during the

14  regular course of regularly conducted business at Pilgrim's

15  Pride?

16          *MR. QUINN:*  Objection, Your Honor, foundation.

17          *THE COURT:*  Sustained.  If you could ask him for his

18  foundation for knowing that.

19          *MR. HART:*  Sure.

20  *BY MR. HART:*

21  *Q.*  Sir, are you aware of how these records were created?

22  *A.*  I am, yes.

23  *Q.*  And could you please share with the jury how you know how

24  these records were created?

25  *A.*  Through my job and various interactions that I have with

Theodore Sangalis - Direct

1    the sales team, I am familiar with how we sort of price things

2    and send bids out to customers in order to establish a

3    contract.

4    Q.  And, sir, are you familiar with how Pilgrim's maintains

5    these records?

6    A.  Yes.

7    Q.  And can you please share with the jury how you know how

8    Pilgrim's stores these records?

9    A.  So it's usually through e-mail.  Every single e-mail that

10   we send is automatically stored on our archive system, so

11   anybody at any time can go back and find those e-mails and find

12   those sheets.

13   Q.  And is it Pilgrim's Pride practice to maintain these

14   records in the regular course of its business?

15          MR. QUINN:  Objection, Your Honor, foundation.

16          THE COURT:  He can answer yes or no and then but after

17   that foundation would have to be established for his knowledge.

18   Overruled.

19   A.  Yes.

20   BY MR. HART:

21   Q.  How are you aware of that, sir?

22   A.  Sorry, how am I aware of what?

23   Q.  How Pilgrim's Pride maintains these records in the regular

24   course of business.

25   A.  Through my work and as corporate counsel again working with

Theodore Sangalis - Direct

1   the sales teams and also again in various litigation.

2   Q.  And are you aware if Pilgrim's Pride regularly maintains

3   this as its business?

4        MR. QUINN:  Objection, Your Honor, foundation again.

5        THE COURT:  Overruled.

6   A.  Yes, it does.

7   BY MR. HART:

8   Q.  Can you please share with the jury how you know that?

9   A.  Again, from my work in litigation and working with the

10  sales teams.

11  Q.  And, sir, do you have an understanding of whether these

12  records were made at or near the time of the records it

13  records?

14  A.  Yeah --

15       MR. QUINN:  Your Honor, objection, foundation.  He

16  can't possibly know that.

17       THE COURT:  Overruled.  He can answer.

18  A.  The e-mails are sent at the time that the bid is made.

19  BY MR. HART:

20  Q.  And with respect to the other categories?

21  A.  And the pricing sheets are sent when they're prepared, yes.

22  Q.  And, sir, do you have an understanding whether these

23  records were made by a person with knowledge of the information

24  transmitted or a person with knowledge who reported into these

25  records?

Theodore Sangalis - Direct

1          MR. QUINN:  Your Honor, can we have a side bar?

2          THE COURT:  Yes.

3      (At the bench:)

4          THE COURT:  Go ahead.

5          MR. QUINN:  Your Honor, he is testifying about draft

6  bids that were prepared in the 2014 time line.  This witness

7  joined Pilgrim's Pride in 2020.  He can't possibly know whether

8  the individuals who prepared it, sent these bids had knowledge

9  of the information transmitted were people with knowledge who

10  transmitted these records.  He may be able to speak about some

11  of the bids that Pilgrim's actually submitted and that are

12  actually on the stipulate list, but he has no foundation to

13  testify about what Tommy Lane or anybody else did in the 2014

14  time period.

15          THE COURT:  Mr. Hart, response?

16          MR. HART:  Yes, Your Honor.  This witness has

17  conducted a review of the material in the binder.  He has gone

18  through and -- sorry.  He has gone through and conducted

19  interviews and did what he needed to do internally to determine

20  whether these were business records, including going --

21  physically going with the IT personnel and seeing what was on

22  the systems.  And I think that he has established that he has

23  the foundation in which to testify about this.

24          THE COURT:  He might have done that, but he hasn't

25  testified about that yet, so that foundation has not been laid

1000

Theodore Sangalis - Direct

1  to this point.

2          Mr. Quinn, go ahead.

3          *MR. QUINN:*  Your Honor, I just wanted to mention that

4  talking to IT about where an e-mail is in the system has

5  nothing to do with his foundation for testifying about the

6  substance of these documents.  And the second point there is

7  that he hasn't actually testified to conducting any interviews

8  with anyone in the sales team about these documents up until

9  this point.

10          *THE COURT:*  Right.  Well, he doesn't have to have

11  personal knowledge about the documents, of course, but the part

12  of the foundation that Mr. Hart referred to, there has been no

13  testimony on it to date, so the objection will be sustained

14  until such time as the appropriate foundation is laid.

15          *MR. HART:*  Your Honor, may I seek some clarification?

16  Are we just talking about the draft price sheets, or what

17  category of the evidence are we speaking about here?

18          *THE COURT:*  I have been wondering that for the last 10

19  questions.

20          *MR. QUINN:*  Your Honor, I was specifically talking

21  about the draft price sheets and some of the calendar invites.

22  It wasn't clear from Mr. Hart's line of questioning which

23  exhibits he was asking the witness about.

24          *THE COURT:*  Agreed.  So, Mr. Hart, that's your job.

25  Thank you.

Theodore Sangalis - Direct

 1         (In open court:)

 2              *MR. HART:*  Thank you, Your Honor.

 3    *BY MR. HART:*

 4    *Q.*  Mr. Sangalis, could we speak about the pricing worksheets

 5    specifically, D-146, D-147, D-148, and D-149?

 6    *A.*  Yes.

 7    *Q.*  What did you do specifically with respect to these exhibits

 8    in your review?

 9    *A.*  Well, in terms of authentication, I looked at the originals

10    and compared them, and then I spoke with our sales team to make

11    sure that my understanding was correct of how these are sent.

12    *Q.*  Did you conduct any -- did you do anything to determine how

13    they were created?

14    *A.*  I did, yes.

15    *Q.*  What did you do?

16              *MR. QUINN:*  Objection, Your Honor, foundation.

17              *THE COURT:*  Overruled.

18    *A.*  I spoke with the sales team to ask how --

19              *MR. QUINN:*  Objection, Your Honor, hearsay.

20              *THE COURT:*  Overruled.

21    *A.*  I spoke with the sales team to ask how they were created,

22    and so the person pricing it creates the spreadsheet.

23    *BY MR. HART:*

24    *Q.*  Did you determine how they were regularly maintained?

25    *A.*  They are regularly maintained on the e-mail.

Theodore Sangalis - Direct

1  Q.  And did you determine whether they were made by someone who

2  has knowledge?

3  A.  Yes.  The person creating the spreadsheet and sending it is

4  the one who has knowledge of that content.

5  Q.  Thank you, sir.

6       With respect to the calendar invites that are GX --

7       MR. HART:  One minute, Your Honor?

8       THE COURT:  Sure.

9  BY MR. HART:

10 Q.  -- GX-1061 and 1062, could you please share with the jury

11 what did you do to determine that these were authentic?

12 A.  So similar to the e-mail of the calendar invites, they are

13 also stored, so the IT sent me the originals.  I compared them

14 to those two exhibits, and they are the same.

15 Q.  And did you -- were you able to determine how these two

16 records were created?

17 A.  The person sending it creates the calendar invite and then

18 sends it out to the individuals.

19 Q.  Were you able to determine how it was maintained by

20 Pilgrim's Pride?

21 A.  It's maintained on our e-mail archive system.

22 Q.  And were you able to determine whether these calendar

23 invites were created by someone with knowledge?

24 A.  The person sending it would know the details sufficient to

25 send the invite, yes.

Theodore Sangalis - Direct

1        *MR. HART:*  Thank you, Your Honor -- Mr. Sangalis.

2   *BY MR. HART:*

3   *Q.*  I refer you to GX-9505, the receipt of certain travel

4   records.

5   *A.*  Okay.

6   *Q.*  Can you please share with the jury what you did to

7   authenticate this record?

8   *A.*  So these are stored on SAP, which is our payment system,

9   and so I asked our accounting team to pull the originals from

10  that system.

11  *Q.*  Were you able to determine how this record was created?

12  *A.*  It's created by the person that incurs the expense and then

13  submitted for reimbursement.

14  *Q.*  Were you able to determine how it was maintained by

15  Pilgrim's Pride?

16  *A.*  So, yes, so when it's submitted, it's stored on that SAP

17  system.

18  *Q.*  Sir, does Pilgrim's Pride have any interest that these

19  expense payments are reliable and accurate?

20  *A.*  Yes.

21  *Q.*  Could you please share that with the jury?

22  *A.*  They need to be accurate such that the reimbursement is

23  accurate.

24  *Q.*  Mr. Sangalis, going back to D-146, D-147, D-148, and D-149,

25  does Pilgrim's have an interest to make sure that these records

Theodore Sangalis - Direct

1    are reliable?

2    A.   Yes, they do.

3    Q.   Could you please share with the jury what that interest is?

4    A.   The pricing that's sent to the sales team needs to be

5    accurate so that we are pricing our products appropriately.

6         MR. HART:  Your Honor, at this time, the government

7    offers the following 16 exhibits into evidence as business

8    records.

9         THE COURT:  Why don't we do categories, category by

10   category I think would be probably better.

11        MR. QUINN:  Your Honor, if we could also take it one

12   by one so we could interpose objections.

13        THE COURT:  That's fine.  One by one but maybe in

14   categories too, if you can.

15        MR. HART:  Yes, Your Honor.  Thank you.

16        With respect to bids, the government offers GX-1104

17   and GX-1105.

18        THE COURT:  Any objection to the admission of Exhibits

19   1104 and 1105?

20        MR. QUINN:  No objection, Your Honor.  It's on the

21   parties' stipulation list.

22        THE COURT:  Okay.  Go ahead, Mr. Hart.

23        MR. HART:  Your Honor, at this time, the government

24   offers D-543 and D-544 into evidence.

25        THE COURT:  Any objection to the admission of D-543 or

Theodore Sangalis - Voir Dire

1    D-544?

2        *MR. QUINN:*  No objection, also on the stipulation

3    list.

4        *THE COURT:*  All right.  Both of those will be

5    admitted.

6        Go ahead, Mr. Hart.

7        *MR. HART:*  Your Honor, the government offers GX-9505

8    in a redacted version.  It was admitted in a prior hearing.

9        *THE COURT:*  All right.  Hold on.  Any objection to the

10   admission of Exhibit 9505 as redacted?

11       *MR. FELDBERG:*  Can I have a brief voir dire on this,

12   Your Honor?

13       *THE COURT:*  Yes.

14       So, ladies and gentlemen, if an attorney asks to voir

15   dire, I am not sure if I mentioned this, but it means that they

16   just want an opportunity to ask a few questions.  I think I

17   talked about this at some earlier point.  But so in connection

18   with the admission of an exhibit, opposing counsel wishes to

19   ask a few questions of the witness.

20       Go ahead, Mr. Feldberg.

21                    VOIR DIRE EXAMINATION

22   *BY MR. FELDBERG:*

23   *Q.*  Mr. Sangalis, I am Roger Austin's lawyer.

24       Receipts such as 9505 are typically attached to

25   expense reports, are they not?

Theodore Sangalis - Voir Dire

 1    A.  That's correct.

 2    Q.  And the expense report shows where the person was and what

 3    the person was doing, correct?

 4    A.  Generally.

 5    Q.  The expense report is not included in 9505, is it?

 6    A.  It is not, no.

 7              MR. FELDBERG:  Thank you.  No objection, Your Honor.

 8              THE COURT:  All right.  Then 9505 will be admitted as

 9    redacted.

10              Go ahead, Mr. Hart.

11              MR. HART:  Your Honor, the government offers GX-10048

12    through GX-10054 into evidence, GX-10048 through 10054.

13              THE COURT:  Any objection to the admission of those

14    exhibits?

15              MR. QUINN:  No objection, also on the stipulation

16    list, Your Honor.

17              THE COURT:  Okay.  One moment.

18              Go ahead, Mr. Hart.

19              MR. HART:  Your Honor, the government offers D-146

20    through D-149 into evidence.

21              THE COURT:  Any objection to the admission of those

22    exhibits?

23              MR. QUINN:  Your Honor, it might be -- if we could

24    have a short side bar on these to discuss?

25              THE COURT:  That's fine.

Theodore Sangalis - Voir Dire

1     (At the bench:)

2          THE COURT:  Go ahead, Mr. Quinn.

3          MR. QUINN:  Your Honor, I think Mr. Schall is actually

4     going to take the lead on this one.

5          THE COURT:  That's fine.  Go ahead, Mr. Schall.

6          MR. SCHALL:  Thank you, Your Honor.

7          Your Honor, for D-146 through D-149, Mr. Hart has

8     attempted to lay a business record foundation for

9     run-of-the-mill e-mails.  This Court has previously held that

10    e-mails standing alone are not business records.

11         THE COURT:  If you don't mind, can we display one of

12    those, like maybe D-146?  I can't remember what they are.  And

13    is what's being displayed now D-146?

14         MR. QUINN:  That's right, Your Honor.

15         THE COURT:  And maybe why don't we display one other

16    example of that group.  Okay.  Is that spreadsheet that's being

17    displayed now an attachment to D-146?

18         MR. SCHALL:  Yes, I believe it's D-147.  Is that

19    correct, Mr. Hart?

20         MR. HART:  That's correct, Your Honor.

21         MR. SCHALL:  As we were discussing, these are

22    run-of-the-mill e-mails which the Court previously ruled

23    e-mails are not business records.

24         In regard to the attachment which is a pricing model,

25    Your Honor, in the pretrial hearing before trial 2, Your Honor

1008

Theodore Sangalis - Voir Dire

1    had ruled previously that pricing models themselves standing

2    alone do not have a legal significance, especially here where

3    you see the transmittal e-mails, they are versions.  They are

4    not final pricing models.

5              THE COURT:  Okay.  Response, Mr. Hart?

6              MR. HART:  Thank you, Your Honor.

7              This particular document as --

8              THE COURT:  Which document are we talking about?

9              MR. HART:  The spreadsheet that is up on the screen,

10   Your Honor.

11             THE COURT:  D-147?

12             MR. HART:  Yes, Your Honor.  The witness has testified

13   that these were relied on by the sales team in terms of the

14   bidding process, and we have laid sufficient foundation to

15   suggest that this is a business record of Pilgrim's.  And these

16   four documents were admitted in the last trial.

17             MR. QUINN:  If I can be heard on that one, Your Honor.

18             THE COURT:  Mr. Hart, what about the D-146?

19             MR. HART:  Your Honor, the e-mail transmitting the

20   record is my understanding that those have been included as

21   business records in prior hearings.

22             THE COURT:  Mr. Schall?

23             MR. SCHALL:  Your Honor, the D-146 or D-149, they were

24   admitted through motion by Mr. Penn and Mr. Austin in the

25   second hearing.  The reason that those two defendants moved

Theodore Sangalis - Voir Dire

1    their admission was for completeness of the process, not for

2    the truth of the matter asserted.  It was to correct -- it was

3    to complete the record based on documentation and evidence that

4    the government had submitted.

5            THE COURT:  Is one of those series that we're talking

6    about right now, is there another e-mail like what we might

7    call a cover e-mail?  Can I look at that, if so, or is it just

8    the other one spreadsheet because I think we are talking about

9    D-146 instead of D-149.

10           MR. SCHALL:  D-148 is the other transmittal e-mail.

11           MR. QUINN:  Mr. Schall is correct.

12           THE COURT:  And are we pulling up D-148 now?

13           MR. HART:  Yes, Your Honor.  Stand by.

14           Your Honor, we are experiencing technical difficulties

15   here.

16           THE COURT:  I saw what I think is D-148.  Okay.

17   So ...

18           MR. HART:  Your Honor, I don't mean to interrupt, but

19   I believe it's up on the screen now if you wish to look at it.

20           THE COURT:  Yeah, I can see that.  And that's D-148,

21   correct?

22           MR. HART:  Yes, Your Honor.

23           THE COURT:  Okay.  So two different rulings based on

24   the two different types of documents that are part of these

25   four exhibits.  First of all, the so-called cover e-mail, it's

Theodore Sangalis - Voir Dire

1   true in previous trials I have allowed in purely cover e-mails,

2   just a cover that shows the transmittal of some attachment.

3   And both D-146 and D-148 are in part that.  However, both D-146

4   and also D-148 have statements in the body of the e-mails, and

5   those are hearsay, and they are not -- fall within any business

6   record exception, because, as we talked about in previous

7   trials, you know, the mere fact that you keep an e-mail in your

8   server does not constitute any type of business record.  They

9   are not -- that's not reliable.  It's just the transmission of

10  particular information.

11       MR. HART:  Your Honor, if I may interject just very

12  briefly, the government would offer to redact the body of the

13  e-mail just to have the caption and the pedigree information

14  put forth in the e-mail.

15       MR. FELDBERG:  Your Honor, if I may, I believe that's

16  what happened in the prior hearing, that the body was redacted

17  in the e-mails and the "from" and "to" and date, et cetera,

18  "subject" were included.

19       THE COURT:  Okay.  With that redaction made to D-146

20  and D-148, any objection to the admission of those cover

21  e-mails?

22       MR. QUINN:  Your Honor, would you consider a limiting

23  instruction that they are being offered only for the purpose of

24  showing the process of constructing the bid and not for the

25  truth of the matters associated in the e-mails?

Theodore Sangalis - Voir Dire

1            *THE COURT:*  Well, there is not really much being

2    asserted in the cover of them.  It just would be the Re: line.

3    I think that this is non-hearsay, and I would not -- I would

4    overrule that objection assuming that that objection is being

5    made to D-146 and D-148 on that ground.

6            Any other objections to D-146 and D-148 as redacted as

7    proposed by Mr. Hart?

8            Okay.  Now let's talk about D-147 and D-149.  Those

9    are pricing models.  Mr. Schall is absolutely correct that in

10   previous trials I have ruled that simply an internal pricing

11   model, particularly just a draft in preparation for a bid, does

12   not have an independent legal significance, but that doesn't

13   mean that they are not a business record.  They are a business

14   record, because, as the witness has testified, the business

15   operates by virtue of making sure that that type of pricing

16   model has accurate information in it, and that is what meets

17   the business record exception.  These are created in the

18   regular course of duty, and the numbers have got to be correct.

19   Pilgrim's or any other company operates because those

20   numbers -- you know, the company has an interest in making sure

21   that those numbers are accurate.  So these wouldn't be admitted

22   as an exception because they have independent legal

23   significance, but they are business records.  They meet the

24   exception and both of them will be admitted, all right?

25           Any questions about that?  Thank you.

Theodore Sangalis - Voir Dire

1           (In open court:)

2           THE COURT:  Then D-146 and D-148 will be admitted as

3    redacted, and D-147 and D-149 will be admitted.

4           MR. HART:  Thank you, Your Honor.

5           THE COURT:  Let me just note that down, Mr. Hart, in

6    my exhibit book.  Hold on.

7           Okay.  Go ahead, Mr. Hart.

8           MR. HART:  Thank you, Your Honor.

9    BY MR. HART:

10   Q.  Mr. Sangalis, were you involved in the production of

11   e-mails in response to the subpoenas we talked about?

12   A.  I was, yes.

13   Q.  Do you have an understanding of how those e-mails were

14   produced in terms of date and time information?

15   A.  Yes.

16   Q.  What is the basis of your understanding in how these

17   e-mails were produced in terms of date and time?

18   A.  I was involved in the process and reviewed the policies of

19   our vendor that helped us to produce the documents.

20   Q.  Could you please share with the jury what your

21   understanding is on how e-mails appeared in date and time?

22   A.  Yes.  So it would be top e-mail, if there is a chain or the

23   e-mail itself, the vendor would convert everything to UTC time

24   so that every e-mail had one time zone that it was produced as.

25   Q.  And could you please share with the jury what UTC time is?

Theodore Sangalis - Voir Dire

1  A.  It's Universal Coordinated Time, I think, but it's what was

2  Greenwich mean but somewhere around the UK just one single time

3  zone that you can -- so it's all unified.

4  Q.  Sir, by way of example, if there is an e-mail chain with

5  multiple e-mails, which one would be fixed with UTC?  Could you

6  please share that with the jury?

7  A.  Yeah, only the top one, so the prior e-mails would have the

8  original time wherever it was sent or received.

9  Q.  Is this process used for trying to standardize the date and

10  time?

11  A.  That's my understanding.

12  Q.  As part of your work with Pilgrim's Pride document

13  productions, including e-mails, did you have the opportunity to

14  review these types of e-mails?

15  A.  I did, yes.

16  Q.  And do these e-mails that you reviewed comport with your

17  understanding of how time zones were processed?

18  A.  It does, yes.

19       MR. HART:  Your Honor, may I have a moment to confer?

20       THE COURT:  You may.

21       MR. HART:  Thank you, Your Honor.

22       The government would offer Government's Exhibit 14 --

23  excuse me, Your Honor.

24       THE COURT:  Sure.

25       MR. HART:  The government at this point, Your Honor,

Theodore Sangalis - Cross

 1    would offer D-292 into evidence.

 2             THE COURT:  Any objection to the admission of Exhibit

 3    D-292?

 4             MR. QUINN:  If they could pull it up real quickly,

 5    Your Honor.

 6             THE COURT:  Yeah, go ahead.

 7             MR. QUINN:  No objection, Your Honor.

 8             THE COURT:  All right.  D-292 will be admitted.

 9             MR. HART:  One more minute, Your Honor.

10             THE COURT:  Sure.

11             MR. LOVELAND:  Your Honor, the Court's indulgence.

12             THE COURT:  No problem.

13             MR. HART:  Thank you, Your Honor.

14             At this time, the government would like to reserve to

15    argue certain of the documents that he authenticated outside

16    the presence of the jury later on today?

17             THE COURT:  Sorry, Mr. Hart.  I don't understand what

18    you meant.

19             MR. HART:  Sure.

20             No further questions, Your Honor.

21             THE COURT:  Cross-examination?

22                           **CROSS-EXAMINATION**

23    BY MR. QUINN:

24    Q.  Mr. Sangalis, how are you doing this morning?

25    A.  I am well, thank you.

Theodore Sangalis - Cross

1   *Q.* My name is Brian Quinn.  I am a lawyer for Jayson Penn.

2   Just a couple questions on a few of the documents just talked

3   about.

4   *A.* Okay.

5   *Q.* Let's start with GX-10106.

6       *MR. QUINN:* And, Your Honor, if we can pull that up

7   just for the Court and the parties?

8       *THE COURT:* Yes, you may.

9   *BY MR. QUINN:*

10  *Q.* Mr. Sangalis, you spoke with the government about this file

11  on May 31st, 2022, right?

12  *A.* I believe so, yes.

13  *Q.* The government asked you about it in an interview, right?

14  *A.* That's right.

15  *Q.* And in that interview, you indicated that you hadn't

16  attended the meeting to which this deck refers, right?

17  *A.* That's correct.

18  *Q.* And this meeting predated your employment at Pilgrim's; is

19  that right?

20  *A.* That's correct.

21  *Q.* You started at Pilgrim's in 2020?

22  *A.* That's right.

23  *Q.* You also told the government that folks like yourself in

24  the legal department aren't routinely asked to review or store

25  this type of data, right?

Theodore Sangalis - Cross

1    *A.*  That's correct, yes.

2    *Q.*  And you told the government that it's not like the

3    corporate secretary stores these types of decks; is that right?

4    *A.*  That's correct.

5    *Q.*  When you looked up this deck in the Pilgrim's system, you

6    said you checked its metadata, right?

7    *A.*  I did, yes.

8    *Q.*  And you testified that the metadata indicated that a Brian

9    Bell was the author of this deck, didn't it?

10    *A.*  That's how I recall it, yes.

11    *Q.*  And you have no idea what, if anything, Mr. Penn added to

12    this deck, right?

13    *A.*  I don't know.

14    *Q.*  Okay.  Now, Mr. Sangalis, you save files on your computer

15    from time to time, right?

16    *A.*  I do.

17    *Q.*  A news article or something you get from a boss?

18    *A.*  Sure.

19    *Q.*  But you are not the person who drafted the contents of

20    those files, are you?

21    *A.*  Not always, no.

22    *Q.*  And you are not suggesting that Mr. Penn drafted this deck,

23    are you?

24    *A.*  I don't know enough to say one way or the other.

25    *Q.*  You just don't know?

Theodore Sangalis - Cross

1    A.   I don't know.

2              MR. QUINN:  Let's take that one down.

3              Your Honor, for the Court and parties, if we can do

4    GX-1061 and GX-1062 side by side.

5              THE COURT:  Sure.

6    BY MR. QUINN:

7    Q.   Mr. Sangalis, let me know when you have a chance to look at

8    those on the screen.

9    A.   Sure.

10   Q.   So Ms. Garland sent you these calendar invites six years

11   before you started in the legal department; is that right,

12   Mr. Sangalis?

13   A.   She did not send them to me.

14   Q.   I am sorry.  She sent the calendar invites six years before

15   you started?

16   A.   According to the data, yes.

17   Q.   And you have no idea whether she accurately recorded on the

18   invite who attended these meetings?

19   A.   I -- no, I don't know.

20   Q.   And you have no idea whether it was her general practice to

21   specify the topic of the meeting on the invite.

22   A.   I don't know what her practice was, no.

23   Q.   Okay.  These would be questions that Ms. Garland could

24   answer, but not you.

25   A.   I assume she could answer those, yes.

Theodore Sangalis - Cross

1    *Q.* Just a couple of final questions, Mr. Sangalis.  You don't

2    know Mr. Penn, do you?

3    *A.* No.  I didn't meet him before.  Shortly after I joined, I

4    didn't get a chance to meet him.

5    *Q.* You do not know Mr. Lovette?

6    *A.* Not personally.

7    *Q.* You do not know Mr. Austin?

8    *A.* Not personally.

9    *Q.* You have never spoken to any of those people?

10   *A.* I did not.

11   *Q.* And you have no personal knowledge of what happened at

12   Pilgrim's Pride before you joined the company in 2020, right?

13   *A.* Not having done it, just have reviewed documents and

14   interviewed various people.

15   *Q.* So no personal knowledge of what happened?

16   *A.* No personal knowledge before I joined, that's correct.

17        *MR. QUINN:* Thank you.

18        Moment to confer, Your Honor?

19        *THE COURT:* You may.

20        *MR. QUINN:* That's all for me, Your Honor.

21        *THE COURT:* Thank you, Mr. Quinn.

22        Mr. Schall?  Mr. Schall, I was just wondering, we are

23   at the break time, but on the other hand, if you just have a

24   few questions, maybe we can get Mr. Sangalis on his way.

25        *MR. SCHALL:* Just a handful of questions, Your Honor.

Theodore Sangalis - Cross

1        *THE COURT:*  Go ahead.

2                          **CROSS-EXAMINATION**

3    *BY MR. SCHALL:*

4    *Q.*  Good morning, Mr. Sangalis.

5    *A.*  Good morning.

6    *Q.*  The only document I would like to talk with you about is

7    GX-10106.  Do you have that in front of you?

8    *A.*  I do, yes.

9    *Q.*  That's a PowerPoint presentation, correct?

10   *A.*  That's correct.

11   *Q.*  That's a pretty lengthy PowerPoint presentation, isn't it?

12   *A.*  Sure.

13   *Q.*  Would you accept my representation it's about 88 pages?

14   *A.*  I would accept that.

15   *Q.*  Now, between the creation date that's shown on the metadata

16   and the date that Mr. Penn last accessed it, the metadata

17   doesn't provide who all may have made edits to that PowerPoint

18   presentation, does it?

19   *A.*  It does not.

20   *Q.*  Or where the information came from that's presented in the

21   PowerPoint, does it?

22   *A.*  It does not.

23   *Q.*  There are a number of notations at the bottom of the

24   PowerPoint.  There is no indication who may have drafted any of

25   that information, is there?

Theodore Sangalis - Cross

1  *A.*  No indication except that it was last edited or first

2  created, that's all I had.

3  *Q.*  So there is no information whatsoever that we can pull out

4  as to what may have happened between the creation date and the

5  last accessed?

6  *A.*  Not that I know of.

7  *Q.*  Just no idea who may have put information into that

8  document or where it may have came from?

9  *A.*  That's right.

10      *MR. SCHALL:*  Thank you, Your Honor.

11      *THE COURT:*  Thank you, Mr. Schall.

12      Mr. Feldberg?

13      *MR. FELDBERG:*  Just a handful of questions, Your

14  Honor.

15                    **CROSS-EXAMINATION**

16  *BY MR. FELDBERG:*

17  *Q.*  Mr. Sangalis, you told us that you don't know Mr. Austin,

18  correct?

19  *A.*  Not personally.

20  *Q.*  And he had retired years before you joined the company,

21  correct?

22  *A.*  That's my understanding.

23  *Q.*  Now, did I hear you correctly on direct examination by

24  Mr. Hart that there was a pricing team that e-mailed prices to

25  the sales team?

Theodore Sangalis - Cross

1   A.   That's my understanding, yes.

2   Q.   And you saw documents in your work that reflected that,

3   correct?

4   A.   That's correct.

5   Q.   And the pricing team, do you know whether they were located

6   at headquarters in Greeley?

7   A.   That's my understanding.

8   Q.   And the sales team was wherever the sales team was,

9   correct?

10  A.   And coming back and forth, yes.

11          MR. FELDBERG:   Thank you.   Nothing further.

12          THE COURT:   Thank you, Mr. Feldberg.

13          Additional cross-examination?

14          All right.   Redirect?

15          Mr. Hart, do you have much?

16          MR. HART:   No redirect, Your Honor.

17          THE COURT:   Okay.   Mr. Sangalis, you are excused.

18          Is he subject to recall?

19          All right.   Thank you, Mr. Sangalis.

20          THE WITNESS:   Thank you.

21          THE COURT:   All right, ladies and gentlemen.   We will

22  go ahead and take the mid-morning break.   Why don't we, since

23  we are a little past our usual time, why don't we plan on

24  reconvening 25 minutes to 11:00, okay, so you get a full 15, 25

25  minutes until 11:00.   The jury is excused.   Thank you.

Theodore Sangalis - Cross

1   (Jury excused.)

2   THE COURT:  So, Mr. Loveland, what's the game plan,

3   then, after the break?

4   MR. LOVELAND:  Yes, Your Honor.  So two brief things.

5   First, Ms. Becker is the next witness that the government

6   intends to call, so I was wondering if it would be amenable to

7   the Court to have her on at 10:50 to test the connection we

8   talked about and have her on before the jury comes back at

9   11:00.

10   THE COURT:  What I would suggest is it won't take long

11   to do that, but let's make sure that the connection is up and

12   running, and then at 10:35 I will mention that to her and her

13   attorney.  And the topics, once again, that you wanted me to

14   refer or mention to her were what again?

15   MR. LOVELAND:  So and I should back up because I think

16   I got ahead of myself, but two things:  One, Your Honor, not to

17   refer to the prior trial as anything other than a prior

18   hearing.  I know that Ms. Barron has instructed Ms. Becker on

19   that, but I think it would be beneficiary for Your Honor to do

20   that.  And then the second is just I know there were

21   objections, and it was hard for Ms. Becker because of the

22   connection.  I do think that the camera is better now having

23   worked on that with Ms. Buchanan on Friday, so that should

24   help.

25        And then the other thing is the government would seek

1  to admit and publish some documents before Ms. Becker

2  testifies, and so I wanted to talk about the timing of that

3  too.

4      THE COURT:  Before she testifies, okay.  That's -- and

5  that won't -- do you intend to show them?  How long do you

6  anticipate that would take?

7      MR. LOVELAND:  20, 30 minutes maximum, Your Honor.

8      THE COURT:  Okay.  Well, what time would you intend to

9  connect Ms. Becker, then, ideally?

10     MR. LOVELAND:  What time did Your Honor ask the jury

11 to come back from the break?

12     THE COURT:  They are going to be ready to go at 10:35.

13     MR. LOVELAND:  Perhaps we can then at 11:00 tell

14 Ms. Becker to call in, if that's possible.

15     THE COURT:  I think that's probably a better thing to

16 do.  And then we'll take a very -- we'll take a brief break so

17 that I can speak with Ms. Becker and her attorney, and then

18 we'll have the jury come back in once she is cued up.

