1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10      Defendants

11 _____

                    REPORTER'S TRANSCRIPT
12                  Trial to Jury, Vol. 14

13 _____

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15 Chief Judge, United States District Court for the District of

16 Colorado, commencing at 8:30 a.m., on the 6th day of July,

17 2022, in Courtroom A201, United States Courthouse, Denver,

18 Colorado.

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2              Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel
 3     Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,
 4     Washington, DC 20530, appearing for Plaintiff.
 5              Anna Tryon Pletcher and Michael Tubach of
 6     O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7     San Francisco, CA 94111-3823;
 8              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9     N.W., Washington, DC 20006, appearing for Defendant Penn.
10              David Beller, Richard Kornfeld and Kelly Page of
11     Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12     CO 80202, appearing for Defendant Fries.
13              Bryan B. Lavine and Laura Anne Kuykendall of Troutman
14     Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite
15     3000, Atlanta, GA 30308;
16              Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,
17     1001 Haxall Point, Richmond VA 23219, appearing for Defendant
18     Brady.
19              Michael Felberg of Reichman, Jorgensen, Lehman,
20     Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21     10017;
22              Laura F. Carwile of Reichman, Jorgensen, Lehman,
23     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
24     CA 94065; appearing for Defendant Austin.
25
```

1            APPEARANCES (Continued)

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                  *    *    *    *    *

8                     PROCEEDINGS

9          *THE COURT:*  We are back on the record.

10         *MR. FELDBERG:*  Your Honor, we don't have to address

11   this right now, but perhaps at the break.  I don't want to

12   delay the jury.  We received an e-mail from the prosecution

13   team at 7:46 this morning attaching two proposed charts they

14   wanted to use in rebuttal summation.  The charts have to do

15   with telephone calls between Mr. Austin and Mr. Brady.  They

16   are both inaccurate and misleading, and because they saved them

17   for rebuttal and didn't put a witness on the stand, we had no

18   opportunity to confront the evidence and demonstrate that they

19   are, in fact, both inaccurate and misleading.  We would like an

20   opportunity to address that either now or at some time before

21   the government's rebuttal.

22         *THE COURT:*  Right.  I think we have to keep on a

23   fairly strict schedule because I have got a judge's meeting at

24   12:15, and because I have to be there, so we'll take it up

25   over -- at the mid-morning break.

1          *MR. FELDBERG:*  Thank you, Your Honor.

2          *MR. KORNFELD:*  Just as a heads-up, Ms. Rahman is

3    actually going to go first this morning and then me.  We

4    switched it up.  Then Mr. Feldberg and Mr. Fagg.

5          *THE COURT:*  Sounds good.  Let's bring the jury in.

6          Have we talked about times because we had six minutes

7    we have to shave off someone?

8          *MR. KORNFELD:*  I think I am going to be a couple

9    minutes short, Your Honor.

10         *MR. FELDBERG:*  At least as of last night, I am going

11   to be a minute or two short as well, Your Honor.

12         *THE COURT:*  Okay.

13         (Jury present.)

14         *THE COURT:*  Ladies and gentlemen, we will have, then,

15   the next closing, and it looks like Ms. Rahman is ready to go.

16         *MS. RAHMAN:*  Thank you, Your Honor.

17                        **CLOSING ARGUMENT**

18         *MS. RAHMAN:*  Speculation, assumptions, unreasonable

19   inferences.  If this happened, if that happened, if suppliers

20   did this, if the customers wanted that, if, if, if.  A federal

21   courtroom is a place for facts and evidence, not hypotheticals

22   and possibilities.  A federal courtroom is a place for

23   witnesses with personal knowledge and expertise, not an

24   admitted liar playing guessing games to please the government.

25         Speculation, assumptions, and reasonable inferences.

1    You deserve better.  Scott Brady deserves better.  All of these

2    innocent men deserve better.

3         The government just spent several weeks telling you

4    all about blind bidding and the confidentiality of the

5    negotiation process and that, despite this confidential

6    process, Scott Brady exchanged pricing information and talked

7    on the phone with his competitors during the negotiations.  And

8    you know what?  All of that is absolutely true.

9         So why did the government just waste the last several

10   weeks of your life telling you facts that are completely

11   uncontested?  To distract you from the government's complete

12   lack of evidence.  Confidentiality, blind bidding, price

13   sharing, none of these are evidence of an agreement between

14   Scott and anyone to fix prices and rig bids.  This case is

15   about whether Scott Brady had an agreement with anyone to fix

16   prices and rig bids for the sale of chicken.  Despite what the

17   government wants you to believe, it's not a case about whether

18   discussing pricing or talking on the phone during a blind bid

19   is a violation of the Sherman Act because it's not.

20        It's not a conspiracy, it's not an agreement, and it's

21   not illegal.  Exchanging pricing information, talking on the

22   phone with competitors, whether the bidding process is

23   confidential or not, that is not illegal absent an agreement to

24   fix prices even if done during a confidential bidding process.

25   The government has to prove beyond a reasonable doubt that

1   there was a conspiracy in the chicken industry and that each of

2   these men knowingly joined that conspiracy, that these men

3   entered into an agreement to break the law.

4         And after more than three weeks of testimony, there is

5   no evidence of that agreement because no agreement ever

6   existed.  The conspiracy is the agreement to fix prices.  It's

7   not an agreement to talk to each other or an agreement to share

8   pricing or an agreement to discuss strategy during the bidding

9   process.  And just as we said in opening, I am not standing

10  here today to try to convince you that you have to like that

11  the suppliers talked to each other or exchanged pricing

12  information.  That's not what you're being asked to decide.

13        Contrary to what the government argued, the question

14  isn't why these men talked on the phone.  That's not an element

15  of the offense.  Your job is to determine whether Scott Brady

16  agreed to break the law.  And what has the government offered

17  you to determine that?  Not evidence, not facts.  Instead, they

18  offer you assumptions and speculation by telling you a story

19  about conduct the prosecution doesn't like or fully understand

20  like suppliers sharing pricing information and talking on the

21  phone during negotiations.

22        By putting on Robbie Bryant twice, someone who had

23  absolutely no knowledge of any agreement among any of these

24  men, the government wants you to assume there was an agreement

25  to fix prices and rig bids.  They want you to look at the fact

1    that these men talked on the phone and sometimes communicated

2    about prices and guess that it must have been because of an

3    illegal agreement.  They want you to fill in the details they

4    aren't able to provide in the hope you'll find there was an

5    illegal agreement.  Never let the truth get in the way of a

6    good story, right?

7            Not one credible witness says there was a conspiracy.

8    The prosecution dumped hundreds of texts and e-mails on you

9    with no witness to explain them.  They argued about the height

10   of bars on bar charts.  They didn't show you the details of the

11   prices they claim are fixed.  They didn't show you all the bids

12   and contracts.  They didn't take the time to explain these

13   documents either.

14           And without any of these facts, the prosecution is

15   asking you to fill in the missing details to somehow find an

16   agreement existed.  That is not your job.  This case, the case

17   you need to decide is about these five men and whether there

18   was an agreement to fix prices.  And you need to assess the

19   evidence against each of these men individually, and that is

20   why today I want to talk to you about the lack of evidence

21   against one of these men, Scott Brady.

22           Scott is a salesman for Claxton Poultry.  Scott's job

23   is to sell chicken, and he is great at it.  But being a

24   salesman is just not negotiating contracts.  Scott coordinates

25   production with the plant.  He makes sure orders are filled.

1   Scott makes sure trucks are there to deliver the products.

2   Scott deals with quality issues and customer complaints.  Scott

3   does that every day, and it requires time spent on the phone

4   with his customers, many of whom are other suppliers.

5           Scott's job was not to put together the cost model.

6   Scott's job was not to come up with the pricing for Claxton's

7   customers.  Scott talked to the customers about the numbers and

8   negotiated volume.  While Scott may have signed a contract, it

9   was done only at the direction of an officer of Claxton and

10  only after pricing and volume had been agreed upon.  Scott did

11  not have pricing authority.  That means he didn't have the

12  authority to set prices for Claxton.  He didn't have the

13  ability.  He couldn't do it.  He couldn't set a price.  And if

14  he couldn't set a price, ask yourself, how could Scott fix a

15  price?  How could he align a price?

16          Let's talk about what the customers told you.

17  Mr. Ledford, Mr. Lewis, Ms. Fisher, Mr. Eddington,

18  Mr. Kronauge.  Scott and Claxton responded to their feedback

19  each and every time during the negotiations.  Claxton lowered

20  pricing every single time it was asked to by a customer and

21  always competed for more volume.  The feedback was not

22  meaningless.  Scott and Mikell didn't refuse to negotiate or

23  change Claxton's number or not come to the table.  They didn't

24  raise prices to match any of Claxton's competitors.  Scott

25  never said, The price is the price.  There is no evidence that

1    Scott ever tried to push pricing up.  And Scott always asked

2    the customers for more loads during the negotiations.

3            And by lowering prices, Claxton undercut its

4    competitors to make money.  That was Scott Brady's job.  That

5    was competition.  And that is completely inconsistent with an

6    agreement to fix and raise prices.  Claxton set its prices

7    independently.  Greg Finch, Claxton's CFO, he told you how it

8    was his job to put together the cost model for the fast-food

9    customers, how he inputted all of the costs on all of the line

10   items and then inserted the margin, and that's how he came up

11   with Claxton's initial bid.  Mr. Finch was directly involved in

12   determining pricing for Claxton's chicken, and he told you

13   pricing at Claxton was done independently each and every time.

14           Claxton's bids were not manipulated or coordinated

15   with competitors.  Claxton's pricing was not the result of any

16   understanding or agreement with competitors.  And the

17   government has failed to show you any evidence to rebut this,

18   none.

19           It was the government's burden to prove to you beyond

20   a reasonable doubt that Scott Brady knowingly and voluntarily

21   entered into an agreement to fix prices and rig bids.  The

22   burden of proof beyond a reasonable doubt is the highest burden

23   in law, and to meet that extremely high burden, the government

24   has tried to build a case around a so-called conspiracy

25   insider, a price increase in 2015, a handful of text messages,

1    and charts with telephone calls between competitors during a

2    blind-bidding process.  That is not sufficient evidence to

3    prove beyond a reasonable doubt that Scott Brady is guilty of

4    price-fixing.

5            Now, let's talk about the so-called insider,

6    Mr. Bryant.  Mr. Bryant met with the prosecutors more than 30

7    times, but not until after all of these men were charged.  But

8    let's be perfectly clear, despite these 30-plus interviews and

9    the government calling him twice in this trial, Mr. Bryant

10   never said there was an agreement until the government's

11   rebuttal case.  Over three days of testimony in this case, the

12   word "agreement" never came out of his mouth until after the

13   defense rested.

14           But Mr. Bryant told you he never had an agreement with

15   Scott Brady to fix prices.  And not only did Mr. Bryant not

16   have an agreement with Scott, no one ever told him they had any

17   agreement with Scott Brady to fix prices, not in 2014, not in

18   2017, not ever.  Mr. Bryant never said that Scott entered into

19   an agreement to do anything.  He hasn't even spoken to Scott

20   since Scott started working at Claxton in 2012, no phone call,

21   no text, no e-mail, nothing.

22           Mr. Bryant says he heard everyone was raising their

23   prices in 2014 and that Pilgrim's got pricing information and

24   used that pricing information to formulate its bids in 2017,

25   but Mr. Bryant told you yesterday there was no quid pro quo.

1   There were no phone calls between competitors telling each

2   other where to be on price.  There was no discussion of you bid

3   high, I'll bid low; or you take volume and I'll lose volume.

4   He is not aware of any of these discussions occurring at any

5   time.

6          What did Mr. Bryant actually say about Scott Brady?

7   He overheard a telephone call in Mr. Austin's office in August

8   of 2014, eight years ago, a call that happened after the

9   first-round bids had already been submitted to RSCS.  And when

10  I say "overheard," he didn't hear anything Scott said on that

11  telephone call.  He heard two things, Mr. Austin say, The price

12  is the price, and, Tell me how many loads you want.  That's it.

13  He didn't hear Mr. Austin convey any price to the person on the

14  phone, and he didn't hear Mr. Austin ask the person on the

15  phone to agree to anything.  There was no quid pro quo.

16         This conversation is not evidence of anything, let

17  alone evidence of an agreement to fix prices.  Now, maybe

18  Mr. Bryant walking in and out of the office eight years ago

19  just got lucky that morning and did hear Mr. Austin say, The

20  price is the price; just tell me how many loads you want twice

21  on two different phone calls with two different suppliers, but

22  who cares?  Pilgrim's did tell that to its customers.  They

23  were absolutely entitled to take that position with the

24  customers in their negotiations.

25         But you didn't hear any evidence from any customer

1    that Claxton or Scott ever said, The price is the price, not

2    one.  Why?  Because Claxton always followed the directional

3    feedback and the customers' feedback on its pricing and

4    negotiated every single year.

5         Let's talk about the 2014 negotiations for the 2015

6    KFC contract.  Mr. Bryant, well, he knows very little about

7    them, and all of them is based on speculation, assumption, and

8    guesses.  Mr. Bryant didn't know what any other suppliers,

9    including Claxton, actually did during the negotiations in

10   2014, not how they calculated their bids, not what the increase

11   was from last year's prices, not what they used to come up with

12   their prices, not what their initial bids were, not how many

13   rounds of bidding they participated in.  He didn't even know

14   their final contract prices.  He knows nothing.  He admits

15   there was no quid pro quo.

16        Mr. Bryant has no information about any coordination

17   among suppliers, and he has no information about what any other

18   supplier did during these negotiations.

19        The only evidence presented during the last three

20   weeks shows that Scott Brady and Claxton acted independently.

21   You heard exactly how Claxton came up with its initial price.

22   Mr. Finch worked up the pricing model for the 2015 KFC contract

23   in late July, and he approached it just like he did with all of

24   Claxton's other contract negotiations.  He figured out

25   Claxton's actual cost for all of the input items and added a

1    10-cent supplier margin.  Next, since RSCS offered to pay a

2    premium to suppliers to bridge the gap between the big-bird and

3    small-bird profitability and address the changing market

4    conditions, Mr. Finch in late July independently came up with

5    Claxton's big-bird premium number for the initial bid.  Since

6    Claxton didn't sell a big bird, he focused on the opportunity

7    cost for Claxton staying with KFC versus moving to Chick-fil-A.

8         At the time, Chick-fil-A paid more and was a growing

9    QSR customer for Claxton.  Mr. Finch calculated that

10   opportunity cost at 12-1/2 cents.  Well, Mikell, he knocked it

11   down to 12 cents, and that 12 cents was what was placed in the

12   cost model for the big-bird adjustment.  That price was the

13   exact same price forwarded to Mikell and Scott on August 1st

14   and the exact same price Claxton submitted 19 days later on

15   August 19th, 2014 to KFC.  No changes.

16        Despite those telephone calls between suppliers on the

17   prosecutor's charts, Claxton calculated the price

18   independently, and once calculated in late July, it was that

19   price that Scott submit to KFC as Claxton's first-round bid.

20   And the government has failed to present you evidence to rebut

21   any of this, so instead they just disregard it.

22        You heard how all of the suppliers approached the

23   negotiations for the 2015 contract differently.  Pilgrim's,

24   they wanted to be the price leader, and they were always very

25   aggressive with their pricing, the price is the price.

1   Pilgrim's refused to negotiate.  Claxton, Claxton wanted to be

2   in the middle.  You heard that from Mr. Suerken, Mr. Eddington,

3   Mr. Finch, Mr. Kronauge.  Claxton, the regional player, asked

4   RSCS to keep it competitive.  Claxton put its trust in RSCS

5   during the negotiations.

6        And what happened during the negotiations?  Claxton

7   came down over 4 cents.  You heard that from Mr. Suerken,

8   Mr. Lewis, and Mr. Finch.  That is completely inconsistent with

9   an agreement to raise or hold prices.  Claxton did negotiate.

10  Claxton followed the directional guidance of RSCS.  Mr. Lewis

11  and Mr. Eddington told you that.  Different strategies for very

12  different companies.  For Claxton, Mikell Fries, and Scott

13  Brady, the evidence was clear.  The price was not the price.

14       Whatever Mr. Bryant understood, no one told him there

15  was any agreement among any of the suppliers.  The only calls

16  he had personal knowledge about were the two "the price is the

17  price" calls.  The government interviewed him time and time

18  again and made him believe there was some understanding between

19  the suppliers.  But you, unlike Mr. Bryant, have the benefit of

20  hearing from witnesses like Mr. Lewis and Mr. Eddington who

21  told you about what really happened during the negotiations in

22  2014 for the 2015 KFC contract.

23       Mr. Eddington, who was brought in as the poultry

24  expert for RSCS, he told you the market conditions were not

25  favorable for RSCS.  There were no small birds available.  KFC

1    was running out of chicken.  RSCS was paying a premium to

2    secure supply, and large birds were a dollar per bird more

3    profitable than the small birds that KFC was buying.  Mr. Lewis

4    told you the same thing.  It was a perfect storm, and it was

5    all true.  Not one witness told you otherwise.  This was not

6    some made-up story by the suppliers to try to scare the

7    customers into paying more for the chicken.  It was the reality

8    of the market conditions at the time of the negotiations.

9        So RSCS asked the suppliers to break out a big-bird

10   premium from the margin number on the cost-plus model.  It was

11   for everyone.  RSCS allowed all of its suppliers to provide a

12   number for the big-bird premium, including Claxton.  RSCS knew

13   the importance of providing an opportunity for everyone to get

14   this premium, whether they currently participated in the

15   large-bird arena or not.

16       There is no dispute that the initial bids in 2014 were

17   high and RSCS wasn't happy, but the fact that the suppliers

18   increased their prices more than the customer had hoped or

19   expected the price would increase is not evidence that these

20   suppliers were in a price-fixing conspiracy.  After all,

21   Mr. Ledford told Mr. Lewis and Mr. Suerken not to negotiate in

22   a crisis.

23       And Mr. Eddington, he testified that he, unlike others

24   on his team at RSCS, expected close to an 8 to 10-cent increase

25   in price from 2014.  Mr. Kronauge from Popeye's, he testified

1    that he negotiated a 14-cent increase for all his suppliers in

2    2014 for 2015, which he believed was warranted.  And at the end

3    of the negotiations, Mr. Eddington told you pricing for 2015

4    ended up well below the worst-case scenario and at the high end

5    of the range he expected.

6        Mr. Eddington and Mr. Suerken both testified the

7    market conditions justified an increase in pricing.  Remember

8    Mr. Suerken, the government's own witness, he told you in these

9    market conditions he wouldn't even bid in the small-bird

10   business.

11       By the time Claxton signed its contract for 2014 -- or

12   2015, Claxton had come down 4 cents and received more volume

13   from RSCS, 77,000 pounds a week, a 15 percent increase in

14   volume from the year before.  For Claxton that is a significant

15   increase.  And the reduction in price and increase in volume is

16   completely inconsistent with the so-called agreement Mr. Bryant

17   testified about.  And Mr. Eddington told you these price

18   increases helped to stabilize the small-bird market.

19   Mr. Suerken also testified that the price increases helped to

20   establish profitability for the small-bird market.

21       And after this price increase, what happened?

22   Claxton, because RSCS asked it to, came down 3 cents in

23   December of 2015, only one year into their three-year contract,

24   even though they were not legally obligated to do so.  And the

25   impact of that 3-cent reduction, that was a savings to RSCS of

 1    over $1.6 million for the last two years of the contract.  That

 2    3-cent decrease for the last two years of that contract, that

 3    was a preview of what was to come.

 4          By 2017, the landscape had changed.  The small-bird

 5    market had stabilized.  There was a new supplier in the mix,

 6    and that Mother's Day crisis, that was a thing of the past.

 7    And what happened?  It was the QSR's turn to take advantage of

 8    the market conditions, which they did.

 9          So let's talk about the 2017 negotiations.  Mr. Bryant

10    claimed there was an understanding in 2017 to limit price

11    decreases, and his handwritten notes reflected competitor bid

12    information he was provided by Mr. Austin.  And because he had

13    this information, the government again wrongly convinced him

14    that these notes were evidence of a conspiracy.

15          But Mr. Bryant never testified that he was acting

16    pursuant to any agreement.  Mr. Bryant never testified that he

17    coordinated prices with anyone.  In fact, Mr. Bryant testified

18    he was not aware of any conversations with competitors in 2017

19    where an agreement was reached on fixing a price and rigging a

20    bid for the 2018 KFC contract.

21          So what happened in 2017?  Mr. Bryant received

22    pricing, and he came up with Pilgrim's price based on what was

23    best for Pilgrim's, not in consultation with any competitors.

24    In fact, he used that pricing to try and undercut the

25    competitors.  Remember, Pilgrim's wanted to be second and then

1    they wanted to be third.  He didn't know what anyone else

2    planned to do or actually did.

3         And let's talk about what Mr. Bryant testified gave

4    him his understanding for 2017.  He told you he had no concern

5    about being undercut or having volume stolen, but as we all

6    saw, Pilgrim's lost over 500,000 pounds of chicken a week after

7    the 2014 negotiations, and they lost some of that volume to

8    Claxton.  Collusion or competition?  Mr. Bryant, the volume

9    guy, didn't even know Pilgrim's lost volume.  And if that was

10   part of the plan, Mr. Bryant, the insider, well, he certainly

11   had no idea.

12        Mr. Bryant also had no idea what actually happened

13   during the negotiations in 2014, what the pricing was for any

14   other supplier, who got more volume, who lost volume.