19 Otherwise, we would have to have Ms. Becker and her attorney

20 connect at 10:35 and then disconnect and wait.  So we will go

21 ahead, and if you could have her be ready to connect at 11:00,

22 and then we will see how it goes.

23     MR. LOVELAND:  We certainly will.

24     The last thing I wanted to mention briefly is I

25 believe Mr. Hart will be seeking to argue for -- we have the

Theodore Sangalis - Cross

1    basis for authenticity for some of the documents about which

2    Mr. Sangalis testified, and I think that the government would

3    propose that we take that up during the lunch hour, just the

4    argument, not the admission of those exhibits.

5          THE COURT:  Okay.  I will let the defendants think

6    about that, and then remind me before we break for lunch, we'll

7    check in with them to see what might be the best way to deal

8    with it and when we should convene, whether we want to do it

9    right away or wait until some time like 1:15 or whatever.

10         MR. LOVELAND:  Thank you very much, Your Honor.

11         THE COURT:  We will be in recess.  Thank you.

12      (Recess at 10:24 a.m. until 10:42 a.m.)

13         THE COURT:  All right.  Let's go ahead and get the

14   jury back in.

15         (Jury present.)

16         THE COURT:  All right, Mr. Loveland, the United States

17   may call its next witness or offer additional exhibits.  Go

18   ahead.

19         MR. LOVELAND:  Thank you, Your Honor.

20         At this point, the United States would move to publish

21   several exhibits and admit and publish one summary chart

22   beginning with Government's Exhibit 982.  We would ask the

23   Court's permission to publish that exhibit.

24         THE COURT:  You may.

25         MR. LOVELAND:  Thank you, Your Honor.

1025

Theodore Sangalis - Cross

1        And, Mr. Ackaouy, if you could zoom in on just the

2   text at the top.

3        THE COURT:  All right.

4        MR. LOVELAND:  Thank you, Your Honor.

5        The government would ask the Court's permission to

6   publish Government's Exhibit 355.

7        THE COURT:  Yes, you may.

8        MR. LOVELAND:  Thank you, Your Honor.

9        Again, if you could zoom in at the top of 355,

10  Mr. Ackaouy, thank you.

11       THE COURT:  All right.

12       MR. LOVELAND:  And, Your Honor, the government would

13  seek to admit and publish Government's Exhibit 57, which is a

14  summary chart, Your Honor.

15       THE COURT:  All right.  Any objection to the admission

16  of Government's Exhibit 57?

17       All right.  Exhibit 57 will be admitted.

18       Ladies and gentlemen, this is another summary exhibit,

19  so the same admonition that I have given you to the two

20  previous summaries you looked at today apply to this one as

21  well.

22       All right.

23       MR. LOVELAND:  Your Honor, the government would seek

24  to publish Government's Exhibit 3037.

25       THE COURT:  That does not seem to appear on

Theodore Sangalis - Cross

1  Attachment --

2          MR. LOVELAND:  Your Honor, we will withdraw.

3          THE COURT:  Okay.

4          MR. LOVELAND:  Just one moment, Your Honor.

5          Your Honor, at this time, the government would seek to

6  admit and then publish Government's Exhibit 1546, which has a

7  limiting instruction.

8          THE COURT:  Any objection to the admission of

9  Exhibit 1546?  I don't actually see a limiting instruction,

10 but --

11         MR. LOVELAND:  That's right, Your Honor.  It has to do

12 with the admission of two other exhibits.

13         THE COURT:  That's correct.

14         MR. FELDBERG:  Correct, which at least as I understand

15 the Court's prior ruling, they must be admitted at the same

16 time.

17         MR. LOVELAND:  And, Your Honor, what we would propose,

18 then, is to admit and publish sequentially 1546, which is a

19 Government's Exhibit, D-839 and I-141.

20         THE COURT:  All right.  And you are moving the

21 admission of D-839 and I-141 at this time as well?

22         MR. LOVELAND:  Yes, Your Honor.

23         THE COURT:  Any objection to the admission of those

24 three exhibits?  And then we will talk about the publication of

25 them in just a minute.

Theodore Sangalis - Cross

1        All right.  So Exhibit 1546 will be admitted, and

2   Exhibits D-839 and I-141 will be admitted as well.

3        And, Mr. Loveland, you may publish at this time, and

4   then afterwards we will publish the other two, but you may

5   publish 1546 at this time.

6        MR. LOVELAND:  Thank you, Your Honor.

7        And Mr. Ackaouy will focus us on the top.

8        THE COURT:  All right.

9        MR. LOVELAND:  Your Honor, we would then request the

10  Court's permission to move on to D-839.

11       THE COURT:  Yes, you may display that at this time.

12       MR. LOVELAND:  Thank you.

13       And Mr. Ackaouy will focus us on the top of D-839.

14       THE COURT:  All right.

15       MR. LOVELAND:  And we will request the Court's

16  permission to move ahead to I-141 and publish that to the jury,

17  Your Honor.

18       THE COURT:  Yes, you may.  All right.

19       MR. LOVELAND:  And, Your Honor, at this point, the

20  government would seek to call Ms. Becker.  And I wonder if this

21  is a convenient time at 10:55 to get her set up on video

22  teleconference.

23       THE COURT:  So, ladies and gentlemen, the next witness

24  is going to appear by video teleconference, okay?  She'll

25  appear live, but she is going to appear by video

Theodore Sangalis - Cross

1  teleconference, and you will be able to watch her testimony

2  through the screen.  But we need to get her connected, and

3  rather having that go on in front of you, I am going to go

4  ahead and excuse you.  It probably will be just about five

5  minutes, but it may be a little bit longer, but if you don't

6  mind, if you can stay close to the jury room, we will get that

7  all set up.  And once we get that set up, Ms. Buchanan will

8  come to get you, all right?

9            The jury is excused.

10           (Jury excused.)

11           MR. LOVELAND:  Your Honor, we had previously tested

12  this on Friday.  Ms. Buchanan helped us with that.  I was

13  wondering if there is a way to zoom a little more on the podium

14  so Ms. Becker can see counsel.  For better or for worse, I

15  think she can see me now.

16           THE COURT:  Ms. Becker, can you hear me?

17           THE WITNESS:  Yes, I can, thank you.

18           THE COURT:  Great.  This is Judge Brimmer.  And let's

19  see if your attorney is connected too.

20           MS. MARCOURT:  Yes, Your Honor, this is Elizabeth

21  Marcourt.  I am connected.

22           THE COURT:  And I am sorry, what was your name,

23  Marcourt?

24           MS. MARCOURT:  Yes, Elizabeth Marcourt.

25           THE COURT:  Okay.  So, Ms. Becker, what I wanted to

Theodore Sangalis - Cross

1   mention to you, the jury is not present right now.  We haven't

2   brought the jury in, but we will do that in just a minute.  But

3   outside of the presence of the jury, Ms. Becker, I wanted to

4   mention to you that it's important during the course of your

5   testimony that we not refer to you having testified in the past

6   in connection with a trial.  The attorneys may have questions

7   for you about previous testimony, but what we're doing is we're

8   calling the previous testimony testimony at a previous hearing,

9   not a trial, okay?

10          THE WITNESS:  Yes, sir.  I am just going to make a

11   note of that.

12          THE COURT:  Great.  We don't want to let the jury know

13   that there has been a previous trial in this case.  We are just

14   going to call it a hearing, so if you're asked about your

15   previous testimony, once again, it would be testimony at a

16   previous hearing.  And if for some reason you referred to your

17   previous testimony, once again, it would just be testimony at a

18   previous hearing, okay?

19          THE WITNESS:  Yes, sir, I got it.  Thank you.

20          THE COURT:  Also, Ms. Becker, it's a little tricky for

21   you, of course, because you can't see very well, at least, all

22   the different attorneys and so forth, but there is a chance

23   that after you're asked a question, the other side may make an

24   objection.  So if you seem to hear something like an

25   interruption, why don't you just stop your testimony right then

Theodore Sangalis - Cross

1    to make sure that if there is indeed an objection, I will then

2    have an opportunity to hear what the objection is and then to

3    rule on it, and then someone will cue you when it's all right

4    for you to answer, all right?

5              THE WITNESS:  I'll do my best.

6              THE COURT:  Great.  I really appreciate that,

7    Ms. Becker.

8              Anything else, Mr. Loveland, before we bring the jury

9    back in?

10             MR. LOVELAND:  No, Your Honor.  If I can just ask

11   Ms. Becker if she can hear and see me.

12             THE WITNESS:  I can, quite well, better than at the

13   last hearing.

14             MR. LOVELAND:  Great.  The red mask is me, Ms. Becker,

15   and that was good.

16             Thank you, Your Honor.

17             THE COURT:  Anything else before we bring the jury

18   back in?

19             All right.  Let's go ahead and do that now.

20             (Jury present.)

21             THE COURT:  All right.  Mr. Loveland, at this time,

22   the United States may call its next witness.

23             MR. LOVELAND:  Thank you, Your Honor.  The United

24   States would call Ms. Florence Becker to the witness stand.

25             THE COURT:  Ms. Becker, you can hear us?

Florence Becker - Direct

1          *THE WITNESS:*  I can, thank you.

2          *THE COURT:*  Great.

3          Ms. Becker, at this time, I am going to have you take

4   an oath that my courtroom deputy, Ms. Buchanan, will administer

5   to you.

6      (**Florence Becker** was sworn.)

7          *THE WITNESS:*  I do.

8          *COURT DEPUTY CLERK:*  Ms. Becker, please state your

9   name and spell your first and last name for the record.

10         *THE WITNESS:*  Florence Becker, F-L-O-R-E-N-C-E,

11  B-E-C-K-E-R.

12         *THE COURT:*  Go ahead, Mr. Loveland.

13                         **DIRECT EXAMINATION**

14  *BY MR. LOVELAND:*

15  *Q.*  Ms. Becker, can you hear and see me okay?

16  *A.*  Yes, I can, thank you.

17  *Q.*  And if at any point you can't, just let me know, okay?

18  *A.*  Okay.

19  *Q.*  Ms. Becker, would you please introduce yourself to the

20  jury.

21  *A.*  Yes.  I go by Flo Becker.  I am here because I worked for

22  Mar-Jac Poultry for 21 years.  I am very --

23  *Q.*  Ms. Becker, I got ahead of myself.  I will ask you more

24  questions in a moment.  First do you prefer to go by Ms. or

25  Mrs. Becker?

Florence Becker - Direct

1    A.   Mrs.

2    Q.   Thank you, Mrs. Becker.

3         Is it the afternoon or morning where you are at?

4    A.   It is 1:00 o'clock.

5    Q.   And where are you joining us from?

6    A.   From Gainesville, Georgia.  And may I say thank you for

7    everyone who allowed me to testify from home. I am very

8    grateful.

9    Q.   Thank you, Mrs. Becker.

10        And where do you live, Mrs. Becker?

11   A.   In Gainesville, Georgia.

12   Q.   How long have you lived there?

13   A.   I have lived in the area for 24 years or thereabouts.

14   Q.   Now, Mrs. Becker, you were mentioning having worked at a

15   company for some number of years.  Did you recently retire?

16   A.   Not recently, three and a half years ago.

17   Q.   And when was that that you retired three and a half years

18   ago?

19   A.   It was 19 -- I wrote that down.  I retired in 2018,

20   December 31st.

21   Q.   Now, before retiring, what sort of work did you do?

22   A.   I was an executive assistant to the vice-president of

23   operations at a poultry company.

24   Q.   All right.  And you said you were an executive assistant at

25   a poultry company.  What was the poultry company?

1033

Florence Becker - Direct

 1   *A.*  Mar-Jac Poultry, Incorporated.

 2   *Q.*  And where did you work as an executive assistant for

 3   Mar-Jac Poultry physically?

 4   *A.*  It was on Aviation Boulevard in Gainesville, Georgia, there

 5   at that time, the main office.  It was also the processing

 6   plant.  The administrative office and processing plant were

 7   together in one building.

 8   *Q.*  And could you describe for the jury, please, Mrs. Becker,

 9   what type of business that Mar-Jac Poultry was in?

10   *A.*  Mar-Jac is an integrated poultry producer; in other words,

11   they go from the egg to the -- excuse me, from -- let's start

12   with the grower to the egg to another grower to the pullet to

13   the chicken to the processing plant.  We also own a feed mill,

14   so we provide the feed to produce it.

15   *Q.*  And Mar-Jac Poultry, does Mar-Jac Poultry eventually sell

16   that chicken?

17   *A.*  Yes, after it is processed, we sell the chicken.

18   *Q.*  Now, you testified that you worked I believe for 21 years

19   for Mar-Jac Poultry.

20   *A.*  Yes.

21   *Q.*  Who specifically did you work for as the executive

22   assistant who was the VP of operations?

23   *A.*  At the beginning of my tour there, I worked for Doug Carnes

24   who was the vice-president of operations.  I don't remember

25   exactly what year Doug retired, but Pete Martin took his place

Florence Becker - Direct

1    as the vice-president of operations.  He was previously the

2    complex manager.  In my job, my job responsibility included

3    working for the complex manager as well as the vice-president

4    of operations.

5    Q.  Okay.  So you served as an executive assistant to both the

6    complex manager and the vice-president of operations?

7    A.  Correct.

8    Q.  And could you unpack for the jury what was the reporting

9    structure for the vice-president of operations as compared to

10   the complex manager?

11   A.  The vice-president of operations reported directly to our

12   board of directors.  The complex manager -- we had an open-door

13   policy, so everyone spoke among themselves, but it was the

14   vice-president of operations to speak directly to the board of

15   directors.

16   Q.  Okay.  And did the complex manager in turn report to the

17   vice-president of operations?

18   A.  Yes.

19   Q.  And could you describe the job responsibilities that the

20   complex manager had at Mar-Jac Poultry?

21   A.  The complex manager is in charge of everything at that

22   particular operation with the exception of finance, and he

23   dabbled in finance a bit as well.  Again, we had an open-door

24   policy, but he had more to do with the live operations which

25   means negotiations with growers and making sure that our

1035

Florence Becker - Direct

1    chickens are up to par to go to the processing plant.

2    Q.  Okay.  And what sort of things was the vice-president of

3    operations responsible for, Mrs. Becker?

4    A.  Well, he also was responsible for everything including,

5    although we had a vice-president in finance, he worked closely

6    with him.

7    Q.  So I believe you testified that Doug Carnes was originally

8    the vice-president of operations and it later became Pete

9    Martin.  Did you work for Pete Martin the entire time of your

10   21-year career first when he was complex manager and then when

11   he was vice-president of operations?

12   A.  I did.  But to clarify, he retired a bit before I did even

13   though he was still connected with the company.  Retirement did

14   not sit with him very well.  He took on some additional

15   responsibilities.

16   Q.  Understood.  Did someone eventually -- when Pete Martin was

17   promoted from complex manager to vice-president of operations,

18   did someone assume the role of complex manager?

19   A.  Yes.  That would be Joel Williams.

20   Q.  And did you also work for Joel Williams for a time when you

21   were executive assistant?

22   A.  Yes, I did.

23   Q.  And could you help the jury, Mrs. Becker, with just some

24   approximate dates of when those three men were in the various

25   positions.

Florence Becker - Direct

1  *A.*  Oh, dear.

2  *Q.*  This is not a math test, Mrs. Becker.

3  *A.*  I understand.  I'm just -- it would only be a guess I'm

4  afraid.  I can't pin anything down for you.  I would say

5  that --

6       *MR. TUBACH:*  Your Honor, I am going to object.  If

7  it's a guess, then she shouldn't be speculating.

8       *THE COURT:*  All right.  Sustained.

9  *BY MR. LOVELAND:*

10  *Q.*  Mrs. Becker, thank you.  We'll move on.  I want to talk

11  about the nature of your job responsibilities as an executive

12  assistant.  Could you describe for the jury some of the things

13  that you did?

14  *A.*  Yes.  About 50 percent of my time was spent in

15  administrative duties, which would include clerical, preparing

16  for conferences and board meetings, general things like that.

17  The other 50 percent of my day was generally spent creating an

18  accounting report that told everyone who looked at the report

19  exactly what happened to that chicken once it entered the

20  processing plant, in other words, how many we yielded from that

21  chicken.

22  *Q.*  I want to unpack some of the clerical responsibilities you

23  had.  Did you in your role as an executive assistant have

24  occasion to handle various handwritten documents that Pete

25  Martin prepared?

Florence Becker - Direct

1    A.   Yes, I did.

2    Q.   And could you describe for the jury how that went with the

3    handwritten documents that Pete Martin prepared?

4    A.   Generally it happened around our quarterly board meetings,

5    and he would write a status report, sometimes several.

6    Frequently he overwrote what other people wrote.  So he would

7    give me a handwritten report or a revised handwritten report of

8    someone else's, you know, a report that he had made revisions

9    to.  And those I would put into our computer for presentation

10   to the board.

11   Q.   When you say put into the computer, do you mean you would

12   type them up, or how would that work?

13   A.   Yes, yes, type them up, yes.

14   Q.   And could you explain what you mean by the word "overwrote"

15   when you were referring to Pete Martin's handwriting?

16   A.   Sure.  A lot of these reports were prepared by supervisors

17   in the plant, and their language may not have been quite as

18   clear as would present a polished report.  I did an awful lot

19   of that myself.  Pete also did some of that.  And that's where

20   the revisions would come in.

21   Q.   So by overwrote you mean revising, editing those sorts of

22   things?

23   A.   Exactly.  Editing is a better word.

24   Q.   And when Pete Martin was overwriting or editing, would he

25   write on top of handwritten documents, or were they sometimes

1038

Florence Becker - Direct

1    also typed-out documents?

2    A.  They could be either.  But we didn't get many typed-out

3    documents.  They were most -- a lot of them were handwritten.

4    Q.  I want to talk a little bit about Mar-Jac in the 21 years

5    you spent there.  In your role, did you come to learn about the

6    chicken industry at a high level and how it worked?

7    A.  I wouldn't say a high level.  I would say I came to learn a

8    lot more about chickens than I did before.

9    Q.  Of course you did.  And did part of that come from your

10   role in accounting in creating this spreadsheet that sort of

11   tracked the chicken movement through the plant?

12   A.  I am really not a numbers person, so I didn't get near as

13   much from that as I did typing those reports that came in.

14   Q.  Okay.  Are you familiar with a company named Pilgrim's

15   Pride?

16   A.  Yes, I am.

17   Q.  Was Pilgrim's Pride a competitor of Mar-Jac's?

18   A.  I would say so, yes.

19   Q.  Now, did Mar-Jac sell chicken to Kentucky Fried Chicken?

20   A.  Yes.

21   Q.  Did Pilgrim's Pride sell chicken to Kentucky Fried Chicken?

22   A.  I do not know.

23          MR. LOVELAND:  Brief indulgence, Your Honor.

24   BY MR. LOVELAND:

25   Q.  Okay, Mrs. Becker.  I want to ask you a little bit more

Florence Becker - Direct

1  about your relationship with Pete Martin and how you worked

2  with him.  Where physically was Pete Martin's office relative

3  to your office?

4  A.  Mine was right next to him, his, with a door adjoining.

5  Q.  And was there somebody else close by to where your office

6  was?

7  A.  Sure.  We were all pretty close together there.  The

8  complex manager was on the other side of me, but there was no

9  door.  You had to walk down a little hallway to him.

10  Q.  So at one point when he was complex manager, Pete Martin

11  was on one side of your office, and then when he became

12  vice-president, he was on the other side of your office?

13  A.  Correct.

14  Q.  But he was always next door?

15  A.  Yes.

16  Q.  I want to ask you if you could give the jury an idea of how

17  many times roughly you saw Pete Martin's handwriting during

18  your 21-year career working with him?

19  A.  Many, many times.

20  Q.  More than 50, Mrs. Becker?

21  A.  Oh, yes.

22  Q.  More than a hundred, Mrs. Becker?

23  A.  Yes.

24  Q.  And what sort of places other than his handwritten notes,

25  if any, did you see Pete Martin's handwriting?  Mrs. Becker, I

Florence Becker - Direct

1  don't think that was a good question.

2  A.  I think that was about it.

3  Q.  Let me try that again.  Excuse me, Mrs. Becker.

4      Did Pete Martin have a desk calendar?

5  A.  Yes, he did.

6  Q.  Could you describe that for the jury?

7  A.  It was a loose-leaf desk calendar, one page per day, and he

8  did make notes to himself on that very often to remind him of

9  who he met with and things like that.

10  Q.  Did you look through those handwritten notes in the desk

11  calendar also as part of your job?

12  A.  No, very rarely.  On occasion he would ask me to find

13  someone's phone number he had written down there, and I would

14  thumb through and try to find it for him, but that was not

15  something I did on a regular basis.

16  Q.  Okay.  Mrs. Becker, you should have a series of envelopes

17  in front of you.

18  A.  I do.

19  Q.  And I think one of them should say Government's Exhibit or

20  Exhibit 1030 on it.

21  A.  I do.

22  Q.  I am going to ask you to please open that and take a few

23  minutes to look at it, but please don't read anything out loud

24  to the jury.  And just let me know when you have had a chance

25  to look at it.

Florence Becker - Direct

1            MR. LOVELAND:  Your Honor, while Ms. Becker is doing

2   that, I would ask if Mr. Ackaouy could publish -- sorry, not

3   publish, display just for the Court and the parties

4   Government's Exhibit 1030.

5            THE COURT:  He may.

6            MR. LOVELAND:  Thank you.

7            Your Honor, I am noticing we are either going to see a

8   document or Mrs. Becker, so I wonder if we should do this

9   through hard copy instead.

10            THE COURT:  What's your proposal, Mr. Loveland?

11            MR. LOVELAND:  I think we should have hard copies for

12   everyone, Your Honor, and I could distribute some copies for

13   the Court of Government's Exhibit 1030.

14            THE COURT:  Yes, you may.

15            MR. LOVELAND:  Thank you.  Your Honor, we have hard

16   copies for the Court.  Defense was previously provided with

17   electronic copies.  I would ask if the defense could rely on

18   those if that's okay.

19            MR. TUBACH:  That's fine, Your Honor, thank you.

20            MR. LOVELAND:  Thank you very much.

21            THE COURT:  Yes, you may provide those.

22            MR. LOVELAND:  May I provide those to Ms. Buchanan?

23            THE COURT:  Yes, you may.

24            MR. LOVELAND:  Thank you.

25   BY MR. LOVELAND:

Florence Becker - Direct

1   *Q.* Mrs. Buchanan, have you had a chance to look at

2   Government's Exhibit 1030?

3           *THE COURT:* You mean Mrs. Becker?

4           *MR. LOVELAND:* Mrs. Becker, excuse me. I apologize.

5   Thank you, Your Honor.

6   *A.* Yes, I have had a chance to look at it.

7   *BY MR. LOVELAND:*

8   *Q.* I am sorry about that, Mrs. Becker.

9   *A.* No problem.

10   *Q.* So based on your career working at Mar-Jac Poultry, are you

11   able to discern some of the information that's in this

12   document?

13   *A.* It appears to be notes from various conversations. Mark

14   McEwen at the top of the page was our grain director. He would

15   order soybean meal and corn from him. And the basis they talk

16   about, it has something to do with the fact that it's a

17   commodity item. There is a market price and then there is

18   something else based on futures, but I honestly don't know

19   enough about that to speak intelligently about it.

20   *Q.* Okay. And you said there were notes. Is this a

21   handwritten document?

22   *A.* Yes.

23   *Q.* There is another name at the top. Are you familiar with

24   the name Steve Campisano?

25   *A.* No, sir, I am not.

Florence Becker - Direct

1    Q.   Now, based on the various portions of this document that

2    you've identified and other identifying features, do you have

3    an opinion as to who may have prepared this document?

4    A.   Generally Pete or Joel would have made -- would have had

5    discussions about corn and soy meal purchases with Mark.

6    Q.   No, I am sorry, Ms. Becker.  I didn't mean to interrupt

7    you.  Please continue.

8    A.   I couldn't guarantee it's his writing as I didn't see him

9    write it, and I am not a handwriting expert.  It looks similar,

10   and it could have been his, Pete's, or Joel for that -- looks

11   more like Pete's than Joel's.

12   Q.   When you say it looks more like Pete's than Joel's and you

13   referred to "he" several times, did you mean Pete Martin,

14   Mrs. Becker?

15   A.   I did.

16   Q.   Are you able see the date at the top of this?

17   A.   Yes, 8/29/14.

18   Q.   Does that date have any significance to you in terms of the

19   various roles that Pete Martin was in at different times during

20   his career?

21   A.   I would -- yes, he would have been vice-president of

22   operations.

23   Q.   Okay.  And, Mrs. Becker, did you handwrite this document?

24   A.   No, I did not.

25   Q.   And there are various titles listed here.  Are you able to

Florence Becker - Voir Dire

1    discern any of the sort of things written that aren't people's

2    names?  I will direct you to the bottom half of this.

3    A.  Well, the companies, Pilgrim's is more than likely

4    Pilgrim's Pride.  Tyson is another very large poultry company

5    as I am sure most of you are aware.  Claxton is another poultry

6    company.  And I have no idea what the rest of this is about.

7              MR. LOVELAND:  Based on that, Your Honor, I would move

8    for the admission of Government's Exhibit 1030, and I am happy

9    to discuss at side bar.

10             THE COURT:  Any objection to the admission of

11   Exhibit 1030?

12             MR. TUBACH:  Can we wait until after cross-examination

13   to admit the document?  I would like an opportunity to voir

14   dire.

15             THE COURT:  Yes.  Go ahead, Mr. Tubach.

16             Mrs. Becker, one of the attorneys has some questions

17   for you at this time.  Go ahead.

18                       VOIR DIRE EXAMINATION

19   BY MR. TUBACH:

20   Q.  Hello, Mrs. Becker.  Can you see me okay?

21   A.  Yes, I can, thank you.

22   Q.  Thank you.

23             You retired, what, about three and a half years ago?

24   A.  That is correct.

25   Q.  And since that time, have you had interaction with

Florence Becker - Voir Dire

1  Mr. Martin?

2  *A.*  Very little.  Sometimes at the company Christmas party or

3  in passing.  My daughter now works there, so if she is on the

4  phone with me, he will say hello and that sort of thing.

5  *Q.*  Thank you.

6  And is it fair to say that Government's Exhibit 1030

7  based on the content of it could have been written either by

8  Mr. Martin or by Mr. Williams?

9  *A.*  Yes.

10  *Q.*  And as you sit here today, you can't tell us which one of

11  those two wrote that document?

12  *A.*  I -- I cannot guarantee which one wrote it for a number of

13  reasons.  If I didn't see them write it, anybody could have

14  written it.  I didn't mean to sound like -- and I have been

15  gone from there a long time, and I am 70 years old, but --

16  *Q.*  Is it fair to say, ma'am, you are just not sure who wrote

17  that document?

18  *A.*  That is fair to say.

19  MR. TUBACH:  Thank you, ma'am.  I have no further

20  questions.

21  THE COURT:  Any objection to the admission of

22  Exhibit 1030?

23  MR. TUBACH:  Yes, Your Honor.  Can we be heard on side

24  bar?

25  THE COURT:  Yes.

Florence Becker - Voir Dire

1   (At the bench:)

2       THE COURT: Mr. Tubach, go ahead.

3       MR. TUBACH: Your Honor, I believe that Ms. Becker's

4   testimony in this trial is not sufficient to authenticate the

5   document under Rule 901. She testified she has been gone from

6   Mar-Jac for a number of years now, and she is, frankly -- based

7   on the content thinks it was either Mr. Martin or Mr. Williams

8   who wrote the note, and she said, quite frankly, she is unsure

9   who wrote it. I think this is not a sufficient basis to admit

10  the document. The government, of course, could have called

11  Mr. Martin, and they chose not to do so. So in light of her

12  equivocal testimony, I would object to the admission of

13  Government's Exhibit 1030.

14      THE COURT: All right. Thank you.

15      Mr. Loveland?

16      MR. LOVELAND: Your Honor, I think that Mrs. Becker

17  has given testimony that was as and in many ways more specific

18  than at the last hearing. Mrs. Becker again identified the

19  length of time that she spent working for Mar-Jac Poultry of 21

20  years. She testified that she worked for Pete Martin for the

21  entirety of her career. He retired briefly but kind of came

22  back because he didn't take well to retirement. She testified

23  about the places she had seen his handwriting. She was -- she

24  did say, Your Honor, that she was not sure whether it was

25  Mr. Williams or Mr. Martin. However, she did also testify that

Florence Becker - Voir Dire

1  it looked more like Pete Martin's handwriting.  She identified

2  the date as significant to the role that Pete Martin had at the

3  time, and I think that she was more specific on the handwriting

4  here, Your Honor, than she was at the last trial.

5       I would just say too that authenticity is a,

6  obviously, a very low threshold, and I think she has more than

7  met that.  Mr. Tubach's voir dire has shown the jury the weight

8  that they can attach to the document, but I think it's

9  straightforwardly admissible for the same reasons it was at the

10  last trial.

11       THE COURT:  Mr. Tubach?

12       MR. TUBACH:  Your Honor, unless there is evidence from

13  which a jury could conclude more likely than not that it is

14  Mr. Martin's handwriting, this document should not be admitted.

15  It would be speculation.  This witness has said, quite frankly,

16  that she is unsure who wrote it.  And given that equivocal

17  testimony, we believe that has not been sufficiently

18  authenticated and admissible under Rule 901.

19       THE COURT:  The objection will be overruled.  It's

20  true that she indicated that she can't be a hundred percent

21  sure.  She even said that in response to Mr. Tubach's question

22  that she can't be sure who wrote it.  She did emphasize in part

23  that she didn't see who wrote it and for that reason couldn't

24  be sure, but as Mr. Loveland pointed out, she does have

25  familiarity with Mr. Martin's handwriting based upon her job

Florence Becker - Cross

1  duties over the years.  And she testified that the handwriting

2  looks more like Pete's than Joel's.  That is a sufficient basis

3  to establish authenticity for purposes of admission.  The jury

4  will, of course, be the ultimate decider of whose handwriting

5  it is, but I will admit Exhibit 1030 at this time.

6          Thank you.

7          (In open court:)

8          THE COURT:  The objection will be overruled.

9  Exhibit 1030 will be admitted.

10         MR. LOVELAND:  Your Honor, the government has no

11 further questions for Mrs. Becker.

12         THE COURT:  All right.  Cross-examination?

13 Mr. Tubach?

14                    **CROSS-EXAMINATION**

15 BY MR. TUBACH:

16 Q.  Hello again, Mrs. Becker.  I have just a couple questions

17 for you if that's okay.

18 A.  Of course.

19 Q.  So where -- you indicated that Mr. Martin retired.  Do you

20 know roughly when he retired?

21 A.  It was not a long time before I did.  I am going to say

22 about -- it probably would have been early in 2018 or late in

23 2017.

24 Q.  And you said something I believe on your direct testimony

25 that that did not sit well with him?

1  *A.*  No, it did not.  And, in fact, in further conversations, he

2  came back on a part-time basis as director of new product

3  development or something like that.  I don't know the exact

4  title.

5  *Q.*  Is he, as far as you know, currently working at Mar-Jac?

6  *A.*  Yes, on a part-time basis.

7  *Q.*  And does he do anything else with his time, do you know?

8  *A.*  Well, yes, he is a bivocational Baptist minister, so he was

9  planning on spending a lot more time in his ministry.

10  *Q.*  Do you know if he has his own church that he ministers to?

11  *A.*  He does, yes.

12  *Q.*  And that's what he does part-time, and part-time he works

13  at Mar-Jac?

14  *A.*  Yes, yes, that's correct.

15  *Q.*  And how long has he been a bivocational Baptist minister?

16  *A.*  A long, long time.  He was a bivocational minister the

17  whole time he was with Mar-Jac.

18       *MR. TUBACH:*  Thank you.  Ma'am, I have no further

19  questions.

20       *THE COURT:*  Thank you, Mr. Tubach.

21       Additional cross-examination?

22       Mr. Beller, go ahead.

23       *MR. BELLER:*  Thank you, Your Honor.