15   Mr. Bryant told you about his understanding of what happened

16   internally at Pilgrim's, but Mr. Bryant had no knowledge about

17   what happened at Claxton or anywhere else in 2014 or 2017.  And

18   how could he?  He never spoke with anybody at Claxton or any

19   other supplier.  More assumptions, more speculation, and more

20   unreasonable inferences.

21        Mr. Bryant may have believed at the time that his

22   handwritten notes on Exhibit 1919 were future bid submissions,

23   but it's clear now that those numbers were current pricing.

24   Exhibit I-054 shows the period 2 pricing.  You can compare it

25   to Exhibit 1919, just as we did with Mr. Bryant during his

1    testimony.  But the government wants you to think that

2    Exhibit 1919 and future pricing are current bids.  It's not.

3    The number on Exhibit 1919 for Claxton is .9943.  Claxton's

4    first-round bid price is on Exhibit F-853.  Ms. Fisher

5    testified about Claxton's first-round bid.  That number is

6    .9939, right there on the bid submission, .9939.

7           Now, the government in their closing showed you the

8    cover e-mail to this bid submission, but all they had to do was

9    turn the page to see the number on the bid submission.  And

10   they would have seen and you would have seen the .9939 is not

11   the number on Mr. Bryant's handwritten notes.  Speaking of

12   turning pages, that's certainly not getting on the same page.

13          So what did Mr. Bryant really say about 2017?

14   Mr. Austin was going to get a blow-by-blow from Scott about an

15   initial meeting with RSCS, and he got pricing information from

16   Mr. Austin, and he used it to place Pilgrim's third in the list

17   of pricing he had.  And why did he do this?  Because RSCS was

18   mad at Pilgrim's and Pilgrim's was trying to improve the

19   relationship.  That has nothing to do with Scott Brady or

20   Claxton.

21          Mr. Bryant doesn't even know who Mr. Austin called to

22   get the information that he wrote down in his handwritten

23   notes.  According to Mr. Bryant's testimony, he had one number

24   over the course of the alleged conspiracy that purported to be

25   Claxton's pricing information, one number in eight years, one

1    number that he used as a data point to independently establish

2    Pilgrim's bid for the 2018 KFC contract and undercut his

3    competitors.  And that number, it wasn't even what he thought

4    it was.

5            Ms. Fisher and Mr. Eddington, they told you about the

6    2017 negotiations.  First, Scott, on behalf of Claxton, he

7    asked for more volume on more than one occasion during the

8    negotiations.  Scott asked for 25 percent more volume for

9    Claxton during the negotiations.  This flies in the face of

10   Mr. Bryant's testimony that no suppliers would ask for more

11   volume.

12           Second, Mr. Eddington told you how RSCS would set up

13   the initial meetings to help with messaging because RSCS knew

14   the suppliers talked and wanted to take advantage of it.  And

15   RSCS purposefully scheduled Pilgrim's last that year in the

16   hope that Pilgrim's, a difficult supplier, would get the

17   message.  RSCS was hoping Pilgrim's would get a blow-by-blow.

18   And RSCS delivered the same message to every single supplier at

19   these meetings, and there was no discussion of pricing.

20           Three, Claxton renegotiated its contract at the

21   request of RSCS before its current contract was even up and,

22   once again, decreased its price.

23           Four, Claxton came down more than 10 cents.

24           And, five, Pilgrim's lost volume once again.

25           It is the government's burden to prove to you the

1    existence of an agreement to fix prices and rig bids.

2    Mr. Bryant's testimony about the 2015 and 2018 KFC contracts

3    doesn't even come close to helping the government reach their

4    burden.

5         You heard a lot about the confidential bidding

6    process.  The buyer wants to control the narrative and maintain

7    its leverage.  The buyer wants to have the information

8    advantage.  And there is absolutely nothing wrong with that,

9    but there is also nothing wrong or illegal about suppliers

10   gathering market intelligence and verifying pricing, including

11   the bids of other suppliers.  And even Mr. Suerken, Mr. Suerken

12   told you that during the negotiations with the suppliers, he

13   provided the prices of competitors to the suppliers.  He just

14   didn't put a name with the price.  And adjusting prices based

15   on the knowledge of other competitors' prices, whether from

16   Mr. Suerken or another supplier, is still an independent

17   pricing decision absent an agreement to fix a price and rig a

18   bid.  It's good business, and it's perfectly legal.

19        But the government, the government wants you to

20   believe the only reason the suppliers exchanged pricing

21   information was because they had an agreement to fix prices and

22   that the exchange of this pricing information is sufficient

23   evidence of such an agreement.  But you saw Instruction Number

24   21, the exchange of pricing information is not illegal in the

25   absence of additional evidence of an agreement.  It is not

1    unlawful for competitors to meet and exchange information

2    necessary to prepare a bid.  It is not unlawful for competitors

3    to meet and discuss common aims or objectives.  And it is not

4    unlawful for competitors to exchange information on

5    independently derived prices.

6         There may be legitimate reasons that would lead

7    competitors to exchange pricing information other than fixing

8    prices and rigging bids.  It is not illegal for a competitor to

9    obtain, rely upon, and act on pricing and other information

10   received from competitors so long as there is no agreement to

11   fix prices and rig bids.  And in this case, there are

12   legitimate reasons to exchange pricing, including price

13   verification and supplier-to-supplier sales, and you heard

14   them.

15        I want to take a minute and talk about the

16   prosecution's charts.  Government counsel spent some time

17   talking about them.  You saw them in the case.  They don't

18   deserve your time or effort.  You have seen and will see the

19   prosecutor's charts, their story boards.  And as I said

20   earlier, why let the facts get in the way of a good story,

21   right?

22        Recall Ms. Evans.  She couldn't tell you whether the

23   prosecutor's charts contained all the relevant e-mails,

24   contracts, or phone calls or even whether the charts were

25   complete.  Ms. Evans told you the charts are missing context

1    and often do not even include the entire contents of an exhibit

2    or its critical attachments with the data, with the numbers.

3    And the government has cherry-picked phone calls off of

4    thousands of pages of phone records, included them on the

5    charts, and based on nothing more than the date of the call,

6    the government is asking you to believe that these calls were

7    in furtherance of some agreement to fix prices.  That's just

8    wrong.

9         Let's look at Exhibit 62.  On February 17, Mr. Stiller

10   is apparently irate to discover that Mr. Eddington is asking

11   for $49 a case and wants Mr. Austin to tell the industry that

12   Pilgrim's is not going to do that.  And the government wants

13   you to believe that there was coordination between the

14   competitors between February 20th and February 23rd involving

15   the $49 case price.  And what was the coordination?  That

16   Pilgrim's is getting the message out to the competitors not to

17   agree to that $49 price.  But you heard Mr. Eddington.  He

18   called Scott on February 22nd and told him he wanted $49 a

19   case, and Scott said okay the very next day and asked for more

20   volume.

21        Where is that on this chart?  Where is the

22   coordination?  And don't forget, this is the year Claxton came

23   down 10-1/2 cents.  You won't see that on the chart either.

24   There was no holding firm.  There was no message.

25        How about Exhibit 58?  Where is the entry for

1    Claxton's calculation of its first-round bid in late July or

2    Mikell and Scott's receipt of the first-round bid on

3    August 1st?  And let's look on page 4.  The government wants

4    you to infer that Scott provided Claxton's pricing information

5    to Mr. Austin.  Well, let's look at the ranges that Claxton was

6    allegedly going in with.  This e-mail is dated August 18th.

7    Claxton submitted its first-round bid the very next day.  And

8    what was the total increase it went in with?  It wasn't 14 to

9    16 cents, it was almost 19 cents, and it had been 19 cents

10   since late July.  This is not getting on the same page.  The

11   bids are in evidence and confirm this fact.

12          Mr. Finch's testimony confirms this fact.  The

13   August 1st e-mail to Mikell and Scott confirm this fact.  The

14   government told you that Pilgrim's was trying to get on the

15   same page with everybody, but Pilgrim's was trying to be the

16   price leader.  It wanted to go in high, but what happened,

17   Claxton went in as one of the highest, clearly not knowing

18   where anyone else was going in, because Claxton's pricing

19   strategy, that's not where it would have wanted to be.  None of

20   that is on the chart because all the prosecution included were

21   margins.  The customers pay prices, not margins.

22          So what happened?  Claxton followed the directional

23   guidance of RSCS.  They came down 4 cents and landed in the

24   middle.  Pilgrim's stayed where it wanted to be because it

25   wanted to be the price leader in accordance with its own

1    internal strategy.  That is not coordination.  That is not

2    getting on the same page.  And Pilgrim's information about

3    Claxton was just plain wrong, just like the prosecutors'

4    charts.

5         The government also flashed up on the screen for you

6    several documents that showed pricing information between Scott

7    and Mikell or Scott and other suppliers or communications

8    between Scott and other suppliers during negotiations.  That's

9    not illegal.  Having pricing information, sharing pricing

10   information, calling each other during negotiations no matter

11   how many times, using pricing information, none of that is

12   illegal absent an agreement to fix prices and rig bids.  And

13   there is no agreement here.

14        So let's talk about some of the documents you've seen.

15   Let's look at Exhibit 1700 where Scott tells Mikell he'll make

16   some calls after Claxton received feedback on a bid in 2013

17   from KFC.  You're going to hear about what happened during

18   these negotiations, but there was no staying on the same page

19   here.  There was no holding firm.  But the government, they

20   selected certain calls Scott made to competitors, including a

21   zero-second call that happened after this e-mail, and they want

22   you to assume these calls were about coordinating this bid,

23   that Scott was making calls to resist feedback.  But as we have

24   seen, Claxton didn't resist feedback.  Numbers don't lie.

25        Let's look at Exhibit 6282.  This contains nothing but

1  period pricing, current pricing.  And the government's told you

2  this case is not about current pricing.  Exhibit 6046 and 6047

3  also about period pricing.  And if you look at the date on this

4  e-mails, it was not during negotiations for anything.  Neither

5  was Exhibit 6282.  Again, the government has made clear current

6  pricing doesn't matter, but yet they admitted these documents

7  anyway.

8       When the government lacks proof, they beg you to

9  speculate.  Nowhere is that more evident than in the

10  government's invitation for you to assume that all of these

11  conversations between suppliers were discussions about

12  conspiring together to raise prices.  But you know that's not

13  true.  Conversations with suppliers happened all the time.

14  Suppliers talked to each other for lots of reasons, including

15  the exchange of pricing.  And there is nothing wrong with that.

16  They work in a food distribution industry and are part of a

17  supply chain that supply chicken to some of the most popular

18  fast-food restaurants in the country, Chick-fil-A, KFC,

19  Popeye's.  They rely upon each other.  They communicate.

20  Chicken is a fresh product that needs to get to the stores.

21       *THE COURT:*  Two minutes.

22       *MS. RAHMAN:*  Suppliers communicate and cooperate and

23  along the way develop relationships.  And speaking of

24  relationships, there is no evidence to support the government's

25  argument that Scott's former employment at Pilgrim's

1  facilitated a price-fixing conspiracy once he moved to Claxton.

2  The prosecution either doesn't understand or doesn't want to

3  understand how the chicken industry works.

4       Let me be very clear.  Scott Brady talked on the phone

5  with competitors, Scott Brady exchanged pricing information

6  with competitors, but Scott Brady did not have the authority to

7  set prices for Claxton, and Scott Brady could not and did not

8  effect an agreement to fix prices and rig bids.  Scott Brady

9  did not enter into an agreement to fix prices and rig bids, and

10  the government has no evidence that he did because no such

11  agreement ever existed.

12       Let's look at J-257.  This shows all of the contract

13  prices.  Did Claxton align its prices with its competitors?

14  No.  In fact, Claxton for almost every year is right at the

15  middle or at the bottom.  Clearly its negotiating strategy was

16  working.  Claxton was undercutting its competitors and taking

17  volume.

18       This case, this case is full of reasonable doubt.  And

19  here is the thing about reasonable doubt.  While you have to be

20  unanimous in your verdict, you each can have a different reason

21  for finding doubt, a different reason to find you're not firmly

22  convinced beyond a reasonable doubt that the government met its

23  burden.

24       When you look at the evidence in this case for

25  whatever reason you each decide, you'll find the prosecution

1    has failed to meet its burden.

2         When I leave this podium, it's a long walk back to the

3    table back to my seat next to Scott.  It means there is nothing

4    more we can do for him and the people that care about him, but

5    you can.  When closing arguments are over, it's your turn.  You

6    have the power to end this and give Scott back his life.  To do

7    that, you must base your verdict on evidence and reasonable

8    inferences from the evidence, not guesses, assumptions, or

9    speculation.  And members of the jury, the prosecution's case

10   is based entirely on unreasonable inferences, assumption, and

11   speculation.

12        The defense isn't afraid of the whole story because

13   it's the truth.  The truth of this case is there was no

14   conspiracy.  There was no agreement.  The truth of this case,

15   the truth of this case is that Scott Brady is not guilty.

16   Scott Brady is innocent.

17        Thank you, Your Honor.

18        *THE COURT:*  Thank you, Ms. Rahman.

19        All right.  Next closing?  Mr. Kornfeld.

20        *MR. KORNFELD:*  May I proceed, Your Honor?

21        *THE COURT:*  Yes, go ahead.

22                        **CLOSING ARGUMENT**

23        *MR. KORNFELD:*  In June 2020, the prosecution took out

24   their pens and wrote their story.  They decided on their

25   characters.  They decided on their plot.  They decided on their

1    conclusion.  And then and only then did they set out to write

2    the chapters.  This is not a case where the investigation

3    followed the facts wherever the facts may lead them.  Quite the

4    contrary.  It was about deciding -- trying to prove a theory

5    after you already decided what that theory is.

6         Mike Ledford in charge of the '13, '14 KFC

7    negotiations said the government's conclusion is wrong.  Kent

8    Kronauge in charge of Popeye's told you the government's

9    conclusion is wrong.  Rich Eddington, RSCS, 2015 to the 2019

10   contracts, told you the government's conclusion is wrong.  But

11   the lack of proof in this case, members of the jury, has not

12   stopped the Department of Justice from continuing to write its

13   fairy tale even when confronted with contradictory facts,

14   contradictory evidence at every step of their investigation.

15        In wielding its pen and writing its false story, the

16   government continues to ignore a number of things.  It ignores

17   knowledgeable witnesses telling them they're wrong.  It ignores

18   experts telling them they are wrong.  It ignores market reports

19   and market conditions telling them they are wrong.  It ignores

20   objective economic data and outcomes telling them they're

21   wrong.  It ignores the law telling them they're wrong.  And it

22   ignores the unique aspects of the broiler chicken business

23   telling them they're wrong.

24        The prosecutors left all of these facts, these

25   experts, this data, this information on the cutting-room floor.

1    And then a year after indicting these men, announcing their

2    decision publicly, then they go about trying to find a narrator

3    for their tall tale.  Among the hundreds of thousands of people

4    in this country that work in the broiler chicken industry, they

5    find one person, Robbie Bryant.  Now, they had to use more than

6    30 interviews to get him there.  They had to ignore the fact

7    that he repeatedly lied to the Federal Bureau of Investigation

8    to get him there, but they got him there to read between the

9    lines, to play the telephone game, to make unreasonable

10   inferences, to parrot his understanding to you again, again,

11   and again, to talk about his assumptions and to get up on that

12   stand less than 24 hours ago and to say to you in response to a

13   question about whether there was an agreement, I guess, yes.

14          I guess, yes.  This is a United States District Court.

15   This is a federal courtroom.  This is not the set of Jeopardy

16   or another quiz show where if you don't know the facts you

17   might just want to hazard a guess.  It doesn't work that way in

18   this room, and it doesn't work that way in this country.  The

19   law does not allow you, as jurors, to guess.  The law does not

20   allow you, as jurors, to assume.  A false narrative that flies

21   in the face of actual evidence, real witnesses, real facts is

22   insufficient for the government to meet their burden of proving

23   to you beyond a reasonable doubt that an agreement existed and

24   that Mikell Fries knowingly participated in it.

25          Now, yesterday the prosecutor told you the first

1   question you need to ask yourselves is why did the suppliers

2   talk.  I got news for you, and you already know this.  Why is

3   not an element of the offense.  Why isn't something the

4   government needs to prove to you beyond a reasonable doubt.

5   But the government keeps talking about the why question because

6   they can't connect the dots.  They can't prove to you beyond a

7   reasonable doubt that an agreement existed.  Don't you think if

8   they could, they would have methodically gone through the

9   evidence to show you why an agreement existed?  They didn't do

10  that.  Instead, they invite you first thing to focus on the

11  why, to knock you off the ball, to distract you.

12          And you already know why they talked, because they

13  can, because it's legal to do so, because being in the supply

14  chain requires it.  So don't let the government focus you on

15  something that's utterly irrelevant both factually and legally.

16  Why don't we stick with the law.

17          The government brought this case, as you know, against

18  Mikell and these other four men as individuals, and they

19  charged each of them as individuals.  So when you are looking

20  at the evidence, please look to see whether the government

21  proved its case beyond a reasonable doubt as to Mikell as an

22  individual and all these men as individuals, because the

23  evidence and the lack of evidence clearly establishes that

24  Mikell Fries is not guilty.  His actions show that he never

25  entered into an illegal price-fixing agreement.

1              But the government long ago decided its theory,

2      decided its conclusion, and then it refused to edit its story

3      even in the face of contradictory facts and contradictory

4      evidence.  The prosecution decided Mr. Fries is guilty before

5      ever interviewing a single one of Claxton's 1700 employees, not

6      an employee, not an executive.  They didn't bother to learn how

7      Claxton operates as a small regional supplier in the greater

8      supply chain.  They didn't bother to learn how Claxton prices

9      its chicken.  They didn't bother to learn the relationships

10     between Mikell and Scott and other people at Claxton in the

11     pricing process.

12             The government didn't call a single witness who said

13     he or she has personal knowledge that Mr. Fries participated in

14     an illegal conspiracy or was even aware of an illegal

15     conspiracy.  And this is telling.  What did Mr. Fries' own

16     customers, who, of course, would be the alleged victims in this

17     supposed conspiracy, what did they tell you right from that

18     witness stand?  Mr. Ledford of RSCS, he told you Mr. Fries

19     responded to his feedback and lowered Claxton's pricing every

20     single time.  He was aware of Claxton's strategy to be in the

21     middle.  He didn't find that odd.  And when Mr. Ledford

22     couldn't get the price that he wanted from Scott, he sometimes

23     went around Scott and talked to Mikell to see if he could get a

24     better price.  And this earned Claxton more volume from RSCS

25     every single year.

1          Mr. Kronauge of Popeye's, he told you Mr. Fries always

2     responded to feedback about pricing to be in the range that

3     Popeye's needed Claxton to be in.   Through years of

4     negotiation, Mr. Kronauge told you that Mikell has become one

5     of his trusted confidants, someone who shoots him straight and

6     will always follow his pricing direction.

7          Mr. Eddington of RSCS, he told you Mr. Fries was

8     always willing to negotiate and never threatened to take his

9     business elsewhere.   Claxton, Mr. Fries, Mr. Brady, they never

10    said, The price is the price.   They always, in fact, responded

11    and moved their prices down.   And you heard about Claxton's

12    4-cent decrease which got Claxton, earned Claxton more

13    business.

14         And the government interviewed each and every one of

15    these incredibly knowledgeable witnesses, each and every once,

16    and they made the conscious decision not to call a single one,

17    to keep that information from you.   And even though the defense

18    has no burden of proof and we accept no burden to prove

19    anything to you, we called them.   Why did we call them?   We are

20    not afraid of the facts.   We are not afraid of all the facts.

21    And we know that you, in order to make your decision, needed to

22    understand all the facts.

23         The government, on the other hand, consciously decided

24    to keep these facts from you.   They consciously decided to edit

25    out these witnesses.   They consciously decided to leave things

1    on the cutting-room floor because the government would rather

2    you focus on their story that they recklessly cut and pasted

3    together in their prosecution summaries, in these color-coded

4    charts.  So we are going to need to talk about these charts,

5    and please bear with me.  It's a little cumbersome to talk

6    about the details that are missing, but I need to do that

7    because you need to see the conscious omissions and the

8    attendant unfairness implicit in those charts.

9           Mr. Beller told you yesterday that the government lost

10   its way in this case.  The government did more than lose its

11   way.  The government attempts to manipulate the very road maps

12   it is asking you to follow on the road to convicting these five

13   men.

14          So let's first discuss the 2013 KFC contract.  For

15   this part of the story, the government gives you three charts,

16   Exhibits 50, 51, and 52, and claims they are an accurate

17   summary of these negotiations, the negotiations that occurred

18   in the fall of 2012.  Now, they could have called Mike Ledford

19   to the stand.  He was the lead negotiator.  He is the man in

20   the room where it happened.  They didn't do that.  Instead,

21   they give you these charts.  And what does Mike Ledford tell

22   you under oath about these charts?  He tells you they are not a

23   complete and accurate summary of the negotiations that happened

24   between RSCS and the chicken producers.  What else do you need

25   to know?  He is in the room.  He says under oath they are

 1    inaccurate and they are.