24                     **CROSS-EXAMINATION**

25  *BY MR. BELLER:*

Florence Becker - Cross

1    *Q.*  Good afternoon, Ms. Becker.  My name is David Beller, and I

2    represent Mikell Fries of Claxton Poultry.  It's nice to chat

3    with you.

4    *A.*  Nice to see you.

5    *Q.*  Ms. Becker, you testified regarding Exhibit 1030, and I

6    think you said that the top part to you was about corn prices

7    or corn and soybean meal; is that right?

8    *A.*  Yes, corn and soybean meal purchases.  That's what it

9    looked like to me.

10   *Q.*  You also mentioned something calls freight and basis; is

11   that right?

12   *A.*  Not freight.  Basis is a term used when talking about this

13   sort of thing, but I don't have a good understanding of what it

14   is.  It has something to do with it's a commodity item.

15   *Q.*  So I promise to not ask you much about basis, ma'am, okay?

16   *A.*  I would probably only be guessing if I answered.

17   *Q.*  Thank you.

18          You said at the top there is a name, and that name is

19   Mark McEwen?

20   *A.*  Yes.

21   *Q.*  And Mr. McEwen is the grain broker; is that right?

22   *A.*  That's correct.

23   *Q.*  So he's the gentleman that would help Mar-Jac with

24   supplemental corn and soybean meal; is that right?

25   *A.*  Yes.  He actually did the purchasing, and it's by railroad

Florence Becker - Cross

1   for the most part, so he would actually contract -- not

2   contract with, but do the purchasing for us.

3   Q.  Okay.  And there was also a gentleman by the name of Steve

4   Campisano.  And his name is written on the top, right?

5   A.  Yes.

6   Q.  And he is the one that you don't know; is that correct?

7   A.  Yes, I do not know him.

8   Q.  And there is a date that's written, and that's August 29th

9   of 2014.  Do you see that?

10  A.  Yes, I do.

11  Q.  Okay.  Now, if we go down just a little bit further, the

12  person who wrote this wrote "talked to Mitch"; is that right?

13  A.  Yes.

14  Q.  Okay.  Do you know if it's Mr. McEwen who talked to Mitch?

15  A.  I have no idea.  I don't know who Mitch is either.

16  Q.  Okay.  Or if that is that Mr. Campisano talked to Mitch, do

17  you know?

18  A.  No, sir, I don't.

19  Q.  Okay.  So you would be guessing on both of those?

20  A.  Yes.  That statement is just meaningless to me.

21  Q.  And the person who wrote this note, insofar as you're

22  aware, would that person know what that that meant?

23  A.  I would hope so.  I think so.

24          MR. LOVELAND:  Objection, Your Honor.

25          THE COURT:  Overruled.

Florence Becker - Cross

1  *BY MR. BELLER:*

2  *Q.*  And let's go down just a little bit further because on the

3  same date there is another reference of talked to Jayson Penn;

4  is that correct?

5  *A.*  Yes.

6  *Q.*  Does that mean that Mr. McEwen talked to Jayson Penn, do

7  you know?

8  *A.*  I do not know.

9  *Q.*  Or how about Mr. Campisano talked to Jayson Penn?

10  *A.*  I am sorry, sir.  I do not know.

11  *Q.*  Or even the person who wrote the note talked to Jayson

12  Penn, we just -- you in reading this don't know; is that fair?

13  *A.*  That is fair.

14  *Q.*  So, ma'am, if I were to push you and ask you questions

15  about this document, would you just be assuming what any of

16  these references mean?

17  *A.*  That's about right.

18  *Q.*  Okay.

19  *A.*  I mean, it looks like the top part is about purchasing,

20  but -- corn and grain.  I would be fairly certain about that,

21  but the rest of the notes under there are meaningless to me.

22  *Q.*  So what it sounds like is the person who would be able to

23  actually speak about this with any substance should be the

24  person who actually wrote it; is that fair?

25              *MR. LOVELAND:*  Objection, Your Honor.

Florence Becker - Redirect

1   A.  I think that's fair.

2          THE COURT:  Hold on one second, Mrs. Becker.

3          Go ahead, Mr. Loveland.

4          MR. LOVELAND:  Objection, speculation, argumentative,

5   and I don't think it's a proper question for Mrs. Becker.

6          THE COURT:  I am going to sustain the objection.  She

7   was actually already asked -- been asked and answered.

8   BY MR. BELLER:

9   Q.  Okay.  One final question, Ms. Becker.  Other than what you

10  are reading on the screen, do you have any personal knowledge

11  about anything that's written on here?

12  A.  No, sir.

13         MR. BELLER:  Thank you, Ms. Becker.

14         I have no further questions, Your Honor.

15         THE COURT:  Thank you, Mr. Beller.

16         Any additional cross-examination?

17         All right.  And, Mr. Loveland, any redirect?

18         MR. LOVELAND:  Just very briefly.

19         THE COURT:  Go ahead.

20                    **REDIRECT EXAMINATION**

21  BY MR. LOVELAND:

22  Q.  Mrs. Becker, is there anyone at Mar-Jac Poultry named

23  Jayson Penn?

24  A.  Not to my knowledge.

25  Q.  How is Jayson Penn spelled on Government's Exhibit 1030

Florence Becker - Redirect

1   before you?

2   *A.*  It -- well, I will tell you what it looks like.  It looks

3   like J-A-F-A-N.  It could be -- and Penn is P-E-N-N.

4   *Q.*  Okay.  I am sorry, Mrs. Becker.  I didn't mean to interrupt

5   you again.

6       *MR. LOVELAND:*  Your Honor, the government --

7   *A.*  It's handwritten.  It's hard to read, sorry.

8   *BY MR. LOVELAND:*

9   *Q.*  Did Pete Martin have a practice of taking notes of his

10  phone calls?

11  *A.*  He -- I don't know about all of his phone calls.  I know in

12  some cases he would write down who he spoke with.  He might

13  write down a phone number on his calendar.

14      *MR. LOVELAND:*  Your Honor, the government would seek

15  to publish Government's Exhibit 1030 at this time or after

16  Mrs. Becker is excused, whatever would be most convenient.

17      *THE COURT:*  It probably would be most convenient for

18  Mrs. Becker if she is excused first.  Is that acceptable?

19      *MR. LOVELAND:*  Absolutely, Your Honor.  There is no

20  further questions for the government.

21      *THE COURT:*  Mrs. Becker, thank you very much for

22  appearing today, and you are excused.

23      *THE WITNESS:*  Thank you very much, and thank you all

24  again for letting me testify from home.

25      *MR. LOVELAND:*  Your Honor, at this time, the

Florence Becker - Redirect

1    government would seek to admit and publish several more

2    exhibits.

3          THE COURT:  Did you want to publish Exhibit 1030?

4          MR. LOVELAND:  Yes.  We would prefer to start there.

5    Thank you very much, Your Honor.

6          THE COURT:  All right.  1030 may be displayed to the

7    jury.

8          All right.

9          MR. LOVELAND:  Thank you, Your Honor.

10         The government would next seek to admit and then

11   publish Government's Exhibit 3037, which is subject to a

12   limiting instruction.

13         THE COURT:  3037?

14         MR. LOVELAND:  Yes, Your Honor.

15         THE COURT:  I am not aware of a limiting instruction

16   as to that one.  Why don't we do a side bar.

17      (At the bench:)

18         THE COURT:  Mr. Loveland, what do you believe the

19   limiting instruction to be?

20         MR. LOVELAND:  Well, Your Honor, I really hate to add

21   one if there is not one, but what we had was the jury can

22   consider the exhibit to prove the existence of a conspiracy but

23   not as to whether any defendant was a member of that

24   conspiracy.

25         THE COURT:  Does that sound consistent with the

Florence Becker - Redirect

1    previous ruling?

2         MR. TUBACH:  Yes, Your Honor, although I believe in

3    candor, it is the lower e-mail of the exhibit that is subject

4    to that limiting instruction.

5         MR. LOVELAND:  That's my understanding too, Your

6    Honor.

7              Thank you, Mr. Tubach, for the clarification.

8         MR. TUBACH:  I believe what the Court said last time

9    is the jury can consider the e-mail to prove the existence of a

10   conspiracy, but not as to whether any defendant was a member of

11   that conspiracy.

12             I can repeat that more slowly if that's helpful.

13        MR. LOVELAND:  I also have it written down on our

14   submission at Docket No. 1378-2, Your Honor.

15        THE COURT:  Mr. Tubach, do you mind repeating the

16   second half of the limiting instruction just so I can

17   double-check what I wrote down?

18        MR. TUBACH:  Of course.  The jury can consider the

19   e-mail to prove the existence of a conspiracy, but not as to

20   whether any defendant was a member of that conspiracy.

21        THE COURT:  Okay.  I am sorry, did someone -- was

22   someone saying something?  All right.  Well, then with that

23   limiting instruction, any objections to the admission of

24   Exhibit 3037?

25        MR. TUBACH:  No further objections, Your Honor.

1    Before we go off side bar, I think we have done this

2  in trial but I am not entirely sure.  When the Court asks are

3  there any objections to the admission of documents that we

4  objected to before, we obviously don't want to stand up and

5  keep saying not previously argued and objected, so I think we

6  have a stipulation in place that all the prior objections are

7  preserved?

8    THE COURT:  Yes, I think we talked about that early on

9  in this trial, but just for clarification, the defendants do

10  not have to renew previous objections.  There is a stipulation,

11  there have been stipulations in the second trial, and the same

12  practice will pertain to this particular trial as well, all

13  right?

14    MR. TUBACH:  Thank you very much.

15    THE COURT:  Thank you.

16    Mr. Loveland, did you have something else?

17    MR. LOVELAND:  Yes, I apologize.  This is the

18  difficulty of being seated here, Your Honor.  Again, and

19  Mr. Tubach flagged this, but the instruction is only for the

20  lower portion of the e-mail.

21    Obviously, I also wanted to raise for the Court

22  outside of the presence of the jury Mr. Lewis appears to be

23  battling some sort of a stomach issue, and we have conferred

24  with his counsel and believe he will be able to come back after

25  lunch.  There are a few more documents that we plan to admit

Florence Becker - Redirect

1    and publish before lunch, so it shouldn't throw off our

2    schedule.  But I wanted to make the Court aware of that.  We

3    obviously hope that he will feel better soon.

4         THE COURT:  Yeah, so the upshot is that there could be

5    a request to take an early lunch?

6         MR. LOVELAND:  Or potentially come back a little late.

7    But I think if we break at noon, I think there is a few summary

8    chart exhibits we will seek to show the jury now which should

9    line up okay on time.

10         THE COURT:  We will play it by ear.  Thank you.

11         (In open court:)

12         THE COURT:  Exhibit 3037 will be admitted.  It may be

13    published.

14         And, ladies and gentlemen, when you have a chance to

15    take a look at it, let me give you the following limiting

16    instruction.  So you will actually see, ladies and gentlemen,

17    that there are two e-mails here.  That lower e-mail from

18    Ms. Brenda Ray, that e-mail may be considered only to prove the

19    existence of a conspiracy, but not for purposes of determining

20    whether any of the -- whether any defendant was a member of

21    that conspiracy.  So, once again, that lower e-mail, only for

22    purposes of determining whether a conspiracy exists, not for

23    purposes of determining whether a defendant was a member of

24    that conspiracy.

25         All right.

Florence Becker - Redirect

1          *MR. LOVELAND:*  Thank you, Your Honor.

2          The government would now move to admit and publish

3     Government's Exhibit 50, which is a summary chart, and we would

4     also follow that with Government's Exhibits 51 and 52.   All

5     three are summary charts, Your Honor.

6          *THE COURT:*  All right.   Any objection to the

7     admission -- why don't we take them one at a time -- to

8     Exhibit 50?

9          Exhibit 50 will be admitted and may be published to

10    the jury.

11         Ladies and gentlemen, once again, this is a summary,

12    and because we have a string of those summaries that are going

13    to be moved and assuming that they are admitted, once again,

14    let me reiterate that instruction that I mentioned to you

15    earlier today, and that is so once again you'll see on the far

16    left-hand side that there is a reference to an exhibit number.

17    And each of those exhibits that are listed on the far

18    right-hand side are exhibits that have been admitted.   The

19    summaries are being admitted because they may assist you in

20    understanding the evidence that has been presented.   But keep

21    in mind that a summary is not evidence of the material it

22    summarizes.   It is only as valid and reliable as the underlying

23    material that it seeks to summarize.   You may give a summary

24    exhibit entire weight, some weight, or no weight at all

25    depending on your assessment of the underlying material and the

Florence Becker - Redirect

1   accuracy of the summary.

2          You may -- yes, so we published the first page, and

3   right now the top of the first page of Exhibit 50 is being

4   shown to the jury.

5          MR. LOVELAND:  Thank you, Your Honor.

6          THE COURT:  All right.  We can do the lower part.  All

7   right.  To the second page top or just the second page.  All

8   right.

9          MR. LOVELAND:  Your Honor, the government would now

10  seek to admit and publish Government's Exhibit 51, which is

11  another summary chart.

12         THE COURT:  Any objection to the admission of

13  Government's Exhibit 51?

14         Exhibit 51 will be admitted.

15         Ladies and gentlemen, same admonition as to the

16  summary exhibits.  The first page may be displayed.

17         MR. LOVELAND:  Thank you, Your Honor.

18         THE COURT:  All right.  The second part of page 1 may

19  be displayed.  All right.  The second page may be displayed.

20  All right.

21         MR. LOVELAND:  Your Honor, the government would now

22  seek to admit and then publish Government's Exhibit 52, which

23  is the next summary chart.

24         THE COURT:  Any objection to the admission of

25  Exhibit 52?

Florence Becker - Redirect

1          All right.  Exhibit 52 will be admitted and may be

2     displayed beginning with page 1, top half.  Same admonition, of

3     course, ladies and gentlemen.  Of course, this is a summary

4     exhibit.

5          All right.  You can show the bottom half of the first

6     page.  All right.  All right.  All right.

7          MR. LOVELAND:  Thank you, Your Honor.

8          I think it's just approaching noon now if it's a

9     convenient time for the Court.  This is a convenient time for

10    the government.

11         THE COURT:  Yes, it is.

12         Ladies and gentlemen, we will go ahead and take the

13    lunch break at this time, so we will go ahead and plan on

14    reconvening at the usual time, 1:30.  Keep those admonitions in

15    mind, those yellow juror buttons visible, and we will see you

16    back at 1:30.  The jury is excused.

17         (Jury excused.)

18         THE COURT:  So Mr. Loveland had mentioned that he

19    thought it would be a good idea to talk about some of the

20    exhibits that the government intends to introduce based upon

21    foundation the government believes was laid by Mr. Sangalis.

22    Did the defendants have a chance to talk about when they might

23    want to discuss those?  We could do it at 1:15, I am not sure

24    how long it might take, or we could do it now.  It doesn't

25    matter to me.

1    Mr. Quinn?

2    MR. QUINN:  Your Honor, I think defendants are happy

3    to do it now or at 1:15.  If the government could let us know

4    how many exhibits are going to be discussed, that might help

5    our discussion.

6    MR. LOVELAND:  Your Honor, just so we can confer fully

7    with Mr. Quinn, I would then suggest we take it up after the

8    lunch break.  This could also give Mr. Lewis a few more minutes

9    for his stomach.  I did want to say that the government is able

10   to call Mr. Suerken in the event Mr. Lewis is not well.

11   THE COURT:  In terms of these PowerPoints, kind of the

12   team-building-type PowerPoint things, do we -- is the

13   government intending to introduce more than -- I think it may

14   be 10103?

15   MR. LOVELAND:  I am going to let Mr. Hart speak.

16   THE COURT:  Sure.

17   MR. HART:  Thank you, Your Honor.

18   There is a single PowerPoint presentation, GX-10106.

19   THE COURT:  106.  That's the government -- in terms of

20   that type of exhibit -- that's the one --

21   MR. HART:  Correct.

22   THE COURT:  Then any objection to -- why don't we

23   reconvene -- and how many other exhibits are we going to talk

24   about too?

25   MR. HART:  Right now, sum total of eight.

Florence Becker - Redirect

1    THE COURT:  And in terms of that PowerPoint that you

2    just referred to, Mr. Hart, does the government intend to

3    introduce the entirety of it?

4    MR. HART:  No, Your Honor.  We would be seeking

5    admissions for pages 1, then 11 through 16.

6    THE COURT:  Okay.  Anything else, Mr. Quinn, before we

7    recess?

8    MR. QUINN:  No.  I am happy to take it up at 1:15.

9    THE COURT:  Mr. Fagg?

10   MR. FAGG:  Just for efficiency purposes, if Mr. Hart

11   has those other eight exhibits.

12   THE COURT:  I think that's what he suggested.  I think

13   that's what he suggested or actually Mr. Loveland suggested we

14   reconvene at 1:15 so there is a chance to confer about what

15   that list is.

16   MR. FAGG:  Okay.  If they need an opportunity to

17   confer, that's fine.  I thought they had the list.

18   THE COURT:  They did, so they could share the list

19   with all of you, and it wouldn't be -- so you would have a

20   little bit of time to take a look at those.

21   We will reconvene -- Mr. Beller has a point.

22   MR. BELLER:  Your Honor, only because of Mr. Lewis'

23   symptoms, and he is going to be on the stand for several hours,

24   I am hoping it makes sense to have a discussion about possibly

25   access to a COVID test before he comes in.

1064

Florence Becker - Redirect

1      THE COURT:  I will let you talk to the government

2  about that.  I don't know the nature of his illness, but -- or

3  how he is feeling.

4      MR. HART:  It's my understanding it's a stomach bug

5  and not that, but we can confer.

6      THE COURT:  Yeah, that's fine.  We will be in recess

7  until 1:15.  Thank you.

8     (Recess at 12:05 p.m. until 1:20 p.m.)

9      THE COURT:  All right.  We are back on the record.

10  The jury is not present.

11      Mr. Hart, go ahead.

12      MR. HART:  Yes, Your Honor.  I think for efficiency it

13  might make sense to sort of group these exhibits because the

14  bases for admission are similar.

15      THE COURT:  Yes.

16      MR. HART:  So for the Court's -- I think that if we

17  sort of chunked 9018, which is the chicken rocket e-mail, 9020,

18  which is the Fonzie e-mail, then GX-10112, 10113, they have

19  some similarities, and then the calendar invites, 1061 and

20  1062, and then we can address the PowerPoint presentation

21  afterwards.

22      THE COURT:  That's fine.

23      MR. HART:  With the Court's permission, could we

24  publish 9018, the chicken rocket e-mail?

25      THE COURT:  Sure.  We'll put that up.  All right.

Florence Becker - Redirect

1           MR. HART:  It's tab 12, I believe, and if you have

2     Sangalis' binder up there.  And this is one of the exhibits

3     that the Court reserved on in the pretrial conference.

4           THE COURT:  Yeah, that's right.  Go ahead, Mr. Hart.

5           MR. HART:  Thank you, Your Honor.

6           This exhibit reflects statements of Defendant Lovette

7     made during key parts of the conspiracy.  It demonstrates his

8     state of mind and his interest in raising prices of chicken as

9     the company is emerging from bankruptcy.  It really goes to the

10    heart of the government's theory, Your Honor.  It shows his

11    interest in getting prices up.  It is relevant.

12          If you look at the e-mail itself, Your Honor,

13    Defendant Lovette received this e-mail at 11:49 a.m., and then

14    Defendant Lovette chose to expand the scope who sees this

15    e-mail and re-forwards it at 8:24 p.m. to senior managers,

16    including two co-conspirators, Defendant Penn and Mr. McGuire,

17    who are heading the bidding for fast-food bids including KFC,

18    the defendant choosing to forward this to a larger broader

19    group, including those who may not be involved with

20    Urner-Barry.

21          The defendant is sending a clear message, a

22    unequivocal message to some of his senior managers on his state

23    of mind.  It's relative to show motive.  And, again, as the

24    company is emerging from bankruptcy, it shows his state of mind

25    of increasing the price of chicken throughout Pilgrim's.

Florence Becker - Redirect

1          *THE COURT:* Response?  Mr. Shaw?

2          *MR. SHAW:* As Mr. Hart said, this one was argued at

3     the pretrial conference, and Your Honor reserved ruling on it.

4     Your Honor specifically reserved ruling for two reasons, I

5     believe.  One was a little bit of definition on what "on behalf

6     of" means.  That's not really the subject of this argument.

7     But more so, what Your Honor asked the government to do was to

8     see whether a witness was going to testify to link up the

9     relevancy of a CEO commenting on a public index.

10          And, Your Honor, the government has not done that

11    here.  They removed the witness for which they had scheduled to

12    testify to this.  They just had a custodian come in and

13    authenticate the document.  Essentially what the government is

14    arguing is that it was a conspiracy with the CEO to want prices

15    to increase when they see it in a public index.  It is simply a

16    comment on a public index, Your Honor, so we would argue this

17    has no relevancy whatsoever to the conspiracy.

18          *THE COURT:* All right.  Thank you.

19          Anything else, Mr. Hart?

20          *MR. HART:* No, just to indicate again that he -- the

21    defendant expanded the scope of who saw this, so it is relevant

22    because he is sharing it with Defendant Penn and Mr. McGuire.

23          *THE COURT:* Okay.  Mr. Beller?

24          *MR. BELLER:* Your Honor, and for the purposes of my

25    client, my concern, of course, is the "on behalf of Bill

Florence Becker - Redirect

1    Lovette" line in that the testimony of Mr. Sangalis is that

2    their system allows a different user to be able to access

3    certain e-mail accounts and be able to send an e-mail on behalf

4    of Mr. Lovette.  So from my perspective, we have multiple

5    layers of hearsay, and we don't know who actually the author of

6    this e-mail is and whether or not Mr. Lovette directed it.  And

7    so under simply a hearsay objection, we would oppose this

8    coming in.

9         THE COURT:  Okay.  Yeah, as to Mr. Beller's objection,

10   that will be overruled.  Mr. Sangalis actually testified that

11   he looked at the metadata, and it was sent by Mr. Lovette, so

12   that is overcome.

13        And as Mr. Schall noted, my concerns about "on behalf

14   of" have been resolved by Mr. Sangalis' testimony, but the

15   relevancy objection has not.  Once again, this is -- the Re:

16   line of this is an Urner-Barry Index, so this is a comment on,

17   you know, a public price, chicken prices rising, and really I

18   can't see any relevance to this at all.  It's just a comment on

19   public prices.  And, you know, as we know from the testimony,

20   the supply of -- or the -- the supply of certain types of

21   chicken, for instance, small birds, was influx.  And the fact

22   that there may be some change in the price of chicken has

23   nothing to do with anything that has to do with a conspiracy.

24   So I will not be admitting this particular exhibit.

25        Next one?

Florence Becker - Redirect

1          MR. HART:  Again, when we were chunking this, Your

2     Honor, the Fonzie e-mail.

3          THE COURT:  Yes.  Let's take a look at that.  What tab

4     is that one?

5          MR. HART:  Tab 17 in your binder.

6          If you can pull that up, Mr. Ackaouy.

7          And, Your Honor, the basis by which we would seek to

8     admit this would be the same, again statements of Defendant

9     Lovette made during key parts of the conspiracy, demonstrates

10    his state of mind.  As for relevancy, it's very similar to the

11    chicken rocket.  He receives this, this e-mail, and he chooses

12    to expand the scope of who he sends this to, including the two

13    co-conspirators, Defendant Penn and Mr. McGuire.

14         THE COURT:  Got it.

15         Anything more, Mr. Schall?

16         MR. SCHALL:  Thank you, Your Honor.

17         Your Honor, it would be the same arguments for GX-9020

18    as we made for GX-9018.  You reserved ruling for the very same

19    reason:  One, whether or not there was going to be any sort of

20    testimony to link up the Georgia Dock with the conspiracy

21    alleged by the government.  There has been no effort and there

22    has been no success by the government to link those two items

23    together.

24         In addition to the arguments already made on GX-9018,

25    without repeating them, I believe at the pretrial conference

Florence Becker - Redirect

 1   Mr. Fagg also raised the additional prejudice of the fact this

 2   e-mail comes from a government entity at agr.georgia.gov, so to

 3   the extent there is any confusion by the jury as to Mr. Lovette

 4   attempting to rig a government index, it also would be very

 5   prejudicial.

 6           *THE COURT:*  Thank you, Mr. Schall.

 7           Mr. Hart, anything more on 9020?

 8           *MR. HART:*  No, Your Honor.  We would be willing to

 9   redact that portion if that changes anything.

10           *THE COURT:*  As to Mr. Schall's last point, the one

11   that Mr. Fagg had mentioned at the pretrial conference?

12           *MR. HART:*  Yes, Your Honor.

13           *THE COURT:*  I am going to sustain the objection as to

14   relevance on this one too.  As I had noted before at the trial

15   preparation hearing, once again, this is some type of a comment

16   on public information.  And given that fact, as Mr. Schall

17   pointed out, there really hasn't been any link between that and

18   anything having to do with this particular case, so I find that

19   it is irrelevant and will not admit 9020.

20           Next one, Mr. Hart?

21           *MR. HART:*  Next in the groupings would be GX-10112 and

22   10113.

23           Let's do 10112, Mr. Ackaouy, first.

24           That's tab 18, Your Honor.

25           *THE COURT:*  Thank you.

1    MR. HART:  The government would be seeking admission

2    for non-hearsay purpose of effect on listener.  It's also

3    Defendant Lovette's statements and an admission pursuant to

4    801(d)(2)(A), and it's relevant to show motive.  The e-mail

5    details as the company was emerging from bankruptcy what

6    happened, the steps that were taken.  And a portion of the

7    record also talks about the company's new pricing strategy,

8    which is something that one of the witnesses, Robbie Bryant,

9    talked about.  He testified when he came in, there was a shift

10   in the culture from a more customer focused to a more

11   bottom-line focused culture.

12        And to clarify for the Court, 10112 is an e-mail from

13   Sheri Garland who is Mr. Lovette's executive assistant.  10113

14   is also an e-mail from Ms. Garland, a message on behalf of

15   Defendant Lovette, which is on tab 19, Your Honor.

16        THE COURT:  Why don't we focus on 10112 at this time.

17        Mr. Schall, any comments?

18        MR. SCHALL:  Yes, Your Honor.  Your Honor, focusing on

19   10112 at the moment, so to address the government's arguments

20   first, there is no effect on the listener that's really been

21   elaborated here, who the effect is supposed to be on or who the

22   listener is.

23        When it comes to the argument on motive, what

24   Robbie -- Mr. Bryant testified to was that when Mr. Lovette

25   came to Pilgrim's, it became a fact-based.  It became data.  It

Florence Becker - Redirect

1  became what's your next best sale.  There is nothing in this

2  document that would go to a motive other than the CEO looking

3  to turn around a company.  There is no motive here when it

4  comes to a price-fixing conspiracy.

5          But, Your Honor, I think the larger issue as to an

6  801(d)(2)(A) argument is that the bottom e-mail is sent from

7  Mr. Lovette.  He then responds to that e-mail again.  But the

8  e-mails above it, first Ms. Rosemary Geelan responds and says,

9  My comments are below in red.  After that, Mr. Fabio says, Some

10 changes in green.  And then Ms. Garland responds last and says,

11 My edits and edition are in blue.  This is a black and white

12 document, Your Honor.  We have no idea what statements were

13 added, edited by those other individuals.  So, Your Honor, I

14 don't think we can differentiate between the statement of

15 hearsay and an 801(d)(2)(A).

16          THE COURT:  All right.  Thank you, Mr. Schall.

17          Mr. Hart?  So first of all, why don't we talk about

18 what appears to be hearsay at the top, the non-Lovette e-mails.

19          MR. FAGG:  Your Honor, can I clarify one thing on

20 that?

21          THE COURT:  What's that, Mr. Fagg?

22          MR. FAGG:  May we clarify one thing with regard to

23 that hearsay?

24          THE COURT:  Yeah.

25          MR. FAGG:  So just to make sure that we are tracking

Florence Becker - Redirect

1    here, if you read each one of these e-mails, the one from

2    Ms. Geelan, the one from Mr. Sandri, and the one from

3    Ms. Garland, each of them are editing Mr. Lovette's original

4    e-mail that was sent at 1027 at 1:43 p.m.

5           THE COURT:  Oh, so your point is that we can't assume

6    that the Lovette e-mails haven't been changed by the subsequent

7    commenters.

8           MR. FAGG:  Correct, Your Honor.  And I think it's more

9    than that.  We affirmatively can see -- they are saying in

10   there, My comments are below in red.  My comments are below in

11   green.  Additional edits are in blue.

12          So there is no way that this original is what

13   Mr. Lovette wrote.  But we have no idea what they changed.

14          THE COURT:  Understood, yeah.  Okay.

15          Mr. Hart, go ahead.

16          MR. HART:  Thank you, Your Honor.

17          Sort of viewing both of these exhibits in tandem,

18   Defendant Lovette eventually, if not wrote all of it, adopted

19   it when it was sent on his behalf to the kickoff meeting

20   attendees.  As for -- to respond to who was the effect on the

21   listener, Defendant Penn is on the CC line.  But also to

22   address in terms of motive, turning around a company to boost

23   profits is a motive to fix prices which tends to make firms

24   profitable, so we would contest.

25          THE COURT:  I am sorry, but what's -- what is the

Florence Becker - Redirect

1   adoptive e-mail?

2           MR. HART:  Sure.  If we turn to 10113 which is tab 19,

3   the subject says a message from Bill Lovette to the 2013

4   kickoff meeting attendees.  It's sent on behalf of his

5   executive assistant.

6           THE COURT:  And how do we know that Ms. Garland is his

7   executive assistant?

8           MR. HART:  The witness testified that the "on behalf"

9   e-mail designation in certain circumstances assistants would

10  have access to sending e-mails on behalf of whom they worked

11  with, if I recall.

12          THE COURT:  I didn't hear anything about Ms. Garland,

13  though.

14          MR. HART:  One minute, Your Honor.

15          THE COURT:  Sure.

16          MR. HART:  Regardless of that issue, Your Honor, it's

17  clear that Ms. Garland was one of the individuals who edited

18  Mr. Lovette's original e-mail and now is sending it to senior

19  executives, as well as attendees of the 2013 kickoff meeting.

20          THE COURT:  Okay.

21          Mr. Schall?

22          MR. SCHALL:  Thank you, Your Honor.

23          So, Your Honor, my recollection is the same.

24  Mr. Sangalis said that certain individuals could be given

25  access.  There was no testimony as to Ms. Garland personally or

Florence Becker - Redirect

1    what her position was.

2         In regard to GX-10113, at the top there it says from

3    Sheri Garland, on behalf of Sheri Garland.  What Mr. Sangalis

4    had testified to was that whoever says is "on behalf of" for

5    further e-mails, that he clarified that's who sent the

6    document.  So here we have --

7         THE COURT:  Of the ones he was asked about, and I

8    can't remember if he was asked about this one, it's in the

9    book, so I guess that was one of the ones, yeah, you are right.

10   So his testimony would have been that "on behalf of" when he

11   looked at the metadata, it was sent by --

12        MR. SCHALL:  By the person who it was sent on behalf

13   of.  That was his testimony.  And Your Honor, to the point that

14   Mr. Hart made that Sheri Garland was the last person to edit

15   it, that would actually speak to the fact that this is Sheri

16   Garland's statement which makes it hearsay.  She is sending it

17   out.  She is the only one it is sent from.  And, Your Honor, I

18   would just also clarify that Ms. Garland was on the

19   government's witness list and they pulled Ms. Garland, so we

20   have no context for this e-mail whatsoever.

21        THE COURT:  Okay.  Thank you, Mr. Schall.

22        Mr. Hart, anything else?

23        MR. HART:  Nothing, Your Honor.

24        THE COURT:  Yeah, so the objection as to 100112 is

25   sustained.  It is true on a black and white copy we just can't

Florence Becker - Redirect

1   tell who wrote what, and I think that the comments by the other

2   people are hearsay.

3           In terms of Mr. Hart's theory about an adoptive

4   admission or at least, you know, Mr. Lovette is adopting a

5   final version of it, that final version being reflected in

6   Exhibit 100113, Mr. Sangalis did not establish a link between

7   the so-called final version in 100113 and Mr. Lovette sending

8   it out, because even though the subject line of this exhibit

9   says "message from Bill Lovette," the testimony of Mr. Sangalis

10  is that if it says "on behalf of," it was actually sent by the

11  person on whose behalf it was sent.  That was the author of it.