 2            And let's look at what the government didn't want and

 3    doesn't want you to know about the fall 2012 negotiations by

 4    talking about chart No. 50.  This supposedly shows the

 5    beginning of the RFP, the first-round bids.  Let's fill in the

 6    missing chapters because the government won't do that.  Where

 7    are the calls between Mike Ledford and Scott and Mikell before

 8    and after the RFP was first sent out, the calls where

 9    Mr. Ledford told you he provided feedback?  Where is Claxton's

10    full first-round bid?  Why are they just showing you the dark

11    meat?  Where is Pilgrim's first-round bid?  Again, why just the

12    dark meat?

13            Well, I'll tell you why.  Because Koch, Claxton, and

14    Pilgrim's all submitted first-round bids using the .30 back

15    formula.  And the government wants you to see these identical

16    formulas and say, Aha, there is the alignment.  There is the

17    alignment.  But we learned throughout this trial that the

18    formula in and of itself doesn't mean anything.  You aren't

19    aligning your prices unless you're also aligning your

20    eight-piece price because it's .30 back from your eight-piece

21    price or .28 back or .32 back, whatever.

22            And where are the suppliers' eight-piece prices?

23    There was more than a 2-cent spread between their eight-piece

24    prices meaning there was an almost 2-cent spread with their

25    dark meat prices.  They may have all been .30 back, but in an

1    industry where pennies matter, they were offering vastly

2    different prices.  Where is that chapter?  It's one that the

3    government didn't want to write.  It's one that the government

4    edited out.

5         Let's look at the next missing chapter from the

6    government's story, prosecution chart 51.  That's the one that

7    has the government's favorite catch phrase, He said, he being

8    Mr. Austin, raise our prices.  Mikell says to Scott, Tell him

9    we're trying.  But Mr. Beller already told you that this

10   exchange is not an agreement.  There is no, We'll do it if

11   you'll do it too.  Even still, let's take a look at what was

12   left on the government's cutting-room floor.

13        Not only does this chart leap all the way to

14   October 26, the last one ends October 10th leaving you to

15   wonder what in the world happened in the intervening 16 days,

16   but it doesn't include even more calls between Scott Brady and

17   Mike Ledford, including a 15-minute call just two hours before

18   Mikell's and Scott's text exchange.  Claxton is receiving

19   feedback from Mr. Ledford and is figuring out how to respond.

20        But just as important as what happens before this

21   whole text message is what happened after Scott Brady says,

22   Will do.  There is not a single communication, not a text, not

23   an e-mail, not a phone record, nothing between Roger Austin and

24   Scott Brady, not on November 14th when Claxton submits its

25   second-round bid, not on November 15, 16, 17.

1          But more importantly, the day after Mikell is told to

2     raise Claxton's prices, what does he do?  He lowers those

3     prices.  He lowers the wing price and in the process undercuts

4     Pilgrim's Pride and takes business.  And then what happens

5     three weeks later in the third-round submission that comes an

6     hour after Mr. Ledford gives Mikell and Scott feedback to lower

7     Claxton's prices, Claxton reduces its price on wings and dark

8     meat and further undercuts Pilgrim's and takes more business

9     away from its supposed co-conspirator.

10          The government wants you to look at the sharing of

11     prices in that text message and focus on the buzz words, Tell

12     them we're trying, Will do, and find from that the "I'll do it

13     if you'll do it too" moment.  If that was enough to convict

14     Mr. Fries, the government would have shown you all the bids,

15     all the contracts before and after this exchange.  They didn't

16     do that because this isn't a quid pro quo.  This is cut-throat

17     competition and no amount of government editing can change that

18     fact.

19          Now, the government asked several witnesses, Well, you

20     wouldn't seriously ask a customer to raise its price, would

21     you, insinuating that the only possible reason Roger would say

22     that is because he was colluding with Claxton.  But that

23     simple-minded explanation ignores the reality of what was

24     happening to Pilgrim's and to Roger Austin during this

25     negotiation as a result of Claxton's low prices.

1          Let's look at what the government left on the

2    cutting-room floor about this.  Look at chart 52.  As of

3    November 28th, Pilgrim's is still the second highest price

4    producer on eight-piece.  And Mr. Ledford, as you heard him

5    talk about from the stand, he is not afraid to threaten to take

6    away volume from the highest-priced producers, and that's

7    exactly what's going on here.  Where is that on prosecution

8    chart 52?  It's in the two-page exhibit that the government

9    only included one sentence from, the sentence they like, the

10   "Roger getting the pulse" sentence.

11         What else is buried in this exhibit?  We are hearing

12   that Claxton and Koch were pretty aggressive with pricing as

13   well as Tyson.  That's not on that chart.

14         Why is Roger Austin calling around to get the pulse in

15   November?  Why is he telling Scott and Mikell that Claxton

16   needs to raise its prices?  Because Claxton is making Pilgrim's

17   look bad.  They are almost 2 cents lower than Pilgrim's is on

18   their eight-piece.  Mr. Ledford is taking a hammer to Pilgrim's

19   during the price negotiations and threatening to take volume

20   away from Pilgrim's if they don't lower their price and get in

21   line with Claxton.

22         And guess what?  Using Claxton as leverage against

23   Pilgrim's worked.  Pilgrim's was forced to reduce its

24   eight-piece price each time, each round to get in line with the

25   lower-priced suppliers like Claxton.  Of course, Roger wanted

1    Claxton to raise its prices.  Claxton was being used as a pawn

2    to force Pilgrim's to do exactly that.  And members of the

3    jury, that is the exact opposite of an agreement with Pilgrim's

4    to raise prices.  And it's not getting on the same page; it is

5    the exact opposite of being on the same page.  They are for

6    completely different pages, and that is evidence of

7    competition, not collusion.

8         The government, as Ms. Rahman has indicated, has built

9    its story on assumptions, on spliced sentences, on speculation,

10   and most shamefully on omissions, inferences without reason.

11   It's created a house of cards as opposed to building a solid

12   foundation for a criminal prosecution.  And that house of cards

13   comes crumbling down when you look at the facts and the

14   evidence in this case, all of the facts and the evidence, not

15   just the facts and the evidence that they want to focus on or

16   that they want to put before you.

17        This flimsy foundation of assumptions and speculation

18   is not limited, unfortunately, to the 2013 contract.  It

19   extends to every single allegation in this case.

20        So let's talk about the missing chapters from the

21   government's story for the 2014 contract.  And this is chart

22   53.  Take a look at chart 53.  Again, it claims to summarize

23   the negotiations that took place in the fall of 2013.  The

24   chart doesn't include the first-round bids for Pilgrim's and

25   Claxton or the 24-minute phone call between Mikell Fries and

1    Mike Ledford after that bid was submitted.  This doesn't just

2    fail to capture the first-round bids; it doesn't include any of

3    Pilgrim's or Claxton's second or third-round bids.  The

4    government doesn't want you to see both Claxton's and Pilgrim's

5    numbers move down bid after bid after bid.

6              Instead, the centerpiece of the prosecution's chart

7    that is supposed to summarize the entire negotiation is the

8    text between Mikell and Scott.  All this text demonstrates is

9    that Mr. Brady learned Pilgrim's dark-meat formula is .30 back

10   and Mr. Fries then considered that formula in independently

11   coming up with Claxton's price, its dark-meat formula.  At no

12   point did Claxton match Pilgrim's prices, its dark-meat price

13   or its eight-piece price.

14             Let's look at the result of Claxton's 2014

15   negotiations with KFC.  From the first bid to the very last,

16   Claxton responds to the feedback of Mr. Ledford just like he

17   told you it did, reducing its eight-piece price 4 cents,

18   lowering its dark-meat price 4 cents.  Again, the government

19   ignores this fact.  This is an important fact that they just

20   want to sweep under the rug and urges you to do the same thing.

21   This isn't getting on the same page; quite the opposite.  What

22   kind of conspiracy to raise prices has a supposed

23   co-conspirator dropping its price considerably at the direction

24   of the customer?  Another house of cards comes crumbling down.

25             And that brings us to the government's flagship

2848

1    allegation, the claim that the suppliers all got together in

2    the summer of '14 and jacked up the price of eight-piece on

3    chicken on the bone to a historic level.  Let's look at what

4    the government edited out of this episode, this chapter.

5            Was the 2015 contract price increase historic?  You

6    bet it was, and you heard why.  And Mr. Tubach yesterday talked

7    in great detail about the market conditions, and you heard it

8    from knowledgeable chicken insiders.  And after being beaten

9    down 4 cents in price during the prior year's contract

10   negotiation, as you know, the market shifted, and now the

11   suppliers had the leverage.  And despite Mike Ledford warning

12   RSCS as he was walking out the door that it shouldn't negotiate

13   during a crisis, during a time where it was going out on the

14   open market and paying 45 cents more a pound than it needed to

15   in order to secure supply, RSCS ignored him, and they moved

16   forward with these negotiations anyway.

17           And now RSCS wants to blame its poor business

18   decisions on some alleged conspiracy?  It is not a crime to

19   take advantage of the basic principles of supply and demand.

20   It's business, business 101.  And it's not a crime to try to

21   recoup some of the money you lost in the prior contract in the

22   next contract.

23           But instead of acknowledging the perfect storm you

24   heard so much about in the summer of '14, the government brings

25   you more prosecution charts and a focus on another unrelated

1    text message between Mikell and Scott that discusses Koch and

2    Pilgrim's strategy.  Knowing a supplier's negotiation strategy

3    is not a crime.  There is no agreement to raise prices

4    together.  What this text shows is that Mr. Fries is clearly

5    surprised that, unlike Claxton, Pilgrim's doesn't respond to

6    the direction of the customer.  That's why he says, Wow.

7    That's a wow if you're Claxton.  Claxton always responds to the

8    feedback of its customers.  You know that from Mr. Eddington,

9    Mr. Kronauge, Mr. Ledford.

10           Feedback is important to Claxton, no matter what you

11   have heard from the prosecution.  And you heard it more

12   importantly from the customers.  How many times yesterday did

13   the government mention the price is the price or holding firm?

14   Did you hear any evidence, any evidence that Claxton ever said

15   the price is the price, that it ever refused to negotiate, that

16   it ever held firm?  No.  You heard the exact opposite evidence,

17   that it always responded.  It couldn't afford not to.

18           And what about the number 11 in this text?  This is

19   not an exchange of future pricing information.  Read the text.

20   Mr. Brady and Mr. Fries were discussing the meetings Mr. Lewis

21   told you that he had at the KFC headquarters in Louisville,

22   Kentucky.  Tench is at 11 is a meeting time Rich Eddington told

23   you wasn't a secret.  Did that meeting with Greg Tench of

24   Mar-Jac occur at 11:00 o'clock?  Who knows.  We don't know.

25   Did the government bring Greg Tench in here to explain this to

1    you?  No.  Did the government ask any of the three RSCS

2    witnesses who testified in this trial about this?  No.  You

3    haven't heard a single bit of testimony about the number 11,

4    $11, 11 cents, 11 anything.  11 has nothing to do with the

5    price of chicken in this case.

6           What is completely omitted from the prosecution's

7    charts for the 2015 contract, that Mr. Fries used Pilgrim's

8    strategy of holding firm and the knowledge that another

9    competitor came down 4 cents to lower its prices and grab

10   77,000 pounds of additional weekly chicken volume from

11   Pilgrim's.  This type of increase may be a drop in the bucket

12   to Pilgrim's, but it is a big deal, 15 percent, to a Claxton.

13          Why would the government not show you the actual

14   contract?  Because lowering your price 4 cents and stealing

15   volume from your customer is inconsistent with the story of

16   holding firm or raising prices.

17          Now, sticking with the missing chapters for the 2015

18   contract negotiations, let's look at chart 59.  It brings you

19   one of the most egregious examples of manufactured evidence

20   against Mr. Fries.  On its chart the government includes the

21   August 28, 2014 Claxton board meeting minutes and asks to focus

22   on the sentence:  He said they are preparing to pay 10 but the

23   industry is asking for 20.

24          The government is asking you to believe that Mr. Fries

25   is in a board meeting with his 94-year-old grandmother,

1    chairman of the board, the other board members.  It's being

2    recorded for all of chicken history in the board minutes, and

3    he is announcing to his board, Hey, just so you guys know, I am

4    engaging in a price-fixing conspiracy with my competitors.

5    That is absurd.  That is absurd.

6          The government is asking you to believe that this

7    information came from a supplier.  That is absurd.  Not only

8    did this exchange come 28 days after Mr. Finch sent the

9    cost-plus model with the increase to Mikell and Scott, but we

10   know from Mr. Kronauge right there on that stand that he told

11   Mikell this information.  We know from Greg Finch that Mikell

12   was conveying his knowledge of that conversation or recounting

13   that conversation to his board.

14         And a large part of these meeting minutes included

15   discussion about the very market conditions that support this

16   price increase, but the government takes a six page -- a

17   six-plus page document and pulls one sentence out, slaps it on

18   to its road map without context or explanation, more

19   assumptions, more speculation, more selective editing, more

20   shameful omissions.

21         After Mikell signed the 2015 contract in the fall of

22   2014, he is nowhere to be found in the government's case, not

23   in '15, not in '16, not in the '17 negotiations for the 2018

24   KFC contract, certainly not in Golden Corral or Sysco.  That

25   has nothing to do with Claxton or Mikell.  But that's not where

1    the government's allegation against Mr. Fries stops.  So let's

2    talk about two other chapters of the government's story that

3    honestly don't make sense but need to be addressed because they

4    are in the summaries.  The first has to do with Chick-fil-A and

5    its decision to switch to NHA, no-antibiotic-ever chicken and

6    its grain-based model.

7            Let's look at this text.  Remember this?  The

8    government puts it up on the screen without a witness, quickly

9    moves on hoping its failure to explain will confuse you and

10   that you would simply assume there is an agreement.  But

11   justice doesn't work that way.  The government told you that

12   Mr. Fries, Mr. Brady, and Mr. Mulrenin of Tyson conspired to

13   raise prices in 2014 when Chick-fil-A decided to convert to

14   antibiotic-free chicken.  But the government doesn't show you a

15   single price associated with that.  It doesn't call a single

16   witness.  Instead, it, again, leaves it up to the defense to

17   call Mike Ledford to explain it to you, so that's what we did.

18           Mike Ledford told you this was a cost to Chick-fil-A

19   and Chick-fil-A was going to pay it.  It was a pass-through.

20   This wasn't a profit to the suppliers.  And the numbers they

21   were coming up with in 2014 weren't even about pricing.  They

22   weren't final.  They were estimates, guesses in a chicken world

23   where everybody was trying to figure out what it was going to

24   cost to make this conversion.  That was not conspiracy.  This

25   was customer service.  They were doing what the customer asked.

1          But not only were these estimates, these were

2    estimates being made in 2014, and the final prices didn't go

3    into effect, the conversion didn't happen until 2018.  You are

4    not only being asked to believe that the suppliers colluded to

5    give Chick-fil-A the type of high quality antibiotic-free

6    chicken it demanded, but that the suppliers also somehow

7    aligned their pricing models submitted to Chick-fil-A.

8          And let's look at prosecution chart 57 that discusses

9    Chick-fil-A's pricing models.  This chart is misleading for two

10   reasons.  First, you learned that the customer dictates the

11   model.  If Chick-fil-A wanted its suppliers on the market-based

12   model, it's on the market-based model.  If Chick-fil-A wanted

13   them on the grain-based model, they were going to be on the

14   grain-based model.  There was no discretion if you wanted to do

15   business with Chick-fil-A.

16         Second, the conversation in this text message is about

17   the grain-based model.  Mike Ledford testified that the only

18   supplier on the grain-based model in 2014 was Tyson, not

19   Pilgrim's, not Claxton, not Perdue.  Read who is on the chart,

20   no one from Tyson.  The only people on this text message are

21   Claxton and Pilgrim's employees.  How can you collude on a

22   pricing model that your company isn't using at the time?

23         And finally we get to the most absurd allegation of

24   them all, which is saying something, that Mikell Fries somehow

25   conspired with Pilgrim's to deny KFC's request for a

1    reduced-weight bird.  This chapter doesn't even make sense, but

2    let me try.  The government's evidence is that it finally found

3    a document with the word "agreement" out of the millions and

4    millions of documents, agreement.  And after Mike Ledford

5    explained on direct examination to you that his request for a

6    reduced-weight bird being discussed in this message, it was

7    basically a fool's errand, but he asked and he expected the

8    producers to talk about it anyway.  I think he called it a

9    research project.

10          The government tellingly on cross-examination doesn't

11   ask him a single question about that.  The prosecution's

12   silence is a concession that this text is nothing more than a

13   blatant attempt to distract you from the facts, to knock you

14   off the ball.  Why is the government asking you to reach

15   conclusions that are not supported by all of the facts and the

16   evidence?  Why is the government making up dialogue?

17          Remember yesterday in their closing argument, well,

18   you know, the bosses are telling the foot soldiers.  The foot

19   soldiers are checking in with the bosses.  There is a

20   recounting of conversations that never occurred.  The

21   government can't just get up and talk about conversations that

22   there is no evidence of in the record.  And as Mr. Beller told

23   you yesterday, what we say, all of us, is not evidence.  You've

24   got to rely on your memory of the evidence.  There is nothing

25   in the record about the puppeteer bosses telling the foot

1    soldiers, to mix two metaphors, what's going on.  And their org

2    chart that they kept going back to, it's an org chart.  It's

3    not like the, you know, recitation of the, you know, Genovese

4    Street Gang in New York City.  The CEO is at the top of the org

5    chart, news flash.  The salespeople are below the CEO, news

6    flash.

7         And by the way, Mikell Fries wasn't the president of

8    Claxton Poultry, as you know from the evidence, during the

9    relevant time period, so that org chart as to Claxton is also

10   unfair, is also edited, is also inaccurate.

11        And then instead of focusing on the evidence, they

12   want you to focus on these silly charts that they sliced and

13   diced and cut up and consciously omitted things from.  The

14   bottom line is the government didn't show you a single business

15   record that implicates Mikell Fries in an illegal price-fixing

16   conspiracy.  It didn't put up a single witness who told you

17   that, not one.

18        And what else is still missing a month later from the

19   prosecution's case?  Well, members of the jury, the government

20   still hasn't asked the questions that I raised in my opening.

21        First, in this alleged agreement where the goal is to

22   fix a price but the prices never align, who decided to be the

23   low price and make less money?  Who got to be the higher price

24   and make more?  And who got to lose business and make no money,

25   all in service of this alleged conspiracy?

1          Second, how can there possibly be a conspiracy to

2     raise prices when the suppliers bluffed each other about their

3     prices?

4          Third, think about the logic of this, how is

5     undercutting each other's prices and stealing volume consistent

6     with an agreement to fix prices?  There is no evidence that

7     that was part of the plan, no evidence.

8          Fourth, who is policing this agreement when Claxton

9     goes about its merry way and cuts prices every time a customer

10    asks it to?  Where is Pilgrim's and the other alleged

11    co-conspirators calling up Mikell, Hey, what in the heck are

12    you doing?  We agreed to raise prices, and you guys are

13    lowering prices.  What is up with that?  It makes no sense.

14          And finally, how is lowering your prices, how is

15    lowering your prices consistent with an agreement to raise

16    prices?  Simple physics suggests, simple logic suggests that up

17    is up and down is down.  The government hasn't answered these

18    questions because it can't.  And don't let the government get

19    up in their rebuttal and write new chapters, new theories, new

20    things, knowing that we can't respond.  They have got the

21    burden of proof.  They get the last word.  Why don't you expect

22    from them, why don't you demand from them that they answer some

23    of these questions instead of raising new ones that they

24    haven't answered.

25          So how do we close the book on the government's

2857

1    fictional story?  How do we finally close the book?  Only you

2    have the power to do that.  You're the ones who can put a stop

3    to Mikell's nightmare and these other four men's nightmares and

4    tell the government that a fairy tale isn't good enough for a

5    federal criminal courtroom where real lives are on the line.

6    This case isn't about money.  It's about real lives and the

7    effect on those lives.

8         You have the power to tell the government that relying

9    on the assumptions and the guesses of an admitted liar, it's

10   not good enough, that guessing is not good enough, that putting

11   up incomplete information is not good enough, by keeping -- the

12   keeping information from the finders of fact, you guys, isn't

13   good enough, that accusing someone of a federal felony and then

14   consciously editing out facts that don't support your theory

15   and witnesses who don't tell a story that's consistent with

16   your theory, that's not good enough.  Do not, please do not do

17   what the government has done.  Do not ignore all the facts.  Do

18   not ignore all the witnesses.  Do not ignore the utter lack of

19   evidence against Mikell Fries in this case.

20        Give this man, give him back his peace.  Give him back

21   his dignity.  Give him back his reputation and give him back

22   his life.  Deliver the justice that Mr. Fries deserves and that

23   the government is trying to keep from him.  Find Mikell Fries

24   not guilty.

25        Thank you.

1          *THE COURT:*  Thank you, Mr. Kornfeld.

2          Ladies and gentlemen, why don't we go ahead and take a

3     10-minute break, okay, at this time, 10-minute break.  Why

4     don't we plan on being ready to go at 10:05, and then later on

5     in the morning we will take a stretch break, but why don't we

6     take 10 minutes now.  Keep the admonitions in mind.  The jury

7     is excused.

8          (Jury excused.)

9          *THE COURT:*  Because we are on a tight schedule, those

10    of you who don't need to be in the courtroom to take up

11    Mr. Feldberg's issue can go ahead and take a break.  I would

12    recommend that you do that now.  But those of you who need to

13    stick around to talk about that issue that Mr. Feldberg

14    flagged, let's talk about that now.