12          So in this case, once again, just as reflected in the

13  "from" line on Exhibit 100113, the author is Sheri Garland, and

14  I haven't heard any testimony about who exactly she is or what

15  relationship she has to Mr. Lovette.  And even if she is

16  Mr. Lovette's executive assistant, that still doesn't mean, as

17  Mr. Schall pointed out, that this isn't things that she wrote.

18  We don't know whether Mr. Lovette approved it.  Ms. Garland was

19  actually the last editor, and we have a number of days passing

20  in between anyway, so it's just a lot of uncertainties.  It

21  hasn't been established.  So I don't find that 100113 can

22  fairly be considered to be some sort of adoption by

23  Mr. Lovette, and as a result, it has the same problems that

24  100112 does in that we're not sure the authorship and,

25  therefore, could contain hearsay, so I will sustain the

Florence Becker - Redirect

1   objection as to that exhibit as well.

2          We're getting a little bit late now, Mr. Hart.  Are

3   these, those final two ones that I think we're going to talk

4   about, the calendar invites, are they something that would come

5   up this afternoon?

6          MR. HART:  These are documents that Mr. Sangalis

7   authenticated.

8          THE COURT:  So that should be pretty quick.  Anything

9   more on that?

10          MR. HART:  1061 and 1062?

11          THE COURT:  Yeah, that's what I was assuming we were

12   going to talk about.

13          MR. HART:  No, Your Honor.  Just they are calendar

14   invites and --

15          THE COURT:  Mr. Schall, anyone else?

16          Mr. Quinn, go ahead.

17          MR. QUINN:  I am happy to weigh in on this.  So at the

18   very least, the hearsay below the line in the calendar invites

19   should be redacted.  And, Your Honor --

20          THE COURT:  Let me check what tab.  I see them.  Go

21   ahead, Mr. Quinn.

22          MR. QUINN:  I am sorry, Your Honor, so I think in 1062

23   there is a hearsay statement below the line.  I am looking at

24   1061 right now.  Your Honor, it's our position that the entire

25   thing is hearsay and that the government hasn't laid any kind

Florence Becker - Redirect

1  of a business record foundation for either of these documents.

2  I asked Mr. Sangalis on the stand whether he had any idea

3  whether Ms. Garland made a usual practice of ensuring the

4  accuracy of the people who attended these meetings or going

5  back afterwards and checking to make sure the people attended,

6  and he said he had absolutely no idea and agreed with me that

7  Ms. Garland would be the one to talk to about both of these

8  exhibits.  So, Your Honor, it's our position the entire

9  Exhibit 1061 and 1062 is hearsay.  At the very least, that

10  sentence below the line in 1062 should be redacted.

11       THE COURT:  Thank you.

12       Mr. Hart, anything more on that?

13       MR. HART:  Only one thing to add very briefly, Your

14  Honor.  The effect on the listener in terms of another basis in

15  which to get it in.

16       THE COURT:  Okay.  Mr. Quinn, go ahead.

17       MR. QUINN:  Your Honor, I would just point out there

18  has been no effect on the listener articulated either by

19  Mr. Sangalis or any other witness.

20       THE COURT:  Right.  There has been no effect on the

21  listener.  I will sustain the objection as to the hearsay in

22  1062, that Re: line at the very bottom, that should be

23  redacted.  Otherwise, I will admit both exhibits and overrule

24  the objections to them.

25       The theory as to the admissibility of these calendar

1078

Florence Becker - Redirect

1   invitations is they are not really hearsay at all.  They are

2   really just a business record being sent to someone who invites

3   someone to a meeting, and I admit these on the same theory as

4   other calendar invites in the second trial, so I will overrule

5   those objections.

6          Mr. Quinn?

7          MR. QUINN:  One quick point.  It looks like there is a

8   reference to JBS in each of these in terms of the location.  If

9   the government would agree to just redact that reference to JBS

10  as well.

11         THE COURT:  Yeah, I see that.  Both of them have in

12  parenthesis a JBS U.S.  Any objection to that, Mr. Hart?

13         MR. HART:  No, Your Honor.

14         THE COURT:  Good idea, Mr. Quinn.

15         Anything else we should do before we bring the jury

16  back in?

17         MR. HART:  There is one more document which probably

18  would take some time, so perhaps it's best that we --

19         THE COURT:  I think we better wait.  I want to try to

20  keep on track even though we are off track right now.

21         Anything else before we bring the jury back in?

22         All right.  Let's bring the jury in.

23         (Jury present.)

24         THE COURT:  Sorry for the delay, ladies and gentlemen.

25  We were talking about a few exhibits, and hopefully that will

Florence Becker - Redirect

1    help things go a little bit smoother.

2         Mr. Loveland, go ahead.

3         *MR. LOVELAND:*  Thank you, Your Honor.

4         At this point, the government would seek the Court's

5    permission to publish Government's Exhibit 1427.

6         *THE COURT:*  You may.

7         *MR. LOVELAND:*  Thank you, Your Honor.

8         *THE COURT:*  All right.

9         *MR. LOVELAND:*  And, Your Honor, the government would

10   next seek to publish Government's Exhibit 3025.  This was on

11   the notice that contained all of the exhibits that were

12   admitted earlier, and the Court ruled it admissible in a prior

13   ruling.  I would -- it should be Docket No. 1363-1 at page 123

14   is Your Honor's ruling.

15        *THE COURT:*  3025 may be displayed.

16        All right.

17        *MR. LOVELAND:*  Thank you, Your Honor.

18        At this point, the government would seek to call

19   Mr. Bob Lewis as a witness.

20      (**Robert Lewis** was sworn.)

21        *THE WITNESS:*  I do.

22        *COURT DEPUTY CLERK:*  Please state your name and spell

23   your first and last name for the record.

24        *THE WITNESS:*  Robert Lewis, R-O-B-E-R-T, L-E-W-I-S.

25        *THE COURT:*  Go ahead, Mr. Hart.

Robert Lewis - Direct

1      **DIRECT EXAMINATION**

2    *BY MR. HART:*

3    *Q.*  Good afternoon, Mr. Lewis.

4    *A.*  Good afternoon.

5    *Q.*  Mr. Lewis, would you please share with the jury where you

6    live.

7    *A.*  Louisville, Kentucky.

8    *Q.*  And where were you born and raised up?

9    *A.*  I was born and raised in Frankfurt, Kentucky.

10   *Q.*  How far did you go in school?

11   *A.*  About two years in college.

12   *Q.*  Did there come a time when you worked in the chicken

13   industry?

14   *A.*  Yes.

15   *Q.*  When did you first work in the chicken industry?

16   *A.*  Beginning in October of 1973.

17   *Q.*  Where did you work?

18   *A.*  Kentucky Fried Chicken.

19   *Q.*  How long did you work for KFC?

20   *A.*  About 25 years.

21   *Q.*  What did you do for KFC?

22   *A.*  I was in the purchasing department.  I handled various

23   product categories through the years, but ended up the last

24   several years buying poultry.

25   *Q.*  Can you share with the jury what the KFC's purchasing group

Robert Lewis - Direct

1   does?

2   A.  It buys all of the restaurant supplies, equipment, food

3   items.

4   Q.  Mr. Lewis, could you pull your mic a little farther up?  I

5   want to make sure everyone can hear you.

6   A.  Sorry.

7   Q.  And, Mr. Lewis, over the years that you worked for KFC in

8   the purchasing group, did you bid out chicken supply contracts?

9   A.  Yes.

10  Q.  And over this time period approximately how many contracts

11  did you bid out?

12  A.  Roughly a hundred.

13  Q.  And could you share with the jury why you left KFC in 1999?

14  A.  The team that I was part of was dissolved, and they asked

15  some of us to move to another organization.  I was one that

16  moved to the other organization.

17  Q.  What was that organization?

18  A.  Restaurant Supply Chain Solutions, which is a buying

19  cooperative.

20  Q.  I am sorry, could you repeat that?  People were coughing.

21  I want to make sure everyone heard that.

22  A.  Yes, Restaurant Supply Chain Solutions which is a buying

23  cooperative.

24  Q.  And could you share with the jury what a buying cooperative

25  is?

Robert Lewis - Direct

1   *A.* Well, in this case, RSCS was the exclusive supply chain

2   management company for Yum Brands.

3   *Q.* And what concepts are a part of Yum Brands?

4   *A.* All of its restaurant concepts, which included KFC, Taco

5   Bell, and Pizza Hut.

6   *Q.* For the purposes of today, sir, when we talk about RSCS,

7   can we commonly refer to it as KFC?

8   *A.* Yes.

9   *Q.* How long did you work for KFC's cooperative?

10  *A.* About 11 years.

11  *Q.* What was your role?

12  *A.* I was director and then senior director of the chicken on

13  the bone poultry procurement.

14  *Q.* And can you share with the jury what sort of

15  responsibilities you had as the senior director of poultry at

16  KFC's co-op?

17  *A.* Yes. Basically managed the supply chain for

18  chicken-on-the-bone products required by KFC.

19  *Q.* Now, you mentioned chicken-on-the-bone products. Can you

20  share with the jury what type of chicken products consist of

21  chicken on the bone?

22  *A.* Chicken on the bone would be the familiar one-piece snack,

23  three-piece meals, 10 and 20-piece buckets that you buy at KFC.

24  *Q.* And during your time at KFC's cooperative, were you

25  involved in the bidding for chicken supply contracts?

Robert Lewis - Direct

 1   A.   Yes.

 2   Q.   And during these 11 years, sir, approximately how many

      chicken supply contracts did you bid out?

 4   A.   One for each year, so 11.

 5   Q.   And, sir, what is the usual length of term of these

 6   contracts that you bid out?

 7   A.   One year.

 8   Q.   From which suppliers did you purchase chicken for KFC

 9   restaurants during the 1999 to 2009 time period?

10   A.   I don't recall the number specifically, but probably in the

11   neighborhood of 12 to 15 suppliers.

12   Q.   Did you purchase from Pilgrim's Pride?

13   A.   Yes.

14   Q.   Claxton?

15   A.   Yes.

16   Q.   Mar-Jac?

17   A.   Yes.

18   Q.   George's?

19   A.   Yes.

20   Q.   Tyson?

21   A.   Yes.

22   Q.   Koch Foods?

23   A.   Yes.

24   Q.   Now, sir, you said that you worked there until 2009.   What

25   did you do after 2009?

Robert Lewis - Direct

1    A.   I went into retirement.

2    Q.   And what did you do in your retirement, sir?

3    A.   Well, I spent a lot of time with my family.  I am very

4    active in my church.  I love woodworking.  I played a little

5    golf like most guys, and I like to read.

6    Q.   During your retirement, did you keep up with the chicken

7    industry?

8    A.   I did not.

9    Q.   Did there come a time when you returned to work for KFC's

10   co-op?

11   A.   Yes.

12   Q.   When did you return?

13   A.   In May of 2014.

14   Q.   In what capacity did you return?

15   A.   As a consultant.

16   Q.   How long did you stay?

17   A.   Approximately seven months.

18   Q.   Why did KFC's co-op ask you to come back?

19   A.   The individual that was leading the team at that point, the

20   poultry team, left abruptly, and they were in the midst of a

21   very critical supply situation, so they asked me to come back

22   and help them work through that challenge.

23   Q.   Okay.  Sir, let's talk about that supply situation.  Was

24   that in 2014?

25   A.   Yes.

Robert Lewis - Direct

1    Q.  How serious of a supply chain situation was there in 2014?

2    A.  Very severe.

3    Q.  And can you share with the jury what you mean by that?

4    A.  Yes.  We were faced with the possibility that a number of

5    KFC restaurants were going to have to close down for lack of

6    supply.

7    Q.  Did you have an understanding of why there was a supply

8    situation in 2014?

9    A.  Yes.

10   Q.  What was the basis for your understanding?

11   A.  My experience.

12   Q.  What did you understand the reasons to be why there was a

13   chicken supply situation?

14        MS. NIELSEN:  Judge, I am going to object as to

15   foundation.

16        THE COURT:  Sustained.  If you could lay foundation

17   for that.

18   BY MR. HART:

19   Q.  Sure.  When you came back to KFC's co-op, what did you do?

20   A.  When I came back to the co-op?  I helped the team, poultry

21   team, secure a supply for KFC.

22   Q.  Did you participate in internal meetings?

23   A.  Internal meetings, yes.

24   Q.  What steps did you take to assess the seriousness of the

25   supply situation?

1086

Robert Lewis - Direct

1   A.  Well, I had initially met with the senior team who were

2   trying to convince me to come back, and they gave me an

3   overview of what the situation was.  And then I better

4   understood it after I sit down with the poultry team and talked

5   through the situation.

6   Q.  And after you sat down with the poultry team, sir, did you

7   come to an understanding of why there was a chicken shortage?

8   A.  Yes.

9   Q.  Could you share with the jury why there was a chicken

10  shortage?

11  A.  There were two primary reasons, one of which was KFC was in

12  the midst of a Mother's Day promotion, and the demand for

13  chicken had exceeded the contract volume that was in place.

14  And the second reason was because of shifting consumer demand.

15  There was greater demand for big birds than small birds, so

16  plants were shifting their production which created part of the

17  shortage for the small birds.

18  Q.  And, Mr. Lewis, could you explain to the jury what you did

19  to address the 2014 chicken shortage?

20  A.  The first step in the process after meeting with the team

21  initially was to contact KFC Corporation and obtain a demand

22  forecast from them that would give us the details of the volume

23  of chicken they would need for 2015.

24  Q.  Are you familiar with the term "incremental load"?

25  A.  Yes.

Robert Lewis - Direct

1    Q.  How are you familiar with the term "incremental load"?

2    A.  From my experience.

3    Q.  Let's talk about incremental loads.  Would you please share

4    with the jury what is an incremental load?

5    A.  An incremental load in this case is a truckload or

6    truckloads of product that were purchased in addition to the

7    contracted quantity.

8    Q.  Did you purchase incremental loads for KFC to address the

9    chicken supply shortage?

10   A.  Yes.

11   Q.  Did you purchase incremental loads from Pilgrim's Pride?

12   A.  Yes.

13   Q.  Did you purchase incremental loads from Claxton?

14   A.  Yes.

15   Q.  Did you purchase incremental loads from other chicken

16   suppliers?

17   A.  I did.

18   Q.  Approximately over what time period did KFC purchase these

19   incremental loads to address the shortfall?

20   A.  I don't remember specifically, but perhaps a

21   couple-of-month period.

22   Q.  Would you please give the jury a sense of approximately how

23   many incremental loads you purchased?

24   A.  I purchased 52 incremental loads.

25   Q.  And when you say "incremental loads," is that a truckload?

Robert Lewis - Direct

1   *A.*  Yeah, a load is a truckload.

2   *Q.*  And approximately how much chicken is on a truckload?

3   *A.*  Approximately 33,500 pounds.

4   *Q.*  Now, you mentioned earlier that an incremental load is

5   chicken that you buy in addition to what's already committed

6   from a contract; is that correct?

7   *A.*  That's correct.

8   *Q.*  And can you give the jury a sense of in 2014 what was the

9   amount of chicken that had been contractually committed to be

10  purchased by KFC during that time period?

11  *A.*  The contracts that we had in place called for a total of

12  200 truckloads of chicken per week .

13  *Q.*  So to get this clear, you had 200 truckloads a week from

14  contract, and then to address the chicken shortage, you

15  purchased an additional 50?

16  *A.*  Yes, 52, actually.

17  *Q.*  52.  Thank you.

18        Approximately what percentage of the total chicken

19  purchased by KFC were these 52 incremental loads?

20  *A.*  If you consider the 200 loads per week over a full year,

21  the 52 incremental loads amounted to less than one-half of

22  1 percent of that total.

23  *Q.*  And sir, approximately how much money did it cost KFC to

24  cover this one-half of 1 percent of the total chicken purchased

25  by KFC over this time period?

Robert Lewis - Direct

1  *A.*  The incrementable cost over and above the contract was

2  about $540,000.

3  *Q.*  Could you please explain to the jury why KFC's co-op paid

4  approximately $540,000 for this extra chicken?

5  *A.*  We were in a very desperate supply situation.  We were at a

6  crisis level.  And in order to make sure that we were able to

7  secure the product, we made these exorbitant offers, if you

8  will, to the suppliers hoping that they would accept an offer

9  of that magnitude.

10  *Q.*  Now, you mentioned exorbitant offers.  What were the

11  prices -- how did the prices for these incremental loads

12  compare to the contract price that you had in existence at that

13  time?

14  *A.*  The contract prices at that time were in the neighborhood

15  of 92 cents per pound FOB the plant.  These incremental loads

16  were purchased in a range of from I believe $1.23 to $1.45 per

17  pound.

18  *Q.*  Based on your decades of experience, sir, did you consider

19  the price by which KFC purchased these incremental loads to be

20  the market price for chicken?

21  *A.*  I did not.

22  *Q.*  Can you please share the jury why you did not?

23  *A.*  Well, again, the current contract price for KFC chicken at

24  that time was 92 cents.  That's a long way from $1.23 and

25  $1.53 -- or $1.45.  And besides, that's a very wide range,

Robert Lewis - Direct

1   $1.23 to $1.45.  Market prices generally don't swing that much

2   in a short period of time.

3   Q.  Sir, after you addressed the supply chain issue, did you

4   have another assignment in 2014?

5   A.  Yes.  Just before my two-month contract ended, I was asked

6   to stay for an additional two months to assist the poultry team

7   in negotiating the 2015 contracts.

8   Q.  Let's talk about the bidding for the 2015 contract.

9        Mr. Lewis, what was your role during the bidding for

10  the 2015 contract?

11  A.  I served as the point person for the negotiations.

12  Q.  And as the point person, were you familiar with internal

13  meetings within KFC's co-op regarding the 2015 contract?

14  A.  Yes.

15  Q.  Did KFC's co-op assemble a team to handle the bidding out

16  of these 2015 contracts?

17  A.  Yes.

18  Q.  Who was part of the team responsible for buying chicken for

19  KFC during the bidding of the 2015 contracts?

20  A.  There were several individuals that would include Pete

21  Suerken, Mary Hester, Steve Campisano, and eventually Rich

22  Eddington, sorry.

23  Q.  Let's go through each of those people's roles.  You

24  mentioned Pete Suerken.  What was his role on the chicken team

25  for the 2015 contract?

Robert Lewis - Direct

1   *A.*  Mr. Suerken was a senior VP of RSCS, and he was our team

2   leader.

3   *Q.*  What does the team leader do on the chicken team at KFC's

4   co-op?

5   *A.*  Well, he determined the approach that we should take with

6   suppliers, pretty much conducted the meetings that we had, and,

7   of course, made all of the important decisions throughout the

8   process.

9   *Q.*  And when you reference important decisions, what are you

10  referring to?

11  *A.*  Well, if -- well, just about anything that had to do with

12  the 2015 negotiations was considered important, so he was the

13  person that we went to for those answers.

14  *Q.*  You also mentioned Mary Hester.  Can you share with the

15  jury what her role was during the 2015 contract, bidding for

16  that contract?

17  *A.*  Mary was also a member of the poultry team and worked in

18  the further-processed chicken area primarily.

19  *Q.*  Can you provide some color on what that means?

20  *A.*  Yes.  KFC requires two categories of products, one being

21  the chicken on the bone which I described earlier.  The other

22  would be further-processed chicken products like nuggets,

23  strips, tenders, filets, popcorn chicken, and things of that

24  nature.

25  *Q.*  Mr. Campisano, you said he was part of the team.  What did

Robert Lewis - Direct

1092

1 he do?

2 A.  He was also part of the further-processed team, but he was

3 also a distribution expert and was tremendous help to us on

4 that side of things as well.

5 Q.  And Mr. Eddington, you testified that he came late to the

6 party, so can you provide some details in terms of when he was

7 first involved in the bidding of the 2015 contracts and what

8 his role was?

9 A.  I don't remember the specific date, but he came in August

10 of 2014, sometime in August, and his responsibility was to

11 replace Mr. Mike Ledford as the leader of the poultry team.

12 Q.  I want to talk about the bidding out of these contracts,

13 but first let's orient the jury on the specifics of the bid.

14 Let's provide the terms of the bid.  Can we do that?

15 A.  Okay.

16 Q.  What was the product that KFC was going to bid out for the

17 2015 contract?

18 A.  The team was going to bid out KFC's chicken-on-the-bone

19 product.

20 Q.  And based on your experience, sir, how important of a

21 product is the eight-piece chicken-on-the-bone product to KFC?

22 A.  For Kentucky Fried Chicken, chicken is by far the most

23 critical raw ingredient that comes into the restaurant.  If a

24 chicken restaurant doesn't have chicken, then it closes down.

25 Q.  And, sir, what size bird does KFC use for its eight-piece

Robert Lewis - Direct

1    chicken-on-the-bone product?

2    A.  It's a 4-pound target weight.

3    Q.  Now, let's talk about the length of contract.  You

4    testified earlier that usually they had one-year contracts?

5    A.  Yes.

6    Q.  What was the length of the term of the contract for 2015?

7    A.  2015 negotiations resulted in a three-year contract.

8    Q.  Do you have an understanding of why KFC wanted a three-year

9    contract?

10   A.  Yes.

11   Q.  What is the basis of your understanding?

12   A.  Well, experience, but also by meeting and discussing it

13   with the poultry team.

14   Q.  What is your understanding of why KFC wanted to bid out a

15   three-year contract for the 2015 contract?

16   A.  Well, we have already talked about the extreme shortage

17   situation.  Normally negotiations for chicken on the bone would

18   occur in the fall of each year.  In this particular case

19   because of the severe shortage, we decided to begin in July and

20   in effect get first in line for the available product.

21   Q.  Approximately how much chicken in total did KFC intend to

22   purchase on a yearly basis for the 2015 contract?

23   A.  For chicken on the bone, it would have been something in

24   excess of 400 million pounds.

25   Q.  From which chicken suppliers did KFC solicit bids for the

Robert Lewis - Direct

1    2015 contract?

2    A.   Six suppliers including Pilgrim's, Tyson Foods, Mar-Jac

3    Poultry, Claxton Poultry, George's, and Koch Foods.

4    Q.   Did you have an understanding whether KFC placed Pilgrim's

5    Pride, Claxton, and other bidders in a competition against each

6    other for the 2015 contract?

7    A.   Yes.

8    Q.   What is the basis for your understanding?

9    A.   My experience and the decision we had made as a team.

10   Q.   What was your understanding on whether KFC placed Pilgrim's

11   Pride, Claxton, and other bidders in a competition against each

12   other for the 2015 contract?

13   A.   The bidding process at RSCS had always been a confidential

14   matter, so we worked with each of those six suppliers one on

15   one to secure the bids for the 2015 contract.

16   Q.   What were Pilgrim's Pride, Claxton, and others competing

17   for for the 2015 contract?

18   A.   They were competing for the 200 truckloads per week of

19   chicken on the bone.

20   Q.   Approximately when did KFC begin the bidding process for

21   the 2015 contract?

22   A.   I don't remember a specific date, but it was sometime in

23   July.

24   Q.   Let's talk about with whom you dealt with from each of the

25   bidders during the 2015 contract.  Was there a primary person

Robert Lewis - Direct

1    from Pilgrim's Pride with whom you interacted during the bid

2    for the 2015 contract?

3    A.  Yes.

4    Q.  Who was the primary person you dealt with from Pilgrim's

5    Pride for the bidding of the 2015 contract?

6    A.  Mr. Roger Austin.

7    Q.  Do you know Defendant Austin?

8    A.  I do.

9    Q.  How long have you known Defendant Austin?

10   A.  Over 15 years.

11   Q.  In what capacity do you know him?

12   A.  I knew him, of course, as a business partner, but also as a

13   personal friend.

14   Q.  Would you be able to identify Defendant Austin if you saw

15   him?

16   A.  Yes.

17   Q.  Do you see Defendant Austin in the courtroom today?

18         MR. FELDBERG:  Your Honor, we will stipulate to

19   identification.

20         THE COURT:  Do you accept the stipulation, Mr. Hart?

21         MR. HART:  I do, Your Honor.

22         THE COURT:  All right.  Thank you.

23         Go ahead, Mr. Hart.

24   BY MR. HART:

25   Q.  Were there people from Claxton with whom you dealt with

Robert Lewis - Direct

1    during the bidding of the 2015 contract?

2    *A.*  Yes.

3    *Q.*  Who were these people from Claxton with whom you

4    interacted?

5    *A.*  Mr. Mikell Fries and Mr. Scott Brady.

6    *Q.*  Let's talk about Mr. Brady first.  Do you know Defendant

7    Brady?

8    *A.*  Yes.

9    *Q.*  How long have you known Defendant Brady?

10   *A.*  I'm not certain, but certainly over 10 years.

11   *Q.*  Would you be able to identify Defendant Brady if you saw

12   him?

13   *A.*  Yes.

14        *MR. LAVINE:*  Your Honor, we will stipulate that

15   Mr. Lewis would be able to identify Mr. Brady in the courtroom.

16        *THE COURT:*  Mr. Hart, do you accept that stipulation?

17        *MR. HART:*  I do, Your Honor.

18        *THE COURT:*  Okay, go ahead.

19   *BY MR. HART:*

20   *Q.*  Do you know Defendant Fries?

21   *A.*  Yes.

22   *Q.*  How long have you known Defendant Fries?

23   *A.*  15 to 20 years.

24   *Q.*  Have you met Defendant Fries face to face?

25   *A.*  Yes.

Robert Lewis - Direct

1    Q.  Would you be able to identify him if you saw him?

2    A.  Yes.

3    Q.  Do you see Defendant Fries in the courtroom today?

4         MR. KORNFELD:  Your Honor, we will similarly stipulate

5    that after 20 years this witness can identify Mr. Fries.

6         THE COURT:  Do you accept that stipulation, Mr. Hart?

7         MR. HART:  Yes, I do, Your Honor.

8         THE COURT:  Thank you.  Go ahead.

9    BY MR. HART:

10   Q.  Who from Tyson was your primary contract for the bidding of

11   the 2015 contracts?

12   A.  Mr. Brian Roberts.

13   Q.  What type of relationship did you have with Mr. Roberts?

14   A.  Both a business and a personal relationship.

15   Q.  From whom from Koch Foods was the point person for the 2015

16   bid?

17   A.  Mr. Bill Kantola.

18   Q.  What type of relationship did you have with Mr. Kantola?

19   A.  Both business and personal.

20   Q.  How about Mar-Jac?

21   A.  Mr. Steve Martin and Mr. Greg Tench.

22   Q.  Do you mean -- who is Peter Martin?

23   A.  I am sorry, Pete Martin.  I beg your pardon.

24   Q.  What type of relationship did you have with Mr. Martin?

25   A.  It was generally a business relationship.

Robert Lewis - Direct

1   Q.  What was his role at Mar-Jac?

2   A.  He served in, like, a CEO capacity.

3   Q.  Did you also interact with someone from George's who was

4   involved in the bid?

5   A.  Yes.

6   Q.  Who was that?

7   A.  Mr. Darrel Keck.

8   Q.  Now we talked about what was the bid, when was the bid, and

9   who was involved in the bid.  Let's talk about the bid itself.

10  Are you familiar with the term "winner-take-all bid"?

11  A.  Yes.

12  Q.  How are you familiar with the term "winner-take-all bid"?

13  A.  From my experience.

14  Q.  Your experience conducting hundreds of bids for supply

15  contracts?

16  A.  Yes.

17  Q.  What is a winner-take-all bid?

18  A.  That is a situation where one supplier among several has

19  the lowest price and receives all of the volume.

20  Q.  In the decades that you worked at KFC, did you ever conduct

21  a winner-take-all bid?

22  A.  No.

23  Q.  Why not?

24  A.  Well, in our case, one supplier never could handle the

25  volume.

Robert Lewis - Direct

1  Q.  Could you just elaborate to the jury what you mean by that?

2  A.  KFC's demand is such that it requires numerous suppliers

3  and plants to accommodate the demand.

4  Q.  Did KFC purchase chicken from all suppliers who bid for the

5  2015 contract?

6  A.  Yes.

7  Q.  Let's shift gears just a little bit, sir.  Are you familiar

8  with the term "cost-plus model"?

9  A.  Yes.

10  Q.  How are you familiar with the term "cost-plus model"?

11  A.  From my experience.

12  Q.  Could you provide a little bit more detail as to your

13  experience with a cost-plus model?

14  A.  Yes.  I actually helped develop the cost-plus model that's

15  used by RSCS.

16  Q.  And can you please explain to the jury what is a cost-plus

17  model?

18  A.  Cost-plus model is a pricing mechanism that's used by RSCS

19  for its chicken-on-the-bone products.  The cost portion of that

20  model would be a summary of all the production cost to produce

21  chickens.  And the plus part of it is the suppliers' margin.

22  Q.  Within the bidding process, can you please explain to the

23  jury how a cost-plus model works?

24  A.  The cost-plus model contains a series of components.  Each

25  one is described in the model.  And suppliers when we go

Robert Lewis - Direct

1    through the bidding process are asked to provide their cost,

2    their true cost for each of those components.

3    Q.  So when we are talking about the cost, is there an

4    itemization of each of the costs?

5    A.  Yes.

6    Q.  And then the supplier's supposed to put in their cost of

7    those itemized descriptions?

8    A.  That's correct.

9    Q.  Do you have an understanding of why KFC developed a

10   cost-plus model as a way to bid out its chicken supply

11   contracts?

12   A.  Yes.

13   Q.  What is your understanding based upon?

14   A.  My experience.

15   Q.  Your experience actually developing the cost-plus model?

16   A.  Well, that, and working with it over the years.

17   Q.  What is your understanding on why KFC developed the

18   cost-plus model as the way to bid out its chicken supply

19   contracts?

20   A.  Well, there were actually several reasons, first of which

21   would be that there is no reliable poultry market as such for

22   KFC's chicken on the bone.  Over the years we had looked at and

23   had actually used market services to price KFC chicken.  An

24   example of that would be the Georgia Dock, Georgia Preliminary

25   many years ago.  That is a market that is actually managed by

Robert Lewis - Direct

1    the USDA in the state of Georgia.  They accumulate

2    information --

3           MS. NIELSEN:  I am sorry to interrupt, but I object.

4    And may we go on side bar, please?

5           THE COURT:  Yes.

6        (At the bench:)

7           THE COURT:  Ms. Nielsen, go ahead.

8           MS. NIELSEN:  Your Honor, my first objection is to

9    relevance of this testimony.  As the Court has previously

10   ruled, this is a per se case, so I don't understand the

11   relevance of him explaining why the cost-plus model was

12   developed.

13          Additionally, the testimony that he is going into is

14   expert opinion testimony.  He is talking about the Georgia Dock

15   and markets and what accumulates, so I think there has been

16   insufficient notice of this expert opinion, and I would object

17   under 401, 403, and 701 and 2.

18          THE COURT:  Thank you.

19          Response, Mr. Hart?

20      MR. HART:  Thank you, Your Honor.

21          What the witness is trying to describe is what he did

22   and why he did it.  He is trying to describe why KFC has the

23   bidding process it does, why it developed the cost-plus model.

24   It's relevant.  It's not expert testimony.  He is a fact

25   witness, and he is describing why he developed the bid -- the

Robert Lewis - Direct

1   bidding process at KFC.

2          THE COURT:  Ms. Nielsen, anything else?

3          MS. NIELSEN:  No, thank you.

4          THE COURT:  The objection will be overruled.  He is

5   just -- he is testifying about the Georgia Dock in connection

6   with why the cost-plus model was developed.  His testimony in

7   terms of the Georgia Dock doesn't appear to be opinion

8   testimony.  He is just describing what it is and presumably

9   will explain why he did not or KFC or RSCS did not consider

10  that to be a good way to price chicken for purposes of the

11  bidding process.  So it does sound like relevant testimony as

12  well.  So the objections will be overruled.

13          Thank you.

14          (In open court:)

15          MR. HART:  Thank you, Your Honor.

16  BY MR. HART:

17  Q.  Mr. Lewis, you were describing the reasons why or your

18  understanding of why KFC developed the cost-plus model.