15         Mr. Feldberg, go ahead.

16         *MR. FELDBERG:*  Thank you, Your Honor.  I will be very

17    brief.

18         We received an e-mail at 7:46 this morning from the

19    prosecution team attaching two charts that they propose to use

20    in rebuttal.  The charts are graphs of phone calls between --

21    purported phone calls between Mr. Austin and Mr. Brady.

22         We had begun reviewing this body of data.  I think,

23    but I am not sure, these are the same charts that were attached

24    to one of the e-mails about Technical Specialist Nelson.  We

25    started reviewing them.  We stopped when the government

1    withdrew Ms. Nelson from their witness list.  But in our

2    initial review, we found that there were both errors in the

3    charts, both over-inclusion and under-inclusion,

4    over-inclusion, for example, in September of 2014, more phone

5    calls than we actually could identify, and under-inclusion in

6    nonbidding ones like March of 2015.

7         The charts are also, in our view, misleading because

8    46 percent of the calls are 1 minute or less.  In 2014,

9    48 percent of the calls are 1 minute or less.  And some of the

10   calls are just a few seconds.  I think there is one that's zero

11   seconds.

12        And the real concern is that we have never had a

13   chance to confront this evidence.  It's now being proposed to

14   be used in the government's rebuttal summation.  We have not

15   had a chance to address it.  We have not had a chance to

16   examine a witness.  We have not had a chance to challenge the

17   evidence, and, therefore, we object to the government's use of

18   these charts in its rebuttal summation.

19        I have a copy for the Court if the Court would like

20   it.

21        THE COURT:  I think so.  If you could hand those to

22   Ms. Grimm, she will hand them up to me.

23        Does the United States know -- I presume it's two

24   charts.

25        MR. LOVELAND:  Your Honor, with the Court's

1    permission, Mr. Dunn can display, it's one chart with

2    additional graphics overlay, but we can display it on the

3    monitor.

4             THE COURT:  Go ahead, Mr. Feldberg.  Anything else?

5             MR. FELDBERG:  I think that's what I need to say, Your

6    Honor.  We are simply objecting.  We haven't had an opportunity

7    to confront.  We haven't had an opportunity to challenge.  And

8    in our view, the charts are both inaccurate and misleading.

9             THE COURT:  Thank you.

10            Mr. Tubach?

11            MR. TUBACH:  Very briefly, Your Honor.  Following up

12   with what Mr. Feldberg said, it may well be all the phone calls

13   themselves are in evidence, but there is no meaningful way for

14   the jury to look at the hundreds of thousands of phone records

15   that are in evidence to test whether this is accurate.  This is

16   absolutely testimonial, and there is no way you can say, well,

17   this is all in evidence, so let's just let them go back and the

18   jury can figure out whether these are right.  There is no way

19   they can do that.  And we have had no opportunity to test

20   whether this is accurate.

21            THE COURT:  Thank you.

22            Mr. Loveland?

23            MR. LOVELAND:  Thank you, Your Honor.  So this chart

24   should look familiar to the Court.

25            THE COURT:  And this chart meaning -- can you briefly

1    describe it for the record?  This is the summary of -- let me

2    try Exhibit -- actually, both purport to summarize the same

3    two.  I guess they are the same chart, but then there is some

4    additional overlay of colored --

5         MR. LOVELAND:  That's accurate, Your Honor,

6    absolutely.  So this chart that's on the screen is the chart

7    that was disclosed in the government's filing on June 24th

8    regarding the notice of Tactical Specialist Nelson's potential

9    testimony.  What this chart does is, according to the

10   methodology that the defendants are well familiar with as it

11   was laid out in the notice, TS Nelson went through and

12   carefully totaled up the number of calls between four phone

13   numbers.

14        Those four phone numbers belong to Roger Austin and

15   Scott Brady, and they are stipulated to at Government's Exhibit

16   9010.  No dispute about these four phone numbers.  The exhibits

17   that were relied upon to create this chart are all admitted in

18   evidence, and you can see that underneath.  It's 8003, 8008,

19   8035, 8039.

20        Now, I want to because Your Honor had asked, let's

21   look at the second one.  I can say what it is and then we

22   can -- I can address some of the points that were raised by

23   Mr. Feldberg and Mr. Tubach.

24        THE COURT:  You have to go real quick because we just

25   don't have much time.

1          MR. LOVELAND:  There are 401 total calls here, Your

2     Honor, that's a graphic.  The red shading will highlight for

3     the jury, that's when bid negotiations were going on for KFC

4     contracts.

5          Now I will turn to the law.  The 10th Circuit, as Your

6     Honor knows, broadly permits the use of demonstratives.  This

7     is a demonstrative.  There is no confrontation clause issue

8     here, just as Your Honor has previously held with summary

9     exhibits and demonstratives in this case.  I would highlight

10     for Your Honor the Court's ruling at Docket No. 741 with

11     respect to summary charts the government was seeking to admit

12     proving calls that Jimmie Little had made.

13          I also want to address the point that defendants have

14     raised about not having time or the ability to check these

15     charts.  First, all of the things in this chart are admitted as

16     evidence.  That evidence has been disclosed far before this

17     trial started.  Second, this exact chart was disclosed weeks

18     ago.  Third, the government has not received any of the

19     underlying data that, for example, Professor Snyder relied upon

20     for his demonstratives and exhibits that were put before the

21     jury.

22          And so while -- I just say that -- to say this is a

23     demonstrative, Your Honor.  The case law is clear that

24     arguments are allowed to display demonstratives.  This

25     demonstrative is accurate.  The evidence is before the jury.

1    It is something that can aid the jury in their assessment of

2    the case.  The defense has used demonstratives throughout their

3    closings, and I expect they will continue to do so.

4        And I would just say that while, Your Honor, it's

5    clear that from the case law demonstratives need not themselves

6    be admitted into evidence either, and that's what's happening

7    here.  While the underlying evidence has been admitted and it's

8    accurate, case law is clear there is no confrontation clause

9    issue as Your Honor has previously held.  This is for argument,

10   and it was given to the defense this morning so that it could

11   be dealt with outside the presence of the jury, but this is not

12   anything new that they haven't seen already, Your Honor.

13       *THE COURT:*  I am going to disallow both of them.

14   These aren't demonstratives; they are graphics that are going

15   to be used in closing.  A demonstrative, of course, is subject

16   to objection by the other side before it's displayed.  The

17   problem here is that, as Mr. Loveland acknowledged, the graphic

18   presentation depends on methodology of Ms. Nelson.  Ms. Nelson

19   didn't testify and that methodology is not in front of the jury

20   at all, so the jury would not, as Mr. Tubach referenced, be

21   able to somehow derive this information from admitted evidence.

22   That wouldn't be possible.  The jury, if it wanted to, couldn't

23   re-create this.

24       It depends on things that occurred outside of the

25   evidence in this case; and as a result, I do agree with

1  Mr. Feldberg that it would not be appropriate or fair for the

2  government to be able to use these two charts.

3          We will be in recess, then, until -- we have a

4  whopping two minutes, all right?  We are going to keep on

5  schedule.

6      (Recess at 10:02 a.m. until 10:06 a.m.)

7          THE COURT:  Let's bring the jury back in.

8          It looks like Mr. Feldberg is up next.  Mr. Feldberg,

9  whenever you are ready.  Thank you.

10          MR. FELDBERG:  Thank you, Your Honor.

11                        **CLOSING ARGUMENT**

12          MR. FELDBERG:  Members of the jury, what kind of

13  conspiracy is this?  The suppliers' prices were all different.

14  The suppliers' bids were all different.  The suppliers'

15  strategies were all different.  Suppliers like Pilgrim's Pride

16  and Claxton made independent decisions based on what they

17  thought was in the best interest of their companies.

18          The customers were satisfied with the prices.  You

19  heard that from Mike Ledford, from Sara Fisher and from Rich

20  Eddington, all from RSCS, the KFC buying cooperative.  Roger

21  Austin, a salesman to KFC, an advocate for KFC, had no

22  authority to decide what Pilgrim's bid to KFC or what its final

23  price was.  That's what the evidence shows.  That's what the

24  objective data shows.

25          We don't convict people in this country of crimes

1    based on speculation or theory, and we certainly don't convict

2    people based on Robbie Bryant's assumptions or claimed

3    understandings.  We try people based on evidence.  And we only

4    convict if there is proof beyond a reasonable doubt sufficient

5    for the prosecution to overcome the presumption of innocence.

6         Let's look at what the evidence shows.  Every

7    supplier's price was different every year.  Every supplier's

8    initial bid was different.  The suppliers' strategies were

9    different.  Pilgrim's wanted to be the price leader.  Claxton

10   wanted to be in the middle.  Many, like Claxton, lowered their

11   bids for the 2015 contract under pressure from the customer.

12   Pilgrim's, on the other hand, did not.  It gave KFC its price

13   in July 2014 and stuck with it all the way through to the

14   contract signing.  Its only price reduction was a small fee

15   that RSCS itself removed from the final price as Mr. Eddington

16   told you.

17        Look at Exhibit I-241 in evidence.  From 2012 to 2013,

18   some suppliers' prices went up; some went down.  They took

19   different approaches.  That isn't price-fixing; that's

20   competition.  If there was price-fixing, you would expect the

21   suppliers not to undercut each other, not to take volume from

22   each other.  Robbie Bryant claimed that was the purpose of the

23   conspiracy.  But the opposite happened.  The suppliers did

24   undercut each other, did take volume from each other.

25        Take a look, Exhibit J-237.  During the seven years of

1    the so-called conspiracy, Pilgrim's lost more than half of its

2    volume of sales to KFC.  KFC awarded that volume to other

3    suppliers who charged lower prices.  Look at what happened.

4    Some of the suppliers lost volume; others gained volume.

5    That's the opposite of price-fixing.  In what world would Roger

6    Austin agree to enter into an agreement to lose over half a

7    million pounds per week, over 29 million pounds per year in

8    volume to his customer so that his competitors could get that

9    business?

10        Let's look at what the evidence shows about Roger.

11   Until his retirement in 2018, long before any charges were

12   filed, he spent his career focusing on selling chicken to KFC.

13   He was close to KFC.  He advocated for KFC.  He moved to

14   Louisville, Kentucky, to be close to KFC.  He built a test

15   chicken in Louisville just for KFC which Mr. Ledford told you

16   was of great value to KFC.  Why?  Because he cared about KFC.

17        The evidence also shows that Roger had no authority to

18   set Pilgrim's bids or prices.  You heard that from several

19   witnesses, including Ted Sangalis, Pilgrim's corporate lawyer,

20   who explained that the company's pricing team at its Greeley

21   headquarters sent Pilgrim's prices to the sales team, which

22   included Roger.  Roger often argued with his superiors for

23   lower prices for KFC.

24        I want to show you an example.  It's Government

25   Exhibit 1544.  Roger and his team have just had the semi final

1   round call with Mike Ledford and his team at RSCS.  Roger urges

2   his superiors to lower Pilgrim's bid.  Jayson Penn responds:

3   What will we be giving up on eight-piece and dark year over

4   year if we do lower the price to your, Roger's recommended

5   number?  Can you do a spreadsheet?  And Roger and his

6   colleagues then do a spreadsheet to show the math from the

7   lower price that Roger was recommending.

8           This is someone in a conspiracy to raise prices?  This

9   is someone trying to cheat KFC?  There is not one bit of

10  evidence that Roger had any motive, any reason to conspire to

11  enter into an agreement to fix prices or rig bids.  There was

12  no reason for him to do so.  There is no evidence that he had

13  anything to gain from a conspiracy.

14          One of the things a jury brings to a criminal case is

15  your everyday common sense.  Does it make any sense to you that

16  a man at the end of a long career devoted to supporting KFC

17  would suddenly enter into a conspiracy to agree to fix prices

18  against KFC when there is no evidence that he had any motive to

19  do so?  None of that makes any sense.

20          But what does the prosecution argue to try to prove

21  beyond a reasonable doubt that there was an illegal agreement?

22  Prices went up in 2015.  Of course, they did.  Supply was

23  tight.  Demand was high.  KFC had hammered the suppliers in the

24  prior year to lower their prices too much so Mike Ledford told

25  you looking back on hindsight, and KFC had run out of chicken

1     on Mother's Day, its busiest day of the year.  Every witness

2     testified that there had to be a price increase for the

3     small-bird market to survive.  Even Robbie Bryant testified

4     that if you didn't think a price increase was coming, you

5     shouldn't have been in the business.

6         Now, there was some disagreement about the size of the

7     increase, but everyone knew it would be substantial.  That

8     disagreement included the suppliers who had different price

9     increases.  You see that in J-218.  Even though the customer,

10    RSCS, wanted the suppliers to be in the tightest possible

11    range, the suppliers' price range for the 2015 contract was

12    more than five times greater than the range the prior year.

13        Ms. Wulff told you in her closing that Bob Lewis and

14    Pete Suerken were surprised by the size of the increase, but

15    Mr. Lewis had retired five years before and told you he had not

16    kept up with the chicken business, and Mr. Suerken told you

17    that 2014 was his first and last time negotiating chicken

18    contracts.  And Mr. Suerken told you that when he spoke with

19    Bill Lovette, then the CEO of Pilgrim's, about the 2015 price

20    increase, Mr. Lovette explained the reasons and that his

21    argument made economic sense and was tough to argue with.

22        Mr. Eddington of RSCS told you that the price increase

23    in 2015 actually stabilized the market for small birds and set

24    the groundwork for price decreases for KFC in subsequent years.

25    And as the evidence shows, prices went up and down just as the

1    fundamental law of supply and demand would predict.

2         Look at J-235.  Pilgrim's price goes up a bit in 2013,

3    goes down a lot in 2014, goes up in 2015, goes down in 2017,

4    and goes down even more in 2018.  And in 2018 at the end of the

5    so-called conspiracy, the price is actually lower than it was

6    in 2012 at the beginning.  This isn't a conspiracy to raise

7    prices or keep them artificially high.  This is the law of

8    supply and demand.

9         What else does the prosecution argue?  There was

10   communication among the suppliers.  Of course there was.  Of

11   course the suppliers wanted to know what their competitors were

12   doing, not to collude, but to compete.  Every sensible business

13   wants to know what its competitors are doing so it can try to

14   make the best decisions for itself.  But more importantly,

15   there is nothing illegal about this communication.  And that's

16   exactly what happened here.

17        When Roger checked around, when he tried to get the

18   pulse, he was talking with everyone.  Mostly it was customers.

19   Mike Ledford told you that he spoke with Roger daily.  And we

20   know from Mr. Ledford and Ms. Fisher and Mr. Eddington that the

21   customers got what they wanted most of the time.  Mike Ledford

22   wrote a report about how successful his negotiations for KFC

23   were.  It's F-808.

24        And take a look at Exhibit E-799.  Mike Ledford tells

25   Roger exactly where Pilgrim's needs to be.  If you went down

1   1.5 cents, you'd still be higher than average but not in a

2   different ballpark like now.  Mr. Ledford is telling Roger and

3   telling Pilgrim's, This is where you need to be.

4        Kent Kronauge of SMS, Popeye's buying cooperative,

5   told you he was usually in the driver's seat in price

6   negotiations and estimated that 13 out of 15 times the customer

7   was in control.  Roger spoke with everyone when he could,

8   including customers, the distributors, and other suppliers to

9   get market intelligence, but the purpose was to compete.  Often

10  Roger was guessing about what his customers were doing.

11       Take a look at Exhibit 1722.  It's an example in

12  January of 2013 after the contracts for 2013 had already been

13  finalized.  Roger tells his boss, Jayson Penn, that he is still

14  trying to find out where everyone went on dark.  If there was

15  an agreement, he would already know.  This is after the

16  contracts had been signed.  Often Roger was wrong in his

17  guesses, for example, in Exhibit 1074, the so-called "Roger did

18  some checking around" e-mail.  Ask yourselves, if there was an

19  agreement to fix prices, why would Roger or anyone have to

20  check around to see what others were doing and why would so

21  much of the information be wrong?  And if there really was an

22  agreement on price, why would the information Roger had,

23  inaccurate as it was, be expressed in 2-cent ranges, the same

24  2-cent range for every supplier?  Doesn't this sound like all

25  of the information came from one source, the customer?

1           Even Robbie Bryant admits that Pilgrim's used the

2    information it had to make independent decisions in its own

3    best interest.  There was no quid pro quo.

4           Let's look at one more example, Exhibit D-839.  I want

5    to show you one more quote from Mr. Bryant:

6           You wanted this information so you could formulate

7    your own strategy toward KFC.

8           Correct.

9           You wanted to know your competitors' prices, bid

10   prices, according to you, so you could decide where to place

11   Pilgrim's price.

12           There was no quid pro quo.

13           Let's look at one more example, Defense Exhibit D-839,

14   an e-mail from Roger to his team.  After guessing about

15   competitor prices, Roger writes:  We don't want them, meaning

16   his superiors, to think we are suggesting meeting those prices.

17   We don't want them to think we're suggesting meeting those

18   prices.  That tells you what Roger's state of mind was at the

19   time.  This isn't price-fixing; it's the opposite.

20           And I want to say a word about the prosecution's

21   summary charts.  This is an excerpt from their chart No. 52,

22   and I want to show you what they left out.  They left out that

23   right before the list of quotes, less than two hours before,

24   Mr. Austin had a call with Mike Ledford of RSCS.  What else did

25   they leave out?  Mr. Austin's response to the price reduction

1    spreadsheet that lists guesses about what other suppliers were

2    pricing, Mr. Austin's actual response omitted from the

3    prosecution's summary chart, We don't want them to think we are

4    suggesting meeting those prices.

5         Now, if you include what actually happened, the

6    Ledford phone call and Roger's statement in an e-mail, We don't

7    want them to think we're suggesting meeting those prices, the

8    slide is completely different.  The meaning is entirely the

9    opposite of what the prosecution is suggesting.

10        Now, we know from the Judge's instructions on the law

11   that the communication among competitors, even communication

12   about price is perfectly legal as long as there is no

13   agreement.  You have seen this slide before in other closing

14   arguments, so I won't dwell on it or read it now.  But the

15   prosecution spent weeks proving that Roger spoke to some of his

16   competitors.  So what?  There is no evidence about what was

17   said on those calls, and there is no evidence that anything

18   illegal happened on those calls.  And talking to your

19   competitors, finding out market intelligence is legal as long

20   as there is no agreement to fix prices or rig bids.

21        And then there is Robbie Bryant.  No one likes to call

22   someone a liar, but unfortunately that's what he is.  He told

23   you he is a liar.  He has lied to the prosecutors and agents in

24   this case multiple times on multiple issues, none of which have

25   anything to do with the case or any of the five men on trial

1    here.  So he is subject to prosecution for the felony of lying

2    to the government, and he can be prosecuted at the discretion

3    of the prosecutors.  They haven't charged him yet, but they

4    could, and he knows it, so he has every incentive to say what

5    the prosecutors want him to say to try to avoid his own

6    prosecution.  And he has well over 30 sessions with the

7    prosecutors during which he rehearsed his testimony, so he

8    knows what they want him to say.

9          You would think that if there really was a conspiracy,

10   the prosecution could find another person out of the hundreds

11   of thousands of employees of the suppliers in the chicken

12   business to corroborate what Mr. Bryant said.  They haven't

13   because they can't.

14         Let's look at what he says.  He claims that at a

15   meeting in July 2014 Jason McGuire had a slide up on a screen

16   and told Roger to put it out to the industry, and Roger,

17   depending on which version Mr. Bryant is giving, either shook

18   his head or nodded without saying anything.  His testimony is

19   ridiculous.  First Mr. Bryant claimed that this happened at a

20   meeting at Popeye's, but we know that's not true.  We have the

21   calendar invite for the meeting at Popeye's, and Roger is not

22   on it.  He wasn't there.  And Kent Kronauge, the president of

23   Popeye's, of SMS, the Popeye's buying cooperative, told you

24   that not only was Roger not at the meeting, but that Popeye's

25   didn't want Roger in Popeye's offices at all because they

1    viewed Roger as too closely aligned with KFC.

2         Well, then Mr. Bryant said, well, maybe this happened

3    at Church's at a meeting, but there is no evidence that

4    Pilgrim's had a meeting with Church's in July 2014.  Mr. Bryant

5    told you he has not seen any documents of any such meeting, no

6    calendar invite, no planning notes or memos, no e-mails, no

7    PowerPoint.  He also told you that in his more than 30 sessions

8    with the prosecution, they have not shown him any documents

9    about any such meeting.  And you can bet if there were any, the

10   prosecution would have shown them to him.

11        More importantly, the prosecution with all of its

12   power could not show you one note, one e-mail, one calendar

13   entry, one PowerPoint, one anything for a meeting at Church's

14   in July 2014.  Roger did not attend any such meeting because no

15   such meeting happened.  The best the prosecution can do is

16   suggest Roger stayed in a hotel over an hour away using a

17   receipt that shows that Roger was not at Church's, but he was

18   at the National Chicken Council meeting.

19        Mr. Bryant's testimony is false.  But even if for some

20   reason you credit it, so what?  The slide Mr. Bryant claims was

21   on the screen was a slide showing AgriStats data that big birds

22   were much more profitable for suppliers than small birds.  That

23   was data that, even Mr. Bryant admitted, everyone in the

24   industry already knew.  So even if you credit Mr. Bryant's

25   testimony, all he says is that Mr. McGuire told Roger to put

1    out to the industry something everyone in the industry already

2    knew.