19  A.  Yes.

20  Q.  Can you continue, please, sir?

21  A.  Yes.  The market that I just mentioned as an example, the

22  Georgia Dock, Georgia Preliminary was a market that was managed

23  by the USDA in the state of Georgia.  It gathered information

24  from the poultry processers within the state to determine the

25  weekly price for small birds.  We realized over the course of

Robert Lewis - Direct

1    time that that market was being influenced heavily by the

2    largest supplier within the state of Georgia, so it was to us

3    more of a supplier-controlled market than it was an open

4    market.

5              MS. NIELSEN:  Judge, I renew my objection, Your

6    Honored, 701, 702, and lack of foundation.

7              THE COURT:  Overruled.  He can testify.

8    A.  So coming to that realization, we decided at that point

9    that we needed to develop a different mechanism for determining

10   KFC's poultry cost.

11   BY MR. HART:

12   Q.  You testified there were several reasons why --

13   A.  Yes.

14   Q.  -- you implemented the cost-plus model?

15   A.  Yes.

16   Q.  That was one of them.  Was there another one, sir?

17   A.  Yes.  A second reason I mentioned earlier, in the cost-plus

18   model, we have a series of components that were described

19   within the model.  We wanted to be able to gain more visibility

20   concerning the true cost of those components, so we felt like a

21   cost-plus model would lead us in that direction.  Now, we don't

22   audit suppliers.  We don't have an open-book policy with them,

23   so there is some degree of trust involved in that process.

24           And the third one is we wanted to develop a more

25   competitive environment for procuring chicken on the bone for

Robert Lewis - Direct

1    KFC.  So in conjunction with the development of the cost-plus

2    model, we also put together a confidentiality process, if you

3    will, where we dealt with suppliers one on one, and they

4    independently provided proposals each year as we were

5    negotiating contracts.

6            So those basically are the reasons we ended up with

7    the cost-plus model.

8    Q.  Mr. Lewis, let's step back for a moment and talk about the

9    bidding process itself.  Are you familiar with the bidding

10   process for the 2015 supply contracts?

11   A.  I am sorry, would you repeat that?

12   Q.  Yes, sir.  Are you familiar with the bidding process for

13   the 2015 contracts?

14   A.  Yes.

15   Q.  And are you familiar with the term "round of bidding"?

16   A.  Yes.

17   Q.  How are you familiar with the term "round of bidding"?

18   A.  From my experience.

19   Q.  Your experience conducting hundreds of bids for supply

20   contracts?

21   A.  Yes, sir.

22   Q.  Could you share with the jury what a round of bidding is?

23   A.  Well, a round of bidding would be a stage, if you will, in

24   the process where in our case a supplier would submit a

25   proposal in round 1, and generally in round 2 we would receive

Robert Lewis - Direct

1    their final price.

2    Q.   How many rounds of bidding were there for the 2015 supply

3    contracts?

4    A.   There were two rounds.

5    Q.   So now let's talk about the bidding process for the 2015

6    contracts.  What was the first step of your process in bidding

7    out the chicken-on-the-bone supply contracts in 2014?  What did

8    you do first, sir?

9    A.   I think I mentioned this earlier, but the first step was to

10   secure that demand forecast from KFC Corporation.

11   Q.   And after you received the demand forecast, what did you

12   do, sir?

13   A.   Well, at that point since I hadn't been in place for a

14   while, I took a look at all the 2014 contracts to see the

15   suppliers involved, the products they supplied, the FOB price,

16   and what volume they had been -- that they were supplying for

17   2014.

18   Q.   Did you review the Pilgrim's 2014 contract?

19   A.   Yes.

20   Q.   Did you review the Claxton's 2014 contract?

21   A.   Yes.

22   Q.   Did you have internal meetings at KFC regarding the bidding

23   for the 2015 contract?

24   A.   Yes.

25   Q.   And among these meetings, did you and your team make any

1106

Robert Lewis - Direct

1  determinations on what your approach would be for the 2015

2  contract?

3  A.  Yes.

4  Q.  What was your approach to the 2015 contract, sir?

5  A.  Well, first of all, I think I mentioned this earlier too,

6  we decided to go out early, to contact the suppliers early.  So

7  then after that began happening in July, in that process I

8  contacted each supplier by telephone to let them know that we

9  were beginning the process.

10 Q.  And were there meetings within KFC's co-op that you made a

11 determination as to what a reasonable bid price might be for

12 the 2015 contracts?

13 A.  We had -- yes.

14 Q.  Can you share that with the jury, please?

15 A.  Yes.  We knew that because of the shortage and because of

16 the greater demand for big birds and lower demand for small

17 birds that we would likely see a price increase from the

18 suppliers.  It was impossible for us to determine what that

19 was, but in my mind, I thought a reasonable increase would be

20 somewhere in the neighborhood of 3 to 5 cents a pound.

21 Q.  And, sir, given the specifications for the bid and the

22 volume that you intended to buy, can you please share with the

23 jury how much a penny was worth for the 2015 contract?

24 A.  A penny was worth $4 million.

25 Q.  So if a penny was worth $4 million, sir, when you said that

Robert Lewis - Direct

1  you thought a 3 to 5-cent increase would be reasonable, how

2  much money is that, sir?

3  A.  That's anywhere from 12 to $20 million, which we thought

4  was a pretty generous amount of money.

5  Q.  And, sir, is that per year, that amount that you just

6  talked about?

7  A.  Yes, I am sorry, yes.

8  Q.  After you developed the bid specifications and KFC's

9  internal strategy, what did you do next, sir, in connection

10  with the bidding out of the 2015 contracts?

11  A.  We arranged to have one-on-one meetings with each of the

12  suppliers that we were going to ask bid on the contract volume.

13  Q.  How did you arrange to have one-on-one meetings?

14  A.  I believe the majority, if not all, were arranged on the

15  telephone.

16  Q.  Did you call your point of contacts at each of the

17  suppliers?

18  A.  Yes.

19  Q.  Did you contact them individually, or did you have a group

20  telephone call with all the suppliers?

21  A.  Well, consistent with the confidential process we were

22  using, each supplier was called individually.

23  Q.  Did you eventually meet with the suppliers?

24  A.  Yes.

25  Q.  Were these meetings face to face?

Robert Lewis - Direct

1    A.   Yes, they were.

2    Q.   Did you meet with the suppliers individually, or did you

3    meet with them collectively as a group?

4    A.   We met with each supplier individually.

5    Q.   Why did you do that, sir?

6    A.   To protect the confidentiality of the process.

7    Q.   Where did these face-to-face meetings take place?

8    A.   At RSCS headquarters in Louisville.

9    Q.   Approximately when did the face-to-face meetings take

10   place?

11   A.   Early August.

12   Q.   Did you meet with Pilgrim's Pride?

13   A.   Yes.

14   Q.   Who did you meet with from Pilgrim's Pride?

15   A.   Mr. Austin.  I believe he had a team of individuals with

16   him, but I don't remember who they were.

17   Q.   Did you meet with Claxton?

18   A.   Yes.

19   Q.   Who did you meet with from Claxton?

20   A.   Mr. Fries and Mr. Brady.

21   Q.   Did you meet with Koch Foods?

22   A.   Yes.

23   Q.   Who did you meet with at Koch Foods?

24   A.   Mr. Kantola.

25   Q.   Did you meet with Tyson?

Robert Lewis - Direct

1    *A.*   Yes.

2    *Q.*   Who did you meet with from Tyson?

3    *A.*   Mr. Roberts.

4    *Q.*   Did you meet with George's?

5    *A.*   Yes.

6    *Q.*   Who did you meet with from George's?

7    *A.*   Mr. Keck, and I think there was some other George's

8    individuals with him.

9    *Q.*   And did you meet up with Mar-Jac?

10   *A.*   Yes.

11   *Q.*   Who did you meet with from Mar-Jac?

12   *A.*   Mr. Martin and Mr. Tench.

13   *Q.*   Sir, do you know what Mr. Tench's role was at Mar-Jac for

14   the 2014 bid?

15   *A.*   Mr. Tench's?

16   *Q.*   Yes, sir.

17   *A.*   Yes.  He was in effect the sales director.

18   *Q.*   Mr. Lewis --

19            *MR. HART:*   Your Honor, may I approach and provide some

20   binders?

21            *THE COURT:*   Yes, you may.

22   *BY MR. HART:*

23   *Q.*   Mr. Lewis, I want to direct you to the binder located in

24   front of you, specifically tabs 1 through 6.  Behind those tabs

25   are documents marked for identification as GX-1134, GX-1135,

Robert Lewis - Direct

1   GX-1136, GX-1137, GX-1139, and GX-1221-1.  Can you please

2   review these documents, sir, and look up at me when you are

3   ready to proceed?

4   A.   Uh-huh.

5   Q.   Do you recognize these documents?

6   A.   Yes.

7   Q.   What do you recognize them to be?

8   A.   Those are e-mails from myself to individual suppliers.

9   Q.   Were they written in connection with the bidding for the

10  2015 supply contracts for KFC?

11  A.   Yes.

12        MR. HART:  Your Honor, the government offers GX-1134,

13  GX-1135, GX-1136, GX-1137, GX-1139, and GX-1221-1 into

14  evidence.

15        THE COURT:  All right.  Any objection to the admission

16  of those documents?

17        MR. LAVINE:  No objection, Your Honor.

18        THE COURT:  Each of those will be admitted.

19        MR. HART:  Your Honor, permission to publish GX-1137.

20        THE COURT:  You may.

21        MR. HART:  Mr. Lewis, if you prefer the hard copy,

22  it's under tab 2 in your binder.  It is also up on the screen

23  if you prefer to see it on the screen.

24  BY MR. HART:

25  Q.   Mr. Lewis, let's orient the jury on this e-mail.  Who wrote

Robert Lewis - Direct

1    this e-mail?

2    *A.*   I wrote the e-mail.

3    *Q.*   To whom did you send it?

4    *A.*   This e-mail was sent to Mr. Fries and Mr. Brady at Claxton

5    Poultry.

6    *Q.*   Who is copied on the e-mail?

7    *A.*   Mr. Suerken, Mr. Eddington, and Mary Hester.

8    *Q.*   When did you write it?

9    *A.*   On August the 7th, 2014.

10   *Q.*   What's the subject of the e-mail?

11   *A.*   Meeting follow-up.

12   *Q.*   And would you please remind the jury at what stage during

13   the bidding process did you send this e-mail?

14   *A.*   These e-mails were sent prior to the submission of the

15   initial proposal from the suppliers.

16   *Q.*   Prior to receiving the first round of bids?

17   *A.*   First round of bids, yes.

18   *Q.*   Let's talk about this e-mail.  Would you please share with

19   the jury what's going on in the e-mail?

20          *MR. KORNFELD:*  Your Honor, I am going to object.  I

21   think the document in evidence speaks for itself.  The jury can

22   read it.

23          *THE COURT:*  Overruled.  He shouldn't read the whole

24   thing, but I think he was asked to summarize it.

25          *MR. HART:*  Just to summarize what's going on in the

Robert Lewis - Direct

1    e-mail, Your Honor.

2              *THE COURT:*  Go ahead.

3    *A.*  The e-mail summarizes the points discussed in the meeting

4    with Mr. Fries and Mr. Brady.

5    *BY MR. HART:*

6    *Q.*  And directing to the first sentence of the body of the

7    e-mail, when did you meet with Defendants Fries and Brady?

8    *A.*  We met on August the 5th.

9    *Q.*  Where was the meeting?

10   *A.*  At RSCS headquarters in Louisville.

11   *Q.*  Did other bidding supply companies participate in this

12   meeting?

13   *A.*  No.

14   *Q.*  Why not?

15   *A.*  Well, again, this is --

16             *MR. KORNFELD:*  Objection, Your Honor.  That's been

17   asked and answered.

18             *THE COURT:*  Sustained.

19   *BY MR. HART:*

20   *Q.*  Directing your attention to the full -- second full

21   sentence at the bottom of the e-mail, would you please explain

22   to the jury what you meant by RSCS has a very different mindset

23   concerning supplier relationships?  What did you mean by that?

24   *A.*  After meeting with the team and discussing this process, I

25   kind of got the feeling that relationships with the poultry

Robert Lewis - Direct

1    suppliers was somewhat strained.  And the idea was we were

2    going to try to do a better job of communicating, and we would

3    try to be more open and transparent, and that it would be more

4    or less a give-and-take relationship rather than a one-sided

5    one.

6    Q.  And, Mr. Lewis, what did you mean by a total different

7    approach to negotiation versus prior years?

8    A.  Well, in that case in the body of the e-mail that covered

9    this, there were a number of things that we could do that would

10   not only benefit RSCS and KFC, but would also benefit the

11   supplier.

12   Q.  Now, what did you mean by transparency and a willingness to

13   give and take?  What does that mean?

14   A.  I don't know that -- and, again, this is just a feeling I

15   got -- I don't know that there had been a lot of openness, open

16   discussions and sharing of information in the past, and we were

17   going to make an attempt to change that.

18   Q.  Directing your attention to the bulleted items in the

19   middle of the page, will you please explain what these are to

20   the jury?

21   A.  I am sorry, would you repeat.

22   Q.  Sure.  I want to direct your attention to the bulleted

23   items in the middle of the page.  Generally, can you describe

24   to the jury what these are?

25   A.  These are all initiatives that we wanted to undertake with

Robert Lewis - Direct

1    the supplier that again had mutual benefit, but it also would

2    hopefully enable us to increase the supply of small birds for

3    KFC and perhaps stabilize pricing for the chicken-on-the-bone

4    product.

5    Q.  And what do you mean by "stabilizing pricing"?

6    A.  Well, we could see that prices were going to go up.  We bid

7    these contracts out so that we can obtain the lowest price, and

8    we thought that some of these initiatives might help us to

9    lower the price in the future.

10   Q.  Directing your attention to the third bullet down, what

11   were you referring to when you requested a realistic cost

12   model?

13   A.  Over the course of time, those components cost items that

14   we discussed about the cost-plus that were in the cost model

15   had been adjusted or changed up or down sometimes without any

16   real reason, so we were using this as an attempt to show the

17   supplier that we really did mean what we were saying, and we

18   were going to allow them to make these adjustments.  It wasn't

19   asking for a price increase.  It was just asking that we wanted

20   them to -- it was asking them to give us their true cost,

21   sorry.

22   Q.  Down toward the bottom of the e-mail, you wrote, Please

23   provide the information by August 19th.  What date does that

24   refer?

25   A.  That date refers to the deadline for the initial proposal,

Robert Lewis - Direct

1    our round 1 of the process.

2           *MR. HART:*  Your Honor, may we publish GX-1139 already

3    admitted into evidence?

4           *THE COURT:*  You may.

5    *BY MR. HART:*

6    *Q.*  Mr. Lewis, if you prefer the hard-copy version, you can go

7    to tab 1 in your binder.

8           Again, Mr. Lewis, can we orient the jury to this

9    e-mail?  Who wrote this e-mail?

10   *A.*  I wrote the e-mail.

11   *Q.*  To whom did you send it?

12   *A.*  I sent it to Mr. Austin at Pilgrim's Pride.

13   *Q.*  Who is copied on the e-mail?

14   *A.*  Mr. Suerken, Mr. Eddington, and Mary Hester.

15   *Q.*  When did you write it?

16   *A.*  It was written on August the 7th, 2014.

17   *Q.*  What's the subject of the e-mail?

18   *A.*  Meeting follow-up.

19   *Q.*  And, again, can you just share for the jury what's going on

20   in this e-mail?

21   *A.*  This confirms the points that were discussed in the meeting

22   that we held with Pilgrim's Pride on August the 1st.

23   *Q.*  Now, sir, was this correspondence similar to the

24   correspondence we just went through for Claxton?

25   *A.*  Yes.

Robert Lewis - Direct

1  Q.  And did you send similar type of correspondences to other

2  chicken suppliers?

3  A.  Yes.

4  Q.  How did you send them?

5  A.  By e-mail.

6  Q.  And did you send them individually, or did you send them

7  collectively?

8  A.  They were sent individually.

9  Q.  Why were they sent individually to each supplier?

10 A.  To protect the confidentiality of our process.

11 Q.  You mentioned that every supplier was given a deadline of

12 August 19 in which to submit their first-round bid?

13 A.  Yes.

14 Q.  Did every bidder meet this deadline?

15 A.  No.

16 Q.  Which bidder missed the deadline?

17 A.  Pilgrim's Pride was slightly late with their submission.

18 Q.  Did any supplier submit their proposal early?

19 A.  Yes, Tyson Foods provided their information on August the

20 11th and Pilgrim's Pride -- or, excuse me, I am sorry, George's

21 on August the 12th.

22 Q.  And at some point in time in August, did you receive all of

23 the first-round submissions --

24 A.  Yes.

25 Q.  -- from the suppliers for the 2015 contract?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   Who did they send -- where were the submissions sent?

3    A.   They were sent to us there at RSCS, to the poultry team.

4    Q.   How were they sent to you?

5    A.   By e-mail.

6    Q.   Did you receive some of these submissions?

7    A.   Yes.

8    Q.   On the submissions you received, do you recall if any other

9    bidder was cc'd on another bidder's submission?

10   A.   I am sorry, what was that question?

11   Q.   Sure.  For the bid submissions that you received, sir, were

12   there any other chicken suppliers cc'd on that transmission?

13   A.   No.

14   Q.   Did you ever receive a bid submission where a company

15   included a competitor on the e-mail?

16   A.   No.

17   Q.   Okay, sir.  Once the first-round bids came in, what was the

18   next step in the bidding process?  What did you do?

19   A.   Went through an evaluation process for the proposals.

20   Q.   And what did you do to go through the evaluation process

21   once you received the first-round bids?

22   A.   I took all the information from the six suppliers that was

23   contained in the cost-plus model and transferred that

24   information on to an Excel worksheet so I could look at each

25   supplier's pricing side by side.

Robert Lewis - Direct

1    Q.  Did you compare each bidder's submission to each other?

2    A.  Yes.

3    Q.  How did you do that?

4    A.  By looking across the line, basically.  They are all

5    fairly, if not identical, very close together, and in that

6    process, I was looking to establish a range, a reasonable range

7    of prices.  If one existed, then I considered that a

8    competitive number for that particular component.  If a

9    particular supplier's price was higher, fell outside that range

10   to the high side, then I would make note of that, and later on

11   I would contact the supplier and challenge them on that number.

12   Q.  Okay, sir.  Just sort of to add more color on that, when

13   you received the bids, you compared each to each other.  To the

14   extent that they were similar, what did you do?

15   A.  When I sensed that they were similar, I did nothing.

16   Q.  And if they were inconsistent or if there was one that was

17   a little different, what did you do?

18   A.  If it were higher, then I would make note and question

19   that.

20   Q.  Once you received all of the first-round bids, did you

21   compare each bidder's FOB price?

22   A.  Yes.

23   Q.  And could you share with the jury what an FOB price is?

24   A.  The FOB price is the bottom-line number in the cost-plus

25   model.  That is the actual cost per pound for chicken on the

Robert Lewis - Direct

1   bone at the supplier's dock.

2   *Q.*   That's the bid price?

3   *A.*   That's the bid price.

4   *Q.*   Once you -- based on your experience, sir, how did the FOB

5   prices compare to previous bids?

6   *A.*   They were shockingly high in comparison.

7   *Q.*   What do you mean by "shockingly high"?

8   *A.*   I had never seen prices at that level in my career.

9   *Q.*   And to provide the jury with some context, what do you mean

10  by "at that level"?

11  *A.*   Well, again, we were currently at about 92 cents per pound

12  under the 2014 contract, and these prices ranged anywhere from

13  15 to 20 cents a pound above that.

14  *Q.*   How much higher were they than the prices you expected to

15  receive from them?

16  *A.*   Three or four times.

17  *Q.*   And, Mr. Lewis, what was shocking about the magnitude of

18  these price increases?

19  *A.*   Well, the millions of dollars in incremental cost that it

20  was going to cause -- cost the KFC system.

21          *MR. HART:*   May I have a minute, Your Honor?

22          *THE COURT:*   You may.

23  *BY MR. HART:*

24  *Q.*   Mr. Lewis, did all six suppliers submit a bid at the exact

25  same bid price?

Robert Lewis - Direct

1    A.   No.

2    Q.   Did all six suppliers submit a bid with a significant price

3    increase?

4    A.   Yes.

5    Q.   What was the amount by which all suppliers increased their

6    bid price over the then-existing 2014 contract price?

7    A.   The bid prices versus the 2014 contract were in a range of

8    15 to 20 cents higher per pound.

9    Q.   After being shocked by these bid prices by all the bidders,

10   what happened next?

11   A.   I contacted the suppliers and let them know that we were

12   surprised and disappointed about what we had received.

13   Q.   What did you mean by "surprised and disappointed"?

14   A.   Well, again, the price increases were unprecedented.  I had

15   never seen FOB prices at that level before.

16   Q.   You said "disappointed."  What did you mean by that?

17   A.   Well, I expected -- I expected something much less in the

18   way of pricing.

19   Q.   Did you challenge each of the six suppliers on price?

20   A.   Yes.

21   Q.   How did you do that?

22   A.   Telephone calls to each individual supplier.

23   Q.   Did you ask each supplier to lower its price?

24   A.   Yes.

25   Q.   How did you communicate this request?

Robert Lewis - Direct

1   *A.*  Well, I just explained -- the question, I am sorry, by

2   telephone.

3   *Q.*  Did you call each supplier individually, or did you call

4   them collectively?

5   *A.*  Individually.

6   *Q.*  Why did you do that?

7   *A.*  To protect the confidentiality of the process.

8   *Q.*  Would you please summarize the nature of the telephone

9   calls that you had with each supplier?

10  *A.*  Virtually every one of the six suppliers gave us a slight

11  decrease in cost.

12  *Q.*  And even after these slight decreases, how did the final

13  bids compare to the 2014 contract price?

14  *A.*  The 2014 contract price versus the 2015 was a range of 11

15  to 18 cents per pound.

16  *Q.*  So was it -- were they high or were they low prices?

17  *A.*  They were high.

18  *Q.*  Based on your experience, sir, was there anything in the

19  market to account for such a high price increase?

20       *MR. KORNFELD:*  Objection, Your Honor, foundation as to

21  this point in time and this witness' knowledge of the market at

22  this point in time.

23       *THE COURT:*  Sustained.  If you could ask him

24  foundation about that.  And also we are getting a little bit of

25  feedback.  I am not sure what's the cause of it, but if anyone

Robert Lewis - Direct

1    near a microphone has a phone that's not on airplane mode, I

2    don't know if that is the cause, but it could be a suspected

3    cause, so you might want to try that.

4            Go ahead, Mr. Hart.

5            MR. HART:  Thank you, Your Honor.

6    BY MR. HART:

7    Q.  Sir, how many years have you -- had you worked in the

8    chicken industry?

9    A.  36 years.

10   Q.  Of those 36 years, how many of those focused on procurement

11   for chicken?

12   A.  Probably 15 to 17 years.

13   Q.  And in those 15 to 17 years, approximately how many bids

14   did you -- for supply contracts did you conduct?

15   A.  Well, generally, it was one contract per year, so 15 to 17

16   contracts.

17   Q.  And those would be with a variety of chicken suppliers,

18   correct?

19   A.  Yes.

20   Q.  So based on your experience, sir, is there anything in the

21   market to account for such a high price for the 2015 bids?

22           MR. KORNFELD:  Your Honor, same objection, and I might

23   be able to better explain it at side bar if the Court wishes.

24           THE COURT:  I am going to overrule the objection.

25   Mr. Lewis has testified about some of the research or

Robert Lewis - Direct

 1   information he gathered when he came back as a contractor.  He

 2   has foundation.

 3        MR. HART:  Thank you, Your Honor.

 4   A.  Would you repeat that, please.

 5   BY MR. HART:

 6   Q.  Yes.  Based on your experience, sir, was there anything in

 7   the market to account for such a high price increase?

 8   A.  Nothing that we could identify.

 9   Q.  Did you have any reason to conclude that the forces of

10   supply and demand warranted such a high price increase?

11        MR. KORNFELD:  Objection, Your Honor, foundation, 701,

12   702, and relevance.

13        THE COURT:  He can base it on what he believed at the

14   time.  I am not sure that you are the cause of it, Mr. Hart,

15   but we will try to figure that out when we take our

16   mid-afternoon break.  We may have IT come up, but in the

17   meantime, we will continue.

18        Go ahead .

19        MR. HART:  I am sorry, Your Honor.  I think there was

20   a question pending before the Court or I didn't hear it because

21   of the feedback.

22        THE COURT:  Do you mean a question that was posed to

23   the witness or --

24        MR. HART:  Yes, Your Honor.  Mr. Loveland is providing

25   you with the convenient record of that question if you want to

Robert Lewis - Direct

1   reask it.

2   *BY MR. HART:*

3   *Q.*  Do you have any reason to conclude that the forces of

4   supply and demand warranted such a large price increase?

5   *A.*  No.

6   *Q.*  Mr. Lewis, I direct you to the binder located in front of

7   you, specifically to tabs 10 through 17.  Behind those tabs are

8   documents marked for identification as GX-1007, 1026, 1028,

9   1029, 1165, 1166, and 1167.

10          *MR. HART:*  Also included in that tab, Your Honor, is

11  GX-1008 which has already been admitted.

12          *THE COURT:*  Let me check on 1008 real quick.  Yes,

13  1008 has been admitted.

14  *BY MR. HART:*

15  *Q.*  Can you please review those records?

16  *A.*  I have.

17  *Q.*  Do you recognize those records, sir?

18  *A.*  Yes.

19  *Q.*  What do you recognize them to be?

20  *A.*  I recognize these to be the suppliers' proposals for

21  round 1.

22          *MR. HART:*  The government offers GX-11007 -- sorry,

23  GX-1007, 1026, 1028, 1029, 1165, 1166, and 1167 into evidence.

24          *THE COURT:*  And included in that list was 1006 did you

25  say, Mr. Hart, or no?

Robert Lewis - Direct

1          MR. HART:  Not on this list, Your Honor.

2          THE COURT:  Okay.  So in the notebook, it's tabs 10

3    through 17 with the exception of 12 which has already been

4    admitted; is that right?

5          MR. HART:  I am sorry, which tab are you referring?

6          THE COURT:  I am referring to the notebook that

7    Mr. Lewis has and just using the tab numbers.  You are moving

8    the admission of the exhibits that are found at tabs 10 through

9    17 with the exception of tab 12; is that correct?

10          MR. HART:  That's correct, Your Honor.

11          THE COURT:  Any objection to the admission of those

12    exhibits?

13          MR. LAVINE:  If I could have one minute, Your Honor.

14          THE COURT:  You may.

15          MR. LAVINE:  No objection, Your Honor.

16          THE COURT:  Then Exhibits 1026, 1007, 1028, 1029,

17    1165, 1166, and 1167 will be admitted.

18          MR. HART:  Thank you, Your Honor.

19    BY MR. HART:

20    Q.  Going back to the binder, Mr. Lewis, specifically tab 18,

21    there is a document marked for identification as GX-1160.  Will

22    you please review and look up at me when you are ready to

23    proceed?

24    A.  Okay.

25    Q.  Do you recognize this exhibit?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   What do you recognize it to be?

3    A.   It's an e-mail from myself to all of the chicken suppliers

4    dated the 29th of August, 2014.

5    Q.   Was this made in connection with the bidding for the 2015

6    supply contract?

7    A.   Yes.

8         MR. HART:   Your Honor, the government offers GX-1160

9    into evidence.

10        THE COURT:   Any objection to Exhibit 1160?

11        MR. LAVINE:   No objection, Your Honor.

12        THE COURT:   1160 will be admitted.

13        MR. HART:   Your Honor, permission to publish GX-1160.

14        THE COURT:   You may.

15   BY MR. HART:

16   Q.   Mr. Lewis, let's orient the jury on to this e-mail.  Who

17   wrote it?

18   A.   I wrote the e-mail.

19   Q.   Who did you send it to?

20   A.   It went to all of the chicken-on-the-bone suppliers.

21   Q.   Who is copied?

22   A.   Mr. Suerken, Mr. Eddington, and Mr. Campisano.

23   Q.   When was it sent?

24   A.   29th of August, 2014.

25   Q.   What's the subject of the e-mail?

Robert Lewis - Direct

1    *A.*  COB negotiations.

2    *Q.*  Sir, when during the bidding process did you send this

3    e-mail?

4    *A.*  This was between round 1 and round 2.

5    *Q.*  So you sent this e-mail after you received the shockingly

6    high bid prices?

7    *A.*  After we received the initial proposal.

8    *Q.*  And could you please share with the jury again what's going

9    on with this e-mail?

10   *A.*  Well, I am telling all the suppliers that we are making

11   good progress, but there were some that still had not provided

12   the information that we were looking for.  And the reason that

13   I copied all of them was kind of a form of prodding, if you

14   will, that the ones who had not submitted their information

15   might do so if they saw that the others had already done so.

16   *Q.*  Were there any other reasons why you sent it collectively

17   to the group as opposed to sending it one on one?

18   *A.*  Yeah, ordinarily we would send information to the suppliers

19   one on one, but in this particular case as a matter of

20   convenience, I decided to send this to everyone at the same

21   time because the wording was identical, and it had nothing in

22   it that contained confidential information.

23   *Q.*  Thank you.

24          Are you familiar with the term "SBRA"?

25   *A.*  Yes.

Robert Lewis - Direct

1    Q.   How are you familiar with the term "SBRA"?

2    A.   From my experience at RSCS.

3    Q.   And can you please explain to the jury what an SBRA is?

4    A.   SBRA stands for supplier business relationship agreement.

5    It is a two-part agreement, the first of which is the master

6    agreement that contains all of the terms and conditions that

7    govern the relationship between RSCS and its suppliers.   The

8    second part of that is what we call addendums, and those

9    addendums contain all of the pricing and product information

10   from the negotiations.

11   Q.   So the SBRA is sort of the master relationship.   And for

12   instance, the bid would be an addendum on to that master

13   relationship.   Is that fair to say?

14   A.   Yeah, the bid would apply to the addendum part of it.

15   Q.   Mr. Lewis, I want to direct you to your binder located in

16   front of you again, specifically to tabs 19 through 24.   Behind

17   those tabs are documents that have previously been admitted as

18   GX-1119, 1121, 1123, 1125, 1126, and 1127.

19          MR. HART:   I believe that they were admitted earlier

20   today, Your Honor?

21          THE COURT:   Yes, they were.

22          MR. HART:   Permission to publish GX-1119.

23   BY MR. HART:

24   Q.   Or, Mr. Lewis, if you would prefer to take a hard-copy

25   look, that would be tab 19.

Robert Lewis - Direct

 1          THE COURT:  You may.

 2          MR. HART:  Thank you, Your Honor.

 3          And, Mr. Ackaouy, could you please turn to page 5 of

 4   GX-1119 that's entitled Exhibit 2?

 5   BY MR. HART:

 6   Q.  Mr. Lewis, could you briefly share with the jury, what are

 7   we looking at on Exhibit 2?

 8   A.  Exhibit 2 --

 9          MR. FELDBERG:  Your Honor, I think there is a

10   redaction issue in the upper right-hand corner.

11          THE COURT:  I can't see it at the moment.

12          MR. FELDBERG:  Solved.

13          THE COURT:  Yes, and so it may be displayed as

14   redacted.

15          MR. HART:  Thank you, Your Honor.

16   BY MR. HART:

17   Q.  Mr. Lewis, could you please share with the jury briefly,

18   what are we looking at in Exhibit 2?

19   A.  Exhibit 2 is the addendum for Claxton Poultry.

20   Q.  And who signed this on behalf of Claxton?

21   A.  Mr. Fries.

22   Q.  And can you share what we're looking at?

23   A.  Yes.  This contains the products that are being committed

24   to, the FOB per pound, and the weekly volume commitment.

25   Q.  So what is the product here, sir?

Robert Lewis - Direct

1    *A.*   The product is chicken on the bone.

2    *Q.*   And what's the period of this addendum?

3    *A.*   The period is for three years, 2015 through 2017.

4    *Q.*   Sir, how much eight-piece chicken-on-the-bone product were

5    KFC restaurants planning to buy from Claxton?

6    *A.*   536,000 pounds per week.

7    *Q.*   And approximately how many truckloads of chicken is that?