3            Then Mr. Bryant claims that on August 22nd, 2014, the

4    day of a meeting between Pilgrim's and RSCS, he walked in and

5    out of Roger's office twice and heard Roger say over the phone

6    twice exactly the same words:  I told them the price is the

7    price; the only question is how many loads.  And he claims that

8    after one call Roger said, That was Brady, and after the other

9    call Roger said, That was Kantola.

10           The claim is preposterous.  He didn't tell anyone in

11   the world about these claimed statements for seven and a half

12   years after they supposedly took place.  He can't remember

13   anything about anything he is asked on cross-examination, but

14   he claims to remember these statements.  His testimony cannot

15   possibly be true.  He heard these statements, he said, on

16   August 22nd, the day of a meeting between Pilgrim's and RSCS.

17   That meeting began at 11:00 a.m.  We have the calendar invite,

18   J-081.

19           Mr. Bryant claims he heard Roger use the past tense, I

20   told them.  The prosecution argued it's black and white.  It

21   sure is.  The telephone records show it.  The telephone records

22   show that the only calls between Roger and Mr. Brady and

23   between Roger and Mr. Kantola were early in the morning well

24   before the RSCS meeting.  There was a 24-second call between

25   Roger and Mr. Kantola at 7:56 a.m., probably there was not even

2876

1   a connection, 24 seconds might have been the hang-up or a

2   voicemail; there is a 19-second call between Roger and Scott

3   Brady at 8:18 a.m., again probably they didn't even connect;

4   and finally a 5-minute call between Roger and Scott Brady at

5   8:55.

6        And there were no other calls that day between Roger

7   and either Mr. Brady or Mr. Kantola.  All the calls were in the

8   morning.  And the early morning calls were likely about

9   covering shorts, because even Mr. Brady testified -- I am

10   sorry, even Mr. Bryant testified that calls about covering

11   shorts usually happened early in the morning.  But in any

12   event, Roger could not possibly have said, I told them, past

13   tense, hours before the meeting even happened.  Mr. Bryant is

14   clearly lying about these calls.

15        But even if for some reason you credit his testimony,

16   again, so what?  He doesn't claim to have heard what the person

17   on the other end of the call said.  He doesn't claim Roger

18   communicated Pilgrim's price.  He doesn't claim Roger asked for

19   or received an agreement on anything.  He just claims Roger

20   communicated Pilgrim's position, which is, of course, perfectly

21   legal.

22        Then Mr. Bryant goes from his claim that he overheard

23   bits of these conversations to his assumption or understanding,

24   in his word, that there was some kind of massive conspiracy to

25   fix prices.  It makes no sense.  There is no logical

1    connection.  Mr. Bryant clearly has no firsthand knowledge, but

2    he thinks he knows what the prosecution wants to hear, so he

3    says it.  This is evidence of a massive conspiracy to fix

4    prices, these three little bits of claimed testimony?  This is

5    evidence of a felony?  It's nothing more than Mr. Bryant's

6    assumptions and fabrications made without actual knowledge in

7    his effort to say what he thinks the prosecution wants to hear

8    to save himself from prosecution.  That's the sum total of

9    Mr. Bryant's claimed evidence for 2014, the claimed statement

10   by Mr. McGuire to Roger at a claimed meeting at Popeye's or

11   Church's that never happened and the two claimed overheard bits

12   of phone calls in August 2014 that couldn't possibly have

13   happened.

14          The only other evidence in 2014 he claims to rely on

15   for his grandiose conspiracy theory is Exhibit 1066, the Jason

16   McGuire dirty drawers e-mail string, which says, not

17   surprisingly, that KFC was surprised by the increase.  But what

18   did Mr. Bryant tell you just yesterday when the prosecution

19   called him in rebuttal about that e-mail?

20          Question:  There is no quid pro quo in that e-mail,

21   right?

22          Answer:  That's correct.

23          Question:  There is no quid pro quo?

24          Answer:  Correct.

25          Question:  You wanted the information so that you

1    could formulate your own strategy for KFC.

2              Answer:  Correct.

3              Mr. Bryant does not claim that there were any

4    conspiratorial conversations for the rest of 2014, for all of

5    2015, for all of 2016, but he claims that two things happened

6    in 2017.  One of those claims that he wanted to position

7    Pilgrim's to be No. 2 in price for the contract beginning in

8    2018 and Roger wanted Pilgrim's to be even lower in price

9    doesn't support a theory of price-fixing.  Pilgrim's wanted to

10   be at a different price than its competitors.  And beyond that,

11   as Mr. Bryant had to admit, it was Roger who was arguing for a

12   lower price than Mr. Bryant, the opposite of a conspiracy to

13   raise prices.

14             His own piece is just not true.  He claims that in a

15   conversation before February 3rd, 2017, Roger gave them other

16   suppliers' first-round bids.  We know that can't be true.

17   First, there is no evidence that all the suppliers had

18   formulated the first-round bids before February 3rd.  More

19   importantly, it is 100 percent clear that what Mr. Austin gave

20   Mr. Bryant were the then-current period 2 prices in effect in

21   February 2017.

22             Compare Mr. Bryant's notes on the left side of the

23   screen, Exhibit 1919, with Exhibit I-054 on the right side of

24   the screen, which is an RSCS document showing period 2 prices

25   in effect in February '17.  They are exactly the same except

1    for a transcription error on one price four places to the right

2    of the decimal point.

3            It's clear to everyone Mr. Bryant's notes are current

4    prices.  And as the prosecution has acknowledged again and

5    again, current period prices have nothing to do with future

6    bids, and this case is not about current prices.

7            Here is how Mr. Bryant's Exhibit 1919 compares to the

8    bids.  There can be no question that Mr. Bryant's notes are

9    current prices, not bid information.

10           Now, the prosecution did a curious thing in its

11   closing argument.  After eliciting Mr. Bryant's false testimony

12   that 1919 is future bids, after asserting time after time that

13   the case is not about current prices, suddenly in summation

14   without any evidence the prosecution argued that the suppliers

15   in 2017 were trying to maintain prices so current prices were

16   the same as future bids.  They just made that up.  There is no

17   evidence to support it.  And the fact is that every supplier,

18   including Pilgrim's, reduced its bids and its prices to KFC in

19   2017.

20           At the end of the day, Mr. Bryant does not actually

21   have firsthand knowledge of anything relevant.  That hasn't

22   stopped him from making things up, from making assumptions to

23   try to conform his testimony to what he thinks the prosecution

24   wants.  It's sad, it's pathetic, it's disgraceful, but it is

25   not any basis on which to convict anybody.  It is not proof of

1   anything beyond a reasonable doubt.

2         A couple of other points.  The prosecution has a text

3   they like, Exhibit 1615, in which Mr. Brady tells Mr. Fries, I

4   spoke with Roger about KFC sizes, and he is in agreement with

5   us.  They like this text because it is maybe the only document

6   in the case that uses the word "agreement."  But what they

7   didn't tell you and what we had to bring out in the defense

8   case is that this text is about Mike Ledford's request for a

9   reduced-weight bird, a request that RSCS's consultants pressed

10  Mr. Ledford to make in which Mr. Ledford told you he knew the

11  suppliers could not fulfill.  The request was impossible.  And

12  it would not surprise him if the suppliers discussed it.

13        And what the prosecution also didn't tell you but

14  Mr. Ledford did when the defense called him is that Mr. Ledford

15  made this request to Roger Austin on February 26, 2013, a week

16  before he made the request to any other supplier and that the

17  next day, February 27, Mr. Austin told him that Pilgrim's had

18  no birds available in that size.  Pilgrim's said it could not

19  fulfill the request a week before the other suppliers,

20  including Mr. Brady, were even asked.  All Mr. Brady is saying

21  in his text message is that when the request finally got to

22  him, Claxton reached the same conclusion that Pilgrim's had

23  already reached a week before.

24        And the prosecution relies on a text exchange between

25  Tim Stiller and Roger on February 17, 2017.  Pilgrim's had just

1    met with RSCS and learned that RSCS was demanding that

2    Pilgrim's reduce its price and was threatening to take away

3    even more volume.  Mr. Stiller is angry and tells Roger to tell

4    the industry Pilgrim's is going to hold.  And at 9:14 p.m. on

5    that February Friday night, Roger ends the conversation by

6    saying, Will do.

7         But look at what happens the next day, Tuesday,

8    February 21st, 2017.  Mr. Stiller e-mails Mr. Bryant and says,

9    Let's only speak fact-based data when we discuss and leave

10   emotions aside.  Everybody calms down.  Pilgrim's promptly does

11   exactly what RSCS is demanding and lowers its price to $49 a

12   case.

13        The burden of proof is entirely on the prosecution.

14   They interviewed no one from Pilgrim's before Indictment, but a

15   year later they stumble upon Robbie Bryant who lies to them

16   about something he did that has nothing to do with this case,

17   so they have him at their mercy.  And he is the only person

18   they can get to say there was a conspiracy.  He is corroborated

19   by no one.

20        Ask yourselves why the prosecution's witnesses had

21   little experience in negotiating chicken contracts and why,

22   even though the defense has no obligation to call any

23   witnesses, it was the defense who called people to testify who

24   know the industry, knowledgeable people, Mike Ledford of RSCS,

25   Kent Kronauge of Popeye's, Greg Finch of Claxton, Rich

1    Eddington of RSCS, all of whom told you that the customers

2    controlled the pricing; the suppliers made independent and

3    different decisions; that the suppliers competed and took

4    volume from each other; that the customers were satisfied with

5    the prices they negotiated; and that they had no knowledge of

6    any conspiracy to fix prices or rig bids.

7            And then look at the testimony of Bruce Bagshaw and

8    Marcus Shelton.  They are the only KFC owners that you heard

9    from.  They owned 46 KFC franchises between them.  They are the

10   alleged victims of this alleged crime.  They have both done

11   business with Roger for decades.  They know this man, and they

12   flew across the country to tell you about them.  They told you

13   that they know from their many years of doing business with him

14   that Roger is a man of integrity, of honesty.  This testimony

15   shows you that the idea that Roger would cheat KFC is absolute

16   nonsense.

17           Roger is presumed innocent, and the burden is on the

18   prosecution to try to prove beyond a reasonable doubt that

19   Roger and the other defendants are guilty.  The prosecution has

20   missed by miles.  This case is a terrible, terrible injustice

21   for Roger and all of these wrongly accused men.  It has upended

22   their lives.  It is terrifying that -- the fact that the

23   prosecution is using its power to prosecute people for a crime

24   they did not commit is frightening.  This prosecution, this

25   misguided prosecution has imposed a terrible burden on Roger

1     and all of these men and wreaked havoc on their lives.

2         In this country, people do not get convicted of a

3     felony unless the prosecution proves their guilt beyond a

4     reasonable doubt.  Maybe that's not true everywhere in the

5     world, but this is an American courtroom, and you are an

6     American jury, and you can lift that terrible burden and do

7     justice by returning the only verdict that justice requires.

8     All of these men are not guilty.  Roger Austin is not guilty.

9         Thank you.

10        *THE COURT:*  Thank you, Mr. Feldberg.

11        Mr. Fagg, whenever you are ready.

12        *MR. FAGG:*  Thank you, Your Honor.

13                        **CLOSING ARGUMENT**

14        *MR. FAGG:*  This case started out as a conspiracy

15    theory, and it still remains that today.  The prosecutors' case

16    is nothing more than a theory, a theory that's based on

17    assumptions and guesses and speculation.

18        The jury instructions that you received from Judge

19    Brimmer, they tell you that you are to judge this case based

20    solely on the evidence.  But that didn't stop the prosecutor

21    from getting up here before you yesterday and saying things

22    about Bill Lovette that are not true, that are 100 percent not

23    supported by the evidence, things like he was a supervisor in

24    crime, that he signed off on the conspiracy.  Those might be

25    catchy sound bites for a fictional story, but these

1    prosecutors, they are not writing a novel.  They are trying to

2    convict this man of a felony.  They are trying to convict all

3    of these five men of a felony.  And they say things like that

4    because they hope that you will latch onto it, because they

5    know that they don't have the evidence to prove their case

6    beyond a reasonable doubt.

7         Let's be crystal clear.  There can be no doubt that

8    the government has failed to prove their case against Bill

9    Lovette.  Bill Lovette never knew of any bid-rigging and

10   price-fixing conspiracy, and he most certainly did not

11   participate in one.  You've sat here over the last month.

12   You've heard the evidence.  You know what the evidence is

13   related to Mr. Lovette.  And more importantly, you know what

14   the evidence is -- what the evidence lacks as it relates to

15   Mr. Lovette.  And what you heard yesterday from the prosecutor

16   bears no resemblance to that evidence that you've heard over

17   the last month.

18        So I want to talk about what the evidence actually

19   shows about Mr. Lovette.  So first, the prosecutors want you to

20   believe that the CEO of a massive global public company with

21   56,000 employees, that he was supervising a conspiracy and not

22   one of those 56,000 employees could come on the stand and say

23   that he was involved or that he had any knowledge.  They

24   brought you one of them, and he said he wasn't involved.  He

25   didn't know about it.

 1              And it's not just the 56,000 employees at Pilgrim's.

 2   They claim that this conspiracy involves dozens and dozens and

 3   dozens of people across dozens and dozens and dozens of

 4   companies.  And from there, they can't bring you anybody.

 5   Think about that.  Nobody has any knowledge?  They try to claim

 6   this notwithstanding the fact that they know, they know that

 7   they have to prove to you that Mr. Lovette and each one of

 8   these individuals knowingly, meaning voluntarily and

 9   intentionally, joined this conspiracy, and they have no

10   witness.  They can't bring you anybody.

11              Instead, what you heard from the stand about

12   Mr. Lovette is that he was a highly respected, button-down CEO,

13   was the CEO of Pilgrim's until he retired in 2019.  Now, I want

14   you to think about that.  This man is at the pinnacle of his

15   career, who is the CEO of this giant company.  He is steering

16   Pilgrim's away from fast food to more profitable business.  He

17   is going to throw it all away for a price-fixing conspiracy

18   related to KFC?  He is going to risk his life and his liberty

19   for a price-fixing conspiracy for something that makes up

20   2 percent of Pilgrim's business?  There is no evidence that he

21   did that, and, in fact, the evidence shows the opposite, and I

22   want to talk about that for a minute.

23              What the evidence shows you is that when Mr. Lovette

24   got to Pilgrim's Pride, he had a strategy, he had a plan for

25   Pilgrim's, and it was based on data and analytics, not a

1    price-fixing or bid-rigging conspiracy.  The actual evidence

2    tells you this, not some made-up story, the actual evidence

3    that you heard from that witness stand, that you see in the

4    documents.  The two Pilgrim's Pride witnesses who testified,

5    they both told you this.  They both told you the same thing,

6    the plan based on data and analytics.  And Mr. Lovette decided

7    to expand Pilgrim's' customer base to a broader base so they

8    could get a better price for their chicken.

9         Brenda Ray and Robbie Bryant both told you this.  They

10   told you that when he arrived at Pilgrim's or before he arrived

11   at Pilgrim's, that Pilgrim's had been chasing volume.  They

12   didn't really care how much they got paid for it.  They didn't

13   care whether it made economic sense.  They just wanted to

14   please the customer, and they were chasing volume for sale

15   after sale.  But Mr. Lovette put in place a plan where they

16   were supposed to make smart decisions and do the right thing.

17   Do the right thing.  This isn't some catchy phrase that I made

18   up; this is what their star witness said about Mr. Lovette's

19   plan.  It was to do the right thing.

20        Mr. Bryant told you that Mr. Lovette focused on

21   ownership and accountability.  He explained that meant driving

22   decisions down into the organization, giving people ownership

23   and control over the decisions they were making.  Pilgrim's

24   employees were expected to be accountable for making fact and

25   data-based decisions, and Mr. Bryant told you that meant having

1    the facts and the data to back up your decisions, good

2    business.

3         He also talked about, Mr. Bryant, he also talked about

4    how this fact and data included analyzing the decisions you

5    were making using things like benchmarking against the current

6    mark, benchmarking, assessing the market, prior bid experience

7    and thinking about opportunity cost, the next best sale.  So

8    they shifted away from just chasing volume and instead focused

9    on trying to find the businesses that made the most sense for

10   Pilgrim's to sell its chicken to.  And those businesses were

11   far more profitable to Pilgrim's.

12        Pilgrim's expanded into the big birds that you have

13   heard so much about in this case.  And Pilgrim's employees are

14   challenged to think about what's your next best sale, and

15   what's in Pilgrim's best economic interest.  That is what the

16   evidence shows about Mr. Lovette.  That's what it shows.  They

17   told you, Ms. Ray and Mr. Bryant both told you that there was

18   clear expectations under his leadership, and it didn't have

19   anything to do with any kind of price-fixing or bid-rigging

20   conspiracy.

21        In fact, Ms. Ray told you that Pilgrim's measured

22   itself based on how it beat the competition.  She explained to

23   you that they used a third-party company that provides this

24   benchmarking information called AgriStats, and you had to beat

25   the competition in order to succeed.

1          Let's look at Mr. Lovette's own words as to what he

2    thought about the competition.  We should not help them one

3    micron.  Ladies and gentlemen, the strategy in Mr. Lovette's

4    own words is not a quid pro quo.  It's not an agreement.  It's

5    the exact opposite of a quid pro quo or an agreement.  And

6    that's the evidence.  That's the evidence as it relates to

7    Mr. Lovette.

8          The prosecution has suggested on multiple occasions

9    that it can only compete by reducing your price.  That's what

10   they've suggested multiple times.  It's ludicrous, and it's not

11   the law.  The evidence shows that Pilgrim's, the second largest

12   chicken producer in the country and was the largest eight-piece

13   supplier to KFC, so Pilgrim's in 2014 for 2015, they know they

14   are in a market where there is low supply and high demand, so

15   Pilgrim's was in a position to demand a fair market price for

16   its product.  They weren't a small regional supplier like

17   Claxton.  No, they were the second largest chicken company in

18   the United States.  They had plants all over the country.  They

19   had thousands of customers.  And they focused on expanding that

20   customer base to the grocery stores, the large grocery stores

21   who were buying those same small birds.

22         They could move on to the next best sale.  They could

23   walk away from a bad deal.  And as you heard from Ms. Ray,

24   that's what's called price courage.  It's a strategy of wanting

25   to be paid a fair price for your product, for having confidence

1    in your product, for believing that your product and the

2    service that comes with it is better than your competition's.

3    That's not a conspiracy.  That's good business.  And this is

4    what the cold, hard evidence of this trial shows, the evidence

5    on which you have to base your decision.

6         You don't base your decision on their closing

7    argument.  You know, Ms. Wulff said yesterday that it may seem

8    counterintuitive that Pilgrim's would enter into a conspiracy

9    where they lost volume to KFC.  And she is right, that would be

10   counterintuitive if you were going to have a price-fixing

11   agreement, bid-rigging agreement related to KFC.  It is

12   counterintuitive.  But the reason why Pilgrim's lost volume to

13   its competitors for KFC had nothing to do with a conspiracy.

14   It had everything to do with price courage, opportunity cost,

15   and Pilgrim's focusing on growing these other customers who

16   were willing to pay more for the product it was selling.

17        The government makes this huge deal out of KFC and how

18   big they were and how important they were for Pilgrim's.  The

19   evidence shows you that they were 2 percent of Pilgrim's

20   overall volume, of Pilgrim's overall business.  And, again,

21   Ms. Ray told you that Pilgrim's was trying to increase its

22   sales to these other customers that made more financial sense

23   to Pilgrim's.  That's exactly what Pilgrim's did.  They didn't

24   need to sell their chicken to KFC.  They could go sell it to

25   somebody else for more.

1          Let's look at one of the government's own exhibits,

2    979.  This is a document they spent a bunch of time talking to

3    Mr. Bryant about because it has big numbers on it, and they

4    want you to be astonished by those.  What this shows is that in

5    2015 Pilgrim's had these retail grocery stores who wanted to

6    buy the same small chicken that KFC was trying to buy, and they

7    were willing to pay 14 to 16 cents -- 14 to 17 cents more than

8    what KFC was paying.

9          This is a case where we are talking about fractions of

10   a penny, and they are willing to pay 14 to 17 cents more.

11   That's a good independent business strategy.  It makes good

12   business sense.  That's the strategy that Mr. Lovette put in

13   place when he got to Pilgrim's.

14         So let's switch gears and talk about the law that

15   applies to this case.  The jury instructions give you your law.

16   And the first question is:  Did the prosecutors prove the

17   existence of a conspiracy to fix prices and rig bids for

18   broiler chicken products beyond a reasonable doubt?  Now, some

19   of the other counsel touched on this earlier, but the

20   government knows this.  They know this.  This isn't a surprise.

21   So when they try to lead you astray with these shorthand

22   questions and say the first question is just why, know that

23   that is their effort to mislead you.  It's a concession that

24   they can't meet this standard.  They cannot prove their case

25   beyond a reasonable doubt, and so they just want you to ask the

1    question why.  That's not the question.

2         If they thought that they could meet this standard,

3    they would have told you.  Anytime they provide a shortcut or a

4    tool kit, know that they are trying to get you to take a

5    shortcut because they can't meet their burden.

6         The prosecutors told you yesterday that Mr. Bryant's

7    testimony was enough to prove the conspiracy, to prove the

8    agreement beyond a reasonable doubt.  They're wrong.  They know

9    they're wrong.  His testimony does not even show there was an

10   agreement much less establish that beyond a reasonable doubt.