8    *A.*   It's 16.

9          MR. HART:   Mr. Ackaouy, could you please turn to

10   page 2 of GX-1119?

11   *BY MR. HART:*

12   *Q.*   This sheet is entitled Exhibit 1.  Who signed this

13   Exhibit 1 on behalf of Claxton?

14   *A.*   Mr. Fries.

15   *Q.*   And can you please explain what we are looking at right

16   now?  There is a right-hand column and left-hand column.  Can

17   you please explain to the jury what's on the left-hand column?

18   *A.*   Left-hand column contains the components, the cost

19   components for processing chicken on the bone.

20   *Q.*   Is this the cost-plus model in action?

21   *A.*   It is.

22   *Q.*   What's the column on the right reflect?

23   *A.*   The column on the right is the cost for each of those

24   components.

25   *Q.*   Directing your attention to page 3 of GX-1119.

Robert Lewis - Direct

1      MR. HART:  Mr. Ackaouy, if you could highlight on the

2   lower part of the record.

3   BY MR. HART:

4   Q.  Could you please tell the jury, Mr. Lewis, what was

5   Claxton's total FOB cost for the 2015 bid?

6   A.  $1.0669.

7   Q.  Now, sir, can you share with the jury, what does that cost

8   represent?

9   A.  That cost represents the price per pound from Claxton FOB

10  their processing plant dock.

11  Q.  Now, sir, what was Claxton's FOB plant cost for the 2014

12  contract?

13  A.  It was in the 90s.  I don't have that in front of me.

14  Q.  Sure.

15      MR. HART:  Mr. Ackaouy, can you please pull up GX-1728

16  which previously has been admitted for the witness and the

17  parties, please.

18      THE COURT:  You may.

19      MR. HART:  And if you could go to page 3 of that

20  document.

21      Your Honor, may we publish GX-1728, page 3?  It should

22  be admitted in evidence.

23      THE COURT:  One second.  Yes, you may.

24  BY MR. HART:

25  Q.  This is the 2014 contract, sir?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   For which supplier?

3    A.   For Claxton Poultry.

4    Q.   Who signed for Claxton?

5    A.   Mr. Brady.

6    Q.   For 2014, what was the FOB plant cost for Claxton?

7    A.   92-3/4 cents per pound.

8    Q.   How does Claxton's 2015 FOB compare to 2014, the 2014 FOB

9    cost?

10   A.   The 2015 price is about 14 cents per pound higher.

11   Q.   Will you be able to perform some calculations on the

12   numbers we just discussed?

13   A.   Sure.

14   Q.   Mr. Lewis, for the 2015 contract for the 536,000 volume

15   pounds per week number identified, how much money is a 1-cent

16   per pound increase?  What does that represent?

17   A.   That will be $5,360.

18   Q.   And how much was the increase for the 2015 contract

19   compared to the 2014 contract?

20   A.   14 cents.

21   Q.   And, Mr. Lewis, how much more money per week did it cost

22   KFC for approximately a 14-cent pound increase compared to

23   2014?

24   A.   Roughly $70,000.

25   Q.   And is that for one week?

Robert Lewis - Direct

1    *A.*   Yes.

2    *Q.*   How many weeks in a year, sir?

3    *A.*   52.

4    *Q.*   What is the total dollar amount of the increase for the

5    entire year?

6    *A.*   Just under $4 million.

7            *THE COURT:*  Convenient breaking spot, Mr. Hart?

8            *MR. HART:*  This is a good spot, Your Honor.

9            *THE COURT:*  Ladies and gentlemen, why don't we go

10   ahead and take the mid-afternoon break.  We will plan on

11   reconvening at 25 minutes until 4:00, okay?  The jury is

12   excused.  Thank you.

13           (Jury excused.)

14           *THE COURT:*  Mr. Lewis, you are excused until 25

15   minutes until 4:00.  Thank you.

16           And everyone else may be seated.  Let's talk about

17   just a few things.

18           All right.  So we don't have to finish talking about

19   these things now, but we were going to be talking about the

20   schedule for tomorrow, and we'll need to be able to tell the

21   jury something if the schedule will be different tomorrow.  So

22   either now or right before the break would be the opportunity

23   for me to get that information to be able to tell them

24   something.  Do we want to talk about that right before we bring

25   the jury back in after the break?

1134

Robert Lewis - Direct

1   MR. HART:  That's acceptable to the government, Your

2   Honor.

3   THE COURT:  Okay.  Just in case people need to gather

4   some additional information over the break.

5   Mr. Lavine?

6   MR. LAVINE:  That's fine, Your Honor.

7   THE COURT:  Why don't we plan on doing that, then.

8   Anything to take up real quickly before we recess?

9   MR. LOVELAND:  Your Honor, I just wanted to flag

10  whenever was a convenient time to argue for the admissibility

11  of Government's Exhibit 10106 which was authenticated by

12  Mr. Sangalis.  It's the PowerPoint.

13  THE COURT:  Were you intending to do that through

14  Mr. Lewis?

15  MR. LOVELAND:  No, Your Honor.  We were planning to

16  rely on the authentication that Mr. Sangalis had to admit it,

17  and then we would publish it.

18  THE COURT:  Why don't we hold off on that, then.  I

19  want to give everyone as much of a break right now as possible,

20  but we will take that up later.  We will be in recess.  Thank

21  you.

22      (Recess at 3:20 p.m. until 3:40 p.m.)

23  THE COURT:  Why don't we talk real quickly about our

24  schedule.  Will there be any request to have the jury come back

25  at a different time tomorrow?

Robert Lewis - Direct

1        MR. LAVINE:  Yes, Your Honor, I was wondering whether

2   we could start at 8:00 o'clock in the morning.

3        THE COURT:  What are we thinking?  Are we looking like

4   we're going to -- when does the government think it's going to

5   rest based upon how we are going along right now?

6        MR. HART:  Well, a lot depends on the

7   cross-examination, but as we are trending right now, Your

8   Honor, sometime before lunch tomorrow, sometime before lunch

9   tomorrow.

10       THE COURT:  Okay.  And then assuming that

11  Mr. Eddington is available at 1:30, let's say, he has to be

12  finished before -- by 5:00?  And how long could you anticipate

13  his testimony will last?

14       MR. LAVINE:  Your Honor, I am not sure, but I think

15  the direct on Eddington may be 2, 2-1/2 hours.  And as long as

16  he is out sometime tomorrow, it's fine, it doesn't have to be

17  5:00 o'clock, but we also have to put in the mix I have got a

18  reserved opening to do.  That's 20 minutes.

19       THE COURT:  True.

20       MR. LAVINE:  I was going to ask for more time.

21       THE COURT:  I thought you were going to ask for less

22  time.  Yeah, I am worried about the schedule, I really am.  I

23  think that you -- I don't think we're going to finish that.

24  But the question is I don't know how long he is going to be

25  away.  Of course, we don't have trial next week.  So what I am

Robert Lewis - Direct

1    thinking about as a possibility of him coming back, you know,

2    sometime the following week, and we finish him up.  Would that

3    be possible as far as you know?

4         MR. LAVINE:  I will do everything I can.

5         THE COURT:  I think we are going to have to do that.

6    In fact, I can ask the jury if they could start at 8:00, but I

7    would rather just assume that we pick up with Mr. Eddington if

8    we don't finish him tomorrow, and his testimony may be a little

9    bit broken up in that regard, but otherwise, as long as we can

10   get him finished up before the defendants close, that might be

11   the real -- that might be the practical solution without trying

12   to put the jury through an unusual schedule to no avail.

13        Mr. Tubach has something to whisper in your ear.

14        MR. TUBACH:  We are going to need to put on two

15   witnesses on Thursday, so the breakup would include putting on

16   witnesses in the middle of when Mr. Lewis testified.  I just

17   want the Court to be aware.  Excuse me, Mr. Eddington.

18        MR. FELDBERG:  I think it's three witnesses, actually.

19        MR. TUBACH:  We would have some witnesses who would

20   need to go in the middle of Mr. Eddington's testimony.

21        THE COURT:  That's what I meant by break up.  There

22   would be witnesses in between, maybe even more, I don't know,

23   but if he is available on the Monday following, so the 27th, I

24   think that's the better solution, I really do.  Any objection

25   to that?  If that's acceptable, then I wouldn't say anything to

Robert Lewis - Direct

1    the jury about coming back at a different time tomorrow

2    morning.  Rather, I would have them just come at 8:30.  And

3    then we would recess at 5:00 o'clock too.

4           MR. KORNFELD:  I was going to mention in addition to

5    the hockey game, there is a 6:40 Rockies game.

6           THE COURT:  Yeah, I don't think the Rockies game would

7    affect anything other than perhaps traffic, but I think that,

8    you know, there could be some jurors who would be anxious -- I

9    don't think we can go late tomorrow is the problem.  How do you

10   think that might work?

11          MR. LAVINE:  Let me check with Mr. Eddington tonight,

12   and I will report back to the Court tomorrow morning.

13          THE COURT:  Okay.  Is it possible that a member of

14   your team could even check with him now while we do the

15   remainder --

16          MS. RAHMAN:  I have reached out to him, Your Honor,

17   and I will let you know when I hear back.

18          THE COURT:  Let's do that, and let's do a quick side

19   bar right at 5:00 just to double-check on that, so, you know,

20   just in case we have to tell anything to the jurors.  Probably

21   not, but that's great.

22              Can we bring the jury in at this time?  Are we ready?

23              Ms. Buchanan, let's bring the jury back in, and you

24   can bring Mr. Lewis back in.

25              (Jury present.)

Robert Lewis - Direct

1          *THE COURT:*  Mr. Hart, go ahead.

2          *MR. HART:*  Thank you, Your Honor.

3          Your Honor, permission to publish GX-1126 which has

4     been admitted into evidence.

5          *THE COURT:*  You may.

6     *BY MR. HART:*

7     *Q.*  And, Mr. Lewis, if you prefer the hard copy in your binder,

8     it's tab 23.

9          *MR. HART:*  Mr. Ackaouy, would you please turn to

10    page 3 of GX-1126 entitled Exhibit 2.

11    *BY MR. HART:*

12    *Q.*  Mr. Lewis --

13          *MR. FELDBERG:*  Once again, redaction issue.

14          *THE COURT:*  Yes.

15    *BY MR. HART:*

16    *Q.*  Mr. Lewis, will you briefly share with the jury what's

17    contained on Exhibit 2?

18    *A.*  Exhibit 2 is the SBRA addendum for Pilgrim's Pride.

19    *Q.*  And who signed this addendum on behalf of Pilgrim's Pride?

20    *A.*  Mr. Austin.

21    *Q.*  What's the product that's being discussed in the exhibit?

22    *A.*  Chicken-on-the-bone products.

23    *Q.*  And what's the period of the addendum?

24    *A.*  2015 through 2017.

25          *MR. HART:*  And, Mr. Ackaouy, if you could zoom in on

Robert Lewis - Direct

1    the chart itself.

2    *BY MR. HART:*

3    *Q.*  Sir, how much eight-piece chicken-on-the-bone product were

4    KFC restaurants planning on buying from Pilgrim's?

5    *A.*  2,110,500 pounds per week.

6    *Q.*  And approximately how many truckloads of chicken is that?

7    *A.*  63.

8         MR. HART:  Mr. Ackaouy, will you place turn to page 2

9    of GX-1126 to a document entitled Exhibit 1?

10   *BY MR. HART:*

11   *Q.*  And, Mr. Lewis, will you please share with the jury what

12   we're looking at here.

13   *A.*  This is the SBRA addendum for Pilgrim's Pride for 2015

14   through 2017.

15   *Q.*  Who signed on behalf of Pilgrim's Pride?

16   *A.*  Mr. Austin.

17   *Q.*  And is this Exhibit 1 structured similarly to the previous

18   one we just saw from Claxton?

19   *A.*  Yes.

20   *Q.*  With the cost on the left-hand side and the price on the

21   right-hand side?

22   *A.*  Yes.

23   *Q.*  The cost-plus model in action?

24   *A.*  Yes.

25   *Q.*  Sir, directing your attention to the total FOB cost, can

Robert Lewis - Direct

1   you share with the jury what the total FOB cost was as

2   reflected in the record?

3   A.   $1.0856.

4   Q.   And what does that price mean, Mr. Lewis?

5   A.   It's the total FOB cost per pound for chicken on the bone.

6   Q.   Thank you.

7        What was Pilgrim's FOB plant cost for 2014, do you

8   recall?

9   A.   I don't recall specifically, but it was in the 90s.

10        MR. HART:   Could you please pull up GX-1729 which has

11   already been admitted?

12        And, Your Honor, permission to publish?

13        THE COURT:   You may.

14        MR. HART:   Specifically to page 3, Mr. Ackaouy.   Could

15   you please publish that?

16   BY MR. HART:

17   Q.   Mr. Lewis, what was the total FOB cost for Pilgrim's Pride

18   in the 2014 contract?

19   A.   92-1/2 cents per pound.

20   Q.   How does Pilgrim's Pride 2015 FOB price compare to the 2014

21   FOB price?

22   A.   The 2015 price was approximately 16 cents per pound higher.

23   Q.   And, Mr. Lewis, would you be able to perform calculations

24   on the numbers we just discussed?

25   A.   Yes.

Robert Lewis - Direct

1  *Q.* For the 2.11 million pounds volume per week, the number you

2  identified, how much money is a 1-cent-per-pound increase?

3  *A.* $21,105.

4  *Q.* And how much was the increase for the 2015 contract?

5  *A.* 16 cents.

6  *Q.* Mr. Lewis, how much more money per week did it cost KFC for

7  a 16-cent pound -- increase per pound on a weekly basis?

8  *A.* Approximately $337,000.

9  *Q.* And that's for one week?

10 *A.* Yes, sir.

11 *Q.* How many weeks in a year?

12 *A.* 52.

13 *Q.* How much of the total amount increase for the entire year?

14 *A.* $17.6 million.

15 *Q.* And that's for one year, sir?

16 *A.* Yes, sir.

17 *Q.* Mr. Lewis, at any point during the bidding for the 2015

18 contract, did chicken suppliers tell you that they were sharing

19 their bid prices with other bidders before submitting the final

20 bid?

21      *MR. FELDBERG:* Objection. There is absolutely no

22 foundation for that question. There is not a bit of evidence

23 that that happened.

24      *THE COURT:* Overruled.

25 *A.* No.

Robert Lewis - Direct

1  *BY MR. HART:*

2  *Q.*  At any point during the bidding for the 2015 contract, did

3  chicken suppliers or any of the bidders tell you they were

4  coordinating bid strategies before formulating their final bid?

5          *MR. TUBACH:*  Same objection, simply lacks foundation,

6  and it's argumentative.

7          *THE COURT:*  Overruled, both objections.

8  *BY MR. HART:*

9  *Q.*  Did any of the bidders for the 2015 contract tell you they

10  exchanged prices before submitting their final bids?

11  *A.*  No.

12  *Q.*  At any point in time during the bidding in the 2015

13  contract, did you provide one chicken supplier's price to

14  another bidder?

15  *A.*  No.

16          *MR. HART:*  Your Honor, may I have a moment to confer

17  with my colleagues?

18          *THE COURT:*  You may.

19  *BY MR. HART:*

20  *Q.*  Sir, at any point during the bidding of the 2015 contract,

21  did chicken suppliers or any bidder tell you they were

22  coordinating bid strategies before submitting their final bid?

23          *MS. NIELSEN:*  Objection, assumes facts not in

24  evidence.

25          *THE COURT:*  I will overrule the objection.  I don't

Robert Lewis - Cross

 1  think the question assumed that's the fact; it's just whether

 2  it happened, so overruled.

 3  A.  No.

 4          MR. HART:  Mr. Ackaouy, can you please pull up for the

 5  parties and the Court GX-1729, specifically page No. 3 of the

 6  exhibit.

 7          Permission to publish, Your Honor?

 8          THE COURT:  You may.

 9  BY MR. HART:

10  Q.  Mr. Lewis, who signed on behalf of Pilgrim's Pride the 2014

11  contract?

12  A.  I do not know.  I don't recognize that signature.

13          MR. HART:  One more minute, Your Honor.

14          THE COURT:  Sure.

15          MR. HART:  That's all the questions I have right now,

16  Your Honor, thank you.

17          THE COURT:  Thank you.

18          Cross-examination?

19          Mr. Lavine?

20          MR. LAVINE:  Your Honor, if I may approach and hand up

21  some documents.

22          THE COURT:  Yes, you may.

23          MR. LAVINE:  May I proceed, Your Honor?

24          THE COURT:  Yes, go ahead.

25                          **CROSS-EXAMINATION**

Robert Lewis - Cross

1  *BY MR. LAVINE:*

2  *Q.*  Mr. Lewis, good afternoon.

3  *A.*  Good afternoon.

4  *Q.*  My name is Bryan Lavine, and I represent Mr. Scott Brady.

5  How are you today?

6  *A.*  A little uncomfortable, but I will make it.

7  *Q.*  If you need to take a break, please let us know.

8  *A.*  Thank you.

9  *Q.*  Now, Mr. Lewis, you retired from RSCS I believe in 2009?

10  *A.*  Yes.

11  *Q.*  And after you retired, you really didn't keep up with any

12  aspect of the industry, did you?

13  *A.*  No.

14  *Q.*  In fact, when I -- so I want to talk to you about the

15  industry.  When I talk to you about the industry --

16      *MR. LAVINE:*  They are saying they can't hear me, Your

17  Honor.

18  *BY MR. LAVINE:*

19  *Q.*  I want to talk to you about the industry and the contacts.

20  The industry would include buyers, suppliers, distributors,

21  producers, growers, all participants in the field.  Would you

22  agree with that's what the industry is, sir?

23  *A.*  Yes.

24  *Q.*  All right.  And you didn't keep up with pricing after you

25  retired, pricing of chicken after you retired.

Robert Lewis - Cross

1    *A.*   No.

2    *Q.*   And you did not keep up with the market changes that might

3    have impacted the industry.

4    *A.*   No.

5    *Q.*   And you didn't do any studying of the market to keep

6    current with regard to market trends in the chicken business

7    area, did you?

8    *A.*   No.

9    *Q.*   And you have not studied the difference between the profits

10   per pound for big bird versus the small bird.

11   *A.*   No.

12   *Q.*   Now, I want to talk a little bit about the suppliers.  And

13   we had a list of names that Mr. Hart gave you.  And you know

14   from your years with RSCS before you -- and I am going to use

15   RSCS instead of KFC if that's okay with you.

16   *A.*   Yes.

17   *Q.*   All right.  Because you worked for RSCS.

18   *A.*   Yes.

19   *Q.*   So you know from your years with RSCS before you retired,

20   many of the suppliers supplying chicken to KFC had been

21   supplying chicken to KFC for years; is that correct?

22   *A.*   That's correct.

23   *Q.*   And unless there was a problem with a supplier, the same

24   suppliers typically would negotiate with RSCS each year to

25   continue supplying chicken to KFC.

Robert Lewis - Cross

1  *A.*  Yes.

2  *Q.*  And you are familiar with many of them.

3  *A.*  Yes.

4  *Q.*  You have been in the business for a long time.

5  *A.*  Yes.

6  *Q.*  And you dealt with many of them even before you retired in

7  2009.

8  *A.*  Yes.

9  *Q.*  And not only do you know who the suppliers are.  The

10  suppliers generally know who else is supplying chicken to KFC,

11  do they not?

12  *A.*  Yes.

13  *Q.*  Because just as I said, some of these suppliers have been

14  doing -- have been supplying chicken to KFC for years, in fact,

15  I am going to say for decades.

16  *A.*  Some of them, that's fair, yes.

17  *Q.*  Okay.  And sometimes you communicate with all the suppliers

18  at once; isn't that right, sir?

19  *A.*  If it's of a noncompetitive nature or nonconfidential

20  nature, yes, that could happen.

21  *Q.*  All right.  And so the suppliers know who is supplying to

22  KFC even from communications from you.

23  *A.*  Yes.

24  *Q.*  So it's not really a secret who is supplying KFC with

25  chicken.

Robert Lewis - Cross

1  A.  That's correct.

2  Q.  So let's talk about a few of these suppliers, if we can.

3  Now, Pilgrim's, you are familiar with Pilgrim's?

4  A.  Yes.

5  Q.  And Pilgrim's had many plants supplying a full range of

6  chicken sizes and products to KFC.

7  A.  Yes.

8  Q.  And Pilgrim's supplied small birds to KFC from several

9  plants.

10  A.  Yes.

11  Q.  And Pilgrim's -- would it be fair to say Pilgrim's was

12  usually on the high end of the pricing?

13  A.  Yes.

14  Q.  And Pilgrim's, would it be fair to say also that Pilgrim's

15  was always aggressive in its pricing?

16  A.  Yes.

17  Q.  Okay.  And aggressive partly because it had other customers

18  ready to take KFC's supply if KFC didn't want it.

19  A.  I'd say yes to an extent.

20  Q.  Okay.  But basically the answer would be yes.

21  A.  Basically.

22  Q.  Right.  Now, George's is another supplier; is that correct?

23  A.  Correct.

24  Q.  And you're familiar with George's.

25  A.  Yes.

1148

Robert Lewis - Cross

1   Q.  And they were pretty much on the low end of the pricing.

2   A.  Yes.

3   Q.  And Tyson's, you are familiar with Tyson's?

4   A.  Yes.

5   Q.  And Tyson's was sometimes on the high end.

6   A.  Yes.

7   Q.  And at this time in 2014 when you came back, Koch was

8   adding capacity to supply more small birds to KFC.

9   A.  That's correct.

10  Q.  And you're also familiar with Claxton, are you not?

11  A.  Yes.

12  Q.  You know Mikell Fries?

13  A.  Yes.

14  Q.  And you know Scott Brady?

15  A.  Yes.

16  Q.  And Claxton, dealing with Claxton, they were willing to

17  negotiate, were they not?

18  A.  Yes.

19  Q.  And Claxton never threatened to take their business

20  elsewhere.

21  A.  No.

22  Q.  And Claxton's approach was not a take-it-or-leave-it

23  situation, was it?

24  A.  No.

25  Q.  All right.  Now, RSCS also had information about suppliers

Robert Lewis - Cross

1  because of the submission of the annual cost information.  It's

2  basically the cost report that you talked about earlier.  But

3  you had that information from the suppliers, correct?

4  A.  Yes.

5  Q.  And up until the time of the 2015 contract, it was an

6  annual contract that was negotiated with the suppliers.

7  A.  That's correct.

8  Q.  And RSCS had the cost for each of these suppliers.

9  A.  Yes.

10 Q.  For each contract year.

11 A.  Yes.

12 Q.  And basically going back as long as that supplier had been

13 submitting chicken to RSCS -- I am sorry, as long as it had

14 been submitting the cost models to RSCS.

15 A.  I'm not certain that every piece of information in that

16 regard was retained, but certainly for some years it was.

17 Q.  It was.  All right.  Thank you.

18       So RSCS track the cost in a sense from year to year

19 for the suppliers, at least the ones that they maintain those

20 records for.

21 A.  Yes.

22 Q.  Like labor costs?

23 A.  Yes.

24 Q.  Track everything that would be in the model itself.

25 A.  Correct.

Robert Lewis - Cross

1   Q.   Now, I want to talk a little bit about the supply chain.

2   Now, RSCS negotiates the price of chicken on behalf of KFC.

3   A.   Yes.

4   Q.   And RSCS negotiates for KFC the volume of chicken that is

5   going to be allocated to the KFC suppliers.

6   A.   Yes.

7   Q.   And RSCS wants to make sure there is enough chicken to

8   supply all of the KFC stores all year round.

9   A.   Correct.

10  Q.   And that's why when you came in, you asked for a projection

11  of the volume that they thought was going to be necessary in

12  2015.

13  A.   Correct.

14  Q.   Now, RSCS also focuses on trying to get the best price

15  possible.

16  A.   Yes.

17  Q.   Now, several suppliers provide the chicken that RSCS

18  acquires for the KFC franchisees.

19  A.   Yes.

20  Q.   And each supplier has to be approved by KFC.

21  A.   That's correct.

22  Q.   And each supplier has to produce chicken according to the

23  specifications demanded by KFC.

24  A.   Yes.

25  Q.   And every plant a supplier uses must be approved by KFC.

Robert Lewis - Cross

1   A.   Yes.

2   Q.   Now, sir, as part of the supply chain or the joint supplier

3   network, if one supplier cannot supply the chicken for KFC for

4   whatever reason, one of the other approved suppliers can step

5   in and deliver that chicken for the other supplier.

6   A.   Yes.

7   Q.   And that's because they both must meet the specifications

8   demanded by KFC.

9   A.   That's correct.

10  Q.   Now, before you retired when you were at RSCS just in 2007,

11  2008, 2009, supply of small birds was not an issue.

12  A.   It was not.

13  Q.   Right.  But in 2014 when you returned to RSCS, supply was

14  very, very, very tight.

15  A.   Yes.

16  Q.   And this was because over time the number of companies

17  producing small birds was reduced.

18  A.   The number of plants producing small birds was reduced,

19  correct.

20  Q.   Correct.  That's a better way to put it.  I agree with

21  that.  The number of plants producing small birds had

22  decreased.

23  A.   Yes.

24  Q.   And there was a move in the industry to consolidate.

25  A.   Yes.

1152

Robert Lewis - Cross

1    Q.  And at least one chicken company filed for bankruptcy.

2    A.  I can think of one, yes.

3    Q.  Right.  And Sanderson Farms had been the largest small-bird

4    supplier for KFC at one point in time; is that correct, sir?

5    A.  That's correct.

6    Q.  But then they moved to large birds.

7    A.  Yes.

8    Q.  And they stopped supplying to KFC.

9    A.  Yes.

10   Q.  Now, would it be fair to say, sir, that when that happened,

11   that this was an indication to you that the demand for chicken

12   on the bone was decreasing and the demand for further-processed

13   products which required to a great extent bigger birds was

14   shifting?

15   A.  Yes.

16   Q.  And you were aware that suppliers were considering

17   converting their small-bird plants to big-bird plants?

18   A.  Not all of them, but some certainly.

19   Q.  But there was some in the industry that were starting to

20   make that conversion or that shift.

21   A.  Yes.

22   Q.  And when a supplier converts a plant from a small-bird to a

23   big-bird plant, it wasn't going to be converted back.

24   A.  No, not without great expense.

25   Q.  Right.  Because it would be almost impossible to convert it

Robert Lewis - Cross

1  back because of costs and everything else associated with it.

2  A.  Correct.

3  Q.  You are also aware that the industry was shifting to a

4  bigger-bird size.

5  A.  Yes.

6  Q.  And as a result, the small-bird size that KFC uses was

7  becoming less readily available.

8  A.  Yes.

9  Q.  And you knew there was an extreme supply shortage of small

10  birds in 2014.

11  A.  I knew there was a shortage, but the extreme shortage at

12  KFC at the time was created also by heavy demand for Mother's

13  Day and July the Fourth holiday period.

14  Q.  Right.  And that was my next question.  And the demand for

15  chicken was much greater for supply in the 2014 time frame?

16  A.  Yes.

17  Q.  And you would have seen that when you came back in May of

18  2014 around Mother's Day that the demand clearly exceeded the

19  supply.

20  A.  Yes.

21  Q.  Now, would it be fair to say or safe to say that RSCS was

22  aware that the big-bird issue which we just talked about

23  changed the industry dramatically?

24  A.  Yes.

25  Q.  And that RSCS would have to pay a price.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And partly because of the market conditions.

3    A.   Yes.

4    Q.   And you will agree with that the big-bird issue that we

5    just talked about was a contributing factor to RSCS having to

6    pay a higher price.

7    A.   Yes.

8    Q.   So I want to talk now a little bit about the crisis that

9    you talked about when you walked in.  When you came in to RSCS

10   in May, you walked into an absolute crisis, correct?

11   A.   Yes.

12   Q.   You didn't anticipate that when you said you would come

13   back and work for them for a period of time, did you?

14   A.   I did not.

15   Q.   So when you return, it's basically in the middle of

16   Mother's Day.  It's the Mother's Day period for KFC.  And do

17   you agree with me, sir, that Mother's Day was KFC's busiest

18   period of the year?

19   A.   Traditionally it had been, yes.

20   Q.   And when I say the busiest, I mean it is the highest demand

21   period for KFC or at least it was at that period of time.

22   A.   At that period of time, yes.

23   Q.   And the supply shortage in May of 2014 was a national

24   issue.

25   A.   Yes.

Robert Lewis - Cross

1  *Q.* And you described that shortage, if I am correct, sir, of

2  KFC product as a near panic.

3  *A.* Yes.

4  *Q.* And KFC operators viewed the supply shortage with a great

5  deal of anxiety and concern.

6  *A.* Yes.

7  *Q.* And they felt the situation was at a near crisis.

8  *A.* Correct.

9  *Q.* KFC stores were facing store closures due to tight supply.

10 *A.* Yes.

11 *Q.* Some stores ran out of fresh chicken and had to use frozen

12 product.

13 *A.* Yes, that's fair.

14 *Q.* And would it be fair to say also that RSCS viewed the

15 supply shortage as a crisis situation?

16 *A.* I am sorry, repeat?

17 *Q.* Would it be fair to say that RSCS on its own viewed the

18 supply shortage as a crisis situation?

19 *A.* Yes.

20 *Q.* With a great deal of anxiety.

21 *A.* Correct.

22 *Q.* Now, these issues of supply that you faced in May of 2014,

23 those same issues existed in July of 2014.

24 *A.* That's correct.

25 *Q.* In fact, as you were about to leave, because if I am

Robert Lewis - Cross

1  correct, sir, you agreed to come on for about a 2-month period?

2  A.  Yes.

3  Q.  And then July 4th rolls around when you are about to leave,

4  correct?

5  A.  Yes.

6  Q.  And RSCS had the same supply issues for the July 4th

7  holiday as it had for the Mother's Day period?

8  A.  Correct.

9  Q.  And it was at that time that they asked you and you so

10  nicely agreed to stay on for a longer period of time.

11  A.  Yes.

12  Q.  So if I'm correct, you ended up staying until about the end

13  of 2014.

14  A.  Yes.  The contract was actually extended twice.

15  Q.  Okay.  Now, in August -- and we are going to get to the bid

16  proposals that you received.  But in August when you received

17  the 2015 contract proposals from the suppliers, would it be

18  accurate to say, sir, that the market conditions that existed

19  in July of 2014 continued to exist at that time?

20  A.  Yes.

21  Q.  Now, I want to talk a little bit about the incremental

22  loads that you bought.  And government counsel took you through

23  it, but I want to take you through the documents and see if we

24  can't put some time frames with regard to when you purchased

25  these incremental loads.

Robert Lewis - Cross

1    Now, during the supply crisis in the summer of 2014,

2    which we are talking about, demand exceeded the loads that RSCS

3    had under contract.

4    A.   Correct.

5    Q.   So it couldn't get enough supply from what it already had

6    under contract; is that correct?

7    A.   Correct.

8    Q.   So RSCS went out and purchased additional loads at a

9    premium from suppliers.

10   A.   Yes.

11   Q.   Now, sir, I wonder if you would look at tab 1 in the book,

12   please, and this is Government's Exhibit 1244.

13        MR. LAVINE:   If you could show it to the Court and the

14   attorneys, please.

15   BY MR. LAVINE:

16   Q.   Now, Mr. Lewis, this is an e-mail from you to various

17   individuals on June 16, 2014; is that correct?

18   A.   That's correct.

19   Q.   And you would have sent this e-mail?

20   A.   Yes.

21        MR. LAVINE:   Your Honor, I would move for the

22   admission of 1244, please.

23        THE COURT:   Any objection to the admission of Exhibit

24   1244?

25        MR. HART:   No objection, Your Honor.

Robert Lewis - Cross

1    *THE COURT:*  1244 will be admitted.

2    *MR. LAVINE:*  Thank you, Your Honor.

3    If we may publish, please.

4    *THE COURT:*  You may.

5  *BY MR. LAVINE:*

6  *Q.*  Now, Mr. Lewis, if you could just take a moment to take a

7  look at this e-mail.

8  *A.*  Yes.

9  *Q.*  Now, this was sent to various individuals, and I just want

10  to go through who the individuals are real quick.  Mitch

11  Mitchell?

12  *A.*  Yes.