11   His testimony says that some unknown people at Pilgrim's talked

12   to some unknown people at another company and shared some

13   unknown information.  Mr. Bryant wasn't in those

14   communications, so he is not really sure what happened, but

15   occasionally he received some of that information, and some of

16   the other lawyers have talked to you about that today.  When he

17   received it, he admitted that he used it to make decisions that

18   were in the best economical decisions for Pilgrim's.

19        He admitted that he used it to make independent

20   decisions.  He admitted that he was not aware of a quid pro

21   quo.  No "we'll do it if you do it."  His testimony eviscerates

22   the first element that they have to prove.  Their star witness,

23   the government's star witness, he denied what they have to

24   prove, and he admitted what sinks their ship.

25        You know, Mr. Bryant admitted or he testified

1    yesterday that his understanding of an agreement is based on

2    his own belief that you shouldn't have, compare, or obtain

3    competitor information because if you do that your decision is

4    not independent.  That's not the law, and they know that's not

5    the law.  Regardless of what Mr. Bryant may believe after 31

6    interviews and 16 practice sessions and, frankly, whatever any

7    other witness thinks, Judge Brimmer gave you the instructions

8    on what constitutes an agreement.  And what it says is that you

9    are perfectly entitled to obtain, compare, rely upon competitor

10   information.  It's not illegal as long as there is no quid pro

11   quo agreement.

12           What else do you have to show that there is no

13   agreement?  You have Professor Snyder.  He told you his

14   objective economic expert analysis does not support the

15   government's theory of an agreement.  And I want to address one

16   point quickly about Professor Snyder.  Was he paid a lot of

17   money?  Yes, he was.  These men's lives and liberty are at

18   stake, and so we wanted to see what does the preeminent expert

19   in the antitrust field, what does he think about the

20   government's prosecution.  Professor Snyder is a Ph.D.

21   economist.  He worked as an economist at the antitrust division

22   of the United States Department of Justice.  He went on to be a

23   dean at three of the top universities in the country.  What

24   Professor Snyder was paid is not the issue.

25           What's important is he did a multi-year analysis that

1   included objective data from a variety of sources, including a

2   number of government sources, the USDA, and based on that

3   analysis, he made three conclusions:  First, information

4   exchanges are to be expected in the industry, unrelated to

5   bid-rigging or price-fixing; two, there are simple and

6   reasonable explanations supported by the economics for observed

7   outcomes, unrelated to bid-rigging and price-fixing; and,

8   three, the economic evidence does not line up with bid-rigging

9   or price-fixing.

10          The United States Department of Justice with its

11   unlimited resources and its in-house economists could not find

12   someone willing to get on the stand and rebut Professor Snyder,

13   so they have to slap a label on him and call him the $850,000

14   man.  The reality is his testimony is unrebutted.  It's

15   uncontroverted.

16          Yesterday Ms. Wulff said that Professor Snyder missed

17   the whole point of the government's allegations.  Wrong.  He

18   understood exactly what the government's allegations were.

19   They just didn't like his answers, and they couldn't find

20   somebody to rebut him.

21          I touched on this a little bit earlier, but the

22   government's alleging an eight-year-long conspiracy, dozens and

23   dozens of people, a bunch of different companies, and there is

24   no one who will get on the stand and first tell you that Bill

25   Lovette knew of or participated in any kind of conspiracy, zero

1    people, and they called only one witness who claimed to have

2    any knowledge whatsoever about the supposed conspiracy,

3    Mr. Bryant.  And his testimony was a long time ago, but it's

4    important to remember, he worked at Pilgrim's.  Mr. Lovette is

5    long gone from Pilgrim's.  He has no allegiance to Mr. Lovette.

6    He told you he has no personal knowledge that Bill Lovette had

7    anything to do with this supposed conspiracy, zero, absolutely

8    nothing.

9         That is fatal to the government's case against

10   Mr. Lovette, and so they want you to just ignore that fact.

11   And so they say, Okay, let's talk about these documents.  Let's

12   dump these documents on the jury with no witness, no context,

13   and no explanation.  And now after yesterday we see why,

14   because they are just going to provide you a verbal tool kit so

15   you can interpret them, which is code for make believe.  We are

16   just going to make it up and hope the jury buys it.

17        But on this tool kit, Mr. Beller told you yesterday,

18   it's not your job to have to put the government's case together

19   for them.  The evidence is closed.  Their time to explain the

20   case to you was before they rested their rebuttal case.  They

21   didn't do it.  They tried to do it yesterday.  It's too late.

22   It's not your job.  You make your decision based on the

23   evidence, not what they tell you and argue to you.

24        So let's talk about these documents that they want you

25   to use your tool kit as it relates to Mr. Lovette.  We are not

1    afraid of them.  Let's go through them in a very methodical way

2    chronologically.  So 2012, we've talked about this.  There is

3    one single e-mail involving Mr. Lovette in 2012.  It was

4    forwarded to him.  He doesn't respond ever.  He doesn't do

5    anything ever.  Totally undeterred by this uncontroverted fact,

6    the prosecutor gave you a story for which they have no

7    evidence.  They claim this evidence was forwarded to

8    Mr. Lovette so that he could sign off on some sort of supposed

9    agreement.  There is zero evidence of that.  That is made up.

10   You have the evidence.  There is no evidence.  They just made

11   that up because it fits with their theory.

12          I also want to just take a step back and think about

13   this.  An e-mail is forwarded to Mr. Lovette and he does

14   nothing.  I would like to think that even the prosecutors don't

15   think you can be forwarded into a conspiracy.  It's ridiculous.

16   It's totally ridiculous.  So that's it for 2012.

17          2015, again, very little here.  Remember, this is the

18   year where RSCS ignored the advice of Mike Ledford, the chicken

19   expert, who said, Put the negotiations off as late in the year

20   as you can; don't negotiate in a crisis; don't do a multi-year

21   negotiation; just do one, survive and get by; we are in a

22   crisis.

23          RSCS, Nope, don't like that; we're going to bring it

24   forward; let's do it in August, do it during the crisis, going

25   to do multi-year.  That's the approach they took.

2896

1          This is also the same year where Pilgrim's had gone to

2     RSCS and told them big birds have a 34-cent-per-pound margin

3     advantage over small birds.  So with that context, let's look

4     at an e-mail.

5          Mr. Lovette gets forwarded another e-mail, and the

6     government loves it, so let's talk about it.  1074, this leads

7     into the e-mail, but we had talked about this earlier.  These

8     are the cost models that Pilgrim's team had been working on day

9     after day after day after day, multiple versions, right?  The

10    government wants you to believe this was make-believe work,

11    make-believe work, make-believe work, make-believe work.

12         So Mr. McGuire and other people at Pilgrim's, they get

13    this information.  They put together a draft bid, and they send

14    it to Mr. Penn for his review.  Mr. Penn responds back.  He

15    says he is good with it, and he is going to review with Bill in

16    the a.m., and that's all Mr. Penn says.  That's it.  And from

17    that, the prosecution makes these made-up allegations that

18    Mr. Lovette signed off on the conspiracy because Mr. Penn says

19    he is going to review it with Mr. Lovette.  There is no

20    evidence that Mr. Lovette signed off on any conspiracy.  They

21    know that.  You can't just say things in a federal court in a

22    criminal trial and proclaim them to be true.  They know there

23    is no evidence of this, but they get up here and they say it

24    anyways.  They know there is no evidence, and they are

25    undeterred.

1          Mr. Penn's lawyer talked to you about this earlier.

2    Even if Mr. Penn had discussed every single word in this e-mail

3    with Mr. Lovette, it wouldn't have mattered, because there is

4    nothing illegal in there, zero.  Compare that document against

5    the jury instructions.  Zero in there that's illegal.

6          This e-mail cannot form the basis of proof beyond a

7    reasonable doubt that Mr. Lovette did anything much less that

8    he knowingly joined in a price-fixing and bid-rigging

9    conspiracy.  It can't form the basis of that, and it absolutely

10   cannot form the basis of that kind of proof beyond a reasonable

11   doubt.  There is zero evidence he did anything.

12         So sticking with this same year, we have the phone

13   call between Mr. Lovette and Mr. Austin, and, gosh, they love

14   it, right?  It's Mr. Lovette, he is on the phone, and they are

15   so excited about it.  Keep in mind he is on the phone with

16   someone who works at his same company.  He is not on the phone

17   with a competitor.  He is on the phone with someone who works

18   at his company.

19         So on their charts they've got this e-mail where

20   Mr. Austin sends Mr. Penn an e-mail.  He gives him a two-page

21   rundown of Mr. Austin's negotiations with RSCS.  I am not going

22   to read it, but you can take a look at it.  It's 1051.

23         Importantly, what Mr. Austin says, at least as it

24   relates to Mr. Lovette, is that Mr. Lovette may get a call from

25   Steve, who is the CEO of RSCS.  He is giving Mr. Lovette a

1   heads-up, the CEO of RSCS may want to talk to you.  Now, read

2   the rest of the e-mail.  We invite you to do that.  We are not

3   afraid of any of the evidence.  There is no mention of any

4   agreement, no mention of any competitor anywhere in that

5   e-mail.  The entire e-mail is just Pilgrim's internal strategy.

6        You want to write a two-page e-mail if you are

7   Mr. Austin if you are involved in a conspiracy?  That's what he

8   did.  So Mr. Penn forwards this recap to Mr. Lovette and he

9   says, I told Roger to proceed, because in there Roger had asked

10   for some feedback on what to do with the negotiations with

11   RSCS.  I told Roger to proceed, totally normal communications.

12        So now Mr. Lovette has this heads-up that the CEO of a

13   customer may want to call him and that Mr. Austin was going to

14   be calling RSCS presumably, and Mr. Penn told him that he had

15   told him to proceed.  So here we are, we are in the crisis

16   year.  RSCS has brought these negotiations forward.  The

17   chicken expert, Ledford, has left.  Suerken has never

18   negotiated chicken.  And RSCS has just run out of chicken.

19   It's not very surprising that the CEO of RSCS may have wanted

20   to talk to Mr. Lovette.  There is also nothing wrong with it.

21        So what happens?  Well, we know what happens.  Pete

22   Suerken testified.  They called him to the stand.  He got on

23   the stand, and he was on the call with Mr. Lovette and the CEO

24   of RSCS.  So anticipating this call, what does Mr. Lovette do?

25   He calls Mr. Austin.  You flagged for me that I might have to

1    have a call with this CEO.  Is there anything I should know?

2    Can I get briefed?  I have read your 2-page e-mail.  That's

3    really helpful.  Can I get some more information?  Totally

4    normal, nothing wrong with this.

5            So then they have the call.  Mr. Lovette talks to

6    Mr. McCormick, the CEO, and Pete Suerken is on also.  And what

7    does Pete Suerken come into this court and tell you about what

8    Mr. Lovette said?  It made sense to him.  It made sense.  So

9    everything I just went through, that's the evidence that's in

10   this case.  That's what the record shows and it makes total

11   sense.

12           We have an e-mail from Mr. Austin saying what's going

13   to happen.  We have Pete Suerken getting on the stand telling

14   you what happened.  And none of it is problematic.  But they

15   want you to believe that this call between Mr. Lovette and

16   Mr. Austin is Mr. Lovette reaching down into the conspiracy and

17   controlling the conspiracy.  Give me a break.  We had an e-mail

18   saying what's going to happen and their own witness telling us

19   what happened.  And it doesn't have anything to do with a

20   conspiracy.  You can't just make stuff up.  So that's it.

21   That's all we have for Mr. Lovette related to 2015.

22           2017, let's take a quick look at that.  The text

23   message, Bill Lovette is not even on this, right?  Come to BL

24   office.  Let's discuss KFC.  It's offensive that the government

25   wants to tell you that this is evidence of anything beyond a

1    reasonable doubt.  It's not.  Mr. Lovette is not even on this

2    e-mail.  Did they make any effort whatsoever, any, to prove to

3    you that this meeting happened?  Just, like, super foundational

4    things, that Mr. Lovette was in the office this day?  No, they

5    didn't, because they don't want to dig and they don't want you

6    to dig.  They didn't even do those foundational things so they

7    most certainly didn't do anything to prove to you beyond a

8    reasonable doubt that if this meeting happened and Mr. Lovette

9    was there and they discussed KFC, that what they actually

10    discussed was a crime, zero evidence.  They didn't even try.

11        So that is everything as it relates to Mr. Lovette and

12    KFC.  Proof beyond a reasonable doubt?  No way, no way.  So

13    because they have nothing, they've got to figure out something,

14    right?  He is the CEO, and we're after him.  So to nobody's

15    surprise, they throw a bunch of documents into evidence with no

16    witness and no context and just say, We'll use the tool kit,

17    and we can speculate, and we can make stuff up.

18        So we've talked about the first one, Exhibit 3025.

19    This is illegal spiel.  You've got Jayson Penn and Bill Lovette

20    e-mailing, and it has the word "illegal," and this is awesome.

21    So they don't call Brian Roberts and ask him what this was

22    about.  They could have done it, and they didn't, because they

23    don't want you to know.  But we are not afraid of the facts and

24    the truth here.  So we call Mike Brown, and he explained to you

25    that he was with Bill Lovette the day before, which is

1    referenced in this e-mail, right?  He is at the NCC.

2    Mr. Lovette is with Mr. Brown the entire time he is there.

3    Mr. Lovette gives a speech that's written by the NCC, approved

4    by the NCC lawyers, speaks to hundreds of people including the

5    media, and nothing he says is illegal.  They are afraid of the

6    facts; we're not.

7         What did Mike Brown tell you?  Bill Lovette is a

8    highly respected and button-down individual meaning he's

9    straight-laced.  He is a serious person.  The fact that they

10   offer this e-mail with no explanation when they had every

11   ability to give you an explanation is wrong.  And Mr. Lovette

12   deserves better than that.  We all deserve better than that.

13        So that brings us to the last e-mail, and this is the

14   Sysco e-mail, and this is total desperation.  So they give you

15   this e-mail, Sysco, Mr. Lovette and Joe Grendys, and they

16   sprinkle in all these questions asking random witnesses if they

17   know Joe Grendys.  So we knew what they were going to do.  We

18   knew they would just dump this document on you with no context,

19   with no witness, and they did.

20        So what do we know about this?  This entire case is

21   about fast-food restaurants, right?  That's all we've talked

22   about for a month.  Sysco is a company that buys everything

23   from carpet to glasses to forks to plates to you name it and

24   food and drinks.  It doesn't have anything to do with

25   fast-food.  So we call a witness to the stand because they

1    won't give you any context.  We call Brenda Ray.  She comes to

2    the stand, and she gives you the context that you need, and she

3    tells you that this e-mail has nothing to do with bids or

4    negotiating contracts.  It has nothing to do with bids or

5    negotiating contracts.  That's what this whole case is about,

6    and that has nothing to do with that, so this e-mail is already

7    doubly irrelevant because it has to do with a company that buys

8    carpets, and it has nothing to do with bids or negotiating

9    contracts for chicken.

10          So what else does Ms. Ray tell you and why is this

11   context important?  Because she told you that Mr. Lovette was

12   not even involved in the negotiations with Sysco.  He had

13   nothing to do with it.  How do you know that he had nothing to

14   do with it?  You don't have to just take Ms. Ray's word for it.

15   This e-mail with Mr. Lovette involves 65-day terms that were

16   supposedly being rammed down some suppliers' throats.  Did

17   Pilgrim's get that?  Ms. Ray told you, no, they didn't.  Did

18   they get 2-month terms proposed to them?  No, they got two-week

19   terms proposed to them.

20          *THE COURT:*  Two minutes.

21          *MR. FAGG:*  The government knows this has nothing to do

22   with anything.  They hope that you will latch onto it because

23   it involves the CEO.  It is not proof of anything.

24          Now, when this case started, it was the government's

25   burden to try to move these men from innocent to guilty beyond

1   a reasonable doubt.  You sat through all of this trial and all

2   of this evidence.  The government's case is nothing but a

3   theory.  It's a guess.  It's speculation.  It's made up.  You

4   have to make your decision based on the evidence in the case.

5   It cannot be made on their made-up story.  There is no way that

6   the government has proved to you beyond a reasonable doubt that

7   Mr. Lovette joined in any conspiracy to rig bids or fix prices,

8   no way.  They barely even tried.

9           So when you are in the jury room, ask yourself and I

10  ask you to ask your fellow jurors, has the government actually

11  proved the case beyond a reasonable doubt, or are they just

12  asking us to speculate, not just to Mr. Lovette, to all these

13  men?  Have they proved this for me each step of the way, or are

14  they asking us to speculate, or are they just making it up?

15          So as some of the other lawyers have mentioned, I have

16  got to sit down now, and I am the last one of the defense

17  lawyers to talk to you, so not only do I not get to get back

18  up, but nobody gets to get back up.  I want you to remember

19  that what we heard yesterday was made up.  What we heard

20  yesterday from the prosecution is not supported by the

21  evidence.

22          Now, I love practicing law because I get to do work,

23  to do justice, but also to prevent injustice.  The ultimate

24  responsibility rests with you, and it's your turn to prevent an

25  injustice from being done in this case.  And so I ask you to

1    return the only verdict that speaks the truth, a verdict that

2    Bill Lovette is not guilty.

3              Thank you.

4              *THE COURT:*  Thank you, Mr. Fagg.

5              Ladies and gentlemen, why don't we take a stretch

6    break, like a minute or two, and we can do that now.

7              (Brief recess.)

8              *MR. BELLER:*  Your Honor, may we have a quick side bar?

9              *THE COURT:*  Yes, you may.

10         (At the bench:)

11             *THE COURT:*  Mr. Beller, go ahead.

12             *MR. BELLER:*  Thank you, Your Honor.

13             Your Honor, I believe Mr. Austin is in the men's room,

14   and so that's the delay, so he has gone to get him.  I just

15   want the Court to be aware.

16             *THE COURT:*  No, I was aware of that and also this kind

17   of is a good time filler.  And I think now we are all present

18   and assembled.  Does that sound right?

19             (In open court:)

20             Mr. Loveland, go ahead.

21             *MR. LOVELAND:*  Thank you, Your Honor.

22                           **REBUTTAL ARGUMENT**

23             *MR. LOVELAND:*  October 10th, 2012, bids are due in for

24   Kentucky Fried Chicken contracts.  In five days leading up to

25   that bid being due, eight, eight phone calls between

1    supposed-to-be competitors.  You can see those calls here.

2    Defendants Roger Austin of Pilgrim's and Scott Brady of

3    Claxton, other conspirators from George's, Tyson's and Koch

4    Foods, they worked the phones to get on the same page.

5            November 13 and 14, 2012, about a month later,

6    second-round bids are now due in.  The very day he submits his

7    bid to KFC who does Roger Austin call?  Supposed-to-be

8    competitor, Scott Brady.  There is no mystery about what they

9    talked about.  The timing of the call tells you that.

10           But to make it easy for you, Scott Brady tells you

11   that.  Scott Brady tells you that when he tells his boss,

12   Mikell Fries, in a text.  Pilgrim's is .30 back, and Tyson is

13   .31 back.  I talked to Roger, and this month he is .03 higher

14   than us.  He said to raise our prices.

15           What does his boss, Mikell Fries, say, Tell him we are

16   trying.

17           Will do.

18           That's not price sharing; that's price-fixing.  That's

19   not an independent decision-making.  That's bid-rigging.  Roger

20   Austin told Scott Brady what to do with Claxton's prices.

21   Mikell Fries says, Tell him we are trying, exclamation point.

22   Independent?  No.  Telling someone what to do is the exact

23   opposite of independent.  Just sharing?  Absolutely not.  They

24   are working together to go up together.

25           And here you see the agreement.  Roger Austin wants

1    Claxton's prices to go up.  Why?  So that Pilgrim's high bid is

2    successful.  Why does Roger Austin share his bid?  Because they

3    have an agreement, because Roger Austin trusts Scott Brady to

4    carry out Scott Brady's end.  Because when they rig bids

5    together, everyone gets higher prices.  Roger Austin says,

6    Here's my bid.  You raise yours.  Here's my bid.  I trust you

7    not to undercut me.  Those are just a handful of texts amongst

8    a mountain of evidence that you have seen and heard.  But those

9    texts, those texts are bid-rigging.  Those texts are

10   price-fixing.  It does not matter how many words you use if the

11   words you use are this clear.  If you say marry me and you hear

12   yes, that's all you need.  You're engaged.  And if you tell

13   your competitor to go up in price and they say, We will, you

14   rigged a bid.  You committed a crime.

15          And Jayson Penn and Bill Lovette, they were rigging

16   this bid here too.  Here is Jayson Penn sending a spreadsheet

17   of competitor prices to Bill Lovette.  These are bids that

18   haven't been submitted yet.  But guess what?  Companies did

19   submit their bids that masked the information that Bill Lovette

20   has now in his hands.  You can see four days later Scott Brady

21   bid that exact same amount, .9620.  What information did Bill

22   Lovette have?  An exact bid.  When did Bill Lovette have it?

23   Before it happened.  That's the agreement working.  That's

24   trust between conspirators in action.  Scott Brady submitted

25   the exact bid Pilgrim's knew he would submit.

1            Now, defense counsel really likes the phrase "quid pro

2    quo."  It's nowhere in the jury instructions.  It's not the

3    law, but they still like saying it.  Well, here this is the

4    agreement in action.  The defendants give each other their bids

5    to get bids back, and they trust each other to go up in price

6    rather than undercut each other.  Whether you call it this for

7    that or you really like Latin, that's the agreement.