13  *Q.*  He is with whom?

14  *A.*  Case Farms.

15  *Q.*  Scott Brady, he is with Claxton?

16  *A.*  Yes.

17  *Q.*  Darrel Keck?

18  *A.*  George's.

19  *Q.*  Ric Blake?

20  *A.*  George's.

21  *Q.*  Bill Kantola?

22  *A.*  Koch.

23  *Q.*  Greg Tench?

24  *A.*  Mar-Jac.

25  *Q.*  Tommy Francis?

1159

Robert Lewis - Cross

1  *A.*  Mar-Jac.

2  *Q.*  Roger Austin?

3  *A.*  Pilgrim's.

4  *Q.*  And Tim Mulrenin?

5  *A.*  Tyson.

6  *Q.*  And Stephen Campisano, he would have been with RSCS; is

7  that correct, sir?

8  *A.*  That's correct.

9  *Q.*  Now, if you would just take a look at this.

10        *MR. LAVINE:*  And, Mr. Brian, if you will just

11  highlight the first sentence, please.

12  *BY MR. LAVINE:*

13  *Q.*  Please tell us what is the purpose of this first sentence

14  in this e-mail.

15  *A.*  It was requesting these individuals to begin providing us

16  with a daily update on their COB production and shipments.

17  *Q.*  So basically you wanted the suppliers to give you daily

18  information regarding their production.

19  *A.*  That's correct, which certainly indicates the severity of

20  the problem.

21  *Q.*  Correct.  And you also wanted to keep RSCS management

22  updated about the demand and supply issues?

23  *A.*  Yes.

24  *Q.*  Because this was a national issue?

25  *A.*  Yes.

Robert Lewis - Cross

1    *Q.* And you were anxious -- because this e-mail is dated

2    June 16, 2014, you were also anxious about the upcoming

3    July 4th holiday.

4    *A.* Yes.

5    *Q.* And upcoming promotions.

6    *A.* Yes, there was a $5 fill-up promotion going on at the same

7    time.

8    *Q.* Right. And whether RSCS would have -- you wanted this

9    because you wanted to determine whether or not RSCS would have

10   enough supply.

11   *A.* Yes.

12   *Q.* Now, as a result of -- I'm going to say there is an extreme

13   shortage of small birds. Is that a fair assessment, sir, at

14   this time?

15   *A.* Extreme shortage of small birds for KFC.

16   *Q.* For KFC, yes. I meant to qualify with KFC.

17   *A.* Yes.

18   *Q.* So RSCS actually asked you to go out and pay the premium,

19   get us the chicken. We've got to deal with these shortages.

20   *A.* Yes.

21   *Q.* So I want to go through some of the purchases you made with

22   the various suppliers.

23        *MR. LAVINE:* If we can turn to Defense Exhibit F-660.

24   And, Mr. Lewis, that would be tab 2 in your book.

25   *BY MR. LAVINE:*

Robert Lewis - Cross

1    *Q.*  Now, sir, in June of 2014, RSCS bought extra loads from

2    Pilgrim's; is that correct?

3    *A.*  That's correct.

4    *Q.*  Now, if you would look at Exhibit F-660, and there are two

5    e-mails on this page, and I want to start with the first e-mail

6    at the bottom.

7              Now, that's an e-mail from you to Mr. Roger Austin,

8    correct?

9    *A.*  Correct.

10   *Q.*  And he is with Pilgrim's?

11   *A.*  Yes.

12   *Q.*  And that's June 25th, 2014?

13   *A.*  Yes.

14   *Q.*  And then the top e-mail is also from you to Mr. Roger

15   Austin?

16   *A.*  Correct.

17   *Q.*  At Pilgrim's?

18   *A.*  Yes.

19   *Q.*  Dated June 27, 2014?

20   *A.*  Yes.

21   *Q.*  And this had to do with the COB commitment summaries?

22   *A.*  Yes.

23              *MR. LAVINE:*  Your Honor, I move for the admission of

24   F-660.

25              *THE COURT:*  Any objection to the admission of F-660?

1162

Robert Lewis - Cross

1     *MR. HART:*  No objection, Your Honor.

2         *THE COURT:*  F-660 will be admitted.

3         *MR. LAVINE:*  May we publish, Your Honor?

4         *THE COURT:*  You may.

5   *BY MR. LAVINE:*

6   *Q.*  Now, according to these e-mails, you paid a premium of

7   $1.30 per pound to Pilgrim's at this time; is that correct?

8   *A.*  I paid $1.30 per pound which was a premium, yes.

9   *Q.*  Right.  A premium for 12 extra loads?

10  *A.*  Yes.

11  *Q.*  And that would be over a three-week period.

12  *A.*  Yes.

13  *Q.*  So one load I believe you said was about 33,500 pounds?

14  *A.*  Correct.

15  *Q.*  So if I do 12 by 33,500, will you take my word for it,

16  that's about 402,000 pounds?

17  *A.*  Yes.

18  *Q.*  Now, it's not only the fact that you were paid this $1.30,

19  this is over and above what Pilgrim's was contractually

20  obligated to supply to RSCS at the time.

21  *A.*  Yes.

22  *Q.*  If you can turn to the --

23  *A.*  I am sorry, for product purchased under the contract.

24  *Q.*  Right.  Over and above what was to be purchased under the

25  contract.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   Yes, thank you for that clarification.

3            Now, if you would look at the second paragraph in the

4    top e-mail.

5            MR. LAVINE:   And if, Mr. Brian, you could mark that,

6    please, sir.   It starts with "finally we appreciate."

7    BY MR. LAVINE:

8    Q.   Now, in looking at this sentence, sir, not only are you

9    buying the 12 extra loads from Pilgrim's, but you are also

10   asking for and you received a right of first refusal from

11   Pilgrim's on any loads of eight-piece and dark meat; is that

12   correct?

13   A.   That's correct.

14   Q.   And that was because this crisis was still ongoing.

15   A.   Yes.

16   Q.   All right.   Now, RSCS also purchased --

17           MR. LAVINE:   Mr. Brian, you can take that down, thank

18   you --

19   BY MR. LAVINE:

20   Q.   -- extra chicken from Mar-Jac in the summer of 2014.

21   A.   I am sorry?

22   Q.   RSCS also purchased extra chicken from Mar-Jac in the

23   summer of 2014.

24   A.   That's correct.

25   Q.   And I believe that RSCS purchased about 10 loads of chicken

Robert Lewis - Cross

1   from Mar-Jac?

2   A.  Yes.

3   Q.  And if I'm correct, and correct me if I'm wrong, sir, I

4   believe the number was $1.40 per pound for those loads.

5   A.  Correct.

6   Q.  Those incremental loads.

7   A.  Yes.

8   Q.  Now, RSCS also purchased additional loads from Claxton.

9   A.  Yes.

10  Q.  So if we can -- if you could take a look at tab 3, please.

11          MR. LAVINE:  And if you could bring up Defense Exhibit

12  J-016.

13  BY MR. LAVINE:

14  Q.  Now, Mr. Lewis, this is an e-mail from you to Mr. Scott

15  Brady at Claxton; is that correct?

16  A.  That's correct.

17  Q.  And it copies some people from RSCS, Carol Knight and Pete

18  Suerken?

19  A.  Yes.

20  Q.  And I believe you said at the time that Mr. Suerken was, I

21  guess, the team leader for the procurement group during this

22  period of time.

23  A.  Yes.

24  Q.  And it's dated June 23rd, 2014.

25  A.  Correct.

Robert Lewis - Cross

1        MR. LAVINE:  Your Honor, I would move the admission of

2    J-016.

3        THE COURT:  Any objection to the admission of J-016?

4        MR. HART:  No, Your Honor.

5        THE COURT:  J-016 will be admitted and may be

6    published.

7        MR. LAVINE:  Thank you, Your Honor.

8    BY MR. LAVINE:

9    Q.  Now, RSCS paid Claxton a premium equal to about 30 cents

10   per pound over and above the current FOB price under its

11   current contract with RSCS.

12   A.  Correct.

13   Q.  And that would be for two truckloads per week for six

14   weeks.

15   A.  Yes.

16   Q.  Now, are you aware, sir, of what Claxton's 2014 contract

17   price was?

18   A.  I believe it was 92-3/4 cents.

19   Q.  All right.  Let's see.  Very good memory, sir.  It's 92.75.

20   You are absolutely correct.

21        So and you will have seen that because you reviewed

22   the 2014 contracts of the suppliers when you came in in May to

23   be able to get a better feel of what was going on with the

24   suppliers and RSCS at the time, correct?

25   A.  Correct.

Robert Lewis - Cross

1   *Q.* So if I do my math, 9725 from $1 -- actually plus 30 cents

2   you would be paying, you will be paying about $1.23 per pound

3   as a premium for those loads.  Would that be correct, sir?

4   *A.* That's correct.

5   *Q.* Now, you also purchased, if I am correct, some additional

6   pounds or loads from George's for a period of time.

7   *A.* Yes.

8   *Q.* Now, if you could turn to tab 4.  I am sorry, it's Defense

9   Exhibit I-074.  Now, Mr. Lewis, this is an e-mail from you to

10  Darrel Keck at George's; is that correct?

11  *A.* That's correct.

12  *Q.* And you copy on this e-mail Mary Hester, Mr. Campisano,

13  Stephen Campisano, I am sorry, Carol Knight, and Pete Suerken?

14  *A.* Yes.

15  *Q.* And it's about the KFC COB supply; is that correct?

16  *A.* That's correct.

17        *MR. LAVINE:*  Your Honor, I would move for the

18  admission of I-074.

19        *THE COURT:*  Any objection to the admission of I-074?

20        *MR. HART:*  No objection, Your Honor.

21        *THE COURT:*  I-074 will be admitted, and it may be

22  published.

23        *MR. HART:*  Your Honor, with a redaction.

24        *MR. LAVINE:*  Your Honor, I believe -- yeah, the

25  redaction is on there, Your Honor.

Robert Lewis - Cross

1    THE COURT:  Okay, that's fine.  Do you agree,

2    Mr. Hart?

3    BY MR. LAVINE:

4    Q.  Looking at I-074, which is tab 4 in the notebook, you are

5    buying additional loads at $1.30 per pound.

6    A.  Yes.

7    Q.  And that would be, as I said, over and above what George's

8    was supplying RSCS under its current contract.

9    A.  Yes.

10   Q.  Now, if you can turn to tab 5.  Because you also bought

11   additional loads from Tyson's?

12   A.  Yes.

13   Q.  All right.  If you can look at tab 5 and tab 6, and that

14   will be Defense Exhibit J-015 and Defense Exhibit J-014.  And

15   let's just start with J-015.

16       Now, J-015 is an e-mail from Tim Mulrenin at Tyson to

17   you at RSCS; is that correct?

18   A.  That's correct.

19   Q.  And it is a transmittal e-mail, and it's transmitting an

20   invoice, is it not, sir?

21   A.  Correct.

22   Q.  And it has to do with -- let me hold off a second.

23       If you would then look at tab 6 which is J-014.  And

24   that's an invoice; is that correct, sir?

25   A.  Yes.

Robert Lewis - Cross

1   Q.  And would you look at the invoice number at the top of the

2   page of J-014.  It's 19002980.  Do you see that, sir?

3   A.  Yes.

4   Q.  And that is the same invoice number that is on J-015, which

5   is tab five for you, sir?  Under Attachments, it references the

6   same invoice number?

7   A.  Yes.

8   Q.  And, Mr. Lewis, would it be accurate to say that the

9   invoice at J-014 was transmitted with the e-mail of J-015?

10  A.  Yes.

11      MR. LAVINE:  Your Honor, I would move the admission of

12  J-015 and J-014.

13      THE COURT:  Any objection to the admission of J-015

14  and J-014?

15      MR. HART:  No objection, Your Honor.

16      THE COURT:  Those will both be admitted and may be

17  published.

18      MR. LAVINE:  Thank you.  If we can publish first

19  J-015.

20  BY MR. LAVINE:

21  Q.  Now, Mr. Lewis, this is an e-mail, as we said, from Tim

22  Mulrenin at Tyson to you, and it has an invoice for the six

23  incremental loads that it is selling to KFC.

24  A.  Yes.

25  Q.  And it references an invoice; is that correct, sir?

Robert Lewis - Cross

1    A.   Yes.

2    Q.   If you turn to tab 6, and it's Exhibit J-014, and please

3    turn to the second page.

4           MR. LAVINE:   And if you would mark the first line,

5    Mr. Brian.   Thank you.

6    BY MR. LAVINE:

7    Q.   Now, Mr. Lewis, this shows that you are -- you, RSCS, is

8    willing to pay and does pay Tyson $1.45 per pound for these

9    incremental loads?

10   A.   That's correct.

11   Q.   Thank you.

12          So as you testified on direct, RSCS purchased about 52

13   loads of chicken from five suppliers from between $1.22 to

14   $1.45 per pound in the summer of 2014 leading up to the 2015

15   contract; is that correct?

16   A.   The purchase of the incremental loads had nothing to do

17   with the 2015 contract.

18   Q.   I completely understand that.  I just want to confirm the

19   52 loads and the fact that you bought 52 loads for prices

20   between $1.22 a pound to $1.45 a pound.

21   A.   Yes.

22   Q.   I am not tying it to the 2015 contract.

23          Now, you bought those loads, and that's when it was

24   actually a problem trying to find supply, was it not, sir?

25   A.   Yes.

Robert Lewis - Cross

1  Q.  You had a difficult time trying to buy supply.

2  A.  Yes.

3  Q.  And at this time, you were out in the marketplace calling

4  people in a sense begging for chicken.

5  A.  Yeah, trying to make them offers they couldn't refuse, yes.

6  Q.  Because you couldn't find the chicken.

7  A.  Yes.

8  Q.  And that was unusual, was it not, sir?

9  A.  Yes.

10  Q.  Can you ever recall a time when you had this type of a

11  crisis?

12  A.  No.

13  Q.  Now, the purchase of this chicken at 30 to 50 cents above

14  the current 2014 contract had a lot to do because of the market

15  conditions.

16  A.  I believe in a lot of these cases the suppliers had to make

17  some special arrangement to come up with the product.  I'm not

18  sure it had a whole lot to do with the market.

19  Q.  Well, the reason you had to pay this, because you couldn't

20  find the supply.  And the reason there was such a shortage was

21  basically because of market conditions.  There was a tremendous

22  demand and less supply.

23  A.  Okay, that's fair.

24  Q.  Now, these market conditions did not change in July of

25  2014, did they?

Robert Lewis - Cross

1   A.   No.

2   Q.   And, in fact, the market conditions did not change in

3   August of 2014.

4   A.   No.

5   Q.   And these same market conditions continued to exist in

6   September of 2014.

7   A.   I think by September we probably were beginning to start

8   breathing easier about the situation.

9   Q.   Okay.  Is it fair to say that the market conditions really

10  didn't change during the negotiation period of the 2015

11  contract?

12  A.   That's correct.

13  Q.   Thank you.

14       Now, I would like to turn now and talk a little bit

15  about the negotiation process.  Now, negotiating with the

16  suppliers, it is a process, is it not, sir?

17  A.   I am sorry?

18  Q.   It's a process.

19  A.   Yes.

20  Q.   Now, these are not take-it-or-leave-it negotiations just as

21  you testified on direct.  It's not a take-it-or-leave-it

22  situation.

23  A.   That's correct.

24  Q.   And a lot of times they will start, for example, with a

25  call to the supplier.

Robert Lewis - Cross

1    A.  Yes.

2    Q.  Just as you made the initial call in July of 2014 to the

3    suppliers.

4    A.  Yes.

5    Q.  And when you make that call to them, you tell them you're

6    going to be following up with questions and eventually asking

7    them to submit a proposal.

8    A.  Yes, but I would include in that that we were going to

9    arrange a meeting to discuss the requirements --

10   Q.  Right.

11   A.  -- we had.

12   Q.  But I am just starting at the initial stage in July of

13   2014.

14   A.  Okay.

15   Q.  And there was follow-up meetings in August, absolutely.

16          Now, after that, there may be e-mail exchanges?

17   A.  Yes.

18   Q.  And bid proposals are many times e-mailed to you or people

19   at RSCS.

20   A.  Yes.

21   Q.  And the proposals should follow or do follow the cost model

22   first developed -- as you stated, that was first developed by

23   you.

24   A.  Yes.

25   Q.  And once --

Robert Lewis - Cross

1    A.   In conjunction with the supplier, not by me personally.

2    Q.   Well, I think it is attributed to you, but that's --

3    A.   I won't take full credit.

4    Q.   Okay, thank you.

5            Once the proposals are submitted, there may be

6    follow-up calls by you or even in this case by Mr. Eddington at

7    RSCS.

8    A.   Or Mr. Suerken, yes.

9    Q.   Or Mr. Suerken, absolutely correct.

10   A.   Yes.

11   Q.   And there are going to be meetings?

12   A.   Yes.

13   Q.   And you may send out invitations, calendar invites to set

14   up those meetings with the individual suppliers.

15   A.   Correct.

16   Q.   And there could be follow-up e-mails after the meetings?

17   A.   Yes.

18   Q.   The point I'm trying to make, sir, is this is a very fluid

19   negotiation process, is it not?

20   A.   It is.

21   Q.   And RSCS doesn't come in and look at the first number and

22   say, Done, negotiation over, let's all go home?

23   A.   That's correct.

24   Q.   You probably wish it did, but it doesn't.

25   A.   Never take the first bid.

Robert Lewis - Cross

1  Q.  Okay.  There you are.

2        And it's not a winner-take-all negotiation?

3  A.  No.

4  Q.  Because all the suppliers are receiving an allocation of

5  volume from RSCS.

6  A.  Yes.

7  Q.  And as you just said, you don't take the first offer from

8  the supplier.

9  A.  That's correct.

10  Q.  Now, during the negotiation, the supplier doesn't just put

11  a number in an envelope, seal it, push it over to the table,

12  and you take it, and that's it.

13  A.  No, it doesn't work that way.

14  Q.  Right.  And that's because there is a process to this

15  negotiation.

16  A.  A confidential process.

17  Q.  Confidential, that's fine.

18        Now, there is multiple rounds of negotiations

19  depending upon the supplier.

20  A.  Correct.

21  Q.  And as you are negotiating with each supplier, you're

22  trying to push the supplier's price down?

23  A.  Yes.

24  Q.  And because the suppliers are also competing on price.

25  A.  Yes.

Robert Lewis - Cross

1  *Q.* And if there is any -- if there is one cost or a line item

2  input on the model that RSCS thinks is too high, you're going

3  to address those issues or those line items with the suppliers

4  and get them to pull -- reduce those line items.

5  *A.* Yes.

6  *Q.* Now, sir --

7       *MR. LAVINE:* If I can have one moment, please, Your

8  Honor.

9       *THE COURT:* Sure.

10  *BY MR. LAVINE:*

11  *Q.* Government counsel showed you Government's Exhibit 1160,

12  which is under tab 24.

13       *MR. LAVINE:* And I believe this has been admitted,

14  Your Honor.

15       *THE COURT:* 1160?

16       *MR. LAVINE:* 1160, yes.

17       *THE COURT:* Let me just double-check it. Yes, it has

18  been admitted, and it may be displayed.

19       *MR. LAVINE:* Thank you, Your Honor.

20  *BY MR. LAVINE:*

21  *Q.* Now, you testified on direct that once in a while you would

22  communicate with suppliers, all the suppliers at a time. It

23  was something that wasn't confidential, just as this e-mail

24  here, which is 1160, where you send this out on August 29 to

25  all of the suppliers.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And you went over that with Mr. Hart when you went through

3    your direct; is that correct?

4    A.   That's correct.

5    Q.   And is it fair to say, sir, that once in a while you do

6    this if you think it might create a little bit more pressure on

7    them to lower the prices.

8    A.   No, I wouldn't -- I don't recall ever doing it in that

9    context.  It would be -- in this case, it was if I let all of

10   them know that some have submitted their information and others

11   haven't, then maybe that was a little bit of pressure to submit

12   the information, not the price.

13   Q.   Fair enough.  Thank you.

14            Now, you wanted the lowest price you could get for

15   RSCS.

16   A.   Yes.

17   Q.   And RSCS's strategy was to keep the prices as close

18   together as possible.

19   A.   Yes.

20   Q.   And one of the reasons for the tight range is because RSCS

21   has multiple KFC customers across the country.

22   A.   Yes.

23   Q.   And you don't want KFC franchisees complaining because one

24   supplier has a lower price than the other.

25   A.   That's correct.

Robert Lewis - Cross

1   Q.   And I'm sure you do get those complaints from franchisees,

2   but you try to avoid that the best you can.

3   A.   Yes.

4   Q.   And one way to do that is try to compress the prices of the

5   suppliers.

6   A.   Yes.

7   Q.   Now, RSCS gives directional guidance to suppliers to try

8   and get them to a specific range or, as you said, a pricing or

9   the lowest possible cost.

10   A.   Yes.

11   Q.   In fact, many times RSCS will try to direct the suppliers'

12   prices towards the lowest priced supplier.

13   A.   Yes.

14   Q.   And when you are negotiating with the suppliers, you're not

15   going to tell them what RSCS's bottom line is, are you?

16   A.   That RSCS's bottom line is?

17   Q.   What RSCS's bottom line or what RSCS thinks is the absolute

18   bottom line.  You're not going to tell them what it is.

19   A.   No, no.  Sorry.

20   Q.   Let's talk about negotiations in 2014 because you said

21   there was a change in approach.  So going into negotiations,

22   you were going to take -- you or RSCS was going to take an

23   approach, different approach as far as the terms of the

24   negotiations.

25   A.   Yes.

Robert Lewis - Cross

1    Q.  And a different approach in terms of communications with

2    the suppliers.

3    A.  Yes.

4    Q.  And you tried to improve supplier communications during the

5    2015 contract negotiations.

6    A.  Yes.

7    Q.  And, in fact, going into negotiations, the relationship

8    between the suppliers and RSCS was not great.

9    A.  It was somewhat strained in my understanding.

10   Q.  And you also looked at the 2014 contracts, did you not,

11   sir?

12   A.  Yes.

13   Q.  Did you look at the 2013 contracts?

14   A.  No.

15   Q.  And in looking at the 2014 contracts, were you able to

16   determine that KFC had pushed the suppliers down about 4 cents

17   in 2014?

18   A.  I was not able.  No, I didn't have that information.

19   Q.  Okay.  If, in fact -- well, let me ask this question.  If

20   RSCS pushes the suppliers down 4 cents from one year to

21   another, that would be a pretty substantial decrease, would it

22   not, sir?

23   A.  Yes, it would.

24   Q.  In fact, it probably would be a little bit out of the norm.

25   A.  Yes.

Robert Lewis - Cross

1  Q.  Now, one of the things, some of the things that you

2  obviously would have seen is KFC was closing stores.

3  A.  Yes.

4  Q.  And you would also know, I believe, sir, are you aware that

5  other QSRs like Chick-fil-A and Popeye's, they were growing?

6  A.  Yes.

7  Q.  And you were able to determine RSCS had not been a good

8  listener in the past.

9  A.  That was my understanding.

10  Q.  And what I mean by that, and I want to make sure we are

11  talking the same thing, RSCS had not addressed previous issues

12  raised by suppliers.

13  A.  To some extent, that's correct.

14  Q.  In fact, is it fair to say, sir, that some of the issues

15  that you had to encounter in 2008 and 2009 had not been

16  resolved in 2014?

17  A.  Some of the -- some of the items that were discussed with

18  suppliers in those one-on-one meetings, yes, I had -- I

19  recognized them.

20  Q.  They hadn't been resolved?

21  A.  Had been an issue before, yes.

22  Q.  I didn't mean to cut you off.

23  A.  No, the answer is yes.

24  Q.  Thank you.

25          Issues like specifications?

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And overpacked cases?

3    A.   Yes.

4    Q.   And could you explain to the members of the jury, when I

5    say "overpacked cases," what does that mean?

6    A.   There is a specification range that's contained in the KFC

7    specification that says that the weight of the case has to be

8    between A and B.  But in order to meet specifications,

9    sometimes those case weights end up being higher than the

10   maximum.  When it's higher than the maximum, then the supplier

11   loses the revenue on those pounds because we put a cap on the

12   weight.

13   Q.   On the weight, even though the actual packed case may weigh

14   more than what the cap is.

15   A.   Yes.  I am assuming it's within specification.

16   Q.   Correct.  And there is also quality assurance issues which

17   had been a controversial issue.

18   A.   Yes.

19   Q.   I take it that was also an issue probably back in 2008 and

20   2009?

21   A.   Yes, it was.

22   Q.   And it hadn't been resolved in 2014 when you arrived.

23   A.   It didn't appear to be.

24   Q.   Right.  And KFC had not shown a desire to work with

25   suppliers on these issues.

Robert Lewis - Cross

1   A.   I think some of them had been addressed, but change is not

2   always easy.

3   Q.   I agree with that, sir.

4   A.   It's -- I mean, you don't snap your fingers and make

5   something happen.  There are consequences.  And I think in some

6   cases KFC found that there were consequences that were not

7   acceptable at the time.

8   Q.   And is it fair to say there wasn't a lot of transparency?

9   A.   I am sorry?

10  Q.   There wasn't a lot of transparency with RSCS -- I mean,

11  with KFC, I am sorry.

12  A.   That was my understanding.

13  Q.   Right.  And as you said, the relationship with the

14  suppliers was suffering.  It was strained.

15  A.   Yes, again, my understanding.

16  Q.   So your idea, and maybe this is the entire management of

17  RSCS, was to be friendlier in dealing with the suppliers?

18  A.   The team's idea, yes.

19  Q.   Share more information with them?

20  A.   Yes.

21  Q.   Communicate more effectively with them?

22  A.   Yes.

23  Q.   And I believe you also said, sir, that when you looked at

24  the cost model, that it had become unrealistic.

25  A.   Certain components within the cost model warranted change.

Robert Lewis - Cross

1   Q.  And that's because an evolution of the negotiation over a

2   period of years of what happened with the input into items in

3   the cost model; is that correct, sir?

4   A.  That's correct.

5   Q.  Now, part of the change that was proposed in 2014 for the

6   2015 contract was to go to a three-year contract.

7   A.  Yes.

8   Q.  And this is because of the supply crisis that RSCS had

9   experienced in Mother's Day in 2014.

10  A.  That was part of the reason, yes.

11  Q.  And it was RSCS's idea to move to a three-year contract.

12  A.  Yes.

13  Q.  And the idea behind that three-year contract was to help

14  guarantee supply on behalf of KFC.

15  A.  Yes.

16  Q.  So they wouldn't have to negotiate year after year after

17  year.  They would have a three-year contract.

18  A.  Correct.

19  Q.  And also, sir, in going to a three-year contract, you were

20  trying to make sure that suppliers didn't switch from small

21  birds to big birds.

22  A.  We were trying to ensure that KFC could get all the product

23  that they required, yes.

24  Q.  You wanted that commitment over that three-year period.

25  A.  Yes, but at the same time, that also gave the supplier a

Robert Lewis - Cross

1    guarantee that we were in it for the long-term, so they could

2    look forward and plan for that production.

3    Q.   Right.  And hopefully there was a benefit to both sides.

4    A.   Correct.

5    Q.   Now, you started, RSCS started negotiations for the 2015

6    contract in the July, August 2014 time frame.

7    A.   Yes.

8    Q.   And in the past, the annual negotiations would have started

9    later than the summertime, would it not?

10   A.   Yes.

11   Q.   And one of the reasons for the early start was that RSCS

12   wanted to lock up supply before their competitors.

13   A.   Yes.

14   Q.   And what you were trying to do was beat out competitors

15   like Popeye's and Chick-fil-A.

16   A.   Yes.

17   Q.   So if you started in July or August and you got the supply

18   locked up for a three-year period, RSCS was in pretty good

19   shape for KFC.

20   A.   Yes.

21   Q.   Now, Mr. Lewis, you would have expected a price premium to

22   guarantee supply for three years especially considering the

23   market and the big-bird issue we've talked about, would you

24   not, sir?

25   A.   I would have expected a slight premium.  I have already

Robert Lewis - Cross

1   said that we anticipated that the prices would go up.  It's the

2   magnitude of the price increase --

3   Q.  I understand that's your position.

4   A.  -- that was of concern.

5   Q.  I understand that.  But I am saying there would be a

6   price -- you would expect a price premium for any supplier to

7   lock up for three years.

8   A.  Not necessarily.  You know, again, it's an advantage for

9   the supplier too to be able to plan for and look forward for

10  that production.

11  Q.  All right.  Let me ask you this question.  If you know,

12  when you came in in May of 2014, you got a commitment from KFC

13  of what their necessary requirements were for supply for that

14  three-year period; is that correct?

15  A.  No.

16  Q.  You didn't?

17  A.  For a one-year period.

18  Q.  For a one year?

19  A.  Yes, sir.

20  Q.  Do you know whether or not KFC actually used all of the

21  supply that was committed for that year?

22  A.  I do not know the answer to that.

23  Q.  All right.  And, sir, if KFC was committed under the

24  contract to buy X volume, if they started closing down stores,

25  if they didn't need all the volume, under the contract are they

Robert Lewis - Cross

1   obligated to buy that supply?

2   A.  Let's see, I think I want to go back to your previous

3   question and expand on my answer, if I may.

4   Q.  Which question?

5   A.  About the forecast from KFC.

6   Q.  Please go right ahead, yes.

7   A.  That set of numbers is done on a weekly basis, and it's not

8   an arbitrary set of numbers.  Those numbers take into

9   consideration any promotional activity that's going to take

10  place throughout the year.  It's also going to include store

11  closings and store openings that are anticipated.  And I think

12  the third thing that I need to mention there is that these

13  suppliers, as you brought up before, have been long-standing

14  suppliers with KFC and RSCS.  The volume that is committed to

15  each and every year is I guess you could safely say it's an

16  estimate, but the suppliers from their experience know that

17  that's a built-in business risk.  We both know that it's

18  possible that we could use more and that we could -- or we

19  could use less.

20  Q.  Right.

21  A.  So the guaranteed supply, I think both parties understood

22  that that number was more of a directional number than a

23  guaranteed number.

24  Q.  Right.  But the supplier is planning on selling so much

25  supply to KFC.  And I guess my question, I think you may have

Robert Lewis - Cross

1    answered it and you tell me if I am reading this wrong, if KFC

2    ends up closing a lot more stores than was anticipated or

3    estimated in their pro forma, KFC is not obligated to buy all

4    of the supply, all of the estimate.

5    A.  The contract actually deals with that.  It says that if KFC

6    restaurants are closed, the volume commitment could be

7    affected.

8    Q.  Right.  And if it is affected, that means that the supplier

9    that has all of this -- the supplier that has all this volume

10   that it was anticipating selling to KFC would have to turn

11   around and try to sell it somewhere else, if that was the case.

12   A.  Yes.

13   Q.  Thank you.

14          Now, I want to talk about Mr. Eddington for a minute

15   because Mr. Eddington came in in August of 2014.

16   A.  That's correct.

17   Q.  And, in fact, you, sir, recruited Mr. Eddington.

18   A.  No, I did not.

19   Q.  Oh, you didn't?

20   A.  Mr. Suerken recruited Mr. Eddington.

21   Q.  Okay.  I was wrong.  I was under the impression that you

22   did.

23   A.  I am glad he came, but I did not recruit him.

24   Q.  Okay.  That's fair enough.

25          Now, Mr. Eddington was brought in to replace Mike

Robert Lewis - Cross

1  Ledford who had been the poultry expert at RSCS for quite a few

2  years.

3  A.  That's correct.

4  Q.  And Mr. Ledford was -- strike that question.

5       And Mr. Ledford left, I believe, in May of 2014.

6  A.  Yes.

7  Q.  And he unexpectedly left, as you said, and all of the

8  sudden you were called to come in and help primarily initially

9  on the supply side.

10 A.  Correct.

11 Q.  Now, Mr. Eddington was brought in as the poultry expert in

12 2014.

13 A.  Yes.

14 Q.  And part of that was because your return was supposed to be

15 temporary, two months give or take.

16 A.  Yes.

17 Q.  Now, Mr. Eddington was hired for his specialization in the

18 chicken industry.