8            Defense attorneys have pointed out that the bid prices

9    weren't always exactly the same for Pilgrim's, Claxton, and the

10   other conspirator companies.  Well, to use a legal term, duh.

11   If everyone submitted the exact same prices, KFC would have

12   figured that out from the very beginning and the plan would

13   have never worked.  Sometimes too conspirators lowered their

14   bids a bit in the face of customer pushback, but conspiracies

15   don't have to be perfect.  In fact, no crime is perfect.  The

16   crime still paid off big, and it paid off big when it mattered

17   the most in 2015.

18           And despite what the defense has tried to tell you,

19   this had nothing to do with covering shortages.  If this was

20   about Pilgrim's and Claxton buying chicken from each other, no

21   one would be talking about raising prices.  Greg Finch, the CFO

22   of Claxton, friends with two of the defendants, admitted that.

23   He laughed at the thought that you would tell someone to raise

24   prices on you before you buy something from them.  So when

25   Mikell Fries and Scott Brady communicate about raising prices

1    from Roger Austin's suggestion, that's it.  There is just no

2    other way to explain it.  That has nothing to do with

3    shortages.  This were working with a competitor to raise bid

4    prices, to rig a bid.

5           Jumping ahead to November 2013, you know where this is

6    going.  Starting on November 1st, 14 calls between

7    supposed-to-be competitors, the very day that Scott Brady

8    submits his bid, one, two, three, four calls with Roger Austin,

9    four calls on bid day starting in the morning running into the

10   afternoon.  You know what those calls were about.  You don't

11   need four calls to just share information.  You don't need four

12   calls on bid day to do anything other than coordinate your

13   bids.

14          And, of course, they make sure they are on the same

15   page as Tyson and Koch Foods too.  To carry out his part in the

16   conspiracy, Scott Brady does what you would expect.  He makes

17   sure everyone is staying on the same page, so he tells his

18   boss, Mikell Fries, Roger is .30 back and not moving.  Mikell

19   Fries plays his role and directs Scott Brady about what to do

20   to keep up their side of the agreement.  Stay .305, then, right

21   around where Roger Austin is.  Again, this isn't about

22   shortages.  You can't move current prices.  This is a rigged

23   bid.

24          The defense ignores this pattern and tries to give you

25   an excuse.  Shortages, that's one excuse, but what nonsense.

1    Scott Brady is telling you here what these calls are about when

2    he tells his boss what the calls are about.  Defense attorneys

3    have tried to talk about assumptions and inferences.  They talk

4    about puzzle pieces.  The implication is that there is

5    something missing because there isn't some contract written

6    down that says, We all agree to rig bids.  Well, again, duh,

7    Dr. Snyder himself told you that would never exist.

8         But Chief Judge Brimmer has also instructed you here,

9    direct proof of a conspiracy may not be available.  A

10   conspiracy may, however, be disclosed by the circumstances or

11   the acts of the members.  That's Jury Instruction 20.  The law

12   here is clear on how this works.  The defendants' actions and

13   circumstances are around the bid.  The calls, texts, e-mails,

14   what they say about what they're doing, that's evidence.

15   That's proof.  That's how the conspiracy worked beyond a

16   reasonable doubt.

17        Let's talk about summer and fall of 2014.  KFC bidding

18   for the three-year contract, this is the big one, the big rig.

19   Beginning on August 11th in the eight days leading up to the

20   bid, 20, 20 calls between supposed-to-be competitors.  You can

21   see those calls here.  That's a lot of phone calls to be

22   engaging in independent decision-making.  I'm not going to go

23   through 2014 in detail because it's the same pattern you've

24   seen.  And despite what the defense has said, you have the

25   tools and you have the evidence to do that.  Summary charts 58

1 | to 60 will walk you through this rigged bid and direct you to

2 | some of the relevant evidence.

3 |    What's important about 2014 to see here is each and

4 | every defendant plays a key role.  During this bid, it's so

5 | important that Jayson Penn himself jumps into the trenches and

6 | works the phones.  He calls over to Tyson.  Later on he calls

7 | over to Pete Martin, a competitor at Mar-Jac.  You can see

8 | that --

9 |    MR. TUBACH:  Your Honor, I object.  That misstates the

10 | evidence.  I would like to have a side bar, please.

11 |    THE COURT:  No side bar.

12 |    Ladies and gentlemen, the statements of the attorneys,

13 | as I indicated to you, and the arguments are not evidence.  The

14 | evidence is what you have heard in court.

15 |    MR. LOVELAND:  Thank you very much, Your Honor.

16 |    Pete Martin's handwritten notes at Exhibit 1030

17 | memorialize that phone call.  How do you know?  It says, Talked

18 | to Jayson Penn.  Sometimes it's that easy.  And when Jayson

19 | Penn gets an update on five should-be competitors' prices from

20 | Roger Austin that Roger Austin collected, what does Jayson Penn

21 | do with those numbers?  He reports them up the chain of

22 | conspirators to Bill Lovette.

23 |    He says he will let Bill Lovette know in the morning.

24 | And Jayson Penn does let Bill Lovette know, I told Roger to

25 | proceed.  Now, this bid, this big rig, so important that Bill

1    Lovette himself jumps on the phone and makes a 15-minute phone

2    call to Roger Austin down the chain.  And, of course, Scott

3    Brady and Roger Austin are on the phone, as you have seen, so,

4    so many times.  Scott Brady again texts Mikell Fries, keep his

5    boss in the loop and let him know what's happening.  I talked

6    to Roger about KFC, and Greeley told him not to come down on

7    price today.  He called Bob.  That's Bob Lewis.  Mikell Fries

8    says, Wow, and, again, remember his exclamation point.

9          And this one is so important that another boss, Mikell

10   Fries, jumps into the trenches and makes a phone call as well.

11   He calls over to should-be competitor Mar-Jac just like Jayson

12   Penn had done.  And when it's all said and done for this

13   bidding, you heard the testimony.  They got him them.  They set

14   record high prices for the chicken industry.  The conspiracy

15   worked.  They got the price hike, and KFC got cheated.

16          Now, the defense attorney for Roger Austin and Scott

17   Brady say that they didn't have authority to set prices on

18   their own.  First and most importantly, that's not the law.

19   Following Chief Judge Brimmer's instructions, you will see

20   pricing authority is not anything to do with the three elements

21   of proving bid-rigging and price-fixing.  And, of course, Roger

22   Austin and Scott Brady had to keep their bosses in the loop.

23   That's how this conspiracy worked.  That's what you see Scott

24   Brady doing in his text messages.  Bosses, Bill Lovette, Jayson

25   Penn, and Mikell Fries, they had a different role in the

1     conspiracy.  Yes, they signed off on the plan, because it was

2     their plan, but the argument is also just wrong on the facts.

3              Scott Brady and Roger Austin personally signed

4     contracts worth millions and millions of dollars.  You saw

5     their signatures with authority to do so delegated down the

6     chain of conspirators.  Scott Brady was signing contracts worth

7     that much money within months of walking in the door at

8     Claxton.  He had all of the authority he needed to carry out

9     his part in the conspiracy as did Roger Austin.  So 2014 is the

10    big win.  It's what they had all hoped for.  They did it.  They

11    conspired together to cheat KFC and set those record prices,

12    but they weren't done, because when 2017 rolled around and

13    bidding was happening again for the three-year contract with

14    KFC, they did it again.

15             Now, the name of the game this time was to hold prices

16    as high as possible.  Keep the price increases that they earned

17    through their conspiracy.  And you will see it in the summary

18    charts, same pattern, same pattern, same pattern.  Robbie

19    Bryant testified that the goal of the conspiracy was to

20    manipulate the outcome of bids, The overall purpose was to

21    increase prices together with our competitors.  Just as you

22    have seen, it matches all the other evidence.  Robbie Bryant

23    saw the conspiracy because he was in it, and he testified that

24    Roger Austin was in the agreement too, the agreement to rig

25    bids and fix prices.

1            The defense attorneys tried to use the word

2    "independent" a bunch of times to explain away the conspiracy.

3    They play word games rather than address the conduct.  They say

4    things make good business sense, and they play business word

5    bingo with things like market intelligence too.  But you have

6    already seen nothing about this was independent.  Independent

7    means independent.  Claxton's own CFO, Greg Finch, testified

8    that independent meant on my own, no help from anyone, not

9    being told by Roger Austin to raise your prices, that's not

10   independent.

11           Of course, it makes good business sense in a way to

12   manipulate bids.  If everyone cheats the customer together,

13   everyone gets higher prices.  Submitting your bid after you've

14   colluded doesn't make it independent.  That decision, the

15   decision to manipulate the outcome of bids, isn't independent

16   just because it's good for you.  It's good for you if it works,

17   and it's good for you if you don't get caught.

18           Now, Robbie Bryant made a mistake.  He wasn't honest

19   at first.  It didn't have anything to do with this case, but

20   that's not what you should do obviously.  What's important here

21   is that he did do the right thing eventually.  He set the

22   record straight, and he came forward to correct it, and that's

23   important.  Now, what's important about Robbie Bryant's

24   testimony is that it's supported by, corroborated by, and

25   confirmed by all of the other evidence in this case.

1    Everything that Robbie Bryant said happened is consistent with

2    what you see in the other evidence.  What Robbie Bryant said

3    happened on those phones is the same thing that Scott Brady

4    says happened on those phones.  It's the same thing that you

5    see in e-mails that Roger Austin sent.

6         When you look at the evidence as a whole and not

7    piecemeal just as Chief Judge Brimmer has instructed you, the

8    pattern becomes obvious because it's the same pattern, and you

9    see that pattern in the summary charts.  These are tools.  They

10   direct you to relevant evidence.  Exhibits 50 to 53 and 56 to

11   62.

12        Now, the defendants, they worked together in the

13   conspiracy, and the more they did, the better they got.  Just

14   like a team gets better the more the team works together.  The

15   defendants grew to trust each other as the conspiracy ran its

16   course.  That's how teams work.  The more you work together,

17   the better you get.  The more you learn to trust each other and

18   stick to the plan.  But, members of the jury, they weren't

19   supposed to be on a team.  They were supposed to be

20   competitors.  That's how our market works.  Competition leads

21   to the best result, the best prices, the best choices.  That's

22   the American system.

23        Instead, the defendants chose collusion over

24   competition, and they knew it was illegal, but they did it

25   anyway because they thought they could make more money that

1    way, and they thought that if they were careful, they wouldn't

2    get caught, but they were wrong.

3           Now, there is no requirement to prove that the

4    defendants knew that their own actions were illegal, but they

5    did, and that evidence, that is powerful evidence.  How do you

6    know that the defendants knew their actions were illegal?

7    Because of their trying but failing to avoid leaving a paper

8    trail, because if they thought they were doing something legal,

9    they thought they were just information or covering shortages,

10   they wouldn't have to cover their tracks.  Jayson Penn said

11   things weren't legal several times in the exhibits that you

12   have seen.

13          In July 2013, he e-mails Bill Lovette.  Apparently

14   your boy was not listening to your illegal spiel on forward

15   pricing.  Now, look at the subject line of this e-mail.  It

16   says Brian Roberts.  You might remember that name.  Brian

17   Roberts is the person from Tyson that Jayson Penn had a phone

18   call with in the days before a KFC bid was due.  Jayson Penn's

19   counsel tried to explain that call away by saying it was the

20   first time that Jayson Penn had ever been on the phone with

21   Brian Roberts.  Could be, but a year before that phone call

22   Jayson Penn is referring to Brian Roberts as Bill Lovette's

23   boy, and he is using the word "illegal." And Jayson Penn was

24   thinking about illegal spiels a year before that phone call

25   with Brian Roberts.

 1          Now, in another e-mail chain, Jayson Penn went on to
 2    write down his thoughts exactly about what he was doing.  You
 3    have seen this one.  He forwards it along and says, Do not
 4    forward, not exactly a legal conversation.  Pause here.  The
 5    defense lawyer's excuse for this one is ridiculous.  The excuse
 6    you were told is Jayson Penn was wrong.  He thought it was
 7    illegal, but he was wrong.  It was actually fine.  No big deal?
 8    He just thought he was committing a crime but he was wrong?
 9    You can take Jayson Penn at his word here.  The explanation is
10    simpler.  It wasn't a legal conversation because price-fixing
11    is a crime, because Jayson Penn knew that and because Jayson
12    Penn wanted to avoid leaving a paper trail.
13          Now, to be clear, the conspirators tried to avoid
14    writing certain things down.  Remember Exhibit 3039, no comp
15    names in e-mail, Robbie Bryant told you exactly what that
16    meant.  To paraphrase it meant don't write it down, stupid.
17    Now, one telling example is when Tim Stiller messed up.  Tim
18    Stiller at Pilgrim's told Jayson Penn, They are listening to my
19    direction.  Who is "they"?  Jayson Penn catches himself.  If
20    they is illegal, don't tell me.  Don't write it down, stupid.
21          Here the defense attorneys have tried to focus you
22    away from the evidence and the defendants' guilt and on to
23    something else.  They talked about the prosecutors, shame.  The
24    investigation went too fast.  The investigation took too long.
25    There were too many interviews.  There weren't enough

2917

1    interviews.  The prosecutors cherry-picked evidence.  The

2    prosecutors put too many documents into evidence for your

3    consideration.

4         At the end of the day, the investigation yielded the

5    exact types of evidence you would expect to find in a

6    price-fixing conspiracy, because the nature of the crime

7    determines the nature of the evidence.  Secret crimes by design

8    leave few witnesses.  This was a secret conspiracy.  They knew

9    their business, and they tried to cover their tracks.  They

10   failed.  Phone calls, text messages, e-mails, handwritten

11   notes, that's DNA.  That's the defense's fingerprints all over

12   this case.

13        Defense attorneys have also made a lot of noise about

14   the number of witnesses.  You have heard from a number of

15   witnesses, but also the secret nature of the crime was designed

16   to limit that.

17        And you know what's better than any witness statement?

18   You know what can't replace a witness' statement?  The

19   defendants' own words, the text messages between Mikell Fries

20   and Scott Brady where they tell you what they're doing, Jayson

21   Penn's own words about how he knows his conduct is illegal,

22   Roger Austin's e-mails.  There is no witness that could give

23   you better than that.  The defense says, Look over here, but

24   the evidence is squarely before you, and all of that evidence

25   matches Robbie Bryant's testimony.

1          The defense attorneys want you to believe that this
2   was just information sharing.  They keep beating that drum.
3   Price sharing is legal so long as there isn't an agreement.  So
4   that's their story, there was no agreement.  The defendants
5   were just telling each other their bids without expecting
6   anything in return.  Well, sometimes you are supposed to
7   believe they are just covering shortages.  Sometimes it's all
8   about supply and demand.  The defense attorneys can't even make
9   up their minds about which excuse to use.

10          But first on the just sharing excuse, it's just not
11  true because you have seen instances where the defendants tell
12  each other what they're doing with their bid prices.  You saw
13  the exchanges.  They were giving each other their bids knowing
14  they would get bids back.  And you have seen an instance where
15  they told each other what to do with the other one's prices.
16  It's just not information sharing.

17          And second, the just sharing theory makes no sense.
18  Why would you tell your competitor your most valuable secret,
19  your bid, without any agreement, any assurance that your
20  supposed-to-be competitors wouldn't undercut your bid?  That is
21  not what anyone would do in a market with competition because
22  your competitor is supposed to try to beat you.  And the very,
23  very last thing you would do in a market with competition is
24  tell your competitor how to beat you.

25          Of course, that's wrong.  There was an agreement.  Why

1    were they sharing bids?  Because the agreement let them.  That

2    was the purpose, just as Robbie Bryant testified, to raise

3    prices and keep them as high as possible together.  That's the

4    why, information and an agreement.  That's the crime.

5         There aren't any buzz words or excuses that can

6    explain away that basic and common-sense truth.  Competitors

7    compete.  Conspirators tell each other secret information to

8    make sure their agreement works.

9         Defense also talks about how sometimes during the

10   conspiracy Pilgrim's lost volume while it was getting higher

11   prices, but that doesn't matter.  Bill Lovette, Jayson Penn,

12   and Roger Austin, they decided to be price leaders for the

13   conspiracy.  It was part of their plan.  So what?  They made

14   more money for just one year of the 2015 to 2017 contract.

15   They made more than $7-1/2 million in additional profit, and

16   they only had to sell 20 percent less chicken.  That's a

17   win-win.  Even in defense arguments to you, the defense

18   attorneys' arguments to you, they took that chicken and they

19   sold it elsewhere.  That was their strategy, and that's what

20   Robbie Bryant told you they did.  Less chicken, more money.

21        Speaking of money, Dr. Snyder did testify at this

22   trial, and he was paid $850,000 to come here and speak to you.

23   How much is that testimony worth to you?  Zero, because he was

24   not even addressing the key evidence in this case.

25        He testified about numbers and his view about what

1    those numbers meant, but he didn't look at any of the evidence

2    that matters.  He didn't look at the e-mails.  He didn't look

3    at the text messages.  He didn't look at the phone records.  He

4    didn't listen to any testimony.  He didn't listen to Robbie

5    Bryant's testimony.  And Dr. Snyder for that reason admitted

6    himself, I cannot offer a separate opinion about the agreement.

7    Well, that's the crime, the agreement is the crime, and he

8    can't offer an opinion on it.  Professor Snyder looked at none

9    of the evidence that mattered most because he can't answer that

10   question without the evidence.  Wrong evidence, wrong question.

11          The defendants were sharing their bids with should-be

12   competitors.  That's not in dispute.  The question is why, why

13   were they sharing their bids?  The answer is because of the

14   conspiracy.  Now, the defense wants you to believe something

15   different.  They just want you to believe that competitors

16   would tell each other their business strategies without any

17   agreement and without expecting anything in return.  The

18   conspirators made those calls and their bids just magically

19   aligned.  No, to borrow from Jayson Penn, these are not legal

20   conversations.

21          What did the defendants get from their conspiracy?

22   Higher prices for their companies.  And one time, the time when

23   it mattered most, they hit the jackpot.  The conspiracy paid

24   off big.  Because when the biggest customer, Kentucky Fried

25   Chicken, put out a three-year contract, what happened?  The

1   defendants and the rest of the conspirators secured

2   record-setting industry-wide prices, the highest price hikes in

3   memory.

4        Now, you heard the testimony.  Pete Suerken didn't

5   know what caused that.  Bob Lewis worked in the chicken

6   industry for decades.  He didn't know what caused it either,

7   because the defendants worked to keep it a secret.  By design,

8   the customer didn't know it was being cheated, didn't know

9   about the conspiracy, but you know why.  You know what led to

10  record-setting price increases because Robbie Bryant told you

11  exactly how the conspiracy worked, because you have seen the

12  phone calls, because you have seen the text messages, because

13  you have seen handwritten notes, because you have heard and

14  seen all the evidence in this case.  You have seen the course

15  of dealing.  You have seen the collusion.  You have seen the

16  agreement, and you know why, the causes of the conspiracy.

17       Bill Lovette, Jayson Penn, Roger Austin, Mikell Fries,

18  and Scott Brady are each guilty beyond a reasonable doubt.

19       Thank you, Your Honor.

20       THE COURT:  Thank you, Mr. Loveland.

21       All right, ladies and gentlemen.  Let me give you some

22  information at this time about your deliberations because I am

23  about ready to excuse you to commence your deliberations.

24       First of all, you will recall in that very last jury

25  instruction, you can take a look at it in your packet, but it

1    mentions a court security officer.  A court security officer

2    will be posted outside of the jury deliberation room.  That is

3    not to keep you in.  That is, rather, to keep you from being

4    inadvertently interrupted by people who don't happen to know

5    that you're back there.  Anytime you want to take a break, you

6    obviously can, okay?

7         However, the court security officer will collect your

8    cellphones while you are in the jury deliberation room

9    deliberating so that some phone call from the outside doesn't

10   interrupt your deliberations.  Once again, anytime you want to

11   take a break to make a phone call, you can do so, but the court

12   security officer will collect them when you are in there

13   deliberating.

14        You can set your own schedule.  You can take breaks

15   when you want.  But if you haven't reached a verdict by

16   5:00 o'clock today, I will bring you in at 5:00 o'clock, and I

17   will go ahead and dismiss you for the day.

18        You can discuss today, ladies and gentlemen, what time

19   you want to start tomorrow and then let me know at 5:00 o'clock

20   today, once again assuming you haven't reached a verdict.  So

21   if for some reason it's more convenient for you to start a

22   little bit earlier, traffic is not as bad or something, you can

23   start as early as 8:00 or you can start as late as

24   9:00 o'clock, but let me know when you have decided on coming

25   in tomorrow, once again assuming you haven't reached a verdict.

1          Keep in mind, ladies and gentlemen, there is no time

2   limit on your deliberations as I mentioned to you way at the

3   beginning of this case, so you are not limited.

4          You all have to be present when you're deliberating,

5   so if one of you wanted to take a break, that's fine, but you

6   can't deliberate while that person is away.  All 12 of you have

7   to be together in order to deliberate.

8          And also, ladies and gentlemen, keep in mind all those

9   admonitions that I have given to you other than the one that

10  you can't deliberate.  You now will be able to deliberate, but,

11  otherwise, keep all those in mind.  You can't look up any

12  information outside of the admitted evidence.  You can't confer

13  with other people.  You can't go visit places.  You can't do

14  any of those types of things.  The evidence is what has been

15  admitted, and, as the instructions indicate, you ultimately

16  will determine the facts from the testimony and the exhibits

17  that have been admitted in this case.