19 A.  I think it's safe to say that was a big part of it, yes.

20 He was a highly qualified individual in other ways too.

21 Q.  He was highly qualified.

22 A.  Yes.

23 Q.  And he was hired to be in a sense the hands-on guy for RSCS

24 eventually?

25 A.  Eventually.

Robert Lewis - Cross

 1   Q.  And he had worked at Mar-Jac before coming to RSCS; is that

 2   correct?

 3   A.  That's correct.

 4   Q.  And eventually, is it fair to say I think in 2014

 5   Mr. Eddington took over the day-to-day negotiations?

 6   A.  He did.  Even though he came in as a poultry industry

 7   expert, there was a learning curve involved in getting

 8   acclimated to the RSCS way of doing business, so the

 9   negotiations were already underway when he arrived.  But you're

10   correct, eventually he took over the day-to-day operations.

11   Q.  And he did take an active role in the negotiations.

12   A.  He did, yeah, he did.

13   Q.  And if I am correct, sir, I think that your first calls to

14   the suppliers were in about July, the first week of July of

15   2014, and I think he came in, if I am correct, August 4 of

16   2014.  Does that sound about right, sir?

17   A.  It sounds about right.  Again, I don't remember specific

18   dates, but that sounds correct.

19   Q.  Now, Mr. Eddington ended up signing the 2015 contract SBRA

20   addendums.  Would that be correct, sir?

21   A.  Yes.

22   Q.  Now, other individuals negotiating for RSCS was Mr. Suerken

23   as you said.  He was the team leader?

24   A.  Yes.

25   Q.  And Mr. Suerken, he was a generalist.  He was not really a

1  poultry specialist, was he?

2  *A.* Mr. Suerken was not a poultry specialist, but he is an

3  expert negotiator and a quite capable individual.

4  *Q.* Okay. All right.

5       MR. LAVINE: Your Honor, if you want, this is a good

6  place for me to break, or I can keep right on going.

7       THE COURT: That's fine. Let me have a side bar with

8  the attorneys real quick, though.

9    (At the bench:)

10      THE COURT: Mr. Lavine, did you happen to just now get

11 an update from Ms. Rahman about tomorrow?

12      MR. LAVINE: Yes, I did, Your Honor. Mr. Eddington,

13 we can start with Mr. Eddington. He will come back on the

14 27th. He is not a very happy camper, but, yes, he can come

15 back on the 27th. We'll make it work.

16      THE COURT: Great. I appreciate that. So I won't say

17 anything to the jury other than I will see them back tomorrow

18 at 8:30, okay?

19      Thank you.

20      Ladies and gentlemen, we will go ahead and recess for

21 the day. We will plan on coming back at 8:30 tomorrow. We

22 will make sure to end right at 5:00 tomorrow just in case

23 anyone is watching the Avalanche game. Otherwise, ladies and

24 gentlemen, keep the admonitions in mind, and I'll see you back

25 at 8:30 tomorrow, all right? The jury is excused.

1      (Jury excused.)

2          THE COURT:  Thank you, Mr. Lewis.  You are excused

3   until 8:30 tomorrow.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  Anything to take up at this time?

6   Mr. Hart or Mr. Loveland?

7          MR. LOVELAND:  Your Honor, I would be happy to --

8          THE COURT:  Take up that one exhibit?

9          MR. LOVELAND:  Yes, Your Honor.

10         THE COURT:  Why don't we take that up at this time.

11         Go ahead.

12         MR. LOVELAND:  Thank you, Your Honor.

13         So I am going to speak specifically to Government's

14   Exhibit 1016 which was I don't know how many binders ago, Your

15   Honor, but 13 --

16         THE COURT:  It's actually 10106.

17         MR. LOVELAND:  Yes, Your Honor, 10106.  So it was

18   tab 13 in Mr. Sangalis' binder.  So, Your Honor, this is the

19   PowerPoint, and this is relevant because it was authenticated

20   as coming from Jayson Penn's hard drive and being edited by

21   Jayson Penn.  And what this PowerPoint goes through, it's a

22   kickoff PowerPoint on page 1.  You can see that the slide deck

23   was -- maybe if Mr. Ackaouy can have control.  Thank you.

24         And what you see, Your Honor, on page 1 is that this

25   was a presentation given to 140 of the top leaders from

1    then-CEO Penn who had edited this.

2         THE COURT:  It doesn't actually say who the audience

3    is I don't believe.

4         MR. LOVELAND:  If we could scroll in on the text, Your

5    Honor.  I am going to make use of this moving platform.

6         What is the purpose of bringing in our company's top

7    140 leaders together at the beginning of the year.  And these

8    are the notes at the bottom of the slide, so this is what the

9    presenter, Jayson Penn, would be using when he gave the

10   presentation.

11        THE COURT:  I see it now.  Got it.

12        MR. LOVELAND:  And I think that's important context

13   because it goes to where the statements are made and the

14   importance of the statements.  So I want to be clear that we're

15   seeking to admit, although we would be open to rule of

16   completeness going broader, page 1 and 11 to 16, so a narrow

17   band.  And I want to just sort of walk through the relevant

18   pages.

19        So page 11 here --

20        THE COURT:  What's the Bates stamp number of that

21   because I don't believe that the page numbers are on here?

22        MR. LOVELAND:  We'll just say the one ending in 137

23   should be page 11, Your Honor.

24        THE COURT:  Okay.

25        MR. LOVELAND:  What this here shows is the agenda.

1    Jayson Penn is the speaker who kicks off this kickoff meeting

2    which is a day long.  So this is further authentication that

3    these are, in fact, Defendant Penn's statements in addition to

4    the authentication provided by Mr. Sangalis.

5              Now, on page 12, which should end in 138, Your Honor,

6    this slide explains Pilgrim's Pride's financial status and its

7    situation before Defendants Lovette and Penn came in to lead.

8    And it says here, It's important for everyone to get on the

9    same page and understand how we got here, what the journey was,

10   and it talks about the bankruptcy before the new leadership

11   came in.  And this is important because it's central to the

12   government's theory of motive in this case.

13             Page 13 goes into more detail.  And it talks

14   specifically here about new management.  New management, of

15   course, means Defendant Lovette and Penn, and these are

16   Defendant Penn's own statements.

17             Now, there are things on this slide that go into

18   details about other strategies that were used, and I think that

19   that's also relevant for the jury to consider.  But the

20   overarching point here is that it's a step-by-step explanation

21   of how Jayson Penn viewed the transformation of the company.

22             So if we can go to the next page, and I will make sure

23   I put the Bates stamp on the record.  We are now at 140.  So

24   this does show the mindset of Jayson Penn to turn the company

25   around.  And I do want to address The Godfather here, Your

 1   Honor.  If we could sort of zoom in on not just the text,

 2   Mr. Ackaouy, but also the slide.

 3          So I think this is a joke made in a corporate setting.

 4   I don't think there is any risk of the jury thinking this is

 5   about mob violence or an actual mafia, but I think what it

 6   shows is the commitment to raising prices.  It's somewhat

 7   appropriate that Mr. Lewis just used the same phrase, an offer

 8   they can't refuse, maybe 40 minutes ago.  But here again it

 9   says, We needed a new leadership direction, strong focus on

10   performance.  Again, it's labeled the turnaround, and this is

11   central to the government's theory of the case, Defendants

12   Lovette and Penn come in, they institute new change, new

13   leadership and profits go up.  And we are going to see that in

14   the next slides.

15          If we could zoom in again, Mr. Ackaouy.

16          The next slide will illustrate this point even more

17   strongly, Your Honor.  I just want to note for the record what

18   Bates number we are on, excuse me.  41, Your Honor.  So you can

19   see here -- and this is another slide that is open to defense

20   argument, but you can see here that profits per pound of

21   chicken are increasing during the key period of the conspiracy.

22   2012 is when the conspiracy is just beginning, and here you see

23   a linear trend in performance from that year.

24          We made great strides in the company as we moved up

25   the page in almost every performance category.

1        If we can do the next page, please.  And if we could

2   zoom in on the text and the slide.

3        Now, Your Honor, this is a very important slide for

4   the government's theory of the case.  December 2015,

5   record-year performance.  Obviously the heart of the

6   government's case is that the contract negotiated in 2014 for

7   2015 to 2017 led to record price increases for the industry.

8   And here we have that matching with the best financial

9   performance in the history of the company.

10        And I think it says, handed over $2.2 billion of cash

11   back to our shareholders.  Again, there is Marlon Brando on the

12   slide, Your Honor, this is a corporate joke.  I don't think

13   there is any risk of the jury thinking that there is more to it

14   than that, but I do think that this slide illustrates exactly

15   why this PowerPoint is relevant to the government's motive

16   theory.  The year after, the first year of the record high

17   price increases is the record here of performance for

18   Pilgrim's.  All of these points are arguable, but I think we

19   have more than met the low threshold for relevance in this case

20   because it is central to the government's theory of motive.

21        And, again, this PowerPoint is I believe 88 pages,

22   Your Honor.  Those are the pages we are focused on, but we

23   would obviously be willing to admit more if the defense wants

24   it to.

25        Again, these are Jayson Penn's words.  I think that

1    that's been more than authenticated based on where it came

2    from, the editing and the nature of the presentation given by

3    the CEO to the 140 top leaders of the company.  I am happy to

4    rest on that, Your Honor, but I would also be happy to answer

5    any questions.

6            THE COURT:  No.  Why don't we hear from any of the

7    defendants who wish to comment.

8            Mr. Quinn, go ahead.

9            MR. QUINN:  Thank you, Your Honor.

10           First and foremost, I think there are just intractable

11   hearsay problems with this document.  Your Honor just got

12   finished stating the objection to GX-10112 on the basis that we

13   could not tell who wrote what and comments by other people are

14   hearsay, and we don't know if Bill Lovette approved it.  That

15   situation is even worse with respect to this deck, Your Honor.

16   I cross-examined Mr. Sangalis on this deck.  He admitted that

17   it wasn't Mr. Penn who was listed as the author.  I asked him:

18   Are you suggesting that Mr. Penn drafted this deck?

19           He said:  I don't know enough to say one way or the

20   other.

21           You just don't know.

22           He clarified the company did not rely on this deck in

23   the usual course of its business, so it's not coming in as a

24   business record.

25           We have -- there is no basis for the assertion that

1    these are Mr. Penn's statements.  No witness will testify that

2    he actually delivered these remarks at any conference.  He

3    wasn't the CEO at the time that this deck was allegedly

4    relevant as Mr. Loveland suggested.  So, Your Honor, on that

5    initial point, I just think there is a total lack of foundation

6    to overcome a hearsay objection here.

7           And then on the relevance point, I couldn't disagree

8    more with Mr. Loveland with respect to the Vito Corleone

9    slides.  I imagine Mr. Lovette's counsel is going to have a lot

10   more to say about that, but we think it's incredibly

11   prejudicial to have Bill Lovette compared to Vito Corleone from

12   the jury.  We stridently disagree.  We think the prejudice

13   under 403 is extreme here.

14          And on the other slides, Your Honor --

15          THE COURT:  Well, on that -- yeah, if he only showed

16   this slide, but this was a presentation by Pilgrim's to

17   Pilgrim's people, and the whole slide deck, it's kind of a

18   rah-rah team building type of a thing.  Obviously, Pilgrim's

19   didn't think that there was some type of ominous or nefarious

20   association being drawn by creating that type of a Godfather

21   analogy for the presentation, so why couldn't a jury figure it

22   out too?

23          MR. QUINN:  The jury is not going to have that

24   context, Your Honor, because no witness is going to testify

25   about this deck.

1    THE COURT:  Anyone who read through it would get it,

2  right?

3    MR. QUINN:  But they are only getting 11 pages of the

4  deck, Your Honor.  So it's going to be -- it's kind of --

5    THE COURT:  Well, I mean, the point is if the entire

6  deck were admitted, that's a predicate, if the entire deck is

7  admitted, why would anyone not think it wasn't considered to be

8  something that's, you know, not ominous or meant to be any type

9  of criticism of Mr. Lovette?

10    MR. QUINN:  You are right, Your Honor, there may be

11  more context in that scenario.

12    I think the broader point is just the deck is chalked

13  full of irrelevant subject matter.  There has been no testimony

14  nor I don't think there will be any testimony connecting these

15  big numbers in the deck to anything in the case.  And we're

16  afraid that the jury is just going to consider defendants to be

17  fat cats who made billions of dollars without any context

18  whatsoever.  What Your Honor said is absolutely correct.  It's

19  like a rah-rah corporate deck that has no discernible

20  connection with the case thus far.  So it's really on relevance

21  and hearsay grounds, Your Honor, we think it's just not

22  admissible.

23    THE COURT:  Okay.

24    Mr. Fagg, go ahead.

25    MR. FAGG:  Thank you, Your Honor.

1          I am not going to retread all the ground that

Mr. Quinn just covered, but as it relates to hearsay, I think

we are glossing over this a bit here, because this is a

document that was on Mr. Penn's home drive.  That's what the

testimony is.

6          There is zero testimony that Mr. Penn did anything to

adopt it, and if so, what he did to adopt it, and there is not

going to be any testimony about that.  So we have no idea what

changes Mr. Penn made.  Two -- so, therefore, those statements

are not attributable to him, and they're hearsay.

11         Two --

THE COURT:  Would admissibility depend upon

attributing them to Mr. Penn?

MR. FAGG:  Otherwise, they don't know who statements

they are, Your Honor.

THE COURT:  Isn't that the broader issue?  It's not

necessarily that we can't attribute them to Mr. Penn, but we

don't know who to attribute it to.  We know who the author was,

but we don't even know anything about that person.

MR. FAGG:  We don't even know what that person does or

anything about that person, right?  So we don't know who it is

attributable to.  And so this entire presentation is hearsay.

The Court has previously ruled that materials that are created

and are presented to different aspects of companies such as

board -- materials that are presented to a board of directors

1    are inadmissible hearsay, like the McKinsey deck that we have

2    so heavily litigated, and it's a stretch to say that this is

3    akin to that.  Part of the reason is we know that the McKinsey

4    deck was delivered to the board of directors to RSCS.  We have

5    no idea what was done with this presentation.

6            And so there is no indicia of reliability or anything

7    else as it relates to this deck.

8            Two, and to the 403 prejudice issues, Your Honor, the

9    notion that this is central to the case flies in the face of

10   everything else that we have seen and heard in this case by way

11   of evidence and by -- that we anticipate that we will hear

12   through the rest of the government's case.

13           The government does not intend to present any sort of

14   witness to talk about the sales at Pilgrim's.  They had a

15   witness on their witness list who could have testified to those

16   things, his name is Mark Glover, and the government took him

17   off of their list, and they removed him.  And only they know

18   why they did that, but the reality is that they did.  And so

19   they are not seeking to admit this document respectfully

20   because it is a very important part of the theory of their

21   case.  If they did, they would have a witness who would be up

22   here talking about these things and authenticating what

23   Pilgrim's profits were and the like, and they are not doing

24   that.

25           They are trying to get it in for the very prejudicial

1    reasons of these images of Mr. Lovette with The Godfather.  And

2    it is striking to me, Your Honor, that after -- so this is

3    particularly relevant right now, and it is the 50th anniversary

4    of the Godfather, and there is only two reasons why I know

5    that.  And one of them is because I was --

6         THE COURT:  One would not be your age, right?

7         MR. FAGG:  One of them is because I was at the

8    pharmacy, and there is a Life magazine that says The Godfather.

9         THE COURT:  When I tell my law clerks about The

10   Godfather, they say I have heard of it, but ...

11        MR. FAGG:  And it has the same picture on the front of

12   it that they have superimposed over Mr. Lovette's face.

13        THE COURT:  What?  Let me see.

14        MR. FAGG:  If it is not the exact same, it is

15   unbelievably the same.  He is holding a cat.  Had a red rose on

16   his left lapel.

17        Two, there is a historical film that's out or series

18   out right now called The Offer that is about making of the

19   Godfather, and it talks about things like -- for example, it

20   talks about the scene in which Marlon Brando orders a severed

21   horse head to be placed under someone's covers.

22        THE COURT:  He doesn't actually order that.  That's

23   just implied.

24        MR. FAGG:  It's implied, which is exactly the

25   implication that the government is trying to make here.  But in

1    the series, they talk about how in even making The Godfather

2    they used a real horse head because a fake one didn't look good

3    enough.

4         So the notion that the government wants to use this

5    deck that's full of hearsay to establish some important points

6    that could be established through witness testimony that could

7    be established through documents that would otherwise be

8    admissible falls flat.

9         And the last point I will make on this, Your Honor, is

10   that what this is relevant to is the government's opening

11   statement when the government got up here and they talked

12   about -- they used words like "crew" and "cronies" and

13   "corruption," and they used those phrases over and over and

14   over again.

15        *THE COURT:*  None of which are used in the Godfather,

16   by the way.

17        *MR. FAGG:*  I think it's a fair inference to make that

18   leap, though, Your Honor.  And so that is the message that they

19   are trying to deliver here with these documents, and there is

20   no indication Mr. Lovette ever saw this, period, and it would

21   be extremely prejudicial to allow this in.

22        *THE COURT:*  Thank you, Mr. Fagg.

23        Anyone else?

24        *MR. KORNFELD:*  Very briefly, Your Honor.

25        *THE COURT:*  Go ahead, Mr. Kornfeld.

1          MR. KORNFELD:  Your Honor, as counsel for the

2    remaining CEO in the case, we are worried about the spill-over

3    effect.  All joking aside, among certain folks, including

4    people in my age demographic, these are iconic images, and this

5    is a direct link between two of the CEOs, two out of the three

6    in this case, and albeit a fictional but probably the most

7    well-known mafiosi in this country.  So I don't need to repeat

8    the 403, but we are very concerned about that.

9          The final thing I would suggest is maybe the Court's

10   clerk's parents might make them watch the movies like I made my

11   kids watch the movies so they would understand these cultural

12   references.

13         MR. LOVELAND:  Your Honor, I think the jury is going

14   to laugh maybe as hard as defense counsel did.  I don't think

15   there is any risk of unfair prejudice here.  I think that it

16   was used in a corporate setting for the same reaction that

17   counsel had just now.  There may have been a real horse head

18   used in the movie.  I didn't know it was the 50th year

19   anniversary.  A year ago I was an AUSA. in Baltimore doing gang

20   and human trafficking cases, and we didn't laugh like that in

21   the courtroom.  I really don't think there is a risk of that in

22   this case.

23         As far as in terms of the authentication, it's found

24   on his hard drive, Jayson Penn's hard drive.  He is the last

25   editor, and the document itself states that he was to present

1    at this kickoff meeting.  I think that's very strong evidence

2    from which a jury can infer that these are Jayson Penn's

3    statements.

4         In terms of it not being a business record and it

5    not -- the figures not being checked, Jayson Penn's own words

6    about the financial well-being of the company and his views of

7    it are arguably more relevant than an accountant's

8    double-checking of it.

9         I also don't think it's at all surprising that a

10   senior executive would take something that was created by

11   someone else, edit it, adopt it, and give it.  I think that's

12   clearly what happened here, and the document itself suggests

13   that in terms of the admissibility.

14        I also think it's worth mentioning that there were

15   prior rulings from the Court in terms of the chicken mafia, and

16   that didn't end up playing out in this case.  And I don't

17   actually think it's apt of a comparison because I really do

18   think this was a joke made in a corporate setting.  And to the

19   extent it's taken by the jury for its cultural reference point,

20   it will be made as a joke.  There is no indicia of violence in

21   this case that the jury could conflate with the violence in the

22   movie The Godfather.

23        I do think the setting in which it was given too.

24   Jayson Penn gave this presentation to 140 of the company's top

25   leaders.  I don't think that that suggests that they were

1    slap-dash with the accounting or the figures.  And I do think

2    that the rest of the PowerPoint provides that context.

3         THE COURT:  Help me out.  Does the PowerPoint, because

4    you are attributing it to Mr. Penn, but are there words in the

5    deck that indicate that he was the one to have made the

6    presentation?

7         MR. LOVELAND:  Can I have the Court's indulgence for a

8    moment?

9         THE COURT:  Sure.

10        MR. LOVELAND:  If you could publish that.

11        I think this slide is very powerful evidence.  Again,

12   Jayson Penn is on the agenda for 45 minutes of opening remarks.

13   And if you look down here, what is being described, As you can

14   see, we have a really full deck today.  We have our friend

15   Brandy back again.  She will exercise our mind and bodies.

16   This is the opening remarks that Jayson Penn gave.  These were

17   the words you would give it you were giving opening remarks.  I

18   think the document itself suggests that.  I don't know that he

19   wrote his own name in any of the notes here, Your Honor, but it

20   literally says, We have a really full deck today.  This is how

21   you would open such a meeting if you were a senior executive

22   doing a kickoff.

23        And I do think, again, the government would be open to

24   admitting more than what we focused on.  We just wanted to

25   highlight for the Court the narrow range of slides that we

1  thought were relevant.  And I do think it is highly relevant

2  evidence that goes to the motive of the case.  It focuses on

3  the core years of the conspiracy.  The slides show profits per

4  pound are soaring sky high following the formation in 2012, and

5  the record-setting year for profits is in 2015.

6          Thank you, Your Honor.

7          THE COURT:  Mr. Quinn, anything real quick?

8          MR. QUINN:  Real quick, Your Honor.  I think

9  Mr. Loveland was bootstrapping hearsay into hearsay.  There is

10  no evidence whatsoever that Jayson Penn gave this presentation.

11         THE COURT:  Well, if you take a look at page 1.  So

12  you have someone saying good morning, so it seems like it was

13  supposed to be in the morning.  The second paragraph, Thank you

14  for traveling.  Today will be a great day.  We have lots of

15  great things planned.  Lisa will update us on our engagement

16  survey, and guess who is right after Mr. Penn.

17         MR. QUINN:  I see those points.  There is no evidence

18  in the record that anyone actually made these statements at any

19  kind of a meeting, so the draft itself may say those things,

20  but there is no corroborating evidence that anybody actually

21  delivered these remarks, so it's all just hearsay.  We know the

22  author isn't Mr. Penn.  We have no idea whether he even made

23  this deck.  The metadata indicates he opens a PowerPoint file.

24  But I opened a PowerPoint file yesterday and I saved it, and it

25  indicates Brian Quinn was last editor in it.  So we really have

1  no idea whether Mr. Penn made it.  And just resting on the rest

2  of our relevance objections, Your Honor, there is no link of

3  those 2.2 billion number or any others to the facts that are at

4  issue in this case.  The government could have called those

5  witnesses, and they didn't.

6          *THE COURT:*  Real quick, Mr. Fagg.

7          *MR. FAGG:*  Just -- thank you, Your Honor.

8          Just to respond to Mr. Loveland's point on this,

9  again, if this was central to their case, if this was actually

10  delivered, they could have called a witness to testify and to

11  confirm that this meeting even happened, much less who said it.

12  And they didn't do that.  And if you look at the page that ends

13  in Bates No. 136, right at the beginning of the slide, there is

14  supposedly going to be some people there that, Oh, let's honor

15  them.  Who is the second person on the left-hand column?  Mark

16  Glover.  He was on the government's witness list, and they took

17  him off.  They took him off after they interviewed him, what

18  appeared to be the first time.

19          So, I mean, the notion that we can just come in here

20  and say -- and hear from Mr. Loveland that he thinks it's safe

21  to assume that somebody came to this meeting and it's safe to

22  assume that so and so delivered this, they could have proved

23  this up if this was central to their case, and they didn't.

24          One other point on 403, Your Honor, is these profit

25  numbers, Mr. Bryant got on the stand and talked about what he

 1   was testifying about was the fresh-food services business unit

 2   and that was it.  That's just one tiny sliver of Pilgrim's.  So

 3   the notion that Pilgrim's had 2.2 -- or $8.2 billion in sales

 4   and $1.2 billion in EBITDA is talking about the entire company.

 5   It's not relevant to what the issues are in the case in

 6   addition to being embedded hearsay within hearsay.

 7           THE COURT:  Okay.  So as Mr. Quinn laid out initially,

 8   there are really two issues here.  One, we have hearsay

 9   objections.  Two, we have relevancy/403 objections.  Let's talk

10   about the hearsay objections first.

11           So we don't know very much from Mr. Sangalis as to

12   this other than who was an author and the fact that this was on

13   Mr. Penn's -- I can't remember what term he used -- a personal

14   business drive at his home.

15           MR. HART:  A home drive, Your Honor.

16           THE COURT:  A home drive that Mr. Penn had access to,

17   but other people with very limited exceptions did not.  And it

18   is true that on page 1, which has a Bates stamp ending in 127,

19   perhaps the jury could conclude that this deck was intended to

20   be delivered by Mr. Penn, and when you look at page 137, you

21   see that Mr. Penn was indeed slated to deliver opening remarks,

22   and as Mr. Hart pointed out, that was supposed to take 45

23   minutes.  This is, I think, an 88-page document and perhaps

24   Mr. Penn could have gotten through the deck in that amount of

25   time.

1    But as Mr. Fagg points out, we don't know if he

2    actually delivered this particular PowerPoint presentation.

3    And let's assume that even if we could infer, a jury could

4    infer that he did, that still doesn't mean the information

5    contained on various slides were anything that Mr. Penn knew

6    about.  They can't be attributable necessarily to Mr. Penn.  Or

7    we can't even infer that they were adopted by Mr. Penn because

8    there has just been no foundation established for the accuracy

9    of the numbers, which then brings us back to the fact that

10   Mr. Quinn argues that this is not a business record, and he

11   analogized back to those McKinsey PowerPoint decks that we had

12   talked about in previous trials, and I think that that's a good

13   analogy, not that the McKinsey ones weren't more substantive

14   than this one, they are a little bit different nature.  But in

15   terms of the relevancy that Mr. Hart and Mr. Loveland outlined,

16   in terms of this particular one, in terms of the turnaround to

17   the company, things of that nature, those are all numbers, and

18   there has just been no foundation for them.

19       And there is no -- we can't consider this a business

20   record because there has been no testimony whatsoever that this

21   is the type of record that was created in the normal course of

22   business and that it -- and the company depended upon the

23   accuracy of the contents of it in order to conduct its

24   business.  So this is almost the opposite of what you would

25   consider to be a business record.

1          And for that reason -- well, and then going back, even

2    if we just look at this deck and don't even worry about whether

3    Mr. Penn used this in a particular meeting, but rather just

4    considered whether or not because he was the last person who

5    apparently may have made a change to it, we still don't know

6    what change Mr. Penn may have made to it and who was the author

7    of the rest of it and whether Mr. Penn had any idea about the

8    information, some of the information within it, in particular

9    the information beginning on page 11 of it that the government

10   intends to admit or the subsequent pages as well, because part

11   of the government's relevancy argument is those are important

12   numbers to put in front of the jury because it shows that the

13   new management team was able to effectuate a turnaround and was

14   highly motivated to do so.

15         But there is -- all that information at this point in

16   time based upon the information that we have is hearsay.  We

17   don't know who those statements are attributable to.  So as a

18   result, the Court will sustain the hearsay objection.  There is

19   no reason to get into the relevancy objection because there is

20   no basis for its admission based on hearsay.

21         Any other issues that we should take up before we

22   recess, then?

23         *MS. NIELSEN:*  Your Honor, real quick, we have an

24   agreement with the government on an issue.  Mr. Suerken was

25   interviewed today and made a statement that he thought

1    Pilgrim's Pride had stolen 200 to $300 million from the KFC

2    franchisees.  I talked to Ms. Wulff at the break, and she has

3    agreed the government will not elicit that information and that

4    Mr. Suerken will be instructed not to say that during his

5    testimony tomorrow.

6         THE COURT:  Okay.  Is that a correct understanding,

7    Ms. Wulff?

8         MS. WULFF:  That is correct.  I have instructed

9    Mr. Suerken's counsel.

10        THE COURT:  Mr. Feldberg?

11        MR. FELDBERG:  Along similar lines, I haven't had a

12   chance to speak with counsel for the government yet because I

13   just saw this for the first time, but in some of his earlier

14   remarks, Mr. Suerken has relieved himself of some rather

15   difficult opinions about Mr. Austin.  That did not come out in

16   the last trial, and I would hope we could agree that it will

17   not, those kinds of comments will not come out in this trial.

18        THE COURT:  I don't know if you are prepared to

19   address that issue, Ms. Wulff, but if you wish to respond at

20   this time, you may.

21        MS. WULFF:  Sure.  I believe Mr. Feldberg is referring

22   to the comments that Mr. Suerken made while the agents

23   conducted the recorded knock-and-talk at his house which was

24   something that was discussed during the second trial, Your

25   Honor.  And my understanding is that -- I am sure counsel will

1    correct me if I'm wrong, but our understanding is the parties

2    are generally not getting into the fact of his knock-and-talk

3    or statements -- the statement in particular that Mr. Feldberg

4    is referencing regarding Mr. Suerken's opinions of Mr. Austin

5    and how he should fare.

6         MR. FELDBERG:  Fair enough.  And as long as

7    Mr. Suerken and his counsel will not blurt that out.

8         THE COURT:  Mr. Feldberg, you can talk to Ms. Wulff

9    about that.  It sounds like it's not going to be an issue.

10         MR. FELDBERG:  Thank you, Your Honor.

11         THE COURT:  Anything else we should discuss?

12         MR. HART:  In connection with some requests, some

13    Touhy requests from the defense, I think we are working towards

14    coming to a resolution.  One of the agents, however, is leaving

15    the country on a personal trip, and we are trying to hammer out

16    either a stipulation or agree to see if the Court would be

17    amenable for him to testify, if need be, by video

18    teleconference.

19         THE COURT:  I would be amenable to that as long as

20    there is some agreement among the parties on that score, but I

21    am glad you are thinking creatively on that, because there is

22    just no reason to put people through a tremendous inconvenience

23    if we can work out some way to get the evidence in front of the

24    jury.

25         MR. FELDBERG:  We are hoping we can reach a

1    stipulation.  If not, we will come up with some other solution.

2         *THE COURT:*  That's great.  Then we will be in recess

3    until 8:30 tomorrow.  Thank you.

4         (Recess at 5:35 p.m.)

5                              INDEX

6    WITNESSES

7       Theodore Sangalis

8            Direct Examination By Mr. Hart                985

9            Voir Dire Examination By Mr. Feldberg        1005

10           Cross-examination By Mr. Quinn               1014

11           Cross-examination By Mr. Schall              1019

12           Cross-examination By Mr. Feldberg            1020

13      Florence Becker

14           Direct Examination By Mr. Loveland           1031

15           Voir Dire Examination By Mr. Tubach          1044

16           Cross-examination By Mr. Tubach              1048

17           Cross-examination By Mr. Beller              1049

18           Redirect Examination By Mr. Loveland         1053

19      Robert Lewis

20           Direct Examination By Mr. Hart               1080

21           Cross-examination By Mr. Lavine              1144

22

23

24

25

1     INDEX (Continued)

2     EXHIBITS

3     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4     Attachment A            972

5     J-014 to J-015          1168

6     J-016                   1165

7     50                      1059

8     51                      1060

9     52                      1061

10    53                       978

11    56                       984

12    57                      1025

13    I-074                   1166

14    I-141                   1027

15    D-146 to D-149          1012

16    D-292                   1014

17    D-543, D-544            1005

18    F-660                   1162

19    D-839                   1027

20    982                     1024

21    1007                    1125

22    1026                    1125

23    1028-1029               1125

24    1030                    1048

25    1104-1105               1004

1                               INDEX (Continued)

2                                  EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 1134-1137 | | 1110 | | | |
| 1139 | | 1110 | | | |
| 1160 | | 1126 | | | |
| 1165-1167 | | 1125 | | | |
| 1221-1 | | 1110 | | | |
| 1244 | | 1158 | | | |
| 1546 | | 1027 | | | |
| 1700 | | 975 | | | |
| 3037 | | 1058 | | | |
| 9505 | | 1006 | | | |
| 10048-10054 | | 1006 | | | |
| 10651 | | 976 | | | |

16                     REPORTER'S CERTIFICATE

17    I certify that the foregoing is a correct transcript from

18  the record of proceedings in the above-entitled matter.   Dated

19  at Denver, Colorado, this 14th day of June, 2022.

21                           S/Janet M. Coppock