18         At some point after you start your deliberations,

19  Ms. Grimm will bring to you the notebooks of the exhibits.

20  Some of those exhibits you'll remember were Excel spreadsheets.

21  She will also bring you thumb drives that will have those types

22  of exhibits on it.  And there is also going to be brought into

23  the deliberation room -- it won't be there when you first get

24  there, but she will bring it back in -- something we call an

25  evidence cart.  It's basically just a computer and a screen

1    that will enable you to take a look at the thumb drives if you

2    want to see those electronic exhibits.

3         If you have any trouble with the evidence cart, send a

4    note out to that effect, and we will try to get that corrected.

5    One thing that I do not want you to do and that is bring in

6    your own device that works better than the evidence cart.  You

7    can't do that.  So you undoubtedly have things like that, but

8    don't do that.  You have got to use the evidence cart, because

9    we have checked over that evidence cart, and it doesn't have

10   any extraneous information on it whatsoever unlike your laptop

11   at home or something like that, okay?

12        If you reach a verdict, as the instructions indicate,

13   give a note to that effect, in other words, we have reached a

14   verdict, to the court security officer who will then bring it

15   to me, but don't hand the verdict form to the court security

16   officer.  Rather, the foreperson will keep the verdict form and

17   the verdict form will then be handed to me in open court when I

18   bring you back in for the verdict, okay?

19        All right.  Let us have our court security officer

20   come forward and take the oath at this time.

21        (Court security officer was sworn.)

22        *COURT SECURITY OFFICER:*  I do.

23        *THE COURT:*  All right.  Ladies and gentlemen, so as

24   you'll recall and as you can see, there are 14 of you, meaning

25   that two of you are alternates and those two alternates are

2925

1    Mr. Barcelona and Mr. Collins.  So I am going to release

2    everyone to commence your deliberations, but Mr. Barcelona and

3    Mr. Collins, do you have any possessions back in the jury room?

4             *JUROR:*  Yes.

5             *THE COURT:*  Here is what I would like you to do.  If

6    you could -- everyone can go out, but if you two could gather

7    up your belongings and then come back into the courtroom, I

8    have some additional instructions for you, okay?

9             Ladies and gentlemen, at this time, the jury is

10   dismissed to commence its deliberations.

11            (Jury excused to deliberate.)

12            *MR. TUBACH:*  Briefly, I want to put on the record why

13   I objected.  I know the Court has a meeting at 12:15.

14            *THE COURT:*  I think we will have to do that at 1:30.

15            *MR. TUBACH:*  1:30?  That's fine, Your Honor.

16            *THE COURT:*  Ms. Grimm, can you make sure they know

17   they can come right back in?

18            Let me just mention that if you want to check the

19   evidence cart, you can do so just to make sure it doesn't have

20   any extraneous information.  I just had our IT department check

21   it, and they have confirmed, it's not the one used last trial,

22   doesn't have anything on it.  Excel was reloaded on it just

23   today, but if you want to, you certainly can.

24            And then is it my understanding that the parties have

25   both checked the exhibit lists and are in agreement?

1                    (Alternate jurors present.)

2          THE COURT:  So, Mr. Barcelona and Mr. Collins, it is

3    one of the things I least enjoy in a trial is identifying the

4    alternate jurors, especially in a trial this long and one where

5    you have paid such careful attention to everything.  As you can

6    imagine, especially in this time where we have some especially

7    infectious variants of COVID going around, if we didn't have

8    alternate jurors, we would be in trouble.  As you know, we lost

9    one of our jurors early on in the case and, you know, by a

10   miracle here we are and both of you are -- weren't called upon

11   because we lost another juror or someone.  So anyway, but

12   still, you know, we have to have alternates, but it's still

13   hard for me to identify those people and have you not be able

14   to participate in the deliberations after all these weeks.

15          I would like to ask a favor of both of you if you are

16   willing, and that is who knows whether or not, you know,

17   someone might come down with an illness or trip and fall or,

18   you know, who knows what, but if that happened and if both of

19   you are willing to still follow the admonitions that I have

20   given you throughout the whole trial, we could then substitute

21   you in as regular jurors.  The deliberations would start all

22   over again so that you would be able to fully participate, but

23   are you willing to do that?  We would then, if there is a

24   verdict, let you know immediately so you wouldn't have to keep

25   doing that, but if you are willing to do that, then we could

2927

1    substitute you back in just in case.  Are you willing to do

2    that, Mr. Barcelona?

3              JUROR:  Yes.

4              THE COURT:  Mr. Collins?

5              JUROR:  Yes.

6              THE COURT:  I really appreciate that.  So as I said,

7    if there is a verdict, we will let you know right away, and

8    that way you will know you won't have to keep following those

9    admonitions, but I really appreciate it.  And thank you so much

10   for taking the time out of your lives to be jurors in this

11   case.  It really is an important responsibility of American

12   citizens, and both of you, as I said, paid such careful

13   attention.  I really appreciate that.

14             All right.  Gentlemen, at this time, both of you are

15   excused, and we will be back in contact with you, all right?

16             Thank you.

17             (Alternate jurors excused.)

18             THE COURT:  So right before we came back into the

19   courtroom, I believe that there was an indication and I know

20   Mr. Torzilli testified that there was an agreement that what

21   we've marked as Court Exhibit 1 and Court Exhibit 2, which is

22   the list of admitted exhibits, has been checked by the

23   government and the government believes that that is an accurate

24   representation of what was admitted; is that correct?

25             MR. TORZILLI:  Yes, Your Honor.  These are acceptable

2928

1    to the government, Court Exhibit 1 and Court Exhibit 2.

2              THE COURT:  Thank you.

3              And, Mr. Quinn, I think as I mentioned yesterday, I

4    think you are the point person for the defendants on the

5    admitted exhibits; is that right?

6              MR. QUINN:  I am, Your Honor.

7              THE COURT:  And have you had a chance, Mr. Quinn, to

8    check Court Exhibit 1 and Court Exhibit 2 the list of admitted

9    exhibits for both the United States and also the defendants?

10             MR. QUINN:  We have, Your Honor, and they are

11   satisfactory to the defendants.

12             THE COURT:  Great.

13             So here is the other thing that I would like to people

14   to do, and that is check the notebooks, the paper copies of the

15   exhibits and also those thumb drives which have the electronic

16   version just to make sure that we are not accidentally sending

17   an admitted exhibit back or that we're not accidentally sending

18   something that wasn't admitted back.  Once you give Ms. Grimm

19   the high sign that both sides have had the ability to check

20   that and that the notebooks, you know, contain only what they

21   are supposed to and the thumb drives contain only what they are

22   supposed to, then she will go ahead and bring the evidence cart

23   and the exhibits back to the jurors, okay?

24             And then I have got to run off to my meeting right

25   now, but we will -- why don't we plan on meeting at 1:30, and I

 1    will let Mr. Tubach make his record, and we can talk about

 2    anything else that we need to talk about at that time.

 3           Mr. Loveland, do you have anything else?

 4           MR. LOVELAND:  I was just standing up for Your Honor

 5    to excuse me.

 6           THE COURT:  Mr. Feldberg?

 7           MR. FELDBERG:  Are the clients' presence required at

 8    1:30?

 9           THE COURT:  I don't think so.  I don't think that's a

10    critical phase.  Mr. Tubach obviously would like to make the

11    record, so defendants can be present if they choose or may

12    choose not to be present at that time.

13           MR. FELDBERG:  Thank you.

14           THE COURT:  We will be in recess, then, until 1:30.

15    Thank you.

16        (Recess at 12:18 p.m. until 1:32 p.m.)

17           THE COURT:  Why don't we do this, Mr. Tubach, if you

18    don't mind.  Why don't we talk about exhibits first because I

19    want to make sure the jury gets the exhibits.  So have the

20    parties agreed on -- have the parties had an opportunity to

21    look through the notebooks to make sure that the paper copies

22    are all in order so that we can at least get that back to the

23    jury?

24           MR. QUINN:  Your Honor, we are actually just finishing

25    up now.  I think we probably have what, guys, another 45

1    minutes or so before we will be totally checked through and

2    ready to send them back.  The lingering issue, Your Honor, is

3    just the natives versus paper issue that we are just having to

4    iron out really quickly.

5              THE COURT:  What's the issue?

6              MR. QUINN:  It's just a native file versus paper copy

7    issue.

8              THE COURT:  Yeah, that's on the electronic ones,

9    right?

10             MR. QUINN:  It turns out that many of the electronic

11   versions weren't moved into evidence, so we are just kind of

12   parsing through the ones that were and weren't and that's

13   what's taking a little longer time.

14             THE COURT:  Okay.  And that brings us to the

15   electronic ones.  So is that the issue, Mr. Torzilli?  Why

16   don't I hear from you on that issue right now.

17             MR. TORZILLI:  There is a question about both what

18   was -- what is the exhibit, is it paper or is it native, and

19   printouts of native files being reflected in paper in the

20   binders, so we are trying to iron out the ones where there are

21   differences between the parties about what actually the exhibit

22   is.

23             THE COURT:  Okay.  And do you agree with Mr. Quinn's

24   estimation of how long that may take to accomplish?

25             MR. TORZILLI:  Yes, as an approximation, yes.

1           THE COURT:  Yeah, we should definitely focus on that

2     because the jury is going to want to get the exhibits at some

3     point in time.  Otherwise, we are going to start getting notes

4     and things of that nature.

5           Okay.  Anything more on the exhibit issue?

6           MR. QUINN:  Not for the defendants, Your Honor.

7           THE COURT:  Mr. Torzilli?

8           MR. TORZILLI:  No, Your Honor.

9           THE COURT:  Obviously, let Ms. Grimm know if there is

10    some issue that I need to rule on and then we'll deal with that

11    expeditiously.

12          I have got a 2:00 o'clock swearing in, not in the

13    courtroom but elsewhere, so I may be -- I will be tied up a

14    little bit with that, but otherwise I will be available to

15    be -- to address any issues.

16          All right.  Mr. Tubach, go ahead.

17          MR. TUBACH:  Thank you, Your Honor.

18          I had moved -- I had objected during Mr. Loveland's

19    rebuttal closing argument because he made what was an important

20    misstatement of fact in the rebuttal.  He stated that Jayson

21    Penn called over to Pete Martin, a competitor at Mar-Jac.  And

22    I objected and two minutes later he made the same statement.

23          That is an objective fact about which there is no

24    dispute.  Jayson Penn did not call Mar-Jac.  We have litigated

25    this now for many trials.  The objective evidence is that the

 1    phone records show that somebody at Mar-Jac called Jayson

 2    Penn's cellphone number.  The way this was set up -- and again

 3    I am reading from the rough transcript, thank you,

 4    Ms. Coppock -- what it says is here is what Mr. Loveland said

 5    the first time around:

 6            What's important about 2014 to see here is each and

 7    every defendant plays a key role.  During this bid it's so

 8    important that Jayson Penn himself jumps into the trenches and

 9    works the phones.  He calls over to Tyson.  Later on he calls

10    over to Pete Martin, a competitor at Mar-Jac.

11            And then I objected.  And then two minutes later when

12    he is talking about Mikell Fries calling Mar-Jac, he says:  He,

13    Mikell Fries, calls over to should-be competitor Mar-Jac just

14    like Jayson Penn had done.  And that's simply wrong.  And it's

15    incredibly prejudicial to Mr. Penn because what the government

16    is trying to insinuate is that Mr. Penn was so actively

17    involved in these negotiations that he went down in the

18    trenches and started making all these phone calls including to

19    Mar-Jac.  It's just false.

20            And it's also not -- that call is not on the

21    government's summary chart which might have cured some of this

22    prejudice, so there is no way for the jury to know unless they

23    dig through the hundred thousand pages the fact that that was

24    simply a false statement.

25            So I have two proposals.  The Court can hear

1    factual --

2            THE COURT:  No, go ahead.  I will hear proposals, then

3    I will let Mr. Loveland have an opportunity to address the

4    Court.

5            MR. TUBACH:  So the first proposal is a mistrial.  We

6    do move for a mistrial.  I do think it's prejudicial to

7    Mr. Penn, and for that reason I do move for a mistrial at this

8    time.

9            Second, the Court could give a curative instruction to

10   the jury that reads something like the following:  The

11   government stated in its rebuttal closing argument that Jayson

12   Penn called Mar-Jac.  That statement is not supported by the

13   evidence in the record.

14           THE COURT:  Okay.  Thank you, Mr. Tubach.

15           Mr. Loveland, go ahead.

16           MR. LOVELAND:  Thank you, Your Honor.  The statement

17   made was as Mr. Tubach represented it.  Jayson Penn was on the

18   phone with Pete Martin at Mar-Jac.  It's supported by the

19   sentence that Mr. Tubach omitted which came right after the

20   objection which is the government's view of what Exhibit 1030

21   reflects.  Pete Martin writes down talked to Jayson Penn in

22   handwritten notes dated on August 24th which is significant

23   because that's a day that Bob Lewis put out an e-mail to

24   everyone who was participating in that bidding cycle asking for

25   another round of bids.

1          In the context of a call from the main line to Jayson

2    Penn's cellphone and the fact that there is a handwritten note

3    that the jury has seen and the government would submit and has

4    argued and has fairly argued is Pete Martin's handwritten

5    notes.  It's more than a fair inference that Jayson Penn and

6    Pete Martin were on the phone together and discussed prices

7    although I didn't go as far as to say that in the rebuttal

8    closing and I think it's also bolstered by the fact that Jayson

9    Penn called over to Tyson as well during and in the same time

10   frame which shows he is making those kinds of calls and to use

11   the metaphor, he was in the trenches when he called over to

12   Tysons just as he was the government would submit when he was

13   on the phone with Pete Martin.

14          *THE COURT:*  Thank you.  Mr. Tubach, ammunition?

15          *MR. TUBACH:*  I think Mr. Loveland just missed my

16   argument entirely.  I am not arguing they wouldn't have argued

17   in closing that Mr. Penn and Mr. Martin spoke.  That's not my

18   point.  My point is he said that Jayson Penn called Pete

19   Martin.  That's my point.  Jayson Penn did not call Pete

20   Martin.  Someone at Mar-Jac called Jayson Penn which is a much

21   more passive role than Mr. Penn would have been playing and

22   Mr. Loveland's response seems to be making an argument I am not

23   making.  It is showing that it was so important that he jumps

24   in the trenches be and works the phones.  It's just false.

25          *THE COURT:*  Mr. Loveland, anything else?

1          *MR. LOVELAND:*  Your Honor, if it was phrased as Jayson

2     Penn called, the evidence is before the jury and they have been

3     instructed numerous times to rely on the evidence.  Whether he

4     is receiving calls from Pete Martin or placing calls to

5     Tyson's, it's the same conduct the government would submit that

6     shows the pattern.  There is no unfair prejudice here and it's

7     squarely before the jury.

8          *THE COURT:*  All right.  So as Mr. Tubach mentioned,

9     there was an objection during the rebuttal argument of

10    Mr. Loveland.  I didn't have a bench conference at the time.

11    We are making the record now.  The proposals that Mr. Tubach

12    have made on behalf of Mr. Penn are, No. 1, for a mistrial; and

13    No. 2, for a curative instruction as Mr. Tubach indicated.

14          I am going to reject both of those.  After the

15    objection I told the jury what I have told them before which is

16    the evidence is what comes in through the exhibits and

17    testimony.  The attorneys' statements, the attorneys' arguments

18    are not evidence.  And the jury will have to determine what the

19    facts are.  The jury is the finder of the facts.

20          If closing arguments were subject to, you know, that's

21    not accurate or whatever, trials would get horribly bogged

22    down, not that lines can't be crossed.  Lines can be crossed.

23    I rejected the government's two graphs because they depended

24    upon things that weren't in evidence.  However, I don't find

25    that the statement of Mr. Loveland reaches the point where

 1   either a cure active instruction is appropriate or a mistrial

 2   is appropriate, and for that reason will reject both of

 3   Mr. Penn's proposals.

 4          Anything else that we should talk about on any subject

 5   while we have the opportunity?

 6          Make sure that -- I think that Ms. Grimm has all of

 7   your phone numbers, but once again, just in case we get a note,

 8   even if it were a note that's really easy, like hey, where are

 9   the exhibits, we still have to meet and talk about them, so

10   don't go too far away from the courthouse.  Make sure that you

11   are reachable by some member of your team so that we can answer

12   any questions that they may have expeditiously.  If we don't

13   hear from the jury, then if everyone could make sure that they

14   are ready to go at 5:00 o'clock and then we will bring the jury

15   in and dismiss the jury, all right?

16          Mr. Tubach, did you have anything else?

17          *MR. TUBACH:*  No, Your Honor.

18          *THE COURT:*  Okay, great.  So we will be in recess

19   until I hear of a request from you or we get to 5:00 o'clock,

20   all right?

21          Thank you.

22      (Recess at 1:42 p.m. until  2:57 p.m.)

23          *THE COURT:*  We are reconvened in 20-CR-152.

24          The jury is not present.  The jury sent out a note

25   that has the time of 2:32 on it indicating that they have a

1    question:  When will we have evidence available?  Waiting to be

2    able to have needed discussion.

3           The jury also notes:  We plan on being here until 5

4    p.m. today and back tomorrow 7/7/2022 at 8:30 a.m., signed by

5    the foreperson.

6           So the question is when will we have the evidence?

7           MR. TUBACH:  Your Honor, just briefly, Mr. Penn is not

8    here yet.  He is making his way through the security, but there

9    is no reason to wait.

10          THE COURT:  I agree with you.  I think that this is a

11   very routine jury question.

12          Either Mr. Torzilli or Mr. Quinn?

13          MR. TORZILLI:  Mr. Quinn can correct me if I'm wrong,

14   but I believe the paper, so the binders, the six binders,

15   everyone has signed off and they are ready to go back to the

16   jury.  And we still have a flash drive we need to finalize, but

17   that should be done pretty quickly, but the binders are ready

18   to go.

19          MR. QUINN:  That's correct, Your Honor.

20          THE COURT:  So here is what I would suggest.  You say

21   that the binders will be brought back shortly and so -- one

22   flash drive?

23          MR. QUINN:  It's just one flash drive, so it's just

24   the government's flash drive that needs to be slightly

25   adjusted.

2938

1          THE COURT:  And for the record, Mr. Penn is here.  I

2    will indicate that the binders will be brought back shortly and

3    the flash drive will be brought back soon as well or something

4    to that effect.

5          MR. QUINN:  Yeah.

6          MR. TORZILLI:  That sounds fine.

7          THE COURT:  Any problems with that answer?  Okay.

8    Well, the jury is sticking around until 5:00 and otherwise we

9    will -- I will send them back and give each of you a copy and

10   we will stand by until we get either a question or

11   5:00 o'clock.

12          The Court will be in recess.

13       (Recess at 3:00 p.m. until 5:00 p.m.)

14          THE COURT:  We are back on the record.  The jury is

15   not present.  It's just a little bit before 5:00 o'clock, so we

16   will go ahead and bring the jury in and then dismiss them for

17   the evening.

18          Let's go ahead and bring the jury in.

19          MR. TUBACH:  I remember from last time you don't

20   require us to be here at 8:30 or whenever they come in, right?

21          THE COURT:  That's exactly right.  So the jury, as you

22   know, plans on coming back at 8:30, but I will inform them they

23   don't won't be brought into court.  And you don't need to be

24   here.  We will just wait for a question or 5:00 o'clock.

25          (Jury present.)

1          Ladies and gentlemen, I will go ahead and dismiss you

2     for the day.  So tomorrow I know that you are going to come

3     back at 8:30.  You won't be coming back into court.  So once

4     you are all there and assembled, you can go ahead and commence

5     your deliberations.  However, just like today if you don't have

6     a verdict by 5:00 o'clock, I will bring you back into court

7     tomorrow at 5:00 and dismiss you at that time.

8          So tonight keep the admonitions in mind.  Even though

9     you are deliberating at this point in time, as I said before,

10     you can't look up information.  Don't let people talk to you

11     about what's going on and try to wheedle information out of

12     you, and then, of course, don't deliberate until 8:30 when all

13     of you are present, okay?

14          Tomorrow we will provide lunch for you as well.

15     Ms. Grimm may have talked to you about that already, but if

16     not, she will talk to you tomorrow morning about that, all

17     right?

18          Hope you have a good evening, ladies and gentlemen.

19     The jury is excused for the day.

20          Jury excused.

21          Anything that we should take up at this time?

22          All right.  We will wait tomorrow for a question or a

23     verdict or until 5:00 o'clock.  The Court will be in recess.

24     Thank you.

25        (Recess at 5:01 p.m.)

1                                      INDEX

2      CLOSING ARGUMENT

3          By Ms. Rahman                                          2811

4          By Mr. Kornfeld                                        2835

5          By Mr. Feldberg                                        2864

6          By Mr. Fagg                                            2883

7          Rebuttal Argument By Mr. Loveland                      2904

8                          REPORTER'S CERTIFICATE

9          I certify that the foregoing is a correct transcript from

10     the record of proceedings in the above-entitled matter.   Dated

11     at Denver, Colorado, this 6th day of July, 2022.

12

13                              S/Janet M. Coppock

14

15

16

17

18

19

20

21

22

23

24

